**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JAERED N. ANDREWS,
COREY D. CLARK,
 JACOB JOHN SMALLEY,
DONNIE WILLIAMS,
TERRELL BRITTENUM,
DERRELL BRITTENUM,
THOMAS DANIELS,
AKRON WATSON,
JU'NOT JOYNER,
CHRIS GOLIGHTLY

                Plaintiffs,

        vs.

FREMANTLEMEDIA N.A., INC.,
AMERICAN IDOL PRODUCTIONS, INC.,
19 ENTERTAINMENT LTD.
CORE MEDIA GROUP, INC.
21St CENTURY FOX, INC.
FOX BROADCASTING COMPANY, INC.
NIGEL LYTHGOE, KEN WARWICK
FORD MOTOR COMPANY, INC.,
COCA-COLA COMPANY, INC.,
AT&T

            Defendants.

Case No. 13-CV-5174 (NRB)

**DEMAND FOR**
**TRIAL BY JURY**

**ECF CASE**

## CLASS-ACTION COMPLAINT

**COMES NOW** the Plaintiffs, African-American citizens of the United States of America,

JAERED N. ANDREWS, an individual citizen of the State of Ohio, COREY D. CLARK, an

individual citizen of the State of Tennessee, JACOB JOHN SMALLEY, an individual citizen of

the State of Oklahoma, DONNIE WILLIAMS, an individual citizen of the State of Florida,

TERRELL BRITTENUM, an individual citizen of the State of New York, DERRELL

BRITTENUM, an individual citizen of the State of New York, THOMAS DANIELS, an individual citizen of the State of Oregon, AKRON WATSON, an individual citizen of the State of Texas, JU'NOT JOYNER, an individual citizen of the State of Maryland, and CHRIS GOLIGHTLY, an individual citizen of the State of California (collectively the "Plaintiffs" or "Black American Idols") by and through their counsel, James H. Freeman, Esq. of JH FREEMAN LAW, 3 Columbus Circle, Floor 15, New York, NY 10019, to state their causes of action at law, in equity and through restorative justice as against FREMANTLEMEDIA NORTH AMERICA, INC., AMERICAN IDOL PRODUCTIONS, INC., 19 ENTERTAINMENT, CORE MEDIA GROUP, INC., NIGEL LYTHGOE, KEN WARWICK, 21ST CENTURY FOX, INC., FOX BROADCASTING COMPANY, INC., FORD MOTOR COMPANY, INC., COCA-COLA COMPANY, INC., and AT&T.

**"DEFENDANTS"**

PRODUCTION-DS + NETWORK-DS + OVERSEER-DS + SPONSOR-DS

**"PRODUCTION-DEFENDANTS"**

FREMANTLE MEDIA NORTHAMERICA, INC., AMERICAN IDOL PRODUCTIONS, INC., 19 ENTERTAINMENT, CORE MEDIA GROUP, INC., NIGEL LYTHGOE, KEN WARWICK.

**"NETWORK-DEFENDANTS"**

21., FOX BROADCASTING COMPANY, INC.

**"OVERSEER-DEFENDANTS"**

NIGEL LYTHGOE, KEN WARWICK.

**"SPONSOR-DEFENDANTS"**

FORD MOTOR COMPANY, INC., COCA-COLA COMPANY, INC., and AT&T.

**"ENTERPRISE-DEFENDANTS"**

PRODUCTION-DEFENDANTS + NETWORK-DEFENDANTS + OVERSEER-DEFENDANTS

# INTRODUCTION

IN 1978, THURGOOD MARSHALL, Associate Justice of the United States Supreme Court,

offered the following words of wisdom:

> **"It is unnecessary in 20th century America to have individual [Blacks] demonstrate that they have been victims of racial discrimination; the racism of our society has been so pervasive that none, regardless of wealth or position, has managed to escape its impact."**

> **"The experience of [the Black Man] in America has been different in kind, not just degree, from that of other ethnic groups. It is not merely the history of slavery alone but also that a whole people were marked as inferior by law.  And that mark has endured.  The dream of America as the great melting pot has not been realized for the [Black Man]; because of his skin color he never even made it into the pot."[1]**

## FOUNDING IDEALS

Our Nation's Founding Fathers were dedicated to the Ideals of the Enlightenment, as expressed through the DECLARATION OF INDEPENDENCE ("All Men are Created Equal"; "Life, Liberty and the Pursuit of Happiness"), U.S. CONSTITUTION ("We the People"; "Blessings of Liberty to Ourselves") and the BILL OF RIGHTS ("Freedom of Speech," "Freedom of Religion").

James Madison and Thomas Jefferson, the Chief Architects of the U.S. Constitution, derived some of their political beliefs about the new "American Experiment" from English philosopher John Locke, who argued that individuals should be free to make choices about how to conduct their lives as long as they do not interfere with the liberty of others.  Jefferson derived the phrase "All Men Are Created Equal" from an idea earlier expressed by Scottish philosopher Francis Hutcheson, who declared that: "Nature makes none masters, none slaves."

By embracing the Ideals of Enlightenment in 1789, the Founding Fathers rejected the Old World view of a central monarchy based on social caste systems.  The revolutionary idea of American society was to abolish such pre-determined notions and recognize instead the individual's natural, inalienable rights to determine their own destiny. The Founders stood for the proposition that all individuals are endowed with the right to *self-determination*: to define their own contribution to society through individual merit, content of character and hard work – that's the "American Dream."

The use of stereotypes to ascribe negative judgments to individuals based on their racial identity constitutes a direct attack on the ideal of self-determination.  Indeed, racial stereotypes turn the dreams of ALL Americans into nightmares.

---

[1] *Regents v. Bakke*, 438 U.S. at 400–01, 98 S.Ct. at 2804, (Marshall, J. dissent).

### *AMERICAN IDOL*

*American Idol* is a "Reality TV" singing competition that swept into the United States from Great Britain in June 2002 and quickly become a pop culture phenomenon. The program format and intellectual property is produced and owned by Defendants FremantleMedia, N.A., Inc., American Idol Productions, Inc., 19 Entertainment, Core Media Group, Inc. (the "PRODUCTION-DEFENDANTS").  The show is broadcast on the FOX network, which is owned and operated by Defendants 21st Century Fox, Inc. and Fox Broadcasting, Inc. (the "NETWORK-DEFENDANTS")  Defendants Ford Motor Company, Coca-Cola Company, and AT&T (the "SPONSOR-DEFENDANTS")  have served as the "marquee" sponsors of *American Idol* since the first season (2002) and have played an active role in the decision-making process behind the production.

Commercial advertisements for the show market *American Idol* to U.S. audiences as representing a tangible opportunity to achieve the "American Dream."  Defendants' advertising campaigns offer the promise of a long-term career opportunity in the music industry, in addition to the Life-altering benefits derived from being declared the winner of the most popular talent contest in U.S. history.  Defendants leveraged the commercial success of its former winning contestants, such as Kelly Clarkson (Season One), to aggressively market their version of the "American Dream" to this Nation's young recording artists.

## QUALIFIED to be the "Next *American Idol*"

Plaintiffs are all former top-ranking African-American contestants who were featured on the popular television program *American Idol* from 2003 through 2010.  Plaintiffs were and are extraordinarily talented young American singers whose dreams, hopes and aspirations as teenagers were inextricably linked to their passion for music and drive to make it in the professional recording industry.

1.  **Jaered N. Andrews –**Top 24 *American Idol* Semi-Finalist [Season Two (2003)]

2.  **Corey D. Clark –**Top 10 *American Idol* Finalist [Season Two (2003)]

3.  **Jacob John Smalley** – Top 32 American Idol Semi-Finalist [Season Two (2003)]

4.  **Donnie Williams –**Top 32 *American Idol* Semi-Finalist [Season Three (2003)]

5.  **Terrell Brittennum** - Top 24 *American Idol* Semi-Finalist [Season Five (2006) / Seven (2008)]

6.  **Derrell Brittenum** - Top 24 *American Idol* Semi-Finalist [Season Five (2006) / Seven (2008)]

7.  **Thomas Daniels** - Top 32 *American Idol* Semi-Finalist [Season Six (2007)]

8.  **Akron Watson** - *American Idol* "Golden Ticket" Winner [Season Six (2007)]

9.    __Ju'Not Joyner__ - Top 36 *American Idol* Semi-Finalist [Season Eight (2009)]

10.    __Chris Golightly__ - Top 24 *American Idol* Semi-Finalist [Season Nine (2010)]

In their respective seasons, each of the Plaintiffs auditioned for the *American Idol* contest alongside roughly 70,000-100,000 other young hopefuls. After passing through an initial "cattle call" followed by a litany of preliminary screening rounds, Plaintiffs were ultimately afforded the opportunity to sing before the panel of expert music industry Judges, consisting of Simon Cowell, Paula Abdul and Randy Jackson, among others.

Each of the Plaintiffs named herein, based on their individual merit, dedication to their craft, and unique singing voices, were awarded a "Golden Ticket to Hollywood" by the panel of expert industry judges. This meant that they were deemed professionally qualified to enter the *American Idol* Contest as *bona fide* contestants.

Plaintiffs were thereafter flown at the PRODUCTION-DEFENDANTS' expense to Los Angeles, California to compete in "Hollywood Week".[2] At the conclusion of the Hollywood rounds, each Plaintiff was selected by the *American Idol* judges as a member of the Semi-Finalist class. This meant that each Plaintiff would be awarded the opportunity to sing for the *popular vote* of the American people.

That was, after all, the entire premise of the marketing campaign behind *American Idol* – the "hook" that distinguished it from all other televised talent contests that came before it – it was the national viewing audience who would decide their fate now.

But the nefarious minds behind the *American Idol* production had other plans for these talented young men. Rather than allow them to compete for the valuable prizes on the basis of their individual merit as artists, the program's top senior executives, British showrunners Nigel Lythgoe and Ken Warwick (the "OVERSEER-DEFENDANTS") ran interference on them, sabotaging their promising careers as recording artists and gutting them of the opportunity they rightfully *earned* to become the next *American Idol*.

Why? Because the Plaintiffs' identities could be used to scandal-monger Nielsen ratings while reinforcing the age-old stereotype of the "black criminal."

__TRAFFICKING IN PERNICIOUS STEREOTYPES__

Beginning in force with its second season (2002-2003), the OVERSEER-DEFENDANTS orchestrated a continuing scheme to unlawfully obtain, disseminate and exploit the criminal history background information of top-ranking Black *American Idol* contestants <u>and</u> top-ranking White *American Idol* contestants.[3] An employer's acquisition of criminal

---

[2] With the exception of Plaintiff Watson who was disqualified before he was to fly to Hollywood based upon a past misdemeanor record for marijuana possession.

[3] Pulling the "rap sheets" of Reality TV contestants was nothing new for Defendant Lythgoe; he had used this technique starting in 2000 in connection with a U.K. show called *PopStars*.

background information is strictly regulated at both the federal and state level.  But it's how the OVERSEER-DEFENDANTS chose to <u>use</u> the "rap sheets" of Black contestants vs. White contestants in conducting what purports to be a *bona fide* contest that provides the basis for this Civil Rights action.

A staggering thirty-one percent (31%) of every *American Idol* Semi-Finalist contestant [Top 24, Top 36-40] who happened to be a young Black male was disqualified from the singing competition for reasons wholly unrelated to their singing talent.  Even though there were three (3) times as many White (or non-black) contestants featured on *American Idol* over the course of ten years, there has never been a single White (or non-black) contestant disqualified from *American Idol* – not ever.

### Black Condemnation

After illegally obtaining the contestants' criminal background information through a process known as "contestant vetting," the OVERSEER-DEFENDANTS, with the aid of the PRODUCTION DEFENDANTS, NETWORK-DEFENDANTS, and even the SPONSOR-DEFENDANTS, chose to systematically disqualify and publicly humiliate - with maximum fanfare - virtually every top-ranking Black *American Idol* contestant who had a record of arrest (no matter how petty the alleged crime and no matter whether there was a conviction or an acquittal).

In at least five cases (Plaintiffs Clark, Andrews, Williams, T. Brittenum and D. Brittenum), the OVERSEER-DEFENDANTS actively interfered with *pending* criminal investigations in gross violation of Plaintiffs' rights to Due Process under the law. In other cases (Plaintiff Daniels and Watson), the producers dragged up *expunged* misdemeanor records and flushed them out into the tabloids, posting their mug shots the very next morning after broadcasting episodes in which the Black contestants had triumphantly received a Golden Ticket to Hollywood. Then, the OVERSEER-DEFENDANTS branded said Plaintiffs for Life on the worldwide internet as "criminals" and "liars" and cast them out into exile before tens of millions of viewers as "American Idol rejects."  All in the name of "family entertainment."

### White Redemption

In stark contrast, whenever the criminal arrest records of top-ranking White *American Idol* contestants were made public – which was quite rare – the White contestants were championed as models of redemption.  It didn't matter whether they had been convicted for <u>armed bank robbery</u> and spent four years in prison, or whether they were convicted on charges of <u>felony drug possession</u>.  Such crimes were labeled as "youthful indiscretion" and the White contestants' participation in the *American Idol* contest was promoted as a "second chance" to turn their life around.   And it sure did: most of the White *American Idol* Contestants whose criminal backgrounds were publicized (at least 7 out of 9) ended up scoring Major record deals and/or respectable careers in the music industry.  They got to live the "American Dream" – just as the commercial ads for *American Idol* had promised.

### *An Invariable Pattern*

An <u>identical pattern</u> of racial disparate treatment is evidenced in the public disqualification of Franchelle "Frenchie" Davis [Season Two (2003)], a student from Howard University and the early favorite to WIN the second season of *American Idol* (according to Judge Simon Cowell). Defendants violated her privacy rights by disclosing to the U.S. media that she had posed topless for an internet site to help pay her way through college, a full four years before she ever auditioned.  The photos, taken in 1998, were never found because the website had gone out of business.

In direct contrast to Frenchie's experience as a Black *American Idol* contestant, there were at least three White *American Idol* contestants who actually did work professionally in the adult entertainment trade as strippers or whose sexually graphic photos actually surfaced on the internet for all of the world to see.  None of these White contestants were disqualified; rather, their public exhibitions of sexuality were celebrated.

### *Racial Animus*

Under the Civil Rights Act of 1866, 42 U.S.C. § 1981, it is fundamental to a system of ordered liberty and justice that the same rules apply to everyone on an equal basis.  The deprivation of civil rights that African-Americans have suffered and continue to endure into the new millennium is an urgent matter of concern for <u>all</u> Americans.  Such deprivation constitutes a direct assault on the fundamental rights of individual liberty and freedom that are embodied in the U.S. Constitution, the Bill of Rights, and the Thirteenth and Fourteenth Amendments.

It is irrefutable that over the course of the last decade, *American Idol's* producers, owners, network, and sponsors have applied one set of "contest rules" to Black participants and an entirely different set of rules to White (or non-black) contestants.  The consistent pattern of publicly disqualifying and humiliating fifteen (15) top-ranking Black *American Idol* contestants (comprising a mere 28-29% of the overall contestant pool), measured against the <u>absolute zero</u> (0) number of disqualified White / non-black contestants (comprising the other 71-72% of the contestant pool), clearly establishes an inference of *racial animus* in the application of *American Idol's* contest rules.  This is exactly the type of unequal treatment that the Civil Rights Acts were intended to remedy.

### <u>ABSENCE OF ANY JUSTIFICATION</u>

Defendants cannot explain the gross statistical disparity evidenced through public disqualifications by shifting blame to the individual Plaintiffs for having being arrested.

### *Innocent Until Proven Guilty*

With respect to those Black contestants who had criminal cases *pending* during their participation as top-ranking *American Idol* contestants, Defendants were foreclosed by the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution from taking any adverse action against them.  A criminal arrest is nothing more than an unproven, hearsay

accusation by a government official.  Plaintiff Clark, Andrews, Williams, T. Brittenum and D. Brittenum were innocent until proven otherwise in a court of competent jurisdiction.

At the time of their respective disqualifications, Plaintiffs were competing for *millions of dollars* in advertised prizes and they were already deemed qualified by the Judges on the basis of their individual merit.   Accordingly, Defendants had NO RIGHT to unilaterally extricate them from what purported to be a *bona fide* singing contest based on moral judgments of the producers or branding considerations of the sponsors.

Because Defendants held themselves out to U.S. consumers as conducting a *bona fide* contest where the *published rules* of the contest indicated that the viewing audience was to decide the advancement or elimination of the contestants, the only proper course of action Defendants had was to tabulate the votes (assuming such votes even counted).  If the viewing audience came to discover criminal arrest information about the contestants during the course of the show  -- which would have been highly improbable without Defendants' background checks -- then the audience would have voted accordingly just as they did with White contestants who had criminal records.  The public disqualifications were simply unnecessary.

### *Prior Records*

If the Defendants were concerned about "reputational" impact on the *American Idol* namebrand because they didn't want any contestants in the show who had criminal record history, they certainly didn't express such concern about the criminal records of White contestants.  Indeed, the majority of them got record deals and endorsements. Taylor Hicks, who is white, had a criminal arrest history for drug possession but was still declared the winner of Season Five.  Bo Bice, who had a felony arrest history, was declared runner up.

Moreover, the criminal record histories of Plaintiff Clark, Williams, T. Brittenum, D. Brittenum and Daniels were <u>known to the producers</u> before said Plaintiffs traveled to Los Angeles to compete in Hollywood Rounds.  Defendants could have eliminated them "behind-the-scenes," thus sparing them the public condemnation. Instead, they chose to expropriate their identities and advertise them as negative stereotypes. None of the Plaintiffs here were auditioning for *American Idol* to glorify criminality or to extol the urban mythology of "life in the streets."   These were R&B / Soul singers, many of whom had a background in the Gospel tradition.

### A COLOSSAL HOAX

In defense of their embarrassing track record, the PRODUCTION-DEFENDANTS and NETWORK-DEFENDANTS have argued in a related EEOC investigation that they were entitled to send any message they wanted about Plaintiffs because they were conducting a "casting."

In retrospect, Plaintiffs agree.  Defendants were in fact at all times engaged in a "casting." Which means, of course, that they were NOT conducting a *bona fide* contest.  The whole thing was a colossal hoax and had Plaintiffs known of the true facts underlying the nature of the program, they never would have entered what they thought was an actual talent contest based on professional judging criteria and audience voting.

### "WILLY WONKA" CONTRACTS

Each of the Plaintiffs *continues to be bound* to highly oppressive, unconscionable *Willy Wonka* contracts in which Defendants purportedly acquired ALL rights throughout the world and in perpetuity to commercially exploit each Plaintiff's name, likeness, identity, persona, biographical information, personal identification, image, background story and voice – regardless of whether Defendants' use is even related to their ordinary course of business.

Plaintiffs herein seek rescission of the *American Idol* CONTESTANT AGREEMENT, an illusory device that carries on the theme of the "Golden Ticket" and the ominous, illegible contract presented to the children at the gateway of the "Willy Wonka" chocolate factory. Like the fantasical depiction of the visually warped contractual language in the famed 1971 movie, the *American Idol* CONTESTANT AGREEMENT strains all levels of comprehension in its mind-bending labyrinth of non-sensical provisions.

### THE HARM

Defendants' adverse action decimated the Plaintiffs' careers in the music industry.   They have all tried to recover, to get on with their lives, pursue independent record deals, and find some meaningful existence separate and apart from Defendants' talent show, but there is no escape from the "Idol Machine." Plaintiffs' detailed arrest record information and "mug shots" remain lodged on the internet as badges of infamy from which there can be no escape. Plaintiffs cannot pass out a demo mix of their music, apply for a job or housing, or meet a new companion without being immediately judged by the adverse profiles that the Defendants have manufactured for the world to see.

Each of the Plaintiffs here was fairly adjudicated as possessing the requisite amount of skill in their chosen profession and recognized for their talent, hard work, and dedication to their craft. They had what it took to make it.  Yet, because they were Black, and because they had arrest records, they were specifically targeted to serve the diabolical function of "public exhibits." Plaintiffs stood by helpless as the Defendants put them (and their families) on display before untold millions of people throughout the world and then ceremoniously struck down their vested right to become the next *American Idol.*

They come to Court seeking justice, to ensure that the "American Dream" remains open for all citizens regardless of their ancestry, and to be reasonably compensated for the loss of equal opportunity that they rightfully deserve.

# TABLE OF CONTENTS

JURISDICTION AND VENUE.................................................................................15
    PERSONAL JURISDICTION ....................................................................................15
    SUBJECT MATTER JURISDICTION .......................................................................15
    VENUE...................................................................................................................16

## PARTIES

PLAINTIFFS ..........................................................................................................18
    COREY D. CLARK ................................................................................................18
    JAERED N. ANDREWS ..........................................................................................18
    JACOB JOHN SMALLEY ........................................................................................19
    DONNIE WILLIAMS ..............................................................................................19
    TERRELL BRITTENUM ..........................................................................................20
    DERRELL BRITTENUM ..........................................................................................20
    AKRON WATSON ..................................................................................................21
    THOMAS DANIELS ................................................................................................21
    JU'NOT JOYNER ...................................................................................................22
    CHRIS GOLIGHTLY ...............................................................................................22

PRODUCTION-DEFENDANTS ...............................................................................24
    FREMANTLEMEDIA NORTH AMERICA, INC. ......................................................24
    AMERICAN IDOL PRODUCTIONS, INC. ...............................................................25
    19 ENTERTAINMENT ............................................................................................26
    CORE MEDIA GROUP, INC. .................................................................................27

NETWORK-DEFENDANTS ....................................................................................29
    21ST CENTURY FOX, INC. ...................................................................................29
    FOX BROADCASTING COMPANY, INC. ................................................................31

OVERSEER-DEFENDANTS ...................................................................................32
    NIGEL LYTHGOE .................................................................................................33
    KEN WARWICK ....................................................................................................33

SPONSOR-DEFENDANTS......................................................................................34
    FORD MOTOR COMPANY, INC. ...........................................................................34
    COCA-COLA COMPANY, INC. .............................................................................35
    AT&T .................................................................................................................37

## DEFINITIONS

A.    FANTASY VS. REALITY...............................................................................40
    (1)  "REALITY" ...................................................................................................40
    (2)  "NON-FICTION" ...........................................................................................40
    (3)  "REAL PEOPLE" ..........................................................................................40
    (4)  "FICTION" / "FANTASY" ............................................................................41
    (5)  "SCRIPTED" ..................................................................................................41
    (6)  REALITY TV "STARS" .................................................................................41
    (7)  "SUSPENSION OF DISBELIEF" ......................................................................42

B.    CONTEST-RELATED TERMS.......................................................................42

C.   SERIES SEASONS .................................................................................... 47

| REALITY TV (1994-2001) |

A.   MANIPULATING "REALITY" ................................................................. 49
   (1)   ALTERNATIVE PROGRAMMING ................................................................. 49
   (2)   *ALIEN AUTOPSY: FACT OR FICTION?* (1995) ......................................... 49
   (3)   WORLD'S GREATEST HOAXES (1998) ....................................................... 50

B.   FREE DISPOSABLE LABOR ................................................................... 51
   (1)   UNION VS. NON-UNION PERFORMERS ...................................................... 51
   (2)   SUBSTANTIAL COST REDUCTION ............................................................. 52
   (3)   DEPRIVATION OF RIGHTS ...................................................................... 53

C.   ILLICIT BACKGROUND CHECKS .......................................................... 54
   (1)   PEDDLING "RAP SHEETS" [SMOKINGGUN.COM] ....................................... 54
   (2)   *WHO WANTS TO MARRY A MILLIONAIRE?* [2000] ................................... 56
   (3)   HOLLYWOOD PRIVATE INVESTIGATORS .................................................. 57

D.   PUBLIC DISQUALIFICATIONS ............................................................. 59
   (1)   DISQUALIFICATION VS. ELIGIBILITY ........................................................ 59
   (2)   HUMILIATION ON PUBLIC DISPLAY .......................................................... 59
   (3)   TARGETING AFRICAN-AMERICANS  [*Temptation Island (2000)*] ............. 60
   (4)   DEFAULT  PRETEXT: "FAILURE TO DISCLOSE" ......................................... 61
   (5)   DEFAMATION SUIT VS. FOX [MARCH 2001] ........................................... 63

E.   REALITY TV "CONTESTS" ................................................................... 64
   (1)   REALITY TV + GAME SHOW [MAY 2000] ............................................... 64
   (2)   LITIGATING *SURVIVOR* [FEBRUARY 2001] ............................................ 65
   (3)   LITIGATING *BOOT CAMP* [MARCH 2001] ............................................. 66
   (4)   MANIPULATING VOTES [JUNE 2001] ...................................................... 66

| PRODUCTION BACKGROUND - U.K. (2001-2002) |

A.   SIMON FULLER .................................................................................. 69
   (1)   19 ENTERTAINMENT .............................................................................. 69
   (2)   360° DEALS ........................................................................................ 70
   (3)   DECISION-MAKING ............................................................................... 71

B.   NIGEL LYTHGOE ................................................................................ 72
   (1)   CHIEF EXECUTIVE ................................................................................ 72
   (2)   *POP STARS U.K.* (2000) ..................................................................... 72

C.   KEN WARWICK ................................................................................... 74

D.   FREMANTLE MEDIA ............................................................................ 75
   (1)   *POP IDOL* [OCTOBER 2001] ................................................................ 75
   (2)   19TV / FREMANTLE PARTNERSHIP AGREEMENT [2001] .......................... 75
   (3)   FOX LICENSING AGREEMENT [APRIL 2002] ........................................... 76

| *AMERICAN IDOL* - CONTEST FORMAT |

A.   AN AMERICAN "CONTEST" .................................................................. 78
   (1)   CONTEST-IN-FACT ............................................................................... 78

(2)   CONTEST-AT-LAW ............................................................................................. 78

**B.   PUBLISHED CONTEST "RULES"** ........................................................... **80**
(1)   ELIGIBILITY REQUIREMENTS ....................................................................... 80
(2)   "RULES" GOVERNING DISQUALIFICATION .............................................. 80
(3)   JUDGING CRITERIA .......................................................................................... 80

**C.   VOTING SYSTEM** ........................................................................................ **81**
(1)   REPRESENTATIONS TO THE U.S. PUBLIC ................................................. 81
(2)   LACK OF TRANSPARENCY AND ACCOUNTABILITY ............................. 81

**D.   ELEMENTS OF SKILL VS. CHANCE** ...................................................... **82**
(1)   GAME OF SKILL ................................................................................................. 82
(2)   GAME OF CHANCE ........................................................................................... 82

**E.   CONTEST PRIZES** ....................................................................................... **83**
(1)   ADVERTISEMENTS TO U.S. PUBLIC ........................................................... 83
(2)   19 ENTERTAINMENT CONTRACTS ........................................................... 83

**F.   REASONABLE EXPECTATIONS** ............................................................ **86**
(1)   GOOD FAITH BELIEF (CONTESTANTS) .................................................... 86
(2)   *BONA FIDE* CONTEST ..................................................................................... 88
(3)   BAD FAITH UNDERTAKING (PROMOTER / SPONSOR) ...................... 89
(4)   NO APPRECIATION OF RISK ....................................................................... 90

## CONTESTANT SOLICITATION

**A.   OFFER OF EMPLOYMENT** ......................................................................... **91**
(1)   MARKET SOLICITATION .................................................................................. 91
(2)   "GOLDEN TICKET" ........................................................................................... 92

**B.   CONTESTANT AGREEMENT** .................................................................. **93**
(1)   PRE-REQUISITE TO HOLLYWOOD ............................................................ 93
(2)   PURPOSE OF CONTESTANT AGREEMENT ............................................. 94
(3)   LANGUAGE INDICATING INTENT TO EMPLOY .................................. 94

**C.   HOLLYWOOD ROUNDS** .......................................................................... **96**
(1)   LOCATION / PLACE OF WORK ...................................................................... 97
(2)   HOURS / SEQUENCE OF WORK .................................................................. 98
(3)   TOOLS, MATERIALS AND EQUIPMENT ................................................... 98
(4)   EXCLUSIVITY ...................................................................................................... 99
(5)   RISK OF PROFIT / LOSS ................................................................................ 100
(6)   ORDINARY COURSE OF BUSINESS ........................................................... 100

**D.   SEMI-FINAL ROUNDS** .......................................................................... **101**

**E.   FINAL ROUNDS** ...................................................................................... **102**

## BLACK *AMERICAN IDOL* DISQUALIFICATIONS

## DELANO COGNOLATTI - SEASON ONE

**A.   PUBLIC DISQUALIFICATION [JULY 1, 2002]** ............................... **104**

**B.   DISPARATE TREATMENT** ....................................................................... **105**

## JAERED ANDREWS - SEASON TWO

**A.   PRE-HOLLYWOOD** ........................................................................................ **106**
   (1)   CLASSIC OVER-ACHIEVER ............................................................................ 106
   (2)   OPEN AUDITIONS [October 31-November 4, 2002] ................................... 107
   (3)   ACT OF SELF DEFENSE  [November 16, 2002] ........................................... 107
   (4)   POLICE INTERVIEW AND RELEASE [November 18, 2002] ............................. 109

**B.   CONTEST PARTICIPATION** ............................................................................ **109**
   (1)   HOLLYWOOD WEEK [December 2002] ........................................................ 109
   (2)   FOX GLOBAL SECURITY [December 2002] ................................................... 110

**C.   DISQUALIFICATION** ..................................................................................... **112**
   (1)   REPORTS OF JAERED'S DISQUALIFICATION [January 30, 2003] ................... 112
   (2)   NOTICE OF DISQUALIFICATION [January 31, 2003] .................................... 113
   (3)   WARRANT FOR JAERED'S ARREST [February 27, 2003] .............................. 115
   (4)   RE-PUBLICATION OF FALSE AND DEFAMATORY REPORTS ........................... 117
   (5)   COMPLETE ACQUITTAL [November 12, 2003] .......................................... 119

## JACOB JOHN SMALLEY- SEASON TWO

**A.   PRE-HOLLYWOOD** ........................................................................................ **121**

**B.   DISQUALIFICATION** ..................................................................................... **122**

**C.   DISPARATE TREATMENT** ............................................................................. **126**

## COREY D. CLARK - SEASON TWO

**A.   PRE-HOLLYWOOD** ........................................................................................ **130**
   (1)   BEFORE *AMERICAN IDOL* .......................................................................... 130
   (2)   REASONABLE EXPECTATIONS ..................................................................... 131
   (3)    FALSE ARREST IN TOPEKA, KANSAS [October 12, 2002] .......................... 133
   (4)   GOLDEN TICKET TO HOLLYWOOD [Nashville, Tennessee (November 4, 2002)] .......... 135
   (5)   SHAWNEE COUNTY CHARGES [December 4, 2002] .................................... 138
   (6)   INTERFERENCE IN LEGAL PROCESS ............................................................. 140

**B.   CONTEST PARTICIPATION** ............................................................................ **142**
   (1)   HOLLYWOOD WEEK [December 9-14, 2002] .............................................. 142
   (2)   BACKGROUND CHECK [December 20, 2002] ............................................. 145
   (3)   SEMI-FINALISTS ROUNDS [February 25, 2003] ......................................... 149
   (4)   PRIZE CONTRACTS [March 8-17, 2003] ................................................... 150
   (5)   AFTRA AND EMPLOYMENT AGREEMENTS [March 10-11, 2012] ................ 151
   (6)   FINAL PERFORMANCE [March 25, 2003] ................................................... 153

**C.   PUBLIC DISQUALIFICATIONS (SEASON TWO)** ............................................. **155**
   (1)   *SMOKING GUN.COM:* JAERED ANDREWS [January 31, 2003] ................... 155
   (2)   *SMOKING GUN.COM:* FRENCHIE DAVIS [February 13, 2003] ................... 155
   (3)   *SMOKING GUN.COM:* TRENYCE [March 27, 2003] ................................... 155
   (4)    *SMOKING GUN.COM:* COREY CLARK [March 31, 2003] ......................... 156
   (5)   FOX'S PRESS RELEASES re: "DISQUALIFICATION" [March 31, 2003] .......... 159
   (6)   CORRESPONDENCE WITH AIP [May 6, 2003] ............................................. 161

## DONNIE WILLIAMS - SEASON THREE

**A.   PRE-HOLLYWOOD** ........................................................................................**162**

**B.   CONTEST PARTICIPATION**............................................................................**164**
   (1)   HOLLYWOOD ROUNDS ........................................................................ 164
   (2)   COURT CASE ........................................................................................... 165
   (3)   SEMI-FINAL ROUNDS ........................................................................... 165

## LEROY W. - SEASON FOUR

**A.   AUDITION**.......................................................................................................**171**

**B.   EXPLOITATION** .............................................................................................**172**

## BRITTENUM TWINS - SEASON FIVE

**A.   PRE-HOLLYWOOD**.........................................................................................**176**
   (1)   OPEN AUDITIONS IN CHICAGO [September 2005]................................. 176
   (2)   ARREST AND CHARGES IN MEMPHIS, TENNESSEE [October 30, 2005] ..... 176
   (3)   TERRELL BACKGROUND CHECK [November 2, 2005] ............................. 177
   (4)   DERRELL BACKGROUND CHECK [November 14, 2005] ........................... 178

**B.   CONTEST PARTICIPATION**............................................................................**179**
   (1)   HOLLYWOOD WEEK [December 2005]................................................... 179
   (2)   SURPRISE ARREST [January 9, 2006] ...................................................... 180
   (3)   SEASON FIVE PREMIERE [January 17, 2006] ........................................... 181

**C.   DISQUALIFICATION** .....................................................................................**183**
   (1)   NOTICE OF DISQUALIFICATION [January 22, 2006]................................ 183
   (2)   EXPLOITATION [January-May 2006]....................................................... 184
   (3)   SEASON SEVEN AUDITIONS .................................................................. 187

## HALICIA T. / TATIANA W. / TORA W

## THOMAS DANIELS - SEASON SIX

**A.   PRE-HOLLYWOOD**.........................................................................................**196**
   (1)   YOUTHFUL INDISCRETION ................................................................... 196
   (2)   GOLDEN TICKET .................................................................................. 197
   (3)   BACKGROUND CHECK ........................................................................... 198

**B.   CONTEST PARTICIPATION**............................................................................**199**
   (1)   HOLLYWOOD ROUNDS [November 16-17, 2006]................................... 199
   (2)   EPISODE AIRDATE [January 17, 2007]..................................................... 200
   (3)   HERO BACK TO "ZERO" [January 18, 2007] ........................................... 202
   (4)   AFTERMATH ........................................................................................ 206

## AKRON WATSON - SEASON SIX

**A.   VIETNAM & MARIHUANA** ...........................................................................**208**
   (1)   CLAUDE WATSON [1972] ...................................................................... 208

    (2)   Akron Gets Booked [April 2003] ........................................................ 210

**B.   GOLDEN TICKET** ...............................................................................**211**
    (1)   Open Audition [August 2006] ........................................................... 211
    (2)   Background Check [September 2006] ................................................ 211

**C.   DISQUALIFICATION** .......................................................................**212**
    (1)   Surprise Call [November 9, 2006] .................................................... 212
    (2)   Local News [January 31, 2007] ........................................................ 214
    (3)   Media Frenzy ................................................................................... 216

**D.   LYTHGOE'S REBUTTAL** ...............................................................**218**

**E.   WHITE COMPARATOR** ..................................................................**222**


**ASHLYN C. - Season Two**

**A.   GOLDEN TICKET** ...............................................................................**223**

**B.   DISQUALIFICATION** .......................................................................**223**


**JU'NOT JOYNER - Season Eight**

**A.   CONTEST PARTICIPATION** ...........................................................**226**
    (1)   Golden Ticket ................................................................................... 226
    (2)   *American Idol* Contestant Agreement (v.08) .................................. 226
    (3)   Participant Background Questionnaire Form (v.08) ......................... 234
    (4)   Contestant Code of Conduct ............................................................ 237

**B.   DECEPTIVE PRACTICES** ...............................................................**238**
    (1)   Illusory Prize ................................................................................... 238
    (2)   Fixing Wild Card ............................................................................. 241
    (3)   Rigged Voting .................................................................................. 242
    (4)   Manipulated Outcome ...................................................................... 242
    (5)   Exploiting "the Hood" ...................................................................... 243
    (6)   Lack of Song Choice ........................................................................ 243
    (7)   Black Listing ..................................................................................... 244


**ANTHONY W. - Season Nine**

**A.   GOLDEN TICKET** ...............................................................................**245**

**B.   EXPLOITATION** ...............................................................................**246**


**CHRIS GOLIGHTLY - Season Ten**

**A.   BACKGROUND** ...................................................................................**248**
    (1)   Orphan .............................................................................................. 248
    (2)   Boy Band .......................................................................................... 248

**B.   CONTESTANT** ...................................................................................**249**
    (1)   Golden Ticket ................................................................................... 249
    (2)   Background Check ............................................................................ 249

**C.   INTERFERENCE FROM FORMER MANAGER** ..........................**250**

D.   DISQUALIFICATION.................................................................................251

**JXJ - SEASON ELEVEN**

A.   PRE-DISQUALIFICATION ........................................................................254
   (1)   BLACK CONTESTANT....................................................................... 254
   (2)   PLANTING RUMOURS........................................................................ 255
   (3)   NEWS OF DISQUALIFICATION .......................................................... 256
   (4)   EXPERT OPINION #1: "CRUEL CHARADE" (March 14, 2012) ......... 258
   (5)   PUBLIC REACTION (PRE-TELECAST) [March 14, 2012] .................. 261

B.   POST-DISQUALIFICATION ....................................................................264
   (1)   TELECAST [March 14, 2012] .......................................................... 264
   (2)   PUBLIC REACTIONS (POST-TELECAST) [March 15, 2012] .............. 266
   (3)   STATE OFFICIALS: "AN OUTRAGE" [March 15, 2012] .................. 268
   (4)   DEFENSES TO MEDIA BACKLASH [March 15, 2012] ..................... 268

C.   JXJ SPEAKS [March 16, 2012]..............................................................271
   (1)   PEOPLE MAGAZINE INTERVIEW ....................................................... 271
   (2)   SHOWBIZ TONIGHT............................................................................ 272

D.   EXPERT OPINION #2 .............................................................................273

**WHITE COMPARATORS**

A.   SCOTT SAVOL [SEASON FOUR] .............................................................276
   (1)   COMPARATIVE RELEVANCE ............................................................. 276
   (2)   DELAYED DISCLOSURE OF CRIMINAL RECORDS [March 31, 2005] ....... 277

B.   BO BICE [SEASON FOUR].......................................................................279
   (1)   COMPARATIVE RELEVANCE ............................................................. 279
   (2)   DELAYED DISCLOSURE OF CRIMINAL RECORDS [April 28, 2005]....... 279
   (3)   CAREER SUCCESS ............................................................................. 282

C.   BUCKY COVINGTON [SEASON FIVE] .....................................................283
   (1)   COMPARATIVE RELEVANCE ............................................................. 283
   (2)   DELAYED DISCLOSURE OF CRIMINAL RECORDS [April 11, 2005]....... 284

D.   TAYLOR HICKS [SEASON FIVE] ............................................................287
   (1)   COMPARATIVE RELEVANCE ............................................................. 287
   (2)   DELAYED DISCLOSURE OF CRIMINAL RECORD ................................ 289
   (3)   CAREER SUCCESS ............................................................................. 291

E.   AMANDA OVERMYER [SEASON SEVEN] ................................................292
   (1)   COMPARATIVE RELEVANCE ............................................................. 292
   (2)   DELAYED DISCLOSURE OF CONVICTION .......................................... 294

F.   JOANNA PACITTI [SEASON EIGHT] .......................................................296

G.   MATT L. [SEASON NINE] .......................................................................300
   (1)   COMPARATIVE RELEVANCE ............................................................. 300
   (2)   DISCLOSURE OF CONVICTION .......................................................... 301

H.   CASEY JAMES [SEASON NINE] ..............................................................303
   (1)   COMPARATIVE RELEVANCE ............................................................. 303
   (2)   DISCLOSURE OF CRIMINAL CONVICTIONS ....................................... 304

(3)   CAREER ................................................................................................... 307

I.   **STEFANO LANGONE [SEASON TEN]** ..............................................**308**
   (1)   COMPARATIVE RELEVANCE .................................................................. 308
   (2)   DISCLOSURE OF CRIMINAL RECORDS ................................................. 310
   (3)   CAREER SUCCESS ................................................................................. 312

J.   **AMY B. [SEASON ELEVEN]** ...............................................................**313**
   (1)   BACKGROUND CHECK ........................................................................... 313
   (2)   EPISODE TELECAST .............................................................................. 314

## CIVIL RIGHTS - BACKGROUND

A.   **IDEALS OF ENLIGHTENMENT** ..........................................................**318**
   (1)   FOUNDING PRINCIPLES ........................................................................ 318
   (2)   SELF-DETERMINATION ......................................................................... 318

B.   **STEREOTYPES** .....................................................................................**319**
   (1)   PREJUDICIAL JUDGMENTS ................................................................... 319
   (2)   STEREOTYPED-THINKING .................................................................... 320
   (3)   PROPAGANDA ....................................................................................... 321
   (4)   WAR ...................................................................................................... 322

C.   **"SUSPICIOUS" MALES** ........................................................................**323**
   (1)   CRIMINAL LABEL .................................................................................. 323
   (2)   NATIONAL MYTH .................................................................................. 323
   (3)   FALSE CORRELATION ........................................................................... 324
   (4)   UNEQUAL JUSTICE ............................................................................... 324
   (5)   PRESUMPTION OF GUILT ..................................................................... 326

D.   **HISTORICAL CONTEXT** .....................................................................**327**
   (1)   20TH CENTURY URBAN PLANNING ........................................................ 327
   (2)   CRIME STATISTICS ............................................................................... 327
   (3)   REDEMPTION FOR WHITE IMMIGRANTS ............................................. 329
   (4)   PUBLIC DEGRADATION IN THE ENTERTAINMENT SPHERE ................. 330

E.   **INTO THE 21ST CENTURY** ..................................................................**331**

## GROSS STATISTICAL DISPARITY

A.   **LEGAL STANDARD** ..............................................................................**333**

B.   **STATISTICAL DATA** ............................................................................**334**
   (1)   OVERVIEW ............................................................................................ 334
   (2)   GOLDEN TICKET HOLDERS (2002-2012) ........................................... 335
   (3)   SEMI-FINAL ROUNDS (2002-2012) .................................................... 336
   (4)   FINAL ROUNDS (2002-2012) .............................................................. 336

C.   **WHITE COMPARATORS** .....................................................................**337**
   (1)   ABSOLUTE IMMUNITY .......................................................................... 337
   (2)   COMPARATIVE ANALYSIS ..................................................................... 338
   (3)   "BLACK CONDEMNATION" VS. "WHITE REDEMPTION" ..................... 339
   (4)   "DISQUALIFIED" VS. "INELIGIBLE TO COMPETE" ............................. 340
   (5)   CALCULATED  DISTRIBUTION .............................................................. 341

## CLASS ACTION ALLEGATIONS

**A.   DEFINITION OF PROPOSED CLASS** ...................................................................... **346**
   (1)   BLACK GOLDEN TICKET HOLDERS (2002-2012) [MALES ONLY] ............ 346
   (2)   RATIONALE FOR PROPOSED CLASS DEFINITION ................................. 346
   (3)   RESERVATION OF RIGHT TO AMEND CLASS ...................................... 348

**B.   NUMEROSITY [FED. R. CIV. P. 23(A)(1)]** ............................................. **348**
   (1)   QUESTIONS OF LAW AND FACT ..................................................... 349
   (2)   COMPANY-WIDE POLICY ............................................................. 350
   (3)   UNIFORMITY OF PRACTICES ......................................................... 351
   (4)   UNIFORMITY OF CLASS MEMBERSHIP ............................................. 353
   (5)   MANAGEMENT ORGANIZATION ..................................................... 353

**C.   TYPICALITY** [FED. R. CIV. P. 23(A)(2)] ............................................... **354**
   (1)   GENERAL ................................................................................. 354
   (2)   INDIVIDUAL .............................................................................. 355

**D.   ADEQUATE REPRESENTATION** ............................................................ **356**

**E.   CLASS CERTIFICATION** ..................................................................... **359**
   (1)   FED. R. CIV. P. 23(B)(2) ........................................................... 359
   (2)   FED. R. CIV. P. 23(B)(3) ........................................................... 360
   (3)   FED. R. CIV. P. 23(B)(4) ........................................................... 362

## COUNT I: 42 U.S.C. § 1981 (EMPLOYMENT DISCRIMINATION)

**A.   LEGAL ELEMENTS** ............................................................................ **364**
   (1)   STATUTORY LANGUAGE .............................................................. 364
   (2)   *PRIMA FACIE* CASE ................................................................... 364

**B.   MEMBERS OF PROTECTED CLASS** ...................................................... **365**
   (1)   EMPLOYMENT STATUS ................................................................ 365
   (2)   QUALIFICATIONS FOR POSITION ................................................... 366

**E.   DISPARATE TREATMENT** .................................................................. **367**
   (1)   TERMINATION / DISQUALIFICATION ............................................. 367
   (2)   CRIMINAL CONDUCT EXCLUSIONS ................................................ 368
   (3)   ASSISTANCE IN RESOLVING OUTSTANDING PROCEEDINGS ................ 370
   (4)   DISTRIBUTION OF CONFIDENTIAL INFORMATION TO PRESS ............. 370
   (5)   FAVORITISM IN SONG SELECTION ................................................ 371
   (6)   FAILURE TO ADOPT BEST PRACTICES ........................................... 372

**D.   ABSENCE OF JUSTIFICATION** ............................................................ **373**
   (1)   ARREST NOT JOB-RELATED ........................................................ 373
   (2)   "CASTING DECISIONS" ARE INAPPLICABLE TO BONA FIDE CONTESTS ...... 375

## COUNT II: 42 U.S.C. § 1981 (INTERFERENCE W/ PRIZE CONTRACT)

**A.   LEGAL ELEMENTS** ............................................................................ **380**
   (1)   STATUTORY LANGUAGE .............................................................. 380
   (2)   *PRIMA FACIE* CASE ................................................................... 380

B.   MEMBERS OF PROTECTED CLASS ............................................................**381**
C.   PRIZE CONTRACTS (19 ENTERTAINMENT) ...........................................**381**
   (1)   360 DEGREE CONTRACTS ...................................................................... 381
   (2)   FAILURE TO DISCLOSE TERMS .............................................................. 382
D.   PRIZE CONTRACT (IMPLIED IN FACT OR AT LAW) .............................**383**
   (1)   MUTUAL ASSENT .................................................................................. 383
   (2)   VALUABLE CONSIDERATION ................................................................. 384
   (3)   PROMISSORY INTERESTS ...................................................................... 384
   (4)   SATISFACTION OF CONDITIONS PRECEDENT ......................................... 386
E.   COVENANT OF GOOD FAITH ...................................................................**387**
   (1)   DUTY TO CONDUCT FAIR CONTEST ...................................................... 387
F.   INTERFERENCE W/ CONTRACTUAL RIGHTS.........................................**389**

---

COUNT III: 42 U.S.C. § 1981 (CONSTRUCTIVE FRAUD / EQUITABLE TRUST)

A.   LEGAL ELEMENTS.......................................................................................**391**
   (1)   STATUTORY LANGUAGE ........................................................................ 391
   (2)   PRIMA FACIE CASE .............................................................................. 391
B.   MEMBERS OF PROTECTED CLASS ...........................................................**392**
   (1)   COPYRIGHT INTERESTS ........................................................................ 392
   (2)   RIGHTS TO PUBLICITY ......................................................................... 392

---

COUNT IV: 42 U.S.C. § 1985(3) (DEPRIVATION OF CONSTITUTIONAL RIGHTS)

A.   LEGAL ELEMENTS.......................................................................................**395**
   (1)   42 U.S.C. § 1985(3)............................................................................. 395
   (2)   ELEMENTS OF SECTION 1985(3) ........................................................... 396
B.   CONSPIRACY................................................................................................**396**
   (1)   DEFINITION .......................................................................................... 396
   (2)   IDENTITY OF MEMBERS ........................................................................ 396
   (3)   FORMULATION ...................................................................................... 396
   (4)   PURPOSE .............................................................................................. 398
   (5)   METHODS ............................................................................................. 399
C.   DEPRIVATION OF CONSTITUTIONAL RIGHTS ......................................**401**
D.   INJURY..........................................................................................................**402**

---

COUNT V: RESCISSION

A.   OVERVIEW.....................................................................................................**404**
   (1)   AGREEMENT SUBJECT TO RESCISSION ................................................. 404
   (2)   GROUNDS FOR RESCISSION .................................................................. 404
B.   ILLEGALITY [CAL. CIV. CODE § 1667] ....................................................**405**
   (1)   STATUTORY LANGUAGE ........................................................................ 405
   (2)   APPLICABILITY ..................................................................................... 405
   (3)   VIOLATIONS OF SECTION 1667 ............................................................ 406

**C.   RIGGED CONTEST [47 U.S.C. § 509]** ...............................................................**406**
    (1)   STATUTORY LANGUAGE .............................................................................. 406
    (2)   APPLICABILITY ........................................................................................... 407
    (3)   PREDOMINANCE OF SKILL OR CHANCE ...................................................... 408
    (4)   VIOLATIONS OF SECTION 509 ..................................................................... 409

**D.   FALSE ADVERTISING RE: CONTEST [47 C.F.R. § 73.1216]**..............................**412**
    (1)   REGULATORY LANGUAGE ............................................................................ 412
    (2)   APPLICABILITY ........................................................................................... 413
    (3)   VIOLATIONS OF SECTION 73.1216 ............................................................... 414

**E.   UNLAWFUL RELEASE [CAL. CIV. CODE § 1668]** ..............................................**416**
    (1)   STATUTORY LANGUAGE & PURPOSE ........................................................... 416
    (2)   VIOLATIONS OF SECTION 1668 .................................................................... 417

**F.   ILLUSORY CONTRACT (COMMON LAW)**..........................................................**418**

**G.   LEGAL DUTY RULE (COMMON LAW)** ............................................................**420**

**H.   FRAUD IN FACTUM (COMMON LAW)** .............................................................**421**

| COUNT VI: UNJUST ENRICHMENT |
| --- |

| PRAYER FOR RELIEF |
| --- |

# JURISDICTION AND VENUE

# JURISDICTION AND VENUE

## PERSONAL JURISDICTION

1.      This Honorable Court has personal jurisdiction over the PRODUCTION-DEFENDANTS because they regularly and continuously transact business in the State of New York vis-à-vis the television production and (purported) contest marketed as *American Idol*.  Each of the PRODUCTION-DEFENDANTS maintains offices within this Judicial District.

2.      The Court has personal jurisdiction over the NETWORK-DEFENDANTS because they regularly and continuously transact business in the State of New York and within this Judicial District vis-à-vis the television production and (purported) contest marketed as *American Idol*. Each of the NETWORK-DEFENDANTS maintain offices within this Judicial District at 1211 Avenue of the Americas, New York, NY 10036.

3.      The Court has personal jurisdiction over the OVERSEER- DEFENDANTS because they regularly and continuously transact business in the State of New York and within this Judicial District vis-à-vis the television production and (purported) contest marketed as *American Idol*.

4.      The Court has personal jurisdiction over the SPONSOR-DEFENDANTS because they regularly and continuously transact business in the State of New York and within this Judicial District vis-à-vis the television production and (purported) contest marketed as *American Idol*.

## SUBJECT MATTER JURISDICTION

5.      This Honorable Court has original jurisdiction pursuant to 28 U.S.C. § 1332 because there are federal questions of law arising out of the relationship between the Class-Plaintiffs and DEFENDANTS, including pursuant to 42 U.S.C. § 1981.

6.      This Honorable Court has supplemental jurisdiction over Plaintiffs' claims

pursuant to 28 U.S.C. § 1367(a) because the causes of action are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

## VENUE

7.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) because, *inter alia*, two of the Plaintiffs reside in this Judicial District, <u>all</u> of the corporate entity DEFENDANTS maintain their headquarters or business offices here and/or continuously transact business within this Judicial District.  Moreover, a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this Judicial District.

# **PARTIES**

# PLAINTIFFS

## COREY D. CLARK

8.      Plaintiff COREY DELANEY CLARK ("Corey Clark" or "Plaintiff Clark") is an individual United States citizen residing in the State of Tennessee.

9.      Corey Clark is an African-American singer, songwriter, musician and professional performer.  Corey Clark is also of Eastern European and Jewish descent through his mother's side of the family.

10.      Plaintiff Clark's talent services, name, image, likeness, identity, persona, copyrighted works and other valuable intellectual property rights have been and continue to be commercially exploited by ENTERPRISE-DEFENDANTS in connection with *American Idol*.

11.      During Season Two, Plaintiff Clark advanced to the Top 10 Finalist round of the *American Idol* Contest and was purportedly voted by the American public to advance to the Top 6 before being unlawfully disqualified by ENTERPRISE-DEFENDANTS.

## JAERED N. ANDREWS

12.      Plaintiff JAERED NEALE ANDREWS ("Jaered Andrews" or "Plaintiff Andrews") is an individual United States citizen residing in the State of Ohio.

13.      Jaered N. Andrews is an African-American singer, songwriter, musician and professional performer.

14.      Plaintiff Andrews' talent services, name, image, likeness, identity, persona, copyrighted works and other valuable intellectual property rights have been and continue to be commercially exploited by ENTERPRISE-DEFENDANTS in connection with *American Idol*.

15.      During Season Two [2002-2003], Plaintiff Andrews advanced to the Top 32 Semi-Finalist round of the purported *American Idol* Contest before being unlawfully disqualified

by DEFENDANTS.

## JACOB JOHN SMALLEY

16.    Plaintiff JACOB JOHN SMALLEY ("Plaintiff Smalley") is an individual United States citizen residing in the State of Oklahoma.

17.    Jacob John Smalley is an African-American singer, songwriter, musician and professional performer.

18.    Plaintiff Smalley's talent services, name, image, likeness, identity, persona, copyrighted works and other valuable intellectual property rights have been and continue to be commercially exploited by ENTERPRISE-DEFENDANTS in connection with *American Idol*.

19.    During Season Two, Plaintiff Smalley advanced to the Top 32 Semi-Finalist round of the *American Idol* Contest before being disqualified or eliminated by DEFENDANTS.

## DONNIE WILLIAMS

20.    Plaintiff DONNIE WILLIAMS ("Donnie Williams" or "Plaintiff Williams") is an individual United States citizen residing in the State of Florida.

21.    Donnie Williams is an African-American singer, songwriter, musician and professional performer.

22.    Plaintiff Williams' talent services, name, image, likeness, identity, persona, copyrighted works and other valuable intellectual property rights have been and continue to be commercially exploited by ENTERPRISE-DEFENDANTS in connection with *American Idol*.

23.    During Season Three [2003-2004], Donnie Williams advanced to the Top 24 Semi-Finalist round of the purported *American Idol* "contest" before being unlawfully disqualified by DEFENDANTS.

## TERRELL BRITTENUM

24.     Plaintiff TERRELL BRITTENUM ("Terrell Brittenum" or "Plaintiff T. Brittenum") is an individual United States citizen residing in the State of New York.

25.     Terrell Brittenum is an African-American singer, songwriter, musician and professional performer.

26.     Plaintiff T. Brittenum's talent services, name, image, likeness, identity, persona, copyrighted works and other valuable intellectual property rights have been and continue to be commercially exploited by ENTERPRISE-DEFENDANTS in connection with *American Idol*.

27.     During Season Five [2005-2006], Terrell Brittenum advanced to the Top 24 Semi-Finalist round of the *American Idol* Contest before being unlawfully disqualified by DEFENDANTS.

## DERRELL BRITTENUM

28.     Plaintiff DERRELL BRITTENUM ("Derrell Brittenum" or "Plaintiff D. Brittenum") is an individual United States citizen residing in the State of New York.

29.     Derrell Brittenum is an African-American singer, songwriter, musician and professional performer.

30.     Plaintiff D. Brittenum's talent services, name, image, likeness, identity, persona, copyrighted works and other valuable intellectual property rights have been and continue to be commercially exploited by ENTERPRISE-DEFENDANTS in connection with *American Idol*.

31.     During Season Five [2005-2006], Derrell Brittenum advanced to the Top 24 Semi-Finalist round of the purported *American Idol* Contest before being unlawfully disqualified by DEFENDANTS.

**AKRON WATSON**

32.     Plaintiff AKRON WATSON ("Akron Watson" or "Plaintiff Watson") is an individual United States citizen residing in the State of Texas.

33.     Akron Watson is an African-American singer, songwriter, musician, actor and professional performer.

34.     Plaintiff Watson's talent services, name, image, likeness, identity, persona, copyrighted works and other valuable intellectual property rights have been and continue to be commercially exploited by ENTERPRISE-DEFENDANTS in connection with *American Idol*.

35.     During Season Six [2006-2007], Akron Watson was awarded a "Golden Ticket" to Hollywood to compete in the *American Idol* Contest before being unlawfully disqualified by DEFENDANTS.


**THOMAS DANIELS**

36.     Plaintiff THOMAS DANIELS ("Thomas Daniels" or "Plaintiff Daniels") is an individual United States citizen residing in the State of Oregon.

37.     Thomas Daniels is an African-American singer, songwriter, rapper, musician, and professional performer.

38.     Plaintiff Daniels's talent services, name, image, likeness, identity, persona, and copyrighted works have been and continue to be commercially exploited by ENTERPRISE-DEFENDANTS in connection with *American Idol*.

39.     During Season Six [2006-2007], Thomas Daniels advanced to the Top 34 Semi-Finalist round of the *American Idol* Contest before being unlawfully disqualified by DEFENDANTS.

## JU'NOT JOYNER

40.     Plaintiff JU'NOT JOYNER is an individual United States citizen residing in the State of Maryland.

41.     Ju'Not Joyner is an African-American singer, songwriter, musician, and professional performer.

42.     Plaintiff Joyner's talent services, name, image, likeness, identity, persona, copyrighted works and valuable intellectual property rights have been and continue to be commercially exploited by ENTERPRISE-DEFENDANTS in connection with *American Idol*.

43.     During Season Eight [2008-2009], Ju'Not Joyner advanced to the Top 36 Semi-Finalist round of the *American Idol* Contest before being unlawfully disqualified or eliminated by DEFENDANTS.

## CHRIS GOLIGHTLY

44.     Plaintiff CHRIS GOLIGHTLY is an individual United States citizen residing in the State of California.

45.     Chris Golightly is an African-American singer, songwriter, musician, and professional performer.

46.     Plaintiff GOLIGHTLY's talent services, name, image, likeness, identity, persona, copyrighted works and valuable intellectual property rights have been and continue to be commercially exploited by ENTERPRISE-DEFENDANTS in connection with *American Idol*.

47.     During Season Eight [2008-2009], Ju'Not Joyner advanced to the Top 36 Semi-Finalist round of the *American Idol* Contest before being unlawfully disqualified by DEFENDANTS.

## PLAINTIFFS' COLLECTIVE DESCRIPTIONS

48.      The term **"term "Public-DQ Plaintiffs"** shall refer to those <u>Plaintiffs who suffered</u> and continue to suffer the <u>permanent condemnation</u> for being publicly disqualified from the *American Idol* Contest:

        **a.**  ANDREWS

        **b.**  CLARK

        **c.**  WILLIAMS

        **d.**  T. BRITTENUM

        **e.**  D. BRITTENUM

        **f.**  WATSON

        **g.**  DANIELS

        **h.**  GOLIGHTLY


49.      The term **"CRI-Plaintiffs"** shall refer to Plaintiffs who had a record of criminal arrest as of the time they were featured as a Contestant on the television program *American Idol*.

        **a.**  ANDREWS

        **b.**  CLARK

        **c.**  SMALLEY

        **d.**  WILLIAMS

        **e.**  T. BRITTENUM

        **f.**  D. BRITTENUM

        **g.**  WATSON

        **h.**  DANIELS

## PRODUCTION-DEFENDANTS

50.   "PRODUCTION-DEFENDANTS" shall collectively refer to the single, common enterprise consisting of FREMANTLEMEDIA NORTHAMERICA, INC., AMERICAN IDOL PRODUCTIONS, INC., 19 ENTERTAINMENT and CORE MEDIA GROUP, INC.

### FREMANTLEMEDIA NORTH AMERICA, INC.

51.   Defendant FREMANTLEMEDIA NORTH AMERICA, INC. ("FREMANTLE") is a corporation organized under the laws of the State of Delaware, Entity No. 2254258, and is authorized and/or registered to do business in the State of New York.

52.   FREMANTLE's registered agent is listed as The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware, 19801 (New Castle County).

53.   FREMANTLE maintains a principal place of business in the United States located within this Judicial District at 1540 Broadway Building, 10th Floor, New York, New York 10036.

54.   FREMANTLE is engaged in the production and financing of entertainment television programming in the United States and in foreign countries.

55.   FREMANTLE actively solicits viewers of broadcast, cable and satellite television in this Judicial District and purposefully avails itself of the laws of the State of New York.

56.   FREMANTLE actively solicits internet and broadband traffic in the State of New York and solicits U.S. citizens and permanent residents to audition for *American Idol* within this Judicial District.

57.   At all times relevant to this action, FREMANTLE maintained control and supervision, jointly and severally, with the NETWORK-DS, PRODUCTION-DS and OVERSEER-DS over the means and manner in which each Plaintiff named herein, and prospective Class member,

was designated to provide his talent services and/or grant his proprietary rights to Defendants for their economic benefit.

58.     At all times relevant to this action, FREMANTLE was part of a single integrated enterprise with the other PRODUCTION-DS and exercised a high degree of centralized control over the labor and business practices of nominal Defendant AMERICAN IDOL PRODUCTIONS, INC. and, in addition, maintains inter-related television and film production operations, common management and common ownership with respect to *American Idol.*

59.     At all times relevant to this action, FREMANTLE exercised supervisory authority over individuals retained and/or employed as attorneys, producers, private investigators and network executives who actively engaged and participated in the unilateral decisions to disqualify the Plaintiffs from the *American Idol* Contest, amongst other adverse actions causing injury to Plaintiffs as set forth herein.

## AMERICAN IDOL PRODUCTIONS, INC.

60.     Defendant AMERICAN IDOL PRODUCTIONS, INC. ("AIP") is a corporation organized under the laws of the State of California, Entity No. C2393632, and is authorized and/or registered to do business in the State of New York.

61.     Defendant AIP maintains a place of business at 4000 W. Alameda Ave, Third Floor, Burbank, California 91505 and/or 7800 Beverly Blvd., Los Angeles, CA 90036-2112.

62.     Defendant AIP's registered agent for service of process is listed as CT Corporation System, 818 W. Seventh Street, Los Angeles, California 90017.

63.     Defendant AIP is owned and controlled by FREMANTLE.

64.     Defendant AIP is listed as the "employer" of *American Idol* Contestants in written employment contracts entered into by Defendant AIP and *American Idol* Contestants.

65.     Defendant AIP requires Contestants to complete and submit W-2 forms, W-9 forms and/or I-9 forms, among other U.S. government, tax, and employment-related forms relevant to this action.

66.     At all times relevant to this action, Defendant AIP shared the same principal offices and production personnel as FREMANTLE.

## 19 ENTERTAINMENT

67.     Defendant 19 ENTERTAINMENT is or was a foreign corporation or entity organized under the laws of the United Kingdom that transacts business in the State of New York vis-à-vis the Production.

68.     Defendant 19 ENTERTAINMENT was founded in the United Kingdom in 1985 and owned by Simon FULLER, the purported "creator" of the U.K. television series *Pop Idol* and its spin-off series *American Idol.*

69.     Defendant 19 ENTERTAINMENT was purchased by Defendant CORE MEDIA GROUP, INC. (formerly CKX, Inc.) in 2005.

70.     Defendant 19 ENTERTAINMENT's principal place of business is located at 650 Madison Ave., New York, NY 10022.

71.     Defendant 19 ENTERTAINMENT is a citizen of the State of New York.

72.     Defendant 19 ENTERTAINMENT is the owner and controller of related companies, subsidiaries, branches and/or divisions, each of which shall be deemed named defendants in this action in the event that upon Corporate Disclosure Statements, any or all are determined to be entities owned separate and apart from Defendant 19 ENTERTAINMENT and/or Defendant CORE MEDIA GROUP, INC. [specifically, 19 RECORDING LTD., 19 TV LTD., 19 MANAGEMENT LTD., 19 TOURING LLC, 19 MERCHANDISING LLC (collectively referred to

herein as the "19 AFFILIATED COMPANIES")].

## CORE MEDIA GROUP, INC.

73.   Defendant CORE MEDIA GROUP, INC. ("CMG") is a corporation organized under the laws of the State of Delaware, Entity No. 3939409 and is authorized and/or registered to do business in the State of New York.

74.   Defendant CMG's registered agent is listed as Corporation Service Co., 2711 Centerville Rd Ste. 400, Wilmington, New Castle 19808 (New Castle County).

75.   Defendant CMG's principal place of business is located at 650 Madison Ave., New York, NY 10022.

76.   Defendant CMG is the successor-in-interest to CKX, Inc., a public company.

77.   Defendant CMG is a company owned and/or controlled by third-party APOLLO GLOBAL MANAGEMENT, LLC (NYSE: APO), a private equity firm headquartered in New York, New York which reportedly bought Defendant CMG on June 21, 2011.

78.   With the purchase of Defendant 19 ENTERTAINMENT, Defendant CMG purportedly acquired a majority share of the rights to the intellectual property associated with the series and contest *American Idol*, including but not limited to the copyrights and state rights of publicity purportedly transferred to Defendant CMG via the Plaintiffs' execution of the respective *American Idol* Contestant Agreements (as amended).

79.   Upon information and belief, Defendant CMG owns all interests in and controls the 19 ENTERTAINMENT-related companies, which include but are not limited to 19 RECORDINGS LTD., 19 MERCHANDISING LTD., 19 MANAGEMENT LTD., 19 TV LTD. and 19 TOURING LTD.

80.   Upon information and belief, 19 ENTERTAINMENT's rights vis-à-vis the

*American Idol* Production are wholly owned and managed by CMG.

81.    Upon information and belief, a portion of 19 ENTERTAINMENT'S rights vis-à-vis the *American Idol* Production are co-owned and/or co-managed by third party XIX ENTERTAINMENT and Simon Fuller.

## NETWORK-DEFENDANTS

82.     "NETWORK-DEFENDANTS" shall collectively refer herein to the single, common enterprise consisting of 21ST CENTURY FOX, INC. (the legal successor-in-interest to News Corporation, Inc.) and Defendant FOX BROADCASTING COMPANY, INC., the New York-based entities that broadcast the U.S.-based television series *American Idol*.

83.     NETWORK- DEFENDANTS are named third party beneficiaries of the AMERICAN IDOL CONTESTANT AGREEMENT.

## 21ST CENTURY FOX, INC.

84.     Defendant 21ST CENTURY FOX, INC. is a corporation organized under the laws of the State of Delaware, that is authorized and/or registered to do business in the State of New York.

85.     Defendant 21ST CENTURY FOX, INC's registered agent is listed as The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware, 19801 (New Castle County).

86.     21ST CENTURY FOX, INC's principal place of business is located at 1211 Avenue of the Americas, New York, New York 10036.

87.     21ST CENTURY FOX, INC. is the parent company and/or whole owner of Defendant FOX BROADCASTING COMPANY, INC., which is the broadcast network that has televised the show *American Idol* from its initial broadcast date in June 2002 through the present day.

88.     Defendant 21ST CENTURY FOX, INC. actively solicits viewers and internet traffic in the State of New York and purposefully avails itself of the laws of the State of New York.

89.     At all times relevant to this action, Defendant 21ST CENTURY FOX, INC. exercised supervisory authority over individuals retained and/or employed by Defendant 21ST CENTURY

FOX, INC. and Defendant FOX.

90.    At all times relevant to this action, authorized representatives of 21ST CENTURY FOX, INC. participated in the decision-making process that led to the unlawful disqualification of each Plaintiff.

91.    At all times relevant to this action, authorized representatives of Defendant 21ST CENTURY FOX, INC. participated in the background check reporting process that led to the disqualification of each Plaintiff.

92.    Defendant 21ST CENTURY FOX, INC. television broadcasting network boasts more than two hundred (200) affiliate stations in the United States. It owns and operates more than twenty-five (25) TV stations, as well as a portfolio of cable networks.

93.    At all times relevant to this action, Defendant 21ST CENTURY FOX, INC. maintained control, jointly and severally with PRODUCTION-DEFENDANTS, over the means and manner in which each Plaintiff was designated to provide his talent services for the economic benefit of Defendants.

94.    At times relevant to this action, 21ST CENTURY FOX, INC.'s CEO played an instrumental role in the development and production activities of *American Idol*, particularly during the initial seasons of the Production in 2002-2005.

95.    At all times relevant to this action, Defendant 21ST CENTURY FOX, INC. was actually part of a single integrated enterprise with the other PRODUCTION- DEFENDANTS and exercised a degree of centralized control over the labor practices of PRODUCTION-DEFENDANTS.

96.    At all times relevant to this action, Defendant 21ST CENTURY FOX, INC. exercised supervisory authority over individuals retained and/or employed as attorneys, producers, private investigators and network executives who actively engaged and participated in the unilateral and

unfettered decisions to disqualify the Plaintiffs from the *American Idol* Contest, amongst other adverse actions causing injury to Plaintiffs as set forth herein.

## FOX BROADCASTING COMPANY, INC.

97.   Defendant FOX BROADCASTING COMPANY ("FOX") is a corporation organized under the laws of the State of Delaware, Entity No. 2090437, and is authorized and/or registered to do business in the State of New York.

98.   Defendant FOX's registered agent is listed as The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware, 19801 (New Castle County).

99.   Defendant FOX is a wholly-owned subsidiary of Defendant 21ST CENTURY FOX, INC.

100.   Defendant FOX's principal place of business within this Judicial District is located at 1211 Avenue of America, New York, New York 10036, in the same office location as Defendant NEWS CORP.

101.   Defendant FOX actively solicits viewers of broadcast, cable and satellite television in the State of New York.

102.   Defendant FOX actively solicits internet and broadband traffic in the State of New York.

103.   At all times relevant to this action, Defendant FOX maintained control, jointly and severally with PRODUCTION-DS, and OVERSEER-DS over the means and manner in which each Plaintiff was designated to provide their talent services and/or grant their proprietary rights to Defendant FOX for its economic benefit.

104.   At all times relevant to this action, Defendant FOX was actually part of a single integrated enterprise with the other PRODUCTION-DEFENDANTS and exercised a degree of

centralized control over the labor practices of PRODUCTION-Ds.

105.   At all times relevant to this action, Defendant 21ST CENTURY FOX, INC. exercised supervisory authority over individuals retained and/or employed as attorneys, accountants, producers, private investigators and network / production executives who actively engaged and participated in the unilateral and unfettered decisions to disqualify each Plaintiff from the *American Idol* Contest, amongst other adverse actions causing injury to Plaintiffs as set forth herein.

## OVERSEER-DEFENDANTS

106.   "OVERSEER-DEFENDANTS" OR "OVERSEER-Ds" shall collectively refer to Defendant Nigel LYTHGOE and Defendant Ken WARWICK.

107.   At all times herein mentioned, the OVERSEER-Ds were the authorized agents, executives, representatives, joint venturers, partners, members, stockholders, and/or employees of the PRODUCTION-Ds and NETWORK-Ds and, in doing the things hereinafter alleged, were acting within the course and scope of such agency and/or employment.

108.   Each of the PRODUCTION-Ds and NETWORK-DEFENDANTS, involved in a common, single enterprise, gave consent to, ratified, approved, and authorized the unlawful acts perpetrated by the OVERSEER-DEFENDANTS as alleged herein.

109.   While acting under the direct control and supervision of PRODUCTION-DEFENDANTS and NETWORK-DEFENDANTS, the OVERSEER-DEFENDANTS played a primary and central role in the racially-motivated decisions to disqualify each of the Plaintiffs (and other Black *American Idol* Contestants who are referenced in this Complaint), as well as the corresponding decisions not to disqualify White *American Idol* contestants who were similarly situated.

**NIGEL LYTHGOE**

110.    Upon information and belief, Defendant NIGEL LYTHGOE ("LYTHGOE") is a foreign national of the United Kingdom / Great Britain.

111.    At times relevant to this action, Defendant LYTHGOE was domiciled and/or authorized to conduct business and/or employed in the United States.

112.    Defendant LYTHGOE actively transacts business within this Judicial District in connection with his continuous role as senior executive producer of U.S.-based television programs.

113.    For over a continuous decade, Defendant LYTGHOE played an active, daily decision-making role in virtually every aspect and detail of the *American Idol* Production.

114.    Mr. LYTHGOE made the "final call" with respect to every decision to *advertise, market and promote* the disqualification of the Public-DQ-Plaintiffs (saving Golightly) from their positions as qualified, *bona fide* Prize Contestants on *American Idol*.

115.    Mr. LYTHGOE also played a central, decision-making role in the comparative decisions to advertise, market and promote White *American Idol* Contestants – most of whom were TOP 10 Finalists – whose "redemption" for past white criminal conduct was promoted throughout their featured participation and without interference.

**KEN WARWICK**

116.    Upon information and belief, Defendant KEN WARWICK ("WARWICK") is a foreign national of the United Kingdom / Great Britain.

117.     At times relative to this action, Defendant WARWICK was domiciled and/or authorized to conduct business and/or employed in the United States.

118.    At all relevant times, Defendant WARWICK actively transacted business within

this Judicial District in connection with his continuous, uninterrupted role as senior executive producer of the *American Idol* Contest and Production from 2002-2013.

119.     For over a continuous decade, Defendant WARWICK played an active role in daily production decisions, including the production choice to publicize the disqualification of each Public-DQ Plaintiff, who were each thereafter extricated from their positions as qualified Prize Contestants in the running to win *American Idol.*

120.     Mr. WARWICK also played a central decision-making role in corresponding production decisions not to publicly disqualify White and non-Black *American Idol* Contestants who were similarly situated (i.e., with criminal record history) in the running to win *American Idol.*

## SPONSOR-DEFENDANTS

121.     "SPONSOR-DEFENDANTS" shall collectively refer to FORD MOTOR COMPANY, COCA-COLA COMPANY, and AT&T MOBILITY, LLC.

### FORD MOTOR COMPANY, INC.

122.     Defendant FORD MOTOR COMPANY, INC. ("FORD") is a publicly traded corporation listed on the New York Stock Exchange [NYSE: F] and organized under the laws of the State of Delaware.

123.     FORD is an American multi-national automaker with principal place of business headquartered at One American Road Suite 1026, Dearborn, Michigan 48126.

124.     FORD regularly transacts business in the State of New York and markets, advertises and sells products within this Judicial District.

125.     FORD regularly transacts business in the State of California and markets,

advertises and sells products within Los Angeles.

126.    At all times relevant to this action, FORD has served as one of the primary, featured and/or marquee sponsors of the *American Idol* Contest, Production and Enterprise.

127.    At all times relevant to this action, Defendant FORD has actively marketed, advertised and promoted the *American Idol* Contest, Production and Enterprise to U.S. consumers.

128.    As Prize Contestants featured on *American Idol*, each of the Plaintiffs made themselves available to promote and endorse Defendant FORD's consumer products to nationwide U.S. television audiences and to extraterritorial cable and satellite subscribers, among other consumers.

129.    Each Plaintiff rendered personal talent services, granted their copyright ownership rights and conveyed a proprietary / statutory interest in their individual names, family names, images, personas and likenesses for the economic benefit of Defendant FORD.

130.    At all times relevant to this action, it was reasonably foreseeable to Defendant FORD that it would derive a substantial economic and commercial benefit for procuring Plaintiffs' talent services and obtaining Plaintiffs' unique proprietary rights in connection with *American Idol*.

131.    Upon information and belief, Defendant FORD, and its agents, employees and/or executives acting under its control and supervision, played an active role in some of the decisions to disqualify Plaintiffs (as well as other Black *American Idol* Contestants) from their position as qualified Prize Contestants featured on *American Idol*.

## COCA-COLA COMPANY, INC.

132.    Defendant COCA-COLA COMPANY, INC. ("COCA-COLA") is a publicly

traded corporation listed on the New York Stock Exchange [NYSE: KO] and organized under the laws of the State of Delaware.

133.    Defendant COCA-COLA is an American multi-national producer of soft drinks and beverages with principal place of business headquartered at 1 Coca-Cola Plaza, Atlanta, GA 30313.

134.    Defendant COCA-COLA regularly transacts business in the State of New York and markets, advertises and sells products within this Judicial District.

135.    Defendant COCA-COLA regularly transacts business in the State of California and markets, advertises and sells products within Los Angeles.

136.    At all times relevant to this action, Defendant COCA-COLA has served as one of the primary, featured and marquee Sponsors, advertisers and promoters of the *American Idol* Contest, Production and Franchise.

137.    As Prize Contestants featured on *American Idol*, each of the Plaintiffs made themselves available to promote and endorse Defendant COCA-COLA's consumer products to nationwide television audiences and to extraterritorial cable and satellite subscribers, among other consumers.

138.    Each Plaintiff rendered personal talent services, granted their copyright ownership rights and conveyed an interest in their individual names, images, personas and likenesses to the PRODUCTION-DEFENDANTS and NETWORK-DEFENDANTS for the economic benefit of Defendant COCA-COLA.

139.    At all times relevant to this action, it was reasonably foreseeable to Defendant COCA-COLA that it would derive a substantial economic and commercial benefit for procuring Plaintiffs' talent services and proprietary rights in connection with *American Idol.*

140.    Upon information and belief, Defendant COCA-COLA, and its agents, employees and/or executives acting under the control and supervision of Defendant COCA-COLA, played an active role in some of the decision to unlawfully disqualify (one or more) of the Plaintiffs from their position as qualified Prize Contestant featured on *American Idol.*

## AT&T

141.    Defendant AT&T is an American multi-national provider of telecommunications services.

142.    Defendant AT&T maintains corporate offices & headquarters at 208 S. Akard St. Dallas TX 75202.

143.    Defendant AT&T also maintains corporate offices and retail stores within this Judicial District.

144.    At all times relevant to this action, Defendant AT&T has served as one of the primary, featured Sponsors, advertisers and promoters of *American Idol*.

145.    As Prize Contestants featured on *American Idol*, each of the Plaintiffs made themselves available to promote Defendant AT&T's consumer products and services to nationwide television audiences and each rendered talent services for the economic benefit of Defendant AT&T.

146.    Each Plaintiff rendered personal talent services, granted their copyright ownership rights and conveyed an interest in their individual names, images, personas and likenesses for the economic benefit of Defendant AT&T.

147.    At all times relevant to this action, it was reasonably foreseeable to Defendant AT&T that it would derive a substantial economic and commercial benefit from procuring Plaintiffs' talent services and proprietary rights in connection with *American Idol.*

148.    Upon information and belief, Defendant AT&T, and its agents, employees and/or executives acting under the control and supervision of Defendant AT&T, played an active role in some of the decisions to unlawfully disqualify Public-DQ-Plaintiffs from their position as qualified Prize Contestant in the running to win *American Idol.*

# REALITY TV

# *DEFINITIONS*

## A.   FANTASY VS. REALITY

### (1)   "REALITY"

149.   The term "reality" is commonly used in the United States to describe events that have occurred in fact.

150.   The term "reality" is commonly used in the United States to describe an individual's everyday or ordinary experiences as they occur in real time.

### (2)   "NON-FICTION"

151.   A televised work of "non-fiction" depicts or describes actual events, places, times, and people that have been documented and objectively verified.

152.   In the United States, literary works that depict or describe naturally-occurring events (or literal happenings) are marketed as "non-fiction," "news," "historical accounts," and/or "documentaries."

### (3)   "REAL PEOPLE"

153.   The term "Reality TV" is used to describe a genre of television programming that depicts events surrounding the lives of "real people."

154.   In the genre of Reality TV, the term "real people" is used to describe non-union performers and/or amateur performers and/or individuals who lack work experience as professional (i.e., paid) television performers.

155.   In the genre of Reality TV, "real people" are depicted as playing the role of themselves, which is distinct from playing a fictional character role in a scripted and/or dramatic program.

156.    Reality TV purports to feature "real people," i.e., U.S. citizens or permanent residents who are selected, auditioned and/or cast by Reality TV producers to play the role of themselves on screen doing "real things" in their ordinary lives.

157.    Reality TV is reality-based television programming.

158.    Reality TV is marketed by Defendant FOX as non-fiction.

## (4)    "FICTION" / "FANTASY"

159.    In the United States, televised works depicting imaginative and/or hypothetical events are marketed as "fiction," "fantasy" and/or "drama."

160.    The term "fantasy" is commonly used in the United States to describe a work of fiction that depicts a supernatural or imaginary world.

## (5)    "SCRIPTED"

161.    The term "scripted" is commonly used in the television industry to refer to a dramatic work of fiction.

## (6)    REALITY TV "STARS"

162.    Like Quiz shows from the 1950's, Reality TV is an "interactive experience" because it permits the ordinary citizen and/or viewer at home to become a television star.

163.    Reality TV provides more than a momentary escape from ordinary life experienced by television audiences; it represents a literal, concrete *opportunity* for viewers to divest themselves of all things ordinary and transmorph through the screen into becoming an overnight celebrity.

164.    The interactive nature of Reality TV is a powerful dynamic because, unlike television programs that have been marketed to audiences as "scripted" (the television industry

term for fictional), Reality TV extends a continuing open invitation to young viewers that beyond the temporary moment in which the audio-visual work is presented.

165.    Reality TV programs explicitly (or implicitly) promise their audience members an economic and social opportunity to maximize the value of one's *entire life*, and by extension, all the fundamental rights conferred upon each U.S. citizen to move about in society through the exercise of those rights.

## (7)    "SUSPENSION OF DISBELIEF"

166.    The term "suspension of disbelief," which was initially formulated by poet Samuel Taylor Coleridge, refers to an audience member's conscious, voluntary act of suspending judgment concerning the implausibility of an imaginary event or fictional character in order to perceive a "semblance of truth" in the fantastical portrayal.[1]

## B.    CONTEST-RELATED TERMS

167.    **"*American Idol*"** shall collectively refer to the *American Idol* Contest, the *American Idol* Production and the *American Idol* Enterprise.

168.    **"*American Idol* Contest or Contest"** shall refer to the purported *bona fide* singing and talent contest that is marketed to U.S. consumers by ENTERPRISE-DEFENDANTS as a "contest" and that is depicted as a *bona fide* contest via the *American Idol* Production.

169.    **"*American Idol* Production"** shall refer to the television series entitled *American Idol* and all of the copyrighted audio-visual works embodying episodes of the series that have

---

[1] Coleridge was an author of fiction who coined the phrase "suspension of disbelief" in 1817:

> **It was agreed, that my endeavours should be directed to persons and characters supernatural, or at least romantic, yet so as to transfer from our inward nature a human interest and a semblance of truth sufficient to procure for these shadows of imagination that willing suspension of disbelief for the moment, which constitutes poetic faith.**

been broadcast on FOX, from June 2002 to present.

170.    **"*American Idol* Enterprise"** shall refer to the global franchise of "IDOL"-related brands, productions, products and services related to *American Idol*.

171.    **"Contestants"** shall refer to any and all singers who have been depicted as contestants on the U.S.-based television series *American Idol*.

172.    **"Contest Prize"** shall refer to the economic value of the *19 Entertainment Prize Contracts* and all consequential benefits and privileges derived from being awarded such contracts, as measured by comparators in the consumer marketplace, e.g., former *American Idol* Finalists who have been awarded the 19 Entertainment Prize Contracts including but not limited to Carrie Underwood, Kelly Clarkson, Clay Aiken, Reuben Studdard, Fantasia Barrino, Jennifer Hudson, Kelly Pickler.

173.    The terms **"disqualification"** or **"disqualified"** shall refer to the adverse action taken at ENTERPRISE-DEFENDANTS' absolute and sole discretion -  against each Plaintiff via permanent removal of each Plaintiff from the pool of "contestants" who were deemed qualified by the panel of Expert Judges and/or audience to win the valuable "prize" offered for winning *American Idol* but for reasons attributed to Claimants' personal conduct other than their singing or performance talent, i.e., their unique qualifications to sing, entertain or perform.

174.    The terms **"eligibility" or "eligible"** shall refer to the published eligibility requirements that Contestants must satisfy before auditioning for *American Idol* at Open Auditions. The eligible age-range for Contestants is currently fifteen (15) to twenty-eight years old. The initial age limit was sixteen to twenty-four in the first three seasons, but the upper limit was raised to twenty-eight in Season Four, and the lower age limit was reduced to fifteen in Season Ten. The Contestants must be legal U.S. residents (citizens or permanent residents).

175.   The terms **"elimination" or "eliminated"** shall refer to the removal of a Contestant from the *American Idol* contest for reasons related to their individual performances in the contest, as determined by the panel of Judges or public vote.

176.   **"Finalist(s)"** shall refer to Top 10 Contestants of Season One, the Top 10 Contestants of Seasons Two through Season Seven, the Top 13 Contestants of Season Eight, the Top 12 or Top 13 Contestants of Seasons Nine, Ten, Eleven and Twelve.  Each Finalist performs songs in the Finals based on a weekly theme which may be a musical genre such as Motown, disco, or big band, songs by artists such as Michael Jackson, Elvis Presley or The Beatles, or more generic themes such as *Billboard* Number 1 hits or songs from the contestant's year of birth.

177.   **"Finals"** shall refer to the final contest rounds of the *American Idol* Contest in which the Finalists perform.  The Finals are broadcast in prime time from CBS Television City in Los Angeles, California in front of a live studio audience. The Finals lasted eight weeks in Season One, eleven weeks in subsequent seasons until Seasons Ten and Eleven which lasted twelve weeks.

178.   **"Golden Ticket"** shall refer to the certificate received by each Plaintiff, and other Contestants featured on American Idol, who have been deemed qualified by a panel of Expert Judges to compete in the American Idol contest based on their individual merit as singers and performers.

179.   **"Golden Ticket Holders"** shall refer to all performers featured on the U.S.-based television series of *American Idol,* from June 2002 through present, who were publicly awarded a Golden Ticket offer to compete in Hollywood Rounds after being qualified by the *American Idol* Judges on the basis of their individual talent and merit.  "Golden Ticket Holders" are also

referred to as "*bona fide* contestants."

180.   **"Hollywood Rounds" or "Hollywood Week"** shall refer to the first round in the Contest held in Los Angeles, California after Contestants have been awarded a Golden Ticket at the Open Auditions.  Once in Hollywood, the contestants perform individually or in groups in a series of rounds. Until season ten, there were usually three rounds of eliminations in Hollywood. In the first round the contestants emerged in groups but performed individually. For the next round, the contestants put themselves in small groups and perform a song together.

181.   **"Expert Judge(s)"** shall refer to the resident judges featured on the television series *American Idol*, including Simon Cowell (Season One-Season Nine), Randy Jackson (Season One-Season Twelve), Paula Abdul (Season One-Season Eight), Kara DioGuardia (Season Eight-Season Nine), Ellen DeGeneres (Season Nine), Jennifer Lopez (Season Ten-Season Eleven), Steven Tyler (Season Ten-Season Eleven).

182.   **"Guest Judges"** shall refer to any judge featured on Seasons One to Seasons Eleven of the Production who was not an Expert Judge.

183.   **"Open Auditions"** shall refer to the initial auditions organized and staged by ENTERPRISE-DEFENDANTS in multiple cities throughout the United States each season.  The auditions are open to all U.S. citizens or permanent residents who meet the published eligibility requirements.  Golden Tickets are awarded at the Open Auditions based on individual merit. Open Auditions are also referred to as "cattle call" auditions.

184.   **"Prize Contestants"** shall refer to *American Idol* Hollywood Round Contestants, *American Idol* Semi-Finalist Contestants and *American Idol* Finalist Contestants.  Their status as Prize Contestants is conferred by virtue of having received a Golden Ticket based on their individual merit.

185.    **"Sponsors"** or **"Contest Sponsors" or "Promoters"** shall refer to *American Idol*'s major, marquee and/or primary corporate sponsors from Season One to Season Eleven including FORD MOTOR COMPANY, COCA-COLA CO., AT&T, NOKIA, APPLE AND OLD NAVY.

186.    **"Semi-Finalist(s)"** shall refer to the Top 30 Contestants in Season One; Top 32 Contestants in Season Two and Season Three; the Top 24 Contestants in Seasons Four, Five, Six and Seven, the Top 36 Contestants in Season Eight; and the Top 24 Contestants in Season Nine.

187.    **"Semi-Finals"** shall refer to the rounds in which Semi-Finalists compete. From Seasons One to Three and Eight to Eleven, the Semi-Finalists were split into different groups to perform individually in their respective night. In Season One, there were three groups of ten, with the top three Contestants from each group making the Finals. In Seasons Two and Three, there were four groups of eight, and the Top 2 of each selected. In Season Eight there were three groups of twelve, with three contestants moving forward – the highest male, the highest female, and the next highest-placed singer.  In Season Ten and Eleven, the males and females perform on separate nights and five of each were chosen. From Seasons Four to Seven and Nine, the 24 Semi-Finalists were divided by gender in order to ensure an equal gender division in the Top 12. The men and women sang separately on consecutive nights, and the bottom two in each groups were eliminated each week until only six of each remained to form the Top 12.

188.    **"Wild Card"** shall refer to the rounds within the Semi-Finals where Contestants who failed to qualify through audience voting were given another chance. In Seasons Two and Three, each of the three judges championed one Contestant with the public advancing a fourth into the finals, making 12 finalists in all. In season eight, four were chosen by the judges to produce a final 13. In seasons ten and eleven, three wildcards were chosen, again making a total of 13.

## C.    SERIES SEASONS

189.    **"Season One"** is the season of *American Idol* that was broadcast from June 11, 2002 through September 4, 2002.  Kelly Clarkson was declared the winner.

190.    **"Season Two"** is the season of *American Idol* that was broadcast from January 21, 2003 through May 21, 2003.  Reuben Studdard was declared the winner.

191.    **"Season Three"** is the season of *American Idol* that was telecast from January 19, 2004 through May 26, 2004.  Fantasia Barrino was declared the winner.

192.    **"Season Four"** is the season of *American Idol* that was broadcast from January 18, 2005 through May 25, 2005.  Carrie Underwood was declared the winner.

193.    **"Season Five"** is the season of *American Idol* that was broadcast from January 17, 2006 through May 30, 2006.  Taylor Hicks was declared the winner.

194.    **"Season Six"** is the season of *American Idol* that was broadcast from January 16, 2007 through May 23, 2007.  Jordin Sparks was declared the winner.

195.    **"Season Seven"** is the season of *American Idol* that was broadcast from January 15, 2008 through May 21, 2008.  David Cook was declared the winner.

196.    **"Season Eight"** is the season of *American Idol* that was broadcast from January 13, 2009 through May 20, 2009.  Kris Allen was declared the winner.

197.    **"Season Nine"** is the season of *American Idol* that was broadcast from January 12, 2010 through May 26, 2010.  Lee Dewyze was declared the winner.

198.     **"Season Ten"** is the season of *American Idol* that was broadcast from January 19, 2011 through May 25, 2011.  Scott McCreery was declared the winner.

199.    **"Season Eleven"** is the season of *American Idol* that was broadcast from January 18, 2012 through May 23, 2012.  Phillip Phillips was declared the winner.

200.  **"Season Twelve"** is the season of *American Idol* that was broadcast from January 18, 2012 through May 23, 2012.  Phillip Phillips was declared the winner.

# "REALITY TV"
# (1994-2001)

## A.   MANIPULATING "REALITY"

### (1)   ALTERNATIVE PROGRAMMING

201.   From 1994 to 2013, Defendant FOX's television department of "alternative programming" was supervised by Michael H. Darnell, a resident of the United States.

202.   Mr. Darnell was initially retained by Defendant FOX in 1994 as a television producer and/or executive to develop programs in the company's "Specials Department."

203.   As the head of FOX's Specials Department, Mr. Darnell developed his own genre of reality-based television programming by editing together recycled images and licensed footage into new, sensational programs.

204.   In May 2013, Mr. Darnell reportedly decided not to renew his employment contract with the NETWORK-ENTERPRISE-DEFENDANTS.

205.   On June 18, 2013, it was reported that Mr. Darnell took a position working at the television department at Warner Brothers.

### (2)   *ALIEN AUTOPSY: FACT OR FICTION?* (1995)

206.   In 1995, Mr. Darnell achieved his first major ratings hit on FOX with a provocative television program, framed as a piece of journalism, entitled *Alien Autopsy: Fact or Fiction*?

207.   Widely considered at the time to be one of the most controversial TV documentary specials ever aired in prime time, (according to www.imdb.com), this famous FOX

Network program stirred the "liveliest debate of any home movie since the *Zapruder* Film," according to TIME MAGAZINE.

208.    The 23-minute "home movie" aired by FOX and investigated by its "journalists" was actually purported to be the actual dissection of an extraterrestial being, supposedly recovered and analyzed by U.S. military doctors near Roswell, New Mexico in 1947.

209.    The idea to broadcast *Alien Autopsy: Fact or Fiction?* reportedly originated when a freelance producer came to Mr. Darnell and claimed to have found film footage, dating back to 1947, of an alien autopsy performed by U.S. military doctors. The freelance producer revealed to Mr. Darnell that the autopsy video was an underline hoax created by some clever U.K. film students.  However, the producer warranted that the film was as old as 1947, a fact that Mr. Darnell reportedly verified through the company Eastman Kodak.

210.    In 1995, FOX televised the initial broadcast of the program entitled *Alien Autopsy: Fact or Fiction*.  The television show was presented and edited in a manner that led the viewing audience to believe that the depicted autopsy of the extraterrestrial being was reality-in-fact.

211.    Darnell, working on behalf of FOX, knew that disclosure to viewers of the fictional aspect of the film depicted in *Alien Autopsy: Fact or Fiction* would undermine the suspense and/or allure of the televised event.  Accordingly, FOX did not disclose to the viewing audience Darnell's knowledge of the fact that the 1947 film was intended to be a hoax.  The television show was a big hit, in no small part because FOX left the audience guessing as to whether the alien autopsy was "fact or fiction."

**(3)    WORLD'S GREATEST HOAXES (1998)**

212.    In 1998, three years after the initial broadcast of *Alien Autopsy: Fact or Fiction?*,

Mr. Darnell's production team at FOX aired another television special entitled *World's Greatest Hoaxes and Secrets Revealed*.  In this program, FOX finally disclosed to the viewing public that the alien autopsy footage depicted in Darnell's 1995 program was indeed a hoax perpetrated by some film students from the U.K.  Darnell also revealed that he had known all along that the 1947 film was a hoax, thereby admitting that the 1995 FOX program was, in and of itself, a "pseudo-documentary" (i.e., an even bigger hoax).

213.    In 1998, after being named "Executive Vice President of Specials and Alternative Programming" for Defendant FOX, and garnering recognition for his success in the ratings, Mr. Darnell revealed to the NEW YORK TIMES the secret behind his alternative brand of television programming.  Darnell said:

> **"The truth is, I'm in entertainment, not in news."**

214.    In 1998, during an interview with the ATLANTA JOURNAL AND CONSTITUTION, Darnell stated:

> **"I will do almost anything for a good number.  As long as it doesn't hurt me, the company or my audience.  I don't cross into human suffering, making fun of hurting a person."**

215.    In 2000, based on Michael Darnell's track record of successfully "manipulating reality" via FOX's alternative television programs, the NEW YORK TIMES coined Mr. Darnell *"a latter-day P.T. Barnum."*

## B.    FREE DISPOSABLE LABOR

## (1)    UNION VS. NON-UNION PERFORMERS

216.    As a matter of industry custom and practice, professional television performers (e.g., actors, singers, dancers, musicians, etc.) who appear on broadcast television are covered by U.S. labor guilds such as the SCREEN ACTOR'S GUILD ("SAG") and/or the AMERICAN

FEDERATION OF TELEVISION AND RADIO PERFORMERS ("AFTRA").

217.    In 1992, the basic cable network MTV televised a program entitled *The Real World*, which is largely credited with being the first U.S.-based reality television program.

218.    *The Real World* focused on the lives of complete strangers who were selected by the show's producers to live together in a house for several months as cameras recorded their inter-personal relationships.  The show was a major ratings hit and, over 20 years after its initial debut, is widely considered an iconic television program in American popular culture.

219.    At the time the MTV show was first broadcast in 1992, the participants featured on MTV's *The Real World* were <u>not</u> classified as professional performers nor dramatic actors, nor were they covered by collective bargaining agreements which require payment of minimum wages, overtime and other key protections afforded to professionals under applicable employment laws and regulations.  They were "real people."

220.    The utilization of "real people" as television performers means that Reality TV producers, such as PRODUCTION-ENTERPRISE-DEFENDANTS, can source non-professional actors for an entire production season from a pool of non-union amateurs.

221.    As part of their standard practice or ordinary course of doing business, Reality TV producers, such as PRODUCTION-ENTERPRISE-DEFENDANTS, utilize free disposable labor that consists of young, impressionable U.S. citizens who eagerly seek to be on television.

222.    In order to engage non-union amateurs to act as participants in *American Idol*, the PRODUCTION-ENTERPRISE-DEFENDANTS categorically exclude from the casting process *all* performers covered by the applicable labor union(s).

## (2)    SUBSTANTIAL COST REDUCTION

223.    Reality TV programs are substantially cheaper to produce than traditional scripted

programs.[2]

224.    Reality TV producers such as PRODUCTION-ENTERPRISE-DEFENDANTS achieve substantial cost reductions through utilization of non-union labor and/or amateur performers in their programs.

225.    An unknown actor featured on a FOX television sitcom who is covered by a SCREEN ACTORS GUILD (SAG) agreement may earn $25,000 or more per episode.

226.    As a result of their proclaimed "amateur" status, Reality TV contestants are rarely compensated in cash for providing their talent services, amongst other valuable consideration, to Reality TV producers such as PRODUCTION-ENTERPRISE-DEFENDANTS.

227.    Reality TV participants on FOX's Reality TV show programs who may be covered by labor unions do not earn more than minimum wage (nor substantially more than minimum wage) in consideration for their personal appearances.

228.    A half-hour television sitcom costs approximately $1.5 million to make and a one-hour dramatic show costs approximately $2.6 million.  In contrast, a one-hour Reality TV program may cost only $750,000-800,000.

229.    The cost of producing a Reality TV program may be one-third (1/3) or less of a traditional sitcom or dramatic series featuring union performers.

**(3)    DEPRIVATION OF RIGHTS**

230.    Utilization of amateur, non-union television performers enabled Reality TV

---

[2] See, e.g., Ryan Westerman, *As Seen on TV: Your Compromising Cameo on National Reality Programming*, 12 J. MARSHALL REV. INTELL. PROP. L. 403 (2013) ("One reason for the decrease in expenses is the cheap cost of labor that comes with hiring " participants" rather than actors with significant celebrity status); Tara Brenner, *A "Quizzical" Look Into The Need For Reality Television Show Regulation*, 22 CARDOZO ARTS & ENT. L.J. 873, 876 (2005) (emphasizing the appeal of reality TV shows to networks comes from the shows' cheaper production costs compared to the costs incurred to make scripted programs and allows the networks to "create" celebrities); see also Brian Stelter, *With New Stars, Reality Shows See Costs Rise*, N.Y. TIMES, July 26, 2010, at B1 ("Reality television became a force because viewers like it and because, without celebrities or big salaries, it was cheap.")

producers such as PRODUCTION-ENTERPRISE-DEFENDANTS to classify on-screen participants as "volunteers," "contestants," "licensors" and/or "grantors of rights."

231.   In their contracts with Reality TV participants, the PRODUCTION-ENTERPRISE-DEFENDANTS expressly disclaim the employment or independent contractor status of the amateur, non-union television performers who appear on-air.

232.   PRODUCTION-ENTERPRISE-DEFENDANTS have also maintained unfettered discretion to commercially exploit names, likenesses, personas, voices and identities of Reality TV contestants in any manner that fits the Producers' needs, throughout the world and in perpetuity.[3]

233.    By virtue of their written adhesion contracts, PRODUCTION-ENTERPRISE-DEFENDANTS were (and are) purportedly granted free reign to manipulate, deceive, defame and commit intentional tortious acts against individual Plaintiffs in their roles as *American Idol* contestants, whether in the pursuit of ratings or for some other malevolent design.

## C.   ILLICIT BACKGROUND CHECKS

### (1)   PEDDLING "RAP SHEETS" [SMOKINGGUN.COM]

234.   SMOKINGGUN.COM is a New York-based entertainment news website established in 1997.

235.   SMOKINGGUN.COM is one of the first commercially successful websites to market the criminal records (past or present), mug shots and/or *sealed* government data of U.S. citizens, particularly celebrities and Reality TV participants, as entertainment news.

---

[3] *Midler v. Ford Motor Co.*, 849 F.2d 460, 462 (9th Cir. 1988) ("The purpose of the media's use of a person's identity is central. If the purpose is 'informative or cultural' the use is immune; 'if it serves no such function but merely exploits the individual portrayed, immunity will not be granted.'") [*quoting* Peter L. Felcher & Edward L. Rubin, *Privacy, Publicity and the Portrayal of Real People by the Media*, 88 YALE L.J. 1577, 1596 (1979)].

236.   SMOKINGGUN.COM'S economic model is based on publishing "hard-to-get" (i.e., sealed) information derived from official U.S. and state government databases maintained and operated by taxpayers.

237.   According to "*The Dog Dialed 911: A Book of Lists From The Smoking Gun*" (2006):

> **Since the Smoking Gun's founding in 1997, our journalism has been rooted in the hunt for primary-source documents like FBI reports, police affidavits and newsworthy lawsuits.**

238.   According to the Smoking Gun.com website:

> **"The Smoking Gun brings you exclusive documents -- cool, confidential, quirky --that can't be found elsewhere on the Web. <u>Using material obtained from government and law enforcement sources,</u> via Freedom of Information requests, and from court files nationwide, we guarantee everything here is 100% authentic." [CDC_2068] (emphasis added).**

239.   In a 2006 article published on "*The Water Cooler*" website, the editor and co-founder of THE SMOKING GUN.COM, William Bastone, revealed that the website had access to sealed documents in a criminal trial involving entertainer Michal Jackson:

> **A year ago we did a bunch of more traditional, long-form narrative investigative stories in and around the Michael Jackson trial, in part <u>because we obtained and had access to documents that were under seal,</u> including all of the sheriff's reports in the case, search warrant affidavits, and then after that we obtained the entire grand jury transcript, which was under a court seal. So we posted a lot of that material and wrote long narrative pieces based on those documents. [CDC_002177]**

240.   In a 2009 on-line article entitled "*Media Impact in NY and DC*", a reporter for THE SMOKINGGUN.COM was asked where the website obtained its public record documents:

> **We spend a lot of time on the phone with court clerks, with police departments.  We travel quite a bit.  We're willing to go across the country if there's a document we have to travel across the country to get…We're pretty much doing the same sort of stuff that every other reporter does in hunting down material.  Except, you see the primary source material. [CDC_002163-64]**

241.   In December 2000, the SMOKINGGUN.COM website was acquired by corporate

broadcaster Court TV.  Prior to the acquisition, SMOKINGGUN.COM was a "grass roots" enterprise operated by 3-4 individuals from a private residence in New York City.

242.    In a 2006 interview with GELF MAGAZINE, the editor of the THE SMOKING GUN.COM stated:

> We're now owned by <u>Court TV.</u>  They don't have anything to do with what we do.  But this is one of the great things with being affiliated with a TV Network: <u>They have the ability to grab the signal from the sky and pump it into our office.</u>

243.    Upon information and belief, SMOKINGGUN.COM is now part of TruTV of Turner Entertainment Digital Network, which is part of the Turner Sports & Entertainment Digital Network, itself a division of Time Warner.

244.    SMOKINGGUN.COM published and continues to publish the criminal record or private background information of Plaintiffs Andrew, Clark, T. Brittenum and D. Brittenum. The website has also published the criminal background information of several other *American Idol* Contestants, including Frenchie Davis, JXJ-11, B. Bice, S. Savol and others.

245.    In the case of Plaintiff Corey Clark, SMOKING GUN.COM published information derived from a police affidavit that was *under court seal* while Mr. Clark's criminal proceeding was pending.

## (2)    *WHO WANTS TO MARRY A MILLIONAIRE?* [2000]

246.    By 2000, Mike Darnell and his team at FOX continued to develop alternative telvision programming that could "shock and awe" the coveted younger demographic.  The final result of Mr. Darnell's efforts included television shows such as *When Stunts Go Bad*, *World's Scariest Police Chases* and *Breaking the Magician's Code*.

247.    On February 15, 2000, FOX broadcast a Reality TV production entitled *Who Wants to Marry a Multi-Millionaire?,* in which 50 women (one from each U.S. state) competed

in a beauty pageant-style contest to be the bride of an unknown multi-millionaire who was revealed to be Rick Rockwell.  He selected Darva Conger of California and married her on the spot as 22 million Americans watched.  *Ms. Conger* received a three-carat diamond ring and more than $100,000 in prizes.

248.    On February 19, 2000, four days after the initial broadcast *Who Wants to Marry a Multi-Millionaire?* on FOX, THE SMOKINGGUN.COM website reportedly "discovered" that one of Rockwell's former girlfriends had filed a restraining order against him for domestic violence in 1991.  The victim claimed that Mr. Rockwell, whose real name was Richard Balkey, assaulted her and stalked her when she tried to break off the engagement.

249.    In the wake of SMOKINGGUN.COM'S publication, Ms. Conger quickly sought an annulment of the marriage and auctioned off her prizes to charity.  She claimed that the marriage was never consummated during a honeymoon to the Caribbean.

250.    Ms. Rockwell was largely condemned by the public as a fraud and a liar as new details regarding his true net worth and employment background surfaced.  In response to the *Smoking Gun.com*'s publication, FOX claimed that Mr. Rockwell had "failed to disclose" his criminal background information during the screening process and further vowed to investigate how the background check had failed to detect the criminal record.

### (3)    HOLLYWOOD PRIVATE INVESTIGATORS

251.    On April 13, 2000, Defendant FOX announced to the press that it had completed an "internal review" using the "outside law firm" of Greenberg, Glusker, Fields, Claman & Machtinger, which purportedly conducted an investigation relating to the background check process used to screen Rockwell.

252.    Defendant FOX claimed that the show's producer, NEXT ENTERTAINMENT,

supervised the screening process and had engaged both a "private investigator" and "national search firm" to conduct the background checks. The LOS ANGELES TIMES reported that, according to FOX:

> Those investigators, however, were prevented from divulging information going back more than seven years under the federal <u>Fair Credit Reporting Act</u>, which says a consumer reporting agency can't report findings older than that except for criminal convictions. The restraining order was initially exposed by the Smoking Gun, an online news site.

> They all worked to the fullest extent within the law,' a Fox spokesman said. 'There was no negligence.' Citing attorney-client privilege, the law firm said it could not discuss its conclusions.

> Fox has stressed that the producers were responsible for checking out Rockwell, though Fox's executive in charge of specials, Mike Darnell, reportedly played an active role in selecting him from among several candidates.

253.    When one of the show's producers for NEXT ENTERTAINMENT was asked about the legacy of *Who Wants to Marry a Millionaire?* in April 2000, he responded that he was "proud of the work we did on the show, and we're proud of the show . . . It's become a cultural icon and something the television business will always remember."

254.    From April 2000 and continuing through the present, *Who Wants to Marry a Millionaire?* has generated hundreds of more media impressions due to the controversy surrounding *Smoking Gun's* publication of Mr. Rockwell's criminal history information than it did through publication of editorial reviews or advertisements of the actual program content.

255.    In April 2000, Defendant FOX acknowledged to the LOS ANGELES TIMES that both Ms. Conger and Mr. Rockwell signed an agreement prior to their appearances on the show saying they could annul the marriage at any time - a fact not conveyed to viewers during the live broadcast.

## D.    PUBLIC DISQUALIFICATIONS

### (1)    DISQUALIFICATION VS. ELIGIBILITY

256.    To be "disqualified" from a contest is to be barred from competing for violation of published contest rules.

257.    To be "disqualified" from a contest implies that the contestant has already been ruled eligible or qualified to compete in such contest.

258.    To be "disqualified" from a contest implies that the ruling of disqualification has taken place after the contestant's performance has begun.

259.    To be "ruled ineligible" means that a contestant does not meet the published eligibility requirements of the contest, such as age or citizenship status.

260.    To be "ruled ineligible" means that a prospective contestant cannot enter into the contest.

261.    To be "eliminated" from a contest means that a contestant has been removed from participation in a contest after his individual performance or display of skill relative to other competitors in the contest has been measured by criteria.

### (2)    HUMILIATION ON PUBLIC DISPLAY

262.    Public humiliation has become one of the hallmarks of Reality TV programming.

263.    A Reality TV contestant may expect to suffer public humiliation if they fail to demonstrate the requisite skill, relative to other competitors, needed to advance in such contest.

264.     To be disqualified from a contest for violating contest rules tends to expose the disqualified contestant to humiliation, contempt, ridicule, stigmatization and adverse opinion by the community at large.

265.    To be disqualified from a televised contest on the scale of the *American Idol*

Production, which at times relevant to this action was broadcast to over 38 million viewers, tends to directly injure such disqualified contestant in his profession, trade or business.

266.    Any decision made by the PRODUCTION-ENTERPRISE-DEFENDANTS, NETWORK-ENTERPRISE-DEFENDANTS and/or SPONSOR-ENTERPRISE-DEFENDANTS to broadcast the event of an *American Idol* contestants' disqualification, or otherwise disseminate to the mass media the occurrence of a contestants' disqualification, is a conscious decision made by those entities or individuals vested with an economic interest in the *American Idol* Production and Enterprise.

### (3)    TARGETING AFRICAN-AMERICANS [*Temptation Island (2000)*]

267.    Beginning in at least January 2001 and continuing through the present, Defendant FOX and its production partners or production associates initiated a long-standing pattern or practice of *publicly* disqualifying African-American Reality TV show contestants.

268.    The NETWORK-ENTERPRISE-DEFENDANTS systemic pattern or practice manifests itself through pre-fabricated, carefully timed, and well-orchestrated mass media disqualifications of popular Reality TV show contestants to drum up media controversy and draw attention to the show.

269.    *Temptation Island* was a FOX Reality TV program aimed to test the fidelity of unmarried but long-established couples who were taken to a Caribbean resort, split up for two weeks and surrounded with attractive prospective partners.  At the conclusion of the series of broadcasts, contestants could elect to stay with their existing partner or go off with one of the island's single inhabitants.

270.    On January 10, 2001, Season One of *Temptation Island* premiered on FOX.

271.    The season finale of *Temptation Island* aired on February 28, 2001.

272.    Ytossie Patterson, then aged 34, and Taheed Watson, then aged 29, were both

aspiring actors who were among four couples featured on the program.  Ms. Patterson and Mr. Watson were the only African-American couple to be featured on *Temptation Island* and had been dating for almost six years.  They had a two-year-old son together.  Patterson and Watson were a photogenic couple and were actively recruited by the show's producers to participate in the program.  They agreed to participate in furtherance of gaining publicity for their acting careers.

273.   On Monday, January 29, 2001, about half-way through the series telecast, , FOX "leaked" to the press that the coming week's episode of *Temptation Island* would feature a "mini-scandal", a disqualification of one of the couples from the island. FOX publicists did not reveal the identity of which couple would be removed.

## (4)   DEFAULT  PRETEXT: "FAILURE TO DISCLOSE"

274.   FOX's purported justification for broadcasting public disqualifications of its Reality TV contestants is invariably based on FOX's alleged "failure to disclose" information pertaining to the contestant's personal background.  The disqualified contestant is then cast out before millions of viewers as a "liar".

275.   On Wednesday, January 31, 2001, Patterson and Watson were unceremoniously and abruptly disqualified from *Temptation Island* during an episode where the couple was confronted by producers on-air with the newfound "revelation" about their two-year-old child.  Patterson and Watson were presented by the FOX program as liars and manipulators who shamelessly concealed the existence of their child from Producers to advance their own selfish need to gain 15 minutes of fame.

276.   The January 31, 2001 episode marked the highest ratings *Temptation Island* had received in its first (and most successful) season in the wake of the well-publicized banishing of

Watson and Patterson.  The scandal helped propel *Temptation Island* to a 9.9 Nielsen rating, 22% share among adults aged 18-to-49, which was 13 percent better than the previous week's 18-to-49 score and the highest 18-to-49 figure for any FOX regular series at that time.  The ratings continued to climb on through to the finale, four weeks after the disqualification, making *Temptation Island* the most successful show on FOX that season.

277.   Defendant FOX issued a statement to the press stating that the couple had misrepresented their status by failing to disclose the existence of their two-year-old child. FOX stated that it was the network's policy "that no couples with children could participate in the show…. As soon as producers learned of the existence of the child, they notified the network and the decision was made to immediately remove them from further participation."

278.   FOX claimed that the background check agency engaged to vet all participants on FOX's unscripted series had failed to discover the existence of the couple's child.

279.   TV GUIDE, which is co-owned by Defendant NEWS CORP., the same parent company that owns FOX, reported that the "The [FOX] network's 'investigative' team apparently learned nothing from the *Who Wants to Marry a Millionaire* fiasco … That makes twice the Fox was outfoxed."

280.   Meanwhile, on February 8, 2001, entertainment critic Karla Peterson of the SAN DIEGO TRIBUNE countered:

> **In fact, FOX learned everything from Who Wants to Marry a Millionaire.  It's the rest of us who are still wearing our dunce caps . . . If the Temptation Island producers were really in the dark about Patterson and Watson's little bundle of joy, they are dangerously dumb . . . And if they did know, but went ahead with the shooting anyway, they are dangerously calculating . . . In the pragmatic world of entertainment, there are no accidents.  <u>But when you play with real life, there can be some real tragedies.</u>**

281.   After the *Temptation Island* episode featuring their disqualification was aired, Ms. Patterson and Mr. Watson were demonized by many of their friends and colleagues and found

themselves black-listed from acting auditions in Los Angeles. Their appearance on *Temptation Island,* and shocking disqualifications from the show, had clearly backfired.

## (5)   DEFAMATION SUIT VS. FOX [March 2001]

282.    On or about March 28, 2001, Ms. Patterson and Mr. Watson, the disqualified Black *Temptation Island* couple, filed a lawsuit against FOX and the show's producer, Rocket Science Laboratories, Inc. in Los Angeles Superior Court – Los Angeles County seeking compensatory and punitive damages for defamation and intentional infliction of emotional distress.

283.    In the civil lawsuit, the couple maintained that FOX and the Reality TV producers always knew that the couple had a young child and that their televised disqualification from the program was a cynical attempt to boost ratings for *Temptation Island.*

284.    Ms. Patterson and Mr. Watson stated that they fully disclosed the existence of their child during the casting process for *Temptation Island* – before taping began – but were told by FOX and the producers that admitting to the child was "the wrong answer."

285.    According to the complaint, Defendant FOX and the producers of *Temptation Island* further informed Ms. Patterson and Mr. Watson that the show needed a "good-looking black couple" to round out the cast and coached them not to discuss the child with anyone.

286.    In the days following the commencement of the lawsuit, a simple background check conducted by the LOS ANGELES TIMES uncovered a paternity suit regarding the birth of Patterson and Watson's son in 1999 that would have easily revealed the child's existence to producers. The LOS ANGELES TIMES concluded that based on their own basic investigative efforts, FOX either failed to conduct a background check or affirmatively chose to overlook the couple's status as parents.

287.    When the *Temptation Island* episode in which Ms. Patterson and Mr. Watson were disqualified was aired, the host of the program chastised the couple on-air for the alleged revelation, which the couple found to be highly condescending and humiliating. Moreover, the content aired was "edited and manipulated" to create the false impression that the couple had concealed their child's existence.

288.    As per the Complaint, "[t]he footage was edited to exclude plaintiffs' responses to the producer's accusations, and falsely portrayed plaintiffs as mischievous and immoral, that they had in fact concealed the existence of their own child and that they had nothing to say about it in the face of this disgraceful tongue lashing."

289.    Ms. Patterson and Mr. Watson also alleged that FOX and the Producer had acted with "malice, oppression and fraud" and that they "intentionally and/or recklessly shamed and maligned [the couple] to boost ratings for their show."

290.    As opposed to the positive publicity the Black couple anticipated by appearing on the FOX show, Ms. Patterson and Mr. Watson received "threats, profanity, epithets and expressions of moral indignation" from the millions of television viewers who saw the episode of *Temptation Island.*

291.    Within one year of filing their claims, it is reported that Defendant FOX settled the lawsuit out of court. [CDC_ 005536]

## E.    REALITY TV "CONTESTS"

## (1)    REALITY TV + GAME SHOW [May 2000]

292.    On May 31, 2000, the CBS network aired a Reality TV program called *Survivor*, which launched a U.S. ratings phenomenon that culminated in an August 2000 first season finale watched by a record 51 million television viewers.

293.   *Survivor* featured "real people," i.e. non-Union performers, who were selected by British Reality TV producers to be isolated together on a remote island and compete for $1 Million and other prizes.

294.   The *Survivor* series uses a system of progressive elimination, allowing the contestants to vote off other "tribe" members until only one final contestant remains and wins the title of "Sole Survivor."

295.   Although the format for *Survivor* was reportedly developed in 1992 by a British television show, its introduction to U.S. airwaves in the summer of 2000 has been marked as the beginning of the Reality TV Contest subgenre of reality-based programming.

296.   *American Idol* is within the scope and subgenre of reality-based programming commonly referred to in the United States as "Reality TV Contests."

## (2)   LITIGATING *SURVIVOR* [February 2001]

297.   On February 5, 2001, a former contestant of the first season of *Survivor*, Stacy Stillman, filed suit in San Francisco County, Superior Court against the producers of the show and CBS alleging claims for fraud, breach of contract and violation of Business and Professions Code section 17200. The crux of Stillman's claims was that the producer of Survivor, Mark Burnett, had manipulated the outcome of the contest by instructing other contestants on the show to vote Stillman "off the island."  [CDC_002311]

298.   Stillman alleged that producers of Survivor persuaded contestants Dirk Been and Sean Kenniff to vote for the elimination of Stillman, instead of contestant Rudy Boesch, a 72-year old former Navy SEAL. The purported reason for this manipulation was to ensure that *Survivor* would retain its older viewers, as Boesch was the only remaining contestant over the age of forty.  [CDC_002311].

299.    On February 20, 2001, and in response to Stillman's action, the producers of Survivor filed a separate lawsuit in Los Angeles alleging, among other claims, defamation and product disparagement. [CDC_002311].

### (3)    LITIGATING *BOOT CAMP* [March 2001]

300.    On March 28, 2001, FOX aired a Reality TV contest called *Boot Camp* which involved sixteen civilian contestants, known as recruits, participating in a real-life military style boot camp 24 hours a day.   The program employed a similar system of progressive elimination utilized by the *Survivor* show.  *Boot Camp's* production company also hired the producer of the first season of *Survivor* to serve as the director and executive of the new series.

301.    On or about April 10, 2001, CBS and Mark Burnett (the producer of *Survivor*), filed a lawsuit against FOX claiming that *Boot Camp* violated federal copyright law and California state law by mimicking significant elements of *Survivor*.  The Complaint alleged that: "All in all, aside from its military setting, the premise and format of *Boot Camp* are virtually identical to *Survivor*."

### (4)    MANIPULATING VOTES [June 2001]

302.    On May 7, 2001, FOX filed an Answer to CBS/Survivor's copyright infringement claim.  Portions of FOX's filed Answer made reference to the ongoing legal dispute between Stillman concerning the manipulation of contest results of *Survivor*.  See *Survivor Productions LLC v. Fox Broadcasting Company*, 2001 WL 35829270 (C.D. Cal. June 12, 2001) [Baird, J.].

303.    In its pleading, Defendant FOX averred that CBS/Survivor "have come to this court with unclean hands . . . [CBS/Survivor] have produced and operated *Survivor* by manipulating contestant voting in order to appeal to a desired audience and obtain a particular outcome."  See FOX Answer at 16, ¶ 55.

304.    Defendant FOX averred in its pleading that "This Court should refuse to entertain any proceedings brought by Plaintiffs to enforce an purported rights in their television program. By reason of the foregoing inequitable conduct on the part of the Plaintiffs, Plaintiffs are barred from recovery."  See FOX 6/07/01 Answer at 16, ¶ 60.

305.    In its pleading, Defendant FOX expressly recognized that "[a] manipulated, fictional show is an entirely different idea than a reality show; the two convey different tones, moods, and levels of tension to the viewer."  [CDC_002305]

306.    Defendant FOX averred that *"Survivor* held discussions with and suggested to more than one of the contestants how to cast their votes and otherwise influenced and manipulated the outcome of the voting.") [CDC_02303; CDC_02305]  See FOX 6/07/01 Answer at ¶ 5:8-12.

307.    Defendant FOX also alleged on the basis of the Stillman lawsuit that the television show *Survivor* was "contrived, that the *Survivor* contest was manipulated by one or more of the producers of *Survivor*, and that *Survivor* is not at all realistic."  [CDC_02303]

308.    In its pleading before the federal court, FOX further claimed that CBS/Survivor's conduct in allegedly manipulating the outcome of *Survivor* was a violation of the television contest "quiz show" statute, 47 U.S.C. § 509 ("Section 509").  FOX claimed that CBS/Survivor's violation of Section 509 highlighted the wrongfulness of the conduct forming the predicate of its unclean hands defense [CDC_02304; CDC_02306, fn. 3].

309.    On its motion to strike portions of the FOX Answer, CBS/Survivor contended that FOX's allegations in its 6/07/01 Answer relating to "contestant manipulation" should be stricken because they were irrelevant to the copyright infringement claim and to ENTERPRISE-DEFENDANTS' unclean hands defense. [CDC_02303]

310.   FOX countered that the manipulation allegations in the Answer were directly relevant to the CBS/Survivor's copyright infringement claim, "because they contradict Plaintiffs' contention that *Boot Camp* copies the 'reality' element of its *Survivor* series.  If Survivor is not a 'reality' program, FOX argued, then any 'reality' elements of *Boot Camp* cannot form the basis of Plaintiffs' copyright infringement claim."  [CDC_02303]

311.   FOX also argued that the contest manipulation allegations were an adequate basis for its unclean hands defense because FOX's allegations demonstrated that Plaintiffs were "wrongfully expanding their copyright into the genre of reality programming ***even though Survivor is <u>not</u> a reality series***." [CDC_02303]  (emphasis added).

# PRODUCTION BACKGROUND:
## *Pop Stars U.K and Pop Idol* (2000-2001)

## A.   SIMON FULLER

### (1)   19 ENTERTAINMENT

312.   Simon FULLER is a British national and music business executive who achieved great financial success through artist management of a mid-1990s U.K. musical group known as the *Spice Girls.*

313.   Defendant 19 ENTERTAINMENT, founded by Mr. FULLER in 1985, was or is the British-based company owned by FULLER that reportedly owns proprietary rights to the *American Idol* television brand, including the *American Idol* series in the United States and local adaptations of the television format which, collectively with *American Idol*, air in over 100 countries around the world.

314.   Defendant 19 ENTERTAINMENT generates revenue through such *Idol*-related content through the control of multiple revenue streams including, for example, television, music, sponsorship and merchandising, touring and artist management.

315.   Defendant 19 ENTERTAINMENT's principal operational and ownership interests are divided amongst multiple subsidiaries or entities under the control and dominion of 19 ENTERTAINMENT, including: 19 TV LIMITED (U.K.); 19 RECORDINGS LIMITED (U.K.); 19 MANAGEMENT LIMITED (U.K.); 19 TOURING LIMITED (U.K.); AND 19 MERCHANDISING LIMITED (U.K.).

316.   19 TV LIMITED (U.K.) owns two-thirds of the *American Idol* brand and coproduces the show in the United States with its partner, FREMANTLE, which owns the other

one-third of the *American Idol* brand. 19 TV LIMITED receives certain fees and revenues relating to the sublicensing of the brand and production and marketing of the shows based on the *American Idol* brand around the world, including licensing and producer fees.  19 TV LIMITED shares a percentage of the revenues FREEMANTLE derives from on-air sponsorships and sales of FREMANTLE branded merchandise.

317.   19 RECORDINGS LIMITED (U.K.) retains the right to sign long-term recording contracts with the winning artists and other finalists from the *American Idol* series in the United States.   For the first nine seasons of the program, Sony / BMG (owned in part by BERTELESMANN) served as 19 ENTERTAINMENT's record label partner with respect to *American Idol* artists in most major territories around the world.

318.   19 MANAGEMENT LIMITED (U.K.) has the right to manage the finalists and garner commissions for more than ten (10) years.

319.   19 TOURING LIMITED (U.K.) has the right to produce *American Idol* tours featuring the Contestants featured on the *American Idol* Production.

320.   19 MERCHANDISING LIMITED (U.K.) has the licensing and merchandising rights for the *American Idol* tours and in the United States and United Kingdom is jointly responsible for off air sponsorship of the televised programs.

## (2)   360° DEALS

321.   In 1998, Mr. FULLER purportedly devised the programming concept for what would become *American Idol*.   Mr. FULLER sought to develop a televised talent show for aspiring recording artists, presented to mass audiences, that he could utilize as a business platform to market undiscovered recording artists in "360° Deals"

322.   Mr. FULLER's talent show would facilitate the signing of "360° Deals" with

amateur, recording artists, who – as a condition precedent to performing in the talent show - would be required to grant 19 ENTERTAINMENT a percentage of ALL of their income, including sales of recorded music, touring & live appearances, merchandising, and movie rights, *in perpetuity*.

323.    In the music industry, a 360° Deal is a contractual relationship between a recording artist and a music industry company (or conglomerate of companies). The umbrella corporate entity agrees to provide financial support for the artist, including direct advances as well as funds for marketing, promotion and touring. The artist agrees to give the company a percentage of all of their income, including sales of recorded music, live performances and any other income.

324.    The 360° Deal business arrangement is an alternative to the traditional recording contract. During the first decade of the 21st century, revenues from recorded music fell dramatically and the profit margins traditionally associated with the record industry disappeared. The 360° deal reflects the fact that much of a musician's income now comes from sources other than recorded music, such as live performance and merchandise.

325.    Mr. FULLER's programming concept would enable him to *freely* procure the complete "penumbra" of proprietary rights and ownership interests that a young recording artist could possibly grant by virtue of written instrument.

## (3)    DECISION-MAKING

326.    With respect to FULLER's decision-making capacity regarding *American Idol*, he has publicly stated as follows:

> I have final say, but everyone feels a part of it," Fuller says. "That's what makes it a family.  It's pretty cool how it works…I'm a big-picture guy, and I'm always thinking about next year, or what's the next thing we can add to the show," he says. "I'm the only person who has crossed every level of 'Idol'-

-from the idea, to looking after the kids, to taking them on the road. So, I see it from inside, outside, front and sideways." **[CDC 05288; CDC_005290]**

## B.   NIGEL LYTHGOE

### (1)   CHIEF EXECUTIVE

327.   Defendant LYTHGOE is the senior British television executive who was retained by FREMANTLE and/or 19 ENTERTAINMENT to produce the *American Idol* show in the United States, from Season One (2002) through Season Eight (2009), Season Eleven (2012) and Season Twelve (2013).

328.   Defendant LYTHGOE operated as the show's chief executive producer and press spokesperson during all times relevant to this action.   Along with lifelong friend and co-executive Ken WARWICK, Defendant LYTHGOE managed the day-to-day operations of the *American Idol* Production. [CDC_005287]

329.   On or about June 9, 2013, about a month after the conclusion of Season Twelve, it was announced that Defendant LYTHGOE had been terminated from his position as an executive producer of *American Idol.*

330.   In describing the cultural impact that the *American Idol* television has had in the United States, Defendant LYTHGOE states:

> **"We've repackaged the 'American dream' and brought it back to this country" [CDC_005287]**

### (2)   *POP STARS U.K.* (2000)

331.   In 2000, LYTHGOE purchased the rights to an Australian show called "PopStars", which was ostensibly the inspiration for the U.K. version of *Pop Idol.*   [CDC_005284-85]

332.   Defendant LYTHGO served as a talent judge on the *Popstars* show and

established himself as a celebrity in Great Britain under the name "Nasty Nigel" for exhibiting tremendous cruelty in his statements directed towards aspiring young recording artists.

333.    On December 21, 2000, the Australian Associated Press reported that then U.K.-based television producer Defendant LYTHGOE was planning to adopt the Reality TV singing competition "*Popstars*", an Australian television show, for audiences in Great Britain.   The article reported that Defendant LYTHGOE claimed that he had bought the rights to the concept "*Popstars"* from the original Australian producers and referred to the program as a "docu-pop-u-tainment" show.  [CDC_005284]

334.    On January 10, 2001, *Popstars* debuted in the U.K.  The first season of the U.K. broadcast ran until March 18, 2001.

335.    The original UK series of *Popstars* was presented as a documentary, looking at the formation of a modern pop group from the auditions through to the first released single. Unlike *American Idol* (and *Pop Idol*), the outcome of the contest was not decided by public vote; rather, the panel of judges decided on which aspiring singers formed the group.

336.    In the spring of 2001, the show format for *Popstars* was also exported to the United States and aired on the WB Television Network

337.    *American Idol* and the *Idol*-related brands became a breakout success worldwide, the *Popstars* show largely disappeared from the airwaves due to poor ratings, except for in Germany where the show remained successful through 2010.

338.    In the same December 21, 2000 news article that announced the U.K. debut of *Popstars*, [CDC_005284-5285] the Australian Associated Press noted that the British tabloid press would be digging into the backgrounds of Reality TV contestants featured on the *Popstars* show:

"The British finalists can expect the celebrity-crazy British press to stake out their group house, find their families and dig into their pasts. They've already been asked to supply producers with police reports on them, available for STG10 ($A26) from local police stations."

339.   On December 1, 2000, Defendant LYTHGOE stated to the London press that each singing contestant featured in his U.K. version of the *Popstars* show would be required to disclose their criminal record to him. [CDC_005284-5285]

LYTHGOE: Like most shows now, we are asking people to give us a breakdown of their background and produce their criminal records. "

340.   After the first season of *Popstars* finished its series run in Great Britain, Defendant LYTHGOE was tapped by Defendant FULLER to produce the *Pop Idol* television program in 2001.

341.   LYTHGOE was thereafter appointed as senior executive producer of the *American Idol* Production.

## C.   KEN WARWICK

342.   From Season One (2002) through Season Twelve (2013), Defendant WARWICK co-managed the day-to-day operations of the *American Idol* Production.  [CDC_005287]

343.   Defendant WARWICK consistently refers to *American Idol* as "my show."

344.   Prior to joining Defendant LYTHGOE to produce *Pop Idol* in the U.K., Defendant WARWICK produced the television show "*Gladiators.*"

345.   On or about June 9, 2013, it was announced that Defendant WARWICK had been terminated from his position as an executive producer of *American Idol.*

## D.   FREMANTLE MEDIA

### (1)   *POP IDOL* [OCTOBER 2001]

346.    In the summer of 2001, 19 ENTERTAINMENT paired up with U.K.-based production company FREMANTLEMEDIA, LTD (FREMANTLE'S PARENT CO.) to produce the *Idol*-branded program in Great Britain under the name *Pop Idol*.

347.    In October 2001, the first season of the television show *Pop Idol* became a smash #1 hit in the U.K. combining the elements of the traditional televised talent show concept whereby contest winners were judged by a panel of experts in the live audience (e.g., *Star Search*); with (b) technological advances which enabled the televised viewing audience to participate in and (allegedly) determine the selection of the contest winners (via phone, texting and internet); and (c) sharp and witty commentary by the panel of music industry experts, most notably Simon Cowell.

### (2)   19TV / FREMANTLE PARTNERSHIP AGREEMENT [2001]

348.    After the success of *Pop Idol* in the U.K.*,* Defendant 19 ENTERTAINMENT, through its wholly owned subsidiary or division, 19 TV Ltd. ("19TV") entered into a worldwide partnership arrangement with FREMANTLE for the production and distribution of the *American Idol* and related *Idol* brands.

349.    Under the terms of this foreign partnership,  FREMANTLE retained the exclusive right to produce (or sublicense production) and distribute *American Idol* programs and formatted series throughout the world except in the United States, where 19TV co-produces the *American Idol* series.

350.    In addition to its joint ownership of the *American Idol* brand, 19TV has the right to receive certain fees and revenues relating to the sublicensing of the *American Idol* brand and

the production of television shows based on the *American Idol* brand and format around the world.

## (3)   FOX LICENSING AGREEMENT [April 2002]

351.   After its break-out success in the U.K. of *Pop Idol*, the producers again tried to pitch the *American Idol* concept to network executives in Los Angeles and were met with a more favorable reception.

352.   The Chief Executive Officer of Defendant NEWS CORP., Rupert Murdoch, reportedly called FOX network executives at the behest of his own daughter, who was a fan of *Pop Idol*, and demanded that FOX "green light" the show in Los Angeles.

353.   After the *American Idol* program was placed into pre-production in the United States, Mr. Murdoch personally participated in the initial meetings and demanded that the American version of *Pop Idol* be identical to the British version in every possible respect.

354.   On or about April 22, 2002, 19TV, FREMANTLE and FOX entered into a licensing agreement (the "FOX Licensing Agreement") whereby Defendant FOX obtained rights to air the *American Idol* Production in the United States.  [CDC_000027]

355.   Under the terms of the FOX Licensing Agreement, Defendant FOX is granted a perpetual and exclusive license, including the right of first negotiation and last refusal, to broadcast any non-scripted television programs featuring the *American Idol* brand or based on the *American Idol* format, or featuring contestants who appear in their roles as *American Idol* winners, intended for broadcast within the United States and its territories.

356.   In addition to license fees, Defendant FOX pays bonus fees to 19TV and FREMANTLE depending on where the *American Idol* series is rated and ranked in the 18-to-49 age demographic. 19TV and FREMANTLE each receive 50% of the ratings/rankings bonus,

with 19TV receiving its share directly from Defendant FOX.  [CDC_000037]

357.    Paragraph 12 of FOX Licensing Agreement also grants FOX an "approval right with respect to the key elements of the Series, including . . . contestants." [CDC_000063]

358.    FREMANTLE and 19TV reserve ownership rights to the copyright in the Series and Episodes.  [CDC_000049]

359.    In-house counsel for Defendant FOX, Minna Taylor and Marisa Fermin, negotiated and executed the FOX Licensing Agreement on behalf of FOX.  [CDC_000067]

# *AMERICAN IDOL*
## *Contest Format*

## A.    AN AMERICAN "CONTEST"

### (1)    CONTEST-IN-FACT

360.    On June 11, 2002,   FOX premiered the first season of the television show *American Idol*.

361.    *American Idol* has been characterized by the media and DEFENDANTS as a Reality TV Contest.

362.    *American Idol* is marketed, packaged, advertised and labeled by DEFENDANTS as a "contest" whose winner is determined by the televised viewing audience after a select number of semi-finalists (anywhere from 24 to 45) have been pre-selected by DEFENDANTS for U.S. audience voting consideration.

### (2)    CONTEST-AT-LAW

363.    As a consumer product marketed over federally-regulated airwaves bearing a USPTO-protected tradename,, the *American Idol* Contest is required by federal law to actually be what it purports to be.  Until Congress instructs otherwise, a contest cannot be advertised by a U.S.-based commercial enterprise as both a fiction and a fact.

364.    Plaintiffs aver that DEFENDANTS' multi-billion dollar product, i.e. a television show, should not be treated by the federal courts any differently than any other product introduced to the U.S. consumer market. There is not any separate statute enacted by any legislature within the United States that applies solely to Reality TV show purveyors.

ENTERPRISE-DEFENDANTS are subject to the same rule of law as any other industry that transacts business in interstate commerce.

365.    The purported *bona fide* contest depicted on the *American Idol* television show fails to meet the legal prerequisites necessary under state or federal law to market and advertise itself as a "contest", either at law or in fact.

366.    ENTERPRISE-DEFENDANTS fail to comply with the legal mandates for operating a *bona fide* contest because ENTERPRISE-DEFENDANTS (purportedly) retain the contractual right to unilaterally disqualify a contestant at any time for any reason in ENTERPRISE-DEFENDANTS' sole and absolute discretion, irrespective of any published contest rules and notwithstanding whether the contest has actually commenced.

367.    The *American Idol* contest fails to comply with the well-established federal and state statutory or common law mandates that govern rules applicable to contests, lotteries and sweepstakes must be brought into compliance immediately in order to protect the U.S. consumer market in general, and more specifically, the young American singers and songwriters who continue to be defrauded and commercially exploited in a foreign-originated system of human trafficking.

368.    The partial key to success in creating *American Idol* as a ratings juggernaut was squarely based on a conscious marketing effort by ENTERPRISE-DEFENDANTS, initiated in Season Two [2002-2003], to commercially advertise the criminal arrest information of top-ranking Black *American Idol* contestants featured on its program, including Corey Clark, Jaered Andrews, Donnie Williams, the Brittenum Twins, Akron Watson.

## B.  PUBLISHED CONTEST "RULES"

### (1)  ELIGIBILITY REQUIREMENTS

369.   ENTERPRISE-DEFENDANTS (purportedly) retain the contractual right to change the contest rules of the contest at any time in DEFENDANTS' sole discretion, even after the contest has begun.

370.   ENTERPRISE-DEFENDANTS (purportedly) retain the contractual right to refuse to make transparent or publish any of the basic rules governing *American Idol* contestant participation, including the terms and conditions set forth in lengthy, 100-plus pages of multiple contracts that Contestants sign without advice of independent counsel during their journey to the semi-finalist rounds.

### (2)  "RULES" GOVERNING DISQUALIFICATION

371.   ENTERPRISE-DEFENDANTS (purportedly) retains the contractual right to alter the value of the prize offered by ENTERPRISE-DEFENDANTS after the contest has already begun, or otherwise make the prize conditional on unforeseen requirements for additional consideration to be provided by the contestant.

372.   DEFENDANTS (purportedly) retains the contractual right to dispense with the public's voting results altogether and select the contest winner at the whim of ENTERPRISE-DEFENDANTS and its corporate sponsors.

373.   In *a bona fide* contest, the adverse action of disqualification must be based on grounds that contest rules have been broken.

### (3)  JUDGING CRITERIA

374.   U.S. consumers are induced by ENTERPRISE-DEFENDANTS to believe that the

Expert Judges of *American Idol* select which Contestants will advance to the Semi-Final Rounds.

375.    "Through the Hollywood Rounds, judges engaged by the show evaluate talent and make decisions on which contestants should advance."[4]

## C.    VOTING SYSTEM

### (1)    REPRESENTATIONS TO THE U.S. PUBLIC

376.    At all times relevant to this action, DEFENDANTS have publicly represented and advertised that from the outset of the Semi-Finalist rounds each season, the Contestants' advancement through the successive elimination rounds depends entirely upon the votes cast by the U.S. television viewing audience.

377.    "Once the Semi-Finalists begin the on-air competition, votes by the American public solely determine who continues to compete, who gets voted off, and eventually who will be named the American Idol."[5]

### (2)    LACK OF TRANSPARENCY AND ACCOUNTABILITY

378.    DEFENDANTS have <u>never</u> disclosed a complete show of votes to the public – broken down by votes tallied as per each contestant - in connection with any elimination round of *American Idol* contestants.

379.    The U.S. public has never been provided with a means to verify the accuracy of the voting results through an independent party or auditor.

---

[4] See Respondents' EEOC Position Statement, p. 7.

[5] See Respondents' EEOC Position Statement, p. 7.

## D.    ELEMENTS OF SKILL vs. CHANCE

### (1)    GAME OF SKILL

380.    The Chief Executive Officer of Defendant FREMANTLE, Cecile Frot-Coutaz, has publicly stated that the contest depicted in the television show *American Idol* is a mixed game of skill and chance:

> **It's partly a singing competition and partly a popularity contest, and that's why it's successful – because viewers relate with the contestants.**[6]

381.    To the extent that the contest depicted on *American Idol* can be deemed a *bona fide* contest pursuant to law, it constitutes a contest of mixed skill <u>and</u> chance.

382.    The element of skill required is a singing voice, the ability to command the stage and the ability to entertain a live audience.

383.    *American Idol* Contestants are required to exercise a degree of intellectual knowledge in terms of their selection of song choice for a particular episode.

384.    *The American Idol contest* could only be considered a game of skill where the performances of the Contestants are scored by the appointed Judges – and no other third party – based on an established set of criteria known to the Contestants before their entry into such contest.

385.    In a game of skill, the Contestant's background information or demographic profile are entirely irrelevant to determining whether such Contestant can claim victory and the prize.

### (2)    GAME OF CHANCE

386.    In order to win the Prize advertised in connection with the *American Idol* Contest,

---

[6]  Halperin, Shirely, AMERICAN IDOL: THE OFFICIAL BACKSTAGE PASS (CELEBRATING TEN YEARS), Introduction, <u>Abrams Books</u> (2011)

Contestants are subject to various, key conditions that reside completely outside of their control.

387.   The element of chance in the *American Idol* Contest is dictated in the first instance by Enterprise-Defendants's internal pre-selection process of the Semi-Finalist Contestants, which process not only includes the consideration of a Contestant's skill or mastery of their trade, but also factors in each Contestant's background information, age, sexual orientation, occupation, past occupation, criminal record, civil litigation record, religion, sex, national origin, race and ethnic background so as to determine whether the Contestant meets the target demographic of the Network-Enterprise-Defendants,   Production-Enterprise-Defendants or Sponsor-Enterprise-Defendants.

388.   The element of chance in the *American Idol* Contest is dictated in the second instance by (what purports to be) the popular vote of the U.S. public, who as a collective does not necessarily cast a vote for the Contestant exhibiting the highest level of skill.

## E.   CONTEST PRIZES

### (1)   ADVERTISEMENTS TO U.S. PUBLIC

389.   In Season One (June 2002), the official prize for winning *American Idol* was advertised by Enterprise-Defendants as a "$1 Million Dollar Recording Contract."

390.   Upon information and belief, at all times after the broadcast of Season One, Enterprise-Defendants did <u>not</u> advertise any cash value amount in connection with the prize awarded for winning American Idol, but rather stated that the victorious contestant would be awarded a "Major Label" recording contract.

### (2)   19 ENTERTAINMENT CONTRACTS

391.   The terms, conditions and actual cash value of the prize for winning the contest

depicted on *American Idol* (the "Prize") are NOT disclosed to U.S. consumers and prospective contestants as part of the marketing, promotions or advertisements in connection with the purported contest.

392.    The Prize for winning the *American Idol* Contest is represented, in part, by a series of written contracts that inure to the benefit of Defendant 19 ENTERTAINMENT, amongst other ENTERPRISE-DEFENDANTS and third party entities.   These agreements are collectively referred to herein as the "19 ENTERTAINMENT Prize Contracts."

393.    The 19 ENTERTAINMENT Prize Contracts require the contestant to grant all ownership rights, proprietary interests and talent services to 19 ENTERTAINMENT on a universal, perpetual, "360 degree" basis, i.e. with respect to each and every aspect of a recording artist's potential revenue streams, including but not limited to artist management commissions, recording royalties, publishing income, film production advances, touring revenue, merchandising receipts and featured attraction appearance fees.

394.    Each season, *American Idol* Contestants must advance to the Semi-Final Rounds or Finalist Rounds <u>before</u> the terms and conditions of the 19 ENTERTAINMENT Prize Contracts are disclosed.

395.    The 19 ENTERTAINMENT Prize Contracts are only disclosed to Contestants after they have been (purportedly) selected by the Expert Judges to perform in the Top 10 or Top 12 Finalist Round [Seasons One-Three] or the Top 24 or Top 36 Semi-Finalist [Season Four-Season Eleven].

396.    Once the terms and conditions of the 19 ENTERTAINMENT Prize Contracts are disclosed to Contestants who reach the Semi-Finalist or Finalist rounds, they are afforded 24-36 hours to execute more than 100 pages of complex commercial contracts without the benefit of

independent counsel or any opportunity for bargained-for-exchange.

397.    ENTERPRISE-DEFENDANTS extract every conceivable legal property right a young American recording artist owns or could potentially own in the future, such as the artist's copyright ownership in any musical works or performances and their rights to publicity in the artist's own name, likeness, image and identity, before the terms and conditions of the 19 ENTERTAINMENT Prize Contracts have even been disclosed.

398.    Failure to sign the 19 ENTERTAINMENT Prize Contracts as presented in the "eleventh hour" before public voting begins leads to automatic disqualification of the Contestant and removal from the Production, even though such Contestant has already rendered his services for the benefit of and conveyed his proprietary rights to ENTERPRISE-DEFENDANTS.

399.    In any given season, four to six months time passes between the date of a Contestant's first audition for *American Idol* and the date when the terms and conditions of the 19 ENTERTAINMENT Prize Contracts are disclosed to such Contestant.

400.    In the event that a Contestant seeks to negotiate the terms or conditions of the 19 ENTERTAINMENT Prize Contracts, ENTERPRISE-DEFENDANTS threaten to not only disqualify such Contestant, but also threaten to target such Contestant with a defamatory media campaign in the tabloid press based on any salacious or derogatory information that ENTERPRISE-DEFENDANTS obtained via their (illegal) background check process.

401.    To ensure that the targets of its commercial exploitation present zero resistance to signing the 19 ENTERTAINMENT Prize Contracts, ENTERPRISE-DEFENDANTS devise a carefully planned procedural mechanism to guarantee inequality in the recording artists' bargaining position.

402.    Contestants who are induced by ENTERPRISE-DEFENDANTS to participate in the

televised *American Idol* Contest are required to sign extremely complex 19 ENTERTAINMENT contracts through "Group Negotiation" sessions.

403.    Any Contestant who poses a substantive question about a contractual term within the "Group Negotiation" session is swiftly reprimanded by producers in front of his peers.  This tactic produces the "group peer pressure" needed by ENTERPRISE-DEFENDANTS to ensure that the 19 ENTERTAINMENT Prize Contracts are signed by the Contestants without any meaningful bargained-for-exchange.

404.    Defendant 19 ENTERTAINMENT also ensures that the Contestants are deprived at all times of the right of independent counsel.

405.    For the sake of appearances, ENTERPRISE-DEFENDANTS arranges to have their own U.S.-based attorneys represent both sides of the transaction between *American Idol* Semi-Finalists or Finalists, on one hand, and Defendant 19 ENTERTAINMENT on the other, such that the young recording artist is deprived of any meaningful opportunity to consult with real independent counsel.

406.    The legal fees of any attorney who is appointed by ENTERPRISE-DEFENDANTS to "serve" as the Contestants' counsel vis-à-vis the 19 ENTERTAINMENT Prize Contracts are paid for by 19 ENTERTAINMENT, the very same company to whom the Contestants are contractually bound (for life), or other members of the ENTERPRISE-DEFENDANTS conspiracy.

## F.    REASONABLE EXPECTATIONS

## (1)    GOOD FAITH BELIEF (CONTESTANTS)

407.    Plaintiffs in this action were audience members of the *American Idol* Production before they eventually became *American Idol* Contestants.

408.    Plaintiffs were solicited to enter into a singing talent contest promoted and

advertised by ENTERPRISE-DEFENDANTS to the American public as a "talent contest" and/or "singing competition" for a valuable prize.

409.    DEFENDANTS have at all times maintained to the public that *American Idol* is a *bona fide* contest for a valuable prize where - beginning from the Semi-Final Rounds each season - the voting public determines the outcome of the contest.

410.    Plaintiffs are all natural-born U.S. citizens whose core perception of the world is based on everyday experiences, common knowledge, education, logical decision-making and personal knowledge of experiential facts derived from having been reared in the American system of ordered liberty.

411.    Plaintiffs were entitled to rely on their common knowledge and experiences as U.S. citizens, as well as the extensive advertising campaigns promoting the *American Idol* Contest, to enter into what they believed to be a *bona fide* "talent contest" and/or "singing competition" where the winner would be decided upon their individual performance merit in their chosen profession of singing.

412.    At all times during their participation as Contestants in the *American Idol* Contest, Plaintiffs believed in good faith that they were participating in a *bona fide* contest to win a valuable prize.

413.    By entering into DEFENDANTS' contest, Plaintiffs acted upon their personal knowledge and common held belief that *American Idol* represented, first and foremost, a *bona fide* talent contest-in-fact whereby the most meritorious singer and performer, as adjudged by a qualified panel of music industry experts and by the American public at large, would be rewarded a valuable prize for winning the contest.

**(2)**   ***B****ONA* ***F****IDE* **C****ONTEST**

414.   The term "bona fide", as used in its ordinary sense, means to be presented in good faith, without deception or fraud.  Synonyms of the term *"bona fide"* include "real," "honest," "sincere," "lawful," "legal," "genuine," "honest," "authentic," "veritable," "true."

415.   Antonyms of the term *"bona fide"* include "spurious," "deceitful," "false," "fraudulent," "untrue."

416.   The formation of Plaintiffs' good faith belief that *American Idol* represented a *bona fide* contest was at all times based on their ordinary, common knowledge of what a "contest" means in American society.

417.   In American society, a contest is *bona fide* if and only if:

(a)   it rates the skills, artistic merit or craftsmanship of one individual as against the skills, artistic merit or craftsmanship of other individuals who have entered the identical contest;

(b)   the rules governing the contest and the procedures used to determine the winner of the contest are deemed fair and reasonable;

(c)   the rules and regulations of such contest are published in advance of the contestant's decision to enter into the contest;

(d)   the contestants who are declared eligible to enter the contest have a vested right to compete for the prize as advertised;

(e)   the rules and regulations governing a contest are applied by the contest promoter / sponsor in good faith, without discriminatory intent, and consistent with the reasonable expectations of the contestants.

**(3)    BAD FAITH UNDERTAKING (PROMOTER / SPONSOR)**

418.    In U.S, a talent contest is presumptively invalid –where the winner of the contest is <u>not</u> determined by a panel of judges appointed to score the contest and/or by the tallied vote of a participating audience who is invited to rank the contestants

419.    In America, a contest without any immovable rules is presumptively invalid.

420.    In America, a talent contest is undertaken in bad faith - and therefore not a *bona fide* contest at all – where the contest promoter and/or contest sponsor:

> (a)    retains the absolute, unfettered discretion to eliminate (or advance) any contestant at any time after the contest has begun,
>
> (b)    makes arbitrary decisions affecting the participation of a contestant without any deference to the judges' scoring criteria or audience choice;
>
> (c)    unilaterally disqualifies a contestant without justification and/or for reasons unrelated to the contestant's performance in the contest;
>
> (d)    unilaterally changes the rules of the contest after it has begun so as to affect the outcome of the contest;
>
> (e)    unilaterally disqualifies a contestant in order to affect the outcome of the contest;
>
> (f)    determines the outcome of the contest based on the economic interests of the promoter/sponsor rather than the performance of the contestant, as ranked by the judges or audience choice;
>
> advertises to the American public what purports to be a *bona fide* contest but which is in actuality a scripted, fictional account of a contest;
>
> (f)    engages in conduct that contradicts the fundamental

doctrines of fairness and reasonableness that are implied in every American-based contest of skill, chance, or mixed skill and chance.

(g)    fails to provide the contestants with material information needed to adjudge whether entry into the contest is worth the contestant's effort and /or risk;

## (4)    NO APPRECIATION OF RISK

421.    Plaintiffs here agreed to enter into a talent contest to compete for a valuable prize based on their individual merit as singers.  Plaintiffs did not at any point voluntarily agree to subject their names, likenesses or identities to the dangerous conditions or hazards that currently impair their proprietary rights.

422.    Upon entering the talent contest sponsored by DEFENDANTS, none of the Plaintiffs named in this action had any knowledge of the particular risk that their names and reputations would be permanently defamed by ENTERPRISE-DEFENDANTS and its media affiliates – repeatedly and continuously- throughout the course of their entire lives.

423.    Upon entering the talent contest sponsored by ENTERPRISE-DEFENDANTS, none of the Plaintiffs named in this action could have possibly appreciated the magnitude of having their names, livelihoods and reputations subject to defamatory campaigns, permanently available on the internet, that would come to impact their entire lives.

# CONTESTANT SOLICITATION

## A.   OFFER OF EMPLOYMENT

### (1)   MARKET SOLICITATION

424.   At all times relevant to this action, DEFENDANTS promoted and advertised the *American Idol* Contest to the U.S. consumer market as a *bona fide* talent contest for a valuable prize.

425.   Plaintiffs each were solicited by DEFENDANTS to enter into what DEFENDANTS publicly advertised to the U.S. consumer market as an opportunity to appear on a national television show through live exhibition of Plaintiffs' singing talent.

426.   At all times relevant to this action, DEFENDANTS actively solicited the personal talent services and live appearances of Plaintiffs for the purpose of commercially exploiting - throughout the world and into perpetuity – Plaintiffs' unique personal appearances and state property rights to publicity as embodied by each Plaintiff's name, voice, image, persona, likeness, personal background and identity.

427.   Plaintiffs each met ALL of the eligibility requirements published by ENTERPRISE-DEFENDANTS prior to Plaintiffs making their personal talent services available to DEFENDANTS.

428.   In response to DEFENDANTS' solicitation to U.S. consumers, Plaintiffs each attended Open Auditions, during their respective seasons of *American Idol*, which were promoted and organized by DEFENDANTS at a time and place specified in advance by the employers.

429.   Upon Plaintiffs' attendance at the Open Auditions, ENTERPRISE-DEFENDANTS held a "cattle call" audition in which each Plaintiff was repeatedly selected by ENTERPRISE-

DEFENDANTS' junior and senior producers in succession over a multiple-day period.

## (2)   "GOLDEN TICKET"

430.    Based on their individual merit as young, talented American singers, each Plaintiff earned a position to perform in front of the resident *American Idol* Judges in their respective seasons.

431.    After Plaintiffs each rendered their live talent services for evaluation by the *American Idol* Judges, Plaintiffs each were adjudged <u>qualified</u> by virtue of their respective singing and performance abilities to enter the Prize Contest in Los Angeles, California.

432.    As a result of being adjudged qualified to compete in California, ENTERPRISE-DEFENDANTS issued each of Plaintiffs, at different times relevant to this action, a Golden Ticket to Hollywood.

433.    The Golden Ticket (Season Two) reads in part:

> "CONGRATULATIONS! YOU HAVE MADE IT TO THE NEXT ROUND OF AUDITIONS, WHICH WILL BE HELD IN HOLLYWOOD, CALIFORNIA…AN INFORMATION PACKET WILL BE MAILED TO YOU WITHIN 10-14 BUSINESS DAYS.  THIS PACKET WILL INCLUDE ALL THE ANSWERS TO YOUR QUESTIONS …. YOU ARE <u>OFFICIALLY</u> ON YOUR WAY TO BECOMING THE NEXT AMERICAN IDOL!"

434.    Plaintiff's on-air acceptance of the Golden Ticket awarded by DEFENDANTS' judges signified Plaintiffs' assent to making their unique talent services available to DEFENDANTS within the State of California, in the first instance.

435.    Plaintiffs' acceptance of the Golden Ticket demonstrates Plaintiffs' assent to make their talent services available in the State of California at a place and time specified by ENTERPRISE-DEFENDANTS and for the economic benefit of ENTERPRISE-DEFENDANTS.

436.    At all times relevant to this action, because DEFENDANTS intended to solicit

Plaintiffs to enter the State of California to perform talent services within the State of California for DEFENDANTS' economic benefit and under ENTERPRISE-DEFENDANTS' direct control and supervision, Plaintiffs are entitled to the statutory protections afforded by California labor laws, which are applicable to ENTERPRISE-DEFENDANTS' conduct as an employer (and/or prospective employer).

## B.   CONTESTANT AGREEMENT

### (1)   PRE-REQUISITE TO HOLLYWOOD

437.    Before DEFENDANTS bear the expense of transporting each Golden Ticket Holder to Los Angeles, California, Plaintiffs were required to execute certain documents and transmit them back to the ENTERPRISE-DEFENDANTS, including an "AMERICAN IDOL CONTESTANT AGREEMENT" and a "PARTICIPATION BACKGROUND INFORMATION FORM".  These key documents are part of the "Information Packet" expressly referred to in the Golden Ticket.

438.    In Season Two (2002-2003), PRODUCTION-DEFENDANTS caused to mail and/or fax to Plaintiff Andrews and Plaintiff Clark the AMERICAN IDOL CONTESTANT AGREEMENT just a few short days prior to their scheduled flight to Los Angeles, California to participate in the Hollywood Rounds.

439.    From Season Three (2003) through Season Nine (2010), in the days prior to flying to Los Angeles, California to participate in the Hollywood Rounds, PRODUCTION-DEFENDANTS caused to mail, e-mail and/or fax to Plaintiffs Williams, Watson, Daniels, T. Brittenum, D. Brittenum, Joyner and Golightly documentation consisting in part of both the AMERICAN IDOL CONTESTANT AGREEMENT and the PARTICIPANT BACKGROUND QUESTIONNAIRE FORM.

440.    Execution of the non-negotiable instrument AMERICAN IDOL CONTESTANT AGREEMENT was a pre-requisite to being transported by ENTERPRISE-DEFENDANTS to the State of

California for the performance of Plaintiffs' respective talent services.

441.    Written completion of the PARTICIPANT BACKGROUND QUESTIONNAIRE FORM by Plaintiffs was a pre-requisite to being transported by Defendant-Employers to the State of California for the rendering of Plaintiffs' respective talent services.

442.    At all relevant times, ENTERPRISE-DEFENDANTS collectively referred to the PARTICIPANT BACKGROUND QUESTIONNAIRE FORM and the AMERICAN IDOL CONTESTANT AGREEMENT in writing as the "Participant Application."

## (2)    PURPOSE OF CONTESTANT AGREEMENT

443.    As per paragraph A.1 of the AMERICAN IDOL CONTESTANT AGREEMENT:

> **"the principal nature and purpose of the Program is to produce a television program in which a competition will be conducted (the "Competition") to search for and select a recording artist." [AICA_02, ¶A.1; CDC_00189]**

444.    The AMERICAN IDOL CONTESTANT AGREEMENT is purportedly binding upon each Plaintiff as a "contestant," on the one hand, and the "Producer", on the other hand.

445.    "Producer" is defined in the AMERICAN IDOL CONTESTANT AGREEMENT as "[Defendant] American Idol Productions, Inc. (AIP), or its designees (together with their respective parent, assigns, subsidiaries and affiliated companies, individually and collectively)."

446.    "Network" is defined in the AMERICAN IDOL CONTESTANT AGREEMENT as "[Defendant] FOX Broadcasting Company."

447.    With the exception of Defendant CARCO, all of the ENTERPRISE-DEFENDANTS named in this action fit within the broad definition of "Producer" or "Network" as those terms are expressly set forth in the AMERICAN IDOL CONTESTANT AGREEMENT.

## (3)    LANGUAGE INDICATING INTENT TO EMPLOY

448.    The AMERICAN IDOL CONTESTANT AGREEMENT contains language that, when

subject to reasonable interpretation, conveys EMPLOYER-ENTERPRISE-DEFENDANTS' intention to enter into a common law employment relationship with Plaintiffs, whereby EMPLOYER-ENTERPRISE-DEFENDANTS retain the absolute right to control the details of how, when and where the Plaintiffs' talent services are to be performed for the economic benefit of ENTERPRISE-DEFENDANTS.

449.   *AMERICAN IDOL* CONTESTANT AGREEMENT (Season Two) provides as follows:

**Paragraph 1 ("Nature of Services")**

If I am selected by Producer to be a contestant on the Series, <u>I agree to be available</u> to participate as a contestant in connection with the production of the Series in Los Angeles, California, <u>as and to the extent required by the Producer</u>." [AICA v.2, ¶1]

I understand and acknowledge that the principal nature and purpose of the Series is to produce a television, program in which a competition will be conducted (the "Competition") to search for and select a music recording artist. If I am selected by Producer to be a contestant on the Series, <u>I agree to be available to participate as a contestant in connection with the production of the Series in Los Angeles, California, as and to the extent required by the Producer</u>, <u>commencing on a date to be determined by Producer and continuing until the completion of my participation on the Series as required by Producer</u>. <u>I further agree to be available and to participate as, when and where Producer may require</u> in connection with publicity, interviews, promotional appearances on behalf of sponsors and similar matters (for example, to appear on news shows, talk shows and other programs, including other Network programs, <u>and to make other appearances as required by Producer</u>) in connection with the Series, or otherwise, as, <u>when and where designated by Producer in its sole discretion</u>." [AICA v.2, ¶ A.1]

**Paragraph 3 ("Publicity and Promotion")**

<u>I agree that for a period commencing on the date of this Agreement and continuing for twelve (12) months following the date or which the Series episode announcing the winner of the Competition is first broadcast, if and when requested by Producer, I shall remain available</u>, subject to existing professional commitments or other commitments, for publicity interviews, publicity photograph sittings, photographs, on-the-air and other publicity activities and for appearances in one (1) or more special programs in connection with the Series." [AICA_02, ¶ C.2]

450.   With respect to ENTERPRISE-DEFENDANTS' direct control and supervision over the means and manner of Plaintiffs' services as a Contestant, the contractual language employed in

later iterations of the AMERICAN IDOL CONTESTANT AGREEMENT (e.g., Season Eight) is

substantially similar to language employed in the early seasons of the Production, such as Season

Two.

451.    The Season Eight version (2010) of the AMERICAN IDOL CONTESTANT AGREEMENT

provides as follows:

> **Paragraph 1: Nature of the Program; Availability**
>
> **If I am selected by Producer to be a contestant on the Program, I agree to be
> available on an exclusive basis to participate as a contestant in connection
> with the production of the Program in the Los Angeles, California area, or any
> other location required by Producer, as and to the extent required by Producer,
> commencing on a date to be determined by Producer and continuing until the
> completion of my participation on the Program as required by Producer. I
> further agree to be available and to participate as, when and where Producer
> may require in connection with publicity, interviews, promotional
> appearances on behalf of sponsors and similar matters (for example, to appear
> on news shows, talk shows and other programs, including other Network
> programs, and to make other appearances as required by Producer) in
> connection with the Program, or otherwise, as, when and where designated by
> Producer in its sole discretion… [AICA v.8, ¶ A.1]**

452.    As a condition of employment in the State of California, ENTERPRISE-
DEFENDANTS required that Plaintiffs would need to suspend any separately established business
or occupation in order to be employed by ENTERPRISE-DEFENDANTS.

453.    At all times after being awarded a Golden Ticket, ENTERPRISE-DEFENDANTS
required that Plaintiffs' talent services could not be made available to other contractors,
purveyors or employers in the same field of business.

## C.    HOLLYWOOD ROUNDS

454.    Upon individually arriving to the State of California for Hollywood Week, each
Plaintiff (save for Watson) were immediately placed under the direct control and daily
supervision of EMPLOYER-ENTERPRISE-DEFENDANTS.After Plaintiff has arrived for Hollywood

week, the EMPLOYER-ENTERPRISE-DEFENDANTS have the absolute right to control how the Plaintiffs' services will be performed.

455. At all times relevant to Plaintiffs' participation in the filming of the Production for televised broadcast, EMPLOYER-ENTERPRISE-DEFENDANTS exercised dominion and control over the manner and means in which Plaintiff performed the required services.

## (1) LOCATION / PLACE OF WORK

456. During Hollywood Rounds, ENTERPRISE-DEFENDANTS specified the place of work in which each Plaintiff was required to perform talent services and make personal appearances.

457. During Hollywood Week, the place of work was centralized at CBS Studios in Los Angeles, California, but also included excursions in or about the Los Angeles County area.

458. During Hollywood Week and all rounds thereafter, ENTERPRISE-DEFENDANTS exercised control over the location and place of work where Plaintiffs' services were to be rendered.

459. Even during times when the Contestants were not providing their talent services, ENTERPRISE-DEFENDANTS conducted unannounced "room checks" to determine whether the Contestants had any "surprise" or unauthorized guests in their rooms.

460. Plaintiffs each engaged in mandatory media appearances under the control and direction of the ENTERPRISE-DEFENDANTS, including for charity events and commercial sponsor advertisements.

461. While competing in the Hollywood Rounds, and with respect to further rounds as well, Plaintiffs were not permitted to leave the main studio production facility without being accompanied by security.

**(2)    HOURS / SEQUENCE OF WORK**

462.    During Hollywood Rounds and all rounds thereafter, ENTERPRISE-DEFENDANTS exercised control over the number of hours worked each day by Plaintiffs.

463.    During Hollywood Rounds and all rounds thereafter, the scheduling of activities and work tasks was organized by ENTERPRISE-DEFENDANTS

464.    During Hollywood Rounds and all rounds thereafter, ENTERPRISE-DEFENDANTS exercised control over the sequence of work to be performed by Plaintiffs.

465.    Plaintiffs had a curfew with respect to sleeping hours.

466.    Plaintiffs were forbidden to talk to any celebrities or anyone of note because it "violated" their rules of conduct while Contestants were staying in the hotel.

**(3)    TOOLS, MATERIALS AND EQUIPMENT**

467.    At all relevant times, ENTERPRISE-DEFENDANTS supplied the tools, materials, and equipment necessary for the provision of Plaintiffs' talent services and live performances, including but not limited to a microphone, a list of pre-licensed compositions to sing, a wardrobe, hair & makeup, a television production studio, a performance stage and a cell phone.

468.    The *tools, material and equipment* necessary or Plaintiffs to render their services are addressed in the *AMERICAN IDOL* CONTESTANT AGREEMENT whereby contestants acknowledge that the Producers:

> directly and/or through independent contractors, will provide various services and equipment in connection with the Series and its contestants. These services and equipment may include, but are not limited to: the operation and management of the sites the Series; air and other travel in connection with the Series; transportation to, from and about the sites of the Series; provision of hotel or other accommodations; provision of food, water and equipment for Series events; training for my participation in the Series; supervision of other activities related to the Series: and medical, psychological and first aid services.  I acknowledge that neither Producer nor any contractor or employee

providing equipment or services in [AICA, ¶ D1.]

469.    At all relevant times, ENTERPRISE-DEFENDANTS controlled the song selection process and made the final decision with respect to song selection for each of the Contestants based on what ENTERPRISE-DEFENDANTS described as appropriate "demographics".

470.    Plaintiffs were at all times forbidden to use any of their social media accounts, which were confiscated during the duration of the Production.

## (4)    EXCLUSIVITY

471.    At all relevant times, ENTERPRISE-DEFENDANTS exclusively control the manner and means through which Plaintiffs render their talent services for the benefit of ENTERPRISE-DEFENDANTS.

472.    At all relevant times, EMPLOYER-ENTERPRISE-DEFENDANTS controlled the terms and conditions under which Plaintiffs, upon reaching the Finalist Rounds, are required to join the labor union, AFTRA, as "principal performers".

473.    ENTERPRISE-DEFENDANTS' intention to establish exclusive control over the talent services to be provided by Plaintiffs is dispositive of ENTERPRISE-DEFENDANTS' intention to form an employment relationship with Plaintiffs.

474.    The AMERICAN IDOL CONTESTANT AGREEMENT conveys ENTERPRISE-DEFENDANTS' intention to form an *exclusive* employment relationship with Plaintiffs.

> **Paragraph 2 ("Services Exclusive")**
>
> **"I agree that during the Exclusivity Period, I shall not appear on or authorize production of or participate in any way with any other television programming, radio programming, print media, on-line services, or any other media outlet** now known or hereafter devised, **or in any commercials or advertisements without Producer's and/or 19 Management Ltd.'s prior written consent."** [AICA_02; ¶ C.2; CDC_000193]

475.    Pursuant to the terms of engagement with ENTERPRISE-DEFENDANTS, the work to

be performed by Plaintiffs (i.e., singing and performing in front of live audiences) requires a particular skill that must be performed live and in person by each Plaintiff.

## (5)   RISK OF PROFIT / LOSS

476.   At no time are Plaintiffs required to make a substantial capital investment in the ENTERPRISE-DEFENDANTS' business or businesses as a part of the employment transaction.

477.   For ENTERPRISE-DEFENDANTS' commercial purposes, the Artists' personal talent services are possessed of their greatest economic value for exploitation as of the date and time of live performance, under circumstances to be determined in this case *at the sole discretion* of the ENTERPRISE-DEFENDANTS.

478.   Upon entering into the employment relationship with Plaintiffs, ENTERPRISE-DEFENDANTS lead Plaintiffs to believe that there will be no direct compensation for their participation in the Production of the Contest, but ENTERPRISE-DEFENDANTS do manifest an intention to *advance,* i.e. loan, things of material benefit material benefits-in-kind and privileges to Plaintiffs as required for Plaintiffs to discharge their obligations of performance, such as for the payment of travel expenses, meals, hotel accommodations and free soft drinks, clothing and cell phones.

479.   Despite their misrepresentations to Plaintiffs during the making of the employment relationship, ENTERPRISE-DEFENDANTS are possessed of superior knowledge – at all times unknown to Plaintiffs - that Plaintiffs are scheduled to receive material economic benefits in kind and cash compensation in exchange for their personal talent services (once being qualified by the Judges to compete in the Semi-Finals and Final rounds).

## (6)   ORDINARY COURSE OF BUSINESS

480.   All of the services performed by Plaintiffs during their participation in the

American Idol Contest was commissioned and directed by EMPLOYER-ENTERPRISE-DEFENDANTS as part of EMPLOYER-ENTERPRISE-DEFENDANTS' ordinary and regular business activities in the U.S. marketplace.

## D.    SEMI-FINAL ROUNDS

481.    Once the *American Idol* Semi-Finalists are selected, ENTERPRISE-DEFENDANTS require Contestants to complete a W-9 Form that needs to be executed by each Contestant in order to receive cash compensation.

482.    A W-9 form is used when a company has made a determination that the person they are paying is an independent contractor (rather than an employee).

483.    A W-9 form is generally used to obtain the correct name and taxpayer identification number of the worker.

484.    The Semi-Finalist Contestants are instructed to complete a W-9 form as a pre-requisite to continuing their participation as Contestants in the Semi-Final Rounds, even though the *AMERICAN IDOL* CONTESTANT AGREEMENT specifically states that Contestants are NOT to be deemed independent contractors [AICA_02, ¶ F.7; ¶ G.7]

485.    All Semi-Finalists are presented with a series of written agreements prepared by the law firm MANATT, PHELPS & PHILLIPS, 11355 West Olympic Blvd., Los Angeles, California 90064.

486.    With respect to Seasons Eight and Season Nine, the 19 ENTERTAINMENT Agreements consist of: (1) Exclusive Recording Agreement w/ 19 RECORDINGS LTD. (approx. 57 pages); (2) 19 TOURING AGREEMENT (approx. 7 pages); (3) 19 MERCHANDISING LTD. (approx. 9 pages); (4) 19 MANAGEMENT LTD. (approx. 7 pages);  (5) TOURING AGREEMENT (*American Idol* Live) (approx. 7 pages); (6) *American Idol* Attraction (approx.. 7 pages).

487.    EMPLOYER-ENTERPRISE-DEFENDANTS also transmit to Semi-Finalist Contestants a series of agreements arranged by Creative Artists Agency (CAA).

488.    These CAA agreements include the Artists Contract-Services, for a period of three (3) years, an AFTRA Standard Exclusive Agency Contract Under Rule 12-C and an AFTRA Commercials Exclusive Agency Contract Under Rule 12-C, each of which carries a term of eighteen (18) months.

## E.    FINAL ROUNDS

489.    By the time any Contestant reaches the Final Rounds, their legal status as employees is memorialized via completion of a Form I-9 Employment Eligibility Verification that lists Defendant AMERICAN IDOL PRODUCTIONS, INC. as Plaintiff's employer.

490.    Finalists are also made to sign a series of "Employment Deal Memos", a "Standard AFTRA Engagement Contract", and an AMERICAN IDOL PRODUCTIONS, INC. "Production Personnel Deal Memo" which describes Plaintiffs as an "employee."

# CONTESTANT ALLEGATIONS

# Season One:
# DELANO CAGNOLATTI

## A.    PUBLIC DISQUALIFICATION [July 1, 2002]

491.    Delano Cagnolatti was the first *American Idol* contestant to ever be publicly disqualified from the show.  Mr, Cagnolatti is African-American.

492.    Mr. Cagnolatti is NOT a Plaintiff in this action.

493.    However, facts surrounding Mr. Cagnolatti's disqualification are relevant to establishing ENTERPRISE-DEFENDANTS' pattern or practice of unlawful activity.

494.    On Monday, July 1, 2002, Defendant FOX reported to news media that one of the Semi-Finalists for *American Idol* (top 30 out of 10,000+) had been disqualified for "failing to disclose" his real age.  The network stated that the culprit would be identified on Wednesday's broadcast.

495.    On Tuesday, July 2, 2002, ENTERPRISE-DEFENDANTS caused to broadcast taped footage of ENTERPRISE-DEFENDANTS LYTHGOE and WARWICK in the process of disqualifying Delano Cagnolatti, an African-American Semi-Finalist, by surprise on national television.

496.    Cagnolatti's actual age at the time of his disqualification was 29, even though ENTERPRISE-DEFENDANTS' published eligibility rules stipulated that contestants needed to be between 16 and 24 years old.

497.    The purpose of the recorded meeting was for ENTERPRISE-DEFENDANTS LYTHGOE and WARWICK to accuse Cagnolatti of being a liar, to publicly humiliate him and to disqualify him from the Contest.  [NY POST (7/3/2002); CDC_000076]

498.    ENTERPRISE-DEFENDANTS claimed that they were unable to detect Cagnolatti's

birthdate at an earlier date because Mr. Cagnolatti allegedly "doctored his driver's license when he applied to be on the show." [CDC_000076]

499.    Upon information and belief, numerous contestants over the course of the last eleven years have misrepresented their age during the audition process for *American Idol*, including many white and non-Black contestants.  However, no other white or non-black contestant in the history of the Series was ever confronted on national television about such misrepresentation, nor otherwise publicly disqualified.

500.    ENTERPRISE-DEFENDANTS, upon allegedly discovering the misrepresentation made by Mr. Cagnolatti about his age, could have simply eliminated him behind the scenes, without the need to publicize his disqualification.  Moreover, having already been qualified by the Judges to compete in the Semi-Finalist round, it is questionable whether ENTERPRISE-DEFENDANTS' disqualification of Mr. Cagnolatti was appropriate.

501.    Upon information and belief, Defendant FREMANTLE and/or Defendant FOX knew Mr. Cagnolatti's actual age before he was ever advanced to the Semi-Finals and intentionally chose to overlook this fact for the specific purpose of staging Mr. Cagnolatti's disqualification on national television for "dramatic effect."

## B.    DISPARATE TREATMENT

502.    As evidence of their personal racial *animus* and/or stereotyped thinking about African-Americans, ENTERPRISE-DEFENDANTS LYTHGOE and WARWICK decided from the very first Season of *American Idol* to consciously convey a message to nationwide U.S. audiences that Black *American Idol* Contestants could not be trusted and deserved to be punished. Conversely, ENTERPRISE-DEFENDANTS LYTHGOE and WARWICK decided that any white or non-black contestants who misrepresented their age – or any other aspect of their personal

background - during the audition process were either eliminated quietly "behind-the-scenes" and without any fanfare, or were otherwise permitted to remain in the Contest despite such representation.

503.    Commenting on Mr. Cagnolatti's disqualification, Scott Grogin, FOX's vice president of corporate communications, stated: "There is a challenge to vetting reality shows.  If somebody wants to get on TV bad enough, they are going to find a way . . . but the further a contestant goes, the more detailed the checks become.  People who provide false information usually get caught." [CDC_000085]

504.    On July 3, 2002, the ALBANY TIMES UNION reported on the Cagnolatti story and claimed that "An independent firm conducts background checks for FOX."   [CDC_000085]

# Season Two:
# JAERED ANDREWS

## A.    PRE-HOLLYWOOD

## (1)    CLASSIC OVER-ACHIEVER

505.    Jaered Neale Andrews, born October 31, 1978, is an African-American singer from Austintown, Ohio.

506.    As a high school and college student, Jaered represented the classic over-achiever, succeeding across the board in academics, athletics, and musical performance.

507.    In academics, Jaered made the list for National Honor's Society; Who's Who Among American High School Students; President's Honor Roll All 4 Years of College Prep. He was awarded a Full Academic Scholarship to Ohio State University (1997) as an Honor Student 3.86 GPA; Spelling Bee Champion; and Participant in SB-140 For Academically

Advanced Students.

508.   In athletics, Jaered's accomplishments were equally impressive: Who's Who Among American High School Athletes; Mahoning Valley All-Star Dunk Contest Runner-Up; Record Holder for Long Jump at Lowellville Local High School; State Track Meet finalist in 100m dash, 200m dash, 4x100m relay, Long Jump (6th place); Mahoning Valley Track & Field MVP (1997); ICL Boy's All-Star Basketball 1st Team; State Honorable Mention Basketball (1997); Varsity Basketball Co-Captain; and Varsity Letterman

509.   Jaered was also a music prodigy: Winner of Youngstown's Annual City-Wide Talent Show; Lead Singer of Hip-Hop Band Ordinary People's (which opened up for acts such as Wyclef Jean, The Roots, G-Love & The Special Sauce; Lowellville's Sweetheart's Dance-King; and Mahoning Valley Singing Star Competition Champion.

510.   When Jaered auditioned for American Idol in the fall of 2002 during the Season Season auditions, he impressed the resident Judges and his fellow Season Two contestants with a unique, dynamic singing voice and stage presence.

## (2)   OPEN AUDITIONS [October 31-November 4, 2002]

511.   Jaered Andrews auditioned for *American Idol* after he had won the #1 position at an "Idol Regional" competition in Ohio.   His local victory enable him to skip the "cattle call" round at Open Auditions in Nashville, Tennessee, which were held on October 31, 2002.

512.   After performing for the resident *American Idol* judges Simon Cowell, Paula Abdul and Randy Jackson, Plaintiff Andrews was awarded a Golden Ticket to Hollywood.

## (3)   ACT OF SELF DEFENSE  [November 16, 2002]

513.   On Saturday, November 16, 2002, Plaintiff Andrews attended a bar called the Blue Ribbon Grille located at 731 Broadway Ave., Farrell, Pa. to meet with some friends.

During Andrews' time at the bar, an inebriated man named Thomas E. Blakely openly harassed Plaintiff Andrews about his African-American heritage and sexual orientation. Blakely, in his drunken state, also attempted to fondle a woman in Andrews' company who had temporarily passed out at the bar. When Andrews complained about Mr. Blakely's conduct to the bar owner, he was ignored.

514.    Jaered Andrews had been waiting at the bar for a car ride to pick him up. When Andrews' car finally arrived at the Blue Ribbon Grille, he exited the bar and was followed outside by Mr. Blakely. Mr. Blakely was swearing and hurling epithets at Plaintiff Andrews and others in his company, letting Andrews know that Blakely was planning to fight him right there in the parking lot outside of the bar.

515.    Shortly after the yells began, Mr. Blakely quickly approached Andrews, who stood his ground. As Blakely thrust forward, closing in on Andrews' physical space, Andrews tapped a right-handed punch to Blakely's face, which connected and sent Mr. Blakely falling backwards towards the ground, where he hit his head on the pavement.

516.    After Mr. Blakely fell to the ground, it was apparent that he was barely conscious. However, the brother of Andrews' long-time partner, J. Allen, flew from out of nowhere and began to kick Blakely's head and face repeatedly. Mr. Allen became enraged upon learning that Mr. Blakely had attempted to fondle a young woman whilst she lay unconscious.

517.    As a result of the altercation, Mr. Blakely was pronounced dead at the hospital later that evening, having died from blunt force trauma to the head. [CDC_002080].

518.    J. Allen was arrested and charged with aggravated assault the night of Blakely's death. [CDC_002583]. Plaintiff Andrews was not arrested because witnesses at the scene corroborated that Jaered had acted in self-defense after Mr. Blakely's unprovoked attack.

**(4)   POLICE INTERVIEW AND RELEASE [November 18, 2002]**

519.    On Monday, November 18, 2002, at approximately 1:40 pm, local police called Jaered Andrews at his home and asked him to voluntarily make an appearance at the police station to be interviewed by Sgt. Riley Smoot of the Southwest Regional Police Department.

520.    At Jaered's visit to the police station on November 18, 2002, Andrews was NOT arrested, nor processed, nor fingerprinted by police – he was simply questioned by a detective, Sgt. Smoot, about his involvement.  During that November 18, 2002 interview with Sgt. Smoot, Plaintiff Andrews stated that he had hit Mr. Blakely one (1) time in self-defense.  [CDC_002080]

521.    As of November 18, 2002, Sgt. Smoot credited Plaintiff Andrews' version of events, whereby he explained that Mr. Blakely's physical attack outside came entirely unprovoked. Jaered's statements were corroborated by multiple witnesses to Blakely's death, and the decision was therefore made by police officers not to arrest or charge Andrews with any crime.

522.    Shortly after the incident took place, it was clear to the local police officers and detectives at the Southwest Regional Police Department that Jaered Andrews had simply acted in self-defense – as any reasonable person would have done in that position - and had no intention to cause Mr. Blakely serious harm via one punch, let alone any intention to cause Mr. Blakely serious harm or death.  The prosecutors instead focused their case on Mr. Allen.

## B.   CONTEST PARTICIPATION

**(1)   HOLLYWOOD WEEK [December 2002]**

523.    On or about Monday, December 9, 2002, Plaintiff Andrews flew to Los Angeles, California at ENTERPRISE-DEFENDANTS' expense to compete in Season Two of Hollywood Week.

524.    During Hollywood Week, Plaintiff Andrews reportedly was one of the only

contestants to receive a standing ovation from all three *American Idol* Judges (Jackson, Cowell, Abdul) at once in response to his performance.

525.   On or about December 13, 2002, after successfully competing in each round, Jaered Andrews was chosen by the *American Idol* judges as one of the Top 32 Semi-Finalist contestants for Season Two.

## (2)   FOX GLOBAL SECURITY [December 2002]

526.   On or about December 14, 2002, shortly after being selected as an *American Idol* Semi-Finalist, Plaintiff Andrews was summoned to a closed interview by representatives of "FOX Global Security".   The interview took place in a hotel room where Jaered was staying at the expense of ENTERPRISE-DEFENDANTS.

527.   During this interview, Andrews met with Sharon Renee Giallo ("GIALLO") who reviewed Mr. Andrews' background information and asked questions pertaining to Mr. Andrews' criminal record.

528.   It was explained to Andrews that GIALLO was conducting background checks for the show's contestants.  Andrews met with GIALLO personally while in Hollywood.

529.   Mr. Andrews also recalls speaking to members of the "FOX Global Security" team in early-mid January of 2003 by telephone, but he does not presently recall the identity of the person with whom he spoke.

530.   Plaintiff Andrews does not recall disclosing any information about the November 16, 2002 incident on any of the written background forms administered by ENTERPRISE-DEFENDANTS.

531.   Because Andrews had anticipated testifying at trial in connection with Mr. Blakely's death, and worried about potential scheduling conflicts, he disclosed to GIALLO and

"FOX Global Security" representatives the circumstances surrounding Mr, Blakely's death, revealing to GIALLO that he had witnessed the death of a man in a November 16, 2002 bar brawl.

532.   Andrews further explained to GIALLO that he had hit Mr. Blakely in self-defense with one punch.  Andrews explained that the man fell backwards and an associate of Andrews named Jerrold Allen proceeded to kick the man's head.   Mr. Blakely was later pronounced dead at the hospital.

533.   During his in-person and/or telephone calls with GIALLO and her team of investigators for "FOX Global Security," Plaintiff Andrews made clear to GIALLO that he had NOT been arrested nor charged with any crime in connection with Blakely's death.   He explained that he might be called in as a witness to testify and he wanted the *American Idol* producers to know about the incident in case of any scheduling conflict.

534.   Plaintiff Andrews explained to GIALLO that he was never arrested for any crime because the police detectives believed Andrews had truly acted in self-defense after interviewing him personally and hearing from corroborating witnesses at the scene.

535.   At the time of his background interview on or about December 14, 2002, GIALLO assured Plaintiff Andrews that his witnessing of Blakely's death would not create any conflict and thanked Andrews for disclosing the incident.

536.   After Hollywood Week, Plaintiff Andrews flew back to Youngstown, Ohio on or about December 16, 2002 to await the Semi-Final rounds in Los Angeles, which were scheduled to begin in Los Angeles, California on February 5, 2003.  He remained very excited about the prospect of competing for a major recording contract.

537.   During the month of January 2003, while back in Youngstown, Plaintiff Andrews

did not receive any communications from Sgt. Riley Smoot or any other member of the local police department or prosecutor's office in Mercer County, Pennsylvania.

## C.    DISQUALIFICATION

### (1)    REPORTS OF JAERED'S DISQUALIFICATION [January 30, 2003]

538.    On or about January 31, 2003, just days before Plaintiff Andrews was scheduled to depart for Los Angeles, California to compete in the Semi-Final rounds, Producers of *American Idol* publicly announced to USA TODAY and TV GUIDE that Jaered Andrews had been disqualified from the show.  [CDC_000321].

539.    USA TODAY reported as follows: "De-idolized: An American Idol finalist was replaced after a Fox background check.  On Wednesday, viewers saw Jaered Andrews of Youngstown, Ohio, become one of the 32 finalists.  But on Thursday, Fox said Andrews had been replaced by George Trice of Jackson, Tenn.  Andrews is a former member of Youngstown-based hip-hop band Ordinary Peoples." [CDC_000321]

540.    Defendant FOX claimed to USA TODAY that Jaered Andrews' former membership in a local hip-hop group *Ordinary Peoples*, a local, un-signed group which had disbanded several years before Andrews' audition for the show, was grounds for Plaintiff Andrews' disqualification.  [CDC_000321]

541.    On February 1, 2003, the MIAMI HERALD reported the reason for Plaintiff Andrews's disqualification as follows: "In other Idol news, one of Wednesday's 32 finalists - Jaered Andrews - has been disqualified, reports TV Guide Online, after a Fox background check revealed him to be a former member of the Ohio-based hip-hop band Ordinary Peoples. [CDC_002566]

542.    TV GUIDE is owned by Defendant NEWS CORP.

543.     On February 11, 2003, ENTERPRISE-DEFENDANTS back-peddled on the reason for Jaered's disqualification, as USA Today reported that Plaintiff Andrews had been "replaced earlier for undisclosed reasons."  [CDC_003778].

544.     On February 24, 2003, the St. Paul Pioneer Press reported that Jaered Andrews was "Evidently disqualified from "American Idol" for already having a music career." [CDC_002578]

## (2)    NOTICE OF DISQUALIFICATION [January 31, 2003]

545.     On or about Friday, January 31, 2003, an unidentified man from "FOX Global Security" telephoned Plaintiff Andrews at his home in Youngstown, Ohio to notify Andrews that he had been officially <u>disqualified</u> from the Series and that Andrews would no longer be welcome to fly to Los Angeles, California to compete in the Semi-Finalist rounds of Season Two of *American Idol.*

546.     Plaintiff Andrews, who was taken completely off guard by the news of his disqualification, asked the FOX representative to state the reason for his disqualification; however, the ENTERPRISE-DEFENDANTS' representative said he was unable to provide any reason and then quickly hung up the phone.

547.     Plaintiff Andrews immediately telephoned the offices of Defendant AIP and Defendant FREMANTLE, but nobody would take his phone call.

548.     After receiving notification of his disqualification from Defendant FOX, Plaintiff Andrews immediately then called the local police detectives in Mercer County, Pennsylvania, including Sgt. Riley Smoot, and asked whether he had been charged with any crimes in connection with the November 2002 incident.   The local police detectives assured Plaintiff Andrews that no charges had been filed against him, nor were there any plans to file any charges

at that time.

549.    Plaintiff Andrews nonetheless remained emotionally distraught and called many of his fellow *American Idol* contestants who were scheduled to appear in the Semi-Final rounds the following week, asking if they had any further information about the reason for Andrews' disqualification.  Those contestants who answered his calls had no idea.

550.    Jaered spent the next 4-5 days making repeated unanswered calls to ENTERPRISE-DEFENDANTS FREMANTLE and Defendant FOX, as well as to the other contestants who had earned a spot in the Semi-Final rounds.

551.    As news of his disqualification spread, Plaintiff Andrews told WKBN-TV of Youngstown, Ohio that he thought he was dropped from the show for "witnessing" Blakely's death.  Andrews reportedly told the station that he was with some friends "when I happened to witness someone getting killed."  [CDC_002609]

552.    By February 5, 2003, the date when Semi-Finals were to begin, Plaintiff Andrews finally resigned himself to the fact that he had been permanently rejected from the show, despite having been selected as a Semi-Finalist.  He never received so much as a courtesy call from any member of the *American Idol* production staff or any network executive.

553.    Plaintiff Andrews' opportunity to become the next *American Idol,* which he had earned "fair and square" through his individual performance talent and hard work*,* had been abruptly eradicated for reasons that he could not possibly understand.

554.    Out of more than 70,000 hopefuls that year, Jaered Andrews had been selected by the celebrated *American Idol* Judges as 1 out of 32 to compete for the public vote.

555.    After leaving Hollywood Week on December 14, 2002, he was confident that he could win the entire contest, particularly having received the only standing ovation from all three

judges during Hollywood Week, including from Simon Cowell who rarely, if ever, gave standing ovations to *American Idol* contestants.

556.    At the time of being selected to compete in the Semi Finals on or about December 14, 2002, Plaintiff Andrews believed that *American Idol* represented a true "once-in-a-lifetime" opportunity to make his dreams as a professional singer and musician come true.  But the "rush" of having a new world of possibility open to him through music was swiftly contravened by the unexpected news concerning his abrupt disqualification from *American Idol.*

557.    ENTERPRISE-DEFENDANTS' unexpected decision to disqualify Plaintiff Andrews on or about January 31, 2003 caused Plaintiff Andrews to experience feelings of hopelessness, despair and severe emotional distress which continue through present day.  But at that point, Jaered Andrews' nightmare as a participant in the *American Idol* Series was only beginning.

## (3)    WARRANT FOR JAERED'S ARREST [February 27, 2003]

558.    On or about Thursday, February 27, 2003, about a month after receiving word of his disqualification via telephone from ENTERPRISE-DEFENDANTS, Jaered Andrews was sitting at home watching Defendant FOX's Local News television channel when he quite suddenly saw his full name "Jaered Andrews" scrolling horizontally along the bottom of the television screen.

559.    The scrolling news ticker stated that Jaered Andrews, a former *American Idol* Semi-Finalist contestant, was a "*wanted fugitive on the run*" and that police were seeking his whereabouts to arrest him in connection with the death of Thomas Blakely (even though Blakely's death had taken place on November 16, 2002, more than three months earlier).

560.    Andrews was perplexed by the FOX News report.  How could he be a *"wanted fugitive on the run"* if he was sitting at home watching television?  If the local authorities were looking for him, any police detective such as Sgt. Riley Smoot simply could have picked up the

phone and called Andrews at home.

561.    At no time prior to the "fugitive" report on FOX local news station was Andrews contacted by Sgt. Riley Smoot or anyone from the local police department in Mercer County, Pennsylvania about any charges being filed against him.

562.    For premeditated "dramatic effect", Andrews was simply declared a "fugitive on the run" by Defendant FOX's news stations.

563.    Jaered Andrews promptly turned himself in to the police after seeing his name advertised on Defendant FOX's local station as a "fugitive on the run."

564.    It was only then, in late February 2003, more than three months after the incident with Mr. Blakely took place and more than three months after Plaintiff Andrews had been interviewed by police detectives and cleared of any wrongdoing, that Andrews found himself being arrested and charged with a misdemeanor crime.

565.    On Thursday, February 27, 2003, a police detective (not a prosecutor) charged Andrews with one misdemeanor count of <u>simple assault</u>.

566.    The following Monday, March 3, 2003, *The Smoking Gun.com* published a three-page copy of the Mercer County, PA criminal complaint filed against Plaintiff Andrews, as well as a mugshot of Andrews and an autopsy report.  [CDC_002077-78].   *The Smoking Gun* article continues to be posted on-line.

567.    Upon information and belief, the fact of Jaered Andrews' criminal record information, as reported and posted in the March 3, 2003 web article, was transmitted to THE SMOKING GUN.COM directly by EMPLOYER-ENTERPRISE-DEFENDANTS.

568.    THE SMOKING GUN.COM article described the Blakely incident in detail, and further explained that the public <u>now</u> knew why Plaintiff Jaered Andrews had been kicked off

the show. [CDC_002077-78].

## (4)   RE-PUBLICATION OF FALSE AND DEFAMATORY REPORTS

569.   The news of Andrews' arrest and ENTERPRISE-DEFENDANTS' reason for disqualification spread through national media by the time most outlets had reported the story, the message was as follows: that Semi-Finalist Jaered Andrews was disqualified from *American Idol* after Producers learned of his arrest for killing a man in a barfight.  Therefore, the clear implication in the media was that Andrews had been disqualified for "failure to disclose" his arrest.  This notion, of course, is factually impossible because Andrews was disqualified a full four weeks before he was ever arrested or charged with any crime.

570.   The false material fact published by EMPLOYER-ENTERPRISE-DEFENDANTS. that Jaered Andrews was disqualified from *American Idol* only after EMPLOYER-ENTERPRISE-DEFENDANTS"learned" of his arrest for assault charges has been repeatedly memorialized and re-published in the press, from the time of Andrew's disqualification in January 2003 through the present day.

571.   On February 4, 2004, MTV NEWS reported that "*Last season the judges advanced Jaered Andrews to the final 32 but kicked him off when FOX learned of his arrest on assault charges in connection with a bar fight that ended with a man's death.*"  [CDC_000827]

572.   On February 5, 2004, the NEW YORK POST (owned by Defendant NEWS CORP.) reported that "Last season, for instance, Jaered Andrews made it to the finals, but was booted when officials learned he'd been arrested on assault charges connected to a bar fight in which a man died." [CDC_000831]

573.   None of the ENTERPRISE-DEFENDANTS has ever taken steps to correct the media's publication of false material facts regarding Plaintiff Andrews' arrest and disqualification.

574.     As a matter of public record, the statement that Plaintiff Andrews was disqualified by EMPLOYER-ENTERPRISE-DEFENDANTS only after the Producers and Network had learned of his arrest is objectively false.

575.     Plaintiff Andrews was not arrested or charged with any crime until a full month after his official disqualification from *American Idol* on or about January 31, 2003.

576.     Media outlets covered the late February / early March 2003 story of Andrews' arrest but the only reporter at the time who recognized the bizarre sequence of events that would have led *American Idol* Producers to disqualify Plaintiff Andrews for a crime which he had <u>not</u> been arrested for - let alone charged with - was Bill Bastone, founding editor of *The Smoking Gun.com.* [CDC_002077-78]

577.     The only plausible explanation for Plaintiff Andrews' disqualification from *American Idol*, which was heavily publicized by EMPLOYER-ENTERPRISE-DEFENDANTS. only after Andrews had been arrested and charged on February 27, 2003, is that EMPLOYER-ENTERPRISE-DEFENDANTS *knew* a full month in advance that Plaintiff Andrews was going to get arrested in Pennsylvania and charged with a crime that he never committed.

578.     Plaintiff Andrews avers on information and belief that GIALLO, or investigators from "FOX Global Security" acting under her direction, communicated directly with Sgt. Riley Smoot and/or other government officials in charge of Plaintiff Andrews' criminal case and that such communications took place <u>before</u> Jaered Andrews was arrested and charged with the crime of simple assault on February 27, 2003.

579.     EMPLOYER-ENTERPRISE-DEFENDANTS intentionally targeted Jaered Andrews for public disqualification from *American Idol* because of their racial animus concerning young black males.

580.     EMPLOYER-ENTERPRISE-DEFENDANTS. consciously decided to exploit Andrews' criminal record as a form of advertising and promotion for the Production and the Enterprise, all the while trafficking in pernicious stereotypes about Black males.

## (5)   COMPLETE ACQUITTAL [November 12, 2003]

581.   On or about November 12, 2003, after Plaintiff Andrews testified before a jury of twelve peers that he had acted in self-defense against a belligerent man who had been harassing Andrews' female companion, it took *less than two hours* for the jury to acquit Jaered Andrews of the simple assault charge.  [CDC_002640; CDC_002650-51]

582.   When Plaintiff Andrews left the courtroom the day of his acquittal, he had expected to see some *American Idol*-related news reporters or cameras there to document his vindication.   He figured with all of the media fanfare surrounding his arrest the previous February, he would have received some press attention now that he had been fully acquitted.

583.   But as Jaered Andrews left the courthouse that day - an innocent man -  no one from the press was there to greet him, no one was there to congratulate him.  The news of his acquittal made a few local newspapers and reality TV blogs but was otherwise barely noticed.

584.   When describing Jaered Andrews, the author of the badmouth.ent article claimed that Plaintiff Andrews had "Killed a Man" [CDC_002674] and then summarized Jaered's legacy as follows:

> Idol producers quickly cut Jaered Andrews from the show claiming he already had a record contract. But the truth was that Andrews was out celebrating being selected for the season two semifinals, when a customer sexually harassed a female friend of Andrews who had passed out in the bar. Andrews gave the guy one punch, knocked him over and he was killed instantly when his head hit the pavement. Andrews was charged with and later acquitted of assault. No murder or manslaughter charge was ever filed, because it was clear to prosecutors he had no intention of killing anyone. <u>Out of everyone on the list, I feel most sorry for Jaered, who made a single mistake that he will have to live with for the rest of his life.</u>

**Where is he now? No information**.

585.     Jaered Andrews did not make a "mistake" when he punched Mr. Blakely on the night of November 16, 2002.  Consistent with his acquittal by jury, Mr. Andrews simply did what any other reasonable person would have done when acting to defend one's person from physical transgression by an unprovoked attacker.

# Season Two:
# FRENCHIE DAVIS

## A. PRE-HOLLYWOOD

586. During Season Two [2002-2003], Franchelle "Frenchie" Davis was a 23-year-old African-American female contestant on *American Idol* and a student at Howard University (on leave at the time of her audition).

587. On October 24-28, 2002, Frenchie auditioned in New York City and was one of 35 singers at the Open Auditions to receive a Golden Ticket.

588. According to Simon Cowell's 2003 autobiography, Frenchie Davis was one of the early favorites to win Season Two. [CDC_004157]

> **The first one to catch our eye [in New York] was Frenchie Davis, a big black woman with her hair dyed blond. She was calm and serene but had a little smile on her face, as if she knew something chat we didn't. Which she did. She knew that she could sing, and the second she opened her mouth we knew it, too. She was absolutely stunning, and the three of us turned to one another and said, "This girl's going to win the competition." She was that good. Frenchie told us that she had made it to the auditions only because her college had bankrolled her trip. She had people who believed in her, and she believed in herself as well; when we told her she was coming through to the next round, she didn't even blink. She knew what she had.**

589. Frenchie was noted for her plus-size frame, powerful voice, and beautiful, all-encompassing spirit. During her limited tenure on the show, she drew comparisons to American singing legend Aretha Franklin.

590. During Hollywood Week, Frenchie Davis consistently received rave reviews from the Judges.

591. On Friday, December 13, 2002, Frenchie Davis was selected as a Top 32 Finalist.

592. On or before December 20, 2002, as a part of the extensive, multi-tiered background check process administered by ENTERPRISE-DEFENDANTS, Ms. Davis disclosed to

*American Idol* producers in writing that she had taken topless photos for an erotic website when she was a teenager, some four years before her 2002 audition.

593.     Frenchie Davis disclosed the details of her erotic photos <u>in writing</u> on page 11 of the PARTICIPANT BACKGROUND QUESTIONNAIRE FORM.

594.     In early-mid January 2003, a representative from Defendant AIP and/or Defendant FMNA visited Frenchie's residence in California and wanted to talk in greater detail about the topless photos.

595.     Upon information and belief, the ENTERPRISE-DEFENDANTS' agent was GIALLO, who wanted to know whether Frenchie had any copies of the topless photos or where they could be located on-line.

596.     Neither Frenchie nor the ENTERPRISE-DEFENDANTS' representative could find the erotic photographs on-line.  Frenchie explained that the website had been taken down and purchased by another adult entertainment company.  Frenchie was not able to find any of the topless photos and, to this day, has not recovered them.

## B.     DISQUALIFICATION

597.     On Friday, January 31, 2003, when ENTERPRISE-DEFENDANTS announced that Jaered Andrews was disqualified from the Contest, Frenchie also became very concerned that she might also get disqualified.

598.     On Monday, February 3, 2003, just a day before the Semi-Final rounds were scheduled to begin with the telecast of Group #1, Frenchie received a call from producer Patrick Lynn who advised that Frenchie's performance, originally scheduled for the following day, would be pushed back until  February 25, 2003 (Group #4).  Lynn said the producers wanted to "save the best for last."  Frenchie continued to grow anxious.

599.    One week later, on the afternoon of Monday, February 10, 2003, Frenchie Davis received a frantic call from her sorority sister from Howard University, who was at the time working at PEOPLE magazine in New York City.  Frenchie learned from her friend that she had been disqualified from *American Idol* and that there was a "smear campaign" in the works. Frenchie's worst fears had been confirmed.

600.    About an hour later, ENTERPRISE-DEFENDANTS' agent Patrick LYNN called Frenchie and summoned her to meet with ENTERPRISE-DEFENDANTS' senior executives at CBS Studios in Los Angeles.  Present at the meeting were Defendant LYTHGOE, Defendant WARWICK and Patrick LYNN.  Defendant LYTHGOE did the talking.

601.    Defendant LYTHGOE told Frenchie that they had received "blackmail" threats from some undisclosed third party who claimed to be in possession of Frenchie's erotic photos and who threatened to post the photos on-line unless Frenchie was disqualified from the show.

602.    As a result of the alleged blackmail threats, Defendant LYTHGOE claimed that ENTERPRISE-DEFENDANTS "had no choice" but to disqualify Frenchie from the *American Idol* Contest.

603.    Defendant LYTHGOE explained that *American Idol* was a "family show" with "family sponsors" and they couldn't risk the media fallout from exposure of the photos.

604.    The idea that the Sponsor-ENTERPRISE-DEFENDANTS FORD, COCA-COLA and AT&T played a role in the decision to disqualify Frenchie Davis was echoed by many of the other decision makers at the time.

605.    On February 13, 2003, Defendant LYTHGOE was quoted in the media as stating that the producers had to be careful in selecting contestants because *American Idol* was a "real family show." [CDC_3796]

606.    Simon Cowell, in his 2003 autobiography, confirmed that the "family sponsors" played a significant role in the decision to disqualify Frenchie Davis.  [CDC_4157].  Cowell wrote that he had received a call one day from Defendant LYTHGOE:

> "Simon," [Lythgoe] said, "we have a problem." Frenchie Davis, one of the odds-on favorites, had posed for an adult Web site some years before. Now her pictures had been discovered, and Nigel and Kenny thought she might have to be removed from the show. I thought it was a tough call. <u>As a record executive, I would keep her in. But if I was in Fox's shoes, protecting a billion-dollar brand, I didn't think 1 would risk offending family sponsors.</u> There were subtler issues at play as well: At the auditions Frenchie had made it quite clear that she was trying to better her life, and I wondered if maybe we weren't sending the wrong message by kicking her off. To Fox's credit, they spent weeks agonizing over the decision. Bur in the end they decided that she would have to go.

607.    The NEW YORK DAILY NEWS explained that *American Idol* had to disqualify Frenchie Davis because it "has a squeaky-clean image that has made it more appealing than other reality fare to big-name advertisers such as [ENTERPRISE-DEFENDANTS] Ford, Coca-Cola and AT&T."

608.    Davis remarked years later that ENTERPRISE-DEFENDANTS "had decided that because *American Idol* was a family show, that they could not have me on the show because of the pictures I had taken – though they had never seen the pictures." [CDC_003855]

609.    On Tuesday, February 11, 2003, approximately a full eight weeks after Ms. Davis had first submitted her written background information form disclosing the history of the topless photos, ENTERPRISE-DEFENDANTS announced Frenchie's unceremonious disqualification from *American Idol* to the national media.

610.    A spokesperson for Defendant FOX told USA TODAY, which first reported Davis' disqualification on Tuesday, February 11, 2003 at 7:31 p.m., the singer would be replaced on the February 25, 2003 telecast. [CDC_003778]

611.    On February 12, 2003, ENTERTAINMENT WEEKLY on-line [CDC_003786-88]

reported that:

> Frenchie Davis, the plus size, neon-haired, full-voiced "American Idol" semifinalist, has been removed from competition, USA Today reports, because she has acknowledged to the producers that she worked for a porn website four years ago. Fox says she'll be replaced during the Feb. 25 episode.
>
> There was no official word from Fox as to the nature of the 23-year-old singer's work for the unnamed website, or why it was grounds for dismissal when Nikki McKibbin, who acknowledged having worked in strip clubs, was allowed to remain in last year's contest and ended up in the top three.
>
> A Fox spokesperson told EW.com that the 23-year old singer had not violated the show's eligibility requirements, but noted that <u>the rules allow the producers to remove contestants at their discretion</u>.
>
> Meanwhile, all traces of her have already been expunged from the "Idol" website.

612.    In the weeks following Frenchie's disqualification, media outlets reported that she had been disqualified for "failing to disclose" the existence of the photos.  [CDC_002621]

> And of course there was the Frenchie kiss-off, with Fox booting 23-year-old Franchelle "Frenchie" Davis from "American Idol" because she had posed topless for a Web site known as "Daddy's Little Girls" under the name "HoneyBrown." Although Frenchie was of legal age when she posed for the pics, ics, Fox dumped her because, unlike Trenyce, she hadn't informed them of the potentially embarrassing news in advance.

613.    On February 12, 2003, David Bloomberg wrote for www.FoxesonIdol.com: [CDC_003792]

> It will certainly be interesting to see how this situation is addressed. But the fact of the matter remains that one of the potentially biggest stars of this season has been eliminated because of something she did four years ago in order to raise money to get back to college – something that has nothing to do with her ability to sing or to be the next American Idol.

614.    USA TODAY reported weeks after her disqualification that "Davis still sounds pained by her forced Idol exit. 'I will never be happy about what happened. I can move on, I can accept it, but I will never be pleased about it.' [CDC_003810]

615.    On February 13, 2003, *The Smoking Gun.com* published an article entitled "Porn Past Sinks American Idol Finalist" in which the New York-based tabloid website revealed

intimate details from an un-named "TSG Source" that described the nature of Davis' erotic photos. [CDC_002071].

616.    Upon simple deduction and belief, ENTERPRISE-DEFENDANTS was the "TSG Source" that purposefully disseminated Frenchie's background information to *The Smoking Gun.com.*

617.    At the time of Frenchie Davis' disqualification, many observers wondered why Frenchie had been disqualified for topless photos whereas Nikki McKibbon, the third-place contestant from Season One of *American Idol*, was NOT disqualified after it was revealed that she had worked in several clubs as a stripper.  [CDC_003781-82].

## C.    DISPARATE TREATMENT

618.    In February 2007, four years after Frenchie Davis was publicly disqualified by ENTERPRISE-DEFENDANTS, photos of a white *American Idol* female Semi-Finalist contestant named Antonella Barba surfaced on-line.   The photos were of a sexually explicit nature, including photos of Barba naked sitting on a toilet, consuming alcohol in states of undress, and one photo in which she appeared to be performing fellatio.  [CDC-003833]

619.    In the wake of controversy that surrounded the salacious photos, *American Idol* host Ryan Seacrest and Judge Simon Cowell rallied support around the white contestant.  Ms. Barba thereafter became one of the most searched names on the Internet.   *American Idol* producers even staged a skit in which Ms. Barba appeared on-stage dressed in a bikini playing with a beachball.

620.    Defendant LYTHGOE made a statement to the press, announcing that Barba would <u>not</u> be disqualified from the competition.  [CDC_003833-34].  Lythgoe claimed that he had only learned of the X-rated photos when a magazine contacted him.   He stated to

ENTERTAINMENT WEEKLY:

"We have really good background checks on everybody, and we deal with that every season. It's sad, isn't it, that your best friends are the ones that come forward with information that will go to [The] Smoking Gun or put your photographs on the web?"

621.    After learning that Barba had <u>not</u> been disqualified, Frenchie Davis told the NEW

YORK POST [CDC_003825-26]

> I couldn't help but notice the difference between the manner in which she was dealt with and how I was dealt with.  I think it's fantastic if 'Idol' has evolved, and I think it's fantastic she [Barba] won't have to go through what I went through four years ago … but if the rules have changed, I believe there should be something to make up for the fact that I was humiliated needlessly. It was a very painful experience for me and it was humiliating for my parents . . . I was upfront about those photographs and I had taken them five years before I was on Idol... It happened and I was honest about it... and weeks later they decided to kick me off the show. They said it was because of the photographs, but my photos certainly weren't sexual. It's not something I'm proud of, but not something I regret either. [emphasis added]

622.    In a written statement to The Showbuzz, [CDC_003826; CDC_3850] Defendant

FOX responded to Frenchie Davis' statements concerning the controversy as follows:

> FOX and the producers of American Idol have no desire to revisit history and sully the reputation of Ms. Davis.  She was removed from the show over 4 years ago and has gone on to a successful performing career. We have never discussed the specifics of why Ms. Davis was eliminated, nor will we now."

623.    In response to the news concerning Antonella Barba's photos and the inaction

taken by *American Idol*, Najee Ali, a Los Angeles-based community organizer, organized a

protest in front of the Kodak Theater.  [CDC_003856]  Ali succinctly stated that Frenchie Davis

had suffered racially disparate treatment at the hands of ENTERPRISE-DEFENDANTS:

> We feel a coalition of leaders [should] meet with FOX and American Idol producers to set some guidelines down because they can't have a rule for white contestants and have different rule for black contestants.  It's obvious that it's a racial bias ... when you have a situation where a black contestant is punished and a similar situation happens to a white contestant and there is no punishment and they're allowed to continue on the show.

624.    On Tuesday, March 6, 2007, Mr. Ali's claims of racism were echoed by talk show

personality Rosie O'Donnell, who was hosting ABC's *The View* at the time.  In response to co-

host Elisabeth Hasselbeck's comment that justification for the disparate treatment was premised on the notion that Davis was paid to take her erotic photos whereas Barba was not, Ms. O'Donnell responded: "I'm a little upset…why is it that Frenchie was kicked off and this girl was not . . . I think it's racist.  I do . . . I think it's because [Frenchie] is black that they kicked her off."  [CDC_003200]

625.    Later on March 6, 2007, Frenchie was asked about the charges of racism against *American Idol*.  Frenchie stated: "It's arguable. So I can certainly understand why people would jump to that conclusion, and I'm giving Idol the benefit of the doubt and not jumping to that conclusion." [CDC-003847]

626.    Later in 2008, Davis told the Associated Press: [CDC_003931]

> I guess I had to be thrown to the wolves to afford these other contestants the luxury of being judged on their talent.  I guess that's what needed to happen.

627.    Ultimately, Frenchie Davis, like every one of the disqualified Black *American Idol* contestants named in this action, simply wanted the fair, equal opportunity as a U.S. citizen to be judged upon her individual merit and talent. That's the *real* American Dream.

628.     Instead, the wicked masterminds behind ENTERPRISE-DEFENDANTS, who knew full well that Frenchie had been designated a front-runner to win the Season Two Contest from an early stage, intentionally targeted Frenchie Davis for public disqualification because of the color of her skin, the full contours of her body, and ENTERPRISE-DEFENDANTS's discriminatory, stereotyped thinking that Black women were somehow not suitable to be viewed by their audiences in erotic photos.  Yet, when overt, sexually explicit photos surfaced on-line of a white *American Idol* contestant, not only did ENTERPRISE-DEFENDANTS fail to disqualify the white contestant on equal terms, but they actually celebrated Antonella Barba as a "model" and "sex symbol" despite her obvious shortcomings as a singer.

> What broke my heart so badly with the Idol experience was that when I left Idol most of the people remembered me because of the controversy.  This show [*The Voice*] symbolized for me, win or lose, I get to walk away from this show and be remembered for my voice and that's all I ever wanted. [CDC_003964]

629.    Moreover, ENTERPRISE-DEFENDANTS never took steps to correct and/or retract the report that Frenchie Davis had "failed to disclose" the photos in advance of her selection, once again demonstrating ENTERPRISE-DEFENDANTS' intent to propagate stereotypes that depict Black *American Idol* contestants as untrustworthy.

630.    Frenchie Davis' disqualification again demonstrates the blatant disregard for the civil rights of its Black employees.

# Season Two:
# COREY CLARK

## A.    PRE-HOLLYWOOD

### (1)    BEFORE *AMERICAN IDOL*

632.    Corey D. Clark, born July 13, 1980, is the eldest son of the marital union between an African-American R&B singer, Duane Clark, and a White/Jewish female vocalist named Jan Clark.  Corey was born in San Bernardino, California, where his grandfather had the privilege of serving as the town's first African-American police officer.

633.    Since Corey was a small child, music always played a major role in his life.  His parents were both working musicians.  At the age of 12 years old, Corey began his music career singing backup for Barry Manilow, who extended him a role on stage.

634.    By the time Corey was 15 years old, he founded his own R&B singing group called *Envy*, recruiting some of the most talented singers in his neighborhood to join the collective.

635.    In 1997, when Corey was only 17 years old, the group went on perform at the world famous *Apollo Theater* (Amateur Night) in New York City.

636.    As a senior in high school, Corey Clark was voted the "Most Likely to be Famous."  [CDC_00001]

637.    In 1998, *Envy* signed an independent record deal in Las Vegas and upon graduation from high school, moved to Los Angeles to pursue professional careers in the music industry.

638.    From 1998-2000, *Envy* played the opening act for such notable groups as *Destiny's Child*, *Mya* and *KRS-One*.  They also appeared on MTV.  However, after two years of

struggling to land a major label record deal as a group, the four members of *Envy* decided to go their separate ways and pursue individual careers as solo artists.

639.    One of *Envy*'s early group members, who Corey had known since he was only 15 years old, was Shaffer C. Smith.  Mr. Smith has gone on to an illustrious career in the music business as chart-topping recording artist / songwriter *Ne-Yo,* a Grammy-award winning international superstar.  [CDC-000003-9]

640.    At about the time that *Ne-Yo* landed his first major label record deal on Columbia Records, Corey Clark, a consummate workaholic focused on his career success as a singer / songwriter, heard about a new concept for a talent show and singing contest.

## (2)    REASONABLE EXPECTATIONS

641.    After auditioning a couple of times for this new model of hybrid talent show / reality contest, and viewing the first season of *American Idol* on television in the summer of 2002, Corey Clark developed a reasonable expectation that such shows could provide a valuable platform to gain visibility and launch his major label solo recording career.

642.    At the time the first season was broadcast, Corey Clark reasonably understood that there was a Reality TV element to the show, manifested by the aspect of living together in a house with other real life singing contestants.  Other than that specific aspect, Plaintiff did not understand the difference between *American Idol* and any other televised talent shows he had seen before, particularly *Star Search*.

643.    *American Idol* in the summer and fall of 2002 was promoted, depicted, marketed and portrayed <u>in fact</u> and <u>at law</u> as a *bona fide* singing contest with a concrete offer of a valuable prize, namely a major label recording contract.

644.    Plaintiff thought the <u>true nature</u> and purpose of *American Idol* was <u>as advertised</u>

in commerce.

645.   In the promotions leading up to auditions for the first season in the Spring of 2002, DEFENDANTS offered through media publications a "$1 Million Recording Contract" to consumers in the U.S. marketplace.

646.   ENTERPRISE-DEFENDANTS' advertising campaign in advance of Season Two, however, did NOT advertise any specific dollar amount as a prize, but continued to tout the Major Label recording contract as a prize while referring to the commercial success of Kelly Clarkson as evidence of the prize.

647.   DEFENDANTS also advertised the prize of *American Idol* as the "American Dream."

648.   The break-out commercial success of *American Idol* season one winner Kelly Clarkson had significantly raised the stakes of the prize in Season Two.  Because now, going into Season Two, the U.S. public was led to expect that the dollar value of "the recording contract" offered in the first season was a virtual by-product of a grander material prize: the widespread fame, glory, adoration and respect of the public marketplace at large for having competed successfully on the merits in good-faith pursuit of the goal to be an *American Idol.*

649.   Even for those Season One finalists who did not place #1, there was a high level of stardom, of instant celebrity, of *lifestyle* that accompanied the finalists' post-show activities, thereby providing a foreseeable expectation that contestants could capitalize on the increased value of the Artist's constitutional rights to publicity, name, identity and likeness.

650.   ENTERPRISE-DEFENDANTS' offer of a Major Label recording contract was exactly the prize that Corey Clark sought to achieve when he auditioned for Season Two of *American Idol* in late October 2002.  His childhood contemporary and long-standing groupmate *Ne-Yo* had

just signed his own major label deal several months prior.  Corey Clark reasoned that if his old friend Shaffer achieved that goal, then Corey himself was certainly capable of achieving the same.

651.    Having viewed the first season of *American Idol* on television, and considering that Justin Guarini had reached the second spot, Corey Clark was extremely confident in his chances to win the entire contest in Season Two.  That sentiment would later be echoed by the master judge Simon Cowell, as well as consummated in more personal terms by Grammy-award winning pop star Paula Abdul.

### (3)        FALSE ARREST IN TOPEKA, KANSAS [October 12, 2002]

652.    Before October 12, 2002, then 22-year-old Corey Clark had never been arrested.

653.    Plaintiff was brought up by his parents to be a law-abiding citizen.  As was highly publicized on Corey Clark's background profile broadcast by DEFENDANTS, Clark's grandfather was one of the first top-ranking Black police officers in the State of California.

654.    On the night of October 12, 2002, Corey Clark was babysitting his 15-year-old sister in their family home in Topeka, Kansas.  He was not living in Kansas at the time, but came back to watch out for his younger sisters at the behest of his parents. They were both working long hours and having trouble coping with a young female teenager who had been sneaking out of the house to meet with her boyfriend.

655.    While babysitting that night, Clark's 15-year-old sister announced that she was leaving to visit a friend.  Corey insisted that she could not go, that he was there to make sure that she could not leave the house.  The two began to argue and the noise escalated.  His sister tried to leave the house and Corey blocked the door.  A neighbor came over to see what the fuss was about.  Corey told her in no uncertain manner to leave the premises.  The neighbor stated that she

would call the police.

656.   When the police officers arrived at the family home, they assessed the situation and decided it would be in the 15-year-old's best interest to be taken to juvenile intake.  Corey Clark adamantly objected to this idea and insisted that the officers wait for his parents to arrive. When Clark refused to let the officers pass to take his sister into custody, the officers put him under arrest, but not before four cops beat him and kicked him to the ground.  One threatened him with a stun gun.

657.   Once apprehended, the police officers wrote detailed narratives about the scene and charged Clark with four misdemeanors, including endangering a child.   Notably, the government's accusations that Clark had physically assaulted his younger sister rested on the testimony of only one officer, M. Soden, who claimed to have interviewed Clark's sister at the scene.

658.   Officer M. Soden stated in his report that although he could not understand much of what the young girl was saying during his interview inside the car, and although M. Soden saw no visible bruises on the young girl's face, M. Soden claimed that Corey Clark's sister had alleged that Plaintiff had "slapped" her in the face.  [CDC_000280; CDC_000291]

659.   Corey Clark's sister has at all times maintained that her older brother Corey Clark never hit her.  On April 21, 2003, Plaintiff's sister was quoted by PEOPLE magazine as saying: "he [Corey] never hit me.   We just started arguing like any brother or sister would". [CDC_000717]

660.   Clark's mother commented to the same PEOPLE magazine article that the entire incident was a misunderstanding, a "babysitting gig gone badly." [CDC_000717]

661.   On October 15, 2002, the Monday after Corey Clark's arrest, he was arraigned

before a Judge who reprimanded the police officers for arresting Clark.  His was released from custody and his bond was set at a mere $100.  [CDC_000099-105]

662.    Corey Clark's "booking profile", dated 10/12/2002, correctly spelled his name "Corey Clark", identified his race as "Black" and listed his address at 04212 SW 33rd Terrace, Topeka, KS 66614.  This booking profile is what was transmitted to the federal NCIC database. [CDC_000107-110]

663.    The Topeka, Kansas Police Department's NCIC Agency Identification number is "KS0890100" [CDC_000294]

664.    As a matter of public record, *all charges, terms and conditions of bond against Plaintiff Clark were dropped in their entirety on November 15, 2002.* [CDC_000120; CDC_000125; CDC_000145]

665.    As reflected on the Shawnee County docket entries, Clark was instructed by the Clerk of Court to pick up his bond check because no charges had been filed within 30 days. [CDC_000120; CDC_000125; CDC_000145]

666.    Plaintiff Clark rightfully assumed that any charges stemming from his October 12, 2002 arrest had been dropped because the arrest was unwarranted in the first instance.

## (4)    GOLDEN TICKET TO HOLLYWOOD [Nashville, Tennessee (November 4, 2002)]

667.    Plaintiff Corey Clark was one of 70,000(+) United States citizens between the ages of 18 and 28 who publically auditioned for Season Two of the hit show in the fall of 2002.

668.    From October 30, 2002 through November 4, 2002, Plaintiff auditioned for the Second Season of *American Idol* in Nashville, Tennessee.  Roughly 5,000 contestants auditioned in Nashville that year.  [CDC_000174; CDC_000176]

669.    At the Open Auditions in Nashville, Tennessee, Corey Clark likely may have

executed a written agreement called the American Idol Audition Agreement.  This agreement asked Clark to disclose his name and birthdate.

670.    Plaintiff Clark was permitted to audition for the three judges in Nashville only after his merit as a singer had been adjudged and certified by *American Idol*'s senior production team, as well as junior producers Jonathan Entz and Ron Deshea.

671.    At the time of the Open Auditions in Nashville, from October 30, 2002 through November 4, 2002, the charges from the October 12, 2002 Topeka arrest had not yet been dropped.

672.    Accordingly, at the Open Auditions, Clark properly disclosed the existence of the arrest to junior producer Jonathan Entz, who had acted as Clark's backstage guide and mentor through the four-day audition process.  In response to Plaintiff's disclosure, Entz told Plaintiff not to worry about it.

673.    On November 4, 2002, after four days of Open Auditions, Plaintiff Clark became one of thirty-one (31) contestants from Nashville and one of two hundred and thirty-four (234) singers nationwide who was awarded a Golden Ticket to Hollywood for Season Two of *American Idol.*

674.    Contestants who are awarded a "Golden Ticket" are provided with all-expenses-paid trips to Los Angeles to compete in the "Hollywood Rounds", where, in the case of Season Two, the contestants were narrowed down from 234 singers to 32 Semi-Finalist contestants.

675.    Plaintiff Clark was awarded a "Golden Ticket" to Hollywood based on a unanimous decision from *American Idol's* distinguished panel of judges: Simon Cowell ("Cowell"), Abdul ("Abdul") and Randy Jackson ("Jackson").  Regarding Plaintiff's audition, Abdul commented that Plaintiff had "star quality"; Cowell stated that Plaintiff had a "good

recording voice".  [CDC_000178]

676.   Simon Cowell also wrote about Corey Clark's Nashville audition in his 2003 published autobiography (pg. 152) stating:

> "We met Corey Clark in Nashville, and Paula [Abdul] fell for him instantly; she thought he could be another Justin Guarini, though he had a twinkle in his eye and it was clear that he was a bit more of a bad boy than Justin." [CDC_004146]

677.   Plaintiff Clark's Golden Ticket indicated that he was to receive an information packet in the mail from *American Idol* within 10-14 business days of his November 4, 2002 audition.  The Golden Ticket further instructed that Plaintiff should not attempt to contact the offices of the Producers.  [CDC_000178]

678.   After his audition on November 4, 2002, Plaintiff Clark did not hear anything from the Producers and did not receive any package in the mail.  However, he was informed via telephone by FMNA's Patrick Lynn ("LYNN") that he had been mailed the packet to a Kansas address, which was returned to sender.  Significantly, Clark never indicated any Kansas address on his application or Audition Agreement at Open Auditions because his family had already moved to Nashville, Tennessee.  This means that ENTERPRISE-DEFENDANTS were aware of Clark's Kansas address in November 2002 via its background check on the NCIC database, which did have a record of Clark's Kansas address.

679.   On the afternoon of Thursday, December 5, 2002, just four days before Plaintiff was scheduled to be in California for the start of Hollywood Week, Plaintiff received an urgent call from Patrick LYNN at the production offices of *American Idol* stating that he needed to "hurry up" and fill out the paperwork and fax it in in before the next business day (Friday, December 6) was over.  Plaintiff stated that he had never received any information packet in the mail.  The production office therefore faxed Plaintiff a document at approximately 3:23 pm on

Thursday, December 5, 2002. [CDC_000183-209]

680.    On December 5, 2002, Patrick LYNN stated that if Corey Clark failed to sign the paperwork within the next business day he would be automatically disqualified.

681.    The December 5, 2002 fax from Defendant American Idol Productions, Inc. contained a 16-page long-form AMERICAN IDOL CONTESTANT AGREEMENT plus travel and press information.  Plaintiff quickly reviewed the Agreement, without the advice of counsel, signed it on Friday, December 6, 2002.  [CDC_000203].

682.    Plaintiff arrived in California on Monday, December 9, 2002, at approximately 4:15 pm, for the beginning of Hollywood Week.  [CDC_000186]

683.    Plaintiff Clark's AMERICAN IDOL CONTESTANT AGREEMENT was countersigned by Amanda Chacon on behalf of American Idol Productions, Inc. on Monday, December 9, 2002. [CDC_000203].

## (5)    SHAWNEE COUNTY CHARGES [December 4, 2002]

684.    On Thursday, December 4, 2002, over two weeks after the bond was refunded, and on the eve of Clark's scheduled departure to Hollywood, the government's charges against Plaintiff Clark were re-instated and a three-count misdemeanor complaint was filed by a Shawnee County District Attorney. [CDC_000136-137]

685.    ENTERPRISE-DEFENDANTS communicated directly via telephone, fax and/or U.S. mail with government officials employed within the Shawnee County criminal court including, inter alia, the Clerk of Shawnee County Court.

686.    Upon    information    and    belief,    ENTERPRISE-DEFENDANTS    established communications with government officials employed by Shawnee County at some time after Clark's case was dismissed on November 15, 2002 but before Clark was charged with any crime

on December 4, 2002.

687.    On December 4, 2002, Shawnee County District Attorney Jean M. Schmidt filed explosive, defamatory charges against Clark, namely misdemeanor charges of Battery and Criminal Restraint, based on zero physical evidence to support such charges nor any eyewitness testimony to the alleged unlawful physical contact.  [CDC_000138-140]

688.    Shawnee County's District Attorneys filed the charges of battery and criminal restraint against Corey Clark without so much as interviewing the alleged minor victim (Clark's then 15-year old sister).

689.    Shawnee County's District Attorneys filed an Affidavit of Officer M. Soden, dated October 12, 2002, with the Criminal Misdemeanor Complaint. [CDC_000141-143] To protect Corey Clark's due process rights, the Affidavit was sealed, i.e., "closed  for examination." [CDC_000121].

690.    The Shawnee County prosecutor's charges of battery and criminal restraint relied solely upon double hearsay accusations made by one police officer, M. Soden.  [CDC_000141-143; CDC_000280].  Officer Soden reported that Clark's sistser "was hard to understand at times" and that he "did not press [her] for many specifics."  [CDC_000281]

691.    While three other police officers also submitted written reports, none of those three officers had received testimony from the alleged victim, Alecia Clark.  [CDC_000280-304]

692.    The police reports of all four officers were drafted within minutes after the four officers had battered, clubbed, kicked, strangled and threatened to tazer ("stun gun") [CDC_000292] Corey Clark in the face for trying to protect his sister from being brought into the government's juvenile custody without good cause. [CDC_000280-304]

693.    While the case was pending, Shawnee County's prosecutors never subpoenaed

any eyewitnesses in the case against Corey Clark, nor did they subpoena the testimony of Alecia Clark.   Instead, the prosecutors only subpoened the testimony of the arresting officers (who never witnessed any contact between Clark and his sister).

### (6)   INTERFERENCE IN LEGAL PROCESS

694.   ENTERPRISE-DEFENDANTS purported to own a contractual right via the *American Idol* Contestant Agreement to defame Corey Clark and destroy his reputation by disseminating falsehoods about Clark for the economic benefit and favorable position of ENTERPRISE-DEFENDANTS.   Such contractual right purported to extend throughout the world and into perpetuity in any and all media known.

695.   Upon information and belief, ENTERPRISE-DEFENDANTS caused to interfere in the government's decision-making process that led to Shawnee County's filing of battery and criminal restraint charges against Plaintiff Clark.

696.   Clark's criminal case in Shawnee County, Kansas was docketed with the Shawnee County Chief Clerk on the morning of December 5, 2002, just hours before ENTERPRISE-DEFENDANTS faxed Clark his long-overdue paperwork, including the AMERICAN IDOL CONTESTANT AGREEMENT and travel itinerary.

697.   As of late afternoon, December 5, 2002, ENTERPRISE-DEFENDANTS afforded Clark a total of one-half (1/2) business day to review and execute the highly verbose AMERICAN IDOL CONTESTANT AGREEMENT.

698.   According to FMNA's Amanda Chacon, Clark's failure to sign the AMERICAN IDOL CONTESTANT AGREEMENT by the next day, December 6, 2002, would be automatic grounds for his disqualification from the Contest.

699.   ENTERPRISE-DEFENDANTS continued to make on-going communications with

Shawnee County's court officials throughout the month of January 2003, obtaining copies of <u>all</u> public records from Plaintiff Clark's files, including civil cases involving bounced checks, and including the criminal complaint filed by Shawnee County prosecutors.

700.    Contrary to Kansas state law and Plaintiff's constitutional rights to due process, ENTERPRISE-DEFENDANTS also obtained a hard copy from the Shawnee County Clerk's office of the Court-Sealed Affidavit of Officer M. Soden which had been marked on the docket as "closed for examination" and was NOT a matter of public record. [CDC_000121; CDC_000141-143]

701.    As of 2002 and 2003, none of the documents maintained in the Shawnee County Clerk's office were maintained in an on-line database that could have been accessible to the public or news media.  Documents in pending criminal cases were stored via hard copy and then later transferred to microfiche once the case was closed.

702.    ENTERPRISE-DEFENDANTS also telephoned Clark's former defense counsel in Topeka, Jason P. Hoffman, Esq., by telephone at various points in time during the month of January 2003.

703.    Plaintiff Clark did not learn of the reinstated Kansas charges (filed 12/04/02) until on or about Monday, January 6, 2003 or Tuesday, January 7, 2003.  This is because Plaintiff's family had moved from Topeka, Kansas to Nashville, Tennessee in November 2002.  When the summons for the criminal complaint was issued by the Shawnee County Court on December 5, 2002, it was sent to an old Topeka address and then returned back to sender.  [CDC_000152-153]

704.    On January 10, 2003, the Shawnee County Clerk's office causes a copy of the clerk's file to be copied and transmitted to Clark's defense counsel.  [CDC_000273]

705.    On June 19, 2003, two of the misdemeanor charges brought against Plaintiff,

including the volatile charges that he had physically battered and restrained his 15-year-old sister, were <u>dismissed</u> by the Shawnee County prosecutor.  [CDC_000122; CDC_000168-171]

706.    Upon the advice of his counsel and in order to avoid traveling back to the State of Kansas, Plaintiff pled no contest to one misdemeanor count of "obstruction of justice" based on resisting arrest. [CDC_000122; CDC_000168-171].  At the time Corey Clark made the plea, he was scared to re-enter the State of Kansas for fear of reprisal by the same police officers who had beaten him on October 12, 2002.

## B.    CONTEST PARTICIPATION

### (1)    HOLLYWOOD WEEK [December 9-14, 2002]

707.    When Corey Clark arrived to Hollywood on December 9, 2002, he was transported by ENTERPRISE-DEFENDANTS to the Glendale Hiton hotel in Glendale, California. [CDC_000207]

708.    Upon his arrival, Plaintiff Clark waited in line with all the other 234 hopefuls, until a junior producer named Camilla Rahman, who is British, waved him over to a check-in table.  Ms. Rahman wanted to ask Clark questions about the background questions contained in the CONTESTANT AGREEMENT that he had signed on December 6, 2002.

709.    When the issue of Corey Clark's criminal history came up, Plaintiff Clark disclosed to Rahman that he had in fact been arrested in Topeka, Kansas on October 12, 2002 but that there was no need to worry about it because the charges against him had been dropped. Clark produced a copy of the returned bond check as proof.  [CDC_000120; CDC_000125; CDC_000145]  Ms. Rahman told Plaintiff not to worry about it.  If it was dismissed, then it was dismissed.  She wished him luck.

710.    During Hollywood Week auditions, which took place at the Alex Theater in

Glendale, California, commenced on Tuesday, December 10, 2002 and ended on Friday, December 13, 2002, contestants were provided complimentary breakfast and lunch. [CDC_000184]

711.    On or about Wednesday, December 11, 2002, Corey Clark sang "Kiss for a Rose" by Seal during his first round "group" audition.  When it was his time to solo, Plaintiff, left the stage and walked over to the Judge's table in order to serenade Paula Abdul while singing.  He also kissed Paula Abdul's hand, much to the delight of Abdul.

712.    After Randy Jackson critiqued Plaintiff for singing off key, Judge Paula Abdul remarked:

> **Corey that was good. Very sweet. Who cares?  I got you to come up to me, come on.  Girls? [turning to audience] would you like that to happen to you?  Girls like that…girls love that.**

713.    By the end of Hollywood Week, on Friday December 13, 2002, Plaintiff learned that he had made the cut as his name was announced as one of the Top 32 contestants.

714.    On Saturday, December 14, 2002, the Top 32 finalists were brought before CNN to do a press junket.

715.    Simon Cowell is one of the most highly respected and successful record industry professionals in the history of the music business.  His professional success is largely based on his ability to predict the future success of unknown, aspiring singers and to "tell it like it is."

716.    At the time that Plaintiff Clark participated on Season Two of *American Idol,* Cowell had amassed considerable success in Europe as an "A&R" (Artist & Repertoire) man, and had been credited with selling more than eighty million albums, thirty number one singles, and a hundred Top 30 singles, non-inclusive of the role he played in forming *American Idol* contestants into viable music industry stars with industry longevity and millions of dollars in sales (e.g., Kelly Clarkson, Carrie Underwood, Clay Aiken).

717.    At some point toward the end of Hollywood Week of Season Two, on or about December 14, 2002, Cowell publically declared to the media that Corey Clark was a strong contender to win Season Two of *American Idol*.

718.    After the close of the highly successful second season, Cowell wrote his autobiography, *I Don't Mean To Be Rude, But . . . The Truth About Fame, Fortune and my Life in Music,* the first edition of which was published in December 2003.  [CDC_003984]

719.    Cowell revealed in his autobiography that Plaintiff Clark was one of the four contestants who he believed was a strong front-runner to win the Season Two contest.  [CDC_004154]

> I did an interview around that time [Hollywood Week] in which I was asked who might win, and I mentioned Frenchie [Davis], Ruben [Studdard], Clay [Aiken] and Corey [Clark].

720.    At an early stage of the competition, it was reasonably foreseeable to Simon Cowell, the most celebrated of *American Idol* Judges, that Plaintiff Corey Clark had a high probability of winning Season Two of *American Idol*. [CDC_004154]

721.    Cowell also wrote in his autobiography that "I felt sorry to see him go.  Corey was one of the few guys who would hang out after the show; he had a good sense of humor, and I never felt he was putting on an act."   [CDC_004177] Cowell added later: "Corey was the rebel of the group.  I found him to be charming, polite, and exactly the same offstage as he was onstage.  Corey has an edge and that is a good thing in the recording industry.  I have a hunch that Corey could get himself a deal."  [CDC_004197]

722.    Cowell's predictions regarding the success of Season Two *American Idol* contestants turned out to be entirely accurate with respect to Ruben Studdard and Clay Aiken.

723.    Studdard was the winner of Season Two of *American Idol*.  According to Cowell's 2003 autobiography, had Studdard not participated in the *American Idol* talent contest,

he never would have landed a record deal with a Major Label.  [CDC_004200]   In contrast, Cowell predicted that Corey Clark was talented enough to get a recording deal even without *American Idol.*  [CDC_004197]

724.    As a direct and proximate result of Studdard's participation in the *American Idol* contest, Studdard has earned in excess of $40 Million since being crowned the *American Idol* of Season Two.

725.    Aiken was the runner-up winner of season two of *American Idol*. As a direct and proximate result of Aiken's second place victory in the *American Idol* contest, Aiken has earned in excess of $40 Million since being crowned the runner-up of *American Idol*.

726.    The other two contestants who Cowell predicted had a reasonable, likely shot at winning the Season Two prize were Frenchie Davis and Plaintiff Corey Clark, each of whom were unilaterally extricated from the contest by ENTERPRISE-DEFENDANTS and gutted of the opportunity to compete on their merit for what turned out to be *at least* a $40 million prize.

727.    At the end of Hollywood Week, Corey Clark had been named as a top semi-finalist and was invited back to compete in the live rounds starting February 5, 2003.

## (2)    BACKGROUND CHECK [December 20, 2002]

728.    On December 20, 2002, Plaintiff received an information packet via Fedex containing ADDENDUM NO. 1 TO CONTESTANT AGREEMENT AND RELEASE, plus a long-form document entitled AMERICAN IDOL PARTICIPANT BACKGROUND QUESTIONNAIRE FORM. [CDC_000218-259]

729.    The cover memo issued by American Idol Productions, Inc., dated December 20, 2002, instructed the contestants to fill out and return the Questionnaire and Addendum #1 via Fedex to: "MMI, 200 N. Tustin Avenue, Suite 100, Santa Ana, CA 92705, Attention: Drew P.

Machonachy, President, for receipt no later than January 6, 2003." [CDC_000224]

730.   ADDENDUM # 1 TO THE CONTESTANT AGREEMENT AND RELEASE [CDC_000226-27] provides in relevant part that:

> Producer requires me to enter into this Addendum in order to further be considered as a contestant on the Series, and I deem it to be in my best interest to enter into this Addendum.

> **ACCORDINGLY, PRODUCER AND I AGREE AS FOLLOWS:**

> **I AGREE TO COMPLETE AND SIGN A COPY OF THIS ADDENDUM AND THE ATTACHED BACKGROUND INVESTIGATION FORM, AND TO RETURN THE SIGNED AND COMPLETED ADDENDUM AND BACKGROUND INVESTIGATION FORM VIA FEDERAL EXPRESS TO MMI, 200 N. TUSTIN AVENUE, SUITE 100, SANTA ANA, CA 92705, ATTENTION: DREW P. MACONACHY, PRESIDENT, FOR RECEIPT NO LATER THAN JANUARY 6, 2003.**

> **I UNDERSTAND THAT IN THE EVENT I DO NOT SIGN AND RETURN THIS ADDENDUM AND/OR THE COMPLETED BACKGROUND INVESTIGATION FORM, I MAY NOT BE ELIGIBLE FOR FURTHER PARTICIPATION IN THE SERIES, BUT THAT THE TERMS AND CONDITIONS OF THE AGREEMENT WILL REMAIN IN FULL FORCE AND EFFECT. [¶ 1]**

> I hereby grant permission to Producer to disclose all of the information on the Background Investigation Form to any third-party investigation service selected by Producer, in its sole discretion, in order to run various background checks on me, which may include, without limitation, consumer reports, criminal conviction reports, civil court searches, searches of sex offender databases, etc. in order to determine my eligibility for further participation on the Series, which determination shall be in Producer's sole discretion, and to use the information in any other manner whatsoever. [¶ 2]

> As more fully set forth in the Agreement, in the event I am eliminated from the Series based upon the results of the background investigation, or for any other reason, I agree that Producer and/or the network broadcasting the Series (the "Network") may make any explanation or announcement, on-air or otherwise, that Producer or the Network may choose as to the reason I was disqualified from the Series. [¶ 3]

> I understand and agree that it may be necessary for me to become a member in good standing, as defined by law, of the American Federation of Television and Radio Artists (AFTRA) in connection with my further participation in the Series and that Producer will assist me in obtaining such membership, if necessary. In the event I become a member of AFTRA, I acknowledge that my AFTRA dues may be deducted by Producer from the first monies payable to me under the AFTRA agreement. [¶ 7]

731.    In Season Two, the 28-page AMERICAN IDOL PARTICIPANT BACKGROUND QUESTIONNAIRE FORM [CDC_000231-259] contained the following questions relating to criminal background checks under the subheading "LITIGATION HISTORY", followed by a checkbox for "Yes" or "No":

| |
|---|
| • "Have you ever been detained arrested or convicted of a felony or misdemeanor offense, either as a juvenile or an adult?" |
| • "Have you ever had a restraining order placed against you?" |
| • "Have you ever had a warrant issued for your arrest, or have you ever failed to appear in court for a traffic related or a criminal matter?" |
| • "Have you any current or outstanding warrants (e.g., traffic tickets, arrests, etc.?)" |

732.    Plaintiff checked the "NO" box for each question identified in the preceding paragraph and signed the form, dated December 24, 2002.  [CDC_000231]

733.    At the time Plaintiff Clark completed the long-form QUESTIONNAIRE on December 24, 2002, Plaintiff believed in good faith that he had been cleared of all charges relating to his October 2002 arrest in Topeka, Kansas.

734.    Plaintiff Clark had picked up the bond check himself from Shawnee County Court on November 18, 2002 and was instructed by the Clerk that the misdemeanor charges against him had been dropped.  [CDC_000120; CDC_000125; CDC_000145]

735.    Plaintiff Clark had already been instructed by an *American Idol* junior producer to not worry about the case since it was dismissed.

736.    Considering the matter to be closed, and believing that the Topeka arrest was false and improper to begin with, Clark answered the form in good faith.

737.    Moreover, the <u>one</u> question on the Background Questionnaire form that asked whether Plaintiff had ever been arrested ["*Have you ever been detained, arrested or convicted of a felony or misdemeanor offense, either as a juvenile or an adult?"*] [CDC_000231] was, on its

face, an *illegal* question pursuant to California Labor Code § 432.7, which prohibits an employer from asking general questions about arrests not resulting in a conviction.

738.   Corey Clark's answer to the general arrest question in the PARTICIPANT BACKGROUND INFORMATION FORM [CDC_000231] is irrelevant and moot, as such question will be stricken as if it never existed pursuant to statutory law, judicial precedent and consistent with public policy.

739.   Plaintiff hand-delivered both documents, ADDENDUM #1, signed January 4, 2003 [CDC_000226-27] and the PARTICIPANT BACKGROUND INFORMATION FORM, signed December 24, 2002, [CDC_000231-269] to the Los Angeles offices of Defendant American Idol Productions, Inc. on Saturday, January 4, 2003.

740.   At the production office in Los Angeles, Clark filled out Fedex Airbills addressed to "Sharon Giallo of MMI".  [CDC_000226].

741.   Clark also delivered to junior producer Patrick LYNN a copy of his Birth Certificate, Social Security Number and California Driver's License.  [CDC_000257]

742.   On or about Monday, January 6, 2003 or Tuesday, January 7, 2003, while already in California, Corey Clark learned *for the first time* that the misdemeanor charges against him in Shawnee County, Kansas had been reinstated by the county prosecutor on December 4, 2002. [CDC_000265-267]

743.   After consulting by telephone with defense counsel Jason Hoffman, Esq. as to whether Clark should inform the senior production team of *American Idol* about the re-instated charges, Plaintiff was specifically instructed by his defense counsel <u>not</u> to disclose the record of the arrest to *American Idol* producers because the charges were currently pending and likely to be dismissed.

744.    Plaintiff's criminal defense counsel, Mr. Hoffman, worried that if the word got out about his pending arrest, given the high profile nature of the program, it would be difficult for Clark to get a fair trial, let alone remain on the show.  To protect his client's rights of due process, therefore, Attorney Hoffman correctly advised Clark to continue on the show.

745.    During the week of January 6, 2003, Clark further consulted with his mentor and confidante Paula Abdul, who similarly told Plaintiff not to say anything further about the Topeka arrest.

746.    Abdul specifically warned Plaintiff Clark that if he disclosed any negative background information to the senior production team, namely LYTHGOE, that LYTHGOE would sell the information to the press.

## (3)    SEMI-FINALISTS ROUNDS [February 25, 2003]

747.    On February 25, 2003, Clark performed the song "Foolish Heart" during a live telecast in which the television audience cast their votes.

748.    After Corey Clark's performance, he received two standing ovations from Randy Jackson and Paula Abdul and extended applause from Abdul and Cowell.  All the Judges, and the host, gave Corey Clark positive remarks:

> • <u>Randy Jackson</u>: "Good job, dude.  Sensational.  Sensational.  Great song.  In Tune.  Thanks, dude."

> • <u>Paula Abdul</u>: "Whoa. Amazing, Un-believable. Unbelievable Great song, you wanna know why great song?  I'm telling you, you just blew me away . ..blew me away.. what a beautiful voice …unique…refreshing.  In tune all the way.  Yeah!  Brilliant, brilliant, brilliant.  I'm really excited, too.  You made America feel that.  You proved right here, right now – you took this serious.  Good for you."

> • <u>Simon Cowell</u>: "You've put me in a good mood, now. In fact this whole show put me in a good mood.  Which I thought was going to make the competition more exciting and I promise you this.  If you get in the Top 10, which I think you will, and Josh gets in the Top 12. Throw in the Kimberlies. If you get in the Top 12, it is a much more exciting show than last year.

- **Ryan Seacrest**: "They [your parents] are very happy for you. Congratulations. Watching you, you make it look so easy. Are you that comfortable, that confident?"

749.    On February 26, 2003, it was announced live on television during the "Results Show" that Corey Clark was voted through by the public to the Top 12 on the strength of the previous night's performance.

## (4)    PRIZE CONTRACTS [March 8-17, 2003]

750.    On Saturday, March 8, 2003, LYTHGOE, his son Simon Lythgoe and WARWICK called the Top 12 American Idol finalists together to inform them that they needed to pick a lawyer to advise them on signing the "American Idol contracts." The Producers announced that they were going to start paying each finalist $1,000 a week, that they would would be given a clothing budget, that they would be receiving a fixed amount of money for each tour appearance, and a percentage of royalties from the Season Two CD compilation of Love Songs.

751.    Shortly after making the announcement, production assistants passed out over eighty pages of complex industry contracts to the Top 12 finalists for their review. [CDC_000_478-557] The contestants were informed that they would need to sign all the contracts by no later than Monday, March 10, 2003 or they would be automatically disqualified from the show.

752.    The producers then trotted out two attorneys that the Producers wanted the finalists to select. One of the attorneys was barely six months out of law school. The other attorney was a well-established Los Angeles-based entertainment attorney with an impressive resume. The choice was clear to most of the contestants: they wanted to pick the established attorney.

753.    Plaintiff, who had experience in dealing with contracts from his past music

industry dealings, expressed concern over the propriety of choosing an attorney that was offered to them by the Producers.  He understood at the time that this was a conflict-of-interest.

754.    Corey Clark broke out from the group as they deliberated and called his confidante and mentor, Paula Abdul.   Plaintiff asked her what he should do.    Abdul recommended that Clark call her personal attorney, Howard Siegel, Esq. of Pryor Cashman in New York, to step in and negotiate on behalf of all of the Top 12 Contestants.

755.    After talking to Attorney Siegel on the cellphone, Corey announced to the other contestants that he had secured an attorney for them and that Mr. Siegel planned to fly out to California the very next day to represent their collective interests in negotiating against the Producers.  The other contestants didn't understand how Plaintiff managed to arrange such a thing, but they were impressed and agreed to defer their decision until meeting Attorney Siegel.

756.    On Sunday, March 9, 2003, Attorney Siegel purportedly flew into California and met with the Top 12 *American Idol* contestants at the "Idol Mansion" and reviewed <u>five separate</u> 19 ENTERTAINMENT contracts with them:    a Recording Agreement, a Management Agreement, a Touring Agreement, a Film Production Agreement, and a Merchandising Agreement.

**(5)     AFTRA AND EMPLOYMENT AGREEMENTS [March 10-11, 2012]**

757.    During Attorney Siegel's meeting with the Top 12 finalists to discuss the 19 Talent contracts, there was no talk whatsoever concerning AFTRA Union contracts, wages or employment agreements.

758.    In fact, the Top 12 Finalists were compelled to sign a lot of various paperwork and contracts throughout the week of March 10, 2003 while in the midst of preparing their live performances for the final rounds.  None of these documents were reviewed by "their" Attorney

Siegel (or any other attorney acting on behalf of the Artists).

759.   For example, on Monday, March 10, 2003, Plaintiff signed a "Recoupable Salary Advance" of $500 with American Idol Productions, Inc.  The documents were presented to him by production staff.  Attorney Siegel was not consulted.  [CDC_000414]

760.   On Tuesday, March 11, 2003, Plaintiff completed a Form I-9 Employment Eligibility Verification that listed American Idol Productions, Inc. as Plaintiff's employer.  The document was signed by Michelle Baker on behalf of employer American Idol Productions, Inc. on March 13, 2003.  [CDC_000416]

761.   At the behest of production staff, Clark also signed an "Employment Deal Memo", [CDC__000418], a series of "Standard AFTRA Engagement Contract(s)" [CDC_000422-426] and an American Idol Productions, Inc. "Production Personnel Deal Memo" [CDC_000431-434] which clearly describes Plaintiff Corey Clark as an underline(employee) of American Idol Productions, Inc. All of these  documents were presented to Plaintiff "on the fly" by production staff.  Attorney Siegel did NOT consult with Corey Clark concerning the execution of any of these employment-related documents.  Plaintiff Clark does not remember reviewing these documents.

762.   That same evening, on March 11, 2003, Clark performed the song "This Old Heart of Mine" during a live telecast of Motown week.  After his rendition, celebrity guest judge Lamont Dozier described Corey Clark as a "**New and Rising Smokey Robinson.**"

763.   On Wednesday, March 12, 2003, Plaintiff signed a Membership Application for the American Federation of Television and Radio Artists (AFTRA) [CDC_000428-429] and signed *American Idol* ADDENDUM #2 to the CONTESTANT AGREEMENT AND RELEASE. [CDC_000407-409]

764.   Attorney Siegel was NOT consulted with respect to any of the preceding five

paragraphs of this Second Amended Complaint.  ADDENDUM #2 [CDC_000407-409] provides in

relevant part that:

> Producer requires me to enter into this Addendum in order to be further
> considered as a contestant on the Series, and I deem it to be in my best
> interest to enter into this Addendum.
>
> I understand and agree that as a condition to my further participation in the
> Series as one of the twelve (12) finalists, or as an alternate, I will be required,
> at the sole discretion of the 19 Companies (as defined below), to enter into:
> (a) an agreement with 19 Recordings Limited for my exclusive services as a
> recording artist (the "Recording Contract"); (b) an agreement with 19
> Merchandising Limited for the use of my name, likeness and biography in
> connection with advertising, endorsement, merchandising and sponsorship
> (the "Merchandising Contract"); and (c) an agreement with 19 Management
> Limited for the management of my career as an artist in the entertainment
> industry.  The Recording Contract, Merchandising Contract and
> Management Contract shall be referred to herein collectively as the "Talent
> Contracts." 19 Recordings Limited, 19 Merchandising Limited and 19
> Management Limited shall be referred to herein collectively as the "19
> Companies."                                    [¶                            1]
>
> I understand that, in the event I enter into the Talent Contracts, the 19
> Companies will make a reasonable contribution to the cost of independent
> legal representation in order to advise me in relation to entering into the
> Talent Contracts.

--------

765.    On Monday, March 17, 2003, Clark signed the 19 ENTERTAINMENT contracts

after consultation with Attorney Siegel. [CDC_000_478-557]

766.    On Tuesday, March 18, 2003, Clark performed the song "Against All Odds" for

Movie Soundtrack week.  Celebrity guest judge Gladys Knight remarked: "I Love the Sound of

Your Voice."

## (6)    FINAL PERFORMANCE [March 25, 2003]

767.    On Tuesday, March 25, 2003, Corey Clark performed the song "Drift Away"

during Country Rock Week.  It would mark his last performance on American Idol.  The Judges

remarked as follows:

- <u>Randy Jackson</u>: "I like it, man, I like it, I thought it was good, man, I like it when you go into your upper register, dawg, it was good, it was good."

- <u>Paula Abdul</u>: "Yeah, you were on it, Corey, you're on it when you pick songs that can go into that beautiful upper register.  And you know what? It's really refreshing, I've said it before, your voice is really refreshing, especially when you go into your upper register and you know what, you are on it tonight, and you are in good voice tonight …"

- <u>Olivia Newton John</u>: "I thought you sang it really well, I liked it.  It suited you, and I liked your new hairdo . . . It was really good."

- <u>Simon Cowell</u>: "I thought, actually compared to last week . . . I thought  you did really really well tonight.  Very very good.

768.   On Wednesday, March 26, 2003, the Results Show revealed that with 9 contestants remaining, Corey Clark was <u>not</u> one of the contestants landing in the bottom 3, which meant that his voting results (if any) placed Corey Clark in the <u>TOP 6</u> as of his last performance on the show.

769.   Before the day Plaintiff was extricated from the show, Corey Clark's "star quality", stage presence and unique musical talent as an African-American singer, songwriter and performer were, on the most part, unanimously celebrated by *American Idol's* judges, celebrity guest judges and producers from the time he first auditioned for Season Two of the show in late October 2002 through the date of his extrication on March 31, 2003.

770.   The national television viewing audience, consisting on average of more than 25 million people, repeatedly voted to advance Corey Clark through the *American Idol* competition as one of the Top 10 Finalists.

771.   Clark entered the contest with the reasonable expectation that he would be given the fair opportunity to compete for the prize.  Had he not been disqualified, there is strong probability that he would have won Season Two of *American Idol*.

772.

## C.    PUBLIC DISQUALIFICATIONS (Season Two)

### (1)    *SMOKING GUN.COM:* JAERED ANDREWS [January 31, 2003]

773.    Plaintiff Jaered Andrews became the first contestant during Season Two to be disqualified from *American Idol* on January 31, 2003.

774.    Plaintiff Andrews' disqualification and criminal arrest were reported by *The Smoking Gun* on March 1, 2003.  [CDC_2077-2082]

### (2)    *SMOKING GUN.COM:* FRENCHIE DAVIS [February 13, 2003]

775.    In December 2002, as a part of the extensive, multi-tiered background check process administered by *Idol*'s Producers and FOX, *inter alia*, Franchelle "Frenchie" Davis disclosed to *American Idol* producers in writing that she had taken topless photos for an erotic website when she was a teenager, some four years before her audition.

776.    On December 14, 2002, Frenchie Davis was selected as a Top 32 Finalist.

777.    On February 11, 2003, approximately two months after Davis had submitted her written background information form, *Idol*'s Producers announced her disqualification to the national media, claiming that she had "failed to disclose" the existence of the topless photos and that "family sponsors" would not allow her to participate in the contest.

778.    On February 13, 2003 (and March 1, 2003), *The SmokingGun.com* published an article entitled "Porn Past Sinks American Idol Finalist" in which the website revealed intimate details from a "TSG Source" that described the nature of Davis' alleged photos.  [CDC_000271-275]

### (3)    *SMOKING GUN.COM:* TRENYCE [March 27, 2003]

779.    On Thursday, March 27, 2003, *The SmokingGun.com* published the criminal

background history and mugshots of female African-American finalist Trenyce.  The article

stated that Trenyce was "busted in October 1999 on a felony theft charge, for which she was

placed the following year in a pre-trial diversion program by a Shelby County [Memphis]

Criminal Court judge (one of those, "keep your nose clean and we'll expunge the records" deals).

[CDC_002084-88]

780.    THE SMOKINGGUN.COM failed to explain how it, a member of the civilian press,

could have possibly discovered a <u>sealed</u> record of a criminal charge that had been <u>expunged</u> from

the public record after Trenyce had completed a <u>youth diversion program</u> four years earlier.

781.    THE SMOKINGGUN.COM further disclosed, without citing any source, that Trenyce

was permitted to stay on the *American Idol* program as a contestant because she had been

forthcoming with producers about the charge, indicating that *The SmokingGun.com* had a direct,

first line of communication with DEFENDANTS.

782.    *DEFENDANTS* disseminated Trenyce's criminal record information to *The

Smoking Gun* for the purpose of exploiting Trenyce's *expunged* criminal record in the U.S.

media as a pre-cursor to DEFENDANTS's planned disqualification of Clark the following week.

783.    On Friday, March 28, 2003, PEOPLE magazine ran a story on the Trenyce incident

and quoted producer Nigel Lythgoe regarding her status: "It was a minor matter that Trenyce

was honest about from the beginning. After looking into it, we felt it warranted no concern

regarding her participation in the show."

## (4)         *SMOKING GUN.COM:* COREY CLARK [March 31, 2003]

784.    On Monday, March 31, 2003, Plaintiff Corey Clark was abruptly "disqualified"

from the *American Idol* contest in a shocking and controversial manner.

785.    Plaintiff's 2003 disqualification from the contest was orchestrated and exploited

for maximum media exposure by DEFENDANTS.

786.　　　On early Monday morning, March 31, 2003, *American Idol* producers woke Clark up and notified him that *The Smoking Gun* had published an article entitled "Another Fallen Idol" concerning Clark's misdemeanor arrest in Topeka, Kansas on October 12, 2002. [CDC_0002090-2095] Clark was led to a computer where he was commanded to read *The Smoking Gun* article, which described in vivid detail police report narratives and witness testimonials.

787.　　　The March 31, 2003 article also published details from Court documents, some of which were sealed, consisting of Plaintiff's criminal and civil court record information from the Shawnee County District Court in Topeka, Kansas. [CDC_0002090-2095] *The Smoking Gun* concluded the article by stating:

> So, were/are "American Idol" producers aware of Clark's criminal predicament?
>
> Well, TSG long ago stopped believing anything that reality TV producers say when it comes to what they did or did not know about a contestant's past. It appears that a combination of Keystone Kops background checks, participant mendacity, and unblinking network indifference has guaranteed that drunk drivers, bankrupt deadbeats, shoplifters, bondage actresses, and assorted convicted criminals will continue to populate reality TV shows.
>
> For its part, Fox has adopted a blanket policy whereby network executives refuse to comment "on the private lives of show participants." That's not a bad stance when you consider that this year's original 32 "American Idol" semifinalists included a convicted thief [Trenyce], an Internet porn model [Frenchie Davis], and a guy who's been charged in connection with a fight that ended in the death of a Pennsylvania man [Jaered Andrews]. In fact, Fox booted the contestant, Jaered Andrews, a month before he was even arrested for misdemeanor assault.
>
> TSG will venture a guess that Fox knew about Clark's rubber checks, but were unaware that he had been popped for battering his little sister (if true, not exactly Idol" behavior).

788.　　　After reading *The Smoking Gun* article, Clark was then told to quickly pack his bags because he needed to go see LYTHGOE and explain what happened.  A security guard escorted Clark from the house where he was staying to CBS Studios.

789.     Having been told to pack his bags, Plaintiff Clark surmised that he was going to be ejected from the contest; but when he resisted going to see LYTHGOE, the security card insisted that he had better go to CBS studios as his attendance was mandatory

790.     When Clark arrived at the studios, Nigel Lythgoe met him along with the staff psychiatrist named "Chris".  LYTHGOE explained that the Producers were willing to let Plaintiff stay on the show "depending on how much you help us clean this up." Lythgoe explained that FOX required Plaintiff to do a videotaped interview immediately.   When Plaintiff expressed concern that he should be allowed to speak with an attorney, LYTHGOE stated that there was no time for that and if Corey had any chance of staying on the show, he would need to appear in the videotape.

791.     Under duress, Plaintiff Clark agreed to be videotaped, thinking that his only chance to stay on the show was to be cooperative. Once the tape started rolling, LYTHGOE asked Plaintiff to apologize to anyone he had "displaced" from getting into the final 12. LYTHGOE also wanted Plaintiff to confess to being a "liar" for not telling senior producers about the arrest.  Plaintiff refused to abide by Lythgoe's  suggestion of being called a liar and LYTHGOE instead suggested that Clark state he was "guilty" of not telling producers about the arrest.  Clark asked again whether making such a statement would ensure that he could stay on the show, and LYTHGOE guaranteed that it would.

792.     Once the videotape interview was over, LYTHGOE left the room. Within 30 minutes, he came back and announced that senior FOX executives demanded that Plaintiff Clark be removed from the show.

793.     Corey Clark was ushered into a van which drove him to his grandfather's house in Rialto.

794.     Nine hours after *The Smoking Gun* reported on Plaintiff's arrest, *The Smoking Gun* then became the first and only publication that Monday, March 31, 2003, to announce that Corey Clark had been "booted" from the show.  [CDC_002113-2114]

795.     On the face of *The Smoking Gun* articles, it clear that *The Smoking Gun's* editor had a direct line into DEFENDANTS.

796.     Plaintiff Clark's disqualification was purportedly based on claims that Plaintiff had "failed to disclose" or "withheld information" from *American Idol* producers concerning his October 12, 2002 arrest in Topeka, Kansas (the "2002 Kansas Arrest").

797.     That evening, on March 31, 2003, *The Smoking Gun* became the first media outlet to report that Clark had been disqualified by DEFENDANTS, reporting that "Nine hours after TSG reported on the pending criminal charges faced by *American Idol* finalist Corey Clark, the 22-year-old singer was removed from the hit program by Fox television and the show's producer." [CDC_002113-2114]

798.     At the time of Plaintiff's 2003 disqualification, the government's misdemeanor charges against Plaintiff were *pending* trial and therefore had yet to be adjudicated.

799.     The corporate decision to disqualify Corey Clark from the *American Idol* contest and Series (for reasons other than his celebrated talent as a singer or performer) was made by *American Idol*'s producers, creators and broadcast network executives; and with the participation of some of *American Idol*'s major corporate sponsors, contractual beneficiaries and/or third party contractual beneficiaries.

**(5)      FOX'S PRESS RELEASES RE: "DISQUALIFICATION" [March 31, 2003]**

800.     The *American Idol* CONTESTANT AGREEMENT signed by "contestants" as a pre-requisite to their further participation on *American Idol* provide that the *American Idol* producers

and/or FOX may disqualify any contestant *at any time* for any reason at their sole and absolute discretion.

801.     However, the rules published by the producers of *American Idol* <u>before</u> contestants enter the contest are different, limiting the producers' absolute right to disqualify to the audition phase only.   This is evidenced by the book published by Fremantle and 19 Entertainment, producers of *American Idol*, who are listed as the co-owners of the copyright to the underlying text contained in a literary work entitled AMERICAN IDOL: THE OFFICIAL BOOK. The book was published in August 2002 by Bantam Books, a division of Random House, Inc. The book sets forth the requirements for competing on *American Idol*.   Regarding disqualification, the book states:

> "**Disqualifications: We reserve the right to disqualify or exclude, in our sole and absolute discretion, any individual from <u>any of the auditions</u> for any reason.**" [CDC_004259] (emphasis added).

802.     Since the date of Corey Clark's extrication from *American Idol* on March 31, 2003, FOX and Production-ENTERPRISE-DEFENDANTS have published or caused to be published numerous written statements to the U.S. news media concerning the alleged justification for removing Plaintiff Corey Clark from Season Two of the *American Idol* contest.

803.     The March 31, 2003 Press Release, issued by Defendant FOX to *The Smoking Gun*.com [CDC_002113-2114] states as follows:

> **Due to events that have recently come to light, American Idol participant Corey Clark has been removed from the contest.**
>
> **All participants are required to provide full and accurate information to assist in background checks, including disclosure of any prior arrests. Corey withheld information about a prior arrest which, had it been known, might have affected his participation in the show. Due to his failure to disclose, compounded by an error in a police report which misspelled Corey's name, the incident was not discovered during the background check. The producers and network feel that Corey's behavior warrants his disqualification.**

> Unfortunately, the search process is not perfect. We regret the error, but the only thing we can do is learn from the incident, continue to improve the background check process, and move on.
>
> At this time, no decision has been made as to how this will impact this week's shows.

804.    In the weeks following Plaintiff's 2003 disqualification, Plaintiff Clark issued public statements to the national media, including PEOPLE magazine, in which he vehemently protested his unjust disqualification from *American Idol.*

805.    Plaintiff Clark particularly challenged the reasons cited by FOX and *American Idol*'s senior executive producer Nigel LYTHGOE as the basis for his disqualification.    Corey Clark surmised that the Producers of *American Idol* knew about the 2002 Kansas Arrest well before the date of his "disqualification."

806.    Plaintiff Clark also explained that the videotaped interview had been manipulated and edited in a misleading manner and that Plaintiff was induced to make certain statements in reliance on Nigel LYTHGOE's representation that he could stay on the show.

807.    Nigel LYTHGOE later publicly denied that anything had been manipulated. [CDC_002625-26]

> In an interview in Los Angeles last week, Lithgoe [sic] denied both charges and was annoyed about the whole Clark episode. He said a police report spelling error was to blame for not knowing of Clark's arrest, adding that there was no need to boot a contestant any contestant - to add drama.
>
> "This program is successful without that," Lithgoe [sic] said.  Lithgoe [sic] said Clark appeared humble and apologetic when the two met after thesmokinggun.com revealed Clark's arrest. "Your heart would've gone out to him," Lithgoe [sic] said. "Then to read I forced him to say certain things. . . . There ya go, he's lying again. And we gave him a public platform to say 'I'm not guilty.'"

## (6)    CORRESPONDENCE WITH AIP [May 6, 2003]

808.    On May 6, 2003, Plaintiff' counsel, Robin Mitchell Joyce, Esq., wrote to counsel

for Defendant AIP, Michael Allan Jaffa, Esq. in response to Jaffa's April 13, 2003 letter

threatening to sue Corey Clark for $5 million for breach of the confidentiality provision

contained in the *American Idol* CONTESTANT AGREEMENT [CDC_000727-728]

809.    In the letter, Attorney Joyce reprimanded Attorney Jaffa for the manner in which

Corey Clark's removal from the show was orchestrated [CDC_000727-728]:

> Had your producers taken the time to investigate this matter, they would
> have found out that the incident in Topeka stemmed from a very sad and silly
> misunderstanding, during which Corey Clark sought to protect his sister, not
> to harm her. This becomes clearly apparent if one bothers to note that the
> resulting charges from this matter were reduced to three rather confusing
> misdemeanors . . .
>
> In addition, Corey's sister has stated time and time again that he never hit
> her, has never hit her, and that they have a close and loving relationship.
> There was no way, however, for Corey, under the circumstances presented to
> him on the morning of his dismissal from *American Idol,* to present that in a
> linear and understandable way or to have his sister with him to explain the
> truth of the matter . . .
>
> With reckless disregard for Corey's reputation and the reputation of his
> family, American Idol broadcast a hacked version of his interview
> constructed solely to support its decision and create controversy . . .
>
> For two days thereafter, Corey tried to reach representatives of *American Idol*
> for assistance in dealing with the press and his pleas were callously ignored.
> It was only then that Corey was forced to rehabilitate his name and, more
> importantly, the reputation of his family, by granting selective interviews.

# Season Two:
# JACOB JOHN SMALLEY

## A. PRE-HOLLYWOOD

810.    Jacob John Smalley, born March 20, 1983, from Lawton, Oklahoma, was 19 years

old when he auditioned for Season Two of *American Idol.*

811.    On or about November 10, 2002, Jacob John received high marks from the Expert

Judges when he first appeared before them at Open Auditions in Austin, Texas.

- <u>Paula Abdul</u>: **"Wow, I think you have the 'X Factor', good, good, good, wonderful."**

- <u>Simon Cowell</u>: **"Very good, your timing was a bit off, but very good.  You have a nice face and a very, very good voice."**

- <u>Randy Jackson</u>: **"Excellent, dude, one of the best that I have heard today.  Excellent, excellent. Very good."**

- <u>Paula Abdul</u>: **"I think we're all saying the same thing…"**

- <u>Simon Cowell</u>: **"…You are going to Hollywood."**

812.    During the month of November, 2002, Plaintiff Smalley did not receive any communications from ENTERPRISE-DEFENDANTS, except for a travel itinerary and information regarding *American Idol* press.

813.    On or about Saturday, November 30, 2002, Jacob John was in the passenger seat of his cousin's car.  They were approaching their family home in Edmond Oklahoma when they were arbitrarily pulled over by Oklahoma County police officers.  Jacob John was asked by one of the officers to step out of the car.  As he complied with the officer's request and stepped to the side of the vehicle, the officer placed his flashlight in Jacob John's face and declared "you are publicly intoxicated."  Incredulous, Jacob John responded: "What do you mean? We're just going home."  The officer countered back angrily:  "No, you are going to jail."  The officer placed handcuffs on Plaintiff Smalley, who protested that he wasn't drunk and had not even been driving the car.  The officer wrote up two charge two charges: one for "Public Intoxication" and one for  "Verbally Resisting Arrest."

814.    At the arraignment the next Monday, the Judge scheduled a Court date for mid-January.

815.    Later that week, a few days before he was scheduled to fly to Los Angeles, California to compete in Hollywood Rounds, Plaintiff Smalley received a fax from Defendant AIP containing, among other documents, the *American Idol* CONTESTANT AGREEMENT.

816.    Plaintiff Smalley did NOT disclose the record of his pending arrest for public intoxication or resisting arrest in the *American Idol* CONTESTANT AGREEMENT.

## B.    CONTEST PARTICIPATION

### (1)    HOLLYWOOD ROUNDS

817.    Jacob John was flown to Los Angeles, California by ENTERPRISE-DEFENDANTS on or about Monday, December 9, 2002 to compete in the Hollywood Rounds.

818.    At the end of the week, after three rounds of cuts, Jacob John was selected by ENTERPRISE-DEFENDANTS as one of the Top 32 Semi-Finalists of *American Idol* Season Two.

819.    On or about December 13, 2002, Jacob John met with one of ENTERPRISE-DEFENDANTS' security advisors to discuss some background information.  At the time, Plaintiff Smalley did NOT disclose the record of his pending arrest for public intoxication.

820.    At the Open Auditions in Austin, Texas on November 10, 2002, Jacob John had met another *American Idol* contestant named Kimberly Caldwell, a white female.  The two began a friendship.  During Hollywood week, according to US Weekly magazine, the two contestants were seen "cuddling" behind the scenes.

821.    On or about December 23, 2002, Jacob John received a Fedex from Defendant AIP containing ADDENDUM #1 to the *American Idol* CONTESTANT AGREEMENT and the PARTICIPANT BACKGROUND INFORMATION FORM.  Plaintiff Smalley did NOT complete and sign these documents until January 2003.  Plaintiff Smalley did not disclose the record of his pending misdemeanor arrest for public intoxication in the PARTICIPANT BACKGROUND INFORMATION FORM.

**(2)   COURT CASE**

822.    On or about December 27, 2002, Plaintiff Smalley received a telephone call from one of ENTERPRISE-DEFENDANTS' agents.  The agent asked Smalley: "What is this 'public intox' on your record?  We can't have you on the show if you have this record outstanding.  If you have any type of arrest on your record, you cannot be on the show."   Jacob John pleaded with ENTERPRISE-DEFENDANTS' agent that he would take care of it immediately.  The agent responded that he would give him one chance to "clean up" his record or he would be disqualified from the Top 32.

823.    On or about the morning Thursday, January 2, 2003, Mr. Smalley went early to the criminal courthouse, reported to the clerk of court, and stated that he wanted to enter a plea of "no contest" on both charges to close out the case.

824.    Upon entering his plea of guilty to the charges, the Oklahoma Judge remarked that he had *personally* spoken to the "people from *American Idol*" and the Judge remarked that "they really have it out for you.  Good luck with the show…"

825.    That same day, on January 2, 2003, Jacob John informed ENTERPRISE-DEFENDANTS by telephone that the outstanding charges had been closed.

**(3)   SEMI-FINAL ROUNDS**

826.    On or about Wednesday, February 5, 2003, Plaintiff Smalley was flown by ENTERPRISE-DEFENDANTS back to Los Angeles, California to compete in Group 2 of the Semi-Finalist rounds of the *American Idol* Contest, which was scheduled to be recorded the coming weekend.

827.    Upon returning to the *American Idol* production set, Plaintiff Smalley noticed that

the producers of the show had grown "cold" to him.

828.    Upon his arrival to the first rehearsal session for his Semi-Final round performance, ENTERPRISE-DEFENDANTS notified Plaintiff Smalley that he was *required* to sing his 4th or 5th song choice on his list of Top 5 songs, which was a downtempo song by singer-songwriter Bryan McKnight (who is African-American).  Plaintiff Smalley protested somewhat because he had been practicing a song by popular recording artist Bryan Adams (who is white), which song was ranked first on his list of Top 5 songs taken from the master song list provided by ENTERPRISE-DEFENDANTS.

829.    Plaintiff Smalley was specifically told by ENTERPRISE-DEFENDANTS that he could NOT sing *any* Bryan Adams song for the Semi-Finalist round.  It came to pass that the identical Bryan Adams song that was ranked #1 on Plaintiff Smalley's list, and which was not performed by any other Top 32 Contestant during the Semi-Final or Wild Card round of Season Two, was later performed by a white contestant during the Top 12 Finalist round of Season Two.

830.    The Semi-Finalists were told by ENTERPRISE-DEFENDANTS that they could invite family members out to Hollywood to attend the Semi-Final round performances.  Plaintiff Smalley therefore invited two of his male cousins to Los Angeles, both of whom were African-American.

831.    On or about February 9-10, 2003, a couple of days after John Jacob's cousins had arrived to the production set of *American Idol*, Plaintiff Smalley received an unannounced visit to his hotel room from Simon Lythgoe, the son of Defendant LYTHGOE, who was and is the senior executive producer of the Production.   LYTHGOE strongly indicated that Plaintiff Smalley would need to "un-invite" his Black cousins from the set of *American Idol*.  LYTHGOE told Jacob John: "You are fucking up the biggest opportunity of your life.   Your cousins are

being loud and obnoxious.  They are ruining your chances.  We are at the point where we want to send them back to Oklahoma just long enough until you are off the show."

832.    Plaintiff Smalley, who did not have the money at the time to purchase transport for his two cousins, thereafter borrowed the money from a fellow contestant to send his family members back to Oklahoma.

833.    On Tuesday, February 12, 2003, Jacob John's performance was broadcast on-air and purportedly submitted to the public vote in Semi-Final Group 2.

834.    On Wednesday, February 13, 2003, it was announced that Ruben Studdard and Kimberly Locke from Group 2 had advanced to the Finalist round.  Plaintiff Smalley was informed that he had been eliminated from the Contest.

835.    After the results show that same evening, Plaintiff Smalley spoke to then Judge Paula Abdul, who told him that he should be "rest assured," that he would come back for the Wild Card rounds and that he was a "star."

836.    For the next two weeks, Plaintiff Smalley prepared himself to return for the Wild Card rounds.  He never received a call from the ENTERPRISE-DEFENDANTS.  Instead, he learned from Kimberly Caldwell, as she boarded the plane, that she had been selected for the Wild Card round.

837.    When Caldwell returned to compete in the Wild Card round, she was adamantly told by agents of the ENTERPRISE-DEFENDANTS that she could not "carry on" a relationship with Plaintiff Smalley because "he was bad news".

838.    Jacob John's image and likeness continues to be owned and marketed on-line by ENTERPRISE-DEFENDANTS.[7]

---

[7] See http://www.americanidol.com/contestants/season_2/jacob_john_smalley

# Season Two:
# DONNIE WILLIAMS

839.   Donnie Williams, born July 26, 1983, is an American soul, gospel and jazz singer-songwriter who in 2004, at the age of 20, became a Top 32 Semi-Finalist in Season Three of *American Idol*.

840.   Williams credits Stevie Wonder, Sam Cooke, Ron Isley and Donny Hathaway as influences and also includes gospel singers Marvin Winans and Dorinda Clark-Cole among his favorites [CDC_002688]

841.   In 2007 THE SAN FRANCISCO CHRONICLE called him:

**A Soul Stylist of the first order [who] might have given Fantasia Barrino some serious competition on "American Idol" if he had not been bounced from the show early in 2004 after a drunken-driving arrest.  [CDC_002689]**

842.   During Season Three, the Semi-Final Rounds, or "Live Shows", were scheduled to air on February 10-11, 2004; February 17-18, 2004; February 24-25, 2004; and March 2-3, 2004.  The wildcard round was to air on March 9-10, 2004.

843.   Plaintiff Williams was scheduled to perform at the Live Show on Tuesday, February 24, 2004.

844.   On the early morning hours of Monday, February 23, 2004, at around 2:00 a.m., Plaintiff Williams was driving home from a celebration party.  He was pulled over by a police officer for speeding in Danville, California.

845.   Plaintiff Williams was cited – but NOT arrested - by the Danville police officer for driving while under the influence.  After being cited, Williams was released into another person's care and his car was towed and stored.  [CDC_002693]

846.   Danville Police would not release Plaintiff Williams' blood-alcohol level, but

said while it was over the legal limit, it did <u>not</u> reach the 0.16 threshold (twice legal limit of .08) which results in booking and jailing.  Williams later retrieved the car around noontime Monday.  [CDC__002693-94]

847.    On the afternoon of Monday, February 23, 2004, Plaintiff Williams called the offices of Defendant FMNA and/or AIP and informed them of the citation he received from police.  Williams was told by ENTERPRISE-DEFENDANTS' representative not to worry about it and that he should report to the production office as soon as practicable.

848.    On or about Wednesday, February 25, 2004, Plaintiff Williams reported to the production offices of Defendant FMNA in Burbank, California.   As he entered the office building, Plaintiff Williams saw a former *American Idol* contestant named George Huff leaving the offices of Defendant WARWICK.  Williams recognized Huff and suspected immediately that Huff had taken his place in the Semi-Finals because Huff had already been cut from the competition before the Semi-Final rounds had been announced.

849.    Plaintiff Williams was thereafter notified by Defendant WARWICK and Defendant LYTHGOE that he was being disqualified from the Season Three program but that he would have an opportunity to compete the following year.   The meeting with the senior producers took place in less than a minute.

850.    On Friday, February 27, 2004, Defendant FOX announced to the press that Plaintiff Williams had been officially disqualified from Season Three of the Production.

> Unfortunately due to recent events "American Idol" participant Donnie Williams has been removed from the contest," said Scott Grogin, Fox VP of corporate communications, says in a statement. "While understanding that Donnie has not been convicted of a crime, the producers and network feel that the nature of the charges against him warrant his disqualification. We wish Donnie the best during what must be a difficult time and once these issues have been resolved, he is welcome to try out for the show again next season.  [CDC_002697; CDC_002704]

851.    On May 22, 2013, ENTERPRISE-DEFENDANTS' highly sophisticated counsel submitted a Position Statement to the EEOC which stated that "Williams was arrested for driving drunk and speeding past police officers at 100 miles per hour.  ***Because the pending criminal matter posed a threat to his continued availability for the show, Mr. Williams was disqualified.***" [Position Statement, p. 13] (emphasis added).

852.    Plaintiff Williams was <u>never</u> arrested.  He was provided with a citation, charged with a misdemeanor and entered a diversion program.

# Season Four:
# LEROY W.

## A.    AUDITION

853.    Leroy W. ("Leroy") is an African-American male citizen of the State of Alabama who was featured as a performer on Season Four of *American Idol*.

854.    On or about September 4-5, 2004, Leroy auditioned for *American Idol* at Open Auditions held by ENTERPRISE-DEFENDANTS in New Orleans, Lousiana.

855.    Mr. Wells is <u>not</u> a plaintiff in this action.

856.    Despite the fact that *American Idol* is billed as a singing contest, Leroy did not sing for his Open Audition in New Orleans.  Instead, he rapped.  When Leroy spoke to the camera or judges, ENTERPRISE-DEFENDANTS added English subtitles.

857.    Describing Leroy's performance on *American Idol,* the MOBILE REGISTER (ALABAMA) would later report:

> Wells' segment put him in a class by himself.
>
> In his favor: An eager-to-please demeanor and enough energy to light up a city. Working against him: An adrenaline-fueled sales pitch that judges had trouble following and <u>a demonstration of hip-hop vocals and footwork that, while impressive, didn't seem to fit a contest limited to conventional singing</u>.
>
> When judges pushed him to actually sing something, he launched into James Brown's "I Feel Good," complete with foot-stomping, hand-clapping percussion and vocal approximations of the tune's horn riffs.
>
> "Dog, you ain't right for this, man, but listen, we love you," said judge Randy Jackson, who seemed to enjoy the interlude immensely.
>
> "You are so entertaining and energetic and fun," judge Paula Abdul consoled, "but you know this isn't the right competition."
>
> "It's just ridiculous. I didn't understand a word you said," said a stunned Simon Cowell, who'd been flabbergasted from the moment Wells bounced onstage.  [CDC_005798]

858.    Leroy did <u>not</u> receive a Golden Ticket to Hollywood.

## B.    EXPLOITATION

859.    On January 5, 2005, Leroy was arrested in Mobile, Alabama on charges of second degree assault and firing a weapon into an occupied vehicle.  The charges allegedly stemmed from an incident that occurred on December 10, 2004. [CDC_005833]

860.    Court records showed that at the time of his January 5, 2005 arrest, Leroy pled no contest to misdemeanor possession of marihuana in 2004 and misdemeanor disorderly conduct in June 2003.  In May 2004, Leroy was also charged for drug possession and for a shooting.  Both of these charges were later dropped. [CDC_005774; 5843]

861.    On Tuesday, January 25, 2005, at 8:00 p.m. EST, the footage of Leroy's Season Four *American Idol* audition was aired in its entirety, with substantial footage of Leroy performing both before and after his audition for the Expert Judges.   The episode reportedly drew more than 28 million viewers.

862.    During the January 25, 2005 episode, Leroy was identified only as a 22-year-old from Grand Bay, Alabama named Leroy W.  His birthdate was not displayed on screen.

863.    On January 25, 2005, the same evening of the broadcast, CHICAGO TRIBUNE described Leroy's audition on *American Idol* as follows:

> He brought the crunk life to "Idol," sporting "crunk teeth," shouting and crip-walking into the audition. He "sang" Ol' Dirty Bastard's "Got Your Money." Most of what he said was indecipherable, but his "Can you dig it?" was loud and clear. [CDC_005794]

864.    On Wednesday, January 26, 2005, Leroy's appearance the prior night "lit up message boards on the official "American Idol" website, idolonfox.com.

> Comments ranged from "Best audition ever. Better than [William] Hung" to "He was a buffoon who completely embarrassed himself." [CDC_005798]

865.    On early Wednesday, January 26, 2005, a publicist for Defendant FOX stated that

the network or producer had  been unable to reach Wells since his episode aired. Defendant

FOX's PR agent reportedly stated on January 26, 2005:

> **"We have gotten so many calls about him, it's hilarious," the publicist said before news
> broke of his incarceration.  [CDC_005798]**

866.    On Thursday, January 27, 2005, in an article entitled "*Leroy W. in a Class By*

*Himself: Idol Jailed During Moment in Limelight,*" the MOBILE REGISTER (ALABAMA) reported

as follows:

> **When the clock started running on** Leroy W.**'s 15 minutes of fame, he was in
> no position to do anything about it . . . His bizarre performance thoroughly
> baffled the talent show's celebrity judges. Among viewers, he earned instant
> comparisons to William Hung, who became a minor celebrity last season
> thanks to singing so badly that it scored well as comedy …**
>
> **[Leroy]'s audition was taped late last summer in New Orleans. When it
> aired Tuesday night [Jan. 25], Wells was in Mobile County Metro Jail.**
>
> **By early Wednesday evening, his release appeared imminent. Chris McNeil
> of Outlaw Bail Bonds said Wells' family members had posted bail and
> [Leroy] likely would be free within hours.**
>
> **For those who saw [Leroy] as an unlikely hero who gate-crashed his way to
> minor celebrity, the news of his legal travails may come as a disappointment.
> But for those who savor "American Idol's" most entertaining losers, the bar
> has been raised a notch.  [CDC__005797]**

867.    On  January  28,  2005,  the  *American  Idol*-dedicated  fan  website,

www.foxesonidol.com posted Leroy's mugshot and published the following:

> **Leroy W. could be credited with providing the most entertaining segment
> on "American Idol" so far this season. While his bad audition was certainly
> bad, it was at least amusing. Leroy W. came to the audition room like a
> fireball of energy and stomped through a rhythmically engaging version of
> Old Dirty Bastard's "Baby I Got Yo Money." The judges certainly were
> amused, dancing along and encouraging, but knowing there was no way
> Leroy was going to advance.  [CDC__005936]**

868.    On January 28, 2005, the UPI News service published an article entitled:

"*American Idol 4 reject Leroy Wells had to watch himself from jail*" and described Leroy W. as:

"One of the most popular, though unsuccessful, performers in this week's American Idol show." [CDC_005939]

869.    On January 30, 2005, NEWSDAY (USA) reported that:

Last week's unintelligible "American Idol" auditioner Leroy W. watched his TV debut last Tuesday from the Mobile (Ala.) County Metro Jail.  E! Online reported he was arrested for allegedly shooting a man in the hip after an argument [CDC_005779]

870.    On February 1, 2005, the KANSAS CITY STAR reported that:

Leroy W. is the baddest of the bad "Idol" wannabes (he's the one who was in jail when his segment aired). [CDC__005782]

871.    On February 8, 2005, Leroy W. was arrested again for disorderly conduct and resisting arrest while standing outside of a local Arby's in Mobile, Alabama.  Sting 7 of website foxesonidol.com reported on the incident as follows: [CDC_005932-33]

[Leroy]'s entertainment value was quite high (if not his chances of advancing on "Idol"). His appearance has made him quite the local celebrity around Mobile. This hasn't helped him. "I see how the media is continuing to feed his notoriety," [Alabama police department spokesperson] Eric Gallichant observed. "Y'all are making him a star. He's getting all this free publicity."

[Leroy]'s brother, who has always staunchly defended his brother, continues to do so. "I'm sure the people out there know what's going on," he said. "It's easy to pick on Leroy W. now, since he has got a little fame. Suddenly, you're talking too loud at an Arby's and you got to be arrested? Oh yeah. The people out there know exactly what's going on here."

872.    Despite their being a complete absence of any allegation that Leroy W. presented any threat of any kind to anyone during his *American Idol* appearance in New Orleans, Sting 7 noted:

But Leroy's arrest may have had some effect on American Idol. It's been reported that Simon Cowell and Paula Abdul are insisting on beefed up security. Simon has no comment about Leroy specifically, but said, "People want to kill me." Cowell told UK's DeHavilland Information Services, "It's serious and we have a lot of security now for that reason. "

"I'm getting 500 emails every week and I have been threatened by people waiting for me with baseball bats." It has even been reported that Cowell is wearing body armor when he makes certain appearances, and has as many as six former special forces soldiers keeping check on him. Paula's only

**response about Leroy has been, "It's really scary."**

873.    As part of its standard practice and ordinary course of business, ENTERPRISE-DEFENDANTS procured criminal record history information concerning Leroy W. at the time of his audition before the Expert Judges in September 2004 or shortly thereafter.

874.    ENTERPRISE-DEFENDANTS knew at the time of airing the January 25, 2005 episode of *American Idol* that Leroy W. was incarcerated in Mobile, Alabama.

875.    Defendant LYTHGOE, who directly participated in the decision to air the footage of Leroy W.'s performance on January 25, 2005, as well as in the subsequent media exploitation of Leroy W.' criminal arrest history, publicly stated at the time that Leroy W. was "not right for the program."

> **"Leroy applied like tens of thousands of others, and we didn't feel he was right for the program. What he does after he auditions, we really cannot account for," Nigel Lythgoe has said. [CDC__005933]**

# Season Five:
# BRITTENUM TWINS

## A.    PRE-HOLLYWOOD

### (1)    OPEN AUDITIONS IN CHICAGO [September 2005]

876.    On September 16, 2005, Terrell and Derrell Brittenum (the "Brittenum Twins") attended the Open Auditions for Season Five of *American Idol* at Soldier Field in Chicago, Illinois.

877.    After performing successfully, they were invited back to the callback venue at the W Hotel on September 20, 2005.  At the time of the Open Audition in Chicago, they were 28 years old.

878.    On or about September 20, 2005, Plaintiff Brittenums, as a pair, performed before the panel of *American Idol* Judges (Abdul, Cowell, Jackson) and each earned a Golden Ticket to Hollywood.

### (2)    ARREST AND CHARGES IN MEMPHIS, TENNESSEE [October 30, 2005]

879.    On October 30, 2005, police officers pulled Terrell Brittenum over at a gas station in Memphis, Tennessee (Shelby County).  The officer ran the license plates on the car Terrell was driving, a 2005 Dodge Magnum, and discovered it was a stolen car from Georgia.  Terrell Brittenum was taken under arrest by the officer.

880.    The Shelby County police department thereafter informed the police department in Rockdale County, Georgia that the stolen vehicle had been recovered.   The vehicle was reportedly sent back to a car dealership in Rockdale County, Georgia.

881.     On October 30, 2005, T. Brittenum was charged by Shelby County prosecutors

with "Theft $10,000-$60,000". A court date of January 10, 2006 was set for T. Brittenum to appear in Shelby County criminal court.

882.   On or about November 2, 2005, T. Brittenum was charged by Shelby County prosecutors "Fugitive from Justice" charge.

883.   On or about November 3, 2005, T. Brittenum was released from jail in Shelby County on $7500 bond.

### (3)   TERRELL BACKGROUND CHECK [November 2, 2005]

884.   On November 2, 2005, Defendant CARCO transmitted a "Participant Report", Case # M1768-00666; Subject #: 103622, concerning Terrell Brittenum ("The Terrell Report") to Minna Taylor, Esq., a senior in-house counsel at Defendant FOX who directly supervised the background check process for *American Idol* contestants at times relevant to this action.

885.   The Terrell Report, dated November 2, 2005, indicated that, under Investigative Summary category "criminal," that the status was "Adverse" indicating "Shelby County, Tennessee, Upper and Lower Court criminal record review. [CDC_002915]

886.   The Terrell Report, dated November 2, 2005, also indicated "Adverse" under the "civil" category and referenced Davidson County, Tennessee. [CDC_002917]

887.   The Terrell Report, dated November 2, 2005, also reported a Shelby County criminal record charge, dated 11/02/2005, entitled "Fugitive from Justice Without Warrant", and indicated "Prosecution Pending." A Court date for the fugitive charge was set in Shelby County, Memphis, Tennessee for January 10, 2006. [CDC_002921]

888.   The Terrell Report, dated November 2, 2005, also indicates, albeit in a different font than the typefont used on the rest of the page, that Terrell was "Arrested on 01/10/2006 for The following warrants: 2005-3968, Forgery; 2005-3969; Theft by Deception; 2005-3970,

Financial Identity Fraud.  [CDC_002921]

889.    The Terrell Report, dated November 2, 2005, also indicates that Terrell had a charge brought in <u>Shelby County, Tennessee</u> of "Theft of Property $10,000-$60,000;"dated 10/30/2005. The listing said that the disposition was "Dismissed"; that the *Sentence Date was 01/10/2006 and the "NEXT COURT DATE:   1/10/2006.   This charge was dismissed."* [CDC_002922]

## (4)    DERRELL BACKGROUND CHECK [November 14, 2005]

890.    On November 14, 2005, Defendant CARCO transmitted a "Participant Report", Case # M1768-00066, Subject #: 103791 concerning Derrell Brittenum ("The Derrell Report") to Minna Taylor, Esq., a senior in-house counsel at Defendant FOX.  [CDC_002926]

891.    The Derrell Report, dated November 14, 2005, indicated that, under the Investigative Summary category "criminal," that the status was "Adverse" indicating "Shelby County, Tennessee, Upper and Lower Court criminal record review re: Brittenum, Derrell Deshon.  [CDC_002927]

892.    The Derrell Report, dated November 14, 2005, also indicated "Adverse" under the "civil" category and referenced Dekalb County, Tennessee.  [CDC_002927]

893.    The Derrell Report, dated November 14, 2005, also reported a Criminal category on page 6.  The entry is clearly "cut and paste" from some other document as it says that "active arrest warrants issued from Rockdale, GA."  [CDC_002931]

894.    The Derrell Report, dated November 14, 2005, also reported Shelby County criminal record charge, dated 10/23/2000, stating that Derrell had been convicted of 29-9-102: Contempt of Court General (misdemeanor) and was sentenced 02/13/2002, having to pay $50 in fines.  [CDC_002931]

895.    The Derrell Report, dated November 14, 2005, also reported Shelby County criminal record charge, dated 10/23/2000, for "Passing Bad Checks Over $500".  The entry said that "Diversion Granted.  This is not a conviction.  On 04/20/2004, Diversion Terminated.  A warrant was issued.  Warrant was still active as of 1/17/2006."  [CDC_002932]

896.    The Derrell Report, dated November 14, 2005, also reported Shelby County criminal record charge, dated 2/23/1998, for "Theft of Property Over $500".  Disposition is listed as Dismissed and indicates that suspect was "Released Without Charge."  [CDC_002932]

## B.    CONTEST PARTICIPATION

### (1)    HOLLYWOOD WEEK [December 2005]

897.    The Brittenums attended the Hollywood Rounds in Los Angeles, California in December, 2005 at ENTERPRISE-DEFENDANTS' expense.

898.    At the end of Hollywood Week, the Brittenum Twins were selected by the *American Idol* Judges to move on to the Semi-Finals.

899.    After the Hollywood rounds were complete, the Brittenum Twins were instructed to meet with GIALLO, ENTERPRISE-DEFENDANTS' private investigator, to discuss their background checks. The Brittenums met with GIALLO in a hotel room in the Marriott that had been converted into an office space.  During the meeting with GIALLO, she explained that the Brittenums needed to disclose their prior criminal arrest history so that ENTERPRISE-DEFENDANTS would be able to protect them in case anything got reported the media.  The Brittenums disclosed to GIALLO the pending criminal charges concerning the Rockdale case.

900.    GIALLO asked the Brittenums to disclose their password to their MySpace page, which they did.

901.    After the Brittenum Twins returned home to Memphis after Hollywood Week,

they began to receive weekly calls from Michael Allan Jaffa, Esq., who was, at the time, lead counsel for Defendant FREMANTLE and/or Defendant AIP.

902.    In each occasion where Attorney Jaffa called the Twins, he wanted to know how the case was coming and whether the Twins could be found living in their mother's house.  Each time Attorney Jaffa called, the Terrell assured him that he and his brother were "staying out of trouble" and were home with their mother.

## (2)    SURPRISE ARREST [January 9, 2006]

903.    As of Monday, January 9, 2006, Terrell Brittenum was staying at his mother's home in Memphis, Tennessee.  At the time, his brother Derrell was staying with his friend outside of Memphis.

904.    On January 9, 2006, at approximately 11:00 p.m. in the evening, Terrell Brittenum received a telephone call from attorney Michael Allan Jaffa, Esq., who was, at the time, lead counsel for Defendant FMNA and/or Defendant AIP. Attorney Jaffa wanted to know how the Brittenums' pending criminal case involving the Dodge Magnum was going and if there had been any recent developments in the case.  Terrell informed Attorney Jaffa that he had a court appearance scheduled for the very next morning, January 10, 2006 in connection with the Dodge Magnum, and that he was hoping everything would turn out fine.  Attorney Jaffa told Terrell to keep Attorney Jaffa updated concerning any more developments.

905.    At about 3:30 a.m. in the morning on January 10, 2006, approximately four hours after Terrell received a phone call from Attorney Jaffa of FMNA and AIP, Terrell was on his living room couch when he heard a loud bang on the outside of his door.  The banging repeated. He opened up the front door to his mother's house and he was greeted by three uniformed police officers.  On the front lawn beyond there were in excess of 15 uniformed police officers with

dogs and flashing lights. Police vehicles were everywhere surrounding the house and driveway.

906.   Terrell was apprehended and brought to Shelby County police department.  He was told that there was a "governor's warrant" issued out of Georgia in connection with the Dodge Magnum.  Terrell did not understand why Georgia would issue a warrant for his arrest if he had a court date scheduled in Memphis that very same morning.  The officers could not explain it.

907.   Within 3-4 days of Terrell's apprehension on January 10, 2006, his mother was able to retain a lawyer in Atlanta, Georgia, to have the governor's warrant lifted. Notwithstanding, and for reasons unknown, the Shelby County police department refused to let Terrell free.  He therefore was not able to watch the premiere of Season Five of *American Idol,* which was scheduled to appear only days later.

### (3)   SEASON FIVE PREMIERE [January 17, 2006]

908.   On Tuesday, January 17, 2006, the premiere episode of Season Five of *American Idol* aired to U.S. audiences.

909.   The Brittenum Twins were the "lead" act to perform for the *American Idol* Judges on the show and commanded substantial airtime.

910.   The premiere episode of Season Five of *American Idol* drew more than 35.5 million viewers, which was a new record for the Series in the Nielsen ratings.  [CDC_002758]  It was the highest ratings point for a premiere in the eleven-year history of the program.

911.   According to *Smoking Gun*, the duo was widely hailed as the standouts of the Series' first episode.  [CDC_002782].

912.   Within *mere hours* after the airing of the premiere episode of Season Five of *American Idol* on the night of January 17, 2006, U.S. news media outlets began reporting, *in*

*extensive detail,* that Terrell Brittenum was being held in Shelby County Jail and that his brother Derrell was a "fugitive on the run."

913.    Upon information and belief, ENTERPRISE-DEFENDANTS caused to provide U.S. news media outlets with all of the details of the Brittenums' arrest record information concerning the *pending charges,* as well as all of the details of their past arrest record information, which was completely unrelated to the pending charges, including arrest information dating back more than eight years to 1998.

914.    MTV News also reported that, according to Steve Shular, a spokesperson for the Shelby County, Tennessee, sheriff's department, the Brittenums had prior misdemeanor records in Shelby County dating back to 1998 and 2000.  [CDC_002762]

915.    Similarly, TVFanForum.com reported detailed arrest background information (more than eight years old) that completely irrelevant to the pending charges relating to the automobile. [CDC_002797]

> **Terrell Brittenum has a Shelby County arrest record for traffic violations and a 2000 misdemeanor citation for disorderly conduct and indecent exposure. The exposure charge was amended to disorderly conduct and he paid a $50 fine.**
>
> **Derrell Brittenum was arrested in 1998 for theft over $500 and in 2000 for contempt of court and passing bad checks, court records show.**

916.    The media reports regarding the Brittenum Twins' past arrest records dating back to 1998 and 2000 were necessary derived from the Derrell Report, dated November 14, 2005 and the Terrell Report, dated November 5, 2005, each of which were issued to Minna Taylor, Esq. of FOX.

917.    Defendant FOX refused to comment on the incident or on the Brittenum Twins' status for the show.  "We do not comment on the personal lives of our show participants," FOX spokesperson Scott Grogin said. [CDC_002784]

918.    On or about Friday, January 20, 2006, Derrell Brittenum checked in to the Rockdale County police department in Atlanta, Georgia.  [CDC_002834]

919.    On or about Saturday, January 21, 2006, Terrell Brittenum reportedly waived an extradition hearing in Shelby County, Tennessee and was thereafter transported by a private carrier to Atlanta, Georgia.  [CDC_002827; 2834]

## C.    DISQUALIFICATION

### (1)    NOTICE OF DISQUALIFICATION [January 22, 2006]

920.    On Sunday, January 22, 2006, according to their defense attorney, the Brittenum Twins were released from the police department in Rockdale County, Atlanta, Georgia on $30,000 bond. [CDC_002798]  They were required to pay $5,000 each to secure the bond.

921.    Because the Brittenums were scheduled to fly back to Los Angeles, California for the Semi-Final Rounds on or about Monday, January 23, 2006 they acted with quick speed to clear up their legal issues.  In furtherance thereof, the Brittenum Twins borrowed $15,000 from family members in order to pay for Terrell's private carrier transport to Atlanta as well as for the bond money required to be released pending the disposition of charges.  Their family loaned them the money so as to ensure that the Brittenums would not miss their call-backs for Semi-Finals in Los Angeles.

922.    On the evening of Sunday, January 22, 2006, the Brittenum Twins received a call from LYNN stating that they had been disqualified from the show because there was "too much media attention" surrounding their arrest.  The Brittenums were heartbroken.  They explained that they had borrowed $15,000 from their family, who were themselves in a fragile economic condition, in order to get all the legal issues cleared up before going back to Hollywood to compete in the Semi-Finals.  The Brittenums also explained to LYNN that they had disclosed

everything about the charges to GIALLO during Hollywood Week, who represented to the Brittenum Twins that she needed to know everything about the *pending* case so that she could protect them.

923.   LYNN explained that the Brittenums could <u>not</u> come back to Los Angeles for the television show under any circumstances because they were "too famous" and there were too many news reporters waiting for them in Hollywood.  LYNN explained that the "airports were crowded" and that the Britteneums were so famous now that it wouldn't be "fair to the other contestants" because the "Brittenum Twins would get all the attention."

924.   At no point after receiving news of their official disqualification did FOX issue a statement to the press indicating that the Brittenum Twins had been disqualified.  FOX did not release to the press any information concerning ENTERPRISE-DEFENDANTS' justification for disqualifying them.

925.   On February 6, 2006, the ATLANTA JOURNAL-CONSTITUTION reported that WARWICK told Buzz at a phone press conference on February 3, 2006 [CDC_002854] that:

> **[T]he show has let many finalists with skeletons in the closet stay as long as the contestants give them advance notice and it's in the past (i.e., Bo Bice with drugs and Nikki McKibbin's time as a stripper). But the Brittenum case was too recent to ignore. 'From what I heard under the circumstances, I think it was a prudent decision,' Warwick said. 'There's a lot of money involved and kids watching this.' He does say the twins will get plenty of airtime once the pre-taped Hollywood auditions begin Wednesday.**

## (2)   EXPLOITATION [January-May 2006]

926.   On January 25, 2006, the lawyer for the Brittenums, Maurice Bennett, announced that the Twins were receiving record label offers from industry veterans such as Jermaine Dupri, and that they had received offers to perform live.   However, FOX would not permit the Brittenums to enter into any engagements.  [CDC_002799]

927.   On or about January 27, 2006 – after the Brittenum Twins had been disqualified by ENTERPRISE-DEFENDANTS – Fox News reported that the Brittenums were still under contract with the show. [CDC_002846]

> The network did, however, reportedly squelch the brothers' planned live appearance Wednesday night on MSNBC's "Scarborough Country" — indicating the Brittenums are still officially under contract to Fox.

928.   On or about January 27, 2006 – after the Brittenum Twins had been disqualified by ENTERPRISE-DEFENDANTS - the NEW YORK POST reported that FOX was impeding the Brittenums' gainful employment. [CDC_002799; 2849]

> The [FOX] network put the kibosh on a planned live performance by the Brittenums Wednesday night on MSNBC's "Scarborough County," indicating that they are probably still under contract.

929.   On February 9, 2006, ENTERPRISE-DEFENDANTS caused to air *American Idol* episodes of Hollywood featuring significant amount of footage of the Brittenum Twins in which they were portrayed in extreme negative light.   ENTERPRISE-DEFENDANTS at this point had already disqualified the Brittenums and orchestrated a media scandal around their pending arrest; but that was not enough.  ENTERPRISE-DEFENDANTS now chose to further exploit the Brittenums and inflict further damage upon their good names and reputations by editing together and broadcasting footage of them which was clearly intended to defame them further.

930.   LYTHGOE knew in December 2005, during Hollywood Week of Season Five, that the Brittenums were going to be disqualified for their pending criminal records and so he leveraged that knowledge and intentionally placed the Brittenums in high-stress situations designed to cause anxiety and irritability.   For example, LYTHGOE falsely represented to Derrell that Terrell had been cut from the competition, simply to generate a reaction out of Derrell.

931.   On Wednesday, February 15, 2006, MSNBC.com reported as follows regarding

the Brittenums' troubled appearance during Hollywood Week:

> **This season's edition was a little less dramatic than usual, but it did have its villains. The Brittenum twins, who made news before the Hollywood round even began for allegedly committing identity theft, and have been the main men on camera ever since, did another clinic on how not to win friends or influence people. But like all good villains, they did get to be at least partially redeemed in the end.**

932.    On Thursday, February 16, 2006, the NEW YORK POST reported that the February 15 episode of *American Idol* had exploited the pending criminal arrest of the Brittenums, including the airing of footage from FOX news affiliates [CDC_002873]:

> **LAST night's "American Idol" episode officially ended the run of troubled Tennessee twins Derrell and Terrell Brittenum. The brothers were actually booted off "Idol" last month after being charged with identity fraud - after making it to the next round in L.A.**
>
> **But just how the show would handle their inevitable exit wasn't revealed until last night. With just minutes left in the show, "Idol" host Ryan Seacrest mentioned the brothers and their legal troubles. The show then rolled several news clips from Fox's Memphis affiliate documenting the Brittenums' legal woes.**
>
> **"So the Brittenum twins are no longer in the competition," Seacrest said. The Brittenums, who have prior arrest records, are accused of using someone else's identity to buy a car last June in Atlanta.**

933.    The *American Idol* episode aired on February 15, 2006 also displayed an image of the Brittenums' faces locked behind jail bars in a cartoon-like manner.

934.    In late-April 2006, LYTHGOE called the Brittenum Twins and invited them to fly out to Los Angeles to appear in the Season Five finale.  LYTHGOE wanted the Brittenums to appear in a "feature sketch" where they would be seen running across the *American Idol* stage as fugitives while *faux* police officers chased them.  The Brittenums refused to participate.

935.    Notwithstanding, in May 2006, ENTERPRISE-DEFENDANTS caused to broadcast footage of the Brittenum Twins on the finale of American Idol and once again referenced their alleged crimes and displayed an animated, cartoon-like set of jail bars closing over the

Brittenums' faces.

936.    In May 2006, the Brittenum Twins entered into a plea deal as "first offenders" and were sentenced to a Diversion Program, which they eventually cleared successfully.  They were also ordered to pay $11,352.22 in restitution and each fined $1,000 each.  [CDC_002896]

## (3)    SEASON SEVEN AUDITIONS

937.    In August 2007, the Brittenum Twins attended the Open Auditions for Season Seven in Atlanta once again, they were both awarded Golden Tickets to Hollywood by Simon Cowell, Paula Abdul and Randy Jackson.   [CDC_002900].  They told the ATLANTA-JOURNAL-CONSTITUTION that "we are truly blessed to be back."  [CDC_002900].

938.    Just days before being flown to Los Angeles, California for Hollywood week, however, the Brittenums received a call from LYNN stating that "FOX Legal" was having problems with the fact that they were now age 29 and therefore too old to compete.   The Brittenums commented that all of the Judges and production staff, including LYTHGOE and WARWICK, knew exactly how old they were before they received Golden Tickets in Atlanta. LYNN said there was nothing he could do to help them.

939.    In December 2007, Brittenums decided, however, to fly to Los Angeles, California for Hollywood Week anyway, at their own expense.

940.    Upon their arrival to the *American Idol* production set in Los Angeles, they were greeted warmly by former Judge Paula Abdul.  They were temporarily admitted past security and had the opportunity to meet with WARWICK and LYTHGOE, who were very cold and short with them.  They informed the Twins that there was no way they could be on the show that year because "FOX Legal" prohibited them based on their age.

# Season Five:
# HALICIA T.

941.    Halicia T., an African-American female citizen from the State of North Carolina, was an *American Idol* Contestant on Season Five of the Production.

942.    Halicia auditioned for *American Idol* on or about October 6, 2005 in Greensboro, North Carolina.  Born in August 1978, Halicia was 27 years old at the time of her audition for *American Idol.*

943.    Halicia, who had an eleven-year-old child with her in the audition and a large family of supporters waiting outside the audition room, impressed the Expert Judges by singing "*It's A Different World."*  Judge Simon Cowell called Halicia "a natural talent" and said he liked her.

944.    After a unanimous vote from the Expert Judges, Halicia was awarded a Golden Ticket to Hollywood.  She kissed Simon Cowell and her family's triumphant reaction was shown to viewers.

945.    Halicia's audition would later be described by REALITY TV MAGAZINE as "a feel-good moment."  [CDC__005474].

946.    Halicia was one of 175 Golden Ticket Holders who attended Hollywood Week at the Orpheum Theater in Los Angeles, California in mid-December 2005.  She was cut from the *American Idol* Contest on the second or third day of Hollywood Week, after the second "group performance" round.  The next day, Halicia returned home to her family in North Carolina.

947.    On Tuesday, January 17, 2006, Season Five of *American Idol* debuted to a U.S. television audience of more than 38 million people.  The Brittenum Twins were the featured lead act.

948.    On Tuesday, January 24, 2006, the *American Idol* episode featuring Open Auditions from Greensboro, North Carolina was broadcast in the U.S.  The episode featured the entirety of Halicia's audition segment [CDC__005474].

949.    Halicia's birthdate was not displayed on-screen as part of the episode.

950.    On Tuesday, January 31, 2006, the two-hour *American Idol* episode featuring Open Auditions from Austin, Texas drew 35 million television viewers.

951.    On Wednesday, February 1, 2006, the *American Idol* episode featuring Open Auditions from Boston, Massachusetts drew 32.4 million viewers.

952.    On February 2, 2006, at 3:18 pm PST, TMZ.com posted an article under its "Celebrity Justice" section entitled *Idol Contender's Criminal Past.*  [CDC_005415]  The web article revealed that Halicia had been twice convicted of misdemeanor crimes, including for criminal trespass on April 12, 1998 (more than 7 years before Halicia's audition for *American Idol*) and for disorderly conduct on July 10, 1998 (also more than 7 years before Ms. Thompson's audition for *American Idol.*    Both incidents stemmed from verbal arguments in public places, one of which involved a North Carolina police officer.  Halicia was only 19 years old at the time of the infractions.  TMZ.com posted the underlying police reports and court documents relating to both incidents and ostensibly interviewed Halicia, who described one of the incidents as "racial".  [CDC_005417-5431]

953.    On Thursday, February 2, 2006 at 1:00 pm PST, E! ENTERTAINMENT CHANNEL on-line (EOnline.com) also reported Halicia's past infractions based on the initial TMZ.com report [CDC__005452]

954.    On Friday, February 3, 2006, at 1:07 a.m., REALITY TV MAGAZINE re-published portions of the TMZ.com article featuring Ms. Thompson's arrest history.  In an article entitled

*"American Idol Contestant Halicia Thompson Criminal Past Exposed", the article stated:*

> TMZ does not address if Halicia Thompson is at risk of being eliminated from the competition for her criminal past. Usually if the criminal offense was minor and the contestant made Idol producers aware of the incident(s), then contestants are allowed to continue in the competition.  [CDC_005474]

955.   In response to the REALITY TV MAGAZINE article concerning Ms. Thompson, one commentator noted as follows:

> Those are newsworthy crimes? How in the world does something as little as that compare to last year's revelations of Bo Bice being arrested for allegedly trying to buy cocaine or Scott Savol allegedly throwing a phone at his girlfriend when she was holding a child? What she did is no worse than what every other celebrity does in Hollywood yet don't get arrested for it . . . This is nothing- she cusses, so what? She's probably had a hard life and racist cops tend to take things out on African-Americans. It is certainly no big deal.  [CDC_005475]

956.   On Friday, February 3, 2006, the VANGUARD NEWS NETWORK (vnnforum.com) re-published the TMZ.com article concerning Ms. Thompson's arrest record history and posted the following headline "*Another American Idol nigger with a rap sheet.*"  [CDC_005459].

957.   In response to the VANGUARD NEWS NETWORK article, a "Senior Member" of the on-line forum commented:

> "It's just the same damn story all the time with these Niggers….Everytime you turn over a rock, there is a fucking nigger under it with a warrant or criminal record!  Un-fucking real!"  [CDC_005460]

958.   As a part of its standard practice and ordinary course of business, ENTERPRISE-DEFENDANTS purported to obtain written consent from Ms. Thompson to procure criminal record history information concerning Ms. Thompson during the background check process of *American Idol* Contestants for Season Five.  This included record information that dated back more than seven (7) years from the time of the infractions.

959.   Upon information and belief, once in possession of Ms. Thompson's criminal history information, ENTERPRISE-DEFENDANTS caused for such information to be disseminated to

the entertainment and tabloid websites, including TMZ.com, prior to or concurrent with the February 7, 2006 broadcast of the *American Idol* episode that features Ms. Ward's Golden Ticket audition.

# Season Five:
# TATIANA W.

960.    Tatiana W., an African-American female citizen from the State of Pennsylvania, was an *American Idol* Contestant on Season Five of the Production. ("Tatiana")

961.    Prior to her appearance on *American Idol,* Tatiana won 2005's MakeAStar.com singer/songwriter contest as well as honorable mention at 2004's VH1 songwriter competition.

962.    Tatiana auditioned for *American Idol* in Boston, Massachusetts on or about October 27, 2005.  Born in August 1983, Tatiana was 22 years old at the time of her audition for *American Idol.*

963.    After singing *"My Cherie Amour",* Tatiana was awarded a Golden Ticket to Hollywood by the Expert Judges.

964.    Tatiana attended Hollywood Week in mid-December 2005.  She was cut from the *American Idol* Contest by the second day of the Hollywood rounds.  [CDC_005483]

965.    On Tuesday, February 7, 2006, at 8:00 pm EST the *American Idol* episode featuring Open Auditions from Boston, Massachusetts was broadcast to U.S. viewers.  Tatiana's entire audition performance was shown to audiences.  Tatiana's birthdate was not displayed on-screen as part of the episode.

966.    On Wednesday, February 8, 2006, at 6:19 p.m. PST, TMZ.com posted an article to its website entitled *"A.I. Contestant – Convicted Shoplifter"* [CDC__005497]

**TMZ has learned 'American Idol' contestant Tatiana Ward, who is on her way to Hollywood after last night's audition, got into legal trouble on her**

way out of Macy's.

> According to legal documents obtained by TMZ, Ward was cited for shoplifting $24 in merchandise from the Macy's Department Store in Montgomery County, PA. The incident occurred on March 22, 2002.

> Ward pled guilty to retail theft and was fined $135. Ward was also cited for carrying false ID. TMZ has learned she had a false New Jersey driver's license. Ward pled not guilty but Judge David Keightly begged to differ, fining her $187.50 for that offense.

> TMZ spoke with Judge Keightly today who is far from **"Simon-esque,"** Judge Keightly said, **"She's a very good singer and I hope she does well in the competition."**

967.    TMZ.com's article entitled *"A.I. Contestant – Convicted Shoplifter"* also posted the underlying court records for Tatiana's non-traffic citations from the Commonwealth of Pennsylvania.  One of the official citations posted by TMZ.com, dated March 22, 2002, contains a "faxline" of "02/08/2006 Wed. 12:48 [p.m.]" from a "District Court" fax number with 215 area code (which is associated with the Commonwealth of Pennsylvania). [CDC_005498]

968.    On Thursday, February 9, 2006, the website "buffaloathome.com" published an article entitled "*American Idol" Contestant Has Shoplifting Record*. [CDC__005508].   The article reads as follows:

> Looks like yet another "American Idol" wannabe has a criminal past TMZ.com reports that Tatiana Ward, who wowed the Fox talent judges on last night's show, was cited for shoplifting in 2002. She was accused of taking 24-dollars in merchandise from a Macy's Department Store in Montgomery County, Pennsylvania . . .

> No word if the report will effect Ward's status on "Idol." Last week it was revealed that 27- year-old North Carolina-native and "Idol" Halicia Thompson had been convicted of second degree trespass and disorderly conduct. Two weeks ago, talented twins Terrell and Derrell Brittenum were dismissed from "Idol," following the news that they were wanted on identity-theft charges. **[CDC_005656] As a part of its standard practice and ordinary course of business,** ENTERPRISE-DEFENDANTS **procured criminal record history information concerning Ms. Ward during the background check process of** *American Idol* **contestants for Season Five.**

969.    As a part of its standard practice and ordinary course of business, ENTERPRISE-

DEFENDANTS purported to obtain written consent from Tatiana to procure criminal record history information concerning Tatiana W. during the background check process of *American Idol* Contestants for Season Five.

970.    Upon information and belief, once in possession of Tatiana W. criminal history information, ENTERPRISE-DEFENDANTS caused for such information to be disseminated to the entertainment and tabloid websites, including TMZ.com, prior to or concurrent with the February 7, 2006 broadcast of the *American Idol* episode that features Tatiana's Golden Ticket audition.

# Season Five:
# TORA W.

971.     Tora W., who is of African-American, was featured as a Contestant on Season Five of *American Idol*.

972.     On or about October 10-13, 2005, Tora W. auditioned for the show in Las Vegas, Nevada and - based on her merit as a singer - was awarded a Golden Ticket to Hollywood by the Expert Judges.

973.     Upon information and belief, footage of Tora W.s audition aired in the episode of *American Idol* that was broadcast by ENTERPRISE-DEFENDANTS on January 31, 2006.

974.     On February 20, 2006, REALITY TV WORLD magazine (www.realitytvworld.com) published an article on-line entitled *"American Idol Contestant Cries Foul: Tuscon Teenager Learns 'Gol Ticket' to Hollywood Doesn't Mean Much"*.  The article reported that Tora W., who is of African-American descent, was disqualified from *American Idol* by ENTERPRISE-DEFENDANTS after receiving a Golden ticket but before being flown to Hollywood. [CDC_007149-50] The article relates the events surrounding Tora's disqualification as follows:

> Four days before 16-year-old Tora W[.] was due to depart for Hollywood after earning a Gold Ticket at American Idol auditions in Las Vegas, she received news that she had been eliminated. One of 175 contestants selected nationwide for the finals, Tora prepared for Hollywood week (Dec 4-10) immediately following the Las Vegas audition in October of 2005. It wasn't until November 30 [2005] that Idol producers told her she had been eliminated and refused to give her a reason.
>
> City auditions over and her contestant status secured, Tora returned home to prepare for American Idol. Knowing she would miss school, she obtained a GED and began a new job training program. However, once her boss found out she would be gone for a week, Tora was forced to resign. Other preparations included purchasing audition attire, vocal coaching and rehearsing music sent to her by the show. Numerous communications from FOX and Idol producers, including airline and hotel reservations received on November 21, confirmed Tora's continued participation in the show.

[CDC_007419]

975.    The 2/20/2006 article in REALITY TV WORLD reveals that Defendant FOX made a statement to the press concerning Tora's abrupt disqualification from Season Five of the show. Despite Ms. Tora W.'s full disclosure of her background information on the PARTICIPANT BACKGROUND QUESTIONNAIRE FORM, ENTERPRISE-DEFENDANTS found a "red flag" during the background investigation that warranted her disqualification from the Contest even after earning a Golden Ticket.

> **In a statement to KMSB Fox 11 in Tucson, an Idol representative indicated there was a "red flag" on Tora's background investigation which had led to her elimination.** However, Tora's information was fully disclosed to producers by October 20th, a full 6 weeks before she was cut. Tora's mother recalls the phone call, "The producer was apologetic but said he didn't know the reason for Tora's elimination. He referred me to Fremantle Media." Ms. Woloshin said she spoke with several people at Fremantle who refused to provide her with a reason.
>
> "I asked if it was something we had done wrong and was told that it was a casting decision and she was welcome to audition again next season. Why would they say that if there had been red flag?" Ms. Woloshin said they also refused to to tell her why the call came at the last hour. "They were very unsympathetic to the loss of school and a job." She added that if the show had eliminated Tora earlier, their lives could have gone back to normal. "I went beyond full disclosure, detailing issues I thought might be a concern. If Tora WAS red flagged, they could have called us much sooner." [CDC_007149-50]

976.    Tora and her mother also expressed "dismay" at having been penalized by ENTERPRISE-DEFENDANTS despite Ms. Woloshin's strict adherence to ENTERPRISE-DEFENDANTS' purported "Contest Rules" concerning non-disclosure of background information:

> When [16-year-old] Tora was asked what she thought about the elimination she responded:
>
> "The news would have been easier to take if they told me why.  I have no idea if I'm suppose to do something different. They [ENTERPRISE-DEFENDANTS] let a lot of people through and find out later that they're criminals. Those people lied on their background checks and they got through. I told the truth and was cut before I got there."
>
> Tora's mother is dismayed that show producers are sending this message to Idol hopefuls. "From a young person's perspective they might think they can get further by hiding issues that may not be appealing. I think you

garner more respect by being honest and open about it. Tora's issues were very minor in the scheme of things."

Although Tora was devastated by the American Idol decision to eliminate her just days before Hollywood, she refuses to give up on a career in music.  [CDC_007150]

# Season Six:
# THOMAS DANIELS

## A.    PRE-HOLLYWOOD

### (1)    YOUTHFUL INDISCRETION

977.    Plaintiff Thomas Daniels is a native-born U.S. citizen of Portland, Oregon, born January 18, 1985. Tommy Daniels grew up in the "small town" of Troutdale, Oregon (Multnomah County).

978.    In late 2004, Plaintiff Daniels, then age 18, had been out with friends drinking. When he left the bar that evening, he was "buzzed", but did not feel drunk or incapable of handling the wheel.  Using the judgment of an 18-year-old, he got in his car and drove about a half-mile only to realize that it was a bad idea for him to be driving.  His vision was blurry.  So he did the responsible thing: he parked the car over to the side of the road and decided to wait some time until he sobered up.

979.    After parking his car on the side of the road, Daniels slid into the passenger side seat to lay back.  He decided to keep the ignition on to stay warm.  When he awoke, it was to a police officer knocking on his car door.  The officer asked Daniels to get out of the car and determined that Daniels was intoxicated.  Plaintiff Daniels was arrested and charged for driving while under the influence of alcohol.  He pled no contest to the charges, paid a fine and was placed into a diversion program, which he completed.

980.    Daniel's DUI conviction was expunged from the public record.

981.    In December 2005, Daniels was arrested for an alleged hit-and-run incident. There were no reported personal injuries or property damage stemming from the incident. Daniels pled no contest to the charge, paid a $50 fine, and attended a safe driving class.  The charge was thereafter expunged from his record.

## (2)    GOLDEN TICKET

982.    On September 19, 2006, Thomas Daniels waited in line for several days and nights to audition for Season Six of *American Idol* in Seattle, Washington.

983.    At the time of his audition for Season Six of *American Idol*, both of Plaintiff Daniels' past misdemeanor convictions had been officially expunged from the public record.

984.    Plaintiff Daniels had previously auditioned for both Season Four (2004) and Season Five (2005) of *American Idol* but did not get past the "cattle call" phase.

985.    After passing through the "cattle call" phase on September 19, 2006, and performing at least three times for different pairs of junior and senior producers, Tommy Daniels was called back to audition for the Expert Judges, which was scheduled for October 2-3, 2006.

986.    Shortly before the Callback round, on or about October 2-3, 2006, Plaintiff Daniels quit his job as a gas station attendant back home in Oregon.  He was confident that he had what it took to be the "next *American Idol."*

987.    On or about October 2-3, 2006, a large number of Daniels' family and friends attended the Callback audition at the W HOTEL in Seattle, Washington to show their support.

988.    When Tommy Daniels finally got his opportunity to sing before the Expert Judges – Simon, Randy and Paula - he was awarded a Golden Ticket to Hollywood by *unanimous* vote.

989.    Appearing before Simon Cowell, Paula Abdul and Randy Jackson, Tommy Daniels sung the song "*Arms of a Woman*" by Amos Lee.  The Expert Judges commented in

relevant part as follows:

- <u>Simon Cowell</u>:  **"I thought you sang that very well, Thomas.  It's nice to hear a non-obvious song again."**

- <u>Paula Abdul</u>: **"Very Nice. Very Soothing.  You know we haven't had a great start here in Seattle."**

- <u>Randy Jackson</u>:  **"Dude, I loved you.  Man, I thought it was really, really nice.  Beautiful tone, baby, beautiful tone. Yes, definitely, definitely."**

- <u>Paula Abdul</u>: **"Yeah, Thomas.  You are absolutely original.  Yes, yes, yes, yes."**

- <u>Simon Cowell</u>: **"It's a Yes.  You are through to Hollywood."**

- <u>Randy Jackson</u>:  **"Welcome to Hollywood."**

## (3)   BACKGROUND CHECK

990.    After Plaintiff Daniels received his Golden Ticket on or about October 2-3, 2006, ENTERPRISE-DEFENDANTS provided him with a packet of documents including a written background questionnaire form ("LFQ.06") and the *American Idol* CONTESTANT AGREEMENT (v.06).

991.    Tommy Daniels was instructed  that he would need to complete <u>all</u> of the paperwork and execute all contracts <u>before</u> he was flown to Los Angeles to compete in Hollywood Rounds.

992.    Tommy Daniels reviewed the voluminous paperwork with his mother, Starla Daniels, who is a public school teacher in Oregon.

993.    With respect to the background application questions concerning Contestants' prior arrests and convictions, Plaintiff Daniels specifically asked his mother whether he should disclose his expunged misdemeanor convictions.  His understanding was that he had already completed diversion programs for both infractions, had paid his fines to the Court, had attended the Court-ordered safe driving classes and, consistent with this understanding, had effectively

paid his dues to society for the crimes he committed. Daniels explained to his mother that he did not think it was fair that he was being asked to disclose his expunged government records to *American Idol.*

994.    Starla Daniels advised her son that because *American Idol* was the "number one" show in the world, and was a very powerful entity, that ENTERPRISE-DEFENDANTS were likely going to discover Tommy's past record in any event.  She explained that he would be doing himself a favor if he simply disclosed the expunged misdemeanor records on the application form.

995.    Accordingly, Plaintiff Daniels followed his mother's advice and completed all of the application forms. He set forth in writing the dates and charges of his expunged misdemeanor records and submitted these forms to ENTERPRISE-DEFENDANTS before he reached Hollywood.

996.    On October 9, 2006, Plaintiff Daniels signed *American Idol* CONTESTANT AGREEMENT (V.06).

## C.    CONTEST PARTICIPATION

### (1)    HOLLYWOOD ROUNDS [November 16-17, 2006]

997.    During Season Six, the Hollywood phase of the audition process was held over a period of four days, from Monday, November 13, 2006 through Friday, November 17, 2006 at the ORPHEUM THEATRE in Los Angeles, California.

998.    Plaintiff Daniels successfully auditioned through three rounds of cuts held on four consecutive days.  In the process, he also established himself as one of the "lead runners" in the Contest who was consistently singled out by his peers and the Expert Judges as a standout performer.

999.    At the end of Hollywood Week for Season Six, Plaintiff Daniels was one of 40

remaining Contestants selected by ENTERPRISE-DEFENDANTS to advance to the next round (the "Green Mile"), which was scheduled for mid-January 2007.

1000.   After the Top 40 was announced, Simon Cowell personally approached Plaintiff Daniels backstage and offered his congratulations. Cowell remarked that Daniels had consistently delivered solid performances throughout the rounds and that Cowell appreciated Daniels' efforts and positive attitude.  Daniels also received adamant praise from Judge Paula Abdul.

1001.   Upon returning home from Hollywood Rounds, Daniels once again was required by ENTERPRISE-DEFENDANTS to faithfully and accurate complete even more documentation relating to his personal background information.  He was reminded again that completion of the forms was required by ENTERPRISE-DEFENDANTS in order for him to continue advancing through to the next round.

## (2)   EPISODE AIRDATE [January 17, 2007]

1002.   The premiere episode of *American Idol* Season Six aired on Tuesday, January 16, 2007.   According to the Nielsen ratings, the January 17, 2007 episode drew 37.3 million television viewers.

1003.   The following night, on Wednesday, January 17, 2007, ENTERPRISE-DEFENDANTS broadcast the second episode of *American Idol* that season, which drew 36.9 million television viewers.

1004.   The DETROIT FREE PRESS noted that the premiere episodes of Season Six of *American Idol* broke Defendant FOX's broadcast record for the number of primetime television viewers:

> **Setting the standard: The first two episodes of "American Idol." The Tuesday and Wednesday audition shows drew 37.3 million and 36.9 viewers respectively,**

**the two biggest nights of prime-time entertainment on FOX since it came onto the air nearly two decades ago. [CDC_003710-11]**

1005.   The January 17, 2007 episode of *American Idol* Season Six featured Tommy Daniels' audition segment as the "lead-off" part of the show.   Consistent with ENTERPRISE-DEFENDANTS' custom and practice, the *American Idol* Contestant featured as the "lead-off" performance on any given audition episode is considered by ENTERPRISE-DEFENDANTS to be the most talented or captivated singer featured in that program.

1006.   During the episode broadcast on January 17, 2007, Daniels' entire audition performance, as recorded in Seattle on or about October 2-3, 2006, was aired by ENTERPRISE-DEFENDANTS, as well as a biographical introduction, the Expert Judges' commentary on Daniels' performance, and footage of a triumphant Tommy Daniels being greeted by a large number of his family members who were ecstatic about his Golden Ticket achievement.

1007.   Thomas Daniel's birthdate was <u>not</u> displayed on-screen during the airing of the January 17, 2007 episode.

1008.   Tommy Daniels watched the January 17, 2007 episode with a room full of close family and friends.   His sister had arranged a gathering for him at a local Karaoke bar in his hometown of Troutdale, Oregon.   When the audition segment of Tommy's *American Idol* performance aired, the crowd of supporters erupted into cheering, celebration, and some measure of disbelief that he was on national television.   His supporters were also ecstatic about how well Tommy had actually scored before the Expert Judges.   He was on "Cloud 9."

1009.   After the episode was broadcast on the evening of Wednesday, January 17, 2007, Thomas Daniels' entire world changed in a flash.   At then age 21, Daniels instantly became the "town hero".   His phone would not stop ringing with congratulatory messages.

1010.   Daniels was not always so popular.   He had spent his entire childhood and high

school years in a rural-suburban community where he was the ONLY African-American student. He was called "nigger" so many times as a child that he simply became accustomed to the word. Daniels was not only singled out by his white classmates as being different; he was consistently told that he was a "half-breed", something "lower than" or "not up to par" with his peers by virtue of his African descent.

1011.   Tommy Daniels got so picked on as a young student in his hometown that he developed a keen sense of humor about his personal experience as the "outsider", which eventually made himvery likeable to his classmates.  But, as a young adult, Tommy Daniels had come to internalize some feelings of "inferiority" due to the sheer repetition and intensity of racial *animus* he had endured as an element of his everyday existence growing up as the only black kid in an all-white county.

1012.   With the broadcast of the January 17, 2007 episode of *American Idol*, any remnant feelings Tommy Daniels had of not being good enough, of not measuring up to his peers, of not being a part of the "American Dream" on the same, equal terms as his white classmates, had instantly evaporated.  All thoughts of self-doubt disappeared. Tommy Daniels the "outcaste" was now Tommy Daniels *"the next American Idol."*  It was now He who set the standard for excellence.

1013.   By the time Plaintiff Daniels returned to his house in the early morning hours of January 18, 2007, there was no question that January 17 had been the greatest night of his entire life.

## (3)   HERO BACK TO "ZERO" [January 18, 2007]

1014.   On Thursday, January 18, 2007, at about eight o'clock in the morning (PST), Plaintiff Daniels was awoke by his father.  He reported that the house phone had not stopped

ringing all morning.  Daniels answered the next phone call.  It was a member of the press.  The FOX reporter wanted to know about his DUI and his hit-and-run and whether Plaintiff Daniels had any comments about his criminal past.  Tommy immediately hung up the phone because he had been repeatedly warned by ENTERPRISE-DEFENDANTS not to speak to the press.

1015.   The phone continued to ring but Tommy Daniels did not answer.  Finally, his friend reached him on his father's cell phone. "Tommy – have you seen this?  They have your DUI MUG SHOT all over TV … on Channel 8 . . . FOX …. all over TMZ.  They have you looking like a criminal on the morning news.  Man, this is fucked up.  Wow, I can't believe they *disqualified* you for that.  I'm so sorry…"

1016.   Daniels recalls that as he logged on to the internet that morning and began reading all about his expunged criminal history and checking out his non-flattering mug shot plastered all over every website, his heart was filled with immeasurable sorrow.  "They raised me up only to drop me right back into the dirt, but even lower…"

1017.   On, January 18, 2007, the day after the airdate of the episode featuring Tommy Daniels' Golden Ticket audition, TMZ.com posted the following article on its website at 5:49 pm PST [CDC_003685]:

> **AMERICAN IDOL WANNABE ALREADY HAS A RECORD**
>
> **Celebrity Justice**
> **1/18/2007 5:49 PM PST BY TMZ STAFF**
>
> **Before he wowed Simon, Paula and Randy during last night's "American Idol" Thomas Daniels took his fair share of punishment from real judges over several criminal charges, including drunk driving.**
>
> **TMZ has unearthed legal documents which reveal that in 2004, Daniels was convicted of DUI in Clackamas, Oregon.  The 21-year-old, who was the first wannabe to get the green light from the "AI" crew on last night's show, pled guilty and was sentenced to a one-year alcohol diversion program and a $680 fine. Daniels also attended eight AA meetings and saw a counselor once a week for two months. After the completing his DUI sentence, the incident was wiped from Daniels' record.**

> **TMZ spoke exclusively with Daniels** who said, in reference to his DUI, **"I was young and dumb and drinking and driving."**
>
> **In December 2005, Daniels was arrested again; this time for hit and run. He failed to appear in court for the arraignment, so Daniels was rearrested. <u>TMZ could not find the disposition of the hit and run</u>. Daniels called the incident "another young and dumb situation."**

1018.   Based on the information published in the above article, at the time of initial publication on January 18, 2007, TMZ.com obtained access to Daniels' records of arrest – including charges that been *expunged* - but did not have information pertaining to the court disposition of all arrests.  This means that TMZ did <u>not</u> retrieve Plaintiff's criminal arrest history from the local court or police department in Oregon.

1019.   As of the initial publication date of the TMZ.com article on January 18, 2007, ENTERPRISE-DEFENDANTS had already been in possession – for several months - of all documents and records pertaining to Thomas Daniels' criminal record history.

1020.   Upon information and belief, TMZ.com obtained Daniels' criminal background information – including his arrest record history - from ENTERPRISE-DEFENDANTS.

1021.   Upon information and belief, in or about January 2007, ENTERPRISE-DEFENDANTS transmitted or caused to transmit information to TMZ.com relating to Daniels' criminal background history – including his expunged arrest record information – for the express purpose of causing TMZ.com to publish Plaintiff's court record information in a manner and timeframe that was consistent with ENTERPRISE-DEFENDANTS' marketing plan, ratings goals and socio-political objectives.

1022.   Various viewpoints, comments and responses were posted to the commentary section of the TMZ.com article, which posted a photograph of Daniels' (then) three-year-old mugshot.  Some of the comments inferred from the TMZ.com article that Daniels had failed to

disclose his arrest history:

> **Daniels may be a so-so singer, but not disclosing his criminal convictions as part of Idol's qualification process is not only a deliberate lie, it's a cover up, fraudulent and deceptive. No doubt, Daniels will try and blame his lying and cover-up on an abusive and poor upbringing.**

> **Being a convicted criminal is a big deal, but evidently Daniels doesn't care at all about this, including those he victimized with his criminal acts. Daniels doesn't belong on the Idol competition and should be yanked from it and disbarred from ever being allowed to participate again . . . Honesty and integrity are more important than so-called talent. [CDC_003691]**

1023.   There were also members of the TMZ.com on-line community who did not believe it was fair game to post Daniels' mug shot and criminal arrest history, noting the ethical issues raised by publishing a citizen's criminal record information where it had already been (supposedly) expunged from government databases or otherwise sealed from public view.

> **I realize DUI is a serious thing, does it mean that we have to bring it out. If the guy was a murderer or a rapist it would be one thing.  Give the guy a break.  He only past the audition.  [CDC_003693] ….**

> **If this was wiped from his record, why did TMZ think it was their business to disclose this information. Leave him alone.  [CDC_003694]**

1024.   Throughout the day of January 18, 2007, and for a couple of days after into the weekend, television, radio and internet outlets around the country reported the "news" of Tommy Daniels' *expunged* 2004 DUI record and *expunged* hit-and-run record, accompanied whenever possible with his official mug shot from the 2004 DUI.

1025.   After he was cut by ENTERPRISE-DEFENDANTS during the Green Mile phase of the *American Idol* Contest, Tommy Daniels received a phone call from a fellow Contestant, Antonella Barba, who was ultimately selected to the Top 24 of Season Six.  Ms. Barba was calling Plaintiff Daniels that day to express her sorrow  - through tears - that Tommy had been disqualified.

1026.   Ms. Barba explained that while the Top 24 Semi-Finalists were at a group

meeting, the ENTERPRISE-DEFENDANTS LYTHGOE and WARWICK announced that one of the Contestants who "should have made the Top 24" had to be disqualified on account of breaching the contract and breaking the rules of the contest.  The producers cited Plaintiff Daniels as an example of what could happen if any contestant going forward failed to disclose their background information as required.

## (4)   AFTERMATH

1027.   In the days, weeks and many years that followed Daniels' disqualification - including to the present day - anytime any one of the 37+ million U.S. citizens who encounters Tommy Daniels and recognizes him in association with *American Idol,* they oft repeat the very same apologetic message as Tommy's friend expressed that fateful morning: that it was "messed up" how they "disqualified" Tommy from *American Idol* for his DUI.  That they should have given him his chance.

1028.   From his disqualification forward, whenever the issue of *American Idol* came up with Plaintiff Daniels' family or friends, it was never to talk about his singing or his artistry or his momentary triumph.  Instead, it was always to talk about how *American Idol* had done him wrong.

1029.   For Daniels' mother, Starla, who was a grade school teacher at the local public school, the experience was particularly difficult.  She took tremendous pride in bragging about her son (as all mothers do); but particularly because he hadn't much to brag about himself during his childhood and had faced tremendous adversity due to his mixed African heritage.  For a brief moment in time, her son's unique talent and gift had been recognized by the most popular television show of all time, no less, and her son was emerging as a true star of the community.

1030.   But with the senseless publication of her son's expunged records and mug shot on

TMZ.com, all of that pride came crashing down.  The message had been confirmed: Tommy Daniels wasn't qualified to be the next *American Idol* after all.  And not because he couldn't sing, but because he was a "criminal."

1031.  Since the day following the January 17, 2007 airdate of *American Idol*, Tommy Daniels has been effectively shut out of the music industry. Despite his extraordinary talent and originality as a musician, singer, producer and lyricist, Plaintiff and his creative works have been systematically rejected by music industry insiders due to his "past association" with *American Idol.*

Plaintiff Daniels is largely considered a "disappointment" to friends and family.  He represents "what could have been" or a "dream shattered." They sympathize with Tommy and believe that he was treated unfairly, but they consider him a "disappointment" nonetheless.

1032.    At age 28, Tommy Daniels' mug shot continues to populate the worldwide internet and he continues to be stigmatized for his "disqualification" from *American Idol* stemming from an expunged 2004 DUI.

# Season Six:
# AKRON WATSON

## A.    VIETNAM & MARIHUANA

## (1)    CLAUDE WATSON [1972]

1033.   Claude Watson, the father of Plaintiff Akron Watson, is an African-American veteran of the Vietnam War.  He was born in Fort Valley, Georgia and joined the service during the late 1960s while still a teenager.

1034.   As a young boy growing up in the rural south, Mr. Watson experienced the effects of draconian racism and Jim Crow.  But he also saw that change was about to come, and was determined to maximize his own potential as an American citizen with equal rights under the law.

1035.   As a young man in his early 20s who had served his country proudly, Claude Watson had dreams of using his military background for good use in his civilian occupation. Thus, in 1972, when the elder Watson returned to the United States from his tour of duty in Vietnam, he applied for an entry-level position with a local police department in the Dallas-Fort Worth area.  Mr. Watson had moved to the State of Texas to be with his wife's family.

1036.   During the job application process in 1972, Claude Watson was asked by the police department – who was aware of his military service in Vietnam - whether he had ever smoked marihuana.

1037.   During the wartime period, it was widely reported by the mass media, who had unprecedented access to the U.S. troops on the ground in Vietnam, that marihuana use was "rampant" amongst the troops – despite being against army rules - and was widely available to

soldiers for its medicinal, therapeutic and healing properties.[8]

1038.   The elder Watson, a disciplined soldier who prided himself on his honesty and integrity, answered the job interview question with the Texas police department truthfully – that he had indeed tried marijuana as a soldier, but only for medicinal purposes while serving his country in Vietnam.  He assured the Texas police department that he had never used marihuana prior to his tour of duty and had no interest whatsoever in using the stimulant upon returning to civilian life in the United States.

1039.   After disclosing his prior use of marihuana during his tour of duty as a U.S. soldier in the Vietnam War, however, Claude Watson was immediately denied the position at the Texas police department and was told not to re-apply.

1040.   In exchange for being an honest citizen and war veteran, Claude Watson's dream to be one of the first Black police officers in the State of Texas was shattered.  He did not bother to re-apply for other positions in law enforcement agencies given that his interview file was a matter of "department-wide" record.

1041.   After months of looking for alternative employment back in 1972-73, Claude Watson ultimately applied for a position at the U.S. post office where he was gainfully employed for almost 40 years before his recent retirement in 2011.   The elder Watson still dreams of being a police officer although is resigned to the notion that he'll need to wait until the "next time around."

---

[8] See http://www.gradesaver.com/the-things-they-carried/study-guide/section9/ ("One of many elements that set the Vietnam War apart from other wars up until that point was drug use, which was rampant among soldiers. Marijuana was grown all over Vietnam, and many soldiers had their first experiences smoking it overseas. It helped them mellow out, it helped them continue fighting. It took their mind off what the war was about…")

**(2)    AKRON GETS BOOKED [April 2003]**

1042.   Years before appearing on the television show *American Idol*, Akron Watson had made a name for himself as an up-and-coming talent in his local Dallas-Fort Worth community of artists, singers, actors and poets.   Akron served as a volunteer at the BLACK ACADEMY OF ARTS and was particularly active in stage productions. With the death of his older brother, Akron also dedicated himself to his Faith.   He actively participated in Gospel functions and theatrical performances.

1043.   On the night of April 26, 2003, Plaintiff Watson had just finished performing at a Gospel show at the University of North Texas.   He got in his car with friends and began driving off campus when he was pulled over by an officer or university security guard riding a bike.   The officer asked Akron to step outside of the vehicle.   The officer then searched the vehicle.   After several minutes, the officer announced that he had found some marihuana in the ashtray of Akron's car, that he had reasonable cause to search the vehicle because he had detected the odor of marihuana, and that Akron was under arrest for possession of a controlled substance.

1044.   Plaintiff Watson was thereafter booked for a misdemeanor Class B offense [CDC_003315] and was appointed defense counsel by the Court.

1045.   On July 22, 2003, Akron's appointed counsel advised him to plea "no contest" and emphasized that because he was a first-time offender, the Court's disposition would be "deferred" temporarily and then expunged from his record if Akron completed a fifteen (15) month probationary period without getting into further trouble with police.   Because Akron did not want to involve his parents (in terms of hiring a defense lawyer to contest the charges) and based on the assurance from his appointed counsel that the misdemeanor record would be expunged, Akron pled no contest to the marihuana possession charge.   In addition to probation,

Plaintiff Watson was ordered to pay a fine of $200.

1046.   Akron completed the fifteen-month probation period without incident and the record of his misdemeanor arrest for marihuana possession was ostensibly expunged from the public record.

## B.   GOLDEN TICKET

### (1)   OPEN AUDITION [August 2006]

1047.   Akron Watson is a native-born U.S. citizen of the State of Texas (Dallas-Forth Worth). born May 17, 1983.

1048.   On August 11, 2006, Akron auditioned at the "cattle call" phase for *American Idol* Season Six in the city of San Antonio, Texas.  Based on a series of performances for junior producers, he received a callback to perform in San Antonio before the Expert Judges.

1049.   On August 26, 2006, Akron ultimately performed before Simon Cowell, Randy Jackson and Paula Abdul.   After some mixed reviews, Plaintiff Watson became one of 24 Contestants from San Antonio, Texas to receive a Golden Ticket in Season Six.   He sang two songs that day, one of which was  "*A Change is Gonna Come*" by legendary singer Sam Cooke. The 1964 single has been celebrated as an "anthem of the American Civil Rights Movement."

1050.   Akron later described his receipt of the Golden Ticket to PEGASUS NEWS, a Dallas-based news outlet, as follows:

> **"I think that was like the triumph of my life," remembers Akron. [CDC_003200]**

### (2)   BACKGROUND CHECK [September 2006]

1051.   In the weeks following Akron's receipt of the Golden Ticket in August 2006, Akron received a phone call from ENTERPRISE-DEFENDANTS' agents, indicating that they wanted

to send a production crew out to Akron's Dallas, Texas home to compile a feature about the young singer that could be used in connection with the "biographical portion" of the show.

1052.   Akron (and his family) was excited by the opportunity to share his background story with the *American Idol* viewers.  He was eager to discuss his life's achievements, as well as the obstacles he had already overcome.  His family viewed Akron's Golden Ticket as a blessing, particularly.

1053.   During the ENTERPRISE-DEFENDANTS' visit to his Texas home, Plaintiff Watson disclosed to ENTERPRISE-DEFENDANTS that in April 2003, he had been arrested by a college security guard for possession of marijuana, even though the University of Texas officer had found nothing but a "roach" (i.e., *de minimus* quantity) in the ash tray of his car.

1054.   Akron Watson further disclosed to ENTERPRISE-DEFENDANTS that he had once been into "partying and chasing girls" but that he changed his errant ways when his brother died. From the moment of his brother's death, Akron dedicated himself to his faith and to being a good Christian.

1055.   In the weeks after the ENTERPRISE-DEFENDANTS' production crew came out to interview Plaintiff Watson, he received numerous e-mails from Defendant AIP and/or Defendant FMNA with information regarding his impending trip to Los Angeles, California for the Hollywood Round of auditions.

## C.   DISQUALIFICATION

### (1)   SURPRISE CALL [November 9, 2006]

1056.   On or about November 9, 2006, about ten weeks after Akron's receipt of the Golden Ticket in San Antonio, Texas, and only four days before Akron was scheduled to fly to Los Angeles, California on November 13, 2006 to compete in the Hollywood rounds, Akron

received a phone call from a representative of ENTERPRISE-DEFENDANTS.   The ENTERPRISE-DEFENDANTS' agent was a male with an English accent.

1057.   Akron later described the November 9, 2006 phone call from ENTERPRISE-DEFENDANTS as follows:

> "I was supposed to leave that Monday, they called me on a Thursday," explains Akron. "They said we're not gonna let you go. And I asked 'why?'"
>
> "And he said 'Well I'm not really sure'… and then he [ENTERPRISE-DEFENDANTS] gave me some alternatives for what I should say to people if they asked why I was kicked off …
>
> "He [ENTERPRISE-DEFENDANTS] told me to tell people that I was now an 'alternate' ... That would protect [me] and protect the show." [CDC_003200]

1058.   On November 9, 2006, Watson was also informed by ENTERPRISE-DEFENDANTS' British representative that the "powers that be" had made their "final decision" and that there was nothing Akron could do.   ENTERPRISE-DEFENDANTS' agent did offer, however, to have Defendant AIP's "psychiatrist" call Akron.

1059.   After receiving the phone call from ENTERPRISE-DEFENDANTS, Akron's entire world was turned upside down.   His hopes and dreams, which had been raised to triumphant levels due to his achievement of winning the Golden Ticket, were shattered.   He had been the pride of his entire community for months; the pride of his family who had endured the senseless loss of Akron's older brother.   Now, Akron had been disqualified from the most popular U.S.-based talent show in history - and for no apparent reason.

1060.   In January 2007, after a lengthy period of mourning, Plaintiff Watson ultimately decided to set up a page on "Myspace.com" to protest his disqualification from *American Idol*. He posted as follows:

> WELL, TWO DAYS BEFORE I WAS SCHEDULED TO LEAVE FOR HOLLYWOOD, I received a call from Idol saying I'm being cut for "unknown reasons." I don't know about you, but that seems jacked up to

me. I want, need, and deserve my shot @ being the next AMERICAN IDOL.  [CDC_003230]

## (2)   LOCAL NEWS [January 31, 2007]

1061.   In the week prior to the airing of the San Antonio, Texas episode (scheduled for February 6, 2007), a journalist with PEGASUS NEWS named Alan Cohen received an "anonymous tip" that Akron Watson, a Dallas-Fort Worth resident, had posted a myspace.com page to protest his disqualification from *American Idol*.  The journalist called Plaintiff Watson to request a live interview at the local news station.  Watson thereafter visited the local station and related his entire disqualification story to Cohen.

1062.   PEGASUS NEWS initially published its story about Plaintiff Watson on Wednesday, January 31, 2007, less than one week before the airing of the San Antonio audition episode. [CDC_003200-02].   After reporting the facts as related by Plaintiff Watson, the journalist commented as follows:

> One might guess that the pot bust would be the reason for Akron not making the show, but others have made it all the way to the finals with felony arrests [citing Bo Bice]. Besides, he told Idol all about his past when they sent a crew to interview him, so they obviously knew about that already.
>
> Yesterday, I spoke twice with "American Idol "PR representative Alex Gillespie to see if the show had any official explanation for why Akron was not allowed to tryout in Hollywood. When I first talked to Gillespie, she told me that she would find out exactly what happened for me. Then when I spoke with her later in the day, she apologized and told me that the show would not ever be giving a reason for Akron's elimination from the competition.
>
> As the Fox network's air-date for the "American Idol" San Antonio search nears, Akron Watson has no clue whether they will even show his audition on television. His dream has been taken from him. Worst of all, he still doesn't know why and maybe never will.  [CDC_003201]

## (3)   EPISODE AIRDATE [February 6, 2007]

1063.   On February 6, 2007, ENTERPRISE-DEFENDANTS aired the final episode of the

Open Auditions phase, which featured Akron Watson's performance from San Antonio, Texas, filmed back in August 11, 2006.

1064.   Plaintiff Watson and his cousin both appeared on the Tuesday, February 6, 2007 episode of *American Idol*.   There was no mention during the episode that Akron Watson had been disqualified from the Contest some 3 months earlier.

1065.   Akron Watson was one of the "feel good" audition stories of the *American Idol* San Antonio auditions.  Akron showed up at the auditions with his cousin William Green. Akron described how he was like Bruce Banner and his cousin was like the Incredible Hulk. Green explained that they were both unemployed with no source of income, and they were putting everything they had into the auditions.  Watson received a Golden Ticket; Green did not.

1066.   That same evening, on February 6, 2007, the popular website RealityTV Magazine (sheknows.com) published a story on-line entitled: *American Idol Un-Invites Contestant Akron Watson.*

> After leaving the audition room, an exuberant Akron leapt into his cousin's arms and was hugged by family and friends. Viewers at home likely couldn't help but feel good for this unemployed guy, who just got the chance of a lifetime.
>
> However, it turns out that Akron's "American Idol" story didn't have a happy Hollywood ending after all.
>
> According to Pegasus News, Akron Watson was later uninvited from the Hollywood auditions. American Idol representatives apparently never even fully explained to Akron why he wasn't being allowed to go. One possibility is that Akron does have a misdemeanor charge of marijuana possession on his record, but Akron claims that he told American Idol about his past. Other contestants with even more serious felony arrests have been allowed to proceed on Idol in the past, as long as they were open and honest with producers.
>
> The even more confusing thing about Akron Watson's elimination is that all indications seem to be that he has turned his life around since his arrest. Pegasus News notes that after a wakeup call when his brother died, Akron dedicated himself to being a good Christian. [CDC_003230]

1067.   The morning after the airing of the February 7, 2013 episode, further news broke

of Akron's previous disqualification and the "blogosphere" ignited.

## (3)  MEDIA FRENZY

1068.  By 10:30 A.M. EST, TMZ.com had already published Akron's mug shot from the

April 2003 arrest, as well as details surrounding his April 2003 arrest. [CDC_003210-11]

> **IDOL HOPEFUL NIXED FROM H'WOOD FOR POT RAP?**
> **2/7/2007 1:30 PM PST BY TMZ STAFF**
>
> **Akron Watson, an "American Idol" contestant from Dallas and one of the feel-good stories of the new season, has been disinvited from the Hollywood round of the show, possibly after producers discovered a pot bust on his record. Watson, whose San Antonio audition aired on last night's "Idol," was arrested in April 2003 for misdemeanor possession of marijuana, according to court records obtained and posted by PegasusNews.com, by way of Reality TV Magazine.**
>
> **He was headed to Hollywood after impressing the judges with his singing, and his story. But Watson tells Pegasus News that two days before he was scheduled to leave for Hollywood, he received a call saying that he would not be competing anymore "for unknown reasons." "Idol" producers did not comment on their withdrawn invitation.**
>
> **Meanwhile, another contestant from San Antonio, facemaker Ashlyn C. was reportedly arrested in August for pouring sugar into the gas tank of her ex-boyfriend's car while a student at Sam Houston State University, according to a report in The HoustonianOnline. When confronted by police, says the Houstonian, Carr confessed to the crime.**
>
> **A spokesman for FOX had no comment.**

1069.  A commentator at www.aoltv.com noted how quickly TMZ.com was able to post

the mug shots of two *American Idol* contestants who had just appeared on the previous night's

show:

> **They really dig up the dirt quickly over at TMZ.com, don't they? They've already posted the mugshots of two of last night's American Idol contestants. [CDC_003245]**

1070.  On February 7, 2007, an article was published on-line entitled: "*Two More*

*American Hopefuls Booted?*" [CDC_003210-11]

> According to Pegasus News, Akron has yet to be given a definitive reason as to why his invitation has been revoked, but "American Idol" insiders claim

that it might have a lot to do with a pot bust on his wrap sheet.

This would seem almost hypocritical since Taylor Hicks had similar problems midway through Season Five and was ultimately left on to later win "American Idol." [CDC__003207]

1071.   On February 7, 2007, an article about Plaintiff Watson's disqualification was published on-line at www.TVFanatic.com [CDC_003258]:

[Watson's] out ... for now. Despite impressing judges with his vocal talent, Akron has been dismissed from Hollywood. The reasons aren't known, but an arrest for marijuana possession has been assumed to be it.

1072.   On February 7, 2007, at 7:15 PM EST, a "mainstream" article about Plaintiff Watson's disqualification entitled "*Akron Watson: Idol Producers Knew About My Past*" was published on-line at PEOPLE.COM [CDC_003274]:

The 23-year-old Dallas-born singer claims that on Nov. 9, two days before he was set to leave for Los Angeles (with a hotel itinerary in hand), he received a phone call telling him not to come.  "From that point I asked why?" Watson tells PEOPLE.  "(The producer) said he didn't have a reason. He didn't know why.  He said that his bosses don't divulge that information to him."

TMZ.com reported on Wednesday [Feb. 7] that it was a prior misdemeanor possession of marijuana charge from 2003 that got him ousted from the competition, based on a story in local Dallas-Fort Worth newspaper Pegasus News.

But Watson insists that before auditioning for Idol, he told producers about his past.

"I was completely open about my background, any trouble I had been in, my medical history – everything!" he tells PEOPLE. "They ask all that information before you audition." (The FOX network had no comment on the reason Watson was told he wouldn't be going to Hollywood after all.) …

"I earned my way in, and you knew about my background, I have no clue why you wouldn't let me go and perform," insists Watson. "It seems like I deserve that opportunity. I still want to know why it is I've been cut. And I still want the opportunity to be on American Idol."

PEGASUS NEWS reported it spoke with Idol publicist Alex Gillespie twice to see "if the show had any official explanation" for the decision. Gillespie allegedly said "she would find out exactly what happened" before later apologizing and stating "that the show would not ever be giving a reason for Watson's elimination from the competition," according to Pegasus News. People also reported that Fox had no comment on the reason Watson was

told he wouldn't be going to Hollywood. [CDC_003274]

## D.   LYTHGOE'S REBUTTAL

1073.   According to NEWSDAY, on Thursday, February 8, 2007, in the wake of the media frenzy surrounding Akron's Golden Ticket revocation, Defendant LYTHGOE participated in a conference call with major media outlets to answer questions regarding the ENTERPRISE-DEFENDANTS' background check procedures and, more specifically, the Akron Watson situation.

1074.   On Friday, February 9, 2007, RealityTVWorld.com published an article on-line entitled: *"American Idol 6 Producer Sheds Some Light on Akron Watson's Ouster,"* which quoted verbatim some of Defendant LYTHGOE's statements to the press on February 8, 2007. [CDC_003289-90]:

> Akron Watson is still wondering why his golden ticket isn't a valid pass to the Hollywood Round of American Idol's sixth season -- and unfortunately for the 23-year-old Dallas, TX singer -- Idol executive producer Nigel Lythgoe couldn't provide a definitive answer.

On Saturday, February 10, 2007, at 4:09 PM EST, REALITY TV MAGAZINE (www.sheknows.com) published an article on-line entitled: *"Akron Watson Getting Booted Was Decision of Fox According to Idol Producer"* [CDC_003296-97]

1075.   The REALITY TV MAGAZINE article reported verbatim Defendant LYTHGOE's February 8, 2007 statements to the mass media concerning Plaintiff Watson's disqualification (as well as statements relating to other *American Idol* Contestant disqualifications based on criminal arrest history and/or ENTERPRISE-DEFENDANTS' background check procedures).   REALITY TV MAGAZINE noted:

> During a recent conference call with media, **"American Idol"** producer Nigel Lythgoe faced repeated questions about Akron Watson. Lythgoe was asked about Akron Watson so many times that it became obvious he was becoming frustrated with the question, and he appeared to be trying to point the finger at [Defendant] FOX in terms of responsibility for Akron's elimination from the competition. [CDC_003296]

1076.   When first asked about Akron Watson and Ashlyn Carr, Defendant LYTHGOE reiterated several times the point that it was Defendant FOX's decision to disqualify *American Idol* Contestants based on their criminal record history:

> **"Number one, we don't get involved, as the producers of the show, in the background checks. That goes out to a private company and FOX. We are informed at the end of the day, 'You can't invite this person, that person, or this person.' And we don't ask why. To be frank, we're not interested."** [CDC_003296; 3289]

> **"If FOX believes that it will damage the show, or damage FOX, or damage the production, then it's best that they just don't come along. With the checks that FOX do, I think you can only do so much."** [CDC_003296; 3289]

1077.   Defendant LYTHGOE also claimed that *Smoking Gun.com* received its information (or "tips") concerning the criminal background information of *American Idol* Contestants from the "so-called friends or family" of the disqualified Contestants themselves:

> **"Every season we get something in Smoking Gun[.com] because somebody gets through the net, and their so-called friends or family will call up Smoking Gun[.com], and it's a lot easier to find out about people when people want to tell you about it, rather than you going and doing searches."** [CDC_003296-97]

1078.   Defendant LYTHGOE stated that the background check process conducted by ENTERPRISE-DEFENDANTS and its agents was "essential" to the *American Idol* Production because ENTERPRISE-DEFENDANTS need to know that "we've got the right people together":

> The fact is, we do background checks. I think it's very essential. We're putting these kids together in a very close environment, and we're working them very hard, and <u>it's essential that we know that we've got the right people together. So Fox gets along with this private security firm.</u> After that, I can't give you any other information because I don't want to know. [CDC_003297; 3289]

1079.   When Defendant LYTHGOE was asked why the arrest details of some of the *American Idol* contestants - i.e., the Plaintiff Brittenum Twins - from past seasons were featured on the television show, Defendant LYTHGOE responded:

> <u>If that occurs, don't forget that was occurring while we were doing the show.</u>

> **So if somebody gets busted while we're doing the show, then we won't**
> **ignore it, especially if we can put it in the television show.  [CDC_003297]**

1080.   In further response to media inquiries about why ENTERPRISE-DEFENDANTS chose

to broadcast Plaintiff Watson's "feel-good" audition footage on February 6, 2007, despite the

fact that ENTERPRISE-DEFENDANTS had already disqualified Akron and revoked his Golden

Ticket three months prior to the episode's airing, Defendant LYTHGOE indicated that the

*American Idol* Golden Ticket was, in effect, illusory and revocable at any time for any reason:

> **Being asked to continue is [sic] Hollywood, and it's got nothing to do with**
> **his story and his performance. When [Watson] came along and auditioned,**
> **we treated him like everybody else. I'm not privy to what the guy's done for**
> **the rest of his life. We certainly couldn't do that [with] over 100,000**
> **contestants that come along.  We treat everybody the same, or attempt to,**
> **and he was part of that process. Whether he's invited back or not by FOX**
> **does not concern me regarding what he did at that audition.  [CDC_003297]**

1081.   Even though Defendant LYTHGOE had previously stated that the PRODUCTION-

ENTERPRISE-DEFENDANTS weren't "interested" in learning the details of the Contestant

background checks purportedly conducted by Defendant FOX, Defendant LYTHGOE made the

point that the PRODUCTION-ENTERPRISE-DEFENDANTS have the final say of what is actually

broadcast to the public as part of the *American Idol* television show.  To illustrate his point,

Defendant LYTHGOE stated that if Plaintiff Watson had been arrested for a more serious crime,

then the PRODUCTION-ENTERPRISE-DEFENDANTS might <u>not</u> have included Akron's audition

segment on the show.  Defendant LYTHGOE explained as follows:

> **"If he'd have murdered somebody we would have thought twice, and if the**
> **mother would come forward and say: 'But he murdered my son, how could**
> **you put him on television?' Then we would certainly attempt to stop him**
> **being on television. But as far as I'm concerned we've just been asked not to**
> **bring him back to Hollywood."  [CDC_003297; 3289]**

1082.   When prodded for a longer explanation about why Akron's audition footage

would be shown even after the fact of his disqualification was already known to ENTERPRISE-

DEFENDANTS, and whether the disqualification would deprive the audience of their "investment"

in Akron's participation as a Golden Ticket Holder, "an apparently exasperated" Defendant

LYTHGOE snapped:

> "Because it was a very important part of the show last week, it showed
> something that was unique . . ." [CDC_003297; 3289]

> "So they've [the television audience] got another 174 people [Golden Ticket
> Holders] to get invested in. I don't want to cut out what is a good story for
> that show . . ." [CDC_003297; 3289]

> "I cannot show you 174 people's stories. <u>So, as far as I'm concerned,
> investing in THIS BOY[9] [Plaintiff Watson] at that point was what I'd like you
> to do,</u> but I would have liked you to have done that with a lot of other people
> that are going to disappear in Hollywood week. That's just the way the show
> goes, and it's been like that for six seasons now. I don't necessarily agree
> with it. <u>Give me another 48 shows and I'll show what actually happened in
> Hollywood</u> ..." [CDC_003297]

> "<u>As I said,</u> it's like a lot of other people, <u>their stories are in there because I
> believe it's</u> <u>a good story</u> that will disappear in Hollywood. THIS BOY[10]
> [Plaintiff Watson] has just been pulled out because he disappeared before
> Hollywood. But people are in there that you will not see who you might be
> invested in on the audition trial." [CDC_3298]

1083.  Defendant LYTHGOE explained that each season of the *American Idol*

Production is divided into three separate "series": (i) the audition process; (ii) the selection of the

Top 24 (Semi-Finalists); and (iii) the "Top 12s" (Finalists).  Defendant LYTHGOE explained

that each of the three phases have a "different set of rules" and that "the fun, the silliness, the

cheekiness" of the television program is reserved for the first Audition phase of the series each

season.

> "Don't forget, as far as I'm concerned, <u>we deal with three series here. It isn't
> just one big 'American Idol' series.</u> I've always looked on it, and I've got my

---

[9] In *Ash vs. Tyson Foods*, 546 U.S. 545, 556 (2006), the United States Supreme Court held that in a Title VII case, use of the term "boy" by a white supervisor to describe an adult African-American employee could serve as direct evidence of the employers' racial *animus*.  The Supreme Court noted that use of the term "boy" – which is historically considered a racial epithet implying white paternalism and black subjugation - was not "always benign." On remand, even the circuit of the Deep South conceded that the term "boy" could <u>not</u> be used in good faith by a white over-seer to describe a Black man in the context of a promotion or hiring decision.  See *Ash vs. Tyson Foods*, 2006 U.S. App. LEXIS 19750 (11th Cir. 2006).

[10] *Id.* (further noting that Akron Watson was a 23-year-old <u>MAN</u> at the time of Defendant LYTHGOE's comments).

team to look on it, that <u>the audition process is one part</u>, that's it's only little series, as far as I'm concerned, <u>moving through to the top 24 is it's own series</u>, it's a different set, <u>it's a different set of rules for the kids that are involved in it, and then going into the top 12 is yet, again, another series that is where the Star is Born</u>."  [CDC_003297]

<u>"So I don't ever really put the fun, the silliness, the cheekiness, of the audition process in with the top 12s. That has its own area and its own story</u>. A lot of the people that you're invested in that area in Hollywood will just disappear. Sometimes they don't even give reasons why." [CDC_003297]

"There's just no time. They've got three days to get it down to 24.  It is, 'No, thank you. No. Goodbye. Thank you.' . . . That is just the way the competition goes".  [CDC_003297]

## E.    WHITE COMPARATOR

1084.   An on-line article posted contemporaneous with the disqualification of Akron

Watson noted the double standard between Akron Watson and Taylor Hicks.

> **Idol has an inconsistent track record dealing with contestants' run-ins with the law.**
>
> **Last season's winner Taylor Hicks was arrested for marijuana possession in 1998, according to a Star magazine report. The charges were dropped, and eight years later Hicks found himself in the competition. [CDC_003328]**

# Season Six:
# ASHLYN C.

## A.    GOLDEN TICKET

1085.   Ashlyn C. ("Ashlyn") is a U.S. citizen of the State of Texas who was featured as a Contestant on Season Six of *American Idol* who, like Plaintiff Akron Watson, auditioned in San Antonio, Texas and received a Golden Ticket from the Expert Judges on or about August 26, 2006.

1086.   Ashyln is **not** a Plaintiff in this action.

1087.   Ashlyn was 18 years old at the time of her August 2006 audition.

1088.   Footage of Ashlyn's Season Six *American Idol* audition was aired in its entirety on February 6, 2007.  Her performance segment was particularly memorable because she initially received a NO from Randy Jackson and Paula Abdul based on her "odd facial inflections"; only to be brought back to sing one more time at Simon Cowell's insistence.

1089.   After her second performance before the Expert Judges, Ashlyn received a Golden Ticket to Hollywood via unanimous vote."  Ashlyn's audition marked one of the first – if not only - times that the original panel of Expert Judges had issued a "reversal."

## B.    DISQUALIFICATION

1090.   On the evening of Tuesday, February 6, 2007, at 8:00 p.m. EST, ENTERPRISE-DEFENDANTS broadcast its *American Idol* episode featuring Ashlyn's San Antonio, Texas audition.

1091.   On Wednesday, February 7, 2007, at 10:30 A.M. EST, TMZ.com published Ashlyn's mug shot from her November 2006 arrest (appearing directly under the mugshot of

fellow Texan Akron Watson).   The TMZ.com article included a statement that Ashlynn had

"confessed to the crime" of criminal mischief [CDC_003210-11]

> Meanwhile, another contestant from San Antonio, facemaker Ashlyn Carr,
> was reportedly arrested in August for pouring sugar into the gas tank of her
> exboyfriend's car while a student at Sam Houston State University,
> according to a report in The HoustonianOnline. When confronted by police,
> says the Houstonian, Carr confessed to the crime.

> A spokesman for FOX had no comment.

1092.   On February 7, 2007, at 3:15 PM EST, PEOPLE.COM published an article entitled:

"*Idol's Comeback Kid: Ashlyn Carr.*"   After relating Ashlyn's audition comeback story, the

PEOPLE article noted:

> Talk about a come back.  Yet there's a bittersweet twist to this fairy tale
> story: TMZ.com reported that Ashlyn was allegedly arrested in August for
> pouring sugar into her ex-boy friend's gas tank while she was a student at
> Sam Houston State University.   And her school newspaper, THE
> HOUSTONIAN ONLINE, reports that Ashlyn confessed to the crime.
> [CDC_003721]

1093.   On February 7, 2007, further on-line publications reported that:

> The Sugarland native [Carr] was arrested for dumping sugar into her ex-
> boyfriend's gas tank. That kind of vindictive behavior usually does not
> endear American Idol producers. Thus far, however, Ashlyn has not been
> removed from the American Idol roster, but the announcement could come
> at any time.  [CDC_003207]

> However, an article on MySanAntonio.com talks about a Sam Houston
> student who was arrested for pouring sugar in her ex boyfriend's gas tank.
> Carr reportedly admitted to the crime, which took place after her Idol
> audition. Therefore, the singer's Hollywood status is unknown at this time.
> [CDC_003258] (TVFanatic.com  2/7/07, 9:03 am)

> Carr was arrested in November for allegedly putting sugar in an ex-
> boyfriend's gas tank. She was arrested on criminal mischief charges and
> booked into the Walker County Jail, according to the arrest report.
> [CDC_003328]

> Jack Choate, the First Assistant District Attorney in Walker County, said
> today that they will not pursue the charge as long as she pays for damages to
> the car. Carr is not attending SHSU this semester. [CDC_003328]

1094.   On February 8, 2007, one internet publication called Ashlyn's mother in Texas:

Ashlyn's mother, Karren Carr, was mum when contacted at the family's Houston home today. Idol reps also had no comment. Karren confirmed that her daughter, who performs regularly around town, was in Houston and in good spirits.

"I'm sure there are a lot of rumors going around, but we prefer not to even comment on anything other than Ashlyn's singing," Karren said.

"I think, with all of this — if you hear Ashlyn, if you see her, it speaks for itself.  (Ashlyn) was born with this gift to sing and to inspire," Karren said. "The experience at American Idol, although it was very emotional, it was very worthy."

 "Now, when she becomes American Idol, are you going to write something about that? [CDC_003328]

1095.  Sunday, February 11, 2007, it was reported in an article on-line that the

HOUSTONIAN ONLINE student newspaper of Sam Houston State University had issued an update /

retraction of its alleged November 14, 2006 article:

**ASHLYN C.[] UPDATE/RETRACTION**

THE HOUSTONIAN ONLINE, the student newspaper of Sam Houston State University, has issued an update/retraction of its Nov. 14 2006 article that stated "several statements indicated that criminal mischief charges had been filed against former Sam Houston student Ashlyn C. In fact, according to the District Attorney's office, no charges will be pursued as long as [Ashlyn] makes restitution for the damages.

She was arrested, but we will not be filing the case. She'll be making restitution for the damages,' Walker County District Attorney David Weeks said on Friday, February 9. The Houstonian would like to apologize for any misleading material that appeared in the article."

# Season Eight:
# JU'NOT JOYNER

## A.  CONTEST PARTICIPATION

### (1)  GOLDEN TICKET

1096.  Plaintiff Ju'Not Ramone Joyner, born June 23, 1982, is a U.S. citizen of the State of Maryland.

1097.  Plaintiff Joyner was featured as a Top 36 Semi-Finalist Contestant on Season Eight of *American Idol*.  He had previously auditioned the prior season, making it to the Hollywood Round, but not through to the Semi-Finalists round.

1098.  On August 19, 2008, Plaintiff Joyner attended the "cattle call" audition round at the Izod Center in New York.  Based on his performances, he was invited to the Callback rounds to be held in New York City at Chelsea Piers on August 26-27, 2008.

1099.  On or about August 26-27, 2008, Plaintiff Joyner was awarded a Golden Ticket to Hollywood by the Expert Judges.

### (2)  *AMERICAN IDOL* CONTESTANT AGREEMENT (V.08)

1100.  On August 28, 2008, Plaintiff Joyner executed the 21-page *American Idol* CONTESTANT AGREEMENT for Season Eight.  The agreement was counter-signed by ENTERPRISE-DEFENDANTS' representative, Amanda Chacon, on September 18, 2008 [CDC_3480]

1101.  **RECITAL** to the *American Idol* CONTESTANT AGREEMENT (V.08), P. 1, provides :

> I understand that I am being considered as a contestant for the television series entitled "AMERICAN IDOL" (the "Program") to be produced by American Idol Productions, Inc., or its designee (together with their respective parent, assigns, subsidiaries and affiliated companies, individually and collectively, "Producer"), and intended for initial exhibition by Fox Broadcasting Company ("Network"). By signing this Contestant Agreement and Release (the "Agreement"), I represent that I

have read, understood and voluntarily agree to abide by its terms and conditions. Producer requires me to enter into this Agreement in order to be considered as a contestant on the Program, and I deem it to be in my best interest to enter into this Agreement. I acknowledge.  [CDC_003461]

1102.   NATURE OF THE PROGRAM/AVAILABILITY, ¶ A.1, P. 1, provides:

I understand and acknowledge that the principal nature and purpose of the Program is to produce a television program in which a competition will be conducted (the "Competition") to search for and select a recording artist. If I am selected by Producer to be a contestant on the Program, I agree to be available on an exclusive basis to participate as a contestant in connection with the production of the Program in the Los Angeles, California area, or any other location required by Producer, as and to the extent required by Producer, commencing on a date to be determined by Producer and continuing until the completion of my participation on the Program as required by Producer. I further agree to be available and to participate as, when and where Producer may require in connection with publicity, interviews, promotional appearances on behalf of sponsors and similar matters (for example, to appear on news shows, talk shows and other programs, including other Network programs, and to make other appearances as required by Producer) in connection with the Program, or otherwise, as, when and where designated by Producer in its sole discretion, as more fully set forth in Section C below.  [CDC_003461]

1103.   AGREEMENT TO COMPLY WITH ALL RULES, ¶ A.5, P. 3 provides in relevant part:

I have voluntarily agreed to participate as a contestant in the Program, if selected by Producer in Producer's sole discretion. I agree to follow all of Producer's rules, directions and instructions in all matters relating to the Program (including contestant selection and decisions regarding the creation and implementation of terms, conditions and rules governing the Program). I further agree that (i) all Program rules are subject to change by Producer in Producer's sole discretion, at any time including, without limitation, while I am participating as a contestant on the Program and that (ii) Producer's decision(s) on all matters (including contestant selection, song selection, the amount of exposure each contestant may or may not receive on the Program or in the promotion for the Program, and the manner in which the Program is produced) shall be final and binding . . . I understand that Producer reserves the right, in its sole discretion, to change, add to, delete from, modify or amend the terms, conditions and rules affecting the conduct of the contestants on the Program, the Program activities, the elimination of contestants from the Program and the granting of any prize(s) . . . I hereby acknowledge that the interests of the Program shall override those of any contestant in the Program.  [CDC_003463]

1104.   VOTING SYSTEM, ¶A.6, P. 3 provides in relevant part:

I understand that Producer will use commercially reasonable efforts to ensure the integrity of the telephone voting systems anticipated to be used in connection with the Competition (including but not limited to wireless,

wireline and/or other forms of telephony; text messaging, MMS messaging, and SMS messaging; online and the Internet; and, any other forms of voting chosen by Producer in its sole discretion) (the "Voting Systems"); <u>however, I acknowledge that problems may occur. In the event of any problems with the telephone voting systems used to determine the advancement of the contestants in the Competition and the selection of the ultimate winner of the Competition, which problems may include the partial or total failure of the system or the misuse of the system by callers or others, Producer shall have the right to determine the advancement of contestants and/or the selection of the winner of the Competition in its sole discretion.</u> I agree to accept the decision of Producer in all such matters as final and binding. Furthermore, I will not myself, nor will I authorize, assist, encourage, permit or facilitate others to, tamper with the telephone Voting Systems, including but not limited to "phone slamming" via a computer device or other computer hacking methods. 1 understand and acknowledge that any tampering with the Voting Systems or any aspect of the voting shall be grounds for immediate disqualification from the Program and the Competition. **[CDC_003463]**

1105. **FALSIFICATION OF DOCUMENTS**, ¶ A.6, P. 4, provides in relevant part:

<u>I acknowledge that Producer reserves the right exercisable at any time at its sole discretion to disqualify me from the Competition should I at any stage fail to supply any information reasonably requested of me, supply untruthful, inaccurate or misleading personal details or information, break the rules or otherwise breach the terms contained herein or for any other reason, at the sole discretion of Producer.</u>

1106. **BACKGROUND CHECKS**, ¶ A.9, P. 4 provides:

I am willing to accurately and completely fill-out a background questionnaire and undergo investigations into my background, which may include but not be limited to reviews of civil and criminal records, financial, credit, employment history, interviews with family and friends, <u>and any other type of background checks deemed necessary by Producer, in its sole discretion</u>, and I agree to sign all necessary consents in connection therewith.

1107. **ALTERNATES**, ¶ A.10, P. 4, provides in relevant part:

I understand that I may be chosen as an alternate contestant to replace another contestant by Producer, <u>I acknowledge and agree that Producer may, at any time and in its sole discretion, add, remove or replace contestants for any reason or for no reason at all</u>. **[CDC_003464]**

1108. **FURTHER DOCUMENTS; DISQUALIFICATION**, ¶ A.12, P. 4 provides:

I acknowledge that Producer may require me to sign further documents and agreements as a condition of my participation in the contestant selection process and my participation in the Program. If I fail or am unable to promptly execute any such documents or instruments, I hereby irrevocably

appoint Producer as my attorney-in-fact to execute and file any such documents or instruments or to do any such acts or deeds, provided that said documents, instruments, acts, and deeds shall not be inconsistent with the terms and conditions of this Agreement. I agree that Producer's and the Network's rights under this Section A.12 constitute a power coupled with an interest and are irrevocable. I understand that I may be removed or disqualified from the Program by Producer for any reason or for no reason at all. I also understand that no such removal or disqualification from the contestant selection process and/or Program will affect any of the rights granted or assigned by me or any of the covenants, agreements, waivers, releases or indemnities made by me in this Agreement, the audition agreements previously executed by me, or any other agreements that I may make, as well as any and all exhibits and attachments to any of the foregoing documents. I also understand that if I refuse to sign any further agreements, releases, authorizations or waivers as required by Producer, I may not be permitted to participate further in the contestant selection process and/or the Program. If I am disqualified from the contestant selection process and/or the Program, Producer may make any explanation or announcement (or no explanation or announcement) to the public through any and all media, including but not limited to the Program, that Producer chooses, as to the reason I was disqualified. All decisions of Producer, in its sole discretion, concerning selection and disqualification of contestants are final and binding. [CDC_003465]

1109.   NO OBLIGATION BY PRODUCER, ¶ A.13, provides:

I understand and agree that the selection of contestants is and shall be within Producer's sole discretion and that Producer is not obligated to select me. I further understand and agree that an invitation by Producer to Los Angeles, California, and/or the studio does not guarantee my appearance or participation as a contestant. If I am selected, and if I appear on the Program or any part thereof, Producer is under no obligation to broadcast, exhibit, or otherwise use or exploit my appearance on the Program or any part thereof. [CDC_003465]

1110.   CONFIDENTIALITY, ¶ A.14, P. 5, provides in relevant part:

I understand that my appearance on the Program, if any, is strictly for the purpose of participating in the Program as a contestant. [CDC_003465]

1111.   FCC (FEDERAL COMMUNICATIONS COMMISSION), ¶ A.14, P. 21, provides:

I am aware that it is a federal offense punishable by fine and/or imprisonment for anyone to do anything which would rig or in any way influence the outcome of the Program with the intent to deceive the viewing public, including but not limited to, tampering with the telephone voting system, and that it is a federal offense to offer or to accept any information or secret assistance in connection with the Program. I agree that I will not participate in any such act or any other deceptive or dishonest act with respect to the Program. If anyone attempts to induce me to perform any such act, I shall immediately notify the Producer as provided in Section A.22,

below. **[CDC_003466]**

1112.   NO WAGES, ¶ A.24, P. 6, provides:

I acknowledge that my contribution to the Program is not a professional performance or appearance and does not entitle me to wages, salary or other compensation, except as may otherwise be set forth herein. **[CDC_003466]**

1113.   NAME AND LIKENESS, ¶ B.24, P. 7, provides in relevant part:

I hereby consent to Producer's filming, taping, photographing and/or recording me for use In and in connection with the Program (including, without limitation, whether I am aware or unaware of the filming, taping, photographing or recording, and by requiring me to wear a microphone up to 24-hours-a-day, 7-days-a-week, at Producer's discretion) and agree to cooperate fully with Producer in such activities. I acknowledge and agree that Producer will be the sole and exclusive owner of all rights and material filmed, taped, photographed and/or recorded pursuant to this Agreement.

In addition, I hereby grant to Producer the unconditional right throughout the universe in perpetuity to use, simulate or portray (and to authorize others to use, simulate or portray) or to refrain from using, simulating or portraying, my name, likeness (whether photographic or otherwise), voice, singing voice, personality, personal identification, personal experiences, life story, biographical data, incidents, situations and events which heretofore occurred or hereafter occur, including without limitation the right to use, or to authorize others to use, any of the foregoing in or in connection with the Program (or any episode or portion thereof) and the advertising, promotion or publicizing of the Program or any Program episode by Producer, the Network, its operations, activities or programming services and in connection with any merchandise, tie-in, sponsor, product or service of any kind by Producer, the Network, or any of its programming services, and in any other manner whatsoever as Producer may elect in its sole discretion (including, but not limited to, exploitation on the Internet, wireless Internet, MMS and SMS messaging).

I understand that in and in connection with the Program, I may reveal and/or relate, and other parties (including, without limitation, employees, agents or representatives of Producer, the Network, CKX, Inc., Telescope, Sony/BMG, the Ford Motor Company, Coca-Cola, AT&T Mobility, LLC, Fox Digital Media, and/or the 19 Companies, and each of their parents, affiliates, and subsidiaries; other contestants; the judges, host, guest stars and/or special correspondents of the Program) may reveal and/or relate information about me of a personal, private, intimate, surprising, defamatory, disparaging, embarrassing or unfavorable nature, that may be factual and/or fictional. I further understand that my appearance, depiction and/or portrayal in the Program and my actions and the actions of others displayed in the Program, may be disparaging, defamatory, embarrassing or of an otherwise unfavorable nature and may expose me to public ridicule, humiliation or condemnation.

1114.   **OWNERSHIP OF RIGHTS**, ¶ B.5, P. 8, provides in relevant part:

> Without limiting the foregoing, I acknowledge and agree that all of the results and proceeds of my granting of rights hereunder including, without limitation, all Contestant Images, artistic, literary, dramatic, musical, photographic, choreographic, and other materials which I may create or furnish in connection with my participation on the Program (collectively, the "Materials"), are being specially commissioned by Producer as a contribution to an audiovisual work and, accordingly, the copyright (and all renewals and extensions thereof) and all other proprietary rights, title and interest in such Materials shall be owned by Producer as the author of such Materials,  [CDC__003468]

1115.   **SERVICES EXCLUSIVE**, ¶ C.3, P. 10, provides in relevant part:

> I agree that during the Exclusivity Period, I shall not appear on or authorize production of or participate in any way with any other television programming, radio programming, print media, on-line services, or any other media outlet now known or hereafter devised (including but not limited to any television or radio programs or internet-based competitions similar to the Program, such as those consisting of or containing a talent contest relating to my musical/performing abilities), or in any commercials or advertisements without the prior written consent of Producer, FremantleMedia North America, Inc., CKX, Inc., the Network, and the  19 Companies. In addition, I agree that for a period of one (1) year from the Season 8 Finale, I will not participate in or render services as a host or judge in any television programs, radio programs, internet-based competitions, or competitions through other media, similar to the Program, without Producer's prior written consent.  [CDC_003470]

1116.   **MANAGEMENT OPTIONS,** ¶C.4, P. 10, provides in relevant part:

> In addition to the exclusivity obligations set forth elsewhere in this   . [CDC_003470]

1117.   **FUTURE AGREEMENTS, PRIZE**, ¶C.6, PP. 10-11, provides in relevant part:

> Notwithstanding the other provisions of this Section C, I understand and agree that in the event I am one of the final twenty-four (24) contestants in the Competition (which number may be increased or decreased, in Producer's sole discretion) ("Top 24"), I will be required to enter into the following agreements: (a) an agreement with 19 Recordings Limited (or an affiliate or designee), for my exclusive services as a recording artist; (b) an agreement with 19 Merchandising Limited (or an affiliate or designee) for the use of my name, likeness and biography in connection with advertising, endorsements, merchandising and sponsorship; (c) an agreement with 19 Management Limited (or an affiliate or designee) for the management of my career as an artist; and (d) an agreement with 19 TV Limited (or an affiliate or designee) for my services in relation to the "American Idol Attraction" at Disney World Resort in Orlando, Florida and the Disney "What's Next" campaign. [CDC_003470-71]

1118.   WAIVER OF ALL CLAIMS AND SUITS, RELEASED CLAIMS, ¶A.6, P.14 provides in relevant part:

> I and the other Releasing Parties hereby unconditionally and irrevocably release and forever discharge each of the Released Parties …from and against any and all claims, liens, agreements, contracts…and liabilities of whatever kind or nature in law, equity or otherwise, whether now known or unknown, suspected or unsuspected, and <u>whether or not concealed or hidden</u> (collectively, the "Released Claims") arising out of or in connection with my preparation for, travel and living accommodations in connection with, participation and appearance in, <u>and withdrawal or elimination from the Program</u> or activities associated with the Program or the production and exploitation of the Program, including, without limitation, claims for injury, illness, damage, loss or harm to me or my property, or my death.
>
> <u>The Released Claims shall include,</u> but not be limited to, those based on negligence of any of the Released Parties … products liability, breach of contract, <u>breach of any statutory or other duty of care owed under applicable laws,</u> <u>defamation,</u> invasion of privacy, publicity or personality, infringement of copyright, and those based on my possession or use of any prize. **[CDC_003474]**

1119.   PROFESSIONAL CONTRACTS; OTHER AGREEMENTS, ¶ E.1, P.14, provides in relevant part:

> [I hereby represent and warrant as follows:] I understand that it is anticipated that the winner of the Competition will be awarded a talent representation contract, a merchandising contract and a recording contract. **[CDC_003476]**

1120.   GUILDS, ¶ E.5, P.16, provides in relevant part:

> [I hereby represent and warrant as follows:] I am not a member of AFTRA, SAG or any other performing arts union or guild.  **[CDC_003476]**

1121.   WARRANTS, ¶ E.7, P.16, provides:

> [I hereby represent and warrant as follows:] I have never been arrested or convicted of a felony or misdemeanor offense, except as follows - please list dates and location of arrest and/or conviction and a brief description of the alleged offense(s)].  **[CDC_003476]**

> _____
> __
> You should be aware that past arrests and/or convictions are not automatic grounds for disqualification, but such information may be used by Producer to determine your eligibility for the Program.

1122.   **CRIMINAL CHARGES**, ¶ E.7, P.16, provides:

> [I hereby represent and warrant as follows:] I agree to notify the Producer immediately if there are any criminal charges brought against me from the date hereof up to and including the expiration of the Exclusivity Period. [CDC_003476]

1123.   **PRODUCER'S RIGHT TO SUSPEND OR TERMINATE AGREEMENT**, ¶ F.1, P.17, provides:

> Producer shall have the right to suspend or terminate this Agreement, as decided by Producer in its sole and absolute discretion, if Producer elects to terminate my participation in the Program or my involvement in any events related to the Program, if the Program is canceled, if the Program format is materially altered, if there is an event of Force Majeure (as defined below), upon my Incapacity (as defined below), or for any reason or no reason whatsoever. "Incapacity" includes without limitation my physical or mental disability, default, or conviction of a  [CDC_003477]

1124.   **PRIZES,** ¶ F.3, P.18, provides:

> I acknowledge and agree that the amount and/or nature of cash and/or prizes awarded are subject to change by Producer, in its sole discretion, at any time including, without limitation, while I am participating as a contestant on the Program. Furthermore, in the event of a malfunction of any nature whatsoever affecting the manner in which the Program is produced, the telephone voting system, the Program rules, the outcome of the Program and/or the awarding of cash and/or prizes, Producer's decision with respect to handling of such malfunction including, but not limited to, the awarding of cash and/or prizes, shall be final.
>
> If a cash prize is awarded to me, then payment shall be made to me as Producer, in its absolute sole discretion, shall deem appropriate. If Producer, the 19 Companies, or any other entity described hereunder deems that I am ineligible to receive any prize, such ineligibility shall be considered a forfeiture of that prize by me and shall release Producer, the Network, any parent, subsidiary, affiliate, or division of either of them, and all persons and entities connected with the Program, from any and all obligations in connection with such prize. I shall pay all state and federal or other taxes on any and all cash and/or prizes I win. I release the Released Parties of liability for any such taxes. Producer may deduct or require payment of any such taxes before delivery of a prize. I shall not advertise my winning of any prize prior to delivery of the prize.

1125.   **REMEDIES**, ¶ F.4, P.18, provides in relevant part:

> I acknowledge and agree that the rights I have granted hereunder and my participation related thereto are unique, unusual, special and extraordinary,

the loss of which would not be adequately compensable in damages in an action at law. I further agree that, in addition to any rights or remedies which Producer may have under this Agreement or otherwise, **[CDC_003478]**

1126.  **RELATIONSHIP OF PARTIES**, ¶ F.7, PP.18-19, provides:

> I acknowledge and agree that my relationship to Producer is limited solely to that of a grantor of rights and not as an employee of Producer or of an independent contractor. I acknowledge and agree that I will be responsible for payment of all taxes and insurance applicable under existing law on all amounts paid to me hereunder, including but not limited to, Social Security taxes, federal, state and local income taxes, disability, unemployment and workers compensation insurance. I hereby agree to complete, execute and deliver, in person, to Producer all required forms necessary for identity and eligibility under the Immigration Reform and Control Act. I warrant and represent that I will make all necessary payments due governmental agencies to comply with the foregoing. **[CDC_003478-79]**

1127.  **COMPLETE AGREEMENT; APPLICABLE LAW**, ¶ F.8, PP.19, provides in relevant part:

> This Agreement, and any exhibits and attachments hereto, contain the entire understanding between the parties, and supersedes all prior negotiations, understandings and agreements (whether written or oral) of the parties hereto relating to the subject matter herein. This Agreement cannot be modified except by a written instrument signed by the parties hereto. This Agreement and all matters or issues collateral thereto shall be governed by the laws of the State of California applicable to contracts executed and performed entirely therein (regardless of the actual place(s) of performance). **[CDC_003479]**

1128.  **THIRD PARTY BENEFICIARY**, ¶ F.10, P. 19, provides:

> I acknowledge and agree that, insofar as the terms of this Agreement relate to CKX, Inc., the Network, FremantleMedia North America, Inc., the 19 Companies, or any other entities described herein, each of them shall be considered as third party beneficiaries to this Agreement.

## (3)    PARTICIPANT BACKGROUND QUESTIONNAIRE FORM (V.08)

1129.  On August 28, 2008, Plaintiff Joyner completed and executed the 36-page PARTICIPANT BACKGROUND QUESTIONNAIRE FORM (V.08) **[CDC_003423]** ("LFQ.8").

1130.  LFQ.8 contains the following written questions under the heading "LITIGATION

HISTORY" [CDC_003424]

&#9670; Have you ever been detained (brought in by the police, held by the police and/or questioned by the police and let go) as an adult or minor?

&#9670; Have you ever been arrested (even if charges were dropped or expunged) as an adult or minor?

&#9670; Have you ever been convicted of a felony or misdemeanor as an adult or minor?

&#9670; Have you any current or outstanding warrants (e.g., traffic tickets, arrests, etc.)?

1131. LFQ.8, P. 30, asks AMERICAN IDOL Contestants to disclose the complete arrest history and criminal conviction history of *"any family member"* or *"any former roommate"* in connection with *"any crime."* There are no temporal restrictions placed upon this inquiry. [CDC__003452]

1132. LFQ.8 ALSO contains multiple written questions under the heading "PSYCHOLOGICAL/MEDICAL HISTORY" that asks Contestants to disclose any and all known medical conditions. [CDC_003446-48]

1133. LFQ.8, Page 32, is entitled "PARTICIPANT CERTIFICATION". The form reads as follows:

I hereby certify that all statements made in this Background Investigation Form are true and complete. I understand that any discrepancies, misstatements, omissions, and/or falsifications will be cause for disqualification, for my name to be removed from the eligibility list or for immediate termination, if a selection has been made.

I further acknowledge and accept that this application form and any other materials (including, but not limited to, photographs, and videotapes) I have submitted or will submit to American Idol Productions, Inc. will become property of American Idol Productions, Inc. and will not be returned.

By signing below, I grant FOX and American Idol Productions, Inc. the right to use any biographical information contained in this Participant Background Questionnaire Form, my home video or taped interview (if any) in any manner whatsoever, and to record, use and publicize my home videotape or taped interview, voice, actions, likeness and appearance in any

manner in connection with this production.

1134.   LFQ.8, p. 32, also contains a section entitled:  FAIR CREDIT REPORTING ACT (FCRA): CONSUMER DISCLOSURE AND GENERAL AUTHORIZATION which reads in its entirety as follows: [CDC_003454]

> In connection with my Participant Application for the program being produced by American Idol Productions, Inc. for FOX, I understand that a consumer report or investigative consumer report, as those terms are defined in the federal Fair Credit Reporting Act as amended (FCRA), 15 U.S.C. 1681 et seq., may be obtained by American Idol Productions, Inc. and FOX from a consumer reporting agency (CRA). I further understand that the CRA may not give out information about me to American Idol Productions, Inc. and FOX without my written consent. It is also understood that the CRA may not report medical information about me to American Idol Productions, Inc. and FOX without my specific prior consent as to the release of such information, which is in addition to my general authorization herein.

> I understand that an investigative consumer report is a special type of consumer report in which information about the character, general reputation, personal characteristics, and mode of living is obtained through personal interviews. (The italicized text represents the exact wording found in Section 603(e) of the federal Fair Credit Reporting Act.) In the event an investigative consumer report is obtained, I understand that (a) I am entitled to receive a summary of my rights, and (b) I have the right to request additional disclosures provided for below as follows:

> Upon my written request to American Idol Productions, Inc. within a reasonable period of time after my receipt of this Fair Credit Reporting Act Consumer Disclosure and General Authorization, American Idol Productions, Inc. shall make a complete and accurate disclosure of the nature and scope of the investigation requested. It is understood that the is disclosure shall be made in writing, mailed, or otherwise delivered to me not later than five (5) days after the date on which the request for such disclosure was received from me or such report was first requested, whichever is later in time.

1135.   LFQ.8, p. 35, contains further language pertaining to the Contestants' rights under the Fair Credit Reporting Act, 15 U.S.C. § 1681.  [CDC_003457]

> **NOTICE OF CONSUMER REPORT AND INVESTIGATIVE CONSUMER REPORT AND SUMMARY OF RIGHTS UNDER THE FAIR CREDIT REPORTING ACT**

> A Consumer Report is a written report prepared by a consumer reporting agency (CRA) that may include a summary of your credit standing, capacity, or worthiness, character, general reputation, personal

characteristics or mode of living.

**The CRA that will be conducting this investigation is CARCO Group Investigations.**

**An Investigative Consumer Report is a report prepared by a CRA that may contain information on your character, general reputation, personal characteristics, or mode of living obtained through personal interviews with your friends, neighbors or associates. The CRA that will be conducting this investigation is CARCO Group Investigations.**

**Under the Fair Credit Reporting Act. you have the right to request additional information on the nature and scope of the Investigative Consumer Report, which you may be the subject of. If you wish to exercise this right, please send a written request to the American Idol Productions, Inc. representative who provided this notice to you.**

**A SUMMARY OF YOUR RIGHTS UNDER THE FAIR CREDIT REPORTING ACT**

**•You must be told if information in your file has been used against you.** Anyone who uses information from a CRA to take action against you-such as denying an application for credit, insurance, or employment-must tell you, and give you the name, address, and phone number of the CRA that provided the consumer report.

**•You can find out what is in your file.** At your request, a CRA must give you the information in your file, and a list of everyone who has requested it recently. There is no charge for the report I a person has taken action against you because of information supplied by the CRA if you request the report within 60 days of receiving notice of the action.

**•You also are entitled to one free report every twelve months upon request if you certify that (1) you are unemployed and plan to seek employment within 60 days, (2) you are on welfare, or (3) your report is inaccurate due to fraud.**

**•Outdated information may not be reported.** In most cases, a CRA may not report negative information that is more than seven years old; ten years for bankruptcies.

## (4)  CONTESTANT CODE OF CONDUCT

1136.  On February 10, 2009, Plaintiff Joyner executed the American Idol – Season 8  -

Contestant Code of Conduct, which provides in relevant part: [CDC_3521-22]

> **1) Be Courteous.** Please treat all other on-camera contestants; the staff and crew of FremantleMedia North America, 19 TV Ltd, and American Idol Productions, Inc. ("Producer"), the staff at all the locations we may visit during the season; the staff of Coca-Cola, Ford Motor Company, AT&T, and other sponsors that you may interface with ("Sponsors"); and anyone

else that you encounter while participating on AMERICAN IDOL with the utmost courtesy and respect. You have been selected because you are responsible adults and we have confidence that you will act this way during your stay. Abusive, harassing or inappropriate behavior will not be tolerated and may result in a variety of sanctions, including but not limited to your removal from AMERICAN IDOL.

5) <u>Do Not Leave Premises</u>. You are not permitted to leave the perimeter of the location(s) where you will be residing. For your safety and the safety of others, do not leave the location(s) for any reason UNLESS instructed by an appropriate member of the production staff and accompanied by members of the production staff. Minors may NEVER travel without being accompanied by their parent or legal guardian.

## B.    DECEPTIVE PRACTICES

## (1)    ILLUSORY PRIZE

1137.   On Sunday, February 8, 2009, the Top 36 Contestants of Season Eight were called to a surprise group meeting at the offices of 19 ENTERTAINMENT in Los Angeles, California. Defendant WARWICK, senior executive producer of the show, conducted the meeting. He explained to the Contestants that they would be required to sign a series of recording, artist management, merchandising and touring contracts with 19 ENTERTAINMENT.

1138. Defendant WARWICK then presented the transactional attorney for 19 ENTERTAINMENT, who briefly summarized to the group what he purported to be the material terms of the transaction.

1139.   19 ENTERTAINMENT's transactional attorney then explained that the Top 36 Contestants would be able to "select" from three possible attorneys to represent them in their "negotiations" vis-à-vis 19 ENTERTAINMENT. ENTERPRISE-DEFENDANTS would be paying for their legal fees.

1140.   The transactional attorney assigned by ENTERPRISE-DEFENDANTS to represent the *American Idol* Season Eight Semi-Finalists, including Plaintiff Joyner, was Gary L. Gilbert, Esq.

of the law firm MANATT, PHELPS & PHILLIPS, LLP, 11355 W. Olympic Blvd., Los Angeles, CA. 90064.

1141.  Plaintiff Joyner was exacerbated by the subject matter of the meeting and the way in which the information was being presented.  Having seen the *American Idol* program for seven years on the air, he thought that the "prize" for winning the *American Idol* Contest was the major label recording contract.  He did not understand why he would have to sign what was essentially the Prize <u>before</u> actually winning the Contest.

1142.  During the meeting, Plaintiff Joyner asked no less than five (5) substantive questions about the contractual terms of the 19 ENTERTAINMENT Prize Contracts.  No other Contestant in the room asked more than one question.    Very few Contestants asked any questions at all.

1143.  After the "question-and-answer" session was complete, the transactional attorney for 19 ENTERTAINMENT told the Top 36 Contestants to "speak among themselves" and select one of three lawyers to represent their interests in the "negotiation" of the 19 ENTERTAINMENT Prize Contracts.

1144.  As the Contestants huddled around, many of them started asking Ju'Not questions about the proposed contracts and wanted to know his advice as to whether they should sign them.  As more and more Contestants began to seek Ju'Not's counsel, one of 19 ENTERTAINMENT's representatives called Plaintiff Joyner into a private office and closed the door.

1145.  Defendant WARWICK was already inside the office, seated at the desk.  He appeared red in the face and visibly angry.  As Plaintiff Joyner sat down, WARWICK stood up and barked:

> **"You're not going to ruin my show!"  What do you think this is?  Of course you know, don't you, that we can get rid of you at any time and for any**

reason we like.  All of these kids simply <u>must</u> sign the contracts. Now just stop asking so many damn questions and get the hell out of my office before I have you kicked off my set.”

1146.   As Plaintiff Joyner left Defendant WARWICK's office, he was somewhat in a state of shock.  Defendant WARWICK had threatened to disqualify him from the *American Idol* Contest simply because he was asking a few basic questions about a series of commercial contracts that would effectively lock up his proprietary rights for a period of infinite duration – and with no benefit of independent counsel or opportunity to bargain for exchange.

1147.   Plaintiff Joyner would later go public with his experience concerning the 19 ENTERTAINMENT contracts, publishing as follows on or about July 30, 2009:

> “They [19 ENTERTAINMENT] pay for our lawyers to negotiate against their lawyer. They make us collectively choose the lawyer, then they act like it's in our best interest. Craziest stuff I've ever seen. I have a son to feed. I had to ask questions and know what I was signing. Plus I write my own songs and I needed to know details...” [CDC_003618]

> “We all had one lawyer and a few hours to go over the details of about 6 or 7 contracts, that we didn't even get a copy of and we didn't get an opportunity to send to an outside attorney and if we didn't sign, we couldn't be on the show.” [CDC_003641]

> “Some folks were like, ‘Just shut up and sign on the dotted line.’ I know better than that...I wasn't complaining...I was asking basic legal questions. There's a huge difference between the two.” [CDC_003618]

> “I definitely believed that affected my time on the show. They didn't like the fact that I wouldn't sign ‘just anything’ and that other contestants were coming asking me questions. So I think they ousted me the first chance they could get...” [CDC_003625]

1148.   After being selected as a Top 36 Semi-Finalist Contestant in Season Eight, Plaintiff Joyner was labeled a “troublemaker” by Defendant WARWICK because Joyner asked too many questions about the 19 ENTERTAINMENT Prize Contracts that all Semi-Finalist Contestants were required to sign.

1149.   Plaintiff Joyner's disqualification was thereafter arranged by ENTERPRISE-DEFENDANTS as *fait accompli* because he expressed legitimate concerns regarding the procedural

and substantive fairness of the 19 ENTERTAINMENT Prize Contracts.

1150.  Plaintiff Joyner was disqualified from the *American Idol* contest and was not invited back for the Wild Card round.

## (2)   FIXING WILD CARD

1151.   In Season Eight, the structure of the Semi-Finals round saw the biggest change as the "Wild Card" round returned for the first time since Season Three. After the television audience purportedly voted for three Finalists from each of three groups of twelve (12) Semi-Finalists, the Expert Judges (purportedly) selected eight (8) of the previously eliminated twenty-seven (27) Semi-Finalists to return and perform a song on the March 5, 2009 show.  Those chosen for the Wildcard were judged by the panel, instead of a vote by the viewers, with four advancing as Finalists.

1152.  Plaintiff Joyner's group performed on March 4, 2009.  He received excellent commentary from the Expert Judges.  However, when the final results from the voting were announced, Joyner was informed that he had come in "fourth place" out of the 12 Semi-Finalists in his group.  He therefore just missed the cut to be one of the three Finalists to advance from his group.

1153.  Given Plaintiff Joyner's strong showing with the Expert Judges, as well as his high placement in the audience voting ranks, it was reasonable to expect that Plaintiff Joyner would have been one of the eight (8) Contestants to be selected for the Wild Card round in Season Eight.  However, Plaintiff Joyner was <u>not</u> selected for the Wild Card round.

1154.  At all relevant times, ENTERPRISE-DEFENDANTS had advertised the Wild Card round as a component of the Contest specifically designed to permit the *Expert Judges* – not anyone else - to select certain Contestants who had not received the highest number of votes

from the public.

1155.   With respect to Plaintiff Joyner, however, it was clearly not the Expert Judges who made the decision to exclude him from the Wild Card round on March 5, 2009.

1156.   The Wild Card round component of the Season Eight *American Idol* Contest was not being utilized by ENTERPRISE-DEFENDANTS as advertised.  As Plaintiff Joyner pointed out in July 2009:

> **"Even if I didn't get in on votes...how did I not get picked for the Wild Card show when I received comments from the Judges that were better than most of the contestants who were picked for the Wild Card show?" [CDC_003618]**

## (3)   RIGGED VOTING

1157.   On July 30, 2009, Plaintiff Joyner also publicly questioned the validity of the purported *American Idol* voting system.

> **"It's a fixed thing if I ever saw one . . . Do you think a billion-dollar enterprise is subject to the whim of the public?" [CD_003625]**

## (4)   MANIPULATED OUTCOME

1158.   While a Contestant on Season Eight of the *American Idol* Production, Plaintiff Joyner observed that ENTERPRISE-DEFENDANTS, rather than conducting a *bona fide* contest, were actively favoring certain Contestants as lead-runners for promotion and advancement. The ENTERPRISE-DEFENDANTS' "preferred" contestants received increased support staff (such as hair, make-up and wardrobe) from the producers and their "background stories" were structured with greater care, creating an environment in which ENTERPRISE-DEFENDANTS' favoritism of certain Contestants was intended to influence the outcome of the Contest or a portion thereof.   As Plaintiff Joyner explained in July 2009:

> **"The producers know who they want and they slant it to reflect that. They fix it in a way that makes you surprised but it's still manipulated." [CDC_003618]**

"What I mean is that people think AI is a talent show. No. It's a reality show with writers!! We're all actors. All these shows have writers that guide the public opinion."  [CDC_003618]

## (5)   EXPLOITING "THE HOOD"

1159.   While a Contestant on Season Eight of *American Idol,* ENTERPRISE-DEFENDANTS attempted to portray Plaintiff Joyner as an "inner city" Black kid who came from a hard scrabble background.  But Plaintiff was not comfortable with the ENTERPRISE-DEFENDANTS' marketing plan for his background story.  He was seeking to rise up from his background, not be pigeon-holed in it.  There was more to his life and personality than what ENTERPRISE-DEFENDANTS were seeking to portray.  He therefore refused to be typecast as an R&B singer from the "Hood."  As one reporter noted back in July 2009:

> Ju'Not also theorized that he was not selected for the top 13 because he refused to let the show's producers exploit his sympathetic "back story" of being from "the hood." Said Ju'Not: "They wanted me to put that out to the world and expose my personal business for ratings. I wouldn't do it."

## (6)   LACK OF SONG CHOICE

1160.   One of the critical elements of the purported *American Idol* Contest is song selection.  The Contestants are constantly rated, criticized, or celebrated by the Expert Judges (and by extension the voting public) for their "song choice" or song selection.

1161.   While a top-ranking Semi-Finalist Contestant on Season Eight of *American Idol*, Plaintiff Joyner learned that he had very little say in terms of what songs he would be able to perform on the show.  Although Contestants were ostensibly provided an opportunity to select their songs from a list of available compositions, ENTERPRISE-DEFENDANTS, through their agent Defendant WARWICK, ultimately maintained the final say.

1162.   In the case of Plaintiff Joyner, Defendant WARWICK notified him that many of

the songs he wanted to sing for his March 4, 2009 Semi-Finalist performance were unavailable. He was not provided with any reason for why the songs were unavailable, he was simply told: "NO, you cannot sing that one."  He was eventually told to sing "*Hey There Delilah*", a song that he had already performed during Hollywood Week.  Although he received high marks from the Expert Judges after his March 4 performance, it was not the song he wanted to sing.

### (7)   BLACK LISTING

1163.  After Plaintiff Joyner was disqualified from the show, he was told that, pursuant to the *American Idol* CONTESTANT AGREEMENT, he was not permitted to talk to any press or media without the authorization of ENTERPRISE-DEFENDANTS' PR department.  Despite his efforts to arrange some PR to help capitalize on his recent television appearance, ENTERPRISE-DEFENDANTS failed to return any of his calls.  Furthermore, he later discovered that while he had been prohibited from talking to the press, many of his fellow Contestants from the Top 36 Semi-Final rounds (who had not made the cut to the Finalist rounds) were making appearances and doing interviews supervised by the ENTERPRISE-DEFENDANTS' PR Department.

1164.  Plaintiff Joyner wrote about his experience being black-listed by the ENTERPRISE-DEFENDANTS in his July 2009 post:

> **"Certain things are supposed to go through Idol's PR department. Needless to say, I had opportunities to come up. I called them and tried to play by "their" rules…and I couldn't even get a return call. Then I found out that other Idols were allowed to participate in activities that the expressly prohibited me from….and that's not me being bitter…once again that's da truth!"**

1165.  When Ju'Not revealed some of the facts surrounding his *American Idol* Contestant experience on-line in late July 2009, it drew some attention. In an on-line article posted on BuddyTV.com entitled "*American Idol: Ju'Not Joyner Comes Out Ranting*, the author

*noted:*

> **"But few detractors have ever been as brutally honest as Ju'Not was today."**

1166. When Ju'Not revealed some of the facts surrounding his *American Idol* Contestant experience on-line in late July 2009, it drew some attention. In an on-line article posted on BuddyTV.com entitled "*American Idol: Ju'Not Joyner Comes Out Ranting, the author noted:*

# Season Nine:
# ANTHONY W

## A.    GOLDEN TICKET

1167.  Season Nine of *American Idol* premiered on Tuesday, January 12, 2010 featuring the audition city of Boston, Massachusetts.

1168.  On Wednesday, January 13, 2010, the second episode of the *American Idol* season featured contestants auditioning in Atlanta, Georgia.

1169.  One of the contestants featured on the January 13, 2010 episode was an African-American male named Anthony "Skii Bo Ski" W (Anthony).

1170.  Anthony is <u>not</u> a plaintiff in this action.

1171.  Anthony's Season Nine audition for the panel of Expert Judges, consisting of Simon Cowell, Randy Jackson, Kara DioGuardi and guest judge Mary J. Blige, had taken place in Atlanta on or about August 16-17, 2009.

1172.  During the episode broadcast on January 13, 2010, Mr. Wheeler was one of 25 contestants seen receiving a Golden Ticket to Hollywood.  Dozens of other hopefuls were shown auditioning as well during the same program.

1173.  During the episode broadcast on January 13, 2010, Anthony's real name (Anthony W.) was not displayed on screen.  Rather, his nickname "Skii Bo Skii" was repeatedly used in connection with his appearance on the program.

1174.  Anthony W.'s birthdate was not displayed on screen.

## B.    EXPLOITATION

1175.  On January 14, 2010, at 3:52 am - within mere hours after the telecast and before the start of next business day – an entertainment and gossip website, RadarOnline.com, posted substantial details about Anthony's criminal arrest history, including court documents and various mug shots. The RadarOnline web article, which dubbed itself an "EXCLUSIVE" stated in part:

> ### TASERED AMERICAN IDOL "SKIIBOSKY" HAS LONG ARREST HISTORY
>
> Whoever has been doing the background checks on the season 9 American Idol contestants may want to dig a little bit deeper in the future.
>
> As RadarOnline.com previously reported wacky Wednesday night contestant Anthony Wheeler. AKA "Skiibosky" has an arrest record.
>
> Now RadarOnline.com can exclusively report that it is not just for one offense, but for five! Including bookings for three drug offenses, battery, contempt of court, violation of probation for driving while license suspended, attempting escape and providing a false ID.

1176.  On January 14, 2010, at 3:52 am, just hours after the premiere of the episode was first telecast, www.RadarOnline.com website published four different mugshots of Anthony, his "Inmate History Report," a Police Affidavit stemming from a 2005 arrest, and a copy of a civil complaint that Anthony had filed against the city of Orlando, Florida in connection with abusive police conduct.   [CDC_004909]

1177.  Given that less than six hours had transpired between the broadcast of the January

13, 2010 episode and the RadarOnline web article, and given that the clerks of court and custodians of records working at police departments and correctional facilities would not have been open for business during these six hours, RadarOnline.com could not have independently researched or legally obtained such hard copy information about Anthony W. from a government source.

1178.   As a part of its standard practice and ordinary course of business, ENTERPRISE-DEFENDANTS procured criminal record history information concerning Anthony W. during the background check process of *American Idol* contestants for Season Nine.

1179.   Upon information and belief, once in possession of Anthony W.'s criminal history information, ENTERPRISE-DEFENDANTS caused for such information to be disseminated to the entertainment and tabloid websites, including RadarOnline.com, concurrent with the January 13, 2010 broadcast of the *American Idol* episode that features Mr. Wheeler's Golden Ticket audition.

1180.   On January 14, 2010, www.Rightcelebrity reported further:

ANTHONY W. AKA 'SKIIBOSKY' IS AMERICAN IDOL SCANDAL

> **A contestant named Anthony W., who goes by 'Skiibosky' is American Idol Season 9's first scandal …**
>
> **Let's just say this guy doesn't fit the bill as the squeaky clean American Idol hopeful. He appeared on the second night of the show's audition phase, which took place in Atlanta…**
>
> **Once in front of Simon and company, he tried his best to charm them, but of course they couldn't get over his ridiculous nickname. After a brief introduction he began to sing 'Heard It Through The Grape Vine.' I hate to admit it, but Anthony W. (Skiibosky) has a decent voice. He even hit the high notes without cracking. Mary J Blige actually broke out in applause as soon as he finished. He was moved on to the next round, and we'll see him again in Hollywood….maybe.**
>
> **After his antics drew considerable attention to him, people have apparently begun to do some digging. It turns out that our charismatic contestant has quite a lengthy criminal past. One outlet wrote today that he has been arrested up to five times!**

> According Radar Online, he has been taken in for drugs three times, battery, contempt of court, aprobation violation, driving with a suspended license, and attempting to escape and providing a false ID. Sounds like he would fit right in to the world of show business!
>
> Sound like the kind of guy who deserves the title of American Idol?

1181.   Since ENTERPRISE-DEFENDANTS' January 2010 exploitation of Anthony W.'s criminal arrest information in the tabloid media, it is unknown whether Anthony was flown to Los Angeles, California to compete in Hollywood Rounds.

# Season Ten:
# CHRIS GOLIGHTLY

## A.   BACKGROUND

## (1)   ORPHAN

1182.   Chris Golightly is an African-American citizen of the State of California who was featured as a Top 24 Semi-Finalist on Season Nine of *American Idol.*

1183.   Mr. Golightly grew up as an orphan and was shuttled between numerous foster homes throughout his youth. In the face of these hardships, he found his calling through music.

## (2)   BOY BAND

1184.   Before auditioning for Season Nine of *American Idol*, Mr. Golightly was a member of musical group DREAM5, a "boy band."   His engagement with the group was procured by written contract with a California-based artist manager and promoter Lawrence D. Franklin, who operated DREAM PROJECTS ENTERTAINMENT.

1185.   After a period of time in DREAM5, Mr. Golightly requested that he be released from his contract with DREAM PROJECT ENTERTAINMENT in order to pursue opportunities as a

solo performer.

1186. On April 10, 2009 Franklin granted Mr. Golightly this release through an unambiguous statement to that effect. The release was further memorialized in a formal document dated June 7, 2009 and signed by both parties.

1187. Mr. Golightly rightfully assumed, based on Franklin's statement and the signed release, that he was no longer under any sort of contractual obligations that would prevent him from engaging in other opportunities within the music industry.

## B.   CONTESTANT

### (1)   GOLDEN TICKET

1188. Mr. Golightly was one of approximately 100,000 United States citizens or permanent residents between the ages of 18 and 28 who publically auditioned for Season Nine of *American Idol* in the Fall of 2009.

1189. From July 28, 2009 through February 17, 2009, Chris Golightly auditioned for Season Nine in Los Angeles, California, ultimately surpassing thousands of other Contestants to earn a Golden Ticket from the Expert Judges.

### (2)   BACKGROUND CHECK

1190. On November 13, 2009, Mr. Golightly received an e-mail from Defendant FMNA claiming that ENTERPRISE-DEFENDANTS were missing paperwork regarding various contracts he was required to sign as a Contestant on the Series. The e-mail asked him to execute the contracts and fax them no later than the following morning.

1191. Mr. Golightly was required to execute the PARTICIPANT BACKGROUND QUESTIONNAIRE FORM (V.09). One of the questions contained therein inquired as to whether Mr.

Golightly had ever been party to a music-related industry contract. Golightly answered this question in good faith and consistent with his ethical duty and contractual obligation.

1192.   For months after execution of the PARTICIPANT BACKGROUND QUESTIONNAIRE, Mr. Golightly faithfully participated in all steps of ENTERPRISE-DEFENDANTS' vetting process. He was repeatedly e-mailed by ENTERPRISE-DEFENDANTS to congratulate him on his advancement to successive rounds, solicit his song requests for performances on the program, determine where to mail his checks, and to deliver additional contracts for him to sign. At no point during this vetting / selection process was Mr. Golightly informed of any potential problems regarding the information he had provided.

1193.   In January of 2010, ENTERPRISE-DEFENDANTS notified Mr. Golightly that he had been selected as one of the Top 24 Semi-Finalist Contestants of *American Idol* for Season Nine. In reliance on this fact, Mr. Golightly extricated himself from the lease on his private apartment and sold his car to pay the lease fees.  These actions, made to Mr. Golightly's detriment, were based on Mr. Golightly's reasonable expectation that he had a highly probable chance of winning Season Nine of *American Idol* based on his talent.

## C.   INTERFERENCE FROM FORMER MANAGER

1194.   On or about February 10, 2010, Mr. Lawrence Franklin, who had briefly served as an artist manager for DREAM5, contacted both Mr. Golightly and 19 ENTERTAINMENT to notify them of Mr. Franklin's claim to be the holder of a valid, enforceable recording contract with Mr. Golightly stemming from his prior, short-lived experience working with the boy band DREAM5.

1195.   On or about February 10, 2010, Mr. Golightly received notification from ENTERPRISE-DEFENDANTS that he would be disqualified from the *American Idol* Contest if Mr.

Franklin's claim to the DREAM5 contract proved to be correct.

1196.  Chris Golightly vehemently protested Mr. Franklin's erroneous legal conclusion concerning the purported validity of the old DREAM5 contract.  The fact was, Mr. Golightly had been formally released from such purported contract with DREAM PROJECT ENTERTAINMENT several months <u>prior to</u> the first audition with *American Idol*.  However, Mr. Golightly – the consummate artist - could not immediately locate a copy of the written release form he signed when he left DREAM5 (the "Written Release").

1197.  Mr. Franklin claimed that 19 ENTERTAINMENT required that so long as Mr. Franklin released Mr. Golightly from the old contract *using* ENTERPRISE-DEFENDANTS*' legal forms*, Golightly would be allowed to continue in the Contest.

1198.  On or about February 11, 2010, Mr. Franklin requested that Defendant 19 ENTERTAINMENT transmit to him the ENTERPRISE-DEFENDANTS' official document release forms.

1199.  Mr. Franklin and Mr. Golightly thereafter waited five (5) days for ENTERPRISE-DEFENDANTS' transaction attorneys to comply with their own protocol.  However, no documentation was received from ENTERPRISE-DEFENDANTS' attorneys during this five-day period.

## D.   DISQUALIFICATION

1200.  On or about February 16, 2010, Mr. Golightly received a phone call from ENTERPRISE-DEFENDANTS' agent Patrick LYNN to notify him of his official disqualification from Season Nine of the *American Idol* Contest.

1201.  ENTERPRISE-DEFENDANTS'    purported    grounds    for    Mr.    Golightly's disqualification, as relayed to him by Patrick LYNN, was the Contestant's "failure to disclose"

the purported existence of the DREAM5 contract, which had been effectively terminated.

1202.   On or about February 17, 2010, Mr. Franklin e-mailed a copy of the Written Release to ENTERPRISE-DEFENDANTS *and* acknowledged his error concerning the enforceability of the terminated DREAM5 contract.  Mr. Franklin further admitted in writing to ENTERPRISE-DEFENDANTS that Mr. Golightly was <u>not</u> under contract.

1203.   Notwithstanding Mr. Franklin's transmission of the Written Release, ENTERPRISE-DEFENDANTS abjectly refused to reconsider their decision concerning Mr. Golightly's abrupt removal from the *American Idol* Contest.  In fact, ENTERPRISE-DEFENDANTS' agents would not even speak to Mr. Golightly.

1204.   Despite being in possession of written documentation that Chris Golightly was no longer under valid contract with DREAM PROJECTS ENTERTAINMENT, ENTERPRISE-DEFENDANTS publicly disqualified him from the *American Idol* Contest, humiliated him before untold millions of Americans, questioned his business integrity before the entire music industry, and thereafter "fanned the flame" of Mr. Golightly's disqualification  in the tabloid media and entertainment press.

1205.   On or about February 18, 2010, Defendant FOX issued an official statement to the mass media concerning Defendant's unilateral adverse action against Mr. Golightly.

**"It has been determined that Chris Golightly is ineligible to continue in the competition."**

1206.   On February 18, 2010, the aforementioned disqualification was confirmed by *American Idol* host Ryan Seacrest on the micro-blogging website TWITTER, who stated:

> [ENTERPRISE-DEFENDANTS had] **"determined that Chris Golightly is ineligible to continue on IDOL, contestant Tim Urban has replaced Golightly as part of the Top 24."**

1207.   Chris Golightly was unceremoniously replaced on the program with alternate performer Tim Urban, who was a White Contestant and who had already been eliminated from

the Contest by virtue of his merit as a singer (or lack thereof).

1208.   From February 18, 2010 onward, ENTERPRISE-DEFENDANTS caused to omit Mr. Golightly from the pre-recorded audition process and transfer airtime to Mr. Urban. ENTERPRISE-DEFENDANTS effectuated this transition in order to create the impression that Mr. Golightly had never earned his spot in the Top 24 Semi-Finalist round.

1209.   Subsequent to Defendant FOX's announcement, Mr. Golightly was able to make brief contact with one of ENTERPRISE-DEFENDANTS' attorneys, who again reiterated that Mr. Golightly's disqualification from the *American Idol* Contest was based on Mr. Golightly's "failure to disclose" the purported DREAM5 contract with Mr. Franklin.

1210.   Mr. Golightly's alleged "failure to disclose" his obsolete contract with a former boy band manager was mere pretext for Golightly's extrication from the *American Idol* Contest.

1211.   ENTERPRISE-DEFENDANTS extricated Mr. Golightly as a Top 24 *American Idol* Semi-Finalist predominately because of his status as an African-American (or "mixed") U.S. citizen coupled with Mr. Golightly's  history of misdemeanor arrests as indicated on his *juvenile*, government-protected "rap sheet."

1212.    The juvenile records unlawfully procured by ENTERPRISE-DEFENDANTS concerned minor infractions of a State-sponsored orphan who had been dispossessed by his biological parents as an infant and who had never experienced the privilege of having a place during childhood to call Home.

# Season Eleven:
# JXJ

## A.        PRE-DISQUALIFICATION

## (1)        BLACK CONTESTANT

1213.      "JXJ" shall be the codename[11] used herein to refer to an African-American Top 12 Finalist contestant on Season Eleven of *American Idol* who was ceremoniously disqualified by ENTERPRISE-DEFENDANTS on the pretext that he had failed to disclose his criminal arrest history.

1214.       JXJ's entire Open Audition footage, filmed in Portland, Oregon, was telecast by ENTERPRISE-DEFENDANTS in January 2012.  ENTERPRISE-DEFENDANTS thereafter continued to focus on JXJ's backstory, exploiting the close relationship between he and his mother.

1215.      Starting December 12, 2012, JXJ was one of 309 Contestants to attend the Hollywood Week in Season Eleven.  He advanced through the Hollywood Rounds.

1216.      When JXJ reached the "Green Mile," however, he was sent home by the Expert Judges before making the Top 24.

1217.      Miraculously, on or about February 28, 2012, during the Season's episode where the Top 12 male contestants were scheduled to perform for the public vote, Host Ryan Seacrest suddenly announced that a special contestants would be brought back into the Contest as a "Judge's Pick."   JXJ thereafter entered the stage through center curtain as the crowd gasped.

---

[11] After news of Plaintiffs' EEOC charges, dated January 6, 2013, somehow leaked to the media on January 25, 2013, JXJ publicly denounced Plaintiffs' charges to the EEOC and stated that he did want his name used in the Plaintiffs' lawsuit.  As per JXJ's demands, Plaintiffs will use best efforts at all times <u>not</u> to cite JXJ's real name in this proceeding and shall redact his name from all documents produced to their opponents or submitted to the Honorable Court.  Notwithstanding Plaintiffs' desire to respect their brethren's right to control his own name and likeness in the marketplace, the highly publicized event of JXJ's disqualification from *American Idol* in March 2012 triggered counsel's investigation into Defendants' decade-long pattern of exploiting top-ranking Black *American Idol* Contestants through disqualification based on alleged criminality.  Accordingly, because this case rests on highly critical and timely issues of constitutional proportions, the objective facts and public statements surrounding JXJ's disqualification are cogent to the fair and equitable disposition of this action.

After singing a rendition of "Another Chance," the Expert Judges commented:

> **Randy**: **"You have such a different voice, that's one of the reasons why we wanted you on this."**
>
> **Jennifer Lopez**:  **"You have such a special voice and such a special spirit and I am glad that America had the chance to see you tonight."**
>
> **Steven Tyler**:  **"What a beautiful thing; that's why we asked you to come back."**

1218.     JXJ's sudden re-appearance in the Season Eleven Contest, which was celebrated with much fanfare by ENTERPRISE-DEFENDANTS, was a completely arbitrary addition to the Top 24 Semi-Finalist Round and one for which, in the absence of a "Wild Card" round, there was no precedent in *American Idol* "Contest Rules".  ENTERPRISE-DEFENDANTS' maneuver made JXJ the 25th Semi-Finalist and thirteenth male Semi-Finalist.

1219.     On February 29, 2012, Host Ryan Seacrest opened the show by stating:

> **"Welcome to American Idol: The only show that can take a high school student and turn him into a platinum selling artist overnight, all thanks to you."**

1220.     When the results of Season Eleven's Finalist rounds were announced, JXJ effortlessly advanced as a Top 13 contender.

1221.     On Thursday, Wednesday 8, 2012, after JXJ's first performance in the Finalist round, JXJ was voted in the bottom 3 out of the Top 13 Finalists.  However, he was not eliminated.

## (2)   PLANTING RUMOURS

1222.   On Thursday, March 8, 2012, TMZ.com published an article entitled *"Idol Contestant JMX – Dad Who Abandoned Him Shows Up"* in which the site reported that the father of JXJ had shown up to the *American Idol* set in Los Angeles "out of the blue" and that JXJ was said to be "extremely upset" [CDC_002955]

> **JXJ had an unwanted caller last night ... his Dad. Jones and his mom had it rough after his father abandoned him 10 years ago. But it's amazing what a**

little fame and potential earning power can do to a fractured relationship.

Last night ... Jones' dad called and tried to make nice. Sources tell us ... the dad told JXJ, "Hi, I'm in Los Angeles. Why are you telling everyone you haven't got a dad?" We're told the 25-year-old contestant was "extremely upset" by the call.

JXJ told a friend, "He's a lovely man but a lousy father."

1223.   On Tuesday, March 13, 2012, at 12:00 pm PDT, TMZ.com published an article entitled *"American Idol Contestant Shovels B.S. To Get Sympathy Vote"* claiming that Contestant JXJ had not been forthcoming about his relationship with his father, calling into question the Contestant's "sob story" that JXJ and his mother were abandoned by his father a decade earlier.

JXJ "has big problems with the truth, because he fabricated a sob story to A.I. producers to win the hearts and minds of the American people."

We spoke with production people on "Idol" who tell us they are "shocked" JXJ concocted the story and it seems like it was all a ploy to get some traction on the show.

1224.   On March 13, 2012, JXJ responded to the accusatory TMZ.com article by posting the following statement to his Twitter account.

"How can I be lying and I never said anything, This story on TMZ. I did not lie to anyone I also did not t(al)lk to or ask anyone to t(a)lk to TMZ on my behalf in the first place.." [CDC-_003031]

## (3)   NEWS OF DISQUALIFICATION

1225.     On Tuesday, March 13, 2012, at an undisclosed time during the day, TMZ.com posted an article as an "Exclusive" entitled American Idol Contestant Will be Kicked Off For Concealing Crimes."

A contestant on American Idol will be kicked off the show Wednesday because the singer concealed multiple crimes from producers ... TMZ has learned.

Sources connected with the show tell us ... the contestant -- one of the final 12 -- was charged with 2 crimes in 2011, one involving violence. We're told in both cases the contestant gave a fake name to cops when arrested.

> In addition, we're told the contestant has outstanding warrants -- again, the singer concealed it from producers.
>
> We're told the contestant was confronted with the information on camera today and the footage will air on Wednesday's show.

1226.     On Tuesday, March 13, at approximately 4:56 p.m., PDT, ENTERPRISE-DEFENDANTS LYTHGOE and WARWICK confronted JXJ on camera about his arrest record history and unceremoniously disqualified him from the show.

1227.     On Tuesday, March 13, 2012, at 7:00 p.m., PDT, TMZ.com published an article entitled *"JXJ Will Be Kicked Off 'American Idol'*.  The article read:

> JXJ will be kicked off "American Idol" Wednesday night, after producers learned he concealed the fact that he was arrested twice last year and has outstanding warrants ... TMZ has learned.
>
> As we first reported, producers discovered Tuesday that JXJ had lied about his criminal history and that triggered the decision to confront him on camera Tuesday afternoon.
>
> We're told one of the incidents involved violence, which was particularly troublesome to producers. He also lied to cops by giving them fake names both times he was arrested.
>
> "A.I." sources tell us ... JXJ will appear on the show tomorrow night before he is sent packing. Over the last few days, we've been reporting that JXJ told producers his father abandoned him 10 years ago, but his dad called TMZ and called B.S. on his son, saying they see each other regularly.
>
> JXJ began tweeting that he never told producers about his dad abandoning him. We're told the producers who knew JXJ had made the statement became generally suspicious and began looking more closely at his background, and that's what led to the revelation of his criminal history.

1228.   TMZ .com reported that JXJ was going to be disqualified on the episode airing Wednesday, March 15, 2012 and that the PRODUCTION-ENTERPRISE-DEFENDANTS were planning to air footage of the disqualification.

1229.   TMZ.com reported that JXJ was able to slip through the show's background checks because he gave cops a fake name both times he was arrested. [CDC_003020]

1230.  In the wake of TMZ.com's report that JXJ was being disqualified from *American Idol*, virtually every news media outlet, whether traditional or blogosphere-oriented, decried the obvious staging, cruel manipulation and public humiliation of JXJ.

### (4)  EXPERT OPINION #1: "CRUEL CHARADE" (March 14, 2012)

1231.  The first *critical* opinion published by the news media in response to the 3/13/12 TMZ.com announcement of JXJ's impending disqualification was Shirley Halperin, who was at the time working as a journalist for the HOLLYWOOD REPORTER.

1232.  Shirley Halperin is a well-respected American music journalist and pop culture author who has regularly contributed to US WEEKLY, ROLLING STONE, ENTERTAINMENT, BILLBOARD, LOS ANGELES TIMES, AND THE HOLLYWOOD REPORTER during her twenty-year-plus career.

1233.  As a long-standing member of the entertainment and music press, Ms. Halperin is considered one of world's leading authorities on the *American Idol* series and its impact on American popular culture.  She has independently covered *American Idol* in the traditional press since the show's initial broadcast in June 2002.

1234.  Upon information and belief, Ms. Halperin works or has worked full-time as a journalist and author covering the *American Idol* television series.

1235.  Ms. Halperin publishes an *American Idol*-related blog called *"Idol Worship"* for BILLBOARD.COM, LOS ANGELES TIMES and HOLLYWOOD REPORTER, and at times relevant to this proceeding, also hosted and published a live, weekly one-hour video talk show called *"Idol-Hangover"* at HOLLYWOODREPORTER.COM.

1236.  Ms. Halperin is the sole credited author of AMERICAN IDOL: CELEBRATING 10 YEARS (THE OFFICIAL BACKSTAGE PASS), which was published by Defendant FMNA in the

United States on or about March 1, 2011 (referred to herein as "THE IDOL YEARBOOK").

1237.   According to the U.S. Copyright Office, Ms. Halperin's authorship of the book was commissioned on a "work-for-hire" basis.  Defendant FMNA currently holds the copyright registration to the literary work.  [CDC_005945]

1238.   On or about March 22, 2011, Ms. Halperin, an *authorized* expert in *American Idol*-related matters, was interviewed by media outlet ACCESS ATLANTA and commented upon her preparation and authorship of IDOL YEARBOOK, indicating that she had "spent several weeks watching every single episode of *American Idol* from Season One to Season Nine". [CDC_005947]

> **Shirley Halperin: "This is a book for those who worship the show.  I've invested so much time and so much of my brain space . . .  I wanted to have something to show for it.  I DO FEEL LIKE AN EXPERT ON 'AMERICAN IDOL.'"** [CDC_005947] (emphasis added)

1239.   On March 14, 2012, at 5:04 a.m. PDT, in reaction to the TMZ news of JXJ's disqualification from *American Idol*, Ms. Halperin published an independent article at HOLLYWOOD REPORTER.com entitled "*American Idol: Did Show Producers Plot the JXJ Scandal in Advance (Opinion): Ask Skeptics Why JXJ is Being Sent Home, and Plenty Smell a <u>Classic Reality Show Ratings Ploy</u>*" [CDC_002955-2965].

1240.   In her 3/14/12 HOLLYWOOD REPORTER article, Ms. Halperin correctly opined that ENTERPRISE-DEFENDANTS had pre-orchestrated JXJ-11's disqualification event through "a calculated campaign" that had been planned by ENTERPRISE-DEFENDANTS "all along":

> **Naturally, [JXJ-11]'s purported lies [about his father] were said to have incensed Idol's "production people" and triggered further digging into his background, but <u>here's a thought: maybe they planned his exit this way all along</u>. The whole 25th candidate was weird to begin with and got sprung on the audience with absolutely no warning, not typical of how Idol operates. And why Jermaine?... [CDC_002956]**
>
> **Then there was the deluge of negative stories on Tuesday, which came so fast and furious, it was starting to feel a little like <u>a calculated campaign</u>, capped**

off with the dramatic news: it would be the end of the road for Jermaine. It's believed he'll say a final goodbye on the show Wednesday night, and that in itself is worth tuning in for. [CDC_002956]

1241.    Ms. Halperin stated in the 3/14/12 HOLLYWOOD REPORTER that JXJ-11's disqualification from Season Eleven of *American Idol* was a "cruel charade" that was "purposely set in motion" by ENTERPRISE-DEFENDANTS to manufacture a "nasty mini-scandal" in order to artificially "boost" *American Idol's* diminished ratings vis-à-vis NBC's *The Voice*.

> Which brings us to another reason why producers may have purposely set in motion a cruel charade: ratings. For the first time, the ratings powerhouse is getting beat in TV's key demo -- and to make it sting that much more: by another singing competition, The Voice . . . there's no doubt momentum is on NBC's side, and with that, a healthy mid-March boost for Idol on the back of a nasty mini-scandal may be just what the ratings doctor ordered. [CDC_002957]

1242.    Ms. Halperin further indicated in the 3/14/12 HOLLYWOOD REPORTER article that ENTERPRISE-DEFENDANTS' sophisticated and lengthy background check process would have necessarily uncovered JXJ-11's four to five outstanding arrest warrants:

> Lastly, what are the chances that Idol's producers, team of background checkers and lawyers would miss two arrests, possibly as-yet-unresolved? As we've heard about the process from insiders and former contestants, it's not only an incredibly long procedure, but one that has been described certainly as thorough and often as "invasive." All potential contestants are warned that if they do not divulge everything, they will be disqualified. Jermaine received fair warning too, no doubt, but it's also possible that the producers knew of his criminal past and chose to keep his history secret -- a card stowed in their back pocket to be pulled out only in case of emergency (or if he's eliminated, whichever comes first). [CDC_002957]

1243.    Ms. Halperin stated in the 3/14/12 HOLLYWOOD REPORTER article that it would be extremely difficult for any human being to bear the severe emotional distress of "being on top of the world one minute and vilified the next":

> [I]T'S IMPORTANT TO REMEMBER THE HUMAN ELEMENT IN THIS STORY AND HOW DIFFICULT IT IS TO GO FROM BEING ON TOP OF THE WORLD ONE MINUTE AND VILIFIED THE NEXT. The emotional impact it can have on [a disqualified American Idol Contestant] must be an incredibly heavy burden to bear, even if he did do something very wrong in his past. Here's hoping there's enough in the show's budget to at least cover some psychotherapy.

> What do you think, Idol Worshipers? Could Jermaine's disqualification be a <u>premeditated ploy</u> or was the show really deceived and caught off-guard? **[CDC_002957]**

## (5)   PUBLIC REACTION (PRE-TELECAST) [March 14, 2012]

1244.   On Wednesday, March 14, 2012, SMOKINGGUN.COM posted an article entitled *"Idol Finalist Has Five Active Arrest Warrants,"* the website published court documents indicating that JXJ was arrested on November 27, 2011 for providing a false name to a police officer.  [CDC_003064] Notably, the State of New Jersey's misdemeanor case correctly listed the government name of JXJ.

1245.   On Wednesday, March 14, 2012 at 10:26 a.m., the CHRISTIAN POST (christianpost.com) published an article on-line entitled: *"Jermaine Jones Disqualified From American Idol, Was it Staged?"*   The article largely re-iterated Shirley Halperin's theory that JXJ's disqualification was staged in order to boost *American Idol's* ratings.   The author of the CHRISTIAN POST also notes, however, that:

> <u>This is not the first time that Idol has been accused of staging an incident in a bid to boost ratings</u>. Last month 16-year-old contestant, Symone Black, collapsed off of the stage after singing before the judges and although she was fine "Idol" producers forced concerned viewers to tune in to the next episode to find out the status of her well being. **[CDC_003072]**

1246.   On Wednesday, March 14, 2012, at 12:15 p.m., EDT, entertainment blogger Lyndsey Parker of "Reality Rocks" reported on the news of JXJ's disqualification. [CDC_003013-17]. Ms. Parker opined that the disqualification was likely orchestrated and that such calculated action would necessarily impact the ultimate outcome of the *American Idol* Contest.

> Of course, the crafty conspiracy theorist in me wonders if this was a ratings ploy all along: You know, bring [JXJ-11] back for the semi-finals to create some drama and buzz, then create even more drama and buzz later on, when his criminal-past bombshell leads to his "shocking" disqualification. **[CDC_003015]**

I just find it a little hard to believe that "Idol's" staff would not have been able to uncover JXJ-11's (very recent) alleged crimes via a standard background check, and it seems fishy that the one contestant that was given a last-minute reprieve is now the one getting the boot.  [CDC_003015]

Is it possible that by bringing back a contestant who was already set up for an early disqualification, the show's producers had sneakily hoped to generate headlines and boost "Idol's" flagging ratings, without jeopardizing any actual worthy contestants' future chances?  [CDC_003015]

We'll never know. But if so, then I beg to differ on that last point: Bringing JXJ-11 back to the show and playing up his public-vote-garnering sob story just may have stolen a legitimate spot in the Top 13 from one of the show's other promising male semi-finalists who could have gone farther . . . [CDC_003015]

While Jermaine's short "Idol" stint may have made for some good television-- and Wednesday night's show will be dramatic indeed—it may have negatively altered Season 11's outcome in the long run.  [CDC_003015]

1247.   On March 14, 2012, at 12:00 PDT, TMZ.com posted an article entitled *"TMZ Live: JXJ . . . Booted off American Idol By His Own Lies."*  [CDC_003156-3160] One of the public commentators to the TMZ article opined:

All this AI stuff is suspect. Nothing anyone says can convince me that this wasn't made up for ratings.  [CDC_003156]

1248.   On March 14, 2012, Lt. Christopher Jones of the Gloucester Township Police Department issued a "Media Inquiry Statement" in which the police department confirmed that JXJ had been arrested twice in the year 2011. [CDC_003068].  Both incidents involved JXJ providing a false name to police officers.  In both incidents, however, the police officers were able to correctly identify JXJ's government name after further inquiry.  As of November 17, 2011, JXJ was scheduled to appear in Court on December 13, 2011 in connection with all outstanding charges.

1249.      On March 14, 2012 at 2:53 p.m., David Hinckley of the New York Daily News posted an article entitled: *"JXJ's Ouster From 'American Idol' May Not Have Producers That*

*Upset: His Record Was Available To Find And There's Big Upside Publicity.*" Following in line with the rational and critical analysis provided by Shirley Halperin and Lyndsey Parker, Mr. Hinckley opined that Enterprise-Defendants had manufactured JXJ's disqualification for ratings:

> So now we know the "American Idol" strategy to counter this season's ratings slump: a spontaneous crossover episode with "America's Most Wanted." [CDC_003109]
>
> As all avid "Idol" and gossip fans know by now, "Idol" finalist JXJ apparently will become ex-finalist JXJ Wednesday night, now that it's been revealed that, among other things, he's racked up four outstanding arrest warrants over the last few years . . .
>
> [But] In the age of Google and a hundred other instant search sites, how does the vetting team for the multi-million dollar "Idol" machine not pick up something like outstanding arrest warrants? [CDC_003109]
>
> [T]here's a substantial body of thought, not all of it cynical, that says a show like "Idol" isn't all that broken up over surprises like this. [CDC_003109]
>
> Yes, in theory JXJ's expected departure tonight will embarrass "Idol," by making it look sloppy.  In reality, "Idol" won't feel embarrassed at all, any more than it felt embarrassed in 2003 when Corey Clark was kicked off the show over a similarly undisclosed legal situation and Frenchie Davis was booted because she had posed for some porno sessions. [CDC_003109]
>
> There could be situations where "Idol" would be embarrassed, like if a judge did something appalling and tried to cover it up. But cases like Jones, Clark or Davis don't come close to that level. [CDC_003109]
>
> Quite the contrary. They're publicity opportunities.
>
> If "Idol" were embarrassed about JXJ, it would quietly dismiss him and move on. By all reports, it plans to have him on the air tonight. Nothing like a little public humiliation to boost audience numbers. True in Salem in the 17th century, true on TV tonight. This is not to say "Idol" doesn't try to ensure contestants are who they say they are. But if someone slips past the system once in a while, no harm no foul. [CDC_003109]

1250.    On March 14, 2012, Defendant FOX, through its website www.foxnews.com, published an article entitled "*Contestant JXJ will be kicked off American Idol for Hiding Criminal Past*". [CDC__002967; CDC_003059].  The article is based on the earlier TMZ report and states:

> Producers allegedly discovered Tuesday night [Mar. 13] that JXJ had been arrested twice and has outstanding warrants, TMZ reported. One of the incidents reportedly involved violence, which especially worried the producers. He also reportedly gave police fake names.
>
> According to TMZ sources, JXJ will appear on Wednesday's show and then will be sent home.  [CDC_003059]

1251.    The 3/14/12 FOX News article also restates its position regarding past disqualifications of *American Idol* Contestants.

> Idol contestants in the past have been disqualified when the show deems that their work or personal history is an issue.  [CDC__002968; 3060]
>
> Corey Clark was disqualified for concealing his arrest record during the second season in 2003. Frenchie Davis was also dropped from "Idol" that year because of her previous appearance on an adult website.  [CDC__002968; 3060]
>
> During the eighth season in 2009, Joanna Pacitti was shown advancing to the top 36 semifinalists after "Hollywood Week" but was later replaced. Pacitti released an a bum in 2006 and had ties to 19 Entertainment, which produces "Idol" with FremantleMedia North America.  [CDC__002968; 3060]
>
> Chris Golightly was dropped from the top 24 semifinalists in the ninth season in 2010 because he didn't disclose that he had a previous record contract. [CDC__002968; 3060]
>
> In contrast, the singing competition allowed past finalists Ike the sixth season's Antonella Barba and the seventh season's David Hernandez to stay on after racy photos that appeared to be Barba leaked online. Hernandez was revealed as having once worked as a nightclub stripper.  [CDC__002968; 3060]

## B.    POST-DISQUALIFICATION

## (1)    TELECAST [March 14, 2012]

1252.    On Wednesday, March 14, 2012, at 8:00 p.m. EST, ENTERPRISE-DEFENDANTS telecast an episode of *American Idol* which featured on-air segments depicting events surrounding JXJ's disqualification from the Contest.

1253.    Host Ryan Seacrest confirmed at the top of the show that ENTERPRISE-DEFENDANTS cooperate with government officials in relation to conducting background checks. Seacrest stated:

> **With the cooperation of law enforcement we discovered information that left us with no choice but to eliminate one of our finalists from the competition. When you're doing a live show, anything can happen.  This is American Idol. [CDC_003041]**

1254.     About ninety minutes into the episode, Enterprise-Defendants broadcast a much hyped-up segment in which JXJ was called into a production office to speak on camera with the paternalistic, stern-faced executive producers, Defendant LYTHGOE and Defendant WARWICK.   The video segment begins with JXJ entering well-appointed offices.  WARWICK and LYTHGOE are sitting on a big white leather couch each wearing business suits and holding pieces of paper.  The screen informs the audience of the time: 4:56 p.m. PDT [Tuesday, March 13]

- **Defendant WARWICK: "Just sit down there a moment, why don't you."**

- **Defendant LYTHGOE:  "There are a number of things that have been going on this week - stories that have been told; that have not been told.  And we've been given further information that we need to talk to you about."**

- **JXJ:  "Um, ok."**

- **Defendant LYTHGOE: "In March of last year, you were charged - criminally charged – with giving a fake name to the police."**

- **JXJ:  "Um, ok."**

- **Defendant LYTHGOE: "And in November again of last year, you were criminally charged and you gave them [another] fake name...Uh, you didn't disclose those charges to us."**

- **JXJ.      [silence]**

- **Defendant WARWICK: "There are four active warrants out for you actually.  To be honest - which surprised us – to be truthful.  You know, we're not judgmental at all.  Lots of kids come to us that have problems.  It's part and parcel of what kids go through today.  We know that.  If they come clean with us and tell us at the beginning, we can help them.  But you did know that you were incumbent to tell us the truth about all of this and it appears that you just haven't on ANY level …"**

- **Defendant LYTHGOE: "We are not allowed to have anyone with an outstanding warrant on the program, and you have four of them against you."**

- **Defendant WARWICK: "We have to let you go, I'm afraid. It's the end of**

the road."

1255.   On Wednesday, March 14, at 9:50 p.m. EST, in an article entitled: *"Idol Top 12 Night: Jermaine Jones' Disqualification Overshadows Episode",* Lyndsey Parker, an entertainment news journalist for REALITY ROCKS, described the on-air disqualification of JXJ by the ALIEN-ENTERPRISE-DEFENDANTS as follows:

> **I actually felt bad for the guy. The vibe of this entire segment felt icky, invasive, exploitative, and just plain wrong. [CDC_003096]**

1256.   Ms. Parker's 3/14/12 REALITY ROCKS article also suggested that the hype surrounding JXJ's disqualification – and the corresponding public humiliation to JXJ - was one of the primary attractions to television viewers.

> **Yes, many viewers tuned in to "Idol" this week not to see this season's remaining finalists warble songs of the '80s and '90s, but to find out just what happened to one of those contestants, who'd never warble on the show again. On Tuesday evening, news had broken on TMZ that JXJ . . . who was brought back to the show at the last minute as a "surprise," had been disqualified for being dishonest about his not-so-gentle alleged criminal past. So on Wednesday, "Idol" <u>fans were eager to learn just how this scandal would be addressed,</u> especially since TMZ had titillatingly reported that footage of JXJ's confrontation with the show's producers would actually air on Wednesday night's performance show.  [CDC__003096]**

## (2)   PUBLIC REACTIONS (POST-TELECAST) [March 15, 2012]

1257.   On Thursday, March 15, 2012, at 4:00 a.m. PDT, Shirley Halperin published a follow-up article to HOLLYWOODREPORTER.COM concerning JXJ's disqualification entitled *"American Idol Finalists React to JXJ Disqualification"* [CDC_002975-76]. The article quotes the reaction of several Top 12 Finalist Contestants, including Erika Van Pelt who stated that JXJ's abrupt disqualification was particularly shocking given the extensive background check procedures imposed upon *American Idol* Contestants.

> **Erika Van Pelt simply described the unfolding drama as "weird," especially considering the <u>thorough background checks</u> they each had to pass.**
>
> **"<u>It was so extensive, which is another reason why we were so shocked and</u>**

confused that this was all of a sudden surfacing," she told THR. "Even after all the drama with him being brought back after being cut on the sing-for-your-life round -- for him to come back and be kicked off again?" [CDC_002976-78]

1258.      On Thursday, March 15, 2012 at 10:37 a.m., the LOS ANGELES TIMES published an article entitled: *"American Idol: [JXJ]'s Dismissal Angers Fans*.  The article quoted various public opinions surrounding the previous night's disqualification episode, all of which openly criticized ENTERPRISE-DEFENDANTS' telecast of adverse action against JXJ, describing the on-air confrontation between the ALIEN-ENTERPRISE-DEFENDANTS and JXJ as *"unprofessional," "tacky", "awkward," "kind of gross*.*"  As one commentator quoted by the LOS ANGELES TIMES succinctly stated:

There was no reason to humiliate JXJ on public TV. [CDC__003004]

1259.      On March 15, 2012, the on-line service BACKGROUNDS ONLINE (backgroundsonline.com), an employment screening resource, posted an article entitled *"American Idol Contestant Dismissed Over Criminal Record."* [CDC_003026].   After describing the circumstances surrounding JXJ's disqualification, the author stated:

This incident is a bit shocking considering American Idol's claims that the contestants are thoroughly vetted . . . A simple and inexpensive background check could have quickly uncovered JXJ's open warrants.  [CDC_003026]

1260.      On Thursday, March 15, 2012, in an article entitled *"Idol Background Checks,"* David Reimer, the Arts & Review editor for THE HEIGHTS, a well-established (1919) independent student newspaper at BOSTON COLLEGE (www.bcheights.com) opined:

At this stage in the show, it is ridiculous for "American Idol" to send someone home for something they should have known about and dealt with. JXJ's legal history might not be unblemished, but he should be allowed a graceful, normal elimination from the show based on how he sings, not on minor infractions.

Maybe the fanfare would be merited if JXJ had actually done something wrong during his time on the show, but that does not appear to be the case. This incident attests to the larger issue of stigmatizing individuals with a

sorted past. We idealize "rehabilitated criminals," but hold prejudice against anyone trying to start over.  [CDC_003010-11]

**(3)   STATE OFFICIALS: "AN OUTRAGE" [March 15, 2012]**

1261.  On Thursday, March 15, 2012, at 2:29 p.m. EDT, in an article entitled: *"Cops: Wasn't Worth Chasing 'Idol' on Small Charges"*, the ASSOCIATED PRESS reported that JXJ's local police department and area government officials were highly dismayed at the manner in which ENTERPRISE-DEFENDANTS handled JXJ's public disqualification:

> TRENTON, N.J. (AP) — A police official in a New Jersey town where a disqualified "American Idol" contestant is the target of two arrest warrants said Thursday the case wasn't big enough to merit going after him in California. [CDC_003194]
>
> Jermaine Jones of Pine Hill, N.J., was kicked off the TV show this week for not revealing he had outstanding warrants. The show's producers say they learned of four warrants as they confronted him about it during a taped segment later aired on television.
>
> [Gloucester Police] Lt. Christopher Jones [who had one day earlier issued the "Media Inquiry Statement"] stated that <u>JXJ's case "wasn't big enough" to merit going after the singer in California.</u> [CDC_003194]
>
> Not everyone was thrilled with the producers' treatment of Jones. Camden County Freeholder Jeffery L. Nash said there was no excuse for breaking the law, but he thought the show could have handled the incident better. [CDC_003194]
>
> <u>"For the producers of the billion dollar show to expose, embarrass and interrogate a young man without an attorney in front of 40 million viewers was an outrage,"</u> Nash said. "In the future, they should do background checks before they start counting their money and playing Judge Judy." [CDC_003194]

**(4)   DEFENSES TO MEDIA BACKLASH [March 15, 2012]**

1262.  On Thursday, March 15, 2012, Defendant WARWICK and Defendant LYTHGOE gave a joint interview to TMZ.com's founder and chief editor, Harry Levin, in which the ALIEN-ENTERPRISE-DEFENDANTS attempted to justify their humiliating on-air disqualification of JXJ.

1263. On March 15, 2012, REALITYTVWORLD.COM published an article entitled *"American Idol Execs: Fake Names Were JXJ's Big Problem"*. The article re-published statements made by Defendant LYTHGOE and Defendant WARWICK to TMZ.com.

> American Idol producers **Nigel Lythgoe and Ken Warwick** say disqualified finalist **JXJ's** biggest mistake was giving police fake names for two of his prior arrests because it made Fox executives question whether his undisclosed criminal record could still be more extensive than the show had discovered. **[CDC_002971]**

1264. Defendant WARWICK claimed that Contestant JXJ-11 had to be disqualified from the *American Idol* Contest because Defendant FOX was unable to determine through their background check procedures the number of false names that JXJ-11 had allegedly provided to government officials.

> • **Defendant WARWICK: "**The big problem for [FOX] was the fact that JXJ had given [the police] false names, and they [FOX and CARCO] were saying, 'This is what we know from the names we found out. There might be other false names and other charges out there that we just don't know about. '" **[CDC_002971]**

1265. In the 3/15/12 interview with TMZ.com, Defendant LYTHGOE attempted to explain ENTERPRISE-DEFENDANTS' decision to stage JXJ's disqualification for television viewing audiences and confront him on camera during the March 14, 2010 episode of *American Idol*.

1266. Citing the ENTERPRISE-DEFENDANTS' 2003 disqualification of Plaintiff Corey Clark, Defendant LYTHGOE stated that the "failure to disclose" criminal record information during the ENTERPRISE-DEFENDANTS' background check process was grounds for removal from the show.

> • **Defendant LYTHGOE: "**We had to confront JXJ, and we've done this in the past, as you know. We did it with Corey Clark again as well. In this situation where self-disclosure isn't forthcoming, we have to sit them down and say: 'These are the charges and the allegations against you.' But there were actually two criminal charges actually last year that [JXJ-11] did not disclose to us as well." **[CDC_002971]**

1267. In the 3/15/12 interview with TMZ.com, Defendant LYTHGOE stated that

ENTERPRISE-DEFENDANTS will ordinarily help Contestants to "clean up" their criminal records provided that they are forthcoming during the background check process.

- **Defendant LYTHGOE: "So the annoying thing is, we have had this in the past, you know - lots of kids having moving violations or they drive on a suspended license or anything like that - and they've got warrants against them that are outstanding. And we helped them where we can in cleaning them up before they come to Idol." [CDC_002971-72]**

1268.  Defendant WARWICK and Defendant LYTHGOE stated that ENTERPRISE-DEFENDANTS have attempted to assist *American Idol* Contestants "mitigate" any pending charges relating to on-going criminal proceedings. According to Defendant WARWICK and Defendant LYTHGOE, such mitigation is effectuated in part through ENTERPRISE-DEFENDANTS' interaction with government officials and/or judges.

- **Defendant WARWICK: "If they tell a judge, 'Look, I'm a contestant on American Idol and there's every possibility this will be great for me, can you let me off? Can you mitigate the charge?' Can you do something that invariably the judge will look on them sympathetically? We would have tried." [CDC_002972]**

- **Defendant LYTHGOE: "We would have certainty done our best. I don't know what would have happened because we don't make these decisions." [CDC_002972]**

1269.  Defendant LYTHGOE stated that *American Idol* Contestant background checks are conducted through a "team" and then submitted to Defendant FOX.

- **Defendant LYTHGOE: "It's done through a team and then put to Fox Broadcasting. I think that would have certainly red-flagged the two criminal charges last year." [CDC_002972]**

1270.  Defendant LYTHGOE and Defendant WARWICK maintained that JXJ-11 failed to disclose his arrest record history to ENTERPRISE-DEFENDANTS because JXJ-11 could not afford to cover the fines ordered by the criminal courts.

- **Defendant WARWICK: "[JXJ-11 was] very apologetic!" [CDC_002972]**

- **Defendant LYTHGOE: "He was actually very good. We said to him, 'Why did you not tell us? Why did you not tell us?' [JXJ-11] said, 'Because I wanted to get the money together and clear them up before I told you.' But it's in the**

region of six or seven thousand dollars. He just doesn't have that kind of money…" [CDC_002972]

- **Defendant WARWICK**: "The truth was he could not possibly pay these fines and these charges. So he said it becomes like a mechanism where just to get on the show, you do lie about them. It's like quicksand. You can't pay the charges, so the next one comes along and you lie about that, and then the next comes along and you lie about that." [CDC_002972]

## C.   JXJ SPEAKS [MARCH 16, 2012]

## (1)   PEOPLE MAGAZINE INTERVIEW

1271.  On Friday, March 16, 2012, at 8:30 a.m. EDT, PEOPLE MAGAZINE published an on-line article entitled: *"JXJ: I Didn't Know I Broke American Idol's Rules"* [CDC_003102-03]

- **PEOPLE**: Did you know you were going to be called in front of producers and that it would be filmed?

**JXJ**: I did not know any of it. I was actually confused. I didn't know what was going on. And I walked in and there were all these lights and cameras. I didn't know what was going on.

- **PEOPLE**: When you signed up for Idol, were you asked if you had a criminal past?

**JXJ**: They did have a question [in which you had to admit] that you were arrested, and that I did do. And they did an extensive background check. When I went home [after my first elimination] and then I went back, I thought, they've done the research at this point. I was a little bit confused.

- **PEOPLE**: Did you know you were breaking the rules?

**JXJ**: I did not know I was breaking the rules, because before I went, I had to obtain a lawyer and take care of some fines before I could go. I just thought everything was taken care of.

- **PEOPLE**: What are your warrants for?

**JXJ**: Two for giving a false name, one allegation of a fight and one for driving with a suspended license. They were all minor charges but of course it was a big deal. Who wants a criminal past? It was a very big deal for me.

- **PEOPLE**: Do you feel you have a scarlet letter affixed to you with the elimination?

**JXJ**: People will judge me or hold it against me, but I don't know anyone that doesn't have a past. Everyone has a past. It's not like I shot someone or assaulted anyone. I was younger. I got caught driving with a suspended license. I gave a false name. I'm not trying to say it was okay, but I'll be all right.

**(2)    SHOWBIZ TONIGHT**

1272.   On Friday evening, March 16, 2012, JXJ appeared on the popular HLN television show SHOWBIZ TONIGHT.  The headline stated that his interview was a "SHOWBIZ EXCLUSIVE" AND JXJ'S "first interview since being kicked off *American Idol* Last night.

1273.   During his interview, JXJ publicly stated that his on-air disqualification came as a complete surprise.

> • **JXJ: "I thought they were bringing it to my attention . . . letting me know that now they are aware of, you know, this, that and the third. I didn't know what was going to happen . . .Until they said it, I had no clue what was going to happen. I was shocked, but I can't really express what my emotions were at that time."  [CDC_005968; CDC_002984-85]**

1274.   On March 16, 2012, JXJ publicly stated that his disqualification from *American Idol* was a "very humbling experience" and he said that he was very disappointed … it hurt a lot."  [CDC_002992]

1275.   During his SHOWBIZ TONIGHT interview, JXJ publicly stated that he had affirmatively disclosed his arrest record history to ENTERPRISE-DEFENDANTS during their background check process.

> • **JXJ: "I know that when I filled out my application, I circled 'yes' that I was previously arrested before." [CDC__005968]**

1276.   During his SHOWBIZ TONIGHT interview, JXJ publicly stated that after submitting his PARTICIPANT BACKGROUND QUESTIONNAIRE FORM (v.11), ENTERPRISE-DEFENDANTS *required* JXJ to hire a criminal defense attorney to handle outstanding arrest warrants.

> • **JXJ: "And, you know, they did a background check on me and there were some information that I had to get a lawyer to take care of before I could even be on the show."  [CDC_005968; CDC__002985]]**

1277.   During his SHOWBIZ TONIGHT interview, JXJ stated said he was not concerned with widespread speculation that ENTERPRISE-DEFENDANTS had planned the disqualification

scandal in advance as a ratings ploy.

1278.  On Friday, March 16, 2012, the HOLLYWOOD REPORTER posted another follow-up article reporting on JXJ's exclusive televised interview with SHOWBIZ TONIGHT. [CDC__002991]   Some of the public opinions reacting to JXJ's interview included the following published statements to HOLLYWOOD REPORTER:

> "When he says it was a "humbling experience," he should have said humiliating and degrading and not worthy of AI.  Lithgoe and Warwick were completely wrong and frankly, I am more embarrased for their lack of humanity then I am for Jermaine's bad choices. [CDC_002995]

> "JXJ has a voice that has been missing in music since we lost Luther and Barry White. What a shame that Idol didn't have the class to step up and guide him to clear up his situation instead for throwing him back into a judicial system that is nothing but the new slavery system with no way out. Idol and FOX have big lawyers and it would have taken nothing [sic] to show him how to correct his past and become the [recording artist] the world named and wanted and need him to be." [CDC_002995]

> "American Idol knew of his mischief related offenses. JXJ admitted to the crimes during the American Idol application process, and he also lawyered up to clarify these matters with American Idol's legal staff. [CDC_002996]

## D.   EXPERT OPINION #2

1279.  On March 17, 2012 at 6:27 PDT, HOLLYWOOD REPORTER posted a video of THR.com's live Friday talk show called "*Idol Hangover No. 3,*" which is hosted by author Shirley Halperin.

1280.  The one-hour video [12] addresses what it calls "shocking news of the disqualification of season eleven finalist JXJ" and featured HOLLYWOOD REPORTER journalist Shirley Halperin further explaining her position on JXJ's disqualification.  Ms. Halperin began the show with the following statements:

> • Shirely Halperin:  We have to get started by getting right into the drama of this week's Idol.  So unexpected.  When we started the week on Monday, we had no idea that 24 hours later we'd see someone disqualified and sent home…

---

[12] http://www.hollywoodreporter.com/video/thrs-idol-hangover-episode-3-301175 (accessed 07/20/13)

I wrote an <u>opinion piece</u> about whether this was possibly <u>planned in advance</u> - I'm not like one of these crazy conspiracy theory people; so it's actually - it's not like me to just consider everything to be a conspiracy - but here's the thing: <u>everyone was saying that</u>. Twitter was on fire with people saying 'This seems like a publicity stunt.'  And I think people were a little upset that if it was a <u>publicity stunt</u>, why would they bring him back just to, like, throw off him two weeks later.

And I brought up this idea of the <u>Human element</u>, too.  I didn't know what he did wrong or how bad it was or it wasn't.  <u>But I think that when you put somebody on a pedestal, you put them on Idol with 20 million people watching them and then you vilify them 24 hours later, it can be really hard on someone's psyche, so I was a little concerned</u>…I just don't want this to get any uglier than it was.  But it was pretty ugly.

1281.  Later in the video show, *"Idol Hangover 3"*, Ms. Halperin and her co-host introduced Richard Rushfield, author of AMERICAN IDOL: THE UNTOLD STORY, and another one of the leading experts in *American Idol* who had been covering the series for the LOS ANGELES TIMES since its inception.

1282.  On April 1, 2005, during Season Four of *American Idol,*

• <u>Shirley Halperin</u>: This kind of controversy – it's not uncommon for Idol – there have been people who have been disqualified.  This one seems - I don't know - a little extra cruel.  Why?

• <u>Richard Rushfield</u>: This scene here: Calling him in and breaking the news to him on the couch with the cameras rolling …You can just imagine, he's got the cameras following him into the office…. and then all of sudden … Watching his face as they break it to him: 'Yes, you've been arrested five times and – and we're ending your career.'  [laughter]…This just seemed - IT WAS CRUEL IN TOO REAL A WAY.

• <u>Shirley Halperin</u>:  Isn't the background check process pretty thorough?  How could they miss this?

• <u>Richard Rushfield</u>:  It seems really shocking that he could have five warrants.  They drop the thing about how he gave a different name – and that was with, what's name Corey  –

• <u>Shirley Halperin</u>:  Corey Clark. His name was misspelled in Season Two – that's right.

• <u>Richard Rushfield</u>:  That's why it didn't come up in the background check because he gave the wrong name.  So perhaps the arrest warrants were under different name.  It seems really odd that they would do a background check and there would be five warrants out -

• <u>Shirley Halperin</u>:  And NONE of them would come through? And I was reading back to the Corey Clark days.  And let's just remember 2003.  The internet was not what it is today.

If you applied for a job, they check your social security.  They are not just checking your name.  That's why I wrote that opinion – it just – it didn't quite fit.

- **Richard Rushfield**:  They definitely milked it – I will tell you that.  They were not just going to brush this under the rug as they have done in the past.  They used this.

# WHITE COMPARATORS

## A.   SCOTT SAVOL [Season Four]

### (1)   COMPARATIVE RELEVANCE

1283.   Scott Savol was featured as a male Contestant on Season Four of *American Idol*.

1284.   Pursuant to the U.S. census of 1870, Mr. Savol would have been categorized as White and/or Caucasoid, Europid or Europoid and, in contrast, would not have been classified as "B" (Black), "M" (Mulatto); C (Chinese); or I (Native American).

1285.   Pursuant to the U.S. census 2000, Mr. Savol would have categorized as White.

1286.   In modern day North American society, Mr. Savol is categorized as White.

1287.   Mr. Savol is not African-American.

1288.   During the Finalist Round of *American Idol* Season Four (2004-2005), Top Finalist Scott Savol became the first White Contestant involved in an *American Idol* "mug shot" scandal.

1289.   Up until the reporting of Mr. Savol's arrest, ENTERPRISE-DEFENDANTS had already scandalized and disqualified five Black Semi-Finalists: Cagnolatti, Plaintiff Andrews, Plaintiff Clark, Frenchie Davis, Plaintiff Donnie Williams.   ENTERPRISE-DEFENDANTS had also ruthlessly exploited the criminal arrest history of Leroy W.

1290.   Despite being charged with a crime of domestic violence for physically assaulting the mother of his child with a telephone (later reduced to disorderly conduct upon conviction), Mr. Savol was not disqualified from *American Idol* by ENTERPRISE-DEFENDANTS.   In contrast, both Plaintiff Clark and Plaintiff Andrews were publicly disqualified from *American Idol* for

assault-related charges.  Neither Plaintiff Clark nor Plaintiff Andrews were ever convicted for assault-related charges.

## (2)  DELAYED DISCLOSURE OF CRIMINAL RECORDS [March 31, 2005]

1291.  The Semi-Finals of *American Idol* Season Four aired from February 23, 2005 through March 9, 2005.

1292.  Mr. Savol performed and appeared in the Final Rounds on March 15-16, 2005; March 22-23, 2005; and March 29-30, 2005.

1293.  On Thursday, March 31, 2005, SMOKINGGUN.COM published an article on-line entitled:  *"American Idol Finalist's Violence Rap (Cops: Savol Roughed Up Ex-Girlfriend During Domestic Dispute*)."  The article reported that Savol had been arrested in connection with a domestic violence incident against the mother of his child.  The SMOKINGGUN.COM article also attached a police report, which stated that Mr. Savol got into a confrontation with his child's mother while he was moving out of their apartment.  Mr. Savol allegedly called her "'vulgar names,'" grabbed her hand, and pulled the engagement ring from her finger and threatened to take the baby.  When she threatened to call 911, he shoved her, grabbed the phone, and threw it at her chest, breaking the phone in the process, the report said.   The mother initially sought just a restraining order on Mr. Savol, but the next day, she signed a warrant for his arrest.

1294.  Mr. Savol eventually struck a plea deal, accepting a misdemeanor charge of disorderly conduct. He was fined $500, given a year's probation, ordered to take an anger management course, and placed under a protective order for a year at Martin's request.

1295.  After the SMOKINGGUN.COM published its 3/31/2005 report, two years from the exact date when Plaintiff Corey Clark was disqualified, several media outlets queried whether Mr. Savol would be disqualified in the same manner that Plaintiff Corey Clark had been two

years earlier.

> Could Savol's history have meant his ouster as an Idol finalist? Two years ago, FOX and the show's producers booted finalist Corey Clark for failing to disclose to them an arrest for allegedly assaulting his 15-yea-rold sister, which hadn't come to light during his background check because his name had been misspelled in a police report.

1296.   On the evening of Thursday, March 31, 2005, after allowing the SMOKINGGUN.COM article to finish its all-day news cycle, Defendant FOX issued the following statement to the press, indicating that Mr. Savol had been "forthcoming" and "honest" and had showed "remorse":

> Scott Savol was forthcoming to the American Idol producers and the network regarding his misdemeanor. After reviewing the facts, in which the charges were reduced to disorderly conduct, we felt that considering Scott's honesty and his remorse, the situation did not warrant his disqualification.

1297.   Mr. Savol continued to compete in the Contest uninhibited and was not eliminated until the public (purportedly) voted him off on May 4, 2011.  He came in fifth place and enjoyed support from ENTERPRISE-DEFENDANTS and a moderately successful career in music at times thereafter.

1298.   In the wake of the Plaintiff Akron Watson disqualification in February 2007, Savol spoke to REALITY TV MAGAZINE (www.sheknows) about how ENTERPRISE-DEFENDANTS' conducted its background check process. [CDC_003319].  Mr. Savol revealed that he disclosed all of his information before being flown to Hollywood.

> ### AMERICAN IDOL 4 FINALIST SCOTT SAVOL REVEALS DETAILS ON IDOL BACKGROUND CHECK PROCESS [CDC_003319]
>
> • **Reality TV Magazine**: What kind of background investigation does the show do on contestants and at what stage does it occur in the audition process?
>
> • **Scott Savol**: I don't know whether or not the background investigation process has changed since Season 4, but when I was on Idol every contestant that went to Hollywood had to fill out information forms and consent to a background investigation. When the group in Hollywood was narrowed down to about 41 contestants (before the final cut for the top 24), we each had to sit

down with private investigators that asked us all kinds of questions.

- **Reality TV Magazine**: At what stage of the audition process did you tell American Idol producers about your arrest for domestic violence?

- **Scott Savol**: Actually my arrest in 2001 was for misdemeanor assault (not domestic violence), which was later pled down to a charge of disorderly conduct for which I received probation. I supplied the show with this information in my background forms/papers, and again in my in-person interviews with the private investigators.

- **Reality TV Magazine**: When news broke about your arrest, what were the rules that American Idol producers gave you in regards to answering questions from the press?

- **Scott Savol**: There were really no rules that I was given by the producers. The news of my arrest broke after I had made the top 12 and the producers simply told me to ignore the negative stuff being said, not to let it bother me, and to keep focused on my performances. The producers were very supportive and told me not to worry about it, as I had been forthcoming about the arrest from the beginning, and not to let this discourage or distract me in the competition.

## B.   BO BICE [Season Four]

### (1)   COMPARATIVE RELEVANCE

1299.   Bo Bice was featured as a male Contestant on Season Four of *American Idol*.

1300.   Pursuant to the U.S. census of 1870, Mr. Bice would have been categorized as White and/or Caucasoid, Europid or Europoid and, in contrast, would not have been classified as "B" (Black), "M" (Mulatto); C (Chinese); or I (Native American).

1301.   Pursuant to the U.S. census 2000, Mr. Bice would have categorized as White.

1302.   In modern day North American society, Mr. Bice is categorized as White.

1303.   Mr. Bice is not African-American.

1304.   During the Finalist Round of *American Idol* Season Four (2004-2005), Top Finalist Bo Bice became the second White Contestant involved in an *American Idol* "mug shot" scandal.

### (2)   DELAYED DISCLOSURE OF CRIMINAL RECORDS [April 28, 2005]

1305.  The Semi-Finals of *American Idol* Season Four aired from February 23, 2005 through March 9, 2005.

1306.  Beginning in mid-March 2005, Mr. Bice performed and appeared in the Final Rounds for seven consecutive weeks: on March 15-16; March 22-23; March 29-30; April 5-6; April 12-13; April 19-20; and April 26-27, 2005.

1307.  On Thursday, April 28, 2005, SMOKINGGUN.COM posted an article entitled

> One of the five remaining "American Idol" finalists was once arrested for felony cocaine possession, but had the charge--and a separate marijuana count--dismissed last year after completing a so-called "diversion program."
>
> Harold "Bo" Bice, 29, was busted in June 2001 by Huntsville, Alabama cops and hit with the drug count, a Class C felony, according to a warrant. He was arrested again in July 2003 near Birmingham and charged with marijuana possession, public intoxication, and possession of drug paraphernalia, according to court records.
>
> He pleaded guilty to the latter two misdemeanors in December 2004. The pot charge was dismissed after Bice's successful completion of the same diversion program that covered his prior cocaine bust.
>
> Bice formally entered the diversion program in 2003 following his pot arrest, and the two separate drug possession charges were effectively merged and covered by Bice's diversion program, according to a TSG source familiar with the cases (the cocaine charge was bounced on April 28, 2004, and the pot rap was dismissed five months ago).
>
> Bice was arrested on the cocaine charge after scoring about 1/2 a gram of the drug from an acquaintance at Huntsville's Silver Dollar strip club, according to a source. If convicted of the felony coke charge, Bice would have faced a maximum of 10 years in jail, though a probationary term would have been more likely.
>
> Bice, who worked at the time in a Huntsville bar, is a long-haired rocker whose gritty appearance and performances have stood out from "American Idol"'s usual pop pablum.

1308.  There were very few comments posted in response to the SMOKING GUN.COM

report, and all such comments expressed unconditional support for Mr. Bice in his bid to win *American Idol, e.g.,*

> I love Bo Bice and I don't care about his arrests. Everyone makes mistakes and should not be judged by the arrests, but by what he has done since the arrests. He took responsibility for his actions and that is what counts.

1309.   On or about April 28, 2005, Defendant FOX issued a statement to the press vehemently defending the "previous indiscretions" of Mr. Bice and claiming that Bice had been "honest" and "forthcoming" during the background check process - as was the case with Mr. Savol.   Defendant FOX stated through its spokesperson:

> "The information disclosed on various salacious gossip Web sites regarding Bo Bice's past was already well-known to FOX and the producers of 'American Idol.' From the beginning, Bo was honest and forthcoming in revealing his previous indiscretions and their outcome."

1310.   On April 28, 2005, MTVNews.com published an article entitled  *"Idol Singer Bo Bice Has Drug Rap Sheet, Court Papers Show (Finalist Was Arrested for Cocaine and Marijuana Possession)"*.   The MTV article stated that Mr. Bice was "widely considered a favorite to win the fourth season of *American Idol*" and, based on Defendant FOX's press statement, would continue to compete.

1311.   Mr. Bice's record of arrest and felony convictions were expunged from the public record at the time they were purportedly disclosed to ENTERPRISE-DEFENDANTS.

1312.   By ENTERPRISE-DEFENDANTS' own admission, ENTERPRISE-DEFENDANTS knew about Mr. Bice's expunged felony convictions at least 5-6 months before SMOKINGGUN.COM ever disclosed his arrest record.

1313.   Upon information and belief, ENTERPRISE-DEFENDANTS transmitted Mr. Bice's criminal arrest history to media outlets, in particular SMOKINGGUN.COM, AT A CAREFULLY ORCHESTRATED TIME.

1314.  The timing of ENTERPRISE-DEFENDANTS' unlawful dissemination of Mr. Bice's expunged criminal arrest history was critical because by the time his arrest record history was finally released to the media by ENTERPRISE-DEFENDANTS, Mr. Bice had already advanced to the Final 4 and had built a sizeable audience on the strength of his talent, merit and appeal.

1315.  The television audience would not have been as forgiving had Bo Bice's criminal record information been released during the Hollywood Rounds or shortly thereafter.

## (3)   CAREER SUCCESS

1316.  On May 24, 2005, Governor Bob Riley of the State of Alabama declared May 24 as "Bo Bice Day."

1317.  On May 25, 2005, one month after the publication of Mr. Bice's felony arrest record, Mr. Bice ultimately became the runner-up in Season Four of the *American Idol* Contest, reaching second place after Carrie Underwood.  Therefore, <u>Mr. Bice was never voted off the show</u>.

1318.  Upon information and belief, subsequent to his participation as a Contestant on Season Four of *American Idol,* 19 ENTERTAINMENT exercised its "options" on the Prize Contracts by signing Mr. Bice to the 19 ENTERTAINMENT "360" deal that all Finalist Contestants were required to sign.

1319.  After his appearance as an A*merican Idol* Contestant, Mr. Bice was signed to a Major Record Label, RCA Records.  Released on June 21, 2005, Bice's first single as an RCA artist  debuted at number two on the Billboard Hot 100 Chart and was certified Gold in July 2005.

1320.  On December 13, 2005, RCA Records released Bo Bice's Major Label debut album, which peaked at number 4 on the U.S. charts and went on to sell 673,000 copies in the

U.S.

1321.   Mr. Bice thereafter released independent albums, bringing his total number of album sales to approximately 745,000.

1322.   Since appearing as a Contestant on Season Four of *American Idol*, Mr. Bice has enjoyed a career as a professional recording artist in the music industry with support from these ENTERPRISE-DEFENDANTS, including but not limited to performing with Willie Nelson at the Bonnaroo Music Festival, appearing on Carlos Santana's album *All That I Am*, performing in the American Idols LIVE! Tour 2005, appearing on *The Tonight Show* with Jay Leno, *The Ellen DeGeneres Show*, *Live with Regis & Kelly*, *The Today Show*, *The Daily Show* with Jon Stewart.

## C.   BUCKY COVINGTON [Season Five]

### (1)   COMPARATIVE RELEVANCE

1323.   William "Bucky" Covington placed eighth (#8) in the Finalist Rounds of *American Idol* Season Five (2005-2006).

1324.   Five seasons into the *American Idol* franchise, Mr. Covington became only the third White *American Idol* Contestant whose criminal arrest history was disseminated to the mass media while he was featured as a Contestant on the *American Idol* television show. [Taylor Hicks would become the fourth in the same Season Five].

1325.   Pursuant to the U.S. census of 1870, Mr. Covington would have been categorized as White and/or Caucasoid, Europid or Europoid and, conversely, would not have been classified as "B" (Black), "M" (Mulatto); "C" (Chinese); or "I" (Native American).

1326.   Pursuant to the U.S. census 2000, Mr. Covington would have been categorized as White.

1327.   In modern day North American society, Mr. Covington is categorized as White.

1328.    Mr. Covington is not African-American.

1329.   In 1998, Bucky Covington was arrested for and charged with fraud in connection with impersonating his identical twin brother and providing a fictitious name to a police officer.

1330.   Mr. Covington is a white comparator of JXJ, among others, who was also arrested for providing a fictitious name to a police officer.

1331.   Mr. Covington is also similarly situated to Plaintiff Brittenums, who were also charged with falsifying their identity.

1332.   Unlike Plaintiff Brittenums and JXJ, ENTERPRISE-DEFENDANTS chose not to disqualify or stigmatize Mr. Covington in connection with his past arrest record for being charged with falsification of his identity.

1333.   In contrast, ENTERPRISE-DEFENDANTS unilaterally decided – in their absolute and sole discretion - to disqualify Black *American Idol* Contestants the Brittenum Twins and JXK in connection with similar charges.

## (2)   DELAYED DISCLOSURE OF CRIMINAL RECORDS [April 11, 2005]

1334.   On or about October 6, 2005, the identical Covington Twins auditioned for *American Idol* Season Five in Greensboro, North Carolina, in their individual capacities.

1335.   Of the two brothers, Bucky Covington eventually advanced to the Top 12 Finalist Round.

1336.   Mr. Covington performed in the Final Rounds for five weeks straight, on March 14-15; March 21-22; March 28-29, April 4-5, without any inhibition.

1337.   On or about Monday, April 10, 2006, COURT TV reported that Mr. Covington "was once arrested for his involvement in a bizarre incident in which he pretended to be his twin

brother to help the sibling avoid criminal prosecution."

1338.  On Monday, April 12, 2006, at 11:51 p.m. EDT, REALITY TV MAGAZINE (www.sheknows.com) published an article on-line entitled *"American Idol Finalist Bucky Covington's Twin-Swapping Legal Scandal."*  The author of the article opined as follows:

> **Will this scandal hurt Bucky in the voting?  If anything, it might be one of those rare scandals that actually helps a contestant. Bucky will likely gain points with some for trying to help keep his brother out of trouble, and it also gives Bucky a little bit of an outlaw image.  [CDC_7141]**

1339.  In 1998, Mr. Covington was charged with resisting a police officer's arrest and giving fictitious information to a police after an incident where he impersonated his twin brother "Rocky".  Rocky was in his pickup when he was hit by another vehicle.  Rocky was driving on a license that was suspended for speeding, drinking while driving and driving with a revoked license. Bucky Covington was afraid that his twin brother would face jail time for driving a suspended license for a second time in 16 months, and so he hastily arranged for the two brothers to switch places.  The police officer was unable to unravel the scheme and both brothers were charged with fraud.

1340.  On Wednesday, April 12, 2006, only two days after the news of his criminal history information was released by the mass media, Mr. Covington was voted off the show, landing him at the #8 spot.

1341.  On Thursday, April 13, 2006, Mr. Covington was interviewed by a reporter for ENTERTAINMENT WEEKLY and was asked to discuss his prior criminal arrest.  [CDC_007135].

> • **EW:  I know this week Court TV reported the news about you and your identical twin brother, Rocky, having a run-in with the law back in 1998, where you had been arrested for impersonating him at the scene of a car accident he had while driving with a suspended license. I know it was relatively innocuous in terms of *Idol* scandal, but do you think that hurt you in any way?**

- **Covington:**  I'd like to say no, it didn't hurt me. But I did get voted off, so it very may well have. I'd hope not, over a little silly car accident thing. It's just a shame they had to bring something like that up from eight years ago

- **EW:**   Well, with the show being the phenomenon it is, I guess it was inevitable.

- **Covington:**  If they're looking for dirt on me and all they found was a car accident in 1998, they're not looking hard enough. [*Laughs.*]

- **EW:** Want to come clean with anything right now?

- **Covington:**  I ain't really got no dirt on me — or I was good at getting away with it.

- **EW:** So people still need to keep digging.

- **Covington:** Exactly — I'm not going to give it to you.

1342.   In the wake of the Court TV report that unearthed Mr. Covington's criminal arrest history on April 11, 2006, Defendant FOX did NOT issue any statement to the press concerning whether Mr. Covington had disclosed the history of his criminal arrest in connection with the background check procedures.

## (3)    CAREER SUCCESS

1343.   Following his appearance on Season Five of *American Idol*, Mr. Covington was signed to LYRIC STREET / HOLLYWOOD RECORDS.  His debut album, entitled *Bucky Covington*, was released on April 17, 2007 and debuted on the Billboard 200 Chart at number four (#4) selling 61,000 copies.

1344.  Mr. Covington's debut album also debuted at number one (#1) on the Top Country Albums chart and sold approximately 405,000 units, producing three hit singles on the Hot Country songs charts.  [CDC_007114]

1345.  After his debut release, Mr. Covington released more studio length albums on independent country music labels.  He continues to work professionally as a musician and recording artist and has recently made appearances in television movies, including *Billy Ray Cyrus: I'm American.*  [CDC_007115-16]

1346.  Upon information and belief, Mr. Covington continues to make a living in his career as a professional musician and performer.

## D.   TAYLOR HICKS [Season Five]

## (1)   COMPARATIVE RELEVANCE

1347.  During the last episodes of the Finalist Rounds of *American Idol* Season Five (2005-2006), that year's eventual Winner, Taylor Hicks, became the third White *American Idol* Contestant whose criminal arrest history was disclosed in connection with *American Idol*.

1348.  Of the four White *American Idol* Contestants during the first Five Seasons whose criminal record information was disseminated to the mass media, none of them were disqualified by ENTERPRISE-DEFENDANTS.

1349.  Rather than disqualifying the White *American Idol* Contestants who had criminal records, the ENTERPRISE-DEFENDANTS invariably celebrated them and advanced them to top-ranking positions in the Contest: Covington placed #8; Savol placed #5; Bice placed #2, and Hicks placed #1.  Mr. Covington, Mr. Bice and Mr. Hicks all secured Major Label record deals subsequent to their appearances on the show.

1350.  Pursuant to the U.S. census of 1870, Mr. Hicks would have been categorized as White and/or Caucasoid, Europid or Europoid and, in contrast, would not have been classified as "B" (Black), "M" (Mulatto); C (Chinese); or I (Native American).

1351.  Pursuant to the U.S. census 2000, Mr. Hicks would have been categorized as

White.

1352.   In modern day North American society, Mr. Hicks is categorized as White.

1353.   Given that Mr. Hicks's style of singing and vocal inflection relies heavily on influences he picked up from the African-American musical inventions of Blues, Soul and R&B music, Mr. Hicks (and/or his fans) garnered the nickname in the media of *"Soul Patrol."* [CDC_007051]

1354.   In 1998, Mr. Hicks was arrested in Alabama during a traffic violation stop for misdemeanor possession of marijuana and drug paraphernalia.

1355.   On May 29, 2006, it was also reported by the WB2 Morning News in Denver that Mr. Hicks was charged with driving while under the influence in connection with the marihuana possession charge.  [CDC_007078]

1356.   The charges stemming from the 1998 criminal charges were reportedly dropped for "lack of prosecution."

1357.   Mr. Hicks is a white comparator of Plaintiff Akron Watson, among other Plaintiffs, who was also arrested for marijuana possession (although not paraphernalia).

1358.   Mr. Hicks is also similarly situated to white contestant Stefano Langone (Season Ten) and white contestant Bo Bice (Season Four), both of whom were also arrested for possession of marijuana prior to their auditions for *American Idol.*

1359.   ENTERPRISE-DEFENDANTS chose not to disqualify or stigmatize the white *American Idol* contestants Mr. Hicks, Mr. Langone or Mr. Bice in connection with their past arrest records for possession of marihuana.  In contrast, ENTERPRISE-DEFENDANTS unilaterally decided – in their absolute and sole discretion – to disqualify Black *American Idol* Contestant Akron Watson for the exact same criminal charge (and of an ostensibly lesser degree).   Plaintiff

Watson had fully disclosed his arrest record to ENTERPRISE-DEFENDANTS.

1360.   During *American Idol* Season Five, the same year in which Mr. Hicks claimed victory, a total of <u>four</u> African-American Golden Ticket holders had already been publicly disqualified and stigmatized due to their criminal arrest history: Plaintiff T. Brittenum, Plaintiff D. Brittenum, Halicia Thompson, and Tatiana Ward.  All of the criminal arrest histories of said Black *American Idol* Contestants were known by ENTERPRISE-DEFENDANTS as early as October or November 2004 and reported by the mass media during the very First Phase of Season Five (i.e., the Open Audition episodes) in January and early February 2005.

## (2)   DELAYED DISCLOSURE OF CRIMINAL RECORD

1361.   In contrast to the Black *American Idol* contestants, ENTERPRISE-DEFENDANTS unilaterally decided to wait until the very last episodes of Season Five – after television audiences had already "invested" in Mr. Hicks on the basis of his singing talent -  before releasing the criminal arrest history information of Mr. Hicks to the mass media.

1362.   Mr. Hicks auditioned for *American Idol* in Las Vegas Nevada on October 10, 2005.

1363.   Through its background check procedures, ENTERPRISE-DEFENDANTS procured the criminal arrest history information of Mr. Hicks in October 2005 or early November 2005, but in no event later than the date that ENTERPRISE-DEFENDANTS flew Mr. Hicks to Los Angeles, California to compete in the Hollywood Rounds.

1364.   The Semi-Finals of *American Idol* Season Five aired from February 23, 2005 through March 9, 2005.

1365.   A full <u>eight months</u> passed between Taylor Hicks's Open Audition and the mass media publication of his criminal charges for possession of marijuana and drug paraphernalia.

1366.   Mr. Hicks' criminal background information was not revealed to the public until early May 2006, just days before the Final Episode of Season Five.

1367.   Upon information and belief, ENTERPRISE-DEFENDANTS transmitted Mr. Hicks' arrest record history to the mass media consistent with ENTERPRISE-DEFENDANTS' marketing objectives and its corporate philosophy of granting redemption and vindication to White *American Idol* Contestants with criminal records while vilifying and condemning Black *American Idol* Contestants.

1368.   On or about May 2, 2006, STAR MAGAZINE published details regarding Taylor Hicks' 1998 criminal arrest in the State of Alabama for possession of (what the DEA describes as) "narcotics."

> The Birmingham, Ala., native was a 21-year-old student at Auburn University when he was pulled over by Alabama State Trooper Jason Black on July 2, 1998, while driving his red Ford Explorer near Tuskegee. In public court documents obtained by Star, Trooper Black wrote: "Subject was stopped for a traffic violation. When I approached the vehicle, I detected the odor of marijuana. When subject opened the glove box to get tag receipt, a wood pipe fell out. The subject said it was a 'pot pipe.' The subject was placed under arrest, read his rights and placed in my patrol vehicle. The subject told me he had marijuana in the vehicle, and that he was going to the beach and that it was just for personal use."
>
> A second state trooper was called to the scene, and a search of Hicks' vehicle began. Trooper Black reported: "A yellow plastic container [holding] vegetable matter believed to be marijuana was found on the back passenger floorboard. A plastic bag [also believed to be containing the drug], and a small metal pipe resembling a cigarette were found in a backpack in the back of the vehicle."
>
> Hicks' car was impounded, and he was charged with misdemeanor counts of possession of marijuana and drug paraphernalia before being taken to the Macon County Jail in Tuskegee. The facility's records show Hicks was released later that same afternoon after hiring a bail bondsman to pay $500 bond.  [CDC_007046]

1369.   Mr. Hicks criminal arrest charge for possession of marijuana was dismissed due to lack "for want of prosecution."

1370.  In the wake of the 5/02/2006 STAR MAGAZINE article, ENTERPRISE-DEFENDANTS did not make any public statement or issue any press release regarding Mr. Hick's past criminal record for possession of controlled substances.

1371.  In the wake of the 5/02/2006 STAR MAGAZINE article, ENTERPRISE-DEFENDANTS did not make any statement regarding whether or not Mr. Hicks disclosed his arrest record information during the background check procedures.

## (3)    CAREER SUCCESS

1372.  On May 10, 2006, Mr. Hicks was announced as one of the Top 3 Finalists for *American Idol* Season Five.  [CDC__007054]

1373.  On May 12, 2006, ENTERPRISE-DEFENDANTS flew Mr. Hicks to Birmingham, Alabama at ENTERPRISE-DEFENDANTS' expense for a weekend of promotional events including television interviews for the local FOX affiliate, a downtown parade, concerts, and an audience with Governor Bob Riley.  [CDC__007054]

1374.  On May 12, 2006, Governor Riley gave Taylor Hicks was the key to the city and issued a proclamation making May 16 "Taylor Hicks Day."  [CDC__007054]

1375.  On May 24, 2006, Mr. Hicks was named the new *American Idol*, winning the title over Katherine McPhee.  The proclamation was purportedly aired to a worldwide audience of 200 million television viewers.  [CDC__007054]

1376.  Upon winning Season Five of *American Idol*, it was announced that Mr. Hicks had been signed to a Major Record Label, Arista Records / 19 ENTERTAINMENT Records and would be managed by Defendant FULLER and 19 ENTERTAINMENT.  [CDC__007054]

1377.  In June 2006, Defendant FORD signed Mr. Hicks to promote Ford's *"Drive on Us"* year-end sales event (despite the fact that Mr. Hicks had once been arrested for possession

of marijuana during a routine traffic stop).  [CDC__007054]

1378.   In August 2006, it was announced that Mr. Hicks received a $750,000 (USD) deal to write a memoir of his life, which was released in July 2007.  The book was entitled *Heart Full of Soul: An Inspirational Memoir About Finding Your Voice and Finding Your Way*. [CDC_007056]

1379.   Mr. Hicks was also named "Hottest Bachelor" by PEOPLE magazine for 2006, appearing on the magazine's cover.  [CDC__007054]

1380.   Mr. Hicks' debut album was released on December 12, 2006.  The album charted #2 position on the U.S. Billboard 200 Chart and was eventually certified by the RIAA as Platinum on the basis of 704,000 units.  [CDC__007054]

1381.   Upon information and belief, Mr. Hicks has released at least two more albums since his debut, bringing his total number of record sales to about 780,000.  [CDC_007163]

1382.   In 2008 and 2009, Mr. Hicks performed on Broadway and on national tour with the popular show *Grease.*  [CDC__007054]

1383.   In May 2009, Taylor Hicks made FORBES MAGAZINE Top-Ten earning *American Idol* Stars list, coming in at number ten, with over $300,000 earned.  [CDC_007058]

1384.   Since winning Season Five of *American Idol*, Taylor Hicks has continued to tour, make paid appearances and earn a living as a professional singer and performer. He is reportedly the first *Idol* winner to secure a long-term residency in Las Vegas where he currently performs at the Paris hotel.  [CDC_007051]

## D.   AMANDA OVERMYER [Season Seven]

## (1)   COMPARATIVE RELEVANCE

1385.   Amanda Overmyer, a citizen of the State of Indiana, was featured as a Contestant

on Season Seven of *American Idol*.  She was 22 years old at the time of her appearance on the show and was working as a register nurse and/or health care specialist.

1386.  Pursuant to the U.S. census of 1870, Ms. Overmyer would have been categorized as White and/or Caucasoid, Europid or Europoid and, in contrast, would not have been classified as "B" (Black), "M" (Mulatto); "C" (Chinese); or "I" (Native American).

1387.  Pursuant to the U.S. census 2000, Ms. Overmyer would have been categorized as White.

1388.  In modern day North American society, Ms. Overmyer is categorized as White.

1389.  Ms. Overmyer is not African-American.

1390.  In October 2006, Ms. Overmyr was arrested on charges of driving under the influence of alcohol.  She later pled guilty to the criminal charge.  [CDC_007513]

1391.  On or about August 14, 2007, Ms. Overmyr auditioned for Season Seven of *American Idol* in Atlanta, Georgia.  She was awarded a Golden Ticket to Hollywood based on unanimous vote of the Judges.

1392.  Through its background check procedures, ENTERPRISE-DEFENDANTS procured the criminal arrest history information of Ms. Overmyer in the Fall of 2007, but in no event later than the date that ENTERPRISE-DEFENDANTS flew Ms. Overmyer to Los Angeles, California to compete in the Hollywood Rounds.

1393.  Plaintiffs do not know whether Ms. Overmyr disclosed her criminal arrest history as part of ENTERPRISE-DEFENDANTS' background check procedures as ENTERPRISE-DEFENDANTS have never discussed such information publicly.

1394.  In contrast to Ms. Overmyr, Plaintiff Donnie Williams and Plaintiff Thomas Daniels – both of whom are African-American – were unceremoniously disqualified from

*American Idol* by ENTERPRISE-DEFENDANTS because they were African-Americans who had either received a pending citation for DUI (Williams) or had an expunged record of DUI after completion of a diversion program (Daniels).

## (2)   DELAYED DISCLOSURE OF CONVICTION

1395.   The Semi-Finals of *American Idol* Season Seven aired from February 21, 2007 through March 6, 2007.

1396.   On February 5, 2008, ENTERPRISE-DEFENDANTS telecast an episode of *American Idol* featuring Ms. Overmyer's audition segment from the Atlanta auditions.

1397.   On February 13, 2008, ENTERPRISE-DEFENDANTS announced that Ms. Overmyer had been selected as one of the Top 24 Semi-Finalists for Season Seven of *American Idol*.

1398.   On February 20, 2008, the Top 12 female Contestants performed for the audience vote.

1399.   On February 21, 2008, ENTERPRISE-DEFENDANTS announced that Ms. Overmyer had advanced to the next round.

1400.   On February 27, 2008, the Top 10 female Contestants performed for the audience vote.

1401.   On February 28, 2008, ENTERPRISE-DEFENDANTS announced that Ms. Overmyer had advanced to the next round.  She was now in the Top 20 overall.

1402.   On February 28, 2008, TMZ.com posted an article under its "Breaking News" section entitled: *"Idol Nurse Busted for DUI"*.  [CDC_007644].  According to the TMZ.com article, Ms. Overmyer had been convicted for driving under the influence (DUI) about one year before her audition for Season Seven of *American Idol*.  She had been driving twice the speed limit in a 45 MPH zone and had a reported blood alcohol level of 0.108.  TMZ.com also posted

Ms. Overmyer's mugshot to promote the article.

> **A. I finalist Amanda Overmyer pleaded guilty to DUI back in October 2006 near her hometown of Mulberry, IN.**
>
> **She received a suspended sentence of 60 days and was placed on 180 days probation, which ended in August 2007.**
>
> **According to the National Enquirer, on the night of her arrest Overmyer had a blood alcohol level of 0.108 and spent six hours in the Montgomery County Jail before her fiancé posted her bail.  [CDC_007663]**

1403.   In response to the TMZ.com article, commentators invariably expressed their dissatisfaction with TMZ's reporting of Ms. Overmyr's criminal arrest background.

> ◆   **Developing story? who in God's name cares about this?!  [CDC_007666]**
>
> > ◆   **So. That was over a year and a half ago ....  [CDC_007666]**
>
> ◆   **So what!!! The broad made a mistake and paid her debt to society. It's in the past, where it should remain unless she screws up again.  [CDC_007668]**
>
> ◆   **Ancient history as far as I'm concerned. Living 25 miles from Crawfordsville, I give her my total sympathy. The cops there are total tools.  [CDC_007669]**
>
> ◆   **This is so not a story. She's on a talent show. She's not a senator. "Story developing"?? Seriously?!  [CDC_007669]**
>
> ◆   **So what? I guess we're supposed to throw her off the show and throw stones at her. Hope she learns from it so she doesn't do it again and hurt someone next time. Other than that, who cares. I like her!!!!! [CDC_007669]**
>
> ◆   **How is this developing? It happened over a year ago and she's already finished probation! Leave the girl alone.  [CDC_007671]**

1404.   Mr. Overmyer was <u>not</u> disqualified from *American Idol* by ENTERPRISE-DEFENDANTS on account of her criminal conviction history.

1405.   Defendant FOX did not make any comment to the press after the mass media reported Ms. Overmyer's criminal conviction history.

1406.   On March 19, 2008, after two weeks of performing live in the Finalist Rounds, Ms. Overmyer was eliminated from the *American Idol* Contest, placing her at the #11 spot.

[CDC_007656].  She was (purportedly) eliminated based on the audience vote.

1407.   After her elimination from the Contest, ENTERPRISE-DEFENDANTS arranged for
Ms. Overmyer to appear on *The Ellen DeGeneres Show*, *Live with Regis & Kelly*, and *The Morning* Show with Mike and Juliet.  [CDC_007656]

1408.   On May 24, 2008, Ms. Overmyer performed at the Women of Rock show at the
*Whisky A Go Go* in West Hollywood.  She sang at the Harley Davidson Summerfest and released
her debut album, *Solidify* in December 2008 [CDC_0079295]

## F.    JOANNA PACITTI [Season Eight]

1409.   Joanna Pacitti was a Contestant featured on Season Eight of *American Idol* who
was 23 years old at the time of her appearance.

1410.   Pursuant to the U.S. census of 1870, Ms. Pacitti would have been categorized as
White and/or Caucasoid, Europid or Europoid and, in contrast, would not have been classified as
"B" (Black), "M" (Mulatto); "C" (Chinese); or "I" (Native American).

1411.   Pursuant to the U.S. census 2000, Ms. Pacitti would have been categorized as
White.

1412.   In modern day North American society, Ms. Pacitti is categorized as White.

1413.   Ms. Pacitti is not African-American.

1414.   Ms. Pacitti was a professional entertainer from the time she was 11 years old and
appeared as "Annie" in the Broadway Bound National Tour show after winning a talent
competition sponsored by Macy's.  She was terminated from the role by the producers before the
show reached Broadway and her parents sued Macy's for breach of contract.

1415.   Before auditioning for Season Nine of *American Idol*, Ms. Pacitti was signed to a
Major Record Label: A&M Records / Geffen Records.  Her debut album was released on August

15, 2006 and it charted at #31 on the Billboard Heatseekers chart.  Throughout 2006, Ms. Pacitti

toured with established recording artists such as Sheryl Crow.  [CDC_007638-42]

1416.  Ms. Pacitti advanced through Hollywood Week despite forgetting her song lyrics

twice.  [CDC_007649]

1417.  On January 21, 2009, ENTERPRISE-DEFENDANTS broadcast an episode of

*American Idol* featuring Ms. Pacitti's audition, which was pre-recorded in Louisville, Kentucky.

Unlike previous seasons, where ENTERPRISE-DEFENDANTS made an effort to conceal the prior

professional experience of the Contestants featured on *American Idol,* ENTERPRISE-DEFENDANTS

decided to make Ms. Pacitti's professional experience a major component of her backstory. One

of the Expert Judges, Kara DioGuardi, recognized at Ms. Pacitti's audition that she had already

been signed to a Major Label recording deal.  [CDC_007645-46]

**"Wait a minute, weren't you on A&M Records?" DioGuardi asked Pacitti.**

**"Yes, a while ago, yes," answered Pacitti.**

**"You were signed right?" wondered DioGuardi.**

**"Yes, I was," replied the *Idol* hopeful.**

**"This is Joanna Pacitti.  I know this girl!" exclaimed the new *Idol* judge.**

**"So hang on -- what didn't go right?" asked Simon Cowell about Pacitti's previous recording contract.**

**"It just didn't work out," she answered.**

**"So it was their fault?" asked Cowell.**

**"I'd hope to say that, yeah," answered Pacitti, who then sang Pat Benatar's "We Belong" for the judges.**

**"I like her.  I like you.  There's something about you," DioGuardi said after the performance, prompting tears from Pacitti.**

**"Aw... it's been rough for you, I know," said DioGuardi.**

**"I'm definitely going to say yes too, based on the voice.  You definitely got a voice," added Randy Jackson.  "Welcome back to Hollywood - -you got quite a journey**

going on!"

**In addition to her initial audition,** *American Idol* **had also acknowledged Pacitti's professional background during Wednesday night's "Final Judgement" episode.**

1418.  Ms. Pacitti's appearance on *American Idol* generated some debate in the media as to whether *American Idol* was a show for amateurs only or for professionals as well. [CDC_007645]

1419.  On Wednesday, February 11, 2009, ENTERPRISE-DEFENDANTS broadcast an episode of *American Idol* called "Final Judgment" in which Ms. Pacitti is shown meeting with the Expert Judges, who decide to advance here to the Semi-Finalist Rounds Top 36 (Season Eight).   Once again, her background as a Major Label recording artist was emphasized: [CDC_007645]

> **"It's been a tough road for you, we've established how difficult this business is with you," [Judge Paula] Abdul told Pacitti as she met with the judges to learn whether she had made the eighth season's semifinals cut.**
>
> **"Joanna, you've done this a bunch of times -- you've had label deals and all this stuff -- when is going to be that time, when is that time that you really step out and show us who you are as an artist?" asked Kara DioGuardi.  "That's my concern with you."**
>
> **"I think the answer to that question is 'When somebody gives her a break' Kara," Simon Cowell responded.**

1420.   On February 11, 2009, within hours after the conclusion of the episode broadcast, Defendant FOX issued a press release concerning Ms. Pacitti: [CDC_007645]

> **"It has been determined that Joanna Pacitti is ineligible to continue in the competition. American Idol contestant Felicia Barton has replaced Ms. Pacitti as part of the Top 36."**

1421.  According to STAR MAGAZINE, Joanna Pacitti, who is white, was declared "ineligible" to compete after advancing to the Top 36 Semi-Final rounds because her professional recording career was *already being managed* by Defendant 19 ENTERTAINMENT, the very same company that manages the talent pool signs the winners to

recording contracts. [CDC_007645-46]

1422.   According to Star magazine, the reasoning behind her withdrawal from *American Idol* was that Pacitti has "very personal connections" to Michelle Young and Roger Widynowski, two executives that work at the Los Angeles office of American Idol's 19 ENTERTAINMENT. [CDC_007646]

1423.  In  addition  to  living  in  the  same  apartment  complex  as  the  19 ENTERTAINMENT executives for several years, Pacitti also  called Young her "manager" and "best friend," and credited Widynowski—a former RCA Records publicist—with "helping me get where I am today."  [CDC_007645-46]

1424.   Executives for 19 ENTERTAINMENT, particularly Simon FULLER who retains the purported option to manage the career of any Contestant who submits themselves to the audition process for *American Idol,* carefully vet EVERY Contestant who is awarded a Golden Ticket to Hollywood.   At the very least, no *American Idol* Contestant passes through Hollywood Rounds without having their entire background information carefully vetted by 19 ENTERTAINMENT.

1425.   PRODUCTION-DEFENDANTS knew at all times that Ms. Pacitti was being managed or guided by executives working within his own organization and under his direct supervision.

1426.   Upon information and belief, Ms. Pacitti's entire participation on *American Idol* was a pre-orchestrated publicity stunt set into motion by ENTERPRISE-DEFENDANTS, who had planned to eliminate her all along.

1427.  Upon information and belief, if the elimination of Ms. Pacitti wasn't a pre-orchestrated scheme to generate controversy, then she was a "plant" by 19 ENTERTAINMENT to further promote and advance the career of a professional recording artist who was already

under the management and control of 19 ENTERPRISE.    Under this scenario, ENTERPRISE-DEFENDANTS decided to withdraw their "plant" after it was determined that Ms. Pacitti's participation in Season Eight of *American Idol* might yield an appearance of impropriety in casting the show's Contestants.

1428.   While Ms. Pacitti's removal from the Contest has no impact on the statistical disparity at issue in this matter, it does raise questions about the deceptive business practices of ENTERPRISE-DEFENDANTS in terms of orchestrating publicity stunts or planting its own professional artists into what purports to be an amateur contest.

## G.    MATT L. [Season Nine]

### (1)    COMPARATIVE RELEVANCE

1429.   Matthew L., a citizen of the State of Florida, was featured as a Contestant on Season Nine of *American Idol*.   He was 25 years old at the time of his appearance on the show.

1430.   Pursuant to the U.S. census of 1870, Matthew L. would have been categorized as White and/or Caucasoid, Europid or Europoid and, in contrast, would not have been classified as "B" (Black), "M" (Mulatto); "C" (Chinese); or "I" (Native American).

1431.   Pursuant to the U.S. census 2000, Matthew L. would have been categorized as White.

1432.   In modern day North American society, Matthew L. is categorized as White, not African-American.

1433.   On or about April 11, 2000, after months of planning and preparation, Matthew L. robbed a Texas bank at gunpoint (using a BB gun).   He escaped in a getaway vehicle with $10,845 in cash and was arrested shortly thereafter.   At age 15, Matthew L. was convicted on a charge of aggravated battery and sentenced to five years in juvenile prison, of which he served

more than three years.  [CDC_007623]

## (2)    DISCLOSURE OF CONVICTION

1434.   On January 20, 2010, ENTERPRISE-DEFENDANTS aired an episode of *American Idol* featuring the performance audition of Matthew L in Orlando, Florida.  The fact of Matthew L's felony conviction was a predominate component of his featured backstory.  He was awarded a Golden Ticket upon unanimous vote.

1435.   After the broadcast of Matthew L.'s performance and backstory on *American Idol*, the mass media invariably celebrated Matthew L.'s appearance on the show as being representative of an opportunity for redemption, a second chance, the start of a new life and the beginning of a new journey.

1436.   On January 20, 2010, Brian Mansfield of USA TODAY published an article: *"The Final Audition: A Shot at Redemption"* [CDC_007592]

> **The 10,000 people who came to Orlando to audition have now been winnowed to a handful. The last contestant of the day, Matthew L., 25, is here for <u>redemption</u>.**
>
> **"I robbed a bank with a BB gun when I was 15," Matt confesses. He spent four years locked up. "It hurt my family so much. I never saw my dad cry before that time." <u>He's hoping that a successful audition will help his parents feel proud of him again</u>.**
>
> **Matt begins singing Ray Lamontagne's "Trouble," and he's got a <u>rough</u>, <u>raw</u>, <u>soulful</u> edge in his voice. The judges sit silent, as if stunned. Simon speaks first, and he's got <u>high praise</u>:**
>
> **"Brilliant. Brilliant. You can really, really sing. It almost feels like you could have written that song that's how good it was."**
>
> **Ultimately, for him, it's the "easiest yes I've said today."**
>
> **Matthew says, "<u>This represents a chance to change everything</u>."**

1437.   On January 21, 2010, the NATIONAL LEDGER published an article entitled *"Matt L.[] American Idol (Video) – Ex Con's Second Chance With Trouble."* [CDC_007597]

**Matt L.** (pictured) is an <u>ex-con</u> looking for a <u>second chance</u> and it appears he has one via reality TV show American idol. The backstory for the 25-year-old contestant revealed that when he was 15 years old, he went <u>behind bars for robbing a bank</u> with a BB Gun. **[CDC_007597]**

Gather.Com notes, "<u>Idol Enthusiasts on Twitter are already clamoring to just give him the prize.</u>" He does have a good voice, it should be interesting to see how he develops and what happens in Hollywood. **[CDC_007597]**

Bumpshack.com adds that Matt, "<u>spent four years of his life in prison, wants to start brand new (life) and pursue his dreams of becoming an Idol and finally making his mother proud.</u>" **[CDC_007597]**

1438.   On Thursday, January 21, 2010, THAINDIAN NEWS posted an article entitled:

*"American Idol: The Matt Lawrence Story"*.  [CDC_007603-04]

This young guy has a very unique story to reveal. At 15, he robbed a bank with BB gun for which he had to spend 4 years behind the bars.  The guy is now turning into a nice human being.  He got good responses from the judges and is going for the "Hollywood" round.  This country boy has **a country accent and feel which is soothing**.  **[CDC_007603-04]**

<u>Matt L.'s story will surely influence a lot of young stars.  Society seldom accepts a person who has once been sent jail. The "American Idol" will give this youth an opportunity to prove himself once again. It will help him forget the past and begin a new journey through "American Idol."</u>  **[CDC_007603-04]**

1439.   On Thursday, January 21, 2010, YAHOO NETWORK posted an article entitled *"Ex-Con Matt Lawrence no 'Trouble' Advancing on American Idol"* [CDC_007608]

Matthew Lawrence walked out onto the American Idol stage in Orlando, Fla., and got right into "Trouble." The judges loved him. <u>And what was not to like about the big ole cowboy hat wearing, well-mannered country boy? That he had a police record? So does Merle Haggard, Kid Rock, and several other notable artists</u>. But Matthew L. had something when he sang that many do not emotion.

When he sang Ray Lamontagne's "Trouble," you truly felt that trouble had been following him since the day he was born . . . <u>Matt L's backstory is one of trouble , unfortunately, so he knows of what he sings</u>.

1440.   Matthew L. was *not* disqualified from *American Idol* by ENTERPRISE-DEFENDANTS on account of his criminal arrest or felony conviction history.

1441.   In contrast to Matthew L., all of the Plaintiffs in this action were unceremoniously

disqualified from *American Idol* and not given a chance of "redemption."

1442.  On March 6, 2010, the website GAINESVILLE.COM published an article entitled "*From Youth Bank Robber To 'Idol' Contestant, Starke Native Rises Up*" in which it revealed that Matthew L. was eliminated from the Contest during Hollywood Week.  [CDC_007724]

## H.    CASEY JAMES [Season Nine]

## (1)    COMPARATIVE RELEVANCE

1443.  Casey James, a citizen of the State of Texas, was featured as a Contestant on Season Nine of *American Idol*.   He was 27 years old at the time of his appearance on the show.

1444.  Pursuant to the U.S. census of 1870, Mr. Langone would have been categorized as White and/or Caucasoid, Europid or Europoid and, in contrast, would not have been classified as "B" (Black), "M" (Mulatto); "C" (Chinese); or "I" (Native American).

1445.  Pursuant to the U.S. census 2000, Mr. James would have been categorized as White.

1446.  In modern day North American society, Mr. James is categorized as White.

1447.  Mr. James is not African-American.

1448.  In November 2001, Mr. James was arrested on charges of reckless driving.  He later pled guilty and served time in jail.  [CDC_007513]

1449.  On December 29, 2002, Mr. James was arrested again driving under the influence and driving on a suspended license to which he pled guilty and served jail time.  [CDC_007513]

1450.  Mr. James was not disqualified from *American Idol* by ENTERPRISE-DEFENDANTS on account of his criminal arrest or criminal conviction history.

1451.  In contrast to Mr. James, Plaintiff Donnie Williams and Plaintiff Thomas Daniels – both of whom are African-American – were unceremoniously disqualified from *American Idol*

by ENTERPRISE-DEFENDANTS because they were African-Americans who had either received a pending citation for DUI (Williams) or had an expunged record of DUI after completion of a diversion program (Daniels).

## (2)   DISCLOSURE OF CRIMINAL CONVICTIONS

1452.   On or about August 7-8, 2010, Mr. James auditioned for *American Idol* before the Expert Judges and was awarded a Golden Ticket to Hollywood.  He was one of 26 Contestants from the Denver, Colorado auditions to be awarded a Golden Ticket.

1453.   After being awarded a Golden Ticket on or about August 7-8, 2011, Ms. James completed ENTERPRISE-DEFENDANTS' written background check process, whereby he was asked to fully disclose the details of his criminal arrest and conviction history on the PARTICIPANT BACKGROUND QUESTIONNAIRE FORM administered by ENTERPRISE-DEFENDANTS.

1454.   Plaintiffs do not know whether Ms. James disclosed his criminal arrest history information to ENTERPRISE-DEFENDANTS as part of its background check process.

1455.   As part of its standard practice and ordinary course of doing business, regardless of whether he disclosed it or not, ENTERPRISE-DEFENDANTS procured Mr. James' criminal arrest history information before flying him to Los Angeles, California to compete in the Hollywood Rounds in December 2010.

1456.   On January 12, 2010, ENTERPRISE-DEFENDANTS premiered Season Nine of *American Idol.*

1457.   On Tuesday, February 2, 2010, ENTERPRISE-DEFENDANTS telecast the Open Auditions episode of *American Idol* featuring Mr. James' performance from his August 7-8, 2009 performance in Denver.

1458.   On February 5, 2010 at 6:35 a.m., RADAR ONLINE posted an article entitled:

*"EXCLUSIVE: American Idol Hopeful Casey James' Jailbird Past"* [CDC_007513].  The article

reported the details of Mr. James history of criminal convictions.

> **American Idol hopeful Casey James wowed the women judges on Tuesday night when he auditioned in Denver Colorado, stripping off his shirt and letting loose his long locks.**
>
> **But the judges in the state of Texas weren't so easily won over by the 27-year-old wannabe singer's casual good looks, coming down hard on him and sentencing him to jail on two separate occasions. RadarOnline.com has learned exclusively that James has a criminal background and has served time in county jail following offenses of driving while intoxicated, driving with an invalid license and reckless driving.**
>
> **The first listed offense, for reckless driving, is from 11/31/01. James pled guilty, was fined $200 and given 30 days in jail as well as being placed on probation for 12 months.**
>
> **Next up, on 12/29/02 James was busted for driving with an invalid license, to which he pled guilty. Was fined $200 and sentenced to 30 days in jail. Finally, on the same date James was arrested for driving while intoxicated, to which he also pled guilty, was fined $300 and sentenced to 75 days in jail.**
>
> **James won a ticket to Hollywood by the skin of his teeth Tuesday, with Simon Cowell telling him bluntly, "That was a bad audition", and Randy not feeling the vibe. But the ladies, who swooned at James' model good looks and chiseled body fought and won him a place in the next round.**
>
> **Time will tell if he ups his game and impresses the boys this time round, but in the meantime. Let's just hope James doesn't drive himself to the auditions.**

1459.  Following the publication of Mr. James' criminal arrest history by RADAR

ONLINE, very few of the entertainment news media outlets ran the story.

1460.  On February 17, 2010, it was announced that Mr. James was one of the Top 24

Finalists for Season Nine of *American Idol*.

1461.  On or about March 11, 2010, after Mr. James began to pick up fans from the

television viewing audience, STAR MAGAZINE published Mr. James' mugshots from his 2001

and/or 2002 arrests.   Entertainment news reporters and bloggers were quick to come to Mr.

James' defense.

It seems that American Idol heart-throb, Casey James had a <u>troubled past</u>.   In fact, at just 17 years old, he found himself getting in trouble with the law.   It started with speeding tickets and ended up with a DWI in 2001 where Casey found himself behind bars.   He made two more trips to jail following the DWI.

BUT, thankfully Casey has reached a <u>much higher place in life and has most definitely learned from his mistakes</u>.   Last night he continued to melt the hearts of girls across America with that sexy voice and his guitar strummin' skills.

Casey, I am so very glad you cleaned up your act!   Thank you.

1462.   On or about March 15, 2011, the [Texas] Fort Worth Weekly published an article on-line entitled: *"Casey James' Drunken Past Goes National."*

1463.   On March 16, 2011, the website bumpshack.com reported on the release of Mr. James' mugshots and criminal record:

As we had previously reported, Casey was raised by his single mother and went through a very complicated stage between his late teens and early twenties before, finally, <u>finding Jesus and dedicating himself to his church</u>.

Casey started getting speeding tickets at the tender age of 17 (who didn't? OK, I didn't!), was arrested for DWI back in 2001 (mug shot above) and was busted two more times for reckless driving and driving with an invalid license, which earned him a one-month jail sentence in 2003.

<u>Casey's story is a good example of how everyone deserves a chance to turn their life around and become a better person</u>.

1464.   On March 16, 2010, MTVNEWS.COM reported on Mr. James' criminal arrest history, largely downplaying the incidents as "youthful indiscretions" [CDC_007521]

Every season, "American Idol" casts a new batch of aspiring singers. And every season, without fail, tabloids work overtime to dig up as much dirt on the newbies as possible. Whether it's Antonel!a Barba's risqué photos or Bo Bice's drug arrests, gossip rags and blogs get a ton of mileage out of "Idol" contestants' <u>youthful indiscretions</u>.

Season nine is no exception. <u>Finalist Casey James is the latest in a long line of "Idol" singers with a rap sheet</u>. Last week, STAR magazine published James' 2001 mug shot, taken when the then-teenager was slapped with a DWI. (James eventually served a month-long jail sentence in 2003 after getting busted an additional two times.)

BUT  the  laid-back  Texan  (who  impressed  the  judges  early  on  with  a

vulnerable-rocker vibe and a shirtless audition) is taking it all in stride.

1465.   MTV fans invariably posted positive comments to the 3/16/2010 MTVNEWS.COM article about Mr. James's criminal arrest history:

> ◆  We all makes mistakes when we're young and Casey is no exception. He paid the price for them and he has moved on with his life in a positive direction and I really admire that. I think he has a lot of character and integrity now. He really is a good guy with a great voice and stellar guitar skills, and I voted hard for him this season. His life will only keep better and better. He has thousands and maybe even millions of fans who love him and I'm proud to be one of them!  [CDC_007522]

> ◆  OMG , Why can't the tabloids find something other then trying to ruin someone's life or hopeful career. I too love Casey James and I will vote for him every week. Rock On Casey! [CDC_007522]

> ◆   That was how many years ago? Casey was how old? He paid his debt to sodety. Tell us about Casey now.He is incredibly talented and has an incredible presence American Idol is a singing contest not a driving contest I will vote for Casey James all the way! [CDC_007522]

1466.   During the months of reporting on Mr. James' criminal arrest and conviction history, Defendant FOX did not make any comment to the mass media concerning Mr. James' past criminal arrest history, including whether or not Mr. James had disclosed the history of his arrests and convictions during the ENTERPRISE-DEFENDANTS' background check process.

1467.   On May 19, 2010, Mr. James was eliminated by (purported) public vote after he competed successfully throughout twelve straight weeks of the *American Idol* Contest, ultimately landing in the #3 spot.

1468.   According to ABOUT.COM:

> The exposure of James' past trouble with the law did not seem to hurt the Idol, perhaps because he did not shy away from admitting his behavior was stupid. Embraced by the American public, this one time troubled man finished as a third-place finalist on the ninth season of "American Idol." [CDC_007510-11]

## (3)   CAREER

1469.   After Season Nine of *American Idol* concluded its broadcast run, Mr. James joined the rest of the Top 10 Finalists on the *American Idols* LIVE! Tour.

1470.  On August 17, 2010, it was announced that James had signed with SONY MUSIC NASHVILLE and his debut album would be released on 19 RECORDINGS / BNA RECORDS in 2011.

1471.  Released on March 20, 2012 through ENTERPRISE-DEFENDANTS' 19 RECORDINGS, the album reportedly peaked at #2 on the U.S. Country chart and #23 on the Billboard Top 200, generating 72,000 in sales on the strength of two successful singles.

## I.    STEFANO LANGONE [Season Ten]

### (1)    COMPARATIVE RELEVANCE

1472.  Stefano Langone was featured as a Top 12 Finalist Contestant on Season Ten of *American Idol*.

1473.  Pursuant to the U.S. census of 1870, Mr. Langone would have been categorized as White and/or Caucasoid, Europid or Europoid and, in contrast, would not have been classified as "B" (Black), "M" (Mulatto); "C" (Chinese); or "I" (Native American).

1474.  Pursuant to the U.S. census 2000, Mr. Langone would have been categorized as White.

1475.  In modern day North American society, Mr. Langone is categorized as White.

1476.  Mr. Langone is not African-American.

1477.  In 2008, Mr. Langone was arrested for possession of marihuana in the State of Washington.  The criminal charge was reportedly dismissed.  [CDC_007449]

1478.  On or about May, 16, 2010, Mr. Langone was arrested on charges of driving under the influence of alcohol.  He later pled guilty to first-degree negligent driving and entered a diversion program.  [CDC_007461]

1479.  Mr. Langone was <u>not</u> disqualified from *American Idol* on account of his arrest record or conviction.

1480.  In contrast to Mr. Langone, Plaintiff Donnie Williams and Plaintiff Thomas Daniels – both of whom are African-American – were disqualified from *American Idol* by ENTERPRISE-DEFENDANTS (despite being qualified by the Expert Judges to compete) because they were African-Americans who had either received a citation for DUI (Williams) or had an expunged record of DUI after completion of a diversion program (Daniels).

1481.  In contrast to Mr. Langone, Plaintiff Akron Watson was disqualified from American Idol by ENTERPRISE-DEFENDANTS (despite being qualified by the Expert Judges to compete) because of his expunged misdemeanor record for marihuana possession.

1482.  On or about November 9-10, 2010, Mr. Langone auditioned for Season Ten of *American Idol* in San Francisco.  He was awarded a Golden Ticket to Hollywood.

1483.  Through its background check procedures, ENTERPRISE-DEFENDANTS procured Mr. Langone's criminal arrest history before flying him to Los Angeles, California to compete in Hollywood Rounds.

1484.  On February 9, 2011, ENTERPRISE-DEFENDANTS telecasted an episode of *American Idol* featuring Mr. Langone's audition segment from his San Francisco audition.  Mr. Langone's backstory revolved around his near-fatal car accident in 2009 after being hit by a drunk driver.

1485.  On February 12, 2011, TMZ.com posted an article entitled: *"Scarred Idol Contestant – Drunk Driving Victim*."  The article displayed Mr. Langone's injuries from being hit my another driver and reported that Mr. Langone was suing the culprit.  [CDC_007422]

1486.  On or about February 24, 2011, the Top 24 Finalists were revealed, including Mr. Langone.

1487.  On or about March 3, 2011, Mr. Langone was chosen by one of  the Expert

judges, Jennifer Lopez, as one of the Wild Cards to join the Top 13 Finalists.

1488.  On March 10, 2011, Mr. Langone performed in the Finalist round and advanced to the next week.

## (2)   DISCLOSURE OF CRIMINAL RECORDS

1489.  On March 16, 2011, Defendant FOX through its website www.foxnews.com posted an article entitled "*American Idol Finalist Stefano Langone's DUI Arrest Revealed.*" Defendant FOX professes its support for the "cute crooner" even while acknowledging that "Stefano failed to reveal" his criminal arrest while talking about his backstory.  [CDC_007461-62]

In keeping with the fine tradition of "American Idol" finalists having rap sheets, STAR magazine has unearthed 22-year old Stefano Langone's 2010 DUI arrest. The cute crooner, who has charmed viewers with his soulful renditions of Stevie Wonder and Marvin Gaye hits, confessed in an emotional interview about how he narrowly escaped death in a car crash caused by a drunk driver on May 28, 2009.

"I was in an accident that changed my life, unfortunately, for the worse," said Langone. "I woke up to a firefighter — and I'll never forget — he looked down at me and he screamed to the EMTs, 'He's alive! He's alive!' They told me that I would never be able to walk the same."

The accident left Stefano deeply scarred with two broken arms and a fractured pelvis.

What Stefano failed to reveal in that interview was that he was arrested a year later —for driving under the influence.

STAR reports that Langone was pulled over by a Washington State Patrol Trooper for speeding and changing lanes without signaling. He failed standard field sobriety tests—like being able to recite the alphabet—and failed a preliminary breath test. He was arrested and taken into custody.

"While en route, Langone began singing," noted his arresting officer.

Could the revelation hurt him in the popular singing competition?

WILL THE NEWS IMPACT YOUR VOTE?

   ⭘   Yes, it invalidates his inspirational story.

   ⭘   No, Everyone makes mistakes

1490.  On March 16, 2011, SEATTLE TIMES posted an article entitled "A*merican Idol's Stefano Langone Convicted of Negligent Driving in 2010,"* noting that ENTERPRISE-DEFENDANTS had made prominent his prior 2009 status as a victim of DUI.  [CDC_007439]

> Most "American Idol" viewers know finalist Stefano Langone, of Kent, was seriously hurt in a 2009 wreck caused by a drunken driver.  What fans may not know is that the charming crooner was arrested last year on suspicion of driving under the influence.
>
> King County District Court records show he was pulled over May 16 and arrested on suspicion of DUI. Ultimately, he pleaded guilty to the lesser misdemeanor charge of first-degree negligent driving. He completed the terms of his sentence — including alcohol-information class and community service.

1491.  In the March 16, 2011 SEATTLE TIMES article, it was also reported that ENTERPRISE-DEFENDANTS had conducted a background check into the incident "in February" and had no comment on whether Mr. Langone's conviction would be grounds for his disqualification. [CDC_007439]

> Court records indicate "Idol" producers verified in February the case was closed. Show representatives reached Wednesday had no comment on whether it would affect his status. [CDC_007439]

1492.  On March 21, 2011, an *Idol*-related blog site, the ASHLEY REALITY ROUND-UP, was posted concerning the report of Mr. Langone's arrest history [CDC_007449]

> Luckily, E! News was able to dig up some juicer dirt on contestant Stefano Langone. Apparently, he's been in trouble with police TWICE for getting down with his bad self! The first time was back in 2008 when he was cited for marijuana possession. [CDC__007449]
>
> More recently, Stefano was arrested for driving under the influence in May of 2010. Cops stopped him for speeding and failing to signal before changing lanes. He had been partying with friends in Belltown, Washington. [CDC__007449]
>
> According to the [police] report, "Stefano smelled of alcohol and authorities noticed his eyes were bloodshot, watery, droopy and (had) dilated pupils." He was then given a field sobriety test, which he failed. Langone did admit to having one "beer several hours earlier," and then submitted to a Breathalyzer test. Registering a 0.098 (above the state's 0.08 legal limit). Langone was taken into custody on suspicion of driving under the influence." [CDC__007449]

> *What's really ironic about this is that just a year earlier, Stefano was almost killed when a drunk driver crashed into him, nearly paralyzing him and leaving him in a wheelchair for awhile.* **[CDC__007450]**
>
> *You'd think after almost being killed by a drunk driver, Stefano would think twice before hitting the keg and then getting behind the wheel.* **[CDC__007450]**
>
> The Ashley was shocked to hear that Stefano had an arrest record. His "aw shucks" demeanor made it seem impossible that he could do anything wrong. His performance last week was one of the strongest of the night…could this hurt his chances of moving on? **[CDC__007450]**
>
> *The dirt on Stefano's arrest is just the latest in a string of 'Idol' scandals.* Each year, at least one or two stories come out about the contestants that "shock" America: from <u>Frenchie Davis'</u> nude picture unveil (which she was kicked off the show for), to <u>Corey Clark's</u> Paula sexy-time scandal with Paula Abdul. **[CDC__007450]**

1493.   On April 21, 2011, Langone was eliminated from the *American Idol* Contest based on the (purported) public vote; and ended up in 7th place.

## (3)   CAREER SUCCESS

1494.   Following his elimination from Season Ten of *American Idol*, Mr. Langone appeared on several talk shows, including *Live with Regis and Kelly* and *The Today Show*, and toured with the *American Idols* LIVE! Tour 2011, which ended in the Philippines on September 21, 2011. **[CDC_007416]**

1495.   On September 25, 2011, it was announced that Langone would be "the latest alum to have his option picked up by 19 ENTERTAINMENT (Defendant FULLER). **[CDC_007467]**

1496.   On January 11, 2012, it was announced that Mr. Langone had signed a record contract with HOLLYWOOD RECORDS, making him the seventh Finalist from Season Ten of *American Idol* to score a Major-Label recording deal. **[CDC_007472]**.  A press representative of Hollywood Records stated:

> We are very excited to have Stefano on our roster. He's an incredibly talented vocalist and songwriter. <u>His story is very inspiring</u> and we are looking forward to helping him achieve his goals. **[CDC_007472]**

1497.   On February 8, 2012, Langone performed in a *Motown* music tribute at CARNEGIE HALL.

## J.   AMY B. [Season Eleven]

### (1)   BACKGROUND CHECK

1498.   Amy B., a citizen of the State of Tennessee, was featured as a Contestant on Season Eleven of *American Idol*.  She was 24 years old at the time of her appearance on the show.

1499.   On or about August 17-18, 2011, Amy B. auditioned for *American Idol* before the Expert Judges and was awarded a Golden Ticket to Hollywood.  She was one of 42 Contestants from the Savannah, Georgia (and South Carolina) auditions to be awarded a Golden Ticket.

1500.   After being awarded a Golden Ticket on or about August 18, 2011, Amy B. completed ENTERPRISE-DEFENDANTS' written background check process, whereby she was asked to fully disclose the details of her criminal arrest and conviction history on the PARTICIPANT BACKGROUND QUESTIONNAIRE FORM administered by ENTERPRISE-DEFENDANTS.

1501.   It is not known whether Ms. Brumfield disclosed her criminal arrest history information to ENTERPRISE-DEFENDANTS as part of its background check process.

1502.   As part of its standard practice and ordinary course of doing business, ENTERPRISE-DEFENDANTS procured Amy B's criminal arrest history information before flying her to Los Angeles to compete in the Hollywood Rounds in December 2011.

1503.   On or about December 12, 2011, Amy B. was flown to Los Angeles, California at ENTERPRISE-DEFENDANTS' expense to compete in the Hollywood Rounds, which was staged at the Pasadena Civic Auditorium.

1504.   On or about December 14, 2011, on the second day of Hollywood Week, Amy B. was cut from the *American Idol* Contest during the group round.

## (2)   EPISODE TELECAST

1505.   On Wednesday, January 18, 2012, at 8:00 p.m. EDT, ENTERPRISE-DEFENDANTS caused to broadcast the premiere episode of Season Eleven of *American Idol*.

1506.   The premiere episode of Season Eleven featured the audition segment of Ms. Brumfield.   Before showing her singing audition, Ms. Brumfield's "feel good" backstory was profiled at length.   At the time of her audition, Amy B. had been dispossessed of her home and was living with her boyfriend and dog in a tent in the wilderness.

1507.   During the background segment, Amy B. is seen on *American Idol* providing a "tour" of her unique outdoor living arrangements to ENTERPRISE-DEFENDANTS' camera crew. She is portrayed as being very upbeat and happy despite her lack of financial means.

> **"I'm kind of struggling - major struggling…We cook our soup over the fire pit, and we enjoy it…I would rather be outdoors and happy than indoors and miserable." [CDC_07567]**

1508.   After showing her background story, Ms. Brumfield performed for the Judges and earned a unanimous vote, thereby receiving a Golden Ticket to Hollywood. Defendant FOX reported that Ms. Brumfield had "blew the 'Idol' judges away with her rendition of *Superwoman* by Alicia Keys."  [CDC_007559].

1509.   Ms. Brumfield's birthdate was not disclosed on-screen at any point during the January 18, 2012 episode.

1510.   As of the airing of the premiere episode of Season Eleven of *American Idol* on January 18, 2012, ENTERPRISE-DEFENDANTS knew that Ms. Brumfield had already been cut from the Contest and knew that she had an extensive history of misdemeanor arrests.

1511.   On Thursday, January 19, 2012, at 7:45 a.m. PST, the Los Angeles-based website TMZ.com published an *"Exclusive"* article entitled *"American Idol – Tent Girl Amy Brumfield Has Boozy Criminal Past."* [CDC_007575-76]

> **"American Idol" wannabe Amy Brumfield ... the 24 year-old singer who lives in a tent ... has a LONG criminal record ... revealing a serious battle with alcohol.**
>
> **According to police records obtained by TMZ, Brumfield has been arrested at least 6 times in the past 7 years ... with 3 arrests involving booze.**
>
> **Brumfield - who blew the "Idol" judges away with her rendition of Superwoman by Alicia Keys - was arrested in Tennessee on August 22, 2010 after cops say she was so drunk, she peed on herself in the lobby of a Baskin Robbins.  Just 9 days before that - on August 13  - she was arrested in front of the Ole Smoky Candy Kitchen ... after cops say she was displayed [sic]"extreme intoxication" ... and was "trying to find someone to take her home."**
>
> **Brumfield was arrested twice in 2007 - once for unlawful detainer (staying at a property after her lease had ended).   The other arrest was for underage consumption of alcohol - for which she pled guilty and was sentenced to probation.**
>
> **Brumfield was also arrested in 2005 for criminal trespass on private property  - the details around that incident are unclear.**

1512.   The 1/19/2012 TMZ.com article posted four (4) different mug shots of Ms. Brumfield from four different arrests, two of which were purportedly taken in 2007 and two of which were taken in 2010.   One of the mugshots published by TMZ.com indicates that Ms. Brumfield had been arrested in Gatlinburg, Tennessee in 2010.  [CDC_007575]

1513.   The 1/19/2012 TMZ.com article was initially published at 9:45 a.m. CST, which is only 15-45 minutes after any clerk of court or police records department in the State of Tennessee would have been opened for business.

1514.   TMZ.com did <u>not</u> manually retrieve Ms. Brumfield's criminal arrest history from any government database maintained in the State of Tennessee between the time of the initial telecast of the premiere episode on the evening of January 18, 2012 and the time of TMZ.com's initial publication of its article concerning Ms. Brumfield in the early morning of January 19,

2012.

1515.   On Thursday, January 19, 2012 at 4:05 p.m. PST, E! ENTERTAINMENT'S EONLINE.COM posted an article entitled: *"American Idol Scandal Already? Tent Girl Amy Brumfield Has a Rap Sheet!"*   The article reported that the Gatlinburg Police Department had confirmed Ms. Brumfield's arrests in August 2010.

> **The girl living in the backwoods of Tennessee comes with quite the backstory. On last night's 'American Idol' season premiere, Amy Brumfield impressed the judges with her voice and sad tale of being unemployed and living in a tent. But while she may be new to American TV audiences, Brumfield isn't a stranger to the local cops.  [CDC_007562]**
>
> **Hey, reinvention and the chance to turn over a new leaf are all part of the American dream, right?! Fox had no comment, so whether it's allowed to be a part of the American Idol dream remains to be seen.  [CDC_007563]**
>
> **But this story could have a happy ending, judging by her audition on "Idol" last night, Brumfield appears motivated to start a whole new life for herself. [CDC_007576]**

1516.   In the wake of TMZ.com's report of Ms. Brumfield's criminal arrest information, Defendant FOX had no comment to the press regarding Ms. Brumfield's criminal arrest record. [CDC_007562]

1517.   Defendant FOX never revealed to the public whether Ms. Brumfield had disclosed her arrest information during the background check process.

1518.   On January 23, 2012, Ms. Brumfield posted a message on her Facebook page indicating that she had been cut from Hollywood Week the second day during the group round. [CDC_007572]

# CIVIL RIGHTS

# ABOLISHING STEREOTYPES

## A.    IDEALS OF ENLIGHTENMENT

### (1)  FOUNDING PRINCIPLES

1519.   Our Nation's Founding Fathers were dedicated to the Ideals of the Enlightenment, as expressed through the DECLARATION OF INDEPENDENCE ("All Men are Created Equal"; "Life, Liberty and the Pursuit of Happiness"), U.S. CONSTITUTION ("We the People"; "Blessings of Liberty to Ourselves") and the BILL OF RIGHTS ("Freedom of Speech," "Freedom of Religion").

1520.   During the Age of Enlightenment, James Madison and Thomas Jefferson, the Chief Architects of the U.S. Constitution, derived some of their political beliefs about the new "American Experiment" from English philosopher John Locke, who argued that individuals should be free to make choices about how to conduct their lives as long as they do not interfere with the liberty of others.   Jefferson derived the phrase "All Men Are Created Equal" from an idea earlier expressed by Scottish philosopher Francis Hutcheson, who declared that: "Nature makes none masters, none slaves."

### (2)  SELF-DETERMINATION

1521.   By embracing the Ideals of Enlightenment, the Founding Fathers rejected the Old World view of a central monarchy based on social caste systems.   The revolutionary idea of American society was to abolish notions of any pre-determined caste system and recognize instead the individual's natural, inalienable rights to determine their own destiny through individual merit, content of character and hard work in their chosen profession.

1522.   America remains as the most powerful country in human history because it stands

for the proposition that <u>all</u> individuals are endowed with the right to *self-determination*; to define their own role and contribution to society based on individual merit, content of character and hard work.

1523.   The use of pre-conceived stereotypes to ascribe judgments to individuals based on their ancestral identity (over which individuals have no control) is directly antithetical to the notion of self-determination.

## B.   STEREOTYPES

### (1)   PREJUDICIAL JUDGMENTS

1524.   Negative stereotypes are prejudicial judgments that assign negative qualities to other groups of people.[13]

1525.   Negative stereotypes serve to reduce or minimize respect for the rights of another individual based on misconceptions ascribed to an entire group of people who share "immutable ancestral characteristics."

1526.   Racial stereotypes attempt to subvert the positive qualities and attributions of an individual's ancestral heritage and cultural background.

1527.   As published by the HARVARD LAW REVIEW:

> **"[R]acial discrimination is injurious** not simply because it attaches generalizations on the basis of 'immutable' physical features, but more importantly <u>because it disrespects the very culture and heritage that define a given racial or ethnic group</u>."[14]

1528.   Adverse judgments made on the basis of negative stereotypes function to deprive the stereotyped victim of his or her constitutional right to self-determination.

---

[13] www.racist-stereotypes.com (accessed 07/18/13)

[14] *Racial Discrimination on the Beat:  Extending the Racial Critique to Police Conduct*, 101 HARV. L. REV. 1494, 1514-15 (1988).

1529.   The use of racial stereotypes as a means to form an opinion about another individual is directly antithetical to the bedrock principles underlying the U.S. system of government, which is to provide a "sphere of protection" under which the value of an individual is to be assessed based on the content of their character, merit, talent or contribution to society.

## (2)   STEREOTYPED-THINKING

1530.   Once negative opinions have been formed as a result of the dissemination of racial stereotypes, they become "internalized" by the target audiences and may impact the conduct and everyday decisions of ordinary citizens.

1531.   Oversimplified and inaccurate portrayals of certain ethnic groups, particularly in mainstream media, profoundly affect how Americans perceive one another, how they relate to one another in everyday society, and, ultimately, how they come to *value each other's lives*.[15]

1532.   As published by BOSTON UNIVERSITY LAW REVIEW:

> **"Once stereotypes have formed, they affect us even when we are aware of them and reject them. Stereotypes can greatly influence the way we perceive, store, use, and remember information. Discrimination, understood as biased decision-making, then flows from the resulting distorted or unobjective information."**[16]

1533.   In many cases, racial stereotypes become so prevalent in mainstream media that they become internalized by target audiences as "truth" and ordinary citizens who subscribe to the fundamental ideals of equality and justice for all people, may begin to act upon such stereotypes unconsciously or automatically.  This concept is known as "stereotyped-thinking"

1534.   As published by MICHIGAN UNIVERSITY LAW REVIEW:

---

[15] Id.

[16] Page, Anthony, *Batson's Blind-Spot: Unconscious Stereotyping and the Peremptory Challenge*, 85 B.U. L.REV. 155, 160 (2005).

**"Studies of the impact of race on white decision-making nearly always explain disparate effects by focusing on negative assessments of, or undesirable outcomes for, nonwhites, rather than positive results for whites. That is, they adopt a conceptual framework in which unconscious race discrimination is triggered by stereotyping."[17]**

## (3)   PROPAGANDA

1535.   Racial stereotypes are expressed as a form of "speech," and are most often embodied in motion picture content, television programs and other audio-visual works.

1536.   Media content that promotes racial stereotypes as part of a *systematic* purpose, i.e., to indoctrinate its target audiences into a false ideology about the "natural and undesirable propensities" about a certain ethnic group, is known as "racial propaganda."

1537.   Racial stereotypes are *learned* through repetition in mainstream media.  As such, the stereotypes must be constantly recycled by racial propagandists, day-by-day, week-by-week, year-to-year and generation-to-generation.  If not perpetuated, the false stereotypes will lose their hold on the belief system of their target audiences.

1538.   Racial propaganda is used to indoctrinate vast numbers of citizens into a *system* of false and derogatory beliefs about an entire group of people.  This form of indoctrination is specifically intended to deprive members of the stereotyped group of their political, socio-economic and civil rights.

1539.   Racial propaganda may serve an ideological function, i.e., to perpetuate "Old World" philosophies that subscribe to the inherent superiority of a "master race."

1540.   Racial propaganda may also serve an economic function, i.e. to subjugate the property rights and labor force of an entire group of people to the unfettered control of the

---

[17] Flagg, B., *Was Blind, But Now I See": White Race Consciousness and the Requirement of Discriminatory Intent*,  91 Mich.L.Rev. 953, 984 (1993).

overseer.

1541.  At its worst, racial propaganda may serve as "justification" for ordinary "God-faring" people to commit unbridled acts of cruelty against their fellow human beings based on nothing more than a victim's immutable characteristics.

## (4)   WAR

1542.  Historically speaking, media content that systematically promotes racial stereotypes has proven to be the most destructive form of speech within the lexicon of all human-generated speech.

1543.  Negative, false stereotypes about the "inherent traits" of African descendants were used to propagate a system of inhumane cruelty for centuries, the systemic remnants of which continue to manifest in the 21st century.

1544.  Racial stereotypes, as disseminated through motion pictures, were used as "weapons of mass destruction" during World War II.  For example, repetition of negative racial stereotypes about Jews and other so-called "undesirables" through Germany's government-controlled film industry ultimately propelled ordinary, law-abiding German citizens to kill millions of innocent unarmed men, women and children.[18]

1545.  During the same world war, racist stereotypes were also used in the United States to justify crimes against Humanity with respect to Japanese civilians. The firebombing of Tokyo as well as the atomic bombs that were dropped on Japan caused human slaughter on a massive scale.  At the time, ordinary Americans believed these actions were justified, in part, because of the negative stereotyping of Japanese people that preceded the war, and the more virulent forms

---

[18] www.racist-stereotypes.com (accessed 07/18/13)

that emerged during the war.[19]

## C.   "SUSPICIOUS" MALES

### (1)   CRIMINAL LABEL

1546.   To be publicly labeled a "criminal" is a flat proclamation of an individual's dishonesty, untrustworthiness, dangerousness to society and/or immorality.

1547.   Because convicted criminals are considered "unfit" to live amongst law-abiding citizens, their property rights are forfeited to the government and they are relegated to subsist in cages.

1548.   To ascribe the label of "criminal" to any person – regardless of an actual conviction - is to automatically devalue their existence as individuals and defame their good will and standing in the community.

1549.   The label of "criminal" restricts a person's ability to move about in society; the label also represents an infringement on a person's liberty right.

### (2)   NATIONAL MYTH

1550.   From the era of Reconstruction through American society in a new millenium, no racial stereotype in American history has been more pervasive than that of "black criminality".

1551.   U.S. Courts have expressly recognized **"the fact that racial stereotypes prevalent in our society associate blacks with crime.**"[20]

1552.   The label of "criminal" is often ascribed to young Black males regardless of whether such individuals have committed a crime (or even thought about committing a crime).

1553.   Images that are used to reinforce the myth of "Black criminality" that are seen in

---

[19] www.racist-stereotypes.com (accessed 07/18/13)
[20] *Buckeye Community Hope Foundation vs. City of Cuyahoga Falls*, 263 F.3d 627, 636-637 (6th Cir. 2001).

motion pictures or on television are often sensationalized and highly exaggerated for the intended effect of perpetuating the false myth.

1554.  As a result of this never-ending stream of media propaganda, law-abiding Black males (who comprise 98% of all Black males) must live in an American society where, by virtue of the color of their skin, they are often perceived as suspicious and labeled as a "criminal."

1555.  In America, young Black males live in a constant state of being stalked as "suspicious individuals." Whether by police officers or other civilians, young Black males are routinely suspected of committing crimes for simply walking down the street, driving a car, sitting on a park bench, or talking with friends.

### (3)   FALSE CORRELATION

1556.  It is the dissemination of racial stereotypes through mass media – not the actual real life conduct or character of the Black male population – which has perpetuated the false myth of "black criminality"

1557.  Any actual correlation between one's ancestry and crime remains a patently false stereotype.  For example, in 1999, in a report filed with the U.S. Commission on Civil Rights, it was estimated that over 98% of African-American citizens do not conform to the stereotype of black criminality.  In other words, even though Black citizens are arrested and convicted for a disproportionate amount of crime as compared to whites, it is nonetheless true that in any given year only about 2 percent of Black citizens are actually charged with a crime.[21]

### (4)   UNEQUAL JUSTICE

1558.  The American criminal justice system has historically served as a focal point of

---

[21] Mauer, Mark, *The Crisis of the Young African-American Male and the Criminal Justice System,* MEMORANDUM TO U.S. COMMISSION ON CIVIL RIGHTS (April 15-16, 1999)

much of societal racism. A long legacy of practices such as the convict leasing system, extra-judicial lynchings, and police brutality have shaped the history of African-Americans and the criminal justice system.[22]

1559.  The statistical fact that Black citizens, particularly young Black males, are arrested at a disproportionately higher rate than whites has much less to do with actual criminal conduct and more to do with "targeted" law enforcement programs established in select police precincts.  In many cases, these police departments, which are often situated in low-income, predominately Black neighborhoods are governed by strict "arrest quotas" which force police officers to make scores of arrests of innocent bystanders.

1560.  The higher disproportionate rate of criminal records amongst Black citizens can also be attributed to the economic objectives of an industrial military complex that is bolstered by systems of mass incarceration.

1561.  Police officers are not immune to acting on the basis of racial stereotypes.

1562.  "[B]ased on their prejudices, police officers are more likely to stop minorities, and minorities are less likely to respond with deference because of their hostility toward police. An officer will view lack of cooperation as an indication of guilt, thereby justifying an arrest."[23] It is a vicious cycle.

1563.  "[W]hen the state treats a given racial group as if it were criminally predisposed -- as when police systematically impute criminal intent to black citizens -- the state identifies the culture that defines the group as having a propensity to be morally depraved, thus endorsing a

---

[22]  Mauer, Mark, *The Crisis of the Young African American Male and the Criminal Justice System,* MEMORANDUM TO U.S. COMMISSION ON CIVIL RIGHTS (April 15-16, 1999)

[23] Stormer & Bernstein, "*The Impact of Kolender v. Lawson  on Law Enforcement and Minority Groups*" 12 HASTINGS CONST.L.Q. 105, 116-117 (1984).

view of those who share in that culture as unworthy of equal respect...."[24]

## (5)   PRESUMPTION OF GUILT

1564.   Even if arrested for probable cause, the record of arrest standing alone (without conviction) inflicts permanent damage on the arrestee.  This is because a record of his arrest (and mug shot) are immediately transmitted to the federal criminal database (NCIC), which despite its government-restricted protocols, has become increasingly easier to access by prospective employers, banks, mortgage lenders and credit bureaus, not to mention entertainment news outlets.

1565.   Thus, the actual court proceeding that ensues after an arrest has been processed becomes an "afterthought."  With misdemeanor charges, there is virtually never an actual trial.  And even if a suspect is fully acquitted at trial, the record of acquittal is unlikely to be transmitted to the NCIC database; such that future employers will only see the fact of the arrest and make judgments accordingly.

1566.   Pursuant to the DUE PROCESS CLAUSE of the Fourteenth Amendment, a criminal arrest by a government official constitutes nothing more than an unproven accusation of misconduct and therefore has no probative value of the actual conduct alleged.   Fourteenth Amendment of the U.S. Constitution strictly prohibits as cruel and unusual any punishment inflicted upon a U.S. citizen according solely to his or her *status* as an arrested individual.

1567.   As per EEOC ENFORCEMENT GUIDANCE, No. 915.002 (4/25/2012):

> **"The fact of an arrest does not establish that criminal conduct has occurred, and an exclusion based on an arrest, in itself, is not job related and consistent with business necessity."[25]**

---

[24] *Racial Discrimination on the Beat:  Extending the Racial Critique to Police Conduct*, 101 HARV. L. REV. 1494, 1514-15 (1988)

[25] EEOC ENFORCEMENT GUIDANCE, No. 915.002, 4/25/2012 ("Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.") (p. 1)

## D.    HISTORICAL CONTEXT

## (1)    20ᵀᴴ CENTURY URBAN PLANNING

1568.   In 2010, Harvard University Press published an award-winning historical treatise entitled THE CONDEMNATION OF BLACKNESS: RACE, CRIME AND THE MAKING OF MODERN URBAN AMERICA[26] by Khalil Gibran Muhammad, Ph.D., who is the Director of the Schomburg Center for Research in Black Culture at the New York Public Library[27] [CDC_005757] ("THE CONDEMNATION OF BLACKNESS").

1569.   The main thesis of Dr. Muhammad's Award-Winning literary work reads:

- ◆  THE CONDEMNATION OF BLACKNESS demonstrates and explains how ideas of racial inferiority and crime became fastened to African-Americans by contrast to ideas of class and crime that shaped views of European immigrants and working-class whites.  [CDC_005771]

- ◆  Chronicling the emergence of deeply embedded notions of black people as a dangerous race of criminals by explicit contrast to working-class whites and European immigrants.

- ◆  THE CONDEMNATION OF BLACKNESS] reveals the influence such ideas have had on urban development and social policies.  [CDC_005758]

- ◆  The racial project of making blacks the "thing against which normality, whiteness, and functionality have been defined," was foundational to the making of modern urban American.  [CDC_005772] (emphasis added)

## (2)    CRIME STATISTICS

1570.   THE CONDEMNATION OF BLACKNESS states, as points of historical fact, that crime statistics showing a disproportionate amount of black prisoners were used as a means to

---

[26] Muhammad, Khalil Gibran, THE CONDEMNATION OF BLACKNESS: RACE, CRIME AND THE MAKING OF MODERN URBAN AMERICA, Harvard University Press (2010), as cited throughout the paragraphs of this section D.(5).

[27] Dr. Muhammad is a former professor of African-American history at Indiana University. His authoritative treatise THE CONDEMNATION OF BLACKNESS won the American Studies Association John Hope Franklin Publication Prize, an annual prize awarded to the best published book in American studies.  He is the great-grandson of Elijah Muhammad.

systematically deprive U.S. citizens of their equal rights under the law:

  ◆  At the dawn of the twentieth century, in a rapidly industrializing, urbanizing and demographically shifting America, <u>blackness was refashioned through crime statistics</u>…[CDC_005770]

  ◆  From the 1890s through the 1930s, from the Progressive era through Prohibition, African-Americans had no monopoly on social banditry, crimes of resistance, or underground entrepreneurship; the 'weapons of the weak' and 'lower-class oppositional culture' extended far and wide and in many directions.  [CDC_005771]

  ◆  With the publication of the 1890 census, <u>prison statistics</u> for the first time <u>became the basis of a national discussion about blacks as a distinct and dangerous criminal population</u>. [CDC_005768]

  ◆  New statistical and racial identities forged out of raw census data showed that African-Americans, as 12 percent of the population, made up 30 percent of the nation's prison population. [CDC_005769]

  ◆  Although specially designed <u>race-conscious laws</u>, <u>discriminatory punishments</u>, and new forms of everyday racial surveillance had been institutionalized by the 1890s as a way <u>to suppress black freedom</u>, white social scientists presented the new crime data as objective, color-blind, and incontrovertible. [CDC_005769]

  ◆  From this moment forward, <u>notions about blacks as criminals materialized in national debates about the fundamental racial and cultural differences between African-American and native-born whites</u> and European immigrants. [CDC_005769]

  ◆  These debates also informed questions about appropriate levels of African-American access to the social and economic infrastructure of the nation.  [CDC_005769]

  1571.   THE CONDEMNATION OF BLACKNESS states, as a point of historical fact, that black crime statistics were used as a means to indoctrinate the white American masses with the message of black inferiority.

  ◆  Beginning in the late Nineteenth century, the statistical rhetoric of the <u>"Negro criminal" became a proxy for a national discourse on black inferiority</u>.  [CDC_005773]

  ◆  In a moment when most white Americans believed in the declining significance of racism, <u>statistical evidence</u> of <u>excessive rates of black arrests</u> and the <u>overrepresentation</u> of black prisoners in the urban North was seen by many whites as indisputable proof of <u>black inferiority</u>. [CDC_5773]

◆   Northern <u>black crime statistics</u> and migration trends in the 1890s, 1900s and 1910s were woven together into a <u>cautionary tale</u> about the <u>exceptional threat</u> black people posed to <u>modern society</u>. CDC_5772]

◆   In the Windy City, in the City of Brotherly Love, and in the nation's Capital of Commerce <u>this tale was told</u>, <u>infused with symbolic references</u> to <u>American civilization</u>, to <u>American modernity</u>, and to the fictive <u>promised land</u> of unending <u>opportunity for all</u> who, regardless of race or class or nationality, sought their fortunes. [CDC_5772]

## (3)   REDEMPTION FOR WHITE IMMIGRANTS

1572.   THE CONDEMNATION OF BLACKNESS states, as a point of historical fact, that white America's association of blacks with crime required a corresponding disassociation of whites from criminality.

◆   Progressive era white social scientists and reformers often reified the racial criminalization process by <u>framing white criminals sympathetically</u> as victims of industrialization. [CDC_5773]

◆   [White sociologists] described a "great army of unfortunates" juxtaposed against an army of self-destructive and pathological blacks who were their "own worst enem[ies]." [CDC_5773]

◆   Consequently, white criminality gradually lost its fearsomeness. [CDC_005770]

◆   The racial-cultural content of white ethnic criminality gradually began to lose its currency during the Progressive era, while black criminality became more visible (and more contested by blacks). [CDC_5774] (emphasis added)

1573.   Dr. Muhammad explains, as a point of historical fact, that these false notions of black criminality resulted in widely-accepted practices of racial discrimination and stereotyped-thinking

◆   For white Americans of every ideological stripe . . . <u>African-American criminality became the most-widely accepted bases for justifying prejudicial thinking, discriminatory treatment, and/or acceptance of racial violence as an instrument of public safety</u>." [CDC_005769]

◆   [Using black crime statistics] as an "objective" measure, it also became a tool to shield white Americans from the charge of racism when they used black crime statistics to support discriminatory public

policies and social welfare practices."  [CDC_005773]

## (4)   PUBLIC DEGRADATION IN THE ENTERTAINMENT SPHERE

1574.   In the early nineteenth century, the American minstrel show emerged as one of America's first forms of popular or mass commercial entertainment. The core attraction of the American minstrel show for white mass audiences was the scathing public humiliation and extraordinarily cruel "typecasting" of African-American citizens, who were grotesquely depicted as buffoons or untrustworthy miscreants. According to Guthrie P. Ramsey Jr., a Professor of Music at the University of Pennsylvania and distinguished author of the scholarly treatise RACE MUSIC: BLACK CULTURES FROM BE-BOP TO HIP-HOP:

> **"One of the legacies of Nineteenth-century Minstrelsy involved the <u>public degradation</u> of the <u>black body</u> in the <u>American entertainment sphere</u>."[28]**

1575.   The historical significance of the American minstrel show has been well-documented and discussed by Jeffrey O.G. Ogbar, Ph.D, a Professor of History at the University of Connecticut,[29] in his scholarly publication HIP-HOP REVOLUTION: THE CULTURE AND POLITICS OF RAP, University Press of Kansas (2007) [CDC_005513].  Professor Ogbar states:

> **"Rooted in the antebellum era's <u>crude and vicious notions of racial subjugation</u>, the minstrel figure remains a touchstone for African American intellectuals, artists, and cultural critics alike…The <u>popular fixation</u> of <u>black people</u> as <u>criminal</u>, lazy, witless <u>miscreants</u> in <u>American popular culture</u> has been <u>well-documented</u>." [CDC_005537][30]**

1576.   Consistent with Professor Ogbar's authoritative treatise, and as points of historical

---

[28] Ramsey Jr., Guthrie P., RACE MUSIC: BLACK CULTURES FROM BE-BOP TO HIP-HOP (MUSIC OF THE AFRICAN DIASPORA), P. 51, <u>University of California Press</u> (2004)

[29] In June 2012, Professor Ogbar was named the University of Connecticut's Vice Provost for Diversity.

[30] Ogbar, Jeffrey O.G., HIP-HOP REVOLUTION: THE CULTURE AND POLITICS OF RAP, <u>University Press of Kansas</u> (2007) [for all paragraphs thereafter in this section D.(3)]

fact in the case at bar, the minstrel show as a form of American popular entertainment was used as a vehicle to indoctrinate the white masses with false notions of white supremacy and black subjugation based on vicious racial stereotypes.

> ◆   <u>Minstrelsy depicted black people</u> as <u>infantile</u> and <u>pathological</u> while <u>underscoring</u> the <u>importance of race</u> to the <u>meaning of democracy in America</u>. In an age that saw the expansion of voting to all white men, the <u>ubiquitous image</u> of the black minstrel . . . <u>affirmed the notion that black men were unfit for the responsibilities of democracy</u>." **[CDC_005537]**

> ◆   The <u>hostile images</u> of <u>black people</u> in <u>minstrelsy</u> <u>helped to promote</u> alliance between northern white workers and southern planters by <u>affirming</u> a universal commitment to <u>white supremacy</u> and its corollary <u>black subjugation</u>. **[CDC_0005538]**

> ◆   The <u>most important function</u> of the minstrel was its role in <u>rationalizing white supremacy</u>. The minstrel . . . was, in effect, an inversion of the white man…offer[ing] a <u>sharp contrast</u> to articulations of <u>whiteness</u> and <u>national identity</u>.

> ◆   The enduring [negative] image[s] insisted that <u>black people</u> were fundamentally <u>ill equipped to compete with white people</u> in any meaningful way. **[CDC_0005538]**

> ◆   In no uncertain terms, these <u>stereotypes</u>, or "<u>controlling images</u>," to paraphrase Patricia Hill Collins, affirmed the guiding principles of <u>white supremacy</u> by revealing the importance of <u>white paternalism</u> and <u>domination</u>. **[CDC_0005538]**

1577.   Consistent with Professor Ogbar's authoritative treatise, and as points of historical fact in the case at bar, the purpose of using entertainment mass media as a vehicle to indoctrinate the American masses with false racial ideology was to justify racial subordination in terms of social, political and economic opportunity in the United States. [CDC_0005538]

# E.   INTO THE 21ˢᵗ CENTURY

1578.   THE CONDEMNATION OF BLACKNESS and the shameful legacy of the 19th century Minstrel Show establishes the unfortunate historical and ideological context upon which this

legal action is based.  In 2013, negative stereotypes disseminated through mass media news and entertainment continue to play a major role in the perpetuation of a national American image of the young Black male as "the criminal."

1579.  Editors of news programs and producers of entertainment content are constantly bombarding the airwaves with negative images of young Black males depicted as criminals. These negative images do not represent the true character of ALL young Black males, they merely reflect an editorial *choice* of the white, mostly foreign Overseer to reinforce its American target audiences with destructive images of what amounts to a very small percentage (less than 2%) of the Black male population who may conform to the stereotype.

1580.  FROM 2003-2012, THE OVERSEER-DEFENDANTS' invariable production decisions to publicly disqualify ONLY Black *American Idol* Contestants with criminal record histories while simultaneously promote White *American Idol* Contestants who had similar (or far more egregious) criminal histories represented an objective to propagate obsolete notions of racial supremacy.

# GROSS STATISTICAL DISPARITY

## *PUBLIC DISQUALIFICATIONS*

## A.    LEGAL STANDARD

1581.  The gross statistical disparity evidenced by the public record constitutes insurmountable evidence of racial discrimination in respondents' public disqualifications of black contestants

1582.   During the first eleven seasons of its highly visible television production (2002-2012), Defendants only chose to publicly disqualify (and thereby condemn) top-ranking Black *American Idol* contestants, who consisted of no more than 28% of the contestant pool.

1583.   Conversely, White (and non-black) *American Idol* contestants, who consisted of the other 72% of the contestant pool were NEVER disqualified, at least not publicly.

1584.   The U.S. Supreme Court has long held that:

> **"where gross statistical disparities can be shown, they alone may in a proper case constitute *prima facie* proof of a pattern or practice of [racial] discrimination."**[31]

1585.   Further, according to EEOC ENFORCEMENT GUIDANCE (915.002, p. 8)

> **"statistical analysis derived from an examination of the employer's applicant data, workforce data, and/or third party criminal background history data may help to determine if the employer counts criminal history information more heavily against members of a protected group."**

---

[31] International Brothers of Teamsters vs. U.S., 431 U.S. 324, 339, 97 S.Ct 184 (1977); see also Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 308 (1977) (indicating that a pattern or practice violation occurs where the employer's policies result in a gross statistical disparity in the success rate of one group as compared to others); Robinson v. MetroNorth, Commuter R.R. Co., 267 F.3d 147, 158 n.3 (2d Cir. 2001) (recognizing that pattern or practice claims require proof of group-wide discrimination).

## B.    STATISTICAL DATA

**(1)    OVERVIEW**

1586.  Measured over a ten-year period, from June 2002 through March 15, 2012, a "gross statistical disparity" exists as between the total number of *publicly* disqualified Black *American Idol* contestants (15) relative to the total number of publicly disqualified White (or non-black) *American Idol* contestants (0).

1587.  The gross statistical disparity that characterizes ENTERPRISE-DEFENDANTS' pattern or practice of disqualifying ONLY Black *American Idol* contestants is, at the time of filing this Complaint, a matter of public record and cannot be reasonably disputed.

1588.  Based on statistical evidence derived from the first eleven seasons of the *American Idol* television program (2002-2012), it is beyond evident that ENTERPRISE-DEFENDANTS have engaged in an wholly immutable pattern and markedly consistent practice of publicly condemning top-ranking Black *American Idol* Contestants through the act of disqualification.

1589.  Conversely, it was also the "standing operating procedure" of the ENTERPRISE-DEFENDANTS to champion the cause of White *American Idol* contestants, such as Bo Bice, Stefano Langone, Casey James, Taylor Hicks, Scott Savol, and Bucky Covington, all of whom were TOP 10 Finalists who had criminal records that were far weightier than those for which the Black *American Idol* Contestants were disqualified.

**(2)   GOLDEN TICKET HOLDERS (2002-2012)**

1590.   Over the course of eleven seasons of *American Idol*, from <u>July 2002</u> through <u>March 2012</u>, there have been approximately **2145** Contestants who received Golden Tickets to Hollywood.

1591.   Of the **2145** <u>Total</u> *American Idol* Contestants who received Golden Tickets to Hollywood, **1523** Contestants [or seventy-one percent (**71%**)] were White (or non-black)[32]

1592.   Of the **2145** <u>Total</u> *American Idol* Contestants who received Golden Tickets to Hollywood, **622** Contestants or [twenty-nine percent (**29%**)] were Black.

1593.   **Zero (0)** out of the <u>**1523**</u> White (or non-black) *American Idol* contestants were Publicly Disqualified.

1594.   **Fifteen (15)** out of <u>**622**</u> Black *American Idol* Golden Ticket Holders were Publicly Disqualified.[33]

1595.   **Thirteen (13)** out of <u>15</u> Black *American Idol* contestants were disqualified for Arrest Records.

1596.   **One (1)** out of **15** Black *American Idol* contestants were disqualified for erotic photos.

1597.   **One (1)** out of **15** Black *American Idol* contestants were disqualified for purportedly falsifying age.

---

[32] "non-black" refers to Asian, Hispanic, Pacific Islander, Indian.

[33] (1) Delano Cagnolatti [Season One]; (2) Jaered Andrews [Season Two]; (3) Frenchie Davis [Season Two]; (4) Corey Clark [Season Two]; (5) Donnie Williams [Season Three]; (6) Terrell Brittenum [Season Five]; (7) Derrell Brittenum [Season Five]; (8) Halicia T. [Season Five]; (9) Tatiana W. [Season Five]; (10) Tora W. [Season Five]; (11) Akron Watson [Season Six]; (12) Ashlynn C. [Season Six]; (13) Anthony W. [Season Nine]; (14) Chris Golightly [Season Nine]; (15) JXJ [Season Eleven].

**(3)   SEMI-FINAL ROUNDS (2002-2012)**

1598.   Over the course of eleven seasons of *American Idol*, from July 2002 through March 2012, **305** Total Contestants Advanced to Semi-Final Rounds [Top 24, Top 32, Top 36]

1599.   White: 71% (**216**) of all *American Idol* Semi-Finalists have been White or non-black.

1600.   Black: 29% (**89**) of all *American Idol* Semi-Finalists have been Black.

1601.   Zero (**0**) out of **216** (0%) White *American Idol* Semi-Finalists were Publicly Disqualified.

1602.   Nine (**9**) out of **89** (10%) Black *American Idol* Semi-Finalists were Publicly Disqualified.[34]

1603.   One-hundred percent (100%) of all *American Idol* Semi-Finalists who have been Publicly Disqualified were Black.

1604.   No White or non-black *American Idol* contestant has ever been Publicly Disqualified.

1605.   Ten-percent (10%) of all Black Contestants who advanced to Semi-Final Rounds were Publicly Disqualified.

1606.   **31% of all Black MALE Contestants who advanced to** *American Idol* **Semi-Final Rounds were Publicly Disqualified.**

**(4)   FINAL ROUNDS (2002-2012)**

1607.   Over the course of eleven seasons of *American Idol*, from July 2002 through March 2012, **138** Total Contestants Advanced to Final Rounds [Top 10, Top 12 or Top 13]

---

[34] (1) Delano Cagnolatti [Season One]; (2) Jaered Andrews [Season Two]; (3) Frenchie Davis [Season Two]; (4) Corey Clark [Season Two]; (5) Donnie Williams [Season Three]; (6) Terrell Brittenum [Season Five]; (7) Derrell Brittenum [Season Five]; (8) Chris Golightly [Season Nine]; (9) Jermaine Jones [Season Eleven].

1608.   <u>White</u>: 73% (100 out of 138) of all *American Idol* Finalists have been White or non-black.

1609.   <u>Black</u>:  27% (38 out of 138) of all *American Idol* Finalists have been Black.

1610.   <u>Zero (**0**)</u> out of **100** White (or non-black) *American Idol* contestants were Publicly Disqualified.

1611.   <u>Two (**2**)</u> out of **38** Black *American Idol* contestants were Publicly Disqualified.[35]

1612.   <u>One hundred percent (100%)</u> of all *American Idol* Finalists who have been publicly disqualified are Black.

1613.   <u>Zero percent (0%)</u> of White (or non-black) *American Idol* Finalists has ever been Publicly Disqualified.

## C.   WHITE COMPARATORS

### (1)   ABSOLUTE IMMUNITY

1614.   Over the course of eleven seasons of *American Idol*, from <u>July 2002</u> through <u>March 2012,</u> there were only nine (<u>9</u>) White *American Idol* Contestants who had their criminal record history information disseminated by ENTERPRISE-DEFENDANTS to the U.S. media. These contestants included Scott Savol [Season Four]; Bo Bice [Season Four]; Taylor Hicks [Season Five]; Bucky Covington [Season Five]; Amanda Overmyr [Season Seven]; Casey James [Season Nine]; Matt L. [Season Nine]; Amy B. [Season Nine]; Stefano Langone [Season Ten].

1615.   ENTERPRISE-DEFENDANTS did <u>NOT</u> disqualify <u>any one</u> of the nine (9) White *American Idol* contestants whose criminal records came to light during telecast of the show.

1616.   Several of the nine (<u>9</u>) White *American Idol* Contestants who had a history of

---

[35] (1) Corey Clark [Season Two]; (2) JXJ [Season Eleven].

criminal arrests were convicted for more serious crimes (e.g., felony armed bank robbery, felony drug possession) than ANY of the Black *American Idol* contestants, whose misdemeanor arrest history was *de minimus* in comparison.

1617.   Seven (7) out of the 9 White *American Idol* contestants whose criminal records were released by O<span>verseer</span>-D<span>efendants</span> to tabloid media actually ***advanced to the Final Rounds***: Hicks [#1]; Bice [#2]; James [#3]; Savol [#5]; Langone [#7]; Covington [#8] and Overmyr [#11].

## (2)   C<span>omparative</span> A<span>nalysis</span>

1618.   **Drugs.**  Taylor HICKS, who is white, was declared the *American Idol* winner in Season Five even though he had an arrest record for marijuana possession.  Bo Bice was declared runner-up even though he had been convicted of a felony.  Plaintiff Akron WATSON, on the other hand, had his Golden Ticket revoked for *de minimus* marijuana possession.

1619.   **DUI.**  Plaintiff Donnie WILLIAMS was disqualified for a pending DUI based on a mere citation - as opposed to arrest (because his intake was barely over the legal limit).  Plaintiff Thomas DANIELS was also disqualified for a past DUI which had been expunged.  In contrast, White *American Idol* contestants Stefano Langone, Amanda Overmyer and Casey James were all permitted to advance to the Finalist rounds even though their DUI arrests had landed them in jail.  Indeed, Mr. James was arrested for reckless driving and DUI so repeatedly that he reportedly spent more than 100 days in jail.

1620.   **Battery / Assault.**  Claimant Corey Clark was disqualified for alleged battery, which police reports claimed was based on a "slap" in the face to his little sister.  The prosecutor dropped the charges.  Plaintiff Jaered Andrews was also disqualified before he was even arrested for simple assault in connection with an act of self-defense.  White contestant Scott Savol, on the

other hand, was not disqualified even though he allegedly threw a telephone at the mother of his child.  The impact of the phone against her chest allegedly caused the phone to break apart. Savol was ordered to complete a domestic violence program as a part of his sentence.  Clark received no such sentence.  Andrews was completely acquitted.

1621.  **False Names to Police.**  JXJ, who is Black, was publicly disqualified in connection with outstanding warrants for allegedly providing false names to police officers. Bucky Covington, who is White, was charged with falsifying his identity to police in connection with a hit-and-run, but was allowed to compete.

## (3)   "BLACK CONDEMNATION" VS. "WHITE REDEMPTION"

1622.  After the OVERSEER-DEFENDANTS released the criminal arrest history of the White *American Idol* Contestants to mass media, the OVERSEER-DEFENDANTS thereafter triumphantly championed them as models of excellence who were given a second chance to "turn their life around" and live the "American Dream" through their participation on *American Idol.*

1623.  Black *American Idol* Contestants who were disqualified in connection with their arrest records were invariably portrayed by the OVERSEER-DEFENDANTS as "untrustworthy" and "dangerous criminals" who had to be cast out into exile in order to preserve the "sanctity" of *American Idol* and to protect its brandname identity as a "family-friendly" show.

1624.  During ten years of broadcasting the show, no crime committed by ANY White *American Idol* Contestant, no matter how egregious, was ever treated by the OVERSEER-DEFENDANTS as a character flaw of the promoted White contestant.  To the contrary, the criminal arrest history of White *American Idol* Contestants was marketed to audiences as a *positive* character attribute, perfectly suitable for the "family-friendly" show.

1625.   With the assistance of the PRODUCTION-DEFENDANTS, seven (7) out of nine (9) White *American Idol* Contestants managed to score lucrative record deals in the industry and have NOT had their musical careers impaired by their participation on *American Idol.*   It can be fairly stated that the White Comparators enjoyed the full benefits and privileges of the transaction without any *materia*l interference by the ENTERPRISE-DEFENDANTS.

1626.   Based on an analysis of the foregoing statistical data, it is <u>transparent</u> that the OVERSEER-DEFENDANTS made <u>conscious, deliberate choices</u> which invariably sought to <u>condemn</u> Black *American Idol* Contestants (11 out of 15 who were Male) while at the same time making decisions to advertise the criminal record history of a very select number of White *American Idol* Contestants (8 out of 9 who were Male) in order to "teach" audiences about the <u>virtue of redemption</u> (i.e., atoning for a fault, deliverance, salvation).

## (4)   "DISQUALIFIED" VS. "INELIGIBLE TO COMPETE"

1627.   From June 2002 through March 2012, there is one example in the public record of a White *American Idol* Contestant, named Joanna Pacitti, who was removed from the Contest by the ENTERPRISE-DEFENDANTS.

1628.   As per the express language of Defendant FOX's press release announcing Ms. Pacitti's removal from the show, Ms. Pacitti was <u>NOT disqualified</u> from *American Idol.*

1629.   Defendant FOX issued the following press release, dated February 11, 2009 (Season Eight):

> **"It has been determined that Joanna Pacitti is <u>ineligible to continue</u> in the competition. *American Idol* contestant Felicia Barton has replaced Ms. Pacitti as part of the Top 36."**

1630.   Joanna Pacitti was declared "ineligible" to compete after advancing to the Top 36 Semi-Final rounds reportedly because her professional recording career was *already being*

*managed* by Defendant 19 ENTERTAINMENT, the very same company that signs the *American Idol* winners to "360 Degree" recording contracts.

### (5)   CALCULATED DISTRIBUTION

1631.   Over the course of a decade, there were 1514 White (or non-black) Golden Ticket Holders invited to Hollywood who *apparently* had no criminal record at all (because it was never advertised by the OVERSEER-DEFENDANTS

1632.   Upon information and belief, there was an ample supply of criminal background information concerning White *American Idol* contestants (derived from the background check process) that the OVERSEER-DEFENDANTS could have readily utilized to advertise the show via tabloids.

1633.   OVERSEER-DEFENDANTS only decided to advertise the criminal record information of White Contestants in the very beginning round [two (2) contestants at Open Auditions / Hollywood Rounds] <u>or</u> the very last round [seven (7) contestants in the Finals].

1634.   In contrast, an inordinate amount of public disqualifications of Black *American Idol* contestants [13 out of 15]  took place in the earlier Hollywood rounds or middle Semi-Final rounds.

1635.   From the perspective of the viewing audience, the *Black American Idol* Contestants were kicked off relatively early enough in the season such that the viewing audience had not yet been provided an opportunity to "invest" in their talent (i.e., become a fan). OVERSEER-DEFENDANTS simply decided to use the "rap sheets" of Black *American Idol* contestants as "tabloid fodder" to advertise the *American Idol* show before the "Main Event" (i.e., live, public voting rounds) began.

1636.   At the early-mid rounds, target audiences still did not know much about the

personal backgrounds or positive attributes of the Black contestants who had been disqualified. Instead, television viewers learned of them through scores of web articles that published their mug shots, criminal case files and police reports.   As indicated by the vast amount of "comments" posted to the internet in the wake of Black male disqualifications, the majority of the Black *American Idol* Contestants who were disqualified in earlier-middle rounds [including ANDREWS, T. BRITTENUM, D, BRITTENUM, WILLIAMS, WATSON, DANIELS] simply became young Black males who conformed to the age-old stereotype of "criminal."   They only appeared on television ONCE before being cast out by the OVERSEER-DEFENDANTS as stereotypical "black criminals."

1637.   As for the two Black *American Idol* Contestants who advanced to the final round [Plaintiff Clark and JXJ], they were portrayed by OVERSEER-DEFENDANTS as the age-old stereotype of the black "criminal" who had somehow "tricked" and "deceived" their way into the Final Round, leaving the OVERSEER-DEFENDANTS no choice but to terminate their participation.

1638.   But the evidence shows quite clear that the OVERSEER-DEFENDANTS knew about the pending cases involving both Plaintiff Clark and JXJ, which means that their highly publicized disqualifications were carefully orchestrated by OVERSEER-DEFENDANTS, who had no intention of letting Plaintiff Clark or JXJ advance to the Top Spot by means of the public vote. Rather, their disqualifications were utilized for maximum "indoctrination" effect.

1639.   OVERSEER-DEFENDANTS chose to advertise the arrest records of White *American Idol* contestants like Hicks, Bice, James, Langone, Covington or Overmyr ONLY when such Top-Ranking talent had already advanced to the Finalist / Top 12 Rounds.   By that time, such contestants had clearly endeared themselves to viewing audiences (and to DEFENDANTS) and were already on the way to a Major Label record deal.   So the release of their criminal arrest

history by that time could be humanized by the Overseer-Defendants and re-contextualized into a story of redemption and positivity.

# GROSS STATISTICAL DISPARITY
## Arrest Records Exploited in U.S. Media
(Concurrent with Appearances on *American Idol*)

| BLACK *GOLDEN TICKETS* [11 out of 622 w/Arrests] | | | WHITE *GOLDEN TICKETS* [9 out of 1523 w/Arrests] | | |
|---|---|---|---|---|---|
| *DISQUALIFIED & CONDEMNED* | | | *VINDICATED & REDEEMED* | | |
| Contestant Name | Criminal Charge(s) | Disposition [At Time of DQ] | Contestant Name | Criminal Charge(s) | Disposition |
| **JAERED ANDREWS** [Season Two] Top 32 | ☐ Simple Assault (Misdemeanor) | (NONE) [Arrested After DQ] Acquitted by Jury | **SCOTT SAVOL** [Season Four] Top 10: Fifth Place | ☐ Domestic Assault ☐ Disorderly Conduct ☐ Trespassing (Misdemeanor) | Pled Guilty to Disorderly Conduct |
| **COREY CLARK** [Season Two] Top 6 | ☐ Battery Restraint ☐ Obstruction of Justice (Misdemeanor) | [PENDING] Dismissed (Plea on Obstruction) | **BO BICE** [Season Four] Top 10: Second Place | ☐ Cocaine Possession ☐ Public Intoxication ☐ Paraphenalia (Felony) | Pled Guilty |
| **DONNIE WILLIAMS** [Season Three] Top 32 | ☐ DUI (Citation – not Arrested) | [PENDING] Diversion | **STEFANO LANGONE** [Season Ten] Top 10: Seventh Place | ☐ DUI ☐ Marijuana Possession (Misdemeanor) | Convicted Jail Time |
| **THOMAS DANIELS** [Season Six] Top 34 | ☐ DUI ☐ Reckless Drivin (Misdemeanor) | Expunged | **CASEY JAMES** [Season Nine] Top 10: Third Place | ☐ DWI ☐ Reckless Driving ☐ Suspended License (Misdemeanor) | Convicted 100+ Days Jail |
| **AKRON WATSON** [Season Six] Golden Ticket | ☐ Marijuana Possession (Misdemeanor) | Diversion | **TAYLOR HICKS** [Season Five] Top 10: First Place | ☐ Marijuana Possession (Misdemeanor) | Unknown |
| **BRITTENUM TWINS** [Season Six] Top 32 [Season Eight] Hollywood | ☐ Forgery, Identity Theft (Felony Reduced) | [PENDING] Diversion | **BUCKY COVINGTON** [Season Five] Top 10: Eighth Place | ☐ Hit-and-Run ☐ False Names to Police ☐ Resisting Arrest ☐ Suspended License (Misdemeanor) | Unknown |
| **ASHLYNN C.** [Season Six] Hollywood | ☐ Property Damag (Misdemeanor) | [PENDING] Dismissed | **MATTHEW L.** [Season Nine] Hollywood | ☐ Bank Robbery (Felony) | Convicted 4 Years in State Prison |
| **HALICIA T.** [Season Five] Hollywood | ☐ Trespass ☐ Disorderly Conduct (Misdemeanor) | Expunged | **AMY B.** [Season Nine] Hollywood | ☐ Public Intoxication ☐ Trespass (Misdemeanor) | Unknown |
| **TATIANA W.** [Season Five] Hollywood | ☐ Shoplifting ☐ False ID (Misdemeanor) | Expunged | **AMANDA OVERMYR** [Season Season] Top 10: Eleventh Place | ☐ DUI (Misdemeanor) | Convicted |
| **ANTONIO W.** [Season Nine] Hollywood | ☐ Drug Possession ☐ Battery (Misdemeanor) | Charges Dropped | | | |
| **JXJ** [Season Eleven] Top 11 | ☐ False Names to Police ☐ Open Container (Misdemeanor) | [PENDING] Unknown | | | |

# CLASS ACTION ALLEGATIONS

# CLASS ACTION ALLEGATIONS

1640.  Plaintiffs bring this action in their own individual capacity and on behalf of a class of persons under Rule 23(a), Rule 23(b)(2), Rule 23(b)(3) and Rule of the FEDERAL RULES OF CIVIL PROCEDURE.

## A.    DEFINITION OF PROPOSED CLASS

## (1)    BLACK GOLDEN TICKET HOLDERS (2002-2012) [Males Only]

1641.  The named Plaintiffs seek to represent a class defined as follows: all African-American males who have earned a Golden Ticket to compete in the *American Idol* Contest at any time from April 20, 2002 through November 15, 2012 (Season One through Season Twelve) and who were subject to one or more aspects of the systemic racial discriminatory practices described in the "*Allegations of Systemic Discrimination*" section of this Class Action Complaint (the "Class").[36]

## (2)    RATIONALE FOR PROPOSED CLASS DEFINITION

1642.  The named Plaintiffs seek to help eradicate the evil of employment discrimination based on false racial stereotypes that continue to deprive Plaintiffs and others in their protected class of the full benefits and privileges of rights ascribed to them as natural-born citizens of the United States.

1643.  The proposed Class definition is "precise, objective and presently ascertainable."[37]

---

[36] As per request, the definition of the proposed Class specifically does not include the individual referred to in this Complaint as "JXJ" who was publicly disqualified in Season Eleven of *American Idol* and who, upon information and good faith belief, settled any claims he may have had arising from his termination via written settlement agreement with one or more of Defendants.

[37] MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.14 (3d ed.1995)

1644.   The named Plaintiffs are each an individual member of the proposed Class.

1645.   Plaintiffs have alleged herein acts of racial disparate treatment by ENTERPRISE-DEFENDANTS against African-American females, specifically against Frenchie Davis, Ashlynn C., Halicia T. and Tatiana D. and aver that both African-American males <u>and</u> females were victimized by ENTERPRISE-DEFENDANTS' pattern or practice of racial discrimination in ENTERPRISE-DEFENDANTS' employment practices.

1646.   Plaintiffs recognize that Section 1981 was enacted to prevent discrimination against a citizen based on their race (regardless of sex); however, Plaintiffs aver that it is appropriate to limit the prospective Class in the first instance to African-American <u>males</u> only because:

(a)      the Civil Rights statutes were intended to provide a legal remedy to those citizens who are victimized by false, negative stereotypes associated with one's ancestral background.  The pernicious stereotype challenged here is largely imposed by American mass media on Black males, (although Black females are not immune to the evils of the false stereotype).

(b)      young Black American *males* have historically suffered and continue to be victimized by tremendous stigmatization in the U.S. workplace associated with the outmoded negative stereotype of the "black criminal" that has largely been propagated and sensationalized by U.S. mass media.

(c)      from a public policy standpoint, this litigation has as one primary objective the need to eradicate the invidious stereotype of the young African-American male as "black criminal" in 21st century American *commercial* speech.

(d)  limitation of the class to African-American males, in the first instance, will make the

litigation more manageable in the furtherance of efficiency and economy to the parties and the Honorable Court.

(e)      all of the named Plaintiffs are male.

## (3)   RESERVATION OF RIGHT TO AMEND CLASS

1647.   Plaintiffs respectfully reserve the right upon the Honorable Court's leave to amend the definition of the Class during or following discovery.

1648.   As of the filing of this Class Action Complaint, Plaintiffs expressly contemplate that the Class will expand to include African-American *females*.

1649.   Plaintiffs also contemplate that the Class may expand to incorporate African-American contestants (male or female) who have applied for employment in other Reality TV Contests that are produced by Defendant FREMANTLE and broadcast by Defendant FOX in the United States, particularly the program entitled *X Factor* (which has been broadcast in the U.S. for two seasons in 2011 and 2012).[38]

## B.   NUMEROSITY [Fed. R. Civ. P. 23(a)(1)]

1650.   The Class is so numerous that joinder of all members is impracticable.

1651.   The Class contemplates the inclusion of U.S. citizens or permanent residents throughout the United States and it would therefore be inconvenient to litigate multiple lawsuits in different judicial districts nationwide.

1652.   For the twelve seasons of *American Idol*, ENTERPRISE-DEFENDANTS awarded a total of approximately two thousand four hundred and thirty-one (2431) Golden Tickets to

---

[38] Plaintiffs emphasize that there is no evidence in the public record to indicate that producers of *X Factor* have engaged in the same pattern or practice of racial discrimination as exhibited by *American Idol;* however, there appears to be common ownership and management (i.e., "locus of autonomy") as between the two programs that raise a reasonable level of suspicion concerning the commonality of background check procedures utilized in the contestant disqualification for *X Factor.*

Hollywood.  Of these 2431 Golden Tickets, it is estimated that anywhere between 24-29% of the Golden Tickets were awarded to African-American Contestants.   Thus, it is estimated that between 583 and 704 of the Golden Tickets were awarded by the ENTERPRISE-DEFENDANTS to African-American Contestants.

1653.   As between male and female African-American contestants, statistical analysis of the Semi-Finalist Contestants from the first eleven seasons of *American Idol* (2002-2012) shows that a total of fifty (50) Semi-Finalists comprised of African-American females and thirty-nine (39) comprised of African-American males.

1654.   It is reasonably estimated that approximately 44% of between 583 and 704 Golden Tickets have been awarded to African-American males.  Thus, including the ten Black males named as Plaintiffs herein, **the size of the proposed Class is estimated to be in the range of 256 and 309 members.**

1655.   All members of the Class are sufficiently numerous to make joinder impracticable.

## C.   COMMONALITY [Fed. R. Civ. P. 23(a)(2)]

### (1)   QUESTIONS OF LAW AND FACT

1656.   There are questions of law and fact common to the Class that predominate over any questions affecting the individuals only[39], including but not limited to:

(a)      Whether ENTERPRISE-DEFENDANTS' conduct vis-à-vis members of the Class violate federal civil rights laws under Section 1981;

(b)      Whether ENTERPRISE-DEFENDANTS maintain a systemic policy, practice or "standard operating procedure" for treating Black American Idol Contestants in a manner that

---

[39] H. Newberg, I Class Actions § 1450 at 504 (1977).

intends to discriminate against the entire Class on the basis of race or ancestry;

(c)     Whether there are statistically significant disparities between the disqualification of Black *American Idol* Contestants and of similarly situated White and non-Black *American Idol* Contestants sufficient to permit an inference of intentional racial discrimination;

(d)     Whether ENTERPRISE-DEFENDANTS' employment application questions concerning arrest records violate Section 432.7 of the California Labor Code.

(e)     Whether ENTERPRISE-DEFENDANTS' disqualifications of Black *American Idols* with records of arrest were justified by business necessity;

(f)     Whether injunctive and/or declaratory relief is needed to adequately remedy past or present racial discrimination against the Class and prevent future discrimination against the Class;

(g)     Whether ENTERPRISE-DEFENDANTS' unlawful conduct justifies an award of compensatory damages to the Class, which may include valuable contest prizes or other similar monetary relief to individual members of the Class;

(h)     Whether ENTERPRISE-DEFENDANTS' unlawful misconduct justifies an award of punitive damages on a class-wide basis or to individual members of the Class.

## (2)     COMPANY-WIDE POLICY

1657.  The commonality requirement is satisfied because the Class members were victims of a systemic policy, practice and custom of racial discrimination.

1658.  As to the commonality requirement, Plaintiffs allege a practice of disparate treatment in the ENTERPRISE-DEFENDANTS' exercise of unbridled discretion in the disqualification of Black *American Idol* Male Contestants, thus raising questions of law and fact common to all disqualified contestants.

1659.  ENTERPRISE-DEFENDANTS' practices and policies, coupled with the racial *animus* or stereotyped thinking of foreign national executives, permeate the corporate culture and have resulted in disparate treatment of *bona fide* contestants who happened to be Black.

1660.  The named Plaintiffs and putative class members were together the victims of a cohesive policy or plan that was motivated by invidious *animus* to exclude African-American males from the *American Idol* Contest based on their past or pending record of criminal arrests.

1661.  ENTERPRISE-DEFENDANTS' employment practice of screening applicants on the basis of criminal records is known as "criminal conduct exclusions."

## (3)   UNIFORMITY OF PRACTICES

1662.  Decisions to disqualify *American Idol* contestants were not based on any objective criteria or written job descriptions.

1663.  There existed a common mode of exercising discretion that pervaded the entire *American Idol* Enterprise.

1664.  Decisions to disqualify *American Idol* Contestants were not based on any criteria or "contest rules" that were publically disseminated to contestants before they entered the contest (and as required by FCC regulation).

1665.  ENTERPRISE-DEFENDANTS' practice of disqualifying Black male contestants based on discretionary authority without reference to any objective criteria has caused Black contestants to be treated differently than every other contestant who was not an African-American male.

1666.  ENTERPRISE-DEFENDANTS' subjective decision-making procedures comprised a common discriminatory link among the named Plaintiffs and the putative Class members.

1667.  ENTERPRISE-DEFENDANTS cannot assert legitimate non-discriminatory reasons for

disqualifying Black *American Idol* Contestants based on their records of arrest or misdemeanor criminal convictions because their background check procedures were not in compliance with federal or state statutes.

1668.   ENTERPRISE-DEFENDANTS made unbridled decisions to disqualify Black *American Idol* Contestants based on records of arrest while simultaneously advancing White *American Idol* Contestants with criminal conduct history was not justified by business necessity.

1669.   ENTERPRISE-DEFENDANTS engaged in stereotyped-thinking by invoking outmoded notions of the "black criminal" that caused *American Idol* Contestants who happened to be young black males to be disfavored in terms of their advancement as *American Idol* Contestants.

1670.   The criminal conduct exclusions utilized by ENTERPRISE-DEFENDANTS during background checks, which operated to exclude Black males from the contestant pool at a grossly disproportionate level, cannot be shown to be related to singing performance as an *American Idol* contestant, nor shown to be related to winning (or top-ranking in) the *American Idol* contest.

1671.   ENTERPRISE-DEFENDANTS engaged in a continuing pattern of discrimination that deprived each Class member an equal opportunity to compete in the *American Idol* Contest on the basis of their individual merit.

1672.   By discriminating on the basis of a forbidden classification, ENTERPRISE-DEFENDANTS reduced the probability that any single member of the Class would find employment as a *bona fide* contestant on *American Idol*, thereby making competition for the limited number of positions more difficult for the entire Class.

1673.   As a result of ENTERPRISE-DEFENDANTS' racial *animus* and stereotyped thinking about young Black males, all Black employment applicants had less of an opportunity to secure a position in the *American Idol* Contest when compared to White and non-Black applicants.

1674.  ENTERPRISE-DEFENDANTS were at all times prohibited by federal law from injecting into the selection process the *a priori* assumption that Black applicants with records of criminal arrest were less acceptable as professional performers, talent contestants and singers than White (or non-Black) applicants with records of criminal arrest.[40]

## (4)    UNIFORMITY OF CLASS MEMBERSHIP

1675.  All named Plaintiffs and prospective Class members met the ENTERPRISE-DEFENDANTS' published contestant eligibility requirements concerning age and citizenship (or residency).

1676.  All named Plaintiffs and prospective Class Members earned a Golden Ticket to Hollywood from the panel of *American Idol* Expert Judges.

1677.  All named Plaintiffs and prospective Class members executed the *American Idol* CONTESTANT AGREEMENT (and amendments thereto), which contained only subtle variations in contractual language during the tenure of the Continuing Violations Period.

1678.  All named Plaintiffs and prospective Class members completed a PARTICIPANT BACKGROUND QUESTIONNAIRE FORM which made written inquiries concerning their criminal arrest history.

1679.  All named Plaintiffs and prospective Class Members were subjected to criminal background check processes by ENTERPRISE-DEFENDANTS and their third-party investigative agent, CARCO Group.

## (5)    MANAGEMENT ORGANIZATION

1680.  ENTERPRISE-DEFENDANTS' management and production organization remained an overwhelmingly White supervisory force that wielded unlimited discretion throughout the

---

[40] See Kohn v. Royall, Koegel and Wells, 59 F.R.D. 515, 521 (1973).

Continuing Violations period.

1681.  Upon information and belief, the decisions to disqualify the named Plaintiffs and the prospective Class members based on criminal exclusions, or to implement ENTERPRISE-DEFENDANTS' policy of disqualifying Black *American Idol* Contestants and disseminating their information to the press, was made by a  revolving group of supervisors, managers, sponsorship representatives and television executives.

1682.  Upon information and belief, during the *entire* Continuing Violations Period, the decisions to disqualify the named Plaintiffs and the prospective Class members were made by the same core group of supervisory executive producers: Nigel LYTHGOE, Ken WARWICK and Simon FULLER, as well as by CECILE FROT-COUTAZ, all of whom are White and, upon information and belief, of foreign nationality.

1683.  Upon information and belief, during the *entire* Continuing Violations Period, decisions to discriminate against the named Plaintiffs and the prospective Class members have been made by the same core group of supervisory NETWORK-DEFENDANT executives: Michael DARNELL and Minna TAYLOR, Esq., who are White and Marisa FERMIN, Esq., who is believed to be Hispanic.

1684. During the *entire* Continuing Violations Period, criminal investigative background checks were conducted by Sharon Renee GIALLO, who is White.

## C.    TYPICALITY [Fed. R. Civ. P. 23(a)(2)]

## (1)    GENERAL

1685.  The claims or defenses of the named Plaintiffs are typical of the claims or defenses of the prospective Class members.

1686.  The named Plaintiffs and prospective Class members all occupied the same

position as employee applicants and/or employees upon receiving their Golden Ticket to Hollywood.    Therefore, all members of the Class were operating in the context of an employment relationship or prospective employment relationship.

1687.  The circumstances surrounding Plaintiffs' grievances involving criminal background checks and criminal conduct exclusions and those surrounding the prospective Class members' grievances are typical amongst the Class for purposes of the Section 1981 claims.

1688.  The discriminatory treatment alleged is typical of ENTERPRISE-DEFENDANTS' challenged employment practices.

1689.  ENTERPRISE-DEFENDANTS' employment practices are motivated by a policy of racial *animus* that pervades the single common enterprise of companies that manage and operate *American Idol.*

1690.  The compensatory damages sought by Plaintiffs and the compensatory damages sought by the prospective Class members are measured by the same economic indicator, i.e., the value of the prizes for performing in connection with and winning (or top-ranking in) the *American Idol* Contest.

1691.  Plaintiffs' individual and class-wide claims overlap on several elements of proof, including ENTERPRISE-DEFENDANTS' systemic policy of conducting illicit background checks, executing commercial contracts that are void on grounds of illegality, disqualifying Black *American Idol* Contestants on the basis of information obtained from improper background checks, failing to develop objective criteria for disqualifications, failing to diversify an all White, largely Alien-based supervisory and decision-making force.

## (2)    INDIVIDUAL

1692.  Plaintiff ANDREWS is a member of the Class and the Section 1981 employment

claims of Plaintiff are typical of the claims of the Class.

1693.   Plaintiff CLARK is a member of the Class and the Section 1981 employment claims of Plaintiff are typical of the claims of the Class.

1694.   Plaintiff SMALLEY is a member of the Class and the Section 1981 employment claims of Plaintiff are typical of the claims of the Class.

1695.   Plaintiff WILLIAMS is a member of the Class and the Section 1981 employment claims of Plaintiff are typical of the claims of the Class.

1696.   Plaintiff T. BRITTENUM is a member of the Class and the Section 1981 employment claims of Plaintiff are typical of the claims of the Class.

1697.   Plaintiff D. BRITTENUM is a member of the Class and the Section 1981 employment claims of Plaintiff are typical of the claims of the Class.

1698.   Plaintiff WATSON is a member of the Class and the Section 1981 employment claims of Plaintiff are typical of the claims of the Class.

1699.   Plaintiff DANIELS is a member of the Class and the Section 1981 employment claims of Plaintiff are typical of the claims of the Class.

1700.   Plaintiff JOYNER is a member of the Class and the Section 1981 employment claims of Plaintiff are typical of the claims of the Class.

1701.   Plaintiff GOLIGHTLY is a member of the Class and the Section 1981 employment claims of Plaintiff are typical of the claims of the Class.

## D.    ADEQUATE REPRESENTATION

1702.   The representative parties named in this action will fairly and adequately protect the interests of the Class.

1703.   The named Plaintiffs do <u>not</u> have interests that are antagonistic to those of the

putative Class members.

1704.   Counsel for Plaintiffs is experienced in complex litigation and is qualified to represent the named Plaintiffs and the Class members.   Moreover, counsel for Plaintiffs is dedicated to vigorously prosecuting the action.

1705.   Plaintiff CLARK will fairly and adequately protect the interest of the members of the Class. Plaintiff CLARK has no interests that are adverse to other members of the Class. Additionally, Plaintiff CLARK has retained counsel who is competent and experienced in complex litigation.  Plaintiff CLARK will vigorously prosecute this case on behalf of the Class.

1706. Plaintiff ANDREWS will fairly and adequately protect the interest of the members of the Class. Plaintiff ANDREWS has no interests that are adverse to other members of the Class. Additionally, Plaintiff ANDREWS has retained counsel who is competent and experienced in complex related litigation.  Plaintiff ANDREWS will vigorously prosecute this case on behalf of the Class.

1707.   Plaintiff SMALLEY will fairly and adequately protect the interest of the members of the Class. Plaintiff SMALLEY has no interests that are adverse to other members of the Class. Additionally, Plaintiff SMALLEY has retained counsel who is competent and experienced in complex litigation.  Plaintiff SMALLEY will vigorously prosecute this case on behalf of the Class.

1708. Plaintiff WILLIAMS will fairly and adequately protect the interest of the members of the Class. Plaintiff WILLIAMS has no interests that are adverse to other members of the Class. Additionally, Plaintiff WILLIAMS has retained counsel who is competent and experienced in complex litigation.  Plaintiff WILLIAMS will vigorously prosecute this case on behalf of the Class.

1709.  Plaintiff T. BRITTENUM will fairly and adequately protect the interest of the members of the Class. Plaintiff T. BRITTENUM has no interests that are adverse to other members of the Class. Additionally, Plaintiff T. BRITTENUM has retained counsel who is competent and experienced in complex litigation.  Plaintiff T. BRITTENUM will vigorously prosecute this case on behalf of the Class.

1710.  Plaintiff D. BRITTENUM will fairly and adequately protect the interest of the members of the Class. Plaintiff D. BRITTENUM has no interests that are adverse to other members of the Class. Additionally, Plaintiff D. BRITTENUM has retained counsel who is competent and experienced in complex entertainment-related litigation.  Plaintiff D. BRITTENUM will vigorously prosecute this case on behalf of the Class.

1711.  Plaintiff WATSON will fairly and adequately protect the interest of the members of the Class. Plaintiff WATSON has no interests that are adverse to other members of the Class. Additionally, Plaintiff WATSON has retained counsel who is competent and experienced in complex litigation.  Plaintiff WATSON will vigorously prosecute this case on behalf of the Class.

1712.  Plaintiff DANIELS will fairly and adequately protect the interest of the members of the Class. Plaintiff DANIELS has no interests that are adverse to other members of the Class. Additionally, Plaintiff DANIELS has retained counsel who is competent and experienced in complex litigation.  Plaintiff DANIELS will vigorously prosecute this case on behalf of the Class.

1713.  Plaintiff WATSON will fairly and adequately protect the interest of the members of the Class. Plaintiff WATSON has no interests that are adverse to other members of the Class. Additionally, Plaintiff WATSON has retained counsel who is competent and experienced in

complex litigation.  Plaintiff WATSON will vigorously prosecute this case on behalf of the Class.

1714.  Plaintiff JOYNER will fairly and adequately protect the interest of the members of the Class. Plaintiff WATSON has no interests that are adverse to other members of the Class. Additionally, Plaintiff WATSON has retained counsel who is competent and experienced in complex litigation.  Plaintiff WATSON will vigorously prosecute this case on behalf of the Class.

## E.     CLASS CERTIFICATION

## (1)     FED. R. CIV. P. 23(B)(2)

1715.  Class certification is appropriate under Rule 23(b)(2) of the FEDERAL RULES OF CIVIL PROCEDURE.

1716.  ENTERPRISE-DEFENDANTS have acted or refused to act on grounds generally applicable to the entire Class, making final injunctive or corresponding declaratory relief appropriate respecting the Class as a whole.

1717.  While the prospective Class members also herein request monetary relief (i.e., compensatory and punitive damages) as part of their Count II Section 1981 claim, injunctive relief and declaratory relief will predominate employment discrimination-related claims.[41]

1718.  The determination regarding monetary relief sought by the individual named Plaintiffs or the prospective Class members may be potentially deferred until the final remedial

---

[41] U.S. vs. City of New York, 276 F.R.D. 22, 30 (E.D.N.Y. 2011) ("a pattern-or-practice disparate treatment claim seeking compensatory damages in addition to equitable relief may be certified for class treatment under (b)(2) if the monetary relief sought does not predominate over the injunctive relief sought") citing Robinson v. Metro-North Commuter Railroad Co., 267 F.3d 147, 166-67, n. 10 (2d Cir. 2001).

phase of the litigation.[42]

## (2)   FED. R. CIV. P. 23(B)(3)

1719.   Class certification is appropriate under Rule 23(b)(3).

1720.   The major liability questions in this litigation are common to the named Plaintiffs and the prospective Class Members arise from identical core allegations:

(a)   whether the *American Idol* CONTESTANT AGREEMENT, as amended, is void *ab initio* on grounds of illegality, fraud-in-factum;

(b)   whether the named Plaintiffs and prospective Class members were employee applicants;

(c)   whether the named Plaintiffs and prospective Class members were former employees at-will or employees for cause

(d)   whether ENTERPRISE-DEFENDANTS' active fraudulent concealment of Plaintiff's legal employment relationship with *American Idol* Contestants suspended the accrual of Plaintiffs' causes of action under employment laws

(e)   repeatedly, knowingly and without justification obtained federal and state regulated background information in order to disqualify Black *American Idol* Contestants (whether publicly or privately);

(f)   revocation of exclusive rights to copyright license

1721.   The common issues of law and fact presented in this Class Action Complaint predominate over any individual issues, including with respect to the criminal background check

---

[42] <u>U.S. vs. City of New York</u>, 276 F.R.D. at 34 (E.D.N.Y. 2011) ("Individual issues arise in … pattern-or-practice cases only if the class established the employer's liability and even if the entire pattern-or-practice disparate treatment claim cannot be certified under (b)(2), a district court should still certify the liability phase of the claim for class treatment under (b)(2), and reconsider the propriety of continued (b)(2) certification if the case proceeds to the remedial phase.")

procedures and written employment application questions utilized by ENTERPRISE-DEFENDANTS to screen the *American Idol* contestants and whether such procedures and inquiries stood in violation of federal and state statutory laws.[43]

1722.   The disparate treatment between Black *American Idol* Contestants and White *American Idol* Contestants respecting criminal conduct exclusions is relevant to establishing ENTERPRISE-DEFENDANTS' systemic policy of racial discrimination, regardless of whether a "pattern or practice" standard of proof (*International Brotherhood of Teamsters*) is sufficient to allow an award of relief to the prospective Class[44] or whether an individual disparate treatment standard of proof (*McDonnell Douglas*) becomes necessary to prove discrimination as to the individual victims.[45]   (The method of proof utilized to demonstrate the substantive merits of Plaintiffs' claims should have no bearing on whether class certification is deemed appropriate).[46]

1723.   A class action procedure is superior to the other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable, as per

---

[43] Myers vs. Hertz Corp., 624 F.3d 537, 549 (2d Cir. 2010) (holding that predominance requirement under Rule 23(b)(3) is satisfied where "some" of the [common] questions can be answered with respect to the members of the class as whole "through generalized proof" and that those common issues are "more substantial" than individual ones).

[44] See, e.g., Chin v. Port Authority of New York, 685 F.3d 135, 148, n. 8 (2d Cir.2012) (concluding that in Title VII jurisprudence, "pattern-or-practice" simply refers to a method of proof and does not constitute a "freestanding cause of action"); Celestine v. Petroleos de Venezuella SA, 266 F.3d 343, 355 (5th Cir.2001) ("A pattern or practice case is not a separate and free-standing cause of action ... but is really merely another method by which disparate treatment can be shown").

[45] Information showing "that blacks generally had their employment terminated as a result of criminal background checks more frequently than did whites … would support (though not be determinative of) [Plaintiff]'s charge of disparate treatment.   See E.E.O.C. v. Dolgencorp, 2008 WL 4542973, * (N.D. Ill. April 15, 2008); citing Bell v. EPA, 232 F.3d 546, 553 (7th Cir.2000)  (statistical evidence can be relevant to an individual's Title VII disparate treatment claim); see also Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 356 (6th Cir.1998) ("corporate culture" of discrimination may provide circumstantial evidence of particularized discrimination against an individual plaintiff).

[46]   "[T]he right of a litigant to employ Rule 23  is a procedural right only, ancillary to the litigation of substantive claims." Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326, 332, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980).

the "numerosity" analysis stated herein.

1724.  Class certification will "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."[47]

1725.  The expense and burden of individual litigation makes it impractical for the members of the prospective Class to pursue individual litigation to vindicate their rights.

## (3)   FED. R. CIV. P. 23(B)(4)

1726.  Class certification is appropriate under Rule 23(b)(4).

1727.  Even if class certification does not satisfy the predominance requirement of Rule 23(b)(3), class certification is appropriate here[48] for the liability phase of "pattern or practice" disparate treatment because there exists particular common issues of fact and law that can be isolated, and which equally impact the Class members, such as:

(a)     whether written employment application questions and consent forms contained in the *American Idol* CONTESTANT AGREEMENT and PARTICIPANT BACKGROUND QUESTIONNAIRE FORM, from Season One (2002) through Season Eleven (2012), and comply with statutory law;

(b)     whether criminal background check procedures utilized by the NETWORK-DEFENDANTS, PRODUCTION-DEFENDANTS, EXECUTIVE-DEFENDANTS and CARCO comply with statutory law.[49]

---

[47] <u>Myers</u>, 624 F.3d at 549 (2d Cir. 2010).

[48] See <u>U.S. vs. City of New York</u>, 276 F.R.D. 22, 30 (2011); <u>citing In re Nassau County Strip Search Cases</u>, 461 F.3d 219, 227 (2d Cir. 2006) and <u>Robinson v. Metro-North Commuter Railroad Co.</u>, 267 F.3d 147, 166-67, n. 10 (2d Cir. 2001).

[49] <u>U.S. vs. City of New York</u>, 276 F.R.D. 22, 30 (2011); citing <u>In re Nassau County Strip Search Cases</u>, 461 F.3d 219, 227 (2d Cir. 2006).

# CAUSES
# OF
# ACTION

# COUNT I

## VIOLATION OF CIVIL RIGHTS ACT (1866)

## 42 U.S.C. § 1981
### (EMPLOYMENT DISCRIMINATION)

———

### Each Plaintiff and Prospective Class Member Against
### ENTERPRISE-DEFENDANTS
[PRODUCTION-DEFENDANTS + NETWORK- DEFENDANTS + OVERSEER-DEFENDANTS]

1728.  Plaintiffs, each in their individual capacity and on behalf of their prospective Class members, repeat and re-allege each and every allegation above as if set forth herein.

## A.  LEGAL ELEMENTS

### (1)  STATUTORY LANGUAGE

1729.  U.S.C. § 1981 ("Section 1981") provides for a "Statement of Equal Rights":

> (a) All persons within the jurisdiction of the United States shall have the same rights in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.  **42 U.S.C. § 1981(a)**

1730.  Section 1981 was enacted as part of the Civil Rights Act of 1866 "to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination because of their ancestry or ethnic characteristics."[50]

### (2)  PRIMA FACIE CASE

1731.  To establish a *prima facie* case of racial discrimination in the context of

---

[50] See, e.g., St. Francis Coll. v. Al–Khazraji, 481 U.S. 604, 609 (1987); Parker v. Metropolitan Tr. Auth., 97 F.Supp 2d 437 (S.D.N.Y. 2000); 42 U.S.C. § 1981.

employment, Plaintiffs and the putative Class members must show that they: (a) are a member of a protected group, (b) qualified for the position of employment; (c) suffered an adverse employment action; and (d) that similarly situated employees, who are not members of the protected group, were treated differently.

## B.    MEMBERS OF PROTECTED CLASS

1732.  Plaintiffs named in this action are members of a protected class of U.S. citizen recognized by federal government as "African-American" or "Black."

1733.  As a member of a protected class of United States citizen, each Plaintiff is vested with a right as an employee or applicant for employment to be free from racial discrimination in the workplace.

## C.    QUALIFIED FOR POSITION
### (1)    EMPLOYMENT STATUS

1734.  At all relevant times, each Plaintiff named in this action was either an employee of or applicant for employment of American Idol Productions, Inc., which is one of the entities that comprises the ENTERPRISE-DEFENDANTS.

1735.  The position of employment at issue was described by ENTERPRISE-DEFENDANTS as "American Idol contestant" or "American Idol participant"

1736.  The position of employment for which Plaintiffs and the prospective Class Members applied entailed the performance role of exhibiting one's singing talents on stage during the course of (what purported to be) a *bona fide* contest for valuable prize.

**(2)**     **QUALIFICATIONS FOR POSITION**

1737.   Each Plaintiff named in this action met the eligibility requirements to compete in the *American Idol* Contest and appear as principal performers on television.

1738.   The singing and performing talent of each Plaintiff named in this action was subjected to professional analysis and review by a panel of *American Idol* Expert Judges, each of whom had decades of experience working in the music industry.

1739.   Each plaintiff received a Golden ticket to Hollywood after being deemed qualified by the Expert Judges.

1740.   All members of the proposed Class also met the eligibility requirements and received a Golden Ticket to Hollywood based on their individual merit as singers and television performers.

1741.   Having met the published eligibility requirements and having received a Golden Ticket to Hollywood based on their individual merit and recognized talent as singers and performers who were adjudged capable of becoming "the next American Idol," each of the Plaintiffs (and prospective Class members) were irrefutably qualified for the position to perform as singers on television and qualified to redeem the contest prizes advertised by ENTERPRISE-DEFENDANTS.

## D.     ADVERSE EMPLOYMENT ACTION

1742.   As set forth in the "Contestant Allegations" section of this Complaint, each Plaintiff suffered adverse employment action because the ENTERPRISE-DEFENDANTS unilaterally terminated from their position as "American Idol contestant" or "American Idol participant."

1743.   Any of the prospective Class members would have been terminated as a result of information obtained during the background check process.

## C.     DISPARATE TREATMENT

1744.  ENTERPRISE-DEFENDANTS have violated Section 1981 by intentionally discriminating against the Plaintiffs and the prospective Class members with respect to the terms, conditions and benefits of their employment or prospective employment and by failing to treat Plaintiffs on equal grounds as similarly situated white (or non-black) *American Idol* contestants.

1745.  ENTERPRISE-DEFENDANTS have also violated Section 1981 by applying a different set of Contest rules to White (and non-Black) *American Idol* Contestants than were applied to Black *American Idol* Contestants.

1746.  Discriminatory application of contest rules was the "standard operating procedure" of ENTERPRISE-DEFENDANTS who unequally burdened the Plaintiffs as *American Idol* Contestants and ultimately deprived them of the opportunity to compete on the basis of their performance merit.

### (1)     TERMINATION / DISQUALIFICATION

1747.  Disparate treatment of Black employees or employee applicants may be readily demonstrated through evidence derived from the public record, which demonstrates a *per se* case of racially-motivated conduct.

1748.  The televised (or internet-promoted) event of disqualification from *American Idol* constituted an unceremonious and hostile act of being STRIPPED of all privileges and benefits of participation on the program (including the opportunity to win the prize), denigrated before untold millions of fellow citizens, viewed as a disappointment by one's own family and friends, and permanently labeled on the internet as an *American Idol* reject or "criminal."

1749.  Over the course of the show's eleven year history, the adverse action of being "officially disqualified" from *American Idol* was reserved exclusively for Black contestants, and

more specifically Black male contestants.

1750.   As a statistical mater, the severe disparity between <u>15</u> publicized disqualifications of Black *American Idol* contestants vs. <u>0</u> publicized disqualifications of White (or non-black) *American Idol* contestants would be highly significant even if the contestant pool were divided down the middle at 50/50.  But Black contestants only comprised about 28% of the contestant pool. There can only be ONE explanation for this glaring disparity in the actual numbers of Black vs. White disqualifications: race.

1751.   Plaintiffs' status as African-American citizens was a determinative factor which motivated ENTERPRISE-DEFENDANTS to intentionally interfere with Plaintiffs' rights, benefits and privileges as an employee or employee applicant.

1752.   But for CRI-Plaintiffs' status as African-American citizens with a criminal arrest history, Plaintiffs would not have been publicly humiliated by ENTERPRISE-DEFENDANTS in connection with the *American Idol* Series.

1753.   Whether ENTERPRISE-DEFENDANTS were engaged in a conscious effort to perpetuate false stereotypes about African-Americans, or whether they simply targeted Black contestants for disqualification because they ascribed less value or consideration for the lives of such contestants, there is an obvious presence of racial *animus* behind such decisions.

1754.   The net effect of the ENTERPRISE-DEFENDANTS' conscious decision to promote Black contestant disqualifications while simultaneously avoiding taking adverse action against White contestants is a systemic deprivation of equal opportunity.

## (2)   CRIMINAL CONDUCT EXCLUSIONS

1755.   The background check procedures and written forms employed by the ENTERPRISE-DEFENDANTS to purportedly screen *American Idol* contestants did <u>not</u> comply with

the statutory mandates proscribed by federal and California law.  Black contestants suffered from disparate treatment as a result of ENTERPRISE-DEFENDANTS' statutory non-compliance.

1756.   ENTERPRISE-DEFENDANTS engaged in the unlawful policy and practice of criminal conduct exclusions that negatively affected the CRI-Plaintiffs.

1757.   Based on the statistical disparity in criminal conduct exclusions evidenced by the public record, there is probable cause to suspect that members of the prospective Class were disqualified "behind-the-scenes" (i.e., not publically) in a disproportionate amount relative to non-members of the Class who completed identical background question forms.

1758.   According to EEOC Enforcement Guidance 915.002, p. 8,

> **"For criminal conduct exclusions, relevant information includes the text of the policy or practice, associated documentation, and information about how the policy or practice was actually implemented." (EEOC, p. 25)**

1759.   ENTERPRISE-DEFENDANTS have maintained an unlawful policy or practice that excludes African-Americans from competing in the *American Idol* contest based on criminal arrest history obtained via the background check process.

1760.   As a pattern or practice of conducting its ordinary course of business, ENTERPRISE-DEFENDANTS utilized Plaintiffs' background information derived from ENTERPRISE-DEFENDANTS' (illegal) background check process to disqualify Plaintiffs.

1761.   African-American contestants were being subjected to a different criminal background check process than similarly situated White or non-Black *American Idol* contestants.

1762.   Racial discriminatory practices in the methods used to conduct background checks of Black *American Idol* contestants was the ENTERPRISE-DEFENDANTS' "standard operating procedure" from April 2002 through until at least January 25, 2013.

**(3)   ASSISTANCE IN RESOLVING OUTSTANDING PROCEEDINGS**

1763.   ENTERPRISE-DEFENDANTS have treated criminal history information of its White contestants is vastly disparate ways as compared to Black contestants. [CDC_007688].

1764.   Whenever a criminal background check revealed information of a pending case, ENTERPRISE-DEFENDANTS offered to help white *American Idol* Contestants resolve any outstanding matters, whether through criminal and traffic court proceedings or even commercial litigation.   Such assistance was offered to white or non-Black contestants in a disproportionate amount of cases relative to Black contestants whose background checks revealed pending cases.

1765.   In the case of the Brittenum Twins, the ENTERPRISE-DEFENDANTS affirmatively offered to help the Brittenum Twins clear up their outstanding legal matters.  But instead, agents of the ENTERPRISE-DEFENDANTS worked to carefully orchestrate a media scandal surrounding the Brittenums' supposed "fugitive" status.

1766.   The ten-year long pattern or practice of treating criminal history information differently for different contestants, depending on race, consisted of more than the mere occurrence of isolated, "accidental" or sporadic discriminatory acts.

**(4)   DISTRIBUTION OF CONFIDENTIAL INFORMATION TO PRESS**

1767.   From April 2002 through at least January 25, 2013, ENTERPRISE-DEFENDANTS engaged in an unlawful policy or practice of utilizing the criminal arrest information (and other confidential information) obtained from contestant background checks as a form of commercial advertising or promotional technique to draw audiences for the *American Idol* television program.

1768.   From April 2002 through until March 2012, it was the standard operating procedure for ENTERPRISE-DEFENDANTS to ONLY publicly condemn top-ranking Black *American Idol* Contestants.

1769.   ENTERPRISE-DEFENDANTS' engaged in an unlawful policy of humiliating Black *American Idol* Contestants through the dissemination of their confidential data to media outlets.

1770.   ENTERPRISE-DEFENDANTS' unfettered decision to stigmatize, vilify and humiliate Plaintiffs as *American Idol* contestants constituted an intentional and/or purposeful action on the part of ENTERPRISE-DEFENDANTS.

1771.   As a pattern or practice of conducting its ordinary course of business, ENTERPRISE-DEFENDANTS have once utilized a white comparators' background information derived from THE background check process to publicly disqualify a White (or non-Black) contestant from *American Idol.*

1772.   ENTERPRISE-DEFENDANTS' adverse action of utilizing Plaintiffs' background information derived from ENTERPRISE-DEFENDANTS' background check process to humiliate Plaintiffs via the tabloids constituted an interference with Plaintiffs' rights as an employee or an applicant for employment.

1773.   Through the unlawful procurement, public disclosure and commercial exploitation of their criminal arrest and/or expunged conviction information, ENTERPRISE-DEFENDANTS interfered with the CRI-Plaintiffs' rights as an employee or an applicant for employment.

## (5)   FAVORTISM IN SONG SELECTION

1774.   THE OVERSEER-DEFENDANTS supervised the daily operation of the program, including matters relating to song selection by the contestants.

1775.   The OVERSEER-DEFENDANTS routinely and consistently "pigeon-holed" Black contestants into selecting songs for the contest performance that Defendant WARWICK described as "genre-appropriate," which meant that WARWICK and LYTHGOE intentionally

excluded some Black contestants, including Plaintiff Joyner and Plaintiff Smalley, from performing musical compositions that were originally performed by white recording artists.

1776.  In contrast, White American Idol contestants were freely able to choose whatever song they preferred and were encouraged to select songs originally performed by Black recording artists (but not at the exclusion of the White contestants' ability to select songs originally performed by white recording artists).

## (6)   FAILURE TO ADOPT BEST PRACTICES

1777.  ENTERPRISE-DEFENDANTS have failed to train its managers, hire officials or guide its decision-makers with respect to the U.S. federal and state laws prohibiting discriminatory conduct in the workplace.

1778.  ENTERPRISE-DEFENDANTS have <u>failed to adhere to best employment practices for the course of the last decade</u> when:

(a)   considering criminal record information as a factor when making adverse decisions concerning ENTERPRISE-DEFENDANTS' conduct in the workplace.

(b)   complying with the law by implementing policies and procedures designed to prevent unlawful discrimination in the workplace.

(c)   promoting and/or sponsoring a purported *bona fide* contest under U.S. law.

(d)   developing a narrowly tailored written policy and procedure for screening applicants and employees for criminal conduct;

(e)   identifying essential job requirements and the actual circumstances under which the jobs are performed;

(f)   disclosing to prospective contestants (i.e., pre-Golden Ticket) the specific offenses that may demonstrate a Contestant's unfitness for performing the job required;

(g)   recording the justification for the policy and procedures implemented in connection with equal treatment of its Contestants;

(h)   recording consultations and research considered in crafting the background check

policy and procedures;

(i)     failing to adopt proper background check questions concerning criminal record inquiries;

(j)     failing to maintain employees' criminal records in a confidential manner;

(k)     failing to use Plaintiffs' criminal background information for the reason it was intended;

(l)     making the criminal arrest history of its featured Contestants one of the focal points of its commercial advertising for the program.

1779.   ENTERPRISE-DEFENDANTS could have used less discriminatory or alternative policies that would have enabled them to meet legitimate goals as effectively as the challenged practice.

## D.     ABSENCE OF JUSTIFICATION

## (1)    ARREST NOT JOB-RELATED

1780.   ENTERPRISE-DEFENDANTS maintained an unlawful practice or policy of making adverse employment decisions based on the arrest records of African-American contestants.

1781.   CRI-Plaintiffs' criminal arrest information was not in any way related to the Plaintiffs' ability to perform in the *American Idol* Contest.

1782.   The fact of an arrest does not establish that criminal conduct has occurred.[51] [CDC_007688]

1783.   Many arrests do not result in criminal charges, or the charges are dismissed. Even if an individual is charged and subsequently prosecuted, he is presumed innocent unless proven guilty. [CDC_007699]

---

[51] Schware v. Bd. of Bar Exam'rs, 353 U.S. 232, 241 (1957) ("The mere fact that a [person] has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct.")

1784.   The EEOC has recently echoed the U.S. Supreme Court's long-standing view on arrest status.  As per EEOC ENFORCEMENT GUIDANCE, No. 915.002 (4/25/2012):

> "The fact of an arrest does not establish that criminal conduct has occurred, and an exclusion based on an arrest, in itself, is not job related and consistent with business necessity."[52]

1785.   ENTERPRISE-DEFENDANTS' interference with Plaintiffs' rights based on an arrest (standing alone) is not job related and consistent with business necessity.  [CDC_007699]

1786.   Each of the Plaintiffs were entirely capable of performing as singers in the *American Idol* Contest, regardless of their arrest records.

1787.   All of the following highly celebrated, world famous Lead Singers have been (a) ranked in *Rolling Stone* Magazine's list of the "100 Greatest Singers"; and (b) *arrested by police* upon suspicion of criminal conduct:   FRANK SINATRA, ELVIS PRESLEY, MICHAEL JACKSON, JOHNNY CASH, JIM MORRISON, ARETHA FRANKLIN, JAMES BROWN, WILLIE NELSON, RAY CHARLES, BOB DYLAN, STEVIE WONDER, BRUCE SPRINGSTEEN, CHUCK BERRY, CARLOS SANTANA, BILLY JOEL, STEVEN TYLER, AXL ROSE, KURT COBAIN, LOUIS ARMSTRONG, WHITNEY HOUSTON, MARY J. BLIGE, JOE COCKER, DON HENLEY, DAVID CROSBY, BON SCOTT, PETE DOHERTY, SCOTT WEILAND, JERRY LEE LEWIS, WILSON PICKETT, BONNIE RAITT,  LITTLE RICHARD, SAM COOKE, ROD STEWART, JOHN LENNON, PAUL MCCARTNEY, MICK JAGGER, GEORGE HARRISON, GEORGE MICHAEL, BOY GEORGE, DAVID BOWIE, AMY WINEHOUSE, AND DAVID BOWIE.

1788.   Being arrested for suspected criminal conduct does nothing to impede a citizen's

---

[52] EEOC ENFORCEMENT GUIDANCE, No. 915.002, 4/25/2012 ("Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.") (p. 1); see also <u>Hamilton v. State</u>, 955 N.E.2d 723, 727 (Ind. 2011) (stating that arrests "do not, by themselves, establish the historical fact that a defendant committed a criminal offense").  3 Wigmore, EVIDENCE, § 980a (1940) (an arrest, by itself, is not considered competent evidence at either a criminal *or civil trial* to prove that a person did certain prohibited acts).

ability to becoming a world famous lead vocalist.

1789.  ENTERPRISE-DEFENDANTS cannot link the relevant Plaintiffs' alleged criminal conduct to the essential functions of competing to be the next *American Idol*; therefore, its policy or practice is NOT job related and consistent with business necessity.

1790.  Having found Plaintiffs ANDREWS, WILLIAMS, T. BRITTENUM, D. BRITTENUM and WATSON to be eligible to compete in *American Idol* and qualified on the basis of their individual singing merit, Defendants are constitutionally foreclosed from disqualifying such Plaintiffs simply because of a pending criminal case.

## (2)   "CASTING DECISIONS" ARE INAPPLICABLE TO BONA FIDE CONTESTS

1791.  ENTERPRISE-DEFENDANTS cannot reasonably rely on "Casting Decisions"[53] to justify its racially-motivated decisions to publicly disqualify Black – and only Black – contestants while championing White *American Idol* contestants who were similarly situated. This is because DEFENDANTS purport to operate a *bona fide* contest for a valuable prize.

1792.  ENTERPRISE-DEFENDANTS cannot on one hand advertise to U.S. consumers that the Judges or the Viewing audience has the power to decide who advances in the *American Idol* contest while on the other hand utilize some arbitrary set of "casting" considerations to make unfettered decisions about the fate of top-Ranking contestants.

1793.  By the time Plaintiffs were disqualified, they had already provided valuable consideration to compete for valuable prizes that had been advertised by Defendants.  Each Plaintiff had already met the published eligibility requirements, received a Golden Ticket, and had been rated by Judges and/or the voting public as qualified to compete on the basis of their singing talent.  If ENTERPRISE-DEFENDANTS somehow retained the right to simply disqualify or

---

[53] <u>Claybrooks v. ABC</u>, 2012 U.S. Dist. LEXIS 147884 (M.D. Tenn. Oct. 15, 2012)

advance whoever they wanted as part of "casting consideration," then such argument would constitute an admission that the *bona fide* contest depicted on American Idol is (and always was) a colossal hoax.

1794.   The American Idol Contestant Agreement certainly described the transaction as a bona fide contest.  For example:

**CONTEST LANGUAGE**

"I understand that *my appearance* on the Series, if any, *is strictly for the purpose of participating in the Series as a <u>contestant</u>.*" [AICA_02, ¶ F.2(c), p. 10]

"I hereby acknowledge that *I have voluntarily agreed* to *participate as a <u>contestant</u>* in the television series currently entitled "American Idol" (the "Series"). *In consideration of* and as an inducement to *American Idol* Productions, Inc. ("Producer") entering into this Contestant Agreement and Release (the "Agreement") and *further considering me as a <u>contestant</u>* on the Series…." [AICA_02, Recitals, p.1]

"1. <u>Nature of the Series: Availability</u>. I understand and acknowledge that the principal nature and purpose of the Series is to produce a television program in which *a <u>competition</u> will be conducted (the "<u>Competition</u>") to search for and select a music recording artist*." [AICA_02, ¶ 1]

1795.   The word "contestant" derives from the English-language dictionary and bears an ordinary and common meaning that is well-known to members of the American populace.  For sake of clarity, the word "contestant" is a noun as used in the relevant context and expressly defined by the leading English-language dictionaries as follows:

- one that participates in a <u>contest</u>.  MERRIAM-WEBSTER UNABRIDGED DICTIONARY (Encyclopedia Britannica Company 2012

- one taking part in a <u>contest</u>; a competitor.  THE AMERICAN HERITAGE® DICTIONARY OF THE ENGLISH LANGUAGE, FOURTH EDITION (Houghton Mifflin Company 2009)

- a person who takes part in a <u>contest</u>; competitor.  COLLINS ENGLISH DICTIONARY – COMPLETE AND UNABRIDGED (Harper Collins Publishers 2003)

- a person who takes part in a <u>contest</u> or competition.  RANDOM HOUSE KERNERMAN WEBSTER'S COLLEGE DICTIONARY (K Dictionaries Ltd. 2010)

1796.   The word "contest" is a noun as used in the relevant context and expressly defined by the leading English dictionaries as follows:

**- a competition in which each contestant performs without direct contact with or interference from competitors.** MERRIAM-WEBSTER UNABRIDGED DICTIONARY (Encyclopedia Britannica Company 2012)

**- a competition, especially one in which entrants perform separately and are rated by judges.** THE AMERICAN HERITAGE® DICTIONARY OF THE ENGLISH LANGUAGE, FOURTH EDITION (Houghton Mifflin Company 2009)

**- a formal game or match in which two or more people, teams, etc., compete and attempt to win.** COLLINS ENGLISH DICTIONARY – COMPLETE AND UNABRIDGED (Harper Collins Publishers 2003)

**- a competition between rivals, as for a prize.** RANDOM HOUSE KERNERMAN WEBSTER'S COLLEGE DICTIONARY (K Dictionaries Ltd. 2010)

1797.   Applying such elementary definitions of "contestant" and "contest" to this matter, Plaintiffs were individually solicited by Plaintiffs to enter into a "formal game or match" in which each Plaintiff was reasonably expected to "compete and attempt to win" through a singing "competition, especially one in which entrants "perform separately and are rated by judges," and "without direct contact with or interference from competitors" and in which each Claimant competed against "rivals, as for a prize."

1798.   The ordinary, common meaning of a "casting" is quite different than a "contest." For sake of clarity, the word "casting" is used in the relevant context and expressly defined by the leading English-language dictionaries as follows:

**- the set of actors in a dramatic production.** MERRIAM-WEBSTER UNABRIDGED DICTIONARY (Encyclopedia Britannica Company 2012)

**- the selection of actors or performers for the parts of a presentation.** THE AMERICAN HERITAGE® DICTIONARY OF THE ENGLISH LANGUAGE, FOURTH EDITION (Houghton Mifflin Company 2009)

**- (Performing Arts / Theatre) the choosing of actors for a production.** COLLINS ENGLISH DICTIONARY – COMPLETE AND UNABRIDGED (Harper Collins Publishers 2003)

**- the act or process of choosing actors for a play, movie, etc.** RANDOM HOUSE KERNERMAN WEBSTER'S COLLEGE DICTIONARY (K Dictionaries Ltd. 2010)

1799.   Applying the definition of "casting" to the matter here, the only segment of the *American Idol* season that could possibly be described as a "casting" would be the Open

Audition rounds where various sorts of decidedly meritless singers are used for comic effect. Such performers have been "cast" because the Overseer-Defendants already know they are not getting a Golden Ticket.

1800.   But once a Golden Ticket has been awarded to a prospective contestant, they have been deemed qualified to compete in American Idol by the Panel of Expert Judges and, therefore, they have become actual (rather than prospective) contestants.   At that point, the contest has begun.

## FUNDAMENTAL DISTINCTION
## b/w "CONTEST" and "CASTING"

| | "CONTEST" | "CASTING" |
|---|---|---|
| HarperCollins[54] Dictionary Definition | **"a formal game or match in which two or more people, teams, etc., compete and attempt to win."** | **"the choosing of actors for a production**." |
| Solicitors | Contest Promoters / Organizers | Television Directors / Producers |
| Participants | Contestants | Actors |
| Legal Status Of Participants | Volunteers | Employees |
| Economic Incentive to Participants | Prize Money | Wages / Salary / Benefits |
| Objective of Participants | To Win a Valuable Prize by Showcasing Individual Merit through Superior Performance in One's Chosen Field of Skill | To Play a Theatrical Role Acting as a Pre-Defined (Often) Fictional Character in a Scripted Teleplay |
| Production Type | *Bona Fide* Account of an Actual Event / Documentary | Dramatic Account of a Theatrical Work / Scripted Teleplay |
| Content | Non-Fictional, Historical, Literal, Matter-of-Fact, Truthful Depiction | Fictional, Fantastical, Imaginary, Non-Literal, False, Illusionary Depiction |
| Qualifications | Contestant Eligibility Requirements <u>Must</u> be Satisfied Before Contest Entry | Arbitrarily and Unilaterally Defined According to Pre-Determined, Scripted Role |
| Rules | Rules <u>Must</u> be Published Before Entering Contest and Apply Equally to Everyone | *Ad Hoc* Proclamations (NOT "Rules") |
| Selection Process | Democratic / Ranked by a Plurality | Autocratic / Chosen by an Elite Few |
| Final Determination | Rated by Judges and/or Voted by Public | Selected by Directors / Casted by Producers |
| Federal Protection to Participants | Consumer Laws; False Advertising | Employment Laws; Labor Unions / Guilds; Title VII |

---

[54] HarperCollins Publishing is owned by Bertlesmann SE & Co. KGaA, the same company that wholly owns and controls FremantleMedia North America, Inc., which is in turn the parent company of American Idol Productions, Inc. and sole owner of all USPTO-registered trademarks to the name *American Idol*.

# COUNT II

## VIOLATION OF CIVIL RIGHTS ACT (1866)

### 42 U.S.C. § 1981
### (INTERFERENCE W/ MAKING OF PRIZE CONTRACTS)

————

**Plaintiffs and Prospective Class Members Against**
PRODUCTION-DEFENDANTS + NETWORK-DEFENDANTS
("ENTERPRISE-DEFENDANTS")

1801.  Plaintiffs, each in their individual capacity and on behalf of their prospective

Class members, repeat and re-allege each and every allegation above as if set forth herein.

## A.    LEGAL ELEMENTS

### (1)    STATUTORY LANGUAGE

1802.  U.S.C. § 1981 ("Section 1981") provides for a "Statement of Equal Rights":

> (a) All persons within the jurisdiction of the United States shall have the same
> rights in every State and Territory to make and enforce contracts, to sue, be
> parties, give evidence, and to the full and equal benefit of all laws and
> proceedings for the security of persons and property as is enjoyed by white
> citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses,
> and exactions of every kind, and to no other.  **42 U.S.C. § 1981(a)**

1803.  Section 1981 was enacted as part of the Civil Rights Act of 1866 "to protect from

discrimination identifiable classes of persons who are subjected to intentional discrimination

because of their ancestry or ethnic characteristics."[55]

### (2)    PRIMA FACIE CASE

1804.  To establish a *prima facie* case of racial discrimination causing interference with a

---

[55] See, e.g., St. Francis Coll. v. Al–Khazraji, 481 U.S. 604, 609 (1987); Parker v. Metropolitan Tr. Auth., 97 F.Supp 2d 437 (S.D.N.Y. 2000); 42 U.S.C. § 1981.

contractual right under 42 U.S.C. § 1981, Plaintiffs must demonstrate that: (1) each plaintiff is a member of a protected class; (2) that the plaintiff has a contractual interest; (3) that defendant intentionally interfered with that contractual interest; (4) with the intent to discriminate on the basis of race.

## B.    MEMBERS OF PROTECTED CLASS

1805.   Plaintiffs named in this action are members of a protected class of U.S. citizen recognized by federal government as "African-American" or "Black."

1806.   As a member of a protected class of United States citizen, each Plaintiff is vested with a right as an employee or applicant for employment to be free from racial discrimination in the workplace.

1807.

## C.    PRIZE CONTRACTS (19 Entertainment)

1808.   ENTERPRISE-DEFENDANTS VIOLATED 42 U.S.C. § 1981 by refusing to extend to the individual Plaintiffs, and members of the prospective Class, the same opportunity to enter into the Prize Contracts that ENTERPRISE-DEFENDANTS extended to white *American Idol* Contestants who had a chance to compete on their merits.

## (1)    360 DEGREE CONTRACTS

1809.   The contracts at issue here contemplated the awarding of valuable contest prizes, including but not limited to the 19 ENTERTAINMENT Prize Contracts.[56]

1810.   At all relevant times, the ENTERPRISE-DEFENDANTS publicly advertised the

---

[56] For the purposes of Section 1981, common law determines what constitutes a contract. At common law, contract law governs the "contest sponsor-contestant" relationship.

Contest Prize for winning *American Idol* as a "Major-Label Record Deal", the most highly coveted type of commercial contract available to aspiring or semi-professional American recording artists, singer/songwriters, and/or lead vocalists.

1811.   This general reference to a "Major Label Record deal" was, in actuality, a voluminous series of "360 Degree Deal" contracts known herein as the 19 ENTERTAINMENT Prize Contracts.

## (2)   FAILURE TO DISCLOSE TERMS

1812.   Because DEFENDANTS purported to operate a *bona fide* contest for a valuable prize, ENTERPRISE-DEFENDANTS, they were required by both statutory law and regulation to present the terms and conditions of the 19 ENTERTAINMENT Prize Contracts to ALL Contestants before they agreed to sign a release and enter the official contest at Open Auditions stage.

1813.   However, rather than disclosing the full terms of the 19 ENTERTAINMENT Prize Contracts to prospective *American Idol* contestants at the time of entry, the ENTERPRISE-DEFENDANTS opted to conceal the terms and conditions of the 19 ENTERTAINMENT Prize Contracts until such time as the (purported) public voting system would begin selecting which contestant advanced.  By that point in the contest, the individual Contestants were unable to negotiate their terms through an independent counsel.  Moreover, they were instructed to sign the documents under threat of immediate disqualification.

1814.   Plaintiff Clark, Joyner and Golightly all signed the 19 ENTERTAINMENT Prize Contracts during their respective seasons.  None of them were represented by independent counsel at the time they executed the 19 ENTERTAINMENT Prize Contracts, which purported to be enforceable as against 19 ENTERTAIMENT (and the 19 affiliated companies) in the event that the offeror exercised an option on the contracts after the contest for that season concluded.

1815.  Upon information and belief, all of the Plaintiffs named in this action and prospective Class members would have been required to sign the 19 ENTERTAIMENT Prize Contracts upon reaching the Semi-Final Rounds had they not been unlawfully disqualified because of their race.

## D.   PRIZE CONTRACT (Implied in Fact or at Law)

1816.  In addition to (or lieu of) the 19 ENTERTAIMENT Prize Contracts, or whatever written contracts ENTERPRISE-DEFENDANTS may have presented to the Plaintiffs at any time regarding the contest prizes, the individual Plaintiffs and the prospective Class members each possessed a separate and divisible contractual (or quasi-contractual) interest in the *advertised prize* for becoming "the next American Idol."

## (1)   MUTUAL ASSENT

1817.  DEFENDANTS' market solicitation to U.S. consumers to enter DEFENDANTS' advertised contest at a specified time and place constituted an offer of a unilateral contract to each Plaintiff and prospective Class members.

1818.  The unilateral contract became mutually binding upon Plaintiffs and DEFENDANTS once the PRODUCTION-DEFENDANTS determined that Plaintiffs had met certain published eligibility requirements, namely age and U.S. residence conditions.

1819.  Plaintiffs' completion of the invited performance in accordance with the terms of the DEFENDANTS' published contest offer constituted acceptance of the DEFENDANTS' unilateral offer.[57]

1820.  As to each Plaintiff named herein, performance by the contest entrant of the act requested by the DEFENDANTS - which was to appear at the Open Auditions for *American Idol* at

---

[57]  RESTATEMENT (SECOND) OF CONTRACTS § 45

a specified time and place and perform for the panel of Expert Judges - <u>constituted an acceptance</u> <u>D</u><small>EFENDANTS</small>' <u>unilateral offer</u> to enter the *American Idol* talent contest.

1821. Each Plaintiff's acceptance of D<small>EFENDANTS</small>' unilateral offer to compete for the advertised Contest Prizes was manifested as of the time of their respective Open Auditions.

1822. Plaintiffs' appearances at their respective Open Auditions and Plaintiffs' rendering of their individual performances for the purpose of being evaluated by the *American Idol* Expert Judges formed a binding bilateral contract as between Plaintiffs and D<small>EFENDANTS</small>.

## (2)   V<small>ALUABLE</small> C<small>ONSIDERATION</small>

1823. Each Plaintiff's (and prospective Class member's) appearance and performance at their respective Open Auditions constituted a detriment to each Plaintiff.

1824. Each Plaintiff (and prospective class member) was required to change his position and course of conduct in order to secure their right to compete in the *American Idol* contest for a valuable prizes, benefits and privileges.

1825. Each Plaintiff (and prospective class member) was required to devote his personal time, creative energy and physical presence in order to secure their right to compete in the *American Idol* contest for valuable prizes, benefits and privileges.

1826. Each Plaintiff was required to perform talent services in the manner prescribed by D<small>EFENDANTS</small> and for the economic benefit of D<small>EFENDANTS</small> in exchange for the opportunity to compete and ultimately win valuable prizes, benefits and privileges.

## (3)   P<small>ROMISSORY</small> I<small>NTERESTS</small>

1827. From the date that each Plaintiff (and prospective Class member) was awarded a Golden Ticket to Hollywood, Plaintiffs were vested with a contractual interest and/or quasi-contractual interest and/or an expectancy interest and/or a promissory interest to redeem contest

prizes, benefits and privileges of substantial economic value.

1828.   From the date that each Plaintiff (and prospective class member) was awarded a Golden Ticket to Hollywood, Plaintiffs were vested with an interest - implied by law in every American contract - to be treated fairly and in good faith.

1829.   The prizes, benefits and privileges that were advertised by DEFENDANTS constituted a reasonably foreseeable economic benefit in exchange for Plaintiffs' participation in the *American Idol* Contest.

1830.   By appearing at Open Auditions in response to DEFENDANTS' market solicitations and by each Contestant rendering their performances in good faith and in exchange for the opportunity to compete in a talent contest that purported to be *bona fide*, Plaintiffs obtained the vested interest to redeem the full value of whatever prizes, benefits and privileges were offered to white *American Idol* contestants who were similarly situated (and permitted to compete on their merit).

1831.   At all relevant times, DEFENDANTS publicly advertised, marketed and promoted the Contest Prize for winning *American Idol* as the <u>tangible</u> fulfillment of the "*American Dream*."

1832.   ENTERPRISE-DEFENDANTS represented that winners of the advertised Contest Prize would be granted certain life-altering privileges and benefits embodied within and flowing from their winning the *American Idol* Contest.

1833.   At all relevant times, ENTERPRISE-DEFENDANTS publicly held out the previous winners of the *American Idol* Contest, most notably Kelly Clarkson (Season One) and Carrie Underwood (Season Four), as tangible fulfillment of the ENTERPRISE-DEFENDANTS' prize offer of the "*American Dream*" to prospective Golden Ticket holders

1834.   The tangible fulfillment of what the ENTERPRISE-DEFENDANTS have advertised as

the "*American Dream"* by virtue of winning the *American Idol* contest, as marketed through past contest winners such as Clarkson and Underwood, is subject to quantification with reasonable certainty.

## (4)   SATISFACTION OF CONDITIONS PRECEDENT

1835.   Each Plaintiff (and prospective Class member) fully complied with the ENTERPRISE-DEFENDANTS' contest eligibility requirements, as published by ENTERPRISE-ENTERPRISE-DEFENDANTS to U.S. consumers.

1836.   Each Plaintiff (and prospective Class member) was awarded a Golden Ticket to Hollywood by the Expert Judges on account of their individual merit as singers and performers.

1837.   Each Plaintiff (and prospective Class member) performed all steps necessary to act in compliance with the terms and conditions of the *American Idol* Contest as advertised to U.S. consumers.

1838.   Each Plaintiff (and prospective Class member) earned their right to compete in what purported to be a *bona fide* contest by virtue of their respective individual performances and unique talent as singers.

1839.   With the exception of Plaintiff Watson (whose Golden Ticket was unlawfully revoked before given the opportunity to compete for the Public Vote), each of the Plaintiffs named in this action ultimately became *American Idol* Semi-Finalists or Finalists who were professionally qualified by the panel of Expert Judges – based solely on their merit - to compete for the Public Vote.

1840.   In response to DEFENDANTS' market solicitation to enter their singing contest, Plaintiffs provided the requested consideration for redeeming the Contest Prize by making Plaintiffs' own special and unique talent services available for the economic benefit of the

DEFENDANTS.

## E.   COVENANT OF GOOD FAITH

## (1)   DUTY TO CONDUCT FAIR CONTEST

1841.   At all relevant times, DEFENDANTS publicly advertised the *American Idol* Contest to the U.S. public as a *bona fide* contest (or "competition") both in law and in fact and were therefore required by federal law, FCC regulations and common law to conduct the contest in good faith and consistent with the reasonable expectations of the solicited contestants.

1842.   By advertising American Idol as a *bona fide* contest for valuable prize in which Judges and the public vote would (purportedly) decide the outcome of the winner, ENTERPRISE-DEFENDANTS promised the Plaintiffs that their **talent** as singers and performers would be evaluated based on their **individual merit** as singers.

1843.   In other words, if a singer is adjudged *bona fide* by the Panel and the singer accepts the Golden Ticket to Hollywood, then the covenant of good faith and fair dealing attaches at that moment on and encompasses the whole transaction.   There is an expectancy interest: the Golden Ticket represents the right to compete at a professional level ("Hollywood"). Amateurs are the ones who don't get the Golden Ticket.

1844.   By entering into written contracts with Plaintiffs that purported to govern the terms and conditions of Plaintiffs' contest participation, ENTERPRISE-DEFENDANTS were required by law to conduct themselves at all times in good faith vis-à-vis Plaintiffs (and the prospective Class) in their capacity as *bona fide* contestants in-fact and at law.

1845.   Even if the written contracts presented by ENTERPRISE-DEFENDANTS are deemed void *ab initio*, Plaintiffs were at all times acting in good faith and acquired a proprietary, enforceable right to be treated by the contest promoter / contest sponsor in good faith upon being

awarded their respective Golden Tickets to Hollywood.

1846.   Plaintiffs' contractual or quasi-contractual right to be treated in good faith via their participation as contestants in the *American Idol* Contest is derived from: (a) executed written contracts; or (b) federal or state law; FCC regulations; or (c) acceptance of a unilateral contract by virtue of the Golden Ticket; or (d) reasonable expectations that necessarily arise via a sponsor-contestant relationship,

1847.   All decisions by the ENTERPRISE-DEFENDANTS concerning the application of *American Idol* contest rules were subject to ENTERPRISE-DEFENDANTS' absolute, sole and unfettered discretion.

1848.   At all relevant times, DEFENDANTS advertised to U.S. consumers that all *American Idol* Contestants, regardless of their race or ethnicity, would be competing for the same Contest Prizes based on the same published terms and conditions.

1849.   At all relevant times, Black *American Idol* Contestants were similarly situated to White and non-Black *American Idol* Contestants in the *American Idol* Contest because they were (purportedly) competing for the same Contest Prize based on the same published terms and conditions.

1850.   At all relevant times, the White Comparators identified in this Complaint were similarly situated to Plaintiffs.[58]

---

[58] According to EEOC Enforcement Guidance 915.002 (p. 8), *similarly situated comparators* are "individuals who are similar to the charging party in relevant respects, except for membership in the protected group. . . Comparators may include people in similar positions, former employees, and people chosen for a position over the charging party. The fact that a charging party was treated differently than individuals who are not in the charging party's protected group by, for example, being subjected to more or different criminal background checks or to different standards for evaluating criminal history, would be evidence of disparate treatment").

## F.    INTERFERENCE w/ CONTRACTUAL RIGHTS

1851.   At all relevant times, ENTERPRISE-DEFENDANTS' decision to disqualify Plaintiffs from the *American Idol* Contest constituted an intentional and/or purposeful action on the part of ENTERPRISE-DEFENDANTS.

1852.   ENTERPRISE-DEFENDANTS' unjustifiable act of disqualification constituted an intentional interference with Plaintiffs' contractual rights and vested interests to:

> (a) make and/or enforce contracts pursuant to Section 1981; and

> (b) enjoy all of the benefits and privileges derived from contracts

1853.   By virtue of the ENTERPRISE-DEFENDANTS' decision to disqualify each Plaintiff from the *American Idol* Contest, Plaintiffs were each deprived of the right to make and/or enforce a series of valuable contracts, namely the 19 ENTERTAINMENT Prize Contracts.

1854.   By virtue of ENTERPRISE-DEFENDANTS' decision to disqualify Plaintiffs from the *American Idol* Contest, Plaintiffs were each deprived of the right to compete for the *American Idol* Contest Prize(s), including but not limited to the tangible fulfillment of the "American Dream" as advertised by ENTERPRISE-DEFENDANTS' comparative reference to former *American Idol* Contestants.

1855.   By virtue of ENTERPRISE-DEFENDANTS' decision to disqualify Plaintiffs from the *American Idol* Contest, Plaintiffs were each deprived of the contractual expectancy to increase the value of their right to publicity via  participation in the *American Idol* Contest and Production.

1856.   By virtue of ENTERPRISE-DEFENDANTS' decision to disqualify Plaintiffs from the *American Idol* Contest, Plaintiffs were each deprived of their contractual right to capitalize from the ENTERPRISE-DEFENDANTS' commercial exploitation of Plaintiffs' respective copyright and authorship interests in their own performances, appearances and renditions via their participation

in the *American Idol* Contest and Production.

1857.   By virtue of ENTERPRISE-DEFENDANTS' decision to disqualify Plaintiffs from the *American Idol* Contest, Plaintiffs were each deprived of their contractual right to be treated in good faith and fair dealing via their participation in the *American Idol* Contest and Production.

1858.   ENTERPRISE-DEFENDANTS' adverse action of disqualification denied Plaintiffs the right to enjoy all of the benefits and privileges of their contractual relationship with ENTERPRISE-DEFENDANTS.

1859.   ENTERPRISE-DEFENDANTS altered a fundamental characteristic of the Plaintiffs' contractual interest(s) to redeem the Contest Prize(s) based on nothing more than the Plaintiffs' status as a young Black male.

1860.   But for Plaintiffs' status as African-American citizens, none of the Plaintiffs here would have been publicly disqualified from the *American Idol* Contest.   This is readily established by the public record fact that NO white or non-black *American Idol* Contestant was ever disqualified publicly from 2002-2013.

1861.   For the entire series run, it always remained the "standing operating procedure" of the ENTERPRISE-DEFENDANTS to routinely undermine the careers, hopes and dreams of innocent, well-meaning young Black recording artists who also wanted a fair and equal opportunity to live whatever version of the "American Dream" that DEFENDANTS were advertising.

# COUNT III

## VIOLATION OF CIVIL RIGHTS ACT (1866)

## 42 U.S.C. § 1981
### (CONSTRUCTIVE FRAUD / EQUITABLE TRUST)

———

### Plaintiffs and Prospective Class Members Against
PRODUCTION-DEFENDANTS + NETWORK-DEFENDANTS
("ENTERPRISE-DEFENDANTS")

1862.   Plaintiffs, each in their individual capacity and on behalf of their prospective Class members, repeat and re-allege each and every allegation above as if set forth herein.

## A.    LEGAL ELEMENTS

### (1)    STATUTORY LANGUAGE

1863.   U.S.C. § 1981 ("Section 1981") provides for a "Statement of Equal Rights":

> (a) All persons within the jurisdiction of the United States shall have the same rights in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.  **42 U.S.C. § 1981(a)**

1864.   Section 1981 was enacted as part of the Civil Rights Act of 1866 "to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination because of their ancestry or ethnic characteristics."[59]

### (2)    PRIMA FACIE CASE

1865.   To establish a *prima facie* case of racial discrimination causing interference with a

---

[59] See, e.g., St. Francis Coll. v. Al–Khazraji, 481 U.S. 604, 609 (1987); Parker v. Metropolitan Tr. Auth., 97 F.Supp 2d 437 (S.D.N.Y. 2000); 42 U.S.C. § 1981.

a citizen's enjoyment of their proprietary or statutory rights under 42 U.S.C. § 1981, Plaintiffs must demonstrate that: (1) each plaintiff is a member of a protected class; (2) that the plaintiff has a proprietary ownership or statutory interest; (3) that defendant intentionally interfered with that proprietary or statutory interest; (4) with the intent to discriminate on the basis of race.

## B.      MEMBERS OF PROTECTED CLASS

1866.  Plaintiffs named in this action are members of a protected class of U.S. citizen recognized by federal government as "African-American" or "Black."

## C.      OWNERSHIP RIGHTS

### (1)    COPYRIGHT INTERESTS

1867.  By virtue of the tangible fixation of the respective Plaintiffs' appearances, performances and creative renditions of pre-existing musical compositions, as embodied in the audio-visual works recorded by ENTERPRISE-DEFENDANTS, Plaintiffs acquired an authorship interest in their own individual performances and renditions.

1868.  In good faith reliance upon and in consideration for ENTERPRISE-DEFENDANTS' representations and purported contractual promises as set forth both expressly and implicitly in the AMERICAN IDOL CONTESTANT AGREEMENT, Plaintiffs purportedly conveyed, assigned and/or otherwise transferred their authorship and copyright ownership interests in said performances and renditions to ENTERPRISE-DEFENDANTS.

### (2)    RIGHTS TO PUBLICITY

1869.  Each Plaintiff is the true and rightful owner of his common law and/or state statutory rights to publicity, which represent a proprietary interest in each Plaintiff's own name,

image, persona, identity, voice, likeness and performance. As component of entering into the *American Idol* CONTESTANT AGREEMENT, each Plaintiff was required to convey their publicity rights to Defendants for an infinite period of duration.

1870. In the digital age of the worldwide internet, a U.S. citizen's name, identity, likeness, image, reputation, persona and public depiction can be irrevocably hijacked and expropriated for a capital enterprise's gain, resulting in the permanent, lifelong impairment of a U.S. citizen's valuable right to control his own identity.

1871. Plaintiffs were forced to involuntarily provide their special and unique talent services, and, without knowledge of any foreseeable consequences to their lifelong pursuit of liberty, irrevocably assign *against their free will* their respective state property interests in their names, images, likenesses and identities for the economic benefit of the ENTERPRISE-DEFENDANTS

## D.   MISAPPROPRIATION / CONVERSION

1872. ENTERPRISE-DEFENDANTS have violated Section 1981 by interfering with Plaintiffs' right to:

> **a.**   appropriating the publicity rights of Plaintiffs;
>
> **b.**   converting such publicity rights to their own beneficial use and enjoyment;
>
> **c.**   conveying such publicity rights to third parties for their own beneficial use;
>
> **d.**   claiming the right of ownership over the Plaintiffs' publicity rights;
>
> **e.**   altering the nature and/or essential character of Plaintiffs' publicity rights;
>
> **f.**   excluding the true owner of his right of ownership;
>
> **g.**   interfering with Plaintiffs' proprietary interest(s) to market the value of their

publicity rights via appearances <u>as singers</u> on the *American Idol* program.

    **h.** expropriating Plaintiffs' copyright and authorship interests in their own performances, appearances and renditions as recorded and archived by ENTERPRISE-DEFENDANTS and/or as featured in the *American Idol* Production.

# COUNT IV

## VIOLATION OF CIVIL RIGHTS ACT (1866)

### 42 U.S.C. § 1985(3)
### (DEPRIVATION OF CONSTITUTIONAL RIGHTS)
### [THIRTEENTH / FOURTEENTH AMENDMENT]

────

#### Plaintiffs  Clark, Smalley, Andrews, Williams, T. Brittenum, D. Brittenum, Watson Against
#### OVERSEER-DEFENDANTS

## A.   LEGAL ELEMENTS

## (1)   42 U.S.C. § 1985(3)

1873.   Section 1985(3) of the Civil Rights Act of 1866 provides as follows:

If two or more persons in any State or Territory conspire or go in disguise on the highway or on he premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

**(2)   ELEMENTS OF SECTION 1985(3)**

1874.   A plaintiff makes out a valid cause of action under § 1985(3) by demonstrating: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) the commission of an overt act in furtherance of the conspiracy; and (4) an injury to either person or property or a deprivation of any right or privilege of a United States citizen.[60]

1875.   Plaintiffs CLARK, ANDREWS, WILLIAMS, T. BRITTENUM, D. BRITTENUM, WATSON in their individual capacity repeat and re-allege each and every allegation above as if set forth herein.

**B.   CONSPIRACY**

**(1)   DEFINITION**

1876.   A conspiracy is  "[a] combination or confederacy between two or more persons formed for the purpose of committing, by their joint efforts, some unlawful or criminal act."[61]

**(2)   IDENTITY OF MEMBERS**

1877.   Plaintiffs identify Defendant LYTHGOE and Defendant WARWICK as members of the conspiracy under Section 1985(3).

**(3)   FORMULATION**

1878.   Defendant LYTHGOE and Defendant WARWICK are long-term collaborators on

---

[60] United Bhd. of Carpenters & Joiners v. Scott, 463 U.S. 825, 828-29, 103 S.Ct. 3352, 3355-56, 77 L.Ed.2d 1049 (1983); Spencer v. Casavilla, 903 F.2d 171, 174 (2d Cir.1990) ("[I]n order to state a claim under § 1985(3) a complaint must allege, inter alia, that the defendants who allegedly conspired sought, with discriminatory intent, to deprive the plaintiff of a right covered by the Constitution or other laws).

[61] BLACK'S LAW DICTIONARY 280 (5th ed. 1979).

various television productions and have reportedly been close friends since their grade school years.

1879.  Defendant LYTHGOE and Defendant WARWICK both worked together during the 2001 television production of *Pop Idol* in the United Kingdom, which was the precursor or "test pilot" to *American Idol.*

1880.  During the production of both *PopStars* and *Pop Idol* in the United Kingdom, and about 2.5 years before *American Idol* pronounced its first ever criminal record-related disqualification (Plaintiff ANDREWS), Defendant LYTGHOE was already making the criminal arrest records of London-based Reality TV show contestants an important feature, "creative component," or "production technique" of his style of Reality TV production (and promotion).

1881.  Upon information and belief, Defendant LYTHGOE and Defendant WARWICK formulated their confederacy in London, back in 2001, working together as co-producers during the initial production of Pop Stars U.K.  This show reportedly laid the foundation for the production and marketing techniques which were ultimately exported from London to Los Angeles in the Spring of 2002.

1882.  Upon arriving to their new home in Los Angeles, the OVERSEER-DEFENDANTS likely found a "kindred spirit" in FOX programming executive Mike DARNELL, who had already supervised the on-air disqualification scandal of an African-American couple from the 2001 show *Temptation Island, which invited a defamation lawsuit.*

1883.  During Season One of *American Idol*, the OVERSEER-DEFENDANTS "tested the waters" of their production techniques in the United States by publicly disqualifying a Black Semi-Finalist Contestant named Delano Cognolatti.   Although not a criminal records-related matter, the OVERSEER-DEFENDANTS consciously decided to confront Mr. Cognolatti on camera

to humiliate him before millions of viewers for allegedly misrepresenting (i.e., failing to disclose) his age.

## (4)   PURPOSE

1884.  The OVERSEER-DEFENDANTS formulated and carried out a conspiracy for the purpose of exploiting the criminal background records of *American Idol* Contestants as a form of:

a.  **RACIAL PROPAGANDA,** i.e., invidious commercial speech intending to indoctrinate target audiences with "lessons" about the "criminality" of young, Black males (who are exiled through public condemnation) as measured against the "youthful indiscretions" of White males (who are championed through redemption and led to "salvation," i.e., a Major record deal).

b.  **SCANDAL-MONGERING,** i.e., a pre-orchestrated and highly publicized incident that brings about disgrace, defamation of character, or offends the moral sensibilities of society.

c.  **COMMERCIAL ADVERTISING,** i.e., employing criminal record information as a "sure-fire" marketing technique designed to generate tons of free "hits" (i.e., media impressions) through write-ups in the entertainment news and tabloid press.

d.  **CROSS-MARKETING,** i.e. reaching out to target audiences who might not otherwise tune in to see a talent search show but are consumers of crime-related shows like "America's Most Wanted"

e.  **SHOCK EFFECT ON THE AUDIENCE,** i.e., the OVERSEER-DEFENDANTS create moments of suspense and dramatic tension in their audiences by introducing a

"criminal element" into what purports to be a "family-friendly" show.

   f.  **WICKED DEPRAVITY,** i.e., the OVERSEER-DEFENDANTS appear to relish their self-appointed roles as "executioners" of the hopes and dreams of young artists.

## (5)   METHODS

1885.   Criminal Background Information of *American Idol* Contestants is first obtained through proprietary written background check forms administered to all those Contestants who have earned a Golden Ticket to Hollywood.   The processing / office administration of these forms is handled by the PRODUCTION-DEFENDANTS, and more specifically FREMANTLE, which for the first ten seasons employed a paralegal named Amanda Chacon to handle the paperwork.

1886.   According to Ms. Chacon, once the completed background forms are received by her office at FREMANTLE / AIP, they are transmitted via Fedex directly to CARCO Group, Inc., a third-party investigator and background check company with principal office in New York.  The West Coast operator / partner of the company was originally known as MMI.

1887.   At all relevant times, a third-party investigator named Sharon Renee GIALLO supervised all aspects of the criminal background check process.   GIALLO ran computer-generated criminal background checks via CARCO's proprietary data aggregator.   Upon information and belief, GIALLO also ran computer-generated background checks through other "sources" on the West Coast.   If any pending criminal cases emerged from the CARCO background checks, then GIALLO would personally interface with local county clerks to obtain court documents through U.S. mail or via Fax.   Once GIALLO compiled her reports on certain contestants, she would then send written Investigative Report forms to Defendant FOX's internal legal department, specifically Minna TAYLOR, Esq. and  Marisa Fermin, Esq.  (2002-2005

only).

1888.   Upon information and belief, once TAYLOR was in possession of the CARCO reports, she communicated "noteworthy" or "red flag" information about Contestants to Defendant LYTHGOE and/or Defendant WARWICK.   At that point, the OVERSEER-DEFENDANTS were ostensibly free to utilize the contestant background information contained in the CARCO reports as they saw fit (despite the many statutory proscriptions against such conduct).

1889.   In some cases, such as with Plaintiff Clark, the Brittenum Twins and JXJ, their (then) pending criminal arrests and humiliating public disqualifications were scripted into the *American Idol* television program by LYTHGOE and WARWICK, who played out the drama as it unfolded in the tabloids and who thereafter promoted the scandals as a core part of the program's "behind-the-scenes" narrative.

## Statements by Warwick Indicating Knowledge of Background Checks

Defendant WARWICK told MTV News: **"This year [Season Three], for the first time ever, we screened all of the 117 that came through to Pasadena. Normally we only screen the final 32. Generally speaking, the whole process of screening these kids is a bit of a nightmare. Some of them are younger, so they're not on the normal registers you would check out."** [CDC_000827].  Warwick's statements were reiterated by the New York Post.  [CDC_000831]

"People are always going to tell lies, so you can't legislate for that until you find out. "But they sign a contract, and if they do that, they are in breach of contract." [CDC_000827].

MTV News: **"Warwick said *extensive criminal checks are done on the singers*, but the producers are "not judgmental at all."** [CDC_000828]

"If a girl's worked in a strip bar but she's a great singer, we don't care," he said. **"But if there is something that is seriously going to bring the show in disrepute, for any reason, it's up to the legal side of FOX and 19 [Entertainment, who produce the show]."** [CDC_000828]

April 28, 2005, Washington Post: **"Why would you want to endanger the success of the show by manipulating it? You only have to get caught once and the whole show becomes worthless,"** [CDC_000910]

Warwick has publicly stated that "**We've had accusations thrown at us since day one, everything from being racist** to having the phone lines fixed." [CDC_000831; CDC_000986]

On January 21, 2007, Daily News of Los Angeles reported that, with respect to the Open Auditions, "**Warwick claimed there isn't enough time to do background checks on contestants appearing in episodes to assess whether judges' behavior is inappropriate toward vulnerable participants.**" [CDC_001193]

During a taped segment, Jones was interviewed by "Idol" executive producers Ken Warwick and Nigel Lythgoe. Warwick told Jones **"you were incumbent to tell us the truth about all of this, and you haven't on any level."** [CDC_001457]

The fake names ultimately did in Jermaine, explained Ken Warwick, who is also an exec producer on the show. "**The big problem...was the fact that he had given false names,**" Warwick said. **"There might be other false names and other...charges that we just don't know about."** [Washington Post, CDC_001463]

## C.    DEPRIVATION OF CONSTITUTIONAL RIGHTS

1890.  Plaintiffs CLARK, ANDREWS, WILLIAMS, T. BRITTENUM, AND D. BRITTENUM were all publicly disqualified on account of PENDING criminal charges before any of them had a basic opportunity to answer the accusations through counsel, let alone face a trial by jury of their peers.

1891.  The respective arrest records of Plaintiffs CLARK, ANDREWS, WILLIAMS, T. BRITTENUM, AND D. BRITTENUM beared no relation whatsoever to their respective abilities to perform in what purported to be a *bona fide* singing contest for a valuable prize.

1892.  In deciding to take such adverse action against them whilst the government's charges against them remained unproven, hearsay accusations, LYTHGOE AND WARWICK intentionally deprived Plaintiffs CLARK, ANDREWS, WILLIAMS, T. BRITTENUM, AND D. BRITTENUM of their protected status under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution as <u>innocent citizens</u> until proven otherwise in a Court of competent jurisdiction.

1893.  Public-DQ-Plaintiffs Fid NOT sign up for *American Idol* to have their names, images and identities expropriated to serve as commercial propaganda for the OVERSEER-

DEFENDANTS' warped racial animus.

1894.  By exploiting their confidential and statutorily proscribed criminal record information as entertainment fodder to perpetuate negative stereotypes (as opposed to serving its intended governmental function to aid law enforcement officers in the discharge of their duties), the OVERSEER-DEFENDANTS' violated the Public-DQ-Plaintiffs' Thirteenth Amendment rights to be free from the "badges and incidents of slavery,"[62] which necessarily includes being individually and culturally liberated from the pernicious stereotype of being labeled a "criminal."

## D.   INJURY

1895.  OVERSEER-DEFENDANTS actively participated in the promotion, sponsorship and commercial exploitation of the *American Idol* Production and Contest featuring each of the named Plaintiffs in this Count.

1896.  With respect to each of Plaintiffs named in this Count, it was reasonably foreseeable to LYTHGOE and WARWICK at the time each Plaintiff was disqualified from the Contest for reasons other than their individual talent that each Plaintiff was possessed of a high statistical probability of claiming the #1 Prize in the *American Idol* televised contest.

1897.  OVERSEER-DEFENDANTS, collectively and individually, reaped substantial economic benefits from the worldwide commercial exploitation of named Plaintiffs' talent

---

[62]  See, e.g., Alexander Tsesis, THE THIRTEENTH AMENDMENT AND AMERICAN FREEDOM: A LEGAL HISTORY (2004) (arguing that scope of Thirteenth Amendment reaches beyond actual enslavement and has important implications for civil liberties); Akhil Reed Amar, *The Case of the Missing Amendments: R.A.V. v. City of St. Paul*, 106 HARV. L. REV. 124 (1992) (positing Thirteenth Amendment as constitutional basis for federal laws restricting hate speech); William M. Carter, Jr., *A Thirteenth Amendment Framework for Combating Racial Profiling*, 39 HARV. C.R.-C.L. L. REV. 17 (2004) (explaining that racial profiling is badge or incident of slavery in violation of Thirteenth Amendment); Petal Nevella Modeste, *Race Hate Speech: The Pervasive Badge of Slavery that Mocks the Thirteenth Amendment*, 44 HOW. L.J. 311 (2001) (arguing that Thirteenth Amendment provides grounds to prohibit racial hate speech).

services, unique voices, cultural heritage, family names, images, personal background, valuable identities and likenesses, including the commercial exploitation of Plaintiffs' unceremonious disqualifications and collateral media scandals;

1898.   OVERSEER-DEFENDANTS HAVE unjustly failed to compensate named Plaintiffs for the valuable economic benefits that they received and continue to receive in perpetuity, as a result of Plaintiffs' "casting" in the Production;

1899.   The failure of OVERSEER-DEFENDANTS to compensate named Plaintiffs for the valuable economic benefits they received as a result of Plaintiffs' participation in the Production was at all relevant times to the Plaintiffs' detriment.

1900.   It would be contrary to equity and good conscience for the OVERSEER-DEFENDANTS' to retain an economic benefit which has accrued to them at the expense of Plaintiffs.

1901.   As a direct and/or proximate result of OVERSEER-DEFENDANTS' systemic misconduct and fundamental misapprehension of the Constitutional rights of a protected class of U.S. citizen, Plaintiffs have been permanently and irrevocably damaged by the direct actions of OVERSEER-DEFENDANTS and are therefore entitled to recover an amount of damages and a measure of injunctive relief to be determined at trial.

# COUNT V

## RESCISSION

### STRIKING DOWN THE AMERICAN IDOL CONTESTANT AGREEMENT (AS VOID AB INITIO)

――

**Plaintiffs and Prospective Class Members Against**
DEFENDANTS

## A.   OVERVIEW

### (1)   AGREEMENT SUBJECT TO RESCISSION

1902.   *American Idol* CONTESTANT AGREEMENT is presented only to those contestants who have been awarded a Golden Ticket to Hollywood.

1903.   The contract is presented as a non-negotiable adhesion contract, under severe time restraints, and only AFTER Golden Ticket Holders have already: (a) performed services for the economic benefit of Defendants; (b) executed an Audition Agreement at the Open Audition phase; (c) been awarded a Golden Ticket to Hollywood after being qualified to enter the contest by a panel of Expert Judges with professional music industry experience.

1904.   Each of the named Plaintiffs in this action executed the *American Idol* CONTESTANT AGREEMENT during their respective seasons, and amendments thereto, and it is reasonable to conclude that all prospective class members executed the document (provided they participated in Hollywood Rounds).

### (2)   GROUNDS FOR RESCISSION

1905.   **STATUTORY.** THE *American Idol* CONTESTANT AGREEMENT is void *ab initio* and

must be struck down in its entirety because its <u>entire purpose</u> and <u>core transaction</u> violates 47 U.S.C. § 509, 47 C.F.R. § 73.1216; and Civ. Code § 1668.

1906.   **COMMON LAW.** THE *American Idol* CONTESTANT AGREEMENT is void *ab initio* and must be struck down in its entirety under the common law doctrines of illegality, fraud-in-factum, legal duty rule, illusory promise (lack of mutual assent), and substantive unconscionability.

## B.   ILLEGALITY [Cal. Civ. Code § 1667]

### (1)   STATUTORY LANGUAGE

1907.   Section 1667 of the California Civil Code ("Section 1667") provides that:

> **That is not lawful which is:  (1) contrary to an express provision of law;  (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals.[63]**

1908.   Under California law, contracts that are contrary to express statutes or to the policy of express statutes are illegal contracts. A determination of illegality, i.e., that a contract stands contrary to the express statutory provision of law, may void the entire contract.[64]   Whether a contract is illegal is a question of law to be determined from the circumstances of each particular case.[65]

### (2)   APPLICABILITY

1909.   Pursuant to the express terms of the *American Idol* CONTESTANT AGREEMENT:

> **This Agreement and all matters or issues collateral thereto shall be**

---

[63] Cal. Civ. Code § 1667

[64] <u>Mechanical Contractors Assn. v. Greater Bay Area Assn.</u>, 78 Cal.Rptr.2d 225, 66 Cal.App.4th 672 (App. 1 Dist. 1998) review denied, certiorari denied 119 S.Ct. 1759, 526 U.S. 1114, 143 L.Ed.2d 791.

[65] <u>Kashani v. Tsann Kuen China Enterprise Co., Ltd</u>. (App. 2 Dist. 2004) 13 Cal.Rptr.3d 174, 118 Cal.App.4th 531.

> **governed by the laws of the State of California applicable to contracts executed and performed entirely therein (regardless of the actual place of performance."  [AICA, v.2, ¶ G.8; CDC_000202]**

1910.   Accordingly, Section 1667 applies to matters concerning the enforceability of the *American Idol* CONTESTANT AGREEMENT.

1911.   Alternatively, if New York law applies by virtue of the Honorable Court's reading of all operative contracts at issue here (e.g., 19 ENTERTAINMENT Prize Contracts) as part of one transaction, then the law is substantially identical.[66]

## (3)   VIOLATIONS OF SECTION 1667

1912.   THE *American Idol* CONTESTANT AGREEMENT is void *ab initio* and must be struck down in its entirety because its entire purpose and core transaction violates 47 U.S.C. § 509, 47 C.F.R. § 73.1216; and Civ. Code § 1668.

## C.   RIGGED CONTEST [47 U.S.C. § 509][67]

## (1)   STATUTORY LANGUAGE

1913.   47 U.S.C. § 509 ("Section 509") of the Communications Act[68] provides as follows:

> **It is unlawful for any person, with intent to deceive the listening or**

---

[66] New York Courts have long recognized that agreements made in violation of law are unenforceable. See Benjamin v. Koeppel, 85 N.Y.2d 549, 626 N.Y.S.2d 982, 983, 650 N.E.2d 829, 830 (1995); Lloyd Capital Corp. v. Pat Henchar, Inc., 80 N.Y.2d 124, 589 N.Y.S.2d 396, 397, 603 N.E.2d 246, 247 (1992); 22 N.Y. Jur.2d CONTRACTS § 195 (1996) (stating that "[a]ny act, promise, or agreement designed or intended to accomplish the furtherance or effectuation of an unlawful purpose is unlawful, and every such promise or agreement is void and unenforceable.").

[67] See also 18 U.S.C.A. § 371, which proscribes a criminal conspiracy to engage in prohibited practices (i.e., rigging) regarding radio and television quiz shows.  Here, there were many various joint venture and partnership contracts in place between the various corporate defendants that would have required a coordinated effort and knowledge of the true facts.  However, do not herein allege a corporate conspiracy.

[68] See Communications Act Amendments of 1960, Pub. L. No. 86-752, § 9, 74 Stat. 889, 897 (codified as amended at 47 U.S.C. § 509 (2006)).

viewing public --

(1) **To supply to any contestant in a purportedly bona fide contest of intellectual knowledge or intellectual skill any special and secret assistance whereby the outcome of such contest will be in whole or in part prearranged or predetermined**

(2) **By means of persuasion, bribery, intimidation, or otherwise, to induce or cause any contestant in a purportedly bona fide contest of intellectual knowledge or intellectual skill to refrain in any manner from using or displaying his knowledge or skill in such contest, whereby the outcome thereof will be in whole or in part prearranged or predetermined.**

(3) **To engage in any artifice or scheme for the purpose of prearranging or predetermining in whole or in part the outcome of a purportedly bona fide contest of intellectual knowledge, intellectual skill, or chance.**

## (2) APPLICABILITY

1914. Section 509 applies to anyone involved in the production, broadcast, or offering a broadcast television program to consumers or licensees, as well as sponsors who knew or should have known that someone violated or plans to violate the statute.

1915. Accordingly, the proscriptions under Section 509 apply to ALL DEFENDANTS named in this action.

1916. Section 509 does not allow DEFENDANTS to exempt themselves from its coverage.

1917. DEFENDANTS acknowledge in the Agreement that:

**"[I]t is a federal offense punishable by fine and/or imprisonment for anyone to do anything which would rig or in any way influence the outcome of the [American Idol] Series with the intent to deceive the viewing public." [AICA, ¶F.2(j); CDC_000199]  (emphasis added)**

1918. While the contractual provision quoted in the preceding paragraph does not directly cite Section 509 expressly, its language can only be reasonably understood to refer to Section 509 because it references a federal, criminal statute that prohibits the rigging or influencing of an outcome concerning a contest that is telecast to the public.

1919.  By requiring Plaintiffs to contractually warrant their understanding of a federal statute that prohibits schemes or artifices to deceive the television viewing audience and/or affect the outcome of the contest, DEFENDANTS may not foreclose the applicability of Section 509 to the purported *bona fide* contest depicted by DEFENDANTS on the *American Idol* Production, from at least Season Two (2002) through Season Eleven (2012).

### (3)   PREDOMINANCE OF SKILL OR CHANCE

1920.  *American Idol* is televised on broadcast television, namely, through channel(s) owned and operated by the NETWORK-DEFENDANTS.

1921.  ENTERPRISE-DEFENDANTS bill, market, promote and/or advertise *American Idol* as a "contest" and/or "competition" characterized by a predominance of *chance*.[69]

1922.  ENTERPRISE-DEFENDANTS bill, market, promote and/or advertise *American Idol* as a contest characterized by a predominance of *skill*.

1923.  ENTERPRISE-DEFENDANTS bill, market, promote and/or advertise *American Idol* as a contest characterized by a predominance of *mixed chance* and *skill*.

1924.  ENTERPRISE-DEFENDANTS bill, market, promote and/or advertise *American Idol* as a contest featuring eligibility rules, participation rules, disqualification rules, winners, contestants, elimination methods, judges, standards of judging, audience voting and prizes.

1925.  *American Idol* Contestants, including Plaintiffs, deem the Production in which they participate to be a contest, game or competition in which there is an actual winner of a valuable prize.

1926.  The purported *American Idol* contest rewards Contestants with natural singing

---

[69] See also N.Y. PENAL LAW § 225.00(1) (2006) (defining "contest of chance" as a "game . . . in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein").

ability, trained singing ability, stage presence, an attractive physical appearance (more often than not), and intellectual skill or knowledge required to select songs and strategize one's position in the Contest relative to other Contestants.

1927.  Presuming the popular audience vote decides the winner, as ENTERPRISE-DEFENDANTS advertise, then the element of chance predominantly determines the outcome or winner of the *American Idol* Contest.

## (4)   VIOLATIONS OF SECTION 509

1928.  After awarding each Plaintiff a Golden Ticket to Hollywood, ENTERPRISE-DEFENDANTS presented each Plaintiff with a non-negotiable consumer contract representing on its face that the *American Idol* Contest was a *bona fide* contest under federal law that was in compliance with, or otherwise did not run afoul of 47 U.S.C. § 509.

1929.  At the time of execution of the *American Idol* CONTESTANT AGREEMENT with each of the named Plaintiffs, ENTERPRISE-DEFENDANTS knew that the *American Idol* Production was not a *bona fide* contest and knew that ENTERPRISE-DEFENDANTS would intentionally deceive the Contestants into believing they were participating in a *bona fide* contest.

1930.  At all times relevant hereto, ENTERPRISE-DEFENDANTS represented to the public that, subsequent to the selection of the Semi-Finalists, a Contestant's advancement through the Contest is determined solely by popular audience vote tabulated by ENTERPRISE-DEFENDANTS through a system of phone call logs, text messages and/or votes lodged on the internet ostensibly designed to ultimately determine the outcome of the contest.

1931.  At times relevant to this action, ENTERPRISE-DEFENDANTS, acting jointly and severally and with knowledge aforethought, intended to deceive the television viewing audience for *American Idol* through artifice directed at the outcome of the *American Idol* Contest.

1932.  ENTERPRISE-DEFENDANTS' purported to reserve unfettered contractual rights to disqualify *American Idol* Contestants - including any Semi-Finalists or Finalists who were purportedly subject to the public voting system - for any reason or at any time.   Such reservation of rights, on its face, vitiates the purpose of conducting a *bona fide* contest because if taken literally, the language squarely permits the ENTERPRISE-DEFENDANTS to change and/or control the outcome of the Contest during any season in which a contest disqualification is made.

1933.  At times relevant to this action, ENTERPRISE-DEFENDANTS utilized its absolute, unfettered right to carry out public disqualifications of top-ranking Black *American Idol* Contestants in a manner that necessarily affected the outcome of the Contest and/or a portion of the outcome of the Contest.

1934.  For example, the ENTERPRISE-DEFENDANTS' unfettered decisions to disqualify Frenchie Davis, a popular Semi-Finalist Contestant and Plaintiff CLARK, a Top 10 Finalist, clearly impacted the outcome of the Season Two winner.   Such arbitrary decisions are particularly suspect given that Expert Judge Simon Cowell predicted that both DAVIS and CLARK had a strong chance (1 out of 4) of winning Season Two of the *American Idol* Contest. ENTERPRISE-DEFENDANTS only decided to disqualify DAVIS and CLARK after Cowell made his predictions.

1935.  Given that both Frenchie DAVIS and Plaintiff CLARK were disqualified without any legal justification, as alleged herein, then such Season Two disqualifications constituted acts of deception on the part of ENTERPRISE-DEFENDANTS intended to limit the television audiences' selection of the ultimate purported winner (Ruben Studdard).

1936. Because ENTERPRISE-DEFENDANTS have failed to demonstrate a legitimate rationale for disqualifying any of the Plaintiffs named herein, then each decision on ENTERPRISE-

DEFENDANTS' part to extricate Plaintiffs from the *American Idol* Contest necessarily tainted the outcome of the Contest during the season in which such disqualification was made.

1937.  ENTERPRISE-DEFENDANTS' unfettered decision to disqualify Plaintiff ANDREWS, CLARK SMALLEY WILLIAMS T. BRITTENUM D. BRITTENUM DANIELS WATSON JOYNER, GOLIGHTLY without legal justification necessarily affected the outcome of the Contest and/or a portion of the outcome of the Contest in violation of Section 509.

1938.  Conversely, ENTERPRISE-DEFENDANTS' decision to refrain from disqualifying the identified White Comparators for their criminal arrest and conviction records impacted the contest's outcome in the year in which such White Comparator(s) were selected by ENTERPRISE-DEFENDANTS to advance.[70]

1939.  ENTERPRISE-DEFENDANTS' unfettered decision to refrain from disqualifying Scott SAVOL, Bo BICE, Bucky COVINGTON, Taylor HICKS, Stefano LANGONE, Casey JAMES, Matt LAWRENCE, and Amanda OVERMYER on the same terms and conditions as the named Plaintiffs necessarily affected the outcome of the Contest and/or a portion of the outcome of the Contest in violation of Section 509.

1940.  ENTERPRISE-DEFENDANTS' discriminatory policy of utilizing the private background information of Black *American Idol* Contestants as a means to decide which Semi-Finalist or Finalists would advance through the Contest (as opposed to utilizing the purported voting system) violates subdivision three of Section 509 as a scheme directed at predetermining

---

[70] See Podlas, Kimberlianne, *Primetime Crimes: Are Reality Television Programs "Illegal Contests" In Violation Of Federal La Introduction*, CARDOZO ARTS & ENTERTAINMENT LAW JOURNAL, Vol. 25, 141 ("When producers intervene to keep certain contestants on air, fail to enforce challenges for or against contestants, and decline to disqualify rule violators, it inures to the benefit of the protected contestant (and to the detriment of the player expelled prematurely). Additionally, since it alters which competitors advance, it impacts a portion of the contest's outcome.") [Note that Plaintiffs cite Podlas in connection with her statutory construction and reasonable interpretation of Section 509; but do not agree with all aspects of the author's factual analysis in the article].

some portion of the outcome.[71]

1941.  ENTERPRISE-DEFENDANTS' claim that contest disqualifications or eliminations depicted on the *American Idol* Contest were a function of "casting" for a Reality TV show rather than a function of conducting a *bona fide* contest evidences ENTERPRISE-DEFENDANTS' knowing violation of Section 509.

1942.  Given: (a) the absolute secrecy and lack of accountability or means to verify results generated by the "Public Voting System" propagated by  ENTERPRISE-DEFENDANTS; (b) ENTERPRISE-DEFENDANTS' purported contractual reservation of unfettered discretion to advance or disqualify any Contestants at will during any stage of the contest; and (c) experiential data that the Public Voting System is NOT used to determine the outcome of the Contest, it is beyond plausible that representations of the ENTERPRISE-DEFENDANTS to U.S. consumers concerning the function and utility of the Public Voting System are not based in objective fact.

## D.     FALSE ADVERTISING re: CONTEST [47 C.F.R. § 73.1216]

## (1)   REGULATORY LANGUAGE

1943.  Pursuant to regulations promulgated by the Federal Communications Commission (FCC), contests that are conducted by broadcast stations such as Defendant FOX are proscribed by statute.

1944.  Section 73.1216, entitled "Licensee-conducted contests" provides in full:

> **A licensee that broadcasts or advertises information about a contest it conducts shall fully and accurately disclose the material terms of the contest, and shall conduct the contest substantially as announced or advertised. No contest description shall be false, misleading or deceptive with respect to any material term.**

---

[71] Id. at 171 ("Section 509 does not require that a scheme (or assistance) designate the winner or final outcome; the statute only requires it to impact an, aspect of the outcome. Altering an elimination (thus altering the fates of two individuals) or immunizing a competitor until the finals, changes an aspect of the outcome."

**Note     1:     For     the     purposes     of     this     rule:**

**(a)   A contest is a scheme in which a prize is offered or awarded, based upon chance, diligence, knowledge or skill, to members of the public.**

**(b) Material terms include those factors which define the operation of the contest and which affect participation therein. Although the material terms may vary widely depending upon the exact nature of the contest, they will generally include: how to enter or participate; eligibility restrictions; entry deadline dates; whether prizes can be won; when prizes can be won; the extent, nature and value of prizes; basis for valuation of prizes; time and means of selection of winners; and/or tie-breaking procedures.**

**Note 2:**

**In general, the time and manner of disclosure of the material terms of a contest are within the licensee's discretion. However, the obligation to disclose the material terms arises at the time the audience is first told how to enter or participate and continues thereafter. The material terms should be disclosed periodically by announcements broadcast on the station conducting the contest, but need not be enumerated each time an announcement promoting the contest is broadcast. Disclosure of material terms in a reasonable number of announcements is sufficient. In addition to the required broadcast announcements, disclosure of the material terms may     be     made     in     a     non-broadcast     manner.**

**Note3:**

**This rule is not applicable to licensee-conducted contests not broadcast or advertised to the general public or to a substantial segment thereof, to contests in which the general public is not requested or permitted to participate, to the commercial advertisement of non-licensee-conducted contests, or to a contest conducted by a non-broadcast division of the licensee or by a non-broadcast company related to the licensee.**

## (2)   APPLICABILITY

1945.  Television broadcast stations operating in the United States, including NETWORK-DEFENDANTS, are subject to Part 73 of Title 47.

1946.  FCC Regulation 73.1216 is applicable to the purported *bona fide* contest depicted via the *American Idol* Production because the Contest is advertised to the general public as a

"contest" and "competition" featuring "contestants," "judges" and "winners."

1947.  DEFENDANTS solicit participants from the general public to compete in the Contest and offer an opportunity for contest entrants to win a valuable prize.  This offer is extended to any member of the general public who meets certain age and residency requirements.

1948.  The purported *bona fide* contest depicted on the *American Idol* Production is (or markets itself to U.S. consumers as) a "contest" within the meaning of Note 1(a) of FCC Regulation 73.1216 because it represents "a scheme in which a prize is offered or awarded, based upon chance, diligence, knowledge or skill, to members of the public."

1949.  At all times relevant to this proceeding, NETWORK-DEFENDANTS, acting jointly and severally with the other ENTERPRISE-DEFENDANTS, have conducted the purported *American Idol* Contest subject to the proscriptions of FCC Regulation 73.1216.

1950.  The Commission's own interpretation of FCC Regulation 73.12.16 mandates that FCC broadcast licensees must award the contest prizes that are announced to the general public.[72]

1951.  ENTERPRISE-DEFENDANTS' repeated, continuing violations of FCC Regulation 73.1216 constitute further grounds to vitiate the *American Idol* CONTESTANT AGREEMENT on the basis of illegality.

## (3)    VIOLATIONS OF SECTION 73.1216

1952.  ENTERPRISE-DEFENDANTS have willfully and repeatedly violated Section 73.1216 of the Commission's rules by broadcasting information about a contest without fully and accurately disclosing all of its material terms, i.e., those factors which define the operation of the contest and which affect a contestant's participation therein.

---

[72] 50 Fed. Reg. 19229, ¶¶ 50-51 (May 7, 1985) (FCC Memorandum Opinion and Order).

1953.  Note 2 of FCC Regulation 73.1216 provides that **"the obligation to disclose the material terms [of the contest] arises *at the time* the audience is first told how to enter or participate and continues thereafter."**

1954.  Therefore, consistent with Note 2 of FCC Regulation 73.1216, all material terms of the contest, i.e., "those factors which define the operation of the contest and which affect participation therein", <u>must</u> be disclosed to *American Idol* Contestants at the <u>Open Auditions</u> phase BEFORE auditioning for a Golden Ticket to Hollywood.

1955.  At all times relevant hereto, ENTERPRISE-DEFENDANTS violated FCC Regulation 73.1216 by:

    **a.**  failing to disclose the extent, nature and value of prizes awarded to *American Idol* Contest winners;

    **b.**  failing to disclose the basis for valuing prizes awarded to the *American Idol* winner;

    **c.**  failing to disclose to the general public information concerning the actual criteria utilized to select or advance the winners of the *American Idol* Contest;

    **d.**  failing to disclose to the general public the eligibility requirements to compete on *American Idol* with respect to criminal arrest or criminal conviction history;

    **e.**  failing to disclose contest rules or guidelines governing disqualifications.

1956.  With respect to each of the named Plaintiffs herein, ENTERPRISE-DEFENDANTS failed to disclose **all material terms of the contest**, i.e., "those factors which define the operation of the contest and which affect participation therein" at the time of their respective Open Auditions.

1957.  ENTERPRISE-DEFENDANTS' failure to provide each Plaintiff with the following

documents, among others, either before or at the time of contest entry (i.e., at the time of their

respective Open Auditions) constituted a direct violation of FCC Regulation 73.1216:

    (a)    AMERICAN IDOL CONTESTANT AGREEMENT

    (b)    ADDENDUM #1 TO THE AMERICAN IDOL CONTESTANT AGREEMENT

    (c)    ADDENDUM #2 TO THE AMERICAN IDOL CONTESTANT AGREEMENT

    (d)    PARTICIPANT BACKGROUND QUESTIONNAIRE

    (e)    19 ENTERTAINMENT PRIZE CONTRACTS

    (f)    EMPLOYMENT AGREEMENT

    (g)    AFTRA MEMBERSHIP FORMS

## E.    UNLAWFUL RELEASE [Cal. Civ. Code § 1668]

### (1)    STATUTORY LANGUAGE & PURPOSE

1958.  Section 1668 of the California Civil Code provides that:

> **All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.**[73]

1959.  Under California law, "contractual releases of future liability for fraud and other intentional wrongs are invariably invalidated."[74]

1960.  Pursuant to the express terms of the *American Idol* CONTESTANT AGREEMENT, the contract states that claims may be released based on information "whether now known or unknown, suspected or unsuspected, and whether or not concealed or hidden." The contract further states that:

---

[73] Cal. Civ.Code § 1668 (West 1999).

[74] McQuirck vs. Donnelley, 189 F.3rd 793, 797 (9th Cir.1999) (holding that §1668 invalidates the total release of future liability for intentional wrongs); citing *Farnham*, 70 Cal.Rptr.2d at 86.

> **"The Released Claims shall include, but not be limited to, those based on … <u>breach of any statutory or other duty of care owed under applicable laws,</u> <u>defamation,</u> <u>invasion of privacy,</u> publicity or personality, infringement of copyright, and those based on my possession or use of any prize." [Section E.3]**

1961.   Accordingly, Section 1668 applies to matters concerning the enforceability of the *American Idol* CONTESTANT AGREEMENT.

> **This Agreement and all matters or issues collateral thereto shall be governed by the laws of the State of California applicable to contracts executed and performed entirely therein (regardless of the actual place of performance). [AICA, v.2, ¶ G.8; CDC_000202]**

## (2)   VIOLATIONS OF SECTION 1668

1962.   The purported releases contained in the *American Idol* CONTESTANT AGREEMENT violate Section 1668 of the California Civil Code by attempting to shield ENTERPRISE-DEFENDANTS from liability for committing <u>intentional torts</u>.

1963.   Under California law, substantive claims for defamation, interference with business expectancy, outrage, and intentional infliction of emotional distress all constitute intentional wrongs.[75]

1964.   At all relevant times, under the express terms of the *American Idol* CONTESTANT AGREEMENT, ENTERPRISE-DEFENDANTS purported to secure the absolute and unfettered right to commit intentional tortious acts against any of the Plaintiffs at any time, for any reason or no reason at all.

1965.   Upon information and belief, the *American Idol* CONTESTANT AGREEMENT utilized by ENTERPRISE-DEFENDANTS in Season Three, Season Five, Season Six, and Season Seven are identical or substantially identical to the language employed in *American Idol*

---

[75] <u>See e.g.,</u> <u>Miller v. National Broad. Co.,</u> 187 Cal.App.3d 1463, 232 Cal.Rptr. 668, 681 (Ct.App.1986) (intentional infliction of emotional distress); <u>Ramona Manor Convalescent Hosp. v. Care Enters.,</u> 177 Cal.App.3d 1120, 225 Cal.Rptr. 120, 124 (Ct.App.1986) (intentional interference with prospective economic advantage); 5 B.E. Witkin, SUMMARY OF CALIF. LAW, Torts, § 471, at 558 (9th ed.1988) (defamation).

CONTESTANT AGREEMENT for Season Two, Season Eight and Season Nine.

1966.  Public-DQ-Plaintiffs were permanently defamed and vilified by the OVERSEER-DEFENDANTS in connection with the Overseers' unilateral decision to cast them as "criminals" and "liars" as a means to propagate their own racial *animus*.

1967.  Public-DQ-Plaintiffs signed up for *American Idol* Contest during its "Golden Years" to further their music careers and to WIN the valuable prizes as advertised.  They were not there on the world stage, in front of friends and family who cared about their hopes and dreams, to become commercial advertisements for the OVERSEER-DEFENDANTS' medieval concepts about racial hierarchy.

1968.  CRI-Plaintiffs' criminal arrest history was unlawfully obtained by ENTERPRISE-DEFENDANTS through federal and state-regulated background checks.  It was not within the reasonable expectations of the CRI-Plaintiffs at the time of entering the contest that their (largely) misdemeanor charges would become lifetime badges of criminality and dishonor, not only to themselves, but to their families and children.[76]

## F.    ILLUSORY CONTRACT (Common Law)

1969.  *American Idol* CONTESTANT AGREEMENT is or purports to be a <u>bilateral</u> contract.

1970.  Under the terms of the *American Idol* CONTESTANT AGREEMENT, Plaintiffs were and/or continue to be bound to perform talent services on behalf of ENTERPRISE-DEFENDANTS and/or grant ownership rights to ENTERPRISE-DEFENDANTS.

1971.  Under the express terms of the *American Idol* CONTESTANT AGREEMENT, Plaintiffs irrevocably granted their valuable rights of publicity and copyright ownership interests

---

[76] Compare <u>Paralift, Inc. v. Superior Court</u>, 29 Cal.Rptr.2d 177, 23 Cal.App.4th 748 (App. 4 Dist. 1993) (contractual release was sufficiently broad that nature of jump which resulted in skydiver's death was within reasonable expectations of parties).

to ENTERPRISE-DEFENDANTS, among other proprietary and intellectual property rights.

1972.  ENTERPRISE-DEFENDANTS continue to exercise dominion and control over the proprietary rights and copyright ownership interests purportedly granted to ENTERPRISE-DEFENDANTS by virtue of the *American Idol* CONTESTANT AGREEMENT.

1973.  Under the express terms of the *American Idol* CONTESTANT AGREEMENT, ENTERPRISE-DEFENDANTS did NOT make any kind of commitment to perform any obligation or duty.

1974.  ENTERPRISE-DEFENDANTS did NOT set forth any promises in the *American Idol* CONTESTANT AGREEMENT which, at the time the document was executed, would have actually come to limit ENTERPRISE-DEFENDANTS' future options.

1975.  Upon its execution, *American Idol* CONTESTANT AGREEMENT did not restrain ENTERPRISE-DEFENDANTS to act in any manner other than consistent with its own unfettered discretion.

1976.  Upon its execution*, American Idol* CONTESTANT AGREEMENT did not compel ENTERPRISE-DEFENDANTS to act in any manner other than in their own best interests.

1977.  Under the express terms of the *American Idol* CONTESTANT AGREEMENT ENTERPRISE-DEFENDANTS can do anything they want or absolutely nothing at all vis-à-vis any of the Plaintiffs.  For example:

> **Producer's Right to Suspend or Terminate this Agreement**.  *Producer shall have the right to terminate this Agreement if Producer determines, in Producer's sole and absolute discretion*, that Producer desires to terminate my participation in connection with the Series, or if the series is canceled or the Series format is materially altered." [AICA_02, ¶ G.1 Pg. 12]

1978.  ENTERPRISE-DEFENDANTS are NOT bound to perform any promise set forth in the *American Idol* CONTESTANT AGREEMENT.

1979.   ENTERPRISE-DEFENDANTS were NEVER bound to perform any promise set forth in *American Idol* CONTESTANT AGREEMENT above and beyond what they had already promised when each Plaintiff was awarded a Golden Ticket to Hollywood.

1980.   At all relevant times, under the express terms of the *American Idol* CONTESTANT AGREEMENT, ENTERPRISE-DEFENDANTS purported to secure the absolute and unfettered right to terminate the *American Idol* CONTESTANT AGREEMENT at any time, for any reason or no reason at all.

1981.   Under the express terms of the *American Idol* CONTESTANT AGREEMENT, ENTERPRISE-DEFENDANTS are not required to provide Plaintiffs any notice in the event they decide to terminate the *American Idol* CONTESTANT AGREEMENT.

## G.    LEGAL DUTY RULE (Common Law)

1982.   Under the terms of the *American Idol* CONTESTANT AGREEMENT, at the time of the signing of the contract, the ENTERPRISE-DEFENDANTS purport to promise to do what ENTERPRISE-DEFENDANTS were already legally obligated to do, namely, to adjudge each Plaintiff on the basis of their performance merit for advancement through the *American Idol* Contest, and in furtherance of their representations that *American Idol* was a *bona fide* contest for a valuable prize where the outcome would be determined by a Voting Public.

1983.   *The American Idol* CONTESTANT AGREEMENT, pursuant to its own express terms, does not require ENTERPRISE-DEFENDANTS to perform any new duty or obligation whatsoever above and beyond permitting Plaintiff to remain in the contest (which was a contest they were already deemed qualified to enter).

## H.    FRAUD IN FACTUM (Common Law)

1984.  By entering the *American Idol* Contest upon the solicitation of the ENTERPRISE-DEFENDANTS, Plaintiffs received something very different from what they contracted for.  As young adults and talented singers who had received encouragement throughout their young lives to pursue their careers in music, *American Idol* (at the times relevant to this action) represented a new kind of opportunity in the music industry to achieve success with a measure of career longevity.

1985.  Plaintiffs believed that they were entering the Contest to further their careers in music, and the best way of doing that, naturally, was to enter the Contest with an intention to WIN.

1986.  Had Plaintiffs known the true facts characterizing the *American Idol* Contest depicted on television, which was (and continues to be) advertised as a *bona fide* contest in fact and at law but, which in actuality, operates as a scripted "casting" where the character roles and winners are ultimately determined by the OVERSEER-DEFENDANTS, Plaintiffs would NEVER have accepted the solicitation to enter into the *American Idol* Contest.

1987.  Had Plaintiffs known the true facts characterizing the bad faith undertaking of the OVERSEER-DEFENDANTS in conducting what amounts to a colossal hoax, Plaintiffs would NEVER have accepted the solicitation to enter into the *American Idol* Contest.

1988.  Had CRI-Plaintiffs known the true facts characterizing the unlawful use and dissemination of their criminal arrest history, CRI-Plaintiffs NEVER would have accepted the solicitation to enter into the *American Idol* Contest.

1989.  Plaintiffs received something entirely different than what they bargained for.

1990.  In the popular vernacular of the MTV generation, Plaintiffs "got Punked." But

there was never any punchline or comic relief that enabled them to walk away from their nightmare situation.  In the age of the ubiquitous internet and the Courts' majority adoption of the highly unjust "single publication" rule, there is nowhere to run and nowhere to hide.

1991.  For the Public-DQ-Plaintiffs, the "Idol Experience" follows them everywhere: within five seconds any prospective employer or new acquaintance can punch up their misdemeanor mug shots, some now dating over ten years. Anyone at any moment can read all about their unceremonious discharge and the false justifications proffered by the OVERSEER-DEFENDANTS in furtherance of their invidious racial *animus*.

1992.  Plaintiffs were misled into signing the *American Idol* CONTESTANT AGREEMENT without knowing or understanding its nature, contents or consequences. Defendants' misrepresentations concerning the *American Idol* Contest as a *bona fide* contest for a valuable prize, which was by its own contractual terms subject to federal regulation and criminal statutory law, must be regarded as going to the very character of the proposed contract itself.  E.A. Farnsworth, *Contracts* § 4.10 (1990).  If this talent show was simply meant to be a "casting" for scripted roles and predetermined storylines that were obviously NOT disclosed to any of the Plaintiffs, then the contest promoter /sponsors needed to disclose that fact to avoid rescission.

1993.   None of the Plaintiffs had a reasonable opportunity to be informed of what exactly they were signing.  First, the "Reality TV Contest" was a new, untested paradigm. Second, the drafters of this agreement knew that the "Reality TV Contest" was a new, untested paradigm and leveraged that experimental quality to engage in psychedelic drafting techniques.

1994.  The *American Idol* CONTESTANT AGREEMENT carries on the theme of the "Golden Ticket" and the ominous, illegible contract presented to the children at the gateway of the "Willy Wonka" chocolate factory.  Like the fantasical depiction of the visually warped contractual

language in the famed 1971 movie, the *American Idol* CONTESTANT AGREEMENT strains all levels of comprehension for those who have endeavored to decipher its labyrinth of conflicting provisions.[77]

1995.   Reality TV producers dealt with business on a regular basis as the owner of the production company. Plaintiffs, in contrast, were teenagers or early twenty-somethings who did not regularly conduct business in the world of Reality TV contests, nor would ordinarily be involved in interpreting and signing contracts that conflates the various rights and obligations exchanged by grantors of rights, "volunteer" contestants and employees.

1996.   As a result of DEFENDANTS' misrepresentation of the character and essential terms of the *American Idol* CONTESTANT AGREEMENT, assent to the contract is impossible.  In such a case there is no contract at all.  RESTATEMENT (SECOND) OF CONTRACTS § 163, comment a (1977).

1997.   Because Plaintiffs were induced to sign an instrument of a completely different nature and/or essential character than what each Plaintiff was led to believe was before him, there was no meeting of the minds to render the contract enforceable.

1998.   ENTERPRISE-DEFENDANTS have at all times failed to inform Plaintiffs of the true nature of the Contest, which is a scripted "casting", nor did they ever disclose the essential terms of the purported talent contest, the valuable prize to be awarded for being adjudicated or voted winner.  Further, they intentionally concealed the Plaintiffs' legal employment status under law, among other critical failures of required disclosures.

1999.   ENTERPRISE-DEFENDANTS' intentional concealment of the basic elements of the

---

[77] "Don't talk to me about contracts, Wonka; I use 'em myself -- they're strictly for suckers." - Mr. Beauregarde, Violet's car salesman father [*Willy Wonka & the Chocolate Factory* (1971)]

Transaction were of such core, fundamental importance that the fraud rendered as an *involuntary* act each Plaintiff's forfeiture of their valuable property and inalienable rights – on a permanent worldwide basis - to the great detriment of the Plaintiffs and to the beneficial gains of the ENTERPRISE-DEFENDANTS.

2000.   As a direct result of the Defendants' misrepresentations about the bona fide nature of their commercially advertised "contest," the *American Idol* CONTESTANT AGREEMENT (and all Addendums thereto) must be struck down as void *ab initio* under the common law theory of fraud in the factum.

2001.   The formation, object, nature, character and function of the *American Idol* CONTESTANT AGREEMENT  is so iniquitous, against the Law of the Land and contrary to public policy that, in the furtherance of justice the Honorable Court should strike it down in its entirety as VOID *AB INITIO*.

# COUNT VI

## UNJUST ENRICHMENT

———

**Plaintiffs Against**
SPONSOR-DEFENDANTS

2002.  Plaintiffs were possessed of a reasonable expectation at the time they entered DEFENDANTS' advertised singing contest that they would be afforded the fair and equal opportunity to compete for a valuable prize of monetary value.

2003.  Plaintiffs were possessed of a reasonable expectation at the time they entered DEFENDANTS' advertised singing contest that their talent as singers and performers would be evaluated by the Judges and appraised by the Public based on their individual merit as singers and performers.

2004.  Through their wrongful, public and private disqualifications from the *American Idol* contest for reasons other than their individual merit as singers and performers, DEFENDANTS deprived Plaintiffs of their reasonable expectations.

2005.  With respect to each of Plaintiffs, it was reasonably foreseeable to SPONSOR-DEFENDANTS, as third party beneficiaries and contest sponsors, at the time each Plaintiff was disqualified from the contest for reasons other than their individual talent that each Plaintiff was possessed of a high statistical probability of winning the #1 prize in the *American Idol* televised contest.

2006.  It would be contrary to equity and good conscience for the SPONSOR-DEFENDANTS to retain an economic benefit which has accrued to them at the expense of Plaintiffs.

2007.  SPONSOR-DEFENDANTS were each individually listed as third-party beneficiaries to the *American Idol* Contestant Agreement and otherwise actively participated in the promotion, sponsorship and commercial exploitation of the *American Idol* Production featuring each of Plaintiffs.

2008.  SPONSOR- DEFENDANTS benefitted from the commercial exploitation of Plaintiffs' respective talent services, voices, names, images, identities and likenesses, as well as from commercial exploitation of Public-DQ-Plaintiffs' respective disqualifications and surrounding media scandals;

2009.  SPONSOR-DEFENDANTS unjustly failed to compensate Plaintiffs for the valuable economic benefits the SPONSOR-DEFENDANTS received as a result of Plaintiffs' participation in the Production.

2010.  The failure of the SPONSOR-DEFENDANTS to compensate Plaintiffs for the valuable economic benefits the Sponsor-DEFENDANTS received as a result of Plaintiffs' participation in the *American Idol* Contest and Production was to the Plaintiffs' detriment.

# PRAYER FOR RELIEF

## COUNT I: 42 U.S.C. § 1981 (Employment Discrimination)

◆ Plaintiffs respectfully seek **injunctive relief** from the Honorable Court to remedy the past employment practices of ENTERPRISE-DEFENDANTS and to prevent such unlawful practices from continuing into the future:

(1) prohibiting the ENTERPRISE-DEFENDANTS from engaging in any act or practice that has the purpose or effect of ascribing the "criminal" label to an African-American television performer featured in what purports to be an "unscripted" Reality TV show;

(2) requiring ENTERPRISE-DEFENDANTS to adopt <u>and</u> publish clearly worded contest rules and regulations (i.e., that an ordinary high school student could understand) which govern a contestant's participation in *American Idol*, or any Reality TV show program distributed in the United States that features a purported *bona fide* contest for a prize.

(3) requiring that ENTERPRISE-DEFENDANTS make their disqualification or elimination decisions about *bona fide* contestants without regard to the contestant's ancestral characteristics;

(4) requiring that ENTERPRISE-DEFENDANTS utilize an objective, job-related and racially-neutral standard to make disqualification decisions about *any* television contestant featured on Defendants' programs;

(5) prohibiting the ENTERPRISE-DEFENDANTS from taking adverse action against any Reality TV contestant on the basis of a *pending* criminal arrest without proper business justification and <u>not</u> before a formal investigation is conducted by a third party investigator who shall be required to memorialize the investigative results and recommendations in a sworn affidavit;

(6) prohibiting the ENTERPRISE-DEFENDANTS from *publicly* disqualifying or purposefully denigrating a Black *American Idol* contestant on the basis of their:

   (a) criminal arrest history (whether pending or resolved);
   (b) background check  / interview process;

(7) requiring each of the PRODUCTION-DEFENDANTS and NETWORK-DEFENDANTS to retain a director of diversity management who would be principally responsible to ensure that the PRODUCTION-DEFENDANTS and NETWORK-DEFENDANTS comply with the terms of the injunction, and the hiring of whom would be subject to comment by the Plaintiffs and Court approval;

<u>COUNT II</u>: 42 U.S.C. § 1981 (Interference with Making of Prize Contracts)

◆   As a direct and/or proximate cause of DEFENDANTS' unlawful interference with Plaintiff's active participation in a purported *bona fide* contest for valuable prize, Plaintiffs seek **compensatory damages** for their economic injuries, lost business opportunity and/or loss of earning potential caused by DEFENDANTS, who intentionally interfered with each Plaintiffs' making and enforcing of his contractual rights and/or quasi-contractual / promissory interests, and who should be held jointly and severally liable to compensate each Plaintiff in an amount to be determined at trial, but estimated to be no less than $25 million ($25,000,000) per Plaintiff plus costs, interest and a reasonable attorney's fee.

<u>COUNT III</u>:  42 U.S.C. § 1981 (Constructive Fraud / Equitable Trust)

◆ [Equivalent Relief as <u>Count V</u>]

<u>COUNT IV</u>:  42 U.S.C. § 1985(3) (Deprivation of Constitutional Rights)

◆   As a direct and/or proximate result of OVERSEER-DEFENDANTS' intentional deprivation of rights, privileges and benefits granted to a protected class of U.S. citizen by the Thirteenth and Fourteenth Amendments to the U.S. Constitution, named Plaintiffs in this Count have been irrevocably damaged by the extreme misconduct of OVERSEER-DEFENDANTS and are therefore entitled to recover an amount of compensatory, general and punitive damages, in an amount to be determined at trial of their peers, plus costs, interests and a reasonable attorney's fees.

<u>COUNT V</u>:  RESCISSION (Various Grounds)

◆ Each Plaintiff seeks a complete **revocation** and undivided **restoration** of any and all grant(s) of ownership rights, proprietary interests, publicity rights, credit attributions and intellectual property licenses or materials that DEFENDANTS purported to acquire, claim to possess and/or may attempt to obtain from each Plaintiff pursuant to the *American Idol* CONTESTANT AGREEMENT (as amended), or any other document or purported agreement related to the subject transaction.

◆   Each Plaintiff seeks a **declaration** of his federal copyright ownership (or joint ownership) interest pursuant to the U.S. Copyright Act of 1976 in all "audiovisual works" or "motion pictures" – whether in tangible or digital "media" now known or hereafter devised - embodying each Plaintiff's name, voice, image, likeness, performances, personal identity, appearances and/or original works relating to his filmed participation on *American Idol*, regardless of whether such footage was published or broadcast.

◆   In furtherance of a declaration of federal copyright ownership and/or revocation of a grant of rights to such ownership, Plaintiff seeks **specific performance** as to any and all audio-visual, motion picture, photographic, graphic and written promotional materials, as fixed in digital format, that are currently in possession, custody or control of any of the named Defendants in this action, and which contain or embody any and ALL of each Plaintiff's filmed performances or which otherwise feature his voice, image, likeness, personal identity, or appearances, whether on-stage, back stage or in any area whatsoever where he may appear at any time during his

participation with the *American Idol* Production and Contest.

◆  Plaintiff seeks **restitutionary disgorgement** of any and all profits generated by DEFENDANTS, jointly and severally, from the unauthorized commercial exploitation of each Plaintiff's respective copyright ownership interests and publicity rights, which were obtained by *Defendants* under fraudulent pretenses and in bad faith, in an amount to be determined at trial plus an award of general damages, punitive damages, interest, costs, and a reasonable attorney's fee.

## COUNT VI: UNJUST ENRICHMENT (Sponsor-Defendants Only)

As third party beneficiaries, contractual assignees of Plaintiffs' valuable rights, and on account of their active, decision-making role as "marquee" contest sponsors of the *American Idol* Contest, the SPONSOR-DEFENDANTS must compensate Plaintiffs for the valuable economic benefits the SPONSOR-DEFENDANTS received as a direct or proximate result of Plaintiffs' participation in the *American Idol* Contest and Production.


Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby respectfully demands a trial by jury of all issues triable of right by a jury.


Dated: July 24, 2013
New York, New York

**RESPECTFULLY SUBMITTED**

*James H. Freeman*

James H. Freeman, Esq.

JH FREEMAN LAW
3 Columbus Circle, 15 FL
New York, NY 10019
Telephone: (212) 931-8535
james@jhfreemanlaw.com

*Attorneys for Plaintiffs*
*Jaered N. Andrews, Corey D. Clark,*
*Donnie Williams, Terrell Brittenum,*
*Derrell Brittenum, Akron Watson,*
*Thomas Daniels, Ju'Not Joyner*
*Chris Golightly, Jacob John Smalley*