**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



JAERED N. ANDREWS,
COREY D. CLARK,
 JACOB JOHN SMALLEY,
DONNIE WILLIAMS,
TERRELL BRITTENUM,
DERRELL BRITTENUM,
THOMAS DANIELS,
AKRON WATSON,
JU'NOT JOYNER,
CHRIS GOLIGHTLY

Case No. 13-CV-5174 (NRB)

               Plaintiffs,

      vs.

**DEMAND FOR**
**TRIAL BY JURY**

FREMANTLEMEDIA N.A., INC.,
AMERICAN IDOL PRODUCTIONS, INC.,
19 ENTERTAINMENT LTD.
CORE MEDIA GROUP, INC.
21St CENTURY FOX, INC.
FOX BROADCASTING COMPANY, INC.
NIGEL LYTHGOE, KEN WARWICK
FORD MOTOR COMPANY, INC.,
COCA-COLA COMPANY, INC.,
AT&T

**ECF CASE**

               Defendants.

---

## ABBREVIATED[1] CLASS-ACTION COMPLAINT

**COMES NOW** the Plaintiffs, African-American citizens of the United States of America,

JAERED N. ANDREWS, an individual citizen of the State of Ohio, COREY D. CLARK, an

individual citizen of the State of Tennessee, JACOB JOHN SMALLEY, an individual citizen of

---

[1] Plaintiff's "abbreviated" complaint is being filed as per the Court's order following the October 3, 2013 pre-motion conference.

the State of Oklahoma, DONNIE WILLIAMS, an individual citizen of the State of Florida, TERRELL BRITTENUM, an individual citizen of the State of New York, DERRELL BRITTENUM, an individual citizen of the State of New York, THOMAS DANIELS, an individual citizen of the State of Oregon, AKRON WATSON, an individual citizen of the State of Texas, JU'NOT JOYNER, an individual citizen of the State of Maryland, and CHRIS GOLIGHTLY, an individual citizen of the State of California (collectively the "Plaintiffs" or "Black American Idols") by and through their counsel, James H. Freeman, Esq. of JH FREEMAN LAW, 3 Columbus Circle, Floor 15, New York, NY 10019; and Matthew Scott Martin, Esq., on behalf of THE LAW OFFICE OF MATTHEW SCOTT MARTIN, LLC, 503 N. Main Street, Suite 528, Pueblo, Colorado 81003 to state their causes of action at law and in equity as against FREMANTLEMEDIA NORTH AMERICA, INC., AMERICAN IDOL PRODUCTIONS, INC., 19 ENTERTAINMENT, CORE MEDIA GROUP, INC., NIGEL LYTHGOE, KEN WARWICK, 21ST CENTURY FOX, INC., FOX BROADCASTING COMPANY, INC., FORD MOTOR COMPANY, INC., COCA-COLA COMPANY, INC., and AT&T.

**"PRODUCTION-DEFENDANTS"**

FREMANTLE MEDIA NORTHAMERICA, INC., AMERICAN IDOL PRODUCTIONS, INC., 19 ENTERTAINMENT, CORE MEDIA GROUP, INC.

**"NETWORK-DEFENDANTS"**

21 CENTURY FOX, INC. FOX BROADCASTING COMPANY, INC.

**"OVERSEER-DEFENDANTS"**

NIGEL LYTHGOE, KEN WARWICK.

**"SPONSOR-DEFENDANTS"**

FORD MOTOR COMPANY, INC., COCA-COLA COMPANY, INC., and AT&T.

**"ENTERPRISE-DEFENDANTS"**

PRODUCTION-DEFENDANTS + NETWORK-DEFENDANTS + OVERSEER-DEFENDANTS

## JURISDICTION AND VENUE

### PERSONAL JURISDICTION

1.      This Honorable Court has personal jurisdiction over the PRODUCTION-DEFENDANTS because they regularly and continuously transact business in the State of New York vis-à-vis the television production and (purported) contest marketed as *American Idol*.  Each of the PRODUCTION-DEFENDANTS maintains offices within this Judicial District.

2.      The Court has personal jurisdiction over the NETWORK-DEFENDANTS because they regularly and continuously transact business in the State of New York and within this Judicial District vis-à-vis the television production and (purported) contest marketed as *American Idol*. Each of the NETWORK-DEFENDANTS maintain offices within this Judicial District at 1211 Avenue of the Americas, New York, NY 10036.

3.      The Court has personal jurisdiction over the OVERSEER- DEFENDANTS because they regularly and continuously transact business in the State of New York and within this Judicial District vis-à-vis the television production and (purported) contest marketed as *American Idol.*

4.      The Court has personal jurisdiction over the SPONSOR-DEFENDANTS because they regularly and continuously transact business in the State of New York and within this Judicial District vis-à-vis the television production and (purported) contest marketed as *American Idol.*

### SUBJECT MATTER JURISDICTION

5.      This Honorable Court has original jurisdiction pursuant to 28 U.S.C. § 1332 because there are federal questions of law arising out of the relationship between the Class-

Plaintiffs and DEFENDANTS, including pursuant to 42 U.S.C. § 1981.

6.      This Honorable Court has supplemental jurisdiction over Plaintiffs' claims in Counts V and VI pursuant to 28 U.S.C. § 1367(a) because the causes of action are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

## VENUE

7.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) because, *inter alia*, two of the Plaintiffs reside in this Judicial District, all of the corporate entity DEFENDANTS maintain their headquarters or business offices here and/or continuously transact business within this Judicial District.  Moreover, a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this Judicial District.

# PLAINTIFFS

## COREY D. CLARK

8.      Plaintiff COREY DELANEY CLARK is a United States citizen residing in the State of Tennessee.

9.      During Season Two, Plaintiff Clark advanced to the Top 10 Finalist round of the *American Idol* Contest before he was disqualified.

## JAERED N. ANDREWS

10.      Plaintiff JAERED NEALE ANDREWS is a United States citizen residing in the State of Ohio.

11.      During Season Two [2002-2003], Plaintiff Andrews advanced to the Top 32 Semi-Finalist round of the *American Idol* Contest before he was disqualified.

## JACOB JOHN SMALLEY

12.      Plaintiff JACOB JOHN SMALLEY is an individual United States citizen residing in the State of Oklahoma.

13.      During Season Two, Plaintiff Smalley advanced to the Top 32 Semi-Finalist round of the *American Idol* Contest before he was disqualified.

## DONNIE WILLIAMS

14.      Plaintiff DONNIE WILLIAMS is an individual United States citizen residing in the State of Florida.

15.      During Season Three [2003-2004], Donnie Williams advanced to the Top 24 Semi-Finalist round of the purported *American Idol* "contest" before being disqualified.

## TERRELL BRITTENUM

16.     Plaintiff TERRELL BRITTENUM is an individual United States citizen residing in the State of New York.

17.     During Season Five [2005-2006], Terrell Brittenum advanced to the Top 24 Semi-Finalist round of the *American Idol* Contest before being unlawfully disqualified by DEFENDANTS.

## DERRELL BRITTENUM

18.     Plaintiff DERRELL BRITTENUM is an individual United States citizen residing in the State of New York.

19.     During Season Five [2005-2006], Derrell Brittenum advanced to the Top 24 Semi-Finalist round of the purported *American Idol* Contest before being disqualified.

## AKRON WATSON

20.     Plaintiff AKRON WATSON is an individual United States citizen residing in the State of Texas.

21.     During Season Six [2006-2007], Akron Watson was awarded a "Golden Ticket" to Hollywood to compete in the *American Idol* Contest before being disqualified

## THOMAS DANIELS

22.     Plaintiff THOMAS DANIELS is an individual United States citizen residing in the State of Oregon.

23.     During Season Six [2006-2007], Thomas Daniels advanced to the Top 34 Semi-Finalist round of the *American Idol* Contest before being unlawfully disqualified by DEFENDANTS.

## Ju'Not Joyner

24.     Plaintiff JU'NOT JOYNER is an individual United States citizen residing in the State of Maryland.

25.     During Season Eight [2008-2009], Ju'Not Joyner advanced to the Top 36 Semi-Finalist round of the *American Idol* Contest before being unlawfully disqualified or eliminated by Defendants.

## Chris Golightly

26.     Plaintiff CHRIS GOLIGHTLY is an individual United States citizen residing in the State of California.

27.     During Season Eight [2008-2009], Ju'Not Joyner advanced to the Top 36 Semi-Finalist round of the *American Idol* Contest before being unlawfully disqualified by Defendants.

## PLAINTIFFS' COLLECTIVE DESCRIPTIONS

28.     The term **"term "Public-DQ Plaintiffs"** shall refer to those Plaintiffs who suffered and continue to suffer the permanent condemnation for being publicly disqualified from the *American Idol* Contest:

> **a.**  ANDREWS
>
> **b.**  CLARK
>
> **c.**  WILLIAMS
>
> **d.**   T. BRITTENUM
>
> **e.**  D. BRITTENUM
>
> **f.**   WATSON

**g.** DANIELS

**h.** GOLIGHTLY

29.    The term **"CRI-PLAINTIFFS"** shall refer to Plaintiffs who had a record of criminal arrest as of the time they were featured as a Contestant on the television program *American Idol*.

**a.** ANDREWS

**b.** CLARK

**c.** SMALLEY

**d.** WILLIAMS

**e.** T. BRITTENUM

**f.** D. BRITTENUM

**g.** WATSON

**h.** DANIELS

## PRODUCTION-DEFENDANTS

30.    "PRODUCTION-DEFENDANTS" shall collectively refer to the single, common enterprise consisting of FREMANTLEMEDIA NORTHAMERICA, INC., AMERICAN IDOL PRODUCTIONS, INC., 19 ENTERTAINMENT and CORE MEDIA GROUP, INC.

### FREMANTLEMEDIA NORTH AMERICA, INC.

31.    Defendant FREMANTLEMEDIA NORTH AMERICA, INC. ("FREMANTLE") is a corporation organized under the laws of the State of Delaware, Entity No. 2254258, and is authorized and/or registered to do business in the State of New York.

32.    FREMANTLE maintains a principal place of business in the United States located within this Judicial District at 1540 Broadway Building, 10th Floor, New York, New York 10036.

33.    FREMANTLE is engaged in the production and financing of entertainment television programming in the United States and in foreign countries.

34.    FREMANTLE actively solicits viewers of broadcast, cable and satellite television in this Judicial District and purposefully avails itself of the laws of the State of New York.

35.    FREMANTLE actively solicits internet and broadband traffic in the State of New York and solicits U.S. citizens and permanent residents to audition for *American Idol* within this Judicial District.

36.    At all times relevant to this action, FREMANTLE maintained control and supervision, jointly and severally, with the NETWORK-DS, PRODUCTION-DS and OVERSEER-DS over the means and manner in which each Plaintiff named herein, and prospective Class member, was designated to provide his talent services and/or grant his proprietary rights to Defendants for their economic benefit.

37.     At all times relevant to this action, FREMANTLE was part of a single integrated enterprise with the other PRODUCTION-DS and exercised a high degree of centralized control over the labor and business practices of nominal Defendant AMERICAN IDOL PRODUCTIONS, INC. and, in addition, maintains inter-related television and film production operations, common management and common ownership with respect to *American Idol.*

38.     At all times relevant to this action, FREMANTLE exercised supervisory authority over individuals retained and/or employed as attorneys, producers, private investigators and network executives who actively engaged and participated in the unilateral decisions to disqualify the Plaintiffs from the *American Idol* Contest, amongst other adverse actions causing injury to Plaintiffs as set forth herein.

## AMERICAN IDOL PRODUCTIONS, INC.

39.     Defendant AMERICAN IDOL PRODUCTIONS, INC. ("AIP") is a corporation organized under the laws of the State of California, Entity No. C2393632, and is authorized and/or registered to do business in the State of New York.

40.     Defendant AIP maintains a place of business at 4000 W. Alameda Ave, Third Floor, Burbank, California 91505 and/or 7800 Beverly Blvd., Los Angeles, CA 90036-2112.

41.     Defendant AIP is owned and controlled by FREMANTLE.

42.     Defendant AIP is listed as the "employer" of *American Idol* Contestants in written employment contracts entered into by Defendant AIP and *American Idol* Contestants.

43.     Defendant AIP requires Contestants to complete and submit W-2 forms, W-9 forms and/or I-9 forms, among other U.S. government, tax, and employment-related forms relevant to this action.

44.     At all times relevant to this action, Defendant AIP shared the same principal

offices and production personnel as FREMANTLE.

## 19 ENTERTAINMENT

45.     Defendant 19 ENTERTAINMENT is or was a foreign corporation or entity organized under the laws of the United Kingdom that transacts business in the State of New York vis-à-vis the Production.

46.     Defendant 19 ENTERTAINMENT was founded in the United Kingdom in 1985 and owned by Simon FULLER, the purported "creator" of the U.K. television series *Pop Idol* and its spin-off series *American Idol.*

47.     Defendant 19 ENTERTAINMENT was purchased by Defendant CORE MEDIA GROUP, INC. (formerly CKX, Inc.) in 2005.

48.     Defendant 19 ENTERTAINMENT's principal place of business is located at 650 Madison Ave., New York, NY 10022.

49.     Defendant 19 ENTERTAINMENT is a citizen of the State of New York.

50.     Defendant 19 ENTERTAINMENT is the owner and controller of related companies, subsidiaries, branches and/or divisions, each of which shall be deemed named defendants in this action in the event that upon Corporate Disclosure Statements, any or all are determined to be entities owned separate and apart from Defendant 19 ENTERTAINMENT and/or Defendant CORE MEDIA GROUP, INC. [specifically, 19 RECORDING LTD., 19 TV LTD., 19 MANAGEMENT LTD., 19 TOURING LLC, 19 MERCHANDISING LLC (collectively referred to herein as the "19 AFFILIATED COMPANIES")].

## CORE MEDIA GROUP, INC.

51.     Defendant CORE MEDIA GROUP, INC. ("CMG") is a corporation organized under the laws of the State of Delaware, Entity No. 3939409 and is authorized and/or registered

to do business in the State of New York.

52.    Defendant CMG's principal place of business is located at 650 Madison Ave., New York, NY 10022.

53.    Defendant CMG is the successor-in-interest to CKX, Inc., a public company.

54.    Defendant CMG is a company owned and/or controlled by third-party APOLLO GLOBAL MANAGEMENT, LLC (NYSE: APO), a private equity firm headquartered in New York, New York which reportedly bought Defendant CMG on June 21, 2011.

55.    With the purchase of Defendant 19 ENTERTAINMENT, Defendant CMG purportedly acquired a majority share of the rights to the intellectual property associated with the series and contest *American Idol*, including but not limited to the copyrights and state rights of publicity purportedly transferred to Defendant CMG via the Plaintiffs' execution of the respective *American Idol* Contestant Agreements (as amended).

56.    Upon information and belief, Defendant CMG owns all interests in and controls the 19 ENTERTAINMENT-related companies, which include but are not limited to 19 RECORDINGS LTD., 19 MERCHANDISING LTD., 19 MANAGEMENT LTD., 19 TV LTD. and 19 TOURING LTD.

57.    Upon information and belief, 19 ENTERTAINMENT's rights vis-à-vis the *American Idol* Production are wholly owned and managed by CMG.

58.    Upon information and belief, a portion of 19 ENTERTAINMENT'S rights vis-à-vis the *American Idol* Production are co-owned and/or co-managed by third party XIX ENTERTAINMENT and Simon Fuller.

## NETWORK-DEFENDANTS

59.     "NETWORK-DEFENDANTS" shall collectively refer herein to the single, common enterprise consisting of 21ST CENTURY FOX, INC. (the legal successor-in-interest to News Corporation, Inc.) and Defendant FOX BROADCASTING COMPANY, INC., the New York-based entities that broadcast the U.S.-based television series *American Idol*.

60.     NETWORK- DEFENDANTS are named third party beneficiaries of the AMERICAN IDOL CONTESTANT AGREEMENT.

## 21ST CENTURY FOX, INC.

61.     Defendant 21ST CENTURY FOX, INC. is a corporation organized under the laws of the State of Delaware, that is authorized and/or registered to do business in the State of New York.

62.     21ST CENTURY FOX, INC'S principal place of business is located at 1211 Avenue of the Americas, New York, New York 10036.

63.     Defendant 21st Century Fox, Inc.. is formerly known as News Corporation, according to its August 19, 2013 Form 10-K Annual Report filed with the United States Securities and Exchange Commission.[2]

64.     21ST CENTURY FOX, INC. is the parent company and/or whole owner of Defendant FOX BROADCASTING COMPANY, INC., which is the broadcast network that has televised the show *American Idol* from its initial broadcast date in June 2002 through the present day.

65.     Defendant 21ST CENTURY FOX, INC. actively solicits viewers and internet traffic in the State of New York and purposefully avails itself of the laws of the State of New York.

66.     At all times relevant to this action, Defendant 21ST CENTURY FOX, INC. exercised

---

[2] Thus, the use of the phrase "21ST CENTURY FOX, INC." in this document will encompass "NEWS CORPORATION if the event referenced occurred when 21ST CENTURY FOX, INC. was known as NEWS CORPORATION.

supervisory authority over individuals retained and/or employed by Defendant 21ST CENTURY FOX, INC. and Defendant FOX.

67.     At all times relevant to this action, authorized representatives of 21ST CENTURY FOX, INC. participated in the decision-making process that led to the unlawful disqualification of each Plaintiff.

68.     At all times relevant to this action, authorized representatives of Defendant 21ST CENTURY FOX, INC. participated in the background check reporting process that led to the disqualification of each Plaintiff.

69.     Defendant 21ST CENTURY FOX, INC. television broadcasting network boasts more than two hundred (200) affiliate stations in the United States. It owns and operates more than twenty-five (25) TV stations, as well as a portfolio of cable networks.

70.     At all times relevant to this action, Defendant 21ST CENTURY FOX, INC. maintained control, jointly and severally with PRODUCTION-DEFENDANTS, over the means and manner in which each Plaintiff was designated to provide his talent services for the economic benefit of Defendants.

71.     At times relevant to this action, 21ST CENTURY FOX, INC.'s CEO played an instrumental role in the development and production activities of *American Idol*, particularly during the initial seasons of the Production in 2002-2005.

72.     At all times relevant to this action, Defendant 21ST CENTURY FOX, INC. was actually part of a single integrated enterprise with the other PRODUCTION- DEFENDANTS and exercised a degree of centralized control over the labor practices of PRODUCTION-DEFENDANTS.

73.     At all times relevant to this action, Defendant 21ST CENTURY FOX, INC. exercised supervisory authority over individuals retained and/or employed as attorneys, producers, private

investigators and network executives who actively engaged and participated in the unilateral and unfettered decisions to disqualify the Plaintiffs from the *American Idol* Contest, amongst other adverse actions causing injury to Plaintiffs as set forth herein.

## FOX BROADCASTING COMPANY, INC.

74.     Defendant FOX BROADCASTING COMPANY ("FOX") is a corporation organized under the laws of the State of Delaware, Entity No. 2090437, and is authorized and/or registered to do business in the State of New York.

75.     Defendant FOX is a wholly-owned subsidiary of Defendant 21ST CENTURY FOX, INC.   Defendant FOX is a subsidiary of Fox Networks, Inc., which is a subsidiary of Fox Entertainment Group, Inc., which is a subsidiary of FEG Holdings, Inc., which is a subsidiary of News America Incorporated, which is a subsidiary of Defendant 21ST CENTURY FOX, INC., Inc.

76.     Defendant FOX's principal place of business within this Judicial District is located at 1211 Avenue of America, New York, New York 10036, in the same office location as Defendant 21ST CENTURY FOX, INC.

77.     Defendant FOX actively solicits viewers of broadcast, cable and satellite television in the State of New York.

78.     Defendant FOX actively solicits internet and broadband traffic in the State of New York.

79.     At all times relevant to this action, Defendant FOX maintained control, jointly and severally with PRODUCTION-DS, and OVERSEER-DS over the means and manner in which each Plaintiff was designated to provide their talent services and/or grant their proprietary rights to Defendant FOX for its economic benefit.

80.    At all times relevant to this action, Defendant FOX was actually part of a single integrated enterprise with the other PRODUCTION-DEFENDANTS and exercised a degree of centralized control over the labor practices of PRODUCTION-DS.

81.    At all times relevant to this action, Defendant FOX exercised supervisory authority over individuals retained and/or employed as attorneys, accountants, producers, private investigators and network / production executives who actively engaged and participated in the unilateral and unfettered decisions to disqualify each Plaintiff from the *American Idol* Contest, amongst other adverse actions causing injury to Plaintiffs as set forth herein.

## **OVERSEER-DEFENDANTS**

82.    "OVERSEER-DEFENDANTS" OR "OVERSEER-DS" shall collectively refer to Defendant Nigel LYTHGOE and Defendant Ken WARWICK.

83.    At all times herein mentioned, the OVERSEER-DS were the authorized agents, executives, representatives, joint venturers, partners, members, stockholders, and/or employees of the PRODUCTION-DS and NETWORK-DS and, in doing the things hereinafter alleged, were acting within the course and scope of such agency and/or employment.

84.    Each of the PRODUCTION-DS and NETWORK-DEFENDANTS, involved in a common, single enterprise, gave consent to, ratified, approved, and authorized the unlawful acts perpetrated by the OVERSEER-DEFENDANTS as alleged herein.

85.    While acting under the direct control and supervision of PRODUCTION-DEFENDANTS and NETWORK-DEFENDANTS, the OVERSEER-DEFENDANTS played a primary and central role in the racially-motivated decisions to disqualify each of the Plaintiffs (and other Black *American Idol* Contestants who are referenced in this Complaint), as well as the corresponding decisions <u>not</u> to disqualify White *American Idol* contestants who were similarly

16

situated.

## NIGEL LYTHGOE

86.     Upon information and belief, Defendant NIGEL LYTHGOE ("LYTHGOE") is a foreign national of the United Kingdom / Great Britain.

87.     At times relevant to this action, Defendant LYTHGOE was domiciled and/or authorized to conduct business and/or employed in the United States.

88.     Defendant LYTHGOE actively transacts business within this Judicial District in connection with his continuous role as senior executive producer of U.S.-based television programs.

89.     For over a continuous decade, Defendant LYTGHOE played an active, daily decision-making role in virtually every aspect and detail of the *American Idol* Production.

90.     Mr. LYTHGOE made the "final call" with respect to every decision to *advertise, market and promote* the disqualification of the Public-DQ-Plaintiffs (saving Golightly) from their positions as qualified, *bona fide* Prize Contestants on *American Idol*.

91.     Mr. LYTHGOE also played a central, decision-making role in the comparative decisions to advertise, market and promote White *American Idol* Contestants – most of whom were TOP 10 Finalists – whose "redemption" for past white criminal conduct was promoted throughout their featured participation and without interference.

## KEN WARWICK

92.     Upon information and belief, Defendant KEN WARWICK ("WARWICK") is a foreign national of the United Kingdom / Great Britain.

93.      At times relative to this action, Defendant WARWICK was domiciled and/or authorized to conduct business and/or employed in the United States.

94.     At all relevant times, Defendant WARWICK actively transacted business within this Judicial District in connection with his continuous, uninterrupted role as senior executive producer of the *American Idol* Contest and Production from 2002-2013.

95.     For over a continuous decade, Defendant WARWICK played an active role in daily production decisions, including the production choice to publicize the disqualification of each Public-DQ Plaintiff, who were each thereafter extricated from their positions as qualified Prize Contestants in the running to win *American Idol.*

96.     Mr. WARWICK also played a central decision-making role in corresponding production decisions <u>not</u> to publicly disqualify White and non-Black *American Idol* Contestants who were similarly situated (i.e., with criminal record history) in the running to win *American Idol.*

## SPONSOR-DEFENDANTS

97.     "SPONSOR-DEFENDANTS" shall collectively refer to FORD MOTOR COMPANY, COCA-COLA COMPANY, and AT&T MOBILITY, LLC.

### FORD MOTOR COMPANY, INC.

98.     Defendant FORD MOTOR COMPANY, INC. ("FORD") is a publicly traded corporation listed on the New York Stock Exchange [NYSE: F] and organized under the laws of the State of Delaware.

99.     FORD is an American multi-national automaker with principal place of business headquartered at One American Road Suite 1026, Dearborn, Michigan 48126.

100.    FORD regularly transacts business in the State of New York and markets, advertises and sells products within this Judicial District.

101.   FORD regularly transacts business in the State of California and markets, advertises and sells products within Los Angeles.

102.   At all times relevant to this action, FORD has served as one of the primary, featured and/or marquee sponsors of the *American Idol* Contest, Production and Enterprise.

103.   At all times relevant to this action, Defendant FORD has actively marketed, advertised and promoted the *American Idol* Contest, Production and Enterprise to U.S. consumers.

104.   As Prize Contestants featured on *American Idol*, each of the Plaintiffs made themselves available to promote and endorse Defendant FORD's consumer products to nationwide U.S. television audiences and to extraterritorial cable and satellite subscribers, among other consumers.

105.   Each Plaintiff rendered personal talent services, granted their copyright ownership rights and conveyed a proprietary / statutory interest in their individual names, family names, images, personas and likenesses for the economic benefit of Defendant FORD.

106.   At all times relevant to this action, it was reasonably foreseeable to Defendant FORD that it would derive a substantial economic and commercial benefit for procuring Plaintiffs' talent services and obtaining Plaintiffs' unique proprietary rights in connection with *American Idol.*

107.   Upon information and belief, Defendant FORD, and its agents, employees and/or executives acting under its control and supervision, played an active role in some of the decisions to disqualify Plaintiffs (as well as other Black *American Idol* Contestants) from their position as qualified Prize Contestants featured on *American Idol.*

## COCA-COLA COMPANY, INC.

108.    Defendant COCA-COLA COMPANY, INC. ("COCA-COLA") is a publicly traded corporation listed on the New York Stock Exchange [NYSE: KO] and organized under the laws of the State of Delaware.

109.    Defendant COCA-COLA is an American multi-national producer of soft drinks and beverages with principal place of business headquartered at 1 Coca-Cola Plaza, Atlanta, GA 30313.

110.    Defendant COCA-COLA regularly transacts business in the State of New York and markets, advertises and sells products within this Judicial District.

111.    Defendant COCA-COLA regularly transacts business in the State of California and markets, advertises and sells products within Los Angeles.

112.    At all times relevant to this action, Defendant COCA-COLA has served as one of the primary, featured and marquee Sponsors, advertisers and promoters of the *American Idol* Contest, Production and Franchise.

113.    As Prize Contestants featured on *American Idol*, each of the Plaintiffs made themselves available to promote and endorse Defendant COCA-COLA's consumer products to nationwide television audiences and to extraterritorial cable and satellite subscribers, among other consumers.

114.    Each Plaintiff rendered personal talent services, granted their copyright ownership rights and conveyed an interest in their individual names, images, personas and likenesses to the PRODUCTION-DEFENDANTS and NETWORK-DEFENDANTS for the economic benefit of Defendant COCA-COLA.

115.    At all times relevant to this action, it was reasonably foreseeable to Defendant COCA-COLA that it would derive a substantial economic and commercial benefit for procuring Plaintiffs' talent services and proprietary rights in connection with *American Idol*.

116.    Upon information and belief, Defendant COCA-COLA, and its agents, employees and/or executives acting under the control and supervision of Defendant COCA-COLA, played an active role in some of the decision to unlawfully disqualify (one or more) of the Plaintiffs from their position as qualified Prize Contestant featured on *American Idol*.

## AT&T

117.    Defendant AT&T is an American multi-national provider of telecommunications services.

118.    Defendant AT&T maintains corporate offices & headquarters at 208 S. Akard St. Dallas TX 75202.

119.    Defendant AT&T also maintains corporate offices and retail stores within this Judicial District.

120.    At all times relevant to this action, Defendant AT&T has served as one of the primary, featured Sponsors, advertisers and promoters of *American Idol*.

121.    As Prize Contestants featured on *American Idol*, each of the Plaintiffs made themselves available to promote Defendant AT&T's consumer products and services to nationwide television audiences and each rendered talent services for the economic benefit of Defendant AT&T.

122.    Each Plaintiff rendered personal talent services, granted their copyright ownership rights and conveyed an interest in their individual names, images, personas and likenesses for the economic benefit of Defendant AT&T.

123.    At all times relevant to this action, it was reasonably foreseeable to Defendant AT&T that it would derive a substantial economic and commercial benefit from procuring Plaintiffs' talent services and proprietary rights in connection with *American Idol.*

124.    Upon information and belief, Defendant AT&T, and its agents, employees and/or executives acting under the control and supervision of Defendant AT&T, played an active role in some of the decisions to unlawfully disqualify Public-DQ-Plaintiffs from their position as qualified Prize Contestant in the running to win *American Idol.*

# PRODUCTION BACKGROUND:
## *Pop Stars U.K and Pop Idol* (2000-2001)

## A.   SIMON FULLER

### (1)   19 ENTERTAINMENT

125.    Simon FULLER is a British national and music business executive who achieved great financial success through artist management of a mid-1990s U.K. musical group known as the *Spice Girls.*

126.    Defendant 19 ENTERTAINMENT, founded by Mr. FULLER in 1985, was or is the British-based company owned by FULLER that reportedly owns proprietary rights to the *American Idol* television brand, including the *American Idol* series in the United States and local adaptations of the television format which, collectively with *American Idol*, air in over 100 countries around the world.

127.    Defendant 19 ENTERTAINMENT generates revenue through such *Idol*-related content through the control of multiple revenue streams including, for example, television, music, sponsorship and merchandising, touring and artist management.

128.    Defendant 19 ENTERTAINMENT's principal operational and ownership interests are divided amongst multiple subsidiaries or entities under the control and dominion of 19 ENTERTAINMENT, including: 19 TV LIMITED (U.K.); 19 RECORDINGS LIMITED (U.K.); 19 MANAGEMENT LIMITED (U.K.); 19 TOURING LIMITED (U.K.); AND 19 MERCHANDISING LIMITED (U.K.).

129.    19 TV LIMITED (U.K.) owns two-thirds of the *American Idol* brand and coproduces the show in the United States with its partner, FREMANTLE, which owns the other one-third of the *American Idol* brand. 19 TV LIMITED receives certain fees and revenues relating to the sublicensing of the brand and production and marketing of the shows based on the *American Idol* brand around the world, including licensing and producer fees.  19 TV LIMITED shares a percentage of the revenues FREMANTLE derives from on-air sponsorships and sales of FREMANTLE branded merchandise.

130.    19 RECORDINGS LIMITED (U.K.) retains the right to sign long-term recording contracts with the winning artists and other finalists from the *American Idol* series in the United States.   For the first nine seasons of the program, Sony / BMG (owned in part by BERTELESMANN) served as 19 ENTERTAINMENT's record label partner with respect to *American Idol* artists in most major territories around the world.

131.    19 MANAGEMENT LIMITED (U.K.) has the right to manage the finalists and garner commissions for more than ten (10) years.

132.    19 TOURING LIMITED (U.K.) has the right to produce *American Idol* tours featuring the Contestants featured on the *American Idol* Production.

133.    19 MERCHANDISING LIMITED (U.K.) has the licensing and merchandising rights for the *American Idol* tours and in the United States and United Kingdom is jointly responsible

for off air sponsorship of the televised programs.

## (2)   360° DEALS

134.   In 1998, Mr. FULLER purportedly devised the programming concept for what would become *American Idol*.   Mr. FULLER sought to develop a televised talent show for aspiring recording artists, presented to mass audiences, that he could utilize as a business platform to market undiscovered recording artists in "360° Deals"

135.   Mr. FULLER's talent show would facilitate the signing of "360° Deals" with amateur, recording artists, who – as a condition precedent to performing in the talent show - would be required to grant 19 ENTERTAINMENT a percentage of ALL of their income, including sales of recorded music, touring & live appearances, merchandising, and movie rights, *in perpetuity* in exchange for providing financial support for the artist, including direct advances as well as funds for marketing, promotion and touring.

136.   The 360° Deal business arrangement is an alternative to the traditional recording contract and a business solution to dramatically declining revenues and shrinking profits from falling sales of recorded music.

137.    comes from sources other than recorded music, such as live performance and merchandise.

138.   Mr. FULLER's programming concept would enable him to *freely* procure the complete "penumbra" of proprietary rights and ownership interests that a young recording artist could possibly grant by virtue of written instrument.

139.   Defendant FULLER had final decision-making authority regarding *American Idol*.

**B.    NIGEL LYTHGOE**

140.    Defendant LYTHGOE is the senior British television executive who was retained by FREMANTLE and/or 19 ENTERTAINMENT to produce the *American Idol* show in the United States, from Season One (2002) through Season Eight (2009), Season Eleven (2012) and Season Twelve (2013).

141.    Defendant LYTHGOE operated as the show's chief executive producer and press spokesperson during all times relevant to this action.   Along with lifelong friend and co-executive Ken WARWICK, Defendant LYTHGOE managed the day-to-day operations of the *American Idol* Production. [CDC_005287]

142.    Prior to being named the senior executive producer of the *American Idol* Production, Defendant LYTHGOE had substantial experience with a similar show in Great Britain upon which *American Idol* was patterned, including experience in creating drama in reality TV

143.    On December 1, 2000, Defendant LYTHGOE stated to the London press that each singing contestant featured in his U.K. version of the *Popstars* show would be required to disclose their criminal record to him. [CDC_005284-5285]

> **LYTHGOE: Like most shows now, <u>we are asking people to</u> give us a breakdown of their** background **and <u>produce their criminal records</u>. "**

**C.    KEN WARWICK**

144.    From Season One (2002) through Season Twelve (2013), Defendant WARWICK co-managed the day-to-day operations of the *American Idol* Production.  [CDC_005287]

145.    Defendant WARWICK consistently refers to *American Idol* as "my show."

## D.     FREMANTLE MEDIA

### (1)     *POP IDOL* [OCTOBER 2001]

146.     In the summer of 2001, 19 ENTERTAINMENT paired up with U.K.-based production company FREMANTLEMEDIA, LTD (FREMANTLE'S PARENT CO.) to produce the *Idol*-branded program in Great Britain under the name *Pop Idol*.

147.     In October 2001, the first season of the television show *Pop Idol* became a smash #1 hit in the U.K. combining the elements of the traditional televised talent show concept whereby contest winners were judged by a panel of experts in the live audience (e.g., *Star Search*); with (b) technological advances which enabled the televised viewing audience to participate in and (allegedly) determine the selection of the contest winners (via phone, texting and internet); and (c) sharp and witty commentary by the panel of music industry experts, most notably Simon Cowell.

### (2)     19TV / FREMANTLE PARTNERSHIP AGREEMENT [2001]

148.     After the success of *Pop Idol* in the U.K*.,* Defendant 19 ENTERTAINMENT, through its wholly owned subsidiary or division, 19 TV Ltd. ("19TV") entered into a worldwide partnership arrangement with FREMANTLE for the production and distribution of the *American Idol* and related *Idol* brands.

149.     Under the terms of this foreign partnership,  FREMANTLE retained the exclusive right to produce (or sublicense production) and distribute *American Idol* programs and formatted series throughout the world except in the United States, where 19TV co-produces the *American Idol* series.

150.     In addition to its joint ownership of the *American Idol* brand, 19TV has the right to receive certain fees and revenues relating to the sublicensing of the *American Idol* brand and

the production of television shows based on the *American Idol* brand and format around the world.

### (3)   FOX LICENSING AGREEMENT [April 2002]

151.    After its break-out success in the U.K. of *Pop Idol*, the producers again tried to pitch the *American Idol* concept to network executives in Los Angeles and were met with a more favorable reception.

152.    The Chief Executive Officer of Defendant NEWS CORP. (now known as Defendant 21st CENTURY FOX), Rupert Murdoch, reportedly called FOX network executives at the behest of his own daughter, who was a fan of *Pop Idol*, and demanded that FOX "green light" the show in Los Angeles.

153.    After the *American Idol* program was placed into pre-production in the United States, Mr. Murdoch personally participated in the initial meetings and demanded that the American version of *Pop Idol* be identical to the British version in every possible respect.

154.    On or about April 22, 2002, 19TV, FREMANTLE and FOX entered into a licensing agreement (the "FOX Licensing Agreement") whereby Defendant FOX obtained rights to air the *American Idol* Production in the United States.  [CDC_000027]

155.    Under the terms of the FOX Licensing Agreement, Defendant FOX is granted a perpetual and exclusive license, including the right of first negotiation and last refusal, to broadcast any non-scripted television programs featuring the *American Idol* brand or based on the *American Idol* format, or featuring contestants who appear in their roles as *American Idol* winners, intended for broadcast within the United States and its territories.

156.    In addition to license fees, Defendant FOX pays bonus fees to 19TV and FREMANTLE depending on where the *American Idol* series is rated and ranked in the 18-to-49

age demographic. 19TV and FREMANTLE each receive 50% of the ratings/rankings bonus, with 19TV receiving its share directly from Defendant FOX.  [CDC_000037]

157.    Paragraph 12 of FOX Licensing Agreement also grants FOX an "approval right with respect to the key elements of the Series, including . . . contestants." [CDC_000063]

158.    FREMANTLE and 19TV reserve ownership rights to the copyright in the Series and Episodes.  [CDC_000049]

159.    In-house counsel for Defendant FOX, Minna Taylor and Marisa Fermin, negotiated and executed the FOX Licensing Agreement on behalf of FOX.  [CDC_000067]


# *AMERICAN IDOL*
## *Contest Format*

A.    "CONTEST"

160.    On June 11, 2002, FOX premiered the first season of the television show *American Idol*.

161.    *American Idol* has been characterized by the media and DEFENDANTS as a Reality TV Contest.

162.    *American Idol* is marketed, packaged, advertised and labeled by DEFENDANTS as a "contest" whose winner is determined by the televised viewing audience after a select number of semi-finalists (anywhere from 24 to 45) have been pre-selected by DEFENDANTS for U.S. audience voting consideration.

163.    As a consumer product marketed over federally-regulated airwaves bearing a USPTO-protected tradename,, the *American Idol* Contest is required by federal law to actually be what it purports to be.  Until Congress instructs otherwise, a contest cannot be advertised by a

U.S.-based commercial enterprise as both a fiction and a fact.

164.     The purported *bona fide* contest depicted on the *American Idol* television show fails to meet the legal prerequisites necessary under state or federal law to market and advertise itself as a "contest", either at law or in fact.

165.     ENTERPRISE-DEFENDANTS fail to comply with the legal mandates for operating a *bona fide* contest because ENTERPRISE-DEFENDANTS (purportedly) retain the contractual right to unilaterally disqualify a contestant at any time for any reason in ENTERPRISE-DEFENDANTS' sole and absolute discretion, irrespective of any published contest rules and notwithstanding whether the contest has actually commenced.

166.     The *American Idol* contest fails to comply with the well-established federal and state statutory or common law mandates that govern rules applicable to contests, lotteries and sweepstakes must be brought into compliance immediately in order to protect the U.S. consumer market in general, and more specifically, the young American singers and songwriters who continue to be defrauded and commercially exploited in a foreign-originated system of human trafficking.

167.     The partial key to success in creating *American Idol* as a ratings juggernaut was squarely based on a conscious marketing effort by ENTERPRISE-DEFENDANTS, initiated in Season Two [2002-2003], to commercially advertise the criminal arrest information of top-ranking Black *American Idol* contestants featured on its program, including Corey Clark, Jaered Andrews, Donnie Williams, the Brittenum Twins, Akron Watson.

## B.     CONTEST "RULES"

## (1)     ELIGIBILITY REQUIREMENTS

168.     ENTERPRISE-DEFENDANTS retain the contractual right to change the contest rules

of the contest at any time in DEFENDANTS' sole discretion, even after the contest has begun.

169.   ENTERPRISE-DEFENDANTS retain the contractual right to refuse to make transparent or publish any of the basic rules governing *American Idol* contestant participation, including the terms and conditions set forth in lengthy, 100-plus pages of multiple contracts that Contestants sign without advice of independent counsel during their journey to the semi-finalist rounds.

## (2)    "RULES" GOVERNING DISQUALIFICATION

170.   ENTERPRISE-DEFENDANTS retains the contractual right to alter the value of the prize offered by ENTERPRISE-DEFENDANTS after the contest has already begun, or otherwise make the prize conditional on unforeseen requirements for additional consideration to be provided by the contestant.

171.   DEFENDANTS retains the contractual right to dispense with the public's voting results altogether and select the contest winner at the whim of ENTERPRISE-DEFENDANTS and its corporate sponsors.

172.   In *a bona fide* contest, the adverse action of disqualification must be based on grounds that contest rules have been broken.

## (3)    JUDGING CRITERIA

173.   U.S. consumers are induced by ENTERPRISE-DEFENDANTS to believe that the Expert Judges of *American Idol* select which Contestants will advance to the Semi-Final Rounds.

174.   Through the Hollywood Rounds, judges engaged by the show evaluate talent and make decisions on which contestants should advance.

## C.   VOTING SYSTEM

### (1)   REPRESENTATIONS TO THE U.S. PUBLIC

175.   At all times relevant to this action, DEFENDANTS have publicly represented and advertised that from the outset of the Semi-Finalist rounds each season, the Contestants' advancement through the successive elimination rounds depends entirely upon the votes cast by the U.S. television viewing audience.

176.   Once the Semi-Finalists begin the on-air competition, votes by the American public solely determine who continues to compete, who gets voted off, and eventually who will be named the American Idol.

### (2)   LACK OF TRANSPARENCY AND ACCOUNTABILITY

177.   DEFENDANTS have never disclosed a complete show of votes to the public – broken down by votes tallied as per each contestant - in connection with any elimination round of *American Idol* contestants.

178.   The U.S. public has never been provided with a means to verify the accuracy of the voting results through an independent party or auditor.

## D.   ELEMENTS OF SKILL vs. CHANCE

179.   The Chief Executive Officer of Defendant FREMANTLE, Cecile Frot-Coutaz, has publicly stated that the contest depicted in the television show *American Idol* is a mixed game of skill and chance.

180.   To the extent that the contest depicted on *American Idol* can be deemed a *bona fide* contest pursuant to law, it constitutes a contest of mixed skill and chance.

181.   The element of skill required is a singing voice, the ability to command the stage

and the ability to entertain a live audience.

182.    *American Idol* Contestants are required to exercise a degree of intellectual knowledge in terms of their selection of song choice for a particular episode.

183.    *The American Idol contest* could only be considered a game of skill where the performances of the Contestants are scored by the appointed Judges – and no other third party – based on an established set of criteria known to the Contestants before their entry into such contest.

184.    In a game of skill, the Contestant's background information or demographic profile are entirely irrelevant to determining whether such Contestant can claim victory and the prize.

185.    In order to win the Prize advertised in connection with the *American Idol* Contest, Contestants are subject to various, key conditions that reside completely outside of their control.

186.    The element of chance in the *American Idol* Contest is dictated in the first instance by ENTERPRISE-DEFENDANTS's internal pre-selection process of the Semi-Finalist Contestants, which process not only includes the consideration of a Contestant's skill or mastery of their trade, but also factors in each Contestant's background information, age, sexual orientation, occupation, past occupation, criminal record, civil litigation record, religion, sex, national origin, race and ethnic background so as to determine whether the Contestant meets the target demographic of the NETWORK-ENTERPRISE-DEFENDANTS,   PRODUCTION-ENTERPRISE-DEFENDANTS OR SPONSOR-ENTERPRISE-DEFENDANTS.

187.    The element of chance in the *American Idol* Contest is dictated in the second instance by (what purports to be) the popular vote of the U.S. public, who as a collective does not necessarily cast a vote for the Contestant exhibiting the highest level of skill.

## E.   CONTEST PRIZES

188.   In Season One (June 2002), the official prize for winning *American Idol* was advertised by ENTERPRISE-DEFENDANTS as a "$1 Million Dollar Recording Contract."

189.   Upon information and belief, at all times after the broadcast of Season One, ENTERPRISE-DEFENDANTS did <u>not</u> advertise any cash value amount in connection with the prize awarded for winning American Idol, but rather stated that the victorious contestant would be awarded a "Major Label" recording contract.

190.   The terms, conditions and actual cash value of the prize for winning the contest depicted on *American Idol* (the "Prize") are NOT disclosed to U.S. consumers and prospective contestants as part of the marketing, promotions or advertisements in connection with the purported contest.

191.   The Prize for winning the *American Idol* Contest is represented, in part, by a series of written contracts that inure to the benefit of Defendant 19 ENTERTAINMENT, amongst other ENTERPRISE-DEFENDANTS and third party entities.   These agreements are collectively referred to herein as the "19 ENTERTAINMENT Prize Contracts."

192.   The 19 ENTERTAINMENT Prize Contracts require the contestant to grant all ownership rights, proprietary interests and talent services to 19 ENTERTAINMENT on a universal, perpetual, "360 degree" basis, i.e. with respect to each and every aspect of a recording artist's potential revenue streams, including but not limited to artist management commissions, recording royalties, publishing income, film production advances, touring revenue, merchandising receipts and featured attraction appearance fees.

193.   Each season, *American Idol* Contestants must advance to the Semi-Final Rounds or Finalist Rounds <u>before </u>the terms and conditions of the 19 ENTERTAINMENT Prize

Contracts are disclosed.

194.    The 19 ENTERTAINMENT Prize Contracts are only disclosed to Contestants after they have been (purportedly) selected by the Expert Judges to perform in the Top 10 or Top 12 Finalist Round [Seasons One-Three] or the Top 24 or Top 36 Semi-Finalist [Season Four-Season Eleven].

195.    Once the terms and conditions of the 19 ENTERTAINMENT Prize Contracts are disclosed to Contestants who reach the Semi-Finalist or Finalist rounds, they are afforded 24-36 hours to execute more than 100 pages of complex commercial contracts without the benefit of independent counsel or any opportunity for bargained-for-exchange.

196.    ENTERPRISE-DEFENDANTS extract every conceivable legal property right a young American recording artist owns or could potentially own in the future, such as the artist's copyright ownership in any musical works or performances and their rights to publicity in the artist's own name, likeness, image and identity, before the terms and conditions of the 19 ENTERTAINMENT Prize Contracts have even been disclosed.

197.    Failure to sign the 19 ENTERTAINMENT Prize Contracts as presented in the "eleventh hour" before public voting begins leads to automatic disqualification of the Contestant and removal from the Production, even though such Contestant has already rendered his services for the benefit of and conveyed his proprietary rights to ENTERPRISE-DEFENDANTS.

198.    In any given season, four to six months time passes between the date of a Contestant's first audition for *American Idol* and the date when the terms and conditions of the 19 ENTERTAINMENT Prize Contracts are disclosed to such Contestant.

199.    In the event that a Contestant seeks to negotiate the terms or conditions of the 19 ENTERTAINMENT Prize Contracts, ENTERPRISE-DEFENDANTS threaten to not only disqualify

such Contestant, but also threaten to target such Contestant with a defamatory media campaign in the tabloid press based on any salacious or derogatory information that ENTERPRISE-DEFENDANTS obtained via their (illegal) background check process.

200.    To ensure that the targets of its commercial exploitation present zero resistance to signing the 19 ENTERTAINMENT Prize Contracts, ENTERPRISE-DEFENDANTS devise a carefully planned procedural mechanism to guarantee inequality in the recording artists' bargaining position.

201.    Contestants who are induced by ENTERPRISE-DEFENDANTS to participate in the televised *American Idol* Contest are required to sign extremely complex 19 ENTERTAINMENT contracts through "Group Negotiation" sessions.

202.    Any Contestant who poses a substantive question about a contractual term within the "Group Negotiation" session is swiftly reprimanded by producers in front of his peers.  This tactic produces the "group peer pressure" needed by ENTERPRISE-DEFENDANTS to ensure that the 19 ENTERTAINMENT Prize Contracts are signed by the Contestants without any meaningful bargained-for-exchange.

203.    Defendant 19 ENTERTAINMENT also ensures that the Contestants are deprived at all times of the right of independent counsel.

204.    For the sake of appearances, ENTERPRISE-DEFENDANTS arranges to have their own U.S.-based attorneys represent both sides of the transaction between *American Idol* Semi-Finalists or Finalists, on one hand, and Defendant 19 ENTERTAINMENT on the other, such that the young recording artist is deprived of any meaningful opportunity to consult with real independent counsel.

205.    The legal fees of any attorney who is appointed by ENTERPRISE-DEFENDANTS to

"serve" as the Contestants' counsel vis-à-vis the 19 ENTERTAINMENT Prize Contracts are paid for by 19 ENTERTAINMENT, the very same company to whom the Contestants are contractually bound (for life), or other members of the ENTERPRISE-DEFENDANTS conspiracy.

## F.     CONTESTANTS' EXPECTATIONS

206.    Plaintiffs in this action were audience members of the *American Idol* Production before they eventually became *American Idol* Contestants.

207.    Plaintiffs were solicited to enter into a singing talent contest promoted and advertised by ENTERPRISE-DEFENDANTS to the American public as a "talent contest" and/or "singing competition" for a valuable prize.

208.    DEFENDANTS have at all times maintained to the public that *American Idol* is a *bona fide* contest for a valuable prize where - beginning from the Semi-Final Rounds each season - the voting public determines the outcome of the contest.

209.    Plaintiffs were entitled to rely on their common knowledge and experiences as U.S. citizens, as well as the extensive advertising campaigns promoting the *American Idol* Contest, to enter into what they believed to be a *bona fide* "talent contest" and/or "singing competition" where the winner would be decided upon their individual performance merit in their chosen profession of singing.

210.    At all times during their participation as Contestants in the *American Idol* Contest, Plaintiffs believed in good faith that they were participating in a *bona fide* contest to win a valuable prize.

211.    By entering into DEFENDANTS' contest, Plaintiffs acted upon their personal knowledge that the *American Idol* represented, first and foremost, a *bona fide* talent contest-in-fact whereby the most meritorious singer and performer, as adjudged by a qualified panel of

music industry experts and by the American public at large, would be rewarded a valuable prize for winning the contest.

212.    Plaintiffs here agreed to enter into a talent contest to compete for a valuable prize based on their individual merit as singers.  Plaintiffs did not at any point voluntarily agree to subject their names, likenesses or identities to the dangerous conditions or hazards that currently impair their proprietary rights.

213.    Upon entering the talent contest sponsored by DEFENDANTS, none of the Plaintiffs named in this action had any knowledge of the particular risk that their names and reputations would be permanently defamed by ENTERPRISE-DEFENDANTS and its media affiliates – repeatedly and continuously- throughout the course of their entire lives.

214.    Upon entering the talent contest sponsored by ENTERPRISE-DEFENDANTS, none of the Plaintiffs named in this action could have possibly appreciated the magnitude of having their names, livelihoods and reputations subject to defamatory campaigns, permanently available on the internet, that would come to impact their entire lives.

# CONTESTANT TRANSACTIONS

## A.    GOLDEN TICKET

215.    At all times relevant to this action, DEFENDANTS promoted and advertised the *American Idol* Contest to the U.S. consumer market as a *bona fide* talent contest for a valuable prize.

216.    Plaintiffs each were solicited by DEFENDANTS to enter into what DEFENDANTS publicly advertised to the U.S. consumer market as an opportunity to appear on a national television show through live exhibition of Plaintiffs' singing talent.

217.   At all times relevant to this action, DEFENDANTS actively solicited the personal talent services and live appearances of Plaintiffs for the purpose of commercially exploiting - throughout the world and into perpetuity – Plaintiffs' unique personal appearances and state property rights to publicity as embodied by each Plaintiff's name, voice, image, persona, likeness, personal background and identity.

218.   Plaintiffs each met ALL of the eligibility requirements published by ENTERPRISE-DEFENDANTS prior to Plaintiffs making their personal talent services available to DEFENDANTS.

219.   In response to DEFENDANTS' solicitation to U.S. consumers, Plaintiffs each attended Open Auditions, during their respective seasons of *American Idol*, which were promoted and organized by DEFENDANTS at a time and place specified in advance by the employers.

220.   Upon Plaintiffs' attendance at the Open Auditions, ENTERPRISE-DEFENDANTS held a "cattle call" audition in which each Plaintiff was repeatedly selected by ENTERPRISE-DEFENDANTS' junior and senior producers in succession over a multiple-day period.

221.   Based on their individual merit as young, talented American singers, each Plaintiff earned a position to perform in front of the resident *American Idol* Judges in their respective seasons.

222.   After Plaintiffs each rendered their live talent services for evaluation by the *American Idol* Judges, Plaintiffs each were adjudged qualified by virtue of their respective singing and performance abilities to enter the Prize Contest in Los Angeles, California.

223.   As a result of being adjudged qualified to compete in California, ENTERPRISE-DEFENDANTS issued each of Plaintiffs, at different times relevant to this action, a Golden Ticket to Hollywood.

224.    The Golden Ticket (Season Two) reads in part:

"CONGRATULATIONS! YOU HAVE MADE IT TO THE NEXT ROUND OF AUDITIONS, WHICH WILL BE HELD IN HOLLYWOOD, CALIFORNIA…AN INFORMATION PACKET WILL BE MAILED TO YOU WITHIN 10-14 BUSINESS DAYS. THIS PACKET WILL INCLUDE ALL THE ANSWERS TO YOUR QUESTIONS …. YOU ARE OFFICIALLY ON YOUR WAY TO BECOMING THE NEXT AMERICAN IDOL!"

225.    Plaintiffs' on-air acceptance of the Golden Ticket awarded by DEFENDANTS' judges signified Plaintiffs' assent to making their unique talent services available to DEFENDANTS within the State of California, in the first instance.

226.    Plaintiffs' acceptance of the Golden Ticket demonstrates Plaintiffs' assent to make their talent services available in the State of California at a place and time specified by ENTERPRISE-DEFENDANTS and for the economic benefit of ENTERPRISE-DEFENDANTS.

227.    At all times relevant to this action, because DEFENDANTS intended to solicit Plaintiffs to enter the State of California to perform talent services within the State of California for DEFENDANTS' economic benefit and under ENTERPRISE-DEFENDANTS' direct control and supervision, Plaintiffs are entitled to the statutory protections afforded by California labor laws, which are applicable to ENTERPRISE-DEFENDANTS' conduct as an employer (and/or prospective employer).

## B.    CONTESTANT AGREEMENT

228.    Before DEFENDANTS bear the expense of transporting each Golden Ticket Holder to Los Angeles, California, Plaintiffs were required to execute certain documents and transmit them back to the ENTERPRISE-DEFENDANTS, including an "*AMERICAN IDOL* CONTESTANT AGREEMENT" and a "PARTICIPATION BACKGROUND INFORMATION FORM".  These key documents are part of the "Information Packet" expressly referred to in the Golden Ticket.

229.    In Season Two (2002-2003), PRODUCTION-DEFENDANTS caused to mail and/or fax to Plaintiff Andrews and Plaintiff Clark the AMERICAN IDOL CONTESTANT AGREEMENT just a few short days prior to their scheduled flight to Los Angeles, California to participate in the Hollywood Rounds.

230.    From Season Three (2003) through Season Nine (2010), in the days prior to flying to Los Angeles, California to participate in the Hollywood Rounds, PRODUCTION-DEFENDANTS caused to mail, e-mail and/or fax to Plaintiffs Williams, Watson, Daniels, T. Brittenum, D. Brittenum, Joyner and Golightly documentation consisting in part of both the AMERICAN IDOL CONTESTANT AGREEMENT and the PARTICIPANT BACKGROUND QUESTIONNAIRE FORM.

231.    Execution of the non-negotiable instrument AMERICAN IDOL CONTESTANT AGREEMENT was a pre-requisite to being transported by ENTERPRISE-DEFENDANTS to the State of California for the performance of Plaintiffs' respective talent services.

232.    Written completion of the PARTICIPANT BACKGROUND QUESTIONNAIRE FORM by Plaintiffs was a pre-requisite to being transported by Defendant-Employers to the State of California for the rendering of Plaintiffs' respective talent services.

233.    At all relevant times, ENTERPRISE-DEFENDANTS collectively referred to the PARTICIPANT BACKGROUND QUESTIONNAIRE FORM and the AMERICAN IDOL CONTESTANT AGREEMENT in writing as the "Participant Application."

234.    As per paragraph A.1 of the AMERICAN IDOL CONTESTANT AGREEMENT:

> **"the principal nature and purpose of the Program is to produce a television program in which a competition will be conducted (the "Competition") to search for and select a recording artist." [AICA_02, ¶A.1; CDC_00189]**

235.    The AMERICAN IDOL CONTESTANT AGREEMENT is purportedly binding upon each Plaintiff as a "contestant," on the one hand, and the "Producer", on the other hand.

236.    "Producer" is defined in the AMERICAN IDOL CONTESTANT AGREEMENT as

"[Defendant] American Idol Productions, Inc. (AIP), or its designees (together with their respective parent, assigns, subsidiaries and affiliated companies, individually and collectively)."

237.    "Network" is defined in the AMERICAN IDOL CONTESTANT AGREEMENT as "[Defendant] FOX Broadcasting Company."

238.    With the exception of Defendant CARCO, all of the ENTERPRISE-DEFENDANTS named in this action fit within the broad definition of "Producer" or "Network" as those terms are expressly set forth in the AMERICAN IDOL CONTESTANT AGREEMENT.

## C.    EMPLOYMENT

239.    Once the American Idol Semi-Finalists are selected, ENTERPRISE-DEFENDANTS require Contestants to complete a W-9 Form that needs to be executed by each Contestant in order to receive cash compensation.

240.    A W-9 form is used when a company has made a determination that the person they are paying is an independent contractor (rather than an employee).

241.    A W-9 form is generally used to obtain the correct name and taxpayer identification number of the worker.

242.    The Semi-Finalist Contestants are instructed to complete a W-9 form as a pre-requisite to continuing their participation as Contestants in the Semi-Final Rounds, even though the AMERICAN IDOL CONTESTANT AGREEMENT specifically states that Contestants are NOT to be deemed independent contractors [AICA_02, ¶ F.7; ¶ G.7]

243.    All Semi-Finalists are presented with a series of written agreements prepared by the law firm MANATT, PHELPS & PHILLIPS, 11355 West Olympic Blvd., Los Angeles, California 90064.

244.    With respect to Seasons Eight and Season Nine, the 19 ENTERTAINMENT

Agreements consist of: (1) Exclusive Recording Agreement w/ 19 RECORDINGS LTD. (approx. 57 pages); (2) 19 TOURING AGREEMENT (approx. 7 pages); (3) 19 MERCHANDISING LTD. (approx. 9 pages); (4) 19 MANAGEMENT LTD. (approx. 7 pages);  (5) TOURING AGREEMENT (*American Idol* Live) (approx. 7 pages); (6) *American Idol* Attraction (approx.. 7 pages).

245.    EMPLOYER-ENTERPRISE-DEFENDANTS also transmit to Semi-Finalist Contestants a series of agreements arranged by Creative Artists Agency (CAA).

246.    These CAA agreements include the Artists Contract-Services, for a period of three (3) years, an AFTRA Standard Exclusive Agency Contract Under Rule 12-C and an AFTRA Commercials Exclusive Agency Contract Under Rule 12-C, each of which carries a term of eighteen (18) months.

247.    By the time any Contestant reaches the Final Rounds, their legal status as an employee is memorialized via completion of a Form I-9 Employment Eligibility Verification that lists Defendant AMERICAN IDOL PRODUCTIONS, INC. as Plaintiff's employer.

248.    Finalists are also made to sign a series of "Employment Deal Memos", a "Standard AFTRA Engagement Contract", and an AMERICAN IDOL PRODUCTIONS, INC. "Production Personnel Deal Memo" which describes that Finalist as an "employee."

# Publicly Disqualified
# BLACK CONTESTANTS

## A.   DELANO CAGNOLATTI [July 1, 2002]

249.   Delano Cagnolatti was the first *American Idol* contestant to be publicly disqualified from the show.

250.   Mr, Cagnolatti is African-American.

251.   On Monday, July 1, 2002, Defendant FOX reported to news media that one of the Semi-Finalists for *American Idol* (top 30 out of 10,000+) had been disqualified for "failing to disclose" his real age.  The network stated that the culprit would be identified on Wednesday's broadcast.

252.   On Tuesday, July 2, 2002, ENTERPRISE-DEFENDANTS caused to broadcast taped footage of LYTHGOE and WARWICK in the process of disqualifying Cagnolatti by surprise on national television.

253.   During the recorded meeting, LYTHGOE and WARWICK publicly accused Cagnolatti of being a liar and disqualified him from the *American Idol* Contest.  [NY POST (7/3/2002); CDC_000076]

254.   Upon information and belief, numerous contestants over the course of the last eleven years have misrepresented their age during the audition process for *American Idol*, including many white and non-Black contestants.

255.   No white or non-black contestant in the history of the Series was ever confronted on national television about such misrepresentation, nor otherwise publicly disqualified.

256.   Upon information and belief, Defendant FREMANTLE and/or Defendant FOX had actual or constructive knowledge of Mr. Cagnolatti's actual age before he was ever advanced

to the Semi-Finals and intentionally chose to overlook this fact for the specific purpose of staging Mr. Cagnolatti's disqualification on national television for "dramatic effect."

## B.     JAERED ANDREWS

### (1)     GOLDEN TICKET [OCTOBER 31, 2002]

257.     Jaered Neale Andrews is an African-American singer from Austintown, Ohio.

258.     On or about October 31, 2002, Jaered Andrews was awarded a Golden Ticket to Hollywood after performing for the resident *American Idol* judges Simon Cowell, Paula Abdul and Randy Jackson.

259.     On Saturday, November 16, 2002, Plaintiff Andrews struck a man, Thomas E. Blakely, in self-defense.   Another person, brother of Andrews' long-time partner, J. Allen, kicked Mr. Blakely in the head and face several times. Mr. Blakely was pronounced dead at the hospital later that evening, having died from blunt force trauma to the head.

260.     J. Allen was arrested and charged with any crime stemming from the altercation with Mr. Blakely. Plaintiff Andrews was <u>not</u> arrested in connection with the incident.

261.     On or about Monday, December 9, 2002, Plaintiff Andrews flew to Los Angeles, California at ENTERPRISE-DEFENDANTS' expense to compete in Season Two of Hollywood Week.

262.     During Hollywood Week, Plaintiff Andrews reportedly was one of the only contestants to receive a standing ovation from all three *American Idol* Judges (Jackson, Cowell, Abdul) at once in response to his performance.

263.     On or about December 13, 2002, after successfully competing in each round, Jaered Andrews was chosen by the *American Idol* judges as one of the Top 32 Semi-Finalist contestants for Season Two

264.     On or about December 14, 2002, Andrews disclosed the circumstances

surrounding Mr. Blakely's death to Sharon GIALLO, an agent of FOX Global Security / MMI / CARCO GROUP, INC.

265.    On or about December 16, 2002, Plaintiff Andrews flew back to Youngstown, Ohio to await the Semi-Final rounds in Los Angeles, which were scheduled to begin in Los Angeles, California on February 5, 2003

## (2)   DISQUALIFICATION [January 31, 2003]

266.    On or about January 31, 2003, just days before Plaintiff Andrews was scheduled to depart for Los Angeles, California to compete in the Semi-Final rounds, Producers of *American Idol* publicly announced to USA TODAY and TV GUIDE that Jaered Andrews had been disqualified from the show.  [CDC_000321].

267.    USA TODAY reported as follows:

"De-idolized: An American Idol finalist was replaced after a Fox background check.  On Wednesday, viewers saw Jaered Andrews of Youngstown, Ohio, become one of the 32 finalists.  But on Thursday, Fox said Andrews had been replaced by George Trice of Jackson, Tenn.  Andrews is a former member of Youngstown-based hip-hop band Ordinary Peoples." [CDC_000321]

268.    Defendant FOX claimed to USA TODAY that Jaered Andrews' former membership in a local hip-hop group *Ordinary Peoples*, a local, un-signed group which had disbanded several years before Andrews' audition for the show, was grounds for Plaintiff Andrews' disqualification.  [CDC_000321]

269.    On February 1, 2003, the MIAMI HERALD reported the reason for Plaintiff Andrews's disqualification as follows:

"In other Idol news, one of Wednesday's 32 finalists - Jaered Andrews - has been disqualified, reports TV Guide Online, after a Fox background check revealed him to be a former member of the Ohio-based hip-hop band Ordinary Peoples. [CDC_002566]

270.    On February 11, 2003, USA TODAY reported that Plaintiff Andrews had been

"replaced earlier for undisclosed reasons."  [CDC_003778].

271.   On February 24, 2003, the ST. PAUL PIONEER PRESS reported that Jaered Andrews was "Evidently disqualified from "American Idol" for already having a music career." [CDC_002578]

272.   On or about Friday, January 31, 2003, an unidentified man from "FOX Global Security" telephoned Plaintiff Andrews at his home in Youngstown, Ohio to notify Andrews that he had been officially disqualified from the Series and that Andrews would no longer be welcome to fly to Los Angeles, California to compete in the Semi-Finalist rounds of Season Two of *American Idol.*

273.   ENTERPRISE-DEFENDANTS' representative said he was unable to provide any reason for the disqualification and then quickly hung up the phone.

## (3)   ARREST [February 27, 2003]

274.   On Thursday, February 27, 2003, a police detective (not a prosecutor) charged Andrews with one misdemeanor count of simple assault. Jaered Andrews learned about the charge from watching FOX's local newscast of the existence of a warrant for his arrest.

275.   The following Monday, March 3, 2003, *The Smoking Gun.com* published a three-page copy of the Mercer County, PA criminal complaint filed against Plaintiff Andrews, as well as a mugshot of Andrews and an autopsy report.  [CDC_002077-78].

276.   *THE SMOKING GUN.COM* article described the Blakely incident in detail, and further explained that the public now knew why Plaintiff Jaered Andrews had been kicked off the show. [CDC_002077-78].

277.   The clear implication in the media was that Andrews had been disqualified for "failure to disclose" his arrest.  This notion is factually impossible because Andrews was

disqualified a full four weeks BEFORE he was ever arrested or charged with any crime.

278.   On February 4, 2004, MTV News reported that: "Last season the judges advanced Jaered Andrews to the final 32 but kicked him off when FOX learned of his arrest on assault charges in connection with a bar fight that ended with a man's death."  [CDC_000827]

279.   On February 5, 2004, the New York Post (owned by Defendant NEWS CORP.) reported that: "Last season, for instance, Jaered Andrews made it to the finals, but was booted when officials learned he'd been arrested on assault charges connected to a bar fight in which a man died." [CDC_000831]

280.   *The Smoking Gun.com* recognized that Plaintiff Andrews had been disqualified from American Idol for a crime which he had not been arrested. [CDC_002077-78]

281.   ENTERPRISE-DEFENDANTS *knew* a full month in advance that Plaintiff Andrews was going to get arrested in Pennsylvania and charged with a crime that he never committed.

282.   ENTERPRISE-DEFENDANTS intentionally targeted Jaered Andrews for public disqualification from *American Idol* because of their racial *animus* concerning young black males.

283.    ENTERPRISE-DEFENDANTS consciously elected to exploit Andrews' pending criminal record as a form of advertising, publicity and promotion for the Production and the Enterprise.

284.   On or about November 12, 2003, after Plaintiff Andrews testified before a jury of twelve peers that he had acted in self-defense against a belligerent man who had been harassing Andrews' female companion, it took *less than two hours* for the jury to acquit Jaered Andrews of the simple assault charge.  [CDC_002640; CDC_002650-51]

## C.    FRENCHIE DAVIS

### (1)    GOLDEN TICKET [OCTOBER 25, 2002]

285.    During Season Two [2002-2003], Franchelle "Frenchie" Davis was a 23-year-old African-American female contestant on *American Idol* and a student at Howard University (on leave at the time of her audition).

286.    On October 24-28, 2002, Frenchie auditioned in New York City and was one of 35 singers at the Open Auditions to receive a Golden Ticket.

287.    According to Simon Cowell's 2003 autobiography, Frenchie Davis was one of the early favorites to win Season Two. [CDC_004157]

> **The first one to catch our eye [in New York] was Frenchie Davis, a big black woman with her hair dyed blond. She was calm and serene but had a little smile on her face, as if she knew something chat we didn't. Which she did. She knew that she could sing, and the second she opened her mouth we knew it, too. She was absolutely stunning, and the three of us turned to one another and said, "This girl's going to win the competition." She was that good. Frenchie told us that she had made it to the auditions only because her college had bankrolled her trip. She had people who believed in her, and she believed in herself as well; when we told her she was coming through to the next round, she didn't even blink. She knew what she had.**

288.    On Friday, December 13, 2002, Frenchie Davis was selected as a Top 32 Finalist.

289.    On or before December 20, 2002, as a part of the background check process administered by ENTERPRISE-DEFENDANTS, Ms. Davis disclosed to *American Idol* producers in writing that she had taken topless photos for an erotic website when she was a teenager.

290.    Frenchie Davis disclosed the details of her erotic photos <u>in writing</u> on page 11 of the PARTICIPANT BACKGROUND QUESTIONNAIRE FORM.

291.    In early-mid January 2003, a representative from Defendant AIP and/or Defendant FMNA visited Frenchie's residence in California and wanted to talk in greater detail about the topless photos.

(2)    DISQUALIFICATION [February 10, 2013]

292.    On Monday, February 10, 2003, ENTERPRISE-DEFENDANTS' agent Patrick LYNN

called Frenchie and summoned her to meet with ENTERPRISE-DEFENDANTS' senior executives at

CBS Studios in Los Angeles.  Present at the meeting were Defendant LYTHGOE, Defendant

WARWICK and Patrick LYNN.  Defendant LYTHGOE did the talking.

293.    Defendant LYTHGOE told Frenchie that they had received "blackmail" threats

from some undisclosed third party who claimed to be in possession of Frenchie's erotic photos

and who threatened to post the photos on-line unless Frenchie was disqualified from the show.

294.    As a result of the alleged blackmail threats, Defendant LYTHGOE claimed that

ENTERPRISE-DEFENDANTS "had no choice" but to disqualify Frenchie from the *American Idol*

Contest.

295.    On February 13, 2003, Defendant LYTHGOE was quoted in the media as stating

that the producers had to be careful in selecting contestants because *American Idol* was a "real

family show." [CDC_3796]

296.    SPONSORSHIP-DEFENDANTS FORD, COCA-COLA and AT&T played a role in the

decision to disqualify Frenchie Davis.

297.    Simon Cowell, in his 2003 autobiography, confirmed that the "family sponsors"

played a significant role in the decision to disqualify Frenchie Davis.  [CDC_4157].  Cowell

wrote that he had received a call one day from Defendant LYTHGOE:

> "Simon," [Lythgoe] said, "we have a problem." Frenchie Davis, one of the
> odds-on favorites, had posed for an adult Web site some years before. Now
> her pictures had been discovered, and Nigel and Kenny thought she might
> have to be removed from the show. I thought it was a tough call. As a record
> executive, I would keep her in. But if I was in Fox's shoes, protecting a
> billion-dollar brand, I didn't think I would risk offending family sponsors.
> There were subtler issues at play as well: At the auditions Frenchie had made
> it quite clear that she was trying to better her life, and I wondered if maybe
> we weren't sending the wrong message by kicking her off. To Fox's credit,

> they spent weeks agonizing over the decision. Bur in the end they decided that she would have to go.

298.     The NEW YORK DAILY NEWS explained that *American Idol* had to disqualify Frenchie Davis because it "has a squeaky-clean image that has made it more appealing than other reality fare to big-name advertisers such as [ENTERPRISE-DEFENDANTS] Ford, Coca-Cola and AT&T."

299.     Davis remarked years later that ENTERPRISE-DEFENDANTS "had decided that because *American Idol* was a family show, that they could not have me on the show because of the pictures I had taken – though they had never seen the pictures."  [CDC_003855]

300.     On Tuesday, February 11, 2003, ENTERPRISE-DEFENDANTS announced Frenchie's unceremonious disqualification from *American Idol* .

301.     In the weeks following Frenchie's disqualification, media outlets reported that she had been disqualified for "failing to disclose" the existence of the photos.  [CDC_002621]

> And of course there was the Frenchie kiss-off, with Fox booting 23-year-old Franchelle **"Frenchie"** Davis from **"American Idol"** because she had posed topless for a Web site known as **"Daddy's Little Girls"** under the name **"HoneyBrown."** Although Frenchie was of legal age when she posed for the pics, ics, Fox dumped her because, unlike Trenyce, <u>she hadn't informed them of the potentially embarrassing news in advance.</u>

302.     On February 12, 2003, David Bloomberg wrote for www.FoxesonIdol.com:  [CDC_003792]

> It will certainly be interesting to see how this situation is addressed. <u>But the fact of the matter remains that one of the potentially biggest stars of this season has been eliminated because of something she did four years ago in order to raise money to get back to college</u> – something that has nothing to do with her ability to sing or to be the next American Idol.

303.     On February 13, 2003, *The Smoking Gun.com* published an article entitled "Porn Past Sinks American Idol Finalist" in which the New York-based tabloid website revealed intimate details from an un-named "TSG Source" that described the nature of Davis' erotic

photos.  [CDC_002071].

304.    In February 2007, photos of a white *American Idol* female Semi-Finalist contestant named Antonella Barba surfaced on-line.   The photos were of a sexually explicit nature.  [CDC-003833]

305.    Defendant LYTHGOE made a statement to the press, announcing that Barba would <u>not</u> be disqualified from the competition.   [CDC_003833-34].   LYTHGOE claimed that he had only learned of the X-rated photos when a magazine contacted him.   He stated to ENTERTAINMENT WEEKLY:

> **We have really good background checks on everybody, and we deal with that every season. It's sad, isn't it, that your best friends are the ones that come forward with information that will go to [The] Smoking Gun or put your photographs on the web?"**

306.    ENTERPRISE-DEFENDANTS never took steps to correct and/or retract the report that Frenchie Davis had "failed to disclose" the photos in advance of her selection, once again demonstrating ENTERPRISE-DEFENDANTS' intent to propagate stereotypes that depict Black *American Idol* contestants as untrustworthy.

307.    DEFENDANTS disqualified Frenchie Davis because of her ancestral characteristics and would not have disqualified her had she been white.

## D.    COREY CLARK

## (1)    ARREST [October 12, 20002]

308.    On October 12, 2002, Corey Clark was arrested at his family home in Topeka, Kansas.  The charges revolved around an alleged assault of his sister.

309.    Corey Clark's sister has at all times maintained that her older brother Corey Clark never hit her.

310.    On October 15, 2002, the Monday after Corey Clark's arrest, he was arraigned before a Judge who reprimanded the police officers for arresting Clark.  Clark was released from custody and his bond was set at $100.  [CDC_000099-105]

311.    *All charges, terms and conditions of bond against Plaintiff Clark were dropped in their entirety on November 15, 2002.* [CDC_000120; CDC_000125; CDC_000145]

312.    Plaintiff Clark assumed that any charges stemming from his October 12, 2002 arrest had been dropped.

## (2)    GOLDEN TICKET [(November 4, 2002)]

313.    Plaintiff Corey Clark was one of 70,000(+) United States citizens between the ages of 18 and 28 who publically auditioned for Season Two of the hit show in the fall of 2002.

314.    From October 30, 2002 through November 4, 2002, Plaintiff Clark auditioned for the Second Season of *American Idol* in Nashville, Tennessee.  Roughly 5,000 contestants auditioned in Nashville that year.  [CDC_000174; CDC_000176]

315.    At the Open Auditions in Nashville, Tennessee, Corey Clark likely executed a written agreement called the American Idol Audition Agreement.  This agreement asked Clark to disclose his name and birthdate.

316.    On November 4, 2002, Plaintiff Clark became one of thirty-one (31) contestants from Nashville and one of two hundred and thirty-four (234) singers nationwide who was awarded a Golden Ticket to Hollywood for Season Two of *American Idol.*

317.    Plaintiff Clark was awarded a "Golden Ticket" to Hollywood based on a unanimous decision from *American Idol's* distinguished panel of judges: Simon Cowell ("Cowell"), Abdul ("Abdul") and Randy Jackson ("Jackson").  Regarding Plaintiff's audition, Abdul commented that Plaintiff had "star quality"; Cowell stated that Plaintiff had a "good

recording voice".  [CDC_000178]

318.   Simon Cowell wrote about Corey Clark's Nashville audition in his 2003 published autobiography (pg. 152) stating:

> "We met Corey Clark in Nashville, and Paula [Abdul] fell for him instantly;
> she thought he could be another Justin Guarini, though he had a twinkle in
> his eye and it was clear that he was a bit more of a bad boy than Justin."
> [CDC_004146]

319.   Plaintiff Clark's Golden Ticket indicated that he was to receive an information packet in the mail from *American Idol* within 10-14 business days of his November 4, 2002 audition.  The Golden Ticket further instructed that Plaintiff should not attempt to contact the offices of the Producers.  [CDC_000178]

320.   On December 5, 2002, Plaintiff received a fax from Defendant American Idol Productions, Inc. contained a 16-page long-form AMERICAN IDOL CONTESTANT AGREEMENT plus travel and press information.  Plaintiff quickly reviewed the Agreement, without the advice of counsel, signed it on Friday, December 6, 2002.  [CDC_000203].

321.   On December 9, 2002, Plaintiff arrived in Los Angeles beginning of Hollywood Week.  [CDC_000186]

322.   Plaintiff Clark's AMERICAN IDOL CONTESTANT AGREEMENT was countersigned by American Idol Productions, Inc. on Monday, December 9, 2002.  [CDC_000203].

## (3)   SHAWNEE COUNTY CHARGES [December 4, 2002]

323.   On Thursday, December 4, 2002, the government's charges against Plaintiff Clark were re-instated and a three-count misdemeanor complaint was filed by a Shawnee County District Attorney. [CDC_000136-137]

324.   ENTERPRISE-DEFENDANTS communicated directly via telephone, fax and/or U.S. mail with government officials employed within the Shawnee County criminal court including,

*inter alia*, the Clerk of Shawnee County Court.

325.   Upon   information   and   belief,   ENTERPRISE-DEFENDANTS   established communications with government officials employed by Shawnee County at some time after Clark's case was dismissed on November 15, 2002 but before Clark was charged with any crime on December 4, 2002.

326.   On December 4, 2002, the Shawnee County District Attorney filed misdemeanor charges of Battery and Criminal Restraint, charges against Clark.  [CDC_000138-140]

327.   Shawnee County's District Attorneys filed an Affidavit of Officer M. Soden, dated October 12, 2002, with the Criminal Misdemeanor Complaint. [CDC_000141-143] To protect Corey Clark's due process rights, the Affidavit was sealed, i.e., "closed  for examination." [CDC_000121].

328.   Upon information and belief, ENTERPRISE-DEFENDANTS caused to interfere in the government's decision-making process that led to Shawnee County's filing of battery and criminal restraint charges against Plaintiff Clark.

329.   ENTERPRISE-DEFENDANTS continued to make on-going communications with Shawnee County's court officials throughout the month of January 2003, obtaining copies of all public records from Plaintiff Clark's files, including civil cases involving bounced checks, and including the criminal complaint filed by Shawnee County prosecutors.

330.   ENTERPRISE-DEFENDANTS also obtained a hard copy from the Shawnee County Clerk's office of the Court-Sealed Affidavit of Officer M. Soden which had been marked on the docket as "closed for examination" and was NOT a matter of public record. [CDC_000121; CDC_000141-143]

331.   As of 2002 and 2003, none of the documents maintained in the Shawnee County

Clerk's office were maintained in an on-line database that could have been accessible to the public or news media.  Documents in pending criminal cases were stored via hard copy and then later transferred to microfiche once the case was closed.

332.  On January 10, 2003, the Shawnee County Clerk's office caused a copy of the clerk's file to be copied and transmitted to Clark's defense counsel.  [CDC_000273]

333.  On June 19, 2003, two of the misdemeanor charges brought against Plaintiff, including the volatile charges that he had physically battered and restrained his 15-year-old sister, were dismissed by the Shawnee County prosecutor.  [CDC_000122; CDC_000168-171]

334.  Upon the advice of his counsel and in order to avoid traveling back to the State of Kansas, Plaintiff pled no contest to one misdemeanor count of "obstruction of justice" based on resisting arrest. [CDC_000122; CDC_000168-171].

**(4)  HOLLYWOOD WEEK [December 9-14, 2002]**

335.  After the close of the highly successful second season, Cowell wrote his autobiography, *I Don't Mean To Be Rude, But . . . The Truth About Fame, Fortune and my Life in Music,* the first edition of which was published in December 2003.  [CDC_003984]

336.  Cowell revealed in his autobiography that Plaintiff Clark was one of the four contestants who he believed was a strong front-runner to win the Season Two contest.  [CDC_004154]

> **I did an interview around that time [Hollywood Week] in which I was asked who might win, and I mentioned Frenchie [Davis], Ruben [Studdard], Clay [Aiken] and Corey [Clark].**

337.  Cowell wrote: "Corey was the rebel of the group.  I found him to be charming, polite, and exactly the same offstage as he was onstage.  Corey has an edge and that is a good thing in the recording industry.  I have a hunch that Corey could get himself a deal."

[CDC_004197]

338.   At the end of Hollywood Week, Corey Clark had been named as a top semi-finalist and was invited back to compete in the live rounds starting February 5, 2003.

## (5)   BACKGROUND CHECK [December 20, 2002]

339.   On December 20, 2002, Plaintiff received an information packet via Fedex containing ADDENDUM NO. 1 TO CONTESTANT AGREEMENT AND RELEASE, plus a long-form document entitled AMERICAN IDOL PARTICIPANT BACKGROUND QUESTIONNAIRE FORM. [CDC_000218-259]

340.   The cover memo issued by American Idol Productions, Inc., dated December 20, 2002, instructed the contestants to fill out and return the Questionnaire and Addendum #1 via Fedex to: "MMI, 200 N. Tustin Avenue, Suite 100, Santa Ana, CA 92705, Attention: Drew P. Machonachy, President, for receipt no later than January 6, 2003." [CDC_000224]

341.   ADDENDUM # 1 TO THE CONTESTANT AGREEMENT AND RELEASE [CDC_000226-27] provides in relevant part that:

> **Producer requires me to enter into this Addendum in order to further be considered as a contestant on the Series, and I deem it to be in my best interest to enter into this Addendum.**
>
> **ACCORDINGLY, PRODUCER AND I AGREE AS FOLLOWS:**
>
> **I AGREE TO COMPLETE AND SIGN A COPY OF THIS ADDENDUM AND THE ATTACHED BACKGROUND INVESTIGATION FORM, AND TO RETURN THE SIGNED AND COMPLETED ADDENDUM AND BACKGROUND INVESTIGATION FORM VIA FEDERAL EXPRESS TO MMI, 200 N. TUSTIN AVENUE, SUITE 100, SANTA ANA, CA 92705, ATTENTION: DREW P. MACONACHY, PRESIDENT, FOR RECEIPT NO LATER THAN JANUARY 6, 2003.**
>
> **I UNDERSTAND THAT IN THE EVENT I DO NOT SIGN AND RETURN THIS ADDENDUM AND/OR THE COMPLETED BACKGROUND INVESTIGATION FORM, I MAY NOT BE ELIGIBLE FOR FURTHER PARTICIPATION IN THE SERIES, BUT THAT THE TERMS AND CONDITIONS OF THE AGREEMENT WILL REMAIN IN FULL FORCE AND EFFECT. [¶ 1]**

I hereby grant permission to Producer to disclose all of the information on the Background Investigation Form to any third-party investigation service selected by Producer, in its sole discretion, in order to run various background checks on me, which may include, without limitation, consumer reports, criminal conviction reports, civil court searches, searches of sex offender databases, etc. in order to determine my eligibility for further participation on the Series, which determination shall be in Producer's sole discretion, and to use the information in any other manner whatsoever. [¶ 2]

As more fully set forth in the Agreement, in the event I am eliminated from the Series based upon the results of the background investigation, or for any other reason, I agree that Producer and/or the network broadcasting the Series (the "Network") may make any explanation or announcement, on-air or otherwise, that Producer or the Network may choose as to the reason I was disqualified from the Series. [¶ 3]

I understand and agree that it may be necessary for me to become a member in good standing, as defined by law, of the American Federation of Television and Radio Artists (AFTRA) in connection with my further participation in the Series and that Producer will assist me in obtaining such membership, if necessary. In the event I become a member of AFTRA, I acknowledge that my AFTRA dues may be deducted by Producer from the first monies payable to me under the AFTRA agreement. [¶ 7]

342.   In Season Two, the 28-page AMERICAN IDOL PARTICIPANT BACKGROUND QUESTIONNAIRE FORM [CDC_000231-259] contained the following questions relating to criminal background checks under the subheading "LITIGATION HISTORY", followed by a checkbox for "Yes" or "No":

| |
|---|
| • **"Have you ever been detained arrested or convicted of a felony or misdemeanor offense, either as a juvenile or an adult?"** |
| • "Have you ever had a restraining order placed against you?" |
| • "Have you ever had a warrant issued for your arrest, or have you ever failed to appear in court for a traffic related or a criminal matter?" |
| • "Have you any current or outstanding warrants (e.g., traffic tickets, arrests, etc.?)" |

343.   At the time Plaintiff Clark completed the long-form QUESTIONNAIRE on December 24, 2002, Plaintiff believed in good faith that he had been cleared of all charges relating to his October 2002 arrest in Topeka, Kansas.

344.   Plaintiff hand-delivered both documents, ADDENDUM #1, signed January 4, 2003

[CDC_000226-27] and the PARTICIPANT BACKGROUND INFORMATION FORM, signed December 24, 2002, [CDC_000231-269] to the Los Angeles offices of Defendant American Idol Productions, Inc. on Saturday, January 4, 2003.

345.    At the production office in Los Angeles, Clark filled out Fedex Airbills addressed to "Sharon Giallo of MMI".  [CDC_000226].

346.    Clark also delivered to junior producer Patrick LYNN a copy of his Birth Certificate, Social Security Number and California Driver's License.  [CDC_000257]

347.    On or about Monday, January 6, 2003 or Tuesday, January 7, 2003, while already in California, Corey Clark learned *for the first time* that the misdemeanor charges against him in Shawnee County, Kansas had been reinstated by the county prosecutor on December 4, 2002. [CDC_000265-267]

## (6)   SEMI-FINALISTS ROUNDS [February 25, 2003]

348.    On February 25, 2003, Clark performed the song "Foolish Heart" during a live telecast in which the television audience cast their votes.

349.    After Corey Clark's performance, he received two standing ovations from Randy Jackson and Paula Abdul and extended applause from Abdul and Cowell.  All the Judges, and the host, gave Corey Clark positive remarks:

- <u>Randy Jackson</u>: "Good job, dude.  Sensational.  Sensational.  Great song.  In Tune. Thanks, dude."

- <u>Paula Abdul</u>: "Whoa. Amazing, Un-believable. Unbelievable Great song, you wanna know why great song?  I'm telling you, you just blew me away . ..blew me away.. what a beautiful voice ...unique...refreshing.  In tune all the way.  Yeah!  Brilliant, brilliant, brilliant.  I'm really excited, too.  You made America feel that.  You proved right here, right now – you took this serious.  Good for you."

- <u>Simon Cowell</u>: "You've put me in a good mood, now. In fact this whole show put me in a good mood.  Which I thought was going to make the competition more exciting and I promise you this.  If you get in the Top 10, which I think you will, and Josh gets in the Top 12. Throw in the Kimberlies. If you get in the Top 12, it is a much more exciting show than last year."

- **Ryan Seacrest:** "They [your parents] are very happy for you.   Congratulations. Watching you, you make it look so easy.  Are you that comfortable, that confident?"

350.    On February 26, 2003, it was announced live on television during the "Results Show" that Corey Clark was voted through by the public to the Top 12 on the strength of the previous night's performance.

## (7)    PRIZE CONTRACTS [March 8-17, 2003]

351.    On Saturday, March 8, 2003, LYTHGOE, his son Simon Lythgoe and WARWICK called the Top 12 American Idol finalists together to inform them that they needed to pick a lawyer to advise them on signing the "American Idol contracts."

352.    The Producers announced that they were going to start paying each finalist $1,000 a week, that they would would be given a clothing budget, that they would be receiving a fixed amount of money for each tour appearance, and a percentage of royalties from the Season Two CD compilation of Love Songs.

353.    Shortly after making the announcement, production assistants passed out over eighty pages of complex industry contracts to the Top 12 finalists for their review. [CDC_000_478-557] The contestants were informed that they would need to sign all the contracts by no later than Monday, March 10, 2003 or they would be automatically disqualified from the show.

354.    On Sunday, March 9, 2003, Attorney Howard Siegel purportedly flew into California and met with the Top 12 *American Idol* contestants at the "Idol Mansion" and reviewed five separate 19 ENTERTAINMENT contracts with them:  a Recording Agreement, a Management Agreement, a Touring Agreement, a Film Production Agreement, and a Merchandising Agreement.

**(8)    AFTRA AND EMPLOYMENT AGREEMENTS [March 10-11, 2012]**

355.    During Attorney Siegel's meeting with the Top 12 finalists to discuss the 19 Talent contracts, there was no talk whatsoever concerning AFTRA Union contracts, wages or employment agreements.

356.    On Monday, March 10, 2003, Plaintiff signed a "Recoupable Salary Advance" of $500 with American Idol Productions, Inc.  The documents were presented to him by production staff.  Attorney Siegel was not consulted.  [CDC_000414]

357.    On Tuesday, March 11, 2003, Plaintiff completed a Form I-9 Employment Eligibility Verification that listed American Idol Productions, Inc. as Plaintiff's employer.  The document was signed by Michelle Baker on behalf of employer American Idol Productions, Inc. on March 13, 2003.  [CDC_000416]

358.    At the behest of production staff, Clark also signed an "Employment Deal Memo", [CDC__000418], a series of "Standard AFTRA Engagement Contract(s)" [CDC_000422-426] and an American Idol Productions, Inc. "Production Personnel Deal Memo" [CDC_000431-434] which clearly describes Plaintiff Corey Clark as an <u>employee</u> of American Idol Productions, Inc.

359.    All of these  documents were presented to Plaintiff "on the fly" by production staff.  Attorney Siegel did NOT consult with Corey Clark concerning the execution of any of these employment-related documents.   Plaintiff Clark does not remember reviewing these documents.

360.    That same evening, on March 11, 2003, Clark performed the song "This Old Heart of Mine" during a live telecast of Motown week.  After his rendition, celebrity guest judge Lamont Dozier described Corey Clark as a "**New and Rising Smokey Robinson.**"

361.    On Wednesday, March 12, 2003, Plaintiff signed a Membership Application for

the American Federation of Television and Radio Artists (AFTRA) [CDC_000428-429] and signed *American Idol* ADDENDUM #2 to the CONTESTANT AGREEMENT AND RELEASE. [CDC_000407-409]

362.   Attorney Siegel was NOT consulted with respect to any of the preceding five paragraphs of this Second Amended Complaint.   ADDENDUM #2 [CDC_000407-409] provides in relevant part that:

> Producer requires me to enter into this Addendum in order to be further considered as a contestant on the Series, and I deem it to be in my best interest to enter into this Addendum.
>
> I understand and agree that as a condition to my further participation in the Series as one of the twelve (12) finalists, or as an alternate, I will be required, at the sole discretion of the 19 Companies (as defined below), to enter into: (a) an agreement with 19 Recordings Limited for my exclusive services as a recording artist (the "Recording Contract"); (b) an agreement with 19 Merchandising Limited for the use of my name, likeness and biography in connection with advertising, endorsement, merchandising and sponsorship (the "Merchandising Contract"); and (c) an agreement with 19 Management Limited for the management of my career as an artist in the entertainment industry. The Recording Contract, Merchandising Contract and Management Contract shall be referred to herein collectively as the "Talent Contracts." 19 Recordings Limited, 19 Merchandising Limited and 19 Management Limited shall be referred to herein collectively as the "19 Companies."                               [¶                               1]
>
> I understand that, in the event I enter into the Talent Contracts, the 19 Companies will make a reasonable contribution to the cost of independent legal representation in order to advise me in relation to entering into the Talent Contracts.

--------

363.   On Monday, March 17, 2003, Clark signed the 19 ENTERTAINMENT contracts after consultation with Attorney Siegel. [CDC_000_478-557]

364.   On Tuesday, March 18, 2003, Clark performed the song "Against All Odds" for Movie Soundtrack week.  Celebrity guest judge Gladys Knight remarked: "I Love the Sound of Your Voice."

**(9)    FINAL PERFORMANCE [March 25, 2003]**

365.    On Tuesday, March 25, 2003, Corey Clark performed the song "Drift Away" during Country Rock Week.  It would mark his last performance on American Idol.  The Judges remarked as follows:

> • <u>Randy Jackson</u>: **"I like it, man, I like it, I thought it was good, man, I like it when you go into your upper register, dawg, it was good, it was good."**

> • <u>Paula Abdul</u>: **"Yeah, you were on it, Corey, you're on it when you pick songs that can go into that beautiful upper register.  And you know what? It's really refreshing, I've said it before, your voice is really refreshing, especially when you go into your upper register and you know what, you are on it tonight, and you are in good voice tonight …"**

> • <u>Olivia Newton John</u>: **"I thought you sang it really well, I liked it.  It suited you, and I liked your new hairdo . . . It was really good."**

> • <u>Simon Cowell</u>: **"I thought, actually compared to last week . . . I thought  you did really really well tonight.  Very very good."**

366.    On Wednesday, March 26, 2003, the Results Show revealed that with 9 contestants remaining, Corey Clark was <u>not</u> one of the contestants landing in the bottom 3, which meant that his voting results (if any) placed Corey Clark in the <u>TOP 6</u> as of his last performance on the show.

**(10)   DISQUALIFICATION**

367.    On Monday, March 31, 2003, Plaintiff Corey Clark was abruptly "disqualified" from the *American Idol* contest in a shocking and controversial manner.

368.    Plaintiff's 2003 disqualification from the contest was orchestrated and exploited for maximum media exposure by DEFENDANTS.

369.    On early Monday morning, March 31, 2003, *American Idol* producers woke Clark up and notified him that *The Smoking Gun* had published an article entitled "Another Fallen Idol" concerning Clark's misdemeanor arrest in Topeka, Kansas on October 12, 2002.

[CDC_0002090-2095] Clark was led to a computer where he was commanded to read *The Smoking Gun* article, which described in vivid detail police report narratives and witness testimonials.

370.    The March 31, 2003 article also published details from Court documents, some of which were sealed, consisting of Plaintiff's criminal and civil court record information from the Shawnee County District Court in Topeka, Kansas. [CDC_0002090-2095] *The Smoking Gun* concluded the article by stating:

> So, were/are "American Idol" producers aware of Clark's criminal predicament?
>
> Well, TSG long ago stopped believing anything that reality TV producers say when it comes to what they did or did not know about a contestant's past. It appears that a combination of Keystone Kops background checks, participant mendacity, and unblinking network indifference has guaranteed that drunk drivers, bankrupt deadbeats, shoplifters, bondage actresses, and assorted convicted criminals will continue to populate reality TV shows.
>
> For its part, Fox has adopted a blanket policy whereby network executives refuse to comment "on the private lives of show participants." That's not a bad stance when you consider that this year's original 32 "American Idol" semifinalists included a convicted thief [Trenyce], an Internet porn model [Frenchie Davis], and a guy who's been charged in connection with a fight that ended in the death of a Pennsylvania man [Jaered Andrews]. In fact, Fox booted the contestant, Jaered Andrews, a month before he was even arrested for misdemeanor assault.
>
> TSG will venture a guess that Fox knew about Clark's rubber checks, but were unaware that he had been popped for battering his little sister (if true, not exactly Idol" behavior).

371.    After reading *The Smoking Gun* article, Clark was then told to quickly pack his bags because he needed to go see LYTHGOE and explain what happened.  A security guard escorted Clark from the house where he was staying to CBS Studios.

372.    Having been told to pack his bags, Plaintiff Clark surmised that he was going to be ejected from the contest; but when he resisted going to see LYTHGOE, the security card insisted that he had better go to CBS studios as his attendance was mandatory

373.    When Clark arrived at the studios, Nigel Lythgoe met him along with the staff

psychiatrist named "Chris".  LYTHGOE explained that the Producers were willing to let Plaintiff stay on the show "depending on how much you help us clean this up." Lythgoe explained that FOX required Plaintiff to do a videotaped interview immediately.   When Plaintiff expressed concern that he should be allowed to speak with an attorney, LYTHGOE stated that there was no time for that and if Corey had any chance of staying on the show, he would need to appear in the videotape.

374.      Under duress, Plaintiff Clark agreed to be videotaped, thinking that his only chance to stay on the show was to be cooperative. Once the tape started rolling, LYTHGOE asked Plaintiff to apologize to anyone he had "displaced" from getting into the final 12. LYTHGOE also wanted Plaintiff to confess to being a "liar" for not telling senior producers about the arrest.  Plaintiff refused to abide by Lythgoe's  suggestion of being called a liar and LYTHGOE instead suggested that Clark state he was "guilty" of not telling producers about the arrest.  Clark asked again whether making such a statement would ensure that he could stay on the show, and LYTHGOE guaranteed that it would.

375.      Once the videotape interview was over, LYTHGOE left the room. Within 30 minutes, he came back and announced that senior FOX executives demanded that Plaintiff Clark be removed from the show.

376.      Corey Clark was ushered into a van which drove him to his grandfather's house in Rialto.

377.      Nine hours after *The Smoking Gun* reported on Plaintiff's arrest, *The Smoking Gun* then became the first and only publication that Monday, March 31, 2003, to announce that Corey Clark had been "booted" from the show.  [CDC_002113-2114]

378.      On the face of *The Smoking Gun* articles, it clear that *The Smoking Gun's* editor

had a direct line into DEFENDANTS.

379.     Plaintiff Clark's disqualification was purportedly based on claims that Plaintiff had "failed to disclose" or "withheld information" from *American Idol* producers concerning his October 12, 2002 arrest in Topeka, Kansas (the "2002 Kansas Arrest").

380.     That evening, on March 31, 2003, *The Smoking Gun* became the first media outlet to report that Clark had been disqualified by DEFENDANTS, reporting that "Nine hours after TSG reported on the pending criminal charges faced by *American Idol* finalist Corey Clark, the 22-year-old singer was removed from the hit program by Fox television and the show's producer." [CDC_002113-2114]

381.     At the time of Plaintiff's 2003 disqualification, the government's misdemeanor charges against Plaintiff were *pending* trial and therefore had yet to be adjudicated.

382.     The corporate decision to disqualify Corey Clark from the *American Idol* contest and Series (for reasons other than his celebrated talent as a singer or performer) was made by *American Idol*'s producers, creators and broadcast network executives; and with the participation of some of *American Idol*'s major corporate sponsors, contractual beneficiaries and/or third party contractual beneficiaries.

**(11)      FOX'S PRESS RELEASES RE: "DISQUALIFICATION" [March 31, 2003]**

383.     The *American Idol* CONTESTANT AGREEMENT signed by "contestants" as a pre-requisite to their further participation on *American Idol* provide that the *American Idol* producers and/or FOX may disqualify any contestant *at any time* for any reason at their sole and absolute discretion.

384.     However, the rules published by the producers of *American Idol* <u>before</u> contestants enter the contest are different, limiting the producers' absolute right to disqualify to

the audition phase only.  This is evidenced by the book published by Fremantle and 19 Entertainment, producers of *American Idol*, who are listed as the co-owners of the copyright to the underlying text contained in a literary work entitled AMERICAN IDOL: THE OFFICIAL BOOK. The book was published in August 2002 by Bantam Books, a division of Random House, Inc. The book sets forth the requirements for competing on *American Idol*.   Regarding disqualification, the book states:

> "**Disqualifications: We reserve the right to disqualify or exclude, in our sole and absolute discretion, any individual from <u>any of the auditions</u> for any reason.**" [CDC_004259] (emphasis added).

385.    Since the date of Corey Clark's extrication from *American Idol* on March 31, 2003, FOX and Production-ENTERPRISE-DEFENDANTS have published or caused to be published numerous written statements to the U.S. news media concerning the alleged justification for removing Plaintiff Corey Clark from Season Two of the *American Idol* contest.

386.    The March 31, 2003 Press Release, issued by Defendant FOX to *The Smoking Gun*.com [CDC_002113-2114] states as follows:

> **Due to events that have recently come to light, American Idol participant Corey Clark has been removed from the contest.**
>
> **All participants are required to provide full and accurate information to assist in background checks, including disclosure of any prior arrests. Corey withheld information about a prior arrest which, had it been known, might have affected his participation in the show. Due to his failure to disclose, compounded by an error in a police report which misspelled Corey's name, the incident was not discovered during the background check. The producers and network feel that Corey's behavior warrants his disqualification.**
>
> **Unfortunately, the search process is not perfect. We regret the error, but the only thing we can do is learn from the incident, continue to improve the background check process, and move on.**
>
> **At this time, no decision has been made as to how this will impact this week's shows.**

**(12)**          **CORRESPONDENCE WITH AIP** [May 6, 2003]

387.     On May 6, 2003, Plaintiff' counsel, Robin Mitchell Joyce, Esq., wrote to counsel for Defendant AIP, Michael Allan Jaffa, Esq. in response to Jaffa's April 13, 2003 letter threatening to sue Corey Clark for $5 million for breach of the confidentiality provision contained in the *American Idol* CONTESTANT AGREEMENT [CDC_000727-728]

388.     In the letter, Attorney Joyce reprimanded Attorney Jaffa for the manner in which Corey Clark's removal from the show was orchestrated [CDC_000727-728]:

> Had your producers taken the time to investigate this matter, they would have found out that the incident in Topeka stemmed from a very sad and silly misunderstanding, during which Corey Clark sought to protect his sister, not to harm her. This becomes clearly apparent if one bothers to note that the resulting charges from this matter were reduced to three rather confusing misdemeanors . . .
>
> In addition, Corey's sister has stated time and time again that he never hit her, has never hit her, and that they have a close and loving relationship. There was no way, however, for Corey, under the circumstances presented to him on the morning of his dismissal from *American Idol,* to present that in a linear and understandable way or to have his sister with him to explain the truth of the matter . . .
>
> With reckless disregard for Corey's reputation and the reputation of his family, American Idol broadcast a hacked version of his interview constructed solely to support its decision and create controversy . . .
>
> For two days thereafter, Corey tried to reach representatives of *American Idol* for assistance in dealing with the press and his pleas were callously ignored. It was only then that Corey was forced to rehabilitate his name and, more importantly, the reputation of his family, by granting selective interviews.

**E.     JOHN JACOB SMALLEY**

**(1)     GOLDEN TICKET**

389.     Jacob John Smalley, from Lawton, Oklahoma, was 19 years old when he auditioned for Season Two of *American Idol.*

390.     On or about November 10, 2002, Jacob John received high marks from the Expert

Judges when he first appeared before them at Open Auditions in Austin, Texas.

- **Paula Abdul**: **"Wow, I think you have the 'X Factor', good, good, good, wonderful."**

- **Simon Cowell**: **"Very good, your timing was a bit off, but very good.  You have a nice face and a very, very good voice."**

- **Randy Jackson**: **"Excellent, dude, one of the best that I have heard today.  Excellent, excellent. Very good."**

- **Paula Abdul**: **"I think we're all saying the same thing…"**

- **Simon Cowell**: **"…You are going to Hollywood."**

## (2)   ARREST

391.    On or about Saturday, November 30, 2002, Plaintiff Smalley was arrested for public intoxication and verbally resisting arrest.

392.    At the arraignment the next Monday, the Judge scheduled a Court date for mid-January 2003.

393.    In early December 2002, Smalley received a fax from Defendant AIP containing, among other documents, the *American Idol* CONTESTANT AGREEMENT.

394.    On December 9, 2002, Jacob John was flown to Los Angeles, California by ENTERPRISE-DEFENDANTS to compete in the Hollywood Rounds.

395.    At the end of the week, Jacob John was selected by ENTERPRISE-DEFENDANTS as one of the Top 32 Semi-Finalists of *American Idol* Season Two.

396.    On or about December 13, 2002, Jacob John met with one of ENTERPRISE-DEFENDANTS' security advisors to discuss his background information.

397.    On or about December 23, 2002, Jacob John received a Fedex from Defendant AIP containing ADDENDUM #1 to the *American Idol* CONTESTANT AGREEMENT and the PARTICIPANT BACKGROUND INFORMATION FORM.

398.    On or about December 27, 2002, Plaintiff Smalley received a telephone call from

one of ENTERPRISE-DEFENDANTS' agents who informed him to "clean up" his criminal record or he would be disqualified from the Top 32.

399.    On or about January 2, 2003, Mr. Smalley entered a plea of "no contest" on both charges to close out the case.

400.    Upon entering his plea of guilty to the charges, the Oklahoma Judge remarked that he had *personally* spoken to the "people from *American Idol*" and the Judge remarked that "they really have it out for you.  Good luck with the show…"

401.    That same day, on or about January 2, 2003, Jacob John informed ENTERPRISE-DEFENDANTS by telephone that the outstanding charges had been closed.

## (3)    DISQUALIFICATION

402.    On or about Wednesday, February 5, 2003, Plaintiff Smalley was flown by ENTERPRISE-DEFENDANTS back to Los Angeles, California to compete in Group 2 of the Semi-Finalist rounds of the *American Idol* Contest, which was scheduled to be recorded the coming weekend.

403.    Upon returning to the *American Idol* production set, Plaintiff Smalley noticed that the producers of the show had grown "cold" to him.

404.    On Tuesday, February 12, 2003, Jacob John's performance was broadcast on-air and purportedly submitted to the public vote in Semi-Final Group 2.

405.    On Wednesday, February 13, 2003, Plaintiff Smalley was informed that he had been eliminated from the Contest.

406.    Jacob John's image and likeness continues to be owned and marketed on-line by ENTERPRISE-DEFENDANTS.[3]

---

[3] See http://www.americanidol.com/contestants/season_2/jacob_john_smalley

## F.   DONNIE WILLIAMS

407.   Donnie Williams, bois an American singer-songwriter who in 2004, at the age of 20, became a Top 32 Semi-Finalist in Season Three of *American Idol.*

408.   During Season Three, the Semi-Final Rounds, or "Live Shows", were scheduled to air on February 10-11, 2004; February 17-18, 2004; February 24-25, 2004; and March 2-3, 2004.  The wildcard round was to air on March 9-10, 2004.

409.   Plaintiff Williams was scheduled to perform at the Live Show on Tuesday, February 24, 2004.

410.   On the early morning hours of Monday, February 23, 2004, at around 2:00 a.m., Plaintiff Williams was driving home from a celebration party.  He was pulled over by a police officer for speeding in Danville, California.

411.   Plaintiff Williams was cited – but NOT arrested - by the Danville police officer for driving while under the influence.  After being cited, Williams was released into another person's care and his car was towed and stored.  [CDC_002693]

412.   On the afternoon of Monday, February 23, 2004, Plaintiff Williams called the offices of Defendant FMNA and/or AIP and informed them of the citation he received from police.  Williams was told by ENTERPRISE-DEFENDANTS' representative not to worry about it and that he should report to the production office as soon as practicable.

413.   On or about Wednesday, February 25, 2004, Plaintiff Williams was notified by Defendant WARWICK and Defendant LYTHGOE that he was being disqualified from the Season Three program but that he would have an opportunity to compete the following year.

414.   On Friday, February 27, 2004, Defendant FOX announced to the press that

Plaintiff Williams had been officially disqualified from Season Three of the Production.

> Unfortunately due to recent events "American Idol" participant Donnie Williams has been removed from the contest," said Scott Grogin, Fox VP of corporate communications, says in a statement. "While understanding that Donnie has not been convicted of a crime, the producers and network feel that the nature of the charges against him warrant his disqualification. We wish Donnie the best during what must be a difficult time and once these issues have been resolved, he is welcome to try out for the show again next season. [CDC_002697; CDC_002704]

415.    On May 22, 2013, ENTERPRISE-DEFENDANTS' submitted a Position Statement to the EEOC which states that "Williams was arrested for driving drunk and speeding past police officers at 100 miles per hour. *Because the pending criminal matter posed a threat to his continued availability for the show, Mr. Williams was disqualified."* [Position Statement, p. 13] (emphasis added).

416.    Plaintiff Williams was never arrested.  He was provided with a citation, charged with a misdemeanor and entered a diversion program.

# Season Five:
# BRITTENUM TWINS

## A.    PRE-HOLLYWOOD

### (1)    OPEN AUDITIONS IN CHICAGO [September 2005]

417.    On September 16, 2005, Terrell and Derrell Brittenum (the "Brittenum Twins") attended the Open Auditions for Season Five of *American Idol* at Soldier Field in Chicago, Illinois.

418.    After performing successfully, they were invited back to the callback venue at the W Hotel on September 20, 2005.  At the time of the Open Audition in Chicago, they were 28 years old.

419.    On or about September 20, 2005, Plaintiff Brittenums, as a pair, performed before the panel of *American Idol* Judges (Abdul, Cowell, Jackson) and each earned a Golden Ticket to Hollywood.

### (2)    ARREST AND CHARGES IN MEMPHIS, TENNESSEE [October 30, 2005]

420.    On October 30, 2005, police officers pulled Terrell Brittenum over at a gas station in Memphis, Tennessee (Shelby County).  The officer ran the license plates on the car Terrell was driving, a 2005 Dodge Magnum, and discovered it was a stolen car from Georgia.  Terrell Brittenum was taken under arrest by the officer.

421.    On October 30, 2005, T. Brittenum was charged by Shelby County prosecutors with "Theft $10,000-$60,000".  A court date of January 10, 2006 was set for T. Brittenum to appear in Shelby County criminal court.

422.    On or about November 2, 2005, T. Brittenum was charged by Shelby County

prosecutors  "Fugitive from Justice" charge.

423.    On or about November 3, 2005, T. Brittenum was released from jail in Shelby County on $7500 bond.

### (3)    TERRELL BACKGROUND CHECK [November 2, 2005]

424.    On November 2, 2005, Defendant CARCO transmitted a "Participant Report", Case # M1768-00666; Subject #: 103622, concerning Terrell Brittenum ("The Terrell Report") to Minna Taylor, Esq., a senior in-house counsel at Defendant FOX who directly supervised the background check process for *American Idol* contestants at times relevant to this action.

425.    The Terrell Report, dated November 2, 2005, indicated that, under Investigative Summary category "criminal," that the status was "Adverse" indicating "Shelby County, Tennessee, Upper and Lower Court criminal record review.  [CDC_002915]

426.    The Terrell Report, dated November 2, 2005, also indicated "Adverse" under the "civil" category and referenced Davidson County, Tennessee.  [CDC_002917]

427.    The Terrell Report, dated November 2, 2005, also reported a Shelby County criminal record charge, dated 11/02/2005, entitled "Fugitive from Justice Without Warrant", and indicated "Prosecution Pending."  A Court date for the fugitive charge was set in Shelby County, Memphis, Tennessee for January 10, 2006.  [CDC_002921]

428.    The Terrell Report, dated November 2, 2005, also indicates, albeit in a different font than the typefont used on the rest of the page, that Terrell was "Arrested on 01/10/2006 for The following warrants: 2005-3968, Forgery; 2005-3969; Theft by Deception; 2005-3970, Financial Identity Fraud.  [CDC_002921]

429.    The Terrell Report, dated November 2, 2005, also indicates that Terrell had a charge brought in <u>Shelby County, Tennessee</u> of "Theft of Property $10,000-$60,000;"dated

10/30/2005. The listing said that the disposition was "Dismissed"; that the *Sentence Date was 01/10/2006 and the "NEXT COURT DATE: 1/10/2006. This charge was dismissed."* [CDC_002922]

**(4)   DERRELL BACKGROUND CHECK [November 14, 2005]**

430.   On November 14, 2005, Defendant CARCO transmitted a "Participant Report", Case # M1768-00066, Subject #: 103791 concerning Derrell Brittenum ("The Derrell Report") to Minna Taylor, Esq., a senior in-house counsel at Defendant FOX.   [CDC_002926]

431.   The Derrell Report, dated November 14, 2005, indicated that, under the Investigative Summary category "criminal," that the status was "Adverse" indicating "Shelby County, Tennessee, Upper and Lower Court criminal record review re: Brittenum, Derrell Deshon. [CDC_002927]

432.   The Derrell Report, dated November 14, 2005, also indicated "Adverse" under the "civil" category and referenced Dekalb County, Tennessee. [CDC_002927]

433.   The Derrell Report, dated November 14, 2005, also reported a Criminal category on page 6. The entry is clearly "cut and paste" from some other document as it says that "active arrest warrants issued from Rockdale, GA." [CDC_002931]

434.   The Derrell Report, dated November 14, 2005, also reported Shelby County criminal record charge, dated 10/23/2000, stating that Derrell had been convicted of 29-9-102: Contempt of Court General (misdemeanor) and was sentenced 02/13/2002, having to pay $50 in fines. [CDC_002931]

435.   The Derrell Report, dated November 14, 2005, also reported Shelby County criminal record charge, dated 10/23/2000, for "Passing Bad Checks Over $500". The entry said that "Diversion Granted. This is not a conviction. On 04/20/2004, Diversion Terminated. A

warrant was issued.  Warrant was still active as of 1/17/2006."  [CDC_002932]

436.    The Derrell Report, dated November 14, 2005, also reported Shelby County criminal record charge, dated 2/23/1998, for "Theft of Property Over $500".  Disposition is listed as Dismissed and indicates that suspect was "Released Without Charge."  [CDC_002932]

## B.    CONTEST PARTICIPATION

### (1)    HOLLYWOOD WEEK [December 2005]

437.    The Brittenums attended the Hollywood Rounds in Los Angeles, California in December, 2005 at ENTERPRISE-DEFENDANTS' expense.

438.    At the end of Hollywood Week, the Brittenum Twins were selected by the *American Idol* Judges to move on to the Semi-Finals.

439.    After the Hollywood rounds were complete, the Brittenum Twins were instructed to meet with GIALLO, ENTERPRISE-DEFENDANTS' private investigator, to discuss their background checks. The Brittenums met with GIALLO in a hotel room in the Marriott that had been converted into an office space.  During the meeting with GIALLO, she explained that the Brittenums needed to disclose their prior criminal arrest history so that ENTERPRISE-DEFENDANTS would be able to protect them in case anything got reported the media.  The Brittenums disclosed to GIALLO the pending criminal charges concerning the Rockdale case.

440.    GIALLO asked the Brittenums to disclose their password to their MySpace page, which they did.

441.    After the Brittenum Twins returned home to Memphis after Hollywood Week, they began to receive weekly calls from Michael Allan Jaffa, Esq., who was, at the time, lead counsel for Defendant FREMANTLE and/or Defendant AIP.

442.    In each occasion where Attorney Jaffa called the Twins, he wanted to know how

the case was coming and whether the Twins could be found living in their mother's house.  Each time Attorney Jaffa called, the Terrell assured him that he and his brother were "staying out of trouble" and were home with their mother.

**(2)** **SURPRISE ARREST [January 9, 2006]**

443.    As of Monday, January 9, 2006, Terrell Brittenum was staying at his mother's home in Memphis, Tennessee.  At the time, his brother Derrell was staying with his friend outside of Memphis.

444.    On January 9, 2006, at approximately 11:00 p.m. in the evening, Terrell Brittenum received a telephone call from attorney Michael Allan Jaffa, Esq., who was, at the time, lead counsel for Defendant FMNA and/or Defendant AIP. Attorney Jaffa wanted to know how the Brittenums' pending criminal case involving the Dodge Magnum was going and if there had been any recent developments in the case.  Terrell informed Attorney Jaffa that he had a court appearance scheduled for the very next morning, January 10, 2006 in connection with the Dodge Magnum, and that he was hoping everything would turn out fine.  Attorney Jaffa told Terrell to keep Attorney Jaffa updated concerning any more developments.

445.    At about 3:30 a.m. in the morning on January 10, 2006, approximately four hours after Terrell received a phone call from Attorney Jaffa of FMNA and AIP, Terrell was on his living room couch when he heard a loud bang on the outside of his door.  The banging repeated. He opened up the front door to his mother's house and he was greeted by three uniformed police officers.  On the front lawn beyond there were in excess of 15 uniformed police officers with dogs and flashing lights. Police vehicles were everywhere surrounding the house and driveway.

446.    Terrell was apprehended and brought to Shelby County police department.  He was told that there was a "governor's warrant" issued out of Georgia in connection with the

Dodge Magnum.  Terrell did not understand why Georgia would issue a warrant for his arrest if he had a court date scheduled in Memphis that very same morning.  The officers could not explain it.

447.    Within 3-4 days of Terrell's apprehension on January 10, 2006, his mother was able to retain a lawyer in Atlanta, Georgia, to have the governor's warrant lifted. Notwithstanding, and for reasons unknown, the Shelby County police department refused to let Terrell free.  He therefore was not able to watch the premiere of Season Five of *American Idol,* which was scheduled to appear only days later.

**(3)    SEASON FIVE PREMIERE [January 17, 2006]**

448.    On Tuesday, January 17, 2006, the premiere episode of Season Five of *American Idol* aired to U.S. audiences.

449.    The Brittenum Twins were the "lead" act to perform for the *American Idol* Judges on the show and commanded substantial airtime.

450.    The premiere episode of Season Five of *American Idol* drew more than 35.5 million viewers, which was a new record for the Series in the Nielsen ratings.  [CDC_002758]  It was the highest ratings point for a premiere in the eleven-year history of the program.

451.    According to *Smoking Gun,* the duo was widely hailed as the standouts of the Series' first episode.  [CDC_002782].

452.    Within *mere hours* after the airing of the premiere episode of Season Five of *American Idol* on the night of January 17, 2006, U.S. news media outlets began reporting, *in extensive detail,* that Terrell Brittenum was being held in Shelby County Jail and that his brother Derrell was a "fugitive on the run."

453.    Upon information and belief, ENTERPRISE-DEFENDANTS caused to provide U.S.

news media outlets with <u>all</u> of the details of the Brittenums' arrest record information concerning the *pending charges,* as well as all of the details of their past arrest record information, which was completely unrelated to the pending charges, including arrest information dating back more than eight years to 1998.

454.    MTV News also reported that, according to Steve Shular, a spokesperson for the Shelby County, Tennessee, sheriff's department, the Brittenums had prior misdemeanor records in Shelby County dating back to 1998 and 2000.  [CDC_002762]

455.    Similarly, TVFanForum.com reported detailed arrest background information (more than eight years old) that completely irrelevant to the pending charges relating to the automobile. [CDC_002797]

> **Terrell Brittenum has a Shelby County arrest record for traffic violations and a 2000 misdemeanor citation for disorderly conduct and indecent exposure. The exposure charge was amended to disorderly conduct and he paid a $50 fine.**
>
> **Derrell Brittenum was arrested in 1998 for theft over $500 and in 2000 for contempt of court and passing bad checks, court records show.**

456.    The media reports regarding the Brittenum Twins' past arrest records dating back to 1998 and 2000 were necessary derived from the Derrell Report, dated November 14, 2005 and the Terrell Report, dated November 5, 2005, each of which were issued to Minna Taylor, Esq. of FOX.

457.    Defendant FOX refused to comment on the incident or on the Brittenum Twins' status for the show.  "We do not comment on the personal lives of our show participants," FOX spokesperson Scott Grogin said. [CDC_002784]

458.    On or about Friday, January 20, 2006, Derrell Brittenum checked in to the Rockdale County police department in Atlanta, Georgia.  [CDC_002834]

459.    On or about Saturday, January 21, 2006, Terrell Brittenum reportedly waived an

extradition hearing in Shelby County, Tennessee and was thereafter transported by a private carrier to Atlanta, Georgia.  [CDC_002827; 2834]

## C.    DISQUALIFICATION

### (1)    NOTICE OF DISQUALIFICATION [January 22, 2006]

460.    On Sunday, January 22, 2006, according to their defense attorney, the Brittenum Twins were released from the police department in Rockdale County, Atlanta, Georgia on $30,000 bond. [CDC_002798]  They were required to pay $5,000 each to secure the bond.

461.    Because the Brittenums were scheduled to fly back to Los Angeles, California for the Semi-Final Rounds on or about Monday, January 23, 2006 they acted with quick speed to clear up their legal issues.  In furtherance thereof, the Brittenum Twins borrowed $15,000 from family members in order to pay for Terrell's private carrier transport to Atlanta as well as for the bond money required to be released pending the disposition of charges.  Their family loaned them the money so as to ensure that the Brittenums would not miss their call-backs for Semi-Finals in Los Angeles.

462.    On the evening of Sunday, January 22, 2006, the Brittenum Twins received a call from LYNN stating that they had been disqualified from the show because there was "too much media attention" surrounding their arrest.  The Brittenums were heartbroken.  They explained that they had borrowed $15,000 from their family, who were themselves in a fragile economic condition, in order to get all the legal issues cleared up before going back to Hollywood to compete in the Semi-Finals.  The Brittenums also explained to LYNN that they had disclosed everything about the charges to GIALLO during Hollywood Week, who represented to the Brittenum Twins that she needed to know everything about the *pending* case so that she could protect them.

463.   LYNN explained that the Brittenums could <u>not</u> come back to Los Angeles for the television show under any circumstances because they were "too famous" and there were too many news reporters waiting for them in Hollywood.  LYNN explained that the "airports were crowded" and that the Britteneums were so famous now that it wouldn't be "fair to the other contestants" because the "Brittenum Twins would get all the attention."

464.   At no point after receiving news of their official disqualification did FOX issue a statement to the press indicating that the Brittenum Twins had been disqualified.  FOX did not release to the press any information concerning ENTERPRISE-DEFENDANTS' justification for disqualifying them.

465.   On February 6, 2006, the ATLANTA JOURNAL-CONSTITUTION reported that WARWICK told Buzz at a phone press conference on February 3, 2006 [CDC_002854] that:

> [T]he show has let many finalists with skeletons in the closet stay as long as the contestants give them advance notice and it's in the past (i.e., Bo Bice with drugs and Nikki McKibbin's time as a stripper). But the Brittenum case was too recent to ignore. 'From what I heard under the circumstances, I think it was a prudent decision,' Warwick said. 'There's a lot of money involved and kids watching this.' He does say the twins will get plenty of airtime once the pre-taped Hollywood auditions begin Wednesday.

## (2)   EXPLOITATION [January-May 2006]

466.   On January 25, 2006, the lawyer for the Brittenums, Maurice Bennett, announced that the Twins were receiving record label offers from industry veterans such as Jermaine Dupri, and that they had received offers to perform live.   However, FOX would not permit the Brittenums to enter into any engagements.  [CDC_002799]

467.   On or about January 27, 2006 – after the Brittenum Twins had been disqualified by ENTERPRISE-DEFENDANTS – Fox News reported that the Brittenums were still under contract with the show. [CDC_002846]

> **The network did, however, reportedly squelch the brothers' planned live**

> appearance Wednesday night on MSNBC's "Scarborough Country" —
> indicating the Brittenums are still officially under contract to Fox.

468.    On or about January 27, 2006 – after the Brittenum Twins had been disqualified by ENTERPRISE-DEFENDANTS - the NEW YORK POST reported that FOX was impeding the Brittenums' gainful employment. [CDC_002799; 2849]

> The [FOX] network put the kibosh on a planned live performance by the
> Brittenums Wednesday night on MSNBC's "Scarborough County,"
> indicating that they are probably still under contract.

469.    On February 9, 2006, ENTERPRISE-DEFENDANTS caused to air *American Idol* episodes of Hollywood featuring significant amount of footage of the Brittenum Twins in which they were portrayed in extreme negative light.    ENTERPRISE-DEFENDANTS at this point had already disqualified the Brittenums and orchestrated a media scandal around their pending arrest; but that was not enough.  ENTERPRISE-DEFENDANTS now chose to further exploit the Brittenums and inflict further damage upon their good names and reputations by editing together and broadcasting footage of them which was clearly intended to defame them further.

470.    LYTHGOE knew in December 2005, during Hollywood Week of Season Five, that the Brittenums were going to be disqualified for their pending criminal records and so he leveraged that knowledge and intentionally placed the Brittenums in high-stress situations designed to cause anxiety and irritability.  For example, LYTHGOE falsely represented to Derrell that Terrell had been cut from the competition, simply to generate a reaction out of Derrell.

471.    On Wednesday, February 15, 2006, MSNBC.com reported as follows regarding the Brittenums' troubled appearance during Hollywood Week:

> This season's edition was a little less dramatic than usual, but it did
> have its villains. The Brittenum twins, who made news before the
> Hollywood round even began for allegedly committing identity theft,
> and have been the main men on camera ever since, did another clinic
> on how not to win friends or influence people. But like all good

villains, they did get to be at least partially redeemed in the end.

472.    On Thursday, February 16, 2006, the NEW YORK POST reported that the February 15 episode of *American Idol* had exploited the pending criminal arrest of the Brittenums, including the airing of footage from FOX news affiliates [CDC_002873]:

> LAST night's "American Idol" episode officially ended the run of troubled Tennessee twins Derrell and Terrell Brittenum. The brothers were actually booted off "Idol" last month after being charged with identity fraud - after making it to the next round in L.A.
>
> But just how the show would handle their inevitable exit wasn't revealed until last night. With just minutes left in the show, "Idol" host Ryan Seacrest mentioned the brothers and their legal troubles. The show then rolled several news clips from Fox's Memphis affiliate documenting the Brittenums' legal woes.
>
> "So the Brittenum twins are no longer in the competition," Seacrest said. The Brittenums, who have prior arrest records, are accused of using someone else's identity to buy a car last June in Atlanta.

473.    The *American Idol* episode aired on February 15, 2006 also displayed an image of the Brittenums' faces locked behind jail bars in a cartoon-like manner.

474.    In late-April 2006, LYTHGOE called the Brittenum Twins and invited them to fly out to Los Angeles to appear in the Season Five finale.  LYTHGOE wanted the Brittenums to appear in a "feature sketch" where they would be seen running across the *American Idol* stage as fugitives while *faux* police officers chased them.  The Brittenums refused to participate.

475.    Notwithstanding, in May 2006, ENTERPRISE-DEFENDANTS caused to broadcast footage of the Brittenum Twins on the finale of American Idol and once again referenced their alleged crimes and displayed an animated, cartoon-like set of jail bars closing over the Brittenums' faces.

476.    In May 2006, the Brittenum Twins entered into a plea deal as "first offenders" and were sentenced to a Diversion Program, which they eventually cleared successfully.  They were also ordered to pay $11,352.22 in restitution and each fined $1,000 each.  [CDC_002896]

**(3)**   **SEASON SEVEN AUDITIONS**

477.   In August 2007, the Brittenum Twins attended the Open Auditions for Season Seven in Atlanta once again, they were both awarded Golden Tickets to Hollywood by Simon Cowell, Paula Abdul and Randy Jackson.   [CDC_002900].   They told the ATLANTA-JOURNAL-CONSTITUTION that "we are truly blessed to be back."   [CDC_002900].

478.   Just days before being flown to Los Angeles, California for Hollywood week, however, the Brittenums received a call from LYNN stating that "FOX Legal" was having problems with the fact that they were now age 29 and therefore too old to compete.   The Brittenums commented that all of the Judges and production staff, including LYTHGOE and WARWICK, knew exactly how old they were before they received Golden Tickets in Atlanta. LYNN said there was nothing he could do to help them.

479.   In December 2007, Brittenums decided, however, to fly to Los Angeles, California for Hollywood Week anyway, at their own expense.

480.   Upon their arrival to the *American Idol* production set in Los Angeles, they were greeted warmly by former Judge Paula Abdul.   They were temporarily admitted past security and had the opportunity to meet with WARWICK and LYTHGOE, who were very cold and short with them.   They informed the Twins that there was no way they could be on the show that year because "FOX Legal" prohibited them based on their age.

# Season Five:
# HALICIA T.

481.   Halicia T., an African-American female citizen from the State of North Carolina, was an *American Idol* Contestant on Season Five of the Production.

482.    Halicia auditioned for *American Idol* on or about October 6, 2005 in Greensboro, North Carolina.  Born in August 1978, Halicia was 27 years old at the time of her audition for *American Idol.*

483.    After a unanimous vote from the Expert Judges, Halicia was awarded a Golden Ticket to Hollywood.  She kissed Simon Cowell and her family's triumphant reaction was shown to viewers.

484.    Halicia's audition would later be described by REALITY TV MAGAZINE as "a feel-good moment."  [CDC__005474].

485.    Halicia was one of 175 Golden Ticket Holders who attended Hollywood Week at the Orpheum Theater in Los Angeles, California in mid-December 2005.  She was cut from the *American Idol* Contest on the second or third day of Hollywood Week, after the second "group performance" round.  The next day, Halicia returned home to her family in North Carolina.

486.    On Tuesday, January 17, 2006, Season Five of *American Idol* debuted to a U.S. television audience of more than 38 million people.  The Brittenum Twins were the featured lead act.

487.    On Tuesday, January 24, 2006, the *American Idol* episode featuring Open Auditions from Greensboro, North Carolina was broadcast in the U.S.  The episode featured the entirety of Halicia's audition segment [CDC__005474].

488.    Halicia's birthdate was not displayed on-screen as part of the episode.

489.    On Tuesday, January 31, 2006, the two-hour *American Idol* episode featuring Open Auditions from Austin, Texas drew 35 million television viewers.

490.    On Wednesday, February 1, 2006, the *American Idol* episode featuring Open Auditions from Boston, Massachusetts drew 32.4 million viewers.

491.   On February 2, 2006, at 3:18 pm PST, TMZ.com posted an article under its "Celebrity Justice" section entitled *Idol Contender's Criminal Past.* [CDC_005415]  The web article revealed that Halicia had been twice convicted of misdemeanor crimes, including for criminal trespass on April 12, 1998 (more than 7 years before Halicia's audition for *American Idol*) and for disorderly conduct on July 10, 1998 (also more than 7 years before Ms. Thompson's audition for *American Idol.*   Both incidents stemmed from verbal arguments in public places, one of which involved a North Carolina police officer.  Halicia was only 19 years old at the time of the infractions.  TMZ.com posted the underlying police reports and court documents relating to both incidents and ostensibly interviewed Halicia, who described one of the incidents as "racial".  [CDC_005417-5431]

492.   On Thursday, February 2, 2006 at 1:00 pm PST, E! ENTERTAINMENT CHANNEL on-line (EOnline.com) also reported Halicia's past infractions based on the initial TMZ.com report [CDC_005452]

493.   On Friday, February 3, 2006, at 1:07 a.m., REALITY TV MAGAZINE re-published portions of the TMZ.com article featuring Ms. Thompson's arrest history.  In an article entitled *"American Idol Contestant Halicia Thompson Criminal Past Exposed", the article stated:*

> **TMZ does not address if Halicia Thompson is at risk of being eliminated from the competition for her criminal past. Usually if the criminal offense was minor and the contestant made Idol producers aware of the incident(s), then contestants are allowed to continue in the competition.  [CDC_005474]**

494.   In response to the REALITY TV MAGAZINE article concerning Ms. Thompson, one commentator noted as follows:

> **Those are newsworthy crimes? How in the world does something as little as that compare to last year's revelations of Bo Bice being arrested for allegedly trying to buy cocaine or Scott Savol allegedly throwing a phone at his girlfriend when she was holding a child? What she did is no worse than what every other celebrity does in Hollywood yet don't get arrested for it . . . This is nothing- she cusses, so what? She's probably had a hard life and racist cops tend to take**

things out on African-Americans. It is certainly no big deal.  [CDC_005475]

495.    On Friday, February 3, 2006, the VANGUARD NEWS NETWORK (vnnforum.com) re-published the TMZ.com article concerning Ms. Thompson's arrest record history and posted the following headline "*Another American Idol nigger with a rap sheet.*"  [CDC_005459].

496.    In response to the VANGUARD NEWS NETWORK article, a "Senior Member" of the on-line forum commented:

> **"It's just the same damn story all the time with these Niggers....Everytime you turn over a rock, there is a fucking nigger under it with a warrant or criminal record!  Un-fucking real!"  [CDC_005460]**

497.    As a part of its standard practice and ordinary course of business, ENTERPRISE-DEFENDANTS purported to obtain written consent from Ms. Thompson to procure criminal record history information concerning Ms. Thompson during the background check process of *American Idol* Contestants for Season Five.  This included record information that dated back more than seven (7) years from the time of the infractions.

498.    Upon information and belief, once in possession of Ms. Thompson's criminal history information, ENTERPRISE-DEFENDANTS caused for such information to be disseminated to the entertainment and tabloid websites, including TMZ.com, prior to or concurrent with the February 7, 2006 broadcast of the *American Idol* episode that features Ms. Ward's Golden Ticket audition.

# Season Five:
# TATIANA W.

499.    Tatiana W., an African-American female citizen from the State of Pennsylvania, was an *American Idol* Contestant on Season Five of the Production. ("Tatiana")

500.    Prior to her appearance on *American Idol,* Tatiana won 2005's MakeAStar.com singer/songwriter contest as well as honorable mention at 2004's VH1 songwriter competition.

501.    Tatiana auditioned for *American Idol* in Boston, Massachusetts on or about October 27, 2005.  Born in August 1983, Tatiana was 22 years old at the time of her audition for *American Idol.*

502.    After singing *"My Cherie Amour",* Tatiana was awarded a Golden Ticket to Hollywood by the Expert Judges.

503.    Tatiana attended Hollywood Week in mid-December 2005.  She was cut from the *American Idol* Contest by the second day of the Hollywood rounds.  [CDC_005483]

504.    On Tuesday, February 7, 2006, at 8:00 pm EST the *American Idol* episode featuring Open Auditions from Boston, Massachusetts was broadcast to U.S. viewers.  Tatiana's entire audition performance was shown to audiences.  Tatiana's birthdate was not displayed on-screen as part of the episode.

505.    On Wednesday, February 8, 2006, at 6:19 p.m. PST, TMZ.com posted an article to its website entitled *"A.I. Contestant – Convicted Shoplifter"* [CDC__005497]

> **TMZ has learned 'American Idol' contestant Tatiana Ward, who is on her way to Hollywood after last night's audition, got into legal trouble on her way out of Macy's.**
>
> **According to legal documents obtained by TMZ, Ward was cited for shoplifting $24 in merchandise from the Macy's Department Store in Montgomery County, PA. The incident occurred on March 22, 2002.**
>
> **Ward pled guilty to retail theft and was fined $135. Ward was also cited for carrying false ID. TMZ has learned she had a false New Jersey driver's license. Ward pled not guilty but Judge David Keightly begged to differ, fining her $187.50 for that offense.**
>
> **TMZ spoke with Judge Keightly today who is far from "Simon-esque," Judge Keightly said, "She's a very good singer and I hope she does well in the competition."**

506.    TMZ.com's article entitled *"A.I. Contestant – Convicted Shoplifter"* also posted

the underlying court records for Tatiana's non-traffic citations from the Commonwealth of Pennsylvania. One of the official citations posted by TMZ.com, dated March 22, 2002, contains a "faxline" of "02/08/2006 Wed. 12:48 [p.m.]" from a "District Court" fax number with 215 area code (which is associated with the Commonwealth of Pennsylvania). [CDC_005498]

507. On Thursday, February 9, 2006, the website "buffaloathome.com" published an article entitled "*American Idol" Contestant Has Shoplifting Record*. [CDC__005508]. The article reads as follows:

> Looks like yet another **"American Idol"** wannabe has a criminal past **TMZ.com** reports that Tatiana Ward, who wowed the Fox talent judges on last night's show, was cited for shoplifting in 2002. She was accused of taking 24-dollars in merchandise from a Macy's Department Store in Montgomery County, Pennsylvania . . .
>
> No word if the report will effect Ward's status on **"Idol."** Last week it was revealed that 27- year-old North Carolina-native and **"Idol"** Halicia Thompson had been convicted of second degree trespass and disorderly conduct. Two weeks ago, talented twins Terrell and Derrell Brittenum were dismissed from **"Idol,"** following the news that they were wanted on identity-theft charges. **[CDC_005656] As a part of its standard practice and ordinary course of business,** ENTERPRISE-DEFENDANTS **procured criminal record history information concerning Ms. Ward during the background check process of** *American Idol* **contestants for Season Five.**

508. As a part of its standard practice and ordinary course of business, ENTERPRISE-DEFENDANTS purported to obtain written consent from Tatiana to procure criminal record history information concerning Tatiana W. during the background check process of *American Idol* Contestants for Season Five.

509. Upon information and belief, once in possession of Tatiana W. criminal history information, ENTERPRISE-DEFENDANTS caused for such information to be disseminated to the entertainment and tabloid websites, including TMZ.com, prior to or concurrent with the February 7, 2006 broadcast of the *American Idol* episode that features Tatiana's Golden Ticket audition.

# Season Five:
# TORA W.

510.     Tora W., who is of African-American, was featured as a Contestant on Season Five of *American Idol.*

511.     On or about October 10-13, 2005, Tora W. auditioned for the show in Las Vegas, Nevada and - based on her merit as a singer - was awarded a Golden Ticket to Hollywood by the Expert Judges.

512.     Upon information and belief, footage of Tora W.s audition aired in the episode of *American Idol* that was broadcast by ENTERPRISE-DEFENDANTS on January 31, 2006.

513.     On February 20, 2006, REALITY TV WORLD magazine ([www.realitytvworld.com](www.realitytvworld.com)) published an article on-line entitled *"American Idol Contestant Cries Foul: Tuscon Teenager Learns 'Gol Ticket' to Hollywood Doesn't Mean Much".* The article reported that Tora W., who is of African-American descent, was disqualified from *American Idol* by ENTERPRISE-DEFENDANTS after receiving a Golden ticket but before being flown to Hollywood. [CDC_007149-50] The article relates the events surrounding Tora's disqualification as follows:

> **Four days before 16-year-old Tora W[.] was due to depart for Hollywood after earning a Gold Ticket at American Idol auditions in Las Vegas, she received news that she had been eliminated. One of 175 contestants selected nationwide for the finals, Tora prepared for Hollywood week (Dec 4-10) immediately following the Las Vegas audition in October of 2005. It wasn't until November 30 [2005] that Idol producers told her she had been eliminated and refused to give her a reason.**
>
> **City auditions over and her contestant status secured, Tora returned home to prepare for American Idol. Knowing she would miss school, she obtained a GED and began a new job training program. However, once her boss found out she would be gone for a week, Tora was forced to resign. Other preparations included purchasing audition attire, vocal coaching and rehearsing music sent to her by the show. Numerous communications from FOX and Idol producers, including airline and hotel reservations received on November 21, confirmed Tora's continued participation in the show.**

[CDC_007419]

514.    The 2/20/2006 article in REALITY TV WORLD reveals that Defendant FOX made a statement to the press concerning Tora's abrupt disqualification from Season Five of the show. Despite Ms. Tora W.'s full disclosure of her background information on the PARTICIPANT BACKGROUND QUESTIONNAIRE FORM, ENTERPRISE-DEFENDANTS found a "red flag" during the background investigation that warranted her disqualification from the Contest even after earning a Golden Ticket.

> **In a statement to KMSB Fox 11 in Tucson, an Idol representative indicated there was a "red flag" on Tora's background investigation which had led to her elimination.** However, Tora's information was fully disclosed to producers by October 20th, a full 6 weeks before she was cut. Tora's mother recalls the phone call, "The producer was apologetic but said he didn't know the reason for Tora's elimination. He referred me to Fremantle Media." Ms. Woloshin said she spoke with several people at Fremantle who refused to provide her with a reason.
>
> "I asked if it was something we had done wrong and was told that it was a casting decision and she was welcome to audition again next season. Why would they say that if there had been red flag?" Ms. Woloshin said they also refused to tell her why the call came at the last hour. "They were very unsympathetic to the loss of school and a job." She added that if the show had eliminated Tora earlier, their lives could have gone back to normal. "I went beyond full disclosure, detailing issues I thought might be a concern. If Tora WAS red flagged, they could have called us much sooner." [CDC_007149-50]

515.    Tora and her mother also expressed "dismay" at having been penalized by ENTERPRISE-DEFENDANTS despite Ms. Woloshin's strict adherence to ENTERPRISE-DEFENDANTS' purported "Contest Rules" concerning non-disclosure of background information:

> When [16-year-old] Tora was asked what she thought about the elimination she responded:
>
> "The news would have been easier to take if they told me why.  I have no idea if I'm suppose to do something different. They [ENTERPRISE-DEFENDANTS] let a lot of people through and find out later that they're criminals. Those people lied on their background checks and they got through. I told the truth and was cut before I got there."
>
> Tora's mother is dismayed that show producers are sending this message to Idol hopefuls. "From a young person's perspective they might think they can get further by hiding issues that may not be appealing. I think you

90

garner more respect by being honest and open about it. Tora's issues were very minor in the scheme of things."

Although Tora was devastated by the American Idol decision to eliminate her just days before Hollywood, she refuses to give up on a career in music.  [CDC_007150]

# Season Six:
# THOMAS DANIELS

## A.   PRE-HOLLYWOOD

## (1)   YOUTHFUL INDISCRETION

516.    Plaintiff Thomas Daniels is a native-born U.S. citizen of Portland, Oregon, born January 18, 1985. Tommy Daniels grew up in the "small town" of Troutdale, Oregon (Multnomah County).

517.    In late 2004, Plaintiff Daniels, then age 18, had been out with friends drinking. When he left the bar that evening, he was "buzzed", but did not feel drunk or incapable of handling the wheel.  Using the judgment of an 18-year-old, he got in his car and drove about a half-mile only to realize that it was a bad idea for him to be driving.  His vision was blurry.  So he did the responsible thing: he parked the car over to the side of the road and decided to wait some time until he sobered up.

518.    After parking his car on the side of the road, Daniels slid into the passenger side seat to lay back.  He decided to keep the ignition on to stay warm.  When he awoke, it was to a police officer knocking on his car door.  The officer asked Daniels to get out of the car and determined that Daniels was intoxicated.  Plaintiff Daniels was arrested and charged for driving while under the influence of alcohol.  He pled no contest to the charges, paid a fine and was placed into a diversion program, which he completed.

519.    Daniel's DUI conviction was expunged from the public record.

520.    In December 2005, Daniels was arrested for an alleged hit-and-run incident. There were no reported personal injuries or property damage stemming from the incident. Daniels pled no contest to the charge, paid a $50 fine, and attended a safe driving class.  The charge was thereafter expunged from his record.

## (2)    GOLDEN TICKET

521.    On September 19, 2006, Thomas Daniels waited in line for several days and nights to audition for Season Six of *American Idol* in Seattle, Washington.

522.    At the time of his audition for Season Six of *American Idol*, both of Plaintiff Daniels' past misdemeanor convictions had been officially expunged from the public record.

523.    Plaintiff Daniels had previously auditioned for both Season Four (2004) and Season Five (2005) of *American Idol* but did not get past the "cattle call" phase.

524.    After passing through the "cattle call" phase on September 19, 2006, and performing at least three times for different pairs of junior and senior producers, Tommy Daniels was called back to audition for the Expert Judges, which was scheduled for October 2-3, 2006.

525.    Shortly before the Callback round, on or about October 2-3, 2006, Plaintiff Daniels quit his job as a gas station attendant back home in Oregon.  He was confident that he had what it took to be the "next *American Idol.*"

526.    On or about October 2-3, 2006, a large number of Daniels' family and friends attended the Callback audition at the W HOTEL in Seattle, Washington to show their support.

527.    When Tommy Daniels finally got his opportunity to sing before the Expert Judges – Simon, Randy and Paula - he was awarded a Golden Ticket to Hollywood by *unanimous* vote.

528.    Appearing before Simon Cowell, Paula Abdul and Randy Jackson, Tommy Daniels sung the song "*Arms of a Woman*" by Amos Lee.  The Expert Judges commented in

relevant part as follows:

- Simon Cowell:  **"I thought you sang that very well, Thomas.  It's nice to hear a non-obvious song again."**

- Paula Abdul: **"Very Nice. Very Soothing.  You know we haven't had a great start here in Seattle."**

- Randy Jackson:  **"Dude, I loved you.  Man, I thought it was really, really nice.  Beautiful tone, baby, beautiful tone. Yes, definitely, definitely."**

- Paula Abdul:  **"Yeah, Thomas.  You are absolutely original.  Yes, yes, yes, yes."**

- Simon Cowell:  **"It's a Yes.  You are through to Hollywood."**

- Randy Jackson:  **"Welcome to Hollywood."**

## (3)   BACKGROUND CHECK

529.    After Plaintiff Daniels received his Golden Ticket on or about October 2-3, 2006, ENTERPRISE-DEFENDANTS provided him with a packet of documents including a written background questionnaire form ("LFQ.06") and the *American Idol* CONTESTANT AGREEMENT (v.06).

530.    Tommy Daniels was instructed  that he would need to complete <u>all</u> of the paperwork and execute all contracts <u>before</u> he was flown to Los Angeles to compete in Hollywood Rounds.

531.    Tommy Daniels reviewed the voluminous paperwork with his mother, Starla Daniels, who is a public school teacher in Oregon.

532.    With respect to the background application questions concerning Contestants' prior arrests and convictions, Plaintiff Daniels specifically asked his mother whether he should disclose his expunged misdemeanor convictions.  His understanding was that he had already completed diversion programs for both infractions, had paid his fines to the Court, had attended the Court-ordered safe driving classes and, consistent with this understanding, had effectively

paid his dues to society for the crimes he committed. Daniels explained to his mother that he did not think it was fair that he was being asked to disclose his expunged government records to *American Idol.*

533.    Starla Daniels advised her son that because *American Idol* was the "number one" show in the world, and was a very powerful entity, that ENTERPRISE-DEFENDANTS were likely going to discover Tommy's past record in any event.  She explained that he would be doing himself a favor if he simply disclosed the expunged misdemeanor records on the application form.

534.    Accordingly, Plaintiff Daniels followed his mother's advice and completed all of the application forms. He set forth in writing the dates and charges of his expunged misdemeanor records and submitted these forms to ENTERPRISE-DEFENDANTS before he reached Hollywood.

535.    On October 9, 2006, Plaintiff Daniels signed *American Idol* CONTESTANT AGREEMENT (V.06).

## B.    CONTEST PARTICIPATION

### (1)    HOLLYWOOD ROUNDS [November 16-17, 2006]

536.    During Season Six, the Hollywood phase of the audition process was held over a period of four days, from Monday, November 13, 2006 through Friday, November 17, 2006 at the ORPHEUM THEATRE in Los Angeles, California.

537.    Plaintiff Daniels successfully auditioned through three rounds of cuts held on four consecutive days.  In the process, he also established himself as one of the "lead runners" in the Contest who was consistently singled out by his peers and the Expert Judges as a standout performer.

538.    At the end of Hollywood Week for Season Six, Plaintiff Daniels was one of 40

remaining Contestants selected by ENTERPRISE-DEFENDANTS to advance to the next round (the "Green Mile"), which was scheduled for mid-January 2007.

539.   After the Top 40 was announced, Simon Cowell personally approached Plaintiff Daniels backstage and offered his congratulations. Cowell remarked that Daniels had consistently delivered solid performances throughout the rounds and that Cowell appreciated Daniels' efforts and positive attitude.  Daniels also received adamant praise from Judge Paula Abdul.

540.   Upon returning home from Hollywood Rounds, Daniels once again was required by ENTERPRISE-DEFENDANTS to faithfully and accurate complete even more documentation relating to his personal background information.  He was reminded again that completion of the forms was required by ENTERPRISE-DEFENDANTS in order for him to continue advancing through to the next round.

## (2)   EPISODE AIRDATE [January 17, 2007]

541.   The premiere episode of *American Idol* Season Six aired on Tuesday, January 16, 2007.  According to the Nielsen ratings, the January 17, 2007 episode drew 37.3 million television viewers.

542.   The following night, on Wednesday, January 17, 2007, ENTERPRISE-DEFENDANTS broadcast the second episode of *American Idol* that season, which drew 36.9 million television viewers.

543.   The DETROIT FREE PRESS noted that the premiere episodes of Season Six of *American Idol* broke Defendant FOX's broadcast record for the number of primetime television viewers:

> **Setting the standard: The first two episodes of "American Idol." The Tuesday and Wednesday audition shows drew 37.3 million and 36.9 viewers respectively,**

**the two biggest nights of prime-time entertainment on FOX since it came onto the air nearly two decades ago. [CDC_003710-11]**

544.    The January 17, 2007 episode of *American Idol* Season Six featured Tommy Daniels' audition segment as the "lead-off" part of the show.   Consistent with ENTERPRISE-DEFENDANTS' custom and practice, the *American Idol* Contestant featured as the "lead-off" performance on any given audition episode is considered by ENTERPRISE-DEFENDANTS to be the most talented or captivated singer featured in that program.

545.    During the episode broadcast on January 17, 2007, Daniels' entire audition performance, as recorded in Seattle on or about October 2-3, 2006, was aired by ENTERPRISE-DEFENDANTS, as well as a biographical introduction, the Expert Judges' commentary on Daniels' performance, and footage of a triumphant Tommy Daniels being greeted by a large number of his family members who were ecstatic about his Golden Ticket achievement.

546.    Thomas Daniel's birthdate was <u>not</u> displayed on-screen during the airing of the January 17, 2007 episode.

547.    Tommy Daniels watched the January 17, 2007 episode with a room full of close family and friends.

548.    With the broadcast of the January 17, 2007 episode of *American Idol*,. Tommy Daniels the "outcaste" was now Tommy Daniels *"the next American Idol.*"

## (3)    HERO BACK TO "ZERO" [January 18, 2007]

549.    On, January 18, 2007, the day after the airdate of the episode featuring Tommy Daniels' Golden Ticket audition, TMZ.com posted the following article on its website at 5:49 pm PST [CDC_003685]:

AMERICAN IDOL WANNABE ALREADY HAS A RECORD

Celebrity Justice

**1/18/2007 5:49 PM PST BY TMZ STAFF**

**Before he wowed Simon, Paula and Randy during last night's "American Idol" Thomas Daniels took his fair share of punishment from real judges over several criminal charges, including drunk driving.**

**TMZ has unearthed legal documents which reveal that in 2004, Daniels was convicted of DUI in Clackamas, Oregon.  The 21-year-old, who was the first wannabe to get the green light from the "AI" crew on last night's show, pled guilty and was sentenced to a one-year alcohol diversion program and a $680 fine. Daniels also attended eight AA meetings and saw a counselor once a week for two months. After the completing his DUI sentence, the incident was wiped from Daniels' record.**

**TMZ spoke exclusively with Daniels who said, in reference to his DUI, "I was young and dumb and drinking and driving."**

**In December 2005, Daniels was arrested again; this time for hit and run. He failed to appear in court for the arraignment, so Daniels was rearrested. TMZ could not find the disposition of the hit and run. Daniels called the incident "another young and dumb situation."**

550.    Based on the information published in the above article, at the time of initial publication on January 18, 2007, TMZ.com obtained access to Daniels' records of arrest – including charges that been *expunged* - but did not have information pertaining to the court disposition of all arrests.  This means that TMZ did <u>not</u> retrieve Plaintiff's criminal arrest history from the local court or police department in Oregon.

551.    As of the initial publication date of the TMZ.com article on January 18, 2007, ENTERPRISE-DEFENDANTS had already been in possession – for several months - of all documents and records pertaining to Thomas Daniels' criminal record history.

552.    Upon information and belief, TMZ.com obtained Daniels' criminal background information – including his arrest record history - from ENTERPRISE-DEFENDANTS.

553.    Upon information and belief, in or about January 2007, ENTERPRISE-DEFENDANTS transmitted or caused to transmit information to TMZ.com relating to Daniels' criminal background history – including his expunged arrest record information – for the express purpose of causing TMZ.com to publish Plaintiff's court record information in a manner and timeframe

that was consistent with ENTERPRISE-DEFENDANTS' marketing plan, ratings goals and socio-political objectives.

554.   Various viewpoints, comments and responses were posted to the commentary section of the TMZ.com article, which posted a photograph of Daniels' (then) three-year-old mugshot.  Some of the comments inferred from the TMZ.com article that Daniels had failed to disclose his arrest history:

> **Daniels may be a so-so singer, but not disclosing his criminal convictions as part of Idol's qualification process is not only a deliberate lie, it's a cover up, fraudulent and deceptive. No doubt, Daniels will try and blame his lying and cover-up on an abusive and poor upbringing.**

> **Being a convicted criminal is a big deal, but evidently Daniels doesn't care at all about this, including those he victimized with his criminal acts. Daniels doesn't belong on the Idol competition and should be yanked from it and disbarred from ever being allowed to participate again . . . Honesty and integrity are more important than so-called talent. [CDC_003691]**

555.   There were also members of the TMZ.com on-line community who did not believe it was fair game to post Daniels' mug shot and criminal arrest history, noting the ethical issues raised by publishing a citizen's criminal record information where it had already been (supposedly) expunged from government databases or otherwise sealed from public view.

> **I realize DUI is a serious thing, does it mean that we have to bring it out. If the guy was a murderer or a rapist it would be one thing.  Give the guy a break.  He only past the audition.  [CDC_003693] ….**

> **If this was wiped from his record, why did TMZ think it was their business to disclose this information. Leave him alone.  [CDC_003694]**

556.   Throughout the day of January 18, 2007, and for a couple of days after into the weekend, television, radio and internet outlets around the country reported the "news" of Tommy Daniels' *expunged* 2004 DUI record and *expunged* hit-and-run record, accompanied whenever possible with his official mug shot from the 2004 DUI.

557.   After he was cut by ENTERPRISE-DEFENDANTS during the Green Mile phase of the

*American Idol* Contest, Tommy Daniels received a phone call from a fellow Contestant, Antonella Barba, who was ultimately selected to the Top 24 of Season Six.  Ms. Barba was calling Plaintiff Daniels that day to express her sorrow  - through tears - that Tommy had been disqualified.

558.   Ms. Barba explained that while the Top 24 Semi-Finalists were at a group meeting, the ENTERPRISE-DEFENDANTS LYTHGOE and WARWICK announced that one of the Contestants who "should have made the Top 24" had to be disqualified on account of breaching the contract and breaking the rules of the contest.  The producers cited Plaintiff Daniels as an example of what could happen if any contestant going forward failed to disclose their background information as required.

## (4)   AFTERMATH

559.   In the days, weeks and many years that followed Daniels' disqualification - including to the present day - anytime any one of the 37+ million U.S. citizens who encounters Tommy Daniels and recognizes him in association with *American Idol,* they oft repeat the very same apologetic message as Tommy's friend expressed that fateful morning: that it was "messed up" how they "disqualified" Tommy from *American Idol* for his DUI.  That they should have given him his chance.

560.   From his disqualification forward, whenever the issue of *American Idol* came up with Plaintiff Daniels' family or friends, it was never to talk about his singing or his artistry or his momentary triumph.  Instead, it was always to talk about how *American Idol* had done him wrong.

561.   For Daniels' mother, Starla, who was a grade school teacher at the local public school, the experience was particularly difficult.  She took tremendous pride in bragging about

her son (as all mothers do); but particularly because he hadn't much to brag about himself during his childhood and had faced tremendous adversity due to his mixed African heritage.  For a brief moment in time, her son's unique talent and gift had been recognized by the most popular television show of all time, no less, and her son was emerging as a true star of the community.

562.    But with the senseless publication of her son's expunged records and mug shot on TMZ.com, all of that pride came crashing down.  The message had been confirmed: Tommy Daniels wasn't qualified to be the next *American Idol* after all.  And not because he couldn't sing, but because he was a "criminal."

563.    Since the day following the January 17, 2007 airdate of *American Idol*, Tommy Daniels has been effectively shut out of the music industry. Despite his extraordinary talent and originality as a musician, singer, producer and lyricist, Plaintiff and his creative works have been systematically rejected by music industry insiders due to his "past association" with *American Idol*.

Plaintiff Daniels is largely considered a "disappointment" to friends and family.  He represents "what could have been" or a "dream shattered." They sympathize with Tommy and believe that he was treated unfairly, but they consider him a "disappointment" nonetheless.

564.    At age 28, Tommy Daniels' mug shot continues to populate the worldwide internet and he continues to be stigmatized for his "disqualification" from *American Idol* stemming from an expunged 2004 DUI.

# Season Six:
# AKRON WATSON

## A.   ARREST

565.   Years before appearing on the television show *American Idol*, Akron Watson had made a name for himself as an up-and-coming talent in his local Dallas-Fort Worth community of artists, singers, actors and poets.  Akron served as a volunteer at the BLACK ACADEMY OF ARTS and was particularly active in stage productions. With the death of his older brother, Akron also dedicated himself to his Faith.  He actively participated in Gospel functions and theatrical performances.

566.   On the night of April 26, 2003, Plaintiff Watson had just finished performing at a Gospel show at the University of North Texas.  He got in his car with friends and began driving off campus when he was pulled over by an officer or university security guard riding a bike.  The officer asked Akron to step outside of the vehicle.  The officer then searched the vehicle.  After several minutes, the officer announced that he had found some marihuana in the ashtray of Akron's car, that he had reasonable cause to search the vehicle because he had detected the odor of marihuana, and that Akron was under arrest for possession of a controlled substance.

567.   Plaintiff Watson was thereafter booked for a misdemeanor Class B offense [CDC_003315] and was appointed defense counsel by the Court.

568.   On July 22, 2003, Akron's appointed counsel advised him to plea "no contest" and emphasized that because he was a first-time offender, the Court's disposition would be "deferred" temporarily and then expunged from his record if Akron completed a fifteen (15) month probationary period without getting into further trouble with police.  Because Akron did not want to involve his parents (in terms of hiring a defense lawyer to contest the charges) and

based on the assurance from his appointed counsel that the misdemeanor record would be expunged, Akron pled no contest to the marihuana possession charge.   In addition to probation, Plaintiff Watson was ordered to pay a fine of $200.

569.    Akron completed the fifteen-month probation period without incident and the record of his misdemeanor arrest for marihuana possession was ostensibly expunged from the public record.

## (1)    OPEN AUDITION [August 2006]

570.    Akron Watson is a native-born U.S. citizen of the State of Texas (Dallas-Forth Worth). born May 17, 1983.

571.    On August 11, 2006, Akron auditioned at the "cattle call" phase for *American Idol* Season Six in the city of San Antonio, Texas.  Based on a series of performances for junior producers, he received a callback to perform in San Antonio before the Expert Judges.

572.    On August 26, 2006, Akron ultimately performed before Simon Cowell, Randy Jackson and Paula Abdul.  After some mixed reviews, Plaintiff Watson became one of 24 Contestants from San Antonio, Texas to receive a Golden Ticket in Season Six.   He sang two songs that day, one of which was  "*A Change is Gonna Come*" by legendary singer Sam Cooke. The 1964 single has been celebrated as an "anthem of the American Civil Rights Movement."

573.    Akron later described his receipt of the Golden Ticket to PEGASUS NEWS, a Dallas-based news outlet, as follows:

**"I think that was like the triumph of my life," remembers Akron. [CDC_003200]**

## (2)    BACKGROUND CHECK [September 2006]

574.    In the weeks following Akron's receipt of the Golden Ticket in August 2006, Akron received a phone call from ENTERPRISE-DEFENDANTS' agents, indicating that they wanted

to send a production crew out to Akron's Dallas, Texas home to compile a feature about the young singer that could be used in connection with the "biographical portion" of the show.

575.    Akron (and his family) was excited by the opportunity to share his background story with the *American Idol* viewers.  He was eager to discuss his life's achievements, as well as the obstacles he had already overcome.  His family viewed Akron's Golden Ticket as a blessing, particularly.

576.    During the ENTERPRISE-DEFENDANTS' visit to his Texas home, Plaintiff Watson disclosed to ENTERPRISE-DEFENDANTS that in April 2003, he had been arrested by a college security guard for possession of marijuana, even though the University of Texas officer had found nothing but a "roach" (i.e., *de minimus* quantity) in the ash tray of his car.

577.    Akron Watson further disclosed to ENTERPRISE-DEFENDANTS that he had once been into "partying and chasing girls" but that he changed his errant ways when his brother died. From the moment of his brother's death, Akron dedicated himself to his faith and to being a good Christian.

578.    In the weeks after the ENTERPRISE-DEFENDANTS' production crew came out to interview Plaintiff Watson, he received numerous e-mails from Defendant AIP and/or Defendant FMNA with information regarding his impending trip to Los Angeles, California for the Hollywood Round of auditions.

## B.    DISQUALIFICATION

### (1)    SURPRISE CALL [November 9, 2006]

579.    On or about November 9, 2006, about ten weeks after Akron's receipt of the Golden Ticket in San Antonio, Texas, and only four days before Akron was scheduled to fly to Los Angeles, California on November 13, 2006 to compete in the Hollywood rounds, Akron

received a phone call from a representative of Enterprise-Defendants.   The Enterprise-Defendants' agent was a male with an English accent.

580.   Akron later described the November 9, 2006 phone call from Enterprise-Defendants as follows:

> **"I was supposed to leave that Monday, they called me on a Thursday,"** explains Akron. **"They said we're not gonna let you go. And I asked 'why?'"**
>
> **"And he said 'Well I'm not really sure'… and then he [Enterprise-Defendants] gave me some alternatives for what I should say to people if they asked why I was kicked off …**
>
> **"He [Enterprise-Defendants] told me to tell people that I was now an 'alternate' … That would protect [me] and protect the show." [CDC_003200]**

581.   On November 9, 2006, Watson was also informed by Enterprise-Defendants' British representative that the "powers that be" had made their "final decision" and that there was nothing Akron could do.   Enterprise-Defendants' agent did offer, however, to have Defendant AIP's "psychiatrist" call Akron.

582.   After receiving the phone call from Enterprise-Defendants, Akron's entire world was turned upside down.   His hopes and dreams, which had been raised to triumphant levels due to his achievement of winning the Golden Ticket, were shattered.   He had been the pride of his entire community for months; the pride of his family who had endured the senseless loss of Akron's older brother.   Now, Akron had been disqualified from the most popular U.S.-based talent show in history - and for no apparent reason.

583.   In January 2007, after a lengthy period of mourning, Plaintiff Watson ultimately decided to set up a page on "Myspace.com" to protest his disqualification from *American Idol.* He posted as follows:

> **WELL, TWO DAYS BEFORE I WAS SCHEDULED TO LEAVE FOR HOLLYWOOD, I received a call from Idol saying I'm being cut for "unknown reasons." I don't know about you, but that seems jacked up to**

> me. I want, need, and deserve my shot @ being the next **AMERICAN IDOL**. [CDC_003230]

## (2)   LOCAL NEWS [January 31, 2007]

584.   In the week prior to the airing of the San Antonio, Texas episode (scheduled for February 6, 2007), a journalist with PEGASUS NEWS named Alan Cohen received an "anonymous tip" that Akron Watson, a Dallas-Fort Worth resident, had posted a myspace.com page to protest his disqualification from *American Idol*.  The journalist called Plaintiff Watson to request a live interview at the local news station.  Watson thereafter visited the local station and related his entire disqualification story to Cohen.

585.   PEGASUS NEWS initially published its story about Plaintiff Watson on Wednesday, January 31, 2007, less than one week before the airing of the San Antonio audition episode. [CDC_003200-02].   After reporting the facts as related by Plaintiff Watson, the journalist commented as follows:

> One might guess that the pot bust would be the reason for Akron not making the show, but others have made it all the way to the finals with felony arrests [citing Bo Bice]. Besides, he told Idol all about his past when they sent a crew to interview him, so they obviously knew about that already.
>
> Yesterday, I spoke twice with "American Idol "PR representative Alex Gillespie to see if the show had any official explanation for why Akron was not allowed to tryout in Hollywood. When I first talked to Gillespie, she told me that she would find out exactly what happened for me. Then when I spoke with her later in the day, she apologized and told me that the show would not ever be giving a reason for Akron's elimination from the competition.
>
> As the Fox network's air-date for the "American Idol" San Antonio search nears, Akron Watson has no clue whether they will even show his audition on television. His dream has been taken from him. Worst of all, he still doesn't know why and maybe never will. [CDC_003201]

## (3)   EPISODE AIRDATE [February 6, 2007]

586.   On February 6, 2007, ENTERPRISE-DEFENDANTS aired the final episode of the

Open Auditions phase, which featured Akron Watson's performance from San Antonio, Texas, filmed back in August 11, 2006.

587.    Plaintiff Watson and his cousin both appeared on the Tuesday, February 6, 2007 episode of *American Idol*.   There was no mention during the episode that Akron Watson had been disqualified from the Contest some 3 months earlier.

588.    Akron Watson was one of the "feel good" audition stories of the *American Idol* San Antonio auditions.  Akron showed up at the auditions with his cousin William Green. Akron described how he was like Bruce Banner and his cousin was like the Incredible Hulk. Green explained that they were both unemployed with no source of income, and they were putting everything they had into the auditions.  Watson received a Golden Ticket; Green did not.

589.    That same evening, on February 6, 2007, the popular website RealityTV Magazine (sheknows.com) published a story on-line entitled: *American Idol Un-Invites Contestant Akron Watson.*

> After leaving the audition room, an exuberant Akron leapt into his cousin's arms and was hugged by family and friends. Viewers at home likely couldn't help but feel good for this unemployed guy, who just got the chance of a lifetime.

> However, it turns out that Akron's "American Idol" story didn't have a happy Hollywood ending after all.

> According to Pegasus News, Akron Watson was later uninvited from the Hollywood auditions. American Idol representatives apparently never even fully explained to Akron why he wasn't being allowed to go. One possibility is that Akron does have a misdemeanor charge of marijuana possession on his record, but Akron claims that he told American Idol about his past. Other contestants with even more serious felony arrests have been allowed to proceed on Idol in the past, as long as they were open and honest with producers.

> The even more confusing thing about Akron Watson's elimination is that all indications seem to be that he has turned his life around since his arrest. Pegasus News notes that after a wakeup call when his brother died, Akron dedicated himself to being a good Christian. [CDC_003230]

590.    The morning after the airing of the February 7, 2013 episode, further news broke

of Akron's previous disqualification and the "blogosphere" ignited.

## (4)   MEDIA FRENZY

591.    By 10:30 A.M. EST, TMZ.com had already published Akron's mug shot from the

April 2003 arrest, as well as details surrounding his April 2003 arrest. [CDC_003210-11]

> **IDOL HOPEFUL NIXED FROM H'WOOD FOR POT RAP?**
> **2/7/2007 1:30 PM PST BY TMZ STAFF**
>
> **Akron Watson, an "American Idol" contestant from Dallas and one of the feel-good stories of the new season, has been disinvited from the Hollywood round of the show, possibly after producers discovered a pot bust on his record. Watson, whose San Antonio audition aired on last night's "Idol," was arrested in April 2003 for misdemeanor possession of marijuana, according to court records obtained and posted by PegasusNews.com, by way of Reality TV Magazine.**
>
> **He was headed to Hollywood after impressing the judges with his singing, and his story. But Watson tells Pegasus News that two days before he was scheduled to leave for Hollywood, he received a call saying that he would not be competing anymore "for unknown reasons." "Idol" producers did not comment on their withdrawn invitation.**
>
> **Meanwhile, another contestant from San Antonio, facemaker Ashlyn C. was reportedly arrested in August for pouring sugar into the gas tank of her ex-boyfriend's car while a student at Sam Houston State University, according to a report in The HoustonianOnline. When confronted by police, says the Houstonian, Carr confessed to the crime.**
>
> **A spokesman for FOX had no comment.**

592.    A commentator at www.aoltv.com noted how quickly TMZ.com was able to post

the mug shots of two *American Idol* contestants who had just appeared on the previous night's

show:

> **They really dig up the dirt quickly over at TMZ.com, don't they? They've already posted the mugshots of two of last night's American Idol contestants. [CDC_003245]**

593.    On February 7, 2007, an article was published on-line entitled: "*Two More

American Hopefuls Booted?*" [CDC_003210-11]

> According to Pegasus News, Akron has yet to be given a definitive reason as
> to why his invitation has been revoked, but "American Idol" insiders claim

> that it might have a lot to do with a pot bust on his wrap sheet.
>
> This would seem almost hypocritical since Taylor Hicks had similar problems midway through Season Five and was ultimately left on to later win "American Idol." [CDC__003207]

594.    On February 7, 2007, an article about Plaintiff Watson's disqualification was published on-line at www.TVFanatic.com [CDC_003258]:

> [Watson's] out ... for now. Despite impressing judges with his vocal talent, Akron has been dismissed from Hollywood. The reasons aren't known, but an arrest for marijuana possession has been assumed to be it.

595.    On February 7, 2007, at 7:15 PM EST, a "mainstream" article about Plaintiff Watson's disqualification entitled "*Akron Watson: Idol Producers Knew About My Past*" was published on-line at PEOPLE.COM [CDC_003274]:

> The 23-year-old Dallas-born singer claims that on Nov. 9, two days before he was set to leave for Los Angeles (with a hotel itinerary in hand), he received a phone call telling him not to come.  "From that point I asked why?" Watson tells PEOPLE.  "(The producer) said he didn't have a reason. He didn't know why.  He said that his bosses don't divulge that information to him."
>
> TMZ.com reported on Wednesday [Feb. 7] that it was a prior misdemeanor possession of marijuana charge from 2003 that got him ousted from the competition, based on a story in local Dallas-Fort Worth newspaper Pegasus News.
>
> But Watson insists that before auditioning for Idol, he told producers about his past.
>
> "I was completely open about my background, any trouble I had been in, my medical history – everything!" he tells PEOPLE. "They ask all that information before you audition." (The FOX network had no comment on the reason Watson was told he wouldn't be going to Hollywood after all.) …
>
> "I earned my way in, and you knew about my background, I have no clue why you wouldn't let me go and perform," insists Watson. "It seems like I deserve that opportunity. I still want to know why it is I've been cut. And I still want the opportunity to be on American Idol."
>
> PEGASUS NEWS reported it spoke with Idol publicist Alex Gillespie twice to see "if the show had any official explanation" for the decision. Gillespie allegedly said "she would find out exactly what happened" before later apologizing and stating "that the show would not ever be giving a reason for Watson's elimination from the competition," according to Pegasus News. People also reported that Fox had no comment on the reason Watson was

told he wouldn't be going to Hollywood. [CDC_003274]

## D.   LYTHGOE'S REBUTTAL

596.   According to NEWSDAY, on Thursday, February 8, 2007, in the wake of the media frenzy surrounding Akron's Golden Ticket revocation, Defendant LYTHGOE participated in a conference call with major media outlets to answer questions regarding the ENTERPRISE-DEFENDANTS' background check procedures and, more specifically, the Akron Watson situation.

597.   On Friday, February 9, 2007, RealityTVWorld.com published an article on-line entitled: *"American Idol 6 Producer Sheds Some Light on Akron Watson's Ouster,"* which quoted verbatim some of Defendant LYTHGOE's statements to the press on February 8, 2007. [CDC_003289-90]:

> Akron Watson is still wondering why his golden ticket isn't a valid pass to the Hollywood Round of American Idol's sixth season -- and unfortunately for the 23-year-old Dallas, TX singer -- Idol executive producer Nigel Lythgoe couldn't provide a definitive answer.

On Saturday, February 10, 2007, at 4:09 PM EST, REALITY TV MAGAZINE (www.sheknows.com) published an article on-line entitled: *"Akron Watson Getting Booted Was Decision of Fox According to Idol Producer"* [CDC_003296-97]

598.   The REALITY TV MAGAZINE article reported verbatim Defendant LYTHGOE's February 8, 2007 statements to the mass media concerning Plaintiff Watson's disqualification (as well as statements relating to other *American Idol* Contestant disqualifications based on criminal arrest history and/or ENTERPRISE-DEFENDANTS' background check procedures).  REALITY TV MAGAZINE noted:

> During a recent conference call with media, **"American Idol"** producer Nigel Lythgoe faced repeated questions about Akron Watson. Lythgoe was asked about Akron Watson so many times that it became obvious he was becoming frustrated with the question, and he appeared to be trying to point the finger at [Defendant] FOX in terms of responsibility for Akron's elimination from the competition. [CDC_003296]

599.   When first asked about Akron Watson and Ashlyn Carr, Defendant LYTHGOE reiterated several times the point that it was Defendant FOX's decision to disqualify *American Idol* Contestants based on their criminal record history:

> **"Number one, we don't get involved, as the producers of the show, in the background checks. That goes out to a private company and FOX. We are informed at the end of the day, 'You can't invite this person, that person, or this person.' And we don't ask why. To be frank, we're not interested."** [CDC_003296; 3289]

> **"If FOX believes that it will damage the show, or damage FOX, or damage the production, then it's best that they just don't come along. With the checks that FOX do, I think you can only do so much."** [CDC_003296; 3289]

600.   Defendant LYTHGOE also claimed that *Smoking Gun.com* received its information (or "tips") concerning the criminal background information of *American Idol* Contestants from the "so-called friends or family" of the disqualified Contestants themselves:

> **"Every season we get something in Smoking Gun[.com] because somebody gets through the net, and their so-called friends or family will call up Smoking Gun[.com], and it's a lot easier to find out about people when people want to tell you about it, rather than you going and doing searches."** [CDC_003296-97]

601.   Defendant LYTHGOE stated that the background check process conducted by ENTERPRISE-DEFENDANTS and its agents was "essential" to the *American Idol* Production because ENTERPRISE-DEFENDANTS need to know that "we've got the right people together":

> The fact is, we do background checks. I think it's very essential. We're putting these kids together in a very close environment, and we're working them very hard, and it's essential that we know that we've got the right people together. So Fox gets along with this private security firm. After that, I can't give you any other information because I don't want to know. [CDC_003297; 3289]

602.   When Defendant LYTHGOE was asked why the arrest details of some of the *American Idol* contestants - i.e., the Plaintiff Brittenum Twins - from past seasons were featured on the television show, Defendant LYTHGOE responded:

> If that occurs, don't forget that was occurring while we were doing the show.

> **So if somebody gets busted while we're doing the show, then we won't ignore it, especially if we can put it in the television show. [CDC_003297]**

603.    In further response to media inquiries about why ENTERPRISE-DEFENDANTS chose to broadcast Plaintiff Watson's "feel-good" audition footage on February 6, 2007, despite the fact that ENTERPRISE-DEFENDANTS had already disqualified Akron and revoked his Golden Ticket three months prior to the episode's airing, Defendant LYTHGOE indicated that the *American Idol* Golden Ticket was, in effect, illusory and revocable at any time for any reason:

> **Being asked to continue is [sic] Hollywood, and it's got nothing to do with his story and his performance. When [Watson] came along and auditioned, we treated him like everybody else. I'm not privy to what the guy's done for the rest of his life. We certainly couldn't do that [with] over 100,000 contestants that come along. We treat everybody the same, or attempt to, and he was part of that process. Whether he's invited back or not by FOX does not concern me regarding what he did at that audition. [CDC_003297]**

604.    Even though Defendant LYTHGOE had previously stated that the PRODUCTION-ENTERPRISE-DEFENDANTS weren't "interested" in learning the details of the Contestant background checks purportedly conducted by Defendant FOX, Defendant LYTHGOE made the point that the PRODUCTION-ENTERPRISE-DEFENDANTS have the final say of what is actually broadcast to the public as part of the *American Idol* television show.  To illustrate his point, Defendant LYTHGOE stated that if Plaintiff Watson had been arrested for a more serious crime, then the PRODUCTION-ENTERPRISE-DEFENDANTS might <u>not</u> have included Akron's audition segment on the show.  Defendant LYTHGOE explained as follows:

> **"If he'd have murdered somebody we would have thought twice, and if the mother would come forward and say: 'But he murdered my son, how could you put him on television?' Then we would certainly attempt to stop him being on television. But as far as I'm concerned we've just been asked not to bring him back to Hollywood." [CDC_003297; 3289]**

605.    When prodded for a longer explanation about why Akron's audition footage would be shown even after the fact of his disqualification was already known to ENTERPRISE-DEFENDANTS, and whether the disqualification would deprive the audience of their "investment"

in Akron's participation as a Golden Ticket Holder, "an apparently exasperated" Defendant

LYTHGOE snapped:

> "Because it was a very important part of the show last week, it showed something that was unique . . ." [CDC_003297; 3289]

> "So they've [the television audience] got another 174 people [Golden Ticket Holders] to get invested in. I don't want to cut out what is a good story for that show . . ." [CDC_003297; 3289]

> "I cannot show you 174 people's stories. <u>So, as far as I'm concerned, investing in THIS BOY[4] [Plaintiff Watson] at that point was what I'd like you to do</u>, but I would have liked you to have done that with a lot of other people that are going to disappear in Hollywood week. That's just the way the show goes, and it's been like that for six seasons now. I don't necessarily agree with it. <u>Give me another 48 shows and I'll show what actually happened in Hollywood</u> …" [CDC_003297]

> "<u>As I said</u>, it's like a lot of other people, <u>their stories are in there because I believe it's</u> <u>a good story</u> that will disappear in Hollywood. <u>THIS BOY[5]</u> [Plaintiff Watson] has just been pulled out because he disappeared before Hollywood. But people are in there that you will not see who you might be invested in on the audition trial." [CDC_3298]

606.     Defendant LYTHGOE explained that each season of the *American Idol*

Production is divided into three separate "series": (i) the audition process; (ii) the selection of the

Top 24 (Semi-Finalists); and (iii) the "Top 12s" (Finalists).   Defendant LYTHGOE explained

that each of the three phases have a "different set of rules" and that "the fun, the silliness, the

cheekiness" of the television program is reserved for the first Audition phase of the series each

season.

> "Don't forget, as far as I'm concerned, <u>we deal with three series here. It isn't</u> <u>just one big 'American Idol' series</u>. I've always looked on it, and I've got my

---

[4] In *Ash vs. Tyson Foods*, 546 U.S. 545, 556 (2006), the United States Supreme Court held that in a Title VII case, use of the term "boy" by a white supervisor to describe an adult African-American employee could serve as direct evidence of the employers' racial *animus*.  The Supreme Court noted that use of the term "boy" – which is historically considered a racial epithet implying white paternalism and black subjugation - was not "always benign." On remand, even the circuit of the Deep South conceded that the term "boy" could <u>not</u> be used in good faith by a white over-seer to describe a Black man in the context of a promotion or hiring decision.  See *Ash vs. Tyson Foods*, 2006 U.S. App. LEXIS 19750 (11th Cir. 2006).

[5] *Id*. (further noting that Akron Watson was a 23-year-old <u>MAN</u> at the time of Defendant LYTHGOE's comments).

team to look on it, that <u>the audition process is one part</u>, that's it's only little series, as far as I'm concerned, <u>moving through to the top 24 is it's own series</u>, it's a different set, <u>it's a different set of rules for the kids that are involved in it, and then going into the top 12 is yet, again, another series that is where the Star is Born</u>."  [CDC_003297]

<u>"So I don't ever really put the fun, the silliness, the cheekiness, of the audition process in with the top 12s. That has its own area and its own story.</u> A lot of the people that you're invested in that area in Hollywood will just disappear. Sometimes they don't even give reasons why." [CDC_003297]

"There's just no time. They've got three days to get it down to 24.  It is, 'No, thank you. No. Goodbye. Thank you.' . . . That is just the way the competition goes".  [CDC_003297]

## E.    WHITE COMPARATOR

607.    An on-line article posted contemporaneous with the disqualification of Akron

Watson noted the double standard between Akron Watson and Taylor Hicks.

> Idol has an inconsistent track record dealing with contestants' run-ins with the law.
>
> Last season's winner Taylor Hicks was arrested for marijuana possession in 1998, according to a Star magazine report. The charges were dropped, and eight years later Hicks found himself in the competition. [CDC_003328]

# Season Six:
# ASHLYN C.

## A.   GOLDEN TICKET

608.   Ashlyn C. ("Ashlyn") is a U.S. citizen of the State of Texas who was featured as a Contestant on Season Six of *American Idol* who, like Plaintiff Akron Watson, auditioned in San Antonio, Texas and received a Golden Ticket from the Expert Judges on or about August 26, 2006.

609.   Ashyln is **not** a Plaintiff in this action.

610.   Ashlyn was 18 years old at the time of her August 2006 audition.

611.   Footage of Ashlyn's Season Six *American Idol* audition was aired in its entirety on February 6, 2007.   Her performance segment was particularly memorable because she initially received a NO from Randy Jackson and Paula Abdul based on her "odd facial inflections"; only to be brought back to sing one more time at Simon Cowell's insistence.

612.   After her second performance before the Expert Judges, Ashlyn received a Golden Ticket to Hollywood via unanimous vote."  Ashlyn's audition marked one of the first – if not only - times that the original panel of Expert Judges had issued a "reversal."

## B.   DISQUALIFICATION

613.   On the evening of Tuesday, February 6, 2007, at 8:00 p.m. EST, ENTERPRISE-DEFENDANTS broadcast its *American Idol* episode featuring Ashlyn's San Antonio, Texas audition.

614.   On Wednesday, February 7, 2007, at 10:30 A.M. EST, TMZ.com published Ashlyn's mug shot from her November 2006 arrest (appearing directly under the mugshot of

fellow Texan Akron Watson).  The TMZ.com article included a statement that Ashlynn had

"confessed to the crime" of criminal mischief [CDC_003210-11]

> Meanwhile, another contestant from San Antonio, facemaker Ashlyn Carr, was reportedly arrested in August for pouring sugar into the gas tank of her exboyfriend's car while a student at Sam Houston State University, according to a report in The HoustonianOnline. When confronted by police, says the Houstonian, Carr confessed to the crime.

> A spokesman for FOX had no comment.

615.   On February 7, 2007, at 3:15 PM EST, PEOPLE.COM published an article entitled:

*"Idol's Comeback Kid: Ashlyn Carr."*   After relating Ashlyn's audition comeback story, the

PEOPLE article noted:

> Talk about a come back.  Yet there's a bittersweet twist to this fairy tale story: TMZ.com reported that Ashlyn was allegedly arrested in August for pouring sugar into her ex-boy friend's gas tank while she was a student at Sam Houston State University.   And her school newspaper, THE HOUSTONIAN ONLINE, reports that Ashlyn confessed to the crime. [CDC_003721]

616.   On February 7, 2007, further on-line publications reported that:

> The Sugarland native [Carr] was arrested for dumping sugar into her exboyfriend's gas tank. That kind of vindictive behavior usually does not endear American Idol producers. Thus far, however, Ashlyn has not been removed from the American Idol roster, but the announcement could come at any time.  [CDC_003207]

> However, an article on MySanAntonio.com talks about a Sam Houston student who was arrested for pouring sugar in her ex boyfriend's gas tank. Carr reportedly admitted to the crime, which took place after her Idol audition. Therefore, the singer's Hollywood status is unknown at this time. [CDC_003258] (TVFanatic.com 2/7/07, 9:03 am)

> Carr was arrested in November for allegedly putting sugar in an exboyfriend's gas tank. She was arrested on criminal mischief charges and booked into the Walker County Jail, according to the arrest report. [CDC_003328]

> Jack Choate, the First Assistant District Attorney in Walker County, said today that they will not pursue the charge as long as she pays for damages to the car. Carr is not attending SHSU this semester. [CDC_003328]

617.   On February 8, 2007, one internet publication called Ashlyn's mother in Texas:

Ashlyn's mother, Karren Carr, was mum when contacted at the family's Houston home today. Idol reps also had no comment. Karren confirmed that her daughter, who performs regularly around town, was in Houston and in good spirits.

"I'm sure there are a lot of rumors going around, but we prefer not to even comment on anything other than Ashlyn's singing," Karren said.

"I think, with all of this — if you hear Ashlyn, if you see her, it speaks for itself.  (Ashlyn) was born with this gift to sing and to inspire," Karren said. "The experience at American Idol, although it was very emotional, it was very worthy."

 "Now, when she becomes American Idol, are you going to write something about that? [CDC_003328]

618.    Sunday, February 11, 2007, it was reported in an article on-line that the

HOUSTONIAN ONLINE student newspaper of Sam Houston State University had issued an update /

retraction of its alleged November 14, 2006 article:

**ASHLYN C.[] UPDATE/RETRACTION**

THE HOUSTONIAN ONLINE, the student newspaper of Sam Houston State University, has issued an update/retraction of its Nov. 14 2006 article that stated "several statements indicated that criminal mischief charges had been filed against former Sam Houston student Ashlyn C. In fact, according to the District Attorney's office, no charges will be pursued as long as [Ashlyn] makes restitution for the damages.

She was arrested, but we will not be filing the case. She'll be making restitution for the damages,' Walker County District Attorney David Weeks said on Friday, February 9. The Houstonian would like to apologize for any misleading material that appeared in the article."

# Season Eight:
# JU'NOT JOYNER

## A.   CONTEST PARTICIPATION

### (1)   GOLDEN TICKET

619.   Plaintiff Ju'Not Ramone Joyner, born June 23, 1982, is a U.S. citizen of the State of Maryland.

620.   Plaintiff Joyner was featured as a Top 36 Semi-Finalist Contestant on Season Eight of *American Idol*.   He had previously auditioned the prior season, making it to the Hollywood Round, but not through to the Semi-Finalists round.

621.   On August 19, 2008, Plaintiff Joyner attended the "cattle call" audition round at the Izod Center in New York.   Based on his performances, he was invited to the Callback rounds to be held in New York City at Chelsea Piers on August 26-27, 2008.

622.   On or about August 26-27, 2008, Plaintiff Joyner was awarded a Golden Ticket to Hollywood by the Expert Judges.

### (2)   *AMERICAN IDOL* CONTESTANT AGREEMENT (V.08)

623.   On August 28, 2008, Plaintiff Joyner executed the 21-page *American Idol* CONTESTANT AGREEMENT for Season Eight.   The agreement was counter-signed by ENTERPRISE-DEFENDANTS' representative, Amanda Chacon, on September 18, 2008 [CDC_3480]

624.   **RECITAL** to the *American Idol* CONTESTANT AGREEMENT (V.08), P. 1, provides :

> I understand that I am being considered as a contestant for the television series entitled "AMERICAN IDOL" (the "Program") to be produced by American Idol Productions, Inc., or its designee (together with their respective parent, assigns, subsidiaries and affiliated companies, individually and collectively, "Producer"), and intended for initial exhibition by Fox Broadcasting Company ("Network"). By signing this Contestant Agreement and Release (the "Agreement"), I represent that I

have read, understood and voluntarily agree to abide by its terms and conditions. Producer requires me to enter into this Agreement in order to be considered as a contestant on the Program, and I deem it to be in my best interest to enter into this Agreement. I acknowledge.  [CDC_003461]

625.   NATURE OF THE PROGRAM/AVAILABILITY, ¶ A.1, P. 1, provides:

I understand and acknowledge that the principal nature and purpose of the Program is to produce a television program in which a competition will be conducted (the "Competition") to search for and select a recording artist. If I am selected by Producer to be a contestant on the Program, I agree to be available on an exclusive basis to participate as a contestant in connection with the production of the Program in the Los Angeles, California area, or any other location required by Producer, as and to the extent required by Producer, commencing on a date to be determined by Producer and continuing until the completion of my participation on the Program as required by Producer. I further agree to be available and to participate as, when and where Producer may require in connection with publicity, interviews, promotional appearances on behalf of sponsors and similar matters (for example, to appear on news shows, talk shows and other programs, including other Network programs, and to make other appearances as required by Producer) in connection with the Program, or otherwise, as, when and where designated by Producer in its sole discretion, as more fully set forth in Section C below.  [CDC_003461]

626.   AGREEMENT TO COMPLY WITH ALL RULES, ¶ A.5, P. 3 provides in relevant part:

I have voluntarily agreed to participate as a contestant in the Program, if selected by Producer in Producer's sole discretion. I agree to follow all of Producer's rules, directions and instructions in all matters relating to the Program (including contestant selection and decisions regarding the creation and implementation of terms, conditions and rules governing the Program). I further agree that (i) all Program rules are subject to change by Producer in Producer's sole discretion, at any time including, without limitation, while I am participating as a contestant on the Program and that (ii) Producer's decision(s) on all matters (including contestant selection, song selection, the amount of exposure each contestant may or may not receive on the Program or in the promotion for the Program, and the manner in which the Program is produced) shall be final and binding . . . I understand that Producer reserves the right, in its sole discretion, to change, add to, delete from, modify or amend the terms, conditions and rules affecting the conduct of the contestants on the Program, the Program activities, the elimination of contestants from the Program and the granting of any prize(s) . . . I hereby acknowledge that the interests of the Program shall override those of any contestant in the Program.  [CDC_003463]

627.   VOTING SYSTEM, ¶A.6, P. 3 provides in relevant part:

I understand that Producer will use commercially reasonable efforts to ensure the integrity of the telephone voting systems anticipated to be used in connection with the Competition (including but not limited to wireless,

wireline and/or other forms of telephony; text messaging, MMS messaging, and SMS messaging; online and the Internet; and, any other forms of voting chosen by Producer in its sole discretion) (the "Voting Systems"); <u>however, I acknowledge that problems may occur. In the event of any problems with the telephone voting systems used to determine the advancement of the contestants in the Competition and the selection of the ultimate winner of the Competition, which problems may include the partial or total failure of the system or the misuse of the system by callers or others, Producer shall have the right to determine the advancement of contestants and/or the selection of the winner of the Competition in its sole discretion.</u> I agree to accept the decision of Producer in all such matters as final and binding. Furthermore, I will not myself, nor will I authorize, assist, encourage, permit or facilitate others to, tamper with the telephone Voting Systems, including but not limited to "phone slamming" via a computer device or other computer hacking methods. I understand and acknowledge that any tampering with the Voting Systems or any aspect of the voting shall be grounds for immediate disqualification from the Program and the Competition.  [CDC_003463]

628.  FALSIFICATION OF DOCUMENTS, ¶ A.6, P. 4, provides in relevant part:

<u>I acknowledge that Producer reserves the right exercisable at any time at its sole discretion to disqualify me from the Competition should I at any stage fail to supply any information reasonably requested of me, supply untruthful, inaccurate or misleading personal details or information, break the rules or otherwise breach the terms contained herein or for any other reason, at the sole discretion of Producer.</u>

629.  BACKGROUND CHECKS, ¶ A.9, P. 4 provides:

I am willing to accurately and completely fill-out a background questionnaire and undergo investigations into my background, which may include but not be limited to reviews of civil and criminal records, financial, credit, employment history, interviews with family and friends, and <u>any other type of background checks deemed necessary by Producer, in its sole discretion</u>, and I agree to sign all necessary consents in connection therewith.

630.  ALTERNATES, ¶ A.10, P. 4, provides in relevant part:

I understand that I may be chosen as an alternate contestant to replace another contestant by Producer, <u>I acknowledge and agree that Producer may, at any time and in its sole discretion, add, remove or replace contestants for any reason or for no reason at all.</u>  [CDC_003464]

631.  FURTHER DOCUMENTS; DISQUALIFICATION, ¶ A.12, P. 4 provides:

I acknowledge that Producer may require me to sign further documents and agreements as a condition of my participation in the contestant selection process and my participation in the Program. If I fail or am unable to promptly execute any such documents or instruments, I hereby irrevocably

appoint Producer as my attorney-in-fact to execute and file any such documents or instruments or to do any such acts or deeds, provided that said documents, instruments, acts, and deeds shall not be inconsistent with the terms and conditions of this Agreement. I agree that Producer's and the Network's rights under this Section A.12 constitute a power coupled with an interest and are irrevocable. <u>I understand that I may be removed or disqualified from the Program by Producer for any reason or for no reason at all.</u> I also understand that no such removal or disqualification from the contestant selection process and/or Program will affect any of the rights granted or assigned by me or any of the covenants, agreements, waivers, releases or indemnities made by me in this Agreement, the audition agreements previously executed by me, or any other agreements that I may make, as well as any and all exhibits and attachments to any of the foregoing documents. <u>I also understand that if I refuse to sign any further agreements, releases, authorizations or waivers as required by Producer, I may not be permitted to participate further in the contestant selection process and/or the Program.</u> <u>If I am disqualified from the contestant selection process and/or the Program, Producer may make any explanation or announcement (or no explanation or announcement) to the public through any and all media, including but not limited to the Program, that Producer chooses, as to the reason I was disqualified.</u> All decisions of Producer, in its sole discretion, concerning selection and disqualification of contestants are final and binding. [CDC_003465]

632.    **NO OBLIGATION BY PRODUCER**, ¶ A.13, provides:

<u>I understand and agree that the selection of contestants is and shall be within Producer's sole discretion</u> and that Producer is not obligated to select me. I further understand and agree that an invitation by Producer to Los Angeles, California, and/or the studio does not guarantee my appearance or participation as a contestant. If I am selected, and if I appear on the Program or any part thereof, Producer is under no obligation to broadcast, exhibit, or otherwise use or exploit my appearance on the Program or any part thereof. [CDC_003465]

633.    **CONFIDENTIALITY**, ¶ A.14, P. 5, provides in relevant part:

<u>I understand that my appearance on the Program, if any, is strictly for the purpose of participating in the Program as a contestant.</u> [CDC_003465]

634.    **FCC (FEDERAL COMMUNICATIONS COMMISSION)**, ¶ A.14, P. 21, provides:

<u>I am aware that it is a federal offense punishable by fine and/or imprisonment for anyone to do anything which would rig or in any way influence the outcome of the Program with the intent to deceive the viewing public</u>, including but not limited to, tampering with the telephone voting system, and that <u>it is a federal offense to offer or to accept any information or secret assistance in connection with the Program.</u> I agree that I will not participate in any such act or any other deceptive or dishonest act with respect to the Program. If anyone attempts to induce me to perform any such act, I shall immediately notify the Producer as provided in Section A.22,

below. [CDC_003466]

635.    NO WAGES, ¶ A.24, P. 6, provides:

I acknowledge that my contribution to the Program is not a professional performance or appearance and does not entitle me to wages, salary or other compensation, except as may otherwise be set forth herein.  [CDC_003466]

636.    NAME AND LIKENESS, ¶ B.24, P. 7, provides in relevant part:

I hereby consent to Producer's filming, taping, photographing and/or recording me for use In and in connection with the Program (including, without limitation, whether I am aware or unaware of the filming, taping, photographing or recording, and by requiring me to wear a microphone up to 24-hours-a-day, 7-days-a-week, at Producer's discretion) and agree to cooperate fully with Producer in such activities. I acknowledge and agree that Producer will be the sole and exclusive owner of all rights and material filmed, taped, photographed and/or recorded pursuant to this Agreement.

In addition, I hereby grant to Producer the unconditional right throughout the universe in perpetuity to use, simulate or portray (and to authorize others to use, simulate or portray) or to refrain from using, simulating or portraying, my name, likeness (whether photographic or otherwise), voice, singing voice, personality, personal identification, personal experiences, life story, biographical data, incidents, situations and events which heretofore occurred or hereafter occur, including without limitation the right to use, or to authorize others to use, any of the foregoing in or in connection with the Program (or any episode or portion thereof) and the advertising, promotion or publicizing of the Program or any Program episode by Producer, the Network, its operations, activities or programming services and in connection with any merchandise, tie-in, sponsor, product or service of any kind by Producer, the Network, or any of its programming services, and in any other manner whatsoever as Producer may elect in its sole discretion (including, but not limited to, exploitation on the Internet, wireless Internet, MMS and SMS messaging).

I understand that in and in connection with the Program, I may reveal and/or relate, and other parties (including, without limitation, employees, agents or representatives of Producer, the Network, CKX, Inc., Telescope, Sony/BMG, the Ford Motor Company, Coca-Cola, AT&T Mobility, LLC, Fox Digital Media, and/or the 19 Companies, and each of their parents, affiliates, and subsidiaries; other contestants; the judges, host, guest stars and/or special correspondents of the Program) may reveal and/or relate information about me of a personal, private, intimate, surprising, defamatory, disparaging, embarrassing or unfavorable nature, that may be factual and/or fictional. I further understand that my appearance, depiction and/or portrayal in the Program and my actions and the actions of others displayed in the Program, may be disparaging, defamatory, embarrassing or of an otherwise unfavorable nature and may expose me to public ridicule, humiliation or condemnation.

637.  **OWNERSHIP OF RIGHTS**, ¶ B.5, P. 8, provides in relevant part:

> Without limiting the foregoing, I acknowledge and agree that all of the results and proceeds of my granting of rights hereunder including, without limitation, all Contestant Images, artistic, literary, dramatic, musical, photographic, choreographic, and other materials which I may create or furnish in connection with my participation on the Program (collectively, the "Materials"), are being specially commissioned by Producer as a contribution to an audiovisual work and, accordingly, the copyright (and all renewals and extensions thereof) and all other proprietary rights, title and interest in such Materials shall be owned by Producer as the author of such Materials,  [CDC__003468]

638.  **SERVICES EXCLUSIVE**, ¶ C.3, P. 10, provides in relevant part:

> I agree that during the Exclusivity Period, I shall not appear on or authorize production of or participate in any way with any other television programming, radio programming, print media, on-line services, or any other media outlet now known or hereafter devised (including but not limited to any television or radio programs or internet-based competitions similar to the Program, such as those consisting of or containing a talent contest relating to my musical/performing abilities), or in any commercials or advertisements without the prior written consent of Producer, FremantleMedia North America, Inc., CKX, Inc., the Network, and the 19 Companies. In addition, I agree that for a period of one (1) year from the Season 8 Finale, I will not participate in or render services as a host or judge in any television programs, radio programs, internet-based competitions, or competitions through other media, similar to the Program, without Producer's prior written consent.  [CDC_003470]

639.  **MANAGEMENT OPTIONS,** ¶C.4, P. 10, provides in relevant part:

> In addition to the exclusivity obligations set forth elsewhere in this  .  [CDC_003470]

640.  **FUTURE AGREEMENTS, PRIZE**, ¶C.6, PP. 10-11, provides in relevant part:

> Notwithstanding the other provisions of this Section C, I understand and agree that in the event I am one of the final twenty-four (24) contestants in the Competition (which number may be increased or decreased, in Producer's sole discretion) ("Top 24"), I will be required to enter into the following agreements: (a) an agreement with 19 Recordings Limited (or an affiliate or designee), for my exclusive services as a recording artist; (b) an agreement with 19 Merchandising Limited (or an affiliate or designee) for the use of my name, likeness and biography in connection with advertising, endorsements, merchandising and sponsorship; (c) an agreement with 19 Management Limited (or an affiliate or designee) for the management of my career as an artist; and (d) an agreement with 19 TV Limited (or an affiliate or designee) for my services in relation to the "American Idol Attraction" at Disney World Resort in Orlando, Florida and the Disney "What's Next" campaign. [CDC_003470-71]

641.   WAIVER OF ALL CLAIMS AND SUITS, RELEASED CLAIMS, ¶A.6, P.14 provides in relevant part:

> I and the other Releasing Parties hereby unconditionally and irrevocably release and forever discharge each of the Released Parties …from and against any and all claims, liens, agreements, contracts…and liabilities of whatever kind or nature in law, equity or otherwise, whether now known or unknown, suspected or unsuspected, and whether or not concealed or hidden (collectively, the "Released Claims") arising out of or in connection with my preparation for, travel and living accommodations in connection with, participation and appearance in, and withdrawal or elimination from the Program or activities associated with the Program or the production and exploitation of the Program, including, without limitation, claims for injury, illness, damage, loss or harm to me or my property, or my death.

> The Released Claims shall include, but not be limited to, those based on negligence of any of the Released Parties … products liability, breach of contract, breach of any statutory or other duty of care owed under applicable laws, defamation, invasion of privacy, publicity or personality, infringement of copyright, and those based on my possession or use of any prize. [CDC_003474]

642.   PROFESSIONAL CONTRACTS; OTHER AGREEMENTS, ¶ E.1, P.14, provides in relevant part:

> [I hereby represent and warrant as follows:] I understand that it is anticipated that the winner of the Competition will be awarded a talent representation contract, a merchandising contract and a recording contract. [CDC_003476]

643.   GUILDS, ¶E.5, P.16, provides in relevant part:

> [I hereby represent and warrant as follows:] I am not a member of AFTRA, SAG or any other performing arts union or guild.  [CDC_003476]

644.   WARRANTS, ¶E.7, P.16, provides:

> [I hereby represent and warrant as follows:] I have never been arrested or convicted of a felony or misdemeanor offense, except as follows - please list dates and location of arrest and/or conviction and a brief description of the alleged offense(s)].  [CDC_003476]

_____
__
> You should be aware that past arrests and/or convictions are not automatic grounds for disqualification, but such information may be used by Producer to determine your eligibility for the Program.

645.   **CRIMINAL CHARGES**, ¶ E.7, P.16, provides:

> [I hereby represent and warrant as follows:] I agree to notify the Producer immediately if there are any criminal charges brought against me from the date hereof up to and including the expiration of the Exclusivity Period. [CDC_003476]

646.   **PRODUCER'S RIGHT TO SUSPEND OR TERMINATE AGREEMENT**, ¶ F.1, P.17, provides:

> Producer shall have the right to suspend or terminate this Agreement, as decided by Producer in its sole and absolute discretion, if Producer elects to terminate my participation in the Program or my involvement in any events related to the Program, if the Program is canceled, if the Program format is materially altered, if there is an event of Force Majeure (as defined below), upon my Incapacity (as defined below), or for any reason or no reason whatsoever. "Incapacity" includes without limitation my physical or mental disability, default, or conviction of a  [CDC_003477]

647.   **PRIZES,** ¶ F.3, P.18, provides:

> I acknowledge and agree that the amount and/or nature of cash and/or prizes awarded are subject to change by Producer, in its sole discretion, at any time including, without limitation, while I am participating as a contestant on the Program. Furthermore, in the event of a malfunction of any nature whatsoever affecting the manner in which the Program is produced, the telephone voting system, the Program rules, the outcome of the Program and/or the awarding of cash and/or prizes, Producer's decision with respect to handling of such malfunction including, but not limited to, the awarding of cash and/or prizes, shall be final.
>
> If a cash prize is awarded to me, then payment shall be made to me as Producer, in its absolute sole discretion, shall deem appropriate. If Producer, the 19 Companies, or any other entity described hereunder deems that I am ineligible to receive any prize, such ineligibility shall be considered a forfeiture of that prize by me and shall release Producer, the Network, any parent, subsidiary, affiliate, or division of either of them, and all persons and entities connected with the Program, from any and all obligations in connection with such prize. I shall pay all state and federal or other taxes on any and all cash and/or prizes I win. I release the Released Parties of liability for any such taxes. Producer may deduct or require payment of any such taxes before delivery of a prize. I shall not advertise my winning of any prize prior to delivery of the prize.

648.   **REMEDIES**, ¶ F.4, P.18, provides in relevant part:

> I acknowledge and agree that the rights I have granted hereunder and my participation related thereto are unique, unusual, special and extraordinary,

the loss of which would not be adequately compensable in damages in an action at law. I further agree that, in addition to any rights or remedies which Producer may have under this Agreement or otherwise, [CDC_003478]

649.   **RELATIONSHIP OF PARTIES**, ¶ F.7, PP.18-19, provides:

I acknowledge and agree that my relationship to Producer is limited solely to that of a grantor of rights and not as an employee of Producer or of an independent contractor. I acknowledge and agree that I will be responsible for payment of all taxes and insurance applicable under existing law on all amounts paid to me hereunder, including but not limited to, Social Security taxes, federal, state and local income taxes, disability, unemployment and workers compensation insurance. I hereby agree to complete, execute and deliver, in person, to Producer all required forms necessary for identity and eligibility under the Immigration Reform and Control Act. I warrant and represent that I will make all necessary payments due governmental agencies to comply with the foregoing. [CDC_003478-79]

650.   **COMPLETE AGREEMENT; APPLICABLE LAW**, ¶ F.8, PP.19, provides in relevant part:

This Agreement, and any exhibits and attachments hereto, contain the entire understanding between the parties, and supersedes all prior negotiations, understandings and agreements (whether written or oral) of the parties hereto relating to the subject matter herein. This Agreement cannot be modified except by a written instrument signed by the parties hereto. This Agreement and all matters or issues collateral thereto shall be governed by the laws of the State of California applicable to contracts executed and performed entirely therein (regardless of the actual place(s) of performance). [CDC_003479]

651.   **THIRD PARTY BENEFICIARY**, ¶ F.10, P. 19, provides:

I acknowledge and agree that, insofar as the terms of this Agreement relate to CKX, Inc., the Network, FremantleMedia North America, Inc., the 19 Companies, or any other entities described herein, each of them shall be considered as third party beneficiaries to this Agreement.

## (3)   PARTICIPANT BACKGROUND QUESTIONNAIRE FORM (V.08)

652.   On August 28, 2008, Plaintiff Joyner completed and executed the 36-page PARTICIPANT BACKGROUND QUESTIONNAIRE FORM (V.08) [CDC_003423] ("LFQ.8").

653.   LFQ.8 contains the following written questions under the heading "LITIGATION

HISTORY" [CDC_003424]

♦ Have you ever been detained (brought in by the police, held by the police and/or questioned by the police and let go) as an adult or minor?

♦ Have you ever been arrested (even if charges were dropped or expunged) as an adult or minor?

♦ Have you ever been convicted of a felony or misdemeanor as an adult or minor?

♦ Have you any current or outstanding warrants (e.g., traffic tickets, arrests, etc.)?

654.   LFQ.8, P. 30, asks AMERICAN IDOL Contestants to disclose the complete arrest history and criminal conviction history of *"any family member"* or *"any former roommate"* in connection with *"any crime."*   There are no temporal restrictions placed upon this inquiry. [CDC__003452]

655.   LFQ.8 ALSO contains multiple written questions under the heading "PSYCHOLOGICAL/MEDICAL HISTORY" that asks Contestants to disclose any and all known medical conditions.   [CDC_003446-48]

656.   LFQ.8, Page 32, is entitled "PARTICIPANT CERTIFICATION".  The form reads as follows:

I hereby certify that all statements made in this Background Investigation Form are true and complete. I understand that any discrepancies, misstatements, omissions, and/or falsifications will be cause for disqualification, for my name to be removed from the eligibility list or for immediate termination, if a selection has been made.

I further acknowledge and accept that this application form and any other materials (including, but not limited to, photographs, and videotapes) I have submitted or will submit to American Idol Productions, Inc. will become property of American Idol Productions, Inc. and will not be returned.

By signing below, I grant FOX and American Idol Productions, Inc. the right to use any biographical information contained in this Participant Background Questionnaire Form, my home video or taped interview (if any) in any manner whatsoever, and to record, use and publicize my home videotape or taped interview, voice, actions, likeness and appearance in any

manner in connection with this production.

657.    LFQ.8, p. 32, also contains a section entitled:  FAIR CREDIT REPORTING ACT

(FCRA): CONSUMER DISCLOSURE AND GENERAL AUTHORIZATION which reads in its

entirety as follows: [CDC_003454]

> In connection with my Participant Application for the program being produced by American Idol Productions, Inc. for FOX, I understand that a consumer report or investigative consumer report, as those terms are defined in the federal Fair Credit Reporting Act as amended (FCRA), 15 U.S.C. 1681 et seq., may be obtained by American Idol Productions, Inc. and FOX from a consumer reporting agency (CRA). I further understand that the CRA may not give out information about me to American Idol Productions, Inc. and FOX without my written consent. It is also understood that the CRA may not report medical information about me to American Idol Productions, Inc. and FOX without my specific prior consent as to the release of such information, which is in addition to my general authorization herein.

> I understand that an investigative consumer report is a special type of consumer report in which information about the character, general reputation, personal characteristics, and mode of living is obtained through personal interviews. (The italicized text represents the exact wording found in Section 603(e) of the federal Fair Credit Reporting Act.) In the event an investigative consumer report is obtained, I understand that (a) I am entitled to receive a summary of my rights, and (b) I have the right to request additional disclosures provided for below as follows:

> Upon my written request to American Idol Productions, Inc. within a reasonable period of time after my receipt of this Fair Credit Reporting Act Consumer Disclosure and General Authorization, American Idol Productions, Inc. shall make a complete and accurate disclosure of the nature and scope of the investigation requested. It is understood that the is disclosure shall be made in writing, mailed, or otherwise delivered to me not later than five (5) days after the date on which the request for such disclosure was received from me or such report was first requested, whichever is later in time.

658.    LFQ.8, p. 35, contains further language pertaining to the Contestants' rights

under the Fair Credit Reporting Act, 15 U.S.C. § 1681.  [CDC_003457]

> **NOTICE OF CONSUMER REPORT AND INVESTIGATIVE CONSUMER REPORT AND SUMMARY OF RIGHTS UNDER THE FAIR CREDIT REPORTING ACT**

> A Consumer Report is a written report prepared by a consumer reporting agency (CRA) that may include a summary of your credit standing, capacity, or worthiness, character, general reputation, personal

characteristics or mode of living.

**The CRA that will be conducting this investigation is CARCO Group Investigations.**

An Investigative Consumer Report is a report prepared by a CRA that may contain information on your character, general reputation, personal characteristics, or mode of living obtained through personal interviews with your friends, neighbors or associates. **The CRA that will be conducting this investigation is CARCO Group Investigations.**

**Under the Fair Credit Reporting Act. you have the right to request additional information on the nature and scope of the Investigative Consumer Report, which you may be the subject of. If you wish to exercise this right, please send a written request to the American Idol Productions, Inc. representative who provided this notice to you.**

A Summary of Your Rights Under the Fair Credit Reporting Act

•You must be told if information in your file has been used against you. Anyone who uses information from a CRA to take action against you-such as denying an application for credit, insurance, or employment-must tell you, and give you the name, address, and phone number of the CRA that provided the consumer report.

•You can find out what is in your file. At your request, a CRA must give you the information in your file, and a list of everyone who has requested it recently. There is no charge for the report I a person has taken action against you because of information supplied by the CRA if you request the report within 60 days of receiving notice of the action.

•You also are entitled to one free report every twelve months upon request if you certify that (1) you are unemployed and plan to seek employment within 60 days, (2) you are on welfare, or (3) your report is inaccurate due to fraud.

•Outdated information may not be reported. In most cases, a CRA may not report negative information that is more than seven years old; ten years for bankruptcies.

## (4)  CONTESTANT CODE OF CONDUCT

659.  On February 10, 2009, Plaintiff Joyner executed the American Idol – Season 8  -

Contestant Code of Conduct, which provides in relevant part: [CDC_3521-22]

1) **Be Courteous.** Please treat all other on-camera contestants; the staff and crew of FremantleMedia North America, 19 TV Ltd, and American Idol Productions, Inc. ("Producer"), the staff at all the locations we may visit during the season; the staff of Coca-Cola, Ford Motor Company, AT&T, and other sponsors that you may interface with ("Sponsors"); and anyone

else that you encounter while participating on AMERICAN IDOL with the utmost courtesy and respect. You have been selected because you are responsible adults and we have confidence that you will act this way during your stay. Abusive, harassing or inappropriate behavior will not be tolerated and may result in a variety of sanctions, including but not limited to your removal from AMERICAN IDOL.

5) <u>Do Not Leave Premises</u>. You are not permitted to leave the perimeter of the location(s) where you will be residing. For your safety and the safety of others, do not leave the location(s) for any reason UNLESS instructed by an appropriate member of the production staff and accompanied by members of the production staff. Minors may NEVER travel without being accompanied by their parent or legal guardian.

## B.    DECEPTIVE PRACTICES

### (1)    ILLUSORY PRIZE

660.    On Sunday, February 8, 2009, the Top 36 Contestants of Season Eight were called to a surprise group meeting at the offices of 19 ENTERTAINMENT in Los Angeles, California. Defendant WARWICK, senior executive producer of the show, conducted the meeting.  He explained to the Contestants that they would be required to sign a series of recording, artist management, merchandising and touring contracts with 19 ENTERTAINMENT.

661.    Defendant WARWICK then presented the transactional attorney for 19 ENTERTAINMENT, who briefly summarized to the group what he purported to be the material terms of the transaction.

662.    19 ENTERTAINMENT's transactional attorney then explained that the Top 36 Contestants would be able to "select" from three possible attorneys to represent them in their "negotiations" vis-à-vis 19 ENTERTAINMENT.  ENTERPRISE-DEFENDANTS would be paying for their legal fees.

663.    The transactional attorney assigned by ENTERPRISE-DEFENDANTS to represent the *American Idol* Season Eight Semi-Finalists, including Plaintiff Joyner, was Gary L. Gilbert, Esq.

of the law firm MANATT, PHELPS & PHILLIPS, LLP, 11355 W. Olympic Blvd., Los Angeles, CA. 90064.

664.    Plaintiff Joyner was exacerbated by the subject matter of the meeting and the way in which the information was being presented.  Having seen the *American Idol* program for seven years on the air, he thought that the "prize" for winning the *American Idol* Contest was the major label recording contract.  He did not understand why he would have to sign what was essentially the Prize <u>before</u> actually winning the Contest.

665.    During the meeting, Plaintiff Joyner asked no less than five (5) substantive questions about the contractual terms of the 19 ENTERTAINMENT Prize Contracts.  No other Contestant in the room asked more than one question.   Very few Contestants asked any questions at all.

666.    After the "question-and-answer" session was complete, the transactional attorney for 19 ENTERTAINMENT told the Top 36 Contestants to "speak among themselves" and select one of three lawyers to represent their interests in the "negotiation" of the 19 ENTERTAINMENT Prize Contracts.

667.    As the Contestants huddled around, many of them started asking Ju'Not questions about the proposed contracts and wanted to know his advice as to whether they should sign them.  As more and more Contestants began to seek Ju'Not's counsel, one of 19 ENTERTAINMENT's representatives called Plaintiff Joyner into a private office and closed the door.

668.    Defendant WARWICK was already inside the office, seated at the desk.  He appeared red in the face and visibly angry.  As Plaintiff Joyner sat down, WARWICK stood up and barked:

> **"You're not going to ruin my show!"  What do you think this is?  Of course you know, don't you, that we can get rid of you at any time and for any**

reason we like.  All of these kids simply <u>must</u> sign the contracts. Now just stop asking so many damn questions and get the hell out of my office before I have you kicked off my set.”

669.   As Plaintiff Joyner left Defendant WARWICK’s office, he was somewhat in a state of shock.  Defendant WARWICK had threatened to disqualify him from the *American Idol* Contest simply because he was asking a few basic questions about a series of commercial contracts that would effectively lock up his proprietary rights for a period of infinite duration – and with no benefit of independent counsel or opportunity to bargain for exchange.

670.   Plaintiff Joyner would later go public with his experience concerning the 19 ENTERTAINMENT contracts, publishing as follows on or about July 30, 2009:

> “They [19 ENTERTAINMENT] pay for our lawyers to negotiate against their lawyer. They make us collectively choose the lawyer, then they act like it’s in our best interest. Craziest stuff I’ve ever seen. I have a son to feed. I had to ask questions and know what I was signing. Plus I write my own songs and I needed to know details...” [CDC_003618]

> “We all had one lawyer and a few hours to go over the details of about 6 or 7 contracts, that we didn’t even get a copy of and we didn’t get an opportunity to send to an outside attorney and if we didn’t sign, we couldn’t be on the show.” [CDC_003641]

> “Some folks were like, ‘Just shut up and sign on the dotted line.’ I know better than that...I wasn’t complaining...I was asking basic legal questions. There’s a huge difference between the two.” [CDC_003618]

> “I definitely believed that affected my time on the show. They didn’t like the fact that I wouldn’t sign ‘just anything’ and that other contestants were coming asking me questions. So I think they ousted me the first chance they could get...” [CDC_003625]

671.   After being selected as a Top 36 Semi-Finalist Contestant in Season Eight, Plaintiff Joyner was labeled a “troublemaker” by Defendant WARWICK because Joyner asked too many questions about the 19 ENTERTAINMENT Prize Contracts that all Semi-Finalist Contestants were required to sign.

672.   Plaintiff Joyner’s disqualification was thereafter arranged by ENTERPRISE-DEFENDANTS as *fait accompli* because he expressed legitimate concerns regarding the procedural

and substantive fairness of the 19 ENTERTAINMENT Prize Contracts.

673.   Plaintiff Joyner was disqualified from the *American Idol* contest and was not invited back for the Wild Card round.

## (2)   FIXING WILD CARD

674.   In Season Eight, the structure of the Semi-Finals round saw the biggest change as the "Wild Card" round returned for the first time since Season Three. After the television audience purportedly voted for three Finalists from each of three groups of twelve (12) Semi-Finalists, the Expert Judges (purportedly) selected eight (8) of the previously eliminated twenty-seven (27) Semi-Finalists to return and perform a song on the March 5, 2009 show. Those chosen for the Wildcard were judged by the panel, instead of a vote by the viewers, with four advancing as Finalists.

675.   Plaintiff Joyner's group performed on March 4, 2009. He received excellent commentary from the Expert Judges. However, when the final results from the voting were announced, Joyner was informed that he had come in "fourth place" out of the 12 Semi-Finalists in his group. He therefore just missed the cut to be one of the three Finalists to advance from his group.

676.   Given Plaintiff Joyner's strong showing with the Expert Judges, as well as his high placement in the audience voting ranks, it was reasonable to expect that Plaintiff Joyner would have been one of the eight (8) Contestants to be selected for the Wild Card round in Season Eight. However, Plaintiff Joyner was not selected for the Wild Card round.

677.   At all relevant times, ENTERPRISE-DEFENDANTS had advertised the Wild Card round as a component of the Contest specifically designed to permit the *Expert Judges* – not anyone else - to select certain Contestants who had not received the highest number of votes

from the public.

678.   With respect to Plaintiff Joyner, however, it was clearly not the Expert Judges who made the decision to exclude him from the Wild Card round on March 5, 2009.

679.   The Wild Card round component of the Season Eight *American Idol* Contest was not being utilized by ENTERPRISE-DEFENDANTS as advertised.  As Plaintiff Joyner pointed out in July 2009:

> **"Even if I didn't get in on votes...how did I not get picked for the Wild Card show when I received comments from the Judges that were better than most of the contestants who were picked for the Wild Card show?" [CDC_003618]**

## (3)   RIGGED VOTING

680.   On July 30, 2009, Plaintiff Joyner also publicly questioned the validity of the purported *American Idol* voting system.

> **"It's a fixed thing if I ever saw one . . . Do you think a billion-dollar enterprise is subject to the whim of the public?" [CD_003625]**

## (4)   MANIPULATED OUTCOME

681.   While a Contestant on Season Eight of the *American Idol* Production, Plaintiff Joyner observed that ENTERPRISE-DEFENDANTS, rather than conducting a *bona fide* contest, were actively favoring certain Contestants as lead-runners for promotion and advancement. The ENTERPRISE-DEFENDANTS' "preferred" contestants received increased support staff (such as hair, make-up and wardrobe) from the producers and their "background stories" were structured with greater care, creating an environment in which ENTERPRISE-DEFENDANTS' favoritism of certain Contestants was intended to influence the outcome of the Contest or a portion thereof.   As Plaintiff Joyner explained in July 2009:

> **"The producers know who they want and they slant it to reflect that. They fix it in a way that makes you surprised but it's still manipulated." [CDC_003618]**

"What I mean is that people think AI is a talent show. No. It's a reality show with writers!! We're all actors. All these shows have writers that guide the public opinion." [CDC_003618]

# Season Nine:
# ANTHONY W

## A.   GOLDEN TICKET

682.   Season Nine of *American Idol* premiered on Tuesday, January 12, 2010 featuring the audition city of Boston, Massachusetts.

683.   On Wednesday, January 13, 2010, the second episode of the *American Idol* season featured contestants auditioning in Atlanta, Georgia.

684.   One of the contestants featured on the January 13, 2010 episode was an African-American male named Anthony "Skii Bo Ski" W (Anthony).

685.   Anthony is <u>not</u> a plaintiff in this action.

686.   Anthony's Season Nine audition for the panel of Expert Judges, consisting of Simon Cowell, Randy Jackson, Kara DioGuardi and guest judge Mary J. Blige, had taken place in Atlanta on or about August 16-17, 2009.

687.   During the episode broadcast on January 13, 2010, Mr. Wheeler was one of 25 contestants seen receiving a Golden Ticket to Hollywood.  Dozens of other hopefuls were shown auditioning as well during the same program.

688.   During the episode broadcast on January 13, 2010, Anthony's real name (Anthony W.) was not displayed on screen.  Rather, his nickname "Skii Bo Skii" was repeatedly used in connection with his appearance on the program.

689.   Anthony W.'s birthdate was not displayed on screen.

## B.    EXPLOITATION

690.    On January 14, 2010, at 3:52 am - within mere hours after the telecast and before the start of next business day – an entertainment and gossip website, RadarOnline.com, posted substantial details about Anthony's criminal arrest history, including court documents and various mug shots. The RadarOnline web article, which dubbed itself an "EXCLUSIVE" stated in part:

> TASERED AMERICAN IDOL "SKIIBOSKY" HAS LONG ARREST HISTORY
>
> Whoever has been doing the background checks on the season 9 American Idol contestants may want to dig a little bit deeper in the future.
>
> As RadarOnline.com previously reported wacky Wednesday night contestant Anthony Wheeler. AKA "Skiibosky" has an arrest record.
>
> Now RadarOnline.com can exclusively report that it is not just for one offense, but for five! Including bookings for three drug offenses, battery, contempt of court, violation of probation for driving while license suspended, attempting escape and providing a false ID.

691.    On January 14, 2010, at 3:52 am, just hours after the premiere of the episode was first telecast, www.RadarOnline.com website published <u>four</u> different mugshots of Anthony, his "Inmate History Report," a Police Affidavit stemming from a 2005 arrest, and a copy of a civil complaint that Anthony had filed against the city of Orlando, Florida in connection with abusive police conduct.   [CDC_004909]

692.    Given that less than six hours had transpired between the broadcast of the January 13, 2010 episode and the RadarOnline web article, and given that the clerks of court and custodians of records working at police departments and correctional facilities would not have been open for business during these six hours, RadarOnline.com could not have independently researched or legally obtained such hard copy information about Anthony W. from a government source.

693.    As a part of its standard practice and ordinary course of business, ENTERPRISE-DEFENDANTS procured criminal record history information concerning Anthony W. during the background check process of *American Idol* contestants for Season Nine.

694.    Upon information and belief, once in possession of Anthony W.'s criminal history information, ENTERPRISE-DEFENDANTS caused for such information to be disseminated to the entertainment and tabloid websites, including RadarOnline.com, concurrent with the January 13, 2010 broadcast of the *American Idol* episode that features Mr. Wheeler's Golden Ticket audition.

695.    On January 14, 2010, www.Rightcelebrity reported further:

ANTHONY W. AKA 'SKIIBOSKY' IS AMERICAN IDOL SCANDAL

A contestant named Anthony W., who goes by 'Skiibosky' is American Idol Season 9's first scandal …

Let's just say this guy doesn't fit the bill as the squeaky clean American Idol hopeful. He appeared on the second night of the show's audition phase, which took place in Atlanta…

Once in front of Simon and company, he tried his best to charm them, but of course they couldn't get over his ridiculous nickname. After a brief introduction he began to sing 'Heard It Through The Grape Vine.' I hate to admit it, but Anthony W. (Skiibosky) has a decent voice. He even hit the high notes without cracking. Mary J Blige actually broke out in applause as soon as he finished. He was moved on to the next round, and we'll see him again in Hollywood….maybe.

After his antics drew considerable attention to him, people have apparently begun to do some digging. It turns out that our charismatic contestant has quite a lengthy criminal past. One outlet wrote today that he has been arrested up to five times!

According Radar Online, he has been taken in for drugs three times, battery, contempt of court, aprobation violation, driving with a suspended license, and attempting to escape and providing a false ID. Sounds like he would fit right in to the world of show business!

Sound like the kind of guy who deserves the title of American Idol?

696.    Since ENTERPRISE-DEFENDANTS' January 2010 exploitation of Anthony W.'s

criminal arrest information in the tabloid media, it is unknown whether Anthony was flown to Los Angeles, California to compete in Hollywood Rounds.

# Season Ten:
# CHRIS GOLIGHTLY

## A.   BACKGROUND

697.   Chris Golightly is an African-American citizen of the State of California who was featured as a Top 24 Semi-Finalist on Season Nine of *American Idol.*

698.   Mr. Golightly grew up as an orphan and was shuttled between numerous foster homes throughout his youth. In the face of these hardships, he found his calling through music.

699.   Before auditioning for Season Nine of *American Idol*, Mr. Golightly was a member of musical group DREAM5, a "boy band."  His engagement with the group was procured by written contract with a California-based artist manager and promoter Lawrence D. Franklin, who operated DREAM PROJECTS ENTERTAINMENT.

700.   After a period of time in DREAM5, Mr. Golightly requested that he be released from his contract with DREAM PROJECT ENTERTAINMENT in order to pursue opportunities as a solo performer.

701.   On April 10, 2009 Franklin granted Mr. Golightly this release through an unambiguous statement to that effect. The release was further memorialized in a formal document dated June 7, 2009 and signed by both parties.

702.   Mr. Golightly rightfully assumed, based on Franklin's statement and the signed release, that he was no longer under any sort of contractual obligations that would prevent him from engaging in other opportunities within the music industry.

## B.    CONTESTANT

703.    Mr. Golightly was one of approximately 100,000 United States citizens or permanent residents between the ages of 18 and 28 who publically auditioned for Season Nine of *American Idol* in the Fall of 2009.

704.    From July 28, 2009 through February 17, 2009, Chris Golightly auditioned for Season Nine in Los Angeles, California, ultimately surpassing thousands of other Contestants to earn a Golden Ticket from the Expert Judges.

705.    On November 13, 2009, Mr. Golightly received an e-mail from Defendant FMNA claiming that ENTERPRISE-DEFENDANTS were missing paperwork regarding various contracts he was required to sign as a Contestant on the Series. The e-mail asked him to execute the contracts and fax them no later than the following morning.

706.    Mr. Golightly was required to execute the PARTICIPANT BACKGROUND QUESTIONNAIRE FORM (V.09). One of the questions contained therein inquired as to whether Mr. Golightly had ever been party to a music-related industry contract. Golightly answered this question in good faith and consistent with his ethical duty and contractual obligation.

707.    For months after execution of the PARTICIPANT BACKGROUND QUESTIONNAIRE, Mr. Golightly faithfully participated in all steps of ENTERPRISE-DEFENDANTS' vetting process. He was repeatedly e-mailed by ENTERPRISE-DEFENDANTS to congratulate him on his advancement to successive rounds, solicit his song requests for performances on the program, determine where to mail his checks, and to deliver additional contracts for him to sign. At no point during this vetting / selection process was Mr. Golightly informed of any potential problems regarding the information he had provided.

708.    In January of 2010, ENTERPRISE-DEFENDANTS notified Mr. Golightly that he had

been selected as one of the Top 24 Semi-Finalist Contestants of *American Idol* for Season Nine. In reliance on this fact, Mr. Golightly extricated himself from the lease on his private apartment and sold his car to pay the lease fees. These actions, made to Mr. Golightly's detriment, were based on Mr. Golightly's reasonable expectation that he had a highly probable chance of winning Season Nine of *American Idol* based on his talent.

## C.     DISQUALIFICATION

709.    On or about February 16, 2010, Mr. Golightly received a phone call from ENTERPRISE-DEFENDANTS' agent Patrick LYNN to notify him of his official disqualification from Season Nine of the *American Idol* Contest.

710.    ENTERPRISE-DEFENDANTS' purported grounds for Mr. Golightly's disqualification, as relayed to him by Patrick LYNN, was the Contestant's "failure to disclose" the purported existence of the DREAM5 contract, which had been effectively terminated.

711.    On or about February 17, 2010, Mr. Franklin e-mailed a copy of the Written Release to ENTERPRISE-DEFENDANTS *and* acknowledged his error concerning the enforceability of the terminated DREAM5 contract. Mr. Franklin further admitted in writing to ENTERPRISE-DEFENDANTS that Mr. Golightly was not under contract.

712.    Notwithstanding Mr. Franklin's transmission of the Written Release, ENTERPRISE-DEFENDANTS abjectly refused to reconsider their decision concerning Mr. Golightly's abrupt removal from the *American Idol* Contest. In fact, ENTERPRISE-DEFENDANTS' agents would not even speak to Mr. Golightly.

713.    Despite being in possession of written documentation that Chris Golightly was no longer under valid contract with DREAM PROJECTS ENTERTAINMENT, ENTERPRISE-DEFENDANTS publicly disqualified him from the *American Idol* Contest, humiliated him before untold millions

of Americans, questioned his business integrity before the entire music industry, and thereafter "fanned the flame" of Mr. Golightly's disqualification  in the tabloid media and entertainment press.

714.    On or about February 18, 2010, Defendant FOX issued an official statement to the mass media concerning Defendant's unilateral adverse action against Mr. Golightly.

**"It has been determined that Chris Golightly is ineligible to continue in the competition."**

715.    On February 18, 2010, the aforementioned disqualification was confirmed by *American Idol* host Ryan Seacrest on the micro-blogging website TWITTER, who stated:

> [ENTERPRISE-DEFENDANTS had] **"determined that Chris Golightly is ineligible to continue on IDOL, contestant Tim Urban has replaced Golightly as part of the Top 24."**

716.    Chris Golightly was unceremoniously replaced on the program with alternate performer Tim Urban, who was a White Contestant and who had already been eliminated from the Contest by virtue of his merit as a singer (or lack thereof).

717.    From February 18, 2010 onward, ENTERPRISE-DEFENDANTS caused to omit Mr. Golightly from the pre-recorded audition process and transfer airtime to Mr. Urban. ENTERPRISE-DEFENDANTS effectuated this transition in order to create the impression that Mr. Golightly had never earned his spot in the Top 24 Semi-Finalist round.

718.    Subsequent to Defendant FOX's announcement, an attorney for FOX indicated that Mr. Golightly's disqualification from the *American Idol* Contest was based on Mr. Golightly's "failure to disclose" the purported DREAM5 contract with Mr. Franklin.

719.    Mr. Golightly's alleged "failure to disclose" his obsolete contract with a former boy band manager was mere pretext for Golightly's extrication from the *American Idol* Contest.

720.    ENTERPRISE-DEFENDANTS extricated Mr. Golightly as a Top 24 *American Idol* Semi-Finalist predominately because of his status as an African-American citizen coupled with

Mr. Golightly's   history of misdemeanor arrests as indicated on his *juvenile*, government-protected "rap sheet."

721.    The juvenile records unlawfully procured by ENTERPRISE-DEFENDANTS concerned minor infractions of a State-sponsored orphan who had been dispossessed by his biological parents as an infant and who had never experienced the privilege of having a place during childhood to call Home.

# Season Eleven:
# JXJ

## A.          PRE-DISQUALIFICATION

## (1)          BLACK CONTESTANT

722.    "JXJ" shall be the codename[6] used herein to refer to an African-American Top 12 Finalist contestant on Season Eleven of *American Idol* who was ceremoniously disqualified by ENTERPRISE-DEFENDANTS on the pretext that he had failed to disclose his criminal arrest history.

723.     JXJ's entire Open Audition footage, filmed in Portland, Oregon, was telecast by ENTERPRISE-DEFENDANTS in January 2012.  ENTERPRISE-DEFENDANTS thereafter continued to focus on JXJ's backstory, exploiting the close relationship between he and his mother.

---

[6] After news of Plaintiffs' EEOC charges, dated January 6, 2013, somehow leaked to the media on January 25, 2013, JXJ publicly denounced Plaintiffs' charges to the EEOC and stated that he did want his name used in the Plaintiffs' lawsuit.  As per JXJ's demands, Plaintiffs will use best efforts at all times not to cite JXJ's real name in this proceeding and shall redact his name from all documents produced to their opponents or submitted to the Honorable Court.  Notwithstanding Plaintiffs' desire to respect their brethren's right to control his own name and likeness in the marketplace, the highly publicized event of JXJ's disqualification from *American Idol* in March 2012 triggered counsel's investigation into Defendants' decade-long pattern of exploiting top-ranking Black *American Idol* Contestants through disqualification based on alleged criminality.  Accordingly, because this case rests on highly critical and timely issues of constitutional proportions, the objective facts and public statements surrounding JXJ's disqualification are cogent to the fair and equitable disposition of this action.

724.     Starting December 12, 2012, JXJ was one of 309 Contestants to attend the Hollywood Week in Season Eleven.  He advanced through the Hollywood Rounds.

725.     When JXJ reached the "Green Mile," however, he was sent home by the Expert Judges before making the Top 24.

726.     On or about February 28, 2012, during the Season's episode where the Top 12 male contestants were scheduled to perform for the public vote, Host Ryan Seacrest announced that a special contestants would be brought back into the Contest as a "Judge's Pick."   JXJ thereafter entered the stage through center curtain as the crowd gasped.  After singing a rendition of "Another Chance," the Expert Judges commented:

> **Randy: "You have such a different voice, that's one of the reasons why we wanted you on this."**
>
> **Jennifer Lopez:  "You have such a special voice and such a special spirit and I am glad that America had the chance to see you tonight."**
>
> **Steven Tyler:  "What a beautiful thing; that's why we asked you to come back."**

727.     JXJ's sudden re-appearance in the Season Eleven Contest, which was celebrated with much fanfare by ENTERPRISE-DEFENDANTS, was a completely arbitrary addition to the Top 24 Semi-Finalist Round and one for which, in the absence of a "Wild Card" round, there was no precedent in *American Idol* "Contest Rules".  ENTERPRISE-DEFENDANTS' maneuver made JXJ the 25th Semi-Finalist and thirteenth male Semi-Finalist.

728.     On February 29, 2012, when the results of Season Eleven's Finalist rounds were announced, JXJ effortlessly advanced as a Top 13 contender.

729.     On Thursday, Wednesday 8, 2012, after JXJ's first performance in the Finalist round, JXJ was voted in the bottom 3 out of the Top 13 Finalists.  However, he was not eliminated.

**(2)**   **PLANTING RUMOURS**

730.   On Thursday, March 8, 2012, TMZ.com published an article entitled *"Idol Contestant JMX – Dad Who Abandoned Him Shows Up"* in which the site reported that the father of JXJ had shown up to the *American Idol* set in Los Angeles "out of the blue" and that JXJ was said to be "extremely upset" [CDC_002955]

> **JXJ had an unwanted caller last night … his Dad. Jones and his mom had it rough after his father abandoned him 10 years ago. But it's amazing what a little fame and potential earning power can do to a fractured relationship.**
>
> **Last night … Jones' dad called and tried to make nice. Sources tell us … the dad told JXJ, "Hi, I'm in Los Angeles. Why are you telling everyone you haven't got a dad?" We're told the 25-year-old contestant was "extremely upset" by the call.**
>
> **JXJ told a friend, "He's a lovely man but a lousy father."**

731.   On Tuesday, March 13, 2012, at 12:00 pm PDT, TMZ.com published an article entitled *"American Idol Contestant Shovels B.S. To Get Sympathy Vote"* claiming that Contestant JXJ had not been forthcoming about his relationship with his father, calling into question the Contestant's "sob story" that JXJ and his mother were abandoned by his father a decade earlier.

> **JXJ "has big problems with the truth, because he fabricated a sob story to A.I. producers to win the hearts and minds of the American people."**
>
> **We spoke with production people on "Idol" who tell us they are "shocked" JXJ concocted the story and it seems like it was all a ploy to get some traction on the show.**

732.   On March 13, 2012, JXJ responded to the accusatory TMZ.com article by posting the following statement to his Twitter account.

> **"How can I be lying and I never said anything, This story on TMZ. I did not lie to anyone I also did not t(al)lk to or ask anyone to t(a)lk to TMZ on my behalf in the first place." [CDC-_003031]**

**(3)**   **NEWS OF DISQUALIFICATION**

733.     On Tuesday, March 13, 2012, at an undisclosed time during the day, TMZ.com

posted an article as an "Exclusive" entitled American Idol Contestant Will be Kicked Off For

Concealing Crimes."

> **A contestant on American Idol will be kicked off the show Wednesday because the singer concealed multiple crimes from producers ... TMZ has learned.**
>
> <u>Sources connected with the show tell us</u> ... the contestant -- one of the final 12 -- was charged with 2 crimes in 2011, one involving violence. We're told in both cases the contestant gave a fake name to cops when arrested.
>
> **In addition, we're told the contestant has outstanding warrants -- again, the singer concealed it from producers.**
>
> **We're told the contestant was confronted with the information on camera today and the footage will air on Wednesday's show.**

734.     On Tuesday, March 13, 2012, at approximately 4:56 p.m., PDT, ENTERPRISE-

DEFENDANTS LYTHGOE and WARWICK confronted JXJ on camera about his arrest record

history and disqualified him from the show.

735.     On Tuesday, March 13, 2012, at 7:00 p.m., PDT, TMZ.com published an article

entitled *"JXJ Will Be Kicked Off 'American Idol'*.  The article read:

> **JXJ will be kicked off "American Idol" Wednesday night, after producers learned he concealed the fact that he was arrested twice last year and has outstanding warrants ... TMZ has learned.**
>
> **As we first reported, producers discovered Tuesday that JXJ had lied about his criminal history and that triggered the decision to confront him on camera Tuesday afternoon.**
>
> **We're told one of the incidents involved violence, which was particularly troublesome to producers. He also lied to cops by giving them fake names both times he was arrested.**
>
> **"A.I." sources tell us ... JXJ will appear on the show tomorrow night before he is sent packing. Over the last few days, we've been reporting that JXJ told producers his father abandoned him 10 years ago, but his dad called TMZ and called B.S. on his son, saying they see each other regularly.**
>
> **JXJ began tweeting that he never told producers about his dad abandoning him. We're told the producers who knew JXJ had made the statement became generally suspicious and began looking more closely at his background, and that's what led to the revelation of his criminal history.**

736.   TMZ .com reported that JXJ was going to be disqualified on the episode airing Wednesday, March 15, 2012 and that the PRODUCTION-ENTERPRISE-DEFENDANTS were planning to air footage of the disqualification.

737.   TMZ.com reported that JXJ was able to slip through the show's background checks because he gave cops a fake name both times he was arrested. [CDC_003020]

## (4)   EXPERT OPINION #1: "CRUEL CHARADE" (March 14, 2012)

738.   As a long-standing member of the entertainment and music press, Ms. Halperin is considered one of world's leading authorities on the *American Idol* series and its impact on American popular culture.   She has independently covered *American Idol* in the traditional press since the show's initial broadcast in June 2002.

739.   Ms. Halperin publishes an *American Idol*-related blog called *"Idol Worship"* for BILLBOARD.COM, LOS ANGELES TIMES and HOLLYWOOD REPORTER, and at times relevant to this proceeding, also hosted and published a live, weekly one-hour video talk show called *"Idol-Hangover"* at HOLLYWOODREPORTER.COM.

740.   Ms. Halperin is the sole credited author of AMERICAN IDOL: CELEBRATING 10 YEARS (THE OFFICIAL BACKSTAGE PASS), which was published by Defendant FMNA in the United States on or about March 1, 2011 (referred to herein as "THE IDOL YEARBOOK").

741.   On or about March 22, 2011, Ms. Halperin, an *authorized* expert in *American Idol*-related matters, was interviewed by media outlet ACCESS ATLANTA and commented upon her preparation and authorship of IDOL YEARBOOK, indicating that she had "spent several weeks watching every single episode of *American Idol* from Season One to Season Nine". [CDC_005947]

**Shirley Halperin: "This is a book for those who worship the show.   I've**

> invested so much time and so much of my brain space . . .  I wanted to have
> something to show for it.  I DO FEEL LIKE AN EXPERT ON 'AMERICAN IDOL.'"
> [CDC_005947] (emphasis added)

742.    On March 14, 2012, at 5:04 a.m. PDT, in reaction to the TMZ news of JXJ's

disqualification from *American Idol*, Ms. Halperin published an independent article at

HOLLYWOOD REPORTER.com entitled "*American Idol: Did Show Producers Plot the JXJ Scandal*

*in Advance (Opinion): Ask Skeptics Why JXJ is Being Sent Home, and Plenty Smell a* <u>*Classic*</u>

<u>*Reality Show Ratings Ploy*</u>" [CDC_002955-2965].

743.    In her 3/14/12 HOLLYWOOD REPORTER article, Ms. Halperin correctly opined that

ENTERPRISE-DEFENDANTS had pre-orchestrated JXJ-11's disqualification event through "a

calculated campaign" that had been planned by ENTERPRISE-DEFENDANTS "all along":

> **Naturally, [JXJ-11]'s purported lies [about his father] were said to have**
> **incensed Idol's "production people" and triggered further digging into his**
> **background, but** <u>**here's a thought: maybe they planned his exit this way all**</u>
> <u>**along**</u>**. The whole 25th candidate was weird to begin with and got sprung on**
> **the audience with absolutely no warning, not typical of how Idol operates.**
> **And why Jermaine?... [CDC_002956]**
>
> **Then there was the deluge of negative stories on Tuesday, which came so fast**
> **and furious, it was starting to feel a little like** <u>**a calculated campaign,**</u> **capped**
> **off with the dramatic news: it would be the end of the road for Jermaine. It's**
> **believed he'll say a final goodbye on the show Wednesday night, and that in**
> **itself is worth tuning in for. [CDC_002956]**

744.    Ms. Halperin stated in the 3/14/12 HOLLYWOOD REPORTER that JXJ-11's

disqualification from Season Eleven of *American Idol* was a "cruel charade" that was "purposely

set in motion" by ENTERPRISE-DEFENDANTS to manufacture a "nasty mini-scandal" in order to

artificially "boost" *American Idol's* diminished ratings vis-à-vis NBC's *The Voice*.

> <u>**Which brings us to another reason why producers may have purposely set in**</u>
> <u>**motion a cruel charade: ratings.**</u> <u>**For the first time, the ratings powerhouse is**</u>
> <u>**getting beat in TV's key demo**</u> **-- and to make it sting that much more: by**
> **another singing competition, The Voice . . . there's no doubt momentum is on**
> **NBC's side, and with that, a healthy mid-March boost for Idol on the back of**
> **a** <u>**nasty mini-scandal**</u> **may be just what the ratings doctor ordered.**
> **[CDC_002957]**

745.     Ms. Halperin further indicated in the 3/14/12 HOLLYWOOD REPORTER article that ENTERPRISE-DEFENDANTS' sophisticated and lengthy background check process would have necessarily uncovered JXJ-11's four to five outstanding arrest warrants:

> **Lastly, what are the chances that Idol's producers, team of background checkers and lawyers would miss two arrests, possibly as-yet-unresolved? As we've heard about the process from insiders and former contestants, it's not only an incredibly long procedure, but one that has been described certainly as thorough and often as "invasive." All potential contestants are warned that if they do not divulge everything, they will be disqualified. Jermaine received fair warning too, no doubt, but it's also possible that the producers knew of his criminal past and chose to keep his history secret -- a card stowed in their back pocket to be pulled out only in case of emergency (or if he's eliminated, whichever comes first). [CDC_002957]**

746.     Ms. Halperin stated in the 3/14/12 HOLLYWOOD REPORTER article that it would be extremely difficult for any human being to bear the severe emotional distress of "being on top of the world one minute and vilified the next":

> **[I]T'S IMPORTANT TO REMEMBER THE HUMAN ELEMENT IN THIS STORY AND HOW DIFFICULT IT IS TO GO FROM BEING ON TOP OF THE WORLD ONE MINUTE AND VILIFIED THE NEXT. The emotional impact it can have on [a disqualified American Idol Contestant] must be an incredibly heavy burden to bear, even if he did do something very wrong in his past. Here's hoping there's enough in the show's budget to at least cover some psychotherapy.**
>
> **Could Jermaine's disqualification be a premeditated ploy or was the show really deceived and caught off-guard?  [CDC_002957]**

## (5)  PUBLIC REACTION (PRE-TELECAST) [March 14, 2012]

747.     On Wednesday, March 14, 2012, SMOKINGGUN.COM posted an article entitled *"Idol Finalist Has Five Active Arrest Warrants,"* the website published court documents indicating that JXJ was arrested on November 27, 2011 for providing a false name to a police officer.  [CDC_003064] Notably, the State of New Jersey's misdemeanor case correctly listed the government name of JXJ.

748.     On Wednesday, March 14, 2012 at 10:26 a.m., the CHRISTIAN POST (christianpost.com) published an article on-line entitled: *"Jermaine Jones Disqualified From*

*American Idol, Was it Staged?"*   The article largely re-iterated Shirley Halperin's theory that

JXJ's disqualification was staged in order to boost *American Idol's* ratings.   The author of the

CHRISTIAN POST also notes, however, that:

> **This is not the first time that Idol has been accused of staging an incident in a
> bid to boost ratings. [CDC_003072]**

749.   On Wednesday, March 14, 2012, at 12:15 p.m., EDT, entertainment blogger

Lyndsey Parker of "Reality Rocks" reported on the news of JXJ's disqualification.

[CDC_003013-17]. Ms. Parker opined that the disqualification was likely orchestrated and that

such calculated action would necessarily impact the ultimate outcome of the *American Idol*

Contest.

> **I just find it a little hard to believe that "Idol's" staff would not have been able
> to uncover JXJ-11's (very recent) alleged crimes via a standard background
> check, and it seems fishy that the one contestant that was given a last-minute
> reprieve is now the one getting the boot.   [CDC_003015]**
>
> **Is it possible that by bringing back a contestant who was already set up for an
> early disqualification, the show's producers had sneakily hoped to generate
> headlines and boost "Idol's" flagging ratings, without jeopardizing any actual
> worthy contestants' future chances?   [CDC_003015]**
>
> **Bringing JXJ-11 back to the show and playing up his public-vote-garnering
> sob story just may have stolen a legitimate spot in the Top 13 from one of the
> show's other promising male semi-finalists who could have gone farther . . .
> [CDC_003015]**

750.   On March 14, 2012, at 12:00 PDT, TMZ.com posted an article entitled *"TMZ

Live: JXJ . . . Booted off American Idol By His Own Lies."* [CDC_003156-3160] One of the

public commentators to the TMZ article opined:

> **All this AI stuff is suspect. Nothing anyone says can convince me that this
> wasn't made up for ratings.   [CDC_003156]**

751.   On March 14, 2012, Lt. Christopher Jones of the Gloucester Township Police

Department issued a "Media Inquiry Statement" in which the police department confirmed that

JXJ had been arrested twice in the year 2011. [CDC_003068].   Both incidents involved JXJ

providing a false name to police officers.  In both incidents, however, the police officers were able to correctly identify JXJ's government name after further inquiry.  As of November 17, 2011, JXJ was scheduled to appear in Court on December 13, 2011 in connection with all outstanding charges.

752.      On March 14, 2012 at 2:53 p.m., David Hinckley of the New York Daily News posted an article entitled: *"JXJ's Ouster From 'American Idol' May Not Have Producers That Upset: His Record Was Available To Find And There's Big Upside Publicity."* Following in line with the rationale provided by Shirley Halperin and Lyndsey Parker, Mr. Hinckley opined that ENTERPRISE-DEFENDANTS had manufactured JXJ's disqualification for ratings:

> So now we know the "American Idol" strategy to counter this season's ratings slump: a spontaneous crossover episode with "America's Most Wanted." [CDC_003109]
>
> [But] In the age of Google and a hundred other instant search sites, how does the vetting team for the multi-million dollar "Idol" machine not pick up something like outstanding arrest warrants? [CDC_003109]
>
> Quite the contrary. They're publicity opportunities.
>
> If "Idol" were embarrassed about JXJ, it would quietly dismiss him and move on. By all reports, it plans to have him on the air tonight. Nothing like a little public humiliation to boost audience numbers. True in Salem in the 17th century, true on TV tonight. This is not to say "Idol" doesn't try to ensure contestants are who they say they are. But if someone slips past the system once in a while, no harm no foul. [CDC_003109]

753.      On March 14, 2012, Defendant FOX, through its website www.foxnews.com, published an article entitled "*Contestant JXJ will be kicked off American Idol for Hiding Criminal Past*".  [CDC__002967; CDC_003059].  The article is based on the earlier TMZ report and states:

> Producers allegedly discovered Tuesday night [Mar. 13] that JXJ had been arrested twice and has outstanding warrants, TMZ reported. One of the incidents reportedly involved violence, which especially worried the producers. He also reportedly gave police fake names.
>
> According to TMZ sources, JXJ will appear on Wednesday's show and then

will be sent home.  [CDC_003059]

## B.    POST-DISQUALIFICATION

## (1)    TELECAST [March 14, 2012]

754.    On Wednesday, March 14, 2012, at 8:00 p.m. EST, ENTERPRISE-DEFENDANTS telecast an episode of *American Idol* which featured on-air segments depicting events surrounding JXJ's disqualification from the Contest.

755.    Host Ryan Seacrest confirmed at the top of the show that ENTERPRISE-DEFENDANTS cooperate with government officials in relation to conducting background checks. Seacrest stated:

> With the cooperation of law enforcement we discovered information that left us with no choice but to eliminate one of our finalists from the competition. When you're doing a live show, anything can happen.  This is American Idol. [CDC_003041]

756.    About ninety minutes into the episode, ENTERPRISE-DEFENDANTS broadcast a much hyped-up segment in which JXJ was called into a production office to speak on camera with the paternalistic, stern-faced executive producers, Defendant LYTHGOE and Defendant WARWICK.   The video segment begins with JXJ entering well-appointed offices.  WARWICK and LYTHGOE are sitting on a big white leather couch each wearing business suits and holding pieces of paper.  The screen informs the audience of the time: 4:56 p.m. PDT [Tuesday, March 13]

- **Defendant WARWICK:** "**Just sit down there a moment, why don't you.**"

- **Defendant LYTHGOE:**  "**There are a number of things that have been going on this week - stories that have been told; that have not been told.  And we've been given further information that we need to talk to you about.**"

- **JXJ:** "**Um, ok.**"

- **Defendant LYTHGOE:** "**In March of last year, you were charged - criminally charged – with giving a fake name to the police.**"

- **JXJ**: "Um, ok."

- **Defendant LYTHGOE**: "And in November again of last year, you were criminally charged and you gave them [another] fake name...Uh, you didn't disclose those charges to us."

- **JXJ**.     [silence]

- **Defendant WARWICK**: "There are four active warrants out for you actually.  To be honest - which surprised us – be truthful.  You know, we're not judgmental at all.  Lots of kids come to us that have problems.  It's part and parcel of what kids go through today.  We know that.  If they come clean with us and tell us at the beginning, we can help them.  But you did know that you were incumbent to tell us the truth about all of this and it appears that you just haven't on ANY level …"

- **Defendant LYTHGOE**: "We are not allowed to have anyone with an outstanding warrant on the program, and you have four of them against you."

- **Defendant WARWICK**: "We have to let you go, I'm afraid. It's the end of the road."

757.   On Wednesday, March 14, at 9:50 p.m. EST, in an article entitled: *"Idol Top 12 Night: Jermaine Jones' Disqualification Overshadows Episode"*, Lyndsey Parker, an entertainment news journalist for REALITY ROCKS, described the on-air disqualification of JXJ by the ALIEN-ENTERPRISE-DEFENDANTS as follows:

> **I actually felt bad for the guy. The vibe of this entire segment felt icky, invasive, exploitative, and just plain wrong. [CDC_003096]**

## (2)   PUBLIC REACTIONS (POST-TELECAST) [March 15, 2012]

758.   On Thursday, March 15, 2012, at 4:00 a.m. PDT, Shirley Halperin published a follow-up article to HOLLYWOODREPORTER.COM concerning JXJ's disqualification entitled *"American Idol Finalists React to JXJ Disqualification"* [CDC_002975-76]. The article quotes the reaction of several Top 12 Finalist Contestants, including Erika Van Pelt who stated that JXJ's abrupt disqualification was particularly shocking given the extensive background check procedures imposed upon *American Idol* Contestants.

> Erika Van Pelt simply described the unfolding drama as "weird," especially considering the <u>thorough background checks</u> they each had had to pass.
>
> **"<u>It was so extensive, which is another reason why we were so shocked and confused that this was all of a sudden surfacing</u>," she told THR. "Even after all the drama with him being brought back after being cut on the sing-for-your-life round -- for him to come back and be kicked off again?" [CDC_002976-78]**

759.     On Thursday, March 15, 2012 at 10:37 a.m., the LOS ANGELES TIMES published an article entitled: *"American Idol: [JXJ]'s Dismissal Angers Fans.*  The article quoted various public opinions surrounding the previous night's disqualification episode, all of which openly criticized ENTERPRISE-DEFENDANTS' telecast of adverse action against JXJ, describing the on-air confrontation between the ALIEN-ENTERPRISE-DEFENDANTS and JXJ as *"unprofessional,"* *"tacky"*, *"awkward,"* *"kind of gross."*  As one commentator quoted by the LOS ANGELES TIMES succinctly stated:

> <u>There was no reason to humiliate JXJ on public TV</u>. **[CDC__003004]**

760.     On March 15, 2012, the on-line service BACKGROUNDS ONLINE (backgroundsonline.com), an employment screening resource, posted an article entitled *"American Idol Contestant Dismissed Over Criminal Record."* [CDC_003026].   After describing the circumstances surrounding JXJ's disqualification, the author stated:

> **This incident is a bit shocking considering American Idol's claims that the contestants are thoroughly vetted . . . A simple and inexpensive background check could have quickly uncovered JXJ's open warrants.  [CDC_003026]**

761.     On Thursday, March 15, 2012, in an article entitled *"Idol Background Checks,"* David Reimer, the Arts & Review editor for THE HEIGHTS, a well-established (1919) independent student newspaper at BOSTON COLLEGE (www.bcheights.com) opined:

> **At this stage in the show, it is <u>ridiculous</u> for "American Idol" to send someone home for something they should already have known about and dealt with. JXJ's legal history might not be unblemished, but <u>he should be allowed a graceful, normal elimination from the show based on how he sings, not on minor infractions</u>.**

> Maybe the fanfare would be merited if JXJ had actually done something wrong during his time on the show, but that does not appear to be the case. <u>This incident attests to the larger issue of stigmatizing individuals with a sorted past.</u> We idealize "rehabilitated criminals," but hold prejudice against anyone trying to start over.  [CDC_003010-11]

### (3)   STATE OFFICIALS: "AN OUTRAGE" [March 15, 2012]

762.   On Thursday, March 15, 2012, at 2:29 p.m. EDT, in an article entitled: *"Cops: Wasn't Worth Chasing 'Idol' on Small Charges",* the ASSOCIATED PRESS reported that JXJ's local police department and area government officials were highly dismayed at the manner in which ENTERPRISE-DEFENDANTS handled JXJ's public disqualification:

> [Gloucester Police] Lt. Christopher Jones stated that <u>JXJ's case "wasn't big enough" to merit going after the singer in California.</u> [CDC_003194]
>
> <u>"For the producers of the billion dollar show to expose, embarrass and interrogate a young man without an attorney in front of 40 million viewers was an outrage,"</u> Nash said. "In the future, they should do background checks before they start counting their money and playing Judge Judy." [CDC_003194]

### (4)   DEFENSES TO MEDIA BACKLASH [March 15, 2012]

763.   On Thursday, March 15, 2012, Defendant WARWICK and Defendant LYTHGOE gave a joint interview to TMZ.com's founder and chief editor, Harry Levin, in which the ALIEN-ENTERPRISE-DEFENDANTS attempted to justify their humiliating on-air disqualification of JXJ.

764.   On March 15, 2012, REALITYTVWORLD.COM published an article entitled *"American Idol Execs: Fake Names Were JXJ's Big Problem"*.  The article re-published statements made by Defendant LYTHGOE and Defendant WARWICK to TMZ.com.

> American Idol producers Nigel Lythgoe and Ken Warwick say disqualified finalist JXJ's biggest mistake was giving police fake names for two of his prior arrests because it made Fox executives question whether his undisclosed criminal record could still be more extensive than the show had discovered.

[CDC_002971]

765.    Defendant WARWICK claimed that Contestant JXJ-11 had to be disqualified from the *American Idol* Contest because Defendant FOX was unable to determine through their background check procedures the number of false names that JXJ-11 had allegedly provided to government officials.

> • **Defendant WARWICK:** "The big problem for [FOX] was the fact that JXJ had given [the police] false names, and they [FOX and CARCO] were saying, 'This is what we know from the names we found out. There might be other false names and other charges out there that we just don't know about. '" [CDC_002971]

766.    In the 3/15/12 interview with TMZ.com, Defendant LYTHGOE attempted to explain ENTERPRISE-DEFENDANTS' decision to stage JXJ's disqualification for television viewing audiences and confront him on camera during the March 14, 2010 episode of *American Idol*.

767.    Citing the ENTERPRISE-DEFENDANTS' 2003 disqualification of Plaintiff Corey Clark, Defendant LYTHGOE stated that the "failure to disclose" criminal record information during the ENTERPRISE-DEFENDANTS' background check process was grounds for removal from the show.

> • **Defendant LYTHGOE:** "We had to confront JXJ, and we've done this in the past, as you know. We did it with Corey Clark again as well. In this situation where self-disclosure isn't forthcoming, we have to sit them down and say: 'These are the charges and the allegations against you.' But there were actually two criminal charges actually last year that [JXJ-11] did not disclose to us as well." [CDC_002971]

768.    In the 3/15/12 interview with TMZ.com, Defendant LYTHGOE stated that ENTERPRISE-DEFENDANTS will ordinarily help Contestants to "clean up" their criminal records provided that they are forthcoming during the background check process.

> • **Defendant LYTHGOE:** "So the annoying thing is, we have had this in the past, you know - lots of kids having moving violations or they drive on a suspended license or anything like that - and they've got warrants against them that are outstanding. And we helped them where we can in cleaning them up before they come to Idol." [CDC_002971-72]

769.   Defendant WARWICK and Defendant LYTHGOE stated that ENTERPRISE-DEFENDANTS have attempted to assist *American Idol* Contestants "mitigate" any pending charges relating to on-going criminal proceedings..

- **Defendant WARWICK: "If they tell a judge, 'Look, I'm a contestant on American Idol and there's every possibility this will be great for me, can you let me off? Can you mitigate the charge?' Can you do something that invariably the judge will look on them sympathetically? We would have tried." [CDC_002972]**

- **Defendant LYTHGOE: "We would have certainly done our best. I don't know what would have happened because we don't make these decisions." [CDC_002972]**

770.   Defendant LYTHGOE stated that *American Idol* Contestant background checks are conducted through a "team" and then submitted to Defendant FOX.

- **Defendant LYTHGOE: "It's done through a team and then put to Fox Broadcasting. I think that would have certainly red-flagged the two criminal charges last year." [CDC_002972]**

771.   Defendant LYTHGOE and Defendant WARWICK maintained that JXJ-11 failed to disclose his arrest record history to ENTERPRISE-DEFENDANTS because JXJ-11 could not afford to cover the fines ordered by the criminal courts.

- **Defendant WARWICK: "[JXJ-11 was] very apologetic!" [CDC_002972]**

- **Defendant LYTHGOE: "He was actually very good. We said to him, 'Why did you not tell us? Why did you not tell us?' [JXJ-11] said, 'Because I wanted to get the money together and clear them up before I told you.' But it's in the region of six or seven thousand dollars. He just doesn't have that kind of money…" [CDC_002972]**

- **Defendant WARWICK: "The truth was he could not possibly pay these fines and these charges. So he said it becomes like a mechanism where just to get on the show, you do lie about them. It's like quicksand. You can't pay the charges, so the next one comes along and you lie about that, and then the next comes along and you lie about that." [CDC_002972]**

## C.   JXJ SPEAKS [MARCH 16, 2012]

## (1)   PEOPLE MAGAZINE INTERVIEW

772.    On Friday, March 16, 2012, at 8:30 a.m. EDT, PEOPLE MAGAZINE published an

on-line article entitled: *"JXJ: I Didn't Know I Broke American Idol's Rules"* [CDC_003102-03]

- **PEOPLE: Did you know you were going to be called in front of producers and that it would be filmed?**

**JXJ: I did not know any of it. I was actually confused. I didn't know what was going on. And I walked in and there were all these lights and cameras. I didn't know what was going on.**

- **PEOPLE: When you signed up for Idol, were you asked if you had a criminal past?**

**JXJ: They did have a question [in which you had to admit] that you were arrested, and that I did do. And they did an extensive background check. When I went home [after my first elimination] and then I went back, I thought, they've done the research at this point. I was a little bit confused.**

- **PEOPLE: Did you know you were breaking the rules?**

**JXJ: I did not know I was breaking the rules, because before I went, I had to obtain a lawyer and take care of some fines before I could go. I just thought everything was taken care of.**

- **PEOPLE: What are your warrants for?**

**JXJ: Two for giving a false name, one allegation of a fight and one for driving with a suspended license. They were all minor charges but of course it was a big deal. Who wants a criminal past? It was a very big deal for me.**

- **PEOPLE: Do you feel you have a scarlet letter affixed to you with the elimination?**

**JXJ: People will judge me or hold it against me, but I don't know anyone that doesn't have a past. Everyone has a past. It's not like I shot someone or assaulted anyone. I was younger. I got caught driving with a suspended license. I gave a false name. I'm not trying to say it was okay, but I'll be all right.**

## (2)   SHOWBIZ TONIGHT

773.    On Friday evening, March 16, 2012, JXJ appeared on the popular HLN television

show SHOWBIZ TONIGHT.  The headline stated that his interview was a "SHOWBIZ EXCLUSIVE"

AND JXJ'S "first interview since being kicked off *American Idol* Last night.

774.    During his interview, JXJ publicly stated that his on-air disqualification came as a

complete surprise.

- **JXJ: "I thought they were bringing it to my attention . . . letting me know that now they are aware of, you know, this, that and the third. I didn't know what was going to happen . . .Until they said it, I had no clue what was going to happen. I was shocked, but I can't really express what my emotions were at that time."  [CDC_005968; CDC_002984-85]**

775.    On March 16, 2012, JXJ publicly stated that his disqualification from *American Idol* was a "very humbling experience" and he said that he was very disappointed … it hurt a lot." [CDC_002992]

776.    During his SHOWBIZ TONIGHT interview, JXJ publicly stated that he had affirmatively disclosed his arrest record history to ENTERPRISE-DEFENDANTS during their background check process.

- **JXJ: "I know that when I filled out my application, I circled 'yes' that I was previously arrested before." [CDC__005968]**

777.    During his SHOWBIZ TONIGHT interview, JXJ publicly stated that after submitting his PARTICIPANT BACKGROUND QUESTIONNAIRE FORM (v.11), ENTERPRISE-DEFENDANTS *required* JXJ to hire a criminal defense attorney to handle outstanding arrest warrants.

- **JXJ: "And, you know, they did a background check on me and there were some information that I had to get a lawyer to take care of before I could even be on the show."  [CDC_005968; CDC__002985]]**

778.    During his SHOWBIZ TONIGHT interview, JXJ stated said he was not concerned with widespread speculation that ENTERPRISE-DEFENDANTS had planned the disqualification scandal in advance as a ratings ploy.

779.    On Friday, March 16, 2012, the HOLLYWOOD REPORTER posted another follow-up article reporting on JXJ's exclusive televised interview with SHOWBIZ TONIGHT. [CDC__002991]    Some of the public opinions reacting to JXJ's interview included the following published statements to HOLLYWOOD REPORTER:

> **"When he says it was a "humbling experience," he should have said humiliating and degrading and not worthy of AI.  Lithgoe and Warwick were completely wrong and frankly, I am more embarrased for their lack of**

157

<u>humanity</u> then I am for Jermaine's bad choices. [CDC_002995]

"**JXJ has a voice that has been missing in music since we lost Luther and Barry White. What a shame that Idol didn't have the class to step up and guide him to clear up his situation instead for throwing him back into a judicial system that is nothing but the new slavery system with no way out. <u>Idol and FOX have big lawyers</u> and it would have taken nothing [sic] to show him how to correct his past and become the [recording artist] the world named and wanted and need him to be.**" [CDC_002995]

"**American Idol knew of his mischief related offenses. JXJ admitted to the crimes during the American Idol application process, and he also lawyered up to clarify these matters with American Idol's legal staff.** [CDC_002996]

## D.   EXPERT OPINION #2

780.   On March 17, 2012 at 6:27 PDT, HOLLYWOOD REPORTER posted a video of THR.com's live Friday talk show called "*Idol Hangover No. 3,*" which is hosted by author Shirley Halperin.

781.   The one-hour video [7] addresses what it calls "shocking news of the disqualification of season eleven finalist JXJ" and featured HOLLYWOOD REPORTER journalist Shirley Halperin further explaining her position on JXJ's disqualification.  Ms. Halperin began the show with the following statements:

> <u>But I think that when you put somebody on a pedestal, you put them on Idol with 20 million people watching them and then you vilify them 24 hours later, it can be really hard on someone's psyche, so I was a little concerned</u>…I just don't want this to get any uglier than it was.  But it was pretty ugly.

782.   Later in the video show, "*Idol Hangover 3*", Ms. Halperin and her co-host introduced Richard Rushfield, author of AMERICAN IDOL: THE UNTOLD STORY, and another one of the leading experts in *American Idol* who had been covering the series for the LOS ANGELES TIMES since its inception.

783.   On April 1, 2005, during Season Four of *American Idol,*

---

[7] http://www.hollywoodreporter.com/video/thrs-idol-hangover-episode-3-301175 (accessed 07/20/13)

- **Shirley Halperin**: This kind of controversy – it's not uncommon for Idol – there have been people who have been disqualified.  This one seems - I don't know - a little extra cruel.  Why?

- **Richard Rushfield**: This scene here: Calling him in and breaking the news to him on the couch with the cameras rolling …You can just imagine, he's got the cameras following him into the office…. and then all of sudden … Watching his face as they break it to him: 'Yes, you've been arrested five times and – and we're ending your career.'  [laughter]…This just seemed - IT WAS CRUEL IN TOO REAL A WAY.

- **Shirley Halperin**:  Isn't the background check process pretty thorough?  How could they miss this?

- **Richard Rushfield**:  It seems really shocking that he could have five warrants.  They drop the thing about how he gave a different name – and that was with, what's name Corey  –

- **Shirley Halperin**:  Corey Clark. His name was misspelled in Season Two – that's right.

- **Richard Rushfield**:  That's why it didn't come up in the background check because he gave the wrong name.  So perhaps the arrest warrants were under different name.  It seems really odd that they would do a background check and there would be five warrants out -

- **Shirley Halperin**:  And NONE of them would come through? And I was reading back to the Corey Clark days.  And let's just remember 2003.  The internet was not what it is today.  If you applied for a job, they check your social security.  They are not just checking your name.  That's why I wrote that opinion – it just – it didn't quite fit.

- **Richard Rushfield**:  They definitely milked it – I will tell you that.  They were not just going to brush this under the rug as they have done in the past.  They used this.

# WHITE COMPARATORS

## A.   SCOTT SAVOL [Season Four]

784.   Scott Savol was featured as a White male Contestant on Season Four of *American Idol*.

785.   Mr. Savol performed and appeared in the Final Rounds on March 15-16, 2005; March 22-23, 2005; and March 29-30, 2005.

786.   On Thursday, March 31, 2005, SMOKINGGUN.COM published an article on-line entitled: "*American Idol Finalist's Violence Rap (Cops: Savol Roughed Up Ex-Girlfriend During Domestic Dispute*)." The article reported that Savol had been arrested in connection with a domestic violence incident against the mother of his child.

787.   Mr. Savol entered a guilty plea, accepting a misdemeanor charge of disorderly conduct. He was fined $500, given a year's probation, ordered to take an anger management course, and placed under a protective order for a year.

788.   After the SMOKINGGUN.COM published its 3/31/2005 report, several media outlets queried whether Mr. Savol would be disqualified in the same manner that Plaintiff Corey Clark had been two years earlier.

789.   On the evening of Thursday, March 31, 2005, Defendant FOX issued the following statement to the press, indicating that Mr. Savol had been "forthcoming" and "honest":

> **Scott Savol was forthcoming to the American Idol producers and the network regarding his misdemeanor. After reviewing the facts, in which the charges were reduced to disorderly conduct, we felt that considering Scott's honesty and his remorse, the situation did not warrant his disqualification.**

790.   Mr. Savol continued to compete in the Contest uninhibited and was not eliminated

until the public voted him off on May 4, 2011.

791.    Mr. Savol came in fifth place and enjoyed support from ENTERPRISE-DEFENDANTS and a moderately successful career in music at times thereafter.

792.    In the wake of the Plaintiff Akron Watson disqualification in February 2007, Mr. Savol spoke to REALITY TV MAGAZINE (www.sheknows) about how ENTERPRISE-DEFENDANTS' conducted its background check process. Mr. Savol revealed that he disclosed all of his information before being flown to Hollywood. [CDC_003319].

> **AMERICAN IDOL 4 FINALIST SCOTT SAVOL REVEALS DETAILS ON IDOL BACKGROUND CHECK PROCESS**
>
> • **Reality TV Magazine**: What kind of background investigation does the show do on contestants and at what stage does it occur in the audition process?
>
> • **Scott Savol**: I don't know whether or not the background investigation process has changed since Season 4, but when I was on Idol every contestant that went to Hollywood had to fill out information forms and consent to a background investigation. When the group in Hollywood was narrowed down to about 41 contestants (before the final cut for the top 24), we each had to sit down with private investigators that asked us all kinds of questions.
>
> • **Reality TV Magazine**: At what stage of the audition process did you tell American Idol producers about your arrest for domestic violence?
>
> • **Scott Savol**: I supplied the show with this information in my background forms/papers, and again in my in-person interviews with the private investigators.
>
> • **Reality TV Magazine**: When news broke about your arrest, what were the rules that American Idol producers gave you in regards to answering questions from the press?
>
> • **Scott Savol**: There were really no rules that I was given by the producers. The news of my arrest broke after I had made the top 12 and the producers simply told me to ignore the negative stuff being said, not to let it bother me, and to keep focused on my performances. The producers were very supportive and told me not to worry about it, as I had been forthcoming about the arrest from the beginning, and not to let this discourage or distract me in the competition.

**B.**     **BO BICE [Season Four]**

793.    Bo Bice was featured as a White Contestant on Season Four of *American Idol*.

794.    Beginning in mid-March 2005, Mr. Bice performed and appeared in the Final Rounds for seven consecutive weeks.

795.    On Thursday, April 28, 2005, SMOKINGGUN.COM posted an article about Mr. Bice's criminal arrest history.

796.    On or about April 28, 2005, Defendant FOX issued a statement to the press defending the "previous indiscretions" of Mr. Bice and claiming that Bice had been "honest" and "forthcoming" during the background check process.  Defendant FOX stated:

> **"The information disclosed on various salacious gossip Web sites regarding Bo Bice's past was already well-known to FOX and the producers of 'American Idol.' From the beginning, Bo was honest and forthcoming in revealing his previous indiscretions and their outcome."**

797.    On April 28, 2005, MTVNews.com published an article entitled  *"Idol Singer Bo Bice Has Drug Rap Sheet, Court Papers Show (Finalist Was Arrested for Cocaine and Marijuana Possession)"*.  The MTV article stated that Mr. Bice was "widely considered a favorite to win the fourth season of *American Idol*" and, based on Defendant FOX's press statement, would continue to compete.

798.    Mr. Bice's record of arrest and felony convictions were expunged from the public record at the time they were purportedly disclosed to ENTERPRISE-DEFENDANTS.

799.    By ENTERPRISE-DEFENDANTS' own admission, ENTERPRISE-DEFENDANTS knew about Mr. Bice's expunged felony convictions before SMOKINGGUN.COM ever disclosed his arrest record.

800.    On May 24, 2005, Governor Bob Riley of the State of Alabama declared May 24 as "Bo Bice Day."

801.   On May 25, 2005, one month after the publication of Mr. Bice's felony arrest record, Mr. Bice became the runner-up in Season Four of the *American Idol* Contest, reaching second place after Carrie Underwood.

802.   Upon information and belief, subsequent to his participation as a Contestant on Season Four of *American Idol*, 19 ENTERTAINMENT exercised its "options" on the Prize Contracts by signing Mr. Bice to 19 ENTERTAINMENT.

803.   After his appearance as an A*merican Idol* Contestant, Mr. Bice was signed to a Major Record Label, RCA Records.  Released on June 21, 2005, Bice's first single as an RCA artist debuted at number two on the Billboard Hot 100 Chart and was certified Gold in July 2005.

804.   On December 13, 2005, RCA Records released Bo Bice's Major Label debut album, which peaked at number 4 on the U.S. charts and went on to sell 673,000 copies in the U.S.

805.   Since appearing as a Contestant on Season Four of *American Idol*, Mr. Bice has enjoyed a career as a professional recording artist in the music industry with support from these ENTERPRISE-DEFENDANTS, including but not limited to performing with Willie Nelson at the Bonnaroo Music Festival, appearing on Carlos Santana's album *All That I Am*, performing in the American Idols LIVE! Tour 2005, appearing on *The Tonight Show* with Jay Leno, *The Ellen DeGeneres Show*, *Live with Regis & Kelly*, *The Today Show*, *The Daily Show* with Jon Stewart.

## C.   BUCKY COVINGTON [Season Five]

806.   William "Bucky" Covington was featured as a White Contestant on Season Five of *American Idol* (2005-2006).

807.   In 1998, Bucky Covington was arrested and charged with fraud in connection with impersonating his identical twin brother and providing a fictitious name to a police officer.

808.   On or about October 6, 2005, the identical Covington Twins auditioned for *American Idol* Season Five in Greensboro, North Carolina, in their individual capacities.

809.   Bucky Covington eventually advanced to the Top 12 Finalist Round.

810.   On or about Monday, April 10, 2006, COURT TV reported that Mr. Covington "was once arrested for his involvement in a bizarre incident in which he pretended to be his twin brother to help the sibling avoid criminal prosecution."

811.   On Monday, April 12, 2006, at 11:51 p.m. EDT, REALITY TV MAGAZINE (www.sheknows.com) published an article on-line entitled *"American Idol Finalist Bucky Covington's Twin-Swapping Legal Scandal."*  The author of the article opined as follows:

> **Bucky will likely gain points with some for trying to help keep his brother out of trouble, and <u>it also gives Bucky a little bit of an outlaw image</u>.  [CDC_7141]**

812.   On Wednesday, April 12, 2006, Mr. Covington was voted off the show, landing him at the #8 spot.

813.   On Thursday, April 13, 2006, Mr. Covington was interviewed by a reporter for ENTERTAINMENT WEEKLY and was asked to discuss his prior criminal arrest.   [CDC_007135].

- **Covington:  If they're looking for dirt on me and all they found was a car accident in 1998, they're not looking hard enough. [*Laughs.*]**

- **EW:  Want to come clean with anything right now?**

- **Covington:  I ain't really got no dirt on me — or I was good at getting away with it.**

- **EW: So people still need to keep digging.**

- **Covington: Exactly — I'm not going to give it to you.**

814.   In the wake of the Court TV report that unearthed Mr. Covington's criminal arrest history, Defendant FOX did NOT issue any statement to the press concerning whether Mr.

Covington had disclosed the history of his criminal arrest in connection with the background check procedures.

815.    Following his appearance on Season Five of *American Idol*, Mr. Covington was signed to LYRIC STREET / HOLLYWOOD RECORDS.  His debut album, entitled *Bucky Covington*, was released on April 17, 2007 and debuted on the Billboard 200 Chart at number four (#4) selling 61,000 copies.

## D.    TAYLOR HICKS [Season Five]

816.    Taylor Hicks was featured as a White Contestant on Season Five of *American Idol*.  (2005-2006).

817.    In 1998, Mr. Hicks was arrested in Alabama during a traffic violation stop for misdemeanor possession of marijuana and drug paraphernalia.

818.    On October 10, 2005, Mr. Hicks auditioned for *American Idol* in Las Vegas Nevada and was awarded a Golden Ticket.

819.    In late October 2005 or early November 2005, ENTERPRISE-DEFENDANTS procured the criminal arrest history information of Mr. Hicks.

820.    Mr. Hicks advanced to the Top 12 round on Season Five of *American Idol*.

821.    On or about May 2, 2006, STAR MAGAZINE published details regarding Taylor Hicks' 1998 criminal arrest in the State of Alabama for possession of (what the DEA describes as) "narcotics."

822.    In the wake of the 5/02/2006 STAR MAGAZINE article, ENTERPRISE-DEFENDANTS did not make any public statement or issue any press release regarding Mr. Hick's past criminal record for possession of controlled substances.

823.    On May 10, 2006, Mr. Hicks was announced as one of the Top 3 Finalists for

*American Idol* Season Five.

824.   On May 24, 2006, Mr. Hicks was named the new *American Idol*, winning the title over Katherine McPhee.  The proclamation was aired to a worldwide audience of 200 million television viewers.

825.   Upon winning Season Five of *American Idol*, it was announced that Mr. Hicks had been signed to a Major Record Label, Arista Records / 19 ENTERTAINMENT Records and would be managed by Defendant FULLER and 19 ENTERTAINMENT.

826.   In June 2006, Defendant FORD signed Mr. Hicks to promote Ford's *"Drive on Us"* year-end sales event.

827.   In August 2006, it was announced that Mr. Hicks received a $750,000 (USD) deal to write a memoir of his life, which was released in July 2007.

828.   Mr. Hicks' debut album was released on December 12, 2006.  The album charted #2 position on the U.S. Billboard 200 Chart and was eventually certified by the RIAA as Platinum on the basis of 704,000 units.

829.   In May 2009, Taylor Hicks made FORBES MAGAZINE Top-Ten earning *American Idol* Stars list, coming in at number ten, with over $300,000 earned.  [CDC_007058]

## E.   AMANDA OVERMYER [Season Seven]

830.   Amanda Overmyer was featured as a White Contestant on Season Seven of *American Idol*.

831.   In October 2006, Ms. Overmyr was arrested on charges of driving under the influence of alcohol.  She later pled guilty to the criminal charge.  [CDC_007513]

832.   On or about August 14, 2007, Ms. Overmyr auditioned for Season Seven of *American Idol* in Atlanta, Georgia.  She was awarded a Golden Ticket to Hollywood based on

unanimous vote of the Judges.

833.    Through its background check procedures, ENTERPRISE-DEFENDANTS procured the criminal arrest history information of Ms. Overmyer in the Fall of 2007.

834.    On February 28, 2008, TMZ.com posted an article under its "Breaking News" section entitled: *"Idol Nurse Busted for DUI"*. [CDC_007644].

835.    Mr. Overmyer was <u>not</u> disqualified from *American Idol* by ENTERPRISE-DEFENDANTS on account of her criminal conviction history.

836.    On March 19, 2008, after two weeks of performing live in the Finalist Rounds, Ms. Overmyer was eliminated from the *American Idol* Contest, placing her at the #11 spot. [CDC_007656].

837.    After her elimination from the Contest, ENTERPRISE-DEFENDANTS arranged for Ms. Overmyer to appear on *The Ellen DeGeneres Show*, *Live with Regis & Kelly*, and *The Morning* Show with Mike and Juliet.

838.    On May 24, 2008, Ms. Overmyer performed at the Women of Rock show at the *Whisky A Go Go* in West Hollywood.  She sang at the Harley Davidson Summerfest and released her debut album, *Solidify* in December 2008.

## F.    JOANNA PACITTI [Season Eight]

839.    Joanna Pacitti was featured as a White Contestant on Season Eight of *American Idol*.  She was 23 years old at the time of her appearance.

840.    Before auditioning for Season Nine of *American Idol*, Ms. Pacitti was signed to a Major Record Label: A&M Records / Geffen Records.

841.    On January 21, 2009, ENTERPRISE-DEFENDANTS broadcast an episode of *American Idol* featuring Ms. Pacitti's audition.  One of the Expert Judges, Kara DioGuardi,

recognized at Ms. Pacitti's audition that she had already been signed to a Major Label recording deal.

842.   Ms. Pacitti's appearance on *American Idol* generated debate as to whether *American Idol* was a show for amateurs or for professionals.

843.   On Wednesday, February 11, 2009, ENTERPRISE-DEFENDANTS broadcast an episode of *American Idol* in which Ms. Pacitti is advanced to the Semi-Finalist Rounds Top 36.

844.   On February 11, 2009, within hours after the conclusion of the episode broadcast, Defendant FOX issued a press release concerning Ms. Pacitti: [CDC_007645]

> **"It has been determined that Joanna Pacitti is ineligible to continue in the competition. American Idol contestant Felicia Barton has replaced Ms. Pacitti as part of the Top 36."**

845.   According to STAR MAGAZINE, Joanna Pacitti was declared "ineligible" to compete after advancing to the Top 36 Semi-Final rounds because her professional recording career was *already being managed* by Defendant 19 ENTERTAINMENT, the very same company that manages the talent pool signs the winners to recording contracts.  The reason for her withdrawal from *American Idol* was that Pacitti had "very personal connections" to two executives that work for 19 ENTERTAINMENT.

## G.   MATTHEW LAWRENCE [Season Nine]

846.   Matthew Lawrence was featured as a White Contestant on Season Nine of *American Idol*.

847.   On or about April 11, 2000, Mr. Lawrence robbed a Texas bank at gunpoint. He escaped in a getaway vehicle with $10,845 in cash and was arrested shortly thereafter.  Mr. Lawrence was convicted on a charge of aggravated battery and sentenced to five years in juvenile prison, of which he served more than three years.  [CDC_007623]

848.    On January 20, 2010, ENTERPRISE-DEFENDANTS aired an episode of *American Idol* featuring the performance audition of Mr. Lawrence.  The fact of Mr. Lawrenece's felony conviction was a predominate component of his featured backstory.  He was awarded a Golden Ticket upon unanimous vote from the Expert Judges.

849.    After the broadcast of Mr. Lawrence's appearance on *American Idol*, the media celebrated Mr. Lawrence's appearance on the show as being representative of an opportunity for "a second chance" and "a shot at redemption."

850.    On January 20, 2010, Brian Mansfield of USA TODAY published an article: *"The Final Audition: A Shot at Redemption"* [CDC_007592]

851.    Mr. Lawrence was <u>not</u> disqualified from *American Idol* by ENTERPRISE-DEFENDANTS on account of his criminal arrest or felony conviction history.

852.    On March 6, 2010, the website GAINESVILLE.COM published an article entitled *"From Youth Bank Robber To 'Idol' Contestant, Starke Native Rises Up"* in which it revealed that Mr. Lawrence was eliminated from the Contest during Hollywood Week.  [CDC_007724]

## H.    CASEY JAMES [Season Nine]

853.    Casey James was featured as a White Contestant on Season Nine of *American Idol*.

854.    In November 2001, Mr. James was arrested on charges of reckless driving.  He later pled guilty and served time in jail.

855.    On December 29, 2002, Mr. James was arrested again driving under the influence and driving on a suspended license to which he pled guilty and served jail time.

856.    On or about August 7-8, 2010, Mr. James auditioned for *American Idol* before the Expert Judges and was awarded a Golden Ticket to Hollywood.

857.   As part of its standard practice and ordinary course of doing business, ENTERPRISE-DEFENDANTS procured Mr. James' criminal arrest history information before flying him to Los Angeles, California to compete in the Hollywood Rounds in December 2010.

858.   On Tuesday, February 2, 2010, ENTERPRISE-DEFENDANTS telecast the Open Auditions episode of *American Idol* featuring Mr. James' performance from his August 7-8, 2009 performance in Denver.

859.   On February 5, 2010 at 6:35 a.m., RADAR ONLINE posted an article entitled: *"EXCLUSIVE: American Idol Hopeful Casey James' Jailbird Past"*  [CDC_007513].

860.   Mr. James was <u>not</u> disqualified from *American Idol* by ENTERPRISE-DEFENDANTS on account of his criminal arrest or criminal conviction history.

861.   On February 17, 2010, it was announced that Mr. James was one of the Top 24 Finalists for Season Nine of *American Idol*.

862.   On or about March 11, 2010, STAR MAGAZINE published Mr. James' mugshots from his 2001 and/or 2002 arrests.

863.   On March 16, 2010, MTVNEWS.COM reported on Mr. James' criminal arrest history, largely downplaying the incidents as "youthful indiscretions" [CDC_007521

864.    During the months of reporting on Mr. James' criminal arrest and conviction history, Defendant FOX did <u>not</u> make any comment to the media concerning Mr. James' past criminal arrest history.

865.   On May 19, 2010, Mr. James was eliminated by public vote after he competed throughout twelve straight weeks of the *American Idol* Contest, ultimately landing in the #3 spot.

866.   After Season Nine of *American Idol* concluded its broadcast run, Mr. James joined the rest of the Top 10 Finalists on the *American Idols* LIVE! Tour.

867.    On August 17, 2010, it was announced that James had signed with SONY MUSIC NASHVILLE and his debut album would be released on 19 RECORDINGS / BNA RECORDS in 2011.

868.    Released on March 20, 2012 through ENTERPRISE-DEFENDANTS' 19 RECORDINGS, the album reportedly peaked at #2 on the U.S. Country chart and #23 on the Billboard Top 200, generating 72,000 in sales on the strength of two successful singles.

## I.    STEFANO LANGONE [Season Ten]

869.    Stefano Langone was featured as a White Contestant on Season Ten of *American Idol*.

870.    In 2008, Mr. Langone was arrested for possession of marihuana in the State of Washington.  [CDC_007449]

871.    On or about May, 16, 2010, Mr. Langone was arrested on charges of driving under the influence of alcohol.  He later pled guilty to first-degree negligent driving and entered a diversion program.

872.    On or about November 9-10, 2010, Mr. Langone auditioned for Season Ten of *American Idol*.  He was awarded a Golden Ticket to Hollywood.

873.    Through its ordinary course of business of conducting background checks, ENTERPRISE-DEFENDANTS procured Mr. Langone's criminal arrest history before flying him to Los Angeles, California to compete in Hollywood Rounds.

874.    Mr. Langone was not disqualified from *American Idol* on account of his arrest record or conviction.

875.    On February 9, 2011, ENTERPRISE-DEFENDANTS telecasted an episode of *American Idol* featuring Mr. Langone's audition segment from his San Francisco audition.  Mr. Langone's backstory revolved around his near-fatal car accident in 2009 after being hit by a

drunk driver.

876.    On February 12, 2011, TMZ.com posted an article entitled: *"Scarred Idol Contestant – Drunk Driving Victim*."  The article displayed Mr. Langone's injuries from being hit my another driver and reported that Mr. Langone was suing the culprit. [CDC_007422]

877.    On or about February 24, 2011, the Top 24 Finalists were revealed, including Mr. Langone.

878.    On or about March 3, 2011, Mr. Langone was chosen by one of the Expert judges, Jennifer Lopez, as one of the Wild Cards to join the Top 13 Finalists.

879.    On March 10, 2011, Mr. Langone performed in the Finalist round and advanced to the next week.

880.    On March 16, 2011, Defendant FOX through its website www.foxnews.com posted an article entitled *"American Idol Finalist Stefano Langone's DUI Arrest Revealed."* Defendant FOX professes its support for the "cute crooner" even while acknowledging that "Stefano failed to reveal" his criminal arrest while talking about his backstory.  [CDC_007461-62]

881.    On March 16, 2011, SEATTLE TIMES posted an article entitled "A*merican Idol's Stefano Langone Convicted of Negligent Driving in 2010,"* noting that ENTERPRISE-DEFENDANTS had made prominent his prior 2009 status as a victim of DUI.  In the article, it was also reported that ENTERPRISE-DEFENDANTS had conducted a background check into the incident "in February" and had no comment on whether Mr. Langone's conviction would be grounds for his disqualification. [CDC_007439]

882.    On April 21, 2011, Langone was eliminated from the *American Idol* Contest based on the (purported) public vote; and ended up in 7th place.

883.     Following his elimination from Season Ten of *American Idol*, Mr. Langone appeared on several talk shows, including *Live with Regis and Kelly* and *The Today Show*, and toured with the *American Idols* LIVE! Tour 2011, which ended in the Philippines on September 21, 2011.

884.     On September 25, 2011, it was announced that Langone would be "the latest alum to have his option picked up by 19 ENTERTAINMENT.

885.     On January 11, 2012, it was announced that Mr. Langone had signed a record contract with HOLLYWOOD RECORDS, making him the seventh Finalist from Season Ten of *American Idol* to score a Major-Label recording deal.

## J.     AMY BRUMFIELD [Season Eleven]

886.     Amy Brumfield was featured as a White Contestant on Season Eleven of *American Idol*.

887.     On or about August 17-18, 2011, Ms. Brumfield auditioned for *American Idol* before the Expert Judges and was awarded a Golden Ticket to Hollywood.

888.     As part of their standard practice and ordinary course of doing business, ENTERPRISE-DEFENDANTS procured Ms. Brumfield's criminal arrest history information before flying her to Los Angeles to compete in the Hollywood Rounds in December 2011.

889.     On or about December 12, 2011, Ms. Brumfield was flown to Los Angeles, California at ENTERPRISE-DEFENDANTS' expense to compete in the Hollywood Rounds.

890.     On or about December 14, 2011, on the second day of Hollywood Week, Ms. Brumfield was cut from the *American Idol* Contest during the group round.

891.     January 18, 2012, Ms. Brumfield's audition was featured on the premiere episode of Season Eleven of American Idol.

892.    As of the airing of the premiere episode of Season Eleven of *American Idol* on January 18, 2012, ENTERPRISE-DEFENDANTS knew that Ms. Brumfield had already been cut from the Contest and knew that she had an extensive history of misdemeanor arrests.

893.    On Thursday, January 19, 2012, at 7:45 a.m. PST, the Los Angeles-based website TMZ.com published an *"Exclusive"* article entitled *"American Idol – Tent Girl Amy Brumfield Has Boozy Criminal Past."* [CDC_007575-76]  The 1/19/2012 TMZ.com article posted four (4) different mug shots of Ms. Brumfield from four different arrests, two of which were purportedly taken in 2007 and two of which were taken in 2010.

894.    The 1/19/2012 TMZ.com article was initially published at 9:45 a.m. CST, which is only 15-45 minutes after any clerk of court or police records department in the State of Tennessee would have been opened for business.

895.    On Thursday, January 19, 2012 at 4:05 p.m. PST, E! ENTERTAINMENT'S EONLINE.COM posted an article entitled: *"American Idol Scandal Already? Tent Girl Amy Brumfield Has a Rap Sheet!"*

896.    In the wake of TMZ.com's report of Ms. Brumfield's criminal arrest information, Defendant FOX had no comment to the press regarding Ms. Brumfield's criminal arrest record. [CDC_007562]

897.    Defendant FOX never revealed to the public whether Ms. Brumfield had disclosed her arrest information during the background check process.

# PATTERN OF RACIAL DISCRIMINATION

## A.   STATISTICAL DATA

### (1)   OVERVIEW

898.   During the first eleven seasons of its highly visible television production (2002-2012), Defendants only chose to publicly disqualify top-ranking Black *American Idol* contestants, who consisted of no more than 29% of the contestant pool.

899.   Conversely, White (and non-black) *American Idol* contestants, who consisted of the other 71% of the contestant pool were NEVER disqualified, at least not publicly.

900.   Measured over a ten-year period, from June 2002 through March 15, 2012, there was a total number of sixteen (16) *publicly* disqualified Black *American Idol* contestants.

901.   Measured over a ten-year period, from June 2002 through March 15, 2012, there were zero (0) number of White (or non-black) *American Idol* Contestants disqualified from the show for any reason.

902.   Measured over a ten-year period, from June 2002 through March 15, 2012, there were zero (0) number of White (or non-black) *American Idol* Contestants publicly disqualified from the show on account of their criminal record information.

### (2)   GOLDEN TICKET HOLDERS (2002-2012)

903.   Over the course of eleven seasons of *American Idol*, from <u>July 2002</u> through <u>March 2012</u>, there have been approximately **2145** Contestants who received Golden Tickets to Hollywood.

904.   Of the **2145** <u>Total</u> *American Idol* Contestants who received Golden Tickets to

Hollywood, **1523** Contestants [or seventy-one percent (**71%**)] were White (or non-black).[8]

905.   Of the **2145** Total *American Idol* Contestants who received Golden Tickets to Hollywood, **622** Contestants or [twenty-nine percent (**29%**)] were Black.

906.   **Zero (0)** out of the **1523** White (or non-black) *American Idol* contestants were Publicly Disqualified.

907.   **Sixteen (16)** out of **622** Black *American Idol* Golden Ticket Holders were Publicly Disqualified.[9]

908.    **Fourteen (14)** out of **16** Black *American Idol* contestants were disqualified for Arrest Records.

909.   **One (1)** out of **16** Black *American Idol* contestants were disqualified for erotic photos.

910.   **One (1)** out of **15** Black *American Idol* contestants were disqualified for purportedly falsifying age.

## (3)   SEMI-FINAL ROUNDS (2002-2012)

911.   Over the course of eleven seasons of *American Idol*, from July 2002 through March 2012, **305** Total Contestants Advanced to Semi-Final Rounds [Top 24, Top 32, Top 36]

912.   White: 71% (**216**) of all *American Idol* Semi-Finalists have been White or non-black.

913.   Black: 29% (**89**) of all *American Idol* Semi-Finalists have been Black.

---

[8] "non-black" refers to Asian, Hispanic, Pacific Islander, Indian.

[9] (1) Delano Cagnolatti [Season One]; (2) Jaered Andrews [Season Two]; (3) Frenchie Davis [Season Two]; (4) Corey Clark [Season Two]; (5) Donnie Williams [Season Three]; (6) Terrell Brittenum [Season Five]; (7) Derrell Brittenum [Season Five]; (8) Halicia T. [Season Five]; (9) Tatiana W. [Season Five]; (10) Tora W. [Season Five]; (11) Akron Watson [Season Six]; (12) Ashlynn C. [Season Six]; (13) Anthony W. [Season Nine]; (14) Chris Golightly [Season Nine]; (15) JXJ [Season Eleven].

914.    Zero (**0**) out of __216__ (0%) White *American Idol* Semi-Finalists were Publicly Disqualified.

915.    Nine (**9**) out of __89__ (10%) Black *American Idol* Semi-Finalists were Publicly Disqualified.[10]

916.    One-hundred percent (100%) of all *American Idol* Semi-Finalists who have been Publicly Disqualified were Black.

917.    No White or non-black *American Idol* contestant has ever been Publicly Disqualified.

918.    Ten-percent (10%) of all Black Contestants who advanced to Semi-Final Rounds were Publicly Disqualified.

919.    Thirty-One (31%) of all Black __MALE__ Contestants who advanced to *American Idol* Semi-Final Rounds were __Publicly Disqualified.__

## (4)    FINAL ROUNDS (2002-2012)

920.    Over the course of eleven seasons of *American Idol*, from __July 2002__ through __March 2012__, **138** Total Contestants Advanced to Final Rounds [Top 10, Top 12 or Top 13]

921.    __White__: 73% (100 out of 138) of all *American Idol* Finalists have been White or non-black.

922.    __Black__: 27% (38 out of 138) of all *American Idol* Finalists have been Black.

923.    __Zero (0)__ out of __100__ White (or non-black) *American Idol* contestants were Publicly Disqualified.

---

[10] (1) Delano Cagnolatti [Season One]; (2) Jaered Andrews [Season Two]; (3) Frenchie Davis [Season Two]; (4) Corey Clark [Season Two]; (5) Donnie Williams [Season Three]; (6) Terrell Brittenum [Season Five]; (7) Derrell Brittenum [Season Five]; (8) Chris Golightly [Season Nine]; (9) Jermaine Jones [Season Eleven].

924.   <u>Two (**2**)</u> out of **38** Black *American Idol* contestants were Publicly Disqualified.[11]

925.   <u>One hundred percent (100%)</u> of all *American Idol* Finalists who have been publicly disqualified are Black.

926.   <u>Zero percent (0%)</u> of White (or non-black) *American Idol* Finalists has ever been Publicly Disqualified.

## C.   WHITE COMPARATORS

927.   Over the course of eleven seasons of *American Idol*, from <u>July 2002</u> through <u>March 2012</u>, there were only nine (<u>9</u>) White *American Idol* Contestants who had their criminal record history information disseminated by ENTERPRISE-DEFENDANTS to the U.S. media. These contestants included Scott Savol [Season Four]; Bo Bice [Season Four]; Taylor Hicks [Season Five]; Bucky Covington [Season Five]; Amanda Overmyr [Season Seven]; Casey James [Season Nine]; Matt L. [Season Nine]; Amy B. [Season Nine]; Stefano Langone [Season Ten].

928.   ENTERPRISE-DEFENDANTS did <u>NOT</u> disqualify <u>any one</u> of the nine (9) White *American Idol* contestants whose criminal records came to light during telecast of the show.

929.   Several of the nine (<u>9</u>) White *American Idol* Contestants who had a history of criminal arrests were convicted for more serious crimes (e.g., felony armed bank robbery, felony drug possession) than ANY of the Black *American Idol* contestants, whose misdemeanor arrest history was *de minimus* in comparison.

930.   Seven (7) out of the <u>9</u> White *American Idol* contestants whose criminal records were released by OVERSEER-DEFENDANTS to tabloid media actually ***advanced to the Final Rounds***: Hicks [#1]; Bice [#2]; James [#3]; Savol [#5]; Langone [#7]; Covington [#8] and

---

[11] (1) Corey Clark [Season Two]; (2) JXJ [Season Eleven].

Overmyr [#11].

931.    **Drugs.**  Taylor HICKS, who is white, was declared the *American Idol* winner in Season Five even though he had an arrest record for marijuana possession.  Bo Bice was declared runner-up even though he had been convicted of a felony.  Plaintiff Akron WATSON, on the other hand, had his Golden Ticket revoked for *de minimus* marijuana possession.

932.    **DUI.**  Plaintiff Donnie WILLIAMS was disqualified for a pending DUI based on a mere citation - as opposed to arrest (because his intake was barely over the legal limit).  Plaintiff Thomas DANIELS was also disqualified for a past DUI which had been expunged.  In contrast, White *American Idol* contestants Stefano Langone, Amanda Overmyer and Casey James were all permitted to advance to the Finalist rounds even though their DUI arrests had landed them in jail.  Indeed, Mr. James was arrested for reckless driving and DUI so repeatedly that he reportedly spent more than 100 days in jail.

933.    **Battery / Assault.**  Claimant Corey Clark was disqualified for alleged battery, which police reports claimed was based on a "slap" in the face to his little sister.  The prosecutor dropped the charges.  Plaintiff Jaered Andrews was also disqualified before he was even arrested for simple assault in connection with an act of self-defense.  White contestant Scott Savol, on the other hand, was not disqualified even though he allegedly threw a telephone at the mother of his child.  The impact of the phone against her chest allegedly caused the phone to break apart.  Savol was ordered to complete a domestic violence program as a part of his sentence.  Clark received no such sentence.  Andrews was completely acquitted.

934.    **False Names to Police.**  JXJ, who is Black, was publicly disqualified in connection with outstanding warrants for allegedly providing false names to police officers.  Bucky Covington, who is White, was charged with falsifying his identity to police in connection

with a hit-and-run, but was allowed to compete.

935.   After the OVERSEER-DEFENDANTS released the criminal arrest history of the White *American Idol* Contestants to mass media, the OVERSEER-DEFENDANTS thereafter triumphantly championed them as models of excellence who were given a second chance to "turn their life around" and live the "American Dream" through their participation on *American Idol.*

936.   Black *American Idol* Contestants who were disqualified in connection with their arrest records were invariably portrayed by the OVERSEER-DEFENDANTS as "untrustworthy" and "dangerous criminals" who had to be cast out into exile in order to preserve the "sanctity" of *American Idol* and to protect its brandname identity as a "family-friendly" show.

937.   During ten years of broadcasting the show, no crime committed by ANY White *American Idol* Contestant, no matter how egregious, was ever treated by the OVERSEER-DEFENDANTS as a character flaw of the promoted White contestant.  To the contrary, the criminal arrest history of White *American Idol* Contestants was marketed to audiences as a *positive* character attribute, perfectly suitable for the "family-friendly" show.

938.   With the assistance of the PRODUCTION-DEFENDANTS, seven (7) out of nine (9) White *American Idol* Contestants managed to score lucrative record deals in the industry and have NOT had their musical careers impaired by their participation on *American Idol.*   It can be fairly stated that the White Comparators enjoyed the full benefits and privileges of the transaction without any *materia*l interference by the ENTERPRISE-DEFENDANTS.

939.   Based on an analysis of the foregoing statistical data, it is <u>transparent</u> that the OVERSEER-DEFENDANTS made <u>conscious, deliberate choices</u> which invariably sought to <u>condemn</u> Black *American Idol* Contestants (11 out of 15 who were Male) while at the same time

making decisions to advertise the criminal record history of a very select number of White *American Idol* Contestants (8 out of 9 who were Male) in order to "teach" audiences about the virtue of redemption (i.e., atoning for a fault, deliverance, salvation).

940.    Over the course of a decade, there were 1514 White (or non-black) Golden Ticket Holders invited to Hollywood who *apparently* had no criminal record at all (because it was never advertised by the OVERSEER-DEFENDANTS

941.    OVERSEER-DEFENDANTS only decided to advertise the criminal record information of White Contestants in the very beginning round [two (2) contestants at Open Auditions / Hollywood Rounds] or the very last round [seven (7) contestants in the Finals].

942.     In contrast, an inordinate amount of public disqualifications of Black *American Idol* contestants [13 out of 15]  took place in the earlier Hollywood rounds or middle Semi-Final rounds.

943.    From the perspective of the viewing audience, the *Black American Idol* Contestants were kicked off relatively early enough in the season such that the viewing audience had not yet been provided an opportunity to "invest" in their talent (i.e., become a fan). OVERSEER-DEFENDANTS simply decided to use the "rap sheets" of Black *American Idol* contestants as "tabloid fodder" to advertise the *American Idol* show before the "Main Event" (i.e., live, public voting rounds) began.

944.    At the early-mid rounds, target audiences still did not know much about the personal backgrounds or positive attributes of the Black contestants who had been disqualified. Instead, television viewers learned of them through scores of web articles that published their mug shots, criminal case files and police reports.   As indicated by the vast amount of "comments" posted to the internet in the wake of Black male disqualifications, the majority of

the Black *American Idol* Contestants who were disqualified in earlier-middle rounds [including ANDREWS, T. BRITTENUM, D, BRITTENUM, WILLIAMS, WATSON, DANIELS] simply became young Black males who conformed to the age-old stereotype of "criminal."   They only appeared on television ONCE before being cast out by the OVERSEER-DEFENDANTS as stereotypical "black criminals."

945.    As for the two Black *American Idol* Contestants who advanced to the final round [Plaintiff Clark and JXJ], they were portrayed by OVERSEER-DEFENDANTS as the age-old stereotype of the black "criminal" who had somehow "tricked" and "deceived" their way into the Final Round, leaving the OVERSEER-DEFENDANTS no choice but to terminate their participation.

946.    But the evidence shows quite clear that the OVERSEER-DEFENDANTS knew about the pending cases involving both Plaintiff Clark and JXJ, which means that their highly publicized disqualifications were carefully orchestrated by OVERSEER-DEFENDANTS, who had no intention of letting Plaintiff Clark or JXJ advance to the Top Spot by means of the public vote. Rather, their disqualifications were utilized for maximum "indoctrination" effect.

947.    OVERSEER-DEFENDANTS chose to advertise the arrest records of White *American Idol* contestants like Hicks, Bice, James, Langone, Covington or Overmyr ONLY when such Top-Ranking talent had already advanced to the Finalist / Top 12 Rounds.  By that time, such contestants had clearly endeared themselves to viewing audiences (and to DEFENDANTS) and were already on the way to a Major Label record deal.  So the release of their criminal arrest history by that time could be humanized by the OVERSEER-DEFENDANTS and re-contextualized into a story of redemption and positivity.

## GROSS STATISTICAL DISPARITY
**Arrest Records Exploited in U.S. Media**
(Concurrent with Appearances on *American Idol*)

| BLACK *GOLDEN TICKETS* [11 out of 622 w/Arrests] | | | WHITE *GOLDEN TICKETS* [9 out of 1523 w/Arrests] | | |
|---|---|---|---|---|---|
| *DISQUALIFIED & CONDEMNED* | | | *VINDICATED & REDEEMED* | | |
| Contestant Name | Criminal Charge(s) | Disposition [At Time of DQ] | Contestant Name | Criminal Charge(s) | Disposition |
| **JAERED ANDREWS** [Season Two] Top 32 | ☐ Simple Assault (Misdemeanor) | (NONE) [Arrested After DQ] Acquitted by Jury | **SCOTT SAVOL** [Season Four] Top 10: Fifth Place | ☐ Domestic Assault ☐ Disorderly Conduct ☐ Trespassing (Misdemeanor) | Pled Guilty to Disorderly Conduct |
| **COREY CLARK** [Season Two] Top 6 | ☐ Battery Restraint ☐ Obstruction of Justice (Misdemeanor) | [PENDING] Dismissed (Plea on Obstruction) | **BO BICE** [Season Four] Top 10: Second Place | ☐ Cocaine Possession ☐ Public Intoxication ☐ Paraphenalia (Felony) | Pled Guilty |
| **DONNIE WILLIAMS** [Season Three] Top 32 | ☐ DUI (Citation – not Arrested) | [PENDING] Diversion | **STEFANO LANGONE** [Season Ten] Top 10: Seventh Place | ☐ DUI ☐ Marijuana Possession (Misdemeanor) | Convicted Jail Time |
| **THOMAS DANIELS** [Season Six] Top 34 | ☐ DUI ☐ Reckless Driving (Misdemeanor) | Expunged | **CASEY JAMES** [Season Nine] Top 10: Third Place | ☐ DWI ☐ Reckless Driving ☐ Suspended License (Misdemeanor) | Convicted 100+ Days Jail |
| **AKRON WATSON** [Season Six] Golden Ticket | ☐ Marijuana Possession (Misdemeanor) | Diversion | **TAYLOR HICKS** [Season Five] Top 10: First Place | ☐ Marijuana Possession (Misdemeanor) | Unknown |
| **BRITTENUM TWINS** [Season Six] Top 32 [Season Eight] Hollywood | ☐ Forgery, Identity Theft (Felony Reduced) | [PENDING] Diversion | **BUCKY COVINGTON** [Season Five] Top 10: Eighth Place | ☐ Hit-and-Run ☐ False Names to Police ☐ Resisting Arrest ☐ Suspended License (Misdemeanor) | Unknown |
| **ASHLYNN C.** [Season Six] Hollywood | ☐ Property Damage (Misdemeanor) | [PENDING] Dismissed | **MATTHEW L.** [Season Nine] Hollywood | ☐ Bank Robbery (Felony) | Convicted 4 Years in State Prison |
| **HALICIA T.** [Season Five] Hollywood | ☐ Trespass ☐ Disorderly Conduct (Misdemeanor) | Expunged | **AMY B.** [Season Nine] Hollywood | ☐ Public Intoxication ☐ Trespass (Misdemeanor) | Unknown |
| **TATIANA W.** [Season Five] Hollywood | ☐ Shoplifting ☐ False ID (Misdemeanor) | Expunged | **AMANDA OVERMYR** [Season Season] Top 10: Eleventh Place | ☐ DUI (Misdemeanor) | Convicted |
| **ANTONIO W.** [Season Nine] Hollywood | ☐ Drug Possession ☐ Battery (Misdemeanor) | Charges Dropped | | | |
| **JXJ** [Season Eleven] Top 11 | ☐ False Names to Police ☐ Open Container (Misdemeanor) | [PENDING] Unknown | | | |

# CLASS ACTION ALLEGATIONS

948.    Plaintiffs bring this action under <u>Count I</u> and <u>Count VII</u> in their own individual capacity and on behalf of a class of persons under Rule 23(a), Rule 23(b)(2), Rule 23(b)(3) and Rule of the FEDERAL RULES OF CIVIL PROCEDURE.

## A.    DEFINITION OF PROPOSED CLASS

## (1)    BLACK GOLDEN TICKET HOLDERS (2002-2012) [Males Only]

949.    The named Plaintiffs seek to represent a class defined as follows: all African-American males who have earned a Golden Ticket to compete in the *American Idol* Contest at any time from <u>April 20, 2002</u> through <u>November 15, 2012</u> (Season One through Season Twelve) (the "Class")

950.    The named Plaintiffs seek to help eradicate the evil of employment discrimination based on false racial stereotypes that continue to deprive Plaintiffs and others in their protected class of the full benefits and privileges of rights ascribed to them as natural-born citizens of the United States.

951.    The proposed Class definition is "precise, objective and presently ascertainable."[12]

952.    The named Plaintiffs are each an individual member of the proposed Class.

953.    Plaintiffs have alleged herein acts of racial disparate treatment by ENTERPRISE-DEFENDANTS against African-American females, specifically against Frenchie Davis, Ashlynn C., Halicia T. and Tatiana D. and aver that both African-American males <u>and</u> females were victimized by ENTERPRISE-DEFENDANTS' pattern or practice of racial discrimination in ENTERPRISE-DEFENDANTS' employment practices.

---

[12] MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.14 (3d ed.1995)

954.    It is appropriate to limit the prospective Class in the first instance to African-American <u>males</u> only because:

    (a)    the Civil Rights statutes were intended to provide a legal remedy to those citizens who are victimized by false, negative stereotypes associated with one's ancestral background.  The pernicious stereotype challenged here is largely imposed by American mass media on Black males;

    (b)    young Black American *males* have historically suffered and continue to be victimized by stigmatization in the U.S. workplace associated with the outmoded negative stereotype of the "black criminal" that has largely been propagated by U.S. mass media.

    (c)    limitation of the class to African-American males, in the first instance, will make the litigation more manageable in the furtherance of efficiency and economy to the parties and the Honorable Court.

    (e)    all of the named Plaintiffs are male.

## (2)   RESERVATION OF RIGHT TO AMEND CLASS

955.    Plaintiffs respectfully reserve the right upon the Honorable Court's leave to amend the definition of the Class during or following discovery.

956.    As of the filing of this Class Action Complaint, Plaintiffs expressly contemplate that the Class will expand to include African-American *females*.

957.    Plaintiffs also contemplate that the Class may expand to incorporate African-American contestants (male or female) who have applied for employment in other Reality TV Contests that are produced by Defendant FREMANTLE and broadcast by Defendant FOX in the United States, particularly the program entitled *X Factor* (which has been broadcast in the U.S. for two seasons in 2011 and 2012).[13]

---

[13] Plaintiffs emphasize that there is no evidence in the public record to indicate that producers of *X Factor* have engaged in the same pattern or practice of racial discrimination as exhibited by *American Idol;* however, there appears to be common ownership and management (i.e., "locus of autonomy") as between the two programs that raise a reasonable level of suspicion concerning the commonality of background check procedures utilized in the contestant disqualification for *X Factor.*

**B.     NUMEROSITY** [Fed. R. Civ. P. 23(a)(1)]

958.     The Class is so numerous that joinder of all members is impracticable.

959.     The Class contemplates the inclusion of U.S. citizens or permanent residents throughout the United States and it would therefore be inconvenient to litigate multiple lawsuits in different judicial districts nationwide.

960.     For the twelve seasons of *American Idol*, ENTERPRISE-DEFENDANTS awarded a total of approximately two thousand four hundred and thirty-one (2431) Golden Tickets to Hollywood.  Of these 2431 Golden Tickets, it is estimated that anywhere between 24-29% of the Golden Tickets were awarded to African-American Contestants.  Thus, it is estimated that between <u>583</u> and <u>704</u> of the Golden Tickets were awarded by the ENTERPRISE-DEFENDANTS to African-American Contestants.

961.     As between male and female African-American contestants, statistical analysis of the Semi-Finalist Contestants from the first eleven seasons of *American Idol* (2002-2012) shows that a total of fifty (50) Semi-Finalists comprised of African-American females and thirty-nine (39) comprised of African-American males.

962.     It is estimated that approximately 44% of between 583 and 704 Golden Tickets have been awarded to African-American males.  Thus, including the ten Black males named as Plaintiffs herein, the size of the proposed Class is estimated to be in the range **of <u>256</u> and <u>309</u>** members.

**C.     COMMONALITY** [Fed. R. Civ. P. 23(a)(2)]

**(1)     QUESTIONS OF LAW AND FACT**

963.     There are questions of law and fact common to the Class that predominate over

any questions affecting the individuals only[14], including but not limited to:

(a)  Whether ENTERPRISE-DEFENDANTS' conduct vis-à-vis members of the Class violate federal civil rights laws;

(b)  Whether ENTERPRISE-DEFENDANTS maintain a systemic policy, practice or "standard operating procedure" for treating Black *American Idol* Contestants in a manner that intends to discriminate against the entire Class on the basis of race or ancestry;

(c)  Whether there are statistically significant disparities between the disqualification of Black *American Idol* Contestants and of similarly situated White and non-Black *American Idol* Contestants sufficient to show the element of Defendants' racial intent;

(d)  Whether ENTERPRISE-DEFENDANTS' employment application questions concerning arrest records violate Section 432.7 of the California Labor Code.

(e)  Whether ENTERPRISE-DEFENDANTS' disqualifications of Black *American Idols* with records of arrest were justified by business necessity;

(f)  Whether injunctive and/or declaratory relief is needed to adequately remedy past or present racial discrimination against the Class and prevent future discrimination against the Class;

(g)  Whether ENTERPRISE-DEFENDANTS' unlawful conduct justifies an award of compensatory damages to the Class, which may include valuable contest prizes or other similar monetary relief to individual members of the Class;

(h)  Whether ENTERPRISE-DEFENDANTS' unlawful misconduct justifies an award of punitive damages on a class-wide basis or to individual members of the Class.

## (2)  COMPANY-WIDE POLICY

964.  The commonality requirement is satisfied because the Class members were victims of a systemic policy, practice and custom of racial discrimination.

965.  As to the commonality requirement, Plaintiffs allege a practice of disparate treatment in the ENTERPRISE-DEFENDANTS' exercise of unbridled discretion in the disqualification of Black *American Idol* Male Contestants, thus raising questions of law and fact

---

[14] H. Newberg, I Class Actions § 1450 at 504 (1977).

common to all disqualified contestants.

966.   ENTERPRISE-DEFENDANTS' practices and policies, coupled with the racial *animus* or stereotyped thinking of foreign national executives, permeate the corporate culture and have resulted in disparate treatment of *bona fide* contestants who happened to be Black.

967.   PRODUCTION-DEFENDANTS have a history of disseminating vicious racial propaganda dating back to World War II.

968.   The named Plaintiffs and putative class members were together the victims of a cohesive policy or plan that was motivated by invidious *animus* to exclude African-American males from the *American Idol* Contest based on their past or pending record of criminal arrests.

## (3)   UNIFORMITY OF PRACTICES

969.   Decisions to disqualify *American Idol* contestants were not based on any objective criteria or written job descriptions.

970.   There existed a common mode of exercising discretion that pervaded the entire *American Idol* Enterprise.

971.   Decisions to disqualify *American Idol* Contestants were not based on any criteria or "contest rules" that were publically disseminated to Contestants before they entered the contest.

972.   ENTERPRISE-DEFENDANTS' practice of disqualifying Black male contestants based on discretionary authority without reference to any objective criteria has caused Black contestants to be treated differently than every other contestant who was not an African-American male.

973.   ENTERPRISE-DEFENDANTS' subjective decision-making procedures comprised a common discriminatory link among the named Plaintiffs and the putative Class members.

974.   ENTERPRISE-DEFENDANTS cannot assert legitimate non-discriminatory reasons for disqualifying Black *American Idol* Contestants based on their records of arrest or misdemeanor criminal convictions because their background check procedures were not in compliance with federal or state statutes.

975.   ENTERPRISE-DEFENDANTS engaged in stereotyped-thinking by invoking outmoded notions of the "black criminal" that caused *American Idol* Contestants who happened to be young black males to be disfavored in terms of their advancement as *American Idol* Contestants.

976.   The criminal conduct exclusions utilized by ENTERPRISE-DEFENDANTS during background checks, which operated to exclude Black males from the contestant pool at a grossly disproportionate level, cannot be shown to be related to singing performance as an *American Idol* contestant, nor shown to be related to winning (or top-ranking in) the *American Idol* contest.

977.   ENTERPRISE-DEFENDANTS engaged in a continuing pattern of discrimination that deprived each Class member an equal opportunity to compete in the *American Idol* Contest on the basis of their individual merit.

978.   By discriminating on the basis of a forbidden classification, ENTERPRISE-DEFENDANTS reduced the probability that any single member of the Class would find employment as a *bona fide* contestant on *American Idol*, thereby making competition for the limited number of positions more difficult for the entire Class.

979.   As a result of ENTERPRISE-DEFENDANTS' racial *animus* and stereotyped thinking about young Black males, all Black employment applicants had less of an opportunity to secure a position in the *American Idol* Contest when compared to White and non-Black applicants.

980.   ENTERPRISE-DEFENDANTS were at all times prohibited by federal law from injecting into the selection process the *a priori* assumption that Black applicants with records of

criminal arrest were less acceptable as professional performers, talent contestants and singers than White (or non-Black) applicants with records of criminal arrest.

## (4)   UNIFORMITY OF CLASS MEMBERSHIP

981.   All named Plaintiffs and prospective Class members met the ENTERPRISE-DEFENDANTS' published contestant eligibility requirements concerning age and citizenship (or residency).

982.   All named Plaintiffs and prospective Class Members earned a Golden Ticket to Hollywood from the panel of *American Idol* Expert Judges.

983.   All named Plaintiffs and prospective Class members executed the *American Idol* CONTESTANT AGREEMENT (and amendments thereto).

984.   All named Plaintiffs and prospective Class members completed a PARTICIPANT BACKGROUND QUESTIONNAIRE FORM which made written inquiries concerning each Contestant's criminal arrest history.

985.   All named Plaintiffs and prospective Class Members were subjected to criminal background check processes by ENTERPRISE-DEFENDANTS and their third-party investigative agent, CARCO Group / MMI.

## (5)   MANAGEMENT ORGANIZATION

986.   ENTERPRISE-DEFENDANTS' management and production organization remained an overwhelmingly White supervisory force that wielded unlimited discretion throughout the Continuing Violations period.

987.   Upon information and belief, the decisions to disqualify the named Plaintiffs and the prospective Class members based on criminal exclusions, or to implement ENTERPRISE-DEFENDANTS' policy of disqualifying Black *American Idol* Contestants and disseminating their

information to the press, was made by the same group of supervisors, managers, sponsorship representatives and television executives.

988.    During the *entire* Continuing Violations Period, the decisions to disqualify the named Plaintiffs and the prospective Class members were made by the same core group of supervisory executive producers: Nigel LYTHGOE and Ken WARWICK, both of whom are White.

989.    Upon information and belief, during the *entire* Continuing Violations Period, decisions to discriminate against the named Plaintiffs and the prospective Class members were made by the same core group of supervisory NETWORK-DEFENDANT executives: Michael DARNELL and Minna TAYLOR, Esq., who are White and Marisa FERMIN, Esq., who is believed to be Hispanic.

990.    During the *entire* Continuing Violations Period, criminal investigative background checks were conducted by a woman named Sharon Renee GIALLO, who is White.

## C.    TYPICALITY [Fed. R. Civ. P. 23(a)(2)]

991.    The claims or defenses of the named Plaintiffs are typical of the claims or defenses of the prospective Class members.

992.    The named Plaintiffs and prospective Class members all occupied the same position as employee applicants and/or employees upon receiving their Golden Ticket to Hollywood.

993.    The circumstances surrounding Plaintiffs' grievances involving criminal background checks and criminal conduct exclusions and those surrounding the prospective Class members' grievances are typical amongst the Class.

994.    The discriminatory treatment alleged is typical of ENTERPRISE-DEFENDANTS'

challenged employment practices.

995. ENTERPRISE-DEFENDANTS' employment practices are motivated by a policy of racial *animus* and/or stereotyped thinking that pervades the single common enterprise of companies that manage and operate *American Idol.*

996. The compensatory damages sought by Plaintiffs and the compensatory damages sought by the prospective Class members are measured by the same economic indicator, i.e., the value of the prizes for performing in connection with and winning (or top-ranking in) the *American Idol* Contest.

997. Plaintiffs' individual and class-wide claims overlap on several elements of proof, including ENTERPRISE-DEFENDANTS' systemic policy of conducting illicit background checks, executing commercial contracts that are void on grounds of illegality, disqualifying Black *American Idol* Contestants on the basis of information obtained from improper background checks, failing to develop objective criteria for disqualifications, and failing to diversify an all White, largely Alien-based supervisory and decision-making force.

998. Plaintiffs are each a member of the Class and the employment discrimination claims of each Plaintiff are typical of the claims of the Class.

## D.     ADEQUATE REPRESENTATION

999. The representative parties named in this action will fairly and adequately protect the interests of the Class.

1000. The named Plaintiffs do <u>not</u> have interests that are antagonistic to those of the putative Class members.

1001. Counsel for Plaintiffs are experienced in complex litigation and are qualified to represent the named Plaintiffs and the Class members.  Moreover, counsel for Plaintiffs are

dedicated to vigorously prosecuting the action.

1002.   Plaintiffs will each fairly and adequately protect the interest of the members of the Class, have no interests that are adverse to other members of the Class, and have retained counsel who are competent and experienced in complex litigation.

## E.    CLASS CERTIFICATION

### (1)    FED. R. CIV. P. 23(B)(2)

1003.   ENTERPRISE-DEFENDANTS have acted or refused to act on grounds generally applicable to the entire Class, making final injunctive or corresponding declaratory relief appropriate respecting the Class as a whole.

1004.   While the prospective Class members also herein request monetary relief (i.e., compensatory and punitive damages) as part of their Count II Section 1981 claim, injunctive relief and declaratory relief will predominate employment discrimination-related claims.

1005.   The determination regarding monetary relief sought by the individual named Plaintiffs or the prospective Class members may be potentially deferred until the final remedial phase of the litigation.

### (2)    FED. R. CIV. P. 23(B)(3)

1006.   The major liability questions in this litigation are common to the named Plaintiffs and the prospective Class Members arise from identical core allegations:

(a)    whether the *American Idol* CONTESTANT AGREEMENT, as amended, is void *ab initio* on grounds of illegality, fraud-in-factum;

(b)    whether the named Plaintiffs and prospective Class members were employee applicants;

(c)    whether the named Plaintiffs and prospective Class members were former employees at-will or employees for cause;

(d)   whether ENTERPRISE-DEFENDANTS' active fraudulent concealment of Plaintiff's legal employment relationship with *American Idol* Contestants suspended the accrual of Plaintiffs' causes of action under employment laws;

(e)   whether ENTERPRISE-DEFENDANTS' repeatedly, knowingly and without justification obtained federal and state regulated background information in order to disqualify Black *American Idol* Contestants (whether publicly or privately);

(f)   revocation of exclusive rights to copyright license

1007.   The common issues of law and fact presented in this Class Action Complaint predominate over any individual issues, including with respect to the criminal background check procedures and written employment application questions utilized by ENTERPRISE-DEFENDANTS to screen the *American Idol* contestants and whether such procedures and inquiries stood in violation of federal and state statutory laws.

1008.   The disparate treatment between Black *American Idol* Contestants and White *American Idol* Contestants respecting criminal conduct exclusions is relevant to establishing ENTERPRISE-DEFENDANTS' systemic policy of racial discrimination.

1009.   A class action procedure is superior to the other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable, as per the "numerosity" analysis stated herein.

1010.   Class certification will achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

1011.   The expense and burden of individual litigation makes it impractical for the members of the prospective Class to pursue individual litigation to vindicate their rights.

## (3)   FED. R. CIV. P. 23(B)(4)

1012.   Even if class certification does not satisfy the predominance requirement of Rule

23(b)(3), class certification is appropriate here for the liability phase of "pattern or practice"

disparate treatment because there exists particular common issues of fact and law that can be

isolated, and which equally impact the Class members, such as:

(a)      whether written employment application questions and consent forms contained in the *American Idol* CONTESTANT AGREEMENT and PARTICIPANT BACKGROUND QUESTIONNAIRE FORM, from Season One (2002) through Season Eleven (2012), and comply with statutory law;

(b)      whether criminal background check procedures utilized by the NETWORK-DEFENDANTS, PRODUCTION-DEFENDANTS, EXECUTIVE-DEFENDANTS and CARCO comply with statutory law.

# COUNT I

## VIOLATION OF CIVIL RIGHTS ACT (1866)

### 42 U.S.C. § 1981
#### (EMPLOYMENT CONTRACTS)

1013.   Plaintiffs, each in their individual capacity and on behalf of their prospective Class members, repeat and re-allege each and every allegation above against Defendants as if set forth herein.

1014.   Each Plaintiff (and prospective Class member) is a member of a protected class of U.S. citizen recognized by the Government as "African-American" or "Black."

1015.   Plaintiff Corey Clark, the only *American Idol* Top 10 Finalist named as Plaintiff, signed an employment contract with PRODUCTION-DEFENDANTS in March 2003 without the benefit of counsel.

1016.   Upon the request of PRODUCTION-DEFENDANTS, Mr. Clark also signed a completed Federal I-9 Form for Employment Verification, listing Defendant AMERICAN IDOL PRODUCTIONS, INC. as Mr. Clark's "employer."

1017.   With the exception of Corey Clark, each Plaintiff (and prospective Class member) is or was either an employee or an applicant for employment of PRODUCTION-DEFENDANTS.

1018.   Each Plaintiff (and prospective Class member) was either an employee or applicant for employment of the PRODUCTION-DEFENDANTS.

1019.    Each Plaintiff (and prospective Class Member) was either an employee or applicant for employment of the PRODUCTION-DEFENDANTS.

1020.   Each Plaintiff (and prospective Class Member) met the eligibility requirements to

compete in the *American Idol* Contest and appear as principal performers on television.

1021.  The singing and performing talent of each Plaintiff (and prospective Class member) was subjected to professional analysis and review by a panel of *American Idol* Expert Judges.

1022.  Each Plaintiff  (and prospective Class member) received a Golden ticket to Hollywood after being deemed qualified by the Expert Judges.

1023.  Having met the published eligibility requirements and having received a Golden Ticket to Hollywood based on his individual merit as singers who were adjudged qualified to become "the next *American Idol*," each Plaintiff (and prospective Class member) was qualified for his position to perform as a singer on television and qualified to redeem the valuable contest prizes advertised by ENTERPRISE-DEFENDANTS.

1024.  As set forth in this Abbreviated Complaint, each Plaintiff suffered adverse employment action because the ENTERPRISE-DEFENDANTS disqualified him from his performance role as a Contestant on the show for reasons unrelated to his singing merit.

1025.  Each of the prospective Class members were terminated as a result of criminal arrest information obtained during the ENTERPRISE-DEFENDANTS' background check process.

1026.  ENTERPRISE-DEFENDANTS have violated Section 1981 by intentionally discriminating against each Plaintiff (and each prospective Class Member) with respect to the terms, conditions and benefits of their employment or prospective employment.

1027.  ENTERPRISE-DEFENDANTS have violated Section 1981 by failing to treat each Plaintiff and each prospective Class Member on equal grounds as similarly situated white (or non-black) *American Idol* contestants.

1028.  ENTERPRISE-DEFENDANTS have violated Section 1981 by applying a different set

of Contest rules to White (and non-Black) *American Idol* Contestants than were applied to Black *American Idol* Contestants.

1029.   Discriminatory application of *American Idol* contest rules was the "standard operating procedure" of ENTERPRISE-DEFENDANTS who deprived each Plaintiff and each prospective Class Member of the opportunity to compete on the basis of their merit as performers.

## TERMINATION

1030.   The televised (or internet-promoted) event of disqualification from *American Idol* constituted an hostile act of being divested of all privileges and benefits of participation on the program (including the opportunity to win the prize), denigrated before untold millions of fellow citizens, viewed as a disappointment by one's own family and friends, and permanently labeled on the internet as an *American Idol* "reject" or "criminal."

1031.   Over the course of the show's eleven year history, the adverse action of being "officially disqualified" from *American Idol* was reserved exclusively for Black contestants, and more specifically Black male contestants.

1032.   Plaintiffs' status as African-American citizens was a determinative factor which motivated ENTERPRISE-DEFENDANTS to intentionally interfere with each Plaintiff's and each prospective Class Member's rights, benefits and privileges as an employee or employee applicant.

1033.   But for CRI-Plaintiffs' status as African-American citizens with a criminal arrest history, Plaintiffs would not have been publicly humiliated by ENTERPRISE-DEFENDANTS in connection with their participation on *American Idol*.

1034.   The background check procedures and written forms employed by the

ENTERPRISE-DEFENDANTS to screen *American Idol* contestants did <u>not</u> comply with the statutory mandates proscribed by federal and California law.

1035.   ENTERPRISE-DEFENDANTS engaged in the unlawful policy and practice of criminal conduct exclusions that negatively affected the CRI-Plaintiffs.

1036.   Based on the statistical disparity in criminal conduct exclusions evidenced by the public record, there is probable cause to suspect that members of the prospective Class were disqualified "behind-the-scenes" (i.e., not publically) in a disproportionate amount relative to non-members of the Class who completed identical background question forms.

1037.   ENTERPRISE-DEFENDANTS have maintained an unlawful policy or practice that excludes African-Americans from competing in the *American Idol* contest based on criminal arrest history obtained via the background check process.

1038.   As a pattern or practice of conducting its ordinary course of business, ENTERPRISE-DEFENDANTS utilized CRI-Plaintiff's background information derived from ENTERPRISE-DEFENDANTS' background check process to disqualify each CRI-Plaintiff.

1039.   Racial discriminatory practices in the methods used to conduct background checks of Black *American Idol* contestants was the ENTERPRISE-DEFENDANTS' "standard operating procedure" from April 2002 through until at least January 25, 2013.

**ASSISTANCE IN RESOLVING OUTSTANDING PROCEEDINGS**

1040.   ENTERPRISE-DEFENDANTS have treated criminal history information of its White *American Idol* Contestants in vastly disparate ways as compared to Black *American Idol* contestants. [CDC_007688].

1041.   Whenever a criminal background check revealed information of a pending case, ENTERPRISE-DEFENDANTS assisted white *American Idol* Contestants to resolve any outstanding

matters, whether through criminal and traffic court proceedings or even commercial litigation. Such assistance was offered to white or non-Black contestants in a disproportionate amount of cases relative to Black contestants whose background checks revealed pending cases.

## DISTRIBUTION OF BACKGROUND INFORMATION TO PRESS

1042.  From April 2002 through at least January 25, 2013, ENTERPRISE-DEFENDANTS engaged in an unlawful policy or practice of utilizing the criminal arrest information (and other confidential information) obtained from contestant background checks as a form of commercial advertising to draw audiences for the *American Idol* television program.

1043.  From April 2002 through until March 2012, it was the standard operating procedure for ENTERPRISE-DEFENDANTS to publicly condemn top-ranking Black *American Idol* Contestants through the dissemination of their criminal background information to both tabloid and traditional media outlets.

1044.  ENTERPRISE-DEFENDANTS' unfettered decision to stigmatize CRI-Plaintiffs as criminals constituted an intentional and/or purposeful action on the part of ENTERPRISE-DEFENDANTS.

1045.  As a pattern or practice of conducting its ordinary course of business, ENTERPRISE-DEFENDANTS have NEVER once utilized criminal background information to publicly disqualify a White (or non-Black) contestant from *American Idol.*

1046.  ENTERPRISE-DEFENDANTS' adverse action of utilizing Plaintiffs' background information derived from ENTERPRISE-DEFENDANTS' background check process to humiliate Plaintiffs constituted an interference with Plaintiffs' rights as an employee or an applicant for employment.

1047.  Through the unlawful procurement, public disclosure and commercial

exploitation of their criminal arrest and/or expunged conviction information, ENTERPRISE-DEFENDANTS interfered with the CRI-Plaintiffs' rights as an employee or an applicant for employment.

## FAILURE TO ADOPT BEST PRACTICES

1048.   ENTERPRISE-DEFENDANTS have failed to train its managers, hire officials or guide its decision-makers with respect to the U.S. federal and state laws prohibiting discriminatory conduct in the workplace.

1049.   ENTERPRISE-DEFENDANTS have failed to adhere to best employment practices for the course of the last decade when:

(a)    considering criminal record information as a factor when making adverse decisions concerning ENTERPRISE-DEFENDANTS' conduct in the workplace.

(b)    complying with the law by implementing policies and procedures designed to prevent unlawful discrimination in the workplace.

(c)    promoting and/or sponsoring a purported *bona fide* contest under U.S. law.

(d)    developing a narrowly tailored written policy and procedure for screening applicants and employees for criminal conduct;

(e)    identifying essential job requirements and the actual circumstances under which the jobs are performed;

(f)    disclosing to prospective contestants (i.e., pre-Golden Ticket) the specific offenses that may demonstrate a Contestant's unfitness for performing the job required;

(g)    recording the justification for the policy and procedures implemented in connection with equal treatment of its Contestants;

(h)    recording consultations and research considered in crafting the background check policy and procedures;

(i)    failing to adopt proper background check questions concerning criminal record inquiries;

(j)    failing to maintain employees' criminal records in a confidential manner;

(k)     failing to use Plaintiffs' criminal background information for the reason it was intended;

(l)     making the criminal arrest history of its featured Contestants one of the focal points of its commercial advertising for the program.

1050.  ENTERPRISE-DEFENDANTS could have used less discriminatory or alternative policies that would have enabled them to meet legitimate goals as effectively as the challenged practice.

1051.  DEFENDANTS violated 42 U.S.C. § 1981 by refusing to extend to each Plaintiff, and to each member of the prospective Class, the same opportunity to enter into employment contracts for valuable prizes, benefits and privileges that DEFENDANTS extended to White *American Idol* Contestants who had a chance to compete on their merits.

1052.  DEFENDANTS altered a fundamental characteristic of the contractual right(s) and/or expectancy interest(s) of each Plaintiff (and prospective Class member) to make/enforce contracts and enjoy the benefits and privileges attendant to such contracts based predominantly on the protected status of each Plaintiff (and prospective Class member) as an African-American citizen.

1053.  But for the status of each Plaintiff (and prospective Class member) as an African-American citizen, he would not have been terminated from the *American Idol* Production.

1054.  If each Plaintiff (and prospective Class member) had been White, he would not have been terminated from the *American Idol* Production and would have been permitted employment based on his individual merit.

1055.  Each Plaintiff (and prospective Class member) had a reasonable probability of economic gain by maintaining his employment for the Production, measured by bonuses awarded from being cast as a winner or top-ranking Finalist in the Production.

1056.  As a direct and/or proximate result of DEFENDANTS' racially-motivated adverse action, each Plaintiff (and prospective Class member) suffered loss of employment benefits, privileges and bonuses in an amount to be determined at trial.

1057.  Before March 14, 2012, none of the Plaintiffs knew, had good cause to believe, nor could have discovered upon the exercise of reasonable due diligence, facts sufficient to state a plausible claim that he was or is an employee or applicant for employment of the *American Idol* Production.

1058.  Before March 14, 2012, none of the Plaintiffs knew, had good cause to believe, nor could have discovered upon the exercise of reasonable due diligence, facts sufficient to state a plausible claim that his termination from the *American Idol* Production was caused by racial discriminatory intent or predominantly motivated by racial *animus* and stereotyped thinking harbored by of any one of the DEFENDANTS.

1059.  DEFENDANTS have affirmatively concealed each Plaintiff's Status as an employee or employee applicant of the PRODUCTION-DEFENDANTS.

1060.  But for DEFENDANTS' decision to publically disqualify JXJ on or about March 14, 2012, none of the Plaintiffs (or prospective Class members) could have discovered upon the exercise of reasonable due diligence, facts sufficient to state a plausible claim that his disqualification from *American Idol* was caused by racial discriminatory intent or predominantly motivated by racial *animus* and stereotyped-thinking harbored by of any one of the DEFENDANTS.

# COUNT II

## VIOLATION OF CIVIL RIGHTS ACT (1866)

### 42 U.S.C. § 1981
### (PRIZE CONTRACTS)

———

**Plaintiffs and Prospective Class Members Against**
**ALL DEFENDANTS**

1061.  Plaintiffs, each in their individual capacity and on behalf of their prospective Class members, repeat and re-allege each and every allegation above as if set forth herein.

1062.  Each Plaintiff and prospective Class member is a member of a protected class of U.S. citizen recognized by the federal government as "African-American" or "Black."

## A.    PLAINTIFFS' CONTRACTUAL INTEREST(S)

### (1)    ALLEGATIONS COMMON TO ALL CONTRACTUAL INTERESTS

1063.  Each Plaintiff (and prospective Class member) fully complied with the DEFENDANTS' contest eligibility requirements, as published by DEFENDANTS to U.S. consumers.

1064.  Each Plaintiff (and prospective Class member) was awarded a Golden Ticket to Hollywood by the *American Idol* Expert Judges on account of his individual merit as a singer.

1065.  Each Plaintiff (and prospective Class member) performed all steps necessary to act in compliance with the terms and conditions of the *American Idol* Contest as advertised to U.S. consumers.

1066.  Each Plaintiff (and prospective Class member) earned their right to compete in what DEFENDANTS purported to be a *bona fide* contest by virtue of his individual performance and unique talent.

1067.  With the exception of Plaintiff WATSON (whose Golden Ticket was unlawfully revoked before given the opportunity to compete for the Public Vote), each of the Plaintiffs named in this action ultimately became *American Idol* Semi-Finalists or Finalists who were professionally qualified by the panel of Expert Judges to compete for the public vote.

1068.  In response to DEFENDANTS' market solicitation to enter their singing contest, each Plaintiff (and prospective Class member) provided the requested consideration for redeeming the Contest Prize by making his own unique talent services available for the economic benefit of DEFENDANTS.

1069.  The valuable prizes, benefits and privileges that were advertised by DEFENDANTS constituted a reasonably foreseeable economic benefit in exchange for the participation of each Plaintiff (and prospective Class member) in the *American Idol* Contest.

1070.  DEFENDANTS publicly advertised, marketed and promoted the Contest Prize for winning *American Idol* as the tangible fulfillment of the "*American Dream*."

1071.  DEFENDANTS represented that winners of the advertised Contest Prize would be granted certain life-altering privileges and benefits embodied within and flowing from their participation in the *American Idol* Contest.

1072.  DEFENDANTS publicly held out the previous winners of the *American Idol* Contest, most notably Kelly Clarkson (Season One) and Carrie Underwood (Season Four), as tangible fulfillment of the DEFENDANTS' prize offer of the "*American Dream*" to prospective Golden Ticket holders

1073.  All decisions by DEFENDANTS concerning the application of *American Idol* contest rules were subject to DEFENDANTS' absolute, sole and unfettered discretion.

1074.  DEFENDANTS advertised to U.S. consumers that all *American Idol* Contestants,

regardless of their race or ethnicity, would be competing for the same Contest Prizes based on the same published terms and conditions.

1075. Black *American Idol* Contestants were similarly situated to White and non-Black *American Idol* Contestants in the *American Idol* Contest because all Contestants were competing for the same Contest Prize based on the same published terms and conditions.

## (2)  PRIZE CONTRACT (WRITTEN)

1076. Plaintiff CLARK, Plaintiff GOLIGHTLY and Plaintiff JOYNER each signed the 19 ENTERTAINMENT Prize Contract in their respective season.

1077. Each Plaintiff and each prospective Class member would have been required to sign the 19 ENTERTAINMENT Prize Contract upon reaching the Semi-Final Rounds had they not been disqualified.

## (3)  PRIZE CONTRACT (IMPLIED-IN-FACT)

1078. DEFENDANTS violated 42 U.S.C. § 1981 by refusing to extend to each Plaintiff, and to each member of the prospective Class, the same opportunity to compete for the advertised prizes, benefits and privileges that ENTERPRISE-DEFENDANTS extended to White *American Idol* Contestants.

1079. Each Plaintiff and prospective Class member possesses an implied contractual interest in the *advertised prize* for becoming "the next American Idol." The contractual interest was founded upon a meeting of the minds, which although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of surrounding circumstances, their tacit understanding.

1080. DEFENDANTS' market solicitation to U.S. consumers to enter DEFENDANTS' advertised contest at a specified time and place constituted a unilateral offer to each Plaintiff and

each prospective Class member of a valuable prize in exchange for participation in the advertised contest.

1081.   Each Plaintiff's completion of the invited performance in accordance with the advertised terms of the DEFENDANTS' published contest offer constituted acceptance of the DEFENDANTS' unilateral offer.

1082.   Each Plaintiff's (and prospective Class member's) appearance at his respective Open Audition, the rendering of his performance for the purpose of being evaluated by the *American Idol* Expert Judges, the Judges' positive evaluation of each Plaintiff's performance, and each Plaintiff's continuing participation in the Contest implied that a contract was in the making in exchange for valuable prizes, benefits and privileges.

1083.   Each Plaintiff's (and prospective Class member's) appearance and performance at his respective Open Auditions constituted a detriment to each Plaintiff and prospective Class member.

1084.   Each Plaintiff (and prospective Class member) was required to change his position in order to secure his right to compete in the *American Idol* Contest in exchange for valuable prizes, benefits and privileges.

1085.   Each Plaintiff (and prospective Class member) was required to devote his personal time, creative energy and physical presence in order to secure his right to compete in the *American Idol* Contest in exchange for valuable prizes, benefits and privileges.

1086.   Each Plaintiff (and prospective Class member) was required to perform talent services in the manner prescribed by DEFENDANTS and for the economic benefit of DEFENDANTS in order to secure his right to compete in the *American Idol* Contest in exchange for valuable prizes, benefits and privileges.

1087.  Each Plaintiff (and prospective class member) was required to disclose confidential information to DEFENDANTS concerning his personal background and family's background that would not have been disclosed but for his participation in order to secure his right to compete in the *American Idol* contest in exchange for valuable prizes, benefits and privileges.

## (4)    COVENANT OF GOOD FAITH AND FAIR DEALING

1088.  DEFENDANTS violated 42 U.S.C. § 1981 by refusing to extend to each Plaintiff, and to each member of the prospective Class, the same opportunity to compete in a *bona fide* contest for valuable prize that DEFENDANTS extended to White *American Idol* Contestants who had a chance to compete on their merits.

1089.  At all relevant times, DEFENDANTS publicly advertised the *American Idol* Contest to the U.S. public as a *bona fide* contest both in law and in fact and were therefore required to conduct the contest in good faith and consistent with the reasonable expectations of the solicited contestants.

1090.  By advertising *American Idol* as a *bona fide* contest for valuable prize in which Expert Judges and the public vote would decide the outcome of the Contest, ENTERPRISE-DEFENDANTS promised each Plaintiff (and prospective class member) that his talent as a singer would be evaluated based on individual merit.

1091.  From the date that each Plaintiff (and prospective class member) was awarded a Golden Ticket to Hollywood, Defendants had an obligation to treat each Plaintiff (and prospective class member) in good faith and consistent with his reasonable expectations.

1092.  By offering to contract with each Plaintiff (whether express or implied), DEFENDANTS were required by law to conduct themselves at all times in good faith vis-à-vis each

Plaintiff (and the prospective Class member) in his capacity as a *bona fide* prize contestant in-fact and at law.

1093.   Each Plaintiff's right to be treated in good faith via his participation as a Contestant in the *American Idol* Contest is derived from: (a) executed written contracts; and/or (b) FCC regulations; and/or (c) acceptance of a unilateral offer by virtue of the Golden Ticket; and/or (d) reasonable expectations that necessarily arise via a contest sponsor-contestant relationship.

## B.   INTERFERENCE w/ CONTRACTUAL INTEREST(S)

1094.   At all relevant times, DEFENDANTS' decision to disqualify each Plaintiff (or prospective Class member) from the *American Idol* Contest constituted an intentional and/or purposeful action on the part of DEFENDANTS.

1095.   DEFENDANTS' act of disqualification as to each Plaintiff (or prospective Class member) constituted an intentional interference with Plaintiffs' contractual interests to make and/or enforce contracts and enjoy all of the benefits and privileges derived from contracts.

1096.   DEFENDANTS' unilateral decisions to disqualify each Plaintiff (and prospective Class member) from the *American Idol* Contest deprived each Plaintiff (and prospective Class member) of his contractual right and/or expectancy interest to:

(a) compete for the valuable *American Idol* Contest Prize; and

(b) increase the value of his right to publicity via  participation in the *American Idol* Contest and Production; and

(c) capitalize from the DEFENDANTS' exploitation of his copyright interests in his own performance via participation in the *American Idol* Contest and Production; and

(d) enjoy all of the benefits and privileges of their contractual relationship or prospective

contractual relationship(s) with DEFENDANTS.

(e) be treated in good faith and fair dealing via their participation in the *American Idol* Contest and Production.

## C.    INTENT

1097.  DEFENDANTS violated 42 U.S.C. § 1981 by refusing to extend to each Plaintiff, and to each member of the prospective Class, the same opportunity to enter into contracts for valuable prizes, benefits and privileges that DEFENDANTS extended to White *American Idol* Contestants who had a chance to compete on their merits.

1098.  DEFENDANTS altered a fundamental characteristic of the contractual right(s) and/or expectancy interest(s) of each Plaintiff (and prospective Class member) to make/enforce contracts and enjoy the benefits and privileges attendant to such contracts based predominantly on the protected status of each Plaintiff (and prospective Class member) as an African-American citizen.

1099.  But for the status of each Plaintiff (and prospective Class member) as an African-American citizen, he would not have been disqualified from the *American Idol* Contest.

1100.  If each Plaintiff (and prospective Class member) had been White, he would not have been disqualified from the *American Idol* Contest and would have been permitted to compete on his individual merit.

1101.  Each Plaintiff (and prospective Class member), whether ranked as a Golden Ticket holder, Semi-Finalist or Top Finalist, had a reasonable probability of economic gain, measured by winning or top-ranking in the *American Idol* Contest during their respective seasons.

1102.  As a direct and/or proximate result of DEFENDANTS' racially-motivated conduct, each Plaintiff (and prospective Class member) suffered economic harm in an amount to be

determined at trial.

1103.   Before March 14, 2012, none of the Plaintiffs knew, had good cause to believe, nor could have discovered upon the exercise of reasonable due diligence, facts sufficient to state a plausible claim that his disqualification from *American Idol* was caused by racial discriminatory intent or predominantly motivated by racial *animus* and stereotyped thinking harbored by of any one of the DEFENDANTS.

1104.   But for DEFENDANTS' decision to publically disqualify JXJ on or about March 14, 2012, none of the Plaintiffs (or prospective Class members) could have discovered upon the exercise of reasonable due diligence, facts sufficient to state a plausible claim that his disqualification from *American Idol* was caused by racial discriminatory intent or predominantly motivated by racial *animus* and stereotyped-thinking harbored by of any one of the DEFENDANTS.

# COUNT III

## VIOLATION OF CIVIL RIGHTS ACT (1866)

### 42 U.S.C. § 1981
### (QUASI-CONTRACT / CONSTRUCTIVE TRUST)

———

**Plaintiffs and Prospective Class Members Against**
PRODUCTION-DEFENDANTS, NETWORK-DEFENDANTS, SPONSORSHIP-DEFENDANTS

1106.  Plaintiffs, each in their individual capacity and on behalf of their prospective Class members, repeat and re-allege each and every allegation above as if set forth herein.

1107.  Each Plaintiff and prospective Class member is a member of a protected class of U.S. citizen recognized by the federal government as "African-American" or "Black."

## A.    FIDUCIARY or CONFIDENTIAL RELATIONSHIP

1108.  PRODUCTION-DEFENDANTS held themselves out to the U.S. public and to *American Idol* Contestants as:

(a)  seasoned  music  industry  practitioners  who  occupied  a  superior  position  in  the entertainment industry vis-à-vis the Contestants; and

(b)  sophisticated professionals who possessed specialized knowledge and expertise in the trade of transforming young, "unsigned" singers into professional musical recording stars.

1109.   Each prospective Class member was between the ages of 16 and 28 at the time of their first audition for *American Idol.*

1110.  Each Plaintiff was between the ages of 19 and 28 at the time of their first audition for *American Idol* and was unsophisticated in matters pertaining to the law in general, including

all of the complex transactional components proposed by Defendants as part of their unilateral offer to the U.S. public.  This includes, but is not limited to long-form recording contracts, artist management contracts, touring agreements, merchandising licensing deals, copyright ownership transfers, contractual reversions, work for hire relationships, labor union rights, AFTRA membership, employment rights, fair credit reporting rights, criminal background check procedures, rights of publicity, reality television production techniques, federal and state contest regulations, and accounting.

1111.  After each Plaintiff (and prospective Class member) was awarded a Golden Ticket to Hollywood, or was otherwise deemed qualified to advance to Hollywood Week, the PRODUCTION-DEFENDANTS assumed the professional role of managing the musical careers of each Plaintiff (and prospective Class member) 360 "degrees" in order to help develop his talents as a professional recording artist and to forge a relationship of trust.

1112.  The 360 "degree" management role assumed by the PRODUCTION-DEFENDANTS entailed ALL professional service aspects of each Plaintiff's business, accounting AND legal representation.

1113.  PRODUCTION-DEFENDANTS acted in the professional capacity as each Plaintiff's artist manager, agent, lawyer, accountant and/or career counselor.

1114.  After securing a Golden Ticket to Hollywood based on their individual merit, each Plaintiff vested their trust in the PRODUCTION-DEFENDANTS to manage his career in a 360 "degree" capacity, thereby creating a fiduciary or confidential relationship between each Plaintiff and PRODUCTION-DEFENDANTS.

1115.  Defendants promised each Plaintiff (and prospective Class member) that they had entered a *bona fide* singing contest for a valuable prize where the criteria for winning the contest

was based on the merits of each Plaintiff's individual performances in the Contest (as rated by the Expert Judges and/or Public Vote).

## B.     JUSTIFIABLE RELIANCE

1116.   Based on the fiduciary or confidential relationship that existed, each Plaintiff reasonably relied on PRODUCTION-DEFENDANTS' representations that *American Idol* was a *bona fide* singing contest for a valuable prize where the criteria for winning the contest was based on the merits of each Plaintiff's individual performances in the Contest (as rated by the Expert Judges and/or Public Vote).

1117.   Based on the fiduciary or confidential relationship that existed, each Plaintiff reasonably relied on PRODUCTION-DEFENDANTS' representations that PRODUCTION-DEFENDANTS would act in the furtherance of each Plaintiff's best interests in providing their professional services and expertise in the fields of artist management, business development, accounting AND legal representation.

1118.   Based on the fiduciary or confidential relationship that existed, each Plaintiff reasonably relied on PRODUCTION-DEFENDANTS' representations that the background information obtained through the "Contestant Vetting" process would be maintained in strict confidence.

## C.     PLAINTIFFS' OWNERSHIP INTERESTS

1119.   By virtue of the tangible fixation of each Plaintiff's appearances, performances and creative renditions of pre-existing musical compositions, as embodied in the audio-visual works recorded by PRODUCTION-DEFENDANTS, each Plaintiff (and prospective Class member) possesses an authorship interest in their respective performances.

1120.   In good faith reliance upon and in consideration for DEFENDANTS' representations that *American Idol* was a *bona fide* contest for a valuable prize, and on account of the special

and/or fiduciary relationship that had been forged with PRODUCTION-DEFENDANTS, each Plaintiff (and prospective Class member) conveyed, assigned and/or otherwise transferred his copyright ownership interests in his performances, appearances and renditions to PRODUCTION-DEFENDANTS for an infinite period of duration by way of the AMERICAN IDOL CONTESTANT AGREEMENT.

1121.   Each Plaintiff is the true and rightful owner of his common law and/or state statutory rights to publicity, which represent a proprietary interest in each Plaintiff's own name, image, persona, identity, voice, likeness and performance.

1122.   In good faith reliance upon and in consideration for DEFENDANTS' representations that American Idol was a *bona fide* contest for a valuable prize, and on account of the special and/or fiduciary relationship that had been forged with PRODUCTION-DEFENDANTS, each Plaintiff (and prospective Class member) conveyed, assigned and/or otherwise transferred their publicity rights to PRODUCTION-DEFENDANTS for an infinite period of duration by way of the *American Idol* CONTESTANT AGREEMENT.

1123.   Each Plaintiff's respective copyright interests and publicity interests are collectively defined herein as Plaintiff's Ownership Interests.

## E.   ADVANTAGE GAINED BY DEFENDANTS

1124.   By virtue of the rights conveyed to PRODUCTION-DEFENDANTS under the *American Idol* CONTESTANT AGREEMENT, the PRODUCTION-DEFENDANTS, NETWORK-DEFENDANTS and SPONSORSHIP-DEFENDANTS have all retained economic benefits from the acquisition and exploitation of each Plaintiff's Ownership Interests.

1125.   The economic benefits retained by the PRODUCTION-DEFENDANTS, NETWORK-DEFENDANTS and SPONSORSHIP-DEFENDANTS include, but are not limited to: licensing fees,

television advertising revenues, internet advertising revenues, merchandising revenues, packaged media sales (e.g., DVD), book sales and worldwide syndication fees generated from the exploitation of Plaintiff's Ownership Interests.

1126.  PRODUCTION-DEFENDANTS continue to retain and possess ownership over the audio-visual recordings and photographs of each Plaintiff's singing performances, personal appearances and artistic renditions in connection with each Plaintiff's participation on *American Idol.*

## F.   BREACH OF DUTY

1127.  PRODUCTION-DEFENDANTS have violated Section 1981 by breaching their duties arising from their fiduciary or confidential relationship vis-à-vis each Plaintiff through deliberate acts (the "Deliberate Acts"), including but not limited:

(a) fraudulent misrepresentation concerning the true nature of the *American Idol* Contest;

(b) acquisition of Plaintiff's Ownership Rights via illusory contracts tainted by illegality, mistake, unconscionability, failure of consideration, absence of consideration and fraud;

(c) racially-motivated disqualifications from the *American Idol* Contest;

(d) unlawful procurement of criminal arrest history information;

(e) illegal transmission of criminal background information to mass media;

(f) commission of defamation, trade disparagement and false light;

(g)  misappropriation and/or conversion of each Plaintiff's Ownership Interests.

1128.  PRODUCTION-DEFENDANTS possessed superior knowledge vis-à-vis each Plaintiff (and prospective Class member) concerning the true nature of the contest depicted on *American Idol*, which is a scripted dramatic work in which the Contestants are cast by PRODUCTION-DEFENDANTS (often at the direction of the SPONSOR-DEFENDANTS) to play a role in the

Production.

1129.   Before May of 2012, none of the Plaintiffs knew, had good cause to believe, nor could have discovered upon the exercise of reasonable due diligence, facts sufficient to state a plausible claim that the *American Idol* Contest was a dramatic fiction rather than a *bona fide* contest.

1130.   But for DEFENDANTS' decision to publically disqualify JXJ on or about March 14, 2012, none of the Plaintiffs could have discovered upon the exercise of reasonable due diligence, facts sufficient to state a plausible claim that the *American Idol* Contest was a dramatic fiction rather than a *bona fide* contest.

1131.   PRODUCTION-DEFENDANTS' contractual acquisition of Plaintiffs' Ownership Rights at the time of each Plaintiff's entry into the *American Idol* Contest was made under fraudulent pretenses in the context of a fiduciary or confidential relationship.

1132.   Contrary to the representations made to the U.S. public by DEFENDANTS, the *American Idol* Contest is a dramatic fiction and the Contestants featured in the dramatic work are unwitting actors who are cast.

1133.   The conveyance of each Plaintiff's Ownership Rights to PRODUCTION-DEFENDANTS was made <u>without</u> the legal informed consent of each Plaintiff (and prospective Class member).

1134.   Plaintiff's Ownership Interests have been acquired under such circumstances that the holder of the legal title to each Plaintiff's Ownership Interests, namely the PRODUCTION-DEFENDANTS, NETWORK-DEFENDANTS and SPONSORSHIP-DEFENDANTS, may not in good conscience retain the beneficial interests attributable to the commercial exploitation and continued retention of said Ownership Rights.

1135.   The absence of lawful, informed consent in the making of the *American Idol* Prize Contract is evidenced by one or more of the following factors which, individually or collectively, render unjust the retention of any beneficial interests in favor of PRODUCTION-DEFENDANTS, NETWORK-DEFENDANTS and SPONSORSHIP-DEFENDANTS:

    (a)    Mistake of fact concerning the true nature of the *American Idol* Contest advertised by Defendants;

    (b)    Mistake of law concerning the true nature of the *American Idol* advertised by Defendants;

    (c)    Undue influence concerning the special and/or fiduciary relationship forged by the PRODUCTION-DEFENDANTS with each Plaintiff;

    (d)    Failure of consideration on account of the innate transactional defect concerning the true nature and purpose of the *American Idol* Contest;

    (e)    Unconscionability

    (f)    Illegality

1136.   PRODUCTION-DEFENDANTS,   NETWORK-DEFENDANTS   and   SPONSORSHIP-DEFENDANTS have violated Section 1981 by misappropriating and/or converting each Plaintiff's Ownership Interests on account of their statutorily proscribed intent and:

    (a) appropriating the publicity rights of each Plaintiff (and prospective Class member);

    (b) converting such publicity rights to their own beneficial use and enjoyment;

    (c) conveying such publicity rights to third parties for such party's beneficial use;

    (d) claiming the right of ownership over each Plaintiff's publicity rights;

    (e) claiming the right of ownership over the Plaintiff's copyrights;

    (f) altering the nature and/or essential character of Plaintiffs' publicity rights;

(g) excluding the true owner of his right of ownership;

(h) interfering with Plaintiff's proprietary interest(s) to market the value of their publicity rights via appearances <u>as singers</u> on the *American Idol* program;

(i) expropriating Plaintiff's copyright and authorship interests in their own performances, appearances and renditions as recorded and archived by ENTERPRISE-DEFENDANTS and/or as featured in the *American Idol* Production.

## G.    INTENT

1137.   But for the status of each Plaintiff (and prospective Class member) as an African-American citizen, he would not have been disqualified from the *American Idol* Contest or subjected to the Deliberate Acts of the PRODUCTION-DEFENDANTS, NETWORK-DEFENDANTS and SPONSORSHIP-DEFENDANTS:

1138.   If any one Plaintiff (or prospective Class member) had been White, he would <u>not</u> have been disqualified from the *American Idol* Contest and would have been evaluated by the Expert Judges and ranked by the Public Vote on the basis of his individual merit.

1139.   As a direct and/or proximate result of their racially-motivated conduct causing harm to each Plaintiff, PRODUCTION-DEFENDANTS, NETWORK-DEFENDANTS and SPONSORSHIP-Defendants gained an unjust advantage.

1140.   Before March 14, 2012, none of the Plaintiffs knew, had good cause to believe, nor could have discovered upon the exercise of reasonable due diligence, facts sufficient to state a plausible claim that his disqualification from *American Idol* was caused by racial discriminatory intent or predominantly motivated by racial *animus* and stereotyped thinking harbored by any one or more of the Defendants.

1141.   But for Defendants' decision to publically disqualify JXJ on or about March 14,

2012, none of the Plaintiffs (or prospective Class members) could have discovered upon the exercise of reasonable due diligence, facts sufficient to state a plausible claim that his disqualification from *American Idol* was caused by racial discriminatory intent or predominantly motivated by racial *animus* and stereotyped-thinking harbored by of any one or more of the Defendants.

1142.  Each Plaintiff was mislead by PRODUCTION-DEFENDANTS to enter into the *American Idol* Contest under fraudulent pretenses and did <u>not</u> receive the benefit of the bargain enjoyed by White *American Idol* Contestants who were similarly situated.

1143.  Had any one Plaintiff known, or had good cause to know, the true nature and purpose of the *American Idol* Contest at the time they first auditioned for *American Idol*, no Plaintiff would have agreed to participate as a Contestant.

# COUNT IV

## VIOLATION OF CIVIL RIGHTS ACT (1866)

### 42 U.S.C. § 1985(3)
### (DEPRIVATION OF CONSTITUTIONAL RIGHTS)
### [THIRTEENTH / FOURTEENTH AMENDMENT]

———

**Plaintiffs  Clark, Smalley, Andrews, Williams, T. Brittenum,
D. Brittenum, Watson Against**
OVERSEER-DEFENDANTS

**A.**   Plaintiffs CLARK, ANDREWS, WILLIAMS, T. BRITTENUM, D.
BRITTENUM, WATSON in their individual capacity repeat and re-allege
each and every allegation above as if set forth herein.

**B.**   **CONSPIRACY**

**(1)**   **DEFINITION**

1144.   A conspiracy is  "[a] combination or confederacy between two or more persons

formed for the purpose of committing, by their joint efforts, some unlawful or criminal act."[15]

**(2)**   **IDENTITY OF MEMBERS**

1145.   Plaintiffs identify Defendant LYTHGOE and Defendant WARWICK as members

of the conspiracy under Section 1985(3).

**(3)**   **FORMULATION**

1146.   Defendant LYTHGOE and Defendant WARWICK are long-term collaborators on

various television productions and have reportedly been close friends since their grade school

years.

---

[15] BLACK'S LAW DICTIONARY 280 (5th ed. 1979).

1147.  Defendant LYTHGOE and Defendant WARWICK both worked together during the 2001 television production of *Pop Idol* in the United Kingdom, which was the precursor or "test pilot" to *American Idol.*

1148.  During the production of both *PopStars* and *Pop Idol* in the United Kingdom, and about 2.5 years before *American Idol* pronounced its first ever criminal record-related disqualification (Plaintiff ANDREWS), Defendant LYTGHOE was already making the criminal arrest records of London-based Reality TV show contestants an important feature, "creative component," or "production technique" of his style of Reality TV production (and promotion).

1149.  Upon information and belief, Defendant LYTHGOE and Defendant WARWICK formulated their confederacy in London, back in 2001, working together as co-producers during the initial production of Pop Stars U.K.  This show reportedly laid the foundation for the production and marketing techniques which were ultimately exported from London to Los Angeles in the Spring of 2002.

1150.  Upon arriving to their new home in Los Angeles, the OVERSEER-DEFENDANTS likely found a "kindred spirit" in FOX programming executive Mike DARNELL, who had already supervised the on-air disqualification scandal of an African-American couple from the 2001 show *Temptation Island, which invited a defamation lawsuit.*

1151.  During Season One of *American Idol*, the OVERSEER-DEFENDANTS "tested the waters" of their production techniques in the United States by publicly disqualifying a Black Semi-Finalist Contestant named Delano Cognolatti.   Although not a criminal records-related matter, the OVERSEER-DEFENDANTS consciously decided to confront Mr. Cognolatti on camera to humiliate him before millions of viewers for allegedly misrepresenting (i.e., failing to disclose) his age.

**(4)   PURPOSE**

1152.   The OVERSEER-DEFENDANTS formulated and carried out a conspiracy for the purpose of exploiting the criminal background records of *American Idol* Contestants as a form of:

a.   **RACIAL PROPAGANDA,** i.e., invidious commercial speech intending to indoctrinate target audiences with "lessons" about the "criminality" of young, Black males (who are exiled through public condemnation) as measured against the "youthful indiscretions" of White males (who are championed through redemption and led to "salvation," i.e., a Major record deal).

b.   **SCANDAL-MONGERING,** i.e., a pre-orchestrated and highly publicized incident that brings about disgrace, defamation of character, or offends the moral sensibilities of society.

c.   **COMMERCIAL ADVERTISING,** i.e., employing criminal record information as a "sure-fire" marketing technique designed to generate tons of free "hits" (i.e., media impressions) through write-ups in the entertainment news and tabloid press.

d.   **CROSS-MARKETING,** i.e. reaching out to target audiences who might not otherwise tune in to see a talent search show but are consumers of crime-related shows like "America's Most Wanted"

e.   **SHOCK EFFECT ON THE AUDIENCE,** i.e., the OVERSEER-DEFENDANTS create moments of suspense and dramatic tension in their audiences by introducing a "criminal element" into what purports to be a "family-friendly" show.

f.   **WICKED DEPRAVITY,** i.e., the OVERSEER-DEFENDANTS appear to relish their

self-appointed roles as "executioners" of the hopes and dreams of young artists.

## (5) METHODS

1153.  Criminal Background Information of *American Idol* Contestants is first obtained through proprietary written background check forms administered to all those Contestants who have earned a Golden Ticket to Hollywood.  The processing / office administration of these forms is handled by the PRODUCTION-DEFENDANTS, and more specifically FREMANTLE, which for the first ten seasons employed a paralegal named Amanda Chacon to handle the paperwork.

1154.  According to Ms. Chacon, once the completed background forms are received by her office at FREMANTLE / AIP, they are transmitted via Fedex directly to CARCO Group, Inc., a third-party investigator and background check company with principal office in New York.  The West Coast operator / partner of the company was originally known as MMI.

1155.  At all relevant times, a third-party investigator named Sharon Renee GIALLO supervised all aspects of the criminal background check process.  GIALLO ran computer-generated criminal background checks via CARCO's proprietary data aggregator.  Upon information and belief, GIALLO also ran computer-generated background checks through other "sources" on the West Coast.  If any pending criminal cases emerged from the CARCO background checks, then GIALLO would personally interface with local county clerks to obtain court documents through U.S. mail or via Fax.  Once GIALLO compiled her reports on certain contestants, she would then send written Investigative Report forms to Defendant FOX's internal legal department, specifically Minna TAYLOR, Esq. and  Marisa Fermin, Esq.  (2002-2005 only).

1156.  Upon information and belief, once TAYLOR was in possession of the CARCO

reports, she communicated "noteworthy" or "red flag" information about Contestants to Defendant LYTHGOE and/or Defendant WARWICK.   At that point, the OVERSEER-DEFENDANTS were ostensibly free to utilize the contestant background information contained in the CARCO reports as they saw fit (despite the many statutory proscriptions against such conduct).

1157.   In some cases, such as with Plaintiff Clark, the Brittenum Twins and JXJ, their (then) pending criminal arrests and humiliating public disqualifications were scripted into the *American Idol* television program by LYTHGOE and WARWICK, who played out the drama as it unfolded in the tabloids and who thereafter promoted the scandals as a core part of the program's "behind-the-scenes" narrative.

## Statements by Warwick Indicating Knowledge of Background Checks

Defendant WARWICK told MTV News: **"This year [Season Three], for the first time ever, we screened all of the 117 that came through to Pasadena. Normally we only screen the final 32. Generally speaking, the whole process of screening these kids is a bit of a nightmare. Some of them are younger, so they're not on the normal registers you would check out."** [CDC_000827].   Warwick's statements were reiterated by the New York Post.  [CDC_000831]

"People are always going to tell lies, so you can't legislate for that until you find out. "But they sign a contract, and if they do that, they are in breach of contract." [CDC_000827].

MTV News: **"Warwick said *extensive criminal checks are done on the singers*, but the producers are "not judgmental at all."** [CDC_000828]

"If a girl's worked in a strip bar but she's a great singer, we don't care," he said.  **"But if there is something that is seriously going to bring the show in disrepute, for any reason, it's up to the legal side of FOX and 19 [Entertainment, who produce the show]."** [CDC_000828]

April 28, 2005, Washington Post: **"Why would you want to endanger the success of the show by manipulating it? You only have to get caught once and the whole show becomes worthless,"** [CDC_000910]

Warwick has publicly stated that "**We've had accusations thrown at us since day one, everything from being racist** to having the phone lines fixed." [CDC_000831; CDC_000986]

On January 21, 2007, Daily News of Los Angeles reported that, with respect to the Open Auditions, "**Warwick claimed there isn't enough time to do background checks on contestants appearing in episodes to assess whether judges' behavior is inappropriate**

toward vulnerable participants." [CDC_001193]

During a taped segment, Jones was interviewed by "Idol" executive producers Ken Warwick and Nigel Lythgoe. Warwick told Jones **"you were incumbent to tell us the truth about all of this, and you haven't on any level."** [CDC_001457]

The fake names ultimately did in Jermaine, explained Ken Warwick, who is also an exec producer on the show. **"The big problem...was the fact that he had given false names,"** Warwick said. **"There might be other false names and other...charges that we just don't know about."** [Washington Post, CDC_001463]

## C.    DEPRIVATION OF CONSTITUTIONAL RIGHTS

1158.  Plaintiffs CLARK, ANDREWS, WILLIAMS, T. BRITTENUM, AND D. BRITTENUM were all publicly disqualified on account of PENDING criminal charges before any of them had a basic opportunity to answer the accusations through counsel, let alone face a trial by jury of their peers.

1159.   The respective arrest records of Plaintiffs CLARK, ANDREWS, WILLIAMS, T. BRITTENUM, AND D. BRITTENUM beared no relation whatsoever to their respective abilities to perform in what purported to be a *bona fide* singing contest for a valuable prize.

1160.  In deciding to take such adverse action against them whilst the government's charges against them remained unproven, hearsay accusations, LYTHGOE AND WARWICK intentionally deprived Plaintiffs CLARK, ANDREWS, WILLIAMS, T. BRITTENUM, AND D. BRITTENUM of their protected status under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution as innocent citizens until proven otherwise in a Court of competent jurisdiction.

1161.  Public-DQ-Plaintiffs Fid NOT sign up for *American Idol* to have their names, images and identities expropriated to serve as commercial propaganda for the OVERSEER-DEFENDANTS' warped racial animus.

1162.  By exploiting their confidential and statutorily proscribed criminal record

information as entertainment fodder to perpetuate negative stereotypes (as opposed to serving its intended governmental function to aid law enforcement officers in the discharge of their duties), the OVERSEER-DEFENDANTS' violated the Public-DQ-Plaintiffs' Thirteenth Amendment rights to be free from the "badges and incidents of slavery," which necessarily includes being individually and culturally liberated from the pernicious stereotype of being labeled a "criminal."

## D.   INJURY

1163.   OVERSEER-DEFENDANTS actively participated in the promotion, sponsorship and commercial exploitation of the *American Idol* Production and Contest featuring each of the named Plaintiffs in this Count.

1164.   With respect to each of Plaintiffs named in this Count, it was reasonably foreseeable to LYTHGOE and WARWICK at the time each Plaintiff was disqualified from the Contest for reasons other than their individual talent that each Plaintiff was possessed of a high statistical probability of claiming the #1 Prize in the *American Idol* televised contest.

1165.   OVERSEER-DEFENDANTS, collectively and individually, reaped substantial economic benefits from the worldwide commercial exploitation of named Plaintiffs' talent services, unique voices, cultural heritage, family names, images, personal background, valuable identities and likenesses, including the commercial exploitation of Plaintiffs' unceremonious disqualifications and collateral media scandals;

1166.   OVERSEER-DEFENDANTS HAVE unjustly failed to compensate named Plaintiffs for the valuable economic benefits that they received and continue to receive in perpetuity, as a result of Plaintiffs' "casting" in the Production;

1167.   The failure of OVERSEER-DEFENDANTS to compensate named Plaintiffs for the

valuable economic benefits they received as a result of Plaintiffs' participation in the Production was at all relevant times to the Plaintiffs' detriment.

1168. It would be contrary to equity and good conscience for the OVERSEER-DEFENDANTS' to retain an economic benefit which has accrued to them at the expense of Plaintiffs.

1169. As a direct and/or proximate result of OVERSEER-DEFENDANTS' systemic misconduct and fundamental misapprehension of the Constitutional rights of a protected class of U.S. citizen, Plaintiffs have been permanently and irrevocably damaged by the direct actions of OVERSEER-DEFENDANTS and are therefore entitled to recover an amount of damages and a measure of injunctive relief to be determined at trial.

# COUNT V

## RESCISSION / RESTITUTION

### STRIKING DOWN THE AMERICAN IDOL CONTESTANT AGREEMENT
### (AS VOID AB INITIO)

———

## A.    OVERVIEW

1170.   PLAINTIFFS in their individual capacity and on behalf of the prospective Class Members repeat and re-allege each and every allegation above as if set forth herein.

1171.   *American Idol* CONTESTANT AGREEMENT is presented only to those contestants who have been awarded a Golden Ticket to Hollywood.

1172.   The contract is presented as a non-negotiable adhesion contract, under severe time restraints, and only AFTER Golden Ticket Holders have already: (a) performed services for the economic benefit of Defendants; (b) executed an Audition Agreement at the Open Audition phase; (c) been awarded a Golden Ticket to Hollywood after being qualified to enter the contest by a panel of Expert Judges with professional music industry experience.

1173.   Each of the named Plaintiffs in this action executed the *American Idol* CONTESTANT AGREEMENT during their respective seasons, and amendments thereto, and it is reasonable to conclude that all prospective class members executed the document (provided they participated in Hollywood Rounds).

1174.   **STATUTORY.**   THE *American Idol* CONTESTANT AGREEMENT is void *ab initio* and must be struck down in its entirety because its entire purpose and core transaction violates 47 U.S.C. § 509, 47 C.F.R. § 73.1216; and Civ. Code § 1668.

1175.   **COMMON LAW.**   THE *American Idol* CONTESTANT AGREEMENT is void *ab initio*

and must be struck down in its entirety under the common law doctrines of illegality, fraud-in-factum, legal duty rule, illusory promise (lack of mutual assent), and substantive unconscionability.

## B.   ILLEGALITY [Cal. Civ. Code § 1667]

1176.   Section 1667 of the California Civil Code ("Section 1667") provides that:

> **That is not lawful which is:  (1) contrary to an express provision of law;  (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals.**

1177.   Under California law, contracts that are contrary to express statutes or to the policy of express statutes are illegal contracts. A determination of illegality, i.e., that a contract stands contrary to the express statutory provision of law, may void the entire contract. Whether a contract is illegal is a question of law to be determined from the circumstances of each particular case.[16]

1178.   Pursuant to the express terms of the *American Idol* CONTESTANT AGREEMENT:

> **This Agreement and all matters or issues collateral thereto shall be governed by the laws of the State of California applicable to contracts executed and performed entirely therein (regardless of the actual place of performance."  [AICA, v.2, ¶ G.8; CDC_000202]**

1179.   Accordingly, Section 1667 applies to matters concerning the enforceability of the *American Idol* CONTESTANT AGREEMENT.

1180.   Alternatively, if New York law applies by virtue of the Honorable Court's reading of all operative contracts at issue here (e.g., 19 ENTERTAINMENT Prize Contracts) as part of one transaction, then the law is substantially identical.

1181.   THE *American Idol* CONTESTANT AGREEMENT is void *ab initio* and must be struck

down in its entirety because its entire purpose and core transaction violates 47 U.S.C. § 509, 47

C.F.R. § 73.1216; and Civ. Code § 1668.

## C.    RIGGED CONTEST [47 U.S.C. § 509]

1182.  47 U.S.C. § 509 ("Section 509") of the Communications Act[17] provides as

follows:

> **It is unlawful for any person, with intent to deceive the listening or**
>
> **viewing public --**
>
> **(1) To supply to any contestant in a purportedly bona fide contest of intellectual knowledge or intellectual skill any special and secret assistance whereby the outcome of such contest will be in whole or in part prearranged or predetermined**
>
> **(2) By means of persuasion, bribery, intimidation, or otherwise, to induce or cause any contestant in a purportedly bona fide contest of intellectual knowledge or intellectual skill to refrain in any manner from using or displaying his knowledge or skill in such contest, whereby the outcome thereof will be in whole or in part prearranged or predetermined.**
>
> **(3) To engage in any artifice or scheme for the purpose of prearranging or predetermining in whole or in part the outcome of a purportedly bona fide contest of intellectual knowledge, intellectual skill, or chance.**

1183.  Section 509 applies to anyone involved in the production, broadcast, or offering a

broadcast television program to consumers or licensees, as well as sponsors who knew or should

have known that someone violated or plans to violate the statute.

1184.  Accordingly, the proscriptions under Section 509 apply to ALL DEFENDANTS

named in this action.

1185.  Section 509 does not allow DEFENDANTS to exempt themselves from its coverage.

1186.  DEFENDANTS acknowledge in the Agreement that:

"**[I]t is a <u>federal offense</u> punishable by fine and/or imprisonment for anyone to do anything which would <u>rig</u> or in any way <u>influence the outcome</u> of the [American Idol] Series with <u>the intent to deceive the viewing public</u>.**" **[AICA, ¶F.2(j); CDC_000199]** **(emphasis added)**

1187.   While the contractual provision quoted in the preceding paragraph does not directly cite Section 509 expressly, its language can only be reasonably understood to refer to Section 509 because it references a <u>federal</u>, <u>criminal</u> statute that prohibits the <u>rigging</u> or <u>influencing of an outcome</u> concerning a contest that is telecast to the <u>public</u>.

1188.   By requiring Plaintiffs to contractually warrant their understanding of a federal statute that prohibits schemes or artifices to deceive the television viewing audience and/or affect the outcome of the contest, DEFENDANTS may not foreclose the applicability of Section 509 to the purported *bona fide* contest depicted by DEFENDANTS on the *American Idol* Production, from at least Season Two (2002) through Season Eleven (2012).

1189.   *American Idol* is televised on broadcast television, namely, through channel(s) owned and operated by the NETWORK-DEFENDANTS.

1190.   ENTERPRISE-DEFENDANTS bill, market, promote and/or advertise *American Idol* as a "contest" and/or "competition" characterized by a predominance of *chance.*[18]

1191.   ENTERPRISE-DEFENDANTS bill, market, promote and/or advertise *American Idol* as a contest characterized by a predominance of *skill.*

1192.   ENTERPRISE-DEFENDANTS bill, market, promote and/or advertise *American Idol* as a contest characterized by a predominance of *mixed chance* and *skill.*

1193.   ENTERPRISE-DEFENDANTS bill, market, promote and/or advertise *American Idol* as a contest featuring eligibility rules, participation rules, disqualification rules, winners, contestants, elimination methods, judges, standards of judging, audience voting and prizes.

---

1194.  *American Idol* Contestants, including Plaintiffs, deem the Production in which they participate to be a contest, game or competition in which there is an actual winner of a valuable prize.

1195.  The purported *American Idol* contest rewards Contestants with natural singing ability, trained singing ability, stage presence, an attractive physical appearance (more often than not), and intellectual skill or knowledge required to select songs and strategize one's position in the Contest relative to other Contestants.

1196.  Presuming the popular audience vote decides the winner, as ENTERPRISE-DEFENDANTS advertise, then the element of chance predominantly determines the outcome or winner of the *American Idol* Contest.

1197.  After awarding each Plaintiff a Golden Ticket to Hollywood, ENTERPRISE-DEFENDANTS presented each Plaintiff with a non-negotiable consumer contract representing on its face that the *American Idol* Contest was a *bona fide* contest under federal law that was in compliance with, or otherwise did not run afoul of 47 U.S.C. § 509.

1198.  At the time of execution of the *American Idol* CONTESTANT AGREEMENT with each of the named Plaintiffs, ENTERPRISE-DEFENDANTS knew that the *American Idol* Production was <u>not</u> a *bona fide* contest and knew that ENTERPRISE-DEFENDANTS would intentionally deceive the Contestants into believing they were participating in a *bona fide* contest.

1199.  At all times relevant hereto, ENTERPRISE-DEFENDANTS represented to the public that, subsequent to the selection of the Semi-Finalists, a Contestant's advancement through the Contest is determined solely by popular audience vote tabulated by ENTERPRISE-DEFENDANTS through a system of phone call logs, text messages and/or votes lodged on the internet ostensibly designed to ultimately determine the outcome of the contest.

1200.  At times relevant to this action, ENTERPRISE-DEFENDANTS, acting jointly and severally and with knowledge aforethought, intended to deceive the television viewing audience for *American Idol* through artifice directed at the outcome of the *American Idol* Contest.

1201.  ENTERPRISE-DEFENDANTS' purported to reserve unfettered contractual rights to disqualify *American Idol* Contestants - including any Semi-Finalists or Finalists who were purportedly subject to the public voting system - for any reason or at any time.   Such reservation of rights, on its face, vitiates the purpose of conducting a *bona fide* contest because if taken literally, the language squarely permits the ENTERPRISE-DEFENDANTS to change and/or control the outcome of the Contest during any season in which a contest disqualification is made.

1202.  At times relevant to this action, ENTERPRISE-DEFENDANTS utilized its absolute, unfettered right to carry out public disqualifications of top-ranking Black *American Idol* Contestants in a manner that necessarily affected the outcome of the Contest and/or a portion of the outcome of the Contest.

1203.  For example, the ENTERPRISE-DEFENDANTS' unfettered decisions to disqualify Frenchie Davis, a popular Semi-Finalist Contestant and Plaintiff CLARK, a Top 10 Finalist, clearly impacted the outcome of the Season Two winner.   Such arbitrary decisions are particularly suspect given that Expert Judge Simon Cowell predicted that both DAVIS and CLARK had a strong chance (1 out of 4) of winning Season Two of the *American Idol* Contest. ENTERPRISE-DEFENDANTS only decided to disqualify DAVIS and CLARK after Cowell made his predictions.

1204.  Given that both Frenchie DAVIS and Plaintiff CLARK were disqualified without any legal justification, as alleged herein, then such Season Two disqualifications constituted acts of deception on the part of ENTERPRISE-DEFENDANTS intended to limit the television audiences'

selection of the ultimate purported winner (Ruben Studdard).

1205. Because ENTERPRISE-DEFENDANTS have failed to demonstrate a legitimate rationale for disqualifying any of the Plaintiffs named herein, then each decision on ENTERPRISE-DEFENDANTS' part to extricate Plaintiffs from the *American Idol* Contest necessarily tainted the outcome of the Contest during the season in which such disqualification was made.

1206. ENTERPRISE-DEFENDANTS' unfettered decision to disqualify Plaintiff ANDREWS, CLARK SMALLEY WILLIAMS T. BRITTENUM D. BRITTENUM DANIELS WATSON JOYNER, GOLIGHTLY without legal justification necessarily affected the outcome of the Contest and/or a portion of the outcome of the Contest in violation of Section 509.

1207. Conversely, ENTERPRISE-DEFENDANTS' decision to refrain from disqualifying the identified White Comparators for their criminal arrest and conviction records impacted the contest's outcome in the year in which such White Comparator(s) were selected by ENTERPRISE-DEFENDANTS to advance.[19]

1208. ENTERPRISE-DEFENDANTS' unfettered decision to refrain from disqualifying Scott SAVOL, Bo BICE, Bucky COVINGTON, Taylor HICKS, Stefano LANGONE, Casey JAMES, Matt LAWRENCE, and Amanda OVERMYER on the same terms and conditions as the named Plaintiffs necessarily affected the outcome of the Contest and/or a portion of the outcome of the Contest in violation of Section 509.

1209. ENTERPRISE-DEFENDANTS' discriminatory policy of utilizing the private background information of Black *American Idol* Contestants as a means to decide which Semi-Finalist or Finalists would advance through the Contest (as opposed to utilizing the purported voting system) violates subdivision three of Section 509 as a scheme directed at predetermining

---

some portion of the outcome.[20]

1210.   ENTERPRISE-DEFENDANTS' claim that contest disqualifications or eliminations depicted on the *American Idol* Contest were a function of "casting" for a Reality TV show rather than a function of conducting a *bona fide* contest evidences ENTERPRISE-DEFENDANTS' knowing violation of Section 509.

1211.   Given: (a) the absolute secrecy and lack of accountability or means to verify results generated by the "Public Voting System" propagated by  ENTERPRISE-DEFENDANTS; (b) ENTERPRISE-DEFENDANTS' purported contractual reservation of unfettered discretion to advance or disqualify any Contestants at will during any stage of the contest; and (c) experiential data that the Public Voting System is NOT used to determine the outcome of the Contest, it is beyond plausible that representations of the ENTERPRISE-DEFENDANTS to U.S. consumers concerning the function and utility of the Public Voting System are not based in objective fact.

## D.    FALSE ADVERTISING re: CONTEST [47 C.F.R. § 73.1216]

1212.   Pursuant to regulations promulgated by the Federal Communications Commission (FCC), contests that are conducted by broadcast stations such as Defendant FOX are proscribed by statute.

1213.   Section 73.1216, entitled "Licensee-conducted contests" provides in full:

**A licensee that broadcasts or advertises information about a contest it conducts shall fully and accurately disclose the material terms of the contest, and shall conduct the contest substantially as announced or advertised. No contest description shall be false, misleading or deceptive with respect to any material term.**

---

[20] Id. at 171 ("Section 509 does not require that a scheme (or assistance) designate the winner or final outcome; the statute only requires it to impact an, aspect of the outcome. Altering an elimination (thus altering the fates of two individuals) or immunizing a competitor until the finals, changes an aspect of the outcome."

**Note     1:**     For     the     purposes     of     this     rule:

**(a)   A contest is a scheme in which a prize is offered or awarded, based upon chance, diligence, knowledge or skill, to members of the public.**

**(b) Material terms include those factors which define the operation of the contest and which affect participation therein. Although the material terms may vary widely depending upon the exact nature of the contest, they will generally include: how to enter or participate; eligibility restrictions; entry deadline dates; whether prizes can be won; when prizes can be won; the extent, nature and value of prizes; basis for valuation of prizes; time and means of selection of winners; and/or tie-breaking procedures.**

**Note 2:**

**In general, the time and manner of disclosure of the material terms of a contestare within the licensee's discretion. However, the obligation to disclose the material terms arises at the time the audience is first told how to enter or participate and continues thereafter. The material terms should be disclosed periodically by announcements broadcast on the station conducting the contest, but need not be enumerated each time an announcement promoting the contest is broadcast. Disclosure of material terms in a reasonable number of announcements is sufficient. In addition to the required broadcast announcements, disclosure of the material terms may     be     made     in     a     non-broadcast     manner.**

**Note3:**

**This rule is not applicable to licensee-conducted contests not broadcast or advertised to the general public or to a substantial segment thereof, to contests in which the general public is not requested or permitted to participate, to the commercial advertisement of non-licensee-conducted contests, or to a contest conducted by a non-broadcast division of the licensee or by a non-broadcast company related to the licensee.**

1214.   Television broadcast stations operating in the United States, including NETWORK-DEFENDANTS, are subject to Part 73 of Title 47.

1215.   FCC Regulation 73.1216 is applicable to the purported *bona fide* contest depicted via the *American Idol* Production because the Contest is advertised to the general public as a "contest" and "competition" featuring "contestants," "judges" and "winners."

237

1216.  DEFENDANTS solicit participants from the general public to compete in the Contest and offer an opportunity for contest entrants to win a valuable prize.  This offer is extended to any member of the general public who meets certain age and residency requirements.

1217.  The purported *bona fide* contest depicted on the *American Idol* Production is (or markets itself to U.S. consumers as) a "contest" within the meaning of Note 1(a) of FCC Regulation 73.1216 because it represents "a scheme in which a prize is offered or awarded, based upon chance, diligence, knowledge or skill, to members of the public."

1218.  At all times relevant to this proceeding, NETWORK-DEFENDANTS, acting jointly and severally with the other ENTERPRISE-DEFENDANTS, have conducted the purported *American Idol* Contest subject to the proscriptions of FCC Regulation 73.1216.

1219.  The Commission's own interpretation of FCC Regulation 73.12.16 mandates that FCC broadcast licensees must award the contest prizes that are announced to the general public.[21]

1220.  ENTERPRISE-DEFENDANTS' repeated, continuing violations of FCC Regulation 73.1216 constitute further grounds to vitiate the *American Idol* CONTESTANT AGREEMENT on the basis of illegality.

1221.  ENTERPRISE-DEFENDANTS have willfully and repeatedly violated Section 73.1216 of the Commission's rules by broadcasting information about a contest without fully and accurately disclosing all of its material terms, i.e., those factors which define the operation of the contest and which affect a contestant's participation therein.

1222.  Note 2 of FCC Regulation 73.1216 provides that **"the obligation to disclose the material terms [of the contest] arises *at the time* the audience is first told how to enter or**

---

[21] 50 Fed. Reg. 19229, ¶¶ 50-51 (May 7, 1985) (FCC Memorandum Opinion and Order).

participate and continues thereafter."

1223.  Therefore, consistent with Note 2 of FCC Regulation 73.1216, all material terms of the contest, i.e., "those factors which define the operation of the contest and which affect participation therein", <u>must</u> be disclosed to *American Idol* Contestants at the <u>Open Auditions</u> phase BEFORE auditioning for a Golden Ticket to Hollywood.

1224.  At all times relevant hereto, ENTERPRISE-DEFENDANTS violated FCC Regulation 73.1216 by:

    **a.**  failing to disclose the extent, nature and value of prizes awarded to *American Idol* Contest winners;

    **b.**  failing to disclose the basis for valuing prizes awarded to the *American Idol* winner;

    **c.**  failing to disclose to the general public information concerning the actual criteria utilized to select or advance the winners of the *American Idol* Contest;

    **d.**  failing to disclose to the general public the eligibility requirements to compete on *American Idol* with respect to criminal arrest or criminal conviction history;

    **e.**  failing to disclose contest rules or guidelines governing disqualifications.

1225.  With respect to each of the named Plaintiffs herein, ENTERPRISE-DEFENDANTS failed to disclose **all material terms of the contest**, i.e., "those factors which define the operation of the contest and which affect participation therein" at the time of their respective Open Auditions.

1226.  ENTERPRISE-DEFENDANTS' failure to provide each Plaintiff with the following documents, among others, either before or at the time of contest entry (i.e., at the time of their respective Open Auditions) constituted a direct violation of FCC Regulation 73.1216:

    (a)        AMERICAN IDOL CONTESTANT AGREEMENT

    (b)        ADDENDUM #1 TO THE AMERICAN IDOL CONTESTANT AGREEMENT

    (c)        ADDENDUM #2 TO THE AMERICAN IDOL CONTESTANT AGREEMENT

    (d)        PARTICIPANT BACKGROUND QUESTIONNAIRE

    (e)        19 ENTERTAINMENT PRIZE CONTRACTS

    (f)        EMPLOYMENT AGREEMENT

    (g)        AFTRA MEMBERSHIP FORMS

## E.    UNLAWFUL RELEASE [Cal. Civ. Code § 1668]

1227.    Section 1668 of the California Civil Code provides that:

> **All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.[22]**

1228.    Under California law, "contractual releases of future liability for fraud and other intentional wrongs are invariably invalidated."[23]

1229.    Pursuant to the express terms of the *American Idol* CONTESTANT AGREEMENT, the contract states that claims may be released based on information "whether now known or unknown, suspected or unsuspected, and whether or not concealed or hidden."  The contract further states that:

> **"The Released Claims shall include, but not be limited to, those based on … breach of any statutory or other duty of care owed under applicable laws, defamation, invasion of privacy, publicity or personality, infringement of copyright, and those based on my possession or use of any prize." [Section E.3]**

---

[22] Cal. Civ.Code § 1668 (West 1999).

[23] McQuirck vs. Donnelley, 189 F.3rd 793, 797 (9th Cir.1999) (holding that §1668 invalidates the total release of future liability for intentional wrongs); citing *Farnham*, 70 Cal.Rptr.2d at 86.

1230.   Accordingly, Section 1668 applies to matters concerning the enforceability of the *American Idol* CONTESTANT AGREEMENT.

> **This Agreement and all matters or issues collateral thereto shall be governed by the laws of the State of California applicable to contracts executed and performed entirely therein (regardless of the actual place of performance).  [AICA, v.2, ¶ G.8; CDC_000202]**

1231.   The purported releases contained in the *American Idol* CONTESTANT AGREEMENT violate Section 1668 of the California Civil Code by attempting to shield ENTERPRISE-DEFENDANTS from liability for committing intentional torts.

1232.   Under California law, substantive claims for defamation, interference with business expectancy, outrage, and intentional infliction of emotional distress all constitute intentional wrongs.[24]

1233.   At all relevant times, under the express terms of the *American Idol* CONTESTANT AGREEMENT, ENTERPRISE-DEFENDANTS purported to secure the absolute and unfettered right to commit intentional tortious acts against any of the Plaintiffs at any time, for any reason or no reason at all.

1234.   Upon information and belief, the *American Idol* CONTESTANT AGREEMENT utilized by ENTERPRISE-DEFENDANTS in Season Three, Season Five, Season Six, and Season Seven are identical or substantially identical to the language employed in *American Idol* CONTESTANT AGREEMENT for Season Two, Season Eight and Season Nine.

1235.   Public-DQ-Plaintiffs were permanently defamed and vilified by the OVERSEER-DEFENDANTS in connection with the Overseers' unilateral decision to cast them as "criminals"

---

[24] See e.g., Miller v. National Broad. Co., 187 Cal.App.3d 1463, 232 Cal.Rptr. 668, 681 (Ct.App.1986) (intentional infliction of emotional distress); Ramona Manor Convalescent Hosp. v. Care Enters.,177 Cal.App.3d 1120, 225 Cal.Rptr. 120, 124 (Ct.App.1986) (intentional interference with prospective economic advantage); 5 B.E. Witkin, SUMMARY OF CALIF. LAW, Torts, § 471, at 558 (9th ed.1988) (defamation).

and "liars" as a means to propagate their own racial *animus*.

1236.  Public-DQ-Plaintiffs signed up for *American Idol* Contest during its "Golden Years" to further their music careers and to WIN the valuable prizes as advertised.  They were not there on the world stage, in front of friends and family who cared about their hopes and dreams, to become commercial advertisements for the OVERSEER-DEFENDANTS' medieval concepts about racial hierarchy.

1237.  CRI-Plaintiffs' criminal arrest history was unlawfully obtained by ENTERPRISE-DEFENDANTS through federal and state-regulated background checks.  It was not within the reasonable expectations of the CRI-Plaintiffs at the time of entering the contest that their (largely) misdemeanor charges would become lifetime badges of criminality and dishonor, not only to themselves, but to their families and children.[25]

## F.   ILLUSORY CONTRACT (Common Law)

1238.  *American Idol* CONTESTANT AGREEMENT is or purports to be a <u>bilateral</u> contract.

1239.  Under the terms of the *American Idol* CONTESTANT AGREEMENT, Plaintiffs were and/or continue to be bound to perform talent services on behalf of ENTERPRISE-DEFENDANTS and/or grant ownership rights to ENTERPRISE-DEFENDANTS.

1240.  Under the express terms of the *American Idol* CONTESTANT AGREEMENT, Plaintiffs irrevocably granted their valuable rights of publicity and copyright ownership interests to ENTERPRISE-DEFENDANTS, among other proprietary and intellectual property rights.

1241.  ENTERPRISE-DEFENDANTS continue to exercise dominion and control over the proprietary rights and copyright ownership interests purportedly granted to ENTERPRISE-

---

[25] Compare <u>Paralift, Inc. v. Superior Court</u>, 29 Cal.Rptr.2d 177, 23 Cal.App.4th 748 (App. 4 Dist. 1993) (contractual release was sufficiently broad that nature of jump which resulted in skydiver's death was within reasonable expectations of parties).

DEFENDANTS by virtue of the *American Idol* CONTESTANT AGREEMENT.

1242.  Under the express terms of the *American Idol* CONTESTANT AGREEMENT, ENTERPRISE-DEFENDANTS did NOT make any kind of commitment to perform any obligation or duty.

1243.  ENTERPRISE-DEFENDANTS did NOT set forth any promises in the *American Idol* CONTESTANT AGREEMENT which, at the time the document was executed, would have actually come to limit ENTERPRISE-DEFENDANTS' future options.

1244.  Upon its execution, *American Idol* CONTESTANT AGREEMENT did not restrain ENTERPRISE-DEFENDANTS to act in any manner other than consistent with its own unfettered discretion.

1245.  Upon its execution*, American Idol* CONTESTANT AGREEMENT did not compel ENTERPRISE-DEFENDANTS to act in any manner other than in their own best interests.

1246.  Under the express terms of the *American Idol* CONTESTANT AGREEMENT ENTERPRISE-DEFENDANTS can do anything they want or absolutely nothing at all vis-à-vis any of the Plaintiffs.  For example:

> **Producer's Right to Suspend or Terminate this Agreement**.  *Producer shall have the right to terminate this Agreement if Producer determines, in Producer's sole and absolute discretion*, that Producer desires to terminate my participation in connection with the Series, or if the series is canceled or the Series format is materially altered." [AICA_02, ¶ G.1 Pg. 12]

1247.  ENTERPRISE-DEFENDANTS are NOT bound to perform any promise set forth in the *American Idol* CONTESTANT AGREEMENT.

1248.  ENTERPRISE-DEFENDANTS were NEVER bound to perform any promise set forth in *American Idol* CONTESTANT AGREEMENT above and beyond what they had already promised when each Plaintiff was awarded a Golden Ticket to Hollywood.

1249.  At all relevant times, under the express terms of the *American Idol* CONTESTANT AGREEMENT, ENTERPRISE-DEFENDANTS purported to secure the absolute and unfettered right to terminate the *American Idol* CONTESTANT AGREEMENT at any time, for any reason or no reason at all.

1250.  Under the express terms of the *American Idol* CONTESTANT AGREEMENT, ENTERPRISE-DEFENDANTS are not required to provide Plaintiffs any notice in the event they decide to terminate the *American Idol* CONTESTANT AGREEMENT.

## G.    LEGAL DUTY RULE (Common Law)

1251.  Under the terms of the *American Idol* CONTESTANT AGREEMENT, at the time of the signing of the contract, the ENTERPRISE-DEFENDANTS purport to promise to do what ENTERPRISE-DEFENDANTS were already legally obligated to do, namely, to adjudge each Plaintiff on the basis of their performance merit for advancement through the *American Idol* Contest, and in furtherance of their representations that *American Idol* was a *bona fide* contest for a valuable prize where the outcome would be determined by a Voting Public.

1252.  *The American Idol* CONTESTANT AGREEMENT, pursuant to its own express terms, does not require ENTERPRISE-DEFENDANTS to perform any new duty or obligation whatsoever above and beyond permitting Plaintiff to remain in the contest (which was a contest they were already deemed qualified to enter).

## H.    FRAUD IN FACTUM (Common Law)

1253.  By entering the *American Idol* Contest upon the solicitation of the ENTERPRISE-DEFENDANTS, Plaintiffs received something very different from what they contracted for.  As young adults and talented singers who had received encouragement throughout their young lives

to pursue their careers in music, *American Idol* (at the times relevant to this action) represented a new kind of opportunity in the music industry to achieve success with a measure of career longevity.

1254.   Plaintiffs believed that they were entering the Contest to further their careers in music, and the best way of doing that, naturally, was to enter the Contest with an intention to WIN.

1255.   Had Plaintiffs known the true facts characterizing the *American Idol* Contest depicted on television, which was (and continues to be) advertised as a *bona fide* contest in fact and at law but, which in actuality, operates as a scripted "casting" where the character roles and winners are ultimately determined by the OVERSEER-DEFENDANTS, Plaintiffs would NEVER have accepted the solicitation to enter into the *American Idol* Contest.

1256.   Had Plaintiffs known the true facts characterizing the bad faith undertaking of the OVERSEER-DEFENDANTS in conducting what amounts to a colossal hoax, Plaintiffs would NEVER have accepted the solicitation to enter into the *American Idol* Contest.

1257.   Had CRI-Plaintiffs known the true facts characterizing the unlawful use and dissemination of their criminal arrest history, CRI-Plaintiffs NEVER would have accepted the solicitation to enter into the *American Idol* Contest.

1258.   Plaintiffs received something entirely different than what they bargained for.

1259.   In the popular vernacular of the MTV generation, Plaintiffs "got Punked." But there was never any punchline or comic relief that enabled them to walk away from their nightmare situation.  In the age of the ubiquitous internet and the Courts' majority adoption of the highly unjust "single publication" rule, there is nowhere to run and nowhere to hide.

1260.   For the Public-DQ-Plaintiffs, the "Idol Experience" follows them everywhere:

within five seconds any prospective employer or new acquaintance can punch up their misdemeanor mug shots, some now dating over ten years. Anyone at any moment can read all about their unceremonious discharge and the false justifications proffered by the Overseer-Defendants in furtherance of their invidious racial *animus*.

1261.  Plaintiffs were misled into signing the *American Idol* Contestant Agreement without knowing or understanding its nature, contents or consequences. Defendants' misrepresentations concerning the *American Idol* Contest as a *bona fide* contest for a valuable prize, which was by its own contractual terms subject to federal regulation and criminal statutory law, must be regarded as going to the very character of the proposed contract itself.  E.A. Farnsworth, *Contracts*§ 4.10 (1990).  If this talent show was simply meant to be a "casting" for scripted roles and predetermined storylines that were obviously NOT disclosed to any of the Plaintiffs, then the contest promoter /sponsors needed to disclose that fact to avoid rescission.

1262.   None of the Plaintiffs had a reasonable opportunity to be informed of what exactly they were signing.  <u>First</u>, the "Reality TV Contest" was a new, untested paradigm. <u>Second</u>, the drafters of this agreement knew that the "Reality TV Contest" was a new, untested paradigm and leveraged that experimental quality to engage in psychedelic drafting techniques.

1263.  The *American Idol* Contestant Agreement carries on the theme of the "Golden Ticket" and the ominous, illegible contract presented to the children at the gateway of the "Willy Wonka" chocolate factory.  Like the fantasical depiction of the visually warped contractual language in the famed 1971 movie, the *American Idol* Contestant Agreement strains all levels of comprehension for those who have endeavored to decipher its labyrinth of conflicting provisions.[26]

---

[26] **"Don't talk to me about contracts, Wonka; I use 'em myself -- they're strictly for suckers."** - Mr.

1264.   Reality TV producers dealt with business on a regular basis as the owner of the production company. Plaintiffs, in contrast, were teenagers or early twenty-somethings who did not regularly conduct business in the world of Reality TV contests, nor would ordinarily be involved in interpreting and signing contracts that conflates the various rights and obligations exchanged by grantors of rights, "volunteer" contestants and employees.

1265.   As a result of DEFENDANTS' misrepresentation of the character and essential terms of the *American Idol* CONTESTANT AGREEMENT, assent to the contract is impossible.  In such a case there is no contract at all.  RESTATEMENT (SECOND) OF CONTRACTS § 163, comment a (1977).

1266.   Because Plaintiffs were induced to sign an instrument of a completely different nature and/or essential character than what each Plaintiff was led to believe was before him, there was no meeting of the minds to render the contract enforceable.

1267.   ENTERPRISE-DEFENDANTS have at all times failed to inform Plaintiffs of the true nature of the Contest, which is a scripted "casting", nor did they ever disclose the essential terms of the purported talent contest, the valuable prize to be awarded for being adjudicated or voted winner.  Further, they intentionally concealed the Plaintiffs' legal employment status under law, among other critical failures of required disclosures.

1268.   ENTERPRISE-DEFENDANTS' intentional concealment of the basic elements of the Transaction were of such core, fundamental importance that the fraud rendered as an *involuntary* act each Plaintiff's forfeiture of their valuable property and inalienable rights – on a permanent worldwide basis - to the great detriment of the Plaintiffs and to the beneficial gains of the ENTERPRISE-DEFENDANTS.

---

Beauregarde, Violet's car salesman father [*Willy Wonka & the Chocolate Factory* (1971)]

1269.   As a direct result of the Defendants' misrepresentations about the bona fide nature of their commercially advertised "contest," the *American Idol* CONTESTANT AGREEMENT (and all Addendums thereto) must be struck down as void *ab initio* under the common law theory of fraud in the factum.

1270.   The formation, object, nature, character and function of the *American Idol* CONTESTANT AGREEMENT  is so iniquitous, against the Law of the Land and contrary to public policy that, in the furtherance of justice the Honorable Court should strike it down in its entirety as VOID *AB INITIO*.

# COUNT VI

## UNJUST ENRICHMENT / RESTITUTION / CONSTRUCTIVE TRUST

1271.    PLAINTIFFS in their individual capacity and on behalf of the prospective Class Members repeat and re-allege each and every allegation above as if set forth herein.

1272.   Plaintiffs were possessed of a reasonable expectation at the time they entered DEFENDANTS' advertised singing contest that they would be afforded the fair and equal opportunity to compete for a valuable prize of monetary value.

1273.   Plaintiffs were possessed of a reasonable expectation at the time they entered DEFENDANTS' advertised singing contest that their talent as singers and performers would be evaluated by the Judges and appraised by the Public based on their individual merit as singers and performers.

1274.   Through their wrongful, public and private disqualifications from the *American Idol* contest for reasons other than their individual merit as singers and performers, DEFENDANTS deprived Plaintiffs of their reasonable expectations.

1275.   With respect to each of Plaintiffs, it was reasonably foreseeable to DEFENDANTS, as third party beneficiaries and contest sponsors, at the time each Plaintiff was disqualified from the contest for reasons other than their individual talent that each Plaintiff was possessed of a high statistical probability of winning the #1 prize in the *American Idol* televised contest.

1276.   It would be contrary to equity and good conscience for the SPONSOR-DEFENDANTS to retain an economic benefit which has accrued to them at the expense of Plaintiffs.

1277.   DEFENDANTS were each individually listed as third-party beneficiaries to the *American Idol* Contestant Agreement and otherwise actively participated in the promotion, sponsorship and commercial exploitation of the *American Idol* Production featuring each of Plaintiffs.

1278.   DEFENDANTS benefitted from the commercial exploitation of Plaintiffs' respective talent services, voices, names, images, identities and likenesses, as well as from commercial exploitation of Public-DQ-Plaintiffs' respective disqualifications and surrounding media scandals;

1279.   DEFENDANTS unjustly failed to compensate Plaintiffs for the valuable economic benefits the SPONSOR-DEFENDANTS received as a result of Plaintiffs' participation in the Production.

1280.   The failure of the DEFENDANTS to compensate Plaintiffs for the valuable economic benefits the DEFENDANTS received as a result of Plaintiffs' participation in the *American Idol* Contest and Production was to the Plaintiffs' detriment.

# COUNT VII

## TITLE VII – EMPLOYMENT DISCRIMINATION

1281.   PLAINTIFFS in their individual capacity and on behalf of the prospective Class Members repeat and re-allege each and every allegation above as if set forth herein.

1282.   Each Plaintiff, save SMALLEY, has received a Right to Sue letter from the EEOC.

1283.   The written question on DEFENDANTS' Background Check forms which asks Contestants to disclose criminal arrest information is statutorily proscribed by California Labor Code section 432.7 and causes a disparate impact on Black *American Idol* Contestants in relation to White *American Idol* Contestants.

1284.   DEFENDANTS' inclusion of the statutorily proscribed question during the "Contestant Vetting" process caused harm to PLAINTIFFS and to prospective Class Members in disproportionate numbers than it did to White *American Idols* Contestants similarly situated.

# PRAYER FOR RELIEF

## COUNT I: 42 U.S.C. § 1981 (Employment Contracts)

◆ Plaintiffs respectfully seek **injunctive relief** from the Honorable Court to remedy the past employment practices of DEFENDANTS and to prevent such unlawful practices from continuing into the future:

(1) prohibiting the DEFENDANTS from engaging in any act or practice that has the purpose or effect of ascribing the "criminal" label to an African-American television performer featured in what purports to be an "unscripted" Reality TV show;

(2) requiring DEFENDANTS to adopt and publish clearly worded contest rules and regulations (i.e., that an ordinary high school student could understand) which govern a contestant's participation in *American Idol*, or any Reality TV show program distributed in the United States that features a purported *bona fide* contest for a prize.

(3) requiring that DEFENDANTS make their disqualification or elimination decisions about *bona fide* contestants without regard to the contestant's ancestral characteristics;

(4) requiring that DEFENDANTS utilize an objective, job-related and racially-neutral standard to make disqualification decisions about *any* television contestant featured on Defendants' programs;

(5) prohibiting the DEFENDANTS from taking adverse action against any Reality TV contestant on the basis of a *pending* criminal arrest without proper business justification and not before a formal investigation is conducted by a third party investigator who shall be required to memorialize the investigative results and recommendations in a sworn affidavit;

(6) prohibiting the DEFENDANTS from *publicly* disqualifying or purposefully denigrating a Black *American Idol* contestant on the basis of their:

    (a)    criminal arrest history (whether pending or resolved);
    (b)    background check  / interview process;

(7) requiring each of the PRODUCTION-DEFENDANTS and NETWORK-DEFENDANTS to retain a director of diversity management who would be principally responsible to ensure that the PRODUCTION-DEFENDANTS and NETWORK-DEFENDANTS comply with the terms of the injunction, and the hiring of whom would be subject to comment by the Plaintiffs and Court approval;

◆ As a direct and/or proximate cause of DEFENDANTS' unlawful interference with Plaintiff making of an employment contract, Plaintiffs seek **compensatory damages** for their economic injuries, lost business opportunity and/or loss of earning potential caused by

DEFENDANTS, who intentionally interfered with each Plaintiffs' making and enforcing of his employment contractual rights and who should be held jointly and severally liable to compensate each Plaintiff in an amount to be determined at trial, plus costs, interest and a reasonable attorney's fee.

**COUNT II**: 42 U.S.C. § 1981 (Prize Contracts)

◆ As a direct and/or proximate cause of DEFENDANTS' unlawful interference with Plaintiff's active participation in a purported *bona fide* contest for valuable prize, Plaintiffs seek **compensatory damages** for their economic injuries, lost business opportunity and/or loss of earning potential caused by DEFENDANTS, who intentionally interfered with each Plaintiffs' making and enforcing of his contractual rights and/or quasi-contractual / promissory interests, and who should be held jointly and severally liable to compensate each Plaintiff in an amount to be determined at trial, but estimated to be no less than $25 million ($25,000,000) per Plaintiff plus costs, interest and a reasonable attorney's fee.

**COUNT III**:  42 U.S.C. § 1981 (Quasi-Contracts / Constructive Trust)

◆ [Equivalent Relief as <u>Count V</u>]

**COUNT IV**:  42 U.S.C. § 1985(3) (Deprivation of Constitutional Rights)

◆ As a direct and/or proximate result of OVERSEER-DEFENDANTS' intentional deprivation of rights, privileges and benefits granted to a protected class of U.S. citizen by the Thirteenth and Fourteenth Amendments to the U.S. Constitution, named Plaintiffs in this Count have been irrevocably damaged by the extreme misconduct of OVERSEER-DEFENDANTS and are therefore entitled to recover an amount of compensatory, general and punitive damages, in an amount to be determined at trial of their peers, plus costs, interests and a reasonable attorney's fees.

**COUNT V**:  RESCISSION (Various Grounds)

◆ Each Plaintiff seeks a complete **revocation** and undivided **restoration** of any and all grant(s) of ownership rights, proprietary interests, publicity rights, credit attributions and intellectual property licenses or materials that DEFENDANTS purported to acquire, claim to possess and/or may attempt to obtain from each Plaintiff pursuant to the *American Idol* CONTESTANT AGREEMENT (as amended), or any other document or purported agreement related to the subject transaction.

◆ Each Plaintiff seeks a **declaration** of his federal copyright ownership (or joint ownership) interest pursuant to the U.S. Copyright Act of 1976 in all "audiovisual works" or "motion pictures" – whether in tangible or digital "media" now known or hereafter devised - embodying each Plaintiff's name, voice, image, likeness, performances, personal identity, appearances and/or original works relating to his filmed participation on *American Idol*, regardless of whether such footage was published or broadcast.

◆ In furtherance of a declaration of federal copyright ownership and/or revocation of a grant of rights to such ownership, Plaintiff seeks **specific performance** as to any and all audio-visual,

motion picture, photographic, graphic and written promotional materials, as fixed in digital format, that are currently in possession, custody or control of any of the named Defendants in this action, and which contain or embody any and ALL of each Plaintiff's filmed performances or which otherwise feature his voice, image, likeness, personal identity, or appearances, whether on-stage, back stage or in any area whatsoever where he may appear at any time during his participation with the *American Idol* Production and Contest.

◆ Plaintiff seeks **restitutionary disgorgement** of any and all profits generated by DEFENDANTS, jointly and severally, from the unauthorized commercial exploitation of each Plaintiff's respective copyright ownership interests and publicity rights, which were obtained by *Defendants* under fraudulent pretenses and in bad faith, in an amount to be determined at trial plus an award of general damages, punitive damages, interest, costs, and a reasonable attorney's fee.

**COUNT VI: UNJUST ENRICHMENT / RESTITUTION / CONSTRUCTIVE TRUST**

As third party beneficiaries, contractual assignees of Plaintiffs' valuable rights, and on account of their active, decision-making role as "marquee" contest sponsors of the *American Idol* Contest, the DEFENDANTS must compensate Plaintiffs for the valuable economic benefits the DEFENDANTS received as a direct or proximate result of Plaintiffs' participation in the *American Idol* Contest and Production.

**COUNT VII:  TITLE VII – CIVIL RIGHTS ACT (Title VII)**

◆ As the Rule of Law and Equity require and in the furtherance of justice.

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby respectfully demands a trial by jury of all issues triable of right by a jury.

Dated: November 11, 2013
New York, New York

**RESPECTFULLY SUBMITTED**

*James H. Freeman*

James H. Freeman, Esq.

JH FREEMAN LAW
3 Columbus Circle, 15 FL
New York, NY 10019

Telephone: (212) 931-8535
james@jhfreemanlaw.com

*Attorneys for Plaintiffs*
*Jaered N. Andrews, Corey D. Clark,*
*Donnie Williams, Terrell Brittenum,*
*Derrell Brittenum, Akron Watson,*
*Thomas Daniels, Ju'Not Joyner*
*Chris Golightly, Jacob John Smalley*