**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JAERED N. ANDREWS,
COREY D. CLARK,
JACOB JOHN SMALLEY,
DONNIE WILLIAMS,
TERRELL BRITTENUM,
DERRELL BRITTENUM,
THOMAS DANIELS,
AKRON WATSON,
JU'NOT JOYNER,
CHRIS GOLIGHTLY

                  Plaintiffs,

       vs.

FREMANTLEMEDIA N.A., INC.,
AMERICAN IDOL PRODUCTIONS, INC.,
19 ENTERTAINMENT LTD.
CORE MEDIA GROUP, INC.
21St CENTURY FOX, INC.
FOX BROADCASTING COMPANY, INC.
NIGEL LYTHGOE, KEN WARWICK
FORD MOTOR COMPANY, INC.,
COCA-COLA COMPANY, INC.,
AT&T

                  Defendants.

Case No. 13-CV-5174 (NRB)

**DEMAND FOR**
**TRIAL BY JURY**

**ECF CASE**

RECEIVED
FEB 19 2014
U.S.D.C. S.D.N.Y.
CASHIERS

---

## THIRD AMENDED COMPLAINT

**COMES NOW** the Plaintiffs, African-American citizens of the United States of America,

JAERED N. ANDREWS, an individual citizen of the State of Ohio, COREY D. CLARK, an

individual citizen of the State of Tennessee, JACOB JOHN SMALLEY, an individual citizen of

the State of Oklahoma, DONNIE WILLIAMS, an individual citizen of the State of Florida,

TERRELL BRITTENUM, an individual citizen of the State of New York, DERRELL

BRITTENUM, an individual citizen of the State of New York, THOMAS DANIELS, an individual citizen of the State of Oregon, AKRON WATSON, an individual citizen of the State of Texas, JU'NOT JOYNER, an individual citizen of the State of Maryland, and CHRIS GOLIGHTLY, an individual citizen of the State of California (collectively the "Plaintiffs" or "Black American Idols") by and through their counsel, James H. Freeman, Esq. JH FREEMAN LAW, 3 Columbus Circle, Floor 15, New York, NY 10019; and Matthew Scott Martin, Esq., LAW OFFICE OF MATTHEW SCOTT MARTIN, LLC, 503 N. Main Street, Suite 528, Pueblo, Colorado 81003,  to state their causes of action at law and in equity as against FREMANTLEMEDIA NORTH   AMERICA,   INC.,   AMERICAN   IDOL   PRODUCTIONS,   INC.,   19 ENTERTAINMENT, CORE MEDIA GROUP, INC., NIGEL LYTHGOE, KEN WARWICK, 21ST CENTURY FOX, INC., FOX BROADCASTING COMPANY, INC., FORD MOTOR COMPANY, INC., COCA-COLA COMPANY, INC., and AT&T.

# TABLE OF
# DEFENDANT DESIGNATIONS

**"PRODUCER-DEFENDANTS"**

- FREMANTLE MEDIA NORTHAMERICA, INC., AMERICAN IDOL PRODUCTIONS, INC., 19 ENTERTAINMENT, CORE MEDIA GROUP, INC.

**"NETWORK-DEFENDANTS"**

- 21 CENTURY FOX, INC., FOX BROADCASTING COMPANY, INC.

**"OVERSEER-DEFENDANTS"**

- NIGEL LYTHGOE, KEN WARWICK

**"ENTERPRISE-DEFENDANTS"**

- PRODUCER-DEFENDANTS + NETWORK-DEFENDANTS + OVERSEER-DEFENDANTS

**"SPONSOR-DEFENDANTS"**

- FORD MOTOR COMPANY, INC. + COCA-COLA + AT&T

**"JOINT VENTURE-DEFENDANTS"**

- PRODUCER-DEFENDANTS + NETWORK-DEFENDANTS + SPONSOR-DEFENDANTS

**"EMPLOYER-DEFENDANTS"**

- PRODUCER-DEFENDANTS + NETWORK-DEFENDANTS

# TABLE OF CONTENTS

JURISDICTION AND VENUE ........................................................................................ 13
    PERSONAL JURISDICTION ..................................................................................... 13
    SUBJECT MATTER JURISDICTION ........................................................................ 13
    VENUE .................................................................................................................. 14

**PARTIES**

PLAINTIFFS ................................................................................................................. 16
    COREY D. CLARK ................................................................................................. 16
    JAERED N. ANDREWS ........................................................................................... 16
    JACOB JOHN SMALLEY ......................................................................................... 16
    DONNIE WILLIAMS ............................................................................................... 16
    TERRELL BRITTENUM ........................................................................................... 17
    DERRELL BRITTENUM ........................................................................................... 17
    AKRON WATSON .................................................................................................. 17
    THOMAS DANIELS ................................................................................................ 17
    JU'NOT JOYNER .................................................................................................... 18
    CHRIS GOLIGHTLY ............................................................................................... 18

PRODUCER-DEFENDANTS ........................................................................................ 19
    FREMANTLEMEDIA NORTH AMERICA, INC. ......................................................... 19
    AMERICAN IDOL PRODUCTIONS, INC. ................................................................ 21
    19 ENTERTAINMENT .............................................................................................. 22
    CORE MEDIA GROUP, INC. .................................................................................. 26

NETWORK-DEFENDANTS ........................................................................................ 28
    21ST CENTURY FOX, INC. ..................................................................................... 29
    FOX BROADCASTING COMPANY, INC. ................................................................. 32

OVERSEER-DEFENDANTS ........................................................................................ 34
    NIGEL LYTHGOE ................................................................................................. 35
    KEN WARWICK .................................................................................................... 35

SPONSOR-DEFENDANTS ........................................................................................... 36
    FORD MOTOR COMPANY, INC. ............................................................................ 36
    COCA-COLA COMPANY, INC. .............................................................................. 39
    AT&T .................................................................................................................. 43

**AMERICAN IDOL - KEY TERMINOLOGY**

A.    CONTEST-RELATED TERMS ........................................................................ 48

B.    PRODUCTION SEASONS ............................................................................... 52

C.    "REALITY TV" ............................................................................................. 53

D.    TALENT "CONTEST" ..................................................................................... 53

E.  EXPERT "JUDGES" .................................................................................... 54

F.  CONTEST "PRIZES" .................................................................................. 54

G.  PUBLIC "VOTING" ................................................................................... 55

H.  DISQUALIFICATIONS ............................................................................. 55

## *AMERICAN IDOL* - CONSUMER TRANSACTIONS

A.  "OPEN AUDITION" AGREEMENT ............................................................ 57

B.  "GOLDEN TICKET" TO HOLLYWOOD ..................................................... 57

C.  "*AMERICAN IDOL* CONTESTANT AGREEMENT" .................................. 58
  (1)  PARTIES TO THE CONTESTANT AGREEMENT .............................................. 59
  (2)   PURPOSE OF THE CONTESTANT AGREEMENT ........................................... 60
  (3)  CONTEST RULES ........................................................................................ 61
  (4)  PRIZES ...................................................................................................... 62
  (5)  PRODUCERS' UNFETTERED DISCRETION .................................................... 64
  (6)  FEDERAL CONTEST-RIGGING STATUTE ...................................................... 65
  (7)  RIGHTS OF PUBLICITY / COPYRIGHT / REPUTATION ................................... 65
  (8)   LEGAL STATUS OF CONTESTANT .............................................................. 67

D.  EMPLOYMENT AGREEMENTS ............................................................... 69
  (1)  SEASON TWO ............................................................................................ 69

E.  AFTRA UNION MEMBERSHIP .............................................................. 70
  (1)  SEASON TWO ............................................................................................ 70
  (2)  SEASON EIGHT .......................................................................................... 70

F.  CONTESTANT AGREEMENT ADDENDUM ............................................. 71

G.  *19 ENTERTAINMENT* PRIZE CONTRACTS ........................................... 72

## *AMERICAN IDOL* - BACKGROUND CHECKS

A.  REALITY TV "CONTESTANT VETTING" ................................................ 76
  (1)  NON-UNION PERFORMERS ........................................................................ 76
  (2)  SMOKINGGUN.COM .................................................................................... 77
  (3)  *WHO WANTS TO MARRY A MILLIONAIRE?* [2000] ....................................... 79
  (4)  THIRD-PARTY INVESTIGATORS .................................................................. 80

B.  CARCO GROUP, INC. ............................................................................. 81
  (1)  SERVICES PROVIDED ................................................................................. 81
  (2)  MINUTES FROM THE SEARCH MEETING (JANUARY 2001) ............................. 82
  (3)  CARCO'S LETTER TO THE EEOC (JULY 26, 2011) ...................................... 83

C.  "CONTESTANT VETTING" – SEASON TWO ........................................... 85
  (1)  OPEN AUDITIONS ...................................................................................... 85
  (2)  AMERICAN IDOL CONTESTANT AGREEMENT, V. 2 ...................................... 85
  (3)  AMERICAN IDOL CONTESTANT AGREEMENT, V. 2 ...................................... 86
  (4)  AMERICAN IDOL PARTICIPANT BACKGROUND QUESTIONNAIRE FORM .......... 87
  (5)  PARTICIPANT CERTIFICATION AND FCRA CONSUMER DISCLOSURE .............. 88

**D.  "CONTESTANT VETTING" – SEASON EIGHT** ....................................................................**88**
  (1)  AMERICAN IDOL CONTESTANT AGREEMENT, v.8..........................................................88
  (2)  AMERICAN IDOL PARTICIPANT BACKGROUND FORM, v.8 ...........................................89

**E.  OVERSEER-DEFENDANTS' STATEMENTS** ....................................................................**89**
  (1)  SEASON THREE (February 4, 2004) .........................................................................90
  (2)  SEASON SIX (January 21, 2007) ..............................................................................90
  (3)  SEASON ELEVEN (March 2012) ..............................................................................94

## BLACK *AMERICAN IDOL* DISQUALIFICATIONS

### DELANO COGNOLATTI - SEASON ONE

  (1)  GOLDEN TICKET [OCTOBER 31, 2002] .....................................................................98

### JAERED ANDREWS - SEASON TWO

  (1)  GOLDEN TICKET [OCTOBER 31, 2002] .....................................................................99
  (2)  WITNESS TO A CRIME [NOVEMBER 16, 2002] ...........................................................99
  (3)  BACKGROUND CHECK [DECEMBER 14, 2002] ..........................................................99
  (4)  DISQUALIFICATION [January 31, 2003] ................................................................ 100
  (5)  ARREST [February 27, 2003] ............................................................................... 101

### FRENCHIE DAVIS - SEASON TWO

  (1)  GOLDEN TICKET [OCTOBER 25, 2002] ................................................................... 104
  (2)  DISQUALIFICATION [February 10, 2013] ............................................................. 105

### COREY D. CLARK - SEASON TWO

**A.  PRE-HOLLYWOOD** ................................................................................................ **108**
  (1)  KANSAS ARREST [October 12, 20002] ................................................................. 108

**B.  CONTEST PARTICIPATION** ................................................................................... **108**
  (1)  GOLDEN TICKET [November 4, 2002] .................................................................. 108
  (2)  PRE-HOLLYWOOD BACKGROUND CHECK [November-December 2002] ...................... 110
  (3)  HOLLYWOOD WEEK [December 9-14, 2002] ......................................................... 112
  (4)  BACKGROUND CHECK FORMS [December 20, 2002] .............................................. 112
  (5)  SEMI-FINALISTS ROUNDS [February 25, 2003]..................................................... 113
  (6)  19 ENTERTAINMENT PRIZE CONTRACTS [March 8-17, 2003]................................... 114
  (7)  EMPLOYMENT AGREEMENTS [March 10-11, 2003] ............................................... 115
  (8)  FINAL PERFORMANCES [March 18-25, 2003] ....................................................... 116

**C.  PUBLIC DISQUALIFICATION** ................................................................................ **117**
  (1)  SMOKING GUN [MARCH 31, 2003] ...................................................................... 117
  (2)  ILLEGAL TRANSMISSION OF CLARK'S RECORDS TO SMOKING GUN.COM .................. 119
  (3)  FOX'S PROFFERED JUSTIFICATION re: "DISQUALIFICATION" .............................. 120
  (4)  POST-DISQUALIFICATION CORRESPONDENCE WITH AIP [May 6, 2003].................... 121
  (5)  DISPOSITION OF 2002 KANSAS ARREST ............................................................... 122

## JACOB JOHN SMALLEY- SEASON TWO

**A.  CONTEST PARTICIPATION**................................................................ **122**
   (1)  GOLDEN TICKET [NOVEMBER 10, 2002].................................................. 122
   (2)  ARREST [NOVEMBER 30, 2002]............................................................ 123
   (3)  HOLLYWOOD WEEK [DECEMBER 9, 2002] .......................................... 123
   (4)  GUILTY PLEA [JANUARY 2, 2003]........................................................ 124
   (5)  DISQUALIFICATION [FEBRUARY 13, 2003] ........................................... 124

## DONNIE WILLIAMS - SEASON THREE

**A.  CONTEST PARTICIPATION**................................................................ **126**
   (1)  GOLDEN TICKET ................................................................................ 126
   (2)  FOX DISQUALIFICATION [FEBRUARY 27, 2004] ................................... 127
   (3)  MAY 2013 POSITION STATEMENT ...................................................... 127
   (4)  CASE DISPOSITION ........................................................................... 127

## BRITTENUM TWINS - SEASON FIVE

**A.  PRE-HOLLYWOOD** ............................................................................. **128**
   (1)  OPEN AUDITIONS IN CHICAGO [September 2005] .............................. 128
   (2)  ARREST AND CHARGES IN MEMPHIS, TENNESSEE [October 30, 2005] ...... 128
   (3)  TERRELL BACKGROUND CHECK [November 2, 2005] ......................... 129
   (4)  DERRELL BACKGROUND CHECK [November 14, 2005] ...................... 130

**B.  CONTEST PARTICIPATION**................................................................ **131**
   (1)  HOLLYWOOD WEEK [December 2005].............................................. 131
   (2)  SURPRISE ARREST [January 9, 2006] ................................................ 132
   (3)  SEASON FIVE PREMIERE [January 17, 2006] ..................................... 133
   (4)  BACKGROUND INFORMATION REPORTED TO MASS MEDIA .................. 134

**C.  DISQUALIFICATION** ........................................................................... **135**
   (1)  NOTICE OF DISQUALIFICATION [January 22, 2006]............................. 135
   (2)  EXPLOITATION [January-May 2006] .................................................. 137
   (3)  SEASON SEVEN AUDITIONS .............................................................. 139

## HALICIA T. / TATIANA W.

## THOMAS DANIELS - SEASON SIX

**A.  PRE-HOLLYWOOD** ............................................................................. **148**
   (1)  YOUTHFUL INDISCRETION ................................................................. 148
   (2)  GOLDEN TICKET [OCTOBER 2-3, 2006]............................................. 149
   (3)  BACKGROUND CHECK ...................................................................... 150

**B.  CONTEST PARTICIPATION**................................................................ **151**
   (1)  HOLLYWOOD ROUNDS [November 16-17, 2006].............................. 151
   (2)  EPISODE AIRDATE [January 17, 2007]............................................... 152
   (3)  DISQUALIFICATION [January 18, 2007] ............................................. 153

## AKRON WATSON - SEASON SIX

**A.  PRE-HOLLYWOOD** ......................................................................... **156**
   (1)  GOLDEN TICKET [August 2006] .......................................... 157
   (2)  BACKGROUND CHECK [September 2006] ............................ 157

**B.  DISQUALIFICATION** .................................................................... **158**
   (1)  SURPRISE CALL [November 9, 2006] .................................. 158
   (2)  LOCAL NEWS [January 31, 2007] ....................................... 159
   (3)  EPISODE AIRDATE [FEBRUARY 6, 2007] ............................ 160
   (4)  MEDIA FRENZY .................................................................... 162

**C.  LYTHGOE'S REBUTTAL** ............................................................. **164**

## ASHLYN C. - SEASON SIX

**A.  GOLDEN TICKET** ........................................................................ **165**

**B.  DISQUALIFICATION** .................................................................... **165**

## JU'NOT JOYNER - SEASON EIGHT

**A.  CONTEST PARTICIPATION** ....................................................... **168**
   (1)  GOLDEN TICKET .................................................................. 168

**B.  DECEPTIVE PRACTICES** ............................................................ **168**
   (1)  ILLUSORY PRIZE .................................................................. 168
   (2)  FIXING WILD CARD .............................................................. 171
   (3)  RIGGED VOTING .................................................................. 172
   (4)  MANIPULATED OUTCOME .................................................... 173

## ANTHONY W. - SEASON NINE

**A.  GOLDEN TICKET** ........................................................................ **174**

**B.  EXPLOITATION OF ARREST RECORDS** .................................... **175**

## CHRIS GOLIGHTLY - SEASON TEN

**A.  BACKGROUND** ............................................................................. **177**

**B.  CONTESTANT PARTICIPATION** ................................................. **178**

**C.  PUBLIC DISQUALIFICATION** ...................................................... **179**

## JXJ - SEASON ELEVEN

**A.  PRE-DISQUALIFICATION** ............................................................ **182**
   (1)  TOP 13 FINALIST ................................................................. 182

(2) PLANTING RUMOURS .......................................................... 183
(3) NEWS OF DISQUALIFICATION ............................................ 184
(4) EXPERT OPINION #1: "CRUEL CHARADE" (March 14, 2012) .......... 186
(5) PUBLIC REACTION (PRE-TELECAST) [March 14, 2012] ............... 188

**B. POST-DISQUALIFICATION** ................................................ **191**
(1) TELECAST [March 14, 2012] ............................................. 191
(2) PUBLIC REACTIONS (POST-TELECAST) [March 15, 2012] ............. 193
(3) STATE OFFICIALS: "AN OUTRAGE" [March 15, 2012] ................. 195
(4) DEFENSES TO MEDIA BACKLASH [March 15, 2012] .................... 195

**C. JXJ SPEAKS [MARCH 16, 2012]** ......................................... **198**
(1) PEOPLE MAGAZINE INTERVIEW .......................................... 198
(2) SHOWBIZ TONIGHT ......................................................... 199

**D. EXPERT OPINION #2** ...................................................... **201**

---

# WHITE *AMERICAN IDOL* CONTESTANTS - W/ CRIMINAL RECORDS

**A. SCOTT SAVOL [SEASON FOUR - 2005]** ................................ **204**

**B. BO BICE [SEASON FOUR - 2005]** ....................................... **205**

**C. BUCKY COVINGTON [SEASON FIVE – 2005-2006]** ..................... **207**

**D. TAYLOR HICKS [SEASON FIVE – (2005-2006)]** ........................ **209**

**E. AMANDA OVERMYER [SEASON SEVEN – (2007-2008)]** ................ **210**

**F. JOANNA PACITTI [SEASON EIGHT – (2008-2009)]** .................... **211**

**G. MATTHEW LAWRENCE [SEASON NINE]** ............................... **212**

**H. CASEY JAMES [SEASON NINE]** .......................................... **213**

**I. STEFANO LANGONE [SEASON TEN]** ..................................... **215**

**J. AMY BRUMFIELD [SEASON ELEVEN]** ................................... **217**

---

# THE "INEXORABLE ZERO"

**A. GROSS STATISTICAL DISPARITY** ....................................... **221**
(1) OVERVIEW .................................................................... 221
(2) GOLDEN TICKET HOLDERS (2002-2012) ................................ 221
(3) SEMI-FINAL ROUNDS (2002-2012) ....................................... 222
(4) FINAL ROUNDS (2002-2012) .............................................. 223
(5) STATISTICAL SIGNIFICANCE ............................................. 224

---

# WHY DID THEY ONLY DISQUALIFY BLACK CONTESTANTS???

**A. POLITICAL MOTIVATION** ................................................. **227**
(1) SHAPING PUBLIC POLICY .................................................. 228
(2) USING CRIME STATISTICS AS A TOOL OF SUPPRESSION ............. 228
(3) PERPETUATING IMAGES OF WHITE SUPREMACY ....................... 229
(4) INDOCTRINATION OF TARGET AUDIENCES .............................. 230

**B.    ENTERTAINMENT FOR THE MASSES** ............................................................. **231**
  (1)  MINSTREL SHOWS ............................................................................................ 231
  (2)  MODERN CRIME SHOWS ................................................................................. 233

**C.    CORPORATE CULTURE** ................................................................................. **233**
  (1)  OLD WORLD BIGOTRY ................................................................................... 233
  (2)  INSIDIOUS PROPAGANDA ............................................................................... 235
  (3)  RACE-BAITING .............................................................................................. 235

**D.    SCANDAL-MONGERING** ................................................................................. **236**
  (1)  TEMPTATION ISLAND ..................................................................................... 236
  (2)  DEFAMATION LAWSUIT [March 2001] ......................................................... 237

## CLASS ACTION ALLEGATIONS

**A.    DEFINITION OF PROPOSED CLASS** ................................................................ **239**
  (1)  BLACK GOLDEN TICKET HOLDERS (2002-2012) [Males Only] ..................... 239
  (2)  RESERVATION OF RIGHT TO AMEND CLASS .................................................. 240

**B.    NUMEROSITY** [FED. R. CIV. P. 23(A)(1)] ...................................................... **241**
  (1)  QUESTIONS OF LAW AND FACT ...................................................................... 241
  (2)  COMPANY-WIDE POLICY ............................................................................... 242
  (3)  UNIFORMITY OF PRACTICES ........................................................................... 243
  (4)  UNIFORMITY OF CLASS MEMBERSHIP ............................................................ 245
  (5)   MANAGEMENT ORGANIZATION ..................................................................... 245

**C.    TYPICALITY** [FED. R. CIV. P. 23(A)(2)] ....................................................... **246**

**D.    ADEQUATE REPRESENTATION** ...................................................................... **247**

**E.    CLASS CERTIFICATION** ................................................................................. **248**
  (1)  FED. R. CIV. P. 23(B)(2) ............................................................................... 248
  (2)  FED. R. CIV. P. 23(B)(3) ............................................................................... 248
  (3)  FED. R. CIV. P. 23(B)(4) ............................................................................... 250

## COUNT I: 42 U.S.C. § 1981 (MAKING OF *19 ENTERTAINMENT PRIZE* CONTRACTS)

**A.    STANDING** ...................................................................................................... **252**

**B.    CONTRACTUAL INTEREST** (19 ENTERTAINMENT PRIZE CONTRACTS) ..................... **253**

**C.    INTERFERENCE** .............................................................................................. **254**

**D.    RACIAL INTENT** ............................................................................................ **255**

**E.    ABSENCE OF LIMITATIONS** ........................................................................... **257**

## COUNT II: 42 U.S.C. § 1981 (MAKING OF *ADVERTISED* PRIZE CONTRACTS)

## COUNT III: 42 U.S.C. § 1981 (BREACH OF COVENANT OF GOOD FAITH & FAIR DEALING)

## COUNT IV: 42 U.S.C. § 1981 (EMPLOYMENT CONTRACTS)

## COUNT V: 42 U.S.C. § 1981 (EQUAL BENEFITS)

A.   LOSS OF SECURITY ........................................................................................ 274

## COUNT VI: 42 U.S.C. § 1983(5) (DEPRIVATION OF CONSTITUTIONAL RIGHTS)

A.   CONSPIRACY ................................................................................................. 276

B.   DEPRIVATION OF RIGHTS ............................................................................. 280

C.   INJURY .......................................................................................................... 281

## COUNT VII: TITLE VII - CIVIL RIGHTS ACT OF 1964 (Disparate Impact)

## COUNT VIII: RESCISSION / RESTITUTION

A.   OVERVIEW ..................................................................................................... 285

B.   ILLEGALITY [CAL. CIV. CODE § 1667] .......................................................... 286

C.   RIGGED CONTEST [47 U.S.C. § 509] ............................................................ 287

D.   FALSE ADVERTISING RE: CONTEST [47 C.F.R. § 73.1216] ........................... 292

E.   UNLAWFUL RELEASE [CAL. CIV. CODE § 1668] ........................................... 296

F.   ILLUSORY CONTRACT (COMMON LAW) ........................................................ 298

G.   LEGAL DUTY RULE (COMMON LAW) ............................................................ 300

H.   FRAUD-IN-FACTUM (COMMON LAW) ............................................................ 300

## COUNT IX: CALIFORNIA LABOR CODE 432.7

A.   STATUTORY LANGUAGE ................................................................................ 303

B.   STANDING ...................................................................................................... 303

C.   VIOLATIONS OF SECTION 432.7 .................................................................... 304
     (1)   GENERAL ARREST QUESTIONS ON WRITTEN APPLICATIONS ................... 304
     (2)   PROHIBITION ON EMPLOYERS' SEARCH FOR RECORDS OF ARREST ......... 305

D.   CAUSATION .................................................................................................... 306

E.   DAMAGES ...................................................................................................... 307
     (1)   ACTUAL *TREBLE* DAMAGES AVAILABLE TO EMPLOYEE *APPLICANTS* ...... 307
     (2)   ACTUAL DAMAGES AVAILABLE TO PLAINTIFF CLARK ............................. 307
     (3)   STATUTE OF LIMITATIONS ..................................................................... 308

## COUNT X: CONSTRUCTIVE FRAUD

## COUNT XI: UNJUST ENRICHMENT

# JURISDICTION AND VENUE

## PERSONAL JURISDICTION

1.      The District Court has personal jurisdiction over the PRODUCER- DEFENDANTS because they regularly and continuously transact business in the State of New York vis-à-vis the television production and (purported) contest marketed as *American Idol*.  Each of the PRODUCER-DEFENDANTS maintains offices within this Judicial District.

2.      The Court has personal jurisdiction over the NETWORK-DEFENDANTS because they regularly and continuously transact business in the State of New York and within this Judicial District vis-à-vis the television production and (purported) contest marketed as *American Idol.* Each of the NETWORK-DEFENDANTS maintain offices within this Judicial District at 1211 Avenue of the Americas, New York, NY 10036.

3.      The Court has personal jurisdiction over the OVERSEER- DEFENDANTS because they regularly and continuously transact business in the State of New York and within this Judicial District vis-à-vis the television production and (purported) contest marketed as *American Idol.*

4.      The Court has personal jurisdiction over the SPONSOR-DEFENDANTS because they regularly and continuously transact business in the State of New York and within this Judicial District vis-à-vis the television production and (purported) contest marketed as *American Idol.*

## SUBJECT MATTER JURISDICTION

5.      This Honorable Court has original jurisdiction pursuant to 28 U.S.C. § 1332 because there are federal questions of law arising out of the relationship between the Plaintiffs and JOINT VENTURE-DEFENDANTS, including pursuant to 42 U.S.C. § 1981, 42 U.S.C. § 1985(3) and Title VII of the Civil Rights Act of 1964.

6.      This Honorable Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because the causes of action are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution.

## VENUE

7.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) because, *inter alia*, three of the Plaintiffs reside in this Judicial District, <u>all</u> of the corporate entity JOINT-VENTURE DEFENDANTS maintain their headquarters or business offices here and/or continuously transact business within this Judicial District.  Moreover, a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this Judicial District.

# PARTIES

## PLAINTIFFS

### COREY D. CLARK

8.      Plaintiff COREY DELANEY CLARK is a United States citizen residing in the State of Tennessee.

9.      During Season Two, Plaintiff Clark advanced to the Top 10 Finalist round of the *American Idol* Contest before he was disqualified.

### JAERED N. ANDREWS

10.      Plaintiff JAERED NEALE ANDREWS is a United States citizen residing in the State of Ohio.

11.      During Season Two, Plaintiff Andrews advanced to the Top 32 Semi-Finalist round of the *American Idol* Contest before he was disqualified.

### JACOB JOHN SMALLEY

12.      Plaintiff JACOB JOHN SMALLEY is a United States citizen residing in the State of Oklahoma.

13.      During Season Two, Plaintiff Smalley advanced to the Top 32 Semi-Finalist round of the *American Idol* Contest before he was disqualified.

### DONNIE WILLIAMS

14.      Plaintiff DONNIE WILLIAMS is a United States citizen residing in the State of Florida.

15.      During Season Three, Plaintiff Williams advanced to the Top 24 Semi-Finalist round of the *American Idol* Contest before being disqualified.

## TERRELL BRITTENUM

16.    Plaintiff TERRELL BRITTENUM is a United States citizen residing in the State of New York.

17.    During Season Five, Plaintiff T. Brittenum advanced to the Top 24 Semi-Finalist round of the *American Idol* Contest before being disqualified.

## DERRELL BRITTENUM

18.    Plaintiff DERRELL BRITTENUM is an individual United States citizen residing in the State of New York.

19.    During Season Five, Plaintiff D. Brittenum advanced to the Top 24 Semi-Finalist round of the purported *American Idol* Contest before being disqualified.

## AKRON WATSON

20.    Plaintiff AKRON WATSON is an individual United States citizen residing in the State of Texas.

21.    During Season Six, Plaintiff Watson was awarded a "Golden Ticket" to Hollywood to compete in the *American Idol* Contest before being disqualified.

## THOMAS DANIELS

22.    Plaintiff THOMAS DANIELS is a United States citizen residing in the State of Oregon.

23.    During Season Six, Plaintiff Daniels advanced to the Top 34 Semi-Finalist round of the *American Idol* Contest before being disqualified.

17

## JU'NOT JOYNER

24.     Plaintiff JU'NOT JOYNER is a United States citizen residing in the State of Maryland.

25.     During Season Eight, Plaintiff Joyner advanced to the Top 36 Semi-Finalist round of the *American Idol* Contest before being disqualified.

## CHRIS GOLIGHTLY

26.     Plaintiff CHRIS GOLIGHTLY is an individual United States citizen residing in the State of California.

27.     During Season Nine, Plaintiff advanced to the Top 36 Semi-Finalist round of the *American Idol* Contest before being disqualified.

## PLAINTIFFS' COLLECTIVE DESCRIPTIONS

28.     The term **"PUBLIC-DQ PLAINTIFFS"** shall herein refer to those <u>Plaintiffs</u> who were publicly disqualified from the *American Idol* Contest:

       **a.** ANDREWS

       **b.** CLARK

       **c.** WILLIAMS

       **d.** T. BRITTENUM

       **e.** D. BRITTENUM

       **f.** WATSON

       **g.** DANIELS

       **h.** GOLIGHTLY

# PRODUCER-DEFENDANTS

29.    "PRODUCER-DEFENDANTS" shall collectively refer to the joint enterprise consisting of FREMANTLEMEDIA NORTHAMERICA, INC., AMERICAN IDOL PRODUCTIONS, INC., 19 ENTERTAINMENT, CORE MEDIA GROUP, INC.

## FREMANTLEMEDIA NORTH AMERICA, INC.

30.    Defendant FREMANTLEMEDIA NORTH AMERICA, INC. ("FREMANTLE") is a corporation organized under the laws of the State of Delaware, Entity No. 2254258, and is authorized and/or registered to do business in the State of New York.

31.    FREMANTLE maintains a principal place of business in the United States located within this Judicial District at 1540 Broadway Building, 10th Floor, New York, New York 10036.

32.    FREMANTLE is engaged in the production and financing of entertainment television programming in the United States and in foreign countries.

33.    FREMANTLE actively solicits viewers of broadcast, cable and satellite television in this Judicial District and purposefully avails itself of the laws of the State of New York.

34.    FREMANTLE actively solicits internet and broadband traffic in the State of New York and solicits U.S. citizens and permanent residents to audition for *American Idol* within this Judicial District.

35.    At all times relevant to this action, FREMANTLE maintained control and supervision over the means and manner in which each Plaintiff named herein, and prospective Class members, was designated to provide his talent services and/or grant his proprietary rights to Defendants for their economic benefit.

36.    At all times relevant to this action, FREMANTLE was part of a single integrated

enterprise with the other PRODUCER-DEFENDANTS and exercised a high degree of centralized control over the labor and business practices of nominal Defendant AMERICAN IDOL PRODUCTIONS, INC., inter-related television and film production operations, common management and common ownership with respect to the *American Idol Production*

37.    At all times relevant to this action, FREMANTLE exercised supervisory authority over individuals retained and/or employed as attorneys, producers, private investigators and network executives who actively engaged and participated in the unilateral decisions to disqualify each Plaintiff from the *American Idol* Contest, amongst other adverse actions causing injury to Plaintiffs as set forth herein.

38.    Because none of the Plaintiffs were present in the corporate suites or production offices at the time adverse decisions were made, Plaintiffs do not know at the time of filing this complaint which of the individual FREMANTLE agents played a role in *American Idol* disqualification decisions, the rigged nature of the *American Idol* Contest or implementation of the background check policies.

39.    Defendant FREMANTLE should be held liable for actively partaking in, lending aid to, or ratifying and adopting the disqualifications of each Plaintiff based on criminal conduct exclusions that were unrelated to the job function of performing on *American Idol.*

40.    Defendant FREMANTLE and the PRODUCER-DEFENDANTS have had an apparent or actual partnership and have authority to bind one another in transactions with third parties from 2002-present.

41.    Defendant FREMANTLE has exercised joint ownership or control over the *American Idol* Production and *American Idol* Contest, including the selection of the Judges, the advancement of Contestants, the elimination of the Contestants and the disqualification of

Contestants from 2002-present.

42.     Defendant FREMANTLE shared in the profits and losses generated by the *American Idol* Enterprise from 2002-present.

43.     Defendant FREMANTLE's agents personally participated in and/or had the right and ability to supervise, direct and control the risk of harm and actual damages alleged in this Third Amended Complaint from 2002-present.

44.     Defendant FREMANTLE possessed a common object and purpose or the undertaking of producing the *American Idol* Contest and shared an equal right to direct and govern the movements and conduct of the other joint venturers in respect to the common object of the enterprise and purpose of the illegal undertaking of conducting criminal background checks to intentionally interfere with Plaintiffs' constitutional rights and proprietary interests.

45.     Defendant FREMANTLE had a duty to each Plaintiff and prospective Class Member to conduct the *American Idol* Contest in good faith and consistent with U.S. law.

## AMERICAN IDOL PRODUCTIONS, INC.

46.     Defendant AMERICAN IDOL PRODUCTIONS, INC. ("AIP") is a corporation organized under the laws of the State of California, Entity No. C2393632, and is authorized and/or registered to do business in the State of New York.

47.     Defendant AIP maintains a place of business at 4000 W. Alameda Ave, Third Floor, Burbank, California 91505 and/or 7800 Beverly Blvd., Los Angeles, CA 90036-2112.

48.     Defendant AIP is wholly owned and controlled by FREMANTLE.

49.     Defendant AIP requires *American Idol* Contestants who reach the final rounds (i.e., Top 13, Top 12 or Top 10) to complete and submit W-2 forms and/or I-9 forms, among other

U.S. government, tax, and employment-related forms relevant to this action.

50.    At all times relevant to this action, Defendant AIP shared the same principal office location, legal counsel, office staff and/or production personnel as FREMANTLE.

## 19 ENTERTAINMENT

51.    Defendant 19 ENTERTAINMENT is or was a foreign corporation or entity organized under the laws of the United Kingdom that transacts business in the State of New York vis-à-vis the Production.

52.    Defendant 19 ENTERTAINMENT was founded in the United Kingdom in 1985 and owned by Simon FULLER, the purported "creator" of the U.K. television series *Pop Idol* and its spin-off series *American Idol.*

53.    Defendant 19 ENTERTAINMENT was purchased by Defendant CORE MEDIA GROUP, INC. (formerly CKX, Inc.) in 2005.

54.    Defendant 19 ENTERTAINMENT's principal place of business is located at 650 Madison Ave., New York, NY 10022.

55.    Defendant 19 ENTERTAINMENT is a citizen of the State of New York.

56.    Defendant 19 ENTERTAINMENT is the owner and controller of related companies, subsidiaries, branches and/or divisions, each of which shall be deemed named defendants in this action in the event that upon Corporate Disclosure Statements, any or all are determined to be entities owned separate and apart from Defendant 19 ENTERTAINMENT and/or Defendant CORE MEDIA GROUP, INC. [specifically, 19 RECORDING LTD., 19 TV LTD., 19 MANAGEMENT LTD., 19 TOURING LLC, 19 MERCHANDISING LLC (collectively referred to herein as the "19 AFFILIATED COMPANIES")].

57.    Defendant 19 ENTERTAINMENT's principal operational and ownership interests are divided amongst multiple subsidiaries or entities under the control and dominion of 19 ENTERTAINMENT, including: 19 TV LIMITED (U.K.); 19 RECORDINGS LIMITED (U.K.); 19 MANAGEMENT LIMITED (U.K.); 19 TOURING LIMITED (U.K.); AND 19 MERCHANDISING LIMITED (U.K.).

58.    Upon information and belief, 19 TV LIMITED (U.K.) owns two-thirds of the *American Idol* brand and co-produces the show in the United States with its partner, FREMANTLE, which owns the other one-third of the *American Idol* brand. 19 TV LIMITED receives certain fees and revenues relating to the sublicensing of the brand and production and marketing of the shows based on the *American Idol* brand around the world, including licensing and producer fees.  19 TV LIMITED shares a percentage of the revenues FREEMANTLE derives from on-air sponsorships and sales of FREMANTLE branded merchandise.

59.    Upon information and belief, 19 RECORDINGS LIMITED (U.K.) retains the right to sign long-term recording contracts with the winning artists and other finalists from the *American Idol* series in the United States.  For the first nine seasons of the program, Sony / BMG (owned in part by  BERTELESMANN) served as 19 ENTERTAINMENT's record label partner with respect to *American Idol* artists in most major territories around the world.

60.    Upon information and belief, 19 MANAGEMENT LIMITED (U.K.) has the right to manage the finalists and garner commissions for more than ten (10) years.

61.    Upon information and belief, 19 TOURING LIMITED (U.K.) has the right to produce *American Idol* tours featuring the Contestants featured on the *American Idol* Production.

62.    Upon information and belief, 19 MERCHANDISING LIMITED (U.K.) has the licensing and merchandising rights for the *American Idol* tours and in the United States and United

Kingdom is jointly responsible for off air sponsorship of the televised programs.

63.     In the summer of 2001, 19 ENTERTAINMENT paired up with Defendant FREMANTLE's parent company, U.K.-based production company FREMANTLEMEDIA, LTD to produce the *Idol*-branded program in Great Britain under the name *Pop Idol*.

64.     After the success of *Pop Idol* in the U.K., Defendant 19 ENTERTAINMENT, through its wholly owned subsidiary or division, 19 TV Ltd. ("19TV") entered into a worldwide partnership arrangement with FREMANTLE for the production and distribution of the *American Idol* and related *Idol* brands.

65.     Under the 2001 terms of this foreign partnership,  FREMANTLE retained the exclusive right to produce (or sublicense production) and distribute *American Idol* programs and formatted series throughout the world except in the United States, where 19TV co-produces the *American Idol* series.

66.     On or about April 22, 2002, 19TV, FREMANTLE and FOX entered into a licensing agreement (the "FOX Licensing Agreement") whereby Defendant FOX obtained rights to air the *American Idol* Production in the United States.  [CDC_000027]

67.     Under the terms of the FOX Licensing Agreement, Defendant FOX is granted a perpetual and exclusive license, including the right of first negotiation and last refusal, to broadcast any non-scripted television programs featuring the *American Idol* brand or based on the *American Idol* format, or featuring contestants who appear in their roles as *American Idol* winners, intended for broadcast within the United States and its territories.

68.     In addition to license fees, Defendant FOX pays bonus fees to 19TV and FREMANTLE depending on where the *American Idol* series is rated and ranked in the 18-to-49 age demographic. 19TV and FREMANTLE each receive 50% of the ratings/rankings bonus, with

19TV receiving its share directly from Defendant FOX.  [CDC_000037]

69.    Paragraph 12 of FOX Licensing Agreement also grants FOX an "approval right with respect to the key elements of the Series, including . . . contestants." [CDC_000063]

70.    FREMANTLE and 19TV reserve ownership rights to the copyright in the Series and Episodes.  [CDC_000049]

71.    In-house counsel for Defendant FOX, Minna Taylor and Marisa Fermin, negotiated and executed the FOX Licensing Agreement on behalf of FOX.  [CDC_000067]

72.    Defendant 19 ENTERTAINMENT should be held liable for actively partaking in, lending aid to, or ratifying and adopting the disqualifications of the Plaintiffs based on criminal conduct exclusions that were unrelated to the job function of performing on *American Idol.*

73.    Defendant 19 ENTERTAINMENT and the PRODUCER-DEFENDANTS have had an apparent or actual partnership and have authority to bind one another in transactions with third parties from 2002-present.

74.    Defendant 19 ENTERTAINMENT has exercised joint ownership or control over the *American Idol* Production and *American Idol* Contest, including the selection of the Judges, the advancement of Contestants, the elimination of the Contestants and the disqualification of Contestants from 2002-present.

75.    Defendant 19 ENTERTAINMENT shared in the profits and losses generated by the *American Idol* Production, the *American Idol* Contest, *American Idol* Enterprise and *American Idol* Contestants from 2002-present.

76.    For eleven consecutive years, over twelve consecutive seasons, Defendant 19 ENTERTAINMENT agents personally participated in and/or had the right and ability to supervise, direct and control the risk of harm and actual damages alleged in this Amended Complaint.

77.    Defendant 19 ENTERTAINMENT possessed a common object and purpose of the undertaking of producing the *American Idol* and *American Idol* Contest and an equal right to direct and govern the movements and conduct of the other joint venturers in respect to the common object of the enterprise and purpose of the illegal undertaking of conducting criminal background checks to intentionally interfere with Plaintiffs' constitutional rights and proprietary interests.

78.    Defendant 19 ENTERTAINMENT had a duty to each Plaintiff to conduct the *American Idol* Contest in good faith and consistent with U.S. law.

## CORE MEDIA GROUP, INC.

79.    Defendant CORE MEDIA GROUP, INC. ("CMG") is a corporation organized under the laws of the State of Delaware, Entity No. 3939409 and is authorized and/or registered to do business in the State of New York.

80.    Defendant CMG's principal place of business is located at 650 Madison Ave., New York, NY 10022.

81.    Upon information and belief, Defendant CMG is the successor-in-interest to CKX, Inc., a public company.

82.    Defendant CMG is a company owned and/or controlled by third-party APOLLO GLOBAL MANAGEMENT, LLC (NYSE: APO), a private equity firm headquartered in New York, New York which reportedly bought Defendant CMG on June 21, 2011.

83.    With the purchase of Defendant 19 ENTERTAINMENT, Defendant CMG reportedly acquired a majority share of the rights to the intellectual property associated with the series and contest *American Idol*, including but not limited to the copyrights and state rights of

publicity purportedly transferred to Defendant CMG via each Plaintiffs' execution of the respective *American Idol* Contestant Agreements (as amended).

84.     Upon information and belief, Defendant CMG owns all interests in and controls the 19 ENTERTAINMENT-related companies, which include but are not limited to XIX ENTERTAINMENT, 19 RECORDINGS LTD., 19 MERCHANDISING LTD., 19 MANAGEMENT LTD., 19 TV LTD. and 19 TOURING LTD.

85.     Upon information and belief, 19 ENTERTAINMENT's rights vis-à-vis the *American Idol* Production are wholly owned and managed by CMG.

86.     Upon information and belief, a portion of 19 ENTERTAINMENT'S rights vis-à-vis the *American Idol* Production and Contest are co-owned and/or co-managed by third party XIX ENTERTAINMENT and Simon Fuller.

87.     Because none of the Plaintiffs were present in the corporate suites or production offices at the time the decision was made to disqualify each Plaintiff, Plaintiffs do not know at the time of filing this complaint which of the individual CORE MEDIA GROUP, INC.'S representatives played a role in *American Idol* disqualification decisions, rigged nature of Contest or background check policies, and expect to obtain such information through discovery.

88.     Defendant CMG should be held liable for actively partaking in, lending aid to, or ratifying and adopting the disqualifications of the Plaintiffs based on criminal conduct unrelated to the job function of performing on *American Idol*.  For eleven consecutive years, and over twelve consecutive broadcast seasons, Defendant CMG and the PRODUCER-DEFENDANTS have had an apparent or actual partnership and have authority to bind one another in transactions with third parties.

89.     Defendant CMG has exercised joint ownership or control over the *American Idol*

Production and *American Idol* Contest, including the selection of the Judges, the advancement of Contestants, the elimination of the Contestants and the disqualification of Contestants from 2005-present.

90.    Defendant CMG shared in the profits and losses generated by the *American Idol* Enterprise from 2005-present.

91.    For eleven consecutive years, and over twelve consecutive seasons, Defendant CMG agents personally participated in and/or had the right and ability to supervise, direct and control the risk of harm and actual damages alleged in this Amended Complaint.

92.    Defendant CMG possessed a common object and purpose of the undertaking of producing the *American Idol* and *American Idol* Contest and an equal right to direct and govern the movements and conduct of the other joint venturers in respect to the common object of the enterprise, *American Idol*, and purpose of the illegal undertaking of conducting criminal background checks to intentionally interfere with Plaintiffs' constitutional rights and proprietary interests.

93.    Defendant CMG had a duty to each Plaintiff to conduct the *American Idol* Contest in good faith and consistent with U.S. law.

## NETWORK-DEFENDANTS

94.    "NETWORK-DEFENDANTS" shall collectively refer herein to the single, common enterprise consisting of 21ST CENTURY FOX, INC. (the legal successor-in-interest to NEWS CORPORATION, INC.) and Defendant FOX BROADCASTING COMPANY, INC., the New York-based entities that broadcast the U.S.-based television series *American Idol* at all times relevant to this action.

## 21ST CENTURY FOX, INC.

95.     Defendant 21ST CENTURY FOX, INC. is a corporation organized under the laws of the State of Delaware, that is authorized and/or registered to do business in the State of New York.

96.     21ST CENTURY FOX, INC's principal place of business is located at 1211 Avenue of the Americas, New York, New York 10036.

97.     According to its August 19, 2013 Form 10-K Annual Report filed with the United States Securities and Exchange Commission, Defendant 21ST CENTURY FOX, INC. is formerly known as News Corporation.[1]

98.     21ST CENTURY FOX, INC. is the parent company and/or whole owner of Defendant FOX BROADCASTING COMPANY, INC., which is the broadcast network that has televised the show *American Idol* from its initial broadcast date in June 2002 through the present day.

99.     Defendant 21ST CENTURY FOX, INC. actively solicits viewers and internet traffic in the State of New York and purposefully avails itself of the laws of the State of New York.

100.    At all times relevant to this action, Defendant 21ST CENTURY FOX, INC. exercised supervisory authority over individuals retained and/or employed by Defendant 21ST CENTURY FOX, INC. and Defendant FOX.

101.    At all times relevant to this action, authorized representatives of 21ST CENTURY FOX, INC. participated in the decision-making process that led to the unlawful disqualification of each Plaintiff.

102.    At all times relevant to this action, authorized representatives of Defendant 21ST

---

[1] Thus, the use of the phrase "21ST CENTURY FOX, INC." in this document will encompass "NEWS CORPORATION if the event referenced occurred when 21ST CENTURY FOX, INC. was known as NEWS CORPORATION.

CENTURY FOX, INC. participated in the background check reporting process that led to the disqualification of each Plaintiff.

103.    At all times relevant to this action, Defendant 21ST CENTURY FOX, INC. maintained control, jointly and severally with PRODUCTION-DEFENDANTS, over the means and manner in which each Plaintiff was designated to provide his talent services for the economic benefit of Defendants.

104.    At times relevant to this action, 21ST CENTURY FOX, INC.'s CEO, Rupert Murdoch, played an instrumental role in the development and production activities of *American Idol*, particularly during the initial seasons of the Production in 2002-2005.

105.    At all times relevant to this action, Defendant 21ST CENTURY FOX, INC. was actually part of a single integrated enterprise with the other PRODUCER-DEFENDANTS, NETWORK-DEFENDANTS, SPONSOR-DEFENDANTS AND OVERSEER-DEFENDANTS and exercised a degree of centralized control over the labor practices of PRODUCER-DEFENDANTS.

106.    At all times relevant to this action, Defendant 21ST CENTURY FOX, INC. exercised supervisory authority over individuals retained and/or employed as attorneys, producers, private investigators and network executives who actively engaged and participated in the unilateral decisions to disqualify each Plaintiff from the *American Idol* Contest.

107.    Because none of the Plaintiffs were present in the corporate suite or production offices at the time the adverse decision was made, Plaintiffs do not know at the time of filing this complaint which of the individual 21ST CENTURY FOX, INC representatives played a role in *American Idol* disqualification decisions, rigged nature of Contest or background check policies, and expect to obtain such information through discovery.

108.    Defendant 21ST CENTURY FOX, INC should be held liable for actively partaking in,

lending aid to, or ratifying and adopting the disqualifications of the Plaintiffs based on criminal conduct unrelated to the job function of performing on *American Idol.* For eleven consecutive years, over twelve consecutive broadcast seasons, Defendant FOX and the PRODUCER-DEFENDANTS have had an apparent or actual partnership and have authority to bind one another in transactions with third parties.

109.    Defendant 21ST CENTURY FOX, INC has exercised joint ownership or control over the *American Idol* Production and *American Idol* Contest, including the selection of the Judges, the advancement of Contestants, the elimination of the Contestants and the disqualification of Contestants from 2002-present.

110.    Defendant 21ST CENTURY FOX, INC has shared in the profits generated by the *American Idol* Production, the *American Idol* Contest, *American Idol* Enterprise and *American Idol* Contestants from 2002-present.

111.    Defendant 21ST CENTURY FOX, INC's agents personally participated in and/or had the right and ability to supervise, direct and control the risk of harm and actual damages alleged in this Third Amended Complaint from 2002-present.

112.    Defendant 21ST CENTURY FOX, INC possessed a common object and purpose of the undertaking of producing the *American Idol* and *American Idol* Contest and an equal right to direct and govern the movements and conduct of the other joint venturers in respect to the common object of the enterprise and purpose of the illegal undertaking of conducting criminal background checks to intentionally interfere with Plaintiffs' constitutional rights and proprietary interests.

113.    Defendant 21ST CENTURY FOX, INC had a duty to each Plaintiff to conduct the *American Idol* Contest in good faith and consistent with U.S. law.

## Fox Broadcasting Company, Inc.

114.    Defendant FOX BROADCASTING COMPANY ("FOX") is a corporation organized under the laws of the State of Delaware, Entity No. 2090437, and is authorized and/or registered to do business in the State of New York.

115.    Defendant FOX is a wholly-owned subsidiary of Defendant 21ST CENTURY FOX, INC.    Defendant FOX is a subsidiary of Fox Networks, Inc., which is a subsidiary of Fox Entertainment Group, Inc., which is a subsidiary of FEG Holdings, Inc., which is a subsidiary of News America Incorporated, which is a subsidiary of Defendant 21ST CENTURY FOX, INC., Inc.

116.    Defendant FOX's principal place of business within this judicial district is located at 1211 Avenue of America, New York, 10036, in the same office location as Defendant 21ST CENTURY FOX, INC.

117.    Defendant FOX actively solicits viewers of broadcast, cable and satellite television in the State of New York.

118.    Defendant FOX actively solicits internet and broadband traffic in the State of New York.

119.    At all times relevant to this action, Defendant FOX maintained control, jointly and severally with ENTERPRISE-DEFENDANTS over the means and manner in which each Plaintiff was designated to provide their talent services and/or grant their proprietary rights to Defendant FOX for its economic benefit.

120.    At all times relevant to this action, Defendant FOX was part of a single integrated enterprise with the other PRODUCER-DEFENDANTS, NETWORK-DEFENDANTS, SPONSOR-DEFENDANTS, and OVERSEER-DEFENDANTS and exercised a degree of centralized control over the

labor practices as an EMPLOYER-DEFENDANT.

121.    At all times relevant to this action, Defendant FOX exercised supervisory authority over individuals retained and/or employed as attorneys, accountants, producers, private investigators and network / production executives who actively engaged and participated in the unilateral decisions to disqualify each Plaintiff from the *American Idol* Contest.

122.    Because none of the Plaintiffs were present in the corporate suites or production offices at the time the adverse decisions were made, Plaintiffs do not know at the time of filing this complaint which of the individual FOX representatives played a role in *American Idol* disqualification decisions, rigged nature of Contest or background check policies, and expect to obtain such information through discovery.

123.    Defendant FOX should be held liable for actively partaking in, lending aid to, or ratifying and adopting the disqualifications of the Plaintiffs based on criminal conduct unrelated to the job function of performing on *American Idol.*  For eleven consecutive years, over twelve consecutive broadcast seasons, Defendant FOX and the PRODUCER-DEFENDANTS have had an apparent or actual partnership and have authority to bind one another in transactions with third parties.

124.    Defendant FOX has exercised joint ownership or control over the *American Idol* Production and *American Idol* Contest, including the selection of the Judges, the advancement of Contestants, the elimination of the Contestants and the disqualification of Contestants from 2002-present.

125.    Defendant FOX has shared in the profits generated by the *American Idol* Production, the *American Idol* Contest, *American Idol* Enterprise and *American Idol* Contestants from 2002-present.

33

126.    For eleven consecutive years, over twelve consecutive seasons, Defendant FOX's agents personally participated in and/or had the right and ability to supervise, direct and control the risk of harm and actual damages alleged in this Third Amended Complaint from 2002-present.

127.    Defendant FOX possessed a common object and purpose of the undertaking of producing the *American Idol* and *American Idol* Contest and an equal right to direct and govern the movements and conduct of the other joint venturers in respect to the common object of the enterprise, *American Idol*, and purpose of the illegal undertaking of conducting criminal background checks to intentionally interfere with Plaintiffs' constitutional rights and proprietary interests.

128.    Defendant FOX had a duty to each Plaintiff to conduct the *American Idol* Contest in good faith and consistent with U.S. law.

## OVERSEER-DEFENDANTS

129.    "OVERSEER-DEFENDANTS" shall collectively refer to Defendant Nigel LYTHGOE and Defendant Ken WARWICK.

130.    At all times herein mentioned, the OVERSEER-DEFENDANTS were the authorized agents, executives, representatives, joint venturers, partners, members, stockholders, and/or employees of the ENTERPRISE-DEFENDANTS and, in doing the things hereinafter alleged, were acting within the course and scope of such agency and/or employment.

131.    While acting under the direct control and supervision of ENTERPRISE-DEFENDANTS, the OVERSEER-DEFENDANTS played a central role in the racially-motivated decisions to disqualify each of the Plaintiffs (and other Black *American Idol* Contestants who are referenced herein) as well as the corresponding decisions not to disqualify White *American Idol* contestants who

34

enjoyed the privilege to compete.

## NIGEL LYTHGOE

132.    Upon information and belief, Defendant NIGEL LYTHGOE ("LYTHGOE") is a foreign national of the United Kingdom / Great Britain.

133.    At times relevant to this action, Defendant LYTHGOE was domiciled and/or authorized to conduct business and/or employed in the United States.

134.    Defendant LYTHGOE actively transacts business within this Judicial District in connection with his continuous role as senior executive producer of U.S.-based television programs.

135.    For over a continuous decade, Defendant LYTGHOE played an active, daily decision-making role in virtually every aspect and detail of the *American Idol* Production.

136.    Defendant LYTHGOE made the "final call" with respect to every decision to *advertise, market and promote* the disqualification of the Public-DQ-Plaintiffs (saving Golightly) from their positions as qualified, *bona fide* Prize Contestants on *American Idol*.

137.    Defendant LYTHGOE also played a central, decision-making role in the comparative decisions to advertise, market and promote White *American Idol* Contestants whose "redemption" for past criminal conduct was celebrated.

## KEN WARWICK

138.    Upon information and belief, Defendant KEN WARWICK ("WARWICK") is a foreign national of the United Kingdom / Great Britain.

139.    At times relative to this action, Defendant WARWICK was domiciled and/or authorized to conduct business and/or employed in the United States.

140.    At all relevant times, Defendant WARWICK actively transacted business within this Judicial District in connection with his continuous, uninterrupted role as senior executive producer of the *American Idol* Contest and Production from 2002-2013.

141.    For over a continuous decade, Defendant WARWICK played an active role in daily production decisions, including the production choice to publicize the disqualification of each Public-DQ Plaintiff, who were each thereafter extricated from their positions as qualified Prize Contestants in the running to win *American Idol*.

142.    Defendant WARWICK also played a central decision-making role in corresponding production decisions <u>not</u> to publicly disqualify White *American Idol* Contestants who had criminal record histories.

## SPONSOR-DEFENDANTS

143.    "SPONSOR-DEFENDANTS" shall collectively refer to Defendants FORD MOTOR COMPANY, COCA-COLA COMPANY, and AT&T MOBILITY, LLC.

## FORD MOTOR COMPANY, INC.

144.    Defendant FORD MOTOR COMPANY, INC. ("FORD") is a publicly traded corporation listed on the New York Stock Exchange [NYSE: F] and organized under the laws of the State of Delaware.

145.    FORD is a multi-national automaker with principal place of business headquartered at One American Road Suite 1026, Dearborn, Michigan 48126.

146.    FORD regularly transacts business in the State of New York and markets, advertises and sells products within this Judicial District.

147.    FORD regularly transacts business in the State of California and markets,

36

advertises and sells products within Los Angeles.

148.    At all times relevant to this action, FORD has served as one of the primary, featured and/or marquee sponsors of the *American Idol* Contest, Production and Enterprise.

149.    At all times relevant to this action, Defendant FORD has actively marketed, advertised and promoted the *American Idol* Contest, Production and Enterprise to U.S. consumers.

150.    As Prize Contestants featured on *American Idol*, each of the Plaintiffs made themselves available to promote and endorse Defendant FORD's consumer products to nationwide U.S. television audiences and to extraterritorial cable and satellite subscribers, among other consumers.

151.    Each Plaintiff rendered personal talent services, granted their copyright ownership rights and conveyed a proprietary / statutory interest in their individual names, family names, images, personas and likenesses for the economic benefit of Defendant FORD.

152.    At all times relevant to this action, it was reasonably foreseeable to Defendant FORD that it would derive a substantial economic and commercial benefit for procuring Plaintiffs' talent services and obtaining Plaintiffs' unique proprietary rights in connection with *American Idol.*

153.    Upon information and belief, Defendant FORD, and its agents, employees and/or executives acting under its control and supervision, played an active role in the decisions to disqualify Plaintiffs (as well as other Black *American Idol* Contestants).

154.    Because none of the Plaintiffs were present in the corporate suites or production offices at the time the decision was made to disqualify each Plaintiff, Plaintiffs do not know at the time of filing this complaint which of the individual FORD representatives played a role in *American Idol* disqualification decisions, rigged nature of the Contest or implementation of

background check policies.

155.    Defendant FORD should be held liable for actively partaking in, lending aid to, or ratifying and adopting the disqualifications of the Plaintiffs based on criminal conduct unrelated to the job function of performing on *American Idol*.  For eleven consecutive years, over twelve consecutive broadcast seasons, Defendant FORD and the PRODUCER-DEFENDANTS have had an apparent or actual partnership and have authority to bind one another in transactions with third parties.

156.    Defendant FORD has exercised joint ownership or control over the *American Idol* Production and *American Idol* Contest, including the selection of the Judges, the advancement of Contestants, the elimination of the Contestants and the disqualification of Contestants from 2002-present.

157.    Defendant FORD has shared in the profits and losses generated by the *American Idol* Enterprise from 2002-present.

158.    Defendant FORD's agents personally participated in and/or had the right and ability to supervise, direct and control the risk of harm and actual damages alleged in this Third Amended Complaint from 2002-present.

159.    Defendant FORD possessed a common object and purpose of the undertaking of producing the *American Idol* Contest and an equal right to direct and govern the movements and conduct of the other joint venturers in respect to the common object of the enterprise and purpose of the illegal undertaking of conducting criminal background checks to intentionally interfere with Plaintiffs' constitutional rights and proprietary interests.

160.    Defendant FORD had a duty to each Plaintiff to conduct the *American Idol* Contest in good faith and in accordance with U.S. law.

161.    Defendant FORD is liable for aiding and abetting the illegal activity described herein because Defendant FORD knowingly and intentionally funded, sponsored and ratified each and every disqualification of Plaintiffs over the course of more than a decade.

162.    Defendant FORD knew that the ENTERPRISE-DEFENDANTS' unlawful conduct constituted a breach of duty to each Plaintiff.

163.    Defendant FORD gave substantial assistance or encouragement to the ENTERPRISE-DEFENDANTS so as to enable ENTERPRISE-DEFENDANTS to commit tortious activity against Plaintiffs.

164.    Defendant FORD's assistance, participation or encouragement to the ENTERPRISE-DEFENDANTS was a substantial factor in causing the wrongful acts complained of herein in terms of the nature of the act encouraged, the amount of assistance given by Defendant FORD over time, Defendants FORD's presence at the time of the wrongful acts, the joint enterprise with the ENTERPRISE-DEFENDANTS and state of mind of FORD's agents.

165.    Defendant FORD had an equal right to control the production decisions concerning contestant disqualifications in its position as a marquee sponsor for the *American Idol* Enterprise for more than a decade.

166.    With respect to each Plaintiff, Defendant FORD ratified the ENTERPRISE-DEFENDANTS' wrongful disqualification decisions and criminal background checks after they were done, and the act of disqualification benefited, or was done in the interest of, Defendant FORD which adopted and ratified the wrongful disqualifications with knowledge of the facts surrounding each Plaintiff's disqualification.

## COCA-COLA COMPANY, INC.

167.    Defendant COCA-COLA COMPANY, INC. ("COCA-COLA") is a publicly traded corporation listed on the New York Stock Exchange [NYSE: KO] and organized under the laws of the State of Delaware.

168.    Defendant COCA-COLA is an American multi-national producer of soft drinks and beverages with principal place of business headquartered at 1 Coca-Cola Plaza, Atlanta, GA 30313.

169.    Defendant COCA-COLA regularly transacts business in the State of New York and markets, advertises and sells products within this Judicial District.

170.    Defendant COCA-COLA regularly transacts business in the State of California and markets, advertises and sells products within Los Angeles.

171.    At all times relevant to this action, Defendant COCA-COLA has served as one of the primary, featured and marquee Sponsors, advertisers and promoters of the *American Idol* Contest, Production and Franchise.

172.    As Prize Contestants featured on *American Idol*, each of the Plaintiffs made themselves available to promote and endorse Defendant COCA-COLA's consumer products to nationwide television audiences and to extraterritorial cable and satellite subscribers, among other consumers.

173.    Each Plaintiff rendered personal talent services, granted their copyright ownership rights and conveyed an interest in their individual names, images, personas and likenesses to the PRODUCER-DEFENDANTS and NETWORK-DEFENDANTS for the economic benefit of Defendant COCA-COLA.

174.    At all times relevant to this action, it was reasonably foreseeable to Defendant COCA-COLA that it would derive a substantial economic and commercial benefit for procuring

40

Plaintiffs' talent services and proprietary rights in connection with *American Idol.*

175. Upon information and belief, Defendant COCA-COLA, and its agents, employees and/or executives acting under the control and supervision of Defendant COCA-COLA, played an active role in some of the decision to unlawfully disqualify (one or more) of the Plaintiffs from their position as qualified Prize Contestant featured on *American Idol.*

176. Because none of the Plaintiffs were present in Defendants COCA-COLA's corporate suites or *American Idol* production offices at the time the decision was made to disqualify each Plaintiff, Plaintiffs do not know at the time of filing this complaint which of the individual COCA-COLA representatives played a role in *American Idol* disqualification decisions, rigged nature of the Contest or implementation of background check policies.

177. Defendant COCA-COLA should be held liable for actively partaking in, lending aid to, or ratifying and adopting the disqualifications of the Plaintiffs based on criminal conduct unrelated to the job function of performing on *American Idol.*

178. Defendant COCA-COLA and the ENTERPRISE-DEFENDANTS have had an apparent or actual partnership and have authority to bind one another in transactions with third parties from 2002-present.

179. Defendant COCA-COLA has exercised joint ownership or control over the *American Idol* Production and *American Idol* Contest, including the selection of the Judges, the advancement of Contestants, the elimination of the Contestants and the disqualification of Contestants from 2002-present.

180. Defendant COCA-COLA has shared in the profits and losses generated by the *American Idol* Enterprise from 2002-present.

181. Defendant COCA-COLA's agents personally participated in and/or had the right

and ability to supervise, direct and control the risk of harm and actual damages alleged in this Third Amended Complaint.

182.   Defendant COCA-COLA possessed a common object and purpose of the undertaking of producing the *American Idol* Contest and shared an equal right to direct and govern the movements and conduct of the other joint venturers in respect to the common object of the enterprise.

183.   Defendant COCA-COLA had a duty to each Plaintiff to conduct the *American Idol* Contest in good faith and in accordance with U.S. law.

184.   Defendant COCA-COLA should be civilly liable for aiding and abetting the illegal activity described herein because Defendant COCA-COLA knowingly and intentionally funded, sponsored and ratified each and every disqualification of Golden Ticket Holders over the course of more than a decade.

185.   Defendant COCA-COLA knew that the ENTERPRISE-DEFENDANTS unlawful conduct constituted a breach of duty to each Plaintiff and Defendant COCA-COLA gave substantial assistance or encouragement to the ENTERPRISE-DEFENDANTS so to enable them to commit tortious activity.

186.   Defendant COCA-COLA's assistance, participation or encouragement to the ENTERPRISE-DEFENDANTS was a substantial factor in causing the wrongful act in terms of the nature of the act encouraged, the amount of assistance given by the ENTERPRISE-DEFENDANTS over time, Defendant COCA-COLA's presence the time of the wrongful acts, the joint enterprise with the ENTERPRISE-DEFENDANTS and the state of mind of COCA-COLA's agents.

187.   Upon information and belief, Defendant COCA-COLA had an equal right to control the production decisions concerning contestant disqualifications given its primary role as

a marquee sponsor for the *American Idol* Enterprise from 2002-present.

188.    With respect to each Plaintiff, Defendant COCA-COLA ratified the ENTERPRISE-DEFENDANTS' wrongful disqualification decisions and criminal background checks after they were done, and the act of disqualification benefited, or was done in the interest of, Defendant COCA-COLA which adopted and ratified the wrongful disqualifications with knowledge of the facts surrounding each Plaintiff's disqualification.

## AT&T

189.    Defendant AT&T is an American multi-national provider of telecommunications services.

190.    Defendant AT&T maintains corporate offices & headquarters at 208 S. Akard St. Dallas TX 75202.

191.    Defendant AT&T also maintains corporate offices and retail stores within this Judicial District.

192.    At all times relevant to this action, Defendant AT&T has served as one of the primary, featured Sponsors, advertisers and promoters of *American Idol*.

193.    As Prize Contestants featured on *American Idol*, each of the Plaintiffs made their talent services available to promote Defendant AT&T's consumer products and services to nationwide television audiences and each rendered talent services for the economic benefit of Defendant AT&T.

194.    Each Plaintiff rendered personal talent services, granted their copyright ownership rights and conveyed an interest in their individual names, images, personas and likenesses for the substantial economic benefit of Defendant AT&T.

195.    At all times relevant to this action, it was reasonably foreseeable to Defendant AT&T that it would derive a substantial economic and commercial benefit from procuring Plaintiffs' talent services and proprietary rights in connection with *American Idol*.

196.    Upon information and belief, Defendant AT&T, and its agents, employees and/or executives acting under the control and supervision of Defendant AT&T, played an active role in the decisions to disqualify each Plaintiff.

197.    Because none of the Plaintiffs, nor their agents, were present in Defendant AT&T's corporate suites or *American Idol* production offices at the time the decision was made to disqualify each Plaintiff, Plaintiffs do not know at the time of filing this complaint which of the individual AT&T representatives played a role in *American Idol* disqualification decisions, or who had knowledge of the rigged nature of the Contest or implementation of the background check policies.

198.    Defendant AT&T should be held liable for actively partaking in, lending aid to, or ratifying and adopting the disqualifications of the Plaintiffs based on criminal conduct unrelated to the job function of performing on *American Idol*.  For eleven consecutive years, over twelve consecutive broadcast seasons, Defendant AT&T and the ENTERPRISE-DEFENDANTS have had an apparent or actual partnership and have authority to bind one another in transactions with third parties.

199.    Defendant AT&T has exercised joint ownership or control over the *American Idol* Production and *American Idol* Contest, including the selection of the Judges, the advancement of Contestants, the elimination of the Contestants and the disqualification of Contestants from 2002-2013.

200.    Defendant AT&T has shared in the profits and losses generated by the *American*

*Idol* Enterprise from 2002-2013.

201.    Defendant AT&T's agents personally participated in and/or had the right and ability to supervise, direct and control the risk of harm and actual damages alleged in this Third Amended Complaint.

202.    Defendant AT&T possessed a common object and purpose of the undertaking of producing the *American Idol* Contest and an equal right to direct and govern the movements and conduct of the other joint venturers in respect to the common object of the enterprise and purpose of the illegal undertaking of conducting criminal background checks to intentionally interfere with Plaintiffs' constitutional rights and proprietary interests.

203.    Defendant AT&T had a duty to each Plaintiff to conduct the *American Idol* Contest in good faith and in accordance with U.S. law.

204.    Defendant AT&T should be civilly liable for aiding and abetting the illegal activity described herein because Defendant AT&T knowingly and intentionally funded, sponsored and ratified such acts over the course of more than a decade.

205.    Defendant AT&T knew that the ENTERPRISE-DEFENDANTS' unlawful conduct constituted a breach of duty to each Plaintiff and Defendant AT&T gave substantial assistance or encouragement to the ENTERPRISE-DEFENDANTS so to enable them to commit tortious activity.

206.    Defendant AT&T's assistance, participation or encouragement to the ENTERPRISE-DEFENDANTS was a substantial factor in causing the wrongful act in terms of the nature of the act encouraged, the amount of assistance given by Defendant AT&T over time, Defendant AT&T's presence at the time of the wrongful act,  the joint enterprise with the ENTERPRISE-DEFENDANTS and state of mind of AT&T's agents.

207.    Defendant AT&T had an equal right to control the production decisions

concerning contestant disqualifications given its position as a lead, marquee sponsor for the *American Idol* Enterprise for more than a decade.

208.    With respect to each Plaintiff, Defendant AT&T ratified the ENTERPRISE-DEFENDANTS' wrongful disqualification decisions and criminal background checks after they were done, and the act of disqualification benefited, or was done in the interest of, Defendant AT&T which adopted and ratified the wrongful disqualifications with knowledge of the facts surrounding each Plaintiff's disqualification.

# *AMERICAN IDOL*

# *AMERICAN IDOL*
## TERMINOLOGY

## A.    CONTEST-RELATED TERMS

210.    **"*American Idol*,"** shall collectively refer to the *American Idol* Contest, the *American Idol* Production and the *American Idol* Enterprise.

211.    "***American Idol* Contest** " shall refer to the purported *bona fide* singing and talent contest that is marketed to U.S. consumers as a "contest" and that is depicted as a *bona fide* contest via the *American Idol* Production.

212.    **"*American Idol* Production"** shall refer to the television series entitled *American Idol* and all of the copyrighted audio-visual works embodying episodes of the series that have been broadcast on FOX, from June 2002 to present.

213.    **"*American Idol* Enterprise"** shall refer to the global franchise of "IDOL"-related brands, productions, products and services related to American Idol.

214.    **"Contestants"** shall refer to any and all singers who have been depicted as contestants on *American Idol*.

215.    **"Contest Prizes"** shall refer to the economic value of the 19 Entertainment Prize Contracts or Advertised Contest Prizes and all consequential benefits and privileges derived from being awarded such prizes.

216.    The terms **"disqualification"** or **"disqualified"** shall refer to the adverse action taken against any Plaintiff or prospective Class Member at the absolute and sole discretion of the ENTERPRISE-DEFENDANTS via their permanent removal from the pool of Contestants who were deemed qualified by the panel of Expert Judges to win the Contest Prizes.

48

217.    The terms **"eligibility"** or "**eligible**" shall refer to the published eligibility requirements that Contestants must satisfy before auditioning for *American Idol* at Open Auditions. The eligible age-range for Contestants is currently fifteen (15) to twenty-eight years old. The initial age limit was sixteen to twenty-four in the first three seasons, but the upper limit was raised to twenty-eight in Season Four, and the lower age limit was reduced to fifteen in Season Ten. The Contestants must be legal U.S. residents (citizens or permanent residents).

218.    The terms **"elimination"** or **"eliminated"** shall refer to the removal of a Contestant from the *American Idol* contest for reasons related to their individual performances in the contest, as determined by the panel of Judges or public vote.

219.    **"Finalist(s)"** shall refer to Top 10 Contestants of Season One, the Top 10 Contestants of Seasons Two through Season Seven, the Top 13 Contestants of Season Eight, the Top 12 or Top 13 Contestants of Seasons Nine, Ten, Eleven and Twelve. Each Finalist performs songs in the Finals based on a weekly theme which may be a musical genre such as Motown, disco, or big band, songs by artists such as Michael Jackson, Elvis Presley or The Beatles, or more generic themes such as Billboard Number 1 hits or songs from the contestant's year of birth.

220.    **"Finals"** shall refer to the final contest rounds of the American Idol Contest in which the Finalists perform. The Finals are broadcast in prime time from CBS Television City in Los Angeles, California in front of a live studio audience. The Finals lasted eight weeks in Season One, eleven weeks in subsequent seasons until Seasons Ten and Eleven which lasted twelve weeks.

221.    **"Golden Ticket"** shall refer to the certificate received by each Plaintiff or prospective Class Member, and other Contestants featured on *American Idol,* who have been

49

deemed qualified by a panel of Expert Judges to compete in the *American Idol* Contest based on their individual merit as singers and performers.

222.    **"Golden Ticket Holders"** shall refer to all performers featured on *American Idol*, from June 2002 through 2012, who were publicly awarded a Golden Ticket offer to compete in Hollywood Rounds after being qualified by the Expert Judges on the basis of their individual talent and merit. "Golden Ticket Holders" are also referred to as "*bona fide* contestants."

223.    **"Hollywood Rounds"** or **"Hollywood Week"** shall refer to the first round in the Contest held in Los Angeles, California after Contestants have been awarded a Golden Ticket at the Open Auditions. Once in Hollywood, the contestants perform individually or in groups in a series of rounds. Until season ten, there were usually three rounds of eliminations in Hollywood. In the first round the contestants emerged in groups but performed individually. For the next round, the contestants put themselves in small groups and perform a song together.

224.    **"Expert Judge(s)"** shall refer to the resident judges featured on *American Idol,* including Simon Cowell (Season One-Season Nine), Randy Jackson (Season One-Season Twelve), Paula Abdul (Season One-Season Eight), Kara DioGuardia (Season Eight-Season Nine), Ellen DeGeneres (Season Nine), Jennifer Lopez (Season Ten- Season Eleven), Steven Tyler (Season Ten-Season Eleven).

225.    **"Guest Judges"** shall refer to any judge featured on Seasons One to Seasons Eleven of the Production who was not an Expert Judge.

226.    **"Open Auditions"** shall refer to the initial auditions organized and staged by the Joint-Venture Defendant in multiple cities throughout the United States each season. The auditions are open to all U.S. citizens or permanent residents who meet the published eligibility requirements. Golden Tickets are awarded at the Open Auditions based on individual merit. Open

Auditions are also referred to as "cattle call" auditions.

227.    **"Prize Contestants"** shall collectively refer to Hollywood Round Contestants, Semi-Finalist Contestants and Finalist Contestants.

228.    **"Semi-Finalist(s)"** shall refer to the Top 30 Contestants in Season One; Top 32 Contestants in Season Two and Season Three; the Top 24 Contestants in Seasons Four, Five, Six and Seven, the Top 36 Contestants in Season Eight; and the Top 24 Contestants in Season Nine.

229.    **"Semi-Finals"** shall refer to the rounds in which Semi-Finalists compete. From Seasons One to Three and Eight to Eleven, the Semi-Finalists were split into different groups to perform individually in their respective night. In Season One, there were three groups of ten, with the top three Contestants from each group making the Finals. In Seasons Two and Three, there were four groups of eight, and the Top 2 of each selected. In Season Eight there were three groups of twelve, with three contestants moving forward – the highest male, the highest female, and the next highest-placed singer. In Season Ten and Eleven, the males and females perform on separate nights and five of each were chosen. From Seasons Four to Seven and Nine, the 24 Semi-Finalists were divided by gender in order to ensure an equal gender division in the Top 12. The men and women sang separately on consecutive nights, and the bottom two in each groups were eliminated each week until only six of each remained to form the Top 12.

230.    **"Wild Card"** shall refer to the rounds within the Semi-Finals where Contestants who failed to qualify through audience voting were given another chance. In Seasons Two and Three, each of the three judges championed one Contestant with the public advancing a fourth into the finals, making 12 finalists in all. In season eight, four were chosen by the judges to produce a final 13. In seasons ten and eleven, three wildcards were chosen, again making a total of 13.

## B.    PRODUCTION SEASONS

231.    **"Season One"** is the season of *American Idol* that was broadcast from June 11, 2002 through September 4, 2002.  Kelly Clarkson was declared the winner.

232.    **"Season Two"** is the season of *American Idol* that was broadcast from January 21, 2003 through May 21, 2003.  Reuben Studdard was declared the winner.

233.    **"Season Three"** is the season of *American Idol* that was telecast from January 19, 2004 through May 26, 2004.  Fantasia Barrino was declared the winner.

234.    **"Season Four"** is the season of *American Idol* that was broadcast from January 18, 2005 through May 25, 2005.  Carrie Underwood was declared the winner.

235.    **"Season Five"** is the season of *American Idol* that was broadcast from January 17, 2006 through May 30, 2006.  Taylor Hicks was declared the winner.

236.    **"Season Six"** is the season of *American Idol* that was broadcast from January 16, 2007 through May 23, 2007.  Jordin Sparks was declared the winner.

237.    **"Season Seven"** is the season of *American Idol* that was broadcast from January 15, 2008 through May 21, 2008.  David Cook was declared the winner.

238.    **"Season Eight"** is the season of *American Idol* that was broadcast from January 13, 2009 through May 20, 2009.  Kris Allen was declared the winner.

239.    **"Season Nine"** is the season of *American Idol* that was broadcast from January 12, 2010 through May 26, 2010.  Lee Dewyze was declared the winner.

240.    **"Season Ten"** is the season of *American Idol* that was broadcast from January 19, 2011 through May 25, 2011.  Scott McCreery was declared the winner.

241.    **"Season Eleven"** is the season of *American Idol* that was broadcast from January 18, 2012 through May 23, 2012.  Phillip Phillips was declared the winner.

242.    **"Season Twelve"** is the season of *American Idol* that was broadcast from January 18, 2012 through May 23, 2012.  Phillip Phillips was declared the winner.

## C.    "REALITY TV"

243.    On June 11, 2002, FOX premiered the first season of *American Idol*.

244.    *American Idol* has been characterized by the media and JOINT VENTURE-DEFENDANTS as a "Reality TV" Contest.

245.    *American Idol* is marketed, packaged, advertised and labeled by JOINT-VENTURE DEFENDANTS as a "contest" whose winner is determined by the "vote" of the televised viewing audience after a select number of semi-finalists (anywhere from 24 to 45) have been pre-selected by expert "judges" for U.S. audience voting consideration.

246.    The target audiences of *American Idol* believe that the content of the program portrays a *bona fide* singing contest featuring real people.

247.    In the genre of Reality TV, "real people" are depicted as playing the role of themselves in an "unscripted" television program. In contrast, the term "scripted" is commonly used in the television industry to refer to a dramatic work of fiction.

248.    At the time of their participation on *American Idol,* each of the Plaintiffs named herein believed that they were contestants who were qualified as themselves to compete in a *bona fide* contest for a valuable prize.

## D.    TALENT "CONTEST"

249.    At all times relevant to this action, JOINT-VENTURE DEFENDANTS promoted and advertised the *American Idol* Contest to the U.S. consumer market as a *bona fide* talent contest for a valuable prize.

250.    Plaintiffs each were solicited by JOINT-VENTURE DEFENDANTS to enter into what JOINT VENTURE-DEFENDANTS publicly advertised to the U.S. consumer market as an opportunity to appear on a national television show through live exhibition of Plaintiffs' singing talent.

251.    At all times relevant to this action, JOINT-VENTURE DEFENDANTS actively solicited the personal talent services and live appearances of each Plaintiff for the purpose of commercially exploiting - throughout the world and into perpetuity – each Plaintiff's unique personal appearances and proprietary rights to publicity as embodied by each Plaintiff's name, voice, image, persona, likeness, personal background and identity.

252.    Plaintiffs each met ALL of the eligibility requirements published by JOINT-VENTURE-DEFENDANTS prior to Plaintiffs making their personal talent services available.

253.    The *American Idol* Contest is a purported game of skill because the performances of the Contestants are depicted in the program and through commercial advertisements as being scored by the Expert Judges from the professional music industry – and no other third party.

254.    The element of chance in the *American Idol* Contest is dictated by (what purports to be) the popular vote of the U.S. public, who as a collective do not necessarily cast a vote for the Contestant exhibiting the highest level of skill.

## E.    EXPERT "JUDGES"

255.    At all relevant times, JOINT VENTURE-DEFENDANTS retained and promoted Expert Judges with respected music industry backgrounds to serve as the *American Idol* panel of Judges.

## F.    CONTEST "PRIZES"

256.    In Season One (June 2002), the official prize for winning *American Idol* was advertised by ENTERPRISE-DEFENDANTS as a "$1 Million Dollar Recording Contract.

257.    Upon information and belief, at all times after the broadcast of Season One, JOINT VENTURE-DEFENDANTS did not advertise any cash value amount in connection with the prize awarded for winning *American Idol*, but in lieu thereof stated that the victorious Contestant would be awarded a "Major Label" recording contract.

258.    The terms, conditions and actual cash value of the prize for winning the contest depicted on *American Idol* (the "Prize") are NOT disclosed to U.S. consumers and prospective contestants by the JOINT VENTURE-DEFENDANTS as part of the marketing, promotions or advertisements in connection with the purported *bona fide* contest.

## G.    PUBLIC "VOTING"

259.    At all times relevant to this action, JOINT VENTURE-DEFENDANTS have publicly represented and advertised that from the outset of the Semi-Finalist rounds each season, the Contestants' advancement through the successive elimination rounds depends entirely upon the votes cast by the U.S. television viewing audience.

260.    At all times relevant to this action, JOINT VENTURE-DEFENDANTS have publicly represented and advertised that once the Semi-Finalists begin the on-air competition, votes by the American public solely determine who continues to compete, who gets voted off, and eventually who will be named the American Idol.

## H.    DISQUALIFICATIONS

261.    In August 2002, during the first season of *American Idol* [2002], PRODUCER-DEFENDANTS published a book entitled AMERICAN IDOL: THE OFFICIAL BOOK. Regarding disqualification, the book states: "**Disqualifications: We reserve the right to disqualify or exclude, in our sole and absolute discretion, any individual from any of the auditions**

55

**for any reason**.” [CDC_004259] (emphasis added).

---

# *AMERICAN IDOL*
# CONSUMER TRANSACTIONS

## A.    "OPEN AUDITION" AGREEMENT[2]

262.    In response to JOINT VENTURE-DEFENDANTS' solicitation to U.S. consumers, Plaintiffs each attended Open Auditions, during their respective seasons of *American Idol*, which were promoted and organized at a time and place specified in advance by JOINT VENTURE-DEFENDANTS

263.    Upon Plaintiffs' attendance at the multiple-day Open Auditions, JOINT VENTURE-DEFENDANTS held a "cattle call" audition in which each Plaintiff was selected by agents of PRODUCER-DEFENDANTS.

264.    Based on their individual merit as young, talented American singers, each Plaintiff earned a position to perform in front of the resident *American Idol* Expert Judges in their respective seasons.

## B.    "GOLDEN TICKET TO HOLLYWOOD"[3]

265.    After each Plaintiff rendered their live talent services for evaluation by the *American Idol* Expert Judges, each Plaintiff was deemed <u>qualified</u> by virtue of their respective singing ability to enter the *American Idol* Prize Contest and compete in Los Angeles, California.

266.    As a result of being adjudged qualified to compete in California, PRODUCER-DEFENDANTS issued each Plaintiff, at different times relevant to this action, a "Golden Ticket" to Hollywood.

---

[2] At the time of filing, Plaintiffs are only in possession of Season One version of the OPEN AUDITION AGREEMENT.

[3] At the time of filing, Plaintiffs are only in possession of Season Two version of the Golden Ticket. [CDC_000178]

267.    The Golden Ticket (Season Two) reads in part:

"CONGRATULATIONS! YOU HAVE MADE IT TO THE NEXT ROUND OF
AUDITIONS, WHICH WILL BE HELD IN HOLLYWOOD,
CALIFORNIA…AN INFORMATION PACKET WILL BE MAILED TO YOU
WITHIN 10-14 BUSINESS DAYS.  THIS PACKET WILL INCLUDE ALL THE
ANSWERS TO YOUR QUESTIONS …. YOU ARE <u>OFFICIALLY</u> ON YOUR
WAY TO BECOMING THE NEXT AMERICAN IDOL!" [CDC_00178]

268.    The "Information Packet" referred to on the face of the Golden Ticket includes the
"AMERICAN IDOL CONTESTANT AGREEMENT" and a "PARTICIPATION BACKGROUND INFORMATION
FORM".

## C.    "*AMERICAN IDOL* CONTESTANT AGREEMENT"[4]

269.    Before JOINT VENTURE-DEFENDANTS bear the expense of transporting each Golden
Ticket Holder to Los Angeles, California, each Plaintiff (and prospective Class Member) was
required to execute certain documents and transmit them back to the PRODUCER-DEFENDANTS and
NETWORK-DEFENDANTS.

270.    In Season Two (2002-2003), ENTERPRISE-DEFENDANTS caused to mail and/or fax
to Plaintiff ANDREWS, Plaintiff SMALLEY and Plaintiff CLARK the AMERICAN IDOL
CONTESTANT AGREEMENT just a few short days prior to their scheduled flight to Los Angeles,
California to participate in the Hollywood Rounds.

271.    From Season Three (2003) through Season Nine (2010), in the days prior to flying
to Los Angeles, California to participate in the Hollywood Rounds, PRODUCER-DEFENDANTS
caused to mail, e-mail and/or fax to Plaintiffs WILLIAMS, WATSON, DANIELS, T.
BRITTENUM, D. BRITTENUM, JOYNER AND GOLIGHTLY documentation consisting in

---

[4] At the time of filing, Plaintiffs are only in possession of Season Two, Season Eight and Season Nine versions of the
AMERICAN IDOL CONTESTANT AGREEMENT.

part of both the AMERICAN IDOL CONTESTANT AGREEMENT and the PARTICIPANT BACKGROUND QUESTIONNAIRE FORM.

272.    Execution of the non-negotiable instrument AMERICAN IDOL CONTESTANT AGREEMENT was a pre-requisite to being transported by JOINT VENTURE-DEFENDANTS to the State of California for the performance of Plaintiffs' respective talent services.

273.    Written completion of the PARTICIPANT BACKGROUND QUESTIONNAIRE FORM by each Plaintiff was a pre-requisite to being transported to the State of California for the rendering of Plaintiffs' respective talent services.

274.    At all relevant times, ENTERPRISE-DEFENDANTS collectively referred to the PARTICIPANT BACKGROUND QUESTIONNAIRE FORM and the AMERICAN IDOL CONTESTANT AGREEMENT as the "Participant Application."

## (1)    PARTIES TO THE CONTESTANT AGREEMENT

### Season Two Version

275.    The AMERICAN IDOL CONTESTANT AGREEMENT is purportedly binding upon each Plaintiff as a "contestant," on the one hand, and the "Producer", on the other hand.

276.    "Producer" is defined in the AMERICAN IDOL CONTESTANT AGREEMENT as "[Defendant] American Idol Productions, Inc. (AIP), or its designees (together with their respective parent, assigns, subsidiaries and affiliated companies, individually and collectively)."

277.    "Network" is defined in the AMERICAN IDOL CONTESTANT AGREEMENT as "[Defendant] FOX Broadcasting Company."

278.    "Released Parties" named in the AMERICAN IDOL CONTESTANT AGREEMENT (SEASON TWO) include 19 RECORDINGS LTD., 19 MERCHANDISING LTD., 19 MANAGEMENT LTD.,

19 TV Ltd., AT&T, Telescope; BMG, RCA Records, Arista Records, CBS Entertainment [CDC_000193; 195].

279.    "Third Party Beneficiaries" named in paragraph G.10 in the AMERICAN IDOL Contestant Agreement, v.2 include 19 Recordings Ltd., 19 Merchandising Ltd., 19 Management Ltd., 19 TV Ltd., and the Network-Defendants

**Season Eight**

280.    **Third Party Beneficiary**, ¶ F.10, p. 19, provides:

> I acknowledge and agree that, insofar as the terms of this Agreement relate to CKX, Inc., the Network, FremantleMedia North America, Inc., the 19 Companies, or any other entities described herein, each of them shall be considered as third party beneficiaries to this Agreement.

## (2)    PURPOSE OF THE CONTESTANT AGREEMENT

**Season Two**

281.    As per paragraph A.1 of the AMERICAN IDOL Contestant Agreement (SEASON TWO):

> "the principal nature and purpose of the Program is to produce a television program in which a competition will be conducted (the "Competition") to search for and select a recording artist." [AICA_02, ¶A.1; CDC_00189]

**Season Eight**[5]

282.    On August 28, 2008, Plaintiff Joyner executed the 21-page American Idol Contestant Agreement for **Season Eight.** The agreement was counter-signed by Producer-Defendants' representative, Amanda Chacon, on September 18, 2008 [CDC_3480]

283.    **Confidentiality**, ¶ A.14, p. 5, provides in relevant part:

---

[5] From this point forward, Plaintiffs highlight certain key language of the AMERICAN IDOL CONTESTANT AGREEMENT, VERSION 8, for illustrative purposes only and respectfully refer the Court to copies of the actual agreements for the language in its context.

> I understand that my appearance on the Program, if any, is strictly for the
> purpose of participating in the Program as a contestant. **[CDC_003465]**

284.   **RECITAL** to the *American Idol* CONTESTANT AGREEMENT (V.08), P. 1, provides in

relevant part:

> I understand that I am being considered as a contestant for the television
> series entitled "AMERICAN IDOL" (the "Program") to be produced by
> American Idol Productions, Inc., or its designee (together with their
> respective parent, assigns, subsidiaries and affiliated companies,
> individually and collectively, "Producer"), and intended for initial
> exhibition by Fox Broadcasting Company ("Network") … Producer
> requires me to enter into this Agreement in order to be considered as a
> contestant on the Program, and I deem it to be in my best interest to
> enter into this Agreement. **[CDC_003461]**

285.   **NATURE OF THE PROGRAM/AVAILABILITY**, ¶ A.1, P. 1, provides:

> I understand and acknowledge that the principal nature and purpose of
> the Program is to produce a television program in which a competition
> will be conducted (the "Competition") to search for and select a
> recording artist. If I am selected by Producer to be a contestant on the
> Program, I agree to be available on an exclusive basis to participate as a
> contestant in connection with the production of the Program in the Los
> Angeles, California area, or any other location required by Producer, as
> and to the extent required by Producer, commencing on a date to be
> determined by Producer and continuing until the completion of my
> participation on the Program as required by Producer. I further agree to
> be available and to participate as, when and where Producer may require
> in connection with publicity, interviews, promotional appearances on
> behalf of sponsors and similar matters (for example, to appear on news
> shows, talk shows and other programs, including other Network
> programs, and to make other appearances as required by Producer) in
> connection with the Program, or otherwise, as, when and where
> designated by Producer in its sole discretion, as more fully set forth in
> Section C below. **[CDC_003461]**

## (3)   CONTEST RULES

286.   **AGREEMENT TO COMPLY WITH ALL RULES**, ¶ A.5, P. 3 provides in relevant part:

> I have voluntarily agreed to participate as a contestant in the Program, if
> selected by Producer in Producer's sole discretion. I agree to follow all of
> Producer's rules, directions and instructions in all matters relating to the
> Program (including contestant selection and decisions regarding the creation
> and implementation of terms, conditions and rules governing the Program). I
> further agree that (i) all Program rules are subject to change by Producer in

Producer's sole discretion, at any time including, without limitation, while I am participating as a contestant on the Program and that (ii) Producer's decision(s) on all matters (including contestant selection, song selection, the amount of exposure each contestant may or may not receive on the Program or in the promotion for the Program, and the manner in which the Program is produced) shall be final and binding . . . I understand that Producer reserves the right, in its sole discretion, to change, add to, delete from, modify or amend the terms, conditions and rules affecting the conduct of the contestants on the Program, the Program activities, the elimination of contestants from the Program and the granting of any prize(s) . . . I hereby acknowledge that the interests of the Program shall override those of any contestant in the Program. [CDC_003463]

287.    VOTING SYSTEM, ¶A.6, P. 3 provides in relevant part:

I understand that Producer will use commercially reasonable efforts to ensure the integrity of the telephone voting systems anticipated to be used in connection with the Competition (including but not limited to wireless, wireline and/or other forms of telephony; text messaging, MMS messaging, and SMS messaging; online and the Internet; and, any other forms of voting chosen by Producer in its sole discretion) (the "Voting Systems"); however, I acknowledge that problems may occur. In the event of any problems with the telephone voting systems used to determine the advancement of the contestants in the Competition and the selection of the ultimate winner of the Competition, which problems may include the partial or total failure of the system or the misuse of the system by callers or others, Producer shall have the right to determine the advancement of contestants and/or the selection of the winner of the Competition in its sole discretion. I agree to accept the decision of Producer in all such matters as final and binding. Furthermore, I will not myself, nor will I authorize, assist, encourage, permit or facilitate others to, tamper with the telephone Voting Systems, including but not limited to "phone slamming" via a computer device or other computer hacking methods. I understand and acknowledge that any tampering with the Voting Systems or any aspect of the voting shall be grounds for immediate disqualification from the Program and the Competition. [CDC_003463]

## (4)    PRIZES

288.    PROFESSIONAL CONTRACTS; OTHER AGREEMENTS, ¶ E.1, P.14,

provides in relevant part:

[I hereby represent and warrant as follows:] I understand that it is anticipated that the winner of the Competition will be awarded a talent representation contract, a merchandising contract and a recording contract. [CDC_003476]

289.    FUTURE AGREEMENTS, PRIZE, ¶C.6, PP. 10-11, provides in relevant

part:

> The other provisions of this Section C, I understand and agree that <u>in the
> event I am one of the final twenty-four (24) contestants in the Competition</u>
> (which number may be increased or decreased, in Producer's sole discretion)
> ("Top 24"), I will be required to enter into the following agreements: (a) an
> agreement with 19 Recordings Limited (or an affiliate or designee), for my
> exclusive services as a recording artist; (b) an agreement with 19
> Merchandising Limited (or an affiliate or designee) for the use of my name,
> likeness and biography in connection with advertising, endorsements,
> merchandising and sponsorship; (c) an agreement with 19 Management
> Limited (or an affiliate or designee) for the management of my career as an
> artist; and (d) an agreement with 19 TV Limited (or an affiliate or designee)
> for my services in relation to the "American Idol Attraction" at Disney World
> Resort in Orlando, Florida and the Disney "What's Next" campaign.
> [CDC_003470-71]

290.    PRIZES, ¶ F.3, P.18, provides:

> <u>I acknowledge and agree that the amount and/or nature of cash and/or
> prizes awarded are subject to change by Producer, in its sole discretion,
> at any time including, without limitation, while I am participating as a
> contestant on the Program.</u> Furthermore, in the event of a <u>malfunction</u>
> of any nature whatsoever affecting the manner in which the Program is
> produced, the telephone voting system, the Program rules, the <u>outcome
> of the Program</u> and/or the awarding of cash and/or prizes, <u>Producer's
> decision with respect to handling of such malfunction</u> including, but not
> limited to, the awarding of cash and/or prizes, <u>shall be final</u>.

> If a cash prize is awarded to me, then payment shall be made to me
> as Producer, in its absolute sole discretion, shall deem appropriate. If
> Producer, the 19 Companies, <u>or any other entity described hereunder
> deems that I am ineligible</u> to receive any prize, such ineligibility shall
> be considered a forfeiture of that prize by me and shall release Producer,
> the Network, any parent, subsidiary, affiliate, or division of either of them,
> and all persons and entities connected with the Program, from any
> and all obligations in connection with such prize. I shall pay all state and
> federal or other taxes on <u>any and all cash and/or prizes I win</u>. I release
> the Released Parties of liability for any such taxes. Producer may deduct
> or require payment of any such taxes before delivery of a prize. I shall not
> advertise my winning of any prize prior to delivery of the prize.

## (5)  PRODUCERS' UNFETTERED DISCRETION[6]

291.  **PRODUCER'S RIGHT TO SUSPEND OR TERMINATE AGREEMENT**, ¶ F.1, P.17, provides:

> Producer shall have the right to suspend or terminate this Agreement, as decided by Producer in its sole and absolute discretion, if Producer elects to terminate my participation in the Program or my involvement in any events related to the Program, if the Program is canceled, if the Program format is materially altered, if there is an event of Force Majeure (as defined below), upon my Incapacity (as defined below), or for any reason or no reason whatsoever. "Incapacity" includes without limitation my physical or mental disability, default, or conviction of a [CDC_003477]

292.  **FALSIFICATION OF DOCUMENTS**, ¶ A.6, P. 4, provides in relevant part:

> I acknowledge that Producer reserves the right exercisable at any time at its sole discretion to disqualify me from the Competition should I at any stage fail to supply any information reasonably requested of me, supply untruthful, inaccurate or misleading personal details or information, break the rules or otherwise breach the terms contained herein or for any other reason, at the sole discretion of Producer.

293.  **ALTERNATES**, ¶ A.10, P. 4, provides in relevant part:

> I understand that I may be chosen as an alternate contestant to replace another contestant by Producer, I acknowledge and agree that Producer may, at any time and in its sole discretion, add, remove or replace contestants for any reason or for no reason at all.  [CDC_003464]

294.  **FURTHER DOCUMENTS; DISQUALIFICATION**, ¶ A.12, P. 4 provides:

> I acknowledge that Producer may require me to sign further documents and agreements as a condition of my participation in the contestant selection process and my participation in the Program. If I fail or am unable to promptly execute any such documents or instruments, I hereby irrevocably appoint Producer as my attorney-in-fact to execute and file any such documents or instruments or to do any such acts or deeds, provided that said documents, instruments, acts, and deeds shall not be inconsistent with the terms and conditions of this Agreement. I agree that Producer's and the Network's rights under this Section A.12 constitute a power coupled with an interest and are irrevocable. I understand that I may be removed or disqualified from the Program by Producer for any reason or for no reason at all. I also understand that no such removal or disqualification from the

contestant selection process and/or Program will affect any of the rights granted or assigned by me or any of the covenants, agreements, waivers, releases or indemnities made by me in this Agreement, the audition agreements previously executed by me, or any other agreements that I may make, as well as any and all exhibits and attachments to any of the foregoing documents. <u>I also understand that if I refuse to sign any further agreements, releases, authorizations or waivers as required by Producer, I may not be permitted to participate further in the contestant selection process and/or the Program. If I am disqualified from the contestant selection process and/or the Program, Producer may make any explanation or announcement (or no explanation or announcement) to the public through any and all media, including but not limited to the Program, that Producer chooses, as to the reason I was disqualified.</u> All decisions of Producer, in its sole discretion, concerning selection and disqualification of contestants are final and binding. **[CDC_003465]**

295.   **NO OBLIGATION BY PRODUCER**, ¶ A.13, provides:

<u>I understand and agree that the selection of contestants is and shall be within Producer's sole discretion</u> and that Producer is not obligated to select me. I further understand and agree that an invitation by Producer to Los Angeles, California, and/or the studio does not guarantee my appearance or participation as a contestant. If I am selected, and if I appear on the Program or any part thereof, Producer is under no obligation to broadcast, exhibit, or otherwise use or exploit my appearance on the Program or any part thereof. **[CDC_003465]**

## (6)   FEDERAL CONTEST-RIGGING STATUTE

296.   **FCC (FEDERAL COMMUNICATIONS COMMISSION)**, ¶ A.14, P. 21, provides:

<u>I am aware that it is a federal offense punishable by fine and/or imprisonment for anyone to do anything which would rig or in any way influence the outcome of the Program with the intent to deceive the viewing public,</u> including but not limited to, tampering with the telephone voting system, and that <u>it is a federal offense to offer or to accept any information or secret assistance in connection with the Program</u>. I agree that I will not participate in any such act or any other deceptive or dishonest act with respect to the Program. If anyone attempts to induce me to perform any such act, I shall immediately notify the Producer as provided in Section A.22, below. **[CDC_003466]**

## (7)   RIGHTS OF PUBLICITY / COPYRIGHT / REPUTATION

297.   **NAME AND LIKENESS**, ¶ B.24, P. 7, provides in relevant part:

I hereby consent to Producer's filming, taping, photographing and/or

recording me for use In and in connection with the Program (including, without limitation, whether I am aware or unaware of the filming, taping, photographing or recording, and by requiring me to wear a microphone up to 24-hours-a-day, 7-days-a-week, at Producer's discretion) and agree to cooperate fully with Producer in such activities. I acknowledge and agree that Producer will be the sole and exclusive owner of all rights and material filmed, taped, photographed and/or recorded pursuant to this Agreement.

In addition, I hereby grant to Producer the unconditional right throughout the universe in perpetuity to use, simulate or portray (and to authorize others to use, simulate or portray) or to refrain from using, simulating or portraying, my name, likeness (whether photographic or otherwise), voice, singing voice, personality, personal identification, personal experiences, life story, biographical data, incidents, situations and events which heretofore occurred or hereafter occur, including without limitation the right to use, or to authorize others to use, any of the foregoing in or in connection with the Program (or any episode or portion thereof) and the advertising, promotion or publicizing of the Program or any Program episode by Producer, the Network, its operations, activities or programming services and in connection with any merchandise, tie-in, sponsor, product or service of any kind by Producer, the Network, or any of its programming services, and in any other manner whatsoever as Producer may elect in its sole discretion (including, but not limited to, exploitation on the Internet, wireless Internet, MMS and SMS messaging).

I understand that in and in connection with the Program, I may reveal and/or relate, and other parties (including, without limitation, employees, agents or representatives of Producer, the Network, CKX, Inc., Telescope, Sony/BMG, the Ford Motor Company, Coca-Cola, AT&T Mobility, LLC, Fox Digital Media, and/or the 19 Companies, and each of their parents, affiliates, and subsidiaries; other contestants; the judges, host, guest stars and/or special correspondents of the Program) may reveal and/or relate information about me of a personal, private, intimate, surprising, defamatory, disparaging, embarrassing or unfavorable nature, that may be factual and/or fictional. I further understand that my appearance, depiction and/or portrayal in the Program and my actions and the actions of others displayed in the Program, may be disparaging, defamatory, embarrassing or of an otherwise unfavorable nature and may expose me to public ridicule, humiliation or condemnation.

298.    OWNERSHIP OF RIGHTS, ¶ B.5, P. 8, provides in relevant part:

Without limiting the foregoing, I acknowledge and agree that all of the results and proceeds of my granting of rights hereunder including, without limitation, all Contestant Images, artistic, literary, dramatic, musical, photographic, choreographic, and other materials which I may create or furnish in connection with my participation on the Program (collectively, the "Materials"), are being specially commissioned by Producer as a contribution to an audiovisual work and, accordingly, the copyright (and all renewals and extensions thereof) and all other proprietary rights, title and

interest in such Materials shall be owned by Producer as the author of such Materials,  [CDC__003468]

## (8) LEGAL STATUS OF CONTESTANT

299.  **SERVICES EXCLUSIVE**, ¶ C.3, P. 10, provides in relevant part:

I agree that during the Exclusivity Period, I shall not appear on or authorize production of or participate in any way with any other television programming, radio programming, print media, on-line services, or any other media outlet now known or hereafter devised (including but not limited to any television or radio programs or internet-based competitions similar to the Program, such as those consisting of or containing a talent contest relating to my musical/performing abilities), or in any commercials or advertisements without the prior written consent of Producer, FremantleMedia North America, Inc., CKX, Inc., the Network, and the  19 Companies. In addition, I agree that for a period of one (1) year from the Season 8 Finale, I will not participate in or render services as a host or judge in any television programs, radio programs, internet-based competitions, or competitions through other media, similar to the Program, without Producer's prior written consent. [CDC_003470]

300.  **WAIVER OF ALL CLAIMS AND SUITS, RELEASED CLAIMS**, ¶A.6, P.14 provides  in

relevant part:

I and the other Releasing Parties hereby unconditionally and irrevocably release and forever discharge each of the Released Parties …from and against any and all claims, liens, agreements, contracts…and liabilities of whatever kind or nature in law, equity or otherwise, whether now known or unknown, suspected or unsuspected, and <u>whether or not concealed or hidden</u> (collectively, the "Released Claims") arising out of or in connection with my preparation for, travel and living accommodations in connection with, participation and appearance in, <u>and withdrawal or elimination from the Program</u> or activities associated with the Program or the production and exploitation of the Program, including, without limitation, claims for injury, illness, damage, loss or harm to me or my property, or my death.

The Released Claims shall include, but not be limited to, those based on negligence of any of the Released Parties … products liability, breach of contract, <u>breach of any statutory or other duty of care owed under applicable laws</u>, <u>defamation</u>, invasion of privacy, publicity or personality, infringement of copyright, and those based on my possession or use of any prize. [CDC_003474]

301.  **GUILDS**, ¶ E.5, P.16, provides in relevant part:

[I hereby represent and warrant as follows:] I am not a member of AFTRA,

SAG or any other performing arts union or guild.  **[CDC_003476]**

302.    **REMEDIES**, ¶ F.4, P.18, provides in relevant part:

I acknowledge and agree that the rights I have granted hereunder and <u>my participation related thereto are unique, unusual, special and extraordinary,</u> the loss of which would not be adequately compensable in damages in an action at law. I further agree that, in addition to any rights or remedies which Producer may have under this Agreement or otherwise,  **[CDC_003478]**

303.    **RELATIONSHIP OF PARTIES**, ¶ F.7, PP.18-19, provides:

<u>I acknowledge and agree that my relationship to Producer is limited solely to that of a grantor of rights and **not as an employee** of Producer or of an independent contractor.</u> I acknowledge and agree that I will be responsible for payment of all taxes and insurance applicable under existing law on all amounts paid to me hereunder, including but not limited to, Social Security taxes, federal, state and local income taxes, disability, unemployment and workers compensation insurance. I hereby agree to complete, execute and deliver, in person, to Producer all required forms necessary for identity and eligibility under the Immigration Reform and Control Act. I warrant and represent that I will make all necessary payments due governmental agencies to comply with the foregoing. **[CDC_003478-79]**

304.    **NO WAGES**, ¶ A.24, P. 6, provides:

<u>I acknowledge that my contribution to the Program is not a professional performance or appearance and does not entitle me to wages,</u> salary or other compensation, except as may otherwise be set forth herein.  **[CDC_003466]**

305.    **COMPLETE AGREEMENT; APPLICABLE LAW**, ¶ F.8, PP.19, provides in relevant part:

This Agreement, and any exhibits and attachments hereto, contain the entire understanding between the parties, and supersedes all prior negotiations, understandings and agreements (whether written or oral) of the parties hereto relating to the subject matter herein. This Agreement cannot be modified except by a written instrument signed by the parties hereto. <u>This Agreement and all matters or issues collateral thereto shall be governed by the laws of the State of California applicable to contracts executed and performed entirely therein</u> (regardless of the actual place(s) of performance). **[CDC_003479]**

## D.    EMPLOYMENT AGREEMENTS[7]

### (1)    SEASON TWO

306.    The *American Idol* Semi-Finalist Contestants are instructed to complete a W-9 form as a pre-requisite to continuing their participation as Contestants in the Semi-Final Rounds, even though the AMERICAN IDOL CONTESTANT AGREEMENT specifically states that Contestants are NOT to be deemed independent contractors [AICA_02, ¶ F.7; ¶ G.7].

307.    In Season Two, the Top 12 Finalists signed volumes of paperwork and contracts throughout the week of March 10, 2003 while in the midst of preparing their live performances for the final rounds.  None of these documents were reviewed by the Prize Contestants' appointed attorney, Howard Siegel.

308.    For example, on Monday, March 10, 2003, Plaintiff Clark signed a "Recoupable Salary Advance" of $500 with American Idol Productions, Inc.  The documents were presented to him by production staff.  Clark's appointed group attorney, Howard Siegel, was not consulted. [CDC_000414]

309.    On Tuesday, March 11, 2003, Plaintiff completed a Form I-9 Employment Eligibility Verification that listed Defendant American Idol Productions, Inc. as employer.  The I-9 document was signed by Michelle Baker on behalf of employer AMERICAN IDOL PRODUCTIONS, Inc. on March 13, 2003.  [CDC_000416]

310.    At the behest of production staff, Plaintiff Clark also signed an "Employment Deal Memo", [CDC__000418], a series of "Standard AFTRA Engagement Contract(s)" [CDC_000422-426] and an American Idol Productions, Inc. "Production Personnel Deal Memo" [CDC_000431-434] which clearly describes Plaintiff Corey Clark as an <u>employee</u> of American

---

[7] Plaintiffs are in possession of the Employment Agreement used in Season Two. [CDC_000418; 422-426]

Idol Productions, Inc. All of these employee-related documents were presented to Plaintiff Clark "on the fly" by production staff.  The appointed attorney, Howard Siegel, did NOT consult with Corey Clark concerning the execution of any of these employment-related documents.

311.    Plaintiff Clark does not remember reviewing or signing these employment-related documents and did not discover them until <u>after</u> substantial due diligence in connection with his defamation lawsuit against MTV (filed July 2012) and following the disqualification of JXJ on March 14, 2012.  [CDC_7937-7960]

## E.    AFTRA UNION MEMBERSHIP[8]

### (1)    SEASON TWO

312.    On Wednesday, March 12, 2003, Plaintiff Clark signed a Membership Application for the American Federation of Television and Radio Artists (AFTRA) [CDC_000428-429; CDC_000407-409].  Attorney Siegel – the assigned legal representative, was NOT consulted with respect to Clark's AFTRA membership.

313.    On or about March 30, 2012, Plaintiff Clark initiated contact with Ms. Zalika Sapp-Weaver, a representative of labor union SAG / AFTRA.  Over the course of the next three months, Ms. Sapp-Weaver transmitted piecemail documents to Plaintiff Clark relating to his 2002-2003 participation on *American Idol,* including paychecks and membership forms.  All of the documents in Ms. Sapp-Weaver's possession were and are maintained in PDF format. [CDC_7929-7936]

### (2)    SEASON EIGHT

314.    JOINT VENTURE-DEFENDANTS required Semi-Finalist Contestants to execute a

---

[8] Plaintiffs are in possession of Season Two, Season Eight and Season Nine of AFTRA-related documents.

series of agreements arranged by Creative Artists Agency ("CAA").

315.    These CAA agreements include the Artists Contract-Services, for a period of three (3) years, an AFTRA Standard Exclusive Agency Contract Under Rule 12-C and an AFTRA Commercials Exclusive Agency Contract Under Rule 12-C, each of which carries a term of eighteen (18) months.

316.    Upon information and belief, by the time a Semi-Finalist Contestant reached the Final Rounds, their legal status as an employee is memorialized via completion of a Form I-9 Employment Eligibility Verification that lists Defendant AMERICAN IDOL PRODUCTIONS, INC. as Plaintiff's employer.

## F.    CONTESTANT AGREEMENT ADDENDUM[9]

317.    In or about March 13, 2003, Plaintiff Clark signed *American Idol* ADDENDUM #2 to the CONTESTANT AGREEMENT AND RELEASE.  [CDC_000407-409]

318.    ADDENDUM #2 [CDC_000407-409] provides in relevant part that:

> **Producer requires me to enter into this Addendum in order to be further considered as a contestant on the Series, and I deem it to be in my best interest to enter into this Addendum.**
>
> **I understand and agree that as a condition to my further participation in the Series as one of the twelve (12) finalists, or as an alternate, I will be required, at the sole discretion of the 19 Companies (as defined below), to enter into: (a) an agreement with 19 Recordings Limited for my exclusive services as a recording artist (the "Recording Contract"); (b) an agreement with 19 Merchandising Limited for the use of my name, likeness and biography in connection with advertising, endorsement, merchandising and sponsorship (the "Merchandising Contract"); and (c) an agreement with 19 Management Limited for the management of my career as an**

---

[9] Plaintiff is in possession of the Season Two version of the addendum.

**artist in the entertainment industry. The Recording Contract, Merchandising Contract and Management Contract shall be referred to herein collectively as the "Talent Contracts." 19 Recordings Limited, 19 Merchandising Limited and 19 Management Limited shall be referred to herein collectively as the "19 Companies." [¶ 1]**

**I understand that, in the event I enter into the Talent Contracts, the 19 Companies will make a reasonable contribution to the cost of independent legal representation in order to advise me in relation to entering into the Talent Contracts.**

## G.    *19 ENTERTAINMENT* PRIZE CONTRACTS[10]

319.    The Prize for winning the *American Idol* Contest is represented, in part, by a series of written contracts that inure to the benefit of Defendant 19 ENTERTAINMENT, the JOINT VENTURE-DEFENDANTS and third party entities.   These agreements are collectively referred to herein as the "19 ENTERTAINMENT Prize Contracts."

320.    With respect to Seasons Eight (2008) and Season Nine (2009), the 19 ENTERTAINMENT Agreements consist of: (1) Exclusive Recording Agreement w/ 19 RECORDINGS LTD. (approx. 57 pages); (2) 19 TOURING AGREEMENT (approx. 7 pages); (3) 19 MERCHANDISING LTD. (approx. 9 pages); (4) 19 MANAGEMENT LTD. (approx. 7 pages);   (5) TOURING AGREEMENT (*American Idol* Live) (approx. 7 pages); (6) *American Idol* Attraction (approx.. 7 pages).

321.    The 19 ENTERTAINMENT Prize Contracts require the contestant to grant all ownership rights, proprietary interests and talent services to 19 ENTERTAINMENT on a universal, perpetual, "360 degree" basis, i.e. with respect to each and every aspect of a recording artist's potential revenue streams, including but not limited to artist management commissions,

---

[10] Plaintiffs are in possession of Season Two, Season Eight and Season Nine of the 19 Entertainment Prize Contracts.

recording royalties, publishing income, film production advances, touring revenue, merchandising receipts and featured attraction appearance fees.

322.    Each season, *American Idol* Contestants must advance to the Semi-Final Rounds or Finalist Rounds before the terms and conditions of the 19 ENTERTAINMENT Prize Contracts are disclosed.

323.    JOINT VENTURE-DEFENDANTS extract every conceivable legal property right a young American recording artist owns or could potentially own in the future, such as the artist's copyright ownership in any musical works or performances and their rights to publicity in the artist's own name, likeness, image and identity.  These rights are purportedly conveyed even before the terms and conditions of the 19 ENTERTAINMENT Prize Contracts have even been disclosed.

324.    The terms of the 19 ENTERTAINMENT Prize Contracts are only disclosed to *American Idol* Contestants who reach the Semi-Finalist or Finalist rounds, they are afforded 24-36 hours to execute more than 100 pages of complex commercial contracts *without* the benefit of independent counsel or any meaningful opportunity for bargained-for-exchange.

325.    Failure to sign the 19 ENTERTAINMENT Prize Contracts as presented in the "eleventh hour" before public voting begins leads to automatic disqualification of the Contestant and removal from the Production, even though such Contestant has already rendered his services for the benefit of and conveyed his proprietary rights to PRODUCER-DEFENDANTS.

326.    In any given season, four to six months time passes between the date of a Contestant's first audition for *American Idol* and the date when the terms and conditions of the 19 ENTERTAINMENT Prize Contracts are disclosed to such Contestant.

327.    In the event that an *American Idol* Contestant seeks to negotiate the terms or

conditions of the 19 ENTERTAINMENT Prize Contracts, PRODUCER-DEFENDANTS have threatened to not only disqualify such Contestant, but also threaten to target such Contestant with a defamatory media campaign in the tabloid press based on any salacious or derogatory information that ENTERPRISE-DEFENDANTS obtained via their (illegal) background check process.

328.    To ensure that the targets of its commercial exploitation present zero resistance to signing the 19 ENTERTAINMENT Prize Contracts, PRODUCER-DEFENDANTS devise a carefully planned procedural mechanism to guarantee inequality in the recording artists' bargaining position.

329.    *American Idol* Contestants who are induced by JOINT VENTURE-DEFENDANTS to participate in the televised *American Idol* Contest are required to sign extremely complex 19 ENTERTAINMENT contracts through "Group Negotiation" sessions.

330.    Any Contestant who poses a substantive question about a contractual term within the "Group Negotiation" session is swiftly reprimanded by producers in front of his peers.  This tactic produces the "group peer pressure" needed by PRODUCER-DEFENDANTS to ensure that the 19 ENTERTAINMENT Prize Contracts are signed by the *American Idol* Contestants without any meaningful bargained-for-exchange.

331.    PRODUCER-DEFENDANTS also ensure that the *American Idol* Contestants are deprived at all times of the right of independent counsel.

332.    PRODUCER-DEFENDANTS arrange to have their own U.S.-based attorneys represent both sides of the transaction between *American Idol* Semi-Finalists / Finalists, on one hand, and Defendant 19 ENTERTAINMENT on the other, such that the young recording artist is deprived of any meaningful opportunity to consult with real independent counsel.

333.    The legal fees of any attorney who is appointed by PRODUCER-DEFENDANTS to

"serve" as the Contestants' counsel vis-à-vis the 19 ENTERTAINMENT Prize Contracts are paid for by 19 ENTERTAINMENT, the very same company to whom the *American Idol* Contestants are contractually bound (for life), or other members of the joint enterprise.

# *AMERICAN IDOL*
# BACKGROUND CHECKS

## A.    REALITY TV "CONTESTANT VETTING"

## (1)    NON-UNION PERFORMERS

334.    As a matter of industry custom and practice, professional television performers (e.g., actors, singers, dancers, musicians, etc.) who appear on broadcast television are covered by U.S. labor guilds such as the SCREEN ACTOR'S GUILD ("SAG") and/or the AMERICAN FEDERATION OF TELEVISION AND RADIO PERFORMERS ("AFTRA").

335.    The utilization of "real people" as television performers means that Reality TV producers, such as PRODUCER-DEFENDANTS, can source non-professional actors for an entire production season from a pool of non-union amateurs.

336.    As part of their standard practice or ordinary course of doing business, ENTERPRISE-DEFENDANTS utilize free disposable labor that consists of young, impressionable U.S. citizens who eagerly seek to be on television.

337.    In order to engage non-union amateurs to enter the *American Idol* Contest, the ENTERPRISE-DEFENDANTS categorically exclude *all* performers who are already covered by the applicable labor union(s).

338.    JOINT VENTURE-DEFENDANTS achieve substantial cost reductions through utilization of non-union labor and/or amateur performers in their programs.  This is because Reality TV programs are substantially cheaper to produce than traditional scripted programs.[11]

---

[11] See, e.g., Ryan Westerman, *As Seen on TV: Your Compromising Cameo on National Reality Programming*, 12 J. MARSHALL REV. INTELL. PROP. L. 403 (2013) ("One reason for the decrease in expenses is the cheap cost of labor that comes with hiring " participants" rather than actors with significant celebrity status); Tara Brenner, *A*

**(2)    SMOKINGGUN.COM**

339.    SMOKINGGUN.COM is a New York-based entertainment news website established in 1997.

340.    SMOKINGGUN.COM is one of the first commercially successful websites to exploit the criminal records, mug shots and/or *sealed* government data of U.S. citizens - particularly celebrities and Reality TV participants - as entertainment news.

341.    SMOKINGGUN.COM'S economic model is based on publishing "hard-to-get" (i.e., sealed) information derived from official U.S. and state government databases maintained and operated by taxpayers.

342.    According to "*The Dog Dialed 911: A Book of Lists From The Smoking Gun*" (2006), which is authored by the Smoking Gun's founder, Bill Bastone:

> **Since the Smoking Gun's founding in 1997, our journalism has been rooted in the hunt for primary-source documents like FBI reports, police affidavits and newsworthy lawsuits.**

343.    According to the Smoking Gun.com website:

> **"The Smoking Gun brings you exclusive documents -- cool, confidential, quirky --that can't be found elsewhere on the Web. <u>Using material obtained from government and law enforcement sources,</u> via Freedom of Information requests, and from court files nationwide, we guarantee everything here is 100% authentic."  [CDC_2068] (emphasis added).**

344.    In a 2006 article published on "*The Water Cooler*" website, the editor and co-founder of THE SMOKING GUN.COM, William Bastone, revealed that the website had access to

---

*"Quizzical" Look Into The Need For Reality Television Show Regulation*, 22 CARDOZO ARTS & ENT. L.J. 873, 876 (2005) (emphasizing the appeal of reality TV shows to networks comes from the shows' cheaper production costs compared to the costs incurred to make scripted programs and allows the networks to "create" celebrities); see also Brian Stelter, *With New Stars, Reality Shows See Costs Rise*, N.Y. TIMES, July 26, 2010, at B1 ("Reality television became a force because viewers like it and because, without celebrities or big salaries, it was cheap.")

sealed documents in a criminal trial involving entertainer Michal Jackson:

> **A year ago we did a bunch of more traditional, long-form narrative investigative stories in and around the Michael Jackson trial, in part <u>because we obtained and had access to documents that were under seal</u>, including all of the sheriff's reports in the case, search warrant affidavits, and then after that we obtained the entire grand jury transcript, which was under a court seal. So we posted a lot of that material and wrote long narrative pieces based on those documents. [CDC_002177]**

345.     In a 2009 on-line article entitled *"Media Impact in NY and DC",* a reporter for

THE SMOKINGGUN.COM was asked where the website obtained its public record documents:

> **We spend a lot of time on the phone with court clerks, with police departments.  We travel quite a bit.  We're willing to go across the country if there's a document we have to travel across the country to get...We're pretty much doing the same sort of stuff that every other reporter does in hunting down material.   Except, you see the primary source material.   [CDC_002163-64]**

346.     In December 2000, the SMOKINGGUN.COM website was acquired by corporate

broadcaster Court TV.  Prior to the acquisition, SMOKINGGUN.COM was a "grass roots" enterprise

operated by 3-4 individuals from a private residence in New York City.

347.     In a 2006 interview with GELF MAGAZINE, the editor of the THE SMOKING

GUN.COM stated:

> **We're now owned by <u>Court TV.</u>  They don't have anything to do with what we do.  But this is one of the great things with being affiliated with a TV Network: <u>They have the ability to grab the signal from the sky and pump it into our office.</u>**

348.     Upon information and belief, SMOKINGGUN.COM is now part of TruTV of Turner

Entertainment Digital Network, which is part of the Turner Sports & Entertainment Digital

Network, itself a division of Time Warner.

349.     SMOKINGGUN.COM published and continues to publish the criminal record or

private background information of Plaintiffs Andrew, Clark, T. Brittenum and D. Brittenum.

350.    The website has also published the criminal background information of several other *American Idol* Contestants, including Frenchie Davis, JXJ, B. Bice, S. Savol and others.

351.    In the case of Plaintiff Corey Clark, SMOKING GUN.COM published information derived from a police affidavit that was *under court seal* while Mr. Clark's criminal proceeding was pending.

### (3)    *WHO WANTS TO MARRY A MILLIONAIRE?* [2000]

352.    On February 15, 2000, FOX broadcast a Reality TV production entitled *Who Wants to Marry a Multi-Millionaire?,* in which 50 women (one from each U.S. state) competed in a beauty pageant-style contest to be the bride of an unknown multi-millionaire who was revealed to be Rick Rockwell.  He selected Darva Conger of California and married her on the spot as 22 million Americans watched.  *Ms. Conger* received a three-carat diamond ring and more than $100,000 in prizes.

353.    On February 19, 2000, four days after the initial broadcast *Who Wants to Marry a Multi-Millionaire?* on FOX, THE SMOKINGGUN.COM website reportedly "discovered" that one of Rockwell's former girlfriends had filed a restraining order against him for domestic violence in 1991.  The victim claimed that Mr. Rockwell, whose real name was Richard Balkey, assaulted her and stalked her when she tried to break off the engagement.

354.    In the wake of SMOKINGGUN.COM'S publication, Ms. Conger quickly sought an annulment of the marriage and auctioned off her prizes to charity.  She claimed that the marriage was never consummated during a honeymoon to the Caribbean.

355.    Ms. Rockwell was largely condemned by the public as a fraud and a liar as new

details regarding his true net worth and employment background surfaced.  In response to the *Smoking Gun.com*'s publication, FOX claimed that Mr. Rockwell had "failed to disclose" his criminal background information during the screening process and further vowed to investigate how the background check had failed to detect the criminal record.

### (4)    THIRD-PARTY INVESTIGATORS

356.    On April 13, 2000, Defendant FOX announced to the press that it had completed an "internal review" using the "outside law firm" of Greenberg, Glusker, Fields, Claman & Machtinger, which purportedly conducted an investigation relating to the background check process used to screen Rockwell.

357.    Defendant FOX claimed that the show's producer, NEXT ENTERTAINMENT, supervised the screening process and had engaged both a "private investigator" and "national search firm" to conduct the background checks. The LOS ANGELES TIMES reported that, according to FOX:

> Those investigators, however, were prevented from divulging information going back more than seven years under the federal Fair Credit Reporting Act, which says a consumer reporting agency can't report findings older than that except for criminal convictions. The restraining order was initially exposed by the Smoking Gun, an online news site.
>
> They all worked to the fullest extent within the law,' a Fox spokesman said. 'There was no negligence.' Citing attorney-client privilege, the law firm said it could not discuss its conclusions.
>
> Fox has stressed that the producers were responsible for checking out Rockwell, though Fox's executive in charge of specials, Mike Darnell, reportedly played an active role in selecting him from among several candidates.

358.    When one of the show's producers for NEXT ENTERTAINMENT was asked about the

legacy of *Who Wants to Marry a Millionaire?* in April 2000, he responded that he was "proud of the work we did on the show, and we're proud of the show . . . It's become a cultural icon and something the television business will always remember."

359.    From April 2000 and continuing through the present, *Who Wants to Marry a Millionaire?* has generated hundreds of more media impressions due to the controversy surrounding *Smoking Gun's* publication of Mr. Rockwell's criminal history information than it did through publication of editorial reviews or advertisements of the actual program content.

360.    In April 2000, Defendant FOX acknowledged to the LOS ANGELES TIMES that both Ms. Conger and Mr. Rockwell signed an agreement prior to their appearances on the show saying they could annul the marriage at any time - a fact not conveyed to viewers during the live broadcast.

## B.    CARCO GROUP, INC.

### (1)    SERVICES PROVIDED

361.    At all times relevant to this proceeding, the JOINT VENTURE-DEFENDANTS retained third party CARCO GROUP, INC. to assist in conducting criminal background checks of *American Idol* Contestants.

362.    Founded in 1977, CARCO Group, Inc., is a nationally recognized information services company that provides investigative, fraud detection, and risk mitigation services to large corporations.   CARCO's corporate headquarters are in Holtsville, NY,

363.    CARCO's Investigative & Security Consulting division and CARCO's Background Screening Services division provide comprehensive background investigations on potential and current employees, vendors, customers, and business partners.

81

364.    CARCO's staff is comprised of former FBI Agents, Certified Public Accountants, Certified Fraud Examiners, Forensic/Investigative Accountants, and former law enforcement investigators.

365.    CARCO markets a service called "Reality TV Contestant Vetting" on its website. [CDC_004690]. This service includes:

> "**Standard Background Search:** This could consist of onsite court criminal and civil record review at the local, state, and federal levels, driving history, media review, property review, employment verification, education verification, sex offender registry search, and statewide public records search. Other searches are available and can be conducted depending on your customized requirements." [CDC_004690]

366.    CARCO's criminal background checks searches federal criminal history records, supplemental criminal information databases, and nationwide wanted persons. [CDC_4697]

## (2)    MINUTES FROM THE SEARCH MEETING (January 2001)

367.    On January 5, 2001, CARCO's vice-president Michael Giordano participated in a meeting of Membership Group of "SEARCH," The National Consortium for Justice Information and Statistics.  [CDC_4720]  The minutes of the meeting are a matter of public record and are significant because they reveal CARCO's policies about eighteen months before the first season of *American Idol* debuted on television.

368.     Mr. Giordano noted that the Fair Credit Reporting Act (FCRA), enacted in 1971, governs CARCO's employment screening activities and deals not only with credit but can also apply to criminal history record information ("CHRI"). [CDC_4720]

369.    As of early 2001, CARCO produced approximately 250,000 criminal history record checks annually, primarily for Fortune 500 companies. [CDC_4720]

370.    When CARCO searches for an individual's criminal history background, the agency is required to have a disclosure and authorization statement from the consumer to conduct a background check. Generally, criminal history record checks encompass a seven-year search of state-level crimes that include felonies and misdemeanors. [CDC_4720]

371.    CARCO's criminal history record search is based on name and date of birth — fingerprints are not used. CARCO's sources for these searches are limited to the upper and lower courts and state-operated law enforcement repositories, where available. [CDC_4720]

372.    CARCO must abide by federal and state law regarding the collection and dissemination of criminal history record information. [CDC_4720]

373.    Restrictions are in place when reporting adverse public record information. These restrictions include ensuring that the record is up-to-date and providing a contemporaneous notice to the consumer about the information being released to the employer. [CDC_4720]

374.    CARCO maintains an archive of all criminal history record information in a centralized, in-house, proprietary computer database with security barriers. [CDC_4721]

375.    As of 2001, Mr. Giordano stated that CARCO would only perform a criminal history record check for employers who are an authorized end-user with permissible purposes and have a FCRA certification on file. [CDC_4721-22]

### (3)    CARCO'S LETTER TO THE EEOC (July 26, 2011)

376.    On July 26, 2011, CARCO wrote a letter to the EEOC concerning its positions on "Arrest and Conviction Records as a Barrier to Employment." [CDC_4769-

377.    CARCO advocated that the following uses of CHRI records should be eliminated: (a) use of arrest records that do not include current case status or disposition in the employment

decision process; (b) use of information from CHRI databases without the CRA perfecting those records through a records search at the originating repository of record (such as the court where the matter was adjudicated) prior to dissemination.

378.    In its letter, CARCO claimed that "it has long declined to report partial or incomplete records for which there is no disposition. Further, CARCO does not include records of dismissal or records with 'not guilty' dispositions in the reports we provide to clients. These are reported as 'clear' to our clients as if the court proceedings never happened. Simply stated, we do not report raw arrests or 'rap sheets.'"

379.    CARCO also recognized that the FBI's database contains inaccuracies and omissions about dispositions, noting that the 2006 Attorney General's Report on Criminal Background Checks reported that only 50% of the arrest records in the Interstate Identification Index include dispositions.

## C.    <u>MMI WEST</u>

380.    MMI was a security consulting firm that offered investigation and litigation support services to the private sector.  The company was founded by two former FBI agents, John Murphy and Drew Maconachy and had offices in Virgina (MMI East) and Los Angeles (MMI West).  [See *Carco Group Inc. v. Maconachy*, 644 F.Supp.2d 218 (2009); CDC_004471]

381.    CARCO acquired the assets of MMI on January 7, 2000. *Carco Group Inc. v. Maconachy*, 644 F.Supp.2d at 223.

382.    During Season Two of *American Idol,* Prize Contestants were instructed to send their background information forms to MMI c/o Drew Maconachy.

## C.  "CONTESTANT VETTING" – SEASON TWO[12]

### (1)  OPEN AUDITIONS

383.    ENTERPRISE-DEFENDANTS obtain the name and birthdate of each Plaintiff at the time of their open auditions in their respective cities.

384.    Upon information and belief, ENTERPRISE-DEFENDANTS use the name and birthdate of each Plaintiff to procure their criminal "rap sheets" through access to the federal NCIC database.

385.    The alleged procurement of each Plaintiff's "rap sheet" took place at some point after the Open Audition of each respective Season, but before any Plaintiff was flown to Los Angeles to compete in Hollywood week.

### (2)  AMERICAN IDOL CONTESTANT AGREEMENT, V. 2

386.    Before being flown to Hollywood, Golden Ticket Holders in Season Two received a 16-page long-form agreement entitled the AMERICAN IDOL CONTESTANT AGREEMENT [CDC_000189-205].

387.    AMERICAN IDOL CONTESTANT AGREEMENT, v.2, asked Prize Contestants to complete the following "fill-in-the-blank" question:

> **"I do not currently have any outstanding warrants (e.g., traffic tickets, arrests, etc.) .... I have never been arrested or convicted of a felony or misdemeanor offense, either as a juvenile or as an adult, except as follows [please list dates and locations of arrest and/or conviction and a brief description of this alleged offense(s)].  [CDC_000198]**

388.    Thus, even before Prize Contestants had been provided any FCRA or consumer disclosure forms – or had been informed what the criminal record information was to be used for

---

[12] Season Two is provided herein as an illustrative example.

– the *American Idol* Contestants were being asked to disclose their full criminal history to the ENTERPRISE-DEFENDANTS, including ANY record of arrest (whether or not resulting in a conviction) from ANY period throughout their life, including juvenile records.

## (3)    AMERICAN IDOL CONTESTANT AGREEMENT, V. 2

389.    After Hollywood Week concluded, and the Semi-Finalists chosen, the American Idol Contestants received another information packet containing two major forms: the ADDENDUM NO. 1 TO CONTESTANT AGREEMENT AND RELEASE. [CDC_000226-27] and a long-form document entitled AMERICAN IDOL PARTICIPANT BACKGROUND QUESTIONNAIRE FORM. [CDC_000218-259]

390.    The Contestants in season two were instructed to complete these forms and send them Fedex to: "MMI, 200 N. Tustin Avenue, Suite 100, Santa Ana, CA 92705, Attention: Drew P. Machonachy, President, for receipt no later than January 6, 2003." [CDC_000224]

391.    ADDENDUM # 1 TO THE CONTESTANT AGREEMENT AND RELEASE [CDC_000226-27] provides in relevant part that:

> **Producer requires me to enter into this Addendum in order to further be considered as a contestant on the Series, and I deem it to be in my best interest to enter into this Addendum.**
>
> **ACCORDINGLY, PRODUCER AND I AGREE AS FOLLOWS:**
>
> **I AGREE TO COMPLETE AND SIGN A COPY OF THIS ADDENDUM AND THE ATTACHED BACKGROUND INVESTIGATION FORM, AND TO RETURN THE SIGNED AND COMPLETED ADDENDUM AND BACKGROUND INVESTIGATION FORM VIA FEDERAL EXPRESS TO MMI, 200 N. TUSTIN AVENUE, SUITE 100, SANTA ANA, CA 92705, ATTENTION: DREW P. MACONACHY, PRESIDENT, FOR RECEIPT NO LATER THAN JANUARY 6, 2003.**
>
> **I UNDERSTAND THAT IN THE EVENT I DO NOT SIGN AND**

RETURN THIS ADDENDUM AND/OR THE COMPLETED BACKGROUND INVESTIGATION FORM, I MAY NOT BE ELIGIBLE FOR FURTHER PARTICIPATION IN THE SERIES, BUT THAT THE TERMS AND CONDITIONS OF THE AGREEMENT WILL REMAIN IN FULL FORCE AND EFFECT. [¶ 1]

I hereby grant permission to Producer to disclose all of the information on the Background Investigation Form to any third-party investigation service selected by Producer, in its sole discretion, in order to run various background checks on me, which may include, without limitation, consumer reports, criminal conviction reports, civil court searches, searches of sex offender databases, etc. in order to determine my eligibility for further participation on the Series, which determination shall be in Producer's sole discretion, and to use the information in any other manner whatsoever. [¶ 2]

As more fully set forth in the Agreement, in the event I am eliminated from the Series based upon the results of the background investigation, or for any other reason, I agree that Producer and/or the network broadcasting the Series (the "Network") may make any explanation or announcement, on-air or otherwise, that Producer or the Network may choose as to the reason I was disqualified from the Series. [¶ 3]

I understand and agree that it may be necessary for me to become a member in good standing, as defined by law, of the American Federation of Television and Radio Artists (AFTRA) in connection with my further participation in the Series and that Producer will assist me in obtaining such membership, if necessary. In the event I become a member of AFTRA, I acknowledge that my AFTRA dues may be deducted by Producer from the first monies payable to me under the AFTRA agreement. [¶ 7]

## (4)    AMERICAN IDOL PARTICIPANT BACKGROUND QUESTIONNAIRE FORM

392.    In Season Two, the 28-page AMERICAN IDOL PARTICIPANT BACKGROUND QUESTIONNAIRE FORM [CDC_000231-259] contained the following questions relating to criminal background checks under the subheading "LITIGATION HISTORY", followed by a checkbox for "Yes" or "No":

> • "Have you ever been detained arrested or convicted of a felony or misdemeanor offense, either as a juvenile or an adult?"

87

| |
|---|
| • "Have you ever had a restraining order placed against you?" |
| • "Have you ever had a warrant issued for your arrest, or have you ever failed to appear in court for a traffic related or a criminal matter?" |
| • "Have you any current or outstanding warrants (e.g., traffic tickets, arrests, etc.?)" |

### (5)   PARTICIPANT CERTIFICATION AND FCRA CONSUMER DISCLOSURE

393.    In Season Two, *American Idol* Contestants were asked to complete a Participant Certification Form and Fair Credit Reporting Act (FCRA) Consumer Disclosure and General Authorization Form, which was included at the end of the Participant Background Questionnaire Form.  [CDC_000258]

394.    After completing these forms, none of the Plaintiffs from Season Two (CLARK, ANDREWS, or SMALLEY) ever received any further paperwork or consumer reports back from the ENTERPRISE-DEFENDANTS in connection with the criminal background check process.

395.    It was not until early March  2012 that Corey Clark was able to obtain a copy of his CARCO report from Sharon Giallo of MMI West and from CARCO's main office in New York.  [CDC_001440-1452].  The reports received consisted of a "mishmash" of "cut-and-paste" information, much of which had been backdated and manipulated by scanning and copying.

## D.   "CONTESTANT VETTING" – SEASON EIGHT

### (1)   AMERICAN IDOL CONTESTANT AGREEMENT, V.8

396.    The *American Idol* Contestant Agreement for Season Eight contains the following language concerning criminal record information:

WARRANTS, ¶ E.7, P.16, provides:

**[I hereby represent and warrant as follows:] I have never been arrested**

88

> **or convicted of a felony or misdemeanor offense, except as follows - please list dates and location of arrest and/or conviction and a brief description of the alleged offense(s)].  [CDC_003476]**
>
> _____
>
> **You should be aware that past arrests and/or convictions are not automatic grounds for disqualification, but such information may be used by Producer to determine your eligibility for the Program.**

BACKGROUND CHECKS, ¶ A.9, P. 4 provides:

> **I am willing to accurately and completely fill-out a background questionnaire and undergo investigations into my background, which may include but not be limited to reviews of civil and criminal records, financial, credit, employment history, interviews with family and friends,  and any other type of background checks deemed necessary by Producer, in its sole discretion, and I agree to sign all necessary consents in connection therewith.**

## (2)    AMERICAN IDOL PARTICIPANT BACKGROUND FORM, V.8

397.    The *American Idol* Participant Background Check form for Season Eight contains the following language concerning criminal record information:

> **Have you ever been arrested (even if charges were dropped or expunged) as an adult or minor?  [CDC_003424]**

398.    In Season Eight, *American Idol* Contestants were also asked to complete a "Participant Certification" and "Fair Credit Reporting Act (FCRA) Consumer Disclosure and General Authorization Form," which was included on the same page at the end of the Participant Background Questionnaire Form.  [CDC_003454]

399.    After completing these forms, Plaintiff Joyner – who answered YES to being arrested - never received any further paperwork or consumer reports back from the ENTERPRISE-DEFENDANTS in connection with the criminal background check process.

## E.    OVERSEER-DEFENDANTS' STATEMENTS

**(1)    SEASON THREE (February 4, 2004)**

400.    On February 4 2004, Defendant WARWICK told MTV News:

> **"This year [Season Three], for the first time ever, we screened all of the 117 that came through to Pasadena. Normally we only screen the final 32. Generally speaking, the whole process of screening these kids is a bit of a nightmare. Some of them are younger, so they're not on the normal registers you would check out."** [CDC_000827].

> **People are always going to tell lies, so you can't legislate for that until you find out. "But they sign a contract, and if they do that, they are in breach of contract.** [CDC_000827].

> **Warwick said *extensive criminal checks are done on the singers*, but the producers are "not judgmental at all. [**CDC_000828]

> **If a girl's worked in a strip bar but she's a great singer, we don't care," he said. "But if there is something that is seriously going to bring the show in disrepute, for any reason, it's up to the legal side of FOX and 19 [Entertainment, who produce the show]."** [CDC_000828]

**(2)    SEASON SIX (January 21, 2007)**

401.    On January 21, 2007, Daily News of Los Angeles reported that, with respect to the

Open Auditions:

> "**Warwick claimed there isn't enough time to do background checks on contestants appearing in episodes to assess whether judges' behavior is inappropriate toward vulnerable participants.**" [CDC_001193]

402.    In February 2007, when first asked about Akron Watson and Ashlyn Carr,

Defendant LYTHGOE reiterated several times the point that it was Defendant FOX's decision to

disqualify *American Idol* Contestants based on their criminal record history:

> • **Defendant LYTHGOE: "Number one, we don't get involved, as the producers of the show, in the background checks. That goes out to a private company and FOX. We are informed at**

**the end of the day, 'You can't invite this person, that person, or this person.' And we don't ask why. To be frank, we're not interested." [CDC_003296; 3289]**

**•  Defendant LYTHGOE: "If FOX believes that it will damage the show, or damage FOX, or damage the production, then it's best that they just don't come along. With the checks that FOX do, I think you can only do so much." [CDC_003296; 3289]**

403.    In February 2007, Defendant LYTHGOE also claimed that *Smoking Gun.com* received its information (or "tips") concerning the criminal background information of *American Idol* Contestants from the "so-called friends or family" of the disqualified Contestants themselves:

**•  Defendant LYTHGOE: "Every season we get something in Smoking Gun[.com] because somebody gets through the net, and their so-called friends or family will call up Smoking Gun[.com], and it's a lot easier to find out about people when people want to tell you about it, rather than you going and doing searches." [CDC_003296-97]**

404.    In February 2007, Defendant LYTHGOE stated that the background check process conducted by ENTERPRISE-DEFENDANTS and its agents was "essential" to the *American Idol* Production because ENTERPRISE-DEFENDANTS need to know that "we've got the right people together":

**•  Defendant LYTHGOE: The fact is, we do background checks. I think it's very essential. We're putting these kids together in a very close environment, and we're working them very hard, and it's essential that we know that we've got the right people together. So Fox gets along with this private security firm. After that, I can't give you any other information because I don't want to know. [CDC_003297; 3289]**

405.    In February 2007, when Defendant LYTHGOE was asked why the arrest details of some of the *American Idol* contestants - i.e., the Plaintiff Brittenum Twins - from past seasons were featured on the television show, Defendant LYTHGOE responded:

**"If that occurs, don't forget that was occurring while we were**

**doing the show. So if somebody gets busted while we're doing the show, then we won't ignore it, especially if we can put it in the television show." [CDC_003297]**

406.    In February 2007, Defendant LYTHGOE admitted that the *American Idol* Golden Ticket was "illusory"

> • **Defendant LYTHGOE: "Being asked to continue is [sic] Hollywood, and it's got nothing to do with his story and his performance. When [Watson] came along and auditioned, we treated him like everybody else. I'm not privy to what the guy's done for the rest of his life. We certainly couldn't do that [with] over 100,000 contestants that come along. We treat everybody the same, or attempt to, and he was part of that process. Whether he's invited back or not by FOX does not concern me regarding what he did at that audition." [CDC_003297]**

407.    Even though Defendant LYTHGOE had previously stated that the PRODUCER-DEFENDANTS weren't "interested" in learning the details of the Contestant background checks purportedly conducted by Defendant FOX, Defendant LYTHGOE made the point that the JOINT VENTURE -DEFENDANTS have the final say of what is actually broadcast to the public as part of the *American Idol* television show.    To illustrate his point, Defendant LYTHGOE stated that if Plaintiff Watson had been arrested for a more serious crime, then the PRODUCER -DEFENDANTS might not have included Akron's audition segment on the show.    Defendant LYTHGOE explained as follows:

> • **Defendant LYTHGOE: "If he'd have murdered somebody we would have thought twice, and if the mother would come forward and say: 'But he murdered my son, how could you put him on television?' Then we would certainly attempt to stop him being on television. But as far as I'm concerned we've just been asked not to bring him back to Hollywood." [CDC_003297; 3289]**

408.    When prodded for a longer explanation about why Akron's audition footage would

be shown even after the fact of his disqualification was already known to ENTERPRISE-DEFENDANTS, and whether the disqualification would deprive the audience of their "investment" in Akron's participation as a Golden Ticket Holder, "an apparently exasperated" Defendant LYTHGOE snapped:

> • **Defendant LYTHGOE: "I cannot show you 174 people's stories. So, as far as I'm concerned, investing in THAT BOY[13] [Plaintiff Watson] at that point was what I'd like you to do, but I would have liked you to have done that with a lot of other people that are going to disappear in Hollywood week. That's just the way the show goes, and it's been like that for six seasons now. I don't necessarily agree with it. Give me another 48 shows and I'll show what actually happened in Hollywood ..." [CDC_003297]**

> • **Defendant LYTHGOE: "As I said, it's like a lot of other people, their stories are in there because I believe it's a good story that will disappear in Hollywood. THIS BOY[14] [Plaintiff Watson] has just been pulled out because he disappeared before Hollywood. But people are in there that you will not see who you might be invested in on the audition trial." [CDC_3298]**

409.    Defendant LYTHGOE also explained that each season of the *American Idol* Production is divided into three separate "series": (i) the audition process; (ii) the selection of the Top 24 (Semi-Finalists); and (iii) the "Top 12s" (Finalists). Defendant LYTHGOE explained that each of the three phases have a "different set of rules" and that "the fun, the silliness, the cheekiness" of the television program is reserved for the first Audition phase of the series each

---

[13] In *Ash vs. Tyson Foods*, 546 U.S. 545, 556 (2006), the United States Supreme Court held that in a Title VII case, use of the term "boy" by a white supervisor to describe an adult African-American employee could serve as direct evidence of the employers' racial *animus*. The Supreme Court noted that use of the term "boy" – which is historically considered a racial epithet implying white paternalism and black subjugation - was not "always benign." On remand, even the circuit of the Deep South conceded that the term "boy" could not be used in good faith by a white over-seer to describe a Black man in the context of a promotion or hiring decision. See *Ash vs. Tyson Foods*, 2006 U.S. App. LEXIS 19750 (11th Cir. 2006).

[14] *Id.* (further noting that Akron Watson was a 23-year-old MAN at the time of Defendant LYTHGOE's comments).

season.

> • **Defendant LYTHGOE: "Don't forget, as far as I'm concerned, we deal with three series here. It isn't just one big 'American Idol' series. I've always looked on it, and I've got my team to look on it, that the audition process is one part, that's it's only little series, as far as I'm concerned, moving through to the top 24 is it's own series, it's a different set, it's a different set of rules for the kids that are involved in it, and then going into the top 12 is yet, again, another series that is where the Star is Born." [CDC_003297]**

> **"So I don't ever really put the fun, the silliness, the cheekiness, of the audition process in with the top 12s. That has its own area and its own story. A lot of the people that you're invested in that area in Hollywood will just disappear. Sometimes they don't even give reasons why." [CDC_003297]**

> **"There's just no time. They've got three days to get it down to 24. It is, 'No, thank you. No. Goodbye. Thank you.' . . . That is just the way the competition goes". [CDC_003297]**

410.    In 2007, Defendant LYTHGOE stated to ENTERTAINMENT WEEKLY:

> **"We have really good background checks on everybody, and we deal with that every season. It's sad, isn't it, that your best friends are the ones that come forward with information that will go to [The] Smoking Gun or put your photographs on the web?"** [CDC_003833-34].

## (3)   SEASON ELEVEN (March 2012)

411.    On March 14, 2012, Ryan Seacrest confirmed at the top of the show that ENTERPRISE-DEFENDANTS cooperated with government officials in relation to conducting background checks.  Seacrest stated:

> **With the cooperation of law enforcement we discovered information that left us with no choice but to eliminate one of our finalists from the competition. When you're doing a live show, anything can happen.    This is *American Idol.*** [CDC_003041]

412.    In a March 15, 2012 interview with TMZ.com, Defendant LYTHGOE attempted to justify JXJ's disqualification. Citing the ENTERPRISE-DEFENDANTS' 2003 disqualification of Plaintiff Corey Clark, Defendant LYTHGOE stated that the "failure to disclose" criminal record information during the background check process was grounds for removal from the show.

> • **Defendant LYTHGOE: "We had to confront JXJ, and we've done this in the past, as you know. We did it with Corey Clark again as well. In this situation where self-disclosure isn't forthcoming, we have to sit them down and say: 'These are the charges and the allegations against you.'  But there were actually two criminal charges actually last year that [JXJ-11] did not disclose to us as well." [CDC_002971]**

413.    In the 3/15/12 interview with TMZ.com, Defendant LYTHGOE stated that PRODUCER-DEFENDANTS will ordinarily help Contestants to "clean up" their criminal records provided that they are forthcoming during the background check process.

> • **Defendant LYTHGOE: "So the annoying thing is, we have had this in the past, you know - lots of kids having moving violations or they drive on a suspended license or anything like that - and they've got warrants against them that are outstanding. And we helped them where we can in cleaning them up before they come to Idol." [CDC_002971-72]**

414.    On March 15, 2012, Defendant WARWICK and Defendant LYTHGOE stated that THEY attempted to assist *American Idol* Contestants "mitigate" any pending criminal charges to help them stay on the show.

> • **Defendant WARWICK: "If they tell a judge, 'Look, I'm a contestant on American Idol and there's every possibility this will be great for me, can you let me off? Can you mitigate the charge?' Can you do something that invariably the judge will look on them sympathetically? We would have tried."** [CDC_002972]

415.    On March 15, 2012, Defendant LYTHGOE stated that *American Idol* Contestant background checks are conducted through a "team" and then submitted to Defendant FOX.

- **Defendant LYTHGOE: "It's done through a team and then put to Fox Broadcasting. I think that would have certainly red-flagged the two criminal charges last year." [CDC_002972]**

416.    On March 15, 2012, Defendant LYTHGOE and Defendant WARWICK maintained that JXJ "failed to disclose" his arrest record history because "he could not possibly afford" to pay his fines.

- **Defendant WARWICK: "[JXJ-11 was] very apologetic!"** [CDC_002972]

- **Defendant LYTHGOE: "He was actually very good. We said to him, 'Why did you not tell us? Why did you not tell us?' [JXJ-11] said, 'Because I wanted to get the money together and clear them up before I told you.' But it's in the region of six or seven thousand dollars. He just doesn't have that kind of money..."** [CDC_002972]

- **Defendant WARWICK: "The truth was he could not possibly pay these fines and these charges. So he said it becomes like a mechanism where just to get on the show, you do lie about them. It's like quicksand. You can't pay the charges, so the next one comes along and you lie about that, and then the next comes along and you lie about that." [CDC_002972]**

# DISQUALIFIED BLACK CONTESTANTS

# Season One:
# DELANO CAGNOLATTI

417.    On July 1, 2002, Delano Cagnolatti was the first *American Idol* contestant to be publicly disqualified from the show.

418.    Mr, Cagnolatti is African-American.

419.    On Monday, July 1, 2002, Defendant FOX reported to news media that one of the Semi-Finalists for *American Idol* (top 30 out of 10,000+) had been disqualified for "failing to disclose" his real age.  The network stated that the culprit would be identified on Wednesday's broadcast.

420.    On Tuesday, July 2, 2002, ENTERPRISE-DEFENDANTS caused to broadcast taped footage of LYTHGOE and WARWICK in the process of disqualifying Cagnolatti by surprise on national television.

421.    During the recorded meeting, LYTHGOE and WARWICK publicly accused Cagnolatti of being a liar and disqualified him from the *American Idol* Contest.  [NY POST (7/3/2002); CDC_000076]

422.    Upon information and belief, numerous contestants over the course of the last eleven years have misrepresented their age during the audition process for *American Idol*, including many white and non-Black contestants.

423.    No white or non-black contestant in the history of the Series was ever confronted on national television about such misrepresentation, nor otherwise publicly disqualified.

424.    Upon information and belief, Defendant FREMANTLE and/or Defendant FOX had actual or constructive knowledge of Mr. Cagnolatti's actual age before he was ever advanced

to the Semi-Finals and intentionally chose to overlook this fact for the specific purpose of staging Mr. Cagnolatti's disqualification on national television for "dramatic effect."

# Season Two:
# JAERED ANDREWS

**(1)    GOLDEN TICKET [OCTOBER 31, 2002]**

425.    Plaintiff Jaered Andrews is an African-American singer from Austintown, Ohio.

426.    On or about October 31, 2002, Jaered Andrews was awarded a Golden Ticket to Hollywood after performing for the resident *American Idol* judges Simon Cowell, Paula Abdul and Randy Jackson.

**(2)    WITNESS TO A CRIME [NOVEMBER 16, 2002]**

427.    On Saturday, November 16, 2002, Plaintiff Andrews struck a man, Thomas E. Blakely, in self-defense.  Another person, the brother of Andrews' long-time partner named J. Allen, kicked Mr. Blakely in the head and face several times. Mr. Blakely was pronounced dead at the hospital later that evening, having died from blunt force trauma to the head.

428.    J. Allen was promptly arrested and charged with crimes stemming from the altercation with Mr. Blakely.

429.    Plaintiff Andrews was interviewed by police but was <u>not</u> arrested in connection with Mr. Blakely's death.

**(3)    BACKGROUND CHECK [DECEMBER 14, 2002]**

430.    On or about Monday, December 9, 2002, Plaintiff Andrews flew to Los Angeles, California at ENTERPRISE-DEFENDANTS' expense to compete in Season Two of Hollywood Week.

431.     During Hollywood Week, Plaintiff Andrews reportedly was one of the only contestants to receive a standing ovation from all three *American Idol* Judges (Jackson, Cowell, Abdul) at once in response to his performance.

432.     On or about December 13, 2002, after successfully competing in each round, Jaered Andrews was chosen by the *American Idol* judges as one of the Top 32 Semi-Finalist contestants for Season Two.

433.     On or about December 14, 2002, Andrews disclosed the circumstances surrounding Mr. Blakely's death to Sharon GIALLO, an agent of FOX Global Security and/or third party corporate investigator MMI / CARCO GROUP, INC.

434.     On or about December 16, 2002, Plaintiff Andrews flew back to Youngstown, Ohio to await the Semi-Final rounds in Los Angeles, which were scheduled to begin in Los Angeles, California on February 5, 2003

## (4)     DISQUALIFICATION [January 31, 2003]

435.     On or about January 31, 2003, just days before Plaintiff Andrews was scheduled to depart for Los Angeles, California to compete in the Semi-Final rounds, the ENTERPRISE-DEFENDANTS publicly announced to USA TODAY and TV GUIDE that Jaered Andrews had been disqualified from the *American Idol* Contest.  [CDC_000321].

436.     USA TODAY reported as follows:

**"De-idolized: An American Idol finalist was replaced after a Fox background check.  On Wednesday, viewers saw Jaered Andrews of Youngstown, Ohio, become one of the 32 finalists. But on Thursday, Fox said Andrews had been replaced by George Trice of Jackson, Tenn.  Andrews is a former member of Youngstown-based hip-hop band Ordinary Peoples."  [CDC_000321]**

437.    ENTERPRISE-DEFENDANTS reported to USA TODAY that the grounds for Plaintiff Andrews' disqualification was his former membership in a local hip-hop group called *Ordinary Peoples*, a local, un-signed group which had disbanded several years before Andrews' audition for *American Idol.* [CDC_000321]

438.    On February 1, 2003, the MIAMI HERALD reported the reason for Plaintiff Andrews's disqualification as follows:

> **"In other Idol news, one of Wednesday's 32 finalists - Jaered Andrews - has been disqualified, reports TV Guide Online, after a Fox background check revealed him to be a former member of the Ohio-based hip-hop band Ordinary Peoples. [CDC_002566]**

439.    On February 11, 2003, USA TODAY reported that Plaintiff Andrews had been "replaced earlier for undisclosed reasons." [CDC_003778].

440.    On February 24, 2003, the ST. PAUL PIONEER PRESS reported that Jaered Andrews was "Evidently disqualified from "American Idol" for already having a music career." [CDC_002578]

441.    On or about Friday, January 31, 2003, an unidentified man from "FOX Global Security" telephoned Plaintiff Andrews at his home in Youngstown, Ohio to notify Andrews that he had been officially <u>disqualified</u> from the Series and that Andrews would no longer be welcome to fly to Los Angeles, California to compete in the Semi-Finalist rounds of Season Two of *American Idol.*

442.    ENTERPRISE-DEFENDANTS' representative said he was unable to provide any reason for the disqualification and then quickly hung up the phone.

## (5)    ARREST [February 27, 2003]

443.    On Thursday, February 27, 2003, a police detective (not a prosecutor) charged

Andrews with one misdemeanor count of <u>simple assault</u>.

444.    Jaered Andrews learned about the charge from watching FOX's local newscast of the existence of a warrant for his arrest.

445.    The following Monday, March 3, 2003, *The Smoking Gun.com* published a three-page copy of the Mercer County, PA criminal complaint filed against Plaintiff Andrews, as well as a mugshot of Andrews and an autopsy report.  [CDC_002077-78].

446.    *The Smoking Gun.com* article described the Blakely incident in detail, and further explained that the public <u>now</u> knew why Plaintiff Jaered Andrews had been kicked off the show. [CDC_002077-78].

447.    The clear implication in the media was that Andrews had been disqualified for "failure to disclose" his arrest.   This notion is factually impossible because Andrews was disqualified a full four weeks BEFORE he was ever arrested or charged with any crime.

448.    On February 4, 2004, MTV NEWS reported that: "Last season the judges advanced Jaered Andrews to the final 32 but kicked him off when FOX learned of his arrest on assault charges in connection with a bar fight that ended with a man's death."  [CDC_000827]

449.    On February 5, 2004, the NEW YORK POST (owned by Defendant NEWS CORP.) reported that: "Last season, for instance, Jaered Andrews made it to the finals, but was booted when officials learned he'd been arrested on assault charges connected to a bar fight in which a man died." [CDC_000831]

450.    *The Smoking Gun.com* recognized that Plaintiff Andrews had been disqualified from American Idol for a crime which he had <u>not</u> been arrested. [CDC_002077-78]

451.    ENTERPRISE-DEFENDANTS *knew* a full month in advance that Plaintiff Andrews was going to get arrested in Pennsylvania and charged with a crime that he never committed.

452.    ENTERPRISE-DEFENDANTS intentionally targeted Jaered Andrews for public disqualification from *American Idol* because of their racial *animus* concerning young black males.

453.    ENTERPRISE-DEFENDANTS consciously elected to exploit Andrews' pending criminal record as a form of advertising, publicity and promotion for *American Idol.*

454.    On or about November 12, 2003, after Plaintiff Andrews testified before a jury of twelve peers that he had acted in self-defense against a belligerent man who had been harassing Andrews' female companion, it took *less than two hours* for the All-white jury to acquit Jaered Andrews of the simple assault charge.  [CDC_002640; CDC_002650-51]

# Season Two:
# FRENCHIE DAVIS

**(1)    GOLDEN TICKET [OCTOBER 25, 2002]**

455.    During Season Two [2002-2003], Franchelle "Frenchie" Davis was a 23-year-old African-American female contestant on *American Idol* and a student at Howard University (on leave at the time of her audition).

456.    On October 24-28, 2002, Frenchie auditioned in New York City and was one of 35 singers at the Open Auditions to receive a Golden Ticket.

457.    According to Simon Cowell's 2003 autobiography, Frenchie Davis was one of the early favorites to win Season Two. [CDC_004157]

> **The first one to catch our eye [in New York] was Frenchie Davis, a big black woman with her hair dyed blond ...She was absolutely stunning, and the three of us turned to one another and said, "This girl's going to win the competition." She was that good ...She knew what she had.**

458.    On Friday, December 13, 2002, Frenchie Davis was selected as a Top 32 Finalist.

459.    On or before December 20, 2002, as a part of the background check process administered by ENTERPRISE-DEFENDANTS, Ms. Davis disclosed to *American Idol* producers in writing that she had taken topless photos for an erotic website when she was a teenager.

460.    Frenchie Davis disclosed the details of her erotic photos <u>in writing</u> on page 11 of the PARTICIPANT BACKGROUND QUESTIONNAIRE FORM.

461.    In early-mid January 2003, a representative from Defendant AIP and/or Defendant FMNA visited Frenchie's residence in California and wanted to talk in greater detail about the topless photos.

## (2)  DISQUALIFICATION [February 10, 2013]

462.   On Monday, February 10, 2003, ENTERPRISE-DEFENDANTS' agent Patrick LYNN called Frenchie and summoned her to meet with ENTERPRISE-DEFENDANTS' senior executives at CBS Studios in Los Angeles.  Present at the meeting were Defendant LYTHGOE, Defendant WARWICK and Patrick LYNN.  Defendant LYTHGOE did the talking.

463.   Defendant LYTHGOE told Frenchie that they had received "blackmail" threats from some undisclosed third party who claimed to be in possession of Frenchie's erotic photos and who threatened to post the photos on-line unless Frenchie was disqualified from the show.

464.   As a result of the alleged blackmail threats, Defendant LYTHGOE claimed that ENTERPRISE-DEFENDANTS "had no choice" but to disqualify Frenchie from the *American Idol* Contest.

465.   On February 13, 2003, Defendant LYTHGOE was quoted in the media as stating that the producers had to be careful in selecting contestants because *American Idol* was a "real family show." [CDC_3796]

466.   Simon Cowell, in his 2003 autobiography, confirmed that the "family sponsors" played a significant role in the decision to disqualify Frenchie Davis.  [CDC_4157].  Cowell wrote that he had received a call one day from Defendant LYTHGOE:

> "Simon," [Lythgoe] said, "we have a problem." Frenchie Davis, one of the odds-on favorites, had posed for an adult Web site some years before. Now her pictures had been discovered, and Nigel and Kenny thought she might have to be removed from the show. I thought it was a tough call. As a record executive, I would keep her in. But if I was in Fox's shoes, protecting a billion-dollar brand, I didn't think I would risk offending family sponsors. There were subtler issues at play as well: At the auditions Frenchie had made it quite clear that she was trying to better her life, and I wondered if maybe we weren't sending the wrong message by kicking her off. To Fox's credit, they spent weeks agonizing over the decision. But

105

**in the end they decided that she would have to go.**

467.    The NEW YORK DAILY NEWS explained that *American Idol* had to disqualify Frenchie Davis because it "has a squeaky-clean image that has made it more appealing than other reality fare to big-name advertisers such as Ford, Coca-Cola and AT&T."

468.    Davis remarked years later that ENTERPRISE-DEFENDANTS "had decided that because *American Idol* was a family show, that they could not have me on the show because of the pictures I had taken – though they had never seen the pictures."  [CDC_003855]

469.    On Tuesday, February 11, 2003, ENTERPRISE-DEFENDANTS announced Frenchie's unceremonious disqualification from *American Idol*.

470.    In the weeks following Frenchie's disqualification, media outlets reported that she had been disqualified for "failing to disclose" the existence of the photos.  [CDC_002621]

> **And of course there was the Frenchie kiss-off, with Fox booting 23-year-old Franchelle "Frenchie" Davis from "American Idol" because she had posed topless for a Web site known as "Daddy's Little Girls" under the name "HoneyBrown." Although Frenchie was of legal age when she posed for the pics, ics, Fox dumped her because, unlike Trenyce, <u>she hadn't informed them of the potentially embarrassing news in advance.</u>**

471.    On February 12, 2003, David Bloomberg wrote for www.FoxesonIdol.com: [CDC_003792]

> **[T]<u>he fact of the matter remains that one of the potentially biggest stars of this season has been eliminated because of something she did four years ago in order to raise money to get back to college –</u> something that has nothing to do with her ability to sing or to be the next American Idol.**

472.    On February 13, 2003, *The Smoking Gun.com* published an article entitled "Porn Past Sinks American Idol Finalist" in which the New York-based tabloid website revealed intimate details from an un-named "TSG Source" that described the nature of Davis' erotic photos.

106

[CDC_002071].

473.    In February 2007, photos of a white *American Idol* female Semi-Finalist contestant named Antonella Barba surfaced on-line.  The photos were of a sexually explicit nature.  [CDC-003833]

474.    Defendant LYTHGOE made a statement to the press, announcing that Barba would <u>not</u> be disqualified from the competition.  [CDC_003833-34].  LYTHGOE claimed that he had only learned of the X-rated photos when a magazine contacted him.   He stated to ENTERTAINMENT WEEKLY:

> **We have really good background checks on everybody, and we deal with that every season. It's sad, isn't it, that your best friends are the ones that come forward with information that will go to [The] Smoking Gun or put your photographs on the web?"**

475.    ENTERPRISE-DEFENDANTS never took steps to correct and/or retract the report that Frenchie Davis had "failed to disclose" the photos in advance of her selection, once again demonstrating ENTERPRISE-DEFENDANTS' intent to propagate stereotypes that depict Black *American Idol* contestants as untrustworthy.

476.    DEFENDANTS disqualified Frenchie Davis because of her ancestral characteristics and would not have disqualified her had she been white.

# Season Two:
# COREY CLARK

## A.    PRE-HOLLYWOOD

### (1)    KANSAS ARREST [October 12, 20002]

477.    On October 12, 2002, Corey Clark was arrested at his family home in Topeka, Kansas.  The charges revolved around an alleged battery of his 15-year-old sister whom he was babysitting at the time.

478.    On or about October 12, 2002, the record details of Plaintiff Clark's arrest and mug shots were transmitted to the Federal NCIC database.

479.    Corey Clark's sister has at all times maintained that her older brother Corey Clark never hit her.

480.    On October 15, 2002, the Monday after Corey Clark's arrest, he was arraigned before a Judge who reprimanded the police officers for arresting Clark.  Clark was released from custody and his bond was set at $100.  [CDC_000099-105]

481.    All charges, terms and conditions of bond against Plaintiff Clark were dropped in their entirety on November 15, 2002. [CDC_000120; CDC_000125; CDC_000145]

## B.    CONTEST PARTICIPATION

### (1)    GOLDEN TICKET [November 4, 2002]

482.    Plaintiff Corey Clark was one of 70,000(+) United States citizens between the ages of 18 and 28 who publically auditioned for Season Two of *American Idol* in the fall of 2002.

483.    From October 30, 2002 through November 4, 2002, Plaintiff Clark auditioned for the Second Season of *American Idol* in Nashville, Tennessee.  Roughly 5,000 contestants

auditioned in Nashville that year.  [CDC_000174; CDC_000176]

484.    At the Open Auditions in Nashville, Tennessee, Corey Clark disclosed his name and birthdate to the PRODUCER-DEFENDANTS.

485.    On November 4, 2002, Plaintiff Clark became one of thirty-one (31) contestants from Nashville and one of two hundred and thirty-four (234) singers nationwide who was awarded a Golden Ticket to Hollywood for Season Two of *American Idol.*

486.    Plaintiff Clark was awarded a "Golden Ticket" to Hollywood based on a unanimous decision from *American Idol's* distinguished panel of judges: Simon Cowell ("Cowell"), Abdul ("Abdul") and Randy Jackson ("Jackson").

487.    Regarding Plaintiff's audition, Abdul commented that Plaintiff had "star quality"; Cowell stated that Plaintiff had a "good recording voice".  [CDC_000178]

488.    Simon Cowell wrote about Corey Clark's Nashville audition in his 2003 published autobiography (pg. 152) stating*:*

> **"We met Corey Clark in Nashville, and Paula [Abdul] fell for him instantly; she thought he could be another Justin Guarini, though he had a twinkle in his eye and it was clear that he was a bit more of a bad boy than Justin." [CDC_004146]**

489.    Plaintiff Clark's Golden Ticket indicated that he was to receive an information packet in the mail from *American Idol* within 10-14 business days of his November 4, 2002 audition.  The Golden Ticket further instructed that Plaintiff should not attempt to contact the offices of the Producers.  [CDC_000178]

490.    On December 5, 2002, Plaintiff received a fax from Defendant American Idol Productions, Inc. contained a 16-page long-form AMERICAN IDOL CONTESTANT AGREEMENT plus travel and press information.  Plaintiff quickly reviewed the Agreement, without the advice of

counsel, signed it on Friday, December 6, 2002.  [CDC_000203].

491.   On December 9, 2002, Plaintiff arrived in Los Angeles beginning of Hollywood Week.  [CDC_000186]

492.   Plaintiff Clark's AMERICAN IDOL CONTESTANT AGREEMENT was countersigned by American Idol Productions, Inc. on Monday, December 9, 2002.  [CDC_000203].

## (2)   PRE-HOLLYWOOD BACKGROUND CHECK [November-December 2002]

493.   Upon information and belief, after Clark was awarded a Golden Ticket, the ENTERPRISE-DEFENDANTS used Plaintiff Clark's name and birthdate without his consent to obtain Plaintiff Clark's "rap sheet" via the federal NCIC database.

494.    Upon information and belief, the ENTERPRISE-DEFENDANTS were in possession of Plaintiff Clark's rap sheet prior to the date upon which Clark was charged with any crimes by the Shawnee County prosecutor and prior to the date when Clark received his "Information Packet" from PRODUCER-DEFENDANTS.

495.   On Thursday, December 4, 2002, a three-count misdemeanor complaint was filed against by a Shawnee County District Attorney in Topeka, Kansas. [CDC_000136-137]

496.   On December 4, 2002, the Shawnee County District Attorney filed misdemeanor charges of Battery and Criminal Restraint against Clark.  [CDC_000138-140]

497.   Shawnee County's District Attorneys filed an Affidavit of Officer M. Soden, dated October 12, 2002, with the Criminal Misdemeanor Complaint. [CDC_000141-143] To protect Corey Clark's due process rights, the Affidavit was sealed, i.e., "closed  for examination." [CDC_000121].

498.   An agent of ENTERPRISE-DEFENDANTS named Sharon Renee GIALLO

110

communicated directly via telephone, fax and/or U.S. mail with government officials employed within the Shawnee County criminal court including, *inter alia*, the Clerk of Shawnee County Court.

499.    Upon    information    and    belief,    ENTERPRISE-DEFENDANTS    established communications with government officials employed by Shawnee County at some time after Clark's case was dismissed on November 15, 2002 but <u>before</u> Clark was charged with any crime on December 4, 2002.

500.    ENTERPRISE-DEFENDANTS continued to make on-going communications with Shawnee County's court officials throughout the month of January 2003, obtaining copies of <u>all</u> public records from Plaintiff Clark's files, including civil cases involving bounced checks, and including the criminal complaint filed by Shawnee County prosecutors.

501.    ENTERPRISE-DEFENDANTS also obtained a hard copy from the Shawnee County Clerk's office of the Court-Sealed Affidavit of Officer M. Soden which had been marked on the docket as "closed for examination" and was NOT a matter of public record. [CDC_000121; CDC_000141-143]

502.    As of 2002 and 2003, none of the documents maintained in the Shawnee County Clerk's office were maintained in an on-line database that could have been accessible to the public or news media.  Documents in pending criminal cases were stored via hard copy and then later transferred to microfiche once the case was closed.

503.    Plaintiff Clark's mug shot photos were maintained by the Shawnee County Police Department and were NOT accessible to members of the public, including the press, in the absence of a Court-issued subpoena.

**(3)    HOLLYWOOD WEEK [December 9-14, 2002]**

504.    After the close of the highly successful second season, Cowell wrote his autobiography, *I Don't Mean To Be Rude, But . . . The Truth About Fame, Fortune and my Life in Music*, the first edition of which was published in December 2003.  [CDC_003984]

505.    Simon Cowell revealed in his 2003 Autobiography that Plaintiff Clark was one of the four contestants who he believed was a strong front-runner to win the Season Two contest.

> **I did an interview around that time [Hollywood Week] in which I was asked who might win, and I mentioned Frenchie [Davis], Ruben [Studdard], Clay [Aiken] and Corey [Clark].** [CDC_004154]

506.    Simon Cowell also wrote in his 2003 Autobiography that:

> **"Corey was the rebel of the group.  I found him to be charming, polite, and exactly the same offstage as he was onstage.  Corey has an edge and that is a good thing in the recording industry.  I have a hunch that Corey could get himself a deal."** [CDC_004197]

507.    At the end of Hollywood Week, Corey Clark had been named as an *American Idol* top semi-finalist and was invited back to compete in the live rounds starting February 5, 2003.

**(4)    BACKGROUND CHECK FORMS [December 20, 2002]**

508.    On December 20, 2002, Plaintiff received an information packet via Fedex containing ADDENDUM NO. 1 TO CONTESTANT AGREEMENT AND RELEASE, plus a long-form document entitled AMERICAN IDOL PARTICIPANT BACKGROUND QUESTIONNAIRE FORM. [CDC_000218-259]

509.    The cover memo issued by Defendant AMERICAN IDOL PRODUCTIONS, INC., dated December 20, 2002, instructed the contestants to fill out and return the Questionnaire and Addendum #1 via Fedex to: "MMI, 200 N. Tustin Avenue, Suite 100, Santa Ana, CA 92705, Attention: Drew P. Machonachy, President, for receipt no later than January 6, 2003."

112

[CDC_000224]

510.    On Saturday, January 4, 2003.    Plaintiff hand-delivered both documents, ADDENDUM #1, signed January 4, 2003 [CDC_000226-27] and the PARTICIPANT BACKGROUND INFORMATION FORM, signed December 24, 2002, [CDC_000231-269] to the Los Angeles offices of Defendant American Idol Productions, Inc.

511.    At the production office in Los Angeles, Clark filled out Fedex Airbills addressed to "Sharon Giallo of MMI".  [CDC_000226].

512.    Plaintiff Clark also delivered to junior producer Patrick LYNN a copy of his Birth Certificate, Social Security Number and California Driver's License.  [CDC_000257]

## (5)    SEMI-FINALISTS ROUNDS [February 25, 2003]

513.    On February 25, 2003, Clark performed the song "Foolish Heart" during a live telecast in which the television audience cast their votes.

514.    After Corey Clark's performance, he received two standing ovations from Randy Jackson and Paula Abdul and extended applause from Abdul and Cowell.  All the Judges, and the host, gave Corey Clark positive remarks:

> • <u>Randy Jackson</u>: "Good job, dude.  Sensational.  Sensational. Great song.  In Tune. Thanks, dude."

> • <u>Paula Abdul</u>: "Whoa. Amazing, Un-believable. Unbelievable Great song, you wanna know why great song?  I'm telling you, you just blew me away . ..blew me away.. what a beautiful voice ...unique...refreshing.  In tune all the way.  Yeah!  Brilliant, brilliant, brilliant.  I'm really excited, too.  You made America feel that.  You proved right here, right now – you took this serious.  Good for you."

> • <u>Simon Cowell</u>: "You've put me in a good mood, now. In fact this whole show put me in a good mood.  Which I thought was going to make the competition more exciting and I promise

113

**you this.  If you get in the Top 10, which I think you will, and Josh gets in the Top 12. Throw in the Kimberlies. If you get in the Top 12, it is a much more exciting show than last year.**

**• <u>Ryan Seacrest</u>: "They [your parents] are very happy for you. Congratulations. Watching you, you make it look so easy.  Are you that comfortable, that confident?"**

515.    On February 26, 2003, it was announced live on television during the "Results Show" that Corey Clark was voted through by the public to the Top 12 on the strength of the previous night's performance.

## (6)    19 ENTERTAINMENT PRIZE CONTRACTS [March 8-17, 2003]

516.    On Saturday, March 8, 2003, the OVERSEER-DEFENDANTS called the Top 12 *American Idol* finalists together to inform them that they needed to pick a lawyer to advise them on signing the "American Idol contracts."

517.    PRODUCER-DEFENDANTS announced that they were going to start paying each Finalist $1,000 a week, that they would be given a clothing budget, that they would be receiving a fixed amount of money for each tour appearance, and a percentage of royalties from the Season Two CD compilation of Love Songs.

518.    Shortly after making the announcement, production assistants passed out over eighty pages of complex industry contracts to the Top 12 finalists for their review. [CDC_000_478-557] The contestants were informed that they would need to sign all the contracts by no later than Monday, March 10, 2003 or they would be automatically disqualified from the show.

519.    On Sunday, March 9, 2003, Attorney Howard Siegel purportedly flew into California and met with the Top 12 *American Idol* contestants at the "Idol Mansion" and reviewed

five separate 19 ENTERTAINMENT contracts with them:   a Recording Agreement, a Management Agreement, a Touring Agreement, a Film Production Agreement, and a Merchandising Agreement.

520.    On or about Monday, March 17, 2003, Clark signed the 19 ENTERTAINMENT contracts. [CDC_000478-557]

## (7)    EMPLOYMENT AGREEMENTS [March 10-11, 2003]

521.    During Attorney Siegel's meeting with the Top 12 finalists to discuss the 19 ENTERTAINMENT PRIZE contracts, there was no talk whatsoever concerning AFTRA Union contracts, wages or employment agreements.

522.    On Monday, March 10, 2003, Plaintiff signed a "Recoupable Salary Advance" of $500 with American Idol Productions, Inc.  The documents were presented to him by production staff.  Attorney Siegel was not consulted.  [CDC_000414]

523.    On Tuesday, March 11, 2003, Plaintiff completed a Form I-9 Employment Eligibility Verification that listed American Idol Productions, Inc. as Plaintiff's employer.  The document was signed by Michelle Baker on behalf of employer American Idol Productions, Inc. on March 13, 2003.  [CDC_000416]

524.    At the behest of production staff, Clark also signed an "Employment Deal Memo", [CDC__000418], a series of "Standard AFTRA Engagement Contract(s)" [CDC_000422-426] and an American Idol Productions, Inc. "Production Personnel Deal Memo" [CDC_000431-434] which clearly describes Plaintiff Corey Clark as an employee of American Idol Productions, Inc. All of these  documents were presented to Plaintiff "on the fly" by production staff.  Attorney Siegel did NOT consult with Corey Clark concerning the execution of any of these employment-

related documents.  Plaintiff Clark does not remember reviewing these documents.

525.   That same evening, on March 11, 2003, Clark performed the song "This Old Heart of Mine" during a live telecast of Motown week.   After his rendition, celebrity guest judge Lamont Dozier described Corey Clark as a "**New and Rising Smokey Robinson.**"

526.   On Wednesday, March 12, 2003, Plaintiff signed a Membership Application for the American Federation of Television and Radio Artists (AFTRA) [CDC_000428-429] and signed *American Idol* ADDENDUM #2 to the CONTESTANT AGREEMENT AND RELEASE. [CDC_000407-409]

527.   Attorney Siegel was NOT consulted and did not provide any counsel with respect to any of the employment-related contracts presented to Plaintiff Clark.

## (8)   FINAL PERFORMANCES [March 18-25, 2003]

528.   On Tuesday, March 18, 2003, Clark performed the song "Against All Odds" for Movie Soundtrack week.  Celebrity guest judge Gladys Knight remarked: "I Love the Sound of Your Voice

529.   On Tuesday, March 25, 2003, Corey Clark performed the song "Drift Away" during Country Rock Week.  It would mark his last performance on American Idol.  The Judges remarked as follows:

> • **Randy Jackson: "I like it, man, I like it, I thought it was good, man, I like it when you go into your upper register, dawg, it was good, it was good."**
>
> • **Paula Abdul: "Yeah, you were on it, Corey, you're on it when you pick songs that can go into that beautiful upper register. And you know what? It's really refreshing, I've said it before, your voice is really refreshing, especially when you go into your upper register and you know what, you are on it tonight, and you are in good voice tonight ..."**

> • **Olivia Newton John:** "I thought you sang it really well, I liked it.  It suited you, and I liked your new hairdo . . . It was really good."
>
> • **Simon Cowell:** "I thought, actually compared to last week . . . I thought  you did really really well tonight.  Very very good.

530.    On Wednesday, March 26, 2003, the Results Show revealed that with 9 contestants remaining, Corey Clark was <u>not</u> one of the contestants landing in the bottom 3, which meant that his voting results (if any) placed Corey Clark in the <u>TOP 6</u> as of his last performance on the show.

## C.    PUBLIC DISQUALIFICATION

### (1)    SMOKING GUN [MARCH 31, 2003]

531.    On Monday, March 31, 2003, Plaintiff Corey Clark was abruptly "disqualified" from the *American Idol* contest in a shocking and controversial manner.

532.    Plaintiff's 2003 disqualification from the contest was orchestrated and exploited for maximum media exposure by DEFENDANTS.

533.    On early Monday morning, March 31, 2003, *American Idol* producers woke Clark up and notified him that *The Smoking Gun* had published an article entitled "Another Fallen Idol" concerning Clark's misdemeanor arrest in Topeka, Kansas on October 12, 2002.  [CDC_0002090-2095] Clark was led to a computer where he was commanded to read *The Smoking Gun* article, which described in vivid detail police report narratives and witness testimonials.

534.    The March 31, 2003 article also published details from Court documents, some of which were sealed, consisting of Plaintiff's criminal and civil court record information from the Shawnee County District Court in Topeka, Kansas. [CDC_0002090-2095] *The Smoking Gun* concluded the article by stating:

So, were/are "American Idol" producers aware of Clark's criminal predicament?

> Well, TSG long ago stopped believing anything that reality TV producers say when it comes to what they did or did not know about a contestant's past. It appears that a combination of Keystone Kops background checks, participant mendacity, and unblinking network indifference has guaranteed that drunk drivers, bankrupt deadbeats, shoplifters, bondage actresses, and assorted convicted criminals will continue to populate reality TV shows.

> For its part, Fox has adopted a blanket policy whereby network executives refuse to comment "on the private lives of show participants." That's not a bad stance when you consider that this year's original 32 "American Idol" semifinalists included a convicted thief [Trenyce], an Internet porn model [Frenchie Davis], and a guy who's been charged in connection with a fight that ended in the death of a Pennsylvania man [Jaered Andrews]. In fact, Fox booted the contestant, Jaered Andrews, a month before he was even arrested for misdemeanor assault.

> TSG will venture a guess that Fox knew about Clark's rubber checks, but were unaware that he had been popped for battering his little sister (if true, not exactly Idol" behavior).

535.     After reading *The Smoking Gun* article, Clark was then told to quickly pack his bags because he needed to go see LYTHGOE and explain what happened.  When Clark arrived at the studios, Nigel LYTHGOE met him along with the staff psychiatrist named "Chris".  LYTHGOE explained that the Producers were willing to let Plaintiff stay on the show "depending on how much you help us clean this up." LYTHGOE explained that FOX required Plaintiff to do a videotaped interview immediately.  When Plaintiff expressed concern that he should be allowed to speak with an attorney, LYTHGOE stated that there was no time for that and if Corey had any chance of staying on the show, he would need to appear in the videotape.

536.     Once the videotape interview was over, LYTHGOE left the room. Within 30 minutes, he came back and announced that senior FOX executives demanded that Plaintiff Clark

be removed from the show.

## (2)   ILLEGAL TRANSMISSION OF CLARK'S RECORDS TO SMOKING GUN.COM

537.      At the time of Plaintiff's 2003 disqualification, the government's misdemeanor charges against Plaintiff were under investigation and therefore had yet to be adjudicated.

538.      Upon information and belief, at same date prior to March 31, 2003, one or more agents of the ENTERPRISE-DEFENDANTS transmitted Clark's criminal record information to the editors of *The Smoking Gun.com*

539.      Editors of the *Smoking Gun*.com were not in the business of conducting nationwide criminal background checks of all *American Idol* Contestants.

540.      Editors of the *Smoking Gun.com* could not have plausibly known about Clark's pending arrest charges without receiving a "tip."

541.      Editors of the *Smoking Gun*.com had no legal way of obtaining the court documents published in the March 31, 2003 article without either: (a) obtaining Clark's express written consent; or (b) physically travelling to Topeka, Kansas to access the hard copy records from the Clerk's Office in Shawnee County.

542.      Editors of the *Smoking Gun*.com did <u>not</u> obtain Clark's written consent to obtain his criminal arrest history information.

543.      Editors of the *Smoking Gun*.com, who were located in New York, did not physically travel to Topeka, Kansas to obtain hard copy records of Plaintiff Clark's criminal arrest history information, which were NOT available on-line as of March 2003.

544.      On March 31, 2003, editors of the *Smoking Gun*.com published detailed information about the night of the arrest that could have only been obtained from a sealed

affidavit of one of Plaintiff Clark's arresting officers, M. Soden.

545.    On the face of the two *The Smoking Gun*.com articles published March 31, 2003, the agents of the ENTERPRISE-DEFENDANTS were clearly in direct communication with the editors of *The Smoking Gun.com* concerning Clark's arrest information and disqualification details.

546.    On Monday, March 31, 2003, nine hours after *The Smoking Gun* first reported on Plaintiff's arrest, *The Smoking Gun* then became the first and only publication to announce that Corey Clark had been "booted" from the show.  [CDC_002113-2114]

## (3)    FOX'S PROFFERED JUSTIFICATION RE: "DISQUALIFICATION"

547.    The March 31, 2003 Press Release, issued by Defendant FOX exclusively to *The Smoking Gun*.com [CDC_002113-2114] states as follows:

> **Due to events that have recently come to light, *American Idol* participant Corey Clark has been removed from the contest.**
>
> **All participants are required to provide full and accurate information to assist in background checks, including disclosure of any prior arrests. Corey withheld information about a prior arrest which, had it been known, might have affected his participation in the show. Due to his failure to disclose, compounded by an error in a police report which misspelled Corey's name, the incident was not discovered during the background check. The producers and network feel that Corey's behavior warrants his disqualification.**
>
> **Unfortunately, the search process is not perfect. We regret the error, but the only thing we can do is learn from the incident, continue to improve the background check process, and move on.**
>
> **At this time, no decision has been made as to how this will impact this week's shows.**

548.    Defendant FOX's proffered justification for Corey Clark's disqualification was pretextual because Plaintiff Clark did in fact disclose the existence of the misdemeanor charges to

agents of the PRODUCER-DEFENDANTS, including *American Idol* Judge Paula Abdul.

549.    Defendant FOX's proffered justification for Corey Clark's disqualification was pretextual because Plaintiff Clark had no legal obligation to disclose the pending misdemeanor charges as part of the ENTERPRISE-DEFENDANTS' background check process.

550.    Defendant FOX's proffered justification for Corey Clark's disqualification was pretextual because the ENTERPRISE-DEFENDANTS had knowledge concerning the existence of Clark's misdemeanor arrest as early as November 2002 (and no later than January 2003).

551.    Defendant FOX's proffered justification for Corey Clark's disqualification was pretextual because Corey Clark's name was spelled correctly in all documents maintained by the Shawnee County Police Department <u>and</u> Shawnee County Department of Corrections, as transmitted to the NCIC.

## (4)    POST-DISQUALIFICATION CORRESPONDENCE WITH AIP [May 6, 2003]

552.    On May 6, 2003, Plaintiff' counsel, Robin Mitchell Joyce, Esq., wrote to counsel for Defendant AIP, Michael Allan Jaffa, Esq. in response to Jaffa's April 13, 2003 letter threatening to sue Corey Clark for $5 million for breach of the confidentiality provision contained in the *American Idol* CONTESTANT AGREEMENT [CDC_000727-728]

553.    In the letter, Attorney Joyce reprimanded Attorney Jaffa for the manner in which Corey Clark's removal from the show was orchestrated [CDC_000727-728]:

> Had your producers taken the time to investigate this matter, they would have found out that the incident in Topeka stemmed from a very sad and silly misunderstanding, during which Corey Clark sought to protect his sister, not to harm her. This becomes clearly apparent if one bothers to note that the resulting charges from this matter were reduced to three rather confusing misdemeanors . . .
>
> In addition, Corey's sister has stated time and time again that he

never hit her, has never hit her, and that they have a close and loving relationship. There was no way, however, for Corey, under the circumstances presented to him on the morning of his dismissal from *American Idol,* to present that in a linear and understandable way or to have his sister with him to explain the truth of the matter . . .

With reckless disregard for Corey's reputation and the reputation of his family, American Idol broadcast a hacked version of his interview constructed solely to support its decision and create controversy . . .

For two days thereafter, Corey tried to reach representatives of *American Idol* for assistance in dealing with the press and his pleas were callously ignored. It was only then that Corey was forced to rehabilitate his name and, more importantly, the reputation of his family, by granting selective interviews.

### (5)    DISPOSITION OF 2002 KANSAS ARREST

554.    On June 19, 2003, two of the misdemeanor charges brought against Plaintiff, including the charges that he had physically battered his 15-year-old sister, were <u>dismissed</u>. [CDC_000122; CDC_000168-171].

555.    Plaintiff Clark's status as an African-American male with a history of criminal arrest was the predominant motivating factor in his disqualification from *American Idol*

# Season Two:
# JOHN JACOB SMALLEY

## A.    CONTEST PARTICIPATION

### (1)    GOLDEN TICKET [NOVEMBER 10, 2002]

556.    Jacob John Smalley, from Lawton, Oklahoma, was 19 years old when he auditioned for Season Two of *American Idol.*

557.    On or about November 10, 2002, Jacob John received high marks from the Expert

122

Judges when he first appeared before them at Open Auditions in Austin, Texas.

> • <u>**Paula Abdul**</u>**: "Wow, I think you have the 'X Factor', good, good, good, wonderful."**

> • <u>**Simon Cowell**</u>**: "Very good, your timing was a bit off, but very good.  You have a nice face and a very, very good voice."**

> •  <u>**Randy Jackson**</u>**: "Excellent, dude, one of the best that I have heard today. Excellent, excellent. Very good."**

> • <u>**Paula Abdul**</u>**: "I think we're all saying the same thing…"**

> • <u>**Simon Cowell**</u>**: "…You are going to Hollywood."**

**(2)    ARREST [NOVEMBER 30, 2002]**

558.    On or about Saturday, November 30, 2002, Plaintiff Smalley was arrested for public intoxication and verbally resisting arrest.

559.    At the arraignment the next Monday, the Judge scheduled a Court date for mid-January 2003.

560.    In early December 2002, Smalley received a fax from Defendant AIP containing, among other documents, the *American Idol* CONTESTANT AGREEMENT.

**(3)    HOLLYWOOD WEEK [DECEMBER 9, 2002]**

561.    On December 9, 2002, Jacob John was flown to Los Angeles, California by JOINT VENTURE-DEFENDANTS to compete in the Hollywood Rounds.

562.    At the end of the week, Jacob John was selected by JOINT VENTURE-DEFENDANTS as one of the Top 32 Semi-Finalists of *American Idol* Season Two.

563.    On or about December 13, 2002, Jacob John met with one of NETWORK-DEFENDANTS' security advisors to discuss his background information.

564.    On or about December 23, 2002, Jacob John received a Fedex from Defendant AIP containing ADDENDUM #1 to the *American Idol* CONTESTANT AGREEMENT and the PARTICIPANT BACKGROUND INFORMATION FORM.

### (4)    GUILTY PLEA [JANUARY 2, 2003]

565.    On or about December 27, 2002, Plaintiff Smalley received a telephone call from an agent of ENTERPRISE-DEFENDANTS who informed him to "clean up" his criminal record or he would be disqualified from the Top 32.

566.    On or about January 2, 2003, Mr. Smalley entered a plea of "no contest" on both charges to close out the case stemming from the November 30 arrest.

567.    Upon entering his plea of guilty to the charges, the Oklahoma Judge remarked that he had *personally* spoken to the "people from *American Idol*" and the Judge remarked that "they really have it out for you.  Good luck with the show…"

568.    That same day, on or about January 2, 2003, Jacob John informed ENTERPRISE-DEFENDANTS by telephone that the outstanding charges had been closed.

### (5)    DISQUALIFICATION [FEBRUARY 13, 2003]

569.    On or about Wednesday, February 5, 2003, Plaintiff Smalley was flown by ENTERPRISE-DEFENDANTS back to Los Angeles, California to compete in Group 2 of the Semi-Finalist rounds of the *American Idol* Contest, which was scheduled to be recorded the coming weekend.

570.    Upon returning to the *American Idol* production set, Plaintiff Smalley noticed that the producers of the show had grown "cold" to him.   In particular, Smalley was not permitted to select a popular song by Bryan Adams (a white singer) and was instead assigned a less well-

known R&B song by a black singer.

571.    On Tuesday, February 12, 2003, Jacob John's performance was broadcast on-air and purportedly submitted to the public vote in Semi-Final Group 2.

572.    On Wednesday, February 13, 2003, Plaintiff Smalley was informed that he had been eliminated from the *American Idol* Contest.

573.    Despite the fact that Plaintiff Smalley was allowed to perform on the show for what purports to be the audience vote, Plaintiff Smalley's status as an African-American male with a history of criminal arrest was the predominant motivating factor in his disqualification from *American Idol*.

# Season Three:
# DONNIE WILLIAMS

## A.    CONTEST PARTICIPATION

### (1)    GOLDEN TICKET

574.    Donnie Williams is an American singer-songwriter who in 2004, became a Top 32 Semi-Finalist in Season Three of *American Idol.*

575.    During Season Three, the Semi-Final Rounds, or "Live Shows", were scheduled to air on February 10-11, 2004; February 17-18, 2004; February 24-25, 2004; and March 2-3, 2004. The wildcard round was to air on March 9-10, 2004.

576.    Plaintiff Williams was scheduled to perform at the Live Show on Tuesday, February 24, 2004.

577.    On the early morning hours of Monday, February 23, 2004, at around 2:00 a.m., Plaintiff Williams was driving home from a celebration party.  He was pulled over by a police officer for speeding in Danville, California.

578.    Plaintiff Williams was cited – but NOT arrested - by the Danville police officer for driving while under the influence.  After being cited, Williams was released into another person's care and his car was towed and stored.  [CDC_002693]

579.    On the afternoon of Monday, February 23, 2004, Plaintiff Williams called the offices of the PRODUCER-DEFENDANTS and informed them of the citation he received from police. Williams was told not to worry about the incident and that he should report to the production office in Los Angeles as soon as practicable.

580.    On or about Wednesday, February 25, 2004, Plaintiff Williams was notified by

126

Defendant WARWICK and Defendant LYTHGOE in person that he was being disqualified from

the Season Three program but that he would have an opportunity to compete the following year.

### (2)   FOX DISQUALIFICATION [FEBRUARY 27, 2004]

581.    On Friday, February 27, 2004, Defendant FOX announced to the press that

Plaintiff Williams had been officially disqualified from Season Three of the Production.

> **Unfortunately due to recent events "American Idol" participant
> Donnie Williams has been removed from the contest," said Scott
> Grogin, Fox VP of corporate communications, says in a statement.
> "While understanding that Donnie has not been convicted of a
> crime, the producers and network feel that the nature of the
> charges against him warrant his disqualification. We wish Donnie
> the best during what must be a difficult time and once these issues
> have been resolved, he is welcome to try out for the show again
> next season.**  [CDC_002697; CDC_002704]

### (3)   MAY 2013 POSITION STATEMENT

582.    On May 22, 2013, ENTERPRISE-DEFENDANTS' submitted a Position Statement to

the EEOC which states that "Williams was arrested for driving drunk and speeding past police

officers at 100 miles per hour.  ***Because the pending criminal matter posed a threat to his***

***continued availability for the show, Mr. Williams was disqualified.***"  [Position Statement, p. 13]

(emphasis added).

### (4)   CASE DISPOSITION

583.    Plaintiff Williams was <u>never</u> arrested.  He was provided with a citation, charged

with a misdemeanor and entered a diversion program.

584.    Plaintiff Williams' status as an African-American male with a history of criminal

arrest was the predominant motivating factor in his disqualification from *American Idol*

# Season Five:
# BRITTENUM TWINS

## A.    PRE-HOLLYWOOD

### (1)    OPEN AUDITIONS IN CHICAGO [September 2005]

585.    On September 16, 2005, Terrell and Derrell Brittenum (the "Brittenum Twins") attended the Open Auditions for Season Five of *American Idol* at Soldier Field in Chicago, Illinois.

586.    After performing successfully, they were invited back to the callback venue at the W Hotel on September 20, 2005.

587.    On or about September 20, 2005, Plaintiff Brittenums, as a pair, performed before the panel of *American Idol* Judges (Abdul, Cowell, Jackson) and each earned a Golden Ticket to Hollywood.

### (2)    ARREST AND CHARGES IN MEMPHIS, TENNESSEE [October 30, 2005]

588.    On October 30, 2005, police officers pulled Terrell Brittenum over at a gas station in Memphis, Tennessee (Shelby County).  The officer ran the license plates on the car Terrell was driving, a 2005 Dodge Magnum, and discovered it was a stolen car from Georgia.  Terrell Brittenum was taken under arrest by the officer.

589.    On October 30, 2005, T. Brittenum was charged by Shelby County prosecutors with "Theft $10,000-$60,000".  A court date of January 10, 2006 was set for T. Brittenum to appear in Shelby County criminal court.

590.    On or about November 2, 2005, T. Brittenum was charged by Shelby County prosecutors  "Fugitive from Justice" charge.

591.   On or about November 3, 2005, T. Brittenum was released from jail in Shelby County on $7500 bond.

### (3)   TERRELL BACKGROUND CHECK [November 2, 2005]

592.   On November 2, 2005, Defendant CARCO transmitted a "Participant Report", Case # M1768-00666; Subject #: 103622, concerning Terrell Brittenum ("The Terrell Report") to Minna Taylor, Esq., a senior in-house counsel at Defendant FOX who directly supervised the background check process for *American Idol* contestants at times relevant to this action.

593.   The Terrell Report, dated November 2, 2005, indicated that, under Investigative Summary category "criminal," that the status was "Adverse" indicating "Shelby County, Tennessee, Upper and Lower Court criminal record review.  [CDC_002915]

594.   The Terrell Report, dated November 2, 2005, also indicated "Adverse" under the "civil" category and referenced Davidson County, Tennessee.  [CDC_002917]

595.   The Terrell Report, dated November 2, 2005, also reported a Shelby County criminal record charge, dated 11/02/2005, entitled "Fugitive from Justice Without Warrant", and indicated "Prosecution Pending."  A Court date for the fugitive charge was set in Shelby County, Memphis, Tennessee for January 10, 2006.  [CDC_002921]

596.   The Terrell Report, dated November 2, 2005, also indicates, albeit in a different font than the typefont used on the rest of the page, that Terrell was "Arrested on 01/10/2006 for The following warrants: 2005-3968, Forgery; 2005-3969; Theft by Deception; 2005-3970, Financial Identity Fraud.  [CDC_002921]

597.   The Terrell Report, dated November 2, 2005, also indicates that Terrell had a charge brought in <u>Shelby County, Tennessee</u> of "Theft of Property $10,000-$60,000;"dated

10/30/2005. The listing said that the disposition was "Dismissed"; that the *Sentence Date was 01/10/2006 and the "NEXT COURT DATE:    1/10/2006.    This charge was dismissed."* [CDC_002922]

### (4)    DERRELL BACKGROUND CHECK [November 14, 2005]

598.    On November 14, 2005, Defendant CARCO transmitted a "Participant Report", Case # M1768-00066, Subject #: 103791 concerning Derrell Brittenum ("The Derrell Report") to Minna Taylor, Esq., a senior in-house counsel at Defendant FOX.   [CDC_002926]

599.    The Derrell Report, dated November 14, 2005, indicated that, under the Investigative Summary category "criminal," that the status was "Adverse" indicating "Shelby County, Tennessee, Upper and Lower Court criminal record review re: Brittenum, Derrell Deshon. [CDC_002927]

600.    The Derrell Report, dated November 14, 2005, also indicated "Adverse" under the "civil" category and referenced Dekalb County, Tennessee.  [CDC_002927]

601.    The Derrell Report, dated November 14, 2005, also reported a Criminal category on page 6.  The entry is clearly "cut and paste" from some other document as it says that "active arrest warrants issued from Rockdale, GA."  [CDC_002931]

602.    The Derrell Report, dated November 14, 2005, also reported Shelby County criminal record charge, dated 10/23/2000, stating that Derrell had been convicted of 29-9-102: Contempt of Court General (misdemeanor) and was sentenced 02/13/2002, having to pay $50 in fines.  [CDC_002931]

603.    The Derrell Report, dated November 14, 2005, also reported Shelby County criminal record charge, dated 10/23/2000, for "Passing Bad Checks Over $500".  The entry said

that "Diversion Granted. This is not a conviction. On 04/20/2004, Diversion Terminated. A warrant was issued. Warrant was still active as of 1/17/2006." [CDC_002932]

604. The Derrell Report, dated November 14, 2005, also reported Shelby County criminal record charge, dated 2/23/1998, for "Theft of Property Over $500". Disposition is listed as Dismissed and indicates that suspect was "Released Without Charge." [CDC_002932]

## B. CONTEST PARTICIPATION

### (1) HOLLYWOOD WEEK [December 2005]

605. The Brittenums attended the Hollywood Rounds in Los Angeles, California in December, 2005 at ENTERPRISE-DEFENDANTS' expense.

606. At the end of Hollywood Week, the Brittenum Twins were selected by the *American Idol* Judges to move on to the Semi-Finals.

607. After the Hollywood rounds were complete, the Brittenum Twins were instructed to meet with Sharon GIALLO, ENTERPRISE-DEFENDANTS' private investigator, to discuss their background checks. The Brittenums met with GIALLO in a hotel room in the Marriott that had been converted into an office space. During the meeting with GIALLO, she explained that the Brittenums needed to disclose their prior criminal arrest history so that ENTERPRISE-DEFENDANTS would be able to protect them in case anything got reported the media. The Brittenums disclosed to GIALLO the pending criminal charges concerning the Rockdale case.

608. GIALLO asked the Brittenums to disclose their password to their MySpace page, which they did.

609. After the Brittenum Twins returned home to Memphis after Hollywood Week, they began to receive weekly calls from Michael Allan Jaffa, Esq., who was, at the time, lead

counsel for Defendant FREMANTLE and/or Defendant AIP.

610.    In each occasion where Attorney Jaffa called the Twins, he wanted to know how the case was coming and whether the Twins could be found living in their mother's house.  Each time Attorney Jaffa called, the Terrell assured him that he and his brother were "staying out of trouble" and were home with their mother.

## (2)    SURPRISE ARREST [January 9, 2006]

611.    As of Monday, January 9, 2006, Terrell Brittenum was staying at his mother's home in Memphis, Tennessee.  At the time, his brother Derrell was staying with his friend outside of Memphis.

612.    On January 9, 2006, at approximately 11:00 p.m. in the evening, Terrell Brittenum received a telephone call from attorney Michael Allan Jaffa, Esq., who was, at the time, lead counsel for Defendant FMNA and/or Defendant AIP. Attorney Jaffa wanted to know how the Brittenums' pending criminal case involving the Dodge Magnum was going and if there had been any recent developments in the case.   Terrell informed Attorney Jaffa that he had a court appearance scheduled for the very next morning, January 10, 2006 in connection with the Dodge Magnum, and that he was hoping everything would turn out fine.  Attorney Jaffa told Terrell to keep Attorney Jaffa updated concerning any more developments.

613.    Late in the morning on January 10, 2006, approximately four hours after Terrell received a phone call from Attorney Jaffa of FMNA and AIP, Terrell was on his living room couch when he heard a loud bang on the outside of his door.  The banging repeated.  He opened up the front door to his mother's house and he was greeted by three uniformed police officers.  On the front lawn beyond there were in excess of 15 uniformed police officers with dogs and flashing

lights. Police vehicles were everywhere surrounding the house and driveway.

614.    Terrell was apprehended and brought to Shelby County police department.  He was told that there was a "governor's warrant" issued out of Georgia in connection with the Dodge Magnum.  Terrell did not understand why Georgia would issue a warrant for his arrest if he had a court date scheduled in Memphis that very same morning.  The officers could not explain it.

615.    Within 3-4 days of Terrell's apprehension on January 10, 2006, his mother was able to retain a lawyer in Atlanta, Georgia, to have the "governor's warrant" lifted. Notwithstanding, and for reasons unknown, the Shelby County police department refused to let Terrell free.  He therefore was not able to watch the premiere of Season Five of *American Idol,* which was scheduled to appear only days later.

**(3)    SEASON FIVE PREMIERE [January 17, 2006]**

616.    On Tuesday, January 17, 2006, the premiere episode of Season Five of *American Idol* aired to U.S. audiences.

617.    The Brittenum Twins were the "lead" act to perform for the *American Idol* Judges on the show and commanded substantial airtime.

618.    The premiere episode of Season Five of *American Idol* drew more than 35.5 million viewers, which was a new record for the Series in the Nielsen ratings.  [CDC_002758]  It was the highest ratings point for a premiere in the eleven-year history of the program.

619.    According to *Smoking Gun*, the duo was widely hailed as the standouts of the Series' first episode.  [CDC_002782].

620.    Within *mere hours* after the airing of the premiere episode of Season Five of *American Idol* on the night of January 17, 2006, U.S. news media outlets began reporting, *in*

*extensive detail,* that Terrell Brittenum was being held in Shelby County Jail and that his brother Derrell was a "fugitive on the run."

### (4)   BACKGROUND INFORMATION REPORTED TO MASS MEDIA

621.   Agents of the PRODUCTION-DEFENDANTS and/or NETWORK-DEFENDANTS caused to provide U.S. news media outlets with all of the details of the Brittenums' arrest record information concerning the *pending charges.*

622.   Agents of the PRODUCTION-DEFENDANTS and/or NETWORK-DEFENDANTS caused to provide U.S. news media outlets with details of their past arrest record information, which was completely unrelated to the pending charges, including arrest information dating back more than eight years to 1998.

623.   MTV News also reported that, according to Steve Shular, a spokesperson for the Shelby County, Tennessee, sheriff's department, the Brittenums had prior misdemeanor records in Shelby County dating back to 1998 and 2000.  [CDC_002762]

624.   Similarly, TVFanForum.com reported detailed arrest background information (more than eight years old) that completely irrelevant to the pending charges relating to the automobile. [CDC_002797]

> **Terrell Brittenum has a Shelby County arrest record for traffic violations and a 2000 misdemeanor citation for disorderly conduct and indecent exposure. The exposure charge was amended to disorderly conduct and he paid a $50 fine.**
>
> **Derrell Brittenum was arrested in 1998 for theft over $500 and in 2000 for contempt of court and passing bad checks, court records show.**

625.   The media reports regarding the Brittenum Twins' past arrest records dating back to 1998 and 2000 were necessary derived from the Derrell Report, dated November 14, 2005 and

the Terrell Report, dated November 5, 2005, each of which were issued to Minna Taylor, Esq. of FOX.

626.    Defendant FOX refused to comment on the incident or on the Brittenum Twins' status for the show.  "We do not comment on the personal lives of our show participants," FOX spokesperson Scott Grogin said. [CDC_002784]

627.    On or about Friday, January 20, 2006, Derrell Brittenum checked in to the Rockdale County police department in Atlanta, Georgia.  [CDC_002834]

628.    On or about Saturday, January 21, 2006, Terrell Brittenum reportedly waived an extradition hearing in Shelby County, Tennessee and was thereafter transported by a private carrier to Atlanta, Georgia.  [CDC_002827; 2834]

## C.    DISQUALIFICATION

### (1)    NOTICE OF DISQUALIFICATION [January 22, 2006]

629.    On Sunday, January 22, 2006, according to their defense attorney, the Brittenum Twins were released from the police department in Rockdale County, Atlanta, Georgia on $30,000 bond. [CDC_002798]  They were required to pay $5,000 each to secure the bond.

630.    Because the Brittenums were scheduled to fly back to Los Angeles, California for the Semi-Final Rounds on or about Monday, January 23, 2006 they acted with quick speed to clear up their legal issues.  In furtherance thereof, the Brittenum Twins borrowed $15,000 from family members in order to pay for Terrell's private carrier transport to Atlanta as well as for the bond money required to be released pending the disposition of charges.  Their family loaned them the money so as to ensure that the Brittenums would not miss their call-backs for Semi-Finals in Los Angeles.

631.    On the evening of Sunday, January 22, 2006, the Brittenum Twins received a call from Patrick LYNN stating that they had been disqualified from the show because there was "too much media attention" surrounding their arrest.    The Brittenums were heartbroken.    They explained that they had borrowed $15,000 from their family, who were themselves in a fragile economic condition, in order to get all the legal issues cleared up before going back to Hollywood to compete in the Semi-Finals.

632.    The Brittenums also explained to Patrick LYNN that they had disclosed everything about the charges to investigator Sharon GIALLO during Hollywood Week, who represented to the Brittenum Twins that she needed to know everything about the *pending* case so that she could protect them.

633.    Patrick LYNN explained that the Brittenums could <u>not</u> come back to Los Angeles for the television show under any circumstances because they were "too famous" and there were too many news reporters waiting for them in Hollywood.    LYNN explained that the "airports were crowded" and that the Britteneums were so famous now that it wouldn't be "fair to the other contestants" because the "Brittenum Twins would get all the attention."

634.    At no point after receiving news of their official disqualification did FOX issue a statement to the press indicating that the Brittenum Twins had been disqualified.    FOX did not release to the press any information concerning ENTERPRISE-DEFENDANTS' justification for disqualifying them.

635.    On February 6, 2006, two weeks after their disqualification from the Contest, the ATLANTA JOURNAL-CONSTITUTION reported that WARWICK told Buzz at a phone press conference on February 3, 2006 [CDC_002854] that:

**[T]he show has let many finalists with skeletons in the closet stay**

**as long as the contestants give them advance notice and it's in the past (i.e., Bo Bice with drugs and Nikki McKibbin's time as a stripper). But the Brittenum case was too recent to ignore. 'From what I heard under the circumstances, I think it was a prudent decision,' Warwick said. 'There's a lot of money involved and kids watching this.' He does say the twins will get plenty of airtime once the pre-taped Hollywood auditions begin Wednesday.**

## (2)  EXPLOITATION [January-May 2006]

636.    On January 25, 2006, the lawyer for the Brittenums, Maurice Bennett, announced that the Twins were receiving record label offers from industry veterans such as Jermaine Dupri, and that they had received offers to perform live.   However, FOX would not permit the Brittenums to enter into any engagements.  [CDC_002799]

637.    On or about January 27, 2006 – after the Brittenum Twins had been disqualified by ENTERPRISE-DEFENDANTS – Fox News reported that the Brittenums were still under contract with the show. [CDC_002846]

> **The network did, however, reportedly squelch the brothers' planned live appearance Wednesday night on MSNBC's "Scarborough Country" —indicating the Brittenums are still officially under contract to Fox.**

638.    On or about January 27, 2006 – after the Brittenum Twins had been disqualified by ENTERPRISE-DEFENDANTS - the NEW YORK POST reported that FOX was impeding the Brittenums' gainful employment. [CDC_002799; 2849]

> **The [FOX] network put the kibosh on a planned live performance by the Brittenums Wednesday night on MSNBC's "Scarborough County," indicating that they are probably still under contract.**

639.    On February 9, 2006, ENTERPRISE-DEFENDANTS caused to air *American Idol* episodes of Hollywood featuring significant amount of footage of the Brittenum Twins in which they were portrayed in extreme negative light.   ENTERPRISE-DEFENDANTS at this point had

already disqualified the Brittenums and orchestrated a media scandal around their pending arrest; but that was not enough. ENTERPRISE-DEFENDANTS now chose to further exploit the Brittenums and inflict further damage upon their good names and reputations by editing together and broadcasting footage of them which was clearly intended to defame them further.

640.    LYTHGOE knew in December 2005, during Hollywood Week of Season Five, that the Brittenums were going to be disqualified for their pending criminal records and so he leveraged that knowledge and intentionally placed the Brittenums in high-stress situations designed to cause anxiety and irritability.  For example, LYTHGOE falsely represented to Derrell that Terrell had been cut from the competition, simply to generate a reaction out of Derrell.

641.    On Wednesday, February 15, 2006, MSNBC.com reported as follows regarding the Brittenums' troubled appearance during Hollywood Week:

> **This season's edition was a little less dramatic than usual, but it did have its villains. The Brittenum twins, who made news before the Hollywood round even began for allegedly committing identity theft, and have been the main men on camera ever since, did another clinic on how not to win friends or influence people. But like all good villains, they did get to be at least partially redeemed in the end.**

642.    On Thursday, February 16, 2006, the NEW YORK POST reported that the February 15 episode of *American Idol* had exploited the pending criminal arrest of the Brittenums, including the airing of footage from FOX news affiliates [CDC_002873]:

> **LAST night's "American Idol" episode officially ended the run of troubled Tennessee twins Derrell and Terrell Brittenum. The brothers were actually booted off "Idol" last month after being charged with identity fraud - after making it to the next round in L.A.**
>
> **But just how the show would handle their inevitable exit wasn't revealed until last night. With just minutes left in the show, "Idol" host Ryan Seacrest mentioned the brothers and their legal**

**troubles. The show then rolled several news clips from Fox's Memphis affiliate documenting the Brittenums' legal woes.**

**"So the Brittenum twins are no longer in the competition," Seacrest said. The Brittenums, who have prior arrest records, are accused of using someone else's identity to buy a car last June in Atlanta.**

643.    The *American Idol* episode aired on February 15, 2006 also displayed an image of the Brittenums' faces locked behind jail bars in a cartoon-like manner.

644.    In late-April 2006, LYTHGOE called the Brittenum Twins and invited them to fly out to Los Angeles to appear in the Season Five finale.  LYTHGOE wanted the Brittenums to appear in a "feature sketch" where they would be seen running across the *American Idol* stage as fugitives while *faux* police officers chased them.  The Brittenums refused to participate.

645.    Notwithstanding, in May 2006, ENTERPRISE-DEFENDANTS caused to broadcast footage of the Brittenum Twins on the finale of *American Idol* and once again referenced their alleged crimes and displayed an animated, cartoon-like set of jail bars closing over the Brittenums' faces.

646.    In May 2006, the Brittenum Twins entered into a plea deal as "first offenders" and were sentenced to a Diversion Program, which they eventually cleared successfully.  They were also ordered to pay $11,352.22 in restitution and each fined $1,000 each.  [CDC_002896]

**(3)    SEASON SEVEN AUDITIONS**

647.    In August 2007, the Brittenum Twins attended the Open Auditions for Season Seven in Atlanta once again, they were both awarded Golden Tickets to Hollywood by Simon Cowell, Paula Abdul and Randy Jackson.   [CDC_002900].  They told the ATLANTA-JOURNAL-CONSTITUTION that "we are truly blessed to be back."  [CDC_002900].

648.    Just days before being flown to Los Angeles, California for Hollywood week, however, the Brittenums received a call from Patrick LYNN stating that "FOX Legal" was having problems with the fact that they were now age 29 and therefore too old to compete.   The Brittenums commented that all of the Judges and production staff, including LYTHGOE and WARWICK, knew exactly how old they were before they received Golden Tickets in Atlanta. LYNN said there was nothing he could do to help them.

649.    In December 2007, Brittenums decided, however, to fly to Los Angeles, California for Hollywood Week anyway, at their own expense.

650.    Upon their arrival to the *American Idol* production set in Los Angeles, they were greeted warmly by former Judge Paula Abdul.  They were temporarily admitted past security and had the opportunity to meet with WARWICK and LYTHGOE, who were very cold and short with them.  They informed the Twins that there was no way they could be on the show that year because "FOX Legal" prohibited them based on their age.

651.    Plaintiff Terrell Brittenum's status as an African-American male with a history of criminal arrest was the predominant motivating factor in his disqualification from *American Idol.*

652.    Plaintiff Derrell Brittenum's status as an African-American male with a history of criminal arrest was the predominant motivating factor in his disqualification from *American Idol*

# Season Five:
# HALICIA T.

653.    Halicia T., an African-American female citizen from the State of North Carolina, was an *American Idol* Contestant on Season Five of the Production.

654.    Halicia T is NOT a plaintiff in this action.

655.    Halicia T. auditioned for *American Idol* on or about October 6, 2005 in Greensboro, North Carolina.  Born in August 1978, Halicia was 27 years old at the time of her audition for *American Idol.*

656.    After a unanimous vote from the Expert Judges, Halicia T. was awarded a Golden Ticket to Hollywood.  She kissed Simon Cowell and her family's triumphant reaction was shown to viewers.

657.    Halicia T's audition would later be described by REALITY TV MAGAZINE as "a feel-good moment."  [CDC__005474].

658.    Halicia T. was one of 175 Golden Ticket Holders who attended Hollywood Week at the Orpheum Theater in Los Angeles, California in mid-December 2005.  She was cut from the *American Idol* Contest on the second or third day of Hollywood Week, after the second "group performance" round.  The next day, Halicia returned home to her family in North Carolina.

659.    On Tuesday, January 17, 2006, Season Five of *American Idol* debuted to a U.S. television audience of more than 38 million people.  The Brittenum Twins were the featured lead act.

660.    On Tuesday, January 24, 2006, the *American Idol* episode featuring Open Auditions from Greensboro, North Carolina was broadcast in the U.S.  The episode featured the

141

entirety of Halicia's audition segment [CDC__005474].

661.    Halicia's birthdate was not displayed on-screen as part of the episode.

662.    On Tuesday, January 31, 2006, the two-hour *American Idol* episode featuring Open Auditions from Austin, Texas drew 35 million television viewers.

663.    On Wednesday, February 1, 2006, the *American Idol* episode featuring Open Auditions from Boston, Massachusetts drew 32.4 million viewers.

664.    On February 2, 2006, at 3:18 pm PST, TMZ.com posted an article under its "Celebrity Justice" section entitled *Idol Contender's Criminal Past.*  [CDC_005415]  The web article revealed that Halicia had been twice convicted of misdemeanor crimes, including for criminal trespass on April 12, 1998 (more than 7 years before Halicia's audition for *American Idol*) and for disorderly conduct on July 10, 1998 (also more than 7 years before Ms. Thompson's audition for *American Idol.*  Both incidents stemmed from verbal arguments in public places, one of which involved a North Carolina police officer.  Halicia was only 19 years old at the time of the infractions.  TMZ.com posted the underlying police reports and court documents relating to both incidents and ostensibly interviewed Halicia, who described one of the incidents as "racial". [CDC_005417-5431]

665.    On Thursday, February 2, 2006 at 1:00 pm PST, E! ENTERTAINMENT CHANNEL on-line (EOnline.com) also reported Halicia's past infractions based on the initial TMZ.com report [CDC__005452]

666.    On Friday, February 3, 2006, at 1:07 a.m., REALITY TV MAGAZINE re-published portions of the TMZ.com article featuring Ms. Thompson's arrest history.  In an article entitled *"American Idol Contestant Halicia Thompson Criminal Past Exposed", the article stated:*

**TMZ does not address if Halicia Thompson is at risk of being**

**eliminated from the competition for her criminal past. Usually if the criminal offense was minor and the contestant made Idol producers aware of the incident(s), then contestants are allowed to continue in the competition. [CDC_005474]**

667.    In response to the REALITY TV MAGAZINE article concerning Ms. Thompson, one commentator noted as follows:

**Those are newsworthy crimes? How in the world does something as little as that compare to last year's revelations of Bo Bice being arrested for allegedly trying to buy cocaine or Scott Savol allegedly throwing a phone at his girlfriend when she was holding a child? What she did is no worse than what every other celebrity does in Hollywood yet don't get arrested for it . . . This is nothing- she cusses, so what? She's probably had a hard life and racist cops tend to take things out on African-Americans. It is certainly no big deal. [CDC_005475]**

668.    On Friday, February 3, 2006, the VANGUARD NEWS NETWORK (vnnforum.com) re-published the TMZ.com article concerning Ms. Thompson's arrest record history and posted the following headline "*Another American Idol nigger with a rap sheet.*"  [CDC_005459].

669.    In response to the VANGUARD NEWS NETWORK article, a "Senior Member" of the on-line forum commented:

**"It's just the same damn story all the time with these Niggers....Everytime you turn over a rock, there is a fucking nigger under it with a warrant or criminal record!   Un-fucking real!" [CDC_005460]**

670.    As a part of its standard practice and ordinary course of business, ENTERPRISE-DEFENDANTS purported to obtain written consent from Ms. Thompson to procure criminal record history information concerning Ms. Thompson during the background check process of *American Idol* Contestants for Season Five.  This included record information that dated back more than seven (7) years from the time of the infractions.

143

671.    Upon information and belief, once in possession of Ms. Thompson's criminal history information, ENTERPRISE-DEFENDANTS caused for such information to be disseminated to the entertainment and tabloid websites, including TMZ.com, prior to or concurrent with the February 7, 2006 broadcast of the *American Idol* episode that features Ms. Ward's Golden Ticket audition.

# Season Five:
# TATIANA W.

672.    Tatiana W., an African-American female citizen from the State of Pennsylvania, was an *American Idol* Contestant on Season Five of the Production.

673.    Prior to her appearance on *American Idol,* Tatiana won 2005's MakeAStar.com singer/songwriter contest as well as honorable mention at 2004's VH1 songwriter competition.

674.    Tatiana W. auditioned for *American Idol* in Boston, Massachusetts on or about October 27, 2005.  Born in August 1983, Tatiana was 22 years old at the time of her audition for *American Idol.*

675.    After singing *"My Cherie Amour",* Tatiana was awarded a Golden Ticket to Hollywood by the Expert Judges.

676.    Tatiana W. attended Hollywood Week in mid-December 2005.  She was cut from the *American Idol* Contest by the second day of the Hollywood rounds.  [CDC_005483]

677.    On Tuesday, February 7, 2006, at 8:00 pm EST the *American Idol* episode featuring Open Auditions from Boston, Massachusetts was broadcast to U.S. viewers.  Tatiana's entire audition performance was shown to audiences.  Tatiana's birthdate was not displayed on-screen as part of the episode.

678.    On Wednesday, February 8, 2006, at 6:19 p.m. PST, TMZ.com posted an article to its website entitled *"A.I. Contestant – Convicted Shoplifter"* [CDC__005497]

> **TMZ has learned 'American Idol' contestant Tatiana Ward, who is on her way to Hollywood after last night's audition, got into legal trouble on her way out of Macy's.**
>
> **According to legal documents obtained by TMZ, Ward was cited for shoplifting $24 in merchandise from the Macy's Department**

> **Store in Montgomery County, PA. The incident occurred on March 22, 2002.**
>
> **Ward pled guilty to retail theft and was fined $135. Ward was also cited for carrying false ID. TMZ has learned she had a false New Jersey driver's license. Ward pled not guilty but Judge David Keightly begged to differ, fining her $187.50 for that offense.**
>
> **TMZ spoke with Judge Keightly today who is far from "Simon-esque," Judge Keightly said, "She's a very good singer and I hope she does well in the competition."**

679.    TMZ.com's article entitled *"A.I. Contestant – Convicted Shoplifter"* also posted the underlying court records for Tatiana's non-traffic citations from the Commonwealth of Pennsylvania.  One of the official citations posted by TMZ.com, dated March 22, 2002, contains a "faxline" of "02/08/2006 Wed. 12:48 [p.m.]" from a "District Court" fax number with 215 area code (which is associated with the Commonwealth of Pennsylvania). [CDC_005498]

680.    On Thursday, February 9, 2006, the website "buffaloathome.com" published an article entitled "*American Idol" Contestant Has Shoplifting Record*. [CDC__005508].  The article reads as follows:

> **Looks like yet another "American Idol" wannabe has a criminal past TMZ.com reports that Tatiana W., who wowed the Fox talent judges on last night's show, was cited for shoplifting in 2002. She was accused of taking 24-dollars in merchandise from a Macy's Department Store in Montgomery County, Pennsylvania . . .**
>
> **No word if the report will effect Ward's status on "Idol." Last week it was revealed that 27- year-old North Carolina-native and "Idol" Halicia T. had been convicted of second degree trespass and disorderly conduct. Two weeks ago, talented twins Terrell and Derrell Brittenum were dismissed from "Idol," following the news that they were wanted on identity-theft charges. [CDC_005656] As a part of its standard practice and ordinary course of business,** ENTERPRISE-DEFENDANTS **procured criminal record history information concerning Ms. W. during the background check process of** *American Idol* **contestants for Season Five.**

681.    As a part of its standard practice and ordinary course of business, ENTERPRISE-DEFENDANTS purported to obtain written consent from Tatiana W. to procure criminal record history information concerning Tatiana W. during the background check process of *American Idol* Contestants for Season Five.

682.    Upon information and belief, once in possession of Tatiana W. criminal history information, ENTERPRISE-DEFENDANTS caused for such information to be disseminated to the entertainment and tabloid websites, including TMZ.com, prior to or concurrent with the February 7, 2006 broadcast of the *American Idol* episode that features Tatiana's Golden Ticket audition.

# Season Six:
# THOMAS DANIELS

## A.    PRE-HOLLYWOOD

### (1)    YOUTHFUL INDISCRETION

683.    Plaintiff Thomas Daniels is a native-born U.S. citizen of Portland, Oregon, born January 18, 1985. Tommy Daniels grew up in the "small town" of Troutdale, Oregon (Multnomah County).

684.    In or about late 2004, Plaintiff Daniels, then age 18, had been out with friends drinking.  When he left the bar that evening, he was "buzzed", but did not feel drunk or incapable of handling the wheel.  Using the judgment of an 18-year-old, he got in his car and drove about a half-mile only to realize that it was a bad idea for him to be driving.  His vision was blurry.  So he did the responsible thing: he parked the car over to the side of the road and decided to wait some time until he sobered up.

685.    After parking his car on the side of the road, Daniels slid into the passenger side seat to lay back.  He decided to keep the ignition on to stay warm.  When he awoke, it was to a police officer knocking on his car door.  The officer asked Daniels to get out of the car and determined that Daniels was intoxicated.  Plaintiff Daniels was arrested and charged for driving while under the influence of alcohol.  He pled no contest to the charges, paid a fine and was placed into a diversion program, which he completed.

686.    Daniel's DUI conviction was expunged from the public record.

687.    In or about December 2005, Daniels was arrested for an alleged "hit-and-run" incident.  There were no reported personal injuries or property damage stemming from the

incident.  Daniels pled no contest to the charge, paid a $50 fine, and attended a safe driving class.  The charge was thereafter expunged from his record.

## (2)    GOLDEN TICKET [OCTOBER 2-3, 2006]

688.    On September 19, 2006, Thomas Daniels waited in line for several days and nights to audition for Season Six of *American Idol* in Seattle, Washington.

689.    At the time of his audition for Season Six of *American Idol*, both of Plaintiff Daniels' past misdemeanor convictions had been officially expunged from the public record.

690.    Plaintiff Daniels had previously auditioned for both Season Four (2004) and Season Five (2005) of *American Idol* but did not get past the "cattle call" phase.

691.    After passing through the "cattle call" phase on September 19, 2006, and performing at least three times for different pairs of junior and senior producers, Tommy Daniels was called back to audition for the Expert Judges, which was scheduled for October 2-3, 2006.

692.    Shortly before the Callback round, on or about October 2-3, 2006, Plaintiff Daniels quit his job as a gas station attendant back home in Oregon.  He was confident that he had what it took to be the "next *American Idol."*

693.    On or about October 2-3, 2006, a large number of Daniels' family and friends attended the Callback audition at the W HOTEL in Seattle, Washington to show their support.

694.    When Tommy Daniels finally got his opportunity to sing before the Expert Judges – Simon, Randy and Paula - he was awarded a Golden Ticket to Hollywood by *unanimous* vote.

695.    Appearing before Simon Cowell, Paula Abdul and Randy Jackson, Tommy Daniels sung the song "*Arms of a Woman*" by Amos Lee.  The Expert Judges commented in relevant part as follows:

- **Simon Cowell**: "I thought you sang that very well, Thomas.  It's nice to hear a non-obvious song again."

- **Paula Abdul**: "Very Nice. Very Soothing.  You know we haven't had a great start here in Seattle."

- **Randy Jackson**: "Dude, I loved you.  Man, I thought it was really, really nice.  Beautiful tone, baby, beautiful tone. Yes, definitely, definitely."

- **Paula Abdul**: "Yeah, Thomas.  You are absolutely original.  Yes, yes, yes, yes."

- **Simon Cowell**: "It's a Yes.  You are through to Hollywood."

- **Randy Jackson**: "Welcome to Hollywood."

## (3)  BACKGROUND CHECK

696.    After Plaintiff Daniels received his Golden Ticket on or about October 2-3, 2006, ENTERPRISE-DEFENDANTS provided him with a packet of documents including a written background questionnaire form ("LFQ.06") and the *American Idol* CONTESTANT AGREEMENT (v.06).

697.    Tommy Daniels was instructed that he would need to complete <u>all</u> of the paperwork and execute all contracts <u>before</u> he was flown to Los Angeles to compete in Hollywood Rounds.

698.    Tommy Daniels reviewed the voluminous paperwork with his mother, Starla Daniels, who is a public school teacher in Oregon.

699.    With respect to the background application questions concerning Contestants' prior arrests and convictions, Plaintiff Daniels specifically asked his mother whether he should disclose his expunged misdemeanor convictions.  His understanding was that he had already completed diversion programs for both infractions, had paid his fines to the Court, had attended

the Court-ordered safe driving classes and, consistent with this understanding, had effectively paid his dues to society for the crimes he committed. Daniels explained to his mother that he did not think it was fair that he was being asked to disclose his expunged government records to *American Idol.*

700.   Starla Daniels advised her son that because *American Idol* was the "number one" show in the world, and was a very powerful entity, that ENTERPRISE-DEFENDANTS were likely going to discover Tommy's past record in any event.  She explained that he would be doing himself a favor if he simply disclosed the expunged misdemeanor records on the application form.

701.   Accordingly, Plaintiff Daniels followed his mother's advice and completed all of the application forms. He set forth in writing the dates and charges of his expunged misdemeanor records and submitted these forms to ENTERPRISE-DEFENDANTS before he reached Hollywood.

702.   On October 9, 2006, Plaintiff Daniels signed *American Idol* CONTESTANT AGREEMENT (V.06).

## B.   CONTEST PARTICIPATION

## (1)   HOLLYWOOD ROUNDS [November 16-17, 2006]

703.   During Season Six, the Hollywood phase of the audition process was held over a period of four days, from Monday, November 13, 2006 through Friday, November 17, 2006 at the ORPHEUM THEATRE in Los Angeles, California.

704.   Plaintiff Daniels successfully auditioned through three rounds of cuts held on four consecutive days.  In the process, he also established himself as one of the "lead runners" in the Contest who was consistently singled out by his peers and the Expert Judges as a standout performer.

705.   At the end of Hollywood Week for Season Six, Plaintiff Daniels was one of 40 remaining Contestants selected by ENTERPRISE-DEFENDANTS to advance to the next round (the "Green Mile"), which was scheduled for mid-January 2007.

706.   After the Top 40 was announced, Simon Cowell personally approached Plaintiff Daniels backstage and offered his congratulations. Cowell remarked that Daniels had consistently delivered solid performances throughout the rounds and that Cowell appreciated Daniels' efforts and positive attitude.  Daniels also received adamant praise from Judge Paula Abdul.

707.   Upon returning home from Hollywood Rounds, Daniels once again was required by ENTERPRISE-DEFENDANTS to faithfully and accurate complete even more documentation relating to his personal background information.  He was reminded again that completion of the forms was required by ENTERPRISE-DEFENDANTS in order for him to continue advancing through to the next round.

## (2)   EPISODE AIRDATE [January 17, 2007]

708.   The premiere episode of *American Idol* Season Six aired on Tuesday, January 16, 2007.  According to the Nielsen ratings, the January 17, 2007 episode drew 37.3 million television viewers.

709.   The following night, on Wednesday, January 17, 2007, ENTERPRISE-DEFENDANTS broadcast the second episode of *American Idol* that season, which drew 36.9 million television viewers.

710.   The DETROIT FREE PRESS noted that the premiere episodes of Season Six of *American Idol* broke Defendant FOX's broadcast record for the number of primetime television viewers:

**Setting the standard: The first two episodes of "American Idol." The Tuesday and Wednesday audition shows drew 37.3 million and 36.9 viewers respectively, <u>the two biggest nights of prime-time entertainment on FOX since it came onto the air nearly two decades ago.</u> [CDC_003710-11]**

711.    The January 17, 2007 episode of *American Idol* Season Six featured Tommy Daniels' audition segment as the "lead-off" part of the show.   Consistent with ENTERPRISE-DEFENDANTS' custom and practice, the *American Idol* Contestant featured as the "lead-off" performance on any given audition episode is considered by ENTERPRISE-DEFENDANTS to be the most talented or captivated singer featured in that program.

712.    During the episode broadcast on January 17, 2007, Daniels' entire audition performance, as recorded in Seattle on or about October 2-3, 2006, was aired by ENTERPRISE-DEFENDANTS, as well as a biographical introduction, the Expert Judges' commentary on Daniels' performance, and footage of a triumphant Tommy Daniels being greeted by a large number of his family members who were ecstatic about his Golden Ticket achievement.

713.    Thomas Daniel's birthdate was <u>not</u> displayed on-screen during the airing of the January 17, 2007 episode.

714.    Tommy Daniels watched the January 17, 2007 episode with a room full of close family and friends.

715.    With the broadcast of the January 17, 2007 episode of *American Idol*,. Tommy Daniels the "outcaste" was now Tommy Daniels *"the next American Idol."*

**(3)    DISQUALIFICATION [January 18, 2007]**

716.    On, January 18, 2007, the day after the airdate of the episode featuring Tommy Daniels' Golden Ticket audition, TMZ.com posted the following article on its website at 5:49 pm

PST [CDC_003685]:

**AMERICAN IDOL WANNABE ALREADY HAS A RECORD**

**Celebrity Justice**
**1/18/2007 5:49 PM PST BY TMZ STAFF**

**Before he wowed Simon, Paula and Randy during last night's "American Idol" Thomas Daniels took his fair share of punishment from real judges over several criminal charges, including drunk driving.**

**TMZ has unearthed legal documents which reveal that in 2004, Daniels was convicted of DUI in Clackamas, Oregon. The 21-year-old, who was the first wannabe to get the green light from the "AI" crew on last night's show, pled guilty and was sentenced to a one-year alcohol diversion program and a $680 fine. Daniels also attended eight AA meetings and saw a counselor once a week for two months. After the completing his DUI sentence, the incident was wiped from Daniels' record ...**

**In December 2005, Daniels was arrested again; this time for hit and run. He failed to appear in court for the arraignment, so Daniels was rearrested. TMZ could not find the disposition of the hit and run.**

717.    Based on the information published in the above article, at the time of initial publication on January 18, 2007, TMZ.com obtained access to Daniels' records of arrest – including charges that been *expunged* - but did not have information pertaining to the court disposition of all arrests.  This means that TMZ did not retrieve Plaintiff's criminal arrest history from the local court or police department in Oregon.

718.    As of the initial publication date of the TMZ.com article on January 18, 2007, ENTERPRISE-DEFENDANTS had already been in possession – for several months - of all documents and records pertaining to Thomas Daniels' criminal record history.

719.    Upon information and belief, TMZ.com obtained Daniels' criminal background information – including his arrest record history - from ENTERPRISE-DEFENDANTS.

154

720.    Upon information and belief, in or about January 2007, ENTERPRISE-DEFENDANTS transmitted or caused to transmit information to TMZ.com relating to Daniels' criminal background history – including his expunged arrest record information – for the express purpose of causing TMZ.com to publish Plaintiff's court record information at the discretion of the ENTERPRISE-DEFENDANTS'.

721.    Throughout the day of January 18, 2007, and for a couple of days after into the weekend, television, radio and internet outlets around the country reported the "news" of Tommy Daniels' *expunged* 2004 DUI record and *expunged* hit-and-run record, accompanied whenever possible with his official mug shot from the 2004 DUI.

722.    Since the day following the January 17, 2007 airdate of *American Idol*, Tommy Daniels has been effectively shut out of the music industry. Despite his extraordinary talent and originality as a musician, singer, producer and lyricist, Plaintiff and his creative works have been systematically rejected by music industry insiders due to his "past association" with *American Idol.*

723.    At age 28, Tommy Daniels' mug shot continues to populate the worldwide internet and he continues to be stigmatized for his "disqualification" from *American Idol.*

724.    Plaintiff Daniel's status as an African-American male with a history of criminal arrest was the predominant motivating factor in his disqualification from *American Idol.*

# Season Six:
# AKRON WATSON

## A.    PRE-HOLLYWOOD

725.    Years before appearing on the television show *American Idol*, Akron Watson had made a name for himself as an up-and-coming talent in his local Dallas-Fort Worth community of artists, singers, actors and poets.  Akron served as a volunteer at the BLACK ACADEMY OF ARTS and was particularly active in stage productions. With the death of his older brother, Akron also dedicated himself to his Faith.   He actively participated in Gospel functions and theatrical performances.

726.    On the night of April 26, 2003, Plaintiff Watson was booked for a misdemeanor Class B offense for having a bit of marihuana in his ashtray. [CDC_003315]

727.    On July 22, 2003, Akron's appointed counsel advised him to plea "no contest" and emphasized that because he was a first-time offender, the Court's disposition would be "deferred" temporarily and then expunged from his record if Akron completed a fifteen (15) month probationary period without getting into further trouble with police.

728.    Because Akron did not want to involve his parents (in terms of hiring a defense lawyer to contest the charges) and based on the assurance from his appointed counsel that the misdemeanor record would be expunged, Akron pled no contest to the marihuana possession charge.   In addition to probation, Plaintiff Watson was ordered to pay a fine of $200.

729.    Akron completed the fifteen-month probation period without incident and the record of his misdemeanor arrest for marihuana possession was oficially expunged from the public record.

**(1)    GOLDEN TICKET [August 2006]**

730.    Akron Watson is a native-born U.S. citizen of the State of Texas (Dallas-Forth Worth). born May 17, 1983.

731.    On August 11, 2006, Akron auditioned at the "cattle call" phase for *American Idol* Season Six in the city of San Antonio, Texas.  Based on a series of performances for junior producers, he received a callback to perform in San Antonio before the Expert Judges.

732.    On August 26, 2006, Akron ultimately performed before Simon Cowell, Randy Jackson and Paula Abdul.  After some mixed reviews, Plaintiff Watson became one of 24 Contestants from San Antonio, Texas to receive a Golden Ticket in Season Six.   He sang two songs that day, one of which was  *"A Change is Gonna Come"* by legendary singer Sam Cooke. The 1964 single has been celebrated as an "anthem of the American Civil Rights Movement."

733.    Akron later described his receipt of the Golden Ticket to PEGASUS NEWS, a Dallas-based news outlet, as follows:

> **"I think that was like the triumph of my life,"** remembers Akron. [CDC_003200]

**(2)    BACKGROUND CHECK [September 2006]**

734.    In the weeks following Akron's receipt of the Golden Ticket in August 2006, Akron received a phone call from ENTERPRISE-DEFENDANTS' agents, indicating that they wanted to send a production crew out to Akron's Dallas, Texas home to compile a feature about the young singer that could be used in connection with the "biographical portion" of the show.

735.    Akron (and his family) was excited by the opportunity to share his background story with the *American Idol* viewers.  He was eager to discuss his life's achievements, as well as the obstacles he had already overcome.  His family viewed Akron's Golden Ticket as a blessing,

particularly.

736.   During the ENTERPRISE-DEFENDANTS' visit to his Texas home, Plaintiff Watson disclosed to ENTERPRISE-DEFENDANTS that in April 2003, he had been arrested by a college security guard for possession of marijuana, even though the University of Texas officer had found nothing but a "roach" (i.e., *de minimus* quantity) in the ash tray of his car.

737.   Akron Watson further disclosed to ENTERPRISE-DEFENDANTS that he had once been into "partying and chasing girls" but that he changed his errant ways when his brother died. From the moment of his brother's death, Akron dedicated himself to his faith and to being a good Christian.

738.   In the weeks after the ENTERPRISE-DEFENDANTS' production crew came out to interview Plaintiff Watson, he received numerous e-mails from Defendant AIP and/or Defendant FMNA with information regarding his impending trip to Los Angeles, California for the Hollywood Round of auditions.

## B.   DISQUALIFICATION

### (1)   SURPRISE CALL [November 9, 2006]

739.   On or about November 9, 2006, about ten weeks after Akron's receipt of the Golden Ticket in San Antonio, Texas, and only four days before Akron was scheduled to fly to Los Angeles, California on November 13, 2006 to compete in the Hollywood rounds, Akron received a phone call from a representative of ENTERPRISE-DEFENDANTS.  The ENTERPRISE-DEFENDANTS' agent was a male with an English accent.

740.   Akron later described the November 9, 2006 phone call from ENTERPRISE-DEFENDANTS as follows:

> **"I was supposed to leave that Monday, they called me on a Thursday,"** explains Akron. **"They said we're not gonna let you go. And I asked 'why?'"**
>
> **"And he said 'Well I'm not really sure'... and then he [ENTERPRISE-DEFENDANTS] gave me some alternatives for what I should say to people if they asked why I was kicked off ...**
>
> **"He [ENTERPRISE-DEFENDANTS] told me to tell people that I was now an 'alternate' ... That would protect [me] and protect the show." [CDC_003200]**

741.    On November 9, 2006, Watson was also informed by ENTERPRISE-DEFENDANTS' British representative that the "powers that be" had made their "final decision" and that there was nothing Akron could do.  ENTERPRISE-DEFENDANTS' agent did offer, however, to have Defendant AIP's "psychiatrist" call Akron.

742.    After receiving the phone call from ENTERPRISE-DEFENDANTS, Akron's entire world was turned upside down.  His hopes and dreams, which had been raised to triumphant levels due to his achievement of winning the Golden Ticket, were shattered.  He had been the pride of his entire community for months; the pride of his family who had endured the senseless loss of Akron's older brother.  Now, Akron had been disqualified from the most popular U.S.-based talent show in history - and for no apparent reason.

743.    In January 2007, after a lengthy period of mourning, Plaintiff Watson ultimately decided to set up a page on "Myspace.com" to protest his disqualification from *American Idol*. He posted as follows:

> **WELL, TWO DAYS BEFORE I WAS SCHEDULED TO LEAVE FOR HOLLYWOOD, I received a call from Idol saying I'm being cut for "unknown reasons." I don't know about you, but that seems jacked up to me. I want, need, and deserve my shot @ being the next AMERICAN IDOL. [CDC_003230]**

## (2)    LOCAL NEWS [January 31, 2007]

744.    In the week prior to the airing of the San Antonio, Texas episode (scheduled for

159

February 6, 2007), a journalist with PEGASUS NEWS named Alan Cohen received an "anonymous tip" that Akron Watson, a Dallas-Fort Worth resident, had posted a myspace.com page to protest his disqualification from *American Idol*.  The journalist called Plaintiff Watson to request a live interview at the local news station.  Watson thereafter visited the local station and related his entire disqualification story to Cohen.

745.    PEGASUS NEWS initially published its story about Plaintiff Watson on Wednesday, January 31, 2007, less than one week before the airing of the San Antonio audition episode. [CDC_003200-02].   After reporting the facts as related by Plaintiff Watson, the journalist commented as follows:

> **One might guess that the pot bust would be the reason for Akron not making the show, but others have made it all the way to the finals with felony arrests [citing Bo Bice]. Besides, he told Idol all about his past when they sent a crew to interview him, so they obviously knew about that already.**
>
> **Yesterday, I spoke twice with "American Idol "PR representative Alex Gillespie to see if the show had any official explanation for why Akron was not allowed to tryout in Hollywood. When I first talked to Gillespie, she told me that she would find out exactly what happened for me. Then when I spoke with her later in the day, she apologized and told me that the show would not ever be giving a reason for Akron's elimination from the competition.**
>
> **As the Fox network's air-date for the "American Idol" San Antonio search nears, Akron Watson has no clue whether they will even show his audition on television. His dream has been taken from him. Worst of all, he still doesn't know why and maybe never will.  [CDC_003201]**

## (3)    EPISODE AIRDATE [FEBRUARY 6, 2007]

746.    On February 6, 2007, ENTERPRISE-DEFENDANTS aired the final episode of the Open Auditions phase, which featured Akron Watson's performance from San Antonio, Texas, filmed back in August 11, 2006.

747.    Plaintiff Watson and his cousin both appeared on the Tuesday, February 6, 2007

episode of *American Idol*. There was no mention during the episode that Akron Watson had been disqualified from the Contest some 3 months earlier.

748. Akron Watson was one of the "feel good" audition stories of the *American Idol* San Antonio auditions. Akron showed up at the auditions with his cousin William Green. Akron described how he was like Bruce Banner and his cousin was like the Incredible Hulk. Green explained that they were both unemployed with no source of income, and they were putting everything they had into the auditions. Watson received a Golden Ticket; Green did not.

749. That same evening, on February 6, 2007, the popular website RealityTV Magazine (sheknows.com) published a story on-line entitled: *American Idol Un-Invites Contestant Akron Watson.*

> After leaving the audition room, an exuberant Akron leapt into his cousin's arms and was hugged by family and friends. Viewers at home likely couldn't help but feel good for this unemployed guy, who just got the chance of a lifetime.
>
> However, it turns out that Akron's "American Idol" story didn't have a happy Hollywood ending after all.
>
> According to Pegasus News, Akron Watson was later uninvited from the Hollywood auditions. American Idol representatives apparently never even fully explained to Akron why he wasn't being allowed to go. One possibility is that Akron does have a misdemeanor charge of marijuana possession on his record, but Akron claims that he told American Idol about his past. Other contestants with even more serious felony arrests have been allowed to proceed on Idol in the past, as long as they were open and honest with producers.
>
> The even more confusing thing about Akron Watson's elimination is that all indications seem to be that he has turned his life around since his arrest. Pegasus News notes that after a wakeup call when his brother died, Akron dedicated himself to being a good Christian. [CDC_003230]

750. The morning after the airing of the February 7, 2013 episode, further news broke of Akron's previous disqualification and the "blogosphere" ignited.

**(4)    MEDIA FRENZY**

751.    By 10:30 A.M. EST, TMZ.com had already published Akron's mug shot from the

April 2003 arrest, as well as details surrounding his April 2003 arrest. [CDC_003210-11]

> **IDOL HOPEFUL NIXED FROM H'WOOD FOR POT RAP?**
> **2/7/2007 1:30 PM PST BY TMZ STAFF**
>
> Akron Watson, an "American Idol" contestant from Dallas and one of the feel-good stories of the new season, has been disinvited from the Hollywood round of the show, possibly after producers discovered a pot bust on his record. Watson, whose San Antonio audition aired on last night's "Idol," was arrested in April 2003 for misdemeanor possession of marijuana, according to court records obtained and posted by PegasusNews.com, by way of Reality TV Magazine.
>
> He was headed to Hollywood after impressing the judges with his singing, and his story. But Watson tells Pegasus News that two days before he was scheduled to leave for Hollywood, he received a call saying that he would not be competing anymore "for unknown reasons." "Idol" producers did not comment on their withdrawn invitation.
>
> Meanwhile, another contestant from San Antonio, facemaker Ashlyn C. was reportedly arrested in August for pouring sugar into the gas tank of her ex-boyfriend's car while a student at Sam Houston State University, according to a report in The HoustonianOnline. When confronted by police, says the Houstonian, Carr confessed to the crime.
>
> A spokesman for FOX had no comment.

752.    A commentator at www.aoltv.com noted how quickly TMZ.com was able to post

the mug shots of two *American Idol* contestants who had just appeared on the previous night's

show:

> They really dig up the dirt quickly over at TMZ.com, don't they? They've already posted the mugshots of two of last night's American Idol contestants. [CDC_003245]

753.    On February 7, 2007, an article was published on-line entitled: "*Two More*

*American Hopefuls Booted?*" [CDC_003210-11]

> According to Pegasus News, Akron has yet to be given a definitive reason as to why his invitation has been revoked, but "American Idol" insiders claim that it might have a lot to do with a pot bust on his wrap sheet.

> This would seem almost hypocritical since Taylor Hicks had similar problems midway through Season Five and was ultimately left on to later win "American Idol." [CDC__003207]

754.    On February 7, 2007, an article about Plaintiff Watson's disqualification was published on-line at www.TVFanatic.com [CDC_003258]:

> [Watson's] out ... for now. Despite impressing judges with his vocal talent, Akron has been dismissed from Hollywood. The reasons aren't known, but an arrest for marijuana possession has been assumed to be it.

755.    On February 7, 2007, at 7:15 PM EST, a "mainstream" article about Plaintiff Watson's disqualification entitled "*Akron Watson: Idol Producers Knew About My Past*" was published on-line at PEOPLE.COM [CDC_003274]:

> The 23-year-old Dallas-born singer claims that on Nov. 9, two days before he was set to leave for Los Angeles (with a hotel itinerary in hand), he received a phone call telling him not to come.  "From that point I asked why?" Watson tells PEOPLE.  "(The producer) said he didn't have a reason.  He didn't know why.  He said that his bosses don't divulge that information to him."
>
> TMZ.com reported on Wednesday [Feb. 7] that it was a prior misdemeanor possession of marijuana charge from 2003 that got him ousted from the competition, based on a story in local Dallas-Fort Worth newspaper Pegasus News.
>
> But Watson insists that before auditioning for Idol, he told producers about his past.
>
> "I was completely open about my background, any trouble I had been in, my medical history – everything!" he tells PEOPLE. "They ask all that information before you audition." (The FOX network had no comment on the reason Watson was told he wouldn't be going to Hollywood after all.) …
>
> "I earned my way in, and you knew about my background, I have no clue why you wouldn't let me go and perform," insists Watson. "It seems like I deserve that opportunity. I still want to know why it is I've been cut. And I still want the opportunity to be on American Idol."
>
> PEGASUS NEWS reported it spoke with Idol publicist Alex Gillespie twice to see "if the show had any official explanation" for the decision. Gillespie allegedly said "she would find out exactly what happened" before later apologizing and stating "that the show would not ever be giving a reason for Watson's elimination from the competition," according to Pegasus News. People also reported that Fox had no comment on the reason Watson was

told he wouldn't be going to Hollywood. [CDC_003274]

## D.    LYTHGOE'S REBUTTAL

756.    According to NEWSDAY, on Thursday, February 8, 2007, in the wake of the media frenzy surrounding Akron's Golden Ticket revocation, Defendant LYTHGOE participated in a conference call with major media outlets to answer questions regarding the ENTERPRISE-DEFENDANTS' background check procedures and, more specifically, the Akron Watson situation. [See section above entitled "Overseer-Defendants' Statements re: Background Checks- 2007].

757.    On Friday, February 9, 2007, RealityTVWorld.com published an article on-line entitled: *"American Idol 6 Producer Sheds Some Light on Akron Watson's Ouster,"* which quoted verbatim some of Defendant LYTHGOE's statements to the press on February 8, 2007. [CDC_003289-90]:

> **Akron Watson is still wondering why his golden ticket isn't a valid pass to the Hollywood Round of American Idol's sixth season -- and unfortunately for the 23-year-old Dallas, TX singer -- Idol executive producer Nigel Lythgoe couldn't provide a definitive answer.**

758.    Plaintiff Joyner's status as an African-American male with a history of criminal arrest was the predominant motivating factor in his disqualification from *American Idol.*

# Season Six:
# ASHLYN C.

## A.    GOLDEN TICKET

759.    Ashlyn C. ("Ashlyn") is a U.S. citizen of the State of Texas who was featured as a Contestant on Season Six of *American Idol* who, like Plaintiff Akron Watson, auditioned in San Antonio, Texas and received a Golden Ticket from the Expert Judges on or about August 26, 2006.

760.    Ashlyn is **not** a Plaintiff in this action.

761.    Ashlyn was 18 years old at the time of her August 2006 audition.

762.    Footage of Ashlyn's Season Six *American Idol* audition was aired in its entirety on February 6, 2007.  Her performance segment was particularly memorable because she initially received a NO from Randy Jackson and Paula Abdul based on her "odd facial inflections"; only to be brought back to sing one more time at Simon Cowell's insistence.

763.    After her second performance before the Expert Judges, Ashlyn received a Golden Ticket to Hollywood via unanimous vote."  Ashlyn's audition marked one of the first – if not only - times that the original panel of Expert Judges had issued a "reversal."

## B.    DISQUALIFICATION

764.    On the evening of Tuesday, February 6, 2007, at 8:00 p.m. EST, ENTERPRISE-DEFENDANTS broadcast its *American Idol* episode featuring Ashlyn's San Antonio, Texas audition.

765.    On Wednesday, February 7, 2007, at 10:30 A.M. EST, TMZ.com published Ashlyn's mug shot from her November 2006 arrest (appearing directly under the mugshot of

fellow Texan Akron Watson).   The TMZ.com article included a statement that Ashlynn had

"confessed to the crime" of criminal mischief [CDC_003210-11]

> Meanwhile, another contestant from San Antonio, facemaker Ashlyn Carr, was reportedly arrested in August for pouring sugar into the gas tank of her exboyfriend's car while a student at Sam Houston State University, according to a report in The HoustonianOnline. When confronted by police, says the Houstonian, Carr confessed to the crime.

> A spokesman for FOX had no comment.

766.    On February 7, 2007, at 3:15 PM EST, PEOPLE.COM published an article entitled:

"*Idol's Comeback Kid: Ashlyn Carr.*"   After relating Ashlyn's audition comeback story, the

PEOPLE article noted:

> Talk about a come back.  Yet there's a bittersweet twist to this fairy tale story: TMZ.com reported that Ashlyn was allegedly arrested in August for pouring sugar into her ex-boy friend's gas tank while she was a student at Sam Houston State University.  <u>And her school newspaper, THE HOUSTONIAN ONLINE, reports that Ashlyn confessed to the crime.</u>  [CDC_003721]

767.    On February 7, 2007, further on-line publications reported that:

> The Sugarland native [Carr] was arrested for dumping sugar into her ex-boyfriend's gas tank. That kind of vindictive behavior usually does not endear American Idol producers. Thus far, however, Ashlyn has not been removed from the American Idol roster, but the announcement could come at any time.  [CDC_003207]

> However, an article on MySanAntonio.com talks about a Sam Houston student who was arrested for pouring sugar in her ex boyfriend's gas tank. Carr reportedly admitted to the crime, which took place after her Idol audition. Therefore, the singer's Hollywood status is unknown at this time. [CDC_003258] (TVFanatic.com 2/7/07, 9:03 am)

> Carr was arrested in November for allegedly putting sugar in an ex-boyfriend's gas tank. She was arrested on criminal mischief charges and booked into the Walker County Jail, according to the arrest report. [CDC_003328]

> Jack Choate, the First Assistant District Attorney in Walker County, said today that they will not pursue the charge as long as she pays for damages to the car. Carr is not attending SHSU this semester. [CDC_003328]

768.    On February 8, 2007, one internet publication called Ashlyn's mother in Texas:

166

> Ashlyn's mother, Karren Carr, was mum when contacted at the family's Houston home today. Idol reps also had no comment. Karren confirmed that her daughter, who performs regularly around town, was in Houston and in good spirits.
>
> "I'm sure there are a lot of rumors going around, but we prefer not to even comment on anything other than Ashlyn's singing," Karren said.
>
> "I think, with all of this — if you hear Ashlyn, if you see her, it speaks for itself.  (Ashlyn) was born with this gift to sing and to inspire," Karren said. "The experience at American Idol, although it was very emotional, it was very worthy."
>
>  "Now, when she becomes American Idol, are you going to write something about that? [CDC_003328]

769.   Sunday, February 11, 2007, it was reported in an article on-line that the HOUSTONIAN ONLINE student newspaper of Sam Houston State University had issued an update / retraction of its alleged November 14, 2006 article:

### ASHLYN C.[] UPDATE/RETRACTION

> THE HOUSTONIAN ONLINE, the student newspaper of Sam Houston State University, has issued an update/retraction of its Nov. 14 2006 article that stated "several statements indicated that criminal mischief charges had been filed against former Sam Houston student Ashlyn C. In fact, according to the District Attorney's office, no charges will be pursued as long as [Ashlynn] makes restitution for the damages.
>
> She was arrested, but we will not be filing the case. She'll be making restitution for the damages,' Walker County District Attorney David Weeks said on Friday, February 9. The Houstonian would like to apologize for any misleading material that appeared in the article."

# Season Eight:
# JU'NOT JOYNER

## A.    CONTEST PARTICIPATION

### (1)    GOLDEN TICKET

770.    Plaintiff Ju'Not Ramone Joyner, born June 23, 1982, is a U.S. citizen of the State of Maryland.

771.    Plaintiff Joyner was featured as a Top 36 Semi-Finalist Contestant on Season Eight of *American Idol*.  He had previously auditioned the prior season, making it to the Hollywood Round, but not through to the Semi-Finalists round.

772.    On August 19, 2008, Plaintiff Joyner attended the "cattle call" audition round at the Izod Center in New York.  Based on his performances, he was invited to the Callback rounds to be held in New York City at Chelsea Piers on August 26-27, 2008.

773.    On or about August 26-27, 2008, Plaintiff Joyner was awarded a Golden Ticket to Hollywood by the Expert Judges.

774.    Like the other Plaintiffs in this action, Plaintiff Joyner had a record of criminal arrest when he auditioned for *American Idol* in Season Eight.

## B.    DECEPTIVE PRACTICES

### (1)    ILLUSORY PRIZE

775.    On Sunday, February 8, 2009, the Top 36 Contestants of Season Eight were called to a surprise group meeting at the offices of 19 ENTERTAINMENT in Los Angeles, California.  Defendant WARWICK, senior executive producer of the show, conducted the meeting.  He

168

explained to the Contestants that they would be required to sign a series of recording, artist management, merchandising and touring contracts with 19 ENTERTAINMENT.

776.    Defendant WARWICK then presented the transactional attorney for 19 ENTERTAINMENT, who briefly summarized to the group what he purported to be the material terms of the transaction.

777.    19 ENTERTAINMENT's transactional attorney then explained that the Top 36 Contestants would be able to "select" from three possible attorneys to represent them in their "negotiations" vis-à-vis 19 ENTERTAINMENT. ENTERPRISE-DEFENDANTS would be paying for their legal fees.

778.    The transactional attorney assigned by ENTERPRISE-DEFENDANTS to represent the *American Idol* Season Eight Semi-Finalists, including Plaintiff Joyner, was Gary L. Gilbert, Esq. of the law firm MANATT, PHELPS & PHILLIPS, LLP, 11355 W. Olympic Blvd., Los Angeles, CA. 90064.

779.    Plaintiff Joyner was exacerbated by the subject matter of the meeting and the way in which the information was being presented. Having seen the *American Idol* program for seven years on the air, he thought that the "prize" for winning the *American Idol* Contest was the major label recording contract. He did not understand why he would have to sign what was essentially the Prize before actually winning the Contest.

780.    During the meeting, Plaintiff Joyner asked no less than five (5) substantive questions about the contractual terms of the 19 ENTERTAINMENT Prize Contracts. No other Contestant in the room asked more than one question. Very few Contestants asked any questions at all.

781.    After the "question-and-answer" session was complete, the transactional attorney

for 19 ENTERTAINMENT told the Top 36 Contestants to "speak among themselves" and select one of three lawyers to represent their interests in the "negotiation" of the 19 ENTERTAINMENT Prize Contracts.

782.    As the Contestants huddled around, many of them started asking Ju'Not questions about the proposed contracts and wanted to know his advice as to whether they should sign them. As more and more Contestants began to seek Ju'Not's counsel, one of 19 ENTERTAINMENT's representatives called Plaintiff Joyner into a private office and closed the door.

783.    Defendant WARWICK was already inside the office, seated at the desk.  He appeared red in the face and visibly angry.  As Plaintiff Joyner sat down, WARWICK stood up and barked:

> **"You're not going to ruin my show!"  What do you think this is?  Of course you know, don't you, that we can get rid of you at any time and for any reason we like.  All of these kids simply <u>must</u> sign the contracts. Now just stop asking so many damn questions and get the hell out of my office before I have you kicked off my set."**

784.    As Plaintiff Joyner left Defendant WARWICK's office, he was somewhat in a state of shock.  Defendant WARWICK had threatened to disqualify him from the *American Idol* Contest simply because he was asking a few basic questions about a series of commercial contracts that would effectively lock up his proprietary rights for a period of infinite duration – and with no benefit of independent counsel or opportunity to bargain for exchange.

785.    Plaintiff Joyner would later go public with his experience concerning the 19 ENTERTAINMENT contracts, publishing as follows on or about July 30, 2009:

> **"They [19 ENTERTAINMENT] pay for our lawyers to negotiate against their lawyer. They make us collectively choose the lawyer, then they act like it's in our best interest. Craziest stuff I've ever seen. I have a son to feed. I had to ask questions and know what I was signing. Plus I write my own songs and I needed to know details..."  [CDC_003618]**

"We all had one lawyer and a few hours to go over the details of about 6 or 7 contracts, that we didn't even get a copy of and we didn't get an opportunity to send to an outside attorney and if we didn't sign, we couldn't be on the show." [CDC_003641]

"Some folks were like, 'Just shut up and sign on the dotted line.' I know better than that...I wasn't complaining...I was asking basic legal questions. There's a huge difference between the two." [CDC_003618]

"I definitely believed that affected my time on the show. They didn't like the fact that I wouldn't sign 'just anything' and that other contestants were coming asking me questions. So I think they ousted me the first chance they could get..." [CDC_003625]

786.    After being selected as a Top 36 Semi-Finalist Contestant in Season Eight, Plaintiff Joyner was labeled a "troublemaker" by Defendant WARWICK because Joyner asked too many questions about the 19 ENTERTAINMENT Prize Contracts that all Semi-Finalist Contestants were required to sign.

787.    Plaintiff Joyner's disqualification was thereafter arranged by ENTERPRISE-DEFENDANTS as *fait accompli* because he expressed legitimate concerns regarding the procedural and substantive fairness of the 19 ENTERTAINMENT Prize Contracts.

788.    Plaintiff Joyner was disqualified from the *American Idol* contest and was not invited back for the Wild Card round.

## (2)    FIXING WILD CARD

789.    In Season Eight, the structure of the Semi-Finals round saw the biggest change as the "Wild Card" round returned for the first time since Season Three. After the television audience purportedly voted for three Finalists from each of three groups of twelve (12) Semi-Finalists, the Expert Judges (purportedly) selected eight (8) of the previously eliminated twenty-seven (27) Semi-Finalists to return and perform a song on the March 5, 2009 show. Those chosen for the Wildcard were judged by the panel, instead of a vote by the viewers, with four advancing

171

as Finalists.

790.   Plaintiff Joyner's group performed on March 4, 2009.  He received excellent commentary from the Expert Judges.  However, when the final results from the voting were announced, Joyner was informed that he had come in "fourth place" out of the 12 Semi-Finalists in his group.  He therefore just missed the cut to be one of the three Finalists to advance from his group.

791.   Given Plaintiff Joyner's strong showing with the Expert Judges, as well as his high placement in the audience voting ranks, it was reasonable to expect that Plaintiff Joyner would have been one of the eight (8) Contestants to be selected for the Wild Card round in Season Eight.  However, Plaintiff Joyner was not selected for the Wild Card round.

792.   At all relevant times, ENTERPRISE-DEFENDANTS had advertised the Wild Card round as a component of the Contest specifically designed to permit the *Expert Judges* – not anyone else - to select certain Contestants who had not received the highest number of votes from the public.

793.   With respect to Plaintiff Joyner, however, it was clearly not the Expert Judges who made the decision to exclude him from the Wild Card round on March 5, 2009.

794.   The Wild Card round component of the Season Eight *American Idol* Contest was not being utilized by ENTERPRISE-DEFENDANTS as advertised.  As Plaintiff Joyner pointed out in July 2009:

> **"Even if I didn't get in on votes...how did I not get picked for the Wild Card show when I received comments from the Judges that were better than most of the contestants who were picked for the Wild Card show?" [CDC_003618]**

## (3)   RIGGED VOTING

795.   On July 30, 2009, Plaintiff Joyner also publicly questioned the validity of the

172

purported *American Idol* voting system.

> **"It's a fixed thing if I ever saw one . . . Do you think a billion-dollar enterprise is subject to the whim of the public?"** [CD_003625]

## (4)    MANIPULATED OUTCOME

796.    While a Contestant on Season Eight of the *American Idol* Production, Plaintiff Joyner observed that ENTERPRISE-DEFENDANTS, rather than conducting a *bona fide* contest, were actively favoring certain Contestants as lead-runners for promotion and advancement. The ENTERPRISE-DEFENDANTS' "preferred" contestants received increased support staff (such as hair, make-up and wardrobe) from the producers and their "background stories" were structured with greater care, creating an environment in which ENTERPRISE-DEFENDANTS' favoritism of certain Contestants was intended to influence the outcome of the Contest or a portion thereof.   As Plaintiff Joyner explained in July 2009.

> **"The producers know who they want and they slant it to reflect that. They fix it in a way that makes you surprised but it's still manipulated."** [CDC_003618]

> **"What I mean is that people think AI is a talent show. No. It's a reality show with writers!! We're all actors. All these shows have writers that guide the public opinion."** [CDC_003618]

797.    Although it appears that Plaintiff Joyner was allowed the opportunity to perform for the public vote, it was, in truth, Plaintiff Joyner's status as an African-American male with a history of criminal arrest that was the predominant motivating factor in his disqualification from *American Idol.*

# Season Nine:
# ANTHONY W.

## A.    GOLDEN TICKET

798.    Season Nine of *American Idol* premiered on Tuesday, January 12, 2010 featuring the audition city of Boston, Massachusetts.

799.    On Wednesday, January 13, 2010, the second episode of the *American Idol* season featured contestants auditioning in Atlanta, Georgia.

800.    One of the contestants featured on the January 13, 2010 episode was an African-American male named Anthony "Skii Bo Ski" W (Anthony).

801.    Anthony is **not** a plaintiff in this action.

802.    Anthony's Season Nine audition for the panel of Expert Judges, consisting of Simon Cowell, Randy Jackson, Kara DioGuardi and guest judge Mary J. Blige, had taken place in Atlanta on or about August 16-17, 2009.

803.    During the episode broadcast on January 13, 2010, Mr. Wheeler was one of 25 contestants seen receiving a Golden Ticket to Hollywood.  Dozens of other hopefuls were shown auditioning as well during the same program.

804.    During the episode broadcast on January 13, 2010, Anthony's real name (Anthony W.) was not displayed on screen.  Rather, his nickname "Skii Bo Skii" was repeatedly used in connection with his appearance on the program.

805.    Anthony W.'s birthdate was not displayed on screen.

## B.    EXPLOITATION OF ARREST RECORDS

806.    On January 14, 2010, at 3:52 am - within mere hours after the telecast and before the start of next business day – an entertainment and gossip website, RadarOnline.com, posted substantial details about Anthony's criminal arrest history, including court documents and various mug shots. The RadarOnline web article, which dubbed itself an "EXCLUSIVE" stated in part:

> TASERED AMERICAN IDOL "SKIIBOSKY" HAS LONG ARREST HISTORY
>
> Whoever has been doing the background checks on the season 9 American Idol contestants may want to dig a little bit deeper in the future.
>
> As RadarOnline.com previously reported wacky Wednesday night contestant Anthony Wheeler. AKA "Skiibosky" has an arrest record.
>
> Now RadarOnline.com can exclusively report that it is not just for one offense, but for five! Including bookings for three drug offenses, battery, contempt of court, violation of probation for driving while license suspended, attempting escape and providing a false ID.

807.    On January 14, 2010, at 3:52 am, just hours after the premiere of the episode was first telecast, www.RadarOnline.com website published four different mugshots of Anthony, his "Inmate History Report," a Police Affidavit stemming from a 2005 arrest, and a copy of a civil complaint that Anthony had filed against the city of Orlando, Florida in connection with abusive police conduct.   [CDC_004909]

808.    Given that less than six hours had transpired between the broadcast of the January 13, 2010 episode and the RadarOnline web article, and given that the clerks of court and custodians of records working at police departments and correctional facilities would not have been open for business during these six hours, RadarOnline.com could not have independently researched or legally obtained such hard copy information about Anthony W. from a government source.

809.   As a part of its standard practice and ordinary course of business, ENTERPRISE-DEFENDANTS procured criminal record history information concerning Anthony W. during the background check process of *American Idol* contestants for Season Nine.

810.   Upon information and belief, once in possession of Anthony W.'s criminal history information, ENTERPRISE-DEFENDANTS caused for such information to be disseminated to the entertainment and tabloid websites, including RadarOnline.com, concurrent with the January 13, 2010 broadcast of the *American Idol* episode that features Mr. Wheeler's Golden Ticket audition.

811.   On January 14, 2010, www.Rightcelebrity reported further:

ANTHONY W. AKA 'SKIIBOSKY' IS AMERICAN IDOL SCANDAL

A contestant named Anthony W., who goes by 'Skiibosky' is American Idol Season 9's first scandal …

Let's just say this guy doesn't fit the bill as the squeaky clean American Idol hopeful. He appeared on the second night of the show's audition phase, which took place in Atlanta…

Once in front of Simon and company, he tried his best to charm them, but of course they couldn't get over his ridiculous nickname. After a brief introduction he began to sing 'Heard It Through The Grape Vine.' I hate to admit it, but Anthony W. (Skiibosky) has a decent voice. He even hit the high notes without cracking. Mary J Blige actually broke out in applause as soon as he finished. He was moved on to the next round, and we'll see him again in Hollywood….maybe.

After his antics drew considerable attention to him, people have apparently begun to do some digging. It turns out that our charismatic contestant has quite a lengthy criminal past. One outlet wrote today that he has been arrested up to five times!

According Radar Online, he has been taken in for drugs three times, battery, contempt of court, aprobation violation, driving with a suspended license, and attempting to escape and providing a false ID. Sounds like he would fit right in to the world of show business!

Sound like the kind of guy who deserves the title of American Idol?

812.   Since ENTERPRISE-DEFENDANTS' January 2010 exploitation of Anthony W.'s

criminal arrest information in the tabloid media, it is unknown whether Anthony was flown to Los Angeles, California to compete in Hollywood Rounds.

# Season Nine:
# CHRIS GOLIGHTLY

## A.    BACKGROUND

813.    Chris Golightly is an African-American citizen of the State of California who was featured as a Top 24 Semi-Finalist on Season Nine of *American Idol*.

814.    Mr. Golightly grew up as an orphan and was shuttled between numerous foster homes throughout his youth. In the face of these hardships, he found his calling through music.

815.    At the time of his audition for *American Idol*, Mr. Golightly had a record of criminal arrest.

816.    Before auditioning for Season Nine of *American Idol*, Mr. Golightly was a member of musical group DREAM5, a "boy band."  His engagement with the group was procured by written contract with a California-based artist manager and promoter Lawrence D. Franklin, who operated DREAM PROJECTS ENTERTAINMENT.

817.    After a period of time in DREAM5, Mr. Golightly requested that he be released from his contract with DREAM PROJECT ENTERTAINMENT in order to pursue opportunities as a solo performer.

818.    On April 10, 2009 Franklin granted Mr. Golightly this release through an unambiguous statement to that effect. The release was further memorialized in a formal document dated June 7, 2009 and signed by both parties.

819.    Mr. Golightly rightfully assumed, based on Franklin's statement and the signed

release, that he was no longer under any sort of contractual obligations that would prevent him from engaging in other opportunities within the music industry.

## B.   CONTESTANT PARTICIPATION

820.   Mr. Golightly was one of approximately 100,000 United States citizens or permanent residents between the ages of 18 and 28 who publically auditioned for Season Nine of *American Idol* in the Fall of 2009.

821.   From July 28, 2009 through February 17, 2009, Chris Golightly auditioned for Season Nine in Los Angeles, California, ultimately surpassing thousands of other Contestants to earn a Golden Ticket from the Expert Judges.

822.   On November 13, 2009, Mr. Golightly received an e-mail from PRODUCER-DEFENDANTS claiming that they were missing paperwork regarding various contracts he was required to sign as a Contestant on the Series. The e-mail asked him to execute the contracts and fax them no later than the following morning.

823.   Mr. Golightly was required to execute the PARTICIPANT BACKGROUND QUESTIONNAIRE FORM (V.09). One of the questions contained therein inquired as to whether Mr. Golightly had ever been party to a music-related industry contract. Golightly answered this question in good faith and consistent with his ethical duty and contractual obligation.

824.   For months after execution of the PARTICIPANT BACKGROUND QUESTIONNAIRE, Mr. Golightly faithfully participated in all steps of the "contestant vetting" process.  He was repeatedly e-mailed by PRODUCER-DEFENDANTS to congratulate him on his advancement to successive rounds, solicit his song requests for performances on the program, determine where to mail his checks, and to deliver additional contracts for him to sign. At no point during this vetting

/ selection process was Mr. Golightly informed of any potential problems regarding the information he had provided.

825.    In January of 2010, the PRODUCER-DEFENDANTS notified Mr. Golightly that he had been selected as one of the Top 24 Semi-Finalist Contestants of *American Idol* for Season Nine. In reliance on this fact, Mr. Golightly extricated himself from the lease on his private apartment and sold his car to pay the lease fees.  These actions, made to Mr. Golightly's detriment, were based on Mr. Golightly's reasonable expectation that he had a highly probable chance of winning Season Nine of *American Idol* based on his talent.

## C.    PUBLIC DISQUALIFICATION

826.    On or about February 16, 2010, Mr. Golightly received a phone call from PRODUCER-DEFENDANTS' agent Patrick LYNN to notify him of his official disqualification from Season Nine of the *American Idol* Contest.

827.    PRODUCER-DEFENDANTS' purported grounds for Mr. Golightly's disqualification, as relayed to him by Patrick LYNN, was the Contestant's "failure to disclose" the purported existence of the DREAM5 contract, which had been effectively terminated.

828.    On or about February 17, 2010, Mr. Franklin e-mailed a copy of the Written Release to THE PRODUCER-DEFENDANTS *and* acknowledged his error concerning the enforceability of the terminated DREAM5 contract.  Mr. Franklin further admitted in writing to the PRODUCER-DEFENDANTS that Mr. Golightly was not under contract.

829.    Notwithstanding Mr. Franklin's transmission of the Written Release, PRODUCER-DEFENDANTS abjectly refused to reconsider their decision concerning Mr. Golightly's abrupt removal from the *American Idol* Contest.  In fact, the PRODUCER-DEFENDANTS' agents would not

even speak to Mr. Golightly.

830.   Despite being in possession of written documentation that Chris Golightly was no longer under valid contract with DREAM PROJECTS ENTERTAINMENT, ENTERPRISE-DEFENDANTS publicly disqualified him from the *American Idol* Contest, humiliated him before untold millions of Americans, questioned his business integrity before the entire music industry, and thereafter "fanned the flame" of Mr. Golightly's disqualification  in the tabloid media and entertainment press.

831.   On or about February 18, 2010, Defendant FOX issued an official statement to the mass media concerning Defendant's unilateral adverse action against Mr. Golightly.

**"It has been determined that Chris Golightly is ineligible to continue in the competition."**

832.   On February 18, 2010, the aforementioned disqualification was confirmed by *American Idol* host Ryan Seacrest on the micro-blogging website TWITTER, who stated:

[ENTERPRISE-DEFENDANTS **had]** "**determined that Chris Golightly is ineligible to continue on IDOL, contestant Tim Urban has replaced Golightly as part of the Top 24."**

833.   Chris Golightly was unceremoniously replaced on the program with alternate performer Tim Urban, who was a White Contestant and who had already been eliminated from the American Idol Contest.

834.   From February 18, 2010 onward, ENTERPRISE-DEFENDANTS caused to omit Mr. Golightly from the pre-recorded audition process and transfer airtime to Mr. Urban.  ENTERPRISE-DEFENDANTS effectuated this transition in order to create the impression that Mr. Golightly had never earned his spot in the Top 24 Semi-Finalist round.

835.   Subsequent to Defendant FOX's announcement, an attorney for FOX indicated

that Mr. Golightly's disqualification from the *American Idol* Contest was based on Mr. Golightly's "failure to disclose" the purported DREAM5 contract with Mr. Franklin.

836.    Mr. Golightly's alleged "failure to disclose" his obsolete contract with a former boy band manager was mere pretext for Golightly's extrication from the *American Idol* Contest.

837.    Mr. Golightly was disqualified as a Top 24 *American Idol* Semi-Finalist predominately because of his status as an African-American citizen coupled with Mr. Golightly's history of misdemeanor arrests as indicated on his *juvenile*, government-protected "rap sheet."

# Season Eleven:
# ("JXJ")

## A.    PRE-DISQUALIFICATION

## (1)    TOP 13 FINALIST

838.    "JXJ" shall be the codename[15] used herein to refer to an African-American Top 12 Finalist contestant on Season Eleven of *American Idol* who was ceremoniously disqualified by ENTERPRISE-DEFENDANTS on the pretext that he had failed to disclose his criminal arrest history.

839.    JXJ's entire Open Audition footage, filmed in Portland, Oregon, was telecast by ENTERPRISE-DEFENDANTS in January 2012. ENTERPRISE-DEFENDANTS thereafter continued to focus on JXJ's backstory, exploiting the close relationship between he and his mother.

840.    Starting December 12, 2012, JXJ was one of 309 Contestants to attend the Hollywood Week in Season Eleven. He advanced through the Hollywood Rounds.

841.    When JXJ reached the "Green Mile," however, he was sent home by the Expert Judges before making the Top 24.

842.    On or about February 28, 2012, during the Season's episode where the Top 12 male contestants were scheduled to perform for the public vote, Host Ryan Seacrest announced that a special contestants would be brought back into the Contest as a "Judge's Pick." JXJ thereafter entered the stage through center curtain as the crowd gasped. After singing a rendition of "Another Chance," the Expert Judges commented:

> **Randy: "You have such a different voice, that's one of the reasons why we wanted you on this."**

---

> **Jennifer Lopez:** *"You have such a special voice and such a special spirit and I am glad that America had the chance to see you tonight."*
>
> **Steven Tyler:** *"What a beautiful thing; that's why we asked you to come back."*

843.    JXJ's sudden re-appearance in the Season Eleven Contest, which was celebrated with much fanfare by ENTERPRISE-DEFENDANTS, was a completely arbitrary addition to the Top 24 Semi-Finalist Round and one for which, in the absence of a "Wild Card" round, there was no precedent in *American Idol* "Contest Rules". ENTERPRISE-DEFENDANTS' maneuver made JXJ the 25th Semi-Finalist and thirteenth male Semi-Finalist.

844.    On February 29, 2012, when the results of Season Eleven's Finalist rounds were announced, JXJ effortlessly advanced as a Top 13 contender.

845.    On Thursday, Wednesday 8, 2012, after JXJ's first performance in the Finalist round, JXJ was voted in the bottom 3 out of the Top 13 Finalists.  However, he was not eliminated.

## (2)    PLANTING RUMOURS

846.    On Thursday, March 8, 2012, TMZ.com published an article entitled *"Idol Contestant JMX – Dad Who Abandoned Him Shows Up"* in which the site reported that the father of JXJ had shown up to the *American Idol* set in Los Angeles "out of the blue" and that JXJ was said to be "extremely upset" [CDC_002955]

> **JXJ had an unwanted caller last night ... his Dad. Jones and his mom had it rough after his father abandoned him 10 years ago. But it's amazing what a little fame and potential earning power can do to a fractured relationship.**
>
> **Last night ... Jones' dad called and tried to make nice. Sources tell us ... the dad told JXJ, "Hi, I'm in Los Angeles. Why are you telling everyone you haven't got a dad?" We're told the 25-year-old**

**contestant was "extremely upset" by the call.**

**JXJ told a friend, "He's a lovely man but a lousy father."**

847.    On Tuesday, March 13, 2012, at 12:00 pm PDT, TMZ.com published an article entitled *"American Idol Contestant Shovels B.S. To Get Sympathy Vote"* claiming that Contestant JXJ had not been forthcoming about his relationship with his father, calling into question the Contestant's "sob story" that JXJ and his mother were abandoned by his father a decade earlier.

**JXJ "has big problems with the truth, because he fabricated a sob story to A.I. producers to win the hearts and minds of the American people."**

**We spoke with production people on "Idol" who tell us they are "shocked" JXJ concocted the story and it seems like it was all a ploy to get some traction on the show.**

848.    On March 13, 2012, JXJ responded to the accusatory TMZ.com article by posting the following statement to his Twitter account.

**"How can I be lying and I never said anything, This story on TMZ. I did not lie to anyone I also did not t(al)lk to or ask anyone to t(a)lk to TMZ on my behalf in the first place." [CDC-_003031]**

**(3)    NEWS OF DISQUALIFICATION**

849.    On Tuesday, March 13, 2012, at an undisclosed time during the day, TMZ.com posted an article as an "Exclusive" entitled American Idol Contestant Will be Kicked Off For Concealing Crimes."

**A contestant on American Idol will be kicked off the show Wednesday because the singer concealed multiple crimes from producers ... TMZ has learned.**

**Sources connected with the show tell us ... the contestant -- one of the final 12 -- was charged with 2 crimes in 2011, one involving violence. We're told in both cases the contestant gave a fake name to cops when arrested.**

184

> In addition, we're told the contestant has outstanding warrants --
> again, the singer concealed it from producers.
>
> We're told the contestant was confronted with the information on
> camera today and the footage will air on Wednesday's show.

850.    On Tuesday, March 13, 2012, at approximately 4:56 p.m., PDT, ENTERPRISE-DEFENDANTS LYTHGOE and WARWICK confronted JXJ on camera about his arrest record history and disqualified him from the show.

851.    On Tuesday, March 13, 2012, at 7:00 p.m., PDT, TMZ.com published an article entitled *"JXJ Will Be Kicked Off 'American Idol'"*.  The article read:

> JXJ will be kicked off "American Idol" Wednesday night, after
> producers learned he concealed the fact that he was arrested twice
> last year and has outstanding warrants ... TMZ has learned.
>
> As we first reported, producers discovered Tuesday that JXJ had
> lied about his criminal history and that triggered the decision to
> confront him on camera Tuesday afternoon.
>
> We're told one of the incidents involved violence, which was
> particularly troublesome to producers. He also lied to cops by
> giving them fake names both times he was arrested.
>
> "A.I." sources tell us ... JXJ will appear on the show tomorrow night
> before he is sent packing. Over the last few days, we've been
> reporting that JXJ told producers his father abandoned him 10
> years ago, but his dad called TMZ and called B.S. on his son, saying
> they see each other regularly.
>
> JXJ began tweeting that he never told producers about his dad
> abandoning him. We're told the producers who knew JXJ had made
> the statement became generally suspicious and began looking
> more closely at his background, and that's what led to the
> revelation of his criminal history.

852.    TMZ .com reported that JXJ was going to be disqualified on the episode airing Wednesday, March 15, 2012 and that the PRODUCTION-ENTERPRISE-DEFENDANTS were planning

185

to air footage of the disqualification.

853.    TMZ.com reported that JXJ was able to slip through the show's background checks because he gave cops a fake name both times he was arrested. [CDC_003020]

## (4)    EXPERT OPINION #1: "CRUEL CHARADE" (March 14, 2012)

854.    As a long-standing member of the entertainment and music press, Ms. Halperin is considered one of world's leading authorities on the *American Idol* series and its impact on American popular culture.  She has independently covered *American Idol* in the traditional press since the show's initial broadcast in June 2002.

855.    Ms. Halperin publishes an *American Idol*-related blog called *"Idol Worship"* for BILLBOARD.COM, LOS ANGELES TIMES and HOLLYWOOD REPORTER, and at times relevant to this proceeding, also hosted and published a live, weekly one-hour video talk show called *"Idol-Hangover"* at HOLLYWOODREPORTER.COM.

856.    Ms. Halperin is the sole credited author of AMERICAN IDOL: CELEBRATING 10 YEARS (THE OFFICIAL BACKSTAGE PASS), which was published by Defendant FMNA in the United States on or about March 1, 2011 (referred to herein as "THE IDOL YEARBOOK").

857.    On or about March 22, 2011, Ms. Halperin, an *authorized* expert in *American Idol*-related matters, was interviewed by media outlet ACCESS ATLANTA and commented upon her preparation and authorship of IDOL YEARBOOK, indicating that she had "spent several weeks watching every single episode of *American Idol* from Season One to Season Nine". [CDC_005947]

> **Shirley Halperin: "This is a book for those who worship the show. I've invested so much time and so much of my brain space . . .  I wanted to have something to show for it.  I DO FEEL LIKE AN EXPERT ON 'AMERICAN IDOL.'"** [CDC_005947] (emphasis added)

858.   On March 14, 2012, at 5:04 a.m. PDT, in reaction to the TMZ news of JXJ's disqualification from *American Idol*, Ms. Halperin published an independent article at HOLLYWOOD REPORTER.com entitled "*American Idol: Did Show Producers Plot the JXJ Scandal in Advance (Opinion): Ask Skeptics Why JXJ is Being Sent Home, and Plenty Smell a <u>Classic Reality Show Ratings Ploy</u>*" [CDC_002955-2965].

859.   In her 3/14/12 HOLLYWOOD REPORTER article, Ms. Halperin correctly opined that ENTERPRISE-DEFENDANTS had pre-orchestrated JXJ-11's disqualification event through "a calculated campaign" that had been planned by ENTERPRISE-DEFENDANTS "all along":

> **Naturally, [JXJ-11]'s purported lies [about his father] were said to have incensed Idol's "production people" and triggered further digging into his background, but <u>here's a thought: maybe they planned his exit this way all along</u>. The whole 25th candidate was weird to begin with and got sprung on the audience with absolutely no warning, not typical of how Idol operates. And why Jermaine?... [CDC_002956]**

> **Then there was the deluge of negative stories on Tuesday, which came so fast and furious, it was starting to feel a little like <u>a calculated campaign</u>, capped off with the dramatic news: it would be the end of the road for Jermaine. It's believed he'll say a final goodbye on the show Wednesday night, and that in itself is worth tuning in for. [CDC_002956]**

860.   Ms. Halperin stated in the 3/14/12 HOLLYWOOD REPORTER that JXJ-11's disqualification from Season Eleven of *American Idol* was a "cruel charade" that was "purposely set in motion" by ENTERPRISE-DEFENDANTS to manufacture a "nasty mini-scandal" in order to artificially "boost" *American Idol's* diminished ratings vis-à-vis NBC's *The Voice*.

> **<u>Which brings us to another reason why producers may have purposely set in motion a cruel charade: ratings. For the first time, the ratings powerhouse is getting beat in TV's key demo</u> -- and to make it sting that much more: by another singing competition, The Voice . . . there's no doubt momentum is on NBC's side, and with**

**that, a healthy mid-March boost for Idol on the back of a <u>nasty mini-scandal</u> may be just what the ratings doctor ordered. [CDC_002957]**

861.   Ms. Halperin further indicated in the 3/14/12 HOLLYWOOD REPORTER article that ENTERPRISE-DEFENDANTS' sophisticated and lengthy background check process would have necessarily uncovered JXJ-11's four to five outstanding arrest warrants:

**<u>Lastly, what are the chances that Idol's producers, team of background checkers and lawyers would miss two arrests, possibly as-yet-unresolved</u>? As we've heard about the process from insiders and former contestants, it's not only an <u>incredibly long procedure</u>, but one that has been described certainly as thorough and often as "invasive." <u>All potential contestants are warned that if they do not divulge everything, they will be disqualified.</u> Jermaine received fair warning too, no doubt, <u>but it's also possible that the producers knew of his criminal past and chose to keep his history secret -- a card stowed in their back pocket to be pulled out only in case of emergency</u> (or if he's eliminated, whichever comes first). [CDC_002957]**

862.   Ms. Halperin stated in the 3/14/12 HOLLYWOOD REPORTER article that it would be extremely difficult for any human being to bear the severe emotional distress of "being on top of the world one minute and vilified the next":

**[I]T'S IMPORTANT TO REMEMBER THE HUMAN ELEMENT IN THIS STORY AND HOW DIFFICULT IT IS TO GO FROM BEING ON TOP OF THE WORLD ONE MINUTE AND VILIFIED THE NEXT. The emotional impact it can have on [a disqualified American Idol Contestant] must be an incredibly heavy burden to bear, even if he did do something very wrong in his past. Here's hoping there's enough in the show's budget to at least cover some psychotherapy.**

**Could Jermaine's disqualification be a <u>premeditated ploy</u> or was the show really deceived and caught off-guard?  [CDC_002957]**

## (5)   PUBLIC REACTION (PRE-TELECAST) [March 14, 2012]

863.   On Wednesday, March 14, 2012, SMOKINGGUN.COM posted an article entitled

*"Idol Finalist Has Five Active Arrest Warrants,"* the website published court documents indicating that JXJ was arrested on November 27, 2011 for providing a false name to a police officer. [CDC_003064] Notably, the State of New Jersey's misdemeanor case correctly listed the government name of JXJ.

864.    On Wednesday, March 14, 2012 at 10:26 a.m., the CHRISTIAN POST (christianpost.com) published an article on-line entitled: *"Jermaine Jones Disqualified From American Idol, Was it Staged?"* The article largely re-iterated Shirley Halperin's theory that JXJ's disqualification was staged in order to boost *American Idol's* ratings. The author of the CHRISTIAN POST also notes, however, that:

> **This is not the first time that Idol has been accused of staging an incident in a bid to boost ratings. [CDC_003072]**

865.    On Wednesday, March 14, 2012, at 12:15 p.m., EDT, entertainment blogger Lyndsey Parker of "Reality Rocks" reported on the news of JXJ's disqualification. [CDC_003013-17]. Ms. Parker opined that the disqualification was likely orchestrated and that such calculated action would necessarily impact the ultimate outcome of the *American Idol* Contest.

> **I just find it a little hard to believe that "Idol's" staff would not have been able to uncover JXJ-11's (very recent) alleged crimes via a standard background check, and it seems fishy that the one contestant that was given a last-minute reprieve is now the one getting the boot.  [CDC_003015]**

> **Is it possible that by bringing back a contestant who was already set up for an early disqualification, the show's producers had sneakily hoped to generate headlines and boost "Idol's" flagging ratings, without jeopardizing any actual worthy contestants' future chances?  [CDC_003015]**

> **Bringing JXJ-11 back to the show and playing up his public-vote-garnering sob story just may have stolen a legitimate spot in the**

189

**Top 13 from one of the show's other promising male semi-finalists who could have gone farther . . . [CDC_003015]**

866.    On March 14, 2012, at 12:00 PDT, TMZ.com posted an article entitled *"TMZ Live: JXJ . . . Booted off American Idol By His Own Lies."* [CDC_003156-3160] One of the public commentators to the TMZ article opined:

**All this AI stuff is suspect. Nothing anyone says can convince me that this wasn't made up for ratings. [CDC_003156]**

867.    On March 14, 2012, Lt. Christopher Jones of the Gloucester Township Police Department issued a "Media Inquiry Statement" in which the police department confirmed that JXJ had been arrested twice in the year 2011. [CDC_003068].  Both incidents involved JXJ providing a false name to police officers.  In both incidents, however, the police officers were able to correctly identify JXJ's government name after further inquiry.  As of November 17, 2011, JXJ was scheduled to appear in Court on December 13, 2011 in connection with all outstanding charges.

868.    On March 14, 2012 at 2:53 p.m., David Hinckley of the New York Daily News posted an article entitled: *"JXJ's Ouster From 'American Idol' May Not Have Producers That Upset: His Record Was Available To Find And There's Big Upside Publicity."* Following in line with the rationale provided by Shirley Halperin and Lyndsey Parker, Mr. Hinckley opined that ENTERPRISE-DEFENDANTS had manufactured JXJ's disqualification for ratings:

**So now we know the "American Idol" strategy to counter this season's ratings slump: a spontaneous crossover episode with "America's Most Wanted." [CDC_003109]**

**[But] In the age of Google and a hundred other instant search sites, how does the vetting team for the multi-million dollar "Idol" machine not pick up something like outstanding arrest warrants? [CDC_003109]**

**Quite the contrary. They're publicity opportunities.**

**If "Idol" were embarrassed about JXJ, it would quietly dismiss him and move on. By all reports, it plans to have him on the air tonight. Nothing like a little public humiliation to boost audience numbers. True in Salem in the 17th century, true on TV tonight. This is not to say "Idol" doesn't try to ensure contestants are who they say they are. But if someone slips past the system once in a while, no harm no foul. [CDC_003109]**

869.    On March 14, 2012, Defendant FOX, through its website www.foxnews.com, published an article entitled "*Contestant JXJ will be kicked off American Idol for Hiding Criminal Past*". [CDC__002967; CDC_003059].  The article is based on the earlier TMZ report and states:

**Producers allegedly discovered Tuesday night [Mar. 13] that JXJ had been arrested twice and has outstanding warrants, TMZ reported. One of the incidents reportedly involved violence, which especially worried the producers. He also reportedly gave police fake names.**

**According to TMZ sources, JXJ will appear on Wednesday's show and then will be sent home.  [CDC_003059]**

## B.    POST-DISQUALIFICATION

### (1)    TELECAST [March 14, 2012]

870.    On Wednesday, March 14, 2012, at 8:00 p.m. EST, ENTERPRISE-DEFENDANTS telecast an episode of *American Idol* which featured on-air segments depicting events surrounding JXJ's disqualification from the Contest.

871.    Host Ryan Seacrest confirmed at the top of the show that ENTERPRISE-DEFENDANTS cooperate with government officials in relation to conducting background checks. Seacrest stated:

**With the cooperation of law enforcement we discovered information that left us with no choice but to eliminate one of our finalists from the competition. When you're doing a live show,**

**anything can happen.  This is American Idol.  [CDC_003041]**

872.    About ninety minutes into the episode, ENTERPRISE-DEFENDANTS broadcast a much hyped-up segment in which JXJ was called into a production office to speak on camera with the paternalistic, stern-faced executive producers, Defendant LYTHGOE and Defendant WARWICK.   The video segment begins with JXJ entering well-appointed offices.  WARWICK and LYTHGOE are sitting on a big white leather couch each wearing business suits and holding pieces of paper.  The screen informs the audience of the time: 4:56 p.m. PDT [Tuesday, March 13]

> **Defendant WARWICK: "Just sit down there a moment, why don't you."**
>
> **Defendant LYTHGOE:   "There are a number of things that have been going on this week - stories that have been told; that have not been told.  And we've been given further information that we need to talk to you about."**
>
> **JXJ: "Um, ok."**
>
> **Defendant LYTHGOE: "In March of last year, you were charged - criminally charged – with giving a fake name to the police."**
>
> **JXJ: "Um, ok."**
>
> **Defendant LYTHGOE: "And in November again of last year, you were criminally charged and you gave them [another] fake name...Uh, you didn't disclose those charges to us."**
>
> **JXJ.          [silence]**
>
> **Defendant WARWICK: "There are four active warrants out for you actually.  To be honest - which surprised us – to be truthful.  You know, we're not judgmental at all.  Lots of kids come to us that have problems.  It's part and parcel of what kids go through today.  We know that.  If they come clean with us and tell us at the beginning, we can help them.  But you did know that you were**

**incumbent to tell us the truth about all of this and it appears that you just haven't on ANY level ..."**

**Defendant LYTHGOE:** **"We are not allowed to have anyone with an outstanding warrant on the program, and you have four of them against you."**

**Defendant WARWICK:** **"We have to let you go, I'm afraid. It's the end of the road."**

873.   On Wednesday, March 14, at 9:50 p.m. EST, in an article entitled: *"Idol Top 12 Night: Jermaine Jones' Disqualification Overshadows Episode",* Lyndsey Parker, an entertainment news journalist for REALITY ROCKS, described the on-air disqualification of JXJ by the ALIEN-ENTERPRISE-DEFENDANTS as follows:

**I actually felt bad for the guy. The vibe of this entire segment felt icky, invasive, exploitative, and just plain wrong. [CDC_003096]**

## (2)   PUBLIC REACTIONS (POST-TELECAST) [March 15, 2012]

874.   On Thursday, March 15, 2012, at 4:00 a.m. PDT, Shirley Halperin published a follow-up article to HOLLYWOODREPORTER.COM concerning JXJ's disqualification entitled *"American Idol Finalists React to JXJ Disqualification"* [CDC_002975-76]. The article quotes the reaction of several Top 12 Finalist Contestants, including Erika Van Pelt who stated that JXJ's abrupt disqualification was particularly shocking given the extensive background check procedures imposed upon *American Idol* Contestants.

**Erika Van Pelt simply described the unfolding drama as "weird," especially considering the <u>thorough background checks</u> they each had to pass.**

**"It was so extensive, which is another reason why we were so shocked and confused that this was all of a sudden surfacing," she told THR. "Even after all the drama with him being brought back after being cut on the sing-for-your-life round -- for him to come**

**back and be kicked off again?"  [CDC_002976-78]**

875.    On Thursday, March 15, 2012 at 10:37 a.m., the LOS ANGELES TIMES published an article entitled:  *"American Idol: [JXJ]'s Dismissal Angers Fans*.  The article quoted various public opinions surrounding the previous night's disqualification episode, all of which openly criticized ENTERPRISE-DEFENDANTS' telecast of adverse action against JXJ, describing the on-air confrontation between the ALIEN-ENTERPRISE-DEFENDANTS and JXJ as *"unprofessional," "tacky", "awkward," "kind of gross."*  As one commentator quoted by the LOS ANGELES TIMES succinctly stated:

**There was no reason to humiliate JXJ on public TV. [CDC_003004]**

876.    On    March    15,    2012,    the    on-line    service    BACKGROUNDS    ONLINE (backgroundsonline.com),    an    employment    screening    resource,    posted    an    article    entitled *"American Idol Contestant Dismissed Over Criminal Record."* [CDC_003026].  After describing the circumstances surrounding JXJ's disqualification, the author stated:

> **This incident is a bit shocking considering American Idol's claims that the contestants are thoroughly vetted . . . A simple and inexpensive background check could have quickly uncovered JXJ's open warrants.  [CDC_003026]**

877.    On Thursday, March 15, 2012, in an article entitled *"Idol Background Checks,"* David Reimer, the Arts & Review editor for THE HEIGHTS, a well-established (1919) independent student newspaper at BOSTON COLLEGE (www.bcheights.com) opined:

> **At this stage in the show, it is <u>ridiculous</u> for "American Idol" to send someone home for something they should already have known about and dealt with. JXJ's legal history might not be unblemished, but <u>he should be allowed a graceful, normal elimination from the show based on how he sings, not on minor infractions</u>.**
>
> **Maybe the fanfare would be merited if JXJ had actually done**

194

**something wrong during his time on the show, but that does not appear to be the case. <u>This incident attests to the larger issue of stigmatizing individuals with a sorted past</u>. We idealize "rehabilitated criminals," but hold prejudice against anyone trying to start over.  [CDC_003010-11]**

### (3)    STATE OFFICIALS: "AN OUTRAGE" [March 15, 2012]

878.    On Thursday, March 15, 2012, at 2:29 p.m. EDT, in an article entitled: *"Cops: Wasn't Worth Chasing 'Idol' on Small Charges"*, the ASSOCIATED PRESS reported that JXJ's local police department and area government officials were highly dismayed at the manner in which ENTERPRISE-DEFENDANTS handled JXJ's public disqualification:

> **[Gloucester Police] Lt. Christopher Jones stated that <u>JXJ's case "wasn't big enough" to merit going after the singer in California</u>. [CDC_003194]**
>
> **<u>"For the producers of the billion dollar show to expose, embarrass and interrogate a young man without an attorney in front of 40 million viewers was an outrage</u>," Nash said. "In the future, they should do background checks before they start counting their money and playing Judge Judy."  [CDC_003194]**

### (4)    DEFENSES TO MEDIA BACKLASH [March 15, 2012]

879.    On Thursday, March 15, 2012, Defendant WARWICK and Defendant LYTHGOE gave a joint interview to TMZ.com's founder and chief editor, Harry Levin, in which the ALIEN-ENTERPRISE-DEFENDANTS attempted to justify their humiliating on-air disqualification of JXJ.

880.    On March 15, 2012, REALITYTVWORLD.COM published an article entitled *"American Idol Execs: Fake Names Were JXJ's Big Problem"*.   The article re-published statements made by Defendant LYTHGOE and Defendant WARWICK to TMZ.com.

> **American Idol producers Nigel Lythgoe and Ken Warwick say disqualified finalist JXJ's biggest mistake was giving police fake**

**names for two of his prior arrests because it made Fox executives question whether his undisclosed criminal record could still be more extensive than the show had discovered.  [CDC_002971]**

881.    Defendant WARWICK claimed that Contestant JXJ-11 had to be disqualified from the *American Idol* Contest because Defendant FOX was unable to determine through their background check procedures the number of false names that JXJ-11 had allegedly provided to government officials.

> • **Defendant WARWICK: "The big problem for [FOX] was the fact that JXJ had given [the police] false names, and they [FOX and CARCO] were saying, 'This is what we know from the names we found out. There might be other false names and other charges out there that we just don't know about. '" [CDC_002971]**

882.    In the 3/15/12 interview with TMZ.com, Defendant LYTHGOE attempted to explain ENTERPRISE-DEFENDANTS' decision to stage JXJ's disqualification for television viewing audiences and confront him on camera during the March 14, 2010 episode of *American Idol*.

883.    Citing the ENTERPRISE-DEFENDANTS' 2003 disqualification of Plaintiff Corey Clark, Defendant LYTHGOE stated that the "failure to disclose" criminal record information during the ENTERPRISE-DEFENDANTS' background check process was grounds for removal from the show.

> • **Defendant LYTHGOE: "We had to confront JXJ, and we've done this in the past, as you know. We did it with Corey Clark again as well. In this situation where self-disclosure isn't forthcoming, we have to sit them down and say: 'These are the charges and the allegations against you.'  But there were actually two criminal charges actually last year that [JXJ-11] did not disclose to us as well." [CDC_002971]**

884.    In the 3/15/12 interview with TMZ.com, Defendant LYTHGOE stated that ENTERPRISE-DEFENDANTS will ordinarily help Contestants to "clean up" their criminal records provided that they are forthcoming during the background check process.

196

- **Defendant LYTHGOE: "So the annoying thing is, we have had this in the past, you know - lots of kids having moving violations or they drive on a suspended license or anything like that - and they've got warrants against them that are outstanding. And we helped them where we can in cleaning them up before they come to Idol." [CDC_002971-72]**

885.    Defendant WARWICK and Defendant LYTHGOE stated that ENTERPRISE-DEFENDANTS have attempted to assist *American Idol* Contestants "mitigate" any pending charges relating to on-going criminal proceedings..

- **Defendant WARWICK: "If they tell a judge, 'Look, I'm a contestant on American Idol and there's every possibility this will be great for me, can you let me off? Can you mitigate the charge?' Can you do something that invariably the judge will look on them sympathetically? We would have tried." [CDC_002972]**

- **Defendant LYTHGOE: "We would have certainty done our best. I don't know what would have happened because we don't make these decisions." [CDC_002972]**

886.    Defendant LYTHGOE stated that *American Idol* Contestant background checks are conducted through a "team" and then submitted to Defendant FOX.

- **Defendant LYTHGOE: "It's done through a team and then put to Fox Broadcasting. I think that would have certainly red-flagged the two criminal charges last year." [CDC_002972]**

887.    Defendant LYTHGOE and Defendant WARWICK maintained that JXJ-11 failed to disclose his arrest record history to ENTERPRISE-DEFENDANTS because JXJ-11 could not afford to cover the fines ordered by the criminal courts.

- **Defendant WARWICK: "[JXJ-11 was] very apologetic!" [CDC_002972]**

- **Defendant LYTHGOE: "He was actually very good. We said to him, 'Why did you not tell us? Why did you not tell us?' [JXJ-11] said, 'Because I wanted to get the money together and clear them up before I told you.' But it's in the region of six or seven thousand dollars. He just doesn't have that kind of money..." [CDC_002972]**

197

- **Defendant WARWICK:** "The truth was he could not possibly pay these fines and these charges. So he said it becomes like a mechanism where just to get on the show, you do lie about them. It's like quicksand. You can't pay the charges, so the next one comes along and you lie about that, and then the next comes along and you lie about that." [CDC_002972]

## C.    JXJ SPEAKS [MARCH 16, 2012]

## (1)    PEOPLE MAGAZINE INTERVIEW

888.    On Friday, March 16, 2012, at 8:30 a.m. EDT, PEOPLE MAGAZINE published an

on-line article entitled: *"JXJ: I Didn't Know I Broke American Idol's Rules"* [CDC_003102-03]

- **PEOPLE:** Did you know you were going to be called in front of producers and that it would be filmed?

- **JXJ:** I did not know any of it. I was actually confused. I didn't know what was going on. And I walked in and there were all these lights and cameras. I didn't know what was going on.

- **PEOPLE:** When you signed up for Idol, were you asked if you had a criminal past?

- **JXJ:** They did have a question [in which you had to admit] that you were arrested, and that I did do. And they did an extensive background check. When I went home [after my first elimination] and then I went back, I thought, they've done the research at this point. I was a little bit confused.

- **PEOPLE:** Did you know you were breaking the rules?

- **JXJ:** I did not know I was breaking the rules, because before I went, I had to obtain a lawyer and take care of some fines before I could go. I just thought everything was taken care of.

- **PEOPLE:** What are your warrants for?

- **JXJ:** Two for giving a false name, one allegation of a fight and one for driving with a suspended license. They were all minor charges but of course it was a big deal. Who wants a criminal past? It was a very big deal for me.

198

- **PEOPLE: Do you feel you have a scarlet letter affixed to you with the elimination?**

- **JXJ: People will judge me or hold it against me, but I don't know anyone that doesn't have a past. Everyone has a past. It's not like I shot someone or assaulted anyone. I was younger. I got caught driving with a suspended license. I gave a false name. I'm not trying to say it was okay, but I'll be all right.**

## (2)    SHOWBIZ TONIGHT

889.    On Friday evening, March 16, 2012, JXJ appeared on the popular HLN television show SHOWBIZ TONIGHT. The headline stated that his interview was a "SHOWBIZ EXCLUSIVE" AND JXJ'S "first interview since being kicked off *American Idol* Last night."

890.    During his interview, JXJ publicly stated that his on-air disqualification came as a complete surprise.

- **JXJ: "I thought they were bringing it to my attention . . . letting me know that now they are aware of, you know, this, that and the third. I didn't know what was going to happen . . .Until they said it, I had no clue what was going to happen. I was shocked, but I can't really express what my emotions were at that time."   [CDC_005968; CDC_002984-85]**

891.    On March 16, 2012, JXJ publicly stated that his disqualification from *American Idol* was a "very humbling experience" and he said that he was very disappointed … it hurt a lot." [CDC_002992]

892.    During his SHOWBIZ TONIGHT interview, JXJ publicly stated that he had affirmatively disclosed his arrest record history to ENTERPRISE-DEFENDANTS during their background check process.

- **JXJ: "I know that when I filled out my application, I circled 'yes' that I was previously arrested before." [CDC_005968]**

893.    During his SHOWBIZ TONIGHT interview, JXJ publicly stated that after submitting

his PARTICIPANT BACKGROUND QUESTIONNAIRE FORM (v.11), ENTERPRISE-DEFENDANTS *required* JXJ to hire a criminal defense attorney to handle outstanding arrest warrants.

> **JXJ: "And, you know, they did a background check on me and there were some information that I had to get a lawyer to take care of before I could even be on the show." [CDC_005968; CDC_002985]**

894.    During his SHOWBIZ TONIGHT interview, JXJ stated said he was not concerned with widespread speculation that ENTERPRISE-DEFENDANTS had planned the disqualification scandal in advance as a ratings ploy.

895.    On Friday, March 16, 2012, the HOLLYWOOD REPORTER posted another follow-up article reporting on JXJ's exclusive televised interview with SHOWBIZ TONIGHT. [CDC__002991]   Some of the public opinions reacting to JXJ's interview included the following published statements to HOLLYWOOD REPORTER:

> **"When he says it was a "humbling experience," he should have said humiliating and degrading and not worthy of AI.  Lithgoe and Warwick were completely wrong and frankly, I am more embarrased for their lack of humanity then I am for Jermaine's bad choices. [CDC_002995]**

> **"JXJ has a voice that has been missing in music since we lost Luther and Barry White. What a shame that Idol didn't have the class to step up and guide him to clear up his situation instead for throwing him back into a judicial system that is nothing but the new slavery system with no way out. Idol and FOX have big lawyers and it would have taken nothing [sic] to show him how to correct his past and become the [recording artist] the world named and wanted and need him to be." [CDC_002995]**

> **"American Idol knew of his mischief related offenses. JXJ admitted to the crimes during the American Idol application process, and he also lawyered up to clarify these matters with American Idol's legal staff. [CDC_002996]**

200

## D.    EXPERT OPINION #2

896.    On March 17, 2012 at 6:27 PDT, HOLLYWOOD REPORTER posted a video of THR.com's live Friday talk show called "*Idol Hangover No. 3,*" which is hosted by author Shirley Halperin.

897.    The one-hour video[16] addresses what it calls "shocking news of the disqualification of season eleven finalist JXJ" and featured HOLLYWOOD REPORTER journalist Shirley Halperin further explaining her position on JXJ's disqualification.  Ms. Halperin began the show with the following statements:

> **But I think that when you put somebody on a pedestal, you put them on Idol with 20 million people watching them and then you vilify them 24 hours later, it can be really hard on someone's psyche, so I was a little concerned...I just don't want this to get any uglier than it was.  But it was pretty ugly.**

898.    Later in the video show, *"Idol Hangover 3"*, Ms. Halperin and her co-host introduced Richard Rushfield, author of AMERICAN IDOL: THE UNTOLD STORY, and another one of the leading experts in *American Idol* who had been covering the series for the LOS ANGELES TIMES since its inception.

899.    On April 1, 2005, during Season Four of *American Idol,*

• **Shirley Halperin:** This kind of controversy – it's not uncommon for Idol – there have been people who have been disqualified.  This one seems - I don't know - a little extra cruel.  Why?

• **Richard Rushfield:** This scene here: Calling him in and breaking the news to him on the couch with the cameras rolling ...You can just imagine, he's got the cameras following him into the office.... and then all of sudden ... Watching his face as they break it to him: 'Yes, you've been arrested five times and – and we're ending your career.'  [laughter]...This just seemed - IT WAS CRUEL IN TOO REAL A WAY.

• **Shirley Halperin:**  Isn't the background check process pretty thorough?  How could they miss this?

---

[16] http://www.hollywoodreporter.com/video/thrs-idol-hangover-episode-3-301175 (accessed 07/20/13)

- **Richard Rushfield**:  It seems really shocking that he could have five warrants.  They drop the thing about how he gave a different name – and that was with**,** what's name Corey  –

- **Shirley Halperin**:  Corey Clark. His name was misspelled in Season Two – that's right.

- **Richard Rushfield**:  That's why it didn't come up in the background check because he gave the wrong name.  So perhaps the arrest warrants were under different name.  It seems really odd that they would do a background check and there would be five warrants out -

- **Shirley Halperin**:  And NONE of them would come through? And I was reading back to the Corey Clark days.  And let's just remember 2003.  The internet was not what it is today.  If you applied for a job, they check your social security.  They are not just checking your name.  That's why I wrote that opinion – it just – it didn't quite fit.

- **Richard Rushfield**:  They definitely milked it – I will tell you that.  They were not just going to brush this under the rug as they have done in the past.  They used this.

# WHITE CONTESTANTS

## [WITH CRIMINAL RECORDS]

## A.    SCOTT SAVOL [Season Four - 2005]

900.    Scott Savol was featured as a White male Contestant on Season Four of *American Idol*.

901.    Mr. Savol performed and appeared in the Final Rounds on March 15-16, 2005; March 22-23, 2005; and March 29-30, 2005.

902.    On Thursday, March 31, 2005, SMOKINGGUN.COM published an article on-line entitled:  *"American Idol Finalist's Violence Rap (Cops: Savol Roughed Up Ex-Girlfriend During Domestic Dispute)*."   The article reported that Savol had been arrested in connection with a domestic violence incident against the mother of his child.

903.    Mr. Savol entered a guilty plea, accepting a misdemeanor charge of disorderly conduct. He was fined $500, given a year's probation, ordered to take an anger management course, and placed under a protective order for a year.

904.    After the SMOKINGGUN.COM published its 3/31/2005 report, several media outlets queried whether Mr. Savol would be disqualified in the same manner that Plaintiff Corey Clark had been two years earlier.

905.    On the evening of Thursday, March 31, 2005, Defendant FOX issued the following statement to the press, indicating that Mr. Savol had been "forthcoming" and "honest":

> **Scott Savol was forthcoming to the American Idol producers and the network regarding his misdemeanor. After reviewing the facts, in which the charges were reduced to disorderly conduct, we felt that considering Scott's honesty and his remorse, the situation did not warrant his disqualification.**

906.    Mr. Savol continued to compete in the Contest uninhibited and was not eliminated until the public voted him off on May 4, 2011.

907.    Mr. Savol came in fifth place and enjoyed support from ENTERPRISE-DEFENDANTS

204

and a moderately successful career in music at times thereafter.

908.    In the wake of the Plaintiff Akron Watson disqualification in February 2007, Mr. Savol spoke to REALITY TV MAGAZINE (www.sheknows) about how ENTERPRISE-DEFENDANTS' conducted its background check process. Mr. Savol revealed that he disclosed all of his information before being flown to Hollywood. [CDC_003319].

**AMERICAN IDOL 4 FINALIST SCOTT SAVOL REVEALS DETAILS ON IDOL BACKGROUND CHECK PROCESS**

- **Reality TV Magazine: What kind of background investigation does the show do on contestants and at what stage does it occur in the audition process?**

- **Scott Savol: I don't know whether or not the background investigation process has changed since Season 4, but when I was on Idol every contestant that went to Hollywood had to fill out information forms and consent to a background investigation. When the group in Hollywood was narrowed down to about 41 contestants (before the final cut for the top 24), we each had to sit down with private investigators that asked us all kinds of questions.**

- **Reality TV Magazine: At what stage of the audition process did you tell American Idol producers about your arrest for domestic violence?**

- **Scott Savol: I supplied the show with this information in my background forms/papers, and again in my in-person interviews with the private investigators.**

- **Reality TV Magazine: When news broke about your arrest, what were the rules that American Idol producers gave you in regards to answering questions from the press?**

- **Scott Savol: There were really no rules that I was given by the producers. The news of my arrest broke after I had made the top 12 and the producers simply told me to ignore the negative stuff being said, not to let it bother me, and to keep focused on my performances. The producers were very supportive and told me not to worry about it, as I had been forthcoming about the arrest from the beginning, and not to let this discourage or distract me in the competition.**

## B.    BO BICE [Season Four - 2005]

909.   Bo Bice was featured as a White Contestant on Season Four of *American Idol*.

910.   Beginning in mid-March 2005, Mr. Bice performed and appeared in the Final Rounds for seven consecutive weeks.

911.   On Thursday, April 28, 2005, SMOKINGGUN.COM posted an article about Mr. Bice's criminal arrest history.

912.   On or about April 28, 2005, Defendant FOX issued a statement to the press defending the "previous indiscretions" of Mr. Bice and claiming that Bice had been "honest" and "forthcoming" during the background check process.  Defendant FOX stated:

> **"The information disclosed on various salacious gossip Web sites regarding Bo Bice's past was already well-known to FOX and the producers of 'American Idol.' From the beginning, Bo was honest and forthcoming in revealing his previous indiscretions and their outcome."**

913.   On April 28, 2005, MTVNews.com published an article entitled  *"Idol Singer Bo Bice Has Drug Rap Sheet, Court Papers Show (Finalist Was Arrested for Cocaine and Marijuana Possession)"*.  The MTV article stated that Mr. Bice was "widely considered a favorite to win the fourth season of *American Idol*" and, based on Defendant FOX's press statement, would continue to compete.

914.   Mr. Bice's record of arrest and felony convictions were expunged from the public record at the time they were purportedly disclosed to ENTERPRISE-DEFENDANTS.

915.   By ENTERPRISE-DEFENDANTS' own admission, ENTERPRISE-DEFENDANTS knew about Mr. Bice's expunged felony convictions before SMOKINGGUN.COM ever disclosed his arrest record.

916.   On May 24, 2005, Governor Bob Riley of the State of Alabama declared May 24 as "Bo Bice Day."

917.    On May 25, 2005, one month after the publication of Mr. Bice's felony arrest record, Mr. Bice became the runner-up in Season Four of the *American Idol* Contest, reaching second place after Carrie Underwood.

918.    Upon information and belief, subsequent to his participation as a Contestant on Season Four of *American Idol,* 19 ENTERTAINMENT exercised its "options" on the Prize Contracts by signing Mr. Bice to 19 ENTERTAINMENT.

919.    After his appearance as an A*merican Idol* Contestant, Mr. Bice was signed to a Major Record Label, RCA Records.  Released on June 21, 2005, Bice's first single as an RCA artist debuted at number two on the Billboard Hot 100 Chart and was certified Gold in July 2005.

920.    On December 13, 2005, RCA Records released Bo Bice's Major Label debut album, which peaked at number 4 on the U.S. charts and went on to sell 673,000 copies in the U.S.

921.    Since appearing as a Contestant on Season Four of *American Idol*, Mr. Bice has enjoyed a career as a professional recording artist in the music industry with support from these ENTERPRISE-DEFENDANTS, including but not limited to performing with Willie Nelson at the Bonnaroo Music Festival, appearing on Carlos Santana's album *All That I Am*, performing in the American Idols LIVE! Tour 2005, appearing on *The Tonight Show* with Jay Leno, *The Ellen DeGeneres Show*, *Live with Regis & Kelly*, *The Today Show*, *The Daily Show* with Jon Stewart.

## C.    BUCKY COVINGTON [Season Five – 2005-2006]

922.    William "Bucky" Covington was featured as a White Contestant on Season Five of *American Idol* (2005-2006).

923.    In 1998, Bucky Covington was arrested and charged with fraud in connection with

207

impersonating his identical twin brother and providing a fictitious name to a police officer.

924.    On or about October 6, 2005, the identical Covington Twins auditioned for *American Idol* Season Five in Greensboro, North Carolina, in their individual capacities.

925.    Bucky Covington eventually advanced to the Top 12 Finalist Round.

926.    On or about Monday, April 10, 2006, COURT TV reported that Mr. Covington "was once arrested for his involvement in a bizarre incident in which he pretended to be his twin brother to help the sibling avoid criminal prosecution."

927.    On Monday, April 12, 2006, at 11:51 p.m. EDT, REALITY TV MAGAZINE (www.sheknows.com) published an article on-line entitled *"American Idol Finalist Bucky Covington's Twin-Swapping Legal Scandal."*  The author of the article opined as follows:

> **Bucky will likely gain points with some for trying to help keep his brother out of trouble, and it also gives Bucky a little bit of an outlaw image.  [CDC_7141]**

928.    On Wednesday, April 12, 2006, Mr. Covington was voted off the show, landing him at the #8 spot.

929.    On Thursday, April 13, 2006, Mr. Covington was interviewed by a reporter for ENTERTAINMENT WEEKLY and was asked to discuss his prior criminal arrest.  [CDC_007135].

> • **Covington:  If they're looking for dirt on me and all they found was a car accident in 1998, they're not looking hard enough. [*Laughs.*]**
>
> • **EW:  Want to come clean with anything right now?**
>
> • **Covington:  I ain't really got no dirt on me — or I was good at getting away with it.**
>
> • **EW: So people still need to keep digging.**
>
> • **Covington: Exactly — I'm not going to give it to you.**

930.    In the wake of the Court TV report that unearthed Mr. Covington's criminal arrest history, Defendant FOX did NOT issue any statement to the press concerning whether Mr. Covington had disclosed the history of his criminal arrest in connection with the background check procedures.

931.    Following his appearance on Season Five of *American Idol*, Mr. Covington was signed to LYRIC STREET / HOLLYWOOD RECORDS.  His debut album, entitled *Bucky Covington*, was released on April 17, 2007 and debuted on the Billboard 200 Chart at number four (#4) selling 61,000 copies.

## D.    TAYLOR HICKS [Season Five – (2005-2006)]

932.    Taylor Hicks was featured as a White Contestant on Season Five of *American Idol*. (2005-2006).

933.    In 1998, Mr. Hicks was arrested in Alabama during a traffic violation stop for misdemeanor possession of marijuana and drug paraphernalia.

934.    On October 10, 2005, Mr. Hicks auditioned for *American Idol* in Las Vegas Nevada and was awarded a Golden Ticket.

935.    In late October 2005 or early November 2005, ENTERPRISE-DEFENDANTS procured the criminal arrest history information of Mr. Hicks.

936.    Mr. Hicks advanced to the Top 12 round on Season Five of *American Idol*.

937.    On or about May 2, 2006, STAR MAGAZINE published details regarding Taylor Hicks' 1998 criminal arrest in the State of Alabama for possession of (what the DEA describes as) "narcotics."

938.    In the wake of the 5/02/2006 STAR MAGAZINE article, ENTERPRISE-DEFENDANTS

209

did not make any public statement or issue any press release regarding Mr. Hick's past criminal record for possession of controlled substances.

939.    On May 10, 2006, Mr. Hicks was announced as one of the Top 3 Finalists for *American Idol* Season Five.

940.    On May 24, 2006, Mr. Hicks was named the new *American Idol*, winning the title over Katherine McPhee.  The proclamation was aired to a worldwide audience of 200 million television viewers.

941.    Upon winning Season Five of *American Idol*, it was announced that Mr. Hicks had been signed to a Major Record Label, Arista Records / 19 ENTERTAINMENT Records and would be managed by Defendant FULLER and 19 ENTERTAINMENT.

942.    In June 2006, Defendant FORD signed Mr. Hicks to promote Ford's *"Drive on Us"* year-end sales event.

943.    In August 2006, it was announced that Mr. Hicks received a $750,000 (USD) deal to write a memoir of his life, which was released in July 2007.

944.    Mr. Hicks' debut album was released on December 12, 2006.  The album charted #2 position on the U.S. Billboard 200 Chart and was eventually certified by the RIAA as Platinum on the basis of 704,000 units.

945.    In May 2009, Taylor Hicks made FORBES MAGAZINE Top-Ten earning *American Idol* Stars list, coming in at number ten, with over $300,000 earned.  [CDC_007058]

## E.    AMANDA OVERMYER [Season Seven – (2007-2008)]

946.    Amanda Overmyer was featured as a White Contestant on Season Seven of

*American Idol.*

947.    In October 2006, Ms. Overmyr was arrested on charges of driving under the influence of alcohol.  She later pled guilty to the criminal charge.  [CDC_007513]

948.    On or about August 14, 2007, Ms. Overmyr auditioned for Season Seven of *American Idol* in Atlanta, Georgia.  She was awarded a Golden Ticket to Hollywood based on unanimous vote of the Judges.

949.    Through its background check procedures, ENTERPRISE-DEFENDANTS procured the criminal arrest history information of Ms. Overmyer in the Fall of 2007.

950.    On February 28, 2008, TMZ.com posted an article under its "Breaking News" section entitled: *"Idol Nurse Busted for DUI"*. [CDC_007644].

951.    Mr. Overmyer was <u>not</u> disqualified from *American Idol* by ENTERPRISE-DEFENDANTS on account of her criminal conviction history.

952.    On March 19, 2008, after two weeks of performing live in the Finalist Rounds, Ms. Overmyer was eliminated from the *American Idol* Contest, placing her at the #11 spot. [CDC_007656].

953.    After her elimination from the Contest, ENTERPRISE-DEFENDANTS arranged for Ms. Overmyer to appear on *The Ellen DeGeneres Show*, *Live with Regis & Kelly*, and *The Morning Show* with Mike and Juliet.

954.    On May 24, 2008, Ms. Overmyer performed at the Women of Rock show at the *Whisky A Go Go* in West Hollywood.  She sang at the Harley Davidson Summerfest and released her debut album, *Solidify* in December 2008.

## F.    JOANNA PACITTI [Season Eight – (2008-2009)]

955.    Joanna Pacitti was featured as a White Contestant on Season Eight of *American Idol*.  She was 23 years old at the time of her appearance.

956.    Before auditioning for Season Nine of *American Idol*, Ms. Pacitti was signed to a Major Record Label: A&M Records / Geffen Records.

957.    On January 21, 2009, ENTERPRISE-DEFENDANTS broadcast an episode of *American Idol* featuring Ms. Pacitti's audition.  One of the Expert Judges, Kara DioGuardi, recognized at Ms. Pacitti's audition that she had already been signed to a Major Label recording deal.

958.    Ms. Pacitti's appearance on *American Idol* generated debate as to whether *American Idol* was a show for amateurs or for professionals.

959.    On Wednesday, February 11, 2009, ENTERPRISE-DEFENDANTS broadcast an episode of *American Idol* in which Ms. Pacitti is advanced to the Semi-Finalist Rounds Top 36.

960.    On February 11, 2009, within hours after the conclusion of the episode broadcast, Defendant FOX issued a press release concerning Ms. Pacitti: [CDC_007645]

> **"It has been determined that Joanna Pacitti is ineligible to continue in the competition. American Idol contestant Felicia Barton has replaced Ms. Pacitti as part of the Top 36."**

961.    According to STAR MAGAZINE, Joanna Pacitti was declared "ineligible" to compete after advancing to the Top 36 Semi-Final rounds because her professional recording career was *already being managed* by Defendant 19 ENTERTAINMENT, the very same company that manages the talent pool signs the winners to recording contracts.  The reason for her withdrawal from *American Idol* was that Pacitti had "very personal connections" to two executives that work for 19 ENTERTAINMENT.

## G.    MATTHEW LAWRENCE [Season Nine]

962.    Matthew Lawrence was featured as a White Contestant on Season Nine of *American Idol*.

963.    On or about April 11, 2000, Mr. Lawrence robbed a Texas bank at gunpoint. He escaped in a getaway vehicle with $10,845 in cash and was arrested shortly thereafter. Mr. Lawrence was convicted on a charge of aggravated battery and sentenced to five years in juvenile prison, of which he served more than three years. [CDC_007623]

964.    On January 20, 2010, ENTERPRISE-DEFENDANTS aired an episode of *American Idol* featuring the performance audition of Mr. Lawrence. The fact of Mr. Lawrenece's felony conviction was a predominate component of his featured backstory. He was awarded a Golden Ticket upon unanimous vote from the Expert Judges.

965.    After the broadcast of Mr. Lawrence's appearance on *American Idol*, the media celebrated Mr. Lawrence's appearance on the show as being representative of an opportunity for "a second chance" and "a shot at redemption."

966.    On January 20, 2010, Brian Mansfield of USA TODAY published an article: *"The Final Audition: A Shot at Redemption"* [CDC_007592]

967.    Mr. Lawrence was <u>not</u> disqualified from *American Idol* by ENTERPRISE-DEFENDANTS on account of his criminal arrest or felony conviction history.

968.    On March 6, 2010, the website GAINESVILLE.COM published an article entitled *"From Youth Bank Robber To 'Idol' Contestant, Starke Native Rises Up"* in which it revealed that Mr. Lawrence was eliminated from the Contest during Hollywood Week. [CDC_007724]

## H.    CASEY JAMES [Season Nine]

969.    Casey James was featured as a White Contestant on Season Nine of *American Idol*.

213

970.    In November 2001, Mr. James was arrested on charges of reckless driving.  He later pled guilty and served time in jail.

971.    On December 29, 2002, Mr. James was arrested again driving under the influence and driving on a suspended license to which he pled guilty and served jail time.

972.    On or about August 7-8, 2010, Mr. James auditioned for *American Idol* before the Expert Judges and was awarded a Golden Ticket to Hollywood.

973.    As part of its standard practice and ordinary course of doing business, ENTERPRISE-DEFENDANTS procured Mr. James' criminal arrest history information before flying him to Los Angeles, California to compete in the Hollywood Rounds in December 2010.

974.    On Tuesday, February 2, 2010, ENTERPRISE-DEFENDANTS telecast the Open Auditions episode of *American Idol* featuring Mr. James' performance from his August 7-8, 2009 performance in Denver.

975.    On February 5, 2010 at 6:35 a.m., RADAR ONLINE posted an article entitled: *"EXCLUSIVE: American Idol Hopeful Casey James' Jailbird Past"*  [CDC_007513].

976.    Mr. James was <u>not</u> disqualified from *American Idol* by ENTERPRISE-DEFENDANTS on account of his criminal arrest or criminal conviction history.

977.    On February 17, 2010, it was announced that Mr. James was one of the Top 24 Finalists for Season Nine of *American Idol*.

978.    On or about March 11, 2010, STAR MAGAZINE published Mr. James' mugshots from his 2001 and/or 2002 arrests.

979.    On March 16, 2010, MTVNEWS.COM reported on Mr. James' criminal arrest history, largely downplaying the incidents as "youthful indiscretions" [CDC_007521

980.    During the months of reporting on Mr. James' criminal arrest and conviction

214

history, Defendant FOX did not make any comment to the media concerning Mr. James' past criminal arrest history.

981.    On May 19, 2010, Mr. James was eliminated by public vote after he competed throughout twelve straight weeks of the *American Idol* Contest, ultimately landing in the #3 spot.

982.    After Season Nine of *American Idol* concluded its broadcast run, Mr. James joined the rest of the Top 10 Finalists on the *American Idols* LIVE! Tour.

983.    On August 17, 2010, it was announced that James had signed with SONY MUSIC NASHVILLE and his debut album would be released on 19 RECORDINGS / BNA RECORDS in 2011.

984.    Released on March 20, 2012 through ENTERPRISE-DEFENDANTS' 19 RECORDINGS, the album reportedly peaked at #2 on the U.S. Country chart and #23 on the Billboard Top 200, generating 72,000 in sales on the strength of two successful singles.

## I.    STEFANO LANGONE [Season Ten]

985.    Stefano Langone was featured as a White Contestant on Season Ten of *American Idol*.

986.    In 2008, Mr. Langone was arrested for possession of marihuana in the State of Washington.  [CDC_007449]

987.    On or about May, 16, 2010, Mr. Langone was arrested on charges of driving under the influence of alcohol.  He later pled guilty to first-degree negligent driving and entered a diversion program.

988.    On or about November 9-10, 2010, Mr. Langone auditioned for Season Ten of *American Idol*.  He was awarded a Golden Ticket to Hollywood.

989.    Through its ordinary course of business of conducting background checks,

ENTERPRISE-DEFENDANTS procured Mr. Langone's criminal arrest history before flying him to Los Angeles, California to compete in Hollywood Rounds.

990.    Mr. Langone was <u>not</u> disqualified from *American Idol* on account of his arrest record or conviction.

991.    On February 9, 2011, ENTERPRISE-DEFENDANTS telecasted an episode of *American Idol* featuring Mr. Langone's audition segment from his San Francisco audition.  Mr. Langone's backstory revolved around his near-fatal car accident in 2009 after being hit by a drunk driver.

992.    On February 12, 2011, TMZ.com posted an article entitled: *"Scarred Idol Contestant – Drunk Driving Victim*." The article displayed Mr. Langone's injuries from being hit my another driver and reported that Mr. Langone was suing the culprit. [CDC_007422]

993.    On or about February 24, 2011, the Top 24 Finalists were revealed, including Mr. Langone.

994.    On or about March 3, 2011, Mr. Langone was chosen by one of the Expert judges, Jennifer Lopez, as one of the Wild Cards to join the Top 13 Finalists.

995.    On March 10, 2011, Mr. Langone performed in the Finalist round and advanced to the next week.

996.    On March 16, 2011, Defendant FOX through its website www.foxnews.com posted an article entitled "*American Idol Finalist Stefano Langone's DUI Arrest Revealed*." Defendant FOX professes its support for the "cute crooner" even while acknowledging that "Stefano failed to reveal" his criminal arrest while talking about his backstory.  [CDC_007461-62]

997.    On March 16, 2011, SEATTLE TIMES posted an article entitled "A*merican Idol's Stefano Langone Convicted of Negligent Driving in 2010,"* noting that ENTERPRISE-DEFENDANTS

had made prominent his prior 2009 status as a victim of DUI.  In the article, it was also reported that ENTERPRISE-DEFENDANTS had conducted a background check into the incident "in February" and had no comment on whether Mr. Langone's conviction would be grounds for his disqualification. [CDC_007439]

998.    On April 21, 2011, Langone was eliminated from the *American Idol* Contest based on the (purported) public vote; and ended up in 7th place.

999.    Following his elimination from Season Ten of *American Idol*, Mr. Langone appeared on several talk shows, including *Live with Regis and Kelly* and *The Today Show*, and toured with the *American Idols* LIVE! Tour 2011, which ended in the Philippines on September 21, 2011.

1000.    On September 25, 2011, it was announced that Langone would be "the latest alum to have his option picked up by 19 ENTERTAINMENT.

1001.    On January 11, 2012, it was announced that Mr. Langone had signed a record contract with HOLLYWOOD RECORDS, making him the seventh Finalist from Season Ten of *American Idol* to score a Major-Label recording deal.

## J.    AMY BRUMFIELD [Season Eleven]

1002.    Amy Brumfield was featured as a White Contestant on Season Eleven of *American Idol*.

1003.    On or about August 17-18, 2011, Ms. Brumfield auditioned for *American Idol* before the Expert Judges and was awarded a Golden Ticket to Hollywood.

1004.    As part of their standard practice and ordinary course of doing business, ENTERPRISE-DEFENDANTS procured Ms. Brumfield's criminal arrest history information before

flying her to Los Angeles to compete in the Hollywood Rounds in December 2011.

1005. On or about December 12, 2011, Ms. Brumfield was flown to Los Angeles, California at ENTERPRISE-DEFENDANTS' expense to compete in the Hollywood Rounds.

1006. On or about December 14, 2011, on the second day of Hollywood Week, Ms. Brumfield was cut from the *American Idol* Contest during the group round.

1007. January 18, 2012, Ms. Brumfield's audition was featured on the premiere episode of Season Eleven of American Idol.

1008. As of the airing of the premiere episode of Season Eleven of *American Idol* on January 18, 2012, ENTERPRISE-DEFENDANTS knew that Ms. Brumfield had already been cut from the Contest and knew that she had an extensive history of misdemeanor arrests.

1009. On Thursday, January 19, 2012, at 7:45 a.m. PST, the Los Angeles-based website TMZ.com published an *"Exclusive"* article entitled *"American Idol – Tent Girl Amy Brumfield Has Boozy Criminal Past."* [CDC_007575-76]  The 1/19/2012 TMZ.com article posted four (4) different mug shots of Ms. Brumfield from four different arrests, two of which were purportedly taken in 2007 and two of which were taken in 2010.

1010. The 1/19/2012 TMZ.com article was initially published at 9:45 a.m. CST, which is only 15-45 minutes after any clerk of court or police records department in the State of Tennessee would have been opened for business.

1011. On Thursday, January 19, 2012 at 4:05 p.m. PST, E! ENTERTAINMENT'S EONLINE.COM posted an article entitled: *"American Idol Scandal Already? Tent Girl Amy Brumfield Has a Rap Sheet!"*

1012. In the wake of TMZ.com's report of Ms. Brumfield's criminal arrest information, Defendant FOX had no comment to the press regarding Ms. Brumfield's criminal arrest record.

218

[CDC_007562]

      1013.   Defendant FOX never revealed to the public whether Ms. Brumfield had disclosed her arrest information during the background check process.

# THE INEXORABLE ZERO

# GROSS STATISTICAL DISPARITY

## A.    PUBLIC DISQUALIFICTIONS

## (1)    OVERVIEW

1014.  During the first eleven[17] seasons of the *American Idol* production (2002-2012), EVERY *American Idol* contestant who was publically disqualified was Black, even though Black contestants consisted of no more than 29% of the overall contestant pool.

1015.  Conversely, White (and non-black) *American Idol* contestants - who consisted of the other approx. 71% of the Contestant pool - were NEVER publicly disqualified.

1016.  Measured over a ten-year period, from June 2002 through March 15, 2012, there was a total number of seventeen (17) *publicly* disqualified Black *American Idol* Contestants.

1017.  Measured over a ten-year period, from June 2002 through March 15, 2012, there were zero (0) number of White (or non-black) *American Idol* Contestants disqualified from the show for any reason.

1018.  Measured over a ten-year period, from June 2002 through March 15, 2012, there were zero (0) number of White (or non-black) *American Idol* Contestants publicly disqualified from the show on account of their criminal record information.

## (2)    GOLDEN TICKET HOLDERS (2002-2012)

1019.  Over the course of eleven seasons of *American Idol*, from <u>July 2002</u> through <u>March 2012</u>, there were approximately **2145** Contestants who received Golden Tickets to Hollywood.

---

[17] Statistics for Season Twelve are unreliable because news of Plaintiffs' complaint to the EEOC was first reported in the mass media on January 25, 2013.

1020.  Of the **2145** <u>Total</u> *American Idol* Contestants who received Golden Tickets to Hollywood, **1523** Contestants [or seventy-one percent (**71%**)] were White (or non-black).[18]

1021.  Of the **2145** <u>Total</u> *American Idol* Contestants who received Golden Tickets to Hollywood, **622** Contestants or [twenty-nine percent (**29%)**] were Black.

1022.  **Zero (0)** out of the **<u>1523</u>** White (or non-black) *American Idol* contestants were Publicly Disqualified.

1023.  **Seventeen (17)** out of **<u>622</u>** Black *American Idol* Golden Ticket Holders were Publicly Disqualified.[19]

1024.   **Fifteen (<u>15</u>)** out of <u>**17**</u> Black *American Idol* contestants were disqualified for Arrest Records.

1025.  **One (1)** out of **17** Black *American Idol* contestants were disqualified for erotic photos.

1026.  **One (1)** out of **17** Black *American Idol* contestants were disqualified for purportedly falsifying age.

1027.  One-hundred percent (100%) of all *American Idol* Golden Ticket Holders who were publicly disqualified from 2002-2012 were Black.

## (3)   SEMI-FINAL ROUNDS (2002-2012)

1028.  Over the course of eleven seasons of *American Idol*, from <u>July 2002</u> through

---

[18] "non-black" refers to Asian, Hispanic, Pacific Islander, Indian.

[19] (1) Delano Cagnolatti [Season One]; (2) Jaered Andrews [Season Two]; (3) Frenchie Davis [Season Two]; (4) Corey Clark [Season Two]; (5) Donnie Williams [Season Three]; (6) Terrell Brittenum [Season Five]; (7) Derrell Brittenum [Season Five]; (8) Halicia T. [Season Five]; (9) Tatiana W. [Season Five]; (10) Tora W. [Season Five]; (11) Akron Watson [Season Six]; (12) Ashlynn C. [Season Six]; (13) Perrie Cataldo [Season Seven]; (14) Anthony W. [Season Nine]; (15) Chris Golightly [Season Nine]; (16) JXJ [Season Eleven].

March 2012, **305** Total Contestants Advanced to Semi-Final Rounds [Top 24, Top 32, Top 36]

1029.  White: 71% (**216**) of all *American Idol* Semi-Finalists have been White or non-black.

1030.  Black: 29% (**89**) of all *American Idol* Semi-Finalists have been Black.

1031.  Zero (**0**) out of **216** (0%) White *American Idol* Semi-Finalists were Publicly Disqualified.

1032.  Nine (**9**) out of **89** (10%) Black *American Idol* Semi-Finalists were Publicly Disqualified.[20]

1033.  One-hundred percent (100%) of all *American Idol* Semi-Finalists who have been Publicly Disqualified were Black.

1034.  No White or non-black *American Idol* contestant has ever been Publicly Disqualified.

1035.  Ten-percent (10%) of all Black Contestants who advanced to Semi-Final Rounds were Publicly Disqualified.

1036.  Thirty-One (31%) of all Black MALE Contestants who advanced to *American Idol* Semi-Final Rounds were Publicly Disqualified.

## (4)    FINAL ROUNDS (2002-2012)

1037.  Over the course of eleven seasons of *American Idol*, from July 2002 through March 2012, **138** Total Contestants Advanced to Final Rounds [Top 10, Top 12 or Top 13]

1038.  White: 73% (100 out of 138) of all *American Idol* Finalists have been White or

---

[20] (1) Delano Cagnolatti [Season One]; (2) Jaered Andrews [Season Two]; (3) Frenchie Davis [Season Two]; (4) Corey Clark [Season Two]; (5) Donnie Williams [Season Three]; (6) Terrell Brittenum [Season Five]; (7) Derrell Brittenum [Season Five]; (8) Chris Golightly [Season Nine]; (9) Jermaine Jones [Season Eleven].

non-black.

1039. <u>Black</u>: 27% (38 out of 138) of all *American Idol* Finalists have been Black.

1040. <u>Zero (**0**)</u> out of **100** White (or non-black) *American Idol* contestants were Publicly Disqualified.

1041. <u>Two (**2**)</u> out of **38** Black *American Idol* contestants were Publicly Disqualified.[21]

1042. <u>One hundred percent (100%)</u> of all *American Idol* Finalists who have been publicly disqualified are Black.

1043. <u>Zero percent (0%)</u> of White (or non-black) *American Idol* Finalists has ever been Publicly Disqualified.

## (5)    STATISTICAL SIGNIFICANCE

1044. Over the course of eleven seasons of *American Idol*, from <u>July 2002</u> through <u>March 2012</u>, there were only nine (9) White *American Idol* Contestants who had their criminal record history information disseminated by ENTERPRISE-DEFENDANTS to the U.S. media. These contestants included Scott Savol [Season Four]; Bo Bice [Season Four]; Taylor Hicks [Season Five]; Bucky Covington [Season Five]; Amanda Overmyr [Season Seven]; Casey James [Season Nine]; Matt L. [Season Nine]; Amy B. [Season Nine]; Stefano Langone [Season Ten].

1045. ENTERPRISE-DEFENDANTS did <u>NOT</u> disqualify <u>any one</u> of the nine (9) White *American Idol* contestants whose criminal records came to light during telecast of the show.

1046. Several of the nine (9) White *American Idol* Contestants who had a history of criminal arrests were convicted for more serious crimes (e.g., felony armed bank robbery, felony drug possession) than ANY of the Black *American Idol* contestants, whose misdemeanor arrest

---

[21] (1) Corey Clark [Season Two]; (2) JXJ [Season Eleven].

history was *de minimus* in comparison.

1047.  Instead, Seven (7) out of the 9 White *American Idol* contestants whose criminal records were released by ENTERPRISE-DEFENDANTS to tabloid media actually ***advanced to the Final Rounds***: Hicks [#1]; Bice [#2]; James [#3]; Savol [#5]; Langone [#7]; Covington [#8] and Overmyr [#11].

1048.  Black *American Idol* Contestants who were disqualified in connection with their arrest records were invariably portrayed by the PRODUCER-DEFENDANTS as "untrustworthy" and "dangerous criminals" who had to be cast out into exile in order to preserve the "sanctity" of *American Idol* and to protect its brandname identity as a "family-friendly" show.

1049.  During ten years of broadcasting *American Idol,* no crime committed by ANY White *American Idol* Contestant, no matter how egregious, was ever treated by the OVERSEER-DEFENDANTS as a character flaw of the promoted White contestant.  To the contrary, the criminal arrest history of White *American Idol* Contestants was marketed to audiences as a *positive* character attribute, perfectly suitable for the "family-friendly" show.

1050.  With the assistance of the PRODUCER-DEFENDANTS, seven (7) out of nine (9) White *American Idol* Contestants managed to score lucrative record deals in the industry and have NOT had their musical careers impaired by their participation on *American Idol.*    It can be fairly stated that the White Comparators enjoyed the full benefits and privileges of the transaction without any *materia*l interference by the ENTERPRISE-DEFENDANTS.

1051.  Based on an analysis of the foregoing statistical data, it is transparent that the OVERSEER-DEFENDANTS made conscious, deliberate choices which invariably sought to condemn Black *American Idol* Contestants (11 out of 15 who were Male) while at the same time making decisions to advertise the criminal record history of a very select number of White *American Idol*

Contestants (8 out of 9 who were Male) in order to "teach" audiences about the <u>virtue of redemption</u> (i.e., atoning for a fault, deliverance, salvation).

1052.   Over the course of a decade, there were 1514 White (or non-black) Golden Ticket Holders invited to Hollywood who *apparently* had no criminal record at all (because it was never advertised).

1053.   OVERSEER-DEFENDANTS only decided to advertise the criminal record information of White Contestants in the very beginning round [two (2) contestants at Open Auditions / Hollywood Rounds] <u>or</u> the very last round [seven (7) contestants in the Finals].  In contrast, an inordinate amount of public disqualifications of Black *American Idol* contestants [13 out of 15] took place in the earlier Hollywood rounds or middle Semi-Final rounds.

1054. From the perspective of the viewing audience, the *Black American Idol* Contestants were kicked off relatively early enough in the season such that the viewing audience had not yet been provided an opportunity to "invest" in their talent (i.e., become a fan). OVERSEER-DEFENDANTS simply decided to use the "rap sheets" of Black *American Idol* contestants as "tabloid fodder" to advertise the *American Idol* show before the "Main Event" (i.e., live, public voting rounds) began.

1055.   At the early-mid rounds, target audiences still did not know much about the personal backgrounds or positive attributes of the Black contestants who had been disqualified. Instead, television viewers learned of them through scores of web articles that published their mug shots, criminal case files and police reports.  As indicated by the vast amount of "comments" posted to the internet in the wake of Black male disqualifications, the majority of the Black *American Idol* Contestants who were disqualified in earlier-middle rounds [including ANDREWS, T. BRITTENUM, D, BRITTENUM, WILLIAMS, WATSON, DANIELS] simply

226

became young Black males who conformed to the age-old stereotype of "criminal." They only appeared on television ONCE before being cast out by the OVERSEER-DEFENDANTS as stereotypical "black criminals."

1056.  As for the two Black *American Idol* Contestants who advanced to the final round [Plaintiff Clark and JXJ], they were portrayed by OVERSEER-DEFENDANTS as the age-old stereotype of the black "criminal" who had somehow "tricked" and "deceived" their way into the Final Round, leaving the OVERSEER-DEFENDANTS no choice but to terminate their participation for so-called "failure to disclose".

1057.  But the evidence shows quite clear that the OVERSEER-DEFENDANTS knew about the pending cases involving both Plaintiff Clark and JXJ, which means that their highly publicized disqualifications were carefully orchestrated.

1058.  OVERSEER-DEFENDANTS chose to advertise the arrest records of White *American Idol* contestants like Hicks, Bice, James, Langone, Covington or Overmyr ONLY when such Top-Ranking talent had already advanced to the Finalist / Top 12 Rounds. By that time, such contestants had clearly endeared themselves to viewing audiences (and to DEFENDANTS) and were already on the way to a Major Label record deal. So the release of their criminal arrest history by that time could be humanized by the OVERSEER-DEFENDANTS and re-contextualized into a story of redemption and positivity.

# WHY WERE <u>ALL</u> THE DISQUALIFIED CONTESTANTS BLACK?

## A.    POLITICAL MOTIVATION

**(1)    SHAPING PUBLIC POLICY**

1059.    In 2010, Harvard University Press published an award-winning historical treatise entitled THE CONDEMNATION OF BLACKNESS: RACE, CRIME AND THE MAKING OF MODERN URBAN AMERICA[22] by Khalil Gibran Muhammad, Ph.D., who is the Director of the Schomburg Center for Research in Black Culture at the New York Public Library [23] [CDC_005757] ("THE CONDEMNATION OF BLACKNESS").

1060.    The main thesis of Dr. Muhammad's Award-Winning literary work reads:

   ◆    **THE CONDEMNATION OF BLACKNESS demonstrates and explains how ideas of racial inferiority and crime became fastened to African-Americans by contrast to ideas of class and crime that shaped views of European immigrants and working-class whites.  [CDC_005771]**

   ◆    **Chronicling the emergence of <u>deeply embedded notions of black people as a dangerous race of criminals by explicit contrast to working-class whites</u> and European immigrants.**

   ◆    **THE CONDEMNATION OF BLACKNESS] reveals the influence such ideas have had on urban development and social policies.  [CDC_005758]**

   ◆    **The racial project of making blacks the "thing against which normality, whiteness, and functionality have been defined," was foundational to the making of modern urban American.  [CDC_005772] (emphasis added)**

**(2)    USING CRIME STATISTICS AS A TOOL OF SUPPRESSION**

1061.    THE CONDEMNATION OF BLACKNESS states, as points of historical fact, that crime statistics showing a disproportionate amount of black prisoners were used as a means to

---

[22] Muhammad, Khalil Gibran, THE CONDEMNATION OF BLACKNESS: RACE, CRIME AND THE MAKING OF MODERN URBAN AMERICA, <u>Harvard University Press</u> (2010), as cited throughout the paragraphs of this section D.(5).

[23] Dr. Muhammad is a former professor of African-American history at Indiana University. His authoritative treatise THE CONDEMNATION OF BLACKNESS won the American Studies Association John Hope Franklin Publication Prize, an annual prize awarded to the best published book in American studies.  He is the great-grandson of Elijah Muhammad.

systematically deprive U.S. citizens of their equal rights under the law:

> ♦    **At the dawn of the twentieth century, in a rapidly industrializing, urbanizing and demographically shifting America, blackness was refashioned through crime statistics...[CDC_005770]**

> ♦    **From the 1890s through the 1930s, from the Progressive era through Prohibition, African-Americans had no monopoly on social banditry, crimes of resistance, or underground entrepreneurship; the 'weapons of the weak' and 'lower-class oppositional culture' extended far and wide and in many directions.  [CDC_005771]**

> ♦    **With the publication of the 1890 census, <u>prison statistics</u> for the first time <u>became the basis of a national discussion about blacks as a distinct and dangerous criminal population</u>. [CDC_005768]**

> ♦    **New statistical and racial identities forged out of raw census data showed that African-Americans, as 12 percent of the population, made up 30 percent of the nation's prison population. [CDC_005769]**

> ♦    **Although specially designed <u>race-conscious laws</u>, <u>discriminatory punishments</u>, and new forms of everyday racial surveillance had been institutionalized by the 1890s as a way <u>to suppress black freedom</u>, white social scientists presented the new crime data as objective, color-blind, and incontrovertible. [CDC_005769]**

> ♦    **From this moment forward, <u>notions about blacks as criminals materialized in national debates about the fundamental racial and cultural differences between African-American and native-born whites</u> and European immigrants. [CDC_005769]**

> ♦    **These debates also informed questions about appropriate levels of African-American access to the social and economic infrastructure of the nation.  [CDC_005769]**

## (3)    PERPETUATING IMAGES OF WHITE SUPREMACY

1062.  THE CONDEMNATION OF BLACKNESS states that white America's association of

blacks with crime required a corresponding disassociation of whites from criminality.

> ♦    **Progressive era white social scientists and reformers often reified the racial criminalization process by <u>framing white criminals sympathetically</u> as victims of industrialization. [CDC_5773]**

> ♦    **[White sociologists] described a "great army of unfortunates" juxtaposed against an army of self-destructive and pathological blacks**

who were their "own worst enem[ies]." [CDC_5773]

◆  **Consequently, white criminality gradually lost its fearsomeness.** [CDC_005770]

◆  **The racial-cultural content of white ethnic criminality gradually began to lose its currency during the Progressive era, while black criminality became more visible (and more contested by blacks).** [CDC_5774] **(emphasis added)**

1063.  Dr. Muhammad explains, as a point of historical fact, that these false notions of black criminality resulted in widely-accepted practices of racial discrimination and stereotyped-thinking:

◆  **For white Americans of every ideological stripe . . . <u>African-American criminality became the most-widely accepted bases for justifying prejudicial thinking, discriminatory treatment, and/or acceptance of racial violence as an instrument of public safety."</u>** [CDC_005769]

◆  **[Using black crime statistics] as an "objective" measure, it also became a tool to shield white Americans from the charge of racism when they used black crime statistics to support discriminatory public policies and social welfare practices."** [CDC_005773]

1064.  Black crime statistics are used as means to indoctrinate the white American masses with the message of white supremacy and black inferiority.

◆  **Beginning in the late Nineteenth century, the statistical rhetoric of the <u>"Negro criminal" became a proxy for a national discourse on black inferiority.</u>** [CDC_005773]

◆  **In a moment when most white Americans believed in the declining significance of racism, <u>statistical evidence</u> of <u>excessive rates of black arrests</u> and the <u>overrepresentation</u> of black prisoners in the urban North was seen by many whites as indisputable proof of <u>black inferiority</u>.** [CDC_5773]

## (4)  INDOCTRINATION OF TARGET AUDIENCES

1065.  Racial propaganda" is a form of a hate speech because it encompasses words and images that attempt to define negative attributes about an entire group of people who share similar ancestral characteristics.

1066.   According to the U.S. Department of Commerce, the definition of "Hate speech should … encompass words and images that 'manifest evidence of prejudice based on race, religion, sexual orientation, or ethnicity.'"

1067.   Images that are used to reinforce the myth of "Black criminality" that are seen in motion pictures or on television are often sensationalized and highly exaggerated for the intended effect of perpetuating the false myth.

1068.   Racial propaganda is used to indoctrinate vast numbers of citizens into a system of false and derogatory beliefs about an entire group of people.  This form of indoctrination is specifically intended to deprive members of the stereotyped group of their political, socio-economic and civil rights.

1069.   Racial propaganda also serves an economic function, i.e. to subjugate the property rights and labor force of an entire group of people to the unfettered control of the overseer.

## B.   ENTERTAINMENT FOR THE MASSES

### (1)   MINSTREL SHOWS

1070.   In the early nineteenth century, the American minstrel show emerged as one of America's first forms of popular or mass commercial entertainment. The core attraction of the American minstrel show for white mass audiences was the scathing public humiliation and extraordinarily cruel "typecasting" of African-American citizens, who were grotesquely depicted as buffoons or untrustworthy miscreants.

1071.   According to Guthrie P. Ramsey Jr., a Professor of Music at the University of Pennsylvania and distinguished author of the scholarly treatise RACE MUSIC: BLACK CULTURES FROM BE-BOP TO HIP-HOP:

**"One of the legacies of Nineteenth-century Minstrelsy involved the <u>public degradation</u> of the <u>black body</u> in the <u>American entertainment sphere</u>."[24]**

1072.   The historical significance of the American minstrel show has been well-documented and discussed by Jeffrey O.G. Ogbar, Ph.D, a Professor of History at the University of Connecticut,[25] in his scholarly publication HIP-HOP REVOLUTION: THE CULTURE AND POLITICS OF RAP, University Press of Kansas (2007) [CDC_005513].  Professor Ogbar states:

**"Rooted in the antebellum era's <u>crude and vicious notions of racial subjugation</u>, the minstrel figure remains a touchstone for African American intellectuals, artists, and cultural critics alike…The <u>popular fixation</u> of <u>black people</u> as <u>criminal</u>, lazy, witless <u>miscreants</u> in <u>American popular culture</u> has been <u>well-documented</u>." [CDC_005537][26]**

1073.   Consistent with Professor Ogbar's authoritative treatise, and as points of historical fact in the case at bar, the minstrel show as a form of American popular entertainment was used as a vehicle to indoctrinate the white masses with false notions of white supremacy and black subjugation based on vicious racial stereotypes.

  ◆   **<u>Minstrelsy depicted black people</u> as <u>infantile</u> and <u>pathological</u> while <u>underscoring</u> the <u>importance of race</u> to the <u>meaning of democracy in America</u>. In an age that saw the expansion of voting to all white men, the <u>ubiquitous image</u> of the black minstrel . . . <u>affirmed the notion that black men were unfit for the responsibilities of democracy</u>." [CDC_005537]**

  ◆   **The <u>hostile images</u> of <u>black people</u> in <u>minstrelsy</u> <u>helped to promote</u> alliance between northern white workers and southern planters by <u>affirming</u> a universal commitment to <u>white supremacy</u> and its corollary <u>black subjugation</u>. [CDC_0005538]**

  ◆   **The <u>most important function</u> of the minstrel was its role in <u>rationalizing white supremacy</u>. The minstrel . . . was, in effect, an inversion of the white man…offer[ing] a <u>sharp contrast</u> to articulations of <u>whiteness</u> and <u>national identity</u>.**

---

[24] Ramsey Jr., Guthrie P., RACE MUSIC: BLACK CULTURES FROM BE-BOP TO HIP-HOP (MUSIC OF THE AFRICAN DIASPORA), P. 51, <u>University of California Press</u> (2004)

[25] In June 2012, Professor Ogbar was named the University of Connecticut's Vice Provost for Diversity.

[26] Ogbar, Jeffrey O.G., HIP-HOP REVOLUTION: THE CULTURE AND POLITICS OF RAP, <u>University Press of Kansas</u> (2007) [for all paragraphs thereafter in this section D.(3)]

◆  The enduring [negative] image[s] insisted that <u>black people</u> were fundamentally <u>ill equipped to compete with white people</u> in any meaningful way. [CDC_0005538]

◆  In no uncertain terms, these <u>stereotypes</u>, or "<u>controlling images,</u>" to paraphrase Patricia Hill Collins, affirmed the guiding principles of <u>white supremacy</u> by revealing the importance of <u>white paternalism</u> and <u>domination</u>. [CDC_0005538]

1074.  Consistent with Professor Ogbar's authoritative treatise, the purpose of using entertainment as a vehicle to indoctrinate the American masses with false racial ideology was to justify racial subordination in terms of social, political and economic opportunity in the United States. [CDC_0005538]

## (2)   MODERN CRIME SHOWS

1075.  An inordinate amount of popular television shows that focus on American criminality, such as "Cops" or "America's Most Wanted", as well as ten o'clock news programs disproportionately convey images of street crime and illicit drug trafficking featuring African-American suspects.

1076.  In contrast, when whites are depicted as criminals on national television, it is generally in the capacity of "white collar crime," such as with Bernie Madoff.

## C.    CORPORATE CULTURE

## (1)   OLD WORLD BIGOTRY

1077.  In the case of *American Idol*, the OVERSEER-DEFENDANTS, LYTHGOE & WARWICK, are white men in their mid-60s from Great Britain who simply did not grow up in a multi-cultural society.  Plaintiffs aver that both men harbor cold, deep-seated bigotry against people of African descent. While appearing on the set of *American Idol*, the OVERSEER-

233

DEFENDANTS adopted a "patriarchal" or condescending tone directed at Black contestants and support staff.

1078.  Lythgoe often referred to full grown black men as "boy" including in some references to Plaintiff Watson.

1079.  The OVERSEER-DEFENDANTS contributed vastly to the ultimate decisions concerning which *American Idol* contestants to publically humiliate – and who to spare from humiliation.  In every case involving criminal arrest records, they always choose to humiliate Black contestants.  They easily could have dismissed the Public-DQ-Plaintiffs quietly.   Instead, the OVERSEER-DEFENDANTS perpetuated the false myth of Black criminality in both the content and promotion of *American Idol*, driving the show to reach its ratings peaks from 2003-2008 (the time period when all of the Plaintiffs named herein were featured on the show).

1080.  LYTHGOE had already started using the criminal records of Reality TV contestants to boost ratings back in the U.K. before *American Idol* debuted in 2002.  Back in Europe, he was called "Nasty Nigel" and he appeared to relish destroying people's lives on national TV.

1081.  LYTGHOE had a great deal to say about the criminal background check process, he knew all about how it worked, and understood how to push the media's buttons, including how to disseminate a Contestant's criminal records to his favorite tabloid sites, Smoking Gun and TMZ.

1082.  For all of the OVERSEER-DEFENDANTS' penchant for cruelty, they could never bring themselves to disqualify one single White *American Idol* Contestant from 2002-2012.   Not one.  Yet, they threw young, unsuspecting black people under the bus without a care in the world – and relished it.  The OVERSEER-DEFENDANTS just didn't care about the lives of the young men

they were destroying with their racial propaganda, or the impact that their cruelty would have and continues to have on Plaintiffs' family and friends.

## (2)    INSIDIOUS PROPAGANDA

1083.   The OVERSEER-DEFENDANTS' rock-solid, invariable pattern of disqualifying Black contestants as part of the most popular U.S. television show in modern history was also in line with the ideological roots of their Master, FremantleMedia, which is an outfit controlled and supervised under the umbrella of a German-based enterprise called Universum Film A.g. ("UFA"), the audio-visual wing of the Bertlesmann empire.

1084.   UFA has a long history in the communications industry, dating back to the World War II era, which includes the mass dissemination of some of the most insidious racial propaganda known to mankind.

1085.   FREMANTLE's corporate history is relevant to the element of racial *animus* or stereotyped-thinking in THIS case (as one part of the "total mix" of information).

## (3)    RACE-BAITING

1086.   In 2011, the NETWORK-DEFENDANTS' parent company News Corp. (now under a different name) was convicted of civil rights violations against Blacks in Australia.[27] Shortly before that incident, one of the NETWORK-DEFENDANTS' U.S. news correspondents actually campaigned to reinstitute 1950s-era Jim Crow laws that would segregate public places, like McDonalds, into "White only" establishments.[28]

1087.   In late February 2009, the NETWORK-DEFENDANTS' subsidiary published an

---

[27] www.theaustralian.com.au/media/andrew-bolt-x-racial-vilification-court-case/story-e6frg996-1226148919092

[28] http://mediamatters.org/mmtv/201005200033

editorial cartoon that depicted two white police officers shooting a chimpanzee while stating "They'll have to find someone else to write the next stimulus bill." The dead primate depicted in the cartoon was construed by sensible readers as an obvious reference to President Obama, who had just taken the office of the presidency. The Nation was outraged, and News Corp. CEO Rupert Murdoch was actually forced to make a rare public apology.[29]

1088.   These types of racially derogatory publications by NETWORK-DEFENDANTS tend to bolster the element of racial *animus* or stereotyped-thinking in THIS case (as one part of the "total mix" of information).

## D.    SCANDAL-MONGERING

### (1)    TEMPTATION ISLAND

1089.   Beginning in January 2001, the NETWORK-DEFENDANTS initiated their long-standing pattern or practice of *publicly* disqualifying African-American Reality TV show contestants.

1090.   *Temptation Island* was a FOX Reality TV program aimed to test the fidelity of unmarried but long-established couples who were taken to a Caribbean resort, split up for two weeks and surrounded with attractive prospective partners. At the conclusion of the show, contestants could elect to stay with their existing partner or go off with one of the island's single inhabitants. Season One of the show premiered on January 10, 2001 and aired its finale on February 28, 2001.

1091.   Ytossie Patterson, then aged 34, and Taheed Watson, aged 29, both aspiring actors, were among four couples featured on the program. They were the only African-American couple

---

[29] http://www.guardian.co.uk/media/2009/feb/24/rupert-murdoch-sorry-chimpanzee-cartoon

to be featured on the show and had been dating for almost six years.  They had a two-year-old son together.  Patterson and Watson were a photogenic couple and were actively recruited by the show's producers to participate in the program.

1092.  On Monday, January 29, 2001, about half-way through the series telecast, FOX "leaked" to the press that the coming week's episode of *Temptation Island* would feature a "mini-scandal," a disqualification of one of the couples from the island. FOX publicists did not reveal the identity of which couple would be removed.

1093.  On Wednesday, January 31, 2001, Patterson and Watson were disqualified from *Temptation Island* during an episode where the couple was confronted by producers on-air with the newfound "revelation" about their two-year-old child.  Patterson and Watson were presented by the Network-Defendants as liars who shamelessly concealed the existence of their child from Producers of the show. The January 31, 2001 episode marked the highest ratings *Temptation Island* had received in its first (and most successful) season in the wake of the well-publicized banishing of Watson and Patterson.

1094.  Defendant FOX issued a statement to the press stating that the couple had misrepresented their status by failing to disclose the existence of their two-year-old child. FOX stated that it was the network's policy "that no couples with children could participate in the show…. As soon as producers learned of the existence of the child, they notified the network and the decision was made to immediately remove them from further participation." FOX claimed that the background check agency engaged to vet all participants on FOX's unscripted series had failed to discover the existence of the couple's child.

## (2)    DEFAMATION LAWSUIT [March 2001]

1095.   On or about March 28, 2001, Patterson and Watson filed a lawsuit against FOX and the show's producer in Los Angeles Superior Court seeking damages for defamation and intentional infliction of emotional distress.   In the civil lawsuit, the couple maintained that the producers always knew that the couple had a child and that their disqualification from the program was a cynical attempt to boost ratings for *Temptation Island.*

1096.   In the days following the commencement of the lawsuit, a simple background check conducted by the LOS ANGELES TIMES easily uncovered a paternity suit regarding the birth of Patterson and Watson's son in 1999 that would have revealed the child's existence to producers. The LOS ANGELES TIMES concluded that based on their own basic investigative efforts, FOX either failed to conduct a background check or chose to overlook the couple's status.

1097.   As per the couple's complaint, "[t]he footage was edited to exclude plaintiffs' responses to the producer's accusations, and falsely portrayed plaintiffs as mischievous and immoral, that they had in fact concealed the existence of their own child and that they had nothing to say about it in the face of this disgraceful tongue lashing."

1098.   Patterson and Watson alleged that FOX and the Producer had acted with "malice, oppression and fraud" and that they "intentionally and/or recklessly shamed and maligned [the couple] to boost ratings for their show."

1099.   It is virtually certain that the NETWORK-DEFENDANTS generated more revenue from airing the couple's scandal on television than whatever sum they paid to settle the case   And, thus, the NETWORK-DEFENDANTS learned that in the Reality TV industry, the reward for breaking the law was far greater than the risk of punishment.   And therein lies the problem that this case seeks to remedy.

# CLASS ACTION ALLEGATIONS

1100.  Plaintiffs bring this action under Count I and Count VII in their own individual capacity and on behalf of a class of persons under Rule 23(a), Rule 23(b)(2), Rule 23(b)(3) and Rule of the FEDERAL RULES OF CIVIL PROCEDURE.

## A.    DEFINITION OF PROPOSED CLASS

## (1)    BLACK GOLDEN TICKET HOLDERS (2002-2012) [Males Only]

1101.  The named Plaintiffs seek to represent a class defined as follows: all African-American males who have earned a Golden Ticket to compete in the *American Idol* Contest at any time from April 20, 2002 through November 15, 2012 (Season One through Season Twelve) (the "Class")

1102.  The named Plaintiffs seek to help eradicate the evil of employment discrimination based on false racial stereotypes that continue to deprive Plaintiffs and others in their protected class of the full benefits and privileges of rights ascribed to them as natural-born citizens of the United States.

1103.  The proposed Class definition is "precise, objective and presently ascertainable."[30]

1104.  The named Plaintiffs are each an individual member of the proposed Class.

1105.  Plaintiffs have alleged herein acts of racial disparate treatment by ENTERPRISE-DEFENDANTS against African-American females, specifically against Frenchie Davis, Ashlynn C., Halicia T. and Tatiana D. and aver that both African-American males and females were victimized by ENTERPRISE-DEFENDANTS' pattern or practice of racial discrimination in

---

[30] MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.14 (3d ed.1995)

ENTERPRISE-DEFENDANTS' employment practices.

1106.  It is appropriate to limit the prospective Class in the first instance to African-American <u>males</u> only because:

(a)    the Civil Rights statutes were intended to provide a legal remedy to those citizens who are victimized by false, negative stereotypes associated with one's ancestral background.  The pernicious stereotype challenged here is largely imposed by American mass media on Black males;

(b)    young Black American *males* have historically suffered and continue to be victimized by stigmatization in the U.S. workplace associated with the outmoded negative stereotype of the "black criminal" that has largely been propagated by U.S. mass media.

(c)    limitation of the class to African-American males, in the first instance, will make the litigation more manageable in the furtherance of efficiency and economy to the parties and the Honorable Court.

(e)    all of the named Plaintiffs are male.

## (2)    RESERVATION OF RIGHT TO AMEND CLASS

1107.  Plaintiffs respectfully reserve the right upon the Honorable Court's leave to amend the definition of the Class during or following discovery.

1108.  As of the filing of this Class Action Complaint, Plaintiffs expressly contemplate that the Class will expand to include African-American *females*.

1109.  Plaintiffs also contemplate that the Class may expand to incorporate African-American contestants (male or female) who have applied for employment in other Reality TV Contests that are produced by Defendant FREMANTLE and broadcast by Defendant FOX in the United States, particularly the program entitled *X Factor* (which has been broadcast in the U.S. for two seasons in 2011 and 2012).

**B.    NUMEROSITY** [Fed. R. Civ. P. 23(a)(1)]

1110.   The Class is so numerous that joinder of all members is impracticable.

1111.   The Class contemplates the inclusion of U.S. citizens or permanent residents throughout the United States and it would therefore be inconvenient to litigate multiple lawsuits in different judicial districts nationwide.

1112.   For the twelve seasons of *American Idol*, ENTERPRISE-DEFENDANTS awarded a total of approximately two thousand four hundred and thirty-one (2431) Golden Tickets to Hollywood.  Of these 2431 Golden Tickets, it is estimated that anywhere between 24-29% of the Golden Tickets were awarded to African-American Contestants.  Thus, it is estimated that between 583 and 704 of the Golden Tickets were awarded by the ENTERPRISE-DEFENDANTS to African-American Contestants.

1113.   As between male and female African-American contestants, statistical analysis of the Semi-Finalist Contestants from the first eleven seasons of *American Idol* (2002-2012) shows that a total of fifty (50) Semi-Finalists comprised of African-American females and thirty-nine (39) comprised of African-American males.

1114.   It is estimated that approximately 44% of between 583 and 704 Golden Tickets have been awarded to African-American males.  Thus, including the ten Black males named as Plaintiffs herein, the size of the proposed Class is estimated to be in the range **of 256 and 309** members.

**C.    COMMONALITY** [Fed. R. Civ. P. 23(a)(2)]

**(1)    QUESTIONS OF LAW AND FACT**

1115.   There are questions of law and fact common to the Class that predominate over

any questions affecting the individuals only[31], including but not limited to:

 (a) Whether ENTERPRISE-DEFENDANTS' conduct vis-à-vis members of the Class violate federal civil rights laws;

 (b) Whether ENTERPRISE-DEFENDANTS maintain a systemic policy, practice or "standard operating procedure" for treating Black *American Idol* Contestants in a manner that intends to discriminate against the entire Class on the basis of race or ancestry;

 (c) Whether there are statistically significant disparities between the disqualification of Black *American Idol* Contestants and of similarly situated White and non-Black *American Idol* Contestants sufficient to show the element of Defendants' racial intent;

 (d) Whether ENTERPRISE-DEFENDANTS' employment application questions concerning arrest records violate Section 432.7 of the California Labor Code.

 (e) Whether ENTERPRISE-DEFENDANTS' disqualifications of Black *American Idols* with records of arrest were justified by business necessity;

 (f) Whether injunctive and/or declaratory relief is needed to adequately remedy past or present racial discrimination against the Class and prevent future discrimination against the Class;

 (g) Whether ENTERPRISE-DEFENDANTS' unlawful conduct justifies an award of compensatory damages to the Class, which may include valuable contest prizes or other similar monetary relief to individual members of the Class;

 (h) Whether ENTERPRISE-DEFENDANTS' unlawful misconduct justifies an award of punitive damages on a class-wide basis or to individual members of the Class.

## (2) COMPANY-WIDE POLICY

1116. The commonality requirement is satisfied because the Class members were victims

of a systemic policy, practice and custom of racial discrimination.

1117. As to the commonality requirement, Plaintiffs allege a practice of disparate

treatment in the ENTERPRISE-DEFENDANTS' exercise of unbridled discretion in the disqualification

of Black *American Idol* Male Contestants, thus raising questions of law and fact common to all

---

[31] H. Newberg, I Class Actions § 1450 at 504 (1977).

disqualified contestants.

1118.   ENTERPRISE-DEFENDANTS' practices and policies, coupled with the racial *animus* or stereotyped thinking of foreign national executives, permeate the corporate culture and have resulted in disparate treatment of *bona fide* contestants who happened to be Black.

1119.   PRODUCTION-DEFENDANTS have a history of disseminating vicious racial propaganda dating back to World War II.

1120.   The named Plaintiffs and putative class members were together the victims of a cohesive policy or plan that was motivated by invidious *animus* to exclude African-American males from the *American Idol* Contest based on their past or pending record of criminal arrests.

**(3)    UNIFORMITY OF PRACTICES**

1121.   Decisions to disqualify *American Idol* contestants were not based on any objective criteria or written job descriptions.

1122.   There existed a common mode of exercising discretion that pervaded the entire *American Idol* Enterprise.

1123.   Decisions to disqualify *American Idol* Contestants were not based on any criteria or "contest rules" that were publically disseminated to Contestants before they entered the contest.

1124.   ENTERPRISE-DEFENDANTS' practice of disqualifying Black male contestants based on discretionary authority without reference to any objective criteria has caused Black contestants to be treated differently than every other contestant who was not an African-American male.

1125.   ENTERPRISE-DEFENDANTS' subjective decision-making procedures comprised a common discriminatory link among the named Plaintiffs and the putative Class members.

1126.   ENTERPRISE-DEFENDANTS cannot assert legitimate non-discriminatory reasons for

disqualifying Black *American Idol* Contestants based on their records of arrest or misdemeanor criminal convictions because their background check procedures were not in compliance with federal or state statutes.

1127.   ENTERPRISE-DEFENDANTS engaged in stereotyped-thinking by invoking outmoded notions of the "black criminal" that caused *American Idol* Contestants who happened to be young black males to be disfavored in terms of their advancement as *American Idol* Contestants.

1128.   The criminal conduct exclusions utilized by ENTERPRISE-DEFENDANTS during background checks, which operated to exclude Black males from the contestant pool at a grossly disproportionate level, cannot be shown to be related to singing performance as an *American Idol* contestant, nor shown to be related to winning (or top-ranking in) the *American Idol* contest.

1129.   ENTERPRISE-DEFENDANTS engaged in a continuing pattern of discrimination that deprived each Class member an equal opportunity to compete in the *American Idol* Contest on the basis of their individual merit.

1130.   By discriminating on the basis of a forbidden classification, ENTERPRISE-DEFENDANTS reduced the probability that any single member of the Class would find employment as a *bona fide* contestant on *American Idol*, thereby making competition for the limited number of positions more difficult for the entire Class.

1131.   As a result of ENTERPRISE-DEFENDANTS' racial *animus* and stereotyped thinking about young Black males, all Black employment applicants had less of an opportunity to secure a position in the *American Idol* Contest when compared to White and non-Black applicants.

1132.   ENTERPRISE-DEFENDANTS were at all times prohibited by federal law from injecting into the selection process the *a priori* assumption that Black applicants with records of criminal arrest were less acceptable as professional performers, talent contestants and singers than

White (or non-Black) applicants with records of criminal arrest.

## (4)    UNIFORMITY OF CLASS MEMBERSHIP

1133.  All named Plaintiffs and prospective Class members met the ENTERPRISE-DEFENDANTS' published contest eligibility requirements concerning age and citizenship (or residency).

1134.  All named Plaintiffs and prospective Class Members earned a Golden Ticket to Hollywood from the panel of *American Idol* Expert Judges.

1135.  All named Plaintiffs and prospective Class members executed the *American Idol* CONTESTANT AGREEMENT (and amendments thereto).

1136.  All named Plaintiffs and prospective Class members completed a PARTICIPANT BACKGROUND QUESTIONNAIRE FORM which made written inquiries concerning each Contestant's criminal arrest history.

1137.  All named Plaintiffs and prospective Class Members were subjected to criminal background check processes by ENTERPRISE-DEFENDANTS and their third-party investigative agent, CARCO Group / MMI.

## (5)    MANAGEMENT ORGANIZATION

1138.  ENTERPRISE-DEFENDANTS' management and production organization remained an overwhelmingly White supervisory force that wielded unlimited discretion throughout the Continuing Violations period.

1139.  Upon information and belief, the decisions to disqualify the named Plaintiffs and the prospective Class members based on criminal exclusions, or to implement ENTERPRISE-DEFENDANTS' policy of disqualifying Black *American Idol* Contestants and disseminating their

information to the press, was made by the same group of supervisors, managers, sponsorship representatives and television executives.

1140.   During the *entire* Continuing Violations Period, the decisions to disqualify the named Plaintiffs and the prospective Class members were made by the same core group of supervisory executive producers: Nigel LYTHGOE and Ken WARWICK, both of whom are White.

1141.   Upon information and belief, during the *entire* Continuing Violations Period, decisions to discriminate against the named Plaintiffs and the prospective Class members were made by the same core group of supervisory NETWORK-DEFENDANT executives: Michael DARNELL and Minna TAYLOR, Esq., who are White and Marisa FERMIN, Esq., who is believed to be Hispanic.

1142.   During the *entire* Continuing Violations Period, criminal investigative background checks were conducted by a woman named Sharon Renee GIALLO, who is White.

## C.    TYPICALITY [Fed. R. Civ. P. 23(a)(2)]

1143.   The claims or defenses of the named Plaintiffs are typical of the claims or defenses of the prospective Class members.

1144.   The named Plaintiffs and prospective Class members all occupied the same position as employee applicants and/or employees upon receiving their Golden Ticket to Hollywood.

1145.   The circumstances surrounding Plaintiffs' grievances involving criminal background checks and criminal conduct exclusions and those surrounding the prospective Class members' grievances are typical amongst the Class.

246

1146.  The discriminatory treatment alleged is typical of ENTERPRISE-DEFENDANTS' challenged employment practices.

1147.  ENTERPRISE-DEFENDANTS' employment practices are motivated by a policy of racial *animus* and/or stereotyped thinking that pervades the single common enterprise of companies that manage and operate *American Idol.*

1148.  The compensatory damages sought by Plaintiffs and the compensatory damages sought by the prospective Class members are measured by the same economic indicator, i.e., the value of the prizes for performing in connection with and winning (or top-ranking in) the *American Idol* Contest.

1149.  Plaintiffs' individual and class-wide claims overlap on several elements of proof, including ENTERPRISE-DEFENDANTS' systemic policy of conducting illicit background checks, executing commercial contracts that are void on grounds of illegality, disqualifying Black *American Idol* Contestants on the basis of information obtained from improper background checks, failing to develop objective criteria for disqualifications, and failing to diversify an all White, largely Alien-based supervisory and decision-making force.

1150.  Plaintiffs are each a member of the Class and the employment discrimination claims of each Plaintiff are typical of the claims of the Class.

## D.    ADEQUATE REPRESENTATION

1151.  The representative parties named in this action will fairly and adequately protect the interests of the Class.

1152.  The named Plaintiffs do <u>not</u> have interests that are antagonistic to those of the putative Class members.

1153.   Counsel for Plaintiffs are experienced in complex litigation and are qualified to represent the named Plaintiffs and the Class members.   Moreover, counsel for Plaintiffs are dedicated to vigorously prosecuting the action.

1154.   Plaintiffs will each fairly and adequately protect the interest of the members of the Class, have no interests that are adverse to other members of the Class, and have retained counsel who are competent and experienced in complex litigation.

## E.   CLASS CERTIFICATION

### (1)   FED. R. CIV. P. 23(B)(2)

1155.   ENTERPRISE-DEFENDANTS have acted or refused to act on grounds generally applicable to the entire Class, making final injunctive or corresponding declaratory relief appropriate respecting the Class as a whole.

1156.   While the prospective Class members also herein request monetary relief (i.e., compensatory and punitive damages) as part of their Count II Section 1981 claim, injunctive relief and declaratory relief will predominate employment discrimination-related claims.

1157.   The determination regarding monetary relief sought by the individual named Plaintiffs or the prospective Class members may be potentially deferred until the final remedial phase of the litigation.

### (2)   FED. R. CIV. P. 23(B)(3)

1158.   The major liability questions in this litigation are common to the named Plaintiffs and the prospective Class Members arise from identical core allegations:

(a)      whether the *American Idol* CONTESTANT AGREEMENT, as amended, is void

*ab initio* on grounds of illegality, fraud-in-factum;

(b)    whether the named Plaintiffs and prospective Class members were employee applicants;

(c)    whether the named Plaintiffs and prospective Class members were former employees at-will or employees for cause;

(d)    whether ENTERPRISE-DEFENDANTS' active fraudulent concealment of Plaintiff's legal employment relationship with *American Idol* Contestants suspended the accrual of Plaintiffs' causes of action under employment laws;

(e)    whether ENTERPRISE-DEFENDANTS' repeatedly, knowingly and without justification obtained federal and state regulated background information in order to disqualify Black *American Idol* Contestants (whether publicly or privately);

(f)    revocation of exclusive rights to copyright license

1159.   The common issues of law and fact presented in this Class Action Complaint predominate over any individual issues, including with respect to the criminal background check procedures and written employment application questions utilized by ENTERPRISE-DEFENDANTS to screen the *American Idol* contestants and whether such procedures and inquiries stood in violation of federal and state statutory laws.

1160.   The disparate treatment between Black *American Idol* Contestants and White *American Idol* Contestants respecting criminal conduct exclusions is relevant to establishing ENTERPRISE-DEFENDANTS' systemic policy of racial discrimination.

1161.   A class action procedure is superior to the other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable, as per the "numerosity" analysis stated herein.

1162.   Class certification will achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

249

1163.  The expense and burden of individual litigation makes it impractical for the members of the prospective Class to pursue individual litigation to vindicate their rights.

## (3)    FED. R. CIV. P. 23(B)(4)

1164.  Even if class certification does not satisfy the predominance requirement of Rule 23(b)(3), class certification is appropriate here for the liability phase of "pattern or practice" disparate treatment because there exists particular common issues of fact and law that can be isolated, and which equally impact the Class members, such as:

(a)    whether written employment application questions and consent forms contained in the *American Idol* CONTESTANT AGREEMENT and PARTICIPANT BACKGROUND QUESTIONNAIRE FORM, from Season One (2002) through Season Eleven (2012), and comply with statutory law;

(b)    whether criminal background check procedures utilized by the NETWORK-DEFENDANTS, PRODUCTION-DEFENDANTS, EXECUTIVE-DEFENDANTS and CARCO comply with statutory law.

250

# COUNTS

# COUNT I

## VIOLATION OF CIVIL RIGHTS ACT (1866)

## 42 U.S.C. § 1981
### (MAKING OF *19 ENTERTAINMENT* PRIZE CONTRACTS)

———

**All Plaintiffs (and Prospective Class Members)**
**vs.**
**JOINT-VENTURE DEFENDANTS**

| THEORY OF LIABILITY | DEFENDANT |
|---|---|
| Primary | ENTERPRISE-DEFENDANTS |
| Joint Venture | SPONSORSHIP-DEFENDANTS |
| Conspiracy | SPONSORSHIP-DEFENDANTS |
| Aiding & Abetting | SPONSORSHIP-DEFENDANTS |
| Sponsorship | SPONSORSHIP-DEFENDANTS |

1165. Plaintiffs, each in their individual capacity and on behalf of their prospective Class members, repeat and re-allege each and every allegation above as if set forth herein.

## A.    STANDING

1166. Each Plaintiff (and prospective Class member) is a member of a protected class of U.S. citizen recognized by the federal government as "African-American" or "Black

1167. Each Plaintiff (and prospective Class member) fully complied with the PRODUCER-DEFENDANTS' contest eligibility requirements, as published to U.S. consumers.

1168. Each Plaintiff (and prospective Class member) was awarded a Golden Ticket to Hollywood by the *American Idol* Expert Judges in their respective seasons on account of his individual merit as a singer.

1169.  Each Plaintiff (and prospective Class member) performed all steps necessary to act in compliance with the terms and conditions of the *American Idol* Contest as advertised to U.S. consumers.

1170.  Each Plaintiff (and prospective Class member) earned their right to compete in what JOINT VENTURE-DEFENDANTS purported to be a *bona fide* contest by virtue of his individual performance and singing talent.

## B.    CONTRACTUAL INTEREST (19 Entertainment Prize Contracts)

1171.  On or about March 9, 2003, Plaintiff CLARK signed the 19 ENTERTAINMENT Prize Contracts in *American Idol* Season Two.  [CDC_000477-550]

1172.  On or about February 10, 2009, Plaintiff JOYNER signed the 19 ENTERTAINMENT Prize Contracts in *American Idol* Season Eight. [CDC_003525-3615]

1173.  Plaintiff GOLIGHTLY signed the 19 ENTERTAINMENT Prize Contracts in *American Idol* Season Nine.

1174.  Plaintiffs ANDREWS, SMALLEY, WILLIAMS, T. BRITTENUM, D. BRITTENUM, WATSON, DANIELS would have been required to sign the 19 ENTERTAIMENT Prize Contract in their respective seasons upon reaching the Semi-Final Rounds or Final Rounds had they not been unlawfully disqualified.

1175.  Each prospective Class member would have been required to sign the 19 ENTERTAIMENT Prize Contracts upon reaching the Semi-Final Rounds had they not been disqualified on account of their criminal arrest history.

1176.  According to their express terms, the 19 ENTERTAINMENT Prize Contracts only became effective upon exercise of contractual options.

1177.   Each Plaintiff's (and prospective Class member's) appearance and performance in the *American Idol* Contest constituted a detriment to each Plaintiff (and prospective Class member).

1178.   Each Plaintiff (and prospective Class member) was required to change his position and devote his personal time, energy and physical presence in order to secure his right to compete in the *American Idol* Contest.

1179.   Each Plaintiff (and prospective Class member) was required to perform talent services in the manner prescribed by JOINT VENTURE-DEFENDANTS and for the economic benefit of JOINT-VENTURE DEFENDANTS in order to secure his right to compete in the *American Idol* Contest.

1180.   Each Plaintiff (and prospective class member) was required to disclose confidential information to JOINT-VENTURE DEFENDANTS concerning his personal background and family's background that would not have been disclosed but for his participation in the *American Idol* contest.

## C.   INTERFERENCE

1181.   ENTERPRISE-DEFENDANTS interfered with each Plaintiff (and prospective class member's) contractual, expectancy and/or quasi-contractual interest to redeem the valuable prizes for the *American Idol* Contest by electing to disqualify each Plaintiff (and prospective class member) from the *American Idol* Contest on grounds of a criminal conduct exclusion.

1182.   SPONSORSHIP-DEFENDANTS interfered with each Plaintiff (and prospective class member's) contractual and/or quasi-contractual interest to redeem the valuable prizes for the member) *American Idol* Contest by providing substantial assistance or encouragement to the

ENTERPRISE-DEFENDANTS to disqualify each Plaintiff with knowledge that criminal conduct exclusions were and are an unlawful basis upon which to disqualify each Plaintiff from the *American Idol* Contest.  Moreover, the SPONSORSHIP-DEFENDANTS should have known that the ENTERPRISE-DEFENDANTS' use of criminal conduct exclusions as a basis to disqualify *American Idol* contestants would result in the disparate treatment of African-Americans -  who have been targeted by false stereotypes  of the criminal label – in contrast to other White or non-Black *American Idol* Golden Ticket holders.  Moreover, the SPONSORSHIP-DEFENDANTS ratified each and every disqualification alleged herein, stood to economically benefit from the disqualifications, and accepted such disqualifications as part of the *American Idol* Contest and Production with knowledge that the disqualifications constituted wrongful conduct. Moreover, each of the SPONSORSHIP-DEFENDANTS agreed to share in the profits or losses of the *American Idol* Enterprise over the course of at least eleven continuous years and therefore any claims they now make indicating their lack of knowledge of material facts should be regarded as willful blindness.

## D.    RACIAL INTENT

1183.   Plaintiffs expressly incorporate by reference all allegations in this pleading – and the exhibits attached hereto - related to the element of racial intent, bigotry, racial *animus* and stereotyped-thinking.

1184.   JOINT VENTURE-DEFENDANTS violated 42 U.S.C. § 1981 by refusing to extend to each Plaintiff (and to each member of the prospective Class) the same opportunity to compete for the advertised contest prizes for the *American Idol* Contest that JOINT VENTURE-DEFENDANTS extended to White *American Idol* Contestants.

1185.  All decisions by the ENTERPRISE-DEFENDANTS concerning the application of

*American Idol* Contest rules were subject to ENTERPRISE-DEFENDANTS' absolute, sole and unfettered discretion.

1186.  All decisions by the ENTERPRISE-DEFENDANTS concerning the application of *American Idol* Contest rules were made without any reference to a published set of objective criteria governing disqualification, exclusion and/or elimination from the *American Idol* Contest.

1187.  Black *American Idol* Contestants who earned a Golden Ticket had the same right to make and enforce contracts as enjoyed by White and non-Black *American Idol* Contestants who earned a Golden Ticket in the *American Idol* Contest because the Golden Ticket Holders over the period of eleven consecutive seasons [2002-2012] represented less than 0.002% of the prospective contestant pool from all of those individuals who were deemed eligible to compete for the *American Idol* Contest prizes.  Moreover, all Golden Ticket Holders were purportedly competing for the same Contest Prizes based on the same published terms and conditions and based on the same performance-based evaluation criteria.

1188.  ENTERPRISE-DEFENDANTS altered a fundamental characteristic of the contractual right(s) and/or expectancy interest(s) of each Plaintiff (and prospective Class member) based predominantly on the protected status of each Plaintiff (and prospective Class member) as an African-American citizen.

1189.  But for the status of each Plaintiff (and prospective Class member) as an African-American citizen, he would <u>not</u> have been disqualified from the *American Idol* Contest.

1190.  If each Plaintiff (and prospective Class member) had been White, he would <u>not</u> have been disqualified from the *American Idol* Contest.

1191.   If each Plaintiff (and prospective Class member) had been White or non-Black, he would <u>not</u> have been disqualified from the *American Idol* Contest on grounds of criminal conduct

exclusions.

1192.   Each Plaintiff (and prospective Class member), whether ranked as a Golden Ticket holder, Semi-Finalist or Top Finalist, had a reasonable probability of economic gain, measured by winning or top-ranking in the *American Idol* Contest during their respective seasons.

1193.   As a direct and/or proximate result of ENTERPRISE-DEFENDANTS' conduct, each Plaintiff (and prospective Class member) suffered economic injury in an amount to be determined at trial.

## E.    ABSENCE OF LIMITATIONS

1194.   Before March 14, 2012, none of the Plaintiffs knew, had good cause to believe, nor could have discovered upon the exercise of reasonable due diligence, facts sufficient to state a plausible legal claim under 42 U.S.C. § 1981 that his disqualification from the *American Idol* Contest was predominantly motivated by racial discriminatory intent, bigotry, racial *animus* or "stereotyped-thinking" of any one of the JOINT VENTURE-DEFENDANTS or its agents.

1195.   Before March 14, 2012, none of the Plaintiffs (nor prospective Class members) had Article III standing to file suit under 42 U.S.C. § 1981 because they could not have provided factual evidence to the Court showing a causal connection between the injury of being disqualified and the racial discriminatory intent, bigotry, racial *animus* or "stereotyped-thinking" that was the determinative, motivating factor that led to their respective exclusions from the *American Idol* Contest.

1196.   Before March 14, 2012, none of the Plaintiffs (nor prospective Class members) had prudential standing to file suit under 42 U.S.C. § 1981 because they could not have reasonably presented factual evidence of a pattern or practice demonstrating the ENTERPRISE-

DEFENDANTS' racial discriminatory intent, bigotry, racial *animus* or "stereotyped-thinking," and it therefore would have been highly implausible to satisfy the "Zone of Interest" test, i.e. that any Plaintiff was within the zone of interest protected by 42 U.S.C. § 1981.

1197.  Before March 14, 2012, none of the Plaintiffs (nor prospective Class members) could have retained counsel in good standing to file suit on their behalf under 42 U.S.C. § 1981 so as to meet the standard of objective reasonableness required by Rule 11 of the Federal Rules of Civil Procedure because no pattern or practice indicating the ENTERPRISE-DEFENDANTS' racial discriminatory intent, bigotry, racial *animus* or "stereotyped-thinking" could have been reasonably detected.

1198.  Before MARCH 14, 2012, the ENTERPRISE-DEFENDANTS' racial discriminatory intent, bigotry, racial *animus* or "stereotyped-thinking" which predominantly motivated the decisions to disqualify each Plaintiff (and prospective Class member) was self-concealing because entry in the *American Idol* Contest was aggressively marketed to U.S. consumers as an equal opportunity accessible to all participants regardless of their racial background and because some of the *American Idol* winners and judges were, in fact, African-American.

1199.  But for ENTERPRISE-DEFENDANTS' decision to publically disqualify JXJ on or about March 14, 2012, none of the Plaintiffs (or prospective Class members) could have discovered upon the exercise of reasonable due diligence, facts sufficient to state a plausible claim that his disqualification from *American Idol* was predominantly motivated by racial discriminatory intent, bigotry, racial *animus* or stereotyped-thinking harbored by any one of the ENTERPRISE-DEFENDANTS or its agents.

# COUNT II

## VIOLATION OF CIVIL RIGHTS ACT (1866)

## 42 U.S.C. § 1981
### (MAKING OF *ADVERTISED* PRIZE CONTRACTS)
___

### All Plaintiffs (and Prospective Class Members) Against
### JOINT VENTURE-DEFENDANTS

| THEORY OF LIABILITY | DEFENDANT |
|---|---|
| Primary | ENTERPRISE-DEFENDANTS |
| Joint Venture | SPONSORSHIP-DEFENDANTS |
| Conspiracy | SPONSORSHIP-DEFENDANTS |
| Aiding & Abetting | SPONSORSHIP-DEFENDANTS |
| Sponsorship | SPONSORSHIP-DEFENDANTS |

1200.   Plaintiffs, each in their individual capacity and on behalf of their prospective Class members, repeat and re-allege each and every allegation above as if set forth herein.

1201.   To avoid repetition, Plaintiffs specifically incorporate by reference ALL paragraphs stated in Count I of this Third Amended Complaint except for those under the heading "Contractual Interest – 19 Entertainment Prize Contracts."

1202.   JOINT VENTURE-DEFENDANTS advertised to U.S. consumers that all *American Idol* Contestants, regardless of their race or ethnicity, would be competing for the same Contest Prizes based on the same published terms and conditions.

1203.   JOINT VENTURE-DEFENDANTS represented that winners of the advertised Contest Prize would be awarded – at the very least - a recording contract with the cash equivalent of one million dollars ($1,000,0000.00)

1204.   JOINT VENTURE-DEFENDANTS represented that winners of the Advertised Contest Prizes would be granted certain life-altering privileges and benefits embodied within and flowing from their participation in the *American Idol* Contest

1205.   JOINT VENTURE-DEFENDANTS publicly advertised, marketed and promoted that part of the Advertised Contest Prize for winning *American Idol* was the tangible fulfillment of the "*American Dream*."

1206.   JOINT VENTURE-DEFENDANTS publicly held out the previous winners and front-runners of the *American Idol* Contest - and their respective annual salaries - as tangible fulfillment of the JOINT VENTURE-DEFENDANTS' prize offer of the "*American Dream*" to prospective Golden Ticket holders.

1207.   In response to JOINT VENTURE-DEFENDANTS' market solicitation to enter the *American Idol* Contest, each Plaintiff (and prospective Class member) provided the requested consideration for redeeming the Advertised Contest Prizes by making his own unique talent services available for the economic benefit of the JOINT VENTURE-DEFENDANTS.

1208.   The valuable prizes, benefits and privileges that were advertised by JOINT VENTURE-DEFENDANTS constituted a reasonably foreseeable economic benefit in exchange for the participation of each Plaintiff (and prospective Class member) in the *American Idol* Contest.

1209.   JOINT VENTURE-DEFENDANTS' market solicitation to U.S. consumers to enter the *American Idol* Contest at a specified time and place constituted an offer to each Plaintiff (and each prospective Class member) of a valuable prize in exchange for participation in the advertised contest.

1210.   Each Plaintiff (and prospective Class member) possesses a contractual and/or quasi-contractual interest in the *advertised prize(s)* for becoming "the next American Idol." This

contractual and/or quasi contractual interest was founded upon a meeting of the minds, which although not embodied in an express written contract, is or was inferred, as a fact, from conduct of the parties showing, in the light of surrounding circumstances, their tacit understanding.

1211.  As a direct and/or proximate result of ENTERPRISE-DEFENDANTS' conduct, each Plaintiff (and prospective Class member) suffered economic injury in an amount to be determined at trial.

# COUNT III

## VIOLATION OF CIVIL RIGHTS ACT (1991)

### 42 U.S.C. § 1981
### (BREACH OF COVENANT OF GOOD FAITH & FAIR DEALING)
### *AMERICAN IDOL* CONTESTANT AGREEMENTS

—

### All Plaintiffs (and Prospective Class Members) Against
### JOINT-VENTURE DEFENDANTS

| THEORY OF LIABILITY | DEFENDANT |
|---|---|
| Primary | ENTERPRISE-DEFENDANTS |
| Joint Venture | SPONSORSHIP-DEFENDANTS |
| Conspiracy | SPONSORSHIP-DEFENDANTS |
| Aiding & Abetting | SPONSORSHIP-DEFENDANTS |
| Sponsorship | SPONSORSHIP-DEFENDANTS |

1212.   Plaintiffs, each in their individual capacity and on behalf of their prospective Class members, repeat and re-allege each and every allegation above as if set forth herein.

1213.   To avoid repetition, Plaintiffs specifically incorporate by reference ALL paragraphs stated in Count I of this Third Amended Complaint except for those paragraphs under the headings "Contractual Interest – 19 Entertainment Prize Contracts" and "Interference."

1214.   At all relevant times, JOINT-VENTURE DEFENDANTS publicly advertised the *American Idol* Contest to the U.S. public as a *bona fide* contest both in law and in fact and were therefore required to conduct the contest in good faith and consistent with the reasonable expectations of the solicited contestants.

1215.   By advertising *American Idol* as a *bona fide* contest for valuable prize in which Expert Judges and the public vote would decide the outcome of the Contest, ENTERPRISE-

DEFENDANTS promised each Plaintiff (and prospective class member) that his talent as a singer would be evaluated based on individual merit.

1216.  From the date that each Plaintiff (and prospective class member) was awarded a Golden Ticket to Hollywood, JOINT-VENTURE DEFENDANTS had an obligation to treat each Plaintiff (and prospective class member) in good faith and consistent with his reasonable expectations.

1217.  By offering to contract with each Plaintiff (whether express or implied), JOINT-VENTURE DEFENDANTS were required by law to conduct themselves at all times in good faith vis-à-vis each Plaintiff (and the prospective Class member) in his capacity as a *bona fide* prize contestant in-fact and at law.

1218.  Each Plaintiff's right to be treated in good faith via his participation as a Contestant in the *American Idol* Contest is derived from: (a) execution of the *American Idol* Contestant Agreement; (b) FCC regulations; and/or (c) reasonable expectations that necessarily arise via a contest sponsor-contestant relationship.

1219.  DEFENDANTS violated 42 U.S.C. § 1981 by refusing to extend to each Plaintiff, and to each member of the prospective Class, the same opportunity to compete in a *bona fide* contest for valuable prize that DEFENDANTS extended to White *American Idol* Contestants who had a chance to compete on their merits.

1220.  At all relevant times, ENTERPRISE-DEFENDANTS' decision to disqualify each Plaintiff (or prospective Class member) from the *American Idol* Contest constituted an intentional and/or purposeful action on the part of ENTERPRISE-DEFENDANTS.

1221.  ENTERPRISE-DEFENDANTS' act of disqualification as to each Plaintiff (or prospective Class member) constituted an intentional interference with each Plaintiffs' enjoyment

263

all of the benefits and privileges derived from the covenant of good faith and fair dealing inherent in all contracts.

1222.  ENTERPRISE-DEFENDANTS' unilateral decisions to disqualify each Plaintiff (and prospective Class member) from the *American Idol* Contest deprived each Plaintiff (and prospective Class member) of his contractual right, quasi-contractual interest and/or expectancy interest to:

(a) compete in good faith for the valuable *American Idol* Contest Prize based on the merits; <u>and</u>

(b) increase the value of his own right to publicity via  participation in the *American Idol* Contest and Production; <u>and</u>

(c) enjoy his own good name and reputation in the community at large;

(d) capitalize from the PRODUCER-DEFENDANTS' exploitation of his copyright interests in his own performance via participation in the *American Idol* Contest and Production; <u>and</u>

(e) enjoy all of the benefits and privileges of their contractual relationship or prospective contractual relationship(s) with  THIRD PARTIES.

# COUNT IV

## VIOLATION OF CIVIL RIGHTS ACT

## 42 U.S.C. § 1981
### (EMPLOYMENT CONTRACT)
### FAILURE TO HIRE - All Plaintiffs and Prospective Class members [1866]
### TERMINATION – Plaintiff Clark [1991]
___

### All Plaintiffs and Prospective Class members Against
### EMPLOYER -DEFENDANTS

1224.  Plaintiffs in their individual capacity, and and on behalf of prospective Class members, repeat and re-allege each and every allegation above as if set forth herein.

**EMPLOYMENT STATUS**

1225.  Plaintiff CLARK is "African-American" or "Black."

1226.  Plaintiff Clark is the only *American Idol* Top 10 Finalist named as Plaintiff.

1227.  In March 2003, Plaintiff CLARK, unbeknownst to him at the time, signed an employment contract with PRODUCER-DEFENDANTS without the benefit of counsel.

1228.  Upon the request of PRODUCER-DEFENDANTS, Plaintiff Clark also signed a completed Federal I-9 Form for Employment Verification, listing Defendant AMERICAN IDOL PRODUCTIONS, INC. as Mr. Clark's "employer."

1229.  Each Plaintiff (and prospective Class member) [excluding CLARK] was an employee applicant of the corporate EMPLOYER -DEFENDANTS.

1230.  Each Plaintiff (and prospective Class Member) met the eligibility requirements to compete in the *American Idol* Contest and appear as principal performers on television.

1231.  The singing and performing talent of each Plaintiff (and prospective Class member) was subjected to professional analysis and review by a panel of *American Idol* Expert Judges.

1232.  Each Plaintiff  (and prospective Class member) received a Golden ticket to Hollywood after being deemed qualified by the Expert Judges.

1233.  Having met the published eligibility requirements and having received a Golden Ticket to Hollywood based on his individual merit as singers who were adjudged qualified to become "the next *American Idol,"* each Plaintiff (and prospective Class member) was qualified for his position to perform as a singer on television and qualified to redeem the valuable contest prizes advertised by THE JOINT VENTURE-DEFENDANTS.

1234.  As set forth in this Third Amended Complaint, each Plaintiff suffered adverse employment action because the EMPLOYER-DEFENDANTS disqualified him from his role in the *American Idol* Production for reasons unrelated to his singing or artistic performance merit.

1235.  Each of the prospective Class members were terminated as a result of criminal arrest information obtained during the EMPLOYER-DEFENDANTS' background check process.

1236.  EMPLOYER-DEFENDANTS  have  violated  Section  1981  by  intentionally discriminating against each Plaintiff (and each prospective Class Member) with respect to the terms, conditions and benefits of their employment or prospective employment.

1237.  EMPLOYER-DEFENDANTS have violated Section 1981 by failing to treat each Plaintiff and each prospective Class Member on equal grounds as White (or non-black) *American Idol* contestants who similarly received Golden Tickets.

## CHALLENGED EMPLOYMENT PRACTICES

1238.  EMPLOYER-DEFENDANTS have violated Section 1981 by applying a different set of employment practices to White (and non-Black) *American Idol* Contestants than were applied to Black *American Idol* Contestants.

1239.  Discriminatory application of these employment practices was the "standard operating procedure" of EMPLOYER-DEFENDANTS who deprived each Plaintiff (and each prospective Class Member) of the opportunity to compete on the basis of their merit as performers.

## (1)    PUBLIC DISQUALIFICATIONS

1240.  The televised (or internet-promoted) event of disqualification from *American Idol* constituted an hostile act of being divested of all privileges and benefits of participation on the program (including the opportunity to win the prize), denigrated before untold millions of fellow citizens, viewed as a disappointment by one's own family and friends, and permanently labeled on the internet as an *American Idol* "reject" or "criminal."

1241.  Over the course of the show's eleven year history, the adverse action of being "officially disqualified" from *American Idol* was reserved exclusively for Black American Idol contestants.

1242.  Plaintiffs' status as African-American citizens was a determinative factor which motivated Corporate EMPLOYER-DEFENDANTS to intentionally interfere with each Plaintiff's and each prospective Class Member's rights, benefits and privileges as an employee or employee applicant.

1243.  But for Plaintiffs' status as African-American citizens with a criminal arrest history, Plaintiffs would not have been publicly humiliated by Corporate EMPLOYER-DEFENDANTS

in connection with their participation on *American Idol*.

## (2)  CRIMINAL CONDUCT EXCLUSIONS

1244.  EMPLOYER-DEFENDANTS have maintained an unlawful policy or practice that excludes African-Americans from competing in the *American Idol* contest based on criminal arrest history obtained via the background check process.

1245.  The background check procedures and written forms employed by the EMPLOYER-DEFENDANTS to screen *American Idol* contestants did <u>not</u> comply with the statutory mandates proscribed by federal and California law.

1246.  EMPLOYER-DEFENDANTS engaged in the unlawful policy and practice of criminal conduct exclusions that negatively affected each Plaintiff (and prospective Class Member).

1247.  Based on the statistical disparity in criminal conduct exclusions evidenced by the public record, there is probable cause to suspect that members of the prospective Class were disqualified "behind-the-scenes" (i.e., not publically) in a disproportionate amount relative to non-members of the Class who completed identical background question forms.

1248.  As a pattern or practice of conducting its ordinary course of business, EMPLOYER-DEFENDANTS utilized Plaintiff's background information derived from EMPLOYER-DEFENDANTS' background check process to disqualify each Plaintiff.

1249.  Racial discriminatory practices in the methods used to conduct background checks of Black *American Idol* contestants was the EMPLOYER-DEFENDANTS' "standard operating procedure" from April 2002 through until at least January 25, 2013.

## (3)  UNEQUAL ASSISTANCE IN RESOLVING OUTSTANDING PROCEEDINGS

1250.  EMPLOYER-DEFENDANTS have treated criminal history information of its White

*American Idol* Contestants in vastly disparate ways as compared to Black *American Idol* contestants. [CDC_007688].

1251.  Whenever a criminal background check revealed information of a pending case, EMPLOYER-DEFENDANTS assisted white *American Idol* Contestants to resolve any outstanding matters, whether through criminal and traffic court proceedings or even commercial litigation. Such assistance was offered to white or non-Black contestants in a disproportionate amount of cases relative to Black contestants whose background checks revealed pending cases.

**(4)    DISTRIBUTION OF BACKGROUND INFORMATION TO PRESS**

1252.  From April 2002 through at least January 25, 2013, EMPLOYER-DEFENDANTS engaged in an unlawful policy or practice of utilizing the criminal arrest information (and other confidential information) obtained from contestant background checks as a form of commercial advertising to draw audiences for the *American Idol* television program.

1253.  From April 2002 through until March 2012, it was the standard operating procedure for EMPLOYER-DEFENDANTS to publicly condemn top-ranking Black *American Idol* Contestants through the dissemination of their criminal background information to both tabloid and traditional media outlets.

1254.  EMPLOYER-DEFENDANTS' unfettered decision to stigmatize Plaintiffs as criminals constituted an intentional and/or purposeful action on the part of ENTERPRISE-DEFENDANTS.

1255.  As a pattern or practice of conducting its ordinary course of business, EMPLOYER-DEFENDANTS have NEVER once utilized criminal background information to publicly disqualify a White (or non-Black) contestant from *American Idol.*

1256.  EMPLOYER-DEFENDANTS' adverse action of utilizing Plaintiffs' background

information derived from ENTERPRISE-DEFENDANTS' background check process to humiliate Plaintiffs constituted an interference with Plaintiffs' rights as an employee or an applicant for employment.

1257.   Through the unlawful procurement, public disclosure and commercial exploitation of their criminal arrest and/or expunged conviction information, EMPLOYER-DEFENDANTS interfered with the Plaintiffs' rights as an employee or an applicant for employment.

## (5)     FAILURE TO ADOPT BEST PRACTICES

1258.   EMPLOYER-DEFENDANTS have failed to train its managers, hire officials or guide its decision-makers with respect to the U.S. federal and state laws prohibiting discriminatory conduct in the workplace.

1259.   EMPLOYER-DEFENDANTS have failed to adhere to best employment practices for the course of the last decade when:

(a)     considering criminal record information as a factor when making adverse decisions concerning ENTERPRISE-DEFENDANTS' conduct in the workplace.

(b)     complying with the law by implementing policies and procedures designed to prevent unlawful discrimination in the workplace.

(c)     promoting and/or sponsoring a purported *bona fide* contest under U.S. law.

(d)     developing a narrowly tailored written policy and procedure for screening applicants and employees for criminal conduct;

(e)     identifying essential job requirements and the actual circumstances under which the jobs are performed;

(f)     disclosing to prospective contestants (i.e., pre-Golden Ticket) the specific offenses that may demonstrate a Contestant's unfitness for performing the job required;

(g)     recording the justification for the policy and procedures implemented in connection with equal treatment of its Contestants;

270

(h)   recording consultations and research considered in crafting the background check policy and procedures;

(i)   failing to adopt proper background check questions concerning criminal record inquiries;

(j)   failing to maintain employees' criminal records in a confidential manner;

(k)   failing to use Plaintiffs' criminal background information for the reason it was intended;

(l)   making the criminal arrest history of its featured Contestants one of the focal points of its commercial advertising for the program.

1260.   EMPLOYER-DEFENDANTS could have used less discriminatory or alternative policies that would have enabled them to meet legitimate goals as effectively as the challenged practice.

1261.   EMPLOYER-DEFENDANTS violated 42 U.S.C. § 1981 by refusing to extend to each Plaintiff, and to each member of the prospective Class, the same opportunity to enter into employment contracts for valuable prizes, benefits and privileges that Enterprise-DEFENDANTS extended to White *American Idol* Contestants who had a chance to compete on their merits.

1262.   EMPLOYER-DEFENDANTS altered a fundamental characteristic of the contractual right(s) and/or expectancy interest(s) of each Plaintiff (and prospective Class member) to make/enforce contracts and enjoy the benefits and privileges attendant to such contracts based predominantly on the protected status of each Plaintiff (and prospective Class member) as an African-American citizen.

1263.   But for the status of each Plaintiff (and prospective Class member) as an African-American citizen, he would not have been terminated from the *American Idol* Production.

1264.   If each Plaintiff (and prospective Class member) had been White, he would not have been terminated from the *American Idol* Production and would have been permitted

employment based on his individual merit.

1265.  Each Plaintiff (and prospective Class member) had a reasonable probability of economic gain by maintaining his employment for the Production, measured by bonuses awarded from being cast as a winner or top-ranking Finalist in the Production.

1266.  As a direct and/or proximate result of EMPLOYER-DEFENDANTS' racially-motivated adverse action, each Plaintiff (and prospective Class member) suffered loss of employment benefits, privileges and bonuses in an amount to be determined at trial.

1267.  Before March 14, 2012, none of the Plaintiffs knew, had good cause to believe, nor could have discovered upon the exercise of reasonable due diligence, facts sufficient to state a plausible claim that he was or is an employee or applicant for employment of the *American Idol* Production.

1268.  Before March 14, 2012, none of the Plaintiffs knew, had good cause to believe, nor could have discovered upon the exercise of reasonable due diligence, facts sufficient to state a plausible claim that his termination from the *American Idol* Production was caused by racial discriminatory intent or predominantly motivated by racial *animus* and stereotyped thinking harbored by of any one of the EMPLOYER-DEFENDANTS.

1269.  EMPLOYER-DEFENDANTS have affirmatively concealed each Plaintiff's Status as an employee or employee applicant of the PRODUCER-DEFENDANTS.

1270.  But for EMPLOYER-DEFENDANTS' decision to publically disqualify JXJ on or about March 14, 2012, none of the Plaintiffs (or prospective Class members) could have discovered upon the exercise of reasonable due diligence, facts sufficient to state a plausible claim that his disqualification from *American Idol* was caused by racial discriminatory intent or predominantly motivated by racial *animus* and stereotyped-thinking harbored by of any one of the EMPLOYER-

DEFENDANTS.

# COUNT V

## VIOLATION OF CIVIL RIGHTS ACT (1866)

### 42 U.S.C. § 1981
### (EQUAL BENEFITS CLAUSE)

——

### Plaintiffs Andrews, Clark, T. Brittenum, D. Brittenum Against

### ENTERPRISE-DEFENDANTS

1271.  Plaintiffs ANDREWS, CLARK, T. BRITTENUM, D. BRITTENUM, in their individual capacity repeat and re-allege the allegations as if set forth herein.

1272.  ENTERPRISE-DEFENDANTS, motivated by their racial animosity against African-Americans, deprived or attempted to deprive each of Plaintiff CLARK, ANDREWS, T. BRITTENUM, D. BRITTENUM of the 'full and equal benefit' of a law or proceeding 'for the security of persons and property" by utilizing their PENDING criminal background check information to boost ratings for *American Idol*.  In doing so, ENTERPRISE-DEFENDANTS attempted to trigger a legal proceeding, or alter the on-going investigation of these proceedings.

1273.  ENTERPRISE-DEFENDANTS would not have taken these same actions against Plaintiffs CLARK, ANDREWS, T. BRITTENUM, D. BRITTENUM had there been white American Idol Contestants engaged in the same conduct.

1274.  Indeed, Plaintiffs do not know how many White *American Idol* Contestants may have had pending criminal trials pending during their time on the show.  It was statistically probable that there were many over the course of a decade. Yet, Plaintiffs aver that the ENTERPRISE-DEFENDANTS worked to conceal such pending arrests of White *American Idol*

274

Contestants from the public and specifically chose to target them instead for public humiliation.

1275.   As a result of the ENTERPRISE-DEFENDANTS' unlawful interference in pending criminal proceedings, Plaintiffs CLARK, ANDREWS, T. BRITTENUM, D. BRITTENUM have been damaged in an amount to be determined at trial.

# COUNT VI

## VIOLATION OF CIVIL RIGHTS ACT

### 42 U.S.C. § 1985(3)
### (DEPRIVATION OF CONSTITUTIONAL RIGHTS)

———

### Public-DQ Plaintiffs Against

### OVERSEER-DEFENDANTS

1276.  Plaintiffs    ANDREWS,    CLARK,    WILLIAMS,    T.    BRITTENUM,    D. BRITTENUM, WATSON, AND DANIELS in their individual capacity repeat and re-allege each and every allegation above as if set forth herein.

## A.    CONSPIRACY

### (1)    DEFINITION

1277.  A conspiracy is  "[a] combination or confederacy between two or more persons formed for the purpose of committing, by their joint efforts, some unlawful or criminal act."[32]

### (2)    IDENTITY OF CONSPIRACY MEMBERS

1278.  Plaintiffs identify Defendant LYTHGOE and Defendant WARWICK as members of the conspiracy under Section 1985(3).

### (3)    FORMULATION OF CONSPIRACY

1279.  Defendant LYTHGOE and Defendant WARWICK are long-term collaborators on various television productions and have reportedly been close friends since their grade school

---

[32] BLACK'S LAW DICTIONARY 280 (5th ed. 1979).

years in Great Britain.

1280.  Defendant LYTHGOE and Defendant WARWICK both worked together during the 2001 television production of *Pop Idol* in the United Kingdom, which was the precursor or "test pilot" to *American Idol.*

1281.  During the production of both *PopStars* and *Pop Idol* in the United Kingdom, and about 2.5 years before *American Idol* pronounced its first ever criminal record-related disqualification (Plaintiff ANDREWS), Defendant LYTGHOE was promoting the criminal arrest records of London-based Reality TV show contestants through British tabloids.

1282.  Upon information and belief, Defendant LYTHGOE and Defendant WARWICK formulated their confederacy in London, back in 2001, working together as co-producers during the initial production of *Pop Stars U.K.*  This show reportedly laid the foundation for the production and marketing techniques which were ultimately exported from London to Los Angeles in the Spring of 2002.

1283.  Upon arriving to their new home in Los Angeles, the OVERSEER-DEFENDANTS leveraged the experience of FOX programming executive Mike DARNELL, who had already supervised the on-air disqualification scandal of an African-American couple from the 2001 show *Temptation Island,* which invited a defamation lawsuit.

1284.  During Season One of *American Idol*, the OVERSEER-DEFENDANTS "tested the waters" of their production techniques in the United States by publicly disqualifying a Black Semi-Finalist Contestant named Delano Cognolatti.  Although not a criminal records-related matter, the OVERSEER-DEFENDANTS consciously decided to confront Mr. Cognolatti on camera to humiliate him before millions of viewers for allegedly misrepresenting (i.e., failing to disclose) his age.

1285.  In or about June 2002, Overseer-Defendants thereafter agreed to systematically utilize the criminal background information illegally obtained through background checks of African-American Contestants to deprive them of their constitutional rights.

## (4)    PURPOSE OF CONSPIRACY

1286.  The OVERSEER-DEFENDANTS formulated and carried out a conspiracy for the purpose of exploiting the criminal background records of *American Idol* Contestants as a form of:

    **a.** **INVIDIOUS RACIAL PROPAGANDA,** i.e., invidious commercial speech intending to indoctrinate target audiences with "lessons" about the "criminality" of young, Black males (who are exiled through public condemnation) as measured against the "youthful indiscretions" of White males (who are championed through redemption and led to "salvation," i.e., a Major record deal).

    **b.** **SCANDAL-MONGERING,** i.e., a pre-orchestrated and highly publicized incident that brings about disgrace, defamation of character, or offends the moral sensibilities of society.

    **c.** **COMMERCIAL ADVERTISING,** i.e., employing criminal record information as a "sure-fire" marketing technique designed to generate tons of free "hits" (i.e., media impressions) through write-ups in the entertainment news and tabloid press.

    **d.** **CROSS-MARKETING,** i.e. reaching out to target audiences who might not otherwise tune in to see a talent search show but are consumers of crime-related shows like "America's Most Wanted"

278

    **e.** **SHOCK EFFECT ON THE AUDIENCE,** i.e., the OVERSEER-DEFENDANTS create moments of suspense and dramatic tension in their audiences by introducing a "criminal element" into what purports to be a "family-friendly" show.

    **f.** **WICKED DEPRAVITY,** i.e., the OVERSEER-DEFENDANTS appear to relish their self-appointed roles as "executioners" of the hopes and dreams of young artists.

## (5)    METHODS OF CONSPIRACY

1287.  Criminal Background Information of *American Idol* Contestants is first obtained through proprietary written background check forms administered to all those Contestants who have earned a Golden Ticket to Hollywood.  The processing / office administration of these forms is handled by the PRODUCTION-DEFENDANTS, and more specifically FREMANTLE, which for the first ten seasons employed a paralegal named Amanda Chacon to handle the paperwork.

1288.   According to Ms. Chacon, once the completed background forms are received by her office at FREMANTLE / AIP, they are transmitted via Fedex directly to CARCO Group, Inc., a third-party investigator and background check company with principal office in New York.  The West Coast operator / partner of the company was originally known as MMI.

1289.  At all relevant times, a third-party investigator named Sharon Renee GIALLO supervised all aspects of the criminal background check process.  GIALLO ran computer-generated criminal background checks via CARCO's proprietary data aggregator.  Upon information and belief, GIALLO also ran computer-generated background checks through other "sources" on the West Coast.  If any pending criminal cases emerged from the CARCO background checks, then GIALLO would personally interface with local county clerks to obtain

court documents through U.S. mail or via Fax.  Once GIALLO compiled her reports on certain contestants, she would then send written Investigative Report forms to Defendant FOX's internal legal department, specifically Minna TAYLOR, Esq. and Marisa Fermin, Esq. (2002-2005 only).

1290.    Upon information and belief, once TAYLOR was in possession of the CARCO reports, she communicated "noteworthy" or "red flag" information about Contestants to Defendant LYTHGOE and/or Defendant WARWICK.  At that point, the OVERSEER-DEFENDANTS were ostensibly free to utilize the contestant background information contained in the CARCO reports as they saw fit.

1291.   In some cases, such as with Plaintiff Clark, the Brittenum Twins and JXJ, their (then) pending criminal arrests and humiliating public disqualifications were incorporated into the content of an *American Idol* television program by LYTHGOE and WARWICK, who orchestrated the scandals as they unfolded in the tabloids.

## B.    DEPRIVATION OF RIGHTS

1292.  Plaintiffs CLARK, ANDREWS, WILLIAMS, T. BRITTENUM, AND D. BRITTENUM were all publicly disqualified on account of PENDING criminal charges before any of them had a basic opportunity to answer the accusations through counsel, let alone face a trial by jury of their peers.

1293.   The respective arrest records of Plaintiffs CLARK, ANDREWS, WILLIAMS, T. BRITTENUM, AND D. BRITTENUM beared no relation whatsoever to their respective abilities to perform in what purported to be a *bona fide* singing contest for a valuable prize.

1294.   In deciding to take such adverse action against them whilst the government's charges against them remained unproven hearsay accusations, LYTHGOE AND WARWICK

intentionally deprived Plaintiffs CLARK, ANDREWS, WILLIAMS, T. BRITTENUM, AND D. BRITTENUM of their protected status under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution as <u>innocent citizens</u> until proven otherwise in a Court of competent jurisdiction.

1295.  Public-DQ-Plaintiffs did NOT enter the *American Idol* Contest to have their names, images and identities expropriated to serve as propaganda for the OVERSEER-DEFENDANTS' warped racial *animus.*

1296.  By exploiting their confidential and statutorily proscribed criminal record information to perpetuate negative stereotypes (as opposed to serving its intended governmental function to aid law enforcement officers in the discharge of their duties), the OVERSEER-DEFENDANTS' violated the PUBLIC-DQ-PLAINTIFFS' Thirteenth Amendment rights to be free from the "badges and incidents of slavery," which necessarily includes being individually and culturally liberated from the pernicious stereotype of being labeled a "criminal."

## C.    <u>INJURY</u>

1297.  OVERSEER-DEFENDANTS actively participated in the promotion, sponsorship and commercial exploitation of the *American Idol* Production and Contest featuring each of the named Plaintiffs in this Count.

1298.  With respect to each of Plaintiffs named in this Count, it was reasonably foreseeable to LYTHGOE and WARWICK at the time each Plaintiff was disqualified from the Contest for reasons other than their individual talent that each Plaintiff was possessed of a high statistical probability of claiming the #1 Prize in the *American Idol* televised contest.

1299.  OVERSEER-DEFENDANTS, collectively and individually, reaped substantial

economic benefits from the worldwide commercial exploitation of named Plaintiffs' talent services, unique voices, cultural heritage, family names, images, personal background, valuable identities and likenesses, including the commercial exploitation of Plaintiffs' unceremonious disqualifications and collateral media scandals;

1300.   OVERSEER-DEFENDANTS have unjustly failed to compensate named Plaintiffs for the valuable economic benefits that they received and continue to receive in perpetuity.

1301.   The failure of OVERSEER-DEFENDANTS to compensate named Plaintiffs for the valuable economic benefits they received as a result of Plaintiffs' participation in the Production was at all relevant times to the Plaintiffs' detriment.

1302.   It would be contrary to equity and good conscience for the OVERSEER-DEFENDANTS' to retain an economic benefit which has accrued to them at the expense of Plaintiffs.

1303.   As a direct and/or proximate result of OVERSEER-DEFENDANTS' systemic misconduct and fundamental misapprehension of the Constitutional rights of a protected class of U.S. citizen, Plaintiffs have been permanently and irrevocably damaged by the direct actions of OVERSEER-DEFENDANTS and are therefore entitled to recover an amount of damages and a measure of injunctive relief to be determined at trial.

# COUNT VII

## CIVIL RIGHTS ACT OF 1964

## Title VII  - 42 U.S.C. § 2000e et seq.

───

**Plaintiffs (and prospective Class Members) Against**
EMPLOYER-DEFENDANTS

1304.  Plaintiffs in their individual capacity, and on behalf of the prospective Class Members, repeat and re-allege each and every allegation above as if set forth herein.

1305.  Jurisdiction of the Honorable Court is invoked pursuant to 28 U.S.C. § 1343(a)(4); 42 U.S.C. § 2000e-5(f) and 28 U.S.C. §§ 2201  and 2202 to secure protection of and to redress deprivation of rights secured by 42 U.S.C.A. §§ 2000e et seq., providing for injunctive and other relief against racial discrimination in unlawful employment practices.

1306.  All conditions precedent to jurisdiction under 42 U.S.C.A. § 2000e-5(f)(3) have occurred or been complied with, to wit: a charge of employment discrimination was timely filed with the EEOC; a Notification of Right to Sue was received from the EEOC by all Plaintiffs (except Smalley); this complaint was filed within 90 days of receipt of the Notification of Right to Sue.

1307.  Each of the EMPLOYER-DEFENDANTS are "employers" within the meaning of 42 U.S.C. § 2000e(b) in that they engaged in an industry affecting commerce and employs at least fifteen persons.

1308.  This count seeks adjudication of Plaintiffs' rights for a permanent injunction restraining EMPLOYER-DEFENDANTS from maintaining a policy, practice, custom or usage of discriminating against African-Americans with respect to compensation, terms, conditions and

privileges of employment; and, more specifically, the use of unlawful criminal conduct exclusions during the *American Idol* "contestant vetting" process.

1309.   The various typewritten questions posed on EMPLOYER-DEFENDANTS' Background Check forms - as identified in this Third Amended Complaint - asks *American Idol* Contestants to disclose criminal arrest information in a manner and through a method that are statutorily proscribed by California law and causes a disparate impact on Black *American Idol* Contestants in relation to White *American Idol* Contestants.

1310.   EMPLOYER-DEFENDANTS' inclusion of the statutorily proscribed questions during the *American Idol* "Contestant Vetting" process caused harm to Black *American Idol* Contestants (and to prospective Class Members) in disproportionate ratio than it did to White *American Idol* Contestants who were similarly situated.

1311.   Plaintiffs and the class they represent seek a permanent injunction enjoining the EMPLOYER-DEFENDANTS, its agents, successors, employees, attorneys and those acting in concert with it and at its direction, from continuing or maintaining the policy, practice, custom and usage of denying, abridging, withholding, conditioning, limiting, or otherwise interfering with the rights of Black *American Idol* Contestants during the background check process.

# COUNT VIII

## <u>RESCISSION / RESTITUTION</u>

### STRIKING DOWN THE *AMERICAN IDOL* CONTESTANT AGREEMENT (AS *VOID AB INITIO*)

———

### Plaintiffs (except Watson) Against
### JOINT VENTURE-DEFENDANTS

## A.    OVERVIEW

1312.   PLAINTIFFS in their individual capacity repeat and re-allege each and every allegation above as if set forth herein.

1313.   *The American Idol* CONTESTANT AGREEMENT is presented only to those Contestants who have been awarded a Golden Ticket to Hollywood.   From Season Two through Season Nine, the contract was presented as a non-negotiable adhesion contract, under severe time restraints, and only AFTER Golden Ticket Holders had already: (a) performed services for the economic benefit of JOINT VENTURE-DEFENDANTS; (b) executed an Audition Agreement at the Open Audition phase; (c) been awarded a Golden Ticket to Hollywood.

1314.   Each of the named Plaintiffs in this action (except Watson) executed the *American Idol* CONTESTANT AGREEMENT during their respective seasons, and amendments thereto, and it is reasonable to conclude that all prospective class members executed the document (provided they participated in Hollywood Rounds).

1315.   **STATUTORY.**   THE *American Idol* CONTESTANT AGREEMENT is void *ab initio* and must be struck down in its entirety because its <u>entire purpose</u> and <u>core transaction</u> violates 47 U.S.C. § 509, 47 C.F.R. § 73.1216; and Civ. Code § 1668.

285

1316.  **COMMON LAW.** THE *American Idol* CONTESTANT AGREEMENT is void *ab initio* and must be struck down in its entirety under the common law doctrines of illegality, fraud-in-factum, legal duty rule, illusory promise (lack of mutual assent), and substantive unconscionability.

## B.    ILLEGALITY [Cal. Civ. Code § 1667]

1317.  Section 1667 of the California Civil Code ("Section 1667") provides that:

> **That is not lawful which is:  (1) contrary to an express provision of law;  (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals.**

1318.  Under California law, contracts that are contrary to express statutes or to the policy of express statutes are illegal contracts. A determination of illegality, i.e., that a contract stands contrary to the express statutory provision of law, may void the entire contract. Whether a contract is illegal is a question of law to be determined from the circumstances of each particular case.[33]

1319.  Pursuant to the express terms of the *American Idol* CONTESTANT AGREEMENT:

> **This Agreement and all matters or issues collateral thereto shall be governed by the laws of the State of California applicable to contracts executed and performed entirely therein (regardless of the actual place of performance." [AICA, v.2, ¶ G.8; CDC_000202]**

1320.  Accordingly, Section 1667 applies to matters concerning the enforceability of the *American Idol* CONTESTANT AGREEMENT.

1321.  Alternatively, if New York law applies by virtue of the Court's reading of all operative contracts at issue here (e.g., 19 ENTERTAINMENT Prize Contracts) as part of one transaction, then the law is substantially identical.

1322.   THE *American Idol* CONTESTANT AGREEMENT is void *ab initio* and must be struck down in its entirety because its <u>entire purpose</u> and <u>core transaction</u> violates 47 U.S.C. § 509, 47 C.F.R. § 73.1216; and Civ. Code § 1668.

## C.    RIGGED CONTEST [47 U.S.C. § 509]

1323.   47 U.S.C. § 509 ("Section 509") of the Communications Act[34] provides as follows:

> **It is unlawful for any person, with intent to deceive the listening or viewing public --**
>
> **(1) To supply to any contestant in a purportedly bona fide contest of intellectual knowledge or intellectual skill any special and secret assistance whereby the outcome of such contest will be in whole or in part prearranged or predetermined**
>
> **(2) By means of persuasion, bribery, intimidation, or otherwise, to induce or cause any contestant in a purportedly bona fide contest of intellectual knowledge or intellectual skill to refrain in any manner from using or displaying his knowledge or skill in such contest, whereby the outcome thereof will be in whole or in part prearranged or predetermined.**
>
> **(3) To engage in any artifice or scheme for the purpose of prearranging or predetermining in whole or in part the outcome of a purportedly bona fide contest of intellectual knowledge, intellectual skill, or chance.**

1324.   Section 509 applies to anyone involved in the production, broadcast, or offering a broadcast television program to consumers or licensees, as well as sponsors who knew or should have known that someone violated or plans to violate the statute.

1325.   Accordingly, the proscriptions under Section 509 apply to ALL DEFENDANTS named in this action.

1326.   Section 509 does not allow DEFENDANTS to exempt themselves from its coverage.

1327.  DEFENDANTS acknowledge in the Agreement that:

> "[I]t is a federal offense punishable by fine and/or imprisonment for anyone to do anything which would rig or in any way influence the outcome of the [American Idol] Series with the intent to deceive the viewing public." [AICA, ¶F.2(j); CDC_000199]  (emphasis added)

1328.  While the contractual provision quoted in the preceding paragraph does not directly cite Section 509 expressly, its language can only be reasonably understood to refer to Section 509 because it references a federal, criminal statute that prohibits the rigging or influencing of an outcome concerning a contest that is telecast to the public.

1329.  By requiring Plaintiffs to contractually warrant their understanding of a federal statute that prohibits schemes or artifices to deceive the television viewing audience and/or affect the outcome of the contest, DEFENDANTS may not foreclose the applicability of Section 509 to the purported *bona fide* contest depicted by DEFENDANTS on the *American Idol* Production, from at least Season Two (2002) through Season Eleven (2012).

1330.  *American Idol* is televised on broadcast television, namely, through channel(s) owned and operated by the NETWORK-DEFENDANTS.

1331.  ENTERPRISE-DEFENDANTS bill, market, promote and/or advertise *American Idol* as a "contest" and/or "competition" characterized by a predominance of *chance.*[35]

1332.  ENTERPRISE-DEFENDANTS bill, market, promote and/or advertise *American Idol* as a contest characterized by a predominance of *skill.*

1333.  ENTERPRISE-DEFENDANTS bill, market, promote and/or advertise *American Idol* as a contest featuring eligibility rules, participation rules, disqualification rules, winners, contestants, elimination methods, judges, standards of judging, audience voting and prizes.

1334.  *American Idol* Contestants, including Plaintiffs, deem the Production in which they participate to be a contest, game or competition in which there is an actual winner of a valuable prize.

1335.  The purported *American Idol* contest rewards Contestants with natural singing ability, trained singing ability, stage presence, an attractive physical appearance (more often than not), and intellectual skill or knowledge required to select songs and strategize one's position in the Contest relative to other Contestants.

1336.  Presuming the popular audience vote decides the winner, as ENTERPRISE-DEFENDANTS advertise, then the element of chance predominantly determines the outcome or winner of the *American Idol* Contest.

1337.  After awarding each Plaintiff a Golden Ticket to Hollywood, ENTERPRISE-DEFENDANTS presented each Plaintiff with a non-negotiable consumer contract representing on its face that the *American Idol* Contest was a *bona fide* contest under federal law that was in compliance with, or otherwise did not run afoul of 47 U.S.C. § 509.

1338.  At the time of execution of the *American Idol* CONTESTANT AGREEMENT with each of the named Plaintiffs, ENTERPRISE-DEFENDANTS knew that the *American Idol* Production was not a *bona fide* contest and knew that ENTERPRISE-DEFENDANTS would intentionally deceive the Contestants into believing they were participating in a *bona fide* contest.

1339.  At all times relevant hereto, ENTERPRISE-DEFENDANTS represented to the public that, subsequent to the selection of the Semi-Finalists, a Contestant's advancement through the Contest is determined solely by popular audience vote tabulated by ENTERPRISE-DEFENDANTS through a system of phone call logs, text messages and/or votes lodged on the internet ostensibly designed to ultimately determine the outcome of the contest.

1340.  At times relevant to this action, ENTERPRISE-DEFENDANTS, acting jointly and severally and with knowledge aforethought, intended to deceive the television viewing audience for *American Idol* through artifice directed at the outcome of the *American Idol* Contest.

1341.  ENTERPRISE-DEFENDANTS' purported to reserve unfettered contractual rights to disqualify *American Idol* Contestants - including any Semi-Finalists or Finalists who were purportedly subject to the public voting system - for any reason or at any time.   Such reservation of rights, on its face, vitiates the purpose of conducting a *bona fide* contest because if taken literally, the language squarely permits the ENTERPRISE-DEFENDANTS to change and/or control the outcome of the Contest during any season in which a contest disqualification is made.

1342.  At times relevant to this action, ENTERPRISE-DEFENDANTS utilized its absolute, unfettered right to carry out public disqualifications of top-ranking Black *American Idol* Contestants in a manner that necessarily affected the outcome of the Contest and/or a portion of the outcome of the Contest.

1343.  For example, the ENTERPRISE-DEFENDANTS' unfettered decisions to disqualify Frenchie Davis, a popular Semi-Finalist Contestant and Plaintiff CLARK, a Top 10 Finalist, clearly impacted the outcome of the Season Two winner.  Such arbitrary decisions are particularly suspect given that Expert Judge Simon Cowell predicted that both DAVIS and CLARK had a strong chance (1 out of 4) of winning Season Two of the *American Idol* Contest. ENTERPRISE-DEFENDANTS only decided to disqualify DAVIS and CLARK after Cowell made his predictions.

1344.  Given that both Frenchie DAVIS and Plaintiff CLARK were disqualified without any legal justification, as alleged herein, then such Season Two disqualifications constituted acts of deception on the part of ENTERPRISE-DEFENDANTS intended to limit the television audiences' selection of the ultimate purported winner (Ruben Studdard).

1345.  Because ENTERPRISE-DEFENDANTS have failed to demonstrate a legitimate rationale for disqualifying any of the Plaintiffs named herein, then each decision on ENTERPRISE-DEFENDANTS' part to extricate Plaintiffs from the *American Idol* Contest necessarily tainted the outcome of the Contest during the season in which such disqualification was made.

1346.  ENTERPRISE-DEFENDANTS' unfettered decision to disqualify Plaintiff ANDREWS, CLARK SMALLEY WILLIAMS T. BRITTENUM D. BRITTENUM DANIELS WATSON JOYNER, GOLIGHTLY without legal justification necessarily affected the outcome of the Contest and/or a portion of the outcome of the Contest in violation of Section 509.

1347.  Conversely, ENTERPRISE-DEFENDANTS' decision <u>to refrain from disqualifying</u> the identified White *American Idol* Contestants for their criminal arrest and conviction records impacted the contest's outcome in the year in which such White Contestants were selected by ENTERPRISE-DEFENDANTS to advance.[36]

1348.  ENTERPRISE-DEFENDANTS' unfettered decision to refrain from disqualifying Scott SAVOL, Bo BICE, Bucky COVINGTON, Taylor HICKS, Stefano LANGONE, Casey JAMES, Matt LAWRENCE, and Amanda OVERMYER on the same terms and conditions as the named Plaintiffs necessarily affected the outcome of the Contest and/or a portion of the outcome of the Contest in violation of Section 509.

1349.  ENTERPRISE-DEFENDANTS' discriminatory policy of utilizing the private background information of Black *American Idol* Contestants as a means to decide which Semi-Finalist or Finalists would advance through the Contest (as opposed to utilizing the purported voting system) violates subdivision three of Section 509 as a scheme directed at predetermining

some portion of the outcome.[37]

1350.  ENTERPRISE-DEFENDANTS' claim that contest disqualifications or eliminations depicted on the *American Idol* Contest were not a function of conducting a *bona fide* contest evidences ENTERPRISE-DEFENDANTS' knowing violation of Section 509.

1351.  Given that: (a) the absolute secrecy and lack of accountability or means to verify results generated by the "Public Voting System" propagated by ENTERPRISE-DEFENDANTS; (b) ENTERPRISE-DEFENDANTS' purported contractual reservation of unfettered discretion to advance or disqualify any Contestants at will during any stage of the contest; and (c) experiential data that the Public Voting System is NOT used to determine the outcome of the Contest, it is beyond plausible that representations of the ENTERPRISE-DEFENDANTS to U.S. consumers concerning the function and utility of the Public Voting System are not based in objective fact.

## D.    FALSE ADVERTISING re: CONTEST [47 C.F.R. § 73.1216]

1352.  Pursuant to regulations promulgated by the Federal Communications Commission (FCC), contests that are conducted by broadcast stations such as Defendant FOX are proscribed by statute.

1353.  Section 73.1216, entitled "Licensee-conducted contests" provides in full:

> **A licensee that broadcasts or advertises information about a contest it conducts shall fully and accurately disclose the material terms of the contest, and shall conduct the contest substantially as announced or advertised. No contest description shall be false, misleading or deceptive with respect to any material term.**

---

[37] Id. at 171 ("Section 509 does not require that a scheme (or assistance) designate the winner or final outcome; the statute only requires it to impact an, aspect of the outcome. Altering an elimination (thus altering the fates of two individuals) or immunizing a competitor until the finals, changes an aspect of the outcome."

**Note       1:       For       the       purposes       of       this       rule:**

**(a)  A contest is a scheme in which a prize is offered or awarded, based upon chance, diligence, knowledge or skill, to members of the public.**

**(b) Material terms include those factors which define the operation of the contest and which affect participation therein. Although the material terms may vary widely depending upon the exact nature of the contest, they will generally include: how to enter or participate; eligibility restrictions; entry deadline dates; whether prizes can be won; when prizes can be won; the extent, nature and value of prizes; basis for valuation of prizes; time and means of selection of winners; and/or tie-breaking procedures.**

**Note 2:**

**In general, the time and manner of disclosure of the material terms of a contestare within the licensee's discretion. However, the obligation to disclose the material terms arises at the time the audience is first told how to enter or participate and continues thereafter. The material terms should be disclosed periodically by announcements broadcast on the station conducting the contest, but need not be enumerated each time an announcement promoting the contest is broadcast. Disclosure of material terms in a reasonable number of announcements is sufficient. In addition to the required broadcast announcements, disclosure of the material terms may       be       made       in       a       non-broadcast       manner.**

**Note3:**

**This rule is not applicable to licensee-conducted contests not broadcast or advertised to the general public or to a substantial segment thereof, to contests in which the general public is not requested or permitted to participate, to the commercial advertisement of non-licensee-conducted contests, or to a contest conducted by a non-broadcast division of the licensee   or   by   a   non-broadcast   company   related   to   the   licensee.**

1354.  Television broadcast stations operating in the United States, including NETWORK-DEFENDANTS, are subject to Part 73 of Title 47.

1355.  FCC Regulation 73.1216 is applicable to the purported *bona fide* contest depicted via the *American Idol* Production because the Contest is advertised to the general public as a

"contest" and "competition" featuring "contestants," "judges" and "winners."

1356.  JOINT VENTURE-DEFENDANTS solicit participants from the general public to compete in the Contest and offer an opportunity for contest entrants to win a valuable prize.  This offer is extended to any member of the general public who meets certain age and residency requirements.

1357.  The purported *bona fide* contest depicted on the *American Idol* Production is (or markets itself to U.S. consumers as) a "contest" within the meaning of Note 1(a) of FCC Regulation 73.1216 because it represents "a scheme in which a prize is offered or awarded, based upon chance, diligence, knowledge or skill, to members of the public."

1358.  At all times relevant to this proceeding, NETWORK-DEFENDANTS, acting jointly and severally with the other JOINT VENTURE-DEFENDANTS, have conducted the purported *American Idol* Contest subject to the proscriptions of FCC Regulation 73.1216.

1359.  The Commission's own interpretation of FCC Regulation 73.12.16 mandates that FCC broadcast licensees must award the contest prizes that are announced to the general public.[38]

1360.  ENTERPRISE-DEFENDANTS' repeated, continuing violations of FCC Regulation 73.1216 constitute further grounds to vitiate the *American Idol* CONTESTANT AGREEMENT on the basis of illegality.

1361.  ENTERPRISE-DEFENDANTS have willfully and repeatedly violated Section 73.1216 of the Commission's rules by broadcasting information about a contest without fully and accurately disclosing all of its material terms, i.e., those factors which define the operation of the contest and which affect a contestant's participation therein.

---

[38] 50 Fed. Reg. 19229, ¶¶ 50-51 (May 7, 1985) (FCC Memorandum Opinion and Order).

1362.   Note 2 of FCC Regulation 73.1216 provides that:

> **"the obligation to disclose the material terms [of the contest] arises *at the time* the audience is first told how to enter or participate and continues thereafter."**

1363.   Therefore, consistent with Note 2 of FCC Regulation 73.1216, all material terms of the contest, i.e., "those factors which define the operation of the contest and which affect participation therein", <u>must</u> be disclosed to *American Idol* Contestants at the <u>Open Auditions</u> phase BEFORE auditioning for a Golden Ticket to Hollywood.

1364.   At all times relevant hereto, ENTERPRISE-DEFENDANTS violated FCC Regulation 73.1216 by:

    **a.**   failing to disclose the extent, nature and value of prizes awarded to *American Idol* Contest winners;

    **b.**   failing to disclose the basis for valuing prizes awarded to the *American Idol* winner;

    **c.**   failing to disclose to the general public information concerning the actual criteria utilized to select or advance the winners of the *American Idol* Contest;

    **d.**   failing to disclose to the general public the eligibility requirements to compete on *American Idol* with respect to criminal arrest or criminal conviction history;

    **e.**   failing to disclose contest rules or guidelines governing disqualifications.

1365.   With respect to each of the named Plaintiffs herein, ENTERPRISE-DEFENDANTS failed to disclose **all material terms of the contest**, i.e., "those factors which define the operation of the contest and which affect participation therein" at the time of their respective Open Auditions.

1366.   ENTERPRISE-DEFENDANTS' failure to provide each Plaintiff with the following

documents, among others, either before or at the time of contest entry (i.e., at the time of their respective Open Auditions) constituted a direct violation of FCC Regulation 73.1216:

    (a)    AMERICAN IDOL CONTESTANT AGREEMENT

    (b)    ADDENDUM #1 TO THE AMERICAN IDOL CONTESTANT AGREEMENT

    (c)    ADDENDUM #2 TO THE AMERICAN IDOL CONTESTANT AGREEMENT

    (d)    PARTICIPANT BACKGROUND QUESTIONNAIRE

    (e)    19 ENTERTAINMENT PRIZE CONTRACTS

    (f)    EMPLOYMENT AGREEMENT

    (g)    AFTRA MEMBERSHIP FORMS

## E.    UNLAWFUL RELEASE [Cal. Civ. Code § 1668]

1367.    Section 1668 of the California Civil Code provides that:

> **All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.[39]**

1368.    Under California law, "contractual releases of future liability for fraud and other intentional wrongs are invariably invalidated."[40]

1369.    Pursuant to the express terms of the *American Idol* CONTESTANT AGREEMENT, the contract states that claims may be released based on information "whether now known or unknown, suspected or unsuspected, and <u>whether or not concealed or hidden</u>." The contract further states that:

---

[39] Cal. Civ.Code § 1668 (West 1999).

[40] <u>McQuirck vs. Donnelley</u>, 189 F.3rd 793, 797 (9th Cir.1999) (holding that §1668 invalidates the total release of future liability for intentional wrongs); citing *Farnham*, 70 Cal.Rptr.2d at 86.

> **"The Released Claims shall include, but not be limited to, those based on … <u>breach of any statutory or other duty of care owed under applicable laws</u>, <u>defamation</u>, <u>invasion of privacy</u>, publicity or personality, infringement of copyright, and those based on my possession or use of any prize." [Section E.3]**

1370.   Accordingly, Section 1668 applies to matters concerning the enforceability of the *American Idol* CONTESTANT AGREEMENT.

> **This Agreement and all matters or issues collateral thereto shall be governed by the laws of the State of California applicable to contracts executed and performed entirely therein (regardless of the actual place of performance).  [AICA, v.2, ¶ G.8; CDC_000202]**

1371.   The purported releases contained in the *American Idol* CONTESTANT AGREEMENT violate Section 1668 of the California Civil Code by attempting to shield ENTERPRISE-DEFENDANTS from liability for committing <u>intentional torts</u>.

1372.   Under California law, substantive claims for defamation, interference with business expectancy, outrage, and intentional infliction of emotional distress all constitute intentional wrongs.[41]

1373.   At all relevant times, under the express terms of the *American Idol* CONTESTANT AGREEMENT, ENTERPRISE-DEFENDANTS purported to secure the absolute and unfettered right to commit intentional tortious acts against any of the Plaintiffs at any time, for any reason or no reason at all.

1374.   Public-DQ-Plaintiffs were permanently defamed and vilified by the OVERSEER-DEFENDANTS in connection with the Overseers' unilateral decision to cast them as "criminals" and "liars" as a means to propagate their own racial *animus*.

---

[41] <u>See e.g.</u>, <u>Miller v. National Broad. Co.</u>, 187 Cal.App.3d 1463, 232 Cal.Rptr. 668, 681 (Ct.App.1986) (intentional infliction of emotional distress); <u>Ramona Manor Convalescent Hosp. v. Care Enters.</u>, 177 Cal.App.3d 1120, 225 Cal.Rptr. 120, 124 (Ct.App.1986) (intentional interference with prospective economic advantage); 5 B.E. Witkin, SUMMARY OF CALIF. LAW, Torts, § 471, at 558 (9th ed.1988) (defamation).

1375.  Public-DQ-Plaintiffs signed up for *American Idol* Contest during its "Golden Years" to further their music careers and to WIN the valuable prizes as advertised.

1376.  Plaintiffs' criminal arrest history was unlawfully obtained by ENTERPRISE-DEFENDANTS through federal and state-regulated background checks.  It was not within the reasonable expectations of the Public-DQ-Plaintiffs at the time of entering the contest that their (largely) misdemeanor charges would become lifetime badges of criminality and dishonor, not only to themselves, but to their families and children.[42]

## F.    ILLUSORY CONTRACT (Common Law)

1377.  *American Idol* CONTESTANT AGREEMENT is or purports to be a <u>bilateral</u> contract.

1378.  Under the terms of the *American Idol* CONTESTANT AGREEMENT, Plaintiffs were and/or continue to be bound to perform talent services on behalf of ENTERPRISE-DEFENDANTS and/or grant ownership rights to ENTERPRISE-DEFENDANTS.

1379.  Under the express terms of the *American Idol* CONTESTANT AGREEMENT, Plaintiffs irrevocably granted their valuable rights of publicity and copyright ownership interests to ENTERPRISE-DEFENDANTS, among other proprietary and intellectual property rights.

1380.  ENTERPRISE-DEFENDANTS continue to exercise dominion and control over the proprietary rights and copyright ownership interests purportedly granted to ENTERPRISE-DEFENDANTS by virtue of the *American Idol* CONTESTANT AGREEMENT.

1381.  Under the express terms of the *American Idol* CONTESTANT AGREEMENT, ENTERPRISE-DEFENDANTS did NOT make any kind of commitment to perform any obligation or

---

[42] Compare <u>Paralift, Inc. v. Superior Court</u>, 29 Cal.Rptr.2d 177, 23 Cal.App.4th 748 (App. 4 Dist. 1993) (contractual release was sufficiently broad that nature of jump which resulted in skydiver's death was within reasonable expectations of parties).

duty.

1382.  ENTERPRISE-DEFENDANTS did NOT set forth any promises in the *American Idol* CONTESTANT AGREEMENT which, at the time the document was executed, would have actually come to limit ENTERPRISE-DEFENDANTS' future options.

1383.  Upon its execution, *American Idol* CONTESTANT AGREEMENT did not restrain ENTERPRISE-DEFENDANTS to act in any manner other than consistent with its own unfettered discretion.

1384.  Upon its execution, *American Idol* CONTESTANT AGREEMENT did not compel ENTERPRISE-DEFENDANTS to act in any manner other than in their own best interests.

1385.  Under the express terms of the *American Idol* CONTESTANT AGREEMENT ENTERPRISE-DEFENDANTS can do anything they want or absolutely nothing at all vis-à-vis any of the Plaintiffs.  For example:

> **Producer's Right to Suspend or Terminate this Agreement**. *Producer shall have the right to terminate this Agreement if Producer determines, in Producer's sole and absolute discretion*, that Producer desires to terminate my participation in connection with the Series, or if the series is canceled or the Series format is materially altered." [AICA_02, ¶ G.1 Pg. 12]

1386.  ENTERPRISE-DEFENDANTS are NOT bound to perform any promise set forth in the *American Idol* CONTESTANT AGREEMENT.

1387.  ENTERPRISE-DEFENDANTS were NEVER bound to perform any promise set forth in *American Idol* CONTESTANT AGREEMENT above and beyond what they had already promised when each Plaintiff was awarded a Golden Ticket to Hollywood.

1388.  At all relevant times, under the express terms of the *American Idol* CONTESTANT AGREEMENT, ENTERPRISE-DEFENDANTS purported to secure the absolute and unfettered right to

terminate the *American Idol* CONTESTANT AGREEMENT at any time, for any reason or no reason at all.

1389. Under the express terms of the *American Idol* CONTESTANT AGREEMENT, ENTERPRISE-DEFENDANTS are not required to provide Plaintiffs any notice in the event they decide to terminate the *American Idol* CONTESTANT AGREEMENT.

## G.   LEGAL DUTY RULE (Common Law)

1390.   Under the terms of the *American Idol* CONTESTANT AGREEMENT, at the time of the signing of the contract, the ENTERPRISE-DEFENDANTS purport to promise to do what ENTERPRISE-DEFENDANTS were already legally obligated to do, namely, to adjudge each Plaintiff on the basis of their performance merit for advancement through the *American Idol* Contest, and in furtherance of their representations that *American Idol* was a *bona fide* contest for a valuable prize where the outcome would be determined by a Voting Public.

1391.   *The American Idol* CONTESTANT AGREEMENT, pursuant to its own express terms, does not require ENTERPRISE-DEFENDANTS to perform any new duty or obligation whatsoever above and beyond permitting Plaintiff to remain in the contest (which was a contest they were already deemed qualified to enter).

## H.   FRAUD-IN-FACTUM (Common Law)

1392.   By entering the *American Idol* Contest upon the solicitation of the ENTERPRISE-DEFENDANTS, Plaintiffs received something very different from what they contracted for.   As young adults and talented singers who had received encouragement throughout their young lives to pursue their careers in music, *American Idol* (at the times relevant to this action) represented a new kind of opportunity in the music industry to achieve success with a measure of career

longevity.

1393.  Plaintiffs believed that they were entering the Contest to further their careers in music, and the best way of doing that, naturally, was to enter the Contest with an intention to WIN.

1394.  Had Plaintiffs known the true facts underlying the fraudulent nature of the *American Idol* Contest depicted on television, Plaintiffs would NEVER have accepted the solicitation to enter into the *American Idol* Contest.

1395.  Had Plaintiffs known the true facts characterizing the bad faith undertaking of the OVERSEER-DEFENDANTS in conducting what amounts to a colossal hoax, Plaintiffs would NEVER have accepted the solicitation to enter into the *American Idol* Contest.

1396.  Had CRI-Plaintiffs known the true facts characterizing the unlawful use and dissemination of their criminal arrest history, CRI-Plaintiffs NEVER would have accepted the solicitation to enter into the *American Idol* Contest.

1397.  Plaintiffs received something entirely different than what they bargained for.

1398.  Plaintiffs were misled into signing the *American Idol* CONTESTANT AGREEMENT without knowing or understanding its nature, contents or consequences.  Defendants' misrepresentations concerning the *American Idol* Contest as a *bona fide* contest for a valuable prize, which was by its own contractual terms subject to federal regulation and criminal statutory law, must be regarded as going to the very character of the proposed contract itself.  E.A. Farnsworth, *Contracts* § 4.10 (1990).

1399.  As a result of ENTERPRISE-DEFENDANTS' misrepresentation of the character and essential terms of the *American Idol* CONTESTANT AGREEMENT, assent to the contract is impossible.  In such a case there is no contract at all.   *See* RESTATEMENT (SECOND) OF

CONTRACTS § 163, comment a (1977).

1400. Because Plaintiffs were induced to sign an instrument of a completely different nature and/or essential character than what each Plaintiff was led to believe was before him, there was no meeting of the minds to render the contract enforceable.

1401. ENTERPRISE-DEFENDANTS have at all times failed to inform Plaintiffs of the true nature of the *American Idol* Production, nor did they ever disclose the essential terms of the valuable prize to be awarded for being adjudicated or voted winner.

1402. ENTERPRISE-DEFENDANTS' intentional concealment of the basic elements of the Transaction were of such core, fundamental importance that the fraud rendered as an *involuntary* act each Plaintiff's forfeiture of their valuable property and inalienable rights – on a permanent worldwide basis - to the great detriment of the Plaintiffs and to the beneficial gains of the ENTERPRISE-DEFENDANTS.

1403. As a direct result of the JOINT VENTURE-DEFENDANTS' misrepresentations about the *bona fide* nature of the contest featured in *American Idol* Production, the *American Idol* CONTESTANT AGREEMENT (and all Addendums thereto) must be struck down as void *ab initio* under the common law theory of fraud in the factum.

1404. The formation, object, nature, character and function of the *American Idol* CONTESTANT AGREEMENT is so iniquitous, against the Law of the Land and contrary to public policy that, in the furtherance of justice the Honorable Court should strike it down in its entirety as VOID *AB INITIO.*

# COUNT IX

## CALIFORNIA LABOR CODE
## SECTION 432.7

————

**Plaintiffs Andrews, Clark, T. Brittenum, D. Brittenum,
Smalley, Joyner, Watson, Golightly and prospective Class Members Against
EMPLOYER-DEFENDANTS**

## A.    STATUTORY LANGUAGE

1405.  California Labor Code § 432.7(a) provides as follows:

> **No employer, whether a public agency or private individual or corporation, shall ask an applicant for employment to disclose, through any written form or verbally, information concerning an arrest or detention that did not result in conviction, or information concerning a referral to, and participation in, any pretrial or post-trial diversion program, nor shall any employer seek from any source whatsoever, or utilize, as a factor in determining any condition of employment including hiring, promotion, termination, or any apprenticeship training program or any other training program leading to employment, any record of arrest or detention that did not result in conviction, or any record regarding a referral to, and participation in, any pretrial or post-trial diversion program. As used in this section, a conviction shall include a plea, verdict, or finding of guilt regardless of whether sentence is imposed by the court. Nothing in this section shall prevent an employer from asking an employee or applicant for employment about an arrest for which the employee or applicant is out on bail or on his or her own recognizance pending trial.[43]**

## B.    STANDING

1406.  Plaintiffs are employees and/or employee applicants of EMPLOYER-DEFENDANTS

within the meaning of Section 432.7 of the California Labor Code.

---

[43] California Labor Code § 432.7(a) reinforces the policy behind Government Code § 12940(d) [California's Fair Employment and Housing Act], which prohibits employers from making any non-job-related inquiry that directly or indirectly limits a person's employment opportunities because of race, color, religion, national origin, ancestry, physical or mental disability, medical condition, marital status, sex, pregnancy, sexual orientation, age, or any other category protected by California state law.

1407.  EMPLOYER-DEFENDANTS are employers and/or prospective employers within the meaning of Section 432.7 of the California Labor Code.

1408.  Plaintiffs did not discover the existence of their legal employment status vis-à-vis EMPLOYER-DEFENDANTS – nor could they have upon the exercise of reasonable due diligence – until late April 2012.

1409.  Under California law, even where employees are residents of other states at the time they are commissioned for work, once solicited and retained to enter the State of California to provide their respective services for the California employer, such employee(s) is entitled to the legislative and judicial protections afforded to employees employed within the State of California.

## C.    VIOLATIONS OF SECTION 432.7

1410.  With respect to each season, EMPLOYER-DEFENDANTS were at all times in complete control over the background check procedures and questions posed as a part of their contestant vetting process, as detailed in this Third Amended Complaint.

1411.  During each named Plaintiffs' participation in the Contest, EMPLOYER-DEFENDANTS had ample opportunity to pose the appropriate background questions in writing consistent with the statutory mandates proscribed by Section 432.7 of the California Labor Code.

## (1)    GENERAL ARREST QUESTIONS ON WRITTEN APPLICATIONS

1412.  Under California law, if an individual citizen is applying for employment, or being considered for promotion, termination, or placement in a job training program, a California employer cannot ask applicants about any arrests that don't result in a conviction, or any arrests that led to participation in a diversion program.

1413.  Under California law, employers are strictly prohibited from asking prospective

employees or employees "general questions regarding an arrest" on an employment application.[44]

1414.   Under California law, employers are strictly prohibited from asking prospective employees "general questions regarding an arrest" on an employment application because those questions are deemed "likely to limit the employment of persons protected by the Fair Employment and Housing Act."[45]

1415.   Despite the express prohibitions proscribed by Section 432.7 of the California Labor Code, ENTERPRISE-DEFENDANTS have continuously violated the statute from 2002-2010 by asking all Golden Ticket Holders to answer general, open-ended questions regarding whether they have been arrested.

1416.   Throughout the course of eleven continuous seasons of the *American Idol* Production, EMPLOYER-DEFENDANTS required Prize Contestants to answer in writing statutorily prohibited job inquiries relating to Plaintiffs' criminal arrest and detention history.

## (2)    PROHIBITION ON EMPLOYERS' SEARCH FOR RECORDS OF ARREST

1417.   California Labor Code Section § 432.7 strictly prohibits employers from seeking from *any source* the arrest record of a prospective employee.

1418.   California Labor Code Section § 432.7 strictly prohibits employers from seeking from *any source* the arrest record of an employee.

1419.   Notwithstanding the express statutory prohibition in Section 432.7 on EMPLOYER-DEFENDANTS' investigation of Plaintiffs' record history of arrests, EMPLOYER-DEFENDANTS caused to procure a "rap sheet" of each Plaintiffs' criminal arrest history (regardless of whether

---

[44] *See* Department of Fair Employment and Housing, 2 Cal. Codes Regs Sec. 7287.4(d)(1) (Register 95, No. 29: 7-21-95); www.dfeh.ca.gov/res/docs/publications/DFEH-161.pdf

[45] *Id.*

such arrests had ever resulted in a conviction).

### (3)    STATUTORY PROHIBITION FORECLOSING ADVERSE ACTION

1420.  California Labor Code § 432.7 expressly prohibits an employer from using the arrest status of an employee applicant or employee as a basis for imposing discipline or other terms and conditions of employment.

1421.  California Labor Code § 432.7 also prohibits employers from taking adverse action against employee applicants or employees for an arrest when the arrest does <u>not</u> lead to a conviction.

1422.  California Labor Code § 432.7 does NOT authorize the EMPLOYER-DEFENDANTS to utilize the information of a mere arrest for disciplinary or adverse action purposes (because to hold otherwise would violate the fundamental constitutional presumption of a suspect's innocence prior to the contrary being proven in a court of law).

1423.  Notwithstanding the express statutory prohibition set forth in Section 432.7, EMPLOYER-DEFENDANTS used unlawfully obtained criminal arrest information concerning each named Plaintiffs to take adverse action against them via the act of disqualifications (regardless of whether such arrests had ever resulted in a conviction or had been *expunged*).

### D.    CAUSATION

1424.  EMPLOYER-DEFENDANTS' committed multiple violations of California Labor Code § 432.7 that are exactly the type of violations that the California State Legislature sought to prevent by prohibiting an employers' misuse of an employee or employee applicant's criminal offender records information.

1425.  EMPLOYER-DEFENDANTS' multiple violations of California Labor Code § 432.7

306

frustrate the intent of the California State Legislature to prevent the adverse impact on employment opportunities based, at least in part, on mere records of arrests where culpability cannot be proved or where the charges have been expunged.

1426. EMPLOYER-DEFENDANTS' multiple violations of California Labor Code § 432.7 was the direct and/or proximate cause of each Public-DQ Plaintiff's abrupt disqualification from the *American Idol* Contest.[46]

## E.    DAMAGES

### (1)    ACTUAL *TREBLE* DAMAGES AVAILABLE TO EMPLOYEE *APPLICANTS*

1427. All Plaintiffs, except Plaintiff Clark, were employee applicants at the time they were disqualified and are therefore entitled to receive actual treble damages pursuant to California Labor Code § 432.7(c), which provides:

> In any case where a person violates this section . . . the applicant may bring an action to recover from that person actual damages or two hundred dollars ($200), whichever is greater, plus costs, and reasonable attorney's fees. An intentional violation of this section shall entitle the applicant to treble actual damages, or five hundred dollars ($500), whichever is greater, plus costs, and reasonable attorney's fees.

### (2)    ACTUAL DAMAGES AVAILABLE TO PLAINTIFF CLARK

1428. Under California law, although "employees" are <u>not</u> entitled to statutory remedies pursuant to California Labor Code § 432.7, employees can recover actual damages against employer via a common law claim for "damages" pursuant to Ca. Civ. Code, § 3523, which states the general rule that "[f]or every wrong there is a remedy."

---

[46] Plead in the alternative to or in conjunction with the EMPLOYER-DEFENDANTS' racial intent, bigotry, racial *animus*, or stereotyped-thinking as set forth elsewhere in this Third Amended Complaint.

**(3)    STATUTE OF LIMITATIONS**

1429.   A two-year statute of limitations applies to actions brought pursuant to California Labor Code 432.7 in the context of wrongful termination.  See CCP 335.1 ("within two years: an action for … injury to … an individual caused by the wrongful act or neglect of another."); and 339 ("Within two years…an action upon a contract [written or unwritten or]…Where the ground for rescission is fraud or mistake, the time does not begin to run until the discovery by the aggrieved party of the facts constituting the fraud or mistake"); Corona v. Target Corp. (N.D. Cal. 2010) (applying two-year statute to Plaintiff's claim under Cal. Labor Code 432.7 where Plaintiff was wrongfully terminated based on misuse of criminal record information derived from employment background checks).

1430.   Here, the two-year statute of limitations runs on California Labor Code 432.7 claim based on wrongful termination when Plaintiff discovered the fact that: (a) he was an employee (or applicant for employment); (b) background check reports from CARCO were falsified and used by Defendants contrary to law.  Plaintiff Clark did not have knowledge of these facts into late April 2012.  The claims are therefore timely.

# COUNT X

## <u>CONSTRUCTIVE FRAUD</u>

### Plaintiffs Against
### PRODUCER-DEFENDANTS

## A.    FIDUCIARY or CONFIDENTIAL RELATIONSHIP

1431.  PRODUCER-DEFENDANTS held themselves out to the U.S. public and to *American Idol* Contestants as:

(a) seasoned music industry practitioners who occupied a superior position in the entertainment industry vis-à-vis the Contestants; and

(b) sophisticated professionals who possessed specialized knowledge and expertise in the trade of transforming young, "unsigned" singers into professional musical recording stars.

1432.  Each Plaintiff was between the ages of 19 and 28 at the time of their first audition for *American Idol* and was unsophisticated in matters pertaining to the law in general, including all of the complex transactional components proposed by PRODUCTION-DEFENDANTS as part of their contest offer to the U.S. public.

1433.  The complex transactional components proposed by PRODUCER-DEFENDANTS includes, but is not limited to long-form recording contracts, artist management contracts, touring agreements, merchandising licensing deals, copyright ownership transfers, contractual reversions, work for hire relationships, labor union rights, AFTRA membership, employment rights, fair credit reporting rights, criminal background check procedures, rights of publicity, reality

television production techniques, federal and state contest regulations, and accounting.

1434.  After each Plaintiff was awarded a Golden Ticket to Hollywood, or was otherwise deemed qualified to advance to Hollywood Week, the PRODUCER-DEFENDANTS assumed the professional role of managing the musical careers of each Plaintiff 360 "degrees" in order to help develop his talents as a professional recording artist and to forge a relationship of trust.

1435.  The 360 "degree" management role assumed by the PRODUCER-DEFENDANTS entailed ALL professional service aspects of each Plaintiff's business, accounting AND legal representation.

1436.  PRODUCER-DEFENDANTS acted in the professional capacity as each Plaintiff's artist manager, agent, lawyer, accountant and/or career counselor.

1437.  After securing a Golden Ticket to Hollywood based on their individual merit, each Plaintiff vested their trust in the PRODUCER-DEFENDANTS to manage his career in a 360 "degree" capacity, thereby creating a fiduciary or confidential relationship between each Plaintiff and PRODUCER-DEFENDANTS.

1438.  PRODUCER-DEFENDANTS promised each Plaintiff that they had entered a *bona fide* singing contest for a valuable prize where the criteria for winning the *American Idol* Contest was based on the merits of each Plaintiff's individual performances in the Contest (as rated by the Expert Judges and/or Public Vote).

## B.    JUSTIFIABLE RELIANCE

1439.  Based on the fiduciary or confidential relationship that existed, each Plaintiff reasonably relied on PRODUCER-DEFENDANTS' representations that *American Idol* was a *bona fide* singing contest for a valuable prize where the criteria for winning the *American Idol* contest was

based on the merits of each Plaintiff's individual performances in the Contest (as rated by the Expert Judges and/or Public Vote).

1440.  Based on the fiduciary or confidential relationship that existed, each Plaintiff reasonably relied on PRODUCER-DEFENDANTS' representations that PRODUCER-DEFENDANTS would act in the furtherance of each Plaintiff's best interests in providing their professional services and expertise in the fields of artist management, business development, accounting AND legal representation.

1441.  Based on the fiduciary or confidential relationship that existed, each Plaintiff reasonably relied on PRODUCER-DEFENDANTS' representations that the background information obtained through the "Contestant Vetting" process would be maintained in strict confidence.

## C.    PLAINTIFFS' OWNERSHIP INTERESTS

### (1)    AUTHORSHIP INTEREST

1442.  By virtue of the tangible fixation of each Plaintiff's appearances, performances and creative renditions of pre-existing musical compositions, as embodied in the audio-visual works recorded by PRODUCER-DEFENDANTS, each Plaintiff possesses an authorship interest in their respective performances.

### (2)    COPYRIGHT INTERESTS

1443.  In good faith reliance upon and in consideration for DEFENDANTS' representations that *American Idol* was a *bona fide* contest for a valuable prize, and on account of the special and/or fiduciary relationship that had been forged with PRODUCER-DEFENDANTS, each Plaintiff conveyed, assigned and/or otherwise transferred his copyright ownership interests in his performances, appearances and renditions to PRODUCER-DEFENDANTS for an infinite period of

311

duration by way of the AMERICAN IDOL CONTESTANT AGREEMENT.

**(3)    RIGHTS TO PUBLICITY**

1444.  Each Plaintiff is the true and rightful owner of his common law and/or state statutory rights to publicity, which represent a proprietary interest in each Plaintiff's own name, image, persona, identity, voice, likeness and performance.

1445.  In good faith reliance upon and in consideration for PRODUCER-DEFENDANTS' representations that *American Idol* was a *bona fide* contest for a valuable prize, and on account of the special and/or fiduciary relationship that had been forged with PRODUCER-DEFENDANTS, each Plaintiff (and prospective Class member) conveyed, assigned and/or otherwise transferred their publicity rights to PRODUCER-DEFENDANTS for an infinite period of duration by way of the *American Idol* CONTESTANT AGREEMENT.

1446.  Each Plaintiff's respective authorship interests, copyright interests and publicity interests are collectively defined herein as "Plaintiff's Ownership Interests."

**D.    ADVANTAGE GAINED BY DEFENDANTS**

1447.  By virtue of the rights conveyed to PRODUCER-DEFENDANTS under the *American Idol* CONTESTANT AGREEMENT, the PRODUCER-DEFENDANTS, NETWORK-DEFENDANTS and SPONSORSHIP-DEFENDANTS have all retained economic benefits from the acquisition and exploitation of each Plaintiff's Ownership Interests.

1448.  The economic benefits retained by the PRODUCER-DEFENDANTS, NETWORK-DEFENDANTS and SPONSORSHIP-DEFENDANTS include, but are not limited to: licensing fees, television advertising revenues, internet advertising revenues, merchandising revenues, packaged media sales (e.g., DVD), book sales and worldwide syndication fees generated from the

exploitation of Plaintiff's Ownership Interests.

1449.   PRODUCER-DEFENDANTS continue to retain and possess ownership over the audio-visual recordings and photographs of each Plaintiff's singing performances, personal appearances and artistic renditions in connection with each Plaintiff's participation on *American Idol.*

## E.    BREACH OF DUTY

1450.   PRODUCER-DEFENDANTS have defrauded Plaintiffs by breaching their duties arising from their fiduciary or confidential relationship vis-à-vis each Plaintiff through deliberate acts (the "Deliberate Acts"), including but not limited to:

(a) fraudulent misrepresentation concerning the true nature of the *American Idol* Contest;

(b) acquisition of Plaintiff's Ownership Rights via illusory contracts tainted by illegality, mistake, unconscionability, failure of consideration, absence of consideration and fraud;

(c) unlawful procurement of criminal arrest history information without consent;

(d) illegal transmission of criminal background information to mass media;

(e) commission of intentional tortious activity, including defamation *per se*, trade disparagement and false light;

(f)  misappropriation and/or conversion of each Plaintiff's Ownership Interests.

1451.   PRODUCER-DEFENDANTS' contractual acquisition of Plaintiffs' Ownership Rights at the time of each Plaintiff's entry into the *American Idol* Contest was made under fraudulent pretenses in the context of a fiduciary or confidential relationship.

1452.   But for THE public disqualification of JXJ-1 from the American Idol Contest on or about March 14, 2012, none of the Plaintiffs knew, had good cause to believe, nor could have discovered upon the exercise of reasonable due diligence, facts sufficient to state a plausible claim that the *American Idol* Contest was rigged and therefore NOT a *bona fide* contest as advertised.

1453. PRODUCER-DEFENDANTS possessed superior knowledge vis-à-vis each Plaintiff concerning the true nature of the contest depicted on *American Idol*, which is rigged and therefore NOT a *bona fide* contest as advertised.

1454. The conveyance of each Plaintiff's Ownership Rights to PRODUCTION-DEFENDANTS was made <u>without</u> the legal informed consent of each Plaintiff.

1455. Plaintiff's Ownership Interests have been acquired under such circumstances that it would not be in good conscience for the PRODUCER-DEFENDANTS to retain legal title to any of Plaintiff's Ownership Interests or retain the economic interests derived from the commercial exploitation of Plaintiff's Ownership Interests.

1456. Plaintiff's Ownership Interests have been acquired under such circumstances that it would not be in good conscience for the NETWORK-DEFENDANTS or SPONSORSHIP-DEFENDANTS to retain legal title to any of Plaintiff's Ownership Interests or retain the economic interests derived from the commercial exploitation of Plaintiff's Ownership Interests.

1457. Plaintiff's Ownership Interests have been acquired under such circumstances that the economic benefits Plaintiffs' Ownership Rights. beneficial interests attributable to the commercial exploitation and continued retention of

1458. The absence of lawful, informed consent in the making of the *American Idol* Prize Contract is evidenced by one or more of the following factors which, individually or collectively, render unjust the retention of any beneficial interests in favor of PRODUCTION-DEFENDANTS, NETWORK-DEFENDANTS and SPONSORSHIP-DEFENDANTS:

(a)     Mistake of fact concerning the true nature of the *American Idol* Contest advertised by Defendants;

(b)     Mistake of law concerning the true nature of the *American Idol* advertised by

Defendants;

(c)     Undue influence concerning the special and/or fiduciary relationship forged by the PRODUCER-DEFENDANTS with each Plaintiff;

(d)     Failure of consideration on account of the innate transactional defect concerning the true nature and purpose of the *American Idol* Contest;

(e)     Unconscionability

(f)     Illegality

1459.    As a direct and/or proximate result of their fraudulent conduct causing harm to each Plaintiff, JOINT VENTURE-DEFENDANTS gained an unjust advantage.

1460.    Before March 14, 2012, none of the Plaintiffs knew, had good cause to believe, nor could have discovered upon the exercise of reasonable due diligence, facts sufficient to state a plausible claim that he had been defrauded.

1461.    Each Plaintiff was mislead by PRODUCER-DEFENDANTS to enter into the *American Idol* Contest under fraudulent pretenses and did <u>not</u> receive the benefit of the bargain of the transaction.

1462.    Had any one Plaintiff known, or had good cause to know, the true nature and purpose of the *American Idol* Contest at the time they first auditioned for *American Idol*, no Plaintiff named herein (or prospective Class Member) would have agreed to participate

# COUNT XI

## UNDERLINED UNJUST ENRICHMENT

### Plaintiffs Against
### JOINT VENTURE-DEFENDANTS

1463.   Plaintiffs in their individual capacity repeat and re-allege each and every allegation above as if set forth herein.

1464.   Plaintiffs were possessed of a reasonable expectation at the time they entered THE *American Idol* Contest that they would be afforded the fair and equal opportunity to compete for a valuable prize of monetary value.

1465.   Plaintiffs were possessed of a reasonable expectation at the time they entered the *American Idol* Contest  their talent as singers and performers would be evaluated by the Expert Judges and appraised by the Public Vote based on their individual merit as singers.

1466.   Through their wrongful from the *American Idol* Contest for reasons other than their individual merit as singers and performers, JOINT VENTURE-DEFENDANTS deprived Plaintiffs of their reasonable expectations.

1467.   With respect to each Plaintiff, it was reasonably foreseeable to JOINT VENTURE-DEFENDANTS, at the time each Plaintiff was disqualified from the contest for reasons other than their merit,  that each Plaintiff was possessed of a high statistical probability of winning or top-ranking in the *American Idol* Contest.

1468.   It would be contrary to equity and good conscience for the JOINT VENTURE-DEFENDANTS to retain an economic benefit which has accrued to them at the expense of Plaintiffs.

1469.   JOINT VENTURE-DEFENDANTS were each individually listed as signatories or third-

party beneficiaries to the *American Idol* Contestant Agreement and otherwise actively participated in the *American Idol* Production featuring each of Plaintiffs.

1470.   JOINT VENTURE-DEFENDANTS benefitted from the commercial exploitation of Plaintiffs' respective talent services, voices, names, images, identities and likenesses, as well as from commercial exploitation of Public-DQ-Plaintiffs' respective disqualifications and surrounding media scandals.

1471.   JOINT VENTURE-DEFENDANTS unjustly failed to compensate Plaintiffs for the valuable economic benefits that the JOINT VENTURE-DEFENDANTS received as a result of Plaintiffs' participation in the *American Idol* Contest and Production.

1472.   The failure of the JOINT VENTURE-DEFENDANTS to compensate each Plaintiff for the valuable economic benefits the JOINT VENTURE-DEFENDANTS received as a result of Plaintiffs' participation in the *American Idol* Contest and Production was to the Plaintiffs' detriment.

# PRAYER FOR RELIEF

<u>COUNT I</u>: **42 U.S.C. § 1981 (Making of *19 Entertainment* Prize Contracts)**

◆ As a direct and/or proximate cause of JOINT VENTURE-DEFENDANTS' unlawful interference with Plaintiff's active participation in a purported *bona fide* contest for valuable prize, each Plaintiff seeks **compensatory damages** for their economic injuries, lost business opportunity and/or loss of earning potential caused by JOINT VENTURE-DEFENDANTS, who intentionally interfered with each Plaintiff's making and enforcing of his contractual rights and/or quasi-contractual interests, and who should be held jointly and severally liable to compensate each Plaintiff in an amount to be determined at trial, plus costs, interest and a reasonable attorney's fee under statutory law and/or in the furtherance of justice.

<u>COUNT II</u>: **42 U.S.C. § 1981 (Making of *Advertised* Prize Contracts)**

◆ As a direct and/or proximate cause of JOINT VENTURE-DEFENDANTS' unlawful interference with Plaintiff's active participation in a purported *bona fide* contest for valuable prize, each Plaintiff seeks **compensatory damages** for their economic injuries, lost business opportunity and/or loss of earning potential caused by JOINT VENTURE-DEFENDANTS, who intentionally interfered with each Plaintiff's making and enforcing of his contractual rights and/or quasi-contractual interests, and who should be held jointly and severally liable to compensate each Plaintiff in an amount to be determined at trial, plus costs, interest and a reasonable attorney's fee under statutory law and/or in the furtherance of justice.

<u>COUNT III</u>: **42 U.S.C. § 1981 (Breach of Covenant of Good Faith and Fair Dealing -**
**_American Idol_ Contestant Agreement)**

◆ As a direct and/or proximate cause of JOINT VENTURE DEFENDANTS' unlawful interference with Plaintiff's active participation in a purported *bona fide* contest for valuable prize, each Plaintiff seeks **compensatory damages** for their economic injuries, lost business opportunity and/or loss of earning potential caused by JOINT VENTURE DEFENDANTS, who intentionally interfered with each Plaintiff's making and enforcing of his contractual rights and/or quasi-contractual interests, and who should be held jointly and severally liable to compensate each Plaintiff in an amount to be determined at trial, plus costs, interest and a reasonable attorney's fee under statutory law and/or in the furtherance of justice.

<u>COUNT IV</u>: **42 U.S.C. § 1981 (Employment Contracts)**

◆ Plaintiffs respectfully seek **injunctive relief** from the Honorable Court to enjoin the unlawful employment practices of EMPLOYER-DEFENDANTS and to prevent such unlawful practices from continuing into the future by:

(1) requiring that EMPLOYER-DEFENDANTS utilize an objective, merit-based, job-related and racially-neutral standard to make disqualification decisions about *American Idol* Prize Contestants;

(2) prohibiting the EMPLOYER-DEFENDANTS from *publicly* disqualifying and/or defaming a Black *American Idol* contestant on the basis of their criminal arrest history (in the absence of such contestant's informed consent).

(3) conducting non-compliant criminal background checks as part of the *American Idol* "contestant vetting" process.

(4) enjoining the EMPLOYER-DEFENDANTS from applying disparate rules or conditions upon *American Idol* Prize Contestants depending on their race or ancestral characteristics.

◆  As a direct and/or proximate cause of EMPLOYER-DEFENDANTS' unlawful interference with Plaintiff's active participation in the *American Idol* Production, each Plaintiff seeks **compensatory damages** for their economic injuries caused by EMPLOYER-DEFENDANTS' unlawful employment practices, in an amount to be determined at trial, plus costs, interest and a reasonable attorney's fee under statutory law and/or in the furtherance of justice.


## COUNT V: 42 U.S.C. § 1981 (Equal Benefits)

◆  As a direct and/or proximate cause of ENTERPRISE-DEFENDANTS' unlawful interference with Plaintiff Andrews, Clark, T. Brittenum and D. Brittenum's then pending government proceedings, each Plaintiff named in this Count seeks **compensatory damages** for their economic injuries, loss of security, lost business opportunity and/or loss of earning potential caused by ENTERPRISE-DEFENDANTS, who should be held jointly and severally liable to compensate each Plaintiff in an amount to be determined at trial, plus costs, interest and a reasonable attorney's fee under statutory law or in the furtherance interests of justice under statutory law and/or in the furtherance of justice.


## COUNT VI:  42 U.S.C. § 1985(3) (Deprivation of Constitutional Rights)

◆  As a direct and/or proximate result of OVERSEER-DEFENDANTS' intentional deprivation of rights, privileges and benefits granted to a protected class of U.S. citizen by the Thirteenth and Fourteenth Amendments to the U.S. Constitution, named Plaintiffs in this Count have been irrevocably damaged by the outrageous misconduct of OVERSEER-DEFENDANTS and are therefore entitled to recover an amount of compensatory, general and punitive damages, in an amount to be determined at trial of their peers, plus costs, interests and a reasonable attorney's fee under statutory law and/or in the furtherance of justice.

<u>**COUNT VII**</u>:  **Title VII – Civil Rights Act of 1964 (Disparate Impact)**

◆  Plaintiffs respectfully seek <u>**injunctive relief**</u> from the Honorable Court to remedy the employment practices of EMPLOYER-DEFENDANTS and to prevent such unlawful practices from continuing into the future by:

    (1)  requiring that EMPLOYER-DEFENDANTS utilize an objective, merit-based, job-related and racially-neutral standard to make casting decisions about *American Idol* Prize Contestants;

    (2)  asking statutorily prohibited criminal arrest questions on their background forms;

    (3)  conducting non-compliant criminal background checks as part of the *American Idol* "contestant vetting" process.

◆  Plaintiffs also respectfully seek their costs and a reasonable attorney's fee under statutory law and/or in the further interests of justice.

<u>**COUNT VIII**</u>:  **Rescission / Restitution**

◆ Each Plaintiff seeks a complete <u>**revocation**</u> and undivided <u>**restoration**</u> of any and all grant(s) of ownership rights, proprietary interests, publicity rights, credit attributions and intellectual property licenses or materials that JOINT VENTURE-DEFENDANTS purported to acquire, claim to possess and/or may attempt to obtain from each Plaintiff pursuant to the *American Idol* CONTESTANT AGREEMENT (as amended), or any other document or purported agreement related to the subject transaction.

◆  Each Plaintiff seeks a <u>**declaration**</u> of his federal copyright ownership (or joint ownership) interest pursuant to the U.S. Copyright Act of 1976 in all "audiovisual works" or "motion pictures" – whether in tangible or digital "media" now known or hereafter devised - embodying each Plaintiff's name, voice, image, likeness, performances, personal identity, appearances and/or original works relating to his filmed participation on *American Idol*, regardless of whether such footage was published or broadcast.

◆  In furtherance of a declaration of federal copyright ownership and/or revocation of a grant of rights to such ownership, Plaintiff seeks <u>**specific performance**</u> as to any and all audio-visual, motion picture, photographic, graphic and written promotional materials, as fixed in digital format, that are currently in possession, custody or control of any of the named Defendants in this action, and which contain or embody any and ALL of each Plaintiff's filmed performances or which otherwise feature his voice, image, likeness, personal identity, or appearances, whether on-stage, back stage or in any area whatsoever where he may appear at any time during his participation with the *American Idol* Production and Contest.

◆  Plaintiff seeks **restitutionary disgorgement** of any and all profits generated by JOINT VENTURE-DEFENDANTS, jointly and severally, from the unauthorized commercial exploitation of each Plaintiff's respective copyright ownership interests and publicity rights, which were obtained by *Defendants* under fraudulent pretenses and in bad faith, in an amount to be determined at trial plus an award of general damages, punitive damages, interest, costs, and a reasonable attorney's fee under statutory law and/or in the further interests of justice.

## COUNT IX: California Labor Code 432.7

◆  As a direct and/or proximate cause of EMPLOYER-DEFENDANTS' violation of Cal. Labor Code 432.7, each Plaintiff named in this Count seeks **actual or statutory damages** from EMPLOYER-DEFENDANTS, who should be held jointly and severally liable to compensate each Plaintiff in an amount to be determined at trial (if actual), plus costs, interest and a reasonable attorney's fee as per statutory law and/or in the further interests of justice.

## COUNT X:  Constructive Fraud

◆ Seek the same Relief as Count VIII

## COUNT XI: Unjust Enrichment

Each Plaintiff seeks reimbursement for the valuable economic benefits that the JOINT VENTURE-DEFENDANTS received as a direct or proximate result of each Plaintiff's participation in the *American Idol* Contest and Production.

**Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby respectfully demands a trial by jury of all issues triable of right by a jury.**

Dated: February 18, 2014
New York, New York

**RESPECTFULLY SUBMITTED**

**/jameshfreeman/**
_____

James H. Freeman, Esq.

JH FREEMAN LAW

JH FREEMAN LAW
3 Columbus Circle, 15 FL
New York, NY 10019
Telephone: (212) 931-8535
james@jhfreemanlaw.com

*Attorneys for Plaintiffs*
*Jaered N. Andrews, Corey D. Clark,*
*Donnie Williams, Terrell Brittenum,*
*Derrell Brittenum, Akron Watson,*
*Thomas Daniels, Ju'Not Joyner*
*Chris Golightly, Jacob John Smalley*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this **20th day** of **February, 2013**, a true and correct copy of the

foregoing was filed with the Court through the ECF-CM electronic filing system, and that

further notice of the same has been provided via e-mail on the following counsel:


Daniel Petrocelli, Esq.
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
Los Angeles, NY 90067
Tel: (310) 246-6770
dpetrocelli@omm.com

*Attorneys for Defendants*
*Fremantlemedia N.A., Inc.,*
*American Idol Productions, Inc.,*
*19 Entertainment Ltd.*
*Core Media Group, Inc.*
*21st Century Fox, Inc.*
*Fox Broadcasting Company, Inc.*
*Nigel Lythgoe, Ken Warwick*
*Ford Motor Company, Inc.,*
*Coca-Cola Company, Inc.,*
*AT&T*


By: *s/ James H. Freeman*