**Note: Do Not Sign This Until You Have Read It Completely**

CONFIDENTIAL

**"AMERICAN IDOL"**
**ADDENDUM #2 TO**
**CONTESTANT AGREEMENT AND RELEASE**

Reference is made to that certain Contestant Agreement and Release and any addenda thereto (collectively, the "Agreement") in connection with my participation in the television series currently entitled "American Idol" (the "Series"). In consideration of and as an inducement to American Idol Productions, Inc. ("Producer") further considering me as a contestant on the Series, I am making the representations, warranties, disclosures, covenants and agreements described in this Addendum #2 to the Agreement (the "Addendum"). Producer requires me to enter into this Addendum in order to be further considered as a contestant on the Series, and I deem it to be in my best interest to enter into this Addendum.

ACCORDINGLY, PRODUCER AND I AGREE AS FOLLOWS:

1. I understand and agree that as a condition to my further participation in the Series as one of the twelve (12) finalists, or as an alternate, I will be required, at the sole discretion of the 19 Companies (as defined below), to enter into (a) an agreement with 19 Recordings Limited for my exclusive services as a recording artist (the "Recording Contract"); (b) an agreement with 19 Merchandising Limited for the use of my name, likeness and biography in connection with advertising, endorsement, merchandising and sponsorship (the "Merchandising Contract"); and (c) an agreement with 19 Management Limited for the management of my career as an artist in the entertainment industry. The Recording Contract, Merchandising Contract and Management Contract shall be referred to herein collectively as the "Talent Contracts." 19 Recordings Limited, 19 Merchandising Limited and 19 Management Limited shall be referred to herein collectively as the "19 Companies."
2. I hereby represent and warrant that, as of the date of this Addendum, I have not entered into any contract or arrangement which might prevent me from entering into the Talent Contracts. In addition, I hereby agree that I will not enter into any contract or arrangement which might prevent me from entering into the Talent Contracts before that date which is three (3) months from the initial broadcast of the final episode of the Series.
3. I have never performed professionally as an entertainer (including but not limited to, as a recording artist, actor, songwriter, or model), nor have I ever entered into a contract for my entertainment services (including but not limited to, my recording, acting, modeling or songwriting services), except as follows (list below all professional performances and/or entertainment contracts):

| Type of Performance | Date of Performance |
|---|---|
| | |
| | |
| | |
| | |
| | |

| Type of Contract | Parties to Contract | Effective Dates of Contract |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

4. I understand that, in the event I enter into the Talent Contracts, the 19 Companies will make a reasonable contribution to the cost of independent legal representation in order to advise me in relation to entering into the Talent Contracts. I hereby agree that any actual or alleged consequence of my following such legal advice shall be included within the matters released and indemnified pursuant to the provisions of Section E of the Agreement.

5. I acknowledge and agree that the confidentiality provisions of Section G.2. of the Agreement shall apply to the Talent Contracts. In addition, I hereby agree that I will not disclose any information concerning the Talent Contracts to anyone (including but not limited to other contestants on the Series) at any time (either before or after production of the Series). Notwithstanding the foregoing, I understand that I may disclose the terms of the Talent Agreements to my attorney.
6. **I understand and agree that in the event I disclose any confidential information concerning the Series, including but not limited to the terms of the Talent Contracts, I may automatically be disqualified from the Series and that Producer, the Network and/or the 19 Companies will be entitled to the relief set forth in Section G.2. of the Agreement.**

INITIAL HERE CC

7. I agree that, from the date of this Addendum, until the later of six (6) months from the date I cease to participate on the Series or three (3) months from the date of the initial broadcast of the final episode of the Series, I will not appear or participate in any television or radio program similar to the Series (i.e., consisting of or containing a talent contest relating to my musical/performing abilities), without Producer's prior written consent. In addition, I agree that for a period of one (1) year from the date of the initial broadcast of the final episode of the Series, I will not render services as a host or judge in any television or radio program similar to the Series, without Producer's prior written consent.
8. I understand that the twelve (12) finalists may be housed in a private residence (which will be coed) in Los Angeles, California. I acknowledge and agree that the provisions of the Agreement shall apply to such private residence, including but not limited to the provisions of Section D. (Acknowledgement and Assumption of Risk) and Section E. (Releases, Waivers and Indemnifications). I also agree that the owner(s), landlord(s), management company(ies) and/or insurer(s) of such private residence shall be added to the definition of "Released Parties" under the Agreement
9. I agree to follow the house rules in connection with my stay at the private residence, if any, a copy of which rules will be provided to me by the Producer.
10. **I hereby represent and warrant that, to the best of my knowledge, I do not have a medical condition that might impact upon my health and well-being or the health and well-being of other contestants or any other person involved in the Series. In the event I do have such a medical condition, I agree to IMMEDIATELY disclose such condition to the Producer on the attached questionnaire.**

INITIAL HERE CC

11. **I hereby warrant and represent that I have truthfully and accurately completed all forms relating to the Series and that I have not withheld any information requested of me by Producer, the Network or the 19 Companies. Furthermore, I acknowledge that Producer reserves the right, exercisable at any time in its sole discretion, to disqualify me from the competition at any stage if I refuse to supply any information reasonably requested of me, supply untruthful, inaccurate or misleading personal details or information, break the rules of the Series or otherwise breach the terms of the Agreement (including this Addendum).**

INITIAL HERE CC

12. I acknowledge that if I am not one of the twelve (12) finalists, I may be chosen as an alternate contestant to replace a previous contestant by Producer, in Producer's sole discretion. If I am chosen as an alternate, I shall remain available to participate in the Series as a contestant if and when chosen by Producer to replace such previous contestant. I understand that if I am selected to be an alternate and am not chosen to replace a contestant, then I do not have any chance to win any prize and no consideration shall be payable to me. I acknowledge and agree that Producer may, at any time and in its sole discretion, add, remove or replace contestants.
13. I agree that in the event I am under 18 years of age, I will cooperate with the 19 Companies, or their designee(s), in having the executed versions of the Talent Contracts court approved, if necessary.

14. I understand and agree that all of the terms and conditions of the Agreement shall remain in effect, including but not limited to the exclusivity and confidentiality provisions. In the event of any discrepancy between this Addendum and the Agreement, which discrepancy would limit or restrict the rights of Producer in any way, the terms of this Addendum shall prevail.

DATED: 3-12-03

CONTESTANT:

[signature]
Signature

Print Name: Corey Clark

Address: 1138 N. Chestnut ave.
Rialto, CA. 92376

Telephone: 909-874-1026

Social Security Number: [redacted]

DATED: 3/12/03

PRODUCER:

AMERICAN IDOL PRODUCTIONS, INC.

By: Amanda Chacon

Its: Secretary

**IF THE ABOVE INDIVIDUAL IS UNDER THE AGE OF 18 YEARS, THE PARENT OR LEGAL GUARDIAN OF SUCH PERSON MUST ALSO SIGN BELOW.**

I hereby warrant that I am the parent and/or legal guardian of ____________________________, the individual who signed the foregoing Addendum (the "Minor"), that I have caused said Minor to execute said Agreement, that I will not instruct, authorize or permit said Minor to disaffirm the foregoing Agreement, and that I will indemnify the Released Parties (as defined in the Agreement) against all claims, liabilities and expenses with respect to said Agreement, and that, knowing of Producer's reliance hereon, I agree to cause said Minor to adhere to all of the provisions of said Addendum and the Agreement. In addition, I agree to be bound by the confidentiality provisions of the Agreement. I further agree to cooperate with Producer in having any and all contracts entered into on behalf of said Minor in connection with the Series court approved, as may be required by Producer, and I hereby waive notice and any opportunity to appear and be heard in connection with any such proceedings.

Dated: ____________________

Place: ____________________

Alias: ____________________

Social Security No.: ____________________

Relationship to Minor: ____________________

______________________________
Name (Please Print)

______________________________
(Signature)

______________________________
Address (Street)

______________________________
(City) (State) (Zip)

______________________________
(Phone No.)

Note: **PLEASE KEEP US ADVISED IN WRITING OF YOUR CURRENT ADDRESS.**

Corey Clark

**QUESTIONNAIRE**

1. Do you have a medical condition that may impact upon your health and well-being or the health and well-being of other contestants or any other person involved in the Series?

☐ Yes (please explain)

☒ No

2. Are you currently taking any medications (either prescribed or non-prescribed)?

☒ Yes (please explain) Medication for Neck and Back Spasms.

☐ No

3. Do you have any allergies (food or drug)?

☐ Yes (please explain)

☒ No

4. Can you swim?

☒ Yes

☐ No

5. Please list the name and phone number of your personal physician below.

6. **Do you have health insurance? (If yes, please provide copy of insurance card)**

☑ **Yes (please list plan provider, name of insured, group no., member no.)** United health Care.

☐ **No**

7. **Please list the name, address, phone and relationship of at least three (3) people we can contact in case of an emergency.**

| Name | Address | Phone | Relationship to you |
|---|---|---|---|
| Sherrie Evans | N. holllywood, CA. | 818-915-5291 | Friend. |
| William Lovett | Chula vista, CA. | 619-406-2716 | Brother |
| Nell Clark | San Diego, CA | 619-698-0651 | Aunt. |



BLANK

CDC_000412

*American Idol Production, Inc.*
# EMPLOYMENT CONTRACT

------------------

*I-9 Form*
*AFTRA Files*
*Pay Stubs*

---------------------------------

3/10/2003 –5/02/2003

---------------------------------

To: COREY D. CLARK

From: AFTRA and Fremantle

Signed: Produced by AFTRA

Returned To:

------------------------

START

# American Idol Productions, Inc.

## Recoupable Salary Advance

March 10, 2003

---

I, Corey Clark, accept a cash salary advance of $500.00 and agree to have this amount deducted from the net amount of my first paycheck for American Idol Season Two.

Signature
SS# 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

7800 Beverly Blvd. Suite 251 Los Angeles. CA 90036
323-575-8000 phone fax 323-575-8050



BLANK

CDC_000415

**U.S. Department of Justice**
Immigration and Naturalization Service

OMB No. 1115-0136
**Employment Eligibility Verification**

**Please read instructions carefully before completing this form. The instructions must be available during completion of this form. ANTI-DISCRIMINATION NOTICE. It is illegal to discriminate against work eligible individuals. Employers ^^NNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a ...re expiration date may also constitute illegal discrimination.**

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins

| Print Name: Last | First | Middle Initial | Maiden Name |
|---|---|---|---|
| Clark | Corey | D. | |

| Address (Street Name and Number) | Apt. # | Date of Birth (month/day/year) |
|---|---|---|
| 1138 N. Chestnut ave. | | 7-15-80 |

| City | State | Zip Code | Social Security # |
|---|---|---|---|
| Rialto | CA. | 92376 | [redacted] |

**I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.**

I attest, under penalty of perjury, that I am (check one of the following):
- [x] A citizen or national of the United States
- [ ] A Lawful Permanent Resident (Alien # A ______)
- [ ] An alien authorized to work until ___/___/___ (Alien # or Admission # ______)

Employee's Signature: [signature]   Date (month/day/year): 3-11-03

**Preparer and/or Translator Certification.** *(To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.*

Preparer's/Translator's Signature | Print Name

Address *(Street Name and Number, City, State, Zip Code)* | Date *(month/day/year)*

**Section 2. Employer Review and Verification.** To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C as listed on the reverse of this form and record the title, number and expiration date, if any, of the document(s)

| | List A | OR | List B | AND | List C |
|---|---|---|---|---|---|
| ...ment title: | | | Drivers license | | Social Security card |
| Issuing authority: | | | California | | SSA |
| Document #: | | | D2274653 | | 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 |
| Expiration Date (if any): | __/__/__ | | 7/13/04 | | Never |
| Document #: | | | | | |
| Expiration Date (if any): | __/__/__ | | | | |

**CERTIFICATION - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on** *(month/day/year)* 03/11/03 **and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment).**

| Signature of Employer or Authorized Representative | Print Name | Title |
|---|---|---|
| MBaker | Michelle Baker | Prod. Coord. |

| Business or Organization Name | Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|---|
| ...merican Idol Productions, Inc. 9... Beverly Blvd. Ste 251 ...s Angeles, CA 90038 | | 02/13/03 |

**Section 3. Updating and Reverification.** To be completed and signed by employer

A. New Name *(if applicable)*

B. Date of rehire *(month/day/year) (if applicable)*

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility.

Document Title: ________ Document #: ________ Expiration Date (if any): __/__/__

**...est, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.**

Signature of Employer or Authorized Representative | Date *(month/day/year)*

Form I-9 (Rev. 11-21-91) N

BLANK

**F S I** *Film Payment Services, Inc.*

# EMPLOYMENT DEALMEMO

| PROD. COMPANY | PROD. TITLE | UNION NO. | OCCUP CODE & SCHEDULE |
|---|---|---|---|
| American Idol inc. | American Idol | AFTRA | |

| EMPLOYEE NAME | SOCIAL SECURITY NUMBER | START DATE | JOB CLASS | SEX |
|---|---|---|---|---|
| Corey Clark | [redacted] | 3/11/03 | Principal | (M) F |

EMPLOYEE ADDRESS: 1138 N. Chestnut ave.

CHECK ONE: ☐ DAILY EMPLOYEE ☐ WEEKLY EMPLOYEE

CITY: Rialto

| STATE | ZIP CODE | PHONE |
|---|---|---|
| CA. | 92376 | 909-874-6016 |

NAME OF LOANOUT COMPANY:

FEDERAL I.D. #: STATE I.D. #:

IS LOANOUT LICENSED TO DO BUSINESS IN THE STATE IN WHICH FILM IS BEING PRODUCED: ☐ YES ☐ NO

IF NO TO ABOVE, IN WHICH STATE ARE YOU LICENSED:

OTHER TERMS & CONDITIONS:

| TERMS OF EMPLOYMENT | STUDIO | LOCATION |
|---|---|---|
| RATE PER HOUR / ACCOUNT: | Per AFTRA Contract | |
| RATE PER WEEK / ACCOUNT: | | |
| OVERTIME RATE IF DIFFERENT FROM GUAR. / ACCOUNT: | | |
| GUARANTEED HOURS | DAY / WEEK | DAY / WEEK |
| IF RATE DOES NOT INCLUDE IDLE | | PAY SATURDAY $ / PAY SUNDAY $ |
| **CAR RENTAL / ACCOUNT: | | |
| **MISCELLANEOUS RENTAL / ACCOUNT: | | |
| PER DIEM / ACCOUNT: | | |

**THESE ITEMS ARE CONSIDERED TAXABLE INCOME UNLESS A WEEKLY ITEMIZED INVOICE IS PROVIDED.

AS A CONDITION OF EMPLOYMENT EMPLOYEE AUTHORIZES EMPLOYER TO AUTOMATICALLY DEDUCT FROM EMPLOYEES' PAYCHECK ANY OVERPAYMENTS OR CASH ADVANCES UNACCOUNTED FOR.

***** YOUR EMPLOYER OF RECORD IS FILM PAYMENT SERVICES, INC. *****

EMPLOYEE SIGNATURE: X [signature] PRODUCTION MANAGEMENT: X [signature]

## BOX/KIT RENTAL AGREEMENT

AS OF JULY, 1990 IRS REGULATIONS REQUIRE THAT AN ITEMIZED FORM BE SUBMITTED TO SUBSTANTIATE KIT RENTALS. IF RENTALS ARE NOT SUBSTANTIATED, KIT RENTALS WILL BE SUBJECT TO WITHHOLDING TAXES AT THE SAME RATES AS WAGES.

RENTAL COMMENCES ON: ________ RATE: ________ PER WK

ITEMIZED INVENTORY:

| QUANTITY | DESCRIPTION | ITEM VALUE | UNIT RENTAL PRICE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

NOTE: IF YOU NEED MORE ROOM, PLEASE ATTACH A SEPARATE SHEET TOTAL VALUES:

I ATTEST THAT THE ABOVE DESCRIBED EQUIPMENT REPRESENTS A VALID RENTAL FOR THIS PRODUCTION.

| EMPLOYEE SIGNATURE | DATE | APPROVAL SIGNATURE | DATE |
|---|---|---|---|
| | | | |

CDC_000418

BLANK

# American Federation of Television and Radio Artists

*affiliated with the AFL-CIO*

## Cast Clearance Report

### American Federation of Television and Radio Artists - Los Angeles

-- Cast List --

*JOB PENDING BASED ON EMPLOYER SIGNATORY STATUS*

**American Idol**

ID : 54367 Episode : 210 Start Date : 03/11/2003

| AFTRA Rep. : | AFTRA Contact : | AFTRA Phone : | AFTRA Fax : |
|---|---|---|---|
| Billie Murphy | Edwin Solorio | 323-634-8100 | 323-634-8246 |
| **Employer of Record :** | **Producer :** | **Casting Director :** | **Job Primary Contact :** |
| | AMERICAN IDOL PRODUCTIONS INC<br><br>Anne Barnett<br>310-255-4700 | | Chris Wagner<br><br>323-575-8050 |

| Status | Name Requested | SSN | Local | Performance Classification | APP | ATH |
|---|---|---|---|---|---|---|
| TH | Aiken,Clay | [redacted] | Taft Hartley | TVP-Day Performer On-Camera | X | |
| OK | Anthony,Keith | [redacted] | Los Angeles | TVP-Stand In | | |
| OK | Barrett,Mark | [redacted] | Los Angeles | TVP-Stand In | | |
| OK | Blum,Larry S. | [redacted] | Los Angeles | TVP-Stand In | | |
| OK | Brandt,Mindy | [redacted] | Los Angeles | TVP-Stand In | | |
| OK | Byrd,Debra | [redacted] | Los Angeles | TVP-Day Performer On-Camera | | |
| TH | Caldwell,Kimberly | [redacted] | Taft Hartley | TVP-Day Performer On-Camera | X | |
| TH | Clark,Corey | [redacted] | Taft Hartley | TVP-Day Performer On-Camera | X | |
| TH | Cobbins,Lashundra | [redacted] | Taft Hartley | TVP-Day Performer On-Camera | X | |
| TH | Demato,Julia | [redacted] | Taft Hartley | TVP-Day Performer On-Camera | X | |
| OK | Gadson,Karen | [redacted] | Los Angeles | TVP-Stand In | | |
| OK | Gentry,Renee | [redacted] | Los Angeles | TVP-Stand In | | |
| TH | Gracin,Joshua | [redacted] | Taft Hartley | TVP-Day Performer On-Camera | X | |
| TH | Grigsby,Charles | [redacted] | Taft Hartley | TVP-Day Performer On-Camera | X | |
| OK | Hall,Keana | [redacted] | Los Angeles | TVP-Stand In | | |
| OK | Hall,Lori | [redacted] | Los Angeles | TVP-Stand In | | |
| OK | Lorning,Steffance | [redacted] | Washington/Baltimore | TVP-Stand In | | |
| TH | Locke,Kimberley | [redacted] | Taft Hartley | TVP-Day Performer On-Camera | X | |
| OK | Meyers,Carole | [redacted] | Los Angeles | TVP-Stand In | | |

BLANK

# STANDARD AFTRA ENGAGEMENT CONTRACT

Agreement Between

Dated: 3/11/03

Corey Clark
1138 Chestnut Ave.
Rialto CA 92376
(hereinafter called "Performer")

and

AMERICAN IDOL PRODUCTIONS, INC.
7800 Beverly Blvd., Suite 251
Los Angeles, CA 90036
(hereinafter called "Producer")

Performer shall render artistic services in connection with the rehearsal and broadcast of the program(s) designated below and preparation in connection with the part or parts to be played:

TITLE OF PROGRAM: American Idol (Episode #210)

TYPE OF PROGRAM Sustaining ( ) Commercial (X) Closed Circuit ( ) Pay TV ( )

SPONSOR (if commercial): VARIOUS

NUMBER OF GUARANTEED DAYS OF EMPLOYMENT: 1
(if Par. 19 of the AFTRA Code is applicable)

PLACE OF PERFORMANCE* CBS Television City, 7800 Beverly Blvd., Los Angeles, CA 90036

SCHEDULED FINAL PERFORMANCE DAY: 3/11/03

AFTRA CLASSIFICATION: principal performer

PART(S) TO BE PLAYED: Self

COMPENSATION: $1,251.00

MAXIMUM REHEARSAL HOURS INCLUDED IN ABOVE COMPENSATION: SEE AEA LETTER
(if Par. 56(b) of the AFTRA Code is applicable)

Execution of this agreement signifies acceptance by Producer and Performer of all of the above terms and conditions and those on the reverse hereof and attached hereto, if any.

[signature] Performer

SS#/FEDID # [redacted]

By: [signature] Producer

*Subject to change in accordance with AFTRA Code.

---

CONTEMPLATED NETWORK BROADCAST ORIGINATION DATE:

BILLING: Performer shall receive billing on the program, in Producer's sole discretion, excepting as required in the AFTRA Code and/or as specifically provided in this paragraph. No inadvertent or unintentional failure to give billing either due to lack of time or otherwise shall be deemed a breach of this agreement.

RATES OF COMPENSATION FOR REPLAYS: Scale

1st: $ AFTRA SCALE 2nd: $ AFTRA SCALE 3rd: $ AFTRA SCALE 4th: $ AFTRA SCALE 5th: $ AFTRA SCALE
6th: $ AFTRA SCALE 7th: $ AFTRA SCALE 8th and all succeeding replays: $ AFTRA SCALE

RATES OF COMPENSATION FOR FOREIGN USE: Scale

Area 1†: $ Area 2†: $ Area 3†: $ Area 4†: $ Area 5†: $

†(As defined in Par. 73(f) of the AFTRA Code)

## STANDARD TERMS AND CONDITIONS

1. Performer shall render Performer's services in connection with this engagement to the best of Performer's ability and subject to Producer's direction and control. Performer will abide by all reasonable rules and regulations of Producer, the broadcaster, the sponsor(s) and their advertising agencies, and Performer shall refrain from any offensive or distasteful remarks or conduct in connection with this engagement. Performer shall, if and as required by this written contract, be available to participate in commercial inserts and loads into and out of such commercial inserts. The Producer, broadcaster(s), and the sponsor(s) and their advertising agencies may open and answer mail addressed to Performer relating to the program, provided that all such mail relating to Performer and intended for him or copies thereof shall be turned over to Performer within a reasonable length of time.

2. (a) Performer shall indemnify Producer, the sponsors and their advertising agencies, the network (if any), and all stations broadcasting the program against and all claims, damages, liabilities, costs and expenses (including reasonable attorneys' fees) arising out of the use of any materials, ideas, creations, and properties (herein called "materials") whether or not required of Performer, furnished by Performer in connection with this engagement, and any ad libs spoken or unauthorized acts done by Performer in connection therewith. Producer shall similarly indemnify Performer in respect to "materials" furnished by Producer, and acts done or words spoken by Performer at Producer's request. Each party will give the other prompt notice of any such claims and/or legal proceedings (and shall send a copy of such notice to AFTRA) and shall cooperate with each other on all matters covered by this paragraph.

(b) If this agreement requires, as an express additional provision, that Performer furnish materials (herein called "required materials") in connection with his performance hereunder, Performer shall submit such required materials to Producer at such time prior to performance thereof as may be reasonably designated by Producer, and such required materials shall, as between Producer and Performer, unless otherwise expressly provided in this agreement under the heading "Additions," be and remain the property of Performer.

3. In full payment for Performer's services and the rights and privileges granted to Performer hereunder, Producer shall pay Performer the compensation hereinbefore specified not later than Thursday after the week during which Performer's services shall have been rendered, subject to the deduction of such taxes and withholdings as are authorized or required by law. There shall be no obligation on Producer's part to producer broadcast the program or use Performer's services or materials, if any.

4. The program hereunder may be originally broadcast either live or by recording over the facilities arranged by or for Producer. The term "recordings," as used herein, shall mean and include any recording or recordings made whether before or during a broadcast transmission, by electrical transcription, tape recording, wire recording, film or any other similar or dissimilar method of recording television programs, whether now known or hereafter developed. All recordings, as between Producer and Performer, shall be Producer's sole property but shall be subject to the restrictions contained in the AFTRA Code in effect at the time such recording is made, except as AFTRA may otherwise permit in writing. Performer will, if required by Producer, re-enact the performance, in whole or in part, in connection with any recording of all or any portion of the program (which Producer may deem desirable) in order to make adjustments necessitated by mechanical failures, or adjustments or corrections in performance after the date of performance, provided that such re-recording is done not later than sixty (60) days after the broadcast in the case of a live program or sixty (60) days after the Performer's final performance day in the case of a pre-recorded program, and shall be subject to the availability of Performer; and provided, further, that Producer shall pay for Performer's services in connection with such re-recording such additional compensation as may be required by the said AFTRA Code.

5. If the broadcast of any program hereunder is prevented by governmental regulation or order, or by a strike, or by failure of broadcasting facilities because of war or other calamity such as fire, earthquake, hurricane, or similar acts of God, or because of the breakdown of such broadcasting facilities due to causes beyond Producer's reasonable control (such as the collapse of the transmitter due to structural defects). Producer shall be relieved of any responsibility for the payment of compensation for the program so prevented; provided that in such case Producer shall reimburse Performer for all out-of-pocket costs necessarily incurred in connection with such program. In addition Performer shall be paid the full applicable rehearsal rate for all hours rehearsed prior to notice of cancellation. The same consequences shall ensue if the program time is preempted by a Presidential broadcast and notice of cancellation for such purpose is given Performer promptly upon such notice having been received by Producer. Where the program time is preempted to broadcast an event of public importance (other than a Presidential broadcast) or where

(Continued)

## STANDARD TERMS AND CONDITIONS

the program is cancelled or prevented for any reason other than those stated above, or where insufficient advance notice has been given under the preceding sentence, Producer shall pay Performer his full contract price for the program so cancelled or prevented.

6. Producer is prohibited from requiring the Performer to refrain from rendering his services in connection with any other television or radio services for any period other than the actual rehearsal and broadcast period involved in this engagement; provided, however, that this prohibition shall not apply if the artist's compensation for this engagement shall be $1,500 or more.

7. Notwithstanding any provision in this agreement to the contrary, it is specifically understood and agreed by all parties hereto:

(a) That they are bound by all the terms and provisions of the applicable AFTRA CODE OF FAIR PRACTICE FOR TELEVISION BROADCASTING. Should there be an inconsistency between this agreement and the said Code of Fair Practice, the said Code shall prevail; but nothing in this provision shall affect terms, compensation, or conditions provided for in this agreement which are more favorable to members of AFTRA than the terms, compensation or conditions provided for in said Code of Fair Practice.

(b) That the artist is covered by the provisions of Paragraph 102 of said Code entitled "AFTRA Pension and Welfare Funds."

(c) That Performer is or will become a member of AFTRA in good standing, subject to and in accordance with the Union Shop Provision of said Code of Fair Practice.

8. If Producer wishes to obtain re-play or foreign use rights for which fees are required pursuant to Paragraph 73 of the AFTRA Code, such fees as are agreed upon shall be separately set forth in this agreement in specific money figures, clearly stating the rate to be paid for each re-play or foreign use, and not by reference to Code paragraph numbers. If Producer has not obtained foreign use rights in accordance with this Paragraph, Producer shall notify AFTRA in advance if, after the execution of this agreement, Producer seeks to secure such rights from Performer.

9. This agreement, when executed by Performer and Producer, shall constitute the entire understanding between them and shall be construed according to the laws of the State of California applicable to contracts fully performed therein.

## ADDITIONS WHICH HAVE NOT BEEN APPROVED BY AFTRA AND ARE NOT PART OF STANDARD FORM*

10. In connection with the program or the series of which it is a part, Producer, the sponsors and their advertising agencies shall have the right, and may grant to others the right, to disseminate, reproduce, print and publish Performer's name, voice, performance, likeness and/or biographical material concerning Performer for publicity and promotion, and for advertising and purposes of trade (but not for the endorsement of any product or service), and in merchandising and licensing with respect to the Series.

11. (a) Producer shall not be required to make any payment to Performer in addition to Performer's compensation specified above Producer's signature on the face of this agreement (hereinafter called the "basic compensation"), unless the aggregate of the minimum AFTRA rates payable to Performer pursuant to the AFTRA Code which is in effect at the time of the performance of Performer's services hereunder, shall exceed the basic compensation, in which event Producer shall pay Performer, in addition to the basic compensation, the amount of such excess.

(b) Notwithstanding anything to the contrary contained in subparagraph (a) of this paragraph 11, if the basic compensation is in excess of the minimum AFTRA rate payable to Performer for Performer's services hereunder (but not more than $850), Producer shall pay Performer at the applicable AFTRA rehearsal rate for all rehearsal hours in excess of the number of hours specified on the face of this agreement.

12. (a) Performer shall furnish all materials required or appropriate for the performance of services under this agreement. All materials furnished by performer, other than materials in the public domain, shall be the property of Performer. Producer shall have the right to broadcast the program in which the materials may be incorporated and the right to make and use and to authorize the making and use of recordings of such program in accordance with the provisions of paragraph 14 hereof, and Producer shall not be required to make any payment to Performer therefor except as provided in paragraph 14 hereof.

(b) In connection with the production or preparation of any program or program matter which is intended for broadcast hereunder, Performer warrants and represents that Performer has not accepted or agreed to accept and will not accept or agree to accept, directly or indirectly, any money, service or other valuable consideration for the inclusion of matter as part of such program matter from any one other than Producer.

13. Performer will, at Producer's request, participate in the presentation of leads into and out of commercial announcements on the program.

14. Producer's rights with respect to recordings of the program shall include without limitation the following:

(i) to replay such recordings in accordance with the provisions of paragraph 73 of the AFTRA Code, and Producer shall pay Performer (at the time specified in said paragraph 73) for each such replay the applicable sum set forth on the face hereof; or, if Exhibit A of the AFTRA Code applies, the minimum applicable sum required to be paid under the applicable provisions of said Exhibit; subject, however, in either case, to the provisions of paragraph 23 hereof.

(ii) to cause or authorize, in accordance with the provisions of sub division 3 or 4, whichever is applicable, of subparagraph (i) B of paragraph 73 of the AFTRA Code, the broadcast of such recordings in each of the "foreign areas" listed in subdivision 2 of the said subparagraph (i) B, and Producer shall pay Performer for such use the applicable sums set forth on the face hereof; it being understood that if subdivision 4 of such subparagraph (i) B is applicable and if no rates are set forth herein for such foreign use, there shall be no payment to Performer therefor; and it being further understood that the provisions of paragraph 23 shall also apply. In connection therewith, if Producer produces a thematic program and more than 75% of such theme program consists of excerpts, Performer hereby consents to the use of Performer's performance in such thematic program, in accordance with subparagraph 8 of Paragraph 73(d) of the AFTRA code. In consideration of Performer's consent, Producer shall pay Performer the minimum sum required by said subparagraph 8. If the excerpt of Performer's performance is longer than three minutes, Performer hereby agrees that the negotiated rate to be paid Performer for such use will be the minimum program fee of the program in which such excerpt is used.

(iii) to cause or authorize, in accordance with the provisions of subdivision (1) or (2), whichever is applicable, of subparagraph (c) of paragraph 73 of the AFTRA Code, the broadcast of such recordings on local non-interconnected stations, and Producer shall make all payments specified in said subparagraph (c);

(iv) to supplement the "network" (as defined in paragraph 71 of the said AFTRA Code) by broadcasting or authorizing the broadcast, within sixty (60) days after the date of the original broadcast of the program of such recordings in any area where the program was not originally broadcast.

(v) to authorize the United States Department of Defense to make recordings of the program and to broadcast such recordings over television stations owned and operated by it;

(vi) to use such recordings for file, reference, audition, trailer and promotional purposes in accordance with the provisions of paragraph 88 of the AFTRA Code;

(vii) to cause or authorize the exhibition of such recordings by means of direct projection in film festivals or competitions.

(viii) to cause or authorize the exploitation of such recordings by any means or device, whether or not now discovered, in "Supplemental Markets" as that term is or shall hereafter be defined in the AFTRA Code, and Producer shall not be required to make any payment to Artist therefor unless required to do so pursuant to the provisions of said AFTRA Code respecting uses in Supplemental Markets; it being understood that if the basic compensation is in excess of twice the basic minimum appropriate program fee specified in the said AFTRA Code, Producer may apply the amount of such excess to any such payment specified in said AFTRA Code.

Producer shall not be required to make any payment to Performer for the use of such recordings as provided in subdivisions (iv), (v), (vi) and (vii) of this paragraph 14. Any exhibition or other use of a recording may be either in color or in black-and-white, or both, at Producer's sole and absolute discretion.

15. Producer shall have the right to terminate this agreement by giving Performer notice to such effect, in the event Performer shall suffer any mental or physical disability, any alteration in Performer's voice which shall, in Producer's opinion, interfere with the proper performance of any of Performer's obligations hereunder.

16. If any provision hereof as applied to either party or to any circumstance shall be adjudged by a court to be void or unenforceable, the same shall in no way affect any other provision hereof, the application of such provision in any other circumstances or the validity or enforceability hereof.

17. This agreement cannot be changed or terminated orally.

18. If Performer's compensation for this engagement is $1,500 or more, Performer agrees not to render services of any kind or nature for or on behalf of Performer or any third party whatsoever during the actual rehearsal and production period under this agreement. Performer warrants that Performer has not rendered services with regard to any television programs which have not received an initial network television broadcast as of the date of this agreement. Furthermore, Performer agrees that Performer will not render services with regard to any program which is scheduled, at the time Performer considers rendering such services, to receive an initial network television broadcast, the origination of which broadcast occurs within twenty-one (21) days prior to or eight (8) days following, the contemplated origination date of the initial network broadcast of the program hereunder. In the event a program on which Performer hereafter renders services is broadcast on a date other than the scheduled date thereof referred to above, and such changed broadcast date falls within the period of broadcast exclusivity hereunder, Performer shall attempt to give Producer prompt notice of such conflicting broadcast date, but Performer's failure to give such notice shall not constitute a breach of this agreement. If, for any reason, the program hereunder cannot be or is not broadcast on the contemplated network broadcast origination date, such program may be initially broadcast on any other date and no additional compensation shall be payable to Performer in such event. In the event Producer changes the origination date of the initial television network broadcast of the program hereunder, Producer shall attempt to give Performer prompt notice of such changed date, but Producer's failure to give such notice shall not constitute a breach of this agreement.

19. Performer represents and warrants that Performer has the right to enter into this agreement and to grant the rights herein granted. All rights, remedies, licenses, property privileges, obligations and agreements in this agreement shall be cumulative. The breach by Performer of the provisions contained in this agreement will cause Producer irreparable injury and damage. Producer shall be entitled as a matter of right, without further notice, to injunctive and other equitable relief to prevent the violation of any of the provisions of this agreement by Performer and to prevent Performer from performing services for, furnishing material to or granting conflicting rights to others. Neither this provision nor the exercise or non-exercise by Producer of any of its rights under this agreement shall constitute a waiver by Producer of any other rights or remedies which Producer may have under this agreement or at law or in equity, and Producer hereby expressly reserves such rights. Producer's liability for any breach shall be limited to the payment of money only and in no event shall any of Producer's rights with respect to the programs be affected thereby.

20. Producer shall have the right to assign this agreement and/or all or any part of the rights granted by Performer herein and hereunder to any person, firm or corporation without limitation provided that no such assignment shall relieve Producer of its obligations hereunder except authorized in the AFTRA Code.

21. Subject to the provisions of paragraph 12(a), Producer shall own and Performer hereby grants all rights of every kind and nature in and to all results and proceeds of Performer's services hereunder. Except as prohibited by the AFTRA Code, Producer shall have the right at any time and from time to time to produce the program in color and/or black-and-white and to edit, delete from, rearrange, and/or combine with other programs the program and any recordings thereof. Producer shall have the right to "dub" over Performer's speaking voice and all musical, instrumental and other sounds to be produced by Performer, to such extent as may be required by Producer, whether in English or in any foreign language or languages designated by Producer, and to "double" some other person in Performer's acts, poses and appearances, including, without limitation, where, in the opinion of Producer, the failure to use a "double" might result in physical injury to Performer.

22. Performer will not furnish or authorize any advertising matter or publicity of any form relating to the program, Performer's services in connection therewith, Producer or its operations or personnel or any exhibitors of the program to any person, firm or corporation other than Producer, and their respective agents and employees, without the prior written approval of Producer in each case.

23. To the extent permitted under the AFTRA Code, if compensation payable to Performer hereunder is in excess of AFTRA minimum scale, Producer may apply such excess against any extra payments which would otherwise be due to Performer under the applicable AFTRA Code with respect to the performance by Performer of his obligations or the exercise by Producer of rights granted by Performer to Producer hereunder. Without limiting the foregoing, Producer shall have the right to credit over-scale payments in excess of twice the full AFTRA minimum fee including all extra payments for additional rehearsal and doubling, toward monies due Performer for re-plays, or "foreign area" uses, of any recordings under the applicable AFTRA code.

24. In the event there is any inconsistency, between this Agreement and the mandatory provisions of the AFTRA Code, the code shall prevail; provided, however, that in such event the provision(s) of this Agreement so affected shall be curtailed, limited or otherwise modified only to the extent necessary to permit compliance with the minimum mandatory terms and conditions of the Code.

25. If the production of any program hereunder is prevented or materially interfered with by any of the causes or events specified in paragraph 5 hereof, then the same consequences as specified in paragraph 5 shall ensue.

26. The waiver by Producer of any breach of this agreement by Performer shall not constitute a waiver of any subsequent breach. Any such waiver by Producer must be in writing to be effective.

27. Any notice permitted or required herein shall be given by prepaid regular, certified or registered mail and shall be deemed complete upon depositing it in the United States post office, branch post office, or sub-station, addressed to the parties at their respective addresses hereinabove indicated. Such notice may likewise be wired to Performer or served personally on Performer or his agent or other representative. The date of mailing, wiring or date of such delivery personally, as the case may be, shall be deemed the date of service thereof.

28. SECTION 508—Reference is made to Section 508 of the Federal Communications Act, which became law on September 13th, 1960, making it a criminal offense for any person, in connection with the production or preparation of any program intended for broadcasting, to accept or pay money service or other valuable consideration for the inclusion of any matter as a part of any such program without disclosing the same to the employer of the person to whom such payment is made or to the person for whom such program is being produced. Performer understands that it is the policy of the Producer not to permit any employee of Producer to accept or pay any such consideration and Performer represents and agrees that Performer has not accepted and will not accept, and has not paid and will not pay any money, service, or other valuable consideration for the inclusion of any "plug," reference, or product identification, or any other matter, in any program produced hereunder.

*For Performer's information, the AFTRA Code provides as follows: "Additions to the standard form must be more favorable to the Performer than, or not inconsistent with, the express provisions of the said standard form contract, and in no event may such additions violate the AFTRA Code."

prod company American Idol Productions, Inc.



BLANK

CDC_000424

# STANDARD AFTRA ENGAGEMENT CONTRACT

Agreement Between

Dated: 3/12/03

Corey Clark
1138 Chestnut Ave.
Rialto CA 92376
(hereinafter called "Performer")

and

AMERICAN IDOL PRODUCTIONS, INC.
7800 Beverly Blvd., Suite 251
Los Angeles, CA 90036
(hereinafter called "Producer")

Performer shall render artistic services in connection with the rehearsal and broadcast of the program(s) designated below and preparation in connection with the part or parts to be played:

TITLE OF PROGRAM: American Idol (Episode #210A)

TYPE OF PROGRAM Sustaining ( ) Commercial (X) Closed Circuit ( ) Pay TV ( )

SPONSOR (if commercial): VARIOUS

NUMBER OF GUARANTEED DAYS OF EMPLOYMENT: 1
(if Par. 19 of the AFTRA Code is applicable)

PLACE OF PERFORMANCE* CBS Television City, 7800 Beverly Blvd., Los Angeles, CA 90036

SCHEDULED FINAL PERFORMANCE DAY:

AFTRA CLASSIFICATION: principal performer

PART(S) TO BE PLAYED: Self

COMPENSATION: $648.00

MAXIMUM REHEARSAL HOURS INCLUDED IN ABOVE COMPENSATION: SEE AEA LETTER
(if Par. 56(b) of the AFTRA Code is applicable)

Execution of this agreement signifies acceptance by Producer and Performer of all of the above terms and conditions and those on the reverse hereof and attached hereto, if any.

Performer

SS#/FEDID # [redacted]

By:

Producer

*Subject to change in accordance with AFTRA Code.

---

CONTEMPLATED NETWORK BROADCAST ORIGINATION DATE:

BILLING: Performer shall receive billing on the program, in Producer's sole discretion, excepting as required in the AFTRA Code and/or as specifically provided in this paragraph. No inadvertent or unintentional failure to give billing either due to lack of time or otherwise shall be deemed a breach of this agreement.

RATES OF COMPENSATION FOR REPLAYS: Scale

1st: $ AFTRA SCALE 2nd: $ AFTRA SCALE 3rd: $ AFTRA SCALE 4th: $ AFTRA SCALE 5th: $ AFTRA SCALE
6th: $ AFTRA SCALE 7th: $ AFTRA SCALE 8th and all succeeding replays: $ AFTRA SCALE

RATES OF COMPENSATION FOR FOREIGN USE: Scale

Area 1†: $ Area 2†: $ Area 3†: $ Area 4†: $ Area 5†: $

†(As defined in Par. 73(f) of the AFTRA Code)

## STANDARD TERMS AND CONDITIONS

1. Performer shall render Performer's services in connection with this engagement to the best of Performer's ability and subject to Producer's direction and control. Performer will abide by all reasonable rules and regulations of Producer, the broadcaster, the sponsor(s) and their advertising agencies, and Performer shall refrain from any offensive or distasteful remarks or conduct in connection with this engagement. Performer shall, if and as required by this written contract, be available to participate in commercial inserts and leads into and out of such commercial inserts. The Producer, broadcaster(s), and the sponsor(s) and their advertising agencies may open and answer mail addressed to Performer relating to the program, provided that all such mail relating to Performer and intended for him or copies thereof shall be turned over to Performer within a reasonable length of time.

2. (a) Performer shall indemnify Producer, the sponsors and their advertising agencies, the network (if any), and all stations broadcasting the program against and all claims, damages, liabilities, costs and expenses (including reasonable attorneys' fees) arising out of the use of any materials, ideas, creations, and properties (herein called "materials") whether or not required of Performer, furnished by Performer in connection with this engagement, and any ad libs spoken or unauthorized acts done by Performer in connection therewith. Producer shall similarly indemnify Performer in respect to "materials" furnished by Producer, and acts done or words spoken by Performer at Producer's request. Each party will give the other prompt notice of any such claims and/or legal proceedings (and shall send a copy of such notice to AFTRA) and shall cooperate with each other on all matters covered by this paragraph.

(b) If this agreement requires, as an express additional provision, that Performer furnish materials (herein called "required materials") in connection with his performance hereunder, Performer shall submit such required materials to Producer at such time prior to performance thereof as may be reasonably designated by Producer, and such required materials shall, as between Producer and Performer, unless otherwise expressly provided in this agreement under the heading "Additions," be and remain the property of Performer.

3. In full payment for Performer's services and the rights and privileges granted to Performer hereunder, Producer shall pay Performer the compensation hereinbefore specified not later than Thursday after the week during which Performer's services shall have been rendered, subject to the deduction of such taxes and withholdings as are authorized or required by law. There shall be no obligation on Producer's part to produce or broadcast the program or use Performer's services or materials, if any.

4. The program hereunder may be originally broadcast either live or by recording over the facilities arranged by or for Producer. The term "recordings," as used herein, shall mean and include any recording or recordings made whether before or during a broadcast transmission, by electrical transcription, tape recording, wire recording, film or any other similar or dissimilar method of recording television programs, whether now known or hereafter developed. All recordings, as between Producer and Performer, shall be Producer's sole property but shall be subject to the restrictions contained in the AFTRA Code in effect at the time such recording is made, except as AFTRA may otherwise permit in writing. Performer will, if required by Producer, re-enact the performance, in whole or in part, in connection with any recording of all or any portion of the program (which Producer may deem desirable) in order to make adjustments necessitated by mechanical failures, or adjustments or corrections to performance after the date of performance, provided that such re-recording is done not later than sixty (60) days after the broadcast in the case of a live program or sixty (60) days after the Performer's final performance day in the case of a pre-recorded program, and shall be subject to the availability of Performer, and provided, further, that Producer shall pay for Performer's services in connection with such re-recording such additional compensation as may be required by the said AFTRA Code.

5. If the broadcast of any program hereunder is prevented by governmental regulation or order, or by a strike, or by failure of broadcasting facilities because of war or other calamity such as fire, earthquake, hurricane, or similar acts of God, or because of the breakdown of such broadcasting facilities due to causes beyond Producer's reasonable control (such as the collapse of the transmitter due to structural defects), Producer shall be relieved of any responsibility for the payment of compensation for the program so prevented, provided that in each case Producer shall reimburse Performer for all out-of-pocket costs necessarily incurred in connection with such program. In addition Performer shall be paid the full applicable rehearsal rate for all hours rehearsed prior to notice of cancellation. The same consequences shall ensue if the program time is preempted by a Presidential broadcast and notice of cancellation for such purpose is given Performer promptly upon such notice having been received by Producer. Where the program time is preempted to broadcast an event of public importance (other than a Presidential broadcast) or where

(Continued)

## STANDARD TERMS AND CONDITIONS

the program is cancelled or prevented for any reason other than those stated above, or where insufficient advance notice has been given under the preceding sentence, Producer shall pay Performer his full contract price for the program so cancelled or prevented.

6. Producer is prohibited from requiring the Performer to refrain from rendering his services in connection with any other television or radio services for any period other than the actual rehearsal and broadcast period involved in this engagement; provided, however, that this prohibition shall not apply if the artist's compensation for this engagement shall be $1,500 or more.

7. Notwithstanding any provision in this agreement to the contrary, it is specifically understood and agreed by all parties hereto:

(a) That they are bound by all the terms and provisions of the applicable AFTRA CODE OF FAIR PRACTICE FOR TELEVISION BROADCASTING. Should there be an inconsistency between this agreement and the said Code of Fair Practice, the said Code shall prevail; but nothing in this provision shall affect terms, compensation, or conditions provided for in this agreement which are more favorable to members of AFTRA than the terms, compensation or conditions provided for in said Code of Fair Practice.

(b) That the artist is covered by the provisions of Paragraph 102 of said Code entitled "AFTRA Pension and Welfare Funds."

(c) That Performer is or will become a member of AFTRA in good standing, subject to and in accordance with the Union Shop Provision of said Code of Fair Practice.

8. If Producer wishes to obtain re-play or foreign use rights for which fees are required pursuant to Paragraph 73 of the AFTRA Code, such fees as are agreed upon shall be separately set forth in this agreement in specific money figures, clearly stating the rate to be paid for each re-play or foreign use, and not by reference to Code paragraph numbers. If Producer has not obtained foreign use rights in accordance with this Paragraph, Producer shall notify AFTRA in advance if, after the execution of this agreement, Producer seeks to secure such rights from Performer.

9. This agreement, when executed by Performer and Producer, shall constitute the entire understanding between them and shall be construed according to the laws of the State of California applicable to contracts fully performed therein.

## ADDITIONS WHICH HAVE NOT BEEN APPROVED BY AFTRA AND ARE NOT PART OF STANDARD FORM*

10. In connection with the program or the series of which it is a part, Producer, the sponsors and their advertising agencies shall have the right, and may grant to others the right, to disseminate, reproduce, print and publish Performer's name, voice, performance, likeness and/or biographical material concerning Performer for publicity and promotion, and for advertising and purposes of trade (but not for the endorsement of any product or service), and in merchandising and licensing with respect to the Series.

11. (a) Producer shall not be required to make any payment to Performer in addition to Performer's compensation specified above Producer's signature on the face of this agreement (hereinafter called the "basic compensation"), unless the aggregate of the minimum AFTRA rates payable to Performer pursuant to the AFTRA Code which is in effect at the time of the performance of Performer's services hereunder, shall exceed the basic compensation, in which event Producer shall pay Performer, in addition to the basic compensation, the amount of such excess.

(b) Notwithstanding anything to the contrary contained in subparagraph (a) of this paragraph 11, if the basic compensation is in excess of the minimum AFTRA rate payable to Performer for Performer's services hereunder (but not more than $850), Producer shall pay Performer at the applicable AFTRA rehearsal rate for all rehearsal hours in excess of the number of hours specified on the face of this agreement.

12. (a) Performer shall furnish all materials required or appropriate for the performance of services under this agreement. All materials furnished by performer, other than materials in the public domain, shall be the property of Performer. Producer shall have the right to broadcast the program in which the materials may be incorporated and the right to make and use and to authorize the making and use of recordings of such program in accordance with the provisions of paragraph 14 hereof, and Producer shall not be required to make any payment to Performer therefor except as provided in paragraph 14 hereof.

(b) In connection with the production or preparation of any program or program matter which is intended for broadcast hereunder, Performer warrants and represents that Performer has not accepted or agreed to accept and will not accept or agree to accept, directly or indirectly, any money, service or other valuable consideration for the inclusion of matter as part of such program matter from any one other than Producer.

13. Performer will, at Producer's request, participate in the presentation of leads into and out of commercial announcements on the program.

14. Producer's rights with respect to recordings of the program shall include without limitation the following:

(i) to replay such recordings in accordance with the provisions of paragraph 73 of the AFTRA Code, and Producer shall pay Performer (at the time specified in said paragraph 73) for each such replay the applicable sum set forth on the face hereof; or, if Exhibit A of the AFTRA Code applies, the minimum applicable sum required to be paid under the applicable provisions of said Exhibit; subject, however, in either case, to the provisions of paragraph 23 hereof.

(ii) to cause or authorize, in accordance with the provisions of sub division 3 or 4, whichever is applicable, of subparagraph (f) B of paragraph 73 of the AFTRA Code, the broadcast of such recordings in each of the "foreign areas" listed in subdivision 2 of the said subparagraph (f) B, and Producer shall pay Performer for such use the applicable sums set forth on the face hereof; it being understood that if subdivision 4 of such subparagraph (f) B is applicable and if no rates are set forth herein for such foreign use, there shall be no payment to Performer therefor; and it being further understood that the provisions of paragraph 23 shall also apply. In connection therewith, if Producer produces a thematic program and more than 75% of such theme program consists of excerpts, Performer hereby consents to the use of Performer's performance in such thematic program, in accordance with subparagraph 8 of Paragraph 73(d) of the AFTRA code. In consideration of Performer's consent, Producer shall pay Performer the minimum sum required by said subparagraph 8. If the excerpt of Performer's performance is longer than three minutes, Performer hereby agrees that the negotiated rate to be paid Performer for such use will be the minimum program fee of the program in which such excerpt is used.

(iii) to cause or authorize, in accordance with the provisions of subdivision (1) or (2), whichever is applicable, of subparagraph (c) of paragraph 73 of the AFTRA Code, the broadcast of such recordings on local non-interconnected stations, and Producer shall make all payments specified in said subparagraph (c);

(iv) to supplement the "network" (as defined in paragraph 71 of the said AFTRA Code) by broadcasting or authorizing the broadcast, within sixty (60) days after the date of the original broadcast of the program of such recordings in any area where the program was not originally broadcast.

(v) to authorize the United States Department of Defense to make recordings of the program and to broadcast such recordings over television stations owned and operated by it;

(vi) to use such recordings for file, reference, audition, trailer and promotional purposes in accordance with the provisions of paragraph 83 of the AFTRA Code;

(vii) to cause or authorize the exhibition of such recordings by means of direct projection in film festivals or competitions.

(viii) to cause or authorize the exploitation of such recordings by any means or device, whether or not now discovered, in "Supplemental Markets" as that term is or shall hereafter be defined in the AFTRA Code, and Producer shall not be required to make any payment to Artist therefor unless required to do so pursuant to the provisions of said AFTRA Code respecting uses in Supplemental Markets; it being understood that if the basic compensation is in excess of twice the basic minimum appropriate program fee specified in the said AFTRA Code, Producer may apply the amount of such excess to any such payment specified in said AFTRA Code.

Producer shall not be required to make any payment to Performer for the use of such recordings as provided in subdivisions (iv), (v), (vi) and (vii) of this paragraph 14. Any exhibition or other use of a recording may be either in color or in black-and-white, or both, at Producer's sole and absolute discretion.

15. Producer shall have the right to terminate this agreement by giving Performer notice to such effect, in the event Performer shall suffer any mental or physical disability, any alteration in Performer's voice which shall, in Producer's opinion, interfere with the proper performance of any of Performer's obligations hereunder.

16. If any provision hereof as applied to either party or to any circumstance shall be adjudged by a court to be void or unenforceable, the same shall in no way affect any other provision hereof, the application of such provision in any other circumstances or the validity or enforceability hereof.

17. This agreement cannot be changed or terminated orally.

18. If Performer's compensation for this engagement is $1,500 or more, Performer agrees not to render services of any kind or nature for or on behalf of Performer or any third party whatsoever during the actual rehearsal and production period under this agreement. Performer warrants that Performer has not rendered services with regard to any television programs which have not received an initial network television broadcast as of the date of this agreement. Furthermore, Performer agrees that Performer will not render services with regard to any program which is scheduled, at the time Performer considers rendering such services, to receive an initial network television broadcast, the origination of which broadcast occurs within twenty-one (21) days prior to or eight (8) days following, the contemplated origination date of the initial network broadcast of the program hereunder. In the event a program on which Performer hereafter renders services is broadcast on a date other than the scheduled date thereof referred to above, and such changed broadcast date falls within the period of broadcast exclusivity hereunder, Performer shall attempt to give Producer prompt notice of such conflicting broadcast date, but Performer's failure to give such notice shall not constitute a breach of this agreement. If, for any reason, the program hereunder cannot be or is not broadcast on the contemplated network broadcast origination date, such program may be initially broadcast on any other date and no additional compensation shall be payable to Performer in such event. In the event Producer changes the origination date of the initial television network broadcast of the program hereunder, Producer shall attempt to give Performer prompt notice of such changed date, but Producer's failure to give such notice shall not constitute a breach of this agreement.

19. Performer represents and warrants that Performer has the right to enter into this agreement and to grant the rights herein granted. All rights, remedies, licenses, property privileges, obligations and agreements in this agreement shall be cumulative. The breach by Performer of the provisions contained in this agreement will cause Producer irreparable injury and damage. Producer shall be entitled as a matter of right, without further notice, to injunctive and other equitable relief to prevent the violation of any of the provisions of this agreement by Performer and to prevent Performer from performing services for, furnishing material to or granting conflicting rights to others. Neither this provision nor the exercise or non-exercise by Producer of any of its rights under this agreement shall constitute a waiver by Producer of any other rights or remedies which Producer may have under this agreement or at law or in equity, and Producer hereby expressly reserves such rights. Producer's liability for any breach shall be limited to the payment of money only and in no event shall any of Producer's rights with respect to the programs be affected thereby.

20. Producer shall have the right to assign this agreement and/or all or any part of the rights granted by Performer herein and hereunder to any person, firm or corporation without limitat- provided that no such assignment shall relieve Producer of its obligations hereunder except authorized in the AFTRA Code.

21. Subject to the provisions of paragraph 12(a), Producer shall own and Performer hereby grants all rights of every kind and nature in and to all results and proceeds of Performer's services hereunder. Except as prohibited by the AFTRA Code, Producer shall have the right at any time and from time to time to produce the program in color and/or black-and-white and to edit, delete from, rearrange, and/or combine with other programs the program and any recordings thereof. Producer shall have the right to "dub" over Performer's speaking voice and all musical, instrumental and other sounds to be produced by Performer, to such extent as may be required by Producer, whether in English or in any foreign language or languages designated by Producer, and to "double" some other person in Performer's acts, poses and appearances, including, without limitation, where, in the opinion of Producer, the failure to use a "double" might result in physical injury to Performer.

22. Performer will not furnish or authorize any advertising matter or publicity of any form relating to the program, Performer's services in connection therewith, Producer or its operations or personnel or any exhibitors of the program to any person, firm or corporation other than Producer, and their respective agents and employees, without the prior written approval of Producer in each case.

23. To the extent permitted under the AFTRA Code, if compensation payable to Performer hereunder is in excess of AFTRA minimum scale, Producer may apply such excess against any extra payments which would otherwise be due to Performer under the applicable AFTRA Code with respect to the performance by Performer of his obligations or the exercise by Producer of rights granted by Performer to Producer hereunder. Without limiting the foregoing, Producer shall have the right to credit over-scale payments in excess of twice the full AFTRA minimum fee including all extra payments for additional rehearsal and doubling, toward monies due Performer for re-plays, or "foreign area" uses, of any recordings under the applicable AFTRA code.

24. In the event there is any inconsistency, between this Agreement and the mandatory provisions of the AFTRA Code, the code shall prevail; provided, however, that in such event the provision(s) of this Agreement so affected shall be curtailed, limited or otherwise modified only to the extent necessary to permit compliance with the minimum mandatory terms and conditions of the Code.

25. If the production of any program hereunder is prevented or materially interfered with by any of the causes or events specified in paragraph 5 hereof, then the same consequences as specified in paragraph 5 shall ensue.

26. The waiver by Producer of any breach of this agreement by Performer shall not constitute a waiver of any subsequent breach. Any such waiver by Producer must be in writing to be effective.

27. Any notice permitted or required herein shall be given by prepaid regular, certified or registered mail and shall be deemed complete upon depositing it in the United States post office, branch post office, or sub-station, addressed to the parties at their respective addresses hereinabove indicated. Such notice may likewise be wired to Performer or served personally on Performer or his agent or other representative. The date of mailing, wiring or date of such delivery personally, as the case may be, shall be deemed the date of service thereof.

28. SECTION 508—Reference is made to Section 508 of the Federal Communications Act, which became law on September 13th, 1960, making it a criminal offense for any person, in connection with the production or preparation of any program intended for broadcasting, to accept or pay mone- service or other valuable consideration for the inclusion of any matter as a part of any such progr without disclosing the same to the employer of the person to whom such payment is made or to person for whom such program is being produced. Performer understands that it is the policy of Producer not to permit any employee of Producer to accept or pay any such consideration and Performer represents and agrees that Performer has not accepted ad will not accept, and has not paid and will not pay any money, service, or other valuable consideration for the inclusion of any "plug," reference, or product identification, or any other matter, in any program produced hereunder.

*For Performer's information, the AFTRA Code provides as follows: "Additions to the standard form must be more favorable to the Performer than, or not inconsistent with, the express provisions of the said standard form contract, and in no event may such additions violate the AFTRA Code."

prod company American Idol Productions. Inc.



BLANK

CDC_000427



DESIGNATION AND APPLICATION FOR MEMBERSHIP IN THE

**AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, LOS ANGELES LOCAL**

AFFILIATED WITH THE AMERICAN FEDERATION OF LABOR/CONGRESS OF INDUSTRIAL ORGANIZATIONS (AFL-CIO)

5757 Wilshire Boulevard, 9th Floor, Los Angeles, California 90036-3689

(323) 634-8100

1. I hereby apply for membership in the AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS and in the Los Angeles Local thereof, and agree to be bound by each and every p[rovision] contained in the American Federation of Television and Radio Artists, in the Constitution of the said Local, by such amendments to said Constitutions as may hereafter be made, and by any [...] by-laws, rules, regulations, orders and resolutions of the Federation and the Local, whether now in force or hereafter enacted. I agree that the said amendments, by-laws, rules, regulations, orders and resolutions are binding upon me as of the date of their lawfully taking effect, regardless of the rights, if any, vested in me prior to such date. I have made no prior application for membership in any other local.
2. I hereby designate the American Federation of Television and Radio Artists as my exclusive agent for collective bargaining purposes in any and all matters dealing with the radio industry, television, sound recordings, electrical transcriptions, any other means for mechanical reproduction, and any other matters or industries within the jurisdiction of the said Federation. I hereby further authorize the said Federation to delegate its right to be my collective bargaining agent to the said Local or to any other subdivision, agent or affiliate of said Federation.
3. I hereby authorize the said Federation or the said Local, or other subdivision, agent or affiliate of the Federation, to enter into agreements with my employers or their representatives, requiring my membership in good standing in the said Federation as a condition of entering into and continuing my employment, and I hereby express my desire that such an agreement be consummated.
4. **I further authorize my employer or AFTRA to deduct from my compensation any initiation fee, and/or dues to the Federation and the Local at such periods as the Federation may designate, and to pay the same directly to the Federation or the Local. It is understood that this authorization is irrevocable for a period of one year from the date endorsed hereon, and is thereafter revocable by me in writing only, delivered to the Federation and the Local.**
5. I hereby authorize AFTRA to collect any sums due me under AFTRA agreements, and if I cannot be located at my last known address, such sums are to be deposited into a Trust Account, and if such sums are unclaimed for six years from the mailing of a notice to me, such sums may thereafter be used by AFTRA to defray its expenses of administration.
6. The above designations and authorizations are completely independent of my status as an applicant for membership under paragraph "1", and of my status as a member.
7. **I understand that my application for membership will be reviewed to determine if my professional name is in conflict with a name recorded on the AFTRA membership rolls and used by a performer already a member. In the event there is such a conflict, I understand that I shall be advised of such conflict and will be requested to make a meaningful change in my professional name.**
8. Initiation Fee: $1200.00 (subject to change without notice)

**PLEASE COMPLETE ALL INFORMATION BELOW AND ON THE REVERSE SIDE OF THIS APPLICATION**

9. Enclosed is $________ covering the first payment of dues and initiation fees.
10. Please register me as (Check One): ☐ Actor ☐ Announcer ☐ Dancer ☐ Newsperson ☒ Singer ☐ Sportscaster ☐ Stuntperson
11. Check class of membership for which you are making this application: ☐ Active ☐ Non-resident (Alien) ☐ Provisional
12. My gross income, under AFTRA's jurisdiction for the previous calendar year, including all royalties and residuals from Radio, Live and Taped Television Programs, Taped Television and Radio Commercials, Sound Recordings, and Non-Broadcast Recorded material was: $________ (If None, write None.)

<u>AFTRA UNIFORM DUES SCHEDULE</u> (subject to change without notice)

- <u>Base Dues</u>: All members pay $58 every six months ($116 annually). Members whose AFTRA earnings in the previous calendar year were <u>less</u> than $2,000 pay only the base dues.
- In addition to the base dues, members who earn $2000 or more in the previous calendar year will pay base dues plus the applicable percentage of all AFTRA earnings a[ccord]ing to the following schedule: <u>For earnings between $2000 and $100,000</u>, 0.675% every six months (1.35% annually); <u>For earnings over $100,000 to $250,000</u>, an additional 0.125% every six months (0.25% annually).

<u>Please note</u>:

- Dues are payable semi-annually.
- Dues are calculated twice a year and rounded to the nearest dollar.
- Penalties accrue thirty (30) days after the beginning of a dues period and thereafter on a monthly basis.
- Maximum semi-annual dues: $921 ($1,842 annually).
- Dues periods begin May 1 and November 1 of each year.

13. List any other unions of which you are a member: ________

**I AFFIRM THAT I HAVE TRUTHFULLY ANSWERED ALL OF THE QUESTIONS ON THIS APPLICATION:** Date 3-12-03

Social Security Number: [redacted] ☐ Female ☒ Male

[signature]
Sign PROFESSIONAL Name Here

Corey Clark
Print PROFESSIONAL Name Here

[signature]
Sign LEGAL Name Here

Corey Clark
Print LEGAL Name Here

1138 N. Chestnut ave — Rialto, CA — 92376
Street — City, State — Zip

Telephone Number(s): (Contact) 909-874-1016 (Work/Pager)____ (Mobile) 310-245-2611

(Fax)____ (Home) 615-758-6995 (E-Mail) Cutieboyclark@MSN.com

Agent's Name: (1)____ Agent's Telephone Number____

For:____

(2)____ Agent's Telephone Number____

For:____

Engagement & Dates:____ Date Received By AFTRA:____

(11/01) **PLEASE TURN APPLICATION OVER AND COMPLETE INFORMATION ON REVERSE SIDE**

**PLEASE COMPLETE BOTH SIDES OF THIS APPLICATION**

*Addendum to Los Angeles AFTRA Membership Application*:

In making this application, I understand that my responsibility as a member of the American Federation of Television and Radio Artists is to join with my fellow members in collective activity to gain just and fair wages and honorable working conditions. I will never cross a picket line sanctioned by AFTRA or engage in struck work. I have not performed work for any producer of commercials not signed to the Interim agreement during the SAG-AFTRA commercials strike in 2000, and acknowledge that I am subject to expulsion from AFTRA if I have done so.

Name (please print): Corey Clark

Signature: [signature] Date: 3-13-03



BLANK

CDC_000430

**AMERICAN IDOL PRODUCTIONS, INC.**
2700 Colorado Avenue, 4th Floor
Santa Monica, California 90404
(310) 255-4700

AFTRA

**PRODUCTION PERSONNEL DEAL MEMO**

PROGRAM: "American Idol: The Search for a Superstar" - Series

PRODUCER: American Idol Productions, Inc. (or its designee)
2700 Colorado Avenue, 4th Floor
Santa Monica, California 90404

| | | | |
|---|---|---|---|
| **LAST NAME:** | Clark | **SOC. SEC. #** | [redacted] |
| **FIRST NAME:** | Corey | **DATE OF BIRTH:** | 7-13-80 |
| **ADDRESS:** | 1138 N. Chestnut ave. | **PHONE #:** | 909-874-1026 |
| | | **FAX #:** | |
| **CITY/STATE/ZIP:** | Rialto, CA. 92376 | **POSITION:** | PRINCIPAL |
| **EMERGENCY CONTACT:** | Sherrie Evans | **DEPARTMENT:** | |
| **RELATIONSHIP:** | Friend | **ACCOUNT:** | 2000 10307 |
| **PHONE #:** | 818-915-5291 | **START DATE:** | 3/11/03 |

| **PAY PROVISIONS:** | **DAILY** | **STUDIO** | **LOCATION** |
|---|---|---|---|
| **RATE:** | PER AFTRA CONTRACT | | |

| | | | |
|---|---|---|---|
| **BOX RENTAL:** | | **ACCOUNT:** | |
| **ADDL. PROVISIONS:** | | | |

1. This Agreement is conditioned upon: (a) Employee's full performance of services hereunder in accordance with Producer's directives and at the highest standards for such services in the television industry; and (b) Employee's delivery of all documents required by Producer, including, without limitation, a completed INS Form I-9 (Employment Eligibility Verification Form) and W-4 tax form.

2. Producer is and shall be the sole owner of all rights in and to the Program and the results and proceeds of Employee's services hereunder for all purposes throughout the universe and in perpetuity. All such results and proceeds shall be deemed "Works Made For Hire" for Producer within the meaning of the U.S. Copyright laws, as works specially ordered or commissioned as part of a television or other audio-visual work. In the event such results and proceeds are determined not to be a "Work Made For Hire," Employee hereby assigns to Producer all rights of every kind in every medium, whether now known, or hereinafter devised, throughout the universe in perpetuity, including without limitation copyright and all renewals and extensions thereof.

3. Producer shall determine, within its sole discretion, whether to accord Employee screen and/or any other credit in connection with the Program (or any other exploitation of the results and proceeds of Employee's services hereunder).

4. Producer may terminate this Agreement with or without cause at any time at Producer's sole discretion, subject only to Producer's obligation to pay Employee any compensation already accrued at the time of termination in the event that such termination is not for Employee's breach of this Agreement.

5. Employee shall not authorize or incur any expense on behalf of Producer or the Program and shall not be entitled to reimbursement of any expense incurred in connection with Employee's services hereunder unless such expense has been pre-approved in writing by Producer's authorized representative and is verified by receipt or voucher.

6. Employee grants Producer the perpetual right throughout the universe to use Employee's name, voice, likeness and biographical information in connection with the Program, for any other exploitation of the results and proceeds of Employee's services hereunder, and the distribution, exhibition, advertising, publicity and exploitation thereof in any and all media now known or hereafter devised.

7. Producer assumes no responsibility for loss or damage to or maintenance of Employee's car, personal equipment, or other personal property, and Producer does not undertake to insure such property. Accordingly, Employee should take appropriate actions to safeguard and insure Employee's personal property.

8. In the event of any dispute relating to the subject matter hereof, Employee's sole remedy shall be an action at law for damages, if any, and in no event shall Employee have the right to seek to enjoin or otherwise interfere with the distribution, exhibition, advertising, exploitation or other use of the Program or any other exploitation of the results and proceeds of Employee's services hereunder. Producer shall be entitled, as a matter of right, without further notice, to injunctive and other equitable relief to prevent the violation of any of the provisions of this Agreement by Employee.

9. There is no minimum guarantee of employment or of employment on a "pay-or-play" basis.

10. Because Employee is a production employee, Employee will not be eligible for any Producer employee benefit or insurance plan generally available to Producer's staff employees.

11. Employee shall not, without Producer's prior knowledge and written consent in each instance, accept any compensation, gift or gratuity whatsoever (regardless of the value or form) where such compensation, gift or gratuity is under any express or implied agreement, understanding or authorization that Employee will act in any particular manner in relation to the giver's business or that giver will reward Employee for having so acted or placed Employee under any actual or moral obligation to so act.

12. The use, possession, dispensation, sale or purchase of any illegal drugs, alcohol or other controlled substance (including, without limitation, the use, possession, dispensation, sale or purchase of any legal prescription drug in a manner inconsistent with law) while in Producer's company vehicle, on Producer's premises, on location or any other premises utilized in connection with the Program whether during employment hours or otherwise shall subject Employee to immediate disciplinary action, including, without limitation, immediate termination.

13. Employee agrees not to disclose any creative and/or material information whatsoever about this Agreement or the Program without the prior approval of Producer in each instance. Employee agrees not to take any unauthorized photographs or copies of any materials for any use whatsoever and agrees to return all such materials at the conclusion of their services.

14. Employee acknowledges and is aware that it is a criminal offense under the Federal Communications Act for any person, in connection with the production or preparation of any program broadcast on television, to accept or pay any money, service or other valuable consideration for the inclusion of any plug, reference, product identification or other matter as a part of such program, unless such acceptance or payment is disclosed in the manner required by law. Employee also further understands that it is the policy of Producer not to permit the acceptance or payment of any such consideration and that any such acceptance or payment would be a default under this Agreement.

15. Employee represents and warrants that: (a) Employee has the full right and authority to enter into this Agreement; (b) the consent of no other person or entity is necessary for Employee to enter into and fully perform under this Agreement; and (c) Employee shall not make any agreement with any other person or entity which is in conflict or otherwise inconsistent with or may in any way impair or encumber any of the agreements, representations and warranties made by Employee hereunder.

16. This Agreement may be assigned or otherwise transferred by Producer to any third party; Employee shall not have the right to assign his or her obligations under this Agreement. This Agreement shall be governed by and construed in accordance with the laws of California applicable to contracts executed and to be performed entirely therein. Employee hereby irrevocably and unconditionally consents to the jurisdiction and venue of the courts of the State of California, and the United States courts located in the State of California, in connection with any lawsuit, action or proceeding arising out of, or related to, this Agreement. The provisions of this Agreement are not subject to any terms or conditions of any union or guild collective bargaining agreements. This Agreement contains the entire agreement between the parties and cannot be modified unless by mutual written consent.

| AGREED TO AND ACCEPTED: | AMERICAN IDOL PRODUCTIONS, INC. |
|---|---|
| By: [signature] | By: [signature] |
| | Its: ______ |
| Date: 3-11-03 | Date: ______ |



BLANK

CDC_000434

# STANDARD AFTRA ENGAGEMENT CONTRACT

Agreement Between Dated: 3/18/03

Corey Clark
1138 Chestnut Ave.
Rialto CA 92376
(hereinafter called "Performer")

and

AMERICAN IDOL PRODUCTIONS, INC.
7800 Beverly Blvd., Suite 251
Los Angeles, CA 90036
(hereinafter called "Producer")

Performer shall render artistic services in connection with the rehearsal and broadcast of the program(s) designated below and preparation in connection with the part or parts to be played:

TITLE OF PROGRAM: American Idol (Episode #211)

TYPE OF PROGRAM Sustaining ( ) Commercial (X) Closed Circuit ( ) Pay TV ( )

SPONSOR (if commercial): VARIOUS

NUMBER OF GUARANTEED DAYS OF EMPLOYMENT: 1
(if Par. 19 of the AFTRA Code is applicable)

PLACE OF PERFORMANCE* CBS Television City, 7800 Beverly Blvd., Los Angeles, CA 90036

SCHEDULED FINAL PERFORMANCE DAY: 3/18/03

AFTRA CLASSIFICATION: principal performer

PART(S) TO BE PLAYED: Self

COMPENSATION: $1,251.00

MAXIMUM REHEARSAL HOURS INCLUDED IN ABOVE COMPENSATION: SEE AEA LETTER
(if Par. 56(b) of the AFTRA Code is applicable)

Execution of this agreement signifies acceptance by Producer and Performer of all of the above terms and conditions and those on the reverse hereof and attached hereto, if any.

[signature]
Performer
SS#/FEDID # [redacted]

By: [signature]
Producer

*Subject to change in accordance with AFTRA Code.

---

CONTEMPLATED NETWORK BROADCAST ORIGINATION DATE:

BILLING: Performer shall receive billing on the program, in Producer's sole discretion, excepting as required in the AFTRA Code and/or as specifically provided in this paragraph. No inadvertent or unintentional failure to give billing either due to lack of time or otherwise shall be deemed a breach of this agreement.

RATES OF COMPENSATION FOR REPLAYS: Scale

1st: $ AFTRA SCALE 2nd: $ AFTRA SCALE 3rd: $ AFTRA SCALE 4th: $ AFTRA SCALE 5th: $ AFTRA SCALE
6th: $ AFTRA SCALE 7th: $ AFTRA SCALE 8th and all succeeding replays: $ AFTRA SCALE

RATES OF COMPENSATION FOR FOREIGN USE: Scale

Area 1†: $ Area 2†: $ Area 3†: $ Area 4†: $ Area 5†: $

†(As defined in Par. 73(f) of the AFTRA Code)

## STANDARD TERMS AND CONDITIONS

1. Performer shall render Performer's services in connection with this engagement to the best of Performer's ability and subject to Producer's direction and control. Performer will abide by all reasonable rules and regulations of Producer, the broadcaster, the sponsor(s) and their advertising agencies, and Performer shall refrain from any offensive or distasteful remarks or conduct in connection with this engagement. Performer shall, if and as required by this written contract, be available to participate in commercial inserts and leads into and out of such commercial inserts. The Producer, broadcaster(s), and the sponsor(s) and their advertising agencies may open and answer mail addressed to Performer relating to the program, provided that all such mail relating to Performer and intended for him or copies thereof shall be turned over to Performer within a reasonable length of time.

2. (a) Performer shall indemnify Producer, the sponsors and their advertising agencies, the network (if any), and all stations broadcasting the program against and all claims, damages, liabilities, costs and expenses (including reasonable attorneys' fees) arising out of the use of any materials, ideas, creations, and properties (herein called "materials") whether or not required of Performer, furnished by Performer in connection with this engagement, and any ad libs spoken or unauthorized acts done by Performer in connection therewith. Producer shall similarly indemnify Performer in respect to "materials" furnished by Producer, and acts done or words spoken by Performer at Producer's request. Each party will give the other prompt notice of any such claims and/or legal proceedings (and shall send a copy of such notice to AFTRA) and shall cooperate with each other on all matters covered by this paragraph.

(b) If this agreement requires, as an express additional provision, that Performer furnish materials (herein called "required materials") in connection with his performance hereunder, Performer shall submit such required materials to Producer at such time prior to performance thereof as may be reasonably designated by Producer, and such required materials shall, as between Producer and Performer, unless otherwise expressly provided in this agreement under the heading "Additions," be and remain the property of Performer.

3. In full payment for Performer's services and the rights and privileges granted to Performer hereunder, Producer shall pay Performer the compensation hereinbefore specified not later than Thursday after the week during which Performer's services shall have been rendered, subject to the deduction of such taxes and withholdings as are authorized or required by law. There shall be no obligation on Producer's part to producer broadcast the program or use Performer's services or materials, if any.

4. The program hereunder may be originally broadcast either live or by recording over the facilities arranged by or for Producer. The term "recordings," as used herein, shall mean and include any recording or recordings made whether before or during a broadcast transmission, by electrical transcription, tape recording, wire recording, film or any other similar or dissimilar method of recording television programs, whether now known or hereafter developed. All recordings, as between Producer and Performer, shall be Producer's sole property but shall be subject to the restrictions contained in the AFTRA Code in effect at the time such recording is made, except as AFTRA may otherwise permit in writing. Performer will, if required by Producer, re-enact the performance, in whole or in part, in connection with any recording of all or any portion of the program (which Producer may deem desirable) in order to make adjustments necessitated by mechanical failures, or adjustments or corrections in performance after the date of performance, provided that such re-recording is done not later than sixty (60) days after the broadcast in the case of a live program or sixty (60) days after the Performer's final performance day in the case of a pre-recorded program, and shall be subject to the availability of Performer, and provided, further, that Producer shall pay for Performer's services in connection with such re-recording such additional compensation as may be required by the said AFTRA Code.

5. If the broadcast of any program hereunder is prevented by governmental regulation or order, or by a strike, or by failure of broadcasting facilities because of war or other calamity such as fire, earthquake, hurricane, or similar acts of God, or because of the breakdown of such broadcasting facilities due to causes beyond Producer's reasonable control (such as the collapse of the transmitter due to structural defects). Producer shall be relieved of any responsibility for the payment of compensation for the program so prevented; provided that in such case Producer shall reimburse Performer for all out-of-pocket costs necessarily incurred in connection with such program. In addition Performer shall be paid the full applicable rehearsal rate for all hours rehearsed prior to notice of cancellation. The same consequences shall ensue if the program time is preempted by a Presidential broadcast and notice of cancellation for such purpose is given Performer promptly upon such notice having been received by Producer. Where the program time is preempted to broadcast an event of public importance (other than a Presidential broadcast) or where

(Continued)



## STANDARD TERMS AND CONDITIONS

the program is cancelled or prevented for any reason other than those stated above, or where insufficient advance notice has been given under the preceding sentence, Producer shall pay Performer his full contract price for the program so cancelled or prevented.

6. Producer is prohibited from requiring the Performer to refrain from rendering his services in connection with any other television or radio services for any period other than the actual rehearsal and broadcast period involved in this engagement; provided, however, that this prohibition shall not apply if the artist's compensation for this engagement shall be $1,500 or more.

7. Notwithstanding any provision in this agreement to the contrary, it is specifically understood and agreed by all parties hereto:

(a) That they are bound by all the terms and provisions of the applicable AFTRA CODE OF FAIR PRACTICE FOR TELEVISION BROADCASTING. Should there be an inconsistency between this agreement and the said Code of Fair Practice, the said Code shall prevail; but nothing in this provision shall affect terms, compensation, or conditions provided for in this agreement which are more favorable to members of AFTRA than the terms, compensation or conditions provided for in said Code of Fair Practice.

(b) That the artist is covered by the provisions of Paragraph 102 of said Code entitled "AFTRA Pension and Welfare Funds."

(c) That Performer is or will become a member of AFTRA in good standing, subject to and in accordance with the Union Shop Provision of said Code of Fair Practice.

8. If Producer wishes to obtain re-play or foreign use rights for which fees are required pursuant to Paragraph 73 of the AFTRA Code, such fees as are agreed upon shall be separately set forth in this agreement in specific money figures, clearly stating the rate to be paid for each re-play or foreign use, and not by reference to Code paragraph numbers. If Producer has not obtained foreign use rights in accordance with this Paragraph, Producer shall notify AFTRA in advance if, after the execution of this agreement, Producer seeks to secure such rights from Performer.

9. This agreement, when executed by Performer and Producer, shall constitute the entire understanding between them and shall be construed according to the laws of the State of California applicable to contracts fully performed therein.

## ADDITIONS WHICH HAVE NOT BEEN APPROVED BY AFTRA AND ARE NOT PART OF STANDARD FORM*

10. In connection with the program or the series of which it is a part, Producer, the sponsors and their advertising agencies shall have the right, and may grant to others the right, to disseminate, reproduce, print and publish Performer's name, voice, performance, likeness and/or biographical material concerning Performer for publicity and promotion, and for advertising and purposes of trade (but not for the endorsement of any product or service), and in merchandising and licensing with respect to the Series.

11. (a) Producer shall not be required to make any payment to Performer in addition to Performer's compensation specified above Producer's signature on the face of this agreement (hereinafter called the "basic compensation"), unless the aggregate of the minimum AFTRA rates payable to Performer pursuant to the AFTRA Code which is in effect at the time of the performance of Performer's services hereunder, shall exceed the basic compensation, in which event Producer shall pay Performer, in addition to the basic compensation, the amount of such excess.

(b) Notwithstanding anything to the contrary contained in subparagraph (a) of this paragraph 11, if the basic compensation is in excess of the minimum AFTRA rate payable to Performer for Performer's services hereunder (but not more than $850), Producer shall pay Performer at the applicable AFTRA rehearsal rate for all rehearsal hours in excess of the number of hours specified on the face of this agreement.

12. (a) Performer shall furnish all materials required or appropriate for the performance of services under this agreement. All materials furnished by performer, other than materials in the public domain, shall be the property of Performer. Producer shall have the right to broadcast the program in which the materials may be incorporated and the right to make and use and to authorize the making and use of recordings of such program in accordance with the provisions of paragraph 14 hereof, and Producer shall not be required to make any payment to Performer therefor except as provided in paragraph 14 hereof.

(b) In connection with the production or preparation of any program or program matter which is intended for broadcast hereunder, Performer warrants and represents that Performer has not accepted or agreed to accept and will not accept or agree to accept, directly or indirectly, any money, service or other valuable consideration for the inclusion of matter as part of such program matter from any one other than Producer.

13. Performer will, at Producer's request, participate in the presentation of leads into and out of commercial announcements on the program.

14. Producer's rights with respect to recordings of the program shall include without limitation the following:

(i) to replay such recordings in accordance with the provisions of paragraph 73 of the AFTRA Code, and Producer shall pay Performer (at the time specified in said paragraph 73) for each such replay the applicable sum set forth on the face hereof; or, if Exhibit A of the AFTRA Code applies, the minimum applicable sum required to be paid under the applicable provisions of said Exhibit; subject, however, in either case, to the provisions of paragraph 23 hereof.

(ii) to cause or authorize, in accordance with the provisions of sub division 3 or 4, whichever is applicable, of subparagraph (i) B of paragraph 73 of the AFTRA Code, the broadcast of such recordings in each of the "foreign areas" listed in subdivision 2 of the said subparagraph (i) B, and Producer shall pay Performer for such use the applicable sums set forth on the face hereof; it being understood that if subdivision 4 of such subparagraph (i) B is applicable and if no rates are set forth herein for such foreign use, there shall be no payment to Performer therefor; and it being further understood that the provisions of paragraph 23 shall also apply. In connection therewith, if Producer produces a thematic program and more than 75% of such theme program consists of excerpts, Performer hereby consents to the use of Performer's performance in such thematic program, in accordance with subparagraph 8 of Paragraph 73(c) of the AFTRA code. In consideration of Performer's consent, Producer shall pay Performer the minimum sum required by said subparagraph 8. If the excerpt of Performer's performance is longer than three minutes, Performer hereby agrees that the negotiated rate to be paid Performer for such use will be the minimum program fee of the program in which such excerpt is used.

(iii) to cause or authorize, in accordance with the provisions of subdivision (1) or (2), whichever is applicable, of subparagraph (c) of paragraph 73 of the AFTRA Code, the broadcast of such recordings on local non-interconnected stations, and Producer shall make all payments specified in said subparagraph (c);

(iv) to supplement the "network" (as defined in paragraph 71 of the said AFTRA Code) by broadcasting or authorizing the broadcast, within sixty (60) days after the date of the original broadcast of the program of such recordings in any area where the program was not originally broadcast.

(v) to authorize the United States Department of Defense to make recordings of the program and to broadcast such recordings over television stations owned and operated by it;

(vi) to use such recordings for file, reference, audition, trailer and promotional purposes in accordance with the provisions of paragraph 88 of the AFTRA Code;

(vii) to cause or authorize the exhibition of such recordings by means of direct projection in film festivals or competitions.

(viii) to cause or authorize the exploitation of such recordings by any means or device, whether or not now discovered, in "Supplemental Markets" as that term is or shall hereafter be defined in the AFTRA Code, and Producer shall not be required to make any payment to Artist therefor unless required to do so pursuant to the provisions of said AFTRA Code respecting uses in Supplemental Markets; it being understood that if the basic compensation is in excess of twice the basic minimum appropriate program fee specified in the said AFTRA Code, Producer may apply the amount of such excess to any such payment specified in said AFTRA Code.

Producer shall not be required to make any payment to Performer for the use of such recordings as provided in subdivisions (iv), (v), (vi) and (vii) of this paragraph 14. Any exhibition or other use of a recording may be either in color or in black-and-white, or both, at Producer's sole and absolute discretion.

15. Producer shall have the right to terminate this agreement by giving Performer notice to such effect, in the event Performer shall suffer any mental or physical disability, any alteration in Performer's voice which shall, in Producer's opinion, interfere with the proper performance of any of Performer's obligations hereunder.

16. If any provision hereof as applied to either party or to any circumstance shall be adjudged by a court to be void or unenforceable, the same shall in no way affect any other provision hereof, the application of such provision in any other circumstances or the validity or enforceability hereof.

17. This agreement cannot be changed or terminated orally.

18. If Performer's compensation for this engagement is $1,500 or more, Performer agrees not to render services of any kind or nature for or on behalf of Performer or any third party whatsoever during the actual rehearsal and production period under this agreement. Performer warrants that Performer has not rendered services with regard to any television programs which have not received an initial network television broadcast as of the date of this agreement. Furthermore, Performer agrees that Performer will not render services with regard to any program which is scheduled, at the time Performer considers rendering such services, to receive an initial network television broadcast, the origination of which broadcast occurs within twenty-one (21) days prior to or eight (8) days following, the contemplated origination date of the initial network broadcast of the program hereunder. In the event a program on which Performer hereafter renders services is broadcast on a date other than the scheduled date thereof referred to above, and such changed broadcast date falls within the period of broadcast exclusively hereunder. Performer shall attempt to give Producer prompt notice of such conflicting broadcast date, but Performer's failure to give such notice shall not constitute a breach of this agreement. If, for any reason, the program hereunder cannot be or is not broadcast on the contemplated network broadcast origination date, such program may be initially broadcast on any other date and no additional compensation shall be payable to Performer in such event. In the event Producer changes the origination date of the initial television network broadcast of the program hereunder, Producer shall attempt to give Performer prompt notice of such changed date, but Producer's failure to give such notice shall not constitute a breach of this agreement.

19. Performer represents and warrants that Performer has the right to enter into this agreement and to grant the rights herein granted. All rights, remedies, licenses, property privileges, obligations and agreements in this agreement shall be cumulative. The breach by Performer of the provisions contained in this agreement will cause Producer irreparable injury and damage. Producer shall be entitled as a matter of right, without further notice, to injunctive and other equitable relief to prevent the violation of any of the provisions of this agreement by Performer and to prevent Performer from performing services for, furnishing material to or granting conflicting rights to others. Neither this provision nor the exercise or non-exercise by Producer of any of its rights under this agreement shall constitute a waiver by Producer of any other rights or remedies which Producer may have under this agreement or at law or in equity, and Producer hereby expressly reserves such rights. Producer's liability for any breach shall be limited to the payment of money only and in no event shall any of Producer's rights with respect to the programs be affected thereby.

20. Producer shall have the right to assign this agreement and/or all or any part of the rights granted by Performer herein and hereunder to any person, firm or corporation without limitation provided that no such assignment shall relieve Producer of its obligations hereunder except authorized in the AFTRA Code.

21. Subject to the provisions of paragraph 12(a), Producer shall own and Performer hereby grants all rights of every kind and nature in and to all results and proceeds of Performer's services hereunder. Except as prohibited by the AFTRA Code, Producer shall have the right at any time and from time to time to produce the program in color and/or black-and-white and to edit, delete from, rearrange, and/or combine with other programs the program and any recordings thereof. Producer shall have the right to "dub" over Performer's speaking voice and all musical, instrumental and other sounds to be produced by Performer, to such extent as may be required by Producer, whether in English or in any foreign language or languages designated by Producer, and to "double" some other person in Performer's acts, poses and appearances, including, without limitation, where, in the opinion of Producer, the failure to use a "double" might result in physical injury to Performer.

22. Performer will not furnish or authorize any advertising matter or publicity of any form relating to the program. Performer's services in connection therewith, Producer or its operations or personnel or any exhibitors of the program to any person, firm or corporation other than Producer, and their respective agents and employees, without the prior written approval of Producer in each case.

23. To the extent permitted under the AFTRA Code, if compensation payable to Performer hereunder is in excess of AFTRA minimum scale, Producer may apply such excess against any extra payments which would otherwise be due to Performer under the applicable AFTRA Code with respect to the performance by Performer of his obligations or the exercise by Producer of rights granted by Performer to Producer hereunder. Without limiting the foregoing, Producer shall have the right to credit over-scale payments in excess of twice the full AFTRA minimum fee including all extra payments for additional rehearsal and doubling, toward monies due Performer for re-plays, or "foreign area" uses, of any recordings under the applicable AFTRA code.

24. In the event there is any inconsistency, between this Agreement and the mandatory provisions of the AFTRA Code, the code shall prevail; provided, however, that in such event the provision(s) of this Agreement so affected shall be curtailed, limited or otherwise modified only to the extent necessary to permit compliance with the minimum mandatory terms and conditions of the Code.

25. If the production of any program hereunder is prevented or materially interfered with by any of the causes or events specified in paragraph 5 hereof, then the same consequences as specified in paragraph 5 shall ensue.

26. The waiver by Producer of any breach of this agreement by Performer shall not constitute a waiver of any subsequent breach. Any such waiver by Producer must be in writing to be effective.

27. Any notice permitted or required herein shall be given by prepaid regular, certified or registered mail and shall be deemed complete upon depositing it in the United States post office, branch post office, or sub-station, addressed to the parties at their respective addresses hereinabove indicated. Such notice may likewise be wired to Performer or served personally on Performer or his agent or other representative. The date of mailing, wiring or date of such delivery personally, as the case may be, shall be deemed the date of service thereof.

28. SECTION 508—Reference is made to Section 508 of the Federal Communications Act, which became law on September 13th, 1960, making it a criminal offense for any person, in connection with the production or preparation of any program intended for broadcasting, to accept or pay money service or other valuable consideration for the inclusion of any matter as a part of any such program without disclosing the same to the employer of the person to whom such payment is made or to person for whom such program is being produced. Performer understands that it is the policy of Producer not to permit any employee of Producer to accept or pay any such consideration and Performer represents and agrees that Performer has not accepted and will not accept, and has not paid and will not pay any money, service, or other valuable consideration for the inclusion of any "plug," reference, or product identification, or any other matter, in any program produced hereunder.

*For Performer's information, the AFTRA Code provides as follows: "Additions to the standard form must be more favorable to the Performer than, or not inconsistent with, the express provisions of the said standard form contract, and in no event may such additions violate the AFTRA Code."

prod company American Idol Productions, Inc.

CDC_000436

BLANK

CDC_000437

# STANDARD AFTRA ENGAGEMENT CONTRACT

Agreement Between

Dated: 3/19/03

Corey Clark
1138 Chestnut Ave.
Rialto CA 92376
(hereinafter called "Performer")

and

AMERICAN IDOL PRODUCTIONS, INC.
7800 Beverly Blvd., Suite 251
Los Angeles, CA 90036
(hereinafter called "Producer")

Performer shall render artistic services in connection with the rehearsal and broadcast of the program(s) designated below and preparation in connection with the part or parts to be played:

TITLE OF PROGRAM: American Idol (Episode #211A)

TYPE OF PROGRAM Sustaining ( ) Commercial (X) Closed Circuit ( ) Pay TV ( )

SPONSOR (If commercial): VARIOUS

NUMBER OF GUARANTEED DAYS OF EMPLOYMENT: 1
(if Par. 19 of the AFTRA Code is applicable)

PLACE OF PERFORMANCE* CBS Television City, 7800 Beverly Blvd., Los Angeles, CA 90036

SCHEDULED FINAL PERFORMANCE DAY: 3/19/03

AFTRA CLASSIFICATION: principal performer

PART(S) TO BE PLAYED: Self

COMPENSATION: $822.00

MAXIMUM REHEARSAL HOURS INCLUDED IN ABOVE COMPENSATION: SEE AEA LETTER
(if Par. 56(b) of the AFTRA Code is applicable)

Execution of this agreement signifies acceptance by Producer and Performer of all of the above terms and conditions and those on the reverse hereof and attached hereto, if any.

[signature]
Performer

SS#/FEDID # [redacted]

By: [signature]
Producer

*Subject to change in accordance with AFTRA Code.

---

CONTEMPLATED NETWORK BROADCAST ORIGINATION DATE:

BILLING: Performer shall receive billing on the program, in Producer's sole discretion, excepting as required in the AFTRA Code and/or as specifically provided in this paragraph. No inadvertent or unintentional failure to give billing either due to lack of time or otherwise shall be deemed a breach of this agreement.

RATES OF COMPENSATION FOR REPLAYS: Scale

1st: $ AFTRA SCALE 2nd: $ AFTRA SCALE 3rd: $ AFTRA SCALE 4th: $ AFTRA SCALE 5th: $ AFTRA SCALE
6th: $ AFTRA SCALE 7th: $ AFTRA SCALE 8th and all succeeding replays: $ AFTRA SCALE

RATES OF COMPENSATION FOR FOREIGN USE: Scale

Area 1†: $ Area 2†: $ Area 3†: $ Area 4†: $ Area 5†: $

†(As defined in Par. 73(f) of the AFTRA Code)

## STANDARD TERMS AND CONDITIONS

1. Performer shall render Performer's services in connection with this engagement to the best of Performer's ability and subject to Producer's direction and control. Performer will abide by all reasonable rules and regulations of Producer, the broadcaster, the sponsor(s) and their advertising agencies, and Performer shall refrain from any offensive or distasteful remarks or conduct in connection with this engagement. Performer shall, if and as required by this written contract, be available to participate in commercial inserts and leads into and out of such commercial inserts. The Producer, broadcaster(s), and the sponsor(s) and their advertising agencies may open and answer mail addressed to Performer relating to the program, provided that all such mail relating to Performer and intended for him or copies thereof shall be turned over to Performer within a reasonable length of time.

2. (a) Performer shall indemnify Producer, the sponsors and their advertising agencies, the network (if any), and all stations broadcasting the program against and all claims, damages, liabilities, costs and expenses (including reasonable attorneys' fees) arising out of the use of any materials, ideas, creations, and properties (herein called "materials") whether or not required of Performer, furnished by Performer in connection with this engagement, and any ad libs spoken or unauthorized acts done by Performer in connection therewith. Producer shall similarly indemnify Performer in respect to "materials" furnished by Producer, and acts done or words spoken by Performer at Producer's request. Each party will give the other prompt notice of any such claims and/or legal proceedings (and shall send a copy of such notice to AFTRA) and shall cooperate with each other on all matters covered by this paragraph.

(b) If this agreement requires, as an express additional provision, that Performer furnish materials (herein called "required materials") in connection with his performance hereunder, Performer shall submit such required materials to Producer at such time prior to performance thereof as may be reasonably designated by Producer, and such required materials shall, as between Producer and Performer, unless otherwise expressly provided in this agreement under the heading "Additions," be and remain the property of Performer.

3. In full payment for Performer's services and the rights and privileges granted to Performer hereunder, Producer shall pay Performer the compensation hereinbefore specified not later than Thursday after the week during which Performer's services shall have been rendered, subject to the deduction of such taxes and withholdings as are authorized or required by law. There shall be no obligation on Producer's part to producer broadcast the program or use Performer's services or materials, if any.

4. The program hereunder may be originally broadcast either live or by recording over the facilities arranged by or for Producer. The term "recordings," as used herein, shall mean and include any recording or recordings made whether before or during a broadcast transmission, by electrical transcription, tape recording, wire recording, film or any other similar or dissimilar method of recording television programs, whether now known or hereafter developed. All recordings, as between Producer and Performer, shall be Producer's sole property but shall be subject to the restrictions contained in the AFTRA Code in effect at the time such recording is made, except as AFTRA may otherwise permit in writing. Performer will, if required by Producer, re-enact the performance, in whole or in part, in connection with any recording of all or any portion of the program (which Producer may deem desirable) in order to make adjustments necessitated by mechanical failures, or adjustments or corrections in performance after the date of performance, provided that such re-recording is done not later than sixty (60) days after the broadcast in the case of a live program or sixty (60) days after the Performer's final performance day in the case of a pre-recorded program, and shall be subject to the availability of Performer, and provided, further, that Producer shall pay for Performer's services in connection with such re-recording such additional compensation as may be required by the said AFTRA Code.

5. If the broadcast of any program hereunder is prevented by governmental regulation or order, or by a strike, or by failure of broadcasting facilities because of war or other calamity such as fire, earthquake, hurricane, or similar acts of God, or because of the breakdown of such broadcasting facilities due to causes beyond Producer's reasonable control (such as the collapse of the transmitter due to structural defects), Producer shall be relieved of any responsibility for the payment of compensation for the program so prevented; provided that in such case Producer shall reimburse Performer for all out-of-pocket costs necessarily incurred in connection with such program. In addition Performer shall be paid the full applicable rehearsal rate for all hours rehearsed prior to notice of cancellation. The same consequences shall ensue if the program time is preempted by a Presidential broadcast and notice of cancellation for such purpose is given Performer promptly upon such notice having been received by Producer. Where the program time is preempted to broadcast an event of public importance (other than a Presidential broadcast) or where

(Continued)



## STANDARD TERMS AND CONDITIONS

the program is cancelled or prevented for any reason other than those stated above, or where insufficient advance notice has been given under the preceding sentence, Producer shall pay Performer his full contract price for the program so cancelled or prevented.

6. Producer is prohibited from requiring the Performer to refrain from rendering his services in connection with any other television or radio services for any period other than the actual rehearsal and broadcast period involved in this engagement; provided, however, that this prohibition shall not apply if the artist's compensation for this engagement shall be $1,500 or more.

7. Notwithstanding any provision in this agreement to the contrary, it is specifically understood and agreed by all parties hereto:

(a) That they are bound by all the terms and provisions of the applicable AFTRA CODE OF FAIR PRACTICE FOR TELEVISION BROADCASTING. Should there be an inconsistency between this agreement and the said Code of Fair Practice, the said Code shall prevail; but nothing in this provision shall affect terms, compensation, or conditions provided for in this agreement which are more favorable to members of AFTRA than the terms, compensation or conditions provided for in said Code of Fair Practice.

(b) That the artist is covered by the provisions of Paragraph 102 of said Code entitled "AFTRA Pension and Welfare Funds."

(c) That Performer is or will become a member of AFTRA in good standing, subject to and in accordance with the Union Shop Provision of said Code of Fair Practice.

8. If Producer wishes to obtain re-play or foreign use rights for which fees are required pursuant to Paragraph 73 of the AFTRA Code, such fees as are agreed upon shall be separately set forth in this agreement in specific money figures, clearly stating the rate to be paid for each re-play or foreign use, and not by reference to Code paragraph numbers. If Producer has not obtained foreign use rights in accordance with this Paragraph, Producer shall notify AFTRA in advance if, after the execution of this agreement, Producer seeks to secure such rights from Performer.

9. This agreement, when executed by Performer and Producer, shall constitute the entire understanding between them and shall be construed according to the laws of the State of California applicable to contracts fully performed therein.

## ADDITIONS WHICH HAVE NOT BEEN APPROVED BY AFTRA AND ARE NOT PART OF STANDARD FORM*

10. In connection with the program or the series of which it is a part, Producer, the sponsors and their advertising agencies shall have the right, and may grant to others the right, to disseminate, reproduce, print and publish Performer's name, voice, performance, likeness and/or biographical material concerning Performer for publicity and promotion, and for advertising and purposes of trade (but not for the endorsement of any product or service), and in merchandising and licensing with respect to the Series.

11. (a) Producer shall not be required to make any payment to Performer in addition to Performer's compensation specified above Producer's signature on the face of this agreement (hereinafter called the "basic compensation"), unless the aggregate of the minimum AFTRA rates payable to Performer pursuant to the AFTRA Code which is in effect at the time of the performance of Performer's services hereunder, shall exceed the basic compensation, in which event Producer shall pay Performer, in addition to the basic compensation, the amount of such excess.

(b) Notwithstanding anything to the contrary contained in subparagraph (a) of this paragraph 11, if the basic compensation is in excess of the minimum AFTRA rate payable to Performer for Performer's services hereunder (but not more than $850), Producer shall pay Performer at the applicable AFTRA rehearsal rate for all rehearsal hours in excess of the number of hours specified on the face of this agreement.

12. (a) Performer shall furnish all materials required or appropriate for the performance of services under this agreement. All materials furnished by performer, other than materials in the public domain, shall be the property of Performer. Producer shall have the right to broadcast the program in which the materials may be incorporated and the right to make and use and to authorize the making and use of recordings of such program in accordance with the provisions of paragraph 14 hereof, and Producer shall not be required to make any payment to Performer therefor except as provided in paragraph 14 hereof.

(b) In connection with the production or preparation of any program or program matter which is intended for broadcast hereunder, Performer warrants and represents that Performer has not accepted or agreed to accept and will not accept or agree to accept, directly or indirectly, any money, service or other valuable consideration for the inclusion of matter as part of such program matter from any one other than Producer.

13. Performer will, at Producer's request, participate in the presentation of leads into and out of commercial announcements on the program.

14. Producer's rights with respect to recordings of the program shall include without limitation the following:

(i) to replay such recordings in accordance with the provisions of paragraph 73 of the AFTRA Code, and Producer shall pay Performer (at the time specified in said paragraph 73) for each such replay the applicable sum set forth on the face hereof; or, if Exhibit A of the AFTRA Code applies, the minimum applicable sum required to be paid under the applicable provisions of said Exhibit; subject, however, in either case, to the provisions of paragraph 23 hereof.

(ii) to cause or authorize, in accordance with the provisions of sub division 3 or 4, whichever is applicable, of subparagraph (i) B of paragraph 73 of the AFTRA Code, the broadcast of such recordings in each of the "foreign areas" listed in subdivision 2 of the said subparagraph (i) B, and Producer shall pay Performer for such use the applicable sums set forth on the face hereof; it being understood that if subdivision 4 of such subparagraph (i) B is applicable and if no rates are set forth herein for such foreign use, there shall be no payment to Performer therefor; and it being further understood that the provisions of paragraph 23 shall also apply. In connection therewith, if Producer produces a thematic program and more than 75% of such theme program consists of excerpts, Performer hereby consents to the use of Performer's performance in such thematic program, in accordance with subparagraph 8 of Paragraph 73(d) of the AFTRA code. In consideration of Performer's consent, Producer shall pay Performer the minimum sum required by said subparagraph 8. If the excerpt of Performer's performance is longer than three minutes, Performer hereby agrees that the negotiated rate to be paid Performer for such use will be the minimum program fee of the program in which such excerpt is used.

(iii) to cause or authorize, in accordance with the provisions of subdivision (1) or (2), whichever is applicable, of subparagraph (c) of paragraph 73 of the AFTRA Code, the broadcast of such recordings on local non-interconnected stations, and Producer shall make all payments specified in said subparagraph (c);

(iv) to supplement the "network" (as defined in paragraph 71 of the said AFTRA Code) by broadcasting or authorizing the broadcast, within sixty (60) days after the date of the original broadcast of the program of such recordings in any area where the program was not originally broadcast.

(v) to authorize the United States Department of Defense to make recordings of the program and to broadcast such recordings over television stations owned and operated by it;

(vi) to use such recordings for file, reference, audition, trailer and promotional purposes in accordance with the provisions of paragraph 68 of the AFTRA Code;

(vii) to cause or authorize the exhibition of such recordings by means of direct projection in film festivals or competitions.

(viii) to cause or authorize the exploitation of such recordings by any means or device, whether or not now discovered, in "Supplemental Markets" as that term is or shall hereafter be defined in the AFTRA Code, and Producer shall not be required to make any payment to Artist therefor unless required to do so pursuant to the provisions of said AFTRA Code respecting uses in Supplemental Markets; it being understood that if the basic compensation is in excess of twice the basic minimum appropriate program fee specified in the said AFTRA Code, Producer may apply the amount of such excess to any such payment specified in said AFTRA Code.

Producer shall not be required to make any payment to Performer for the use of such recordings as provided in subdivisions (iv), (v), (vi) and (vii) of this paragraph 14. Any exhibition or other use of a recording may be either in color or in black-and-white, or both, at Producer's sole and absolute discretion.

15. Producer shall have the right to terminate this agreement by giving Performer notice to such effect, in the event Performer shall suffer any mental or physical disability, any alteration in Performer's voice which shall, in Producer's opinion, interfere with the proper performance of any of Performer's obligations hereunder.

16. If any provision hereof as applied to either party or to any circumstance shall be adjudged by a court to be void or unenforceable, the same shall in no way affect any other provision hereof, the application of such provision in any other circumstances or the validity or enforceability hereof.

17. This agreement cannot be changed or terminated orally.

18. If Performer's compensation for this engagement is $1,500 or more, Performer agrees not to render services of any kind or nature for or on behalf of Performer or any third party whatsoever during the actual rehearsal and production period under this agreement. Performer warrants that Performer has not rendered services with regard to any television programs which have not received an initial network television broadcast as of the date of this agreement. Furthermore, Performer agrees that Performer will not render services with regard to any program which is scheduled, at the time Performer considers rendering such services, to receive an initial network television broadcast, the origination of which broadcast occurs within twenty-one (21) days prior to or eight (8) days following, the contemplated origination date of the initial network broadcast of the program hereunder. In the event a program on which Performer hereafter renders services is broadcast on a date other than the scheduled date thereof referred to above, and such changed broadcast date falls within the period of broadcast exclusively hereunder, Performer shall attempt to give Producer prompt notice of such conflicting broadcast date, but Performer's failure to give such notice shall not constitute a breach of this agreement. If, for any reason, the program hereunder cannot be or is not broadcast on the contemplated network broadcast origination date, such program may be initially broadcast on any other date and no additional compensation shall be payable to Performer in such event. In the event Producer changes the origination date of the initial television network broadcast of the program hereunder, Producer shall attempt to give Performer prompt notice of such changed date, but Producer's failure to give such notice shall not constitute a breach of this agreement.

19. Performer represents and warrants that Performer has the right to enter into this agreement and to grant the rights herein granted. All rights, remedies, licenses, property privileges, obligations and agreements in this agreement shall be cumulative. The breach by Performer of the provisions contained in this agreement will cause Producer irreparable injury and damage. Producer shall be entitled as a matter of right, without further notice, to injunctive and other equitable relief to prevent the violation of any of the provisions of this agreement by Performer and to prevent Performer from performing services for, furnishing material to or granting conflicting rights to others. Neither this provision nor the exercise or non-exercise by Producer of any of its rights under this agreement shall constitute a waiver by Producer of any other rights or remedies which Producer may have under this agreement or at law or in equity, and Producer hereby expressly reserves such rights. Producer's liability for any breach shall be limited to the payment of money only and in no event shall any of Producer's rights with respect to the programs be affected thereby.

20. Producer shall have the right to assign this agreement and/or all or any part of the rights granted by Performer herein and hereunder to any person, firm or corporation without limitation provided that no such assignment shall relieve Producer of its obligations hereunder except authorized in the AFTRA Code.

21. Subject to the provisions of paragraph 12(a), Producer shall own and Performer hereby grants all rights of every kind and nature in and to all results and proceeds of Performer's services hereunder. Except as prohibited by the AFTRA Code, Producer shall have the right at any time and from time to time to produce the program in color and/or black-and-white and to cut, delete from, rearrange, and/or combine with other programs the program and any recordings thereof. Producer shall have the right to "dub" over Performer's speaking voice and all musical, instrumental and other sounds to be produced by Performer, to such extent as may be required by Producer, whether in English or in any foreign language or languages designated by Producer, and to "double" some other person in Performer's acts, poses and appearances, including, without limitation, where, in the opinion of Producer, the failure to use a "double" might result in physical injury to Performer.

22. Performer will not furnish or authorize any advertising matter or publicity of any form relating to the program, Performer's services in connection therewith, Producer or its operations or personnel or any exhibitors of the program to any person, firm or corporation other than Producer, and their respective agents and employees, without the prior written approval of Producer in each case.

23. To the extent permitted under the AFTRA Code, if compensation payable to Performer hereunder is in excess of AFTRA minimum scale, Producer may apply such excess against any extra payments which would otherwise be due to Performer under the applicable AFTRA Code with respect to the performance by Performer of his obligations or the exercise by Producer of rights granted by Performer to Producer hereunder. Without limiting the foregoing, Producer shall have the right to credit over-scale payments in excess of twice the full AFTRA minimum fee including all extra payments for additional rehearsal and doubling, toward monies due Performer for re-plays, or "foreign area" uses, of any recordings under the applicable AFTRA code.

24. In the event there is any inconsistency, between this Agreement and the mandatory provisions of the AFTRA Code, the code shall prevail; provided, however, that in such event the provision(s) of this Agreement so affected shall be curtailed, limited or otherwise modified only to the extent necessary to permit compliance with the minimum mandatory terms and conditions of the Code.

25. If the production of any program hereunder is prevented or materially interfered with by any of the causes or events specified in paragraph 5 hereof, then the same consequences as specified in paragraph 5 shall ensue.

26. The waiver by Producer of any breach of this agreement by Performer shall not constitute a waiver of any subsequent breach. Any such waiver by Producer must be in writing to be effective.

27. Any notice permitted or required herein shall be given by prepaid regular, certified or registered mail and shall be deemed complete upon depositing it in the United States post office, branch post office, or sub-station, addressed to the parties at their respective addresses hereinabove indicated. Such notice may likewise be wired to Performer or served personally on Performer or his agent or other representative. The date of mailing, wiring or date of such delivery personally, as the case may be, shall be deemed the date of service thereof.

28. SECTION 508—Reference is made to Section 508 of the Federal Communications Act, which became law on September 13th, 1960, making it a criminal offense for any person, in connection with the production or preparation of any program intended for broadcasting, to accept or pay money service or other valuable consideration for the inclusion of any matter as a part of any such program without disclosing the same to the employer of the person to whom such payment is made or to person for whom such program is being produced. Performer understands that it is the policy of Producer not to permit any employee of Producer to accept or pay any such consideration and Performer represents and agrees that Performer has not accepted and will not accept, and has not paid and will not pay any money, service, or other valuable consideration for the inclusion of any "plug," reference, or product identification, or any other matter, in any program produced hereunder.

*For Performer's information, the AFTRA Code provides as follows: "Additions to the standard form must be more favorable to the Performer than, or not inconsistent with, the express provisions of the said standard form contract, and in no event may such additions violate the AFTRA Code."

prod company American Idol Productions, Inc.

CDC_000439

BLANK

CDC_000440