**Dated: 17 March 2003**

**Exclusive Recording Agreement**

**Between**

**19 Recordings Limited**

**and**

**Corey Clark**

CDC_000479

## INDEX

1. Definitions
2. Recording Services
3. Recording Commitment
4. Recording Costs
5. Release Commitment
6. Advances
7. Royalties
8. Union Payments
9. Mechanical Copyright Licences and Payments
10. Audio Visual Material
11. Internet Rights
12. Ownership
13. Recording Restrictions
14. Sampling Provisions
15. Name and Likeness
16. Accounting
17. Attendance at Publicity Sessions, Touring and Promotion
18. Warranties
19. Co-operation in Unauthorised Manufacture
20. Consents and Approvals
21. Indemnities
22. Force Majeure
23. Parties' Rights and Remedies
24. Assignment
25. Notices
26. Modifications
27. Governing Law
28. Trade Marks
29. Artist Approvals
30. Miscellaneous
31. Legal Advice
32. E.M.U.
33. Licence Agreement

CDC_000480

**THIS AGREEMENT** is made the ............. day of .................................... 2003

**BETWEEN**

(1)    **19 RECORDINGS LIMITED** of  Unit 33, Ransome's Dock, 35-37 Parkgate Road, LONDON SW11 4NP (herein called "Company" which expression shall include its successors and assigns) and

(2)    **Corey Clark** of care of Howard Siegel Esq., Pryor Cashman Sherman & Flynn, 410 Park Avenue, New York, NY 10022, USA  (herein called "Artist")

**IT IS AGREED** as follows:

## 1.    DEFINITIONS

The following words shall have the meanings respectively set out opposite them:-

1.1    "**Album**" shall mean a Record containing not less than twelve (12) (or such lesser number as Company may require) nor more than twenty-five (25) different Tracks and totalling no fewer than forty-five (45) minutes of playing time (unless otherwise agreed by Company in writing in respect of a particular Record).

1.2    "**Artist's Name**" shall mean any professional name which Artist may use during the Term.

1.3    "**Audio Material**" shall mean any audio only Recording(s) of Artist's Performance(s) made pursuant to this Agreement.

1.4    "**Audio Visual Device**" shall mean a reproduction of Audio Visual Material in any form whether now known or hereafter devised by which such Audio Visual Material (including Audio Visual Material embodied in Video Clips and/or Long Form Videos) can be perceived reproduced or otherwise communicated either directly or with the aid of a machine or other device including but not limited to Videocassette, Videodisc, DVD Video, CDROM and/or CDi.

1.5    "**Audio Visual Material**" shall mean:

(a)    any film and any other audio visual Recording made pursuant to this Agreement embodying any actual or mimed Performance hereunder whether or not such Performance is of a Title embodied in Audio Material together with such Supplementary Material as Company may require (and whether or not together with graphics, text and/or data and whether or not comprising any interactive element(s)); and

(b)    any film and any other audio visual Recording made pursuant to this Agreement which does not feature Artist but is synchronised with Audio Material hereunder (including without limitation animated and/or illustrated film or videotape) (and whether or not together with graphics, text and/or data and whether or not comprising any interactive element(s)).

1.6    "**CDPA**" shall mean the Copyright Designs and Patents Act 1988 as modified or re-enacted and any subordinate legislation thereunder before or after the date of this Agreement.

- 3 -

CDC_000481

1.7    "Company's Receipts" shall mean (subject to the provisions of clause 7.16 below) Company's actual receipts or credits against a prior advance (net of discounts, in respect of Electronic Sales) attributable (by reference, in respect of any Internet Radio Service, to usage reports) to Audio Material or Audio-Visual Material (or the exploitation of Recording Agreement Internet Rights and/or Additional Internet Rights as applicable) less VAT and similar duties, an on-line cost contribution of twenty-five per cent (25%) and Company's out of pocket expenses in fulfilling such sales, being the cost of postage/delivery and packing, any fees or commissions paid to a third party in relation to such sale/exploitation and any cost of collecting the relevant income (excluding Company's overhead costs in respect thereof). Where Company receives accounting from its licensees based on the licensee's receipts "Company's Receipts" shall mean the licensee's receipts upon which Company receives the accounting.

1.8    "Competition" shall mean the competition to select an "Idol" forming part of the Series.

1.9    "Compilation Album" shall mean a multi-artist compilation album released by Company or any of its licencees through conventional retail outlets (excluding consumer-selected "compilations") and embodying inter alia Audio Material.

1.10    "Container Charge" shall mean a percentage of the Dealer Price of a Record or Audio Visual Device (as the case may be) deducted prior to calculation of the royalty due which notionally represents that proportion of the Dealer Price which relates to the packaging of such Record or Audio Visual Device and being as follows: in respect of 7" vinyl Singles in special bags - fifteen per cent (15%); in respect of 12" vinyl Singles in special bags and other non-Album vinyl Records -seventeen and a half per cent (17.5%); in respect of vinyl Albums and audio cassette tapes - twenty per cent (20%); in respect of compact discs, Audio Visual Devices and New Technology Records - twenty five per cent (25%).

1.11    "Artist's Consent" shall mean the approval of Artist, such approval not to be unreasonably withheld or delayed and to be deemed given if not specifically denied with specific and valid reasons given within ten (10) working days of Company's request for such approval. After the expiry of the Term and/or in relation to the exploitation of Recording Agreement Internet Rights and Additional Internet Rights Artist's Consent shall be deemed given in respect of any matter for which it is required unless specified to the contrary herein.

1.12    "Contract Period" shall mean:

(a)    in relation to the First Contract Period – a period commencing on the date hereof and expiring on the date three (3) months after initial transmission of the last episode of the Series.

(b)    in relation to the Second Contract Period and each subsequent Contract Period – a period of thirteen (13) months or, if longer, a period expiring on the sooner of five (5) months after the initial release in the USA of the Recording Commitment Album due in such Contract Period or five (5) months after Company's receipt of the Release Notice in respect of such Recording Commitment Album.

1.13    "Dealer Price" shall mean either:

- 4 -

(a)     the published price (excluding any tax, duties or levies) gross of all discounts (howsoever arising) at which Records or Audio Visual Devices are customarily available from Company or Company's licensees or sub-licensees (as the case may be) to dealers or wholesalers or sub-distributors (as the case may be) in the country of retail sale; or

(b)     if no such published price exists the actual price gross of all discounts charged for such Records or Audio Visual Devices by Company or Company's licensees or sub-licensees (as the case may be) to dealers or wholesalers or sub-distributors (as the case may be) in such country; or

(c)     if Company is accounted to on a different basis the price upon which royalties due to Company from Company's licensees in respect of sales of Records or Audio Visual Devices hereunder are calculated by such licensees PROVIDED THAT in such latter case if Company is being accounted to on a  retail price basis in lieu of a dealer price basis, Company reserves the right in such instances to make an appropriate reduction in the royalty rate payable to the Artist hereunder in respect of such sales in order to reflect the increased price upon which such royalties are calculated to achieve the same penny rate.

Where for the purposes of this sub-clause 1.13 the country of retail sale cannot reasonably be determined then the Dealer Price shall be the applicable price as determined above in the country of manufacture of the Records or Audio Visual Devices concerned. In each instance, the Dealer Price shall be net of all government duties, sales taxes forming part of such price and the applicable Container Charge.

1.14     "Deliver/Delivery/Delivered"

(1)     In respect of each Recording of Audio Material of the Recording Commitment or in respect of any other Audio Material to which this Agreement may apply these words shall mean actual delivery to the Chief Executive of Company (currently Simon Fuller) or the holding to the order of Compnay in a studio of all the following items in respect of each mix thereof:

(a)     one finished, fully edited, mixed, equalized and leadered stereo half inch master tape of the applicable Audio Material (identifiably marked up) together with two (2) CDR copies thereof, each and every original session tape, each and every multi-track master (together with tape copies or data files in CDR or other format approved by Company of each session and all final recorded elements recorded on hard drive), each and every non-equalized mix version and all work and/or file copies used during recording and/or mixing together with safety copies of each of the above which copies must be made in a different format to the original ("Delivery Materials"). The Delivery Materials shall only be deemed to be Delivered hereunder if the Audio Material embodied thereon fulfil all the criteria specified in this Agreement including those set out in sub-clauses 3.6 and 3.7;

(b)     all of the Delivery Materials shall be fully marked showing, inter alia, track sheets, lyrics, charts, recall information, and software versions and hardware used during the recording/mixing process. All multi-tracks must contain tones marked at the front or end thereof;

(c)     further copies of the half inch master tape(s) and CDR copies referred to in (a) above with (at Company's election) either (i) the lead vocal

- 5 -

removed or (ii) the lead vocal diminished in volume or (iii) the backing vocals removed or (iv) the backing vocals diminished in volume, PROVIDED THAT such further copies shall only be required in respect of any Audio Material comprising the "A" side of a Single and any Audio Material included on an Album which prior to completion of recording of the relevant Recording Commitment Album Company has notified Artist may be released as the "A" side of a Single;

(d) a list of (and where applicable fully completed Musicians' Union consent forms and other relevant forms/documentation in respect of including any documentation required in relation to artists rights under the EC Council Directive 92/100/EC ("Rental Directive")) all featured performers, background vocal performers, instrumental performers and other performers who performed services in connection with the applicable Audio Material and all data required by Company for purposes of CDPA or otherwise;

(e) fully completed licences and clearances in accordance with clause 14 in respect of all Sampled Recordings and Composition Extracts included in such Audio Material;

(f) in the event Company shall so elect in its discretion and without limiting the generality of clause 12 a fully executed valid and binding assignment in such terms as Company may require of all and any rights of Artist whatsoever in relation to the applicable Audio Material(s) and the Performances embodied therein.

(2) In respect of each Recording of Audio Visual Material these words shall mean:

(a) as to Audio Material embodied in the sound track or tracks of such Audio Visual Material (if such Audio Material has not then already been Delivered) all the applicable items set forth in sub-clauses 1.14(1)(a) to (g) unless Company in its discretion elects by notice in writing to Artist to dispense with any such item; and

(b) as to any and all other Audio Visual Material not subject to (a) above embodied therein delivery of (or holding to Compnay's order in a studio of) two (2) Digibeta copies of the Audio Visual Material (one (1) original master copy and one (1) protection copy) of suitable technical quality for broadcast throughout the United Kingdom and the USA by standard TV broadcast and the original signed clearances from all Performers other than the Artist whose performances appear in the Audio Visual Material.

In respect of the matters referred to in each of sub-clauses 1 and 2 above in the event that Artist delivers all of the items specified to Company then Company shall be deemed to have accepted Delivery thereof (and Delivery shall be deemed to have occurred) unless (i) within twenty (20) working days thereof Company has notified Artist in writing that it does not accept Delivery of the applicable Album or Audio Visual Material (as applicable) or (ii) Company and Artist mutually agree that Delivery has not occurred. Notwithstanding the foregoing, Company may at its election accept less than all the items specified above in fulfilment of Delivery of the applicable Audio or Audio Visual Material(s).

-6-

CDC_000484

Company shall give its reasons in writing for any refusal to regard as Delivered any Audio or Audio Visual Material received from Artist which Artist indicates that it wishes to form part of the Recording Commitment. Company shall not reject Audio Material on artistic grounds if the Audio Material complies with clause 3.7.

1.15 "**Electronic Sales**" shall mean the sale or rental or on-demand or near on-demand delivery or distribution of Records and/or Audio Visual Devices where the orders for such sales, rentals or distributions are made electronically (directly or indirectly) by the individual consumer and such sales are fulfilled either:

    (a)    electronically; or
    (b)    by Mail Order Operation

For the purposes hereof, the country of sale of an Electronic Sale fulfilled electronically shall be deemed to be the country in which the relevant sale is delivered to the consumer (to the extent that the same is reasonably identifiable by Company) or, at Company's election, the country from which the relevant sale is fulfilled.

1.16 "**Equivalent Formats**" shall mean the off-line Records, in compact disc format or such format as replaces the compact disc as the leading audio format in the USA from time to time, or Audio Visual Devices, in VHS format or such format as replaces VHS as the leading audio visual format in the USA from time to time, which corresponds to the on-line Audio or AudioVisual Material as applicable, or, if none, then a compact disc or VHS (as applicable) in the same price category as the relevant on-line sale.

1.17 "**Internet Radio Service**" shall mean an on-line streamed broadcasting or simulcasting service, whether free or subscription based, operating across one or more channels, whether genre or artist specific or otherwise and with or without interactive and/or intelligent capabilities.

1.18 "**Licence Agreement**" shall mean an agreement between Company and a third party pursuant to which the third party is granted the right to release Records featuring Artist's Performances under this Agreement.

1.19 "**Long Form Video**" shall mean Audio Visual Material made or commissioned by Company expressly for the purpose of inclusion in Audio Visual Devices to be offered for sale hereunder and/or in any public performance, diffusion or broadcast by any means including cable, satellite, digital or analogue systems as a separate programme but excluding Audio Visual Material which when made or commissioned by Company is intended first for inclusion in any Video Clip.

1.20 "**Mail Order Operation**" shall mean the sale or rental of Records and/or Audio Visual Devices where such sales or rentals are ordered and/or fulfilled by means of postage or courier.

1.21 "**Material**" shall mean all and any Audio Material, Audio Visual Material and Supplementary Material.

1.22 "**Minor Territories**" shall mean Albania, Bulgaria, the Czech Republic, Slovakia, Hungary, Poland, Romania, Latvia, Lithuania, Estonia, Russia and all countries formerly part of the Soviet Union, Yugoslavia and all countries formerly part of Yugoslavia, China, India, Pakistan, Saudi Arabia, Iran, Iraq, Syria, Lebanon, Kuwait, Jordan and all countries of Africa (excluding South Africa).

- 7 -

CDC_000485

1.23 **"Mutually Agreed"** shall mean agreed between Artist and Company, such agreement not to be unreasonably withheld or delayed by either party and with both parties acting in good faith with a view to seeking such agreement. Company (acting reasonably) may decide any matter required to be Mutually Agreed hereunder after the expiry of the Term or in the event that Artist is not available to agree such matter (Company having made reasonable efforts to locate Artist with a view to securing Artist's agreement), or in the event that Artist and Company are unable to reach agreement with respect to such matter.

1.24 **"New Technology Records"** shall mean Records in any form which is not generally available on sale at the date hereof including without prejudice to the generality of the foregoing digital audio tape or DAT, mini disc, digital compact cassette, DVD Audio and Super Audio CD.

1.25 **"Non-Musical Recordings"** shall mean camcorder or other video footage of Artist's rehearsals, recording sessions or live appearances containing no Performances; interviews, chats and competitions featuring or conducted with the participation of the Artist; any other recordings featuring Artist or other materials, footage, information, data or news created by or relating to Artist but not containing any Performances. To the extent that any Non-Musical Recordings are commissioned by or delivered to Company, the same shall be deemed to comprise Material hereunder save for any made under the tour option agreement between 19 Touring Limited and Artist of today's date ("Tour Option Agreement").

1.26 **"Performance"** and **"Perform"** shall mean Artist's rendition of services in the performing of musical works and/or lyrics and/or any series of musical sounds in combination or otherwise either alone or with others.

1.27 **"Producer"** shall mean any person other than the Artist who is to receive any payment or acknowledgement for services in connection with the production engineering mixing or remixing of Audio Material.

1.28 The noun **"Record"** shall mean a reproduction of Audio Material in any form now or later developed (including but not limited to discs and tapes) in which sounds alone excluding visual images (other than technical data such as credits or lyrics) can be perceived reproduced or otherwise communicated directly and/or with the aid of a machine or other device. Notwithstanding the foregoing, subject to the provisions of sub-clause 7.13 below, the formats known as "CD Plus", "CD+" or "CD Extra" shall be deemed to be Records for the purposes hereof. For the avoidance of doubt, the noun "record" shall mean a reproduction of sound recording(s) in any form now or later developed (including but not limited to discs and tapes) in which sounds alone excluding visual images (other than technical data such as credits or lyrics) can be perceived reproduced or otherwise communicated directly and/or with the aid of a machine or other device.

1.29 **"Recording"** shall mean any Performances of the Artist recorded in whatever medium and whether stored permanently, temporarily or ephemerally including but not limited to Material.

1.30 **"Recording Commitment"** shall mean the minimum quantity of Audio Material required to be Delivered to Company during the relevant Contract Period. Such Audio Material shall be sufficient to comprise:

    (a)    during the First Contract Period – two (2) Tracks intended for release on an 'American Idol' branded Compilation Album.

- 8 -

    (b)       during each Contract Period after the First Contract Period - one (1) Album (the "First Album", "Second Album" et seq as applicable).

1.31    **"Recording Commitment Album"** shall mean an Album forming part of the Recording Commitment for the Second or subsequent Contract Periods .

1.32    **"Recording Costs"** shall mean all costs and charges generally recognised as recording costs in the record industry which are incurred in respect of the recording of Audio Material hereunder including all costs of recording, mixing and remixing, sequencing, dubbing, editing, digitising or format conversion (PROVIDED THAT Company shall only be entitled to recoup one set of format conversion costs per Record per format), DVD authoring (save in connection with the creation of DVD Videos where the applicable costs shall be deemed part of the applicable budget and recouped accordingly) and 5.1 remixing, the creation of enhanced formats (e.g. CD-Plus), mastering and re-mastering and any costs of cutting of lacquers and production masters Provided that fifty per cent (50%) per Track of mastering and cutting costs in respect of any Record released by Company in the USA shall be non-recoupable and non-deductible and shall not fall within this definition; and the advances, fees and expenses of producers, engineers, mixers and remixers, musicians, vocalists, arrangers, copyists and conductors; and all studio charges, porterage, instrument and equipment rentals and purchases; and all costs for arrangements, orchestrations and copying; and all union scale payments due to all persons who render performances or services in connection with recording sessions (and all taxes required to be paid thereon if not recovered by Company), and all fee-based amounts payable pursuant to any collective bargaining agreement between Company and any union representing persons who render performances or services in connection with recording sessions; and all travel and living expenses (if any) required for session participants and others (including Artist).

1.33    **"Records Sold"** shall mean Records shipped or otherwise distributed for sale in respect of which Company is paid (or for which Company receives a credit against a previously paid advance) and which are not returned or exchanged (such returned or exchanged Records shall include but not be limited to "one hundred per cent return or exchange" returns, privileged returns, defective merchandise, credits, errors in billing and errors in shipment).  For the purposes of this paragraph:

    (a)       in the event that Records hereunder are shipped for sale at a discounted price or subject to any special merchandising plan the number of such Records deemed to have been shipped shall be determined by reducing the number of Records shipped by the percentage of discount granted or the percentage deduction provided under such merchandising plan as the case may be;

    (b)       in the event that a discount is granted in the form of so-called but actual "free" or "bonus" Records such Records shall be deemed not to be included in the number of Records Sold;

    (c)       Records Sold shall be deemed not to include so called but actual "free" or "bonus" or "dividend" Records distributed by Mail Order Operations, through record clubs or similar means or any Records Sold by any record club at concessionary rates and claimed as part of a "free goods allowance";

    (d)       in the event that Records which have been shipped for sale at a discounted Dealer Price or subject to a merchandising plan or in respect of which a discount has been granted in the form of "free" or "bonus" Records are

- 9 -

returned then the number of such Records deemed to have been returned shall be determined by reducing the number of Records returned by the percentage of discount (however granted) in effect under that discount or the percentage reduction employed in such merchandising plan applicable to such Records at the time of such return.

1.34 **"Royalty Base Price"** shall mean the Dealer Price of the applicable Records and Audio Visual Devices (or the relevant Equivalent Formats) provided that in respect of Electronic Sales and sales through Mail Order Operations, the Royalty Base Price shall be deemed to be Company's Receipts in respect of such sales/rental.

1.35 **"the Royalty"** shall mean the total of any and all royalties and flat fee income whenever payable by Company to Artist which shall be inclusive of any royalty payable to any Producer in respect of the exploitation of Material.

1.36 **"Series"** shall mean the second series of "American Idol:The Search For A Superstar" to be transmitted on television in the United States of America.

1.37 **"Single"** shall mean a compact digital audio disc Record containing no fewer than two (2) nor more than four (4) Tracks and/or the analogue tape cassette and/or New Technology Record and/or seven inch (45rpm) vinyl Record and/or twelve inch (45 or 33rpm) vinyl Record equivalents thereof.

1.38 **"Standard Packaging"** shall mean:

    (a)    in respect of vinyl Singles, vinyl Albums and twelve inch laser discs, a four standard colour sleeve with or without a white inner;

    (b)    in respect of compact discs and any other form of laser disc other than a twelve inch laser disc, a four standard colour stitched booklet of not more than eight (8) pages, up to two (2) colours printed on the disc, a clear tray and a printed back inlay of up to four (4) colours ("the Basic Format") or any variation of the foregoing elements provided always that the total cost to Company shall not exceed the cost of the Basic Format;

    (c)    in respect of an audio cassette, a four standard colour inlay card with three fold-outs;

    (d)    in respect of video cassettes, a single page four standard colour insert.

1.39 **"Supplementary Material"** shall mean any Recordings by or other recordings of Artist made hereunder or delivered to Company during the Term hereof which do not contain Audio Material and/or Audio Visual Material and are intended primarily to support the off-line release of Recordings by Artist.

1.40 **"Term"** shall mean a period commencing on the date hereof and continuing for one Contract Period ("First Contract Period") together with any additional Contract Period(s) hereinafter set forth in respect of which Company exercises its option. Company shall have the following separate irrevocable options to extend the Term:

    (a)    in the First Contract Period by a further Contract Period ("the Second Contract Period"); and

- 10 -

CDC_000488

(b)   in the Second Contract Period by a further Contract Period ("the Third Contract Period"); and

(c)   in the Third Contract Period by a further Contract Period ("the Fourth Contract Period"); and

(d)   in the Fourth Contract Period by a further Contract Period ("the Fifth Contract Period")

(e)   in the Fifth Contract Period by a further Contract Period ("the Sixth Contract Period")

(f)   in the Sixth Contract Period by a further Contract Period ("the Seventh Contract Period")

Subject to clause 33 below each such option to extend the Term shall be exercisable by notice in writing given by Company to Artist prior to or on the date of the expiry of the then current Contract Period. Each Contract Period (if any) after the First Contract Period shall commence on the expiry of the preceding Contract Period.

1.41   "Territory" shall mean the World and the Solar System.

1.42   "Title" shall mean a musical composition with or without lyrics performed or to be performed by Artist.

1.43   "Track" shall mean Audio Material comprising one separate and distinct Title of not less than three (3) minutes nor more than six (6) minutes of playing time.

1.44   "United States of America" or "US" shall mean the United States of America its territories and possessions.

1.45   "Video Clips" shall mean Audio Visual Material made or commissioned by Company as an audio visual representation of and/or accompaniment for any Audio Material intended by Company to be embodied on Records for release hereunder as the "A" side of a Single.

1.46   "Webcast" shall mean an audio or audio-visual Internet broadcast whether streamed live, near-live or archived comprising one (1) or more of Artist's discrete live concert Performances.

1.47   "Major Territories" shall mean United Kingdom, Canada, Germany, France, Italy, Spain, Australia and Japan.

References to Clauses and Schedules are unless otherwise stated references to clauses of and Schedules to this Agreement and such Schedules (if any) form part of this Agreement and have the same form and effect as if expressly set out in the body of this Agreement

## 2.     RECORDING SERVICES

2.1    Save as permitted pursuant to Clause 13 below and any recording pursuant to the Tour Option Agreement, Artist shall during the period commencing on the date hereof and continuing for the Term make, authorise and/or permit the making of Recordings exclusively for Company throughout the Territory.

2.2    Artist shall:

- 11 -

CDC_000489

(a) Perform for Company recordings to comprise the Recording Commitment for each Contract Period during such Contract Period so that the Recording Commitment may be Delivered to Company during such Contract Period; and

(b) use Artist's reasonable endeavours to ensure that the Recording Commitment for each Contract Period is completed and Delivered within six (6) months (three (3) months in the case of the First Contract Period) of the commencement thereof.

2.3 Company shall provide all necessary facilities to enable the Recording Commitment to be made and shall give Artist all relevant assistance in ensuring timely Delivery of the Recording Commitment. Company shall require the producer of Audio Material or Audio Visual Material to deliver the items referred to in clasue 1.14 pursuant to the agreement for such producer's services.

## 3. RECORDING COMMITMENT

3.1 During the First Contract Period Artist shall perform for Company so that Company may record two (2) Titles selected by Company. The producer of the Tracks to be recorded during the First Contract Period shall be selected by Company after consultation with Artist and shall be James McMillan for the initial recording sessions.

3.2 In respect of each Recording Commitment Album, the following provisions shall apply:-

(a) Artist shall perform for Company so that Company may record twenty (20) Titles. The Titles for the First Album shall be selected by Company after consultation with Artist and notified to Artist prior to recording. The Titles for the Second and each subsequent Album shall be selected by mutual agreement between Company and Artist

(b) The identity of Producers for the First Album of Audio Material shall be selected by Company after consultation with Artist. The identity of Producers of Audio Material for the Second Album shall be selected by mutual agreement between Company and Artist.

(c) Company shall select the Tracks to be incorporated on to each Recording Commitment Album hereunder after consultation with Artist.

(d) Company or Company's licensee shall engage and account to and pay producers, mixers and remixers. Producer mixer and remixer terms shall be mutually agreed between Company and Artist but the royalty rate shall be deemed mutually agreed in respect of any producers/mixers/remixer engaged by Company in the event that the total producer/mixer/remixer basic royalty rate on each applicable Track does not exceed five per cent (5%) on a dealer price basis reduced calculated and paid as Artist's royalty. Company shall supply Artist with a copy of each producer contract promptly following completion of the agreement.

3.3 The studios to be used for recording, mixing and mastering the Tracks shall be designated by Company after consulatation with Artist.

- 12 -

3.4     Upon Company's request and subject to Artist's Consent, Artist shall render such performances as will enable Company to make a reasonable amount of Supplementary Material and a reasonable number of foreign language versions of Audio Material made hereunder. The Audio Material of those versions will not count towards the Audio Material required to fulfil the Recording Commitment. The costs incurred in making Supplementary Material pursuant to this sub-clause 3.4 and the said foreign language versions shall be recoupable from the Royalty.

3.5     Upon Company's request during the Second Contract Period and any subsequent Contract Periods Artist shall render such additional Performances as will enable Company in each Contract Period to make up to three (3) additional Tracks to be incorporated as the 'B' sides of Singles the 'A' sides or lead Tracks of which incorporate Tracks made hereunder. Such additional Tracks will not count towards the Audio Material required to fulfil the Recording Commitment. Artist shall render additional Performances in order to enable Company to make, such additional mixes of Audio Material Delivered hereunder as Company shall reasonably require for bona fide marketing purposes subject to a maximum of three (3) per Single.

3.6.1   Without limiting Company's rights generally hereunder Company shall be at liberty notwithstanding any provision to the contrary herein (but shall not be obliged hereunder) to compile and release so-called Greatest Hits or Best Of Album Records of Audio Material hereunder ("Greatest Hits Album(s)"). Company shall consult Artist on the track listing for any Greatest Hits Album. Company shall not release more than one Greatest Hits Album during the Term and not more than two further Greatest Hits albums after the Term without Artist's prior written approval.

3.6.2   In relation to any Greatest Hits Album to be first released during the Term Artist shall, if so requested by Company record Audio Material for Delivery to Company sufficient to comprise up to two (2) Tracks additional to the applicable Recording Commitment ("Bonus Tracks"). The Recording Budget for such Bonus Tracks shall be Mutually Agreed pursuant to sub-clause 4.1 below.. The amounts so designated shall to the extent paid or incurred by Company be additional advances recoupable from the Royalty.

3.7     Artist's Performances of Audio Material hereunder shall be reasonably consistent in concept and style but allowing for genuine artistic development of Artist in Company's reasonable opinion) and the lyrical content thereof shall be Performed in the English language. For the purposes of the fulfilment of the Recording Commitment (a) any multiple Album recorded hereunder shall be deemed a single Album (b) any Audio Material shall comprise audio only Performances of Titles previously unreleased by Artist, rendered by Artist in a recording studio and substantially recorded during the applicable Contract Period.

3.8     The making of Audio Material hereunder shall not be deemed to have been completed and such Audio Material shall not count towards the Recording Commitment and the Recording Commitment shall not be deemed to have been fulfilled unless such Audio Material is in the reasonable opinion of Company technically satisfactory for the purpose of making Records therefrom. Company may require that such Audio Material be re-recorded in accordance with the terms hereof in order to obtain Audio Material which is technically satisfactory to Company as aforesaid.

3.10    "Live" performances, multiple Albums spoken word Material, instrumental Performances without vocal Performances and Audio Visual Material shall not count towards the Recording Commitment without Company's prior written consent. Artist

CDC_000491

shall not be obliged to make any such recordings (save as otherwise provided herein for Audio Visual Material) without Artist's prior written consent.

## 4.    RECORDING COSTS

4.1    The budget for the Recording Costs to be incurred in respect of any Audio Material including for avoidance of doubt in respect of any remixes enhanced formats and special effects ("the Recording Budget") shall be Mutually Agreed and shall be sufficient to enable Artist (acting reasonably) to record the relevant Recording Commitment and shall include a ten per cent (10%) contingency. A copy of each Recording Budget shall after being Mutually Agreed be made available by Company to Artist PROVIDED THAT inadvertent failure to do so shall not constitute a breach of this Agreement. Company shall pay the Recording Costs in connection with the making of Audio Material up to the relevant Recording Budget. An amount equal to all such Recording Costs shall be treated as a non-returnable advance recoupable from the Royalty. If the Recording Budget is exceeded by reason of Artist's wilful or negligent act or default then Company may deduct an amount equal to any such excess Recording Costs paid by Company from any sums due and becoming due to Artist hereunder but excluding Mechanical Royalties.

4.2    Company shall have no obligation to continue or permit the continuation of any recording if Company reasonably anticipates that the Recording Commitment will not be completed or fulfilled within 110% of the Recording Budget due to Artist's negligence or default.

4.3    Artist shall not incur nor purport to incur any costs on behalf of Company without Company's specific prior written approval.

## 5.    RELEASE COMMITMENT

5.1.1    If the Recording Commitment Album for a Contract Period has been completed and Delivered and Company has not released such Album in the USA within six (6) months (excluding December if the said six (6) month period would otherwise have expired in December) after Delivery thereof then Artist shall be entitled as Artist's sole remedy to serve notice on Company specifically referring to this Clause 5.1.1 requesting that such Album be released in the USA within the period of sixty (60) days (excluding December) following receipt by Company of such notice ("Release Notice").   It shall be a condition precedent of Artist's entitlement to rely on the provisions of this clause that all consents and/or other approvals shall have been given by Artist in respect of all relevant matters in relation to Company's entitlement to release such Album for which it is required not less than sixty (60) days prior to service by Artist of the applicable Release Notice.

5.1.2    Failing such release within such sixty (60) day period Artist may serve further notice on Company which notice shall if specifically referring to this sub-clause 5.1.2 and if duly received within thirty (30) days promptly following such sixty (60) day period be effective as Artist's sole remedy to:

(a)    terminate the Term; and

(b)    to require Company to re-assign to Artist the copyright and all other rights vested in Company (but subject to any applicable third party rights and excluding any territory or territories where the applicable Album has been released by one of Company's licensees) in all Audio Material (and all Audio-Visual Material) made and delivered in respect of the applicable unreleased

- 14 -

CDC_000492

Recording Commitment Album and associated Singles in consideration of which Artist shall either (at Artist's election, which shall be notified in writing to Company when serving the notice referred to at line 2 of this sub-clause 5.1.2) repay to Company within seven (7) working days of such notice the full amount of all costs incurred by Company in creating such Material which have not at that date previously been recouped from the Royalty, or alternatively pay to Company in perpetuity a fraction (the numerator of which shall be four (4) and the denominator of which shall be the gross royalty payable to Artist by the applicable third party) of all third party advances (excluding such element of such advances as are expended on recording costs) received by Artist in respect thereof and a royalty payable from record one a royalty of four per cent (4%) of the Royalty Base Price as calculated herein on all worldwide exploitation of the applicable Material plus all applicable Producer and third party royalties and a pro rata share of all flat fee income derived worldwide in perpetuity therefrom.

For the avoidance of doubt in the event that such Album is released at any time prior to receipt of such further notice then such further notice shall be of no effect.

5.2    If the Recording Commitment Album for a Contract Period has been Delivered and Company has not released such Album in the United Kingdom and/or Germany and/or France and/or Italy and/or Spain and/or Australia and/or Japan and/or Canada (provided the relevant country is part of the Territory) within seven (7) months (excluding December) following release of such Album in the USA then Artist shall be entitled as Artist's sole remedy to serve notice on Company specifically referring to this sub-clause 5.2 requesting that such Album be released in the applicable country of the Territory within the period of sixty (60) days (excluding December) following receipt by Company of such notice. Failing such release within such sixty (60) day cure period Artist may serve further notice on Company which notice shall if specifically referring to this sub-clause 5.3 and if duly received within thirty (30) days following such sixty (60) day cure period be effective as Artist's sole remedy to require Company to license such Album in the relevant country(ies) to a third party nominated by Artist and approved by Company (such approval not to be unreasonably withheld or delayed) on terms and conditions to be mutually agreed following receipt by Company of such notice. For avoidance of doubt in the event that such Album is released in the relevant countries at any time prior to receipt of such further notice then such further notice shall be of no effect.

5.3    In the event Long Form Video Material is made or commissioned by Company and has been Delivered then if Company has not released an Audio Visual Device embodying such Long Form Video Material in the USA within nine (9) months (excluding December) after Delivery thereof then Artist shall be entitled as Artist's sole remedy to serve notice on Company specifically referring to this sub-clause 5.3 requesting that such Long Form Video Material be released in the USA within the period of ninety (90) days (excluding December) following receipt by Company of such notice. Failing such release within such ninety (90) day period Artist may serve further notice on Company which notice shall if specifically referring to this sub-clause 5.3 and if duly received promptly following such ninety (90) day period be effective as Artist's sole remedy to require Company to license such Long Form Video Material in the USA to a third party nominated by Artist and approved by Company (such approval not to be unreasonably withheld or delayed) on terms and conditions to be mutually agreed between Company and Artist following receipt by Company of such notice. For avoidance of doubt in the event that such Long Form Video Material (as applicable) is released at any time prior to receipt of such further notice then such further notice shall be of no effect.

- 15 -

CDC_000493

5.4    Company shall be entitled in respect of any licence to a third party issued pursuant to sub-clauses 5.2 and/or 5.3 above to receive thirty per cent (30%) of any advance and royalty paid by such third party in respect of the rights granted. Company shall credit to Artist's applicable royalty balance hereunder such royalties received from such third party as equal the Royalty (as the same may have been reduced pursuant to the provisions hereof) applicable in respect of the relevant Album or Audio Visual Device.

5.5    Notwithstanding anything contained herein to the contrary, in the event that Company has made available for exploitation by way of Electronic Sales via the Internet sound files comprising the Audio Material contained on any Recording Commitment Album (PROVIDED ALWAYS THAT electronic sales have at the relevant date achieved a market penetration in the applicable territory by reference to official published industry statistics of fifteen per cent (15%) or more), Company shall be deemed by such action to have complied with its obligations to release such Album pursuant to this clause 5.

## 6.    ADVANCES

6.1    Save as otherwise herein provided in sub-clause 21.4 below Company shall pay Artist the following sums by way of non-returnable advances against and recoupable from the Royalty:

6.1.1    in respect of the First Contract Period:-

(a)    US$6,250 within 7 working days after commencement of the First Contract Period;

(b)    US$6,250 within 7 working days after Delivery of the Recording Commitment for the First Contract Period.

6.1.2    in respect of the Second Contract Period the following:-

(a)    if Artist wins the Competition:

(i)    one hundred and seventy five thousand US dollars (US$175,000) within seven (7) working days after the commencement of the Second Contract Period; and

(ii)    one hundred and seventy five  thousand US dollars (US$175,000) within seven (7) working days of Delivery to Company of the Recording Commitment for the Second Contract Period.

(b)    if Artist is placed Second in the Competition:-

(i)    one hundred and fifty thousand US dollars (US$150,000) within seven (7) working days after the commencement of the Second Contract Period ; and

(ii)    one hundred and fifty thousand US dollars (US$150,000) within seven (7) working days after Delivery to Company of the Recording Commitment for the Second Contract Period.

(c)    if Artist is placed third to tenth (inclusive) in the Competition:-

- 16 -

CDC_000494

      (i)     one hundred thousand US dollars (US$100,000) within seven (7) working days after commencement of the Second Contract Period; and

      (ii)    one hundred thousand US dollars (US$100,000) within seven (7) working days after Delivery to Company of the Recording Commitment for the Second Contract Period.

6.1.3    subject to the minimum and maximum figures specified in sub-clause 6.1.4 below, the advance payable in each of the Third to Seventh Contract Periods shall be determined by reference to Artist's share (net of third party royalties) ("Share") of the accrued royalty earnings as at the date twelve (12) months after the initial USA release of the Recording Commitment Album last delivered to Company ("the Date"). Such advance shall equal seventy per cent (70%)of the Share of the total accrued royalties net of reasonable reserves in respect of Records Sold at full price of such Album as shown on the last accounting statement submitted by Company to Artist prior to the Date and taking into account pipeline royalties (being the Share of royalties net of reasonable reserves held by Company or its licensees in the USA and in Major Territories but not yet accounted to Artist in respect of Records Sold in the USA and by Company or Company's licensees in Major Territories) as at the Date in respect of such Album.

6.1.4    The total advance payment due in each of the Third to Seventh Contract Periods shall be governed by the maximum and minimum figures as set out below:

    (a)  if Artist wins the Competition:-

      (i)     a minimum of two hundred and seventy five thousand US dollars (US$275,000) and a maximum of five hundred and fifty thousand US dollars (US$550,000) in respect of the Third Contract Period

      (ii)    a minimum of three hundred and twenty five thousand US dollars (US$325,000) and a maximum of six hundred and fifty thousand US dollars (US$650,000) in respect of the Fourth Contract Period

      (iii)   a minimum of three hundred and seventy five thousand US dollars (US$375,000) and a maximum of seven hundred thousand US dollars (US$700,000) in respect of the Fifth Contract Period

      (iv)   a minimum of four hundred and fifty thousand US dollars (US$450,000) and a maximum of nine hundred thousand US dollars (US$900,000) in respect of the Sixth Contract Period.

      (v)    a minimum of five hundred thousand US dollars (US$500,000) and a maximum of one million US dollars (US$1,000,000) in respect of the Seventh Contract Period.

    (b)  if Artist is placed second in the Competition:

- 17 -

(i)    a minimum of two hundred and twenty five thousand US dollars (US$225,000) and a maximum of four hundred and fifty thousand US dollars (US$450,000) in respect of the Third Contract Period;

(ii)   a minimum of two hundred and seventy five thousand US dollars (US$275,000) and a maximum of five hundred and fifty thousand US dollars (US$550,000) in respect of the Fourth Contract Period;

(iii)  a minimum of three hundred and twenty five thousand US dollars (US$325,000) and a maximum of six hundred and fifty thousand US dollars (US$650,000) in respect of the Fifth Contract Period;

(iv)   a minimum of four hundred thousand US dollars (US$400,000) and a maximum of eight hundred thousand US dollars (US$800,000) in respect of the Sixth Contract Period;

(v)    a minimum of four hundred and fifty thousand US dollars (US$450,000) and a maximum of nine hundred thousand US dollars (US$900,000) in respect of the Seventh Contract Period.

(c)   if Artist is placed third to tenth (inclusive) in the Competition:

(i)    a minimum of one hundred and seventy five thousand US dollars (US$175,000) and a maximum of three hundred and fifty thousand US dollars (US$350,000) in respect of the Third Contract Period;

(ii)   a minimum of two hundred and twenty five thousand US dollars (US$225,000) and a maximum of four hundred and fifty thousand US dollars (US$450,000) in respect of the Fourth Contract Period;

(iii)  a minimum of two hundred and seventy five thousand US dollars (US$275,000) and a maximum of five hundred and fifty thousand US dollars (US$550,000) in respect of the Fifth Contract Period.

(iv)   a minimum of three hundred and twenty five thousand US dollars (US$325,000) and a maximum of six hundred and fifty thousand US dollars (US$650,000) in respect of the Sixth Contract Period;

(v)    a minimum of four hundred thousand US dollars (US$400,000) and a maximum of eight hundred thousand US dollars (US$800,000) in respect of the Seventh Contract Period.

6.2    SAVE in respect of the advances payable in the First and Second Contract Periods the advances set out above shall be paid as follows:-

- 18 -

(a)     one third (1/3rd) of the minimum advance due within seven (7) working days of commencement of the applicable Contract Period; and

(b)     one third (1/3rd) of the minimum advance due within seven (7) working days of bona fide commencement of recording of the Recording Commitment Album due in the applicable Contract Period (for the purposes hereof recording of the relevant Recording Commitment Album shall only be deemed to have commenced if (in accordance with the provisions of sub-clauses 3.2, 3.3, 3.7 and 3.10 hereof) recording of at least three (3) Tracks intended by Artist and Company to form part of such Recording Commitment Album, in respect of which all relevant matters hereunder have been agreed, has commenced); and

(c)     the remaining balance within seven (7) working days following the Delivery of the Recording Commitment due in such Contract Period;

In the event that bona fide commencement of recording pursuant to sub-clause (b) above occurs after the relevant Date for calculation, the payment made to Artist pursuant to sub-clause (b) above shall be equivalent to two-thirds of the actual advance due as calculated pursuant to sub-clauses 6.1.3 and 6.1.4 above less the payment made pursuant to sub-clause (a) above.  In the event that Delivery of the applicable Recording Commitment occurs prior to the relevant Date for calculation, the payment made pursuant to sub-clause (c) above shall consist of one third (1/3rd) of the minimum advance due, and the remaining balance due (if any) shall be paid within seven (7) working days following the applicable Date).

6.3     Any advances paid prior to the dates upon which they are due shall constitute due payment thereof by Company for the purposes hereof but such advances shall not be pre-paid without Artist's consent.

6.4     No advances shall be payable hereunder other than as specified above or below.

6.5     In respect of a Greatest Hits Album released in USA during the Term or within five (5) months thereafter, Company shall pay Artist an advance exclusive of Recording Costs of three hundred and seventy five thousand US dollars (US$375,000) less any unrecouped balance unrecouped on Artist's royalty account but subject to a minimum figure of seventy five thousand US dollars (US$75,000) in any event. Such advance, if any, shall be payable on release of such Greatest Hits Album.

6.6     Company agrees to pay to Artist a non-recoupable fee of $2,500 within 7 working days after commencement of the First Contract Period.

## 7.     ROYALTIES

7.1     In consideration of the services rendered and procured and rights granted by Artist hereunder Company shall accrue to the credit of Artist a royalty in respect of one hundred per cent (100%) of Records Sold by Company or its licensees. Subject as herein provided such royalty shall be calculated on the Royalty Base Price of the relevant Record and shall as set forth herein be inclusive of all royalties to any Producer or other third party (excluding only mechanical copyright royalties) and shall be at a rate determined according to the country of retail sale, the Contract Period of release, and the nature and configuration of the applicable Record in accordance with the following table:

- 19 -

CDC_000497

| Records Sold as Albums | | Country of Sale | |
|---|---|---|---|
| | USA | Major Territories | ROW |
| First Album | 18% | 16% | 15% |
| Second Album | 18% | 16% | 15% |
| Third Album | 18% | 16% | 15% |
| Fourth Album | 18% | 17% | 16% |
| Fifth Album | 18% | 17% | 16% |
| Sixth Album | 18% | 17% | 16% |
| Records Other than Albums | | | |
| | 14% | 12% | 11% |

PROVIDED THAT on an Album by Album basis if the number of Records Sold during the Term of any Recording Commitment Album throughout the world exceeds one million (1,000,000), then the royalty rate in respect of Records Sold of such Album in excess of one million (1,000,000) shall increase by 0.5% in each territory.

For the purposes of the above escalation, Records Sold shall be deemed to refer to Records Sold at full price through normal retail outlets only and also Records Sold embodying Electronic Sales at full price made in territories in which Electronic Sales have at the relevant date achieved a market penetration by reference to official published industry statistics of fifteen per cent (15%) or more.

7.2    Royalties on Records Sold outside the USA shall be computed in the national currency in which Company or its licensee is accounted to at the rate of exchange in effect at the time of payment to Company as reflected in the books of Company. Company shall use reasonable endeavours to procure that its licensees are obliged to render accountings to Company in respect of Records Sold no less frequently that twice in each calendar year. If Company is paid for Records Sold outside the United Kingdom, and Company cannot legally remit such payment to the United Kingdom, then (in the event that royalties would be payable to Artist if such payment were remitted) Company shall notify Artist in writing and at Artist's election and expense Company shall deposit the royalties payable to Artist with respect to such Records Sold in the currency and in the country in which Company receives payment therefor. Such deposit and notice to Artist shall discharge Company of the royalty obligation for Records Sold to which such royalties are applicable. If the laws of any country require taxes on such remittances to be withheld at source then the royalties that accrue to Artist shall be reduced proportionately. Company shall give Artist reasonable assistance in endeavouring to obtain necessary certificates of tax in respect of such withheld monies. Company shall use its reasonable endeavours to complete and submit appropriate double taxation exemption claim forms in respect of payments to Company in the UK.

7.3    If the royalty which Company receives is under the foreign exchange remittance regulations of any country restricted to a royalty which is equal to or less than the aggregate of Artist's applicable royalty rate pursuant to this clause 7 and four per cent (4%) of the Royalty Base Price, then such royalty up to a maximum of eight per cent (8%) of the Royalty Base Price shall be divided equally between Artist and Company and after such division any royalty in excess of eight per cent (8%) of the Royalty Base Price shall accrue to Artist. Artist's share of such royalty receipts shall be in place of the otherwise applicable royalty rate.

- 20 -

CDC_000498

7.4.1    In respect of Records Sold by Company or its licensees in the following categories the Royalty shall be at one-half (1/2) of the applicable rate and calculated in accordance with the royalty calculation provisions of this Agreement unless otherwise stated:

    (a)    budget price Records (being Records the Dealer Price of which is equal to or less than sixty-five per cent (65%) of Company's or its licensee's Dealer Price for Records sold on its full price line label);

    (b)    sales to or through record clubs (excluding Electronic Sales) and/or sales for rental (excluding Electronic Sales) (where the Royalty Base Price shall be the price upon which royalties to Company are calculated);

    (c)    sales by or through Mail Order Operations (excluding Electronic Sales);

    (d)    so-called soundtrack Records (PROVIDED THAT Company shall at its election be entitled to apply either the reduced rate hereunder or to account in respect of such Records pursuant to sub-clause 7.6 below);

    (e)    sales through P.X outlets;

    (f)    educational sales, governmental sales and sales to libraries;

    (g)    Records Sold in the Minor Territories.

    (h)    Records sold as Singles at a discount of thirty-five per cent (35%) or more, but less than fifty per cent (50%), from Company's Dealer Price.

    (i)    Compilation Albums (other than 'American Idol' Compilation Albums)

7.4.2    In respect of Records Sold by Company or its licensees in the following categories the Royalty shall be at the following proportions of the otherwise applicable rate and calculated in accordance with the royalty calculation provisions of this Agreement unless otherwise stated:

    (a)    New Technology Records:- eighty per cent (80%) of the otherwise applicable rate PROVIDED THAT in the event that any particular format of New Technology Record achieves a market penetration in any territory of fifteen per cent (15%) or more by reference to statistics published by the BPI or the equivalent body in the applicable territory, the said eighty per cent (80%) rate shall in respect solely of that particular format be increased to one hundred per cent (100%) but only with effect from sales in that territory which take place in the accounting period which commences after the date upon which such market penetration has been achieved.

    (b)    Mid-price Records (being Records the Dealer Price of which is equal to or less than eighty per cent (80%) but more than sixty-five per cent (65%) of Company's or its licensees Dealer Price for Records sold on its full price line label) – two thirds (2/3rds) of the otherwise applicable rate.

7.4.2 A  The excess costs of any packaging other than Standard Packaging used on Records and/or Audio-Visual Devices hereunder shall be recoupable from the Royalty.

- 21 -

CDC_000499

7.4.3    For the avoidance of doubt no more than one of the provisions of sub-clauses 7.4.1 and/or 7.4.2 shall be applied when accounting to Artist for any Record Sold and no Record Sold to which either such sub-clause applies shall count towards the total of Records Sold required to cause any increase in royalty rates set forth in this Agreement as the same may be amended.

7.5.1    In respect of Records Sold by Company or its licensees the marketing of which is supported by a major advertising campaign on radio and/or television in recognition that the cost of marketing the sale of Records hereunder by such means will be a speculative venture, it is agreed that the Royalty shall be at fifty per cent (50%) of the otherwise applicable rate in respect thereof.  The half-rate reduction referred to in sub-clause 7.5.1 above shall be limited in application to Records Sold in the accounting period in which the sell-in period prior to the campaign occurs, in the accounting period(s) in which the campaign is conducted and in the next two accounting periods thereafter.  The half-rate reduction shall cease when the amount retained by Company by virtue of the royalty reduction equals 50% of the cost of the TV campaign concerned (including the cost of producing the advertisements).

7.5.2    If Company releases Albums hereunder in conjunction with television and/or radio advertising campaigns in the following countries the following terms will apply in place of sub-clause 7.5.1:-

(a)    if the TV spend (including the production costs of the applicable advertisement) in the USA for each such Album is in excess of one hundred and fifty thousand dollars (US$150,000), fifty per cent (50%) of the TV spend in the USA shall be treated as an advance recoupable from the Royalty;

(b)    if the radio spend (including the production costs of the applicable advertisement) in the USA for each such Album is in excess of seventy five thousand dollars (US$75,000), fifty per cent (50%) of the radio spend in the USA shall be treated as an advance recoupable from the Royalty;

(c)    if the TV spend or radio spend (including the production costs of the applicable advertisement) is in excess of the following sums in the following countries, the royalty payable to Artist on Records Sold in the relevant country shall be reduced by the amount of any royalty reduction in Company's royalty agreed between Company and the applicable licensee until such time as 50% of the TV/radio spend in the country concerned has been recovered from the royalty retained by Company on the Album the subject of the TV or radio advertising campaign and PROVIDED THAT Artist's royalty rate shall in no event be reduced to more than fifty per cent (50%) of the otherwise applicable rate.

- 22 -

CDC_000500

| TV Spend | Radio Spend | Country |
|---|---|---|
| US$30,000 | US$15,000 | Australia |
| US$50,000 | US$25,000 | Belgium |
| US$30,000 | US$15,000 | Brazil |
| US$50,000 | US$25,000 | Canada |
| US$30,000 | US$15,000 | Denmark |
| US$75,000 | US$37,500 | France |
| US$60,000 | US$30,000 | Germany |
| US$45,000 | US$22,500 | Holland |
| US$60,000 | US$30,000 | Italy |
| US$45,000 | US$22,500 | Japan |
| US$15,000 | US$7,500 | New Zealand |
| US$30,000 | US$15,000 | Portugal |
| US$50,000 | US$25,000 | Spain |
| US$30,000 | US$15,000 | Sweden |
| US$100,000 | US$20,000 | United Kingdom |

(d)     there will be no royalty reduction on Records Sold in the USA by reason solely of such TV/radio campaigns if the applicable spend is less than the appropriate amounts referred to in (a) and (b) above. There shall be no royalty reduction or recoupment of TV or radio spend if the TV or radio spend is less than the appropriate amount referred to in (c) above for the country concerned;

7.6     Subject always to the provisions of sub-clause 7.16 below, Company will credit to Artist's royalty balance fifty per cent (50%) of net income (not being advances of royalty) (where "net income" shall mean the net income on which Company receives accounting from its licensee net of direct costs relating to the applicable exploitation) received by or credited to Company in the UK on a flat fee basis (paid in lieu of a royalty rate and not being sales through Mail Order Operations) which is specifically attributed to the exploitation of Audio Material including so-called "premiums" but excluding exploitation under sub-clause 7.7 below.

7.7     In respect of Electronic Sales, the Royalty shall be at eighty per cent (80%) of the otherwise applicable royalty rate calculated on the relevant Royalty Base Price of the Records or Audio Visual Devices rising to one hundred per cent (100%) of the otherwise applicable royaty rate from the accounting date after electronic sales achieve a market penetration of fifteen per cent (15%) or more by reference to official published industry statistics in the country concerned.

7.8     In the event that Company receives or is credited with royalties or fees in respect of exploitation by Webcast, pay-per-view, digital broadcast and/or cable retransmission (for the avoidance of doubt excluding Electronic Sales and exploitation by means of Internet Radio Service(s)) and such royalties or fees are directly and identifiably attributable to Audio Material hereunder then notwithstanding anything else to the contrary contained herein Company shall credit forty per cent (40%) of Company's Receipts (after deduction of any actual costs associated with the applicable Webcast) to Artist's royalty balance hereunder.

7.9     In respect of Records Sold by Company or its licensees which comprise Material together with other recordings not comprising Material the royalty in respect thereof

CDC_000501

shall be that proportion of the rate otherwise applicable that the number of Tracks embodied on such Record bears to the total number of royalty bearing tracks embodied on such Record.

7.10 No royalty shall be paid in respect of vinyl picture discs, coloured vinyl Records and vinyl disc Records which are not round; and Records supplied by Company to juke box companies at no more than cost price; and sales as deletions, cut-outs, overstocks or as scrap; and reasonable numbers of promotional Records consistent with industry standards; and Records distributed to members of staff of Company or its licensees; and Records Sold as Singles in the USA at a discount of fifty per cent (50%) or more from Company's Dealer Price.

7.11 If Artist performs pursuant hereto jointly with any artist(s) in favour of whom Company or its licensees is obliged to accrue royalties in respect of Records Sold embodying such joint performances then the royalty in respect of such Records and the applicable proportion of net income under sub-clauses 7.6 and 7.8 above shall be that proportion of the rate or the income as the case may be otherwise applicable as the number "one" (1) bears to the total number of Artist's (including Artist) whose performances are contained on such Record and to whom Company or its licensees is obliged to pay royalties. Notwithstanding the foregoing Artist shall not Perform hereunder with any other Artist to whom Company or its licensees is obliged to pay royalties without the prior written consent of Company and Artist and for purposes of this sub-clause 7.11 Artist shall count as one where Artist is a group of more than one.

7.12 Company's obligation under this Agreement to accrue to the credit of Artist the Royalty in respect of the exploitation of Recordings shall be limited to the extent that such exploitation occurs during the life of copyright (including all extensions and renewals) of the sound recording embodied in such Record in the country of sale or other exploitation.

7.13 In respect of Records Sold in the form known as "CD Plus", "CD+" or "CD Extra" Company shall credit to Artist's royalty balance one hundred per cent (100%) of the royalty otherwise payable in respect of such Records Sold less a royalty of two per cent (2%) in respect of Audio-Visual Material embodied thereon calculated as provided herein which two per cent (2%) royalty shall be credited to the applicable Audio Visual account hereunder.

7.14 Company shall maintain a separate royalty balance for Artist, to which Company shall credit forty per cent (40%) of Company's Receipts directly and identifiably attributable to third party sponsorship and/or endorsement of or advertising on Artist Site(s) procured by Company; sixty per cent (60%) of Company's Receipts directly and identifiably attributable to third party sponsorship and/or endorsement of or advertising on Artist Site(s) procured by Artist; sixty five per cent (65%) of Company's Receipts directly and identifiably attributable to the sale of tickets and/or items of merchandise from Artist Site(s) (provided that Artist's prior written consent shall be required for the sale of tickets or merchandise from Artist's Site); forty per cent (40%) of Company's Receipts otherwise directly and identifiably attributable to the exploitation by Company of the Additional Internet Rights and not provided for elsewhere in this clause 7 and excluding any commission received by Company pursuant to clause 11.7 below.

7.15 For the avoidance of doubt, in relation to Company's Receipts arising from the exploitation of Audio Material by means of an Internet Radio Service or any other kind of streaming service not specifically provided for above, in the event that the

- 24 -

licence or other agreement pursuant to which such moneys are received by Company describes or characterises the exploitation as "broadcast" or "transmission" Company shall (subject to the provisions of clause 7.16 below) credit Artist's royalty balance hereunder with forty per cent (40%) thereof, but where the licence or other agreement does not so describe the exploitation as indicated above or describes or characterises the exploitation as "distribution" or "sales" then such monies shall be treated in accordance with the provisions of sub-clause 7.7 above. In the event that such a service is operated by Company or its affiliates its nature shall be characterised by the basis upon which Company accounts to the majority of its then current roster in respect of exploitation by such service.

7.16    For the avoidance of doubt, notwithstanding anything contained herein to the contrary, Artist shall not be entitled to a share of income received by or credited to Company on a general or label basis and/or income received by Company from broadcasting and public performance collection societies such as Phonographic Performance Limited. Company shall not be entitled to a share of income received by or credited to Artist from broadcasting and public performance collection societies such as Phonographic Performance Limited.

7.17    If Company renegotiates its Licence Agreement and obtains improvements in the calcualtion of royalties payable to Company (such as the reduction of Container Charges, limits on free goods, restrictions on reserves) Company agrees to pass on to Artist the benefit of such improved terms in respect of the same sales to which the improved terms apply.

## 8.    UNION PAYMENTS

8.1    If a royalty or other payment becomes due in respect of any Audio Material made hereunder to any union or other similar third party including but not limited to the American Federation of Musicians or AFTRA or to any organisation or trust fund established by them pursuant to any collective bargaining agreement or otherwise ("Union Payments"), Company may make all such Union Payments and deduct an amount equal thereto from the Royalty. Artist will not knowingly record Audio Material hereunder in circumstances which would give rise to such Union Payments without Company's prior written consent, but if Artist inadvertently does not seek that consent or a payment becomes due retrospectively or in circumstances where Artist did not know such a payment would become due, then Company shall not be prevented from deducting as aforesaid the full amount so defrayed. Company shall not make arrangements for the recording of Audio Material or Audio Visual Material giving rise to Union Payments without Artist's prior written consent.

## 9.    MECHANICAL COPYRIGHT LICENCES AND PAYMENT

9.1    In the event that Artist has written in whole or in part (to the extent of the part only), or Artist owns or controls, directly or indirectly in whole or in part (to the extent of the part only) any Titles embodied in any Audio Material made hereunder or Artist has a direct or indirect interest in the income to be derived therefrom or from the copyright thereof (including any reversionary interest) ("Controlled Titles") Artist hereby agrees, warrants, represents and undertakes that:

    (a)    prompt written notice of any Titles which are Controlled Titles will be given to Company;

- 25 -

CDC_000503

(b)    Artist will procure that Company and its licensees will promptly receive valid mechanical licenses upon application therefor in respect of all Controlled Titles so as to enable Company and its licensees to exploit Records embodying the same throughout the Territory;

(c)    Artist will procure that Company and its licensees shall not be required to pay any mechanical royalties in respect of Controlled Titles embodied in Records at a rate in excess of the following rates in force from time to time of the applicable Audio Material embodying each Controlled Title:

(i)    In the United Kingdom the rate set by the Copyright Tribunal or (in the absence of such rate) the rate agreed between the BPI and the MCPS from time to time ("the UK Rate") or (if Company obtains a mechanical licence outside the United Kingdom) the rate set for the payment of mechanical royalties on the standard terms of the body granting such licence (or in the absence of such rate the rate agreed between the bona fide record industry and publishing industry bodies in the country in which Company obtains such licence which shall not be lower than the UK rate);

(ii)    In the United States of America seventy-five per cent (75%) of the minimum statutory rate imposed by the United States Copyright Act (without regard to playing time/ rising to one hundred per cent (100%) in respect of Records Sold on an Album by Album basis in excess of five hundred thousand (500,000) units in the United States of America;

(iii)    In Canada seventy-five per cent (75%) of the rate payable pursuant to the CMRRA-CRIA Mechanical Licensing Agreement 1990 as amended or any future replacement thereof (without regard to playing time) rising, solely in the event that the escalation provided for in sub-clause 9.1 (c) (ii) above has become applicable to the applicable Album as at the date of the Canadian sales achievement, to one hundred per cent (100%) in respect of Records Sold on an Album by Album basis in excess of fifty thousand (50,000) units in Canada;

(iv)    In any other country either:

A.    the prescribed or compulsory rate (as the case may be) fixed in such country or;

B.    if none exists, the generally accepted rate negotiated between Record companies and music publishers therein (without regard to playing time).

The rate specified above for each country is hereinafter referred to as "the Controlled Title Rate".

(d)    If as a result of the breach of such agreements, warranties, representations or undertakings as aforesaid Company or any of its licensees is required to pay mechanical royalties in excess of the Controlled Title Rate then Company shall have the right to deduct such excess from any Record royalties and/or flat fee income payable to Artist hereunder.

- 26 -

CDC_000504

(e)    Notwithstanding any contrary provision contained herein in respect of the USA and Canada Company and its licensees shall only be required to pay any mechanical royalties in respect of Controlled Titles embodied on Records Sold, and fifty per cent (50%) of album free goods distributed in the USA.

(f)    Where Controlled Titles consist of arrangements of Titles in the public domain then the applicable mechanical rate shall be reduced to that proportion applied by the applicable local performing rights society in its award in respect of those Titles.

9.2    If Company or its licensees shall be required in the United States of America and/or Canada to pay a mechanical royalty rate on Records Sold in excess of twelve times (12x) the Controlled Title Rate per (single) Album or two times (2x) the Controlled Title Rate per 7" vinyl Single or three times (3x) the Controlled Title Rate per 12" vinyl CD or cassette Single or six times (6x) the Controlled Title Rate with respect to any Record which is longer than a Single but shorter than an Album, then Company shall have the right to deduct such excess first from any mechanical royalties payable to Artist or Artist's publisher in respect of Controlled Titles and thereafter from the Royalty. Company agrees not to release a Record in USA and Canada that would produce an excess payment hereunder without Artist's prior written consent.

9.3    In the event that Company is unable to obtain a mechanical licence for the USA in the case of a Controlled Title which is embodied on Audio Material otherwise completed in accordance with the terms hereof the Audio Material containing any such Controlled Title shall be deemed not to have been Delivered until such licence has been obtained. In the event that Company is unable to obtain a mechanical licence on the above terms for any part of the Territory in respect of a Controlled Title which is embodied in Audio Material which is otherwise completed in accordance with the terms hereof, then any release commitment for that part of the Territory shall not apply to any Record embodying such Audio Material.

9.4    Company and its licensees shall be responsible for the payment of all mechanical copyright royalties payable as the result of Company's and its licensees' manufacture distribution and sale of Records hereunder subject to all applicable provisions of this Agreement.

9.5    Artist shall use reasonable endeavours to procure that Company is entitled to reproduce without charge the lyrics of any Controlled Titles recorded hereunder in the packaging and artwork of Records and Audio Visual Devices released hereunder and shall procure that Company is entitled to use free of charge up to thirty (30) seconds of any Controlled Title embodied in any Audio-Material recorded hereunder in the form of a wav.file, mp3.file and/or mov.quicktime file (or any subsequent equivalent or similar format) on its or any of Company's Licensed Affiliates' website(s) or on any Artist's website created by Company pursuant to this Agreement.

## 10.    AUDIO VISUAL MATERIAL

10.1    Company shall be exclusively entitled to make, commission or approve the recording of audio visual Performances (including without limitation Audio Visual Material in the form of Video Clips and/or Long Form Videos).

10.2    The treatment, story-board, producer and director of any Audio Visual Material shall be Mutually Agreed, Artist and Company agreeing to co-operate fully and in a timely manner so as to ensure that Mutual Agreement is reached promptly so that Company may comply with its proposed release schedule and associated promotional and

CDC_000505

marketing campaign. The budget for the recording of such Audio Visual Material ("the Audio Visual Material Budget") shall be Mutually Agreed and shall be reasonable in the context of the applicable mutually agreed treatment, story-board producer and director and shall be sufficient to enable the Company to record such Audio Visual Material and shall include a contingency fund of ten per cent (10%) of the total budget (excluding any contingencies). The Audio Visual Material Budget shall include without limitation any synchronisation fees payable to the publishers of Titles (including Controlled Titles) embodied in the applicable Audio Visual Material, and all Union Payments. In the event that the Audio Visual Material Budget is exceeded due to Artist's default without the prior written consent of Company the amount of such excess (the "Excess Costs") shall be fully deductible from any and all sums becoming due to Artist hereunder.

10.3    Upon Company's request, prior reasonable notice and subject to prior commitments Artist shall attend all filming sessions in connection with Audio Visual Material and undertakes to render performances free of charge to the best of Artist's ability in connection therewith and to attend promptly at such times and places as Company shall designate for the making of Audio Visual Material and Long Form Videos (and subject to Artist's Consent such amount of Supplementary Material as is in Company's reasonable opinion required for inclusion on Audio Visual Devices). The costs of creating Supplementary Material hereunder shall be recoupable as if the same were a Video Clip pursuant to sub-clause 10.4 below.    Company shall reimburse to Artist any reasonable out of pocket travelling and living expenses of Artist approved by Company. Such expenses shall form part of the Audio Visual Material Budget and be recouped in the manner specified in sub-clause 10.4 below.

10.4    In respect of any Video Clip fifty per cent (50%) of the costs within the Audio Visual Material Budget incurred by Company in making Video Clips and/or any Excess Costs for any Audio Visual Material (to the extent not recovered in accordance with sub-clause 10.2 above) shall be deemed an advance recoupable only against the Royalty. Any balance of all such costs in respect of Audio Visual Material together with all and any costs incurred by Company in making Long Form Videos shall be recoupable against all and any monies payable to Artist in respect of the exploitation of all Audio Visual Material hereunder save for mechanical royalties or payments of "quasi mechanicals".

10.5    In respect of the exploitation of Audio Visual Material Company shall credit to Artist's royalty balance:

(a)    in respect of Audio Visual Devices Sold by Company or Company's Licensed Affiliates - a royalty of twelve per cent (12%) in respect of sales in the USA and eleven percent (11%) in respect of sales in the rest of Territory calculated on the Royalty Base Price of each Audio Visual Device Sold PROVIDED THAT on a Long Form Video by Long Form Video and country by country basis, in the event that the number of Records Sold during the Term of any Long Form Video in any country exceeds the amounts set out in the table below, then the royalty rate in respect of Audio-Visual Devices Sold of such Long Form Video in such country in excess of such amounts shall increase in each instance by the additional royalty set out in the table below:

- 28 -

CDC_000506

| Country | Amount of Records Sold | Increase in Royalty |
|---------|------------------------|---------------------|
| USA | 100,000 | 0.5% |
| USA | 200,000 | 0.5% |
| ROW | 200,000 | 0.5% |
| ROW | 300,000 | 0.5% |

For the purposes of the foregoing escalations, reference to Audio-Visual Devices Sold shall be deemed to refer to Audio-Visual Devices Sold at full price through normal retail outlets only. For the purposes of calculating the number of Audio Visual Devices Sold hereunder, the provisions of sub-clause 1.33 above shall apply insofar as is practicable as if "Records" (as specified therein) were Audio Visual Devices. In calculating royalties payable pursuant to this sub-clause the provisions of Clause 7 above relating to the calculation of Record royalties shall apply to Audio Visual Devices (insofar as they are capable of applying) as if "Records" (as specified therein) were Audio Visual Devices and as if "Audio Material" as specified therein was Audio Visual Material;

(b) subject to the provisions of sub-clauses 7.8 and 7.15 above, in respect of all other forms of exploitation of Audio Visual Material (and any other audio-visual performances in respect of which Company has given its consent) by Company, its licensees, sub-licensees and/or third parties, fifty per cent (50%) of Company's actual receipts in the United Kingdom from such exploitation.

10.6 For the avoidance of doubt the amounts credited to Artist's royalty balance in respect of Audio Visual Material pursuant to sub-clause 10.5(a) and (b) above shall first be applied towards recoupment of the cost of making the same in accordance with sub-clause 10.4 above.

10.7 For the avoidance of doubt if Audio Visual Material is exploited together with other audio visual material not subject to this Agreement for which Company is obliged to pay a royalty then the royalties and/or share of net receipts credited to Artist's royalty balance pursuant to sub-clause 10.5 above shall be reduced pro rata according to the duration of Audio Visual Material used as against the duration of the whole Audio Visual Device in which they are incorporated.

10.8 In respect of all Controlled Titles embodied in Audio Visual Material Artist shall as and when requested by Company procure the grant to Company and its licensees of:

(a) an irrevocable worldwide perpetual licence to synchronise Controlled Titles in Audio Visual Material and to exploit the same as so synchronised by all means now or hereafter known including without limitation the right to cause the broadcast and/or other transmission delivery and/or exhibition of each such Controlled Title incorporated in such Audio Visual Material by any and all means. In respect of any Audio Visual Devices comprising Titles and Controlled Titles the fee for such synchronisation licence shall be free in respect of all promotional usage and for commercial exploitation in any and all media shall not exceed the fee for synchronisation payable to other publishers to whom fees are payable in respect of the particular exploitation; and/or

(b) an irrevocable worldwide perpetual mechanical licence to enable Company to manufacture, distribute and exploit Audio Visual Devices in all ways and by

- 29 -

CDC_000507

all means. Company shall pay mechanical royalties in respect of Controlled Titles embodied in any such Audio Visual Devices subject to and in accordance with the provisions of sub-clauses 9 (a), (b), (c)(i) and (c)(iv) above as if references therein to "Audio Material" were references to Audio Visual Material and as if references to "Records" were references to Audio Visual Devices and if no industry rate is agreed in any country of the Territory, the applicable rate in that country shall not in any event be greater than five per cent (5%) of the applicable Royalty Base Price. The foregoing rate shall be inclusive of any payment for any lyric reproduction.

10.9    If Company has not made, commissioned or acquired a Long Form Video featuring Artist prior to expiry of the Third Contract Period, Artist shall have the right during the Fourth Contract Period to require Company to make and release a Long Form Video in accordance with this clause 10 featuring Artist performing live in concert when Artist next performs live performances in the USA at venues with a capacity in excess of 8,000. If Company fails to make and release such a Long Form Video Artist may seek third party offers to make and release such a Long Form Video. Artist shall notify Company in writing of the terms of a third party offer Artist wishes to accept and Company shall have 30 days after receipt of Artist's notice to match those terms (excluding any terms Company cannot match which are individual to the third party, such as keyman clauses). If Company elects to match Company shall be bound to make and release and Artist shall be bound to perform on the matched terms. If Company does not match the terms Artist shall be free to enter into an agreement with the third party on the terms rejected by Company. This procedure shall be repeated until either Company matches a third party offer or Artist enters into a contract with a third party on terms Company has refused or failed to match.

## 11.    INTERNET PROVISIONS

11.1    It is hereby acknowledged and agreed that pursuant to the terms and conditions of this Agreement, Company has the exclusive right to exploit the products and services of Artist created and rendered pursuant to this Agreement and all Material by means of the Internet (irrespective of the manner by which the Internet is accessed) including, without limitation, the exclusive right to distribute and sell Material on-line and to authorise others to do so on its behalf and the exclusive right to permit, commission, arrange and/or authorise Webcasts containing Artist's Performance(s) or all or any part of any Material. For the purposes of the following provisions, such right shall be referred to as the "Recording Agreement Internet Rights".

11.2    Artist hereby grants to Company and its licensees the exclusive right to (and Company agrees that during the Term from time to time it shall) create, host, manage, maintain, update and service website(s) and/or webpage(s) on the Internet relating primarily to the Artist's services pursuant to this Agreement and the products thereof ("Artist Site(s)") whether as part of any other site or independently therefrom as Company may elect in its discretion from time to time. Artist Site(s) shall be jointly owned by Company & Artist but the domain name or URL shall be owned by Artist. The general appearance and style of Artist Site(s) during the Term hereof shall be mutually agreed, and both parties agree to co-operate fully, in good faith and in a timely manner so as to ensure that Artist Site(s) may be made operational promptly following signature hereof and may thereafter be maintained and operated in an efficient and compelling a manner as possible (for which purpose Company and Artist to meet on a regular basis during the Term in order to discuss the general appearance, style and content of Artist Site(s)). For the avoidance of doubt, the parties acknowledge that Company shall be responsible for and shall incorporate Materials, information and other material on to the Artist Site(s) on a day to day basis

- 30 -

CDC_000508

without consultation. Artist shall regularly on an on-going basis provide to Company free of charge Non-Musical Recordings from time to time during the Term or otherwise as reasonably requested by Company. The costs of creating any Non-Musical Recordings which are commissioned by Company shall be paid for by Company pursuant to a mutually agreed budget. Company shall be entitled to incorporate into the Artist Site(s) links to third party sites relevant to the rights granted hereunder and to aggregate content from other artists working in similar genres of music onto the Artist Site(s). The cost of creating, hosting, maintaining (including creating Non-Musical Recordings), updating and servicing Artist Site(s) during the Term shall be paid by Company in accordance with mutually agreed budgets agreed prior to release of each Album under this Agreement and shall be treated as follows:

    (a)    the first fifteen thousand US dollars (US$15,000) of each budget shall be non-recoupable;

    (b)    fifty per cent (50%) of all such costs over (US$15,000) shall be recoupable from the Royalty.

11.3    For the purposes of this Agreement, the term "Additional Internet Rights" shall mean the right throughout the Territory during the Term to manage and exploit by means of the Internet (however the same may be accessed whether by PC, cable, digital television, WAP or otherwise howsoever) the products of Artist's efforts and Artist's services in all branches of the entertainment industry including but not limited to:-

11.3.1  the on-line exploitation of Non-Musical Recordings which do not comprise Material by way of Internet Radio, Webcasting or otherwise; and

11.3.2  the provision of on-line live/tour information and on-line ticket sales; and

11.3.3  the exploitation of on-line sponsorship opportunities; and

11.3.4  the advertising and sale of Artist's branded merchandising on-line; and

11.3.5  the rights referred to in clause 11.2 above in respect of Additional Internet Rights including the right to incorporate links to other websites/pages relevant to such Additional Internet Rights and any other on-line business or enterprise in which the Artist's reputation may be put to advantageous use.

11.4    Artist hereby grants non-exclusively to Company the Additional Internet Rights. Notwithstanding the non-exclusivity of this grant of rights, Artist shall not:-

11.4.1  supply any Non-Musical Recordings to any third party without ensuring that all such Non-Musical Recordings are also available to Company on a non-exclusive basis free of charge and that any third party site to which Non-Musical Recordings are supplied shall contain links back to Artist Site(s) prominently placed in close proximity to such Non-Musical Recordings; and/or

11.4.2  make a general grant of such Additional Internet Rights or a limited grant covering a range of such rights to any third party (as opposed to a one-off grant of individual rights falling within this category of rights); and/or

- 31 -

CDC_000509

11.4.3 provide any Non-Musical Recordings to any third party site(s) which are artist specific and/or which purport, represent or imply that they comprise "official" or "endorsed" site(s); and

11.4.4 although there will be third parties with whom Company, and Artist will want to co-operate in providing one-off performances (which may be musical or non-musical in nature), no such performances will be provided without Company's prior consent (and pursuant to agreements concluded by Company in accordance with the relevant provisions hereof); and

11.4.5 Artist shall notify Company prior to concluding any agreement with a third party in respect of any or all of the Additional Internet Rights in sufficient time to afford Company the opportunity to explore any potential cross-promotional opportunities with such third parties.

11.5    Company shall have the exclusive right at its recoupable expense to and to authorise its licensees at its and their discretion to make, pursue, modify, discontinue or abandon any application to register (and to renew any such registrations) the Artist Name and any variations thereon and any logo or design used by Artist or in connection with Artist's services the subject of this Agreement (and variations thereon) as URLs with all available suffixes, including, without limitation: .com, .net, .uk, .de, .ie, .fr,.jp, .tv and .cd (the "Addresses"). The Addresses shall be jointly owned by Company and Company's licensee and shall be linked to the Artist Site(s). Following the expiry of the Term hereof, Company shall transfer the Addresses and other elements of the Artist Site to Artist PROVIDED THAT Artist shall procure that on any website maintained by or on behalf of Artist there shall be a prominently-placed hyperlink to Company's or Company's licensee's website.

11.6    Artist hereby irrevocably appoints Company to be the attorney of Artist for the sole purpose of making any such application and executing any documentation necessary to pursue or secure any such registrations and hereby grants Company the right to enforce such rights against any third parties on both Company's and Artist's behalf. Company agrees to supply to Artist copies of any documents executed in accordance with this power.

11.7    Artist acknowledges and agrees that Company shall be entitled to retain for its own benefit a commission on any sales made by third parties to consumers driven to such third parties' websites/pages from Artist's Site(s), subject to Company concluding agreements with such third parties in respect thereof. and provided that any such commission shall first be applied in recoupment of any unrecouped recoupable costs referred to in the final sentence of sub-clause 11.2 above

11.8    Any consumer data collected by Company as a result of or arising from its operation of the Artist Site(s) ("Consumer Names") shall, as between Company and Artist, be owned by Company but shall be avilable to Artist subject only to any applicable data protection laws.

11.9    Company shall obtain Artist's approval of any advertising of third party products or services on the Artist Site and of any links to other sites save Company's or Company's licensees sites.

11.10   Company acknowledges that Company does not own Artist's Name.

## 12.    OWNERSHIP

- 32 -

CDC_000510

12.1.1    Artist hereby assigns to Company, its licensees and successors in title the entire copyright and all other rights of a like nature and all other rights now or hereafter conferred by the law in force in any part of the World in and to (i) all Material made commissioned or approved hereunder during the Term and (ii) any Recordings made prior to or during the Term which Artist owns or to which Artist is able to acquire rights (which Artist shall use its best endeavours to do) (other than those listed in Schedule 1 hereto) (other than Recordings permitted pursuant to clause 13 below, and demo Recordings given to Artist's publisher PROVIDED ALWAYS THAT the same are not distributed to the public) (including, without limitation, all rights of reproduction, fixation, rental, distribution, broadcast and communication to the public and performers' property rights as referred to in the CDPA) (free of any claims by Artist, Artist or any other person) throughout the World for the full duration of such copyright and other rights, and for any and all extensions and renewals thereof.

12.1.2    The entire copyright and all other rights of a like nature and all other rights now or hereafter conferred by the law in force in any part of the world in and to any promotional, marketing and advertising material (such as but not limited to artwork, text, sleeve notes, label copy, graphics, data, posters and point of sale material) and any consumer data or other information created and/or compiled by or on behalf of Company shall vest and belong to Company (free of any claims by Artist or any other person) throughout the world for the full duration of such copyright and other rights and for any and all extensions and renewals thereof.  For the avoidance of doubt nothing contained on this Agreement is intended to assign to Company the copyright in any music composed or lyrics written by Artist.

12.2    To the extent that any rights in any of the material referred to in sub-clause 12.1.2 above vest at any time in Artist such rights (subject as set out therein) are hereby assigned to Company absolutely and with the benefit to Company of all covenants, warranties, agreements or representations expressed or implied herein and by way of present assignment of present and/or future rights for the full duration thereof (together with all extensions and renewals to the extent permitted by law) and in the event that any such rights vest at any time in Artist, Artist shall promptly assign the same to Company. Without limiting the foregoing Artist will upon Company's request execute and deliver to Company such documents deeds or other instruments and in such form as Company may require to confirm or further assure to Company its licensees and successors in title all or any of the rights intended to be granted to Company by this agreement.

12.3    Subject always to any approvals or restrictions contained in this Agreement, Company and its licensees shall have (without limiting the generality of rights granted hereunder) the sole exclusive and unlimited right throughout the Territory to and to authorise and permit others to:

(a)    manufacture Records and Audio Visual Devices by any method(s) now or hereafter known embodying any portion(s) or all of the Material recorded or deemed to have been recorded hereunder; and

(b)    to store the Material in data banks and to distribute the same by telephone line, cable, transmitter, satellite, internet, online or any other manner or form of communication; and

(c)    broadcast, perform publicly and to permit public performances and broadcasts and digital and/or other on line and/or internet and/or electronic transmissions and/or communications to the public and making available of

- 33 -

CDC_000511

all and any such Material and all and any such Records and Audio Visual
Devices; and

(d)    repackage, sell, transfer, deal in, exploit all and any such Material (as well as
duplicates and derivatives of the same) and all and any Records and Audio
Visual Devices derived therefrom; and

(e)    delete or otherwise dispose of Records and Audio Visual Devices derived
from Material; and

(f)    collect any and all income payable to Company and/or its licensees arising
from the exercise of any or all of the rights granted to Company herein

Subject always to any approvals or restrictions contained in this Agreement, all such
rights may be exercised at such times and places, in any and all media and manner
and under any trademarks, trade names or labels as shall be determined and/or
designated by Company in its sole and absolute discretion.

## 13.   RECORDING RESTRICTIONS

13.1    Artist shall not anywhere in the Territory:

13.1.1    during the Term render any Performance whereby any Recording may be made for
any third party or make any such Recording on Artist's own account.
Notwithstanding the foregoing it shall not be a breach of this clause for Artist to:

(a)    Perform as a non-featured sideman at recording sessions for record
companies other than Company, PROVIDED that Company receives prior
notice from Artist of such Performance (specifying the other record
company, other Artists, title(s) of track(s) and nature and extent of Artist's
Performance). It shall be a precondition of ARTIST rendering such
Performance that Artist shall enter into a written agreement with such
record company (a copy of which Artist shall promptly furnish to Company)
under which any credit or reference to Artist in connection therewith
(including, but not limited to, on artwork for sleeves, labels and advertising)
shall be as a non-featured sideman (as opposed to as an artist) and shall be
smaller and less prominent than that given to the featured artist thereon and
no larger nor more prominent than that given to any other non-featured
sideman thereon.

(b)    act as (a) record producer(s) mixer or remixer for any third party (without
rendering any musical services save as set out in sub-clause 13.1.1(a)
above), PROVIDED THAT Artist may only be credited in respect thereof in
Artist's legal name.

Artist will not permit or approve the use of any artwork which could or
might imply that Artist has rendered any Performance thereon other than as
permitted by this sub-clause 13.1.1.

(c)    Perform up to three (3) Tracks at a time for third parties for the purpose of
making radio and/or television programmes and allow the makers of such
programmes to record such Performances for radio and television
broadcasts, PROVIDED THAT Artist may only do so pursuant to a written
agreement (and in respect thereof Artist hereby grants and shall procure that
Artist grants to Company full authority and power of attorney to negotiate

- 34 -

CDC_000512

and execute such written agreements) which limits the use of any such Performance and/or recording to a free or subscription based television and/or radio broadcast in the countries in which the programme is made solely by the broadcaster commissioning the programme and not by any licensees of that broadcaster. For the avoidance of doubt, such agreement shall prohibit the inclusion of such Performances and/or recordings on records and/or audio-visual devices and/or in any pay or subscription television services or in any internet broadcast, Webcast or streaming services.

Nothing contained in this sub-clause shall restrict Artist from undertaking work in films and/or television and/or radio in which Artist's performances are solely dramatic in nature (as opposed to musical) or where Artist is acting as a non-music performing presenter and/or limited to an interview of Artist provided that Artist shall procure that no records or audio-visual devices shall be distributed to the public embodying any part of any recorded interview of Artist without Company's prior written consent.

13.2    Subject to the provisions of sub-clauses 13.1.1(a) and 13.1.1(b) above, Artist shall not anywhere in the Territory during the Term use or authorise the use of Artist's Name without the prior written consent of Company for the purpose of distributing to the public any Recordings other than Audio Material made hereunder and as otherwise permitted by this Agreement.

13.3    Artist shall not anywhere in the Territory during the Term purport to grant rights or permission for or assist in the exploitation of recording(s) of Performance(s) made before the Term and owned or controlled by Artist, unless otherwise expressly agreed in writing between the parties hereto.  Artist agrees, warrants and represents that to the best of Artist's knowledge there are no prior recordings of Performance(s) made before the Term now in existence or any restrictions upon Titles which Artist may record except as disclosed in Schedule 1 hereto.

13.4    Artist shall not anywhere in the Territory for a period of five years immediately following the end of the Term render any Performance whereby a recording may be distributed to the public of any Title embodied in any Material for any person, firm or company other than Company or make such a recording on Artist's own account, PROVIDED THAT the foregoing period of five (5) years shall be reduced to one (1) year in respect only of any Title which shall have been embodied solely in a Long Form Video hereunder but has not been exploited on Record and PROVIDED FURTHER THAT Artist shall be entitled to record any Title embodied as aforesaid after the expiry of eighteen (18) months following the end of the Term should Material embodying such Title not have been released by Company or one of Company's Licensed Affiliates prior to the expiry of such period.

13.5    For the purposes of the CDPA this Agreement shall be deemed to be an "exclusive recording contract" as defined in Section 185 thereof. Artist shall notify any third party for which Artist records a Performance permitted pursuant to this clause 13 that such Performance is made subject to the Company's rights as the "person having recording rights" in relation to the Artist's Performances (as specified in the CDPA).

## 14.    SAMPLING PROVISIONS

14.1    In the event that Artist wishes to include in any Material so-called "sampled" extracts from other recordings not wholly owned or wholly controlled by Artist ("Sampled

- 35 -

CDC_000513

Recordings") and/or utilises extracts from compositions and/or any literary or other copyright works other than Controlled Titles ("Composition Extracts") then:

14.1.1    such Sampled Recordings and/or Composition Extracts shall only be included with Company's prior written consent;

14.1.2    Artist and any individual Producer of the relevant Material will promptly furnish to Company a fully itemised and detailed list in the form a copy of which is attached as Schedule 2 hereto together with a listening tape recording copy for Company's reference of all Sampled Recordings and Composition Extracts included therein with details of the owners thereof and their licensees and a copy of every clearance agreement and correspondence with such owners and licensees and the identity of the recordings and compositions concerned.

14.2    For the purposes of this clause Delivery of the relevant Material shall be deemed not to have occurred and Company's written consent to the use of Sampled Recordings and/or Composition Extracts shall not be deemed to have been given until at Company's election either (a) Company has secured all requisite licences and clearances in respect thereof or (b) Artist has secured requisite licences and clearances and has furnished copies thereof to Company.

14.3    For the purposes hereof the expression "Sampling Payments" shall include, without limitation, any fees, royalties, advances, costs and legal expenses incurred in connection with the use of Sampled Recordings and/or Composition Extracts, any and all costs incurred in obtaining or endeavouring to obtain the requisite licences and clearances in respect thereof, and any re-recording, re-editing and re-cutting costs required in order to secure the deletion and/or removal of a Sampled Recording and/or Composition Extract. The expression "Sampling Payments" shall exclude mechanical royalties payable in respect of Composition Extracts. Company shall have the right to and to require Artist to edit and/or re-record any Material in order to remove any Sampled Recording or Composition Extract for which any requisite licence or clearance is not obtained in writing by such date as Company deems necessary to permit planned release schedules to be met. Any Sampling Payments incurred as a result of Artist's act or default shall be deductible from any and all sums (other than mechanical royalties) payable to Artist pursuant to this Agreement. To the extent that Company is unable to recover such Sampling Payments from such sums within six (6) months of payment thereof, Artist undertakes at all times to keep Company fully indemnified from and against all such Sampling Payments, to the extent not recovered from the applicable Producer, and to the extent incurred pursuant to a court order or a settlement reached with Artist's consent, not to be unreasonably withheld or delayed.

14.4    Company shall (unless otherwise approved by Artist) ensure that each agreement entered into by Company with a Producer hereunder shall contain a provision substantially to the effect that the Producer shall not include samples in Audio Material without Company's prior written consent.

## 15.    NAME AND LIKENESS

15.1    Company shall have the irrevocable right and licence to use and publish and permit others to use and publish Artist's Name. Company's right to use Artist's Name pursuant to this clause 15 shall be exclusive during the Term and non-exclusive after the Term in relation to Records and shall be non-exclusive in relation to non-Record uses. Company shall also have the irrevocable right and licence to use and publish and permit others to use and publish Artist's approved photographs, likenesses,

- 36 -

CDC_000514

signature, caricatures, sobriquets, logos, facsimiles and biographical materials and other such materials for the purpose of and in association with the exploitation of Material made hereunder (including, without limitation, on Artist Site(s) and Company's or its affiliates' websites) and the use of all such materials shall be subject to Artist's Consent during the Term, PROVIDED THAT in the event that Artist provides any of the aforementioned materials then Artist shall be deemed to have consented to use of such material and any previously approved materials shall be deemed approved for future use for the purposes of this Agreement. Company shall use its best commercial endeavours to procure that its licensees outside the USA use materials used in the USA or materials previously approved for the applicable licensee PROVIDED THAT inadvertent failure to do so shall not constitute a breach of this Agreement. In the event that Artist's Consent is given subject to a bona fide qualification arising from existing legitimate third party rights, Company shall use its best commercial endeavours to abide thereby.

15.2 Artist hereby warrants and represents that Artist has and will continue to have the right both during and after the Term to use and to license others to use Artist's Name and all of the aforesaid materials.

15.3 During the Term Artist shall only use for the purposes of this Agreement Artist's Name approved by Company in writing. Company hereby approves Artist's real (i.e. legal) name.

## 16.    ACCOUNTING

16.1 Company shall furnish to Artist within sixty (60) days after Company's receipt of accounting from Company's licensee (which Company warrants its licensee will be obliged to deliver within ninety (90) days after the 30 June and 31 December in each year (or such other semi-annual accounting period as designated by Company from time to time)) a statement prepared in accordance with Company's standard accounting procedure showing in reasonable detail the calculation of and the total royalties that have been credited to Artist's balance hereunder in the period of six (6) months prior to such date and shall pay Artist any balance shown to be due when furnishing such statement, PROVIDED THAT following the expiry of the Term Company shall not be liable to furnish any statements for any period in which royalties accrued have not exceeded one hundred US dollars (US$100) although one statement in respect of each period shall be provided to Artist on request from time to time. Company shall only be obliged to account to Artist in respect of Records Sold for which Company has received accounting and payment (or credit against a previously paid advance) from Company's licensees.

16.2 Company may maintain reasonable reserves (but not in addition to any reserves held by Company's licensee) on account of Records and Audio Visual Devices which may be returned or exchanged and will subsequently make adjustments based on the number of Records and/or Audio Visual Devices actually returned or exchanged, PROVIDED THAT each such reserve shall be released equally over two accounting periods following that in which it was first maintained. In the event that reserves are insufficient to cover Records returned or exchanged in any accounting period Company may deduct from any royalties that accrue that is payable in such or any subsequent accounting period an amount equal to such deficit. Company shall be entitled to deduct from payments otherwise accruing due to Artist such sums as it may be required to deduct by way of withholding or similar taxes but shall upon Artist's request provide such relevant information as is in Company's possession in order to assist Artist to recover such sums deducted.

- 37 -

CDC_000515

16.3    Unless within thrity (30) months of the date of Company's rendering of any statement furnished hereunder Artist shall have notified Company in writing of any bona fide objections thereto such statement shall be conclusive evidence as to the accuracy of accountings made to Artist hereunder during the period covered by such statement and final and binding on and not open to dispute by Artist.

16.4    Company agrees that Artist may (but not more than once during any calendar year and only once with respect to any statement rendered hereunder) inspect examine and otherwise audit ("Audit") Company's books and records for the purposes of determining the accuracy of Company's statements to Artist hereunder. Artist shall not be entitled to Audit any records which do not specifically relate to the exploitation of Material hereunder. All Audits shall be made during regular business hours upon reasonable prior notice (not less than sixty (60) days) and shall be conducted on Artist's behalf by an independent chartered accountant ("the Auditor"). Each examination shall be made at Artist's own expense at Company's regular place of business in the United Kingdom where such books and/or records are maintained. If Artist wishes to make a claim for underpayment, Artist shall furnish Company with a copy of the Auditor's report promptly following the conclusion of the Audit. If such Audit reveals an underpayment to Artist of ten per cent (10%) of total royalties due hereunder during the period covered by such Audit or fifteen thousand US dollars (US$15,000) whichever is the greater, then Company shall pay all reasonable audit costs (excluding accommodation travel and subsistence costs) of such Audit up to a maximum of US$15,000. Artist agrees that, for the avoidance of doubt, although in respect of money claimed to be due to Artist as a result of any Audit, the rights of Audit granted by this Agreement are a substantial remedy for any underpayment which any such Audit may reveal, neither the grant by Company nor the exercise by Artist of any right of Audit in connection with this Agreement shall, of itself, give rise to or be deemed to be proof of debt.

16.5    Artist may not engage the Auditor to Audit when the Auditor is presently engaged in any other audit or inspection of Company's books and records of account in respect of which any claim is still outstanding or is involved in the negotiation of a settlement of such an audit or inspection on behalf of another person. If Artist's chosen Auditor is so engaged Company agrees that upon written request from Artist Company shall extend the period of 30 months in clause 16.3 above to 34 months to allow the Auditor to finalise the outstanding audit. No person or firm shall be designated as the Auditor if its remuneration is to be calculated wholly by reference to the amount of any discrepancy revealed by the Audit and/or the terms of any settlement and/or the outcome of any proceedings arising out of the Audit. Artist shall procure that the Auditor will prior to the start of the Audit execute an unconditional undertaking to Company in a form reasonably prescribed by Company providing, inter alia, that the Auditor shall treat as confidential all information regarding Company's affairs and business which it may acquire in the course of the Audit and not to disclose the same to Artist (and Artist's professional advisers) or to any third party save to the extent necessary to discharge Auditor's responsibilities to Artist in relation to the Audit.

16.6    Any and all sums paid by Company hereunder or on Company's behalf hereunder in a currency other than Sterling shall be treated as the Sterling equivalent thereof as reflected in Company's books on the date of receipt.

16.7    Company shall be entitled to recoup advances paid within 90 days after an accounting date from royalties accrued due to Artist at such accounting date.

## 17.    ATTENDANCE AT PUBLICITY SESSIONS, TOURING AND PROMOTIONS

CDC_000516

17.1    For the purposes of furthering Artist's career and/or selling or otherwise exploiting Material made hereunder, Artist (subject to Artist's prior commitments) shall during the Term, as Company may reasonably request from time to time and subject to the provisions of clauses 11 and 13 above, attend any photographic and/or publicity sessions, press receptions, interviews (both on and off-line), appear on radio programmes, in television programmes, Webcasts and in any film to which clause 10 does not apply and which Company may produce or commission and shall co-operate in such other reasonable publicity ventures as Company may arrange, without payment therefor by Company (except as otherwise provided below).

17.2    Company shall reimburse Artist promptly following receipt of valid receipts for those reasonable out-of-pocket travelling and living expenses necessarily incurred by or on behalf of Artist in connection with the foregoing. No reimbursement shall be in excess of the specific amounts approved by Company prior to the same being incurred. For the avoidance of doubt, Company shall not reimburse expenses incurred by or in relation to any individual other than Artist unless it has previously agreed to do so. In the event that any fees are payable by third parties in respect of the foregoing, Artist hereby grants to Company and its licensees full authority and power of attorney to negotiate and execute documentation in this regard and to collect such fees on Artist's behalf.   In the event Company incurs with Artist's approval any expenditure in supporting Artist's concerts or personal appearances or for dance rehearsals, hire of dancers to augment Artist's performance, all such expenditure shall be recoupable from royalties due to Artist hereunder provided that expenditure incurred by Company in respect of Artist appearances on television or radio in the USA excluding the aforesaid items shall not be recoupable. On all occasions when any appearance fee is payable to Artist, Company shall be entitled to collect such fees and Company shall deduct therefrom all of those reasonable out-of-pocket travelling and living expenses incurred by or on behalf of Artist in connection therewith and any remaining credit balance shall be credited to Artist's royalty balance hereunder.   Fifty per cent (50%) of the costs of stage or other clothing purchased by Company with Artist's consent to augment Artist's performances shall be recoupable from the Royalty.   Artist shall not incur any costs or endeavour to commit Company to any expense in this regard without Company's prior consent.

## 18.    WARRANTIES

18.1    Artist agrees, warrants, represents and undertakes that:

(a)    Artist is and will remain entitled to enter into and perform this Agreement and to grant, licence (as and if applicable) and assign to Company all the rights herein granted, licensed and/or assigned free of al encumbrances and third party rights and Artist shall at Artist's own cost do all that Artist can upon Company's request to perfect the said grant of rights; and

(b)    None of the Titles selected by Artist which are embodied in any of the Material hereunder, nor any arrangement or adaptation of any Title which is initiated or carried out by Artist, nor Artist's performance of any Title, shall infringe the copyright or any other rights (such as but not limited to so-called moral rights or performers' rights) of any third party nor be criminally obscene nor defamatory of any person firm or company; and

- 39 -

CDC_000517

(c)    Artist will observe all requirements of all relevant unions having jurisdiction in connection with the making of Audio Material and Audio Visual Material; and

(d)    Artist is resident in the USA for taxation purposes (and shall give written notice to Company of any changes thereto together with details thereof); and

(e)    None of Artist and any person deriving any rights from Artist shall at any time do or authorise any person to do anything inconsistent with or which might diminish or impair any of Company's rights hereunder nor shall the extent of Artist's Performances hereunder be misrepresented to Company; and

(f)    Neither Artist nor anyone on behalf of Artist shall make any claim or commence any proceedings against Company its licensees or successors in title in reliance upon any rights in the nature of moral rights now or hereafter known in any part of the world in relation to the exploitation of any Material made by Company under this Agreement and Artist shall as Company may require pursuant to clause 19 below make the benefit of any such moral rights available to assist Company in proceedings as therein described; and

(g)    Artist is not a minor.

## 19.    CO-OPERATION IN UNAUTHORISED MANUFACTURE ETC.

19.1    At the request and expense of Company and subject to Artist's availablity, Artist shall co-operate fully in preventing (including but not limited to  assisting Company in legal proceedings) the unauthorised manufacture or sale and/or distribution of Records and Audio Visual Devices and any other devices embodying performances of Artist (whether or not the same are embodied in Material made hereunder) and/or the use of Artist's Name and/or photographs, likenesses, biographical material and such other identification and/or materials in such manner as may derogate from rights granted to Company hereunder. Company may with Artist's consent (not to be unreasonably withheld or delayed) take such steps or institute such legal proceedings in the name of Artist as Company may deem suitable, PROVIDED THAT all of the costs of such proceedings and related costs shall be borne by Company. Company shall be entitled to deduct such costs incurred from all sums recovered as a result of such proceedings, and shall credit one half of any excess recovery to Artst's royalty balance. Nothing herein shall be construed as a limitation on any other rights Company may have hereunder or in any way affect the agreements, warranties, representations, undertakings and indemnities given herein.

## 20.    CONSENTS AND APPROVALS

20.1    Artist hereby grants to Company all consents required to enable Company to exercise all the rights of Company hereunder and to exploit fully all Material made hereunder.

20.2    Where Artist's Consent is required in relation to any creative issue relating to the making of any Material hereunder and Artist does in fact participate in the making of such Material, such participation shall comprise the necessary consent/agreement (as applicable) for the purposes of this Agreement.

## 21.    INDEMNITIES

- 40 -

CDC_000518

21.1    Company and Artist mutually agree at all times to keep the other fully indemnified from and against all losses and expenses (including but not limited to reasonable legal fees and expenses) which the party alleging default ("the Indemnitee") may sustain or incur by reason of any actual or alleged breach or non-observance of any provisions hereof by the other party hereto ("the Indemnitor") or any warranty representation or undertaking given by the Indemnitor being untrue inaccurate or unfulfilled.

21.2    The Indemnitee shall give written notice to the Indemnitor of claims to which the provisions of this clause relate and the Indemnitor shall have the right at its own cost and expense to participate in the defence of any such claim (without prejudice to its liability under such indemnity). Company shall on giving written notice to Artist, be entitled to withhold from royalties, fees and advances payable to Artist hereunder such amounts as are reasonably necessary to protect Company from such claim and are directly related to Company's potential liability under such claim until liability in respect of such claim is finally settled or adjudicated and Company has been reimbursed all costs and expenses incurred (including legal costs). Notwithstanding the foregoing, Company shall release any withholding made in accordance with the provisions of this Clause together with any interest earned thereon during the period of withholding in respect of any particular claim if proceedings are not instituted within six (6) months of the date upon which Company first establishes such withholding to meet the claim.

21.3    Neither party hereto shall be entitled to effect a settlement with a third party in relation to which the indemnity herein contained applies and is to be relied upon without the prior written agreement of the other party hereto to the terms of that settlement, such agreement not to be unreasonably withheld or delayed. For the avoidance of doubt any costs losses and expenses incurred by the Indemnitee falling within the scope of the indemnity given by the Indemnitor under sub-clause 21.1 above and not reimbursed under any settlement as aforesaid shall be reimbursed promptly by the Indemnitor and where the same is due to Company from Artist Company shall be entitled to deduct the same from any sums due to Artist hereunder.

21.4    Notwithstanding the foregoing if Artist at any time refuses to fulfil Artist's material obligations hereunder or breaches any of the material terms and conditions hereof Company may without prejudice to its other rights serve notice on Artist requesting that Artist remedy such refusal/breach within fourteen (14) days following receipt by Company of such notice.   In the event that Artist does not so remedy such refusal/breach within such fourteen (14) day period, Company may without prejudice to its other rights suspend its obligations hereunder (including without limitation its obligation to pay advances) by written notice to Artist for the duration of such default or breach until the same has been cured and the Term shall thereafter be deemed automatically extended for a period equal to all or any part of the period of such default or breach PROVIDED THAT no such suspension or extension for any one default shall exceed nine (9) months.

21.5    Company shall have the right at its sole expense to purchase one or more insurance policy(ies) covering Artist's life and/or any disability suffered by Artist due to accident or sickness. Company shall be the named owner and beneficiary of any such policy(ies).  Artist shall co-operate in the completion of any necessary proposal form for such insurance but Artist shall not be required to attend any medical examinations.  Company agrees that Artist shall be added as an additional insured on any such policy

22.    **FORCE MAJEURE**

CDC_000519

22.1     If by reason of an act of God, outbreak of hostilities (whether or not war is declared), insurrection, riot, act of terrorism, civil disturbance, government act or regulation, fire, flood, explosion, accident, theft, strike, lockout or trade dispute (whether involving employees of Company or of other parties), any action by any trade union or by any association of Artist's musicians and/or composers or any other cause or reason beyond Company's control Company is prevented from or materially hampered in manufacturing, distributing or selling Records and/or Audio Visual Devices in the USA or Artist is prevented from performing Artist's obligations due to such reasons or illness, incapacity or other reason beyod Artist's control then:

(a)     Neither party shall not liable to the other for any loss expense or disadvantage suffered bythe other; and

(b)     Company may by written notice to Artist suspend the current Contract Period or any of its obligations hereunder (save for any obligation to account to, and/or (unless the applicable event prevents it) pay royalties to Artist hereunder) for such period as Company is so prevented or materially hampered, but so that no Contract Period shall be suspended for any period or periods in aggregate exceeding twelve (12) months. In such event a number of days equal to the number of days of such suspension shall be added to the then current Contract Period Provided that in respect of any option which falls due to be exercised within thirty (30) days of the end of such period of extension or suspension Company shall in respect thereof have no less than thirty (30) days in which to exercise such option pursuant to this Agreement and the then-current Contract Period shall be further extended by a period of up to thirty (30) days as necessary to give effect to the foregoing and permit the valid exercise of such option during the Term. Notwithstanding the foregoing, if the aforementioned affects only Company then no Contract Period shall be suspended for any period or periods in aggregate exceeding six (6) months.

## 23.    PARTIES' RIGHTS AND REMEDIES

23.1     If for any reason either party materially breaches this Agreement ("the Defaulting Party") then without limiting the rights of the party alleging default ("the Non-Defaulting Party") that party may at its election by written notice to the Defaulting Party where such breach is capable of remedy require the Defaulting Party to cure the default complained of and where that breach is capable of cure but remains uncured at the end of sixty (60) days after receipt of such notice by the Defaulting Party, then the Non-Defaulting Party may terminate the Term by further written notice, such termination to have effect from the date of service of such notice. If either party validly exercises such right of termination, such termination shall be without prejudice to the rights of both parties which survive the Term and any rights the Non-Defaulting Party may have by reason of such breach. For the purposes of this sub-clause Artist's failure to materially perform will exclude any illness or incapacity preventing Artist's services being supplied in accordance with the terms of this Agreement.

23.2     Except as otherwise expressly indicated herein to the contrary the rights and remedies of the parties as specified herein are not to be exclusive of each other or of any other rights or remedies of the parties. The parties may exercise or decline to

CDC_000520

exercise any one or more of their respective rights and remedies as they may deem fit, without jeopardizing any other rights and remedies.

23.3     In the event that:

(a)     a receiver is appointed over Company's interest under this Agreement and/or the whole of its assets and is not removed within ninety days after such appointment takes effect; or

(b)     an order is made or an effective resolution is passed for Company's winding up or reorganisation entered into in consequence or anticipation of insolvency (but excluding for the purposes of reconstruction or amalgamation)

then in any one of such events Artist shall have the right (within fourteen (14) days of learning of the occurrence of such event) to terminate the Term.

## 24.     ASSIGNMENT

24.1     The rights and privileges to which Artist is entitled under this Agreement cannot be assigned disposed of charged or transferred by Artist in any way whatsoever and the parties acknowledge that this Agreement does not purport to confer upon any third party any of those rights and privileges or any other benefit to the Artist under this Agreement.

24.2     Company may assign the benefit of and/or any of its obligations hereunder to its holding company or to any subsidiary or associated company or affiliate of Company, or to any company acquiring substantially all the undertaking or assets of Company or its holding company or subsidiaries or associates thereof. For the purposes of this clause "subsidiary" and "holding company" shall have the meanings set out in Section 736 of the Companies Act 1985 and "associated company" shall mean a company which is associated with another company either through holdings of shares to an extent of not less than twenty five per cent (25%) of its equity share capital (as defined in the said Act) or through common directors to an extent of not less than one-third (1/3) for the time being of the total number of directors. Company will remain primarily liable notwithstanding such assignment.

## 25.     NOTICES

25.1     All notices hereunder or in connection herewith shall be in writing and shall be addressed as follows:

To:     Artist care of Howard Siegel Esq., Pryor Cashman Sherman & Flynn, 410 Park Avenue, New York, NY 10022, USA.

To:     Company at Unit 33 Ransome's Dock 35–37 Parkgate Road London SW11 4NP, United Kingdom
Attention: Simon Fuller

or to such other address as may be notified in writing in conformance herewith. Notices shall be sent by hand or by special delivery within the United Kingdom and shall be deemed given on the day on which they are sent in such manner. A copy of all notices to Company shall be sent to Andy Stinson, 33 Ransome's Dock, 35-37 Parkgate Road, London SW11 4NP, United Kingdom. If the notice to Artist is not addressed care of Howard Siegel, a courtesy copy of each notice to Artist shall be

- 43 -

CDC_000521

sent to Howard Siegel Esq., Pryor Cashman Sherman and Flynn, 410 Park Avenue, New York, NY 10022, USA.

## 26.    MODIFICATIONS

26.1    The entire agreement between the parties in relation to the subject matter hereof is contained herein. No modification amendment or waiver of this Agreement or any provision hereof shall be binding upon any party unless confirmed in writing by the parties. No waiver of any provisions of or default under this Agreement shall affect any party's right thereafter to enforce such provision or to exercise any right or remedy hereunder in respect of a subsequent default. If any part of this Agreement shall be determined to be invalid or unenforceable by a court of competent jurisdiction or by any other legally constituted body having the jurisdiction to make such determination then such part or parts shall be deemed never to have been incorporated in this Agreement but all other terms and provisions in the remainder of this Agreement shall remain in full force and effect.

26.1    Artist hereby gives Artist's consent to the processing of any data necessary for the performance of this recording agreement or necessary for complying with any legal obligation upon Company. Any such processing will be fair and lawful within the meaning of the Data Protection Act 1988.

## 27.    GOVERNING LAW

27.1    This Agreement and any and all extensions and/or modifications thereof shall be governed by and construed in accordance with the laws of England and the High Court of England and Wales shall have exclusive jurisdiction to determine all matters arising therefrom.

## 28.    TRADE MARKS

28.1    Company shall be at liberty to and to authorise its licensees at its and their discretion to make pursue modify discontinue or abandon any application to register (in Artist's name with Company (or, at Company's election, Company's licensee) specified as the exclusive registered user) the Artist Name and any logo or design used by Artist and approved by Artist in connection with Artist's services the subject of this agreement as a trademark in the USA and such other parts of the Territory as Company and its licensees may reasonably require in order to protect in the applicable class or classes (in respect of trademarks) those rights granted to Company under this Agreement including without limitation in the UK classes 9, 16, 25 and 41 and any overseas equivalents thereof.

28.2    Artist hereby irrevocably appoints Company to be the attorney of Artist for the purpose of making any such application and executing any documentation necessary to pursue or secure any such registrations and in such event fifty per cent (50%) of any costs or expenses incurred by Company in connection therewith pursuant to a mutually agreed budget shall be regarded as additional advances recoupable from the Royalty.

28.3    Following the expiry of the Term Artist shall permit Company its licensees and successors in title to continue without charge of any kind to exploit those of Company's rights hereunder which survive termination of the Term by reference to any such trademark as registered user thereof.

- 44 -

CDC_000522

28.4    Nothing herein shall oblige Company or its licensees to make or pursue any application for trade-mark registration nor to maintain support or defend any such registration if any such application is successful and Artist agrees that neither Artist nor anyone on behalf of Artist will make any claim against Company its licensees and successors in relation to any act or omission concerning trademarks and trademark applications hereunder.

## 29.    ARTIST APPROVALS

29.1    Company shall not without the prior written consent of Artist in each case:-

29.1.1    release by any means (including Electronic Sales) any Record or Audio Visual Device embodying Material which is sold or distributed as a so-called "premium" or as an endorsement or in connection with the sale of any product, commodity or service;

29.1.2    release a Record embodying Audio Material which is pressed in special or odd shaped or coloured vinyl or as a vinyl picture disc;

29.1.3    release any Recording Commitment Album embodying Audio Material (a) in the USA as a low price record within nine (9) months from its initial full price release in the USA, or, (b) outside the USA as a low price record prior to its release in the USA as a low price record;

29.1.4    (subject always to all so-called industry blanket licences) grant to a third party a licence for the synchronisation of Audio Material in:-

(a)    a television or radio advertisement for a third party product or service;

(b)    a motion picture of any kind released during the Term

(c)    a motion picture which is pornographic.

29.1.5    release or otherwise exploit any so-called "demos" or outtakes;

29.1.6    release or otherwise exploit any Material comprising recordings of "live" Performances by Artist unless specifically made or delivered hereunder for release and/or other exploitation.

29.2    In the event that any primarily interactive product (such as a CDi or CD ROM) is made or produced hereunder the parties agree that the budget therefor shall be Mutually Agreed and shall be recoupable only from royalties and flat fee income accruing to the credit of Artist in respect of interactive products.

29.3    Company agrees to consult Artist in relation to the artwork for each Recording Commitment Album relased under this Agreement

## 30.    MISCELLANEOUS

- 45 -

CDC_000523

30.1    Clause headings used herein are for convenience of reference only and are not part of any clause and shall not be used in construing the meaning of any clause of this Agreement.

30.2    All references to the masculine gender shall include the feminine gender also and words in the singular shall include the plural and vice versa.

30.3    In the event that Company overpays Artist or pays any sums to Artist in error Artist shall give written notice to Company of such overpayment or erroneous payment and shall promptly after discovery thereof by Artist reimburse the same to Company following Company's request so to do. At Company's election, Company may deduct any or all of such overpayment or erroneous payment from any monies due to Artist pursuant to this Agreement within three (3) years following the date of the overpayment or erroneous payment.

30.4    Artist acknowledges that in the course of performing Artist's obligations hereunder Artist will be exposed to information which is confidential and/or commercially sensitive and which if disclosed may be liable to cause significant harm to Company, its clients and customers. Artist agrees to keep secret during the Term and thereafter and not for any reason to use, communicate or reveal to any other person (whether for Artist's or another's benefit or otherwise) any confidential information which has come into Artist's knowledge during the Term. Artist shall use Artist's best endeavours to prevent publication or disclosure of any such information by Artist or any other party. Given the high public profile of various of Company's staff, clients and customers and the effect unwanted publicity can have on the private life, career and earning capacity of the same, Artist acknowledges that this requirement of confidence is a very important and fundamental term of this Agreement.  Artist may reveal any such information to Artist's professional advisors or if required to do so by law.

30.5    Company acknowledges that in the course of performing its obligations hereunder Company will be exposed to information which is confidential and/or commercially sensitive and which if disclosed may be liable to cause significant harm to Artist. Company agrees to keep secret during the Term and thereafter and not for any reason to use, communicate or reveal to any other person (whether for Company's or another's benefit or otherwise) any confidential information which has come into Company's knowledge during the Term.  Company shall use its best endeavours to prevent publication or disclosure of any such information by Company or any other party.  Given the high public profile of Artist and the effect unwanted publicity can have on the private life, career and earning capacity of the same, Company acknowledges that this requirement of confidence is a very important and fundamental term of this Agreement.

30.6    By way of example only, information will be deemed confidential if it is not in the public domain and relates to any financial information; marketing strategies and tactics; current and future plans relating to development, production or sales, including the timing of any such matters; the development and engagement of artists and/or producers or recording engineers; and the creating, acquiring and/or licensing of repertoire from third parties.

30.7    Information which is publicly available or becomes publicly available through no breach of this Agreement shall not be treated as confidential hereunder.

**31.    LEGAL ADVICE**

- 46 -

CDC_000524

31.1   Artist acknowledges that Company has advised Artist to take independent legal advice from a lawyer specialising in the music business on the terms and conditions of this Agreement and on the implications of Artist executing it and that such advice has been taken prior to Artist executing this Agreement.

## 32.   E.M.U.

32.1   Company and Artist agree that, except as provided in sub-clause 31.3 below, the occurrence or non-occurrence of an event associated with economic and monetary union in the European Community as described in sub-clause 31.2 below ("an EMU Event") will not have the effect of altering any term of or excusing performance of any obligation or any transaction under this agreement, nor the effect of discharging, frustrating, cancelling, rescinding or terminating this agreement in whole or in part, nor the effect of giving Company or Artist the right unilaterally to alter or terminate this agreement or any transaction hereunder, nor the effect, in and of itself, of giving rise to an event of default or termination or of providing the basis for designation of an early termination date.

32.2   "An event associated with economic and monetary union in the European Community" includes, without limitation, each (and any combination) of the following:

(i)    the introduction of, changeover to or operation of a single or unified European currency (whether known as the euro or otherwise) ("the single currency");

(ii)   the fixing of conversion rates between a member state's current and the single currency or between the currencies of member states;

(iii)  the substitution of the single currency for the ECU as the unit of account of the European Community;

(iv)   the introduction of the single currency as lawful currency in a member state;

(v)    the withdrawal from legal tender of any currency that, before the introduction of the single currency, was lawful currency in one of the member states; or

(vi)   the disappearance or replacement of a relevant rate option or other price source for the ECU or the national currency of any member state, or the failure of the agreed sponsor (or a successor sponsor) to publish or display a relevant rate, index, price, page or screen.

32.3   Any agreement between Company and Artist that is intended to amend or override the provisions of this clause 31 will be effective only if it is duly executed in writing by an authorised officer of each of the parties and expressly refers to this clause or to an EMU Event.

32.4   If the United Kingdom participates in the third stage of economic and monetary union as laid down in Article 109L(4) of the Treaty establishing the European Community then as from and including the date on which (if at all) the single currency (by whatever name it may be known) is accordingly introduced as the lawful currency of England until such time (if at all) as the pound sterling is withdrawn as legal tender in

- 47 -

CDC_000525

England, any payment obligation under this Agreement that is denominated in US dollars may at Company's discretion be performed (to the extent permitted by applicable legislation) either in US dollars or in the single currency at such conversion rate as may be irrevocably fixed for the pound sterling in accordance with the said Article 109L(4).

## 33.    LICENCE AGREEMENT

33.1    If Artist does not win the Competition the Second Contract Period shall not commence unless Company enters into a Licence Agreement on or prior to the date 3 months after initial transmission of the final episode of the Series and serves written notice upon Artist to that effect.

33.2    If Company enters into a Licence Agreement and serves notice pursuant to clause 33.1 above. Artist agrees to execute an inducement letter in favour of the licensee in the form set out in Schedule 3 to this Agreement.

33.3    If Company fails to enter into a Licence Agreement and give notice pursuant to clause 33.1 above on or prior to the date 3 months after transmission of the final episode of the Series, the Second Contract Period shall not commence and the Term shall cease at the expiry of the First Contract Period.

33.4    If Artist wins the Competition Company shall be deemed to have exercised Company's option to extend the Term for the Second Contract Period.

33.5    If Artist wins the Competition Artist agrees to execute an inducement letter in favour of Company's licensee in the form set out in Schedule 3 to this Agreement.

## 34    ASSOCIATED AGREEMENTS

34.1    Artist will not be in breach of this agreement by performing Artist's obligations pursuant to any agreement with another company in the 19 Entertainment Limited group of companies.

IN WITNESS whereof a duly authorised officer of each of the parties hereto has entered into this Agreement the day and year first above written.

SIGNED by                    )
for and on behalf of     : )
19 RECORDINGS LIMITED    )
in the presence of:-         )

SIGNED by                    )
COREY CLARK               )
in the presence of:         )

NOTICE TO ARTIST

- 48 -

CDC_000526

**THIS AGREEMENT IS INTENDED TO BE LEGALLY BINDING AND IS BY ITS NATURE RESTRICTIVE. YOU SHOULD CONSULT AN INDEPENDENT EXPERT LEGAL ADVISOR BEFORE SIGNING AND BY YOUR SIGNATURE HERETO YOU CONFIRM THAT YOU HAVE SO CONSULTED AN INDEPENDENT EXPERT LEGAL ADVISOR.**

CDC_000527

**SCHEDULE 1**

Details of prior recordings

None

CDC_000528

SCHEDULE 2

TO :

**SAMPLE CLEARANCE REQUEST FORM**

There is a sample which requires clearance on the following recording by the following Artist. Please proceed to obtain clearance until otherwise advised.

**SAMPLE DETAILS**

Artist                    _____

Track                    _____

Recording Sampled    _____

(Artist, Track title, Record company, Catalogue Number)

Details Of Sample        _____

_____

(Specify instrument(s) sampled, length of sample and number of times looped)

Publisher Details        _____

(Writer's names and Publisher's name)

I have enclosed with this form a cassette which includes the following:

**1.** The Original recording from which the sample has been taken.
**2.** The sample itself.
**3.** The track into which the sample has been placed.

Signed:_____

**Please note:** Where a re-recording has taken place instead of a sampling, clearance is still required from the relevant publisher for the use of the song. Please complete the relevant sections and supply a cassette of the original song, element re-recorded and new track.

- 51 -

CDC_000529

**SCHEDULE 3**

**INDUCEMENT LETTER**

**TO:**    [Licensee]

**FROM: Corey Clark**

Dated: _____ 2003

Dear Sirs

As an inducement for you to enter into an agreement with 19 Recordings Limited ("Contractor") for the product of my recording services ("the Agreement") and in consideration of the sum of one pound (US$1.00) paid by you to me (receipt of which is hereby acknowledged) and in further consideration of your entering into the Agreement, I hereby represent, warrant, undertake and agree as follows:

1.    I have an agreement with Contractor ("the Recording Agreement") a copy of which is attached under the terms of which Contractor is and will at all times during the term of the Recording Agreement be entitled to the results and proceeds of my recording services.

2.    I will fully perform the provisions of the Recording Agreement.

3.    In the event that during the Term of the Agreement:

Contractor shall enter into liquidation whether voluntary or not (save for the purposes of amalgamation or reconstruction) or administration or make any arrangement for the benefit of creditors generally or a receiver or other custodian of any similar kind of all or a substantial part of Contractor's undertaking shall be appointed and not discharged within 30 days or be dissolved or otherwise cease to exist or cease to be entitled to provide my services or require me to perform my services under the Recording Agreement which breach is not capable of being cured or if the Term of the Agreement is terminated as a result of Contractor's breach, then I shall, if you so elect, enter into an agreement with you ("the New Agreement") on the same terms and conditions as set out in the Recording Agreement but for a term equivalent to the unexpired term of the Recording Agreement at the date of your election. Your election must be made within thirty (30) days of the earlier of your receipt of a notice from me informing you of the event giving rise to your right to elect or (in the absence of notice from me) from you becoming aware of the relevant event. If the Recording Agreement should determine then I shall not anywhere in the world render my services as a recording artist for any other person until the expiry of 60 days from the date you receive my notice or, if you elect that I should enter into the New Agreement, until I have entered into the same and thereafter I shall render my recording services to you in accordance with the New Agreement.

- 52 -

CDC_000530

4. I shall look solely to Contractor for payment of fees, advances and royalties unless and until you exercise your rights under paragraph 3 above.

5. By my signature of this letter I hereby give you all consents you may require to enable you to exploit recordings embodying performances by me under the Agreement.

6. Any permitted assignment by you of the Agreement shall constitute an assignment of this agreement to such assignee and I hereby consent to any such permitted assignment.

7. I shall indemnify and hold you harmless from and against any liability, loss, damage, cost and expense (including reasonable legal costs) paid or incurred by you by reason of any breach of my representations, warranties or agreements contained herein to the extent of an award of judgement of a court of competent jurisdiction or a settlement made by you on terms first approved by me in writing (such approval not to be unreasonably withheld or delayed) in accordance with the terms of the Recording Agreement.

8. My obligations under this agreement are not dependent or conditional upon any notice being given by you to me of Contractor entering into liquidation or administration or being dissolved or ceasing to exist or being in default under the Agreement. I shall not be released from any obligations hereunder by any waiver or indulgence being granted.

9. This Agreement and all amendments and additions hereto shall be governed by English Law and the High Court of England and Wales shall have exclusive jurisdiction to determine all matters arising hereunder.

10. I hereby acknowledge and warrant that I have been advised by you to take and have taken independent expert legal advice in relation to this Agreement.

Yours faithfully                              Accepted and Agreed


..............................              ..............................
**Corey Clark**                              for and on behalf of
                                             [Licensee]

- 53 -

CDC_000531



CDC_000532



*19 Entertainment*
*MANAGEMENT*

CDC_000533

From: 19 Management Limited
Unit 33
Ransomes Dock
35-37 Parkgate Road
London  SW11 4NP

To:   Corey Clark
c/o Howard Siegel Esq.
Pryor Cashman Sherman & Flynn
410 Park Avenue
New York
NY 10022
USA

Date      17 March 2003

Dear Corey

You have been selected as one of the eleven finalists in the competition forming part of the second season of the television series "American Idol:The Search For A Superstar" co-produced by Fremantle Media North America Inc and 19 TV Limited ("the Series").  You have agreed to enter into this agreement, after receiving independent legal advice, as part of the arrangements for the competition.  This agreement will be fully effective if you win the competition or if (as a losing finalist) our associated record company, 19 Recordings Limited, obtains a Licence Agreement in respect of your recordings.

We write to confirm our agreement with you as follows: -

1.    (a)    You appoint us to act and we agree to act as your sole and exclusive manager throughout the world ("the Territory") in connection with your activities in the entertainment industry ("the Activities") including those listed below:-

            (i)    the performance of musical compositions in concert, for broadcast by radio or television in films or any other media;

            (ii)   the composition of musical works and lyrics and the exploitation of musical works and lyrics by any medium of publication;

CDC_000534

  (iii)  performances for film, television or other audio visual devices;

  (iv)  the production engineering and mixing of sound recordings;

  (v)  personal appearances.

 (b)  Your activities as a recording artist and in connection with merchandising and sponsorship are excluded from this Agreement.

2. (a)  The term of this appointment ("the Term") shall be a period which commences on the Commencement Date and will continue until the date three (3) years after the Commencement Date.

 (b)  The Commencement Date shall be either;

  (i)  the date upon which you win the competition forming part of the Series; or

  (ii)  if you do not win the competition, the date upon which we notify you that 19 Recordings Limited has secured a Licence Agreement pursuant to clause 33 of the agreement of today's date between you and 19 Recordings Limited ("the Recording Agreement").  We will serve any such notice promptly following securing the Licence Agreement.

 (c)  If you do not win the competition and we do not serve notice upon you pursuant to paragraph 2(b)(ii) on or prior to the date 3 months after transmission of the last episode of the Series the Term shall not commence and the restriction in paragraph 7(b) below shall cease.

3.  During the Term we agree to use our best endeavours to enhance and develop your career as a performing artist and songwriter and generally to render all services customarily rendered by a manager in connection with the Activities.

4.  In consideration of our services you agree to pay to us a fee equal to twenty per cent (20%) of all monies described in paragraph 5 below.

5. (a)  We shall be entitled to receive our fee upon all gross monies or monies worth (exclusive of VAT or any similar taxes) received by you or received by any third party on your behalf during the Term and arising within the Territory from any of the Activities whether undertaken by you as a result of any contract or other arrangement negotiated by us on your behalf or otherwise.

-2-

CDC_000535

(b)    After the Term we shall continue to be entitled to receive our fee at the rates set out in sub-paragraph 5(c) below on all monies received by you or received by any third party on your behalf during the period of ten (10) years after the Term which arise from: -

    (i)    concerts performed after the Term, the agreements for which were concluded during the Term;

    (ii)    personal appearances after the Term, the agreements for which were concluded during the Term;

    (iii)    residuals and other payments received after the Term from radio, TV and film appearances during the Term; and

    (iv)    exploitation of musical works or lyrics written (in whole or in part) by you prior to or during the Term which are exploited for the first time during the Term.

(c)    The rates referred to in sub-paragraph (b) above are: -

    (i)    twenty per cent (20%) for the first five (5) years after the Term

    (ii)    ten per cent (10%) for the balance of the ten (10) years referred to in (b) above.

(d)    Notwithstanding the provisions of sub-paragraphs (a) and (b) above: -

    (i)    we shall not be entitled to be paid our fee on any monies advanced to you for, or utilised for, tour support or for reimbursement of travel or other out of pocket expenses;

    (ii)    our fee on monies arising from your live concert performances shall be calculated on your net income from such performances (i.e. gross income less bona fide expenses incurred in connection with such performance;

    (iii)    the third party cost of collecting monies shall be deducted prior to calculating our fee;

-3-

CDC_000536

(iv)    if you are obliged to pay co-writers or co-publishers from monies received by you such payments shall be deducted prior to calculation of our fee;

(v)    we shall not be entitled to our fee on any monies paid to you by 19 Recordings Limited pursuant to the Recording Agreement;

(vi)`    we shall not be entitled to our fee on any monies paid to you by 19 Merchandising Limited pursuant to the agreement of today's date between you and 19 Merchandising Limited;

(vii)    we shall not be entitled to our fee on any monies paid to you by American Idol Productions for your appearances in the Series or associated programmes; and

(iv)    we shall not be entitled to our fee on any monies paid to you by a company within the 19 Entertainment Limited group of companies.

(e)    For the purposes of this paragraph 5 a royalty credit received by you in respect of any music or lyrics the income from which is subject to our fee shall be treated as money received by you SAVE THAT we shall not be entitled to receive our fee on royalties credited to you which recoup an advance on which we have already received our fee.

6.    (a)    We shall invoice you (or the company or companies through which you provide your services) for our fee on a monthly basis in respect of monies received during the preceding month and you shall pay our fee within thirty days of your receipt of our invoice.

(b)    You shall keep accurate and up to date books of account showing all monies received by you or on your behalf from the Activities. We or our representative shall have the right to inspect your books and records relating to the Activities upon reasonable notice during normal office hours not more than once per calendar year.

7.    You warrant that: -

(a)    you have the right to enter into this Agreement;

(b)    during the period from the date of this agreement until the Commencement Date you will not appoint any third party to act as your manager within the Territory;

-4-

(c)  during the Term you will not appoint any third party to act as your manager in respect of the Activities within the Territory; and

(d)  during the Term you will refer to us all enquiries for your services in connection with the Activities within the Territory.

8.  You agree to be responsible for any commission payable to a so-called "booking agent" for your live performances during the Term.  We will have the right to approve the appointment of any booking agent such approval not to be unreasonably withheld. Booking agents commission is a tour expense for the purposes of paragraph 5(d)(ii) above.

9.  We shall not be entitled to sign any agreement on your behalf and we hereby undertake not to hold ourselves or our representative out as having the right to do so  PROVIDED THAT we shall be entitled to sign "one-off" radio, promotional, television or live appearance contracts (excluding concert apperances before a paying audience) on your behalf for appearances you have been consulted on and have approved in principle.

10.  We shall be solely responsible for our office expenses.  Any other expenses reasonably and necessarily incurred by us with your prior approval in connection with the performance of our obligations under this agreement shall be reimbursed by you upon your receipt of the relevant invoices.  If our representative travels specifically on your behalf and you have approved such travel you shall reimburse our reasonable travel and accommodation expenses.

11.  We shall be free to supply management services to other artists at our discretion.

12.  As part of the consideration for this agreement, you agree to enter into the movie option agreement attached as Exhibit A at the same time as entering into this agreement.  If 19 exercises 19's option pursuant to the movie option agreement we shall not be entitled to charge our fee on monies recived by you pursuant to the movie option agreement.

13  As part of the consideration for entering into this agreement, you grant to us an irrevocable option to enter into the tour agreement attached as Exhibit B.  We may exercise our option by counter-signing and returning the tour agreement to you at any time prior to 16 May 2003.  If exercise our option we shall not be entitled to charge our fee on monies recieved by you pursuant to the tour agreement.

14.  (a)  You shall have the right to terminate this appointment if:

CDC_000538

<div style="margin-left: 2em;">

(i)  we are in breach of any of our material obligations under this agreement and fail to remedy the breach within thirty (30) days following receipt of written notice specifying the breach and requiring us to remedy it; or

(ii)  we are unable to provide the personal services of Simon Fuller for more than 30 consecutive days or 60 days in aggregate in any 12 month period when reasonably required hereunder; or

(iii)  we go into liquidation (other than for the purpose of amalgamation or reconstruction).

(b)  We shall have the right to terminate this appointment in the event that you become insolvent or are adjudicated bankrupt.

</div>

15. Notices to be served under this agreement shall be in writing and shall be sufficiently served if sent to the party to be served at the address set out above by hand or by prepaid registered post. The date of delivery (if by hand) or the date of posting (if by post) shall be deemed to be the date of service. Copies of all notices to you shall be sent to Howard Siegel Esq., Pryor Cashman Sherman and Flynn, 410 Park Avenue, 10th Floor, New York, NY, 10022, USA.

16. This agreement shall be governed by English law and the parties submit to the jurisdiction of the High Court of Justice in England

17. We shall not assign the benefit of this agreement during the Term without your prior written consent. No assignment in accordance with this clause shall relieve us from our obligations hereunder unless such assignee shall covenant with you under deed to observe and perform all our obligations.

18. It is agreed that each party shall indemnify the other from and against all costs (including reasonable legal costs) and damages suffered by one party as a result of any breach or non-performance by the other party of all or any of the undertakings, representations, warranties, obligations and agreements contained in this Agreement. This indemnity is limited to payments made pursuant to a court order or a settlement made with the consent of the indemnifying party (such consent not to be unreasonably withheld or delayed).

19. No waiver or affirmation of any breach of or non-compliance with any term of this Agreement by either party shall be deemed to be a waiver or affirmation of any preceding or succeeding breach of or non-compliance with the same or any other term.

CDC_000539

20.   This Agreement shall not be deemed to give rise to any partnership between us.

21.   The parties do not intend that any term of this Agreement shall be enforceable solely by virtue of the Contracts (Rights of Third Parties) Act 1999 by any person who is not a party to this Agreement.

If the above correctly reflects your understanding of our agreement please sign where indicated below.

Yours sincerely                                    Accepted and Agreed

..................................................          ..................................................
For and on behalf of                               **COREY CLARK**
**19 MANAGEMENT LIMITED**

-7-

**CDC_000540**



CDC_000541

## EXHIBIT A

1    **Grant of Option:** Corey Clark.("Talent") hereby grants to 19 Entertainment Limited (" 19") an irrevocable option to engage Talent's acting services in connection with either a feature length theatrical motion picture or a television motion picture (each individually referred to as a "Picture") designated by 19 but shall not be overtly sexual or violent and shall  not require Talent's role to adversely affect Talent's reputation or credibility.  Said option shall remain in full force and effect for a period ("Option Period") beginning on the date of this Agreement and expiring one (1) year thereafter.

2.    **Outside Engagement:**  During the Option Period, Talent shall not accept any engagement to perform and Talent shall not perform acting services for a third party in connection with the production of a theatrical motion picture, television production  ("Outside Engagement") unless 19 has failed to exercise 19's right of preemption as provided in Paragraph 4 below.

3.    **Exercise of Option:**  19 may exercise 19's option for the Picture only by giving Talent written notice of such exercise prior to expiration of the Option Period.  If 19 exercises 19's option for the Picture, 19 shall designate a start date and engage Talent's services for the total amount of $350,000 covering all of Talent's services on the Picture.  If 19 exercises its option 19 agrees to negotiate in good faith with Talent for prticipation by Talent in the "back end" profits of the Picture having regard to Talent's role in the Picture and the level of such participation normally afforded to actors of a similar status and reputation to Talent. 19 and Talent will negotiate in good faith to conclude a long form agreement for Talent's acting services in the Picture to include all customary terms.

4.    **Preemption Right:**  At all times during the Option Period, 19 shall have the right to preempt Talent's services in connection with an Outside Engagement in accordance with the following procedure:

    (a)    **Notice of Outside Engagement:** Each time that Talent proposes to accept a bona fide "pay-or-play" offer for an engagement of Talent's acting services ( as a step in a development deal or otherwise) in connection with an actual production of an Outside Engagement, Talent shall advise 19 in writing of the title of such Outside Engagement, the name of the producer and distributor thereof, and the proposed commencement and estimated finishing dates of Talent's services in connection therewith.  Such notice shall not be given earlier than four (4) months or later than one (1) month before the proposed commencement date of Talent's services in connection with said Outside Engagement.

    (b)    **Exercise of Preemption Right:**  19 may exercise 19's right of preemption hereunder by giving Talent written notice of 19's election to do so not later than 15 business days after 19's receipt of Talent's notice.  19 shall, in 19's notice, designate a start date for commencement of Talent's services in connection with principal photography of the Picture, which start date shall, notwithstanding, anything herein contained, be not later than four months subsequent to the date specified in Talent's written notice as the proposed commencement date of principal photography in connection with the proposed Outside Engagement.

<div align="center">-8-</div>

CDC_000542

(c)     Preemption Start Date:  If 19 preempts an Outside Engagement as provided herein, 19 shall be deemed to have exercised 19's option, and Talent will report to 19 on the preemption start date so designated by 19.

(d)     Termination of Outside Engagement:  If for any reason Talent will not be rendering services in connection with an Outside Engagement of which 19 has received notice pursuant to subparagraph 4(a) above and which 19  has not preempted, Talent shall give written notice to 19 of such fact immediately upon obtaining knowledge that Talent shall not be rendering such outside services.  Thereafter, if 19 has not designated a start date and Talent desires to accept another Outside Engagement for Talent's acting services, the preemption procedure set forth above shall apply.

(e)     Postponed Outside Start Date:  If 19 does not exercise 19's preemption right after Talent has provided 19 with written notice pursuant to subparagraph 4(a) above herein, the proposed outside start date is postponed more than one month later than the date previously designated by Talent and Talent is not then contractually committed to the Outside Engagement, 19 shall have the right to preempt said postponed date in accordance with the procedure set forth in subparagraph 4(b) above.

5.     **Extension of Option Period:**  In the event that during the Option Period, the development or production of motion pictures by 19 shall be prevented or substantially interfered with by reason of any force majeure event (i.e., any labor dispute, fire, war, governmental action or other unexpected or disruptive event), or if Talent shall become unavailable by any reason of Talent's illness or physical disability, or if Talent shall be in default under the Agreement, or if Talent shall be performing services on an Outside Engagement, then the Option Period shall be automatically extended for a period equivalent to the period that such event exists not to exceed 6 months if the force majeure event is industry wide and not to exceed 3 months if only relating to 19 or Talent.

6.     **Notices:**  Notices to be served under this agreement shall be in writing and addressed to the party to be served at the address set  out below or at such other address notified in accordance with this paragraph.  Notices shall be sent by hand or by mail and shall be deemed served on the day of delivery (if by hand) or the day of mailing (if by mail).  Notices to Talent shall be sent to Howard Siegel Esq., Pryor Cashman Sherman and Flynn, 410 Park Avenue, 10th Floor, New York, NY 10022, USA.  Notices to 19 shall be sent to Simon Fuller, 19 Entertainment Limited, 33 Ransome's Dock, 35-37 Parkgate Road, London, SW11 4NP, UK

Signed by

-------------------------------------
Talent

Signed by

17ʰ March 2003

-9-



*19 Entertainment*
*TOURING*

CDC_000544

From:    19 Touring Limited
Unit 33
Ransome's Dock
35-37 Parkgate Road
London SW11 4NP

To:    Corey Clark
c/o Howard Siegel Esq
Pryor Cashman Sherman & Flynn
410 Park Avenue
New York
NY 10022
USA

17 March 2003

Dear Corey

### YOUR SERVICES

1.    We hereby engage you to render and you agree to render your services to us as a vocalist in connection with the Tour (defined below) throughout the United States of America ("Territory") for the Term (defined below). Your services will be exclusive to us.

2.    The Term of this Agreement will commence on 16 June 2003 and (subject to the provisions of clause 9) shall continue until .30 August 2003.

3.    During the Term you agree to render such services as we may reasonably require including (without limitation) rehearsals, live appearances and promotional appearances on radio and television and all industry normal services ancillary thereto as a vocalist on an American Idol Finalists Live Tour ("the Tour") throughout the Territory. You agree to render such services as and when required by us at times and places within the Territory designated by us.

4.    (a)    You hereby grant us all consents necessary including all consents pursuant to the Copyright Designs and Patents Acts 1988 to fully exploit the product of your services throughout the world. You consent to us making audio and visual recordings of your performances on the Tour, backstage and in rehearsals. If we exploit any such recordings commercially as an audio visual device we agree to pay royalties to you on sales of such device as a Long Form Video at the same rates and on the same terms (including recoupment) as set out in clause 10 of the agreement between you and 19 Recordings Limited of today's date ("Recording Agreement"). Royalties payable to you under this Agreement shall not be available to recoup any costs incurred pursuant to the Recording Agreement.

(b)    You hereby assign to us with full title guarantee the entire copyright (present and future) and all rights of a similar nature in the products of your services

CDC_000545

including (without limitation) all arrangements, recordings, films and video tapes throughout the world for the full period of such rights and any extensions and renewals of the same. You agree to execute any further documents necessary to confirm the assignment of such rights to us. For the avoidance of doubt nothing contained in this clause shall operate to assign the copyright in any music composed or lyrics written by you.

5.   (a)   In full and final consideration of the provision of your services within the Territory and the rights granted hereunder we shall pay to you:-

   (i)   $3,000 per show;

   (ii)   a per diem of $50 on non-show days including rehearsals; and

   (iii)   an amount equal to the Relevant Fraction of 50% of Tour Merchandise Profit.

   (b)   For the purposes of sub-paragraph (a) above:-

   (i)   "Relevant Fraction" shall mean a fraction the numerator of which is one and the denominator of which is the number of American Idol featured vocalists (including you) appearing on the Tour.

   (ii)   "Tour Merchandise Profit" shall mean gross monies received by or credited to us from the Tour brochure and other items of Tour merchandise sold by us or on our behalf less all industry typical costs and expenses actually paid and incurred by us in connection with the brochure and other items of merchandise including (without limitation) the costs of design, manufacture, hall fees, security hired specifically to protect against bootleg merchandise, payments to Fremantle Media for use of the 'American Idol' logo on merchandise and payments to any third party merchandise fulfilment company for their services. Booking agents fees are not deductible.

6.   We shall be responsible for reasonable transportation and hotel accommodation for you during the Tour as well as reasonable transportation to and from rehearsals and to and from your residence at the beginning and end of the Tour. The class of such transportation and hotel accommodation shall be of a standard similar to that provided on the last American Idol finalists tour of the USA. We shall have no liability in respect of any hotel or transportation expenses arranged by you or any party other than us or in respect of personal expenses including (without limitation) meals, telephone calls, valet services or any other expenses incurred by you. We shall be responsible for the provision and cleaning of stage clothes. We shall provide three meals on show days.

7.   We agree to account to you for your share of Tour Merchandise Profit within 60 days after we receive final accounting information in respect of the tour merchandise. You shall have the right to appoint a chartered or certified accountant to inspect our books and records relating to the calculation of Tour Merchandise Profit. Only one such inspection shall take place and shall be conducted at your sole expense.

CDC_000546

8.    (a)    You acknowledge and agree that you do not have any interest whatsoever in and to the name 'American Idol' and you agree that you shall not at any time have the right nor hold yourself out as having the right to use the name 'American Idol' for any commercial reason or purpose whatsoever.

    (b)    You will refer all enquiries in connection with the provision of your services hereunder to us whether such enquiries are from the press, relate to sponsorship or any matter whatsoever. You will not give any interviews concerning the Tour or provide any Tour information or material to or for the use of the media or any other third party save as permitted or arranged by us.

    (c)    You will not at any time use or disclose to any third party any confidential information relating to this agreement, the Tour, other performers, us or any of our associated companies, their business or affairs or any confidential information or material of a personal commercial or business nature. You are entitled to reveal confidential information to your professional advisors and as required by law.

    (d)    It is agreed that each party shall indemnify the other from and against all costs (including reasonable legal costs) and damages suffered by one party as a result of any breach or non-performance by the other party of all or any of the undertakings, representations, warranties, obligations and agreements contained in this Agreement. This indemnity is limited to payments made pursuant to a court order or a settlement made with the consent of the indemnifying party (such consent not to be unreasonably withheld or delayed).

9.    You agree that we shall be entitled to use free of charge and authorise others to use free of charge your name, photograph, likeness and biography for the purposes of advertising and otherwise exploiting the Tour and the products of your services on the Tour including without limitation merchandising and tour brochures. We agree to obtain your approval of individual likenesses of you used on Tour merchandise. Merchandise manufactured shall be of similar quality and style as used on the last American Idol finalists tour.

10.    We may terminate the Term by giving you notice in writing if:-

    (a)    you fail to fulfil any of your material obligations under this agreement and fail to remedy such failure (if capable of remedy) within 48 hours of our request for you to do so; or

    (b)    you are engaged in any criminal activity;

11.    (a)    This agreement shall not be construed so as to give rise to the relationship of employer and employee between us and shall not give rise to a partnership between us.

    (b)    This agreement is subject to English law and the High Court of Justice in England is the exclusive Court of competent jurisdiction.

    (c)    You warrant that you are an independent contractor.

CDC_000547

12.    You agree to comply with all reasonable requests and instructions from us or the tour manager.

13     You warrant that you are resident in USA for tax purposes.

14.    We agree to add your name as an additional insured on public liability insurance policies taken out by us in relation to the Tour

15.    You will not be in breach of any agreement with an associated company of ours by performing your services under this agreement.

16     Notices to be served under this agreement shall be in writing and shall be sufficiently served if sent to the party to be served at the address set out above by hand or by prepaid registered post. The date of delivery (if by hand) or the date of posting (if by post) shall be deemed to be the date of service.  Copies of all notices to you shall be sent to Howard Siegel Esq., Pryor Cashman Sherman and Flynn, 410 Park Avenue, 10th Floor, New York, NY, 10022, USA.

If the foregoing correctly reflects your understanding of our agreement would you please sign below.

Yours sincerely                                    Accepted and Agreed


......................................            ......................................
For and on behalf of                              Corey Clark
*19 Touring Limited*

CDC_000548

*EXHIBIT A*

*Date*                                    *Venue*

CDC_000549