Police lean heavily on their data networks. Every state has computer reservoirs of criminal records, details about missing persons, and a wide array of alerts. One of the most widely used is the National Crime Information Center, a classified national network run by the FBI. That's the system that fueled Levin's black market business. With a name or license plate number, anybody with access can call up information such as arrests, detentions, indictments, even police notations. You can get addresses, birth dates, Social Security numbers, as well as gender, race, and physical attributes. These sensitive details are supposed to be protected under federal and state laws. Investigators and others with access are strictly prohibited from sharing the information with outsiders.

There are long-standing rules restricting the use of the FBI's information system. From the moment it was first approved by Attorney General John Mitchell in 1970, critics warned that it was only a matter of time before it would be misused. In *The Rise of the Computer State*, an

important early examination of the impact of computers and networks on society, David Burnham warned about the potential erosion of checks and balances on law enforcement authority. It was that fear that had earlier prompted Congress to approve an amendment to the Omnibus Crime Control and Safe Streets Act of 1968, which stated: "The collection, storage and dissemination of . . . [criminal history] information shall take place under procedures reasonably designed to insure that all such information is kept current therein; the Administration shall assure that the security and privacy of all information shall only be used for law enforcement and criminal justice and other lawful purposes."

Police point to those kinds of policies as the bulwark against abuses. In many instances, though, such policies have had the force of clouds. Police across the country have been caught checking out the backgrounds of attractive women, a practice known as "running plates for dates." They have sold confidential records for bags of cash, and used derogatory files to undermine political opponents. Ari Schwartz, associate director of the Center for Democracy and Technology in Washing-

way to ease the sharing of information from agency to agency inside the government. Members include the CIA, the Defense Intelligence Agency, the National Security Administration, and the Justice Department. "There's more collaboration in the last year," Ritchhart said, than in the last twenty years."

BUT HOW WERE THE FBI and other agencies going to stop authorities from abusing these tools? It is often assumed that police will behave properly. But that can be misleading, even setting aside the history of domestic spying thirty years ago. Police often use their networks and information resources as private databanks, from which they can make withdrawals whenever they please.

Consider the case of a former FBI agent cum private investigator named Mike Levin. Working with a group of people who were assumed to be above reproach, he obtained scores of classified records from an FBI-run system called the National Crime Information Center for $100 each. Levin then sold the reports as fast as he could. At least five of his customers were under investigation by federal authorities, including some New York mobsters. A few were involved in a probe of federal mortgage fraud. At least one was an attorney looking to get an edge for a client who faced federal securities charges. His co-conspirators? He told investigators who caught on to the scheme that they included a communications security specialist in the FBI's Las Vegas office and a woman who worked in the city's courts. Two others were agents in the Nevada state attorney general's office. In 2001, Levin pleaded guilty to selling the documents and became a federal witness.

The great majority of officers and investigators undoubtedly follow the rules; but there seem to be exceptions everywhere. The black market for confidential police records is widespread and thriving. From small-town police departments to the vaunted FBI, data systems seep information that's supposed to be secure and private. Even supposing that a national intelligence network will improve the overall security of



BLANK

CDC_007885

# NATIONAL INCIDENT-BASED REPORTING SYSTEM (NIBRS)

## Frequently Asked Questions (FAQs)

## General Information

## THE BASICS

**What is the National Incident-Based Reporting System (NIBRS)?**

The NIBRS is an incident-based reporting system in which agencies collect data on each single crime occurrence. NIBRS data are received from participating local, state, and federal law enforcement agencies having automated records systems. An agency can build a system to suit its own needs, including any collection/storage of information required for administration and operations, as well as to report data required by the NIBRS to the Uniform Crime Reporting (UCR) Program.

The NIBRS collects data on each single incident and arrest within 22 offense categories made up of 46 specific crimes called Group A offenses. For each of the offenses coming to the attention of law enforcement, specified types of facts about each crime are reported. In addition to the Group A offenses, there are 11 Group B offense categories for which only arrest data are reported.

**How did NIBRS start?**

Over the years, a broad utility for UCR data evolved, and law enforcement expanded its capabilities to supply crime information. In the late 1970s, the law enforcement community called for a thorough evaluation of the UCR Program to recommend an expanded and enhanced data collection system to meet the needs of law enforcement in the 21st century.

The South Carolina Law Enforcement Division was the first entity to use the proposed system to determine its workability. At a national UCR conference in March 1988, participants approved the new system.

**What are the benefits of participating in the NIBRS?**

The benefits of participating in the NIBRS are:

The NIBRS can furnish information on nearly every major criminal justice issue facing law enforcement today, including terrorism, white collar crime, weapons offenses, missing children where criminality is involved, drug/narcotics offenses, drug involvement in all offenses, hate crimes, spousal abuse, abuse of the elderly, child abuse, domestic violence, juvenile crime/gangs, parental abduction, organized crime, pornography/child pornography, driving under the influence, and alcohol-related offenses.

Using the NIBRS, legislators, municipal planners/administrators, academicians, sociologists, and the public will have access to more comprehensive crime information than the traditional Summary reporting system can provide.

The NIBRS produces more detailed, accurate, and meaningful data than the Summary reporting system. Armed with such information, law enforcement can better make a case to acquire the resources needed to fight crime.

The NIBRS enables agencies to find similarities in crime-fighting problems so that agencies can work together to develop solutions or discover strategies for addressing the issues.

Full participation in the NIBRS provides statistics to enable a law enforcement agency to provide a full accounting of the status of public safety within the jurisdiction to the police commissioner, chief, sheriff, or director.

**How are the NIBRS and the Summary reporting system alike?**

Most of the general concepts for collecting, scoring, and reporting UCR data in the *UCR Handbook* (2004) remain applicable in the NIBRS. For example, the jurisdictional rules for collecting data from city, county, state, tribal, and federal law enforcement agencies and the conditions under which a state UCR Program must operate remain the same. The *UCR Handbook,* NIBRS Edition (1992), provides a comprehensive look at NIBRS and combines the old requirements retained from the traditional UCR Program with the new NIBRS requirements.

**How does the NIBRS differ from the Summary reporting system?**

The NIBRS has much more detail in its reporting system than the traditional Summary reporting system. In the NIBRS, agencies collect offense information on 46 crimes known as Group A offenses; in the Summary reporting system, agencies collect offense

information on eight crimes known as Part I offenses. In the NIBRS, an updated definition of rape includes both male and female victims; in the Summary reporting system, only females can be reported as rape victims. According to p. 14 of the NIBRS Volume 1: *Data Collection Guidelines* (August 2000), in the Summary reporting system, there is no way to report whether most crimes were completed or only attempted. In the NIBRS, each offense is designated as either attempted or completed.

In the Summary reporting system, the "Hierarchy Rule" governs multiple offense reporting. If more than one crime was committed by the same person or group of persons and the time and space intervals separating the crimes were insignificant, then the crime highest in the hierarchy is the only offense reported. However, in the NIBRS, if more than one crime was committed by the same person or group of persons and the time and space intervals were insignificant, all of the crimes are reported as offenses within the same incident.

The Summary reporting system has two crime categories: Crimes Against Persons (e.g., murder, rape, and aggravated assault) and Crimes Against Property (e.g., robbery, burglary, and larceny-theft). In the NIBRS, a third crime category was added, Crimes Against Society, to represent society's prohibitions against certain types of activities (e.g., drug or narcotic offenses).

The NIBRS collects information about crimes committed using a computer; the Summary reporting system does not. The NIBRS collects more comprehensive data about drug offenses than the Summary reporting system.

## OFFENSE INFORMATION

### What crimes are reported in the NIBRS?

The following offense categories, known as Group A offenses, are those for which extensive crime data are collected in the NIBRS.

1. Arson
2. Assault Offenses - Aggravated Assault, Simple Assault, Intimidation
3. Bribery
4. Burglary/Breaking and Entering
5. Counterfeiting/Forgery
6. Destruction/Damage/Vandalism of Property
7. Drug/Narcotic Offenses - Drug/Narcotic Violations, Drug Equipment Violations
8. Embezzlement
9. Extortion/Blackmail

10. Fraud Offenses - False Pretenses/Swindle/Confidence Game, Credit Card/Automatic Teller Machine Fraud, Impersonation, Welfare Fraud, Wire Fraud
11. Gambling Offenses - Betting/Wagering, Operating/Promoting/Assisting Gambling, Gambling Equipment Violations, Sports Tampering
12. Homicide Offenses - Murder and Nonnegligent Manslaughter, Negligent Manslaughter, Justifiable Homicide
13. Kidnapping/Abduction
14. Larceny/Theft Offenses - Pocket-picking, Purse-snatching, Shoplifting, Theft from Building, Theft from Coin-Operated Machine or Device, Theft from Motor Vehicle, Theft of Motor Vehicle Parts or Accessories, All Other Larceny
15. Motor Vehicle Theft
16. Pornography/Obscene Material
17. Prostitution Offenses - Prostitution, Assisting or Promoting Prostitution
18. Robbery
19. Sex Offenses, Forcible - Forcible Rape, Forcible Sodomy, Sexual Assault With An Object, Forcible Fondling
20. Sex Offenses, Nonforcible - Incest, Statutory Rape
21. Stolen Property Offenses (Receiving, etc.)
22. Weapon Law Violations

There are 11 additional offenses, known as Group B offenses, for which only arrest data are reported.

1. Bad Checks
2. Curfew/Loitering/Vagrancy Violations
3. Disorderly Conduct
4. Driving Under the Influence
5. Drunkenness
6. Family Offenses, Nonviolent
7. Liquor Law Violations
8. Peeping Tom
9. Runaway
10. Trespass of Real Property
11. All Other Offenses

## AGENCY PARTICIPATION

### How widespread is the NIBRS today?

Agencies and state UCR Programs are constantly developing, testing, or implementing the NIBRS. In 2007, 6,444 law enforcement agencies contributed NIBRS data to the UCR Program. The data from those agencies represent 25 percent of the U.S. population and 25 percent of the crime statistics collected by the UCR Program.

Implementation of NIBRS is occurring at a pace commensurate with the resources, abilities, and limitations of the contributing law enforcement agencies. As of 2007, the FBI has certified 31 state UCR Programs for NIBRS participation. Ten of those state Programs submit their crime data exclusively via the NIBRS. Nine state UCR Programs are in the various stages of testing NIBRS. Six other state agencies are in various stages of planning and development.

### How do I find out if my agency or state contributes NIBRS or Summary reporting system data?

Contact your local law enforcement agency.

## AVAILABLE INFORMATION

### How can I get NIBRS information?

Several NIBRS manuals, studies, and papers are available at the UCR Program's Web site at <www.fbi.gov/ucr/ucr.htm>. In addition, NIBRS information is available from the UCR Program at: Multimedia Productions Group Criminal Justice Information Services Division, Federal Bureau of Investigation, Module D3, 1000 Custer Hollow Road, Clarksburg, West Virginia 26306-0157; telephone (304) 625-4995; facsimile (304) 625-5394; e-mail <cjis_comm@leo.gov>. (E-mail requesters must include the requester's contact information such as name, address, and telephone number.)

### I looked through my copy of *Crime in the United States* and could not find any NIBRS data. Why?

Many agencies are either certified to report crime data through the NIBRS or are in the process of developing NIBRS reporting systems. However, until the UCR Program receives the majority of data via the NIBRS, the FBI will continue to report crime statistics to the Nation in a traditional format. The FBI converts statistics submitted by agencies via the NIBRS to the traditional Summary format and incorporates them into the national

crime database. When converting NIBRS data to the traditional Summary format, the UCR Program takes only one offense from each NIBRS incident based on the application of the Hierarchy Rule.

## THE SPECIFICS

**Because the NIBRS collects data on each crime incident and the Summary system does not, if my law enforcement agency begins reporting data via the NIBRS, will the number of offenses for my area rise?**

No. Many studies have found that multiple offense crimes account for a very small number of offenses and should not have a great impact on the overall crime statistics. The Bureau of Justice Statistics (BJS) published a special report in July 2000 (updated in February 2001) concerning the effects of the NIBRS on crime statistics. The report is available at the BJS Web site at <www.ojp.usdoj.gov/bjs/pub/pdf/encs.pdf>.

## NIBRS REQUIREMENTS

**What are the requirements for submission of data into the NIBRS?**

Submission guidelines are outlined in the UCR Program's NIBRS Volume 1: *Data Collection Guidelines,* August 2000. Section D, p. 3 of NIBRS Volume 1, states:

> Full participation in NIBRS necessitates that an agency have the data processing and other resources needed to meet all of NIBRS' requirements. Participation should not place any significantly new burden on officers preparing incident and arrest reports as most of the data required for NIBRS are already being entered into such reports. On the other hand, because the data to be extracted from the reports for national purposes are more detailed in NIBRS than in the traditional UCR Summary system, increased data entry and data processing burdens are involved. Therefore, agencies wishing to participate should have sufficient data processing and other resources to fulfill all of the reporting requirements set forth in NIBRS Volume 2: *Data Submission Specifications.*
>
> NIBRS data are to be generated as a by-product of state and local incident-based reporting (IBR) systems. This means that a state or local agency may build its IBR system to suit its individual needs; i.e., it can have a different file structure than that used by the national UCR Program and include additional data elements and data values. However, when it is time to report to the national UCR Program, the local or state agency should extract from its IBR system only the data required by NIBRS and record it onto magnetic media in NIBRS' format for submission to the FBI.

CDC_007891

Before a local or state agency begins submitting data directly to the FBI, the agency will be asked to demonstrate its ability to meet NIBRS' reporting requirements by submitting test data on magnetic media to the FBI. If a local agency is going to participate indirectly through its state UCR Program, it is the state's responsibility to ensure that the local agency is able to fulfill NIBRS data submission requirements.

**Can any local, county, state, tribal, or federal agency submit NIBRS data?**

The UCR Program's policy is to accept NIBRS test data only from individual state UCR Programs or from individual submitting agencies in those states that do not possess a state UCR Program. However, the FBI may conduct a case-by-case assessment to determine if any one local, county, state, tribal, or federal agency can be considered.

**Is there a process for changing NIBRS requirements or policies?**

The FBI frequently receives inquiries from law enforcement agencies that want to change policy or make a suggestion for change. If an agency wants to present its suggestions to the CJIS Advisory Policy Board for consideration, the agency should prepare a written description of the current policy along with an explanation of the proposed change and its benefits. The agency should forward the proposal to the CJIS Security Officer for that state for review. The CSO will then forward the suggestion to the appropriate regional Working Group chairperson. The chairpersons coordinate with the CJIS Division to identify proposed topics and prepare the agendas for the biannual Working Group meetings.



BLANK

CDC_007893





| Title: | National Criminal Database Products |
|---|---|
| Written By: | Gary Hanley, Chief Operating Officer, USA-FACT |
| Date: | April 5, 2007 |

Note: USA-FACT is a Consumer Credit Reporting Agency and not a legal firm. Please review any opinion offered by USA-FACT with your Legal Department. Per our Subscriber Agreement, USA-FACT does not offer legal advice, however for courtesy to our clients, USA-FACT will provide reference information to offer an opinion.

**What a National Criminal Database Is Not**

To this point in the evolution of the screening industry, there is no all-inclusive National Criminal Database [NCD] product in existence. The most famous National Criminal Database is the FBI's National Crime Information Center [NCIC]. Access to the NCIC is limited to law enforcement personnel only and any access that is currently being sold on the open market by screening companies is being done so illegally and without the permission of the FBI[1]. The NCIC is the only NCD that actually integrates with law enforcement agencies across the country and even that is in a very limited manner. The balance of information that enters the NCIC are records compiled by each state's Department of Justice in an information share process between the two entities. A recent study funded by the National Association of Professional Background Screeners [NAPBS] concluded that even the FBI's NCIC is not comprehensive enough to be used as the sole source for searching criminal records when conducting a background check[2].

There are dozens of companies that purchase and compile public records to create their own proprietary National Criminal Database product. The NCD products currently available on the screening market are compilations of purchased records from different public record entities all across the country; <u>these databases are not directly integrated with county courthouse indices to process up to date searches</u>. There are thousands of sources of criminal information for sale in this country but compiling them into an all-inclusive database cannot replace the effectiveness of directly searching the counties of an address history associated with your applicant.

**The National Criminal Database Product**

The background screening industry has evolved tremendously over the past two decades and professional background screening companies such as USA-FACT have made significant progress in shaping the information retrieval methods in this country to provide their customers with the highest quality screening possible. The primary sources for criminal records searches are at the county and federal district court system and today they remain the benchmark for due diligence criminal background checks.

Proprietary National Criminal Database searches have come under increasing scrutiny and regulation by the federal government. Compiled databases are inherently inaccurate in some critical ways.

I. Because not all data in this country is for sale, employers will miss records using a database product. USA-FACT has tested the largest national databases on the market against live courthouse searches and our data has determined them to be at best about 60% accurate.

II. Databases are updated sporadically. Sometimes this is the fault of the court system that sells the data. There are occasions when the courthouse is not able to meet the download schedule requested by the re-seller and other occasions when a re-seller who cannot afford to purchase downloads regularly is the culprit.

III. Database accuracy is affected because good reporting practices have yet to be implemented within our court systems. For example, state repositories are notoriously inaccurate because the counties within the state are not required to report their data. Additionally, there is no "uniform system" in place for the convenience of the counties that do report their data.





The primary concern of the federal government with the use of database products is consumer rights. They are concerned about protecting a "consumer" whose employment or prospective employment could be jeopardized because an employer considered a potentially incomplete court record. Post-adjudication actions such as an expungement or set-aside judgment are good examples. They are just now beginning to enforce FCRA regulations on database use.

There are two additional factors that have dramatically increased the legal exposure an employer now faces by using a database as their primary screening tool. The first has to do with the recent negative press surrounding the two largest criminal database companies. USA-FACT believes this will force the federal government to take a closer look at the method used to compile criminal databases and lead to a closer scrutiny of the product which could filter down to the end-users. The second factor is more significant. The vivid disclosures and acknowledgements that screening companies and government entities have made regarding the questionable accuracy of the products they sell (USA-FACT requires clients to sign a disclosure when using the NCD as a sole means of screening). These published statements have placed employers in a "should have known" situation in the event a problem occurs. Many employers continue to use databases as their sole screening source regardless of the risk, as a cost saving measure. However, an employer using a criminal database search as their primary screening tool is exposing their hiring process to possible legal action.

## Summary

There is a place for database use in employment screening. The National Criminal Database can enhance the applicant screening effort by increasing the coverage area of the search as a supplement to the comprehensive live county courthouse search. A National Criminal Database could possibly identify a crime an applicant or employee may have committed while traveling or on vacation. They can also be helpful in the event your applicant intentionally lied on their application about where they have lived or worked. The National Criminal Database search is ideal for companies hiring over-the-road drivers, traveling executives or sales staff.

USA-FACT in no situation ever utilizes the National Criminal Database search to process county criminal searches.

USA-FACT is always searching for ways to improve the quality and effectiveness of the service we provide and it is our belief that databases should never be used as a primary screening tool. We believe this is best for our clients and the safety of their employees and customers. However, we also believe that our Nationwide Criminal Database product, when properly used and properly integrated into your screening process, can enhance the effectiveness of your screening program.

## Works Cited:

1 – In a phone interview with Stephen Fischer Jr. at the Federal Bureau of Investigation, Mr. Fischer informed USA-FACT that the NCIC remains prohibited from providing National Wants and Warrants information to private screening companies.

2 – Press Release from the NAPBS, August 25, 2005: Study Finds FBI Criminal Database Search Ineffective for Employment Background Checks.





USA-FACT
The FACT Pages: White Paper

Professional
Applicant Screening
Solutions

## Sources Used to Compile Proprietary National Criminal Database Products

National Criminal Database (NCD) Sources
About 70% of all sources and approximately 50% of all criminal records in this country are available for sale to companies compiling database information. This is a graphic of the sources of the NCD and how information flows in this country. The NCD does not include every record from every source, only records of those sources that make them available for resell.
State Sex Offender
Dept. of Corrections [DOC] Prison Records Searches Comprised solely of incarceration records transferred from county (Repository Data)
County Courthouses
Over 3,100 counties
Over 5,000 courthouses
Most up to date info
Info usually contains identifiers
State Databases
Available in 38 States
Maintained by DOJ
Comprised mainly of DOC records (Repository Data)
INTERPOL & OFAC Int'l Terrorist
Federal District Courts
92 Federal Districts
Source info for crimes against the federal government
Few identifiers in the information
Not contained in other databases
The NCIC
All sources are obligated to report to the FBI but not all do and there are no published regular intervals. The NCIC is not available to private industry.

## Criminal Information Sources

All criminal databases are compilations of either county or federal district criminal records. State repositories are a compilation of records derived from both the county courthouses and from Department of Corrections records. Department of Correction Records are comprised of county courthouse records. The federal district courts maintain their own records and these records will not be found in the National Criminal Database in the original form. However, federal district records may be found in the NCD when obtained through research but cannot be purchased for inclusion from the federal districts.

If you have any questions regarding this information or you would like a copy of the article published by the NAPBS regarding the NCIC Study, please contact USA-FACT at 800.547.0263 or by email at gary@usafact.com.



BLANK

CDC_007897

search

HOME ABOUT REPORTS BECOME A CLIENT ORDERING FAQ CONTACT

Search

search

Archives

June 2012
May 2012
March 2012
February 2012
January 2012
December 2011
November 2011
October 2011
September 2011
August 2011
July 2011
June 2011
May 2011
April 2011
March 2011
February 2011
January 2011
December 2010
November 2010
October 2010
September 2010
August 2010
July 2010
June 2010
May 2010
March 2010

# BEWARE OF BACKGROUND INVESTIGATION COMPANIES THAT OFFER FBI NCIC CHECKS

All you need to do is type in a few key words into Google and headlines pop up promising easy access to FBI criminal records. But when you click on the link, it goes nowhere or to a background screening company's Web site which then states that it searches public records only, and makes no further mention of the teasing lead.

And except for a few non-government entities, such ones performing authorized criminal justice functions under contract with law enforcement agencies, entities whose purpose is to provide information to authorized agencies to facilitate the apprehension of fugitives or locate missing persons and stolen property, or similar objectives, and federally chartered banking institutions, their bank subsidiaries and direct affiliates, the records are off-limits to the public. Of course, an individual can request his/her own record, typically for a personal review, to challenge the information on file, to meet a requirement for adopting a child in the U.S. or internationally, to satisfy a mandate to live, work, or travel in a foreign country, or to obtain certain professional licenses.

So exactly what is the FBI's National Crime Information Center? The NCIC, as it is commonly known, is the United States' central database for tracking crime related information. Maintained by the FBI's Criminal Justice Information Services Division, the NCIC is interlinked with similar systems held by each state. Data is received from federal, state, local and tribal law enforcement agencies, along with railroad police, and non-law enforcement agencies, such as state and federal motor vehicle registration and licensing authorities.

The NCIC was launched January 27, 1967 with five files and 356,784 records. By the end of 2009, it amassed more than 15 million active records in 19 files, separated into seven property files containing records of stolen articles, boats, guns, license plates, parts, securities, and vehicles, and 12 person-related files containing information in connection with supervised releases, national sex offender registry, foreign fugitives, immigration violators, missing persons, protection orders, unidentified persons, U.S. Secret Service protective list, gangs, known or suspected terrorists, wanted persons, and identity theft. Also a part of the system is the Interstate Identification Index, which provides images that can be associated with NCIC records to help identify people and property items.

The database is not infallible. Its many critics say that the underfunded system is limited in content, contains errors and has outdated information. But the black market for NCIC records is flourishing, despite risks of prison time and financial penalties. While in most instances the motivation for misuse is monetary gain, in an extreme example of personal incentive, a former law enforcement officer in Arizona obtained NCIC information from three other officers and used it to track down and murder his girlfriend.

Written by JGold

View all posts by: JGold

« Previous post

Next Post »



Search by Author, Title or Content

Article Content | Search Articles

- Home
- Submit Articles
- Author Guidelines
- Publisher Guidelines
- Content Feeds
- RSS Feeds
- FAQ
- Contact Us

# Cost Of Negligent Free Background Searches Online - Is It Cost Effective To Do Background Checks? *by JAM Miller*

**in Society / Government (submitted 2012-02-26)**

Searching for **cost of negligent free background s**

**West Garden Spa**
243 West 30th Street, New York, NY 10001

www.WestGardenSpa.com

Back in Touch **Massage** Therapy
427 Water St, Teaneck, NJ 07666

www.backintouchmassagetherapynj.com

**Naturally Yoga**
175 Rock Road , Glen Rock, NJ 07452

www.naturallyyoga.com

**Massage** Envy of Scarsdale
777 White Plains Road, Scarsdale, NY 10583

www.MassageEnvy.com

AdChoices Chitika Opt out?

Searching for **cost of negligent free background searches onli**

**Rentals By E-Z**
1173 Raritan Rd, Clark, NJ 07066

www.ezrentalcenter.com

**Clarkstown Heating AC & Plumbing**
95 S Pearl St, Pearl River, NY 10965

www.clarkstownhvac.com

AdChoices Chitika Opt out?

The National Instant Criminal Criminal file check Drive (NICS) is actually an instant prison information check plan that is utilized when a particular person is trying to buy a gun in America. The plan is a direct consequence of the Brady Handgun Assault Prevention Act starting to be signed into law on Nov 30, 1993.

That Act involves that someone wanting to acquire a firearm post to a prison document search. Even though immediately designed by the FBI, the NICS was made via a joint work together with the Bureau of Alcohol, Tobacco, Guns and Explosives, Division of Justice and declare and local law enforcement agencies.

Just how the NICS Performs - According to the FBI's web site, all venues have the option to make use of a state-based NICS plan which works as a center man between the NICS drive and the state's Government Firearm Licensees (FFL). As a result, once promoting a firearm, the FFL contacts a state-selected company to begin the background check. However, once a state doesn't possess a state-based NICS plan, each and every FFL carrying out work in that say must talk with the FBI's NICS directly to remain objective it is important to consider knowledge check. Today, when an FFL produce a qualifications check, a lot of countrywide FBI maintained directories should be investigated using an individual's identify and available information (e.g., sex, dob, arrange of delivery, address, and so forth.). The directories viewed against involve: The Interstate Indentification List which maintains quite a few prison offender records.

The NCIC which maintains data certain to individuals who are topic to warrants, have identified gang/terrorist associations, and so forth. The NICS List that keeps intel not currently inside the various databases on individuals who're federally not allowed to have a gun.

The Division of Homeland Security's U.S. Immigration law and Traditions Enforcement databases is additionally queried once an application is initiated for somebody who may be a non-U.S. resident. NICS inspections are usually achieved inside of a couple of mins immediately after being requested and all queries which don't offer back again outcomes may be able to proceed in contrast to any look-ups returns benefits which, stop the deal of the gun, are rejected. However, if the result's a likely ground for denying the usage, the FFL is mandated to get in touch using the law enforcement / judicial bureau for info needed for an ultimate decision. Consistent with with the Brady Act, that data should be due to again within 3 hitting nights and if not, the FFL has the chance to legitimately finish the transfer of the firearm. Individuals who are rejected the purchase of a gun may ask that the NICS or the declare which refined their trade supply the variables powering the denial.

Not everyone can access it, somewhat ease of access is limited to authorized individuals only, with stiff penalties for all unlawful entry, amongst it charges for acquiring information which is illicitly obtained from the NCIC. Which explained,

the computer responds quickly. Nevertheless, a positive come from the NCIC isn't actually probable result in for a police soldier to detain a particular person. NCIC rules demand the inquiring group to get in contact using the getting into program to verify the particulars are precise and up-to-date. After the background is affirmed, the inquiring business may take behaviorial act to detain a fugitive, return a missing customized, charge a topic with infringement of a protection order, or retrieve unsuccessful property.

The Fable of a Nationwide File - Though the Nationwide Crime Facts Center is a "national" database, international students have also tons of of distinct criminal directories maintained at the county, township and city amounts all over the Combined States. Therefore, any corporation that offers a "complete nationwide prison document" lookup is promotion a plan which is enjoy fool's gold. This kind of a query will be definetely difficult, tireless and particularly pricey. Merely look at the versatile posting that are viewed for investing in a handgun, such as a NCIS legal document search.

Black Market for Qualifications Inspections
Possessing stated which, there is a massive illicit marketplace for NCIC legal document check info, from personal detectives to corporations, info is generally provided by persons who had been formerly police officers in some official ability and who may have connections to a subdivision of associates who even now sustain reputable accessibility to the NCIC repository.

As well as the NCIC repository, 29 states possess their own statewide criminal offender records. Nevertheless, state prison indexes get their records from the county value and if counties do not present their information records to the state, which statewide catalog doesn't consist of all information. A healthy dose of web based mostly companies additionally supply access to say and various court information that people may order. These firms are beginning to be increasingly wide-spread and will perform the vast majority of the do the job on your behalf. Most have additionally gone as far as to flow sociable social networking checks, unveiling peoples' sociable profiles in their queries.

County Checks - Consequently, county amount background exams might possibly be the more effective. Performing a county amount qualifications check demands seeking offender court records at the county quantity. Described by one site, "In some counties offender and misdemeanor documents are taken care of in a coupled inde and so offenses and misdemeanor data have to be scrutinised out individually. If you are truly significant on a criminal background check, it could be helpful to

check BRB Publications' Sourcebook to General public Data Information for an in detail description of distinct jurisdictions.

## About the Author

There are a lot of great website and or charitable background checks done on the internet today in the future there will be twice as many history searches done on felonious activity and other types of activity that include government, FBI, and CIA types of checks.

When doing a free employment check the following details are verified, most of the verification news is done, by checking or verifying the ID, which includes a person's Social Security number and employment history, as well as previous addresses and lawful convictions that this person may have. This should aid you get begun

Searching for **cost of negligent free background searches online is it cost effective to do**

**Midtown Podiatric Center**
62 W. 45th St., New York, NY 10036
www.SingerRobertH.com

**Dr. Philip J MIller - NYC**
60 East 56th Street3rd Floor, New York, NY 10022
www.rhinoplastymaster.com

**Lose 3 Inches in 2 Weeks**
535 Fifth AvenueSte 920, New York, NY 10017
www.betterbodysolutions.com

**Manhattan Oral Surgery**
12 East 41st StreetSuite 1102, New York, NY 10017
www.midmanhattanoralsurgery.com

**Grand Central Foot Care**
122 E. 42nd St.Suite 2901, New York, NY 10168
www.GrandCentralFootcare.com

**New York Sinus Center**
36A East 36th St, New York, NY 10016
www.NYSinusCenter.com

**Dr. Marks DDS-Midtown NYC**
347 5th AveSuite 1310, New York, NY 10118
www.oktooth.com

**USA Dental**
175 Madison Avenue , New York, NY 10016
www.usadentalny.com

**NYC Cardiovascular Center**
345 East 37th StreetSuite 314, New York, NY 10016
www.NYHeartDoc.com

**Dr. Harry Schanzer- NYC**
993 Park Avenue , New York, NY 10028
www.DRSchanzer.com

AdChoices

Chitika Opt out?

Use and distribution of this article is subject to our Publisher Guidelines whereby the original author's information and copyright must be included.

**JAM Miller**



- RSS Feed
- Report Article
- Publish Article
- Print Article
- Add to Favorites

- Article Directory
- About
- FAQ
- Contact Us
- Advanced Search
- Privacy Statement
- Disclaimer

**GoArticles.com © 2012, All Rights Reserved.**



BLANK

CDC_007905

# EPIC - Electronic Privacy Information Center

- Home
- About EPIC
- Policy Issues
- Bookstore
- Press
- Events
- Support EPIC

Focusing public attention on emerging privacy and civil liberties issues

## Sign on letter - Require Accuracy for NCIC

---

**JOINT LETTER AND ONLINE PETITION**
Require Accuracy for Nation's Largest Criminal Justice Database

---

- A broad coalition of organizations across the United States has endorsed a letter urging the reestablishment of accuracy requirements for the FBI's National Crime Information Center (NCIC), the nation's largest criminal justice database.

- More than 3,000 individuals from 47 states and the District of Columbia have signed an online petition to the Office of Management and Budget (OMB) also supporting the Privacy Act accuracy requirements.

- The petition drive will continue until the OMB acts on the request. Individuals may sign petition online at: http://www.petitiononline.com/ncic/petition.html

**CONTENTS**

[1] Summary - Require Accuracy for NCIC
[2] Joint Letter for Organizations
[3] Online Petition for Individuals

[4] References - DOJ Information on NCIC

---

## [1] SUMMARY

---

The Justice Department has administratively discharged the FBI of its statutory duty to ensure the accuracy and completeness of the over 39 million criminal records it maintains in its National Crime Information Center (NCIC) database. This action poses significant risks to privacy and effective law enforcement.

The NCIC system provides over 80,000 law enforcement agencies with access to data on wanted persons, missing persons, gang members, as well as information about stolen cars, boats, and other information. The Privacy Act of 1974 requires the FBI to make reasonable efforts to ensure the accuracy and completeness of the records in the NCIC system. Now, the Justice Department has exempted the system from the accuracy requirements of this important law.

We believe it is particularly important to ensure that Privacy Act obligations are applied to government record systems as the government considers dramatic expansion of record-keeping systems and the incorporation of private sector databases that are frequently inaccurate and unreliable.

The Privacy Act should continue to govern the maintenance and use of this important law enforcement database.

**ORGANIZATIONS**: Please send email to ncic-petition@epic.org with

- Name
- Title
- Affiliation
- Email and phone numbers

The deadline for signing on is Monday, April 7, 2003 by 6:00 p.m.

**INDIVIDUALS**: To sign on, go to http://www.petitiononline.com/ncic/petition.html.

Thank you for your support.

Marc Rotenberg, EPIC Executive Director
Kerry Smith, EPIC IPIOP Fellow

---

**[2] JOINT LETTER -**

---

Mitchell E. Daniels, Jr.
Director, Office of Management and Budget
725 17th Street, NW
Washington, D.C. 20503

Dear Mr. Daniels:

We are writing to request that the OMB exercise its oversight responsibilities under 5 U.S.C. §552 by reviewing and revising the FBI's recent rule exempting the National Crime Information Center (NCIC) system from the accuracy requirements of the Privacy Act of 1974. [1]

The NCIC database provides over 80,000 law enforcement agencies with access to a computerized network of more than 39 million records regarding criminal activity. For the past thirty years, the FBI has operated the NCIC database with the Privacy Act accuracy requirement in place. The relevant provision requires that any agency that maintains a system of records, "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individuals in the determination." [2] Circumventing that statutory obligation poses significant risks not only for individuals whose record files may be part of this data system, but also for communities that rely on law enforcement to employ effective, reliable tools for ensuring public safety. Accordingly, the OMB should request that the FBI continue to follow the obligations of the Privacy Act.

The NCIC database was first established by the FBI, under the direction of J. Edgar Hoover, in 1967. The purpose for maintaining the system is to facilitate the quick exchange of information about crimes and criminal activities between various law enforcement agencies. The FBI recently spent $182 million to modernize the data system. It now provides law enforcement agencies with instant access to fingerprinting and mugshot images. It also continues to include information on stolen vehicles and

other articles; persons with outstanding felony and misdemeanor warrants; missing persons; suspected gang members; suspected terrorists; and individuals' arrest records.

NCIC is used by a broad range of criminal justice agencies, from top federal law enforcement officials to municipal police. During its first year of implementation, approximately 2 million inquiries were processed. Since then, its use has grown significantly. In March 2002, the FBI set a new record for inquiries processed in one day, responding to 3,295,587 requests. On average, there are 2.8 million transaction processed each day, with an average response time of 0.16 seconds. As a result, any error in the NCIC database can spread across the country in less than a second. [3]

Several well publicized incidents demonstrate the consequences of inaccurate and incomplete information in the NCIC. In one case, a Los Angeles man was arrested five times, three at gun point, due to an error in the NCIC. [4] In another, a Phoenix resident, who was pulled over for driving the wrong way down a one-way street, was arrested after an NCIC inquiry erroneously revealed an outstanding misdemeanor arrest warrant that had been quashed weeks earlier. [5] These incidents, and others like it, reveal the potential harms that individuals may face if the records in the NCIC database are not accurate. These incidents demonstrate that the FBI should work to improve the accuracy of this system of records, rather than administratively exempt itself of this important duty.

Indeed, one of the major purposes behind the enactment of the Privacy Act was to guard against these harms by establishing standards for the quality of data the government collects about individuals. In passing the Act, Congress found that "the opportunities for an individual to secure employment, insurance, and credit, and his rights to due process, and other legal protections are endangered by the misuse of certain information systems," and therefore "it is necessary and proper for the Congress to regulate the collection, maintenance, use and dissemination of information by such agencies." [6] To that end, Congress passed the Act to ensure, among other things, that any information held by the government would be "current and accurate for its intended use." [7]

Since the passage of the Privacy Act thirty years ago, there has been general agreement that the FBI would go forward with the NCIC

database, provided that it comply with the Act's obligations. Now, the FBI effectively seeks to sever that agreement, suddenly asserting that "it is impossible to determine in advance what information is accurate, relevant, timely and complete." [8] This is a sharp, historical departure. The Privacy Act should continue to operate for this important set of records.

The obligations of the Privacy Act are important not only for the individuals who may have records in the NCIC database, but also for the effectiveness of the data system itself as a law enforcement tool. In Arizona v. Evans, the Supreme Court held that the Fourth Amendment's exclusionary rule did not require the suppression of evidence obtained during an arrest that was based upon false information in the NCIC database. Justice O'Connor, writing in concurrence, asserted that it would be unreasonable, however, for a police department to depend upon a record keeping system that has no accuracy safeguards and routinely leads to false arrests. [9] She said that if the police blindly relied on a data system without adequate mechanisms to ensure its accuracy, then courts could prohibit the use of any evidence obtained in an arrest resulting from erroneous information in the database. In the case before the Court, O'Connor believed that the police department's reliance on NCIC was reasonable. Nevertheless, she indicated that if procedures were not in place to help ensure the accuracy of the data, evidence collected during those arrests could be suppressed. Her concurrence underscores how the Privacy Act's data quality requirements serve as an important mechanism for ensuring the legitimate, effective use of the NCIC database for law enforcement activities. The FBI's unilateral decision to exempt this data system from the accuracy obligations of the Privacy Act puts criminal justice agencies at risk of unreasonably relying on inaccurate, incomplete information.

Given the risks inaccurate NCIC data poses to both individuals and law enforcement agencies, the F.B.I. should continue to comply with the obligations of the Privacy Act. We ask that the OMB evaluate the effect of the FBI's rule on the rights of individuals, pursuant to 5 U.S.C. §552a(r), and request that the FBI rescind its decision to exempt the NCIC database from the obligations of the Privacy Act.

Sincerely,

American-Arab Anti-Discrimination Committee
American Association of Law Libraries
American Civil Liberties Union
American Library Association
Annabelle Foundation
Arab American Institute
Arizona Breakfast Club
Asian American Legal Defense and Education Fund
Association of Research Libraries
The Bronx Defenders
Center for Cognitive Liberty & Ethics
Center for Constitutional Rights
Center for Democracy and Technology
Center for National Security Studies
Coastal Women's Shelter
Collective Heritage Institute
Colorado Coalition Against Domestic Violence
Competitive Enterprise Institute
Computer Professionals for Social Responsibility
Connecticut Coalition Against Domestic Violence
Connecticut Sexual Assault Crisis Services
Consumer Action
Consumers Against Privacy Invasion and Numbering
Consumer Task Force for Automotive Issues
Council on American-Islamic Relations
CryptoRights Foundation
Denver Domestic Violence Task Force
Domain Name Rights Coalition
Domestic Violence and Mental Health Policy Initiative
Domestic Violence Center of Santa Clarita Valley
Domestic Violence Coordinating Council of California
Drug Policy Alliance
Electronic Frontier Foundation
Electronic Privacy Information Center
Fairfax County Privacy Council
Family Relations Program
Financial Resources for Women and Children
Gang Reduction, Awareness, Prevention and Education
Greater Chattanooga Coalition Against Domestic & Community Violence

Green Party of Clark County, Washington
Gun Owners of America
Human Options
Human Rights Watch
Identity Theft Resource Center
The Institute for Publishing Arts
Iowa Coalition Against Domestic Violence
Kansas Coalition Against Sexual and Domestic Violence
League of Women Voters of Collier County, Florida
Maine Educators Against Fingerprinting
Marjaree Mason Center
Maryland Coalition Against Sexual Assault
Mint Green Ribbon for the Awareness of Abuse
The Multiracial Activist
National Alliance to End Sexual Violence
National Coalition Against Domestic Violence
National Consumers League
National H.I.R.E. Network, Helping Individuals with criminal records
Reenter through Employment
National Immigration Law Center
National Network to End Domestic Violence
NetAction
Nevada Public Health Foundation
New Mexico Chapter, National Organization for Women
New York Office of the Appellate Defender
New York State Coalition Against Domestic Violence
New York State Coalition Against Sexual Assault Options
People For the American Way
PrivacyActivism
Privacy Journal
Privacy Rights Clearinghouse
Privacy Rights Now Coalition
Rape Recovery Center of Utah
Sikh Mediawatch and Resource Task Force
Statewide California Coalition for Battered Women
Sojourn Services for Battered Women and Their Children
South Carolina Hispanic Outreach
Sure Helpline Rape Crisis Center
Texas Association Against Sexual Assault
Texas Chapter, National Association of Social Workers

Unified Solutions Coaching & Consulting Group
Union of American Hebrew Congregations
U.S. Association for Computing Machinery, Public Policy Committee
Utne Magazine
Vermont Network Against Domestic Violence and Sexual Assault
Virginians Aligned Against Sexual Assault
Virginia Citizens Defense League
Wisconsin Coalition Against Sexual Assault

cc.

The Honorable Susan M. Collins, Chair,
Senate Governmental Affairs Committee

The Honorable Joseph I. Lieberman, Ranking Member,
Senate Governmental Affairs Committee

The Honorable Thomas M. Davis, Chair,
House Government Reform Committee

The Honorable Henry A. Waxman, Ranking Member,
House Government Reform Committee

[1] This final rule also exempts the Central Records System and National Center for the Analysis of Violent Crime systems from accuracy requirements of the Privacy Act. Privacy Act of 1974; Implementation, 68 Fed. Reg. 14140 (Mar. 24, 2003) (to be codified as 28 C.F.R. pt. 16).
[2] 5 U.S.C. §552a(e)(5).
[3] See Arizona v. Evans, 514 U.S. 1, 28 (1995) (Ginsburg, J., dissenting).
[4] See Rogan v. Los Angeles, 668 F. Supp. 1384 (C.D. Cal. 1987).
[5] See Arizona v. Evans, 514 U.S. 1 (1995).
[6] Congressional Findings and Statement of Purpose, Pub. L. No. 93-579, §2(a)(3) & (5) (1974)
[7] Id. at §2(b)(4).
[8] 68 Fed. Reg. at 14140.
[9] See Evans, 514 U.S. at 16-17.

## [3] ONLINE PETITION -

---

Mitchell E. Daniels, Jr.
Director, Office of Management and Budget
725 17th Street, NW
Washington, D.C. 20503

Dear Mr. Daniels:

We strongly oppose the Justice Department's recent decision to lift the Privacy Act requirement that the FBI ensure the accuracy and completeness of the over 39 million criminal records it maintains in its National Crime Information Center (NCIC) database. This action poses significant risks to both privacy and effective law enforcement.

Over 80,000 law enforcement agencies have access to the NCIC system. The database includes records on wanted persons, missing persons, gang members, citizen arrest records, as well as information about stolen cars, boats, and other information. The Privacy Act of 1974 requires the FBI to make reasonable efforts to ensure the accuracy and completeness of the records in the NCIC system. Now, the Justice Department has exempted the system from the accuracy requirements of this important law.

There have been several well publicized cases of innocent persons being subject to false arrest due to inaccurate information in the NCIC system. The Supreme Court has also expressed concern about reliance on inaccurate records in the NCIC.

We believe it is particularly important to ensure that Privacy Act obligations are applied to government record systems as the government considers dramatic expansion of record-keeping systems and the incorporation of private sector databases that are frequently inaccurate and unreliable.

The FBI should work to improve the accuracy and completeness of the NCIC, rather than exempt itself from its well established legal obligations. We urge the OMB to exercise its oversight responsibility and require the Justice Department to comply with the Privacy Act obligations for the NCIC. The Privacy Act should continue to govern the maintenance and use of this important law enforcement database.

Sincerely,

[Individuals]

---

## [4] REFERENCES

---

DOJ Information on NCIC:

The FBI National Crime Information Center (NCIC) 2000
http://www.fbi.gov/hq/cjisd/ncic.htm

FBI Announces the Implementation of NCIC 2000, July 15, 1999
http://www.fbi.gov/pressrel/pressrel99/ncic2000.htm

NCIC and the Freedom of Information Act
http://foia.fbi.gov/ncic552.htm

U.S. Department of Justice, NCIC 2000 Newsletters
http://permanent.access.gpo.gov/lps3213/pdinfo.htm

The Investigator, National Crime Information Center: 30 Years on the Beat, Dec. 1996-1997 Issue, available at the FBI Library
http://permanent.access.gpo.gov/lps3213/ncicinv.htm

U.S. Department of Justice, Use and Management of Criminal History Record Information: A Comprehensive Report, 1993.
http://www.ojp.gov/bjs/pub/pdf/cchuse.pdf

Additional Information on NCIC:

Federation of American Scientists, NCIC Information
http://www.fas.org/irp/agency/doj/fbi/is/ncic.htm

The Associated Press, Justice Department Lifts FBI Database Limits
http://abcnews.go.com/wire/Politics/ap20030324_2121.html

# Support EPIC

Defend Privacy.
Donate Now.

## Search epic.org

Go

## Hot Policy Issues

- Body Scanners
- Cloud Computing
- Childrens' Online Privacy
- Cybersecurity
- DHS Media Monitoring
- Drones and UAVs
- EU Data Protection Directive
- Facebook
- Facebook Facial Recognition
- FAST Project
- FBI Watchlist
- FCC Google Street View Investigation
- Fusion Centers
- Google Street View
- Intelligence Oversight Board
- Locational Privacy
- Medical Record Privacy
- National ID
- NSTIC
- Open Government
- PATRIOT Act
- Privacy Convention
- Re-identification
- Search Engine Privacy
- Secure Communities
- Smart Grid
- Social Networking Privacy
- Student Privacy
- Voter Photo ID

# Connect with EPIC

EPIC on Facebook

EPIC on Twitter

EPIC RSS Feed

# EPIC Bookstore

Litigation Under the Federal Open Government Laws 2010

More EPIC Publications...

Electronic Privacy Information Center | 1718 Connecticut Ave. NW Washington, DC 20009 | More info | Privacy Policy



BLANK

CDC_007918